WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re                                        :        **Chapter 11**
:
**DITECH HOLDING CORPORATION**, *et al.*,    :        **Case No. 19-[_____] (__)**
:
Debtors.[1]                           :        **(Joint Administration Pending)**
:
---------------------------------------------------------------x

**MOTION OF DEBTORS FOR INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING DEBTORS TO CONTINUE**
**ORIGINATION AND SERVICING OF FORWARD MORTGAGE**
**LOANS IN ORDINARY COURSE AND GRANTING RELATED RELIEF,**
**(II) MODIFYING AUTOMATIC STAY ON A LIMITED BASIS TO FACILITATE**
**DEBTORS' ONGOING OPERATIONS, AND (III) SCHEDULING A FINAL HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

## Table of Contents

Preliminary Statement ...................................................................................................1

Background...................................................................................................................3

Jurisdiction..................................................................................................................4

Relief Requested ........................................................................................................5

I. Debtors' Forward Mortgage Origination Business and Securitization Activities......................5

    A.      Loan Origination Business .................................................................5

    B.      Loan Sale and Securitization Activities ..............................................8

          (i)      Fannie Mae and Freddie Mac Sales and Securitizations ............................8

          (ii)     Ginnie Mae Issuances ...............................................................10

          (iii)    Sales to Private Parties .............................................................12

II. Debtors' Forward Mortgage Servicing Business and Related Activities ...............................13

    A.      Loan Servicing Business ...................................................................13

          (i)      GSE Loan Servicing Obligations ..............................................14

          (ii)     Ginnie Mae Agreements and Related Loan Servicing Obligations ..........15

          (iii)    Private Loan Servicing Obligations .......................................16

          (iv)    Sale of Master Servicing Rights.............................................17

    B.      Loan Servicing and Subservicing Functions .....................................18

    C.      Servicer Advances and Related Financing Facilities...........................19

          (i)      Continuous Obligations to Remit Servicer Advances ..............................20

          (ii)     Financing of Servicer Advance Receivables ...........................................22

    D.      Non-Performing Loan Servicing Activities .......................................23

          (i)      Loss Mitigation .......................................................................23

          (ii)     Foreclosure Activities...............................................................24

               (a)    Agency Loan Foreclosure Process...............................................24

               (b)    Private Loan Foreclosure Process...............................................26

III. Other Matters Related to Debtors' Origination and Servicing Businesses ...........................29

    A.      Critical Vendors...............................................................................29

    B.      Compliance and Regulatory Obligations ...........................................33

    C.      Limited Relief from Automatic Stay .................................................35

          (i)      Foreclosure and Eviction Proceedings ....................................35

          (ii)     Borrower Bankruptcy Proceedings ..........................................36

i

(iii)    Actions Involving Amount, Validity, or Priority of Liens ........................38

D.    Assurances of Future Performance ....................................................39

IV. Applicable Authority.............................................................................................41

A.    The Court Should Authorize Debtors (i) to Originate and Service Loans in Ordinary Course of Business, and (ii) to Honor and Pay Prepetition Obligations Related Thereto......................................................................41

(i)    The Debtors' Activities Satisfy Ordinary Course of Business Standard ...................................................................................42

(ii)    The Requested Relief, Including Payment of Critical Vendor Claims, is Both Necessary and Appropriate to Conserve Value of Debtors' Estates...................................................................45

B.    The Court Should Authorize Debtors to Sell REOs Free and Clear....................47

C.    The Court Should Grant the Limited Stay Relief Requested Herein Pursuant to Section 362(d)(1) of the Bankruptcy Code.......................................48

D.    The Court Should Authorize Debtors to Provide Fannie Mae, Freddie Mac, and Ginnie Mae Assurances of Future Performance...................................48

Scope of Motion............................................................................................................54

Reservation of Rights....................................................................................................55

Debtors Satisfy Bankruptcy Rule 6003(b) ..................................................................55

Waiver of Bankruptcy Rules 6004(a) and (h) .............................................................56

Notice ...........................................................................................................................56

**Exhibit A:**    Proposed Interim Order

Schedule 1:    Fannie Mae Assurances of Future Performance

Schedule 2:    Freddie Mac Assurances of Future Performance

Schedule 3:    Ginnie Mae Assurances of Future Performance

WEIL:\96914033\1\41703.0010

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### **Preliminary Statement**

1.          Ditech Financial LLC ("**Ditech**"), a Debtor in these chapter 11 cases, is a licensed mortgage loan originator and servicer.[2]  Ditech's business is comprised of two main segments:  forward mortgage originations and forward mortgage servicing, both of which are capital intensive.   In the forward mortgage origination segment, Ditech provides financing to prospective home buyers and existing home owners seeking to refinance their home loans through the origination or purchase of residential mortgage loans.  As part of its origination activities, Ditech originates a range of mortgage loans that are either (a) eligible for securitization by government sponsored enterprises, such as Fannie Mae[3] and Freddie Mac (respectively, the "**Fannie Mae Loans**" and the "**Freddie Mac Loans**" and, collectively, the "**GSE Loans**") or (b) federally insured or guaranteed and eligible for a Ginnie Mae securitization (the "**Ginnie Securitized Loans**" and collectively with the GSE Loans,

---

[2] All references to "mortgage," "mortgage loan," or "loan" in this Motion are to the type of mortgage loans often referred in the industry as "forward" mortgage loans, which are mortgage loans that generally accrue interest and amortize over time.

[3] As used herein, "Fannie Mae" means the Federal National Mortgage Association and "Freddie Mac" means the Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored enterprises ("**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, thereby enabling such lenders quick access to liquidity fueled by market demand for residential mortgage backed securities ("**RMBS**").

As used herein, "Ginnie Mae" means the Government National Mortgage Association.  Ginnie Mae is a federal corporation within the U.S. Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on RMBS backed by federally insured or guaranteed loans (*e.g.*, loans insured by the Federal Housing Administration ("**FHA**"), guaranteed by the Department of Veterans Affairs ("**VA**"), or guaranteed by the Department of Agriculture ("**USDA**")).

the "**Agency Loans**").  As discussed in further detail below, Ditech sells substantially all of its originated or purchased mortgage loans either through whole loan sales or through the sale of RMBS securities.

2.      Ditech generates revenue when a mortgage loan is initially funded, *e.g.*, through various fees paid by the borrower, and when the mortgage loan is sold and/or securitized, *e.g.*, through premiums paid based on the market value of the loan.  After the mortgage loans are sold, Ditech often maintains mortgage servicing rights ("**MSRs**") or, if it has sold the MSRs, acts as subservicer.  Forward mortgage loan servicing and the sale of MSRs accounted for approximately 58% and 22%, respectively, of the Debtors' revenue for the year ended December 31, 2018.  Other than the servicing of the Debtors' reverse mortgage portfolio, which is performed by Debtor Reverse Mortgage Solutions, Inc. ("**RMS**"), all of the Debtors' loan servicing is performed by Ditech.  Ditech acts as primary servicer on loans for which it (a) originated and retained the MSRs and (b) purchased the MSRs from third parties.  In addition to acting as a primary servicer, Ditech also acts as a subservicer on loans that it either (a) originated and sold the MSRs to a third party and entered into a subservicing arrangement or (b) did not originate but was engaged as subservicer by the MSR owner.

3.      Selling and servicing Agency Loans accounts for a significant portion of the Debtors' revenue.  Accordingly, maintaining eligibility to sell, securitize, and service Agency Loans is a vital component of the Debtors' business and essential to a successful reorganization. Indeed, the failure to comply with the terms and conditions set forth in the applicable Agency Agreements (as defined below) may result in the applicable agency terminating the GSE Agreements and revoking the Debtors' selling and servicing authorizations.  In the case of Ginnie Securitized Loans, for example, Ditech could be placed in a default subject to the terms

2

and conditions of that certain Cross-Default Agreement, dated as of July 17, 2015 (the "**Cross-Default Agreement**"), pursuant to which the interests of both Ditech and RMS in the applicable underlying forward and reverse mortgage portfolios could be extinguished without compensation or any rights of reimbursement; and a default subject to the terms and conditions of the Ginnie Mae Agreements (as defined below).  Without the ability to access the liquid agency sale and servicing markets, the Debtors will be unable to operate their businesses.   It is therefore imperative that the Debtors be permitted to continue to perform under the Agency Agreements, which will allow them to operate their business in the ordinary course without interruption so as to preserve the value maximizing transactions contemplated by the Restructuring Support Agreement (as defined below).  Further, if the relief requested is not granted, the Debtors will be unable to secure debtor in possession financing and to administer these chapter 11 cases.  Approval of this Motion and the ability to comply with and remain an approved servicer, originator, and issuer with the GSEs and Ginnie Mae, as applicable, are conditions to the debtor in possession financing.

### Background

4.    On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").   The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

5.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

WEIL:\96914033\1\41703.0010

6.       The Debtors commenced these chapter 11 cases on a prearranged basis with the support of more than 75% of their term loan lenders, who have committed to support a value-maximizing chapter 11 plan that contemplates a debt-to-equity recapitalization transaction and provides for the simultaneous marketing of all or substantially all of the Debtors' assets to the extent such sale represents a higher or better value than the recapitalization transaction. Consistent with their obligations under that certain Restructuring Support Agreement, dated as of February 8, 2019 (the "**Restructuring Support Agreement**"), the Debtors intend to file a proposed plan of reorganization shortly hereafter and will seek to emerge from chapter 11 on an expedited timeframe.

7.       Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "**Lombardo Declaration**"),[4] which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

## Jurisdiction

8.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Lombardo Declaration.

WEIL:\96914033\1\41703.0010

**Relief Requested**

9.      By this Motion, pursuant to sections 105(a), 362, 363(c), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors seek authority, but not direction, to continue in the ordinary course of business:

> (a)     to originate and purchase mortgage loans;
>
> (b)     to sell and securitize loans, including by performing under certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, and private parties;
>
> (c)     to service and subservice loans pursuant to terms and conditions set forth in certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, other applicable federal agencies, and private parties;
>
> (d)     to make servicing advances;
>
> (e)     to pay prepetition amounts owed to critical vendors on the terms and conditions described herein;
>
> (f)     to fulfill compliance and regulatory obligations; and
>
> (g)     to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae and comply therewith.

10.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

**I.**
**Debtors' Forward Mortgage Origination Business and Securitization Activities**

**A.     Loan Origination Business**

11.     Ditech's mortgage loan origination business involves purchasing residential mortgage loans from correspondent and wholesale lenders as well as making residential mortgage loans (both refinance and purchase) directly to consumers.  Ditech classifies its mortgage loan origination business into the following three channels:

> (a)     Consumer Lending, whereby Ditech originates mortgage loans primarily through loan officers at a centralized call center.  Leads to the call center are typically generated through (i) referrals from

5

Ditech's servicing call centers and (ii) direct mail, internet, telephone and general advertising campaign solicitations of consumers, whose loans are not necessarily in Ditech's existing servicing portfolio;

(b)   <u>Correspondent Lending</u>, whereby Ditech purchases closed mortgage loans from a network of lenders in the marketplace; and

(c)   <u>Wholesale Lending</u>, whereby Ditech originates mortgage loans originated through a network of approved brokers.[5]

12.    In 2018, Ditech originated or purchased over $12.6 billion in mortgage loans.  Of these loans approximately 30% were originated through the consumer lending channel, approximately 64% were purchased in the correspondent lending channel, and approximately 6% were originated through the wholesale lending channel.  Based on the unpaid principal balance ("**UPB**") of the loans originated by Ditech during this time period, approximately 30% were eligible for securitization by Fannie Mae, approximately 13% were eligible for securitization by Freddie Mac, and approximately 57% were eligible for private securitizations guaranteed by Ginnie Mae.[6]

13.    Ditech funds its mortgage loan origination business with cash borrowed under that certain Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, by and among Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as buyer, Alpine Securitization LTD, as buyer, Barclays Bank PLC, as buyer, and Ditech, as seller (such agreement, as amended, the "**Prepetition MRA**"

---

[5] Ditech reentered this origination segment in the third quarter of 2016 and is looking to expand this method of origination.

[6] To the extent that Ditech identifies a loan ineligible for GSE securitizations and/or Ginnie Mae guarantees during its retail origination process, it may elect to close and fund such loan as long as it lines up a private buyer for such loan at the pre-closing stage of the process.  Such loans constitute a relatively small percentage of all loans originated by Ditech.

WEIL:\96914033\1\41703.0010

and such buyers, the "**Warehouse Buyers**"), as well as cash on its balance sheet.[7]    The Prepetition MRA has an advance rate of 95% with respect to qualifying Agency Loans, meaning that Ditech can finance up to 95% of the origination or acquisition and must fund the remaining 5% (referred in the industry as the "haircut") with balance sheet cash.  As of the Commencement Date, the Debtors had $470 million outstanding under the Prepetition MRA.

14.    Ditech obtains funding under the Prepetition MRA by instructing the Warehouse Buyers to fund the applicable advance rate of a mortgage loan at the time of origination or acquisition of that loan.  The result is what is referred to in the Prepetition MRA as the purchase of the loan by the Warehouse Buyers, which in turn triggers a reciprocal obligation on Ditech's part to repurchase the loan from the Warehouse Buyers at cost plus fees and an agreed amount of interest.  Effectively, Ditech obtains funding from the Warehouse Buyers, uses that money to originate or acquire a mortgage loan, grants the Warehouse Buyers a back-up security interest in that mortgage loan, and promises to repay the Warehouse Buyers the amounts borrowed plus fees and interest within a contractually specified timeframe.  Ditech usually repays its borrowings under the Prepetition MRA related to a given mortgage loan within approximately 20 calendar days through the sale and/or securitization of the underlying mortgage loans.

15.    Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business to fund their originations and purchases of mortgage loans and to pay related obligations, regardless of whether such obligations arose prepetition or postpetition.

---

[7] Contemporaneously herewith, the Debtors filed a motion seeking authority to, among other things, obtain up to $650 million in warehouse financing that will refinance and replace the Prepetition MRA and to obtain access to $1.9 billion in hedging capacity, among other financing (the "**DIP Motion**").

WEIL:\96914033\1\41703.0010

### B.    Loan Sale and Securitization Activities

16.    Ditech sells substantially all of the mortgage loans that it originates or purchases into the secondary market via three channels:  (a) sales into Fannie Mae or Freddie Mac securitizations, (b) the issuance by Ditech of Ginnie Mae guaranteed RMBS, and (c) sales to private parties, each of which is described below.

*(i)    Fannie Mae and Freddie Mac Sales and Securitizations*

17.    Ditech is eligible to sell mortgage loans (a) to Fannie Mae pursuant to the terms and conditions of that certain Fannie Mae Mortgage Selling and Servicing Contract dated as of March 23, 2005 (together with all supplements, addendums, amendments, and related agreements, the  "**Fannie Mae Mortgage Selling and Servicing Contract**"), which includes that certain Selling Guide:  Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Selling Guide**" and, together with the Fannie Mae Mortgage Selling and Servicing Contract, the "**Fannie Sales Agreement**") and (b) to Freddie Mac pursuant to the terms and conditions of (i) that certain Master Agreement dated as of August 1, 2014, as amended and restated on October 6, 2017 (together with all supplements, addendums, amendments, and related agreements, the  "**Freddie Master Agreement**"), (ii) that certain Purchase Agreement dated as of November 7, 2018 (together with all supplements, addendums, amendments, and related agreements, the  "**Freddie Purchase Agreement**"), and (iii) the Freddie Mac Single-Family Seller/Servicer Guide (the "**Freddie Selling and Servicing Guide**" and, together with the Freddie Master Agreement and the Freddie Purchase Agreement, the "**Freddie Agreements**" and, together further with the Fannie Sales Agreement, the "**GSE Sales Agreements**").

18.    Pursuant to the GSE Sales Agreements, Ditech sells mortgage loans to GSE-sponsored securitization vehicles and uses the proceeds, which could be in the form of

8

(a) RMBS that Ditech subsequently sells in the open market, or (b) cash that Ditech uses to repay the borrowings under the Prepetition MRA.[8]  The GSEs securitize the mortgage loans and sell the resulting RMBS in the secondary market.  The GSEs also provide a guarantee that the stated principal and interest ("**P&I**") payments will be timely passed through to the ultimate buyers of the RMBS.

19.     The ability to sell to the GSEs carries certain costs.  For example, the GSE Sales Agreements permit the GSEs to charge sellers both upfront and ongoing guaranty fees (collectively, the "**GSE Guaranty Fees**") intended to cover the credit risk and other costs that the GSEs may incur as a result of guaranteeing the securities.  GSE Guaranty Fees are passed through to mortgage borrowers as part of the interest rate charged on their loans.  The GSE Sales Agreements may also require the procurement of mortgage insurance.  Such insurance premiums may be paid upfront or over the life of the loan, with the cost being passed through to the borrower as part of the interest rate charged or as points paid at closing.

20.     Furthermore, under the GSE Sales Agreements, if Ditech breaches certain of its representations and warranties to the GSEs, for example by selling a nonconforming loan, Ditech may be obligated to repurchase that loan from the GSE (such obligations, the "**GSE Repurchase Obligations**").  As of the Commencement Date, the Debtors estimate that Ditech has GSE Repurchase Obligations of approximately $10.7 million, which amount is reflected as a liability related to loans originated prepetition on the Debtors' books and records.  The Debtors estimate that approximately $35 million in GSE Repurchase Obligations will become due and owing during the first 30 days of these chapter 11 cases.

---

[8] When Ditech receives RMBS in lieu of cash in exchange for conveying loans to the securitization vehicles sponsored by Fannie Mae or Freddie Mac, Ditech customarily sells the securities that it receives to Fannie Mae, Freddie Mac, or third party investors.

WEIL:\96914033\1\41703.0010

21.     Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to honor and perform under the GSE Sales Agreements, (b) to pay the GSE Guaranty Fees as well as any origination related fees and expenses, (c) to honor and pay the GSE Repurchase Obligations, and (d) to perform other activities and pay fees related to mortgage loan origination, including paying all obligations related to loans originated prepetition.

*(ii)     Ginnie Mae Issuances*

22.     Unlike the GSEs, Ginnie Mae does not issue, sell, or buy RMBS, nor does it purchase mortgage loans.  Instead, private issuers approved by Ginnie Mae, such as Ditech, originate eligible loans (*i.e.*, loans federally insured or guaranteed by the FHA, the VA, or the USDA), pool the loans into securities, and issue RMBS for which Ginnie Mae guarantees the issuer's timely payment of principal and interest to the investors.  If a borrower fails to make a timely payment on a mortgage loan, Ditech, as the RMBS issuer, must use its own funds to ensure that the security holders receive timely payments, following which Ditech seeks reimbursement from the applicable agency (*i.e.*, the FHA, the VA, or the USDA).  Pursuant to the terms and conditions of that certain Master Servicing Agreement dated as of October 9, 2015 (collectively with the Cross-Default Agreement, that certain Escrow Tri-Party Agreement dated as of January 30, 2019, all guaranty agreements, RMBS prospectus documents, escrow agreements, acknowledgment agreements, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Master Servicing Agreements**") and the Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**" and, together with the Ginnie Mae Master Servicing Agreements, the "**Ginnie Mae Agreements**"), Ditech has commitment authority from Ginnie Mae to pool and securitize up to $800 million in eligible mortgage loans.  This authority

10

carries a commitment fee (the "**Ginnie Mae Commitment Fee**"), which is based on the amount of the commitment.

23.     Under the Ginnie Mae Agreements, Ditech is subject to certain continuing recourse obligations (the "**Ginnie Mae Buyout Obligations**").  Specifically, if a defective loan is discovered, Ditech is required (a) to cure the defect, (b) to substitute the defective loan with an eligible loan, or (c) to purchase the defective loan from the mortgage pool at the outstanding principal balance.  The Ginnie Mae Agreements also require Ditech to fund principal and interest payments to RMBS investors to the extent such payments are due to investors and are not recovered from other sources.  As of the Commencement Date, the Debtors estimate that Ginnie Mae Buyout Obligations are approximately $10.1 million, which is reflected on the Debtors' books and records as a liability related to loans originated prepetition.  The Debtors estimate that approximately $23 million in Ginnie Mae Buyout Obligations will become due during the first 30 days of these chapter 11 cases.

24.     The Ginnie Mae Commitment Fee is automatically deducted from Ditech's account at the time that the request to guarantee a security is processed.  In addition, for each security for which Ditech is the issuer of record, Ditech is required to pay Ginnie Mae a monthly guaranty fee that is computed by multiplying the aggregate principal balance of the guaranteed securities outstanding at the beginning of the monthly reporting period by the applicable annual rate[9] divided by twelve (the "**Ginnie Mae Guaranty Fee**").  Ditech must also pay (a) Ginnie Mae (i) transfer fees of approximately $250 to $500 per pool or loan package (the "**Ginnie Mae Transfer Fees**") when Ditech transfers the issuer responsibility for such pools or loan packages to another issuer and (ii) acknowledgment agreement fees at the time of

---

[9] The current annual guarantee rates are as follows (a) .06 percent for single family pools and loan packages, (b) .30 percent for manufactured housing pools and loan packages, and (c) .13 percent for multifamily pools.

WEIL:\96914033\1\41703.0010

application of approximately $1,000 (the "**Ginnie Mae Acknowledgment Agreement Fees**" and, together with the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, and the Ginnie Mae Transfer Fees, the "**Ginnie Mae Fees**") when Ginnie Mae approves an acknowledgment agreement permitting Ditech to pledge its servicing rights as security for a loan from a private lender; (b) the fees of the document custodian (including, as required by the Ginnie Mae Agreements, the obligation to pay fees to post letters of credit if the document custodian determines that Ditech submitted an incomplete package of documents); (c) the fees of the funds custodian; and (d) the fees of the central paying and transfer agent ((b) through (d) collectively, the "**Ginnie Mae Administrative Fees**").

25.       Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to honor and perform under the Ginnie Mae Agreements, (b) to honor and pay the Ginnie Mae Buyout Obligations, (c) to pay the Ginnie Mae Fees, and (d) to pay the Ginnie Mae Administrative Fees, including, in each instance, all obligations related to loans originated prepetition.

### (iii)       *Sales to Private Parties*

26.       As noted above, from time to time, Ditech elects to fund and close certain loans that are ineligible for GSE securitizations and/or Ginnie Mae securitizations.  Such loans constitute a relatively small percentage of Ditech's origination activities and are typically funded only to the extent that Ditech has secured a private buyer for the loan in advance.  These loans are sold to private investors pursuant to mortgage loan purchase agreements ("**MLPAs**").  Ditech typically does not retain servicing rights to these loans.

27.       Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to sell mortgage loans to private investors and

WEIL:\96914033\1\41703.0010

(b) to enter into, and perform under, MLPAs, including, to pay all obligations related to loans originated prepetition.

**II.**
**Debtors' Forward Mortgage Servicing Business and Related Activities**

**A.     Loan Servicing Business**

28.     Mortgage loans serviced or subserviced by Ditech generally fall within one of two broad categories:  (a) Agency Loans and (b) non-agency private loans.  As explained in Section I above, Agency Loans are comprised of GSE Loans and Ginnie Securitized Loans. Non-agency private loans are generally loans that (a) could not have been sold to the GSEs or placed in a Ginnie Mae guaranteed security, (b) were subject to a GSE Repurchase Obligation or a Ginnie Mae Buyout Obligation, or (c) were otherwise sold to private investors in "private label" securitization transactions (collectively, the "**Private Loans**").  The Private Loans that Ditech services or subservices have generally been placed in (a) securitization trusts in which the Debtors have residual interest (the "**Residual Trusts**"), (b) securitization trusts to which certain Debtors (other than Ditech) own MSRs (the "**Non-Residual Trusts**" and, together with the Residual Trusts, the "**Legacy Trusts**"), (c) third-party private securitization trusts or loan portfolios; or (d) private loan portfolios owned by various Debtor entities.

29.     As of December 31, 2018, Ditech serviced approximately 1.1 million individual Agency Loans with a collective UPB of approximately \$159 billion.[10]  In 2018, the Debtors earned approximately 32%, 3%, and 12% of their total revenue from servicing or subservicing loans with Fannie Mae, Freddie Mac, and Ginnie Mae, respectively.    In

---

[10] In addition to mortgage loans in various GSE/Ginnie Mae securitizations, these figures include a relatively small percentage of real estate owned ("**REO**") units, which are properties that are owned by a lender following foreclosure.  In such cases, the title of a REO unit resides with the mortgagee (for example, with respect to GSE Loans, the GSE securitization trust).

WEIL:\96914033\1\41703.0010

comparison, Ditech services or subservices approximately 242,000 Private Loans (including REO units) with a collective UPB of approximately $11.2 billion.

(i)       *GSE Loan Servicing Obligations*

30.      Ditech is eligible to service and subservice (a) Fannie Mae Loans pursuant to the terms set forth in the Fannie Mae Mortgage Selling and Servicing Contract, that certain Subservicing Agreement effective as of December 22, 2010 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Subservicing Agreement**"), each of which includes that certain Servicing Guide:  Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Servicing Guide**" and, together with the Fannie Selling Guide, the "**Fannie Guides**"), and that certain Pledge and Security Agreement effective as of December 19, 2014 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Pledge Agreement**" and, together further with the Fannie Mae Mortgage Selling and Servicing Contract, the Fannie Subservicing Agreement, and the Fannie Servicing Guide, the "**Fannie Servicing Agreements**") and (b) Freddie Mac Loans pursuant to the terms set forth in the Freddie Agreements (collectively with the Fannie Servicing Agreements, the "**GSE Servicing Agreements**").

31.      Pursuant to the Fannie Servicing Agreements, Ditech is required to maintain a minimum balance in a custody account and has granted Fannie a perfected, first priority security interest in such custody account and amounts therein (the "Collateral" as defined in the Fannie Pledge Agreement being referred to herein as the "**Fannie Collateral**") as collateral security for, among other things, Ditech's obligations under the Fannie Servicing Agreements.  Ditech has also granted Freddie Mac a perfected, first priority security interest in certain pledged accounts pursuant to the Amended and Restated Collateral Account Control

14

Agreement, dated as of January 17, 2014, and the Amended and Restated Collateral Pledge Agreement, dated as of January 17, 2014, (the "**Freddie Mac Pledge Agreements**") as collateral security for Ditech's obligations under the Freddie Agreements.

32.     The interest charged on mortgage loans, which once sold becomes the property of Fannie Mae or Freddie Mac, as applicable, pays for the servicing of those loans. With respect to the Fannie Mae and Freddie Mac securitized loans, Ditech determines the amount of servicing compensation that it would like to receive at the time that it sets the interest rate at which it is willing to fund a loan.  Ditech generally seeks to deliver its GSE Loans into securities that maximize its economics, considering both the price received for the loan and the value of the excess cash flows.

33.     Through this Motion, the Debtors seek Court authority, but not direction, to continue to service and subservice GSE Loans in the ordinary course, including by continuing to perform under the GSE Servicing Agreements and by continuing to honor and pay the GSE Repurchase Obligations and all prepetition amounts arising under the GSE Servicing Agreements.

                    (ii)      *Ginnie Mae Agreements and Related Loan Servicing Obligations*

34.     As an approved issuer for Ginnie Mae, Ditech is qualified to service Ginnie Securitized Loans but must comply with the servicing (and subservicing) terms set forth in the Ginnie Mae Agreements, as well as the mortgage guidelines promulgated by the FHA, the VA, and the USDA, as applicable (collectively, the "**Government Loan Servicing Guidelines**" and, together with the Ginnie Mae Agreements and the GSE Servicing Agreements, the "**Agency Servicing Agreements**" and, together further with the GSE Sales Agreements, the "**Agency Agreements**").   With respect to Ginnie Mae guaranteed RMBS, Ditech, as the issuer, is responsible for the administration of the securities and the servicing of the pools of mortgages,

WEIL:\96914033\1\41703.0010

but it may arrange for another Ginnie Mae issuer (*i.e.*, a subservicer) to perform certain servicing functions. To cover the issuer responsibility, Ditech receives a servicing fee based on, and payable only from, the interest portion of each monthly installment actually collected from the borrower. A failure by Ditech to honor its issuer responsibilities would result in a default subject to the terms and conditions of the Cross-Default Agreement, which could have detrimental effects on the Debtors' estates.

35. Through this Motion, the Debtors seek Court authority, but not direction, to continue to service Ginnie Securitized Loans in the ordinary course, including by continuing to perform under the Ginnie Mae Agreements and the applicable Government Loan Servicing Guidelines.

(iii)    *Private Loan Servicing Obligations*

36. In addition to servicing and subservicing Agency Loans, Ditech also services Private Loans that (a) have been securitized and for which Ditech either (i) owns the MSRs or (ii) is hired as a subservicer or (b) have not been securitized and the MSR owner has hired Ditech as subservicer. The servicing and subservicing relationships between Ditech and private label securitizations ("**PLS**") and MSR owners, as applicable, are governed by private contracts (the "**Private Servicing Agreements**"). As of the Commencement Date, Ditech is party to approximately 230 Private Servicing Agreements. Although the servicing fees, servicing guidelines, and other terms vary from agreement to agreement, Ditech generally performs the same Servicing Functions (as defined below) for Private Loans as it does for GSE Loans.

37. Through this Motion, the Debtors seek Court authority, but not direction, to continue to service and subservice Private Loans in the ordinary course, including by continuing to perform under the Private Servicing Agreements.

16

*(iv)    Sale of Master Servicing Rights*

38.     From time to time, Ditech enters into contracts to sell MSRs and related reimbursement rights for Servicer Advances (as defined below).  These contracts are typically either for the sale of a batch of MSRs that Ditech has already aggregated together (a so-called "bulk sale") or for the sale of a set amount of MSRs to be sold on a regular (or "flow") basis.  In addition, these contracts also specify whether the MSR sales are being sold on a "servicing retained" or "servicing released" basis.  With respect to MSRs sold on a "servicing retained" basis, Ditech retains the relationship with the borrower and continues to service the loan as a subservicer.  With respect to MSRs sold on a "servicing released" basis, Ditech has no further involvement with the loan unless the buyer elects to use Ditech as a subservicer of the loans. Ditech is currently party to various contracts pursuant to which MSRs are sold monthly on either a bulk or flow basis, as well as to various subservicing contracts pursuant to which Ditech is engaged as subservicer.

39.     On August 8, 2016, Ditech and New Residential Mortgage LLC ("**NRM**") entered into a certain Subservicing Agreement (as amended and as may be further amended, modified, or restated from time to time and in effect, the "**NRM Subservicing Agreement**") whereby NRM engaged Ditech as subservicer for certain mortgage loans for which Ditech had sold NRM the MSRs.  Pursuant to the terms and conditions of the NRM Subservicing Agreement, Ditech subserviced approximately 555,000 mortgage loans for NRM, which subservicing accounted for approximately $8 million in monthly servicing revenue and approximately 18% of the Ditech's overall monthly servicing revenue.

40.     On January 17, 2019, Ditech received a notice from NRM terminating the NRM Subservicing Agreement.  As a result of the termination and pursuant to the terms of the NRM Subservicing Agreement, Ditech is obligated to transfer the subservicing of these loans

WEIL:\96914033\1\41703.0010

(and the rights to receive fees therefor) to successor subservicers (the "**NRM Servicing Transition**").  Ditech is complying with its NRM Servicing Transition obligations under the NRM Subservicing Agreement and will continue to service affected GSE Loans and, as applicable, transfer the servicing thereof in accordance with the applicable GSE Servicing Agreements.

41.    Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to sell MSRs and related reimbursement rights for Servicer Advances and (b) the NRM Servicing Transition.

**B.    Loan Servicing and Subservicing Functions**

42.    Regardless of whether Ditech acts as primary servicer or performs sub-servicing for a third party, Ditech's responsibilities with respect to the underlying mortgage loans are substantially similar and generally require that Ditech perform the following functions (generally, the "**Servicing Functions**"):

(a)    collect and account for mortgage loan payments received from borrowers, including payments of principal and interest ("**P&I**") and payments of property taxes and insurance premiums ("**T&I**");[11]

(b)    remit P&I proceeds to applicable entities and parties in interest, including those entities responsible for making distributions to RMBS holders;[12]

(c)    hold T&I funds in trust in custodial and/or escrow accounts and timely pay property taxes and insurance premiums;

---

[11] In general, payments of principal and interest are the property of the mortgagee, which may be a GSE, a securitization trust, private investor, or Ditech if the underlying loan is on Ditech's balance sheet.  Similarly, T&I payments are generally received and held in trust for the applicable taxing authorities and mortgage insurers, as applicable.  For the avoidance of doubt, the Debtors acknowledge that the payments of principal and interest, as well as the payments of taxes and insurance, that are the property of others do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code.

[12] In limited instances, only with respect to private securitizations, the Debtors perform master servicing functions, which include administration of the RMBS and distribution of payments to investors.

(d)  make advances with respect to P&I payments (such advances, the "**P&I Advances**");

(e)  make advances with respect to T&I payments (such advances, the "**T&I Advances**");

(f)  respond to borrower inquiries;

(g)  counsel or otherwise work with delinquent borrowers (including by helping borrowers modify their loans in accordance with federal programs intended to assist homeowners remain in their homes);

(h)  supervise foreclosures and property dispositions; and

(i)  generally administer mortgage loans consistent with contractual undertakings and business practices.

43.    When performing the Servicing Functions as the primary servicer, Ditech typically earns loan servicing fees equal to a specified percentage of the UPB of the loans being serviced as well as any late payment fees, modification fees, or other similar fees that it might be entitled to collect and keep (in whole or in part).  In addition, Ditech may also earn interest income, or the "float," on collections during the time between when they are deposited in the applicable custodial account and the time the funds are distributed to investors.  When performing the Servicing Functions as a subservicer, Ditech typically receives a flat monthly fee per loan.

44.    Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business to service and subservice loans.

**C.    Servicer Advances and Related Financing Facilities**

45.    As discussed in further detail below, part of Ditech's Servicing Functions is to make certain advances for which Ditech is entitled to reimbursement.  Ditech has financed many of these receivables in order to access the liquidity necessary to continue to meet its servicing obligations.

WEIL:\96914033\1\41703.0010

*(i)    Continuous Obligations to Remit Servicer Advances*

46.    Pursuant to the terms of the applicable Agency Servicing Agreements and Private Servicing Agreements, to the extent funds in the applicable custodial accounts are insufficient, Ditech is required to make, from its own accounts, (a) P&I Advances to the applicable securitization trusts and/or securitized mortgage pools in order to cover delinquent principal and interest payments on the underlying loans and ensure the timely payment of principal and interest to investors and (b) T&I Advances sufficient to cover delinquent taxes and insurance premiums (which, with respect to Ginnie Mae Loans, include FHA mortgage insurance premiums).  Ditech is generally reimbursed for these advances by either (a) the borrower (once the borrower makes the required mortgage payment), (b) the applicable GSE, (c) the FHA, VA, or USDA, as applicable, or (d) the applicable private investor or securitization.

47.    In addition, Ditech is obligated to pay all reasonable, customary, and necessary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations, which may include:

(a)    fees and expenses to various servicing vendors, including but not limited to, property inspectors and maintenance contractors;

(b)    fees and expenses associated with enforcement or judicial proceedings, including foreclosures, bankruptcy, eviction, and/or litigation actions;

(c)    fees and expenses associated with loan modification activities, including state and local recording fees;

(d)    costs and expenses associated with the management and maintenance of property, including the liquidation of property that has been foreclosed upon; and

(e)    costs to preserve foreclosed property prior to liquidation (items (a) through (e), collectively, the "**Corporate Advances**" and, together with the P&I Advances and T&I Advances, the "**Servicer Advances**").

20

48.    When a loan becomes delinquent Ditech must generally continue making Servicer Advances until the time it determines that future Servicer Advances will be non-recoverable from the related loans, at which time Ditech may stop making the P&I Advances (although, as discussed below, it may still be required to make the T&I Advances and Corporate Advances), or in the case of Ginnie Mae Loans, in accordance with the Ginnie Mae Agreements.

49.    P&I Advances and T&I Advances are generally reimbursable to Ditech on a priority basis from amounts paid by the borrower, the proceeds of insurance policies, or the liquidation of the underlying loan (whether through foreclosure or upon repurchase of the loan from the securitization pool), or in the case of Ginnie Mae Loans, in accordance with the Ginnie Mae Agreements.  For Corporate Advances, however, Ditech usually does not get reimbursed until a loan is paid in full, modified (and the Corporate Advances are paid or capitalized as part of the modification), or foreclosed upon and the underlying property is sold, in which case Ditech is either (a) reimbursed from the sale proceeds before such funds are distributed to other parties, if Ditech is the party liquidating the property, or (b) required to submit a claim for reimbursement, if a third party is handling the liquidation.

50.    Ditech regularly submits claims for reimbursement of Servicer Advances to Fannie Mae, Freddie Mac, the FHA, the VA, the USDA, and private investors (such claims, the "**Advance Receivables**").  As of December 31, 2018, Ditech had the following Advance Receivables:

(a)    approximately $15.2 million on account of P&I Advances made with respect to Agency Loans and approximately $19.3 million on account of P&I Advances made with respect to the Private Loans;

(b)    approximately $202.4 million on account of T&I Advances made with respect to Agency Loans and approximately $46 million on account of T&I Advances made with respect to Private Loans; and

21

(c) approximately $127.7 million on account of Corporate Advances made with respect to Agency Loans and approximately $134.7 million on account of Corporate Advances made with respect to Private Loans.

As discussed in further detail below, because Ditech's obligations to make Servicer Advances are large and the timeline for reimbursement can be long, Ditech has financed many of its Advance Receivables in order to access the liquidity necessary to continue to meet such obligations.

51.    Through this Motion, the Debtors seek authority, but not direction, to continue in the ordinary course of business to make Servicer Advances, whether arising from prepetition or postpetition obligations, in accordance with the Agency Servicing Agreements and Private Servicing Agreements, as applicable.

(ii)    *Financing of Servicer Advance Receivables*

52.    Ditech is generally reimbursed for Servicer Advances either by the borrowers (when the borrowers make their mortgage payments), by the GSEs, or by the PLS administrators.  In February 2018, Ditech entered into receivables sale agreements to contribute Ditech's rights to receive reimbursements from the GSEs and the PLS administrators, respectively, to two securitization vehicles, Ditech Agency Advance Depositor LLC ("**Non-Debtor SPV Agency Depositor**") and Ditech PLS Advance Depositor LLC ("**Non-Debtor SPV PLS Depositor**"), that subsequently transferred such rights to Ditech Agency Advance Trust ("**Non-Debtor SPV Agency Issuer**") and Ditech PLS Advance Trust II ("**Non-Debtor SPV PLS Issuer**" and, together with the Non-Debtor SPV Agency Issuer, the "**Non-Debtor SPV Issuers**"), respectively.[13]   The Non-Debtor SPV Issuers, in turn, issued notes to third party investors (collectively, the "**Prepetition Servicer Advance Facility VFNs**") and upstream the

---

[13] The Non-Debtor SPV Issuers are bankruptcy remote entities that are not Debtors in these chapter 11 cases.

proceeds to Ditech to be used in the ordinary course of business.  As discussed in the DIP Motion, the Debtors propose to replace these prepetition facilities with new functionally and structurally similar facilities with up to $250 million in total committed capacity.

### D.    Non-Performing Loan Servicing Activities

53.    During the life of a loan, a borrower may experience financial difficulties meeting the repayment obligations on his or her loan.  When a borrower becomes delinquent in meeting his or her obligations, the loan does not immediately go into foreclosure.  Rather, Ditech, as servicer or subservicer, first counsels or otherwise works with such borrowers to rehabilitate their situation either through deferments, forbearances, or loan modifications.  Only when such interventions fail does Ditech begin foreclosure proceedings.

### (i)    *Loss Mitigation*

54.    As part of Ditech's counseling and modification services, Ditech (a) participates in a number of loan modification programs pursuant to the applicable Agency Agreements, (b) makes certain incentive payments or rebates to borrowers in connection with the closing of short sales, the vacating of properties in lieu of foreclosure or eviction proceedings, and the payoff of loans (collectively, the "**Loss Mitigation Payments**"), and (c) enters into forbearance, modification, or deferment arrangements with borrowers (any such arrangement, the "**Deferment and Forbearance Arrangement**").  The policies and practices regarding Deferment and Forbearance Arrangements are designed to manage borrower relationships, maximize collections, and avoid foreclosure (or repossession of collateral, as applicable), if reasonably possible.  By entering into Deferment and Forbearance Arrangements, Ditech provides a delinquent borrower (or, in limited circumstances, a current borrower if a default of his or her loan is reasonably judged to be imminent) certain relief or a work-out to repay defaulted amounts.  Such relief or work-outs include (a) agreements for the borrower to repay

23

past due amounts over time in addition to regularly scheduled payments, (b) forgiveness of (i) past due amounts and/or (ii) assessed but unpaid fees or other charges, (c) interest rate reductions, and/or (d) term extensions. Ditech enters into such agreements not only to mitigate costs associated with foreclosures (and to preserve the value of the servicing (and subservicing) rights on these loans), but also to pursue a policy of assisting committed (and financially able) borrowers to retain ownership of their home.

55.     Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business to continue (a) to modify loans and to participate in loan modification programs, (b) make Loss Mitigation Payments, and (c) to enter into, and perform under existing, Deferment and Forbearance Arrangements, including honoring all obligations related thereto that accrued in whole or part prior to the Commencement Date.

*(ii)    Foreclosure Activities*

56.     As a last resort, Ditech, in its role as servicer or subservicer, institutes foreclosure procedures on both Agency Loans and Private Loans when loan modification efforts prove unsuccessful. These foreclosure procedures may result in the sale of the properties underlying these loans to third parties ("**Foreclosure Sales**"). To the extent that foreclosed properties are not sold to third-parties in Foreclosure Sales, Ditech may undertake to sell such REO properties on behalf of the owner, or the owner may undertake to sell them itself.[14]

(a)     Agency Loan Foreclosure Process

57.     In Ditech's capacity as servicer, Ditech may institute foreclosure proceedings on Agency Loans. Ditech is generally not responsible for making P&I Advances to

---

[14] Generally, after a property is foreclosed upon, the title vests in the owner of the loan and that owner, in turn, markets and sells the property itself. In some instances, however, particularly where the owner is a securitization trust, the servicing agreements provide that the servicer is responsible for marketing and selling the property on behalf of the owner.

investors on GSE Loans while the foreclosure process is ongoing or on REOs resulting from such foreclosures. Ditech is, however, responsible for making P&I Advances on Ginnie Securitized Loans in foreclosure as long as such loans remain in a Ginnie Mae securitization. In addition, Ditech remains responsible for managing the properties underlying Ginnie Securitized Loans until such properties are deemed to be "in conveyance condition" and are either conveyed to the FHA or custody is transferred to the VA. In addition, Ditech generally remains responsible, pursuant to the terms and conditions of the applicable Agency Servicing Agreements, for making T&I Advances and Corporate Advances on Agency Loans while the foreclosure process is ongoing.

58.     Unless otherwise resolved through a short sale, a deed in lieu of foreclosure, or similar alternative procedure, foreclosure proceedings generally result in one of two outcomes, (x) the property being sold to a third party or (y) the owner (or the servicer on behalf of the owner) taking title to the property and the property becoming REO (in each case, an "**Agency REO**"). With respect to GSE Loans, Ditech commonly conducts foreclosures in its own name, rather than in the name of the owner of the applicable GSE Loan. As a consequence, immediately following such foreclosures, title to the resulting REO is held in Ditech's name, even though ownership of, and equitable title to, such REO is vested in either Fannie Mae or Freddie Mac. On such occasions, in order to reflect actual ownership, Ditech subsequently transfers or assigns the deed relating to the REO to the true owner. However, with respect to Ginnie Securitized Loans, Ditech commonly forecloses on properties in the name of the owner of

25

the applicable Ginnie Securitized Loan such that title to any resulting REO immediately vests in such owner upon foreclosure.[15]

59.    Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business, and without further order of the Court, to engage in foreclosure activities with respect to Agency Loans, including (a) to conduct foreclosures, short sales, deeds in lieu of foreclosure, and similar actions, (b) to pay any T&I Advances and Corporate Advances, including any prepetition amounts owed, with respect to (i) GSE Loans in accordance with the applicable GSE Servicing Agreements and (ii) Ginnie Securitized Loans until such loans are conveyed to the FHA or transferred into the custody of the VA, in each case as required pursuant to the applicable Government Loan Servicing Guidelines, (c) to pay any P&I Advances, including any prepetition amounts owed, with respect to Ginnie Securitized Loans until such loans are conveyed to the FHA or transferred into the custody of the VA, in each case as required pursuant to the Ginnie Mae Agreements and the applicable Government Loan Servicing Guidelines, (d) to distribute net sale proceeds to the appropriate parties in accordance with the applicable Agency Servicing Agreements, and (e) as necessary, to transfer or assign deeds to Agency REOs to the applicable owner of the Agency REO.

(b)    Private Loan Foreclosure Process

60.    Following the foreclosure of Private Loans owned by either Legacy Trusts or by third parties and serviced by Ditech, Ditech typically markets and sells the REO (the "**Private REO**") itself, though often with the assistance of real estate brokers.  Where the Private Loans are owned by third parties (and Ditech is the servicer or subservicer), Ditech remits the net proceeds of any sale to the appropriate parties in accordance with the relevant

---

[15] If the resulting REO relates to a Ginnie Mae Loan that has not been fully liquidated from a Ginnie Mae guaranteed RMBS, such REO will not be owned by a third-party investor and the sale proceeds will be remitted to the RMBS investor.

WEIL:\96914033\1\41703.0010

Private Servicing Agreements and submits a claim for repayment of outstanding Servicer Advances to the applicable investor.

61.     Pending the sale of a property underlying a Private Loan or a Private REO to a third party, Ditech remains responsible for managing and maintaining these properties, which may include making P&I Advances on delinquent Private Loans until title is conveyed pursuant to a foreclosure sale or through REO liquidation.  It may also include continuing making T&I Advances and Corporate Advances, such as regular property inspections, payment of homeowner association and management fees, utilities, lawn care, repairs, and other basic property maintenance, as well as payments to various vendors and professionals such as foreclosure professionals (*i.e.*, attorneys, appraisers, inspectors, field service companies, realtors, title companies, etc.) and real estate brokers.  The payment of Servicer Advances by Ditech are necessary to preserve the value of Private REOs pending sale.  In 2018, Ditech made T&I Advances and Corporate Advances in connection with Private REOs in the approximate amounts of $750,000 and $11.6 million, respectively.

62.     As of January 2019, Ditech estimates that it holds or services approximately 2,000 Private REOs with an aggregate UPB of approximately $100 million.  Of these properties, approximately 292 are under a sale contract, with approximately 289 scheduled to close on or before March 2019.  The estimated sale proceeds from Private REOs for 2018 is approximately $106 million.

63.     At the closing of a Foreclosure Sale on a Private Loan or at the sale of a Private REO, Ditech is generally required to deliver marketable and insurable title to the purchaser of the property.  However, solely because Ditech has commenced these chapter 11 cases, certain title insurance companies, escrow agents, or other third parties may refuse to

insure, pass clear title to the purchasers of property owned by Ditech or sold in its capacity as servicer, or otherwise facilitate the sale absent an order from the Court confirming Ditech authority to sell the property (whether in its capacity as owner or servicer) in the ordinary course of business.  Without delivery of marketable and insurable title, a purchaser (or its lender) may be hesitant, or refuse, to proceed with closing a sale.  Inability to complete these sales would significantly impair the expected revenues from these sales and disrupt Ditech's operations.  Indeed, Ditech will incur significant administrative costs in connection with the preservation of these properties that would have otherwise been sold.  Moreover, the value of such properties becomes more uncertain the longer they remain on the market.  Therefore, any delay in the sale of a property underlying a foreclosed Private Loan or of a Private REO could lead to a reduction in the purchase price of such properties.

64.    Accordingly, through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business, and without further order of the Court, to engage in foreclosure activities with respect to Private Loans, including to (a) pay any Servicer Advances—including any prepetition amounts owed—with respect to Private REOs and Private Loans in foreclosure, (b) conduct Foreclosure Sales on Private Loans and sell Private REOs, whether owned by the Debtors or on behalf of third parties in the Debtors' capacity as servicer or subservicer, on an "as is where is" basis and without any representation and warranties except for title, in their discretion and subject to their business judgment, and free and clear of any and all liens and encumbrances, and (c) remit (i) overpayments to purchasers and (ii) net sale proceeds to the appropriate parties, each of (a) through (c) in accordance with the relevant Private Servicing Agreements.

WEIL:\96914033\1\41703.0010

**III.**
**Other Matters Related to Debtors' Origination and Servicing Businesses**

A.     **Critical Vendors**

65.     In connection with their general corporate activities, as well as their origination and servicing businesses, the Debtors utilize the services of numerous third-party vendors, service providers, and professionals that are critical to operations (collectively, "**Critical Ditech Vendors**"). The Debtors' Critical Ditech Vendors can largely be grouped into one of two buckets, "**Critical Corporate and Origination Vendors**" and "**Critical Ditech Servicing Vendors**".

66.     Critical Corporate and Origination Vendors perform a variety of essential functions, including:

(a)     <u>Critical Daily Operations Support</u>: The Debtors rely on key third-party vendors to provide:

(i)     <u>Essential Loan Level Activity Services</u>, such as provision of consumer credit information, borrower due diligence, title searches, validations, and related services, as well as the arrangement of closing events, the provision of title insurance policies, and the performance of property appraisals critical to the underwriting review and loan decision process (appraisals are required on most of the approximately 2,500 to 5,000 monthly mortgage applications that Ditech underwrites); and

(ii)     <u>Baseline Technology Requirements</u>, such as critical IT systems and support tools to manage a pipeline of over 2,800 loan applications and 2,000 mortgage leads, and maintenance of applications necessary for the timely management, hedging, and trading of core and non-core assets;

(b)     <u>Business Process Outsourcing</u>: The Debtors outsource some of their business process tasks to third-party vendors that perform critical functions such as lead generation, loan set-up, loan underwriting, loan processing, loan closing, and certain post-closing functions;

(c)    <u>Legal and Compliance Advisory</u>:  The Debtors utilize third-party services and tools to assess and maintain compliance with state and federal regulations, supporting fees, loan products, and licensing requirements; and

(d)    <u>Customer Communication and Documentation</u>:  The Debtors rely on third-party services to package and securely deliver loan documents to borrowers in compliance with the Real Estate Settlement Procedures Act ("**RESPA**"), 12 U.S.C. §§ 2601, *et seq*.

67.    Critical Ditech Servicing Vendors perform the following necessary functions:

(a)    <u>Critical General Support Services</u>:  The Debtors rely on third-party vendors to (i) maintain the technology used to perform loan servicing processes, (ii) operate call routing technology, which routes approximately 200,000 customer calls per month and directs workflow to service loans, (iii) perform collections and processing of customer payments, (iv) manage loan records and facilitate rapid and efficient access thereto, including with respect to foreclosures, lien releases, and loss mitigation activities, (v) provide title services, including the performance of the title searches necessary to validate property ownership for recordation purposes, and (vi) maintain customer correspondence and coordinate over 3.8 million mailings to customers each month regarding payments, legal and regulatory notifications, delinquencies, etc.;

(b)    <u>Business Process Outsourcing</u>:  The Debtors outsource approximately 38% of their Servicing Functions to companies that are able to provide technology, labor, and expertise on a more cost-effective basis than if the Debtors were to perform such activities in-house.  Provision of services by these companies is a critical component of the cost-structure for the Debtors' servicing business;

(c)    <u>Escrow Services</u>:  The Debtors utilize third-party escrow service providers who assist with the processing, calculation, and collection of escrow payments, including monitoring taxes, mortgage insurance and other types of hazard insurance, as required under the RESPA;

(d)    <u>Legal and Compliance Advisory</u>:  The Debtors utilize third-party services and tools to assess and maintain compliance with state and federal regulations, servicing requirements, and licensing standards;

30

(e)     <u>Default and Bankruptcy Counsel</u>:  The Debtors utilize default and bankruptcy counsel on daily basis for the servicing of loans where a borrower is in foreclosure or bankruptcy; and

(f)     <u>Property Preservation and Maintenance</u>:    The Debtors employ various eviction, foreclosure, and property preservation professionals, including attorneys, appraisers, inspectors, field service companies, realtors, and title companies, to conduct foreclosures, evictions, and to manage and market residential properties foreclosed upon by the Debtors, and to ensure compliance with state and local property preservation and registration requirements.  The performance of these activities by the Debtors are required under the Agency Servicing Agreements and the Private Servicing Agreements, and helps to preserve property value and maximize the proceeds received from the sale of real estate (which, among other things, are used to reimburse the Debtors for their Servicer Advances).

68.     Expenses for the vendors included in categories (a) through (d) above are paid directly by the Debtors, and are generally part of the Debtors' corporate overhead.  Vendors included in categories (e) and (f), however, generally constitute Corporate Advances that are paid by the Debtors but are subject to reimbursement.

69.     Employing these specialized vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these vendors would not only be difficult and disruptive, but also cost-prohibitive.  The Debtors have developed long-standing relationships with their Critical Ditech Vendors, which has enabled them to negotiate favorable pricing, credit terms, and priority scheduling.  Any failure to timely honor the Debtors' prepetition obligations to the Critical Ditech Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair the Debtors' operations and the value of the enterprise.

70.     In light of the above, through this Motion and the RMS OCB Motion, filed contemporaneously herewith, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of, in the Debtors' sole discretion, the Critical Ditech

31

Vendors and the Critical RMS Vendors (as defined in the RMS OCB Motion) (collectively, the "**Critical Vendors**").    The Debtors estimate that as of the Commencement Date, **approximately $52.5 million** in aggregate payments remain outstanding to the Critical Vendors. Subject to Court approval, the Debtors seek to pay (a) up to **approximately $35 million** of such prepetition amounts to Critical Vendors during the first thirty (30) days of these chapter 11 cases, of which the Debtors expect **approximately $30.6 million** will either be prefunded or reimbursed to the Debtors and (b) up to **approximately $40 million** (inclusive of the interim amounts) of such prepetition amounts to Critical Vendors on a final basis.  Without the requested relief, the Critical Vendors may refuse to continue providing services to Ditech postpetition or may impose unfavorable trade terms, such as cash in advance requirements, security deposits, and/or restrictive trade credit.

71.    The Debtors propose to condition payment of the prepetition claims of Critical Vendors on the agreement of individual Critical Vendors to continue providing services to the Debtors pursuant to the parties' customary trade terms, practices, and programs (including credit limits, pricing, timing of payments, allowance, normal availability, and other applicable terms and programs) under which such Critical Vendors provided products and/or services to the Debtors prior to the Commencement Date (such terms, the "**Customary Trade Terms**"), or pursuant to such other trade practices and programs that are acceptable to the Debtors.  Payment of a prepetition claim to any individual Critical Vendor will be subject to the advance review and approval of the chief financial officer of the Company in consultation with the Debtors' management and AlixPartners LLP.  The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any prepetition claim.  If a Critical Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such

WEIL:\96914033\1\41703.0010

other terms as are agreed by the parties) following receipt of full or partial payment on its prepetition claim, the Debtors hereby seek authority, in their sole discretion and without further order of the Court, (a) to declare that any payments made to a Critical Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity and (b) to take actions to recover or seek disgorgement of any payment made to a Critical Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

72.    Promptly after entry of the Proposed Interim Order and weekly thereafter, the Debtors propose to provide counsel for any statutory committee appointed in these chapter 11 cases and the Office of the United States Trustee for the Southern District of New York with a schedule of all payments made to the Critical Vendors on account of prepetition claims in accordance with the terms of the Proposed Interim Order, which shall include the name and address of the Critical Vendor and the amount and date of the payment.

**B.    Compliance and Regulatory Obligations**

73.    Ditech and certain of its affiliates are subject to state licensing requirements, including personal licenses, which licenses must be obtained, maintained, and renewed, as applicable, in the ordinary course.  In addition, Ditech is subject to periodic state and federal regulatory exams and audits, which may carry certain costs and expenses.  Further, to the extent that Ditech identifies, whether through internal or external audits, regulatory agencies, investors, client complaints, litigation, or other means, origination or servicing errors or lack of compliance with state or federal laws or regulations, Ditech is obligated to remediate such errors or violations, as applicable.  Such remedial measures may require Ditech (a) to make payments

33

to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (b) to forgive past due amounts and/or assessed but unpaid fees or other charges, (c) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (d) to incur and pay certain expenses, (e) to pay the costs and expenses of state and federal regulatory examinations, or (f) to take such other measures as may be required by, or agreed to with, state and federal regulators.  As part of such activities, Ditech reviews and reconciles accounts that belong to borrowers that are either currently or previously debtors in bankruptcy cases filed under chapter 13 of the Bankruptcy Code.  As part of such reviews and reconciliations, Ditech may waive amounts that are currently due on the borrower's account but are not collectible pursuant to the Bankruptcy Code or applicable non-bankruptcy law, or may perform other appropriate account adjustments.

74.    Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay related obligations, (b) to submit to, and comply with, state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (iv) to incur and pay certain expenses, (v) to pay the costs and expenses of state and federal regulatory examinations, and (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators.

WEIL:\96914033\1\41703.0010

### C.    Limited Relief from Automatic Stay

#### (i)    Foreclosure and Eviction Proceedings

75.    In its capacity as servicer, Ditech is currently party to approximately 16,400 judicial and non-judicial foreclosure proceedings and approximately 350 eviction proceedings, which, as noted above, Ditech has sought to proceed with in the ordinary course.  In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against Ditech in order to preserve their respective interests in underlying property as owner or tenant.   However, such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Commencement Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code. Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

76.    Through this Motion, the Debtors request that the Court enter a standing order modifying the stay imposed by section 362(a) of the Bankruptcy Code to allow borrowers, mortgagors, and lienholders (each, an "**Interested Party**") to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure and eviction proceedings brought by the Debtors to the limited extent such claims, cross-claims, third-party claims, and counterclaims, including the appeals of such, have the sole purpose of defending, unwinding, or otherwise enjoining or precluding any foreclosure or eviction, and do not have an adverse effect on any of the Debtors' assets.  Notwithstanding the foregoing, the Debtors request that absent further order of the Court, the automatic stay remain in full force and effect with respect to any and all other pending or future claims and counterclaims by Interested

WEIL:\96914033\1\41703.0010

Parties, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) claims of recoupment or setoff, (c) relief that if granted would affect the amount, validity, and/or priority of lien(s) on property owned or serviced by the Debtors, (d) relief that if granted would not terminate or preclude the prosecution and completion of a foreclosure or eviction, or (e) actions asserted in the form of a class action or collective action, and that, should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims or counterclaims fall within the exception to the automatic stay approved by the Court, the Court retain exclusive jurisdiction to hear and resolve such disputes.

*(ii)    Borrower Bankruptcy Proceedings*

77.    Certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "**Bankrupt Borrowers**"). In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file documents required by the Bankruptcy Code and Bankruptcy Rules, including proofs of claims, notices of payment change, notices of postpetition fees, responses to notices of final cures, motions to lift the automatic stay, and related amendments and appeals. Given the importance of allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the unnecessary degree of complexity and costs that would accrue against the Debtors' estates by requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt Borrower's bankruptcy case (each, a "**Bankruptcy Trustee**"), or the United States Trustees assigned to oversee such cases (each, a "**United States Trustee**"), to obtain stay relief with respect to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, the Debtors believe that limited relief from the automatic stay is merited.

36

78.     Accordingly, through this Motion, the Debtors request that the Court enter a standing order modifying the automatic stay pursuant to the following terms and conditions:

(a)     except as set forth herein, and provided an action outlined below would not affect the value or validity of an asset or claim held by the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

(i)     to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure (collectively, the "**Required Bankruptcy Documents**") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

(ii)    to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

(iii)   to assert appeals with respect to items (i) and (ii); and

(iv)    to seek an accounting from the Debtors with respect to the Bankrupt Borrower's loan;

(b)     except as set forth herein, a Bankrupt Borrower shall be entitled:

(i)     to engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankrupt Borrower's loan; and

(ii)    to engage in discussion with the Debtors and execute a modification of the Bankrupt Borrower's loan or otherwise discuss, enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all the Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:

(i)     for monetary relief of any kind and of any nature against the Debtors, with the exception of:  (A) a reduction in the amount of arrearage listed on a proof of claim that would not affect the total amount of the claim; (B) an objection to the amount listed on a notice of payment change; or (C) an objection to the amount past due listed on a response to notice of final cure;

37

(ii)     for violation of any local, state, or federal statute or other law in connection with the origination of the Bankrupt Borrower's loan;

(iii)     for relief that if granted, would have an effect on the amount, validity, or priority of the Debtors' claim or lien against a Bankrupt Borrower or the property of the Bankrupt Borrower securing such claim or lien of the Debtors; or

(iv)     asserted in the form of a class action;

(d)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankrupt Borrower on behalf of any other class of borrowers;

(e)     with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim for which the automatic stay has been lifted by the terms of the Proposed Interim Order;

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Proposed Interim Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

(g)     nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

(h)     should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the exception to the automatic stay approved by the Court, the Court shall retain exclusive jurisdiction to hear and resolve such dispute.

*(iii)     Actions Involving Amount, Validity, or Priority of Liens*

79.     The Debtors are often a party to actions involving the amount, validity,

and/or priority of liens with respect to properties subject to mortgages owned or serviced by the

WEIL:\96914033\1\41703.0010

Debtors (such actions, "**Title Disputes**").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto. Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order modifying the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.  Notwithstanding the foregoing, the Debtors request that absent further order of the Court, the automatic stay remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third-party claims, and counterclaims against the Debtors, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) relief that if granted would affect the amount, validity, and/or priority of lien(s) held by the Debtors, (c) actions for partition, eminent domain, or seizure of the property securing lien(s) held by the Debtors, (d) relief that is not necessary for the resolution of the Title Dispute, or (e) actions asserted in the form of a class action or collective action, and that, should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by the Court, the Court retain exclusive jurisdiction to hear and resolve such disputes.

> ### D.    Assurances of Future Performance

80.    Fannie Mae, Freddie Mac, and Ginnie Mae have each requested,[16] and the Debtors have agreed, subject to Court approval, to provide certain assurances regarding the Debtors' ability to originate, sell, service, and securitize the Fannie Mae Loans, Freddie Mac

---

[16] In addition, on February 8, 2019, Ginnie Mae sent Ditech a notice of violation ("**Notice of Violation**") stating that Ginnie Mae learned of certain actions, including the pending filing of these chapter 11 cases, that purportedly constitute a violation of the terms of the Ginnie Mae Guide.  The Notice of Violation outlined certain remedies available to Ginnie Mae as a result of Ditech's actions, but advised Ditech that Ginnie Mae would forbear from exercising remedies for a period of 125 days (the "**Forbearance Period**") provided that Ditech otherwise complied with the terms set forth in the Notice of Violation, including complying with additional requests of Ginnie Mae during the Forbearance Period.

Loans, and Ginnie Securitized Loans, respectively, during the course of these chapter 11 cases, as set forth on **Schedules 1**, **2**, and **3** to the Proposed Interim Order.  The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable.  In addition, the Debtors' debtor in possession financing is conditioned upon the Debtors' continued operations in the ordinary course.  Thus, it is essential that the Debtors be authorized to provide such assurances to Fannie Mae, Freddie Mac, and Ginnie Mae, respectively.  The Debtors have every intention of maintaining their origination, servicing, and with respect to Ginnie Securitized Loans, securitization-related, operations in accordance with the standards and requirements set forth in the Agency Agreements.

81.     The Debtors request that any order entered by the Court approving the relief requested in this Motion also provide that all payments by the Debtors to the GSEs, to Ginnie Mae, and to Ginnie Mae guaranteed RMBS investors under the Agency Agreements (including, without limitation, repurchase or repurchase-related requests and requests for payments of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related escrows, fees and claims) shall be made free and clear of any lien, security interest, or other interest of any party, including, without limitation, any prepetition or postpetition lenders.

82.     Through this Motion, the Debtors do not seek a determination as to the applicability, if any, of the automatic stay under Bankruptcy Code section 362(a) to requests by Fannie Mae, Freddie Mac, or Ginnie Mae to the Debtors to honor their origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, including, without limitation, repurchase or repurchase-related

requests and requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Agency Agreements.  Rather, the Debtors, Fannie Mae, Freddie Mac, and Ginnie Mae each reserve their rights with respect to this issue.

83.    If, and to the extent that, the automatic stay under Bankruptcy Code section 362(a) applies to requests by Fannie Mae, Freddie Mac, and Ginnie Mae that the Debtors honor their origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, the Debtors request that the Court modify the automatic stay to the limited extent necessary to allow Fannie Mae, Freddie Mac, and Ginnie Mae to make such requests to the Debtors, including, without limitation, repurchase or repurchase-related requests and requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Agency Agreements; *provided that*, Fannie Mae, Freddie Mac, and Ginnie Mae reserve all rights to assert that they may exercise any and all rights available to them under their respective agreements notwithstanding the automatic stay.

## IV.
## Applicable Authority

### A.    The Court Should Authorize Debtors (i) to Originate and Service Loans in Ordinary Course of Business, and (ii) to Honor and Pay Prepetition Obligations Related Thereto

84.    As set forth above, through this Motion, the Debtors seek authority, but not direction, to continue their forward mortgage origination and servicing businesses in the ordinary course of business, and to honor and pay prepetition obligations related thereto.  The

41

requested relief is both appropriate and necessary as it (a) falls squarely within sections 363(c)(1), 1107(a), and 1108 of the Bankruptcy Code, which, taken together, authorize a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business and (b) protects and conserves the value of the Debtors' estate, including by providing invaluable comfort to parties doing business with the Debtors.

(i)    *The Debtors' Activities Satisfy Ordinary Course of Business Standard*

85.    Section 363 of the Bankruptcy Code provides for a debtor's use, sale, or lease of property in either (a) the *ordinary course of business*, pursuant to section 363(c)(1) or (b) *outside the ordinary course of business*, pursuant to section 363(b)(1). 11 U.S.C. §§ 363(b)(1), 363(c)(1). In particular, section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). By contrast, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1). In differentiating between ordinary and non-ordinary course transactions, section 363 "strike[s] a balance [between] allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (citing *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992)).

WEIL:\96914033\1\41703.0010

86.      Although not defined in the Bankruptcy Code, the term *ordinary course of business* has generally "been accepted to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business." *Id.* (citations omitted).  Courts in this district apply a two part test to determine whether transactions are *ordinary course*.  *Id.*; *see also In re Crystal Apparel, Inc.*, 207 B.R. 406, 409 (S.D.N.Y. 1997); *In re Dana Corp.*, 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006); *In re Coordinated Apparel, Inc.*, 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995); *In re Leslie Fay Companies, Inc.*, 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Under the two part test, transactions are ordinary course if they satisfy (a) the "creditor's expectation," or "vertical," test and (b) the "industry-wide," or "horizontal," test.

87.      "Under the vertical test, [a] court views [a] disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those [that] he accepted when he decided to enter into a contract with the debtor." *In re Lavigne*, 114 F.3d at 385 (citations omitted).  Under the horizontal test, the inquiry "is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *In re Dana Corp.*, 358 B.R. at 580 (citations omitted).  In other words, the combined test is whether the transactions at issue are (a) of a kind that creditors would expect these specific Debtors to undertake in the day-to-day operations of their business and (b) of a kind that similar businesses, here other forward mortgage loan origination and servicing businesses, would undertake in the day-to-day operations of their businesses.  *See In re Johns-Manville Corp.*, 60 B.R. at 616–18; *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("The touchstone of 'ordinariness' is

43

thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.").

88.     Here, each of the activities for which the Debtors seek Court authority to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the forward mortgage loan origination and servicing industry, thereby satisfying both the vertical and horizontal tests.  Indeed, a hypothetical creditor would expect that the Debtors, as forward mortgage originators and servicers, would engage in the activities, and incur the related financial obligations, described in this Motion.  Further, similar relief has been granted in the chapter 11 cases of numerous other mortgage originators, lenders, and/or servicers.  *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jul. 25, 2012) [Docket No. 898] (authorizing debtors to, among other things, (a) process and fund prepetition mortgage loan commitments, (b) continue brokerage, origination, and sale activities, (c) perform under certain mortgage loan purchase and sale agreements, (d) pay certain prepetition amounts due to critical origination vendors, and (e) honor mortgage loan repurchase obligations); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 401] (authorizing debtors to continue, among other things, (a) service government sponsored loans, (b) perform foreclosure activities related to certain GSE REOs, and (c) pay certain prepetition amounts due to critical servicing vendors and foreclosure professionals); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 402] (authorizing debtors to, among other things, continue to (a) service private label mortgage loans and (b) engage in sales activities related to loans in foreclosure and REOs); *In re Thornburg Mortgage, Inc.*, No. 09-17787 (DWK) (Bankr. D. Md. May 6, 2009) [Docket No. 49] (authorizing debtors to, among other things, continue mortgage loan servicing, auditing, and

fulfillment services in the ordinary course of business); *In re Am. Home Mortgage Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) [Docket No. 358] (authorizing debtors to, among other things, (a) sell REOs in the ordinary course free and clear of any and all liens and encumbrances and (b) continue funding Servicer Advances); *In re Aegis Mortgage Corp.*, No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007) [Docket No. 35] (authorizing debtors to, among other things, (a) sell certain mortgage loans owned by the debtors, (b) continue performing under existing subservicing agreements, and (c) enter into new subservicing agreements); *In re Mortgage Lenders Network USA, Inc.*, No. 07-10146 (PJW) (Bankr. D. Del. Mar. 19, 2007) [Docket No. 304] (authorizing debtors to, among other things, (a) sell certain loans, (b) honor certain loan commitments, and (c) incur new servicing obligations in the ordinary course of business).

    (ii)    *The Requested Relief, Including Payment of Critical Vendor Claims, is Both Necessary and Appropriate to Conserve Value of Debtors' Estates*

89.    The Debtors, as debtors in possession operating their businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, owe "fiduciary duties to the bankruptcy estate and must, among other things, protect and conserve property in [their] possession for the benefit of creditors and refrain from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." *In re Ashley River Consulting, LLC*, Case No. 14-13406 (MG), 2015 WL 1540941, *8 (Bankr. S.D.N.Y. 2015) (citing *In re Ionosphere Clubs, Inc. (Ionosphere II)*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (internal quotations omitted)). As one court has recognized, "[i]mplicit in the duties of a Chapter 11 trustee or a debtor in possession as set out in Sections 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going-concern value." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Accordingly, the

WEIL:\96914033\1\41703.0010

Court may, pursuant to section 105(a) of the Bankruptcy Code, "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," including the protection and conservation of the Debtors' estates.  11 U.S.C. § 105(a).

90.    As this Court has previously explained, "[t]he ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.  It was articulated by the United States Supreme Court in *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286 (1882) and is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment' rule. This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor."  *In re Ionosphere Clubs, Inc. (Ionosphere I)*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989).  The "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of prepetition claims *necessary* to "facilitat[e] the continued operation and rehabilitation of the debtor."  *Id.* at 176.

91.    The relief requested herein is necessary to allow the Debtors to conserve, enhance, and maximize the value of their estates for the benefit of all stakeholders and thereby fulfill their fiduciary duties.  The Debtors' business (and the mortgage origination and servicing industry in general) is a structural feedback loop whereby the cash that leaves the business (whether to fund prepetition loan originations, to pay prepetition claims of Critical Vendors, to perform Servicing Functions and fulfill related prepetition obligations, including obligations to make Servicer Advances, etc.) directly influences the cash that comes into the business (whether from securitization activities, mortgage origination or servicing fees, Advance Receivables, etc.). Without the uninterrupted payment of ordinary course prepetition obligations, the Debtors'

WEIL:\96914033\1\41703.0010

revenue stream dries up and their going concern value is threatened.    Accordingly, the

prepetition payments contemplated herein are unequivocally necessary to facilitate the Debtors'

continued operation and rehabilitation.    Further, the limited non-monetary relief sought in

association with these payments provides invaluable comfort to parties doing business with the

Debtors—many of whom are lenders that cannot be compelled to continue lending to the Debtors

postpetition—and therefore is necessary and appropriate under the circumstances.

> **B.**    **The Court Should Authorize Debtors to Sell REOs Free and Clear**

92.    Section 363(f) of the Bankruptcy Code provides that a debtor in:

possession:

> may sell property . . . free and clear of any interest
> in such property of an entity other than the estate,
> only if—
>
> (1) applicable nonbankruptcy law permits sale of
>      such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which
>      such property is to be sold is greater than the
>      aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or
>      equitable proceeding, to accept a monetary
>      satisfaction of such interest.

11 U.S.C. §363(f).

93.    At closing for the sales of REOs, the Debtors are required to deliver

marketable and insurable title free and clear of liens or encumbrances.    To convey marketable

and insurable title to the prospective buyers at closing, the Debtors request authority to sell the

REOs free and clear of any lien or encumbrance either pursuant to (a) section 363(f) of the

Bankruptcy Code, to the extent that the REO is owned by the Debtors, or (b) applicable non-bankruptcy law, to the extent the REO is owned by third parties. The relief requested herein has been granted by other courts in a similar context. *See e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 402] (authorizing the debtors to sell property free and clear of liens and encumbrances in the ordinary course); *In re Am. Home Mortg. Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) [Docket No. 358] (confirming the debtors' authority to sell real estate owned or serviced by the debtors free and clear of liens and encumbrances in the ordinary course).

C.    **The Court Should Grant the Limited Stay Relief Requested Herein Pursuant to Section 362(d)(1) of the Bankruptcy Code**

94.    The Bankruptcy Code provides that the Court may grant stay relief "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). The Debtors respectfully submit that it is in the best interests of their estates to permit, pursuant to the terms set forth herein, borrowers and tenants to raise claims and defenses in foreclosure and eviction proceedings, to allow Bankrupt Borrowers to prosecute their bankruptcy cases, and for Title Disputes to be resolved because requiring each of these parties to obtain stay relief would likely add an unnecessary degree of complexity, costs, and delay to both the underlying procedures as well as the administration of these chapter 11 cases. The Debtors believe that the limited stay relief requested herein will allow for an efficient and fair process with respect to mortgage foreclosures, tenant evictions, Bankrupt Borrowers, and Title Disputes and thereby preserve the interests of the Debtors' estates.

D.    **The Court Should Authorize Debtors to Provide Fannie Mae, Freddie Mac, and Ginnie Mae Assurances of Future Performance**

95.    As set forth above, through this Motion, the Debtors seek authority, but not direction, to continue to perform under the applicable Agency Agreements and to honor and

pay prepetition obligations arising thereunder, as well as to provide Fannie Mae, Freddie Mac, and Ginnie Mae with certain assurances related thereto. The requested relief is narrowly tailored, appropriate, and necessary under section 105(a) of the Bankruptcy Code as it permits the Debtors to operate in the ordinary course, while avoiding the need to litigate the scope and extent of the automatic stay with respect to the applicable Agency Agreements. Absent the relief requested, there are at least three grounds upon which the Debtors could potentially need to litigate the applicability of the automatic stay with Fannie Mae, Freddie Mac, and/or Ginnie Mae: (a) whether the GSE Agreements are, in whole or in part, safe harbored contracts under the Bankruptcy Code; (b) whether the National Housing Act exempts Ginnie Mae from the automatic stay; and (c) whether the GSEs and Ginnie Mae are entitled to adequate assurance under the Bankruptcy Code.

96.     With respect to the first ground, the Bankruptcy Code provides that, in certain circumstances, counterparties to certain types of agreements are entitled to exercise remedies against the debtor's property, notwithstanding the automatic stay and the general rule that so-called "*ipso facto clauses*" are not enforceable. Specifically, section 362(b)(7) of the Bankruptcy Code provides that the automatic stay does not preclude:

> the exercise by a repo participant or financial participant of any contractual right (as defined in section 559 of the Bankruptcy Code) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559 of the Bankruptcy Code) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements.

11 U.S.C. § 362(b). Section 559 of the Bankruptcy Code provides in the relevant part that:

> [t]he exercise of a contractual right of a repo
> participant or financial participant to cause the
> liquidation, termination, or acceleration of **a
> repurchase agreement because of a condition of
> the kind specified in section 365(e)(1) of this title
> shall not be stayed, avoided, or otherwise limited
> by operation of any provision of this title** or by
> order of a court or administrative agency in any
> proceeding under this title, unless, where the debtor
> is a stockbroker or securities clearing agency, such
> order is authorized under the provisions of the
> Securities Investor Protection Act of 1970 or any
> statute administered by the Securities and Exchange
> Commission.

11 U.S.C. § 559 (emphasis added).

97.    Section 101(47) of the Bankruptcy Code defines the term repurchase

agreement, which definition also applies to a reverse repurchase agreement, as follows:

> (A) . . .
>
> (i)    an agreement, including related terms, which
>        provides for the transfer of one or more
>        certificates of deposit, mortgage related
>        securities (as defined in section 3 of the
>        Securities Exchange Act of 1934), mortgage
>        loans, interests in mortgage related securities or
>        mortgage loans, eligible bankers' acceptances,
>        qualified foreign government securities
>        (defined as a security that is a direct obligation
>        of, or that is fully guaranteed by, the central
>        government of a member of the Organization
>        for Economic Cooperation and Development),
>        or securities that are direct obligations of, or
>        that are fully guaranteed by, the United States
>        or any agency of the United States against the
>        transfer of funds by the transferee of such
>        certificates of deposit, eligible bankers'
>        acceptances, securities, mortgage loans, or
>        interests, with a simultaneous agreement by
>        such transferee to transfer to the transferor
>        thereof certificates of deposit, eligible bankers'
>        acceptance, securities, mortgage loans, or
>        interests of the kind described in this clause, at
>        a date certain not later than 1 year after such

WEIL:\96914033\1\41703.0010

transfer or on demand, against the transfer of funds;

(ii) any combination of agreements or transactions referred to in clauses (i) and (iii);

(iii) an option to enter into an agreement or transaction referred to in clause (i) or (ii);

(iv) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), or (iii), together with all supplements to any such master agreement, without regard to whether such master agreement provides for an agreement or transaction that is not a repurchase agreement under this paragraph, except that such master agreement shall be considered to be a repurchase agreement under this paragraph only with respect to each agreement or transaction under the master agreement that is referred to in clause (i), (ii), or (iii); or

(v) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii), or (iv), including any guarantee or reimbursement obligation by or to a repo participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562 of this title; and

(B) does not include a repurchase obligation under a participation in a commercial mortgage loan.

11 U.S.C. § 101(47).

98.     In *In re Am. Home Mortg., Inc.*, the Bankruptcy Court for the District of Delaware held, among other things, that the portion of a private contract that provided for the purchase and repurchase of mortgage loans, but not the portion that provided for the servicing of such loans, constituted a "repurchase agreement," as such term is defined in section 101(47) of

51

the Bankruptcy Code, and that the "safe harbor" protections afforded under the Bankruptcy Code to "repurchase agreements" therefore applied.  379 B.R. 503, 518 (Bankr. D. Del. 2008).  With respect to the servicing portion of the contract, the court found that such portion, as a matter of non-bankruptcy law, was severable from the repurchase agreement and was (a) not a repurchase agreement and (b) not a securities contract, and thus did not fall within any of the safe harbor provisions of the Bankruptcy Code.  *Id.* at 521–22.

99.    The GSE Agreements contain similar loan purchase and repurchase obligations to the ones found to constitute a repurchase agreement in *In re Am. Home Mortg.* The GSEs may, however, assert, as they have in other cases, that the servicing, selling, and repurchasing portions of their agreements are integrated and cannot be severed from each other as a matter of non-bankruptcy law, making the entirety of their agreements terminable at will pursuant to section 559 of the Bankruptcy Code.  *See, e.g., In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 5, 2012) [Docket No. 218] (reservation of rights in which Fannie Mae asserts that the underlying contract is "a single integrated contract that provides for both loan origination and loan servicing").  The Debtors do not concede that any portion of the GSE Agreements are repurchase agreements or that the GSEs themselves are "financial institutions" entitled to the safe harbor protections of the Bankruptcy Code.  At the outset of these cases the Debtors simply cannot incur the uncertainty and expense of litigating with the GSEs and thereby risk an adverse ruling on these pivotal issues, nor is it in the Debtors economic interests to do so.  Cooperation with the GSEs is essential to the Debtors' business.

100.    With respect to second ground, section 306(g) of the National Housing Act provides that

> No State or local law, and no Federal law (except
> Federal law enacted expressly in limitation of this

WEIL:\96914033\1\41703.0010

> subsection after the effective date of this sentence),
> shall preclude or limit the exercise by [Ginnie Mae]
> of (A) its power to contract with the issuer on the
> terms stated in the preceding sentence, (B) its rights
> to enforce any such contract with the issuer, or
> (C) its ownership rights as provided in the
> preceding sentence . . .

12 U.S.C. § 1721(g). Bankruptcy courts in other jurisdictions have interpreted this statute to

mean that the automatic stay does not apply to Ginnie Mae when it is enforcing its contractual

rights, including rights of termination. *See In re Whitcomb & Keller Morg. Co., Inc.*, 8 B.R. 83,

87 (Bankr. N.D. Ind. 1980) (finding that Ginnie Mae was not required to seek relief from the

automatic stay prior to (a) terminating debtor's issuer status and (b) attempting to arrange the

transfer of debtors' servicing obligations to another entity); *In re Commonwealth Mortg. Co.,

Inc.*, 145 B.R. 368 (Bankr. D. Mass. 1992) (holding that automatic stay does not apply to actions

by Ginnie Mae to enforce its contract with debtor); *see also In re Am. Home Mortg., Inc.*,

No. 07-11047 (CSS) (Bankr. Del. Sept. 20, 207) [Docket No. 863] (as ordered stipulation by

debtor agreeing not to contest that Ginnie Mae is not subject to automatic stay).

       101.    With respect to the third ground, case law suggests that where a party to a

contract has grounds for uncertainty as to the future performance of his or her counterparty, he or

she can request that such counterparty provide adequate assurance of future performance. *See In

re Metromedia Fiber Network, Inc.*, 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005) ("The requirement

of adequate assurance . . . is based on a recognition that an essential element of any contract is

performance . . . and that a continuing sense of reliance and security that the promised

performance will be forthcoming when due, is an important feature of the bargain.") (internal

quotations omitted). If such counterparty is a debtor in a case filed under the Bankruptcy Code

and thereby a beneficiary of the automatic stay, the contract party may move to have the

automatic stay lifted on the basis that such adequate assurance of future performance is lacking

53

and the contract party accordingly wishes to terminate the contract. *See In re Lucre*, *Inc.*, 339 B.R. 648, 664 (Bankr. W.D. Mich. 2006) (decision lifting automatic stay to permit contract party subject to prepetition injunction to challenge injunction and cease performing pending debtor's decision to assume or reject contract).

102.    Accordingly, to address and consensually resolve each of the above potential grounds for litigation between the Debtors, Fannie Mae, Freddie Mac, and Ginnie Mae, the Debtors have agreed to continue to fulfill their origination, securitization, and servicing obligations under the applicable Agency Agreements in the ordinary course, and the Debtors have negotiated with Fannie Mae, Freddie Mac, and Ginnie Mae the terms of the assurances set forth on **Schedules 1**, **2**, and **3** (collectively, the "**GSE and Ginnie Mae Assurances**"), respectively, to the Proposed Interim Order to incentivize Fannie Mae, Freddie Mac, and Ginnie Mae to support and work with the Debtors during their restructuring.  The GSE and Ginnie Mae Assurances were negotiated at arms' length and avoid the uncertainty, time, cost, and expense of litigating with each of the GSEs and Ginnie Mae regarding the scope and/or applicability of the automatic stay.  The Debtors, in their business judgment, believe that the GSE and Ginnie Mae Assurances are appropriate, narrowly tailored, and essential under the circumstances.  The GSE and Ginnie Mae Assurances should be approved as fair and reasonable and in the best interests of the estate.  Further, similar relief has been granted in the chapter 11 cases of other mortgage originators and servicers.  *See, e.g., In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jul. 25, 2012) [Docket No. 401] (granting assurance terms to Fannie Mae and Freddie Mac).

## Scope of Motion

103.    This Motion does not cover all aspects of the Debtors' forward mortgage origination and servicing businesses.  Whether or not a business activity is described in this

Motion, and whether or not the Debtors seek an order with respect to the continuation of such activity, if the activity is of the nature of those that the Debtors conduct in the ordinary course of business, the Debtors intend to continue to conduct such activity after the Commencement Date pursuant to the authority granted to them by section 363(c) of the Bankruptcy Code.  Absence of a description of a particular activity or request for a specific relief related to the Debtors' forward mortgage origination or servicing business shall not limit the rights of the Debtors to conduct their business and manage their assets in the ordinary course without prior Court approval.

### Reservation of Rights

104.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Debtors Satisfy Bankruptcy Rule 6003(b)

105.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  As described above and in the Lombardo Declaration,

WEIL:\96914033\1\41703.0010

the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003(b) is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

106.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Lombardo Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Notice

107.    Notice of this Motion has been provided to (a) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Greg M. Zipes and Benjamin J. Higgins) (the "**U.S. Trustee**"); (b) the Debtors' five (5) largest secured creditors on a consolidated basis; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of New York; (f) counsel to the Prepetition Term Loan Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Brian M. Resnick and Michelle M. McGreal); (g) counsel to the Term Loan Ad Hoc Group, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654 (Attn: Patrick J. Nash and Gregory F. Pesce); (h) Wilmington Savings Fund Society, FSB, as trustee

under that certain Indenture for 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024, 500 Delaware Avenue, Wilmington, Delaware 19801 (Attn:  Corporate Trust, Walter Investment); (i) counsel to the Second Lien Ad Hoc Group, Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, Los Angeles, California 90067 (Attn:  Gregory A. Bray and Melainie K. Mansfield); (j) counsel to the Barclays Bank PLC, as DIP Agent, and Barclays Capital Inc., as DIP Lender, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attn:  Sarah M. Ward, Mark A. McDermott, and Melissa Tiarks); (k) counsel to Nomura Corporate Funding Americas, LLC, Jones Day, 250 Vesey Street, New York, New York 10281 (Attn: Ben Rosenblum); (l) the Banks;[17] (m) the Securities and Exchange Commission; (n) counsel to Fannie Mae, O'Melveny & Meyers LLP, 400 South Hope Street, 18th Floor, Los Angeles, California 90071 (Attn:  Stephen Warren, Jennifer Taylor, and Darren Patrick); (o) counsel to Freddie Mac, McKool Smith PC, 600 Travis Street, Suite 7000, Houston, Texas 77002 (Attn: Paul D. Moak); and (p) U.S. Department of Housing and Urban Development, 451 Seventh St., SW, Room 9250, Washington, DC 20410 (Attn:  Lisa Mulrain, Assistant General Counsel, Office of General Counsel, Finance Division) (collectively, the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

108.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

---

[17] The term "**Banks**" shall have the meaning ascribed to such term in the *Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, (V) Extend Time to Comply With, or Seek Waiver of, 11 U.S.C. § 345(b), and (VI) Granting Related Relief,* filed contemporaneously herewith.

WEIL:\96914033\1\41703.0010

WHEREFORE the Debtors respectfully request entry of interim and final orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 11, 2019
New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

### Exhibit A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                          :

In re                        :         **Chapter 11**
                          :

**DITECH HOLDING CORPORATION,** *et al.*,  :       **Case No. 19-[_____] (__)**
                          :

          Debtors.[1]           :         **(Joint Administration Pending)**
                          :

------------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO CONTINUE ORIGINATION AND SERVICING OF FORWARD MORTGAGE LOANS IN ORDINARY COURSE AND GRANTING RELATED RELIEF, (II) MODIFYING AUTOMATIC STAY ON A LIMITED BASIS TO FACILITATE DEBTORS' ONGOING OPERATIONS, AND (III) SCHEDULING A FINAL HEARING

Upon the motion (the "**Motion**")[2] of Ditech Holding Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), pursuant to sections 105(a), 362, 363(c), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors request authority, but not direction, to continue in the ordinary course of business (a) to originate and purchase mortgage loans; (b) to sell and securitize loans, including by performing under certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, and private parties; (c) to service and subservice loans pursuant to terms and conditions set forth in certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, other applicable federal agencies, and private parties; (d) to make servicing advances; (e) to pay

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

prepetition amounts owed to critical vendors; (f) to fulfill compliance and regulatory obligations; and (g) to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Lombardo Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis to the extent set forth herein.

### Forward Mortgage Origination Business

2.      The Debtors are authorized but not directed, to continue in the ordinary course of business:

WEIL:\96914033\1\41703.0010

(a)   to fund their origination and purchase of mortgage loans and to pay related obligations, regardless of whether such obligations arose prepetition or postpetition;

(b)   (i) to honor and perform under the GSE Sales Agreements, (ii) to pay the GSE Guaranty Fees, (iii) to honor and pay the GSE Repurchase Obligations, and (iv) to perform other activities and pay fees related to mortgage loan origination, including paying all obligations related to loans originated prepetition;

(c)   (i) to honor and perform under the Ginnie Mae Agreements, (ii) to honor and pay the Ginnie Mae Buyout Obligations, (iii) to pay the Ginnie Mae Fees, and (iv) to pay the Ginnie Mae Administrative Fees, including, in each instance, all obligations related to loans originated prepetition; and

(d)   (i) to sell mortgage loans to private investors and (ii) to enter into, and perform under, MLPAs, including, to pay all obligations related to loans originated prepetition.

**Forward Mortgage Servicing Business**

3.    The Debtors are authorized but not directed, to continue in the ordinary course of business:

(a)   to service and subservice GSE Loans in the ordinary course, including by continuing to perform under the GSE Servicing Agreements and by continuing to honor and pay the GSE Repurchase Obligations and all prepetition amounts arising under the GSE Servicing Agreements;

(b)   to service Ginnie Securitized Loans in the ordinary course, including by continuing to perform under the Ginnie Mae Agreements and the applicable Government Loan Servicing Guidelines;

(c)   to service and subservice Private Loans in the ordinary course, including by continuing to perform under the Private Servicing Agreements;

(d)   (i) to sell MSRs and related reimbursement rights for Servicer Advances and (ii) the NRM Servicing Transition;

(e)   to service and subservice loans;

3

(f)       to make Servicer Advances, whether arising from prepetition or postpetition obligations, in accordance with the Agency Servicing Agreements and Private Servicing Agreements, as applicable;

(g)       (i) to modify loans and to participate in loan modification programs, (ii) make Loss Mitigation Payments, and (iii) to enter into, and perform under existing, Deferment and Forbearance Arrangements, including honoring all obligations related thereto that accrued in whole or part prior to the Commencement Date;

(h)       to engage in foreclosure activities with respect to Agency Loans, including to (i) to conduct foreclosures, short sales, deeds in lieu of foreclosure, and similar actions, (ii) to pay any T&I Advances and Corporate Advances, including any prepetition amounts owed, with respect to (A) GSE Loans in accordance with the applicable GSE Servicing Agreements and (B) Ginnie Securitized Loans until such loans are conveyed to the FHA or transferred into the custody of the VA, in each case as required pursuant to the applicable Government Loan Servicing Guidelines, (iii) to pay any P&I Advances, including any prepetition amounts owed, with respect to Ginnie Securitized Loans until such loans are conveyed to the FHA or transferred into the custody of the VA, in each case as required pursuant to the Ginnie Mae Agreements and the applicable Government Loan Servicing Guidelines, (iv) to distribute net sale proceeds to the appropriate parties in accordance with the applicable Agency Servicing Agreements, and (v) as necessary, to transfer or assign deeds to Agency REOs to the applicable owner of the Agency REO; and

(i)       to engage in foreclosure activities with respect to Private Loans, including to (i) pay any Servicer Advances—including any prepetition amounts owed—with respect to Private REOs and Private Loans in foreclosure, (ii) conduct Foreclosure Sales on Private Loans and sell Private REOs, whether owned by the Debtors or on behalf of third parties in the Debtors' capacity as servicer or subservicer, on an "as is where is" basis and without any representation and warranties except for title, in their discretion and subject to their business judgment, and free and clear of any and all liens and encumbrances either pursuant to (A) section 363(f) of the Bankruptcy Code, to the extent that the Private REO is owned by the Debtors, or (B) applicable non-bankruptcy law, to the extent the Private REO is owned by third parties, and (iii) remit (A) overpayments to purchasers and (B) net sale proceeds to the appropriate parties, each of (i) through (iii) in accordance with the relevant Private Servicing Agreements.

4

4.      The principal, interest, and funds for the payment of property taxes and insurance premiums collected by Ditech in connection with its performance of its Servicing Functions do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code, and no lien or other interest therein will be given by the Debtors to any party.

**Additional Relief Related to Forward Mortgage Origination and Servicing Businesses**

5.      The Debtors are authorized but not directed, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay related obligations, (b) to submit to, and comply with, state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (iv) to incur and pay certain expenses, (v) to pay the costs and expenses of state and federal regulatory examinations, and (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators.

**Critical Vendors**

6.      Pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors, upon such terms and in the manner provided in this Order and the Motion and subject to the Management Approval Process (as defined below); *provided*, that payments to Critical Vendors on account of prepetition claims shall not exceed $35 million, during the first thirty (30) days following the Commencement Date; *provided*, *further*, that payments to Critical Vendors on account of such prepetition claims

WEIL:\96914033\1\41703.0010

may not be accelerated and shall be made only in the ordinary course in accordance with Customary Trade Terms.

7.      As used herein, the term "**Management Approval Process**" means the advance review and approval by the chief financial officer of the Company, following consultation with the Debtors' management and AlixPartners LLP, of any prepetition payment made to a Critical Vendor.

8.      Promptly after entry of this Order and weekly thereafter, the Debtors shall provide counsel to the Term Loan Ad Hoc Group, counsel for any statutory committee appointed in the Debtors' cases, and the Office of the United States Trustee for the Southern District of New York with a schedule of all payments made to the Critical Vendors on account of prepetition claims in accordance with the terms of this Order, which shall include the name and address of the Critical Vendor as well as the amount and date of the payment.

9.      If a Critical Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, upon notice to any statutory committee appointed in the Debtors' cases, and without further order of the Court:

    (a)      Declare that any payments made to the Critical Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Vendor without further order of the Court or action by any person or entity; and

    (b)      Take actions to recover or seek disgorgement of any payment made to the Critical Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Vendor, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

WEIL:\96914033\1\41703.0010

10.     Under such circumstances, such Critical Vendor shall immediately repay to the Debtors any payment made to it on account of its prepetition claims to the extent that such payments exceed its postpetition claims, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

11.     Nothing herein shall:

(a)     Constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Vendor;

(b)     Be construed to waive, limit, or in any way affect the Debtors' ability to dispute a claim of a Critical Vendor;

(c)     Be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Order;

(d)     Be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor; or

(e)     Be deemed to require the Debtors to make any of the payments to the Critical Vendors authorized herein.

12.     Notwithstanding entry of this Order, the Debtors' rights to enforce the automatic stay provision of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

## Limited Relief from Automatic Stay

*Borrower Foreclosure and Eviction Proceedings*

13.     The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to allow borrowers, mortgagors, and lienholders (each, an "**Interested Party**") to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure and eviction proceedings brought by the Debtors to the limited extent

7

such claims, cross-claims, third-party claims, and counterclaims, including the appeals of such, have the sole purpose of defending, unwinding, or otherwise enjoining or precluding any foreclosure or eviction, and do not have an adverse effect on any of the Debtors' assets.

14.    Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third-party claims, and counterclaims by Interested Parties related to judicial and non-judicial foreclosure and eviction proceedings, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) claims of recoupment or setoff, (c) relief that if granted would affect the amount, validity, and/or priority of lien(s) on property owned or serviced by the Debtors, (d) relief that if granted would not terminate or preclude the prosecution and completion of a foreclosure or eviction, and (e) actions asserted in the form of a class action or collective action.

15.    Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

*Borrower Bankruptcy Proceedings*

16.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who has sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**"), is hereby modified pursuant to the following terms and conditions:

    (a)    except as set forth herein, and provided an action outlined below would not affect the value or validity of an asset or claim held by the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

WEIL:\96914033\1\41703.0010

(i)      to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure (collectively, the "**Required Bankruptcy Documents**") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

(ii)     to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

(iii)    to assert appeals with respect to items (i) and (ii); and

(iv)     to seek an accounting from the Debtors with respect to the Bankrupt Borrower's loan;

(b)      except as set forth herein, a Bankrupt Borrower shall be entitled:

(i)      to engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankrupt Borrower's loan; and

(ii)     to engage in discussion with the Debtors and execute a modification of the Bankrupt Borrower's loan or otherwise discuss, enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)      absent further order of this Court, the automatic stay shall remain in full force and effect with respect to all the Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:

(i)      for monetary relief of any kind and of any nature against the Debtors, with the exception of:  (A) a reduction in the amount of arrearage listed on a proof of claim that would not affect the total amount of the claim; (B) an objection to the amount listed on a notice of payment change; or (C) an objection to the amount past due listed on a response to notice of final cure;

(ii)     for violation of any local, state, or federal statute or other law in connection with the origination of the Bankrupt Borrower's loan;

(iii)    for relief that if granted, would have an effect on the amount, validity, or priority of the Debtors' claim or lien against a Bankrupt Borrower or the property of the Bankrupt Borrower securing such claim or lien of the Debtors; or

(iv)     asserted in the form of a class action;

WEIL:\96914033\1\41703.0010

(d)     absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankrupt Borrower on behalf of any other class of borrowers;

(e)     with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim for which the automatic stay has been lifted by the terms of this Order;

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

(g)     nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

(h)     should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such dispute.

*Actions Involving Amount, Validity, or Priority of Liens*

17.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**") is hereby modified to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.

10

18.     Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third-party claims, and counterclaims against the Debtors, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) relief that if granted would affect the amount, validity, and/or priority of lien(s) held by the Debtors, (c) actions for partition, eminent domain, or seizure of the property securing lien(s) held by the Debtors, (d) relief that is not necessary for the resolution of the Title Dispute, or (e) actions asserted in the form of a class action or collective action.

19.     Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

**Additional Relief Related to Fannie Mae, Freddie Mac, and Ginnie Mae**

20.     The Debtors are authorized to provide to Fannie Mae, Freddie Mac, and Ginnie Mae assurances of future performance under the applicable Agency Agreements on the terms and conditions set forth in **Schedules 1**, **2**, and **3** to this Order and to comply therewith; *provided, that*, nothing herein, including the provision of such assurances, shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and Fannie Mae, Freddie Mac, or Ginnie Mae, as applicable. The acceptance by Fannie Mae, Freddie Mac, and Ginnie Mae of the assurances and related relief granted pursuant to this Order shall not be deemed to constitute consent by Fannie Mae, Freddie Mac, and Ginnie Mae of the assumption and assignment of the applicable Agency Agreements or to the release of any Debtor from any obligations under the Ginnie Mae Agreements.  Notwithstanding anything herein or in any order to the contrary, Fannie Mae,

11

Freddie Mac, and Ginnie Mae may seek additional assurances or modification to its grant of assurances provided herein so as to provide different or additional assurance, without prejudice to the right of the Debtors or any other party in interest to contest any such addition or modification.

21.    For the avoidance of doubt, all payments by the Debtors to Fannie Mae, Freddie Mac, Ginnie Mae, and Ginnie Mae guaranteed RMBS investors under the Agency Agreements (including, without limitation, repurchase or repurchase-related requests and requests for payments of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related escrows, fees and claims) shall be made free and clear of any lien, security interest, or other interest of any party, including, without limitation, any prepetition or postpetition lenders.

22.    Nothing in this Order constitutes a determination of the applicability, if any, of the automatic stay under Bankruptcy Code section 362(a) to requests by Fannie Mae, Freddie Mac, or Ginnie Mae to the Debtors to honor their origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, including, without limitation, repurchase or repurchase-related requests and requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Agency Agreements, and the rights of all parties are reserved with respect thereto.

23.    To the extent that the automatic stay under Bankruptcy Code section 362(a) applies to requests by Fannie Mae, Freddie Mac, and Ginnie Mae that the Debtors honor their origination-related, servicing-related, and with respect to Ginnie Securitized Loans,

WEIL:\96914033\1\41703.0010

securitization-related, commitments and obligations, the automatic stay is hereby modified to the limited extent necessary to allow Fannie Mae, Freddie Mac, and Ginnie Mae to make such requests to the Debtors, including, without limitation, repurchase or repurchase-related requests and requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Agency Agreements; *provided, that*, Fannie Mae and Ginnie Mae reserve all rights to assert that they may exercise any and all rights available to them under their respective agreements notwithstanding the automatic stay.

### Other Relief

24.     Nothing in the Motion or this Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the final hearing to consider the relief requested in the Motion (the "**Final Hearing**").

25.     Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

26.     Notwithstanding anything to the contrary contained herein or in the Motion, any payment, obligation or other relief authorized by this Order shall be subject to and limited by the requirements imposed on the Debtors under the terms of any interim and/or final

order approving the Debtors' motion for *Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 365, 503, 507, 546, 548, 555, 559 and 561 (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief,* as may be amended or superseded from time to time, or any budget in connection therewith, entered by this Court in these chapter 11 cases.

27.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

28.     Nothing herein shall be construed to limit the right of any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to take any action not subject to the automatic stay.

29.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

30.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

31.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

32.     The Final Hearing shall be held on _____, 2019, at _____ **(Prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served in accordance with the Case Management Order.

14

33.     This Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Order.

34.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

35.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.


Dated: _____, 2019
        New York, New York


                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

WEIL:\96914033\1\41703.0010

**<u>Schedule 1</u>**

**Fannie Mae Assurances of Future Performance**

**Fannie Mae Assurances of Future Performance**[1]

1.    Ditech shall provide Fannie Mae staff with regular access to Ditech facilities, including reasonable access to its books, records, and accounts, so as to allow Fannie Mae to oversee Ditech's performance of its servicing duties.

2.    Ditech shall at all times maintain its servicing performance to the standards set forth in certain Fannie Mae Mortgage Selling and Servicing Contract dated as of March 23, 2005 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Mae Mortgage Selling and Servicing Contract**"), which includes that certain Selling Guide:  Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Selling Guide**") and that certain Servicing Guide: Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Servicing Guide**" and, together with the Fannie Selling Guide, the "**Fannie Guides**"), that certain Subservicing Agreement effective as of December 22, 2010 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Subservicing Agreement**"), and that certain Pledge and Security Agreement effective as of December 19, 2014 (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Pledge Agreement**" and, together further with the Fannie Mae Mortgage Selling and Servicing Contract, the Fannie Subservicing Agreement, and the Fannie Guides, the "**Fannie Agreements**"), as well as to the following supplemental standards:

(a)    As to each separate portfolio of Fannie Mae loans serviced or subserviced by Ditech, Ditech shall maintain monthly STAR Scorecard metrics as good as or better than such metrics for such portfolio as of the month ending November 30, 2018;

(b)    No STAR overall operational assessment can result in a rating of "red";

(c)    Any formal servicing compliance review must not return an overall risk rating of 'high';

(d)    As applicable, Ditech shall comply with the High Touch Servicing Protocols previously agreed to by Fannie Mae and Ditech;

(e)    Ditech shall use best efforts to reduce the net population of seriously delinquent loans;

(f)    Ditech shall timely comply with all servicing action plans;

(g)    Ditech shall deliver custodial account reconciliations of all P&I and T&I accounts relating to Fannie Mae Loans via tapes to Fannie Mae on or before the fifteenth day of the month immediately following the reconciliation period;

(h)    Ditech shall provide Fannie Mae with a copy of its key employee retention program and key employee incentive program;

---

[1] Capitalized terms used but not otherwise defined herein or in the Motion shall have the meaning ascribed to such term in the Fannie Agreements (as defined below).

(i)    Ditech shall at all times maintain staffing levels commensurate with the servicing portfolio, including maintaining adequate staffing within the requisite servicing departments;

(j)    Ditech shall provide notice to Fannie Mae, within two (2) business days, of (i) senior management departures and/or (ii) the number of loans per employee falling below the level as of the date of the bankruptcy filing;

(k)    Ditech shall provide all reporting and other servicing information as reasonably requested by Fannie Mae, including such additional reports that may be requested, as currently permitted under the Fannie Servicing Guide;

(l)    Ditech shall continue regularly scheduled engagements with Fannie Mae, such as the monthly performance reviews at the current participation level, including Ditech senior management;

(m)    Ditech shall keep Fannie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions as it deems appropriate, which extensions will not be withheld solely on the basis of Ditech's bankruptcy proceedings;

(n)    Ditech shall deliver to Fannie Mae the following information: (i) on a quarterly basis, a completed Mortgage Bank Financial Reporting Form, (ii) monthly financial statements, and (iii) weekly liquidity reporting, in each case, on the same timeframe as such reports were delivered immediately prior to the Commencement Date;

(o)    Ditech shall continue to meet margin requirements as may be required under the Fannie Agreements in connection with the sale of loans; and

(p)    Ditech agrees to comply with the Fannie Servicing Guide to facilitate the orderly transfer of servicing rights to any new servicer where applicable.

3.    Ditech shall maintain response times to file requests (for both origination and servicing files) timely (within 30 days) as is current practice and Ditech will comply with Fannie Mae timelines for appeal letters, identifying "impasse loans", and for supplying missing documents as well as timely addressing aged repurchase issues.

4.    Ditech shall not grant a lien or security interest (including any adequate protection liens) in (a) any cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including, without limitation, the Fannie Pledge Agreement), or (b) any mortgage servicing rights with respect to mortgages which are now or hereafter serviced or subserviced by Ditech for Fannie Mae, except as otherwise expressly authorized by, that certain Acknowledgment Agreement With Respect to Servicing Advance Receivables, dated as of February 9, 2018 and effective as of February 12, 2018, and amended as of April 20, 2018 (as further amended, restated, supplemented or otherwise modified from time to time), among Fannie Mae, Ditech, Ditech Agency Advance Depositor LLC, Ditech Agency Advance Trust, Wells Fargo Bank, N.A, in its capacity as Indenture Trustee, and Barclays Bank PLC, in its capacity as Administrative Agent; or by that certain

2

First Amended and Restated Acknowledgment Agreement dated as of February 9, 2018 (as amended, restated, supplemented or otherwise modified from time to time), among Fannie Mae, Ditech, Credit Suisse AG, Cayman Islands Brach, in its capacity as collateral agent for the First Lien Secured Party, and Wilmington Savings Fund Society, FSB, in its capacity as Collateral Agent for the Second Lien Secured Party.  In addition, Ditech shall not seek to modify or otherwise affect Fannie Mae's rights under the Fannie Mae Pledge Agreement.

WEIL:\96914033\1\41703.0010

## **Schedule 2**

**Freddie Mac Assurances of Future Performance**

## **Freddie Mac Assurances of Future Performance**[1]

1. Ditech shall provide Freddie Mac staff with regular access to Ditech facilities, including reasonable access to its books, records, and accounts, so as to allow Freddie Mac to oversee Ditech's performance of its servicing duties.

2. Ditech shall at all times maintain its servicing performance consistent with the standards set forth in the that certain Master Agreement dated as of August 1, 2014, as amended and restated on October 6, 2017 (together with all supplements, addendums, amendments, and related agreements, the "**Freddie Master Agreement**"), that certain Purchase Agreement dated as of November 7, 2018 (together with all supplements, addendums, amendments, and related agreements, the "**Freddie Purchase Agreement**"), and the Freddie Mac Single-Family Seller/Servicer Guide (the "**Freddie Selling and Servicing Guide**" and, together with the Freddie Master Agreement and the Freddie Purchase Agreement, the "**Freddie Agreements**"), as well as with the following supplemental standards (*provided that*, nothing herein is intended to waive or release any of Ditech's current obligations under the Freddie Agreements):

   (a) In connection with any operation assessment by Freddie Mac's Counterparty Operations Risk Evaluation group ("**CORE**"), Ditech must maintain an operational assessment that is above "critical" or "major" for each finding in connection with such assessment. If there is a finding by CORE of "critical," "major" or "other" for any matter that is within the scope of any CORE review, Ditech must remediate and address each such finding;

   (b) Ditech shall deliver custodial account reconciliations of all P&I and T&I accounts relating to Freddie Mac Loans via tapes to Freddie Mac on or before the fifth day of the month immediately following the reconciliation period;

   (c) Ditech shall provide Freddie Mac with a copy of its key employee retention program and key employee incentive program;

   (d) Ditech shall at all times maintain staffing levels commensurate with the servicing portfolio, including maintaining adequate staffing within the requisite servicing departments;

   (e) Ditech shall provide notice to Freddie Mac, within five business days, of senior management departures or larger-than-average departures of non-management personnel;

   (f) Ditech shall provide all reporting and other servicing information as reasonably requested by Freddie Mac, including (without limitation) fraud reports and such additional reports that may be requested by Freddie Mac, in accordance with the Freddie Selling and Servicing Guide;

---

[1] Capitalized terms used but not otherwise defined herein or in the Motion shall have the meaning ascribed to such term in the Freddie Agreements (as defined below).

(g)    Ditech shall confer and consult with Freddie Mac in good faith with respect to the implementation of any new programs/directives, and policy changes and Ditech will (i) comply with such changes if compliance is required pursuant to applicable law or regulation, or if noncompliance would itself constitute grounds for termination of Ditech as a seller/servicer under the Freddie Agreements, and (ii) use commercially reasonable efforts to comply with such changes in all other cases, notwithstanding possible additional costs to implement those changes;

(h)    Ditech shall keep Freddie Mac apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions as it deems appropriate, which extensions will not be withheld solely on the basis of Ditech's bankruptcy proceedings. As with other lenders, Freddie Mac will acknowledge, but not approve, extension requests and will not assert a breach based solely on such non-compliance for up to 90 days of non-compliance;

(i)    Ditech shall continue (post-filing) its regularly scheduled meetings and engagements with Freddie Mac, including (without limitation) monthly executive meetings and any and all reviews relating to the servicing of the Freddie Mac servicing portfolio;

(j)    Ditech shall maintain response times to file requests (for both origination and servicing files) timely (within 30 days), as is current practice, and Ditech will comply with Freddie Mac timelines for appeal letters, and for supplying missing documents, as well as timely addressing aged repurchase issues; and

(k)    Ditech agrees to comply with the Freddie Selling and Servicing Guide, and specifically Chapter 7101 thereof, to facilitate the orderly transfer of servicing rights to any new servicing agent where applicable.

3.    Ditech shall not grant a lien or security interest (including any adequate protection liens) in (a) any cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Amended and Restated Collateral Account Control Agreement, dated as of January 17, 2014, and the Amended and Restated Collateral Pledge Agreement, dated as of January 17, 2014) (collectively, the "**Freddie Mac Pledge Agreements**"), (b) any mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech for Freddie Mac, or (c) the "Servicing Collateral" as defined and referenced in, and except as otherwise expressly authorized by, that certain Second Amended and Restated Acknowledgement Agreement, dated as of October 30, 2015, among Freddie Mac, Ditech, and Credit Suisse AG, Cayman Islands Branch.  In addition, Ditech shall not seek to modify or otherwise affect Freddie Mac's rights under the Freddie Mac Pledge Agreements.

WEIL:\96914033\1\41703.0010

## Schedule 3

**Ginnie Mae Assurances of Future Performance**

WEIL:\96914033\1\41703.0010

## Ginnie Mae Assurances of Future Performance[1]

1.   Ditech shall provide Ginnie Mae staff and its designees with regular access to Ditech facilities, including reasonable access to its books, records, and accounts, so as to allow Ginnie Mae to oversee Ditech's performance of its securitization duties.

2.   Ditech shall at all times maintain its securitization performance to the standards set forth in that certain Master Servicing Agreement dated as of October 9, 2015 (collectively with the Cross-Default Agreement, that certain Escrow Tri-Party Agreement dated as of January 30, 2019, all guaranty agreements, RMBS prospectus documents, escrow agreements, acknowledgment agreements, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Master Servicing Agreements**") and the Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**" and, together with the Ginnie Mae Master Servicing Agreements, the "**Ginnie Mae Agreements**") as well as to the following supplemental or existing standards:

   (a)   Ditech shall deliver custodial account reconciliations of all P&I and T&I accounts relating to Ginnie Securitized Loans via tapes to Ginnie Mae on or before the 15th day of the month immediately following the reconciliation period;

   (b)   Ditech shall provide Ginnie Mae with a copy of its key employee retention program and key employee incentive program and updates to form HUD 11702, as applicable;

   (c)   Ditech shall provide notice to Ginnie Mae of senior management departures and updates to form HUD 11702, as applicable, as required under the Ginnie Mae Agreements;

   (d)   Ditech shall provide Ginnie Mae with a report identifying the Critical Vendors for the Ginnie Mae guaranteed RMBS portfolio and a contact list of parties (other than document custodians) to whom loan collateral documents have been or are delivered, including ancillary systems and location of any origination, credit, and servicing files, imaging, and records stored in hard copy format;

   (e)   Ditech shall provide all reporting and other securitization information requested by Ginnie Mae, including such additional reports that may be reasonably requested, as currently permitted under the Ginnie Mae Agreements; and

   (f)   Ditech shall keep Ginnie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions from Ginnie Mae, in Ginnie Mae's sole discretion, which extensions will not be withheld solely on the basis of Ditech's bankruptcy proceedings. Ditech may not seek extensions of the statutory requirement to obtain mortgage insurance or guaranty for pooled loans or extensions of regulatory requirements. A request to approve a transfer of issuer responsibility is not an extension request.

---

[1] Capitalized terms used but not otherwise defined in the Motion shall have the meaning ascribed to such term in the Ginnie Mae Agreements (as defined below).

3.    Ditech shall maintain response times to file requests timely as is current practice and Ditech will comply with the requisite timelines pursuant to the Ginnie Mae Agreements.

4.    Ditech shall timely comply with the Ginnie Mae Buyout Obligations set forth in the Ginnie Mae Agreements.

5.    Ditech shall maintain delinquency rates on outstanding pools and loan packages below the threshold levels described in the Ginnie Mae Guide.

6.    Ditech shall comply with all the terms and conditions outlined in the Ginnie Mae Notice of Violation dated as of February 8, 2019.

WEIL:\96914033\1\41703.0010