**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                                      :

                                                           :        **Chapter 11**

**DITECH HOLDING CORPORATION**, *et al.*,                  :

                                                           :        **Case No. 19-10412 (JLG)**

                                                           :

           Debtors.[1]                                     :        **(Jointly Administered)**

                                                           :

---------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 559, 560 AND 561 (A) AUTHORIZING DEBTORS TO ENTER INTO REPURCHASE AGREEMENT FACILITIES, SERVICER ADVANCE FACILITIES AND RELATED DOCUMENTS; (B) AUTHORIZING DEBTORS TO SELL MORTGAGE LOANS AND SERVICER ADVANCE RECEIVABLES IN THE ORDINARY COURSE OF BUSINESS; (C) GRANTING BACK-UP LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (D) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION; (E) MODIFYING THE AUTOMATIC STAY; (F) SCHEDULING A FINAL HEARING; AND (G) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Ditech Holding Corporation ("**Ditech**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") seeking entry of an interim order (this "**Interim Order**") and a final order upon terms substantially similar to those

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

contained in this Interim Order (the "**Final Order**" and, together with this Interim Order, the "**DIP Orders**") providing for, among other things, the following relief:

(i)     authorizing, pursuant to sections 105(a) and 363(b), and, to the extent applicable, section 364(c), of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"):

(a)     Debtor Ditech Financial LLC ("**Ditech Financial**") to execute, enter into, deliver, perform under, and enter into transactions under (1) that certain Master Repurchase Agreement, to be dated on or about the DIP Closing Date (as defined below), attached as **Exhibit B** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Forward Repo Facility Agreement**"), between Ditech Financial, as seller, Barclays Bank PLC, as the DIP Agent (as defined below), and the buyers from time to time party thereto (collectively with the DIP Agent acting on behalf of such buyers, the "**DIP Forward Repo Facility Purchasers**"), and (2) all other Program Agreements (as defined in the DIP Forward Repo Facility Agreement) (collectively with the DIP Forward Repo Facility Agreement, the "**DIP Forward Repo Facility Documents**"), which provide for a maximum committed amount of up to $650 million (the "**DIP Forward Repo Facility**");[3]

(b)     Debtor Reverse Mortgage Solutions, Inc. ("**RMS**") to execute, enter into, deliver, perform under, and enter into transactions under (1) that certain Amended and Restated Master Repurchase Agreement, to be dated on or about the DIP Closing Date, attached as **Exhibit C** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Reverse Repo Facility Agreement**"), between RMS, as seller, RMS REO BRC II, LLC (the "**DIP REO Subsidiary**"), the DIP Agent, and the buyers from time to time party thereto (collectively with the DIP Agent acting on behalf of such buyers, the "**DIP Reverse Repo Facility Purchasers**"), and (2) all other Program Documents (as defined in the DIP Reverse Repo Facility Agreement) (collectively with the DIP Reverse Repo Facility Agreement, the "**DIP Reverse Repo Facility Documents**"), which provide

---

[3]     For purposes herein, the "**DIP Forward Repo Facility Parties**" means (a) the DIP Agent, acting on behalf of any other DIP Forward Repo Facility Purchaser or otherwise acting pursuant to or in connection with the DIP Forward Repo Facility or any DIP Forward Repo Facility Document, and (b) the DIP Forward Repo Facility Purchasers, in each case, in their respective capacities as such.

for a maximum committed amount of up to $1,000 million (the "**DIP Reverse Repo Facility**");[4] and

(c)     RMS to execute, enter into, deliver, perform under, and enter into transactions under (1) one or more repurchase agreements for Ginnie Mae HMBS, to be filed with the Bankruptcy Court by the Final Hearing (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP HMBS Repo Facility Agreement**" and together with the DIP Forward Repo Facility Agreement and the DIP Reverse Repo Facility Agreement, the "**DIP Repo Facility Agreements**") between RMS, the DIP Agent, and the buyers from time to time party thereto (collectively with the DIP Agent acting on behalf of such buyers, the "**DIP HMBS Repo Facility Purchasers**" and together with the DIP Forward Repo Facility Purchasers and the DIP Reverse Repo Facility Purchasers, the "**DIP Repo Facility Purchasers**"), and (2) all other documentation related thereto (the "**DIP HMBS Repo Facility Documents**" and together with the DIP Forward Repo Facility Documents and the DIP Reverse Repo Facility Documents, the "**DIP Repo Facility Documents**"), which provide for a maximum committed amount of up to $80 million in the aggregate for all the DIP HMBS Repo Facility Agreements (the "**DIP HMBS Repo Facilities**" and together with the DIP Forward Repo Facility and the DIP Reverse Repo Facility, the "**DIP Repo Facilities**"); *provided* that the maximum combined committed amount under the DIP HMBS Repo Facility Documents and the DIP Reverse Repo Facility Documents shall not exceed $1,000 million in the aggregate;[5]

(d)     Ditech Financial to cause its wholly-owned, non-debtor, special purpose subsidiaries, Ditech Agency Advance Trust (the "**Non-Debtor SPV Agency Issuer**") and Ditech PLS Advance Trust II (the "**Non-Debtor SPV PLS Issuer**" and, together with the Non-Debtor SPV Agency Issuer, the "**Non-Debtor SPV Issuers**") to execute, enter into, deliver, perform under, and issue notes pursuant to, as applicable, the following documents, which

---

[4]     For purposes herein, the "**DIP Reverse Repo Facility Parties**" means (a) the DIP Agent, acting on behalf of any other DIP Reverse Repo Facility Purchaser or otherwise acting pursuant to or in connection with the DIP Reverse Repo Facility or any DIP Reverse Repo Facility Document, and (b) the DIP Reverse Repo Facility Purchasers, in each case, in their respective capacities as such.

[5]     For purposes herein, the "**DIP HMBS Repo Facility Parties**" means (a) the DIP Agent, acting on behalf of any other DIP HMBS Repo Facility Purchaser or otherwise acting pursuant to or in connection with any of the DIP HMBS Repo Facilities or any DIP HMBS Repo Facility Document, and (b) the DIP HMBS Repo Facility Purchasers, in each case, in their respective capacities as such.

For purposes herein, the "**DIP Repo Facility Parties**" means (a) the DIP Forward Repo Facility Parties, (b) the DIP Reverse Repo Facility Parties, and (c) the DIP HMBS Repo Facility Parties, in each case, in their respective capacities as such.

provide for an aggregate maximum committed amount of up to $250 million pursuant to the DIP Servicer Advance Facility Documents (as defined below) (the "**DIP Servicer Advance Facilities**"):

(1)    (A) that certain Indenture Supplement, to be dated on or about the DIP Closing Date, attached as **Exhibit D** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Servicer Advance Agency Facility Supplement**"), among Ditech Financial, as administrator and servicer, Non-Debtor SPV Agency Issuer, as issuer, Wells Fargo Bank, N.A., as indenture trustee, calculation agent, paying agent and securities intermediary (in such capacities, the "**DIP Servicer Advance Agency Facility Indenture Trustee**"), and Barclays Bank PLC, as administrative agent (in such capacity, the "**DIP Servicer Advance Agency Facility Agent**"), and (B) all other Transaction Documents (as defined in the DIP Servicer Advance Agency Facility Supplement) (collectively with the DIP Servicer Advance Agency Facility Supplement, the "**DIP Servicer Advance Agency Facility Documents**"); and

(2)    (A) that certain Indenture Supplement, to be dated on or about the DIP Closing Date, attached as **Exhibit E** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Servicer Advance PLS Facility Supplement**" and, together with the DIP Servicer Advance Agency Facility Supplement, the "**DIP Servicer Advance Facility Supplements**"), among Ditech Financial, as administrator and servicer, Non-Debtor SPV PLS Issuer, as issuer, Wells Fargo Bank, N.A., as indenture trustee, calculation agent, paying agent and securities intermediary (in such capacities, the "**DIP Servicer Advance PLS Facility Indenture Trustee**" and, together with the DIP Servicer Advance Agency Facility Indenture Trustee, the "**DIP Servicer Advance Facility Indenture Trustees**"), and Barclays Bank PLC, as administrative agent (in such capacity, the "**DIP Servicer Advance PLS Facility Agent**" and, together with the DIP Servicer Advance Agency Facility Agent, the "**DIP Servicer Advance Facility Agents**"), and (B) all other Transaction Documents (as defined in the DIP Servicer Advance PLS Facility Supplement) (collectively with the DIP Servicer Advance PLS Facility Supplement, the "**DIP Servicer Advance PLS Facility Documents**" and, together with the DIP Servicer Advance Agency Facility Documents, the "**DIP Servicer Advance Facility Documents**" and, together with all obligations or liabilities with respect to the DIP Servicer Advance

Facility Documents, the "**DIP Servicer Advance Facility Obligations**");[6]

(e)    Ditech Financial to cause its wholly-owned, non-debtor, special purpose subsidiaries, Ditech Agency Advance Depositor LLC (the "**Non-Debtor SPV Agency Depositor**") and Ditech PLS Advance Depositor LLC (the "**Non-Debtor SPV PLS Depositor**" and, together with the Non-Debtor SPV Agency Depositor, the "**Depositors**") to execute, enter into, deliver, and perform under the applicable DIP Servicer Advance Facility Documents;

(f)    Ditech Financial to execute, enter into, deliver, perform under, and enter into transactions under

    (1)    an amendment to the Prepetition Barclays MSFTA (as defined below) on or about the DIP Closing Date, attached as **Exhibit F** to the Motion (as amended and as the same may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Barclays MSFTA**"), between Ditech Financial and Barclays Capital Inc. ("**Barclays Capital**");

    (2)    an amendment to the Prepetition Nomura MSFTA (as defined below) on or about the DIP Closing Date, attached as **Exhibit G** to the Motion (as amended and as the same may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Nomura MSFTA**"), between Ditech Financial and Nomura Securities International, Inc. ("**Nomura Securities**"); and

    (3)    to the extent entered into in connection with the DIP Forward Repo Facility Agreement, any other Master Securities Forward Transaction Agreement between Ditech Financial and any other DIP Forward Repo Facility Purchaser (for so long as such counterparty continues to be a DIP Forward Repo Facility Purchaser) (any such counterparty together with Barclays Capital and Nomura Securities, the "**DIP MSFTA Counterparties**"), on terms and conditions no less favorable to Ditech Financial in any material respect, when taken as a whole, than the terms and conditions set forth in the DIP Barclays MSFTA or the DIP Nomura MSFTA (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof) (collectively with the DIP Barclays MSFTA and the DIP Nomura

---

[6]    For purposes herein, the "**DIP Servicer Advance Facility Parties**" means (a) the DIP Servicer Advance Facility Indenture Trustees, (b) the DIP Servicer Advance Facility Agents, and (c) the DIP Servicer Advance Facility VFN Noteholders (as defined below), in each case, in their respective capacities as such.

MSFTA, the "**DIP MSFTAs**" and, together with all obligations or liabilities with respect to the DIP MSFTAs, the "**DIP MSFTA Obligations**");

pursuant to which, from time to time, Ditech Financial and the DIP MSFTA Counterparties will enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may determine, which provide for a maximum committed amount of up to $1,900 million, in the aggregate, for all of the DIP MSFTAs;

(g)     Ditech Financial to execute, enter into, deliver, perform under, and enter into hedging transactions with:

(1)     Fannie Mae (as defined below) subject to the provisions set forth in that certain Selling Guide: Fannie Mae Single Family (together with all supplements, addendums, amendments, and related agreements, the "**Fannie Selling Guide**," and transactions thereunder, the "**Fannie Hedges**"));

(2)     to the extent disclosed to the DIP Lenders in "Schedule 2: Other MSFTAs & Hedges" to that certain Commitment Letter dated as of February 8, 2019 (the "**MSFTA Schedule**"), certain other existing counterparties pursuant to those certain prepetition Master Securities Forward Transaction Agreements (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Other MSFTAs**," and future transactions thereunder, the "**Prepetition Other Hedges**"); and

(3)     to the extent not disclosed on the MSFTA Schedule, with the consent of the DIP Agent (acting at the direction of the Required Buyers (as defined below)), certain other counterparties pursuant to any new Master Securities Forward Transaction Agreements (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**Postpetition Other MSFTAs**," and transactions thereunder, the "**Postpetition Other Hedges**," and together with the Fannie Hedges and the Prepetition Other Hedges, the "**Non-DIP Hedges**");

(h)     Ditech, Ditech Financial and RMS to execute, enter into, deliver, and perform under that certain Margin, Setoff and Netting Agreement, to be dated on or about the DIP Closing Date, attached as **Exhibit I** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof (the "**DIP Netting Agreement**" and all obligations or liabilities with respect thereto, the "**DIP Netting Obligations**") with the DIP Agent, the DIP

MSFTA Counterparties party thereto from time to time, and the DIP Repo Facility Parties party thereto from time to time;[7]

(i)    Ditech, Ditech Financial and RMS to execute, enter into, deliver, and perform under that certain Omnibus Master Refinancing Agreement, to be dated on or about the DIP Closing Date, attached as **Exhibit J** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**Master Refinancing Agreement**" and, together with the DIP Repo Facility Documents, the DIP Servicer Advance Facility Documents, the DIP MSFTAs, the DIP Netting Agreement, the DIP Guaranty (as defined below), and all other instruments, agreements and documents related to any of the foregoing, the "**DIP Documents**"), among Ditech, Ditech Financial, RMS, the DIP REO Subsidiary, Barclays Bank PLC, as Administrative Agent (as defined in the Master Refinancing Agreement) (in such capacity, the "**DIP Agent**"), the buyers party thereto from time to time (collectively, the "**DIP Lenders**"), and the other DIP Credit Parties (as defined below) party thereto from time to time (together with all obligations or liabilities with respect thereto, the "**Master Refinancing Agreement Obligations**");[8] and

(j)    Ditech to execute, enter into, deliver, and perform under that certain Master DIP Guaranty, to be dated on or about the DIP Closing Date, attached as **Exhibit H** to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Guaranty**"), pursuant to which Ditech has agreed to guaranty the obligations of Ditech Financial, RMS, and the DIP REO Subsidiary under the DIP Repo Facilities, the DIP MSFTAs, the DIP Netting Agreement, the Master Refinancing Agreement, and the other DIP Documents;

(ii)    authorizing, in each case pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code and, in the case of (a) and (b) below, sections 362(b)(6), 362(b)(7), 555 and 559 of the Bankruptcy Code,

(a)    Ditech Financial to repurchase all assets sold pursuant to the terms of that certain Prepetition Forward Repo Facility (as defined below), to terminate

---

[7]    For purposes herein, the "**DIP Netting Parties**" means, collectively, (a) the DIP Agent, (b) the DIP MSFTA Counterparties, and (c) the DIP Repo Facility Parties, in each case, in their respective capacities as such.

[8]    For purposes herein, (a) "**DIP Closing Date**" means the "Effective Date" (as defined in the Master Refinancing Agreement); (b) "**DIP Facilities**" means, collectively, the DIP Repo Facilities, the DIP Servicer Advance Facilities, the DIP Netting Agreement, the DIP MSFTAs, the Master Refinancing Agreement, and the DIP Guaranty; and (c) "**DIP Obligations**" means, collectively, all liabilities or obligations of the Debtors, the Non-Debtor SPV Issuers, the Depositors, and their respective affiliates under the DIP Documents, including, without limitation, the DIP Forward Repo Facility Obligations, the DIP Reverse Repo Facility Obligations, the DIP Servicer Advance Facility Obligations, the DIP MSFTA Obligations, and the DIP Netting Obligations.

the Prepetition Forward Repo Facility and any related program documents, and to sell all such assets pursuant to the terms of the DIP Forward Repo Facility, thereby repurchasing and repaying the Prepetition Forward Repo Facility with proceeds from the sale of such assets under the DIP Forward Repo Facility Documents;

(b)     RMS to repurchase all assets sold pursuant to the terms of the Prepetition Reverse Repo Facilities (as defined below), to amend and restate the Prepetition Bilateral Reverse Repo Facility (as defined below), to terminate the Prepetition Exit Reverse Repo Facilities (as defined below) and any related program documents, and to sell all such assets pursuant to the terms of the DIP Reverse Repo Facility, thereby repurchasing and repaying the Prepetition Reverse Repo Facilities with proceeds from the sale of such assets under the DIP Reverse Repo Facility Documents;

(c)     Ditech Financial to cause the Non-Debtor SPV Issuers to refinance and thereby  repay all of the outstanding Prepetition Servicer Advance Facility VFNs (as defined below) issued by such Non-Debtor SPV Issuers with proceeds of new variable funding notes to be issued pursuant to the terms of the DIP Servicer Advance Facility Documents (the "**DIP Servicer Advance Facility VFNs**" and the holders thereof, the "**DIP Servicer Advance Facility VFN Noteholders**") and to replace the existing administrative agents with the DIP Servicer Advance Facility Agents; and

(d)     RMS (1) to cause (x) the CS REO Subsidiaries (as defined below) to transfer all of the CS REO Assets (as defined below) and (y) the DIP REO Subsidiary to transfer all of the Prepetition DIP REO Assets (as defined below) to RMS, and (2) immediately following such transfers, to transfer all such CS REO Assets and Prepetition DIP REO Assets to the DIP REO Subsidiary;

(iii)     authorizing, in each case in the ordinary course of business pursuant to sections 105(a), 363(c)(1) and 363(f) of the Bankruptcy Code,

(a)     Ditech Financial to sell and repurchase mortgage loans and related assets pursuant to the DIP Forward Repo Facility Documents;

(b)     RMS to sell and repurchase mortgage loans and related assets pursuant to the DIP Reverse Repo Facility Documents;

(c)     Ditech Financial to sell and transfer to the Depositors (to be subsequently transferred to the Non-Debtor SPV Issuers) receivables related to certain advances it has made and continues to make as servicer (the "**Servicer Advances**") pursuant to the DIP Servicer Advance Facility Documents and for Ditech Financial to cause such Non-Debtor SPV Issuers to issue one or more DIP Servicer Advance Facility VFNs from time to time to finance the purchase of such Servicer Advances; and

(d)     Ditech Financial to enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities pursuant to the DIP MSFTAs;

(iv)    granting, subject to the Carve-Out (as defined below) and the priorities identified herein (including the priority of First Lien Term Loan Obligations (as defined below) and related adequate protection obligations, in each case, over First Lien Term Loan Collateral (as defined below) as described herein);

(a)     to the DIP Agent, superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, against (1) each of Ditech Financial and RMS to secure such Debtors' DIP Obligations on a joint and several basis, and (2) Ditech to secure its DIP Obligations under the DIP Guaranty and the other DIP Documents to which it is a party;

(b)     to the DIP Agent, on behalf of the DIP Forward Repo Facility Parties, (1) a "backup" first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP Forward Repo Facility Backup Collateral (as defined below), and (2) a "backup" second-priority lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on the DIP Reverse Repo Facility Backup Collateral (as defined below), in each case, to secure the obligations of Ditech Financial under the DIP Forward Repo Facility Documents;

(c)     to the DIP Agent, on behalf of the DIP Reverse Repo Facility Parties, (1) a "backup"' first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP Reverse Repo Facility Backup Collateral (as defined below), and (2) a "backup" second-priority lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on the DIP Forward Repo Facility Backup Collateral, in each case, to secure the obligations of RMS under the DIP Reverse Repo Facility Documents;

(d)     to the DIP MSFTA Counterparties, (1) a first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP MSFTA Collateral (as defined below) to secure the obligations of Ditech Financial under the DIP MSFTAs, and (2) superpriority claims pursuant to sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code against Ditech Financial to secure the obligations of Ditech Financial under the DIP MSFTAs; and

(e)     to the DIP Agent, on behalf of the DIP Netting Parties, a first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP Netting Collateral (as defined below) to secure the obligations of Ditech, Ditech Financial and RMS, as applicable, under the DIP Netting Agreement;

(v)    authorizing Ditech Financial, pursuant to sections 105(a), 363(b) and 364(c)(2) of the Bankruptcy Code, to grant a first-priority lien and security interest on the equity interests of the Depositors, any distributions on account of such equity interests, and all other rights to payment that Ditech Financial has with respect to the Depositors (collectively, the "**Securitization Entities Collateral**"), to the DIP Agent, for the benefit of the DIP Netting Parties, to secure Ditech Financial's obligations under the DIP Forward Repo Facility Documents, the obligations of RMS and the DIP REO Subsidiary under the DIP Reverse Repo Facility Documents and all other DIP Obligations (other than obligations under any of the DIP Servicer Advance Facility Documents);

(vi)    authorizing the Debtors, pursuant to sections 361, 362 and 363 of the Bankruptcy Code:

    (a)    to use Prepetition 1L/2L Collateral (as defined below) of the Debtors, including Cash Collateral (as defined below), pursuant to sections 362 and 363 of the Bankruptcy Code, in accordance with the terms of this Interim Order;

    (b)    to use National Founders Facility Prepetition Collateral (as defined below) of the Debtors, including Cash Collateral (as defined below), pursuant to sections 362 and 363 of the Bankruptcy Code, in accordance with the terms of this Interim Order; and

    (c)    to provide adequate protection, pursuant to section 361 of the Bankruptcy Code, subject to the Carve-Out and the priorities identified herein, to:

        (1)    Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacities, collectively, the "**First Lien Term Loan Agent**") on behalf of the holders (in such capacities, the "**First Lien Term Loan Lenders**" and, together with the First Lien Term Loan Agent, the "**First Lien Term Loan Parties**") of loans (the "**First Lien Term Loans**") made under that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**First Lien Term Loan Credit Agreement**" and, together with all instruments, agreements and documents related thereto, the "**First Lien Term Loan Credit Documents**");

        (2)    Wilmington Savings Fund Society, FSB, as indenture trustee (the "**Second Lien Notes Indenture Trustee**"), on behalf of the holders (in such capacities, the "**Second Lien Noteholders**" and, together with the Second Lien Notes Indenture Trustee, the "**Second Lien Notes Parties**" and, collectively with the First Lien Term Loan Parties, the "**Prepetition 1L/2L Parties**") of those certain second lien notes (the "**Second Lien Notes**") issued under that certain

Indenture, dated as of February 9, 2018 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Second Lien Notes Indenture**" and, together with all instruments, agreements and documents related thereto, the "**Second Lien Notes Documents**" and, collectively with the First Lien Term Loan Documents, the "**Prepetition 1L/2L Documents**"); and

(3)   the National Founders Facility Parties (as defined below).

(vii)   upon entry of the Final Order, with respect to the DIP Obligations, the DIP Liens (as defined below), the DIP Collateral (as defined below), the Adequate Protection Liens (as defined below), the Adequate Protection Collateral (as defined below), the First Lien Term Loan Obligations (as defined below), the First Lien Term Loan Security Interests (as defined below), the First Lien Term Loan Collateral (as defined below), the National Founders Facility Obligations (as defined below), and the National Founders Facility Collateral (as defined below) as applicable, granting waivers of:

(a)   any Debtors' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(b)   the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code; and

(c)   the equitable doctrine of marshaling or similar doctrines;

(viii)   authorizing modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(ix)   requesting an interim hearing to authorize entry of this Interim Order;

(x)   requesting a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order; and

(xi)   scheduling a final hearing with respect to the Motion (the "**Final Hearing**").

The Interim Hearing having been held before the Bankruptcy Court on February 13, 2019, pursuant to Rules 2002, 4001(b)(2), 6004, 9014 and, to the extent applicable, 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rule 4001-2 of the Bankruptcy Rules for the Southern District of New York (the "**Local**

**Bankruptcy Rules**"); and upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor:

**THE BANKRUPTCY COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[9]

A.     *Petition Date*.   On February 11, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

B.     *Joint Administration*.   On the February 13, 2019, the Bankruptcy Court entered an order approving the joint administration of the Chapter 11 Cases.

C.     *Debtors in Possession*.   The Debtors are continuing in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

D.     *Official Committees*.   No trustee or examiner or official committee of unsecured creditors (a "**Creditors' Committee**") or any other statutory committee has been appointed in these Chapter 11 Cases as of the date of this Interim Order.

E.     *Jurisdiction and Venue*.   The Bankruptcy Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b) and 1334.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   The Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.   Venue for the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.   The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 559, 560 and 561 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Rule 4001-2 of the Local Bankruptcy Rules.

---

[9]     The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

**F.**    *Notice*.    Adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other further notice of the Motion or the entry of this Interim Order shall be required, except as set forth in Paragraph 65 of this Interim Order.

**G.**    ***Debtors' Stipulations:    Prepetition Warehouse Parties, the Prepetition Warehouse Liens, the Prepetition Warehouse Collateral, and the Prepetition Warehouse Obligations.***    After consultation with their attorneys and financial advisors, the Debtors, on their behalf and on behalf of their estates, admit, acknowledge, agree, and stipulate to the following, subject to the provisions of Paragraph 47 of this Interim Order:

    a.    ***Prepetition Forward Repo Facility and Related Matters.***

    (i)    <u>Prepetition Forward Repo Facility</u>.    As of the Petition Date, Ditech Financial was party to that certain Amended and Restated Master Repurchase Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**<u>Prepetition Forward Repo Master Repurchase Agreement</u>**"), dated as of November 18, 2016, by and among Ditech Financial, as seller, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent (the "**<u>Prepetition Forward Repo Facility Agent</u>**"), and the buyers party thereto (the "**<u>Prepetition Forward Repo Facility Purchasers</u>**," and such facility, the "**<u>Prepetition Forward Repo Facility</u>**").[10]

    (ii)    <u>Prepetition Forward Repo Facility Transactions</u>. Pursuant to the Prepetition Forward Repo Facility, (A) Ditech Financial originated forward mortgage loans, (B) Ditech Financial transferred and sold such mortgage loans to the Prepetition Forward Repo Facility

---

[10]    For purposes herein, the "**<u>Prepetition Forward Repo Facility Parties</u>**" means (a) the Prepetition Forward Repo Facility Agent and (b) the Prepetition Forward Repo Facility Purchasers, in each case, in their respective capacities as such.

Parties against the transfer of funds by the Prepetition Forward Repo Facility Parties to Ditech Financial (which funds were used by Ditech Financial to fund the mortgage loans), (C) the Prepetition Forward Repo Facility Parties, simultaneously with the transfer and sale described in the preceding clause (B), agreed to transfer the mortgage loans back to Ditech Financial against the transfer of funds by Ditech Financial to the Prepetition Forward Repo Facility Parties, and (D) following Ditech Financial's repurchase of mortgage loans from the Prepetition Forward Repo Facility Parties as described in the preceding clause (C), Ditech Financial sold the repurchased mortgage loans into GSE-sponsored mortgage securitizations (using the proceeds from such securitizations to fund the repurchases from the Prepetition Forward Repo Facility Parties).

(iii)    <u>Prepetition Forward Repo Facility Obligations</u>.  As of the Petition Date, the amount of the outstanding repurchase obligations under the Prepetition Forward Repo Facility was no less than approximately $231,394,016.81 (together with all "Obligations" as such term is defined in the Prepetition Forward Repo Facility, and all other amounts that may become allowed or allowable under section 506(b) of the Bankruptcy Code, including interest, fees, premiums, costs and other charges, the "**<u>Prepetition Forward Repo Facility Obligations</u>**").

(iv)    <u>Prepetition Forward Repo Facility Backup Liens and Prepetition Forward Repo Facility Backup Collateral</u>.[11]  Pursuant to the Prepetition Forward Repo Master Repurchase Agreement, the parties thereto acknowledge that, although the parties intend that all Transactions thereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, and in any event, Ditech Financial pledged to the Prepetition Forward Repo Facility Agent as security for the performance by Ditech Financial of its Obligations, and

---

[11]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the Prepetition Forward Repo Master Repurchase Agreement.

granted, assigned, and pledged to the Prepetition Forward Repo Facility Agent, a fully-perfected, first-priority lien and security interest (collectively, the "**Prepetition Forward Repo Facility Backup Liens**") in:

(A)    the Purchased Mortgage Loans, any Agency Security or right to receive such Agency Security when issued to the extent backed by any of the Purchased Mortgage Loans, the Records, and all related Servicing Rights, the Program Agreements (to the extent such Program Agreements and Ditech Financial's right thereunder relate to the Purchased Mortgage Loans), any related Take-out Commitments, any Property relating to the Purchased Mortgage Loans, all insurance policies and insurance proceeds relating to any Purchased Mortgage Loan or the related Mortgaged Property, including but not limited to, any payments or proceeds under any related primary insurance, hazard insurance and FHA Mortgage Insurance Contracts and VA Loan Guaranty Agreements (if any), Income, the Collection Account, Interest Rate Protection Agreements, accounts (including any interest of Ditech Financial in escrow accounts) and any other contract rights (other than those rights retained by Fannie Mae (as defined below) pursuant to the Fannie Mae Lender Contracts (as defined below), Freddie Mac (as defined below) under any applicable agreements, instruments, accounts, payments, rights to payment (including payments of interest or finance charges), general intangibles and other assets, in each case, relating to the Purchased Mortgage Loans (including, without limitation, any other accounts) or any interest in the Purchased Mortgage Loans, and any proceeds (including the related securitization proceeds) and distributions with respect to any of the foregoing and any other property, rights, title or interests as are specified on a Transaction Request and/or Trust Receipt, in all instances, whether now owned or hereafter acquired, now existing or hereafter created, and

(B)    in the event that Ditech Financial is deemed to retain any residual Servicing Rights, the Servicing Rights and proceeds related thereto and in all instances, whether now owned or hereafter acquired, now existing or hereafter created (the foregoing (A) and (B) together, the "**Prepetition Forward Repo Facility Backup Collateral**").

(v)    <u>Validity, Perfection, and Priority of Prepetition Forward Repo Facility Backup Liens and Prepetition Forward Repo Facility Obligations</u>.  The Debtors hereby further acknowledge and agree that as of the Petition Date:

(A)    The Prepetition Forward Repo Facility Obligations constitute legal, valid, binding, and non-avoidable obligations of Ditech Financial enforceable in accordance with the terms of the Prepetition Forward Repo Master Repurchase Agreement;

(B)    The Prepetition Forward Repo Facility Backup Liens on the Prepetition Forward Repo Facility Backup Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the Prepetition Forward Repo Facility Agent, for the benefit of itself and the Prepetition Forward Repo Facility Purchasers for fair consideration and reasonably equivalent value;

(C)    The Prepetition Forward Repo Facility Backup Liens are senior in priority over any and all other liens on the Prepetition Forward Repo Facility Backup Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under the Prepetition Forward Repo Master Repurchase Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Forward Repo Facility Backup Liens as of the Petition Date) (the "**Permitted Prior Forward Facility Repo Liens**");

(D)    No portion of the Prepetition Forward Repo Facility Backup Liens, the Prepetition Forward Repo Facility Obligations or any payments made to the Prepetition Forward Repo Facility Agent or the Prepetition Forward Repo Facility Purchasers or applied to or paid on account of the Prepetition Forward Repo Facility Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any

other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)    The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any claims and causes of action arising under sections 502(d), 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (the "**Avoidance Actions**"), against any of the Prepetition Forward Repo Facility Agent or the Prepetition Forward Repo Facility Purchasers or any of their officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (the "**Representatives**");

(F)    The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Forward Repo Facility Obligations or the validity, extent and priority of the Prepetition Forward Repo Facility Backup Liens;

(G)    The Prepetition Forward Repo Facility Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(H)    The Debtors are in default of their obligations under the Prepetition Forward Repo Master Repurchase Agreement, including as a result of the Chapter 11 Cases, and one or more Events of Default (as defined in the Prepetition Forward Repo Master Repurchase Agreement) has occurred and is continuing.

b.    ***Prepetition Reverse Repo Facilities and Related Matters.***

(i)    <u>Prepetition Reverse Repo Facilities</u>. As of the Petition Date, RMS was party to that certain (A) Master Repurchase Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Bilateral Reverse Repo Master Repurchase Agreement**"), dated as of April 23, 2018, between RMS, as seller, and Barclays Bank PLC, as purchaser and agent (in such capacities, respectively, the "**Prepetition Bilateral Reverse Repo Facility Purchaser**" and the

"**Prepetition Bilateral Reverse Repo Facility Agent**") (such facility, the "**Prepetition Bilateral Reverse Repo Facility**"), and (B) the Second Amended and Restated Master Repurchase Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Exit Reverse Repo Master Repurchase Agreement**" and, together with the Prepetition Bilateral Reverse Repo Master Repurchase Agreement, the "**Prepetition Reverse Repo Master Repurchase Agreements**," and, together with the Prepetition Forward Repo Master Repurchase Agreements, the "**Prepetition Repo Master Repurchase Agreements**"), dated as of November 30, 2017, by and among RMS, as seller, RMS REO CS, LLC, RMS REO BRC, LLC (together with RMS REO CS, LLC, the "**CS REO Subsidiaries**"), as the seller parties party thereto, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent (in such capacity, the "**Prepetition Exit Reverse Repo Facility Agent**" and, together with the Prepetition Bilateral Reverse Repo Facility Agent, the "**Prepetition Reverse Repo Facility Agents**"), and the buyers party thereto (the "**Prepetition Exit Reverse Repo Facility Purchasers**" and, together with the Prepetition Bilateral Reverse Repo Facility Purchaser, the "**Prepetition Reverse Repo Facility Purchasers**") (such facility, the "**Prepetition Exit Reverse Repo Facility**" and, together with the Prepetition Bilateral Reverse Repo Facility, the "**Prepetition Reverse Repo Facilities**" and, together with the Prepetition Forward Repo Facility, the "**Prepetition Repo Facilities**").[12]

(ii)    Prepetition Reverse Repo Facilities Transactions.  Pursuant to the Prepetition Reverse Repo Facilities, (A) RMS originated reverse mortgage loans, (B) RMS

---

[12]    For purposes herein, the "**Prepetition Reverse Repo Facility Parties**" means (a) the Prepetition Reverse Repo Facility Agents and (b) the Prepetition Reverse Repo Facility Purchasers, in each case, in their respective capacities as such.

For purposes herein, the "**Prepetition Repo Facilities Parties**" means (a) the Prepetition Forward Repo Facilities Parties and (b) the Prepetition Reverse Repo Facilities Parties, in each case, in their respective capacities as such.

transferred and sold such mortgage loans to the Prepetition Reverse Repo Facility Parties against the transfer of funds by the Prepetition Reverse Repo Facility Parties to RMS (which funds were used by RMS to fund the mortgage loans), (C) the Prepetition Reverse Repo Facility Parties, simultaneously with the transfer and sale described in the preceding clause (B), agreed to transfer the mortgage loans back to RMS against the transfer of funds by RMS to the Prepetition Reverse Repo Facility Parties, and (D) following RMS's repurchase of mortgage loans from the Prepetition Reverse Repo Facility Parties as described in the preceding clause (C), RMS either sold the repurchased mortgage loans into GSE-sponsored mortgage securitizations (using the proceeds from such securitizations to fund the repurchases from the Prepetition Reverse Repo Facility Parties) or submitted claims to the Federal Housing Administration and United States Department of Veteran Affairs (the "**VA**") (using the proceeds thereof to fund repurchases from the Prepetition Reverse Repo Facility Parties).

(iii)    _Prepetition Reverse Repo Facility Obligations_. As of the Petition Date, the amount of the outstanding repurchase obligations under (A) the Prepetition Bilateral Reverse Repo Facility was no less than approximately $342,079,981.82 (together with all "Obligations" as such term is defined in the Prepetition Bilateral Reverse Repo Facility, and all other amounts that may become allowed or allowable under section 506(b) of the Bankruptcy Code, including interest, fees, premiums, costs and other charges, the "**Prepetition Bilateral Reverse Repo Facility Obligations**") and (B) the Prepetition Exit Reverse Repo Facility was no less than approximately $370,936,294.43 (together with all "Obligations" as such term is defined in the Prepetition Exit Reverse Repo Facility, and all other amounts that may become allowed or allowable under section 506(b) of the Bankruptcy Code, including interest, fees, premiums, costs and other charges, the "**Prepetition Exit Reverse Repo Facility Obligations**" and, together with

the Prepetition Bilateral Reverse Repo Facility Obligations, the "**Prepetition Reverse Repo Facility Obligations**").

(iv)    Prepetition Bilateral Reverse Repo Facility Backup Liens and Prepetition Bilateral Reverse Repo Facility Backup Collateral.[13]   Pursuant to the Prepetition Bilateral Reverse Repo Master Repurchase Agreement, the parties thereto acknowledge that, although the parties intend that (other than for tax and accounting purposes) all Transactions thereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, and in any event, RMS pledged to the Prepetition Bilateral Reverse Repo Facility Agent as security for the performance by RMS of its Obligations and granted, assigned, and pledged to the Prepetition Bilateral Reverse Repo Facility Agent a fully-perfected, first-priority security interest (collectively, the "**Prepetition Bilateral Reverse Repo Facility Backup Liens**") in:

(A)    each Eligible Mortgage Loan subject to a Transaction and the REO Asset and

(B)    (1) the Mortgage Loans subject to a Transaction, (2) the Servicing Rights related to the Mortgage Loans subject to a Transaction, (3) RMS's rights under any related Hedge Instruments to the extent related to the Mortgage Loans subject to a Transaction, (4) such other Property, rights, titles or interest as are specified on the related Seller Mortgage Loan Schedule that are related to the Mortgage Loans subject to a Transaction, (5) rights to payment under all mortgage guarantees and insurance relating to the individual Mortgage Loans subject to a Transaction (issued by governmental agencies or otherwise) or the related Mortgaged Property and any mortgage insurance certificate or other document evidencing such mortgage guarantees or insurance and all claims and payments related to the Mortgage Loans subject to a Transaction, (6) all guarantees or other support for the Mortgage Loans subject to a Transaction, and  (7) all rights to Income (including all sale proceeds and all other proceeds as defined in Section 9-102(a)(64) of the Uniform

---

[13]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the Prepetition Bilateral Reverse Repo Master Repurchase Agreement.

Commercial Code and all other collections and distributions thereon (including, without limitation, any proceeds received in respect of mortgage insurance)) and the rights to enforce such payments arising from the Mortgage Loans subject to a Transaction and any other contract rights (other than those rights retained by Fannie Mae pursuant to the Fannie Mae Lender Contracts), payments, rights to payment (including payments of interest or finance charges) with respect thereto and all rights to proceeds as defined in Section 9-102(a)(64) of the Uniform Commercial Code, and

(C)    (1) the REO Asset and the REO Property File with respect to any REO Property held by RMS or REO Subsidiary, as applicable, (2) the Collection Account and all amounts on deposit therein, (3) all Additional Purchased Mortgage Loans, (4) all "accounts," "deposit accounts," "securities accounts," "chattel paper," "deposit accounts," "documents," "general intangibles," "instruments," "investment property," and "securities accounts," relating to the foregoing as each of those terms is defined in the Uniform Commercial Code and all cash and Cash Equivalents and all other products and proceeds relating to or constituting any or all of the foregoing, (5) any purchase agreements or other agreements or contracts relating to or constituting any or all of the foregoing, (6) any other collateral pledged or otherwise relating to any or all of the foregoing, together with all files, material documents, instruments, surveys (if available), certificates, correspondence, appraisals, computer records, computer storage media, accounting records and other books and records relating to the foregoing, (7) any rights retained by RMS in any Mortgage Loans that it transfers to the REO Subsidiary and (8) any and all replacements, substitutions, distributions on, or proceeds with respect to, any of the foregoing, and Additional Purchased Mortgage Loans delivered pursuant to Section 7(b) of the Prepetition Bilateral Reverse Repo Master Repurchase Agreement (the foregoing (A) through (C), collectively, the "**Prepetition Bilateral Reverse Repo Facility Backup Collateral**").

(v)    Prepetition Exit Reverse Repo Facility Backup Liens and Prepetition Exit Reverse Repo Facility Backup Collateral.[14]    Pursuant to the Prepetition Exit

---

[14]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the Prepetition Exit Reverse Repo Master Repurchase Agreement.

Reverse Repo Master Repurchase Agreement, the parties thereto acknowledge that, although the parties intend that all Transactions thereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, and in any event, RMS (with respect to following clause (A)) and each REO Subsidiary (with respect to following clause (B)) pledged to the Prepetition Exit Reverse Repo Facility Agent as security for the performance by RMS of its Obligations and granted, assigned, and pledged to the Prepetition Exit Reverse Repo Facility Agent a fully-perfected, first-priority security interest (collectively, the "**Prepetition Exit Reverse Repo Facility Backup Liens**" and, together with the Prepetition Bilateral Reverse Repo Facility Backup Liens, the "**Prepetition Reverse Repo Facility Backup Liens**") in:

(A)     the Purchased Assets (including, without limitation, all Scheduled HECM Payments, all Unscheduled HECM Payments and all MIP Payments), including related Servicing Rights, Servicer Advances payable by HUD and/or VA, all debenture interest payable by HUD on account of any HECM Buyout, and Asset Documents, the beneficial interest in the Contributed REO Property, any Agency Security or right to receive such Agency Security when issued to the extent backed by any of the Purchased Assets and Contributed REO Property, the Records, the Program Agreements (to the extent such Program Agreements and RMS's right thereunder relate to the Purchased Assets or Contributed REO Property), any related Take-out Commitments, any Property relating to any Purchased Assets or Contributed REO Property, all insurance policies and insurance proceeds relating to any Purchased Asset, Contributed REO Property or the related Mortgaged Property, including, but not limited to, any payments or proceeds under any related primary insurance, hazard insurance and FHA Mortgage Insurance Contracts and VA Loan Guaranty Agreements (if any), Income, Interest Rate Protection Agreements, accounts (including any interest of RMS in escrow accounts) and any other contract rights (other than those rights retained by GNMA pursuant to the GNMA Guide and Fannie Mae pursuant to the Fannie Mae Lender Contracts), instruments, accounts, payments, rights to payment (including payments of interest or finance charges), general intangibles related to the

Purchased Assets, and other assets, in each case, relating to the Purchased Assets or Contributed REO Property (including, without limitation, any other accounts) or any interest in the Purchased Assets or Contributed REO Property, and any proceeds (including the related securitization proceeds) and distributions with respect to any of the foregoing and any other property, rights, title or interests as are specified on a Transaction Request and/or Trust Receipt and/or delivered to the Prepetition Exit Reverse Repo Facility Agent pursuant to a Transaction, in all instances, whether now owned or hereafter acquired, now existing or hereafter created, and,

(B)     the REO Properties, all related Servicing Rights, Asset Documents, the Records, the Program Agreements (to the extent such Program Agreements and each REO Subsidiary's rights thereunder relate to the REO Properties), any related Take-Out Commitments, any Property relating to the REO Properties, all insurance policies and insurance proceeds relating to any REO Property, as applicable, including, but not limited to, any payments or proceeds under any related primary insurance, hazard insurance and FHA Mortgage Insurance Contracts and VA Loan Guaranty Agreements (if any), Income, Interest Rate Protection Agreements, accounts (including any interest of each REO Subsidiary in escrow accounts) and any other contract rights (other than those rights retained by GNMA pursuant to the GNMA Guide and Fannie Mae pursuant to the Fannie Mae Lender Contracts), instruments, accounts, payments, rights to payment (including payments of interest or finance charges), general intangibles and other assets relating to the REO Properties (including, without limitation, any other accounts) or any interest in the REO Properties, and any proceeds (including the related securitization proceeds) and distributions with respect to any of the foregoing and any other property, rights, title or interests as are specified on a Transaction Request and/or Trust Receipt and/or delivered to the Prepetition Exit Reverse Repo Facility Agent pursuant to a Transaction, in all instances, whether now owned or hereafter acquired, now existing or hereafter created (the  foregoing (A) and (B), together, the "**Prepetition Exit Reverse Repo Facility Backup Collateral**," and, together with the Prepetition Bilateral Reverse Repo Facility Backup Collateral, the "**Prepetition Reverse Repo Facility Backup Collateral**" and, together with the Prepetition Forward Repo Facility Backup Collateral, the "**Prepetition Repo Facility Backup Collateral**").

   (vi) <u>Validity, Perfection, and Priority of Prepetition Reverse Repo</u>

<u>Facility Backup Liens and Prepetition Reverse Repo Facility Obligations</u>.  The Debtors hereby

further acknowledge and agree that as of the Petition Date:

   (A) The Prepetition Reverse Repo Facility Obligations constitute legal, valid, binding, and non-avoidable obligations of RMS enforceable in accordance with the terms of the applicable Prepetition Reverse Repo Master Repurchase Agreement;

   (B) The Prepetition Reverse Repo Facility Backup Liens on the Prepetition Reverse Repo Facility Backup Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the Prepetition Reverse Repo Facility Agents, for the benefit of themselves and the Prepetition Reverse Repo Facility Purchasers, for fair consideration and reasonably equivalent value;

   (C) The Prepetition Reverse Repo Facility Backup Liens are senior in priority over any and all other liens on the Prepetition Reverse Repo Facility Backup Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under each of the Prepetition Reverse Repo Master Repurchase Agreements (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Reverse Repo Facility Backup Liens as of the Petition Date) (the "**Permitted Prior Reverse Repo Facility Liens**");

   (D) No portion of the Prepetition Reverse Repo Facility Backup Liens, the Prepetition Reverse Repo Facility Obligations or any payments made to any of the Prepetition Reverse Repo Facility Agents or the Prepetition Reverse Repo Facility Purchasers or applied to or paid on account of the Prepetition Reverse Repo Facility Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)     The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the Prepetition Reverse Repo Facility Agents or the Prepetition Reverse Repo Facility Purchasers or any of their respective Representatives;

(F)     The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Reverse Repo Facility Obligations or the validity, extent and priority of the Prepetition Reverse Repo Facility Backup Liens;

(G)     The Prepetition Reverse Repo Facility Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(H)     The Debtors have been and are in default of their obligations under the Prepetition Reverse Repo Master Repurchase Agreements, including as a result of the Chapter 11 Cases, and an Event of Default (as defined in the Prepetition Forward Repo Master Repurchase Agreements) has occurred and is continuing.

c.      *Prepetition Servicer Advance Facilities and Related Matters*.

(i)     <u>Prepetition Servicer Advance Facilities</u>.  As of the Petition Date, Ditech Financial was party to:

(A)     that certain Indenture (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**<u>Prepetition Servicer Advance Agency Facility Indenture</u>**" and, the facility thereunder, the "**<u>Prepetition Servicer Advance Agency Facility</u>**") dated as of February 9, 2018, and effective as of February 12, 2018, among Non-Debtor SPV Agency Issuer, as issuer of Series 2018-VF1 Advance Receivables Backed Notes (the "**<u>Prepetition Servicer Advance Agency Facility VFNs</u>**"), Wells Fargo, as indenture trustee, calculation agent, paying agent and securities intermediary (in such capacities, the "**<u>Prepetition Servicer Advance Agency Facility Indenture Trustee</u>**"), Ditech Financial, as servicer and administrator, and Credit Suisse, as administrative agent (the "**<u>Prepetition Servicer Advance Agency Facility Agent</u>**"); and

(B)    that certain Indenture (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Servicer Advance PLS Facility Indenture**" and, together with the Prepetition Servicer Advance Agency Facility Indenture, the "**Prepetition Servicer Advance Facility Indentures**;" and, the facility thereunder, the "**Prepetition Servicer Advance PLS Facility**" and, together with the Prepetition Servicer Advance Agency Facility, the "**Prepetition Servicer Advance Facilities**"), dated as of February 9, 2018, and effective as of February 12, 2018, among Non-Debtor SPV PLS Issuer, as issuer, of Series 2018-VF1 Advance Receivables Backed Notes (the "**Prepetition Servicer Advance PLS Facility VFNs**" and, together with the Prepetition Servicer Advance Agency Facility VFNs, the "**Prepetition Servicer Advance Facility VFNs**"), Wells Fargo, as indenture trustee, calculation agent, paying agent and securities intermediary (in such capacities, the "**Prepetition Servicer Advance PLS Facility Indenture Trustee**" and, together with the Prepetition Servicer Advance Agency Facility Indenture Trustee, the "**Prepetition Servicer Advance Facility Indenture Trustees**"), Ditech Financial, as servicer and administrator, and Credit Suisse, as administrative agent (the "**Prepetition Servicer Advance PLS Facility Agent**" and, together with the Prepetition Servicer Advance Agency Facility Agent, the "**Prepetition Servicer Advance Facility Agents**").[15]

(ii)    Prepetition Servicer Advance Facilities Transactions.  Pursuant to the Prepetition Servicer Advance Facilities, Ditech Financial accessed liquidity through the sale of its rights to collect repayment of servicer advances to the Depositors, which in turn sold them to the Non-Debtor SPV Issuers.  The Non-Debtor SPV Issuers issued the Prepetition Servicer Advance Facility VFNs to investors (collectively, the "**Prepetition Servicer Advance Facility VFN Noteholders**"), the obligations under which were secured by the Servicer Advance receivables transferred by Ditech Financial.

---

[15]    For purposes herein, the "**Prepetition Servicer Advance Facility Parties**" means (a) the Prepetition Servicer Advance Facility Indenture Trustees, (b) the Prepetition Servicer Advance Facility Agents, and (c) the Prepetition Servicer Advance Facility VFN Noteholders, in each case, in their respective capacities as such.

(iii)    _Prepetition Servicer Advance Facility Obligations_. As of the Petition Date, (A) an aggregate amount of no less than approximately $132,263,093.09 was outstanding under the Prepetition Servicer Advance Agency Facility (together with all other debts and amounts owed thereunder, including interest, fees, premiums, costs and other charges, the "**Prepetition Servicer Advance Agency Facility Obligations**"), and (B) an aggregate amount of no less than approximately $77,147,790.24 was outstanding under the Prepetition Servicer Advance PLS Facility (together with all other debts and amounts owed thereunder, including interest, fees, premiums, costs and other charges, the "**Prepetition Servicer Advance PLS Facility Obligations**" and, together with the Prepetition Servicer Advance Agency Facility Obligations, the "**Prepetition Servicer Advance Facility Obligations**").

(iv)    _Prepetition Servicer Advance Facility Liens and Prepetition Servicer Advance Facility Collateral_.[16]  Pursuant to the Prepetition Servicer Advance Facilities, the Non-Debtor SPV Issuers granted to the Prepetition Servicer Advance Facility Indenture Trustees for the benefit and security of the Prepetition Servicer Advance Facility VFN Noteholders, among other parties, a fully-perfected first-priority security interest (collectively, the "**Prepetition Servicer Advance Facility Liens**") in all of such issuers' right, title and interest in and to the following, whether then owned or thereafter acquired and wheresoever located, and all monies, securities, instruments, accounts, general intangibles, payment intangibles, goods, letter of credit rights, chattel paper, financial assets, investment property and other property consisting of, arising from or relating to any of the following (collectively, the "**Prepetition Servicer Advance Facility Collateral**"), subject to and subordinate in all respects to all rights, powers, and

---

[16]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the applicable Prepetition Servicer Advance Facility Indenture.

prerogatives of (a) Fannie Mae under and in connection with the Fannie Mae Lender Contracts

and (b) Freddie Mac under any applicable agreements:

(A)    all right, title and interest of each Prepetition Servicer Advance Facility Issuer (A) existing as of the Cut-off Date in, to and under the Initial Receivables, and (B) in, to and under any Additional Receivables, and (C) in the case of both Initial Receivables and Additional Receivables, all monies due or to become due thereon, and all amounts received or receivable with respect thereto, and all proceeds thereof (including "proceeds" as defined in the UCC in effect in all relevant jurisdictions (including, without limitation, any proceeds of any Sales)), together with all rights of the Issuer, as the assignee of the Receivables Seller, to enforce such Receivables (and including any Indemnity Payments made with respect to the Receivables for which a payment is made by the Issuer, the Depositor or the Receivables Seller as described in Section 2.3 of the Prepetition Servicer Advance Facility Indentures);

(B)    all rights of each Prepetition Servicer Advance Facility Issuer as purchaser under the Receivables Pooling Agreement and of the Receivables Seller's rights under the Receivables Sale Agreement, including, without limitation, the Issuer's rights as assignee of the Depositor's rights under the Receivables Sale Agreement, including, without limitation, the right to enforce the obligations of the Receivables Seller and the Servicer under the Receivables Sale Agreement with respect to the Receivables;

(C)    the Trust Accounts, and all amounts and property on deposit or credited to the Trust Accounts (excluding investment earnings thereon) from time to time (whether or not constituting or derived from payments, collections or recoveries received, made or realized in respect of the Receivables);

(D)    all rights of each Prepetition Servicer Advance Facility Issuer under any Derivative Agreement or Supplemental Credit Enhancement Agreement;

(E)    all right, title and interest of each Prepetition Servicer Advance Facility Issuer as assignee of the Depositor, the Receivables Seller and the Servicer to rights to payment on the Receivables with respect to each Designated Pool under

each related Designated Servicing Agreement on the related Sale Dates of the Receivables, and under all related documents, instruments and agreements pursuant to which the Receivables Seller acquired, or acquired an interest in, any of the Receivables;

(F)    all other monies, securities, reserves and other property now or at any time in the possession of the Indenture Trustee or its bailee, agent or custodian and relating to any of the foregoing; and

(G)    all present and future claims, demands, causes and choses in action in respect of any and all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any and all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

d.    ***Prepetition MSFTAs and Related Matters.***

(i)    <u>Prepetition MSFTAs</u>.  As of the Petition Date, Ditech Financial was party to (A) that certain Master Securities Forward Transaction Agreement, dated as of May 18, 2017 (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**<u>Prepetition Barclays MSFTA</u>**"), between Ditech Financial and Barclays Capital (in such capacity, the "**<u>Prepetition Barclays MSFTA Counterparty</u>**") and (B) that certain Master Securities Forward Transaction Agreement, dated as of May 20, 2013 (as the same was amended on July 11, 2017 and as may be further amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**<u>Prepetition Nomura MSFTA</u>**" and, together with the Prepetition Barclays MSFTA, the "**<u>Prepetition MSFTAs</u>**") between Ditech Financial and Nomura Securities (in such capacity, the

"**Prepetition Nomura MSFTA Counterparty**" and, together with the Prepetition Barclays MSFTA Counterparty, the "**Prepetition MSFTA Counterparties**"), pursuant to which, from time to time, Ditech Financial and the Prepetition MSFTA Counterparties entered into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may have determined, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions that result or may result in the delayed delivery of securities. Such transactions were subject to netting and setoff rights as set forth in the Prepetition MSFTAs.

(ii)     <u>Prepetition MSFTA Obligations</u>. As of the Petition Date, the amount of the outstanding obligations under (A) the Prepetition Barclays MSFTA was no less than approximately $1,216,723 (the "**Prepetition Barclays MSFTA Obligations**") and (B) the Prepetition Nomura MSFTA was no less than approximately $1,250,000 (the "**Prepetition Nomura MSFTA Obligations**" and, together with the Prepetition Barclays MSFTA Obligations, the "**Prepetition MSFTA Obligations**").

(iii)     <u>Prepetition MSFTA Liens and Prepetition MSFTA Collateral</u>.[17] Pursuant to each Prepetition MSFTA, any Prepetition MSFTA Party that becomes obligated to provide Forward Collateral (as defined therein) pursuant to the terms of such Prepetition MSFTA agreed to pledge to the other Prepetition MSFTA Party a continuing first-priority lien and security interest (collectively, the "**Prepetition MSFTA Liens**") in and right of setoff against all Forward Collateral and all securities, money and other property, then or thereafter delivered by or on behalf of the pledging Prepetition MSFTA Party under such Prepetition MSFTA to or for the benefit of

---

[17]   Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the Prepetition MSFTAs.

the pledgee Prepetition MSFTA Party in connection with such Prepetition MSFTA or any

Transaction (as defined therein), or then or thereafter held or carried by or on behalf of such

pledgee Prepetition MSFTA Party in connection with such Prepetition MSFTA or any Transaction,

and all proceeds of any of the foregoing (collectively, the "**Prepetition MSFTA Collateral**").

      (iv)    <u>Validity, Perfection, and Priority of Prepetition MSFTA Liens and
Prepetition MSFTA Obligations</u>.  The Debtors hereby further acknowledge and agree that as of

the Petition Date:

    (A)    The Prepetition MSFTA Obligations constitute legal, valid, binding, and non-avoidable obligations of Ditech Financial enforceable in accordance with the terms of the applicable Prepetition MSFTA;

    (B)    The Prepetition MSFTA Liens on the Prepetition MSFTA Collateral for each Prepetition MSFTA are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the relevant Prepetition MSFTA Counterparty under such Prepetition MSFTA for fair consideration and reasonably equivalent value;

    (C)    The Prepetition MSFTA Liens are senior in priority over any and all other liens on the Prepetition MSFTA Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under the relevant Prepetition MSFTA (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition MSFTA Liens as of the Petition Date) (the "**Permitted Prior MSFTA Liens**");

    (D)    No portion of the Prepetition MSFTA Liens, the Prepetition MSFTA Obligations or any payments made to any Prepetition MSFTA Counterparty or applied to or paid on account of any Prepetition MSFTA Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any

other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)     The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any Prepetition MSFTA Counterparty or any of its respective Representatives;

(F)     The Debtors have waived, discharged, and released any right to challenge any of the Prepetition MSFTA Obligations or the validity, extent and priority of the Prepetition MSFTA Liens;

(G)     The Prepetition MSFTA Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(H)     The Debtors have been and are in default of their obligations under the Prepetition MSFTAs, including as a result of the Chapter 11 Cases, and an Event of Default (as defined in each Prepetition MSFTA) has occurred and is continuing.

e.      ***Prepetition Netting Agreement and Related Matters.***

(i)     <u>Prepetition Netting Agreement</u>.  As of the Petition Date, certain Debtors were party to that certain Margin, Setoff and Netting Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "**<u>Prepetition Netting Agreement</u>**"), dated as of November 30, 2017, by and among (A) Credit Suisse First Boston Mortgage Capital LLC (the "**<u>Prepetition Netting Agent</u>**" and, together with the Prepetition Forward Repo Facility Agent, the Prepetition Reverse Repo Facility Agents, the Prepetition Servicer Advance Facility Agent, and the Prepetition MSFTA Counterparties, the "**<u>Prepetition Warehouse Agents</u>**"), (B) Credit Suisse Securities (USA) LLC, (C) Credit Suisse AG, (D) Alpine Securitization Ltd (the parties listed in clauses (A)–(D), including their affiliates and related entities to the extent set forth in the Prepetition Netting Agreement, the "**<u>Prepetition CS Netting Buyers</u>**"), (E) Barclays Bank PLC, (F) Barclays Capital,

Inc. (the parties listed in clauses (E)–(F), including their affiliates and related entities to the extent set forth in the Prepetition Netting Agreement, the "**Prepetition Barclays Netting Buyers**" and, together with the Prepetition CS Netting Buyers, the "**Prepetition Netting Buyers**" and, together with the Prepetition Netting Agent, the "**Prepetition Netting Parties**"), (G) Ditech Financial (the "**Prepetition Netting Seller**"), (H) RMS, (I) Non-Debtor RMS REO BRC, LLC, and (J) Non-Debtor RMS REO CS, LLC, pursuant to which the Prepetition Netting Seller agreed to permit netting and grant setoff rights to each of the Prepetition Netting Buyers with respect to obligations or liabilities (the "**Prepetition Netting Obligations**" and, together with the Prepetition Forward Repo Facility Obligations, the Prepetition Reverse Repo Facility Obligations, the Prepetition Servicer Advance Facility Obligations, and the Prepetition MSFTA Obligations, the "**Prepetition Warehouse Obligations**") arising under various transactions, including transactions under the Prepetition Forward Repo Facility and Prepetition MSFTAs.

(ii)    Prepetition Netting Agreement Obligations. As of the Petition Date, the amount of the outstanding Prepetition Netting Obligations was equal to no less than the aggregate amount of the Prepetition Forward Repo Facility Obligations and the Prepetition MSFTA Obligations.

(iii)    Prepetition Netting Liens and Prepetition Netting Collateral.[18] Pursuant to the Prepetition Netting Agreement, the Prepetition Netting Seller pledged to the Prepetition Netting Agent, for the benefit of each Prepetition Netting Buyer, as security and margin for the payment and performance of all Obligations of the Prepetition Netting Seller to any Prepetition Netting Buyer, a security interest (collectively, the "**Prepetition Netting Liens**" and,

---

[18]    Capitalized terms used but not otherwise defined in this sub-clause shall have the meanings ascribed to such terms in the Prepetition Netting Agreement.

together with the Prepetition Forward Repo Facility Backup Liens, the Prepetition Reverse Repo Facility Backup Liens, the Prepetition Servicer Advance Facility Liens, and the Prepetition MSFTA Liens, the "**Prepetition Warehouse Liens**"), whether then owned or thereafter acquired, existing or thereafter created, but only to the extent constituting Excluded Collateral (as defined under the Credit Facilities Security Agreement):

    (A)    each Deposit Account, Securities Account or other trust or custodial account maintained for the Prepetition Netting Seller by or with any Prepetition Netting Buyer pursuant to a Governing Agreement;

    (B)    all property (including Security Entitlements) then or thereafter credited to or held in any such account or otherwise held, or carried by or through, or subject to the control of any Prepetition Netting Buyer or agent thereof in connection with a Governing Agreement whether fully paid or otherwise;

    (C)    all rights under the Governing Agreements, including, without limitation, all rights of the Prepetition Netting Seller in any obligation of any Prepetition Netting Buyer and all rights of the Prepetition Netting Seller in or to any Activity in connection with a Governing Agreement;

    (D)    all Accounts, Chattel Paper, Commodity Accounts, Commodity Contracts, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights and Securities held under or constituting collateral or security or related to or under any Governing Agreement; and

    (E)    all Proceeds of or distributions on any of the foregoing (the foregoing clauses (A) through (E), collectively, the "**Prepetition Netting Collateral**" and, together with the Prepetition Forward Repo Facility Backup Collateral, the Prepetition Reverse Repo Facility Backup Collateral, the Prepetition Servicer Advance Collateral, and the Prepetition MSFTA Collateral, the "**Prepetition Warehouse Collateral**").

    (iv)    <u>Validity, Perfection, and Priority of Prepetition Netting Liens and Prepetition Netting Obligations</u>.  The Debtors hereby further acknowledge and agree that as of the Petition Date:

(A)     The Prepetition Netting Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Netting Seller enforceable in accordance with the terms of the Prepetition Netting Agreement;

(B)     The Prepetition Netting Liens on the Prepetition Netting Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the Prepetition Netting Agent, for the benefit of itself and the Prepetition Netting Buyers, for fair consideration and reasonably equivalent value;

(C)     The Prepetition Netting Liens are senior in priority over any and all other liens on the Prepetition Netting Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under the Prepetition Netting Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Netting Liens as of the Petition Date) (the "**Permitted Prior Netting Liens**" and, together with the Permitted Prior Forward Repo Facility Liens, the Permitted Prior Reverse Repo Facility Liens, and the Permitted Prior MSFTA Liens, the "**Permitted Prior Warehouse Liens**");

(D)     No portion of the Prepetition Netting Liens, the Prepetition Netting Obligations or any payments made to the Prepetition Netting Agent or the Prepetition Netting Buyers or applied to or paid on account of the Prepetition Netting Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)     The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the Prepetition Netting Agent or the Prepetition Netting Buyers or any of their respective Representatives;

(F)     The Debtors have waived, discharged, and released any right
to challenge any of the Prepetition Netting Obligations or the
validity, extent and priority of the Prepetition Netting Liens;

(G)     The Prepetition Netting Obligations constitute allowed,
secured claims within the meaning of sections 502 and 506
of the Bankruptcy Code; and

(H)     The Debtors have been and are in default of the obligations
subject to the Prepetition Netting Agreement, including as a
result of the Chapter 11 Cases, and an Event of Default (as
defined in the Prepetition Netting Agreement) has occurred
and is continuing.

H.     *Debtors' Stipulations: Prepetition 1L/2L Parties, the Prepetition 1L/2L Liens, the Prepetition 1L/2L Collateral, and the Prepetition 1L/2L Obligations.* After consultation with their attorneys and financial advisors, the Debtors admit, acknowledge, agree, and stipulate to the following, subject to the provisions of Paragraph 47 of this Interim Order:

a.     *First Lien Term Loans*.  As of the Petition Date, Ditech was party to the First Lien Term Loan Credit Agreement.  Ditech is indebted to the First Lien Term Loan Parties, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than $961,355,635, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the First Lien Term Loan Credit Documents), charges, indemnities, any amounts owing on account of call protections contained in the First Lien Term Loan Credit Documents, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in First Lien Term Loan Credit Documents (collectively, the "**First Lien Term Loan Obligations**").  The First Lien Term Loan Obligations are guaranteed by Ditech Financial, RMS, and certain other direct and indirect subsidiaries of Ditech and are secured (the "**First Lien Term Loan Security Interests**") by (x) a fully-perfected, first-priority lien and security interest on substantially all assets of the Debtors other than the "Excluded

Collateral" as that term is defined in the First Lien Term Loan Credit Documents and (y) upon

indefeasible payment in full in cash of all DIP Obligations, Prepetition Warehouse Obligations,

and Acceptable Refinancing (as defined below), as applicable, a perfected, first-priority security

interest in and against all property that would have constituted Excluded Collateral (as defined in

the First Lien Term Loan Credit Documents) solely due to being subject to a lien securing such

DIP Obligations, Prepetition Warehouse Obligations, and Acceptable Refinancing, as applicable

(the "**First Lien Term Loan Collateral**").

b.      *Validity, Perfection, and Priority of First Lien Term Loans and First Lien*

*Term Loan Obligations*.    The Debtors hereby further acknowledge and agree that as of the

Petition Date:

(i)     The First Lien Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the First Lien Term Loan Credit Agreement;

(ii)    The First Lien Term Loan Security Interests on the First Lien Term Loan Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to the First Lien Term Loan Agent, for the benefit of itself and the First Lien Term Loan Lenders, for fair consideration and reasonably equivalent value;

(iii)   The First Lien Term Loan Security Interests are senior in priority over any and all other liens on the First Lien Term Loan Collateral, subject only to certain liens senior by operation of law or otherwise permitted to be senior under the First Lien Term Loan Credit Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the First Lien Term Loan Security Interests as of the Petition Date) and subject and subordinate in all respects to all rights, powers, and prerogatives of (a) Fannie Mae under and in connection with the applicable Fannie Mae Acknowledgement Agreements (as defined below), the Fannie Mae Lender Contracts (as defined below), and all other rights and remedies of Fannie Mae, including with respect to the Fannie Mae Collateral (as defined below) as provided in the Fannie Mae Pledge Agreement and (b) Freddie Mac (as defined below) under and in accordance with the applicable Freddie Mac

agreements, including the Freddie Mac Pledge Agreement (as defined below) (the "**Permitted First Lien Term Loan Prior Liens**");

(iv)    No portion of the First Lien Term Loan Security Interests, the First Lien Term Loan Obligations, or any payments made to the First Lien Term Loan Agent or the First Lien Term Loan Lenders or applied to or paid on account of the First Lien Term Loan Obligations prior to the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(v)    The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the First Lien Term Loan Agent, the First Lien Term Loan Lenders, or any of their respective Representatives;

(vi)    The Debtors have waived, discharged, and released any right to challenge any of the First Lien Term Loan Obligations or the validity, extent and priority of the First Lien Term Loan Security Interests;

(vii)    The First Lien Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(viii)    The Debtors have been and are in default of their obligations under the First Lien Term Loan Credit Agreement, including as a result of the Chapter 11 Cases, and an Event of Default (as defined in the First Lien Term Loan Credit Agreement) has occurred and is continuing.

    c.    *Second Lien Notes*.  As of the Petition Date, Ditech was party to the Second Lien Notes Indenture.  The amount of the outstanding obligations under the Second Lien Notes Indenture as of the Petition Date was no less than approximately $253,895,875, including all amounts that may become allowed or allowable under section 506(b) of the Bankruptcy Code, including interest, fees, premiums, costs and other charges (the "**Second Lien Notes Obligations**"

and, together with the First Lien Term Loan Obligations, the "**Prepetition 1L/2L Obligations**"). The Debtors' obligations under the Second Lien Notes Indenture are guaranteed by Ditech Financial, RMS, and certain other direct and indirect subsidiaries of Ditech and are secured (the "**Second Lien Notes Security Interests**" and together with the First Lien Term Loan Security Interests, the "**Prepetition 1L/2L Security Interests**") by a fully-perfected, second-priority lien and security interest on the First Lien Term Loan Collateral, other than the "Excluded Collateral" as that term is defined in the Second Lien Notes Indenture, subordinate only to the First Lien Term Loan Security Interests (the "**Second Lien Notes Collateral**" and together with the First Lien Term Loan Collateral, the "**Prepetition 1L/2L Collateral**") and certain liens senior by operation of law or otherwise permitted to be senior under the Second Lien Notes Indenture (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Second Lien Notes Security Interests as of the Petition Date) and subject to and subordinate in all respects to all rights, powers, and prerogatives of (a) Fannie Mae under and in connection with the applicable Fannie Mae Acknowledgement Agreements, the Fannie Mae Lender Contracts, and all other rights and remedies of Fannie Mae, including with respect to the Fannie Mae Collateral as provided in the Fannie Mae Pledge Agreement and (b) Freddie Mac under any applicable agreements (the "**Permitted Second Lien Notes Prior Liens**").

　　　　d.　　*Intercreditor Agreement*.　The relative rights of the Prepetition 1L/2L Parties to, and the priority of their respective security interests in, the Prepetition 1L/2L Collateral are set forth in that certain First Lien/Second Lien Intercreditor Agreement, dated as of February 9, 2018 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Prepetition 1L/2L Intercreditor**

**Agreement**").    All obligations set forth in the Prepetition 1L/2L Intercreditor Agreement constitute legal, valid, binding, enforceable, and non-avoidable obligations of the parties thereto.

I.    ***Debtors' Stipulations:    National Founders Facility Parties, the National Founders Facility Liens, the National Founders Facility Collateral, and the National Founders Facility Obligations.***    The Debtors, on their behalf and on behalf of their estates, admit, acknowledge, agree, and stipulate to the following, subject to the provisions of Paragraph 47 of this Interim Order:

    a.    ***National Founders Facility and Related Matters.***

        (i)    National Founders Facility.    As of the Petition Date, RMS was party to the Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018 (the "**National Founders Participation Agreement**"), by and between RMS and RMS 2018-09, LLC, one of RMS's subsidiaries, as purchaser (the "**RMS SPV**"), and the related Reverse Mortgage Servicing Agreement of even date therewith (the "**National Founders Servicing Agreement**"), by and among RMS, the RMS SPV, and National Founders LP, as note purchaser (with its affiliates, "**National Founders**"),  in connection with the related Note Purchase Agreement of even date therewith (the "**National Founders NPA**" and, along with each of the National Founders Participation Agreement and the National Founders Servicing Agreement, a "**National Founders Facility Agreement**", and collectively, the "**National Founders Facility**", and the non-Debtor parties thereof, the "**National Founders Facility Parties**"), by and between the RMS SPV, as issuer, and National Founders, as note purchaser.

        (ii)    National Founders Facility Transactions. Pursuant to the National Founders Facility, (A) National Founders purchased from the RMS SPV a note (the "**RMS SPV Note**"), (B) the RMS SPV used the funds from the purchase of the RMS SPV Note to purchase a

participation interest in mortgage assets from RMS, (C) only bare legal title to the mortgage assets subject to the participation interest remains with RMS, (D) National Founders has a lien on, among other things, substantially all of the assets of RMS SPV, including the participation interests sold to RMS, (E) payments with respect to such mortgage assets are, and are required to be, from time to time forwarded to RMS SPV for repayment of the RMS SPV Note, (F) National Founders and the RMS SPV retained RMS as servicer of such mortgage assets, and (G) pursuant to such servicing arrangement, National Founders advances funds for obligations for servicing such mortgage assets.

(iii)     National Founders Facility Obligations and Collateral. As of the Petition Date, RMS has outstanding and ongoing obligations under the National Founders Participation Agreement and the National Founders Servicing Agreement, a failure to perform under which obligations is an event of default under the National Founders NPA subject to the applicable notice and cure provisions.  The amount of the outstanding obligations under the RMS SPV Note as of the Petition Date was approximately $219,300,000, including all amounts that may become allowed or allowable under section 506(b) of the Bankruptcy Code, including interest, fees, premiums, costs and other charges (the "**National Founders NPA Obligations**" and, together with RMS's obligations under the National Founders Participation Agreement and the National Founders Servicing Agreement, the "**National Founders Facility Obligations**").  The National Founders Facility Obligations are secured by fully-perfected, first-priority liens on all of the collateral held by RMS subject to the liens and interests granted to the RMS SPV for the benefit of National Founders and, with respect to (a) the Custodial Account, (b) the Advance Account, and (c) the Client Collection Account, each as defined in the National Founders Servicing Agreement, to National Founders under the National Founders Facility (the "**National Founders**

**Facility Prepetition Liens**"), as applicable, including, but not limited to, the Collateral Accounts[19], and funds therein, proceeds of the Mortgage Assets, and the Advance Account, and the funds therein (the "**National Founders Facility Prepetition Collateral**"). For purposes of this Interim Order, the term "National Founders Facility Cash Collateral," including, without limitation, the Advance Account Funds and all cash proceeds of the National Founders Mortgage Assets and, shall constitute "cash collateral" as described in section 363(a) of the Bankruptcy Code.

(iv)    Validity, Perfection, and Priority of National Founders Facility Obligations and National Founders Facility Collateral. The Debtors hereby further acknowledge and agree that as of the Petition Date:

(A)    The National Founders Facility Obligations constitute legal, valid, binding, and non-avoidable obligations of RMS and the RMS SPV, respectively, enforceable in accordance with the terms of the applicable National Founders Facility Agreements;

(B)    The National Founders Facility Prepetition Liens on the National Founder Facility Prepetition Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to National Founders and the RMS SPV, for the benefit of National Founders, as applicable, for fair consideration and reasonably equivalent value;

(C)    The National Founders Facility Prepetition Liens are senior in priority over any and all other liens on the National Founder Facility Prepetition Collateral;

(D)    No portion of the National Founders Facility Prepetition Lien, the National Founders Facility Obligations or any payments made to any of the National Founders Facility Parties or applied to or paid on account of the National Founders Facility Obligations prior to the Petition Date is

---

[19]    The "Collateral Accounts" are defined to include the Advance Account and Restricted Accounts (as defined under the National Founders Facility Deposit Account Control Agreement and including the Payment Clearing Account (to the extent it contains proceeds on account of the Mortgage Assets securing the National Founders Facility), the Custodial Account, and the Client Collections Account) or otherwise exclusively controlled by National Founders.

subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(E)     The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the National Founders Facility Parties or any of their respective Representatives;

(F)     The Debtors have waived, discharged, and released any right to challenge any of the National Founders Facility Obligations or the validity, extent and priority of the National Founders Facility Prepetition Liens; and

(G)     The National Founders Facility Obligations, to the extent are obligations of RMS under the National Founders Facility, constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

J.     *Government Sponsored Entities*

a.     *Fannie Mae; Servicing Rights and Reservation*.     Notwithstanding anything to the contrary contained in the DIP Documents or this Interim Order no lien or security interest granted by the DIP Documents or this Interim Order (including any Adequate Protection Lien) shall (a) attach to, modify, include or otherwise affect mortgage servicing rights or Servicer Advance receivables with respect to mortgages which are now or hereafter serviced or subserviced by Ditech or RMS (or any of their respective affiliates) for Federal National Mortgage Association ("**Fannie Mae**") except as expressly consented to by Fannie Mae pursuant to (1) that certain First Amended and Restated Acknowledgment Agreement dated as of February 9, 2018 (as amended) by and among the First Lien Term Loan Agent, the Second Lien Notes Indenture

Trustee, Ditech Financial, and Fannie Mae, (2) that certain Acknowledgment Agreement With Respect to Servicing Advance Receivables dated as of February 9, 2018, and effective as of February 12, 2018 (as amended) by and among Ditech Financial, the Prepetition Servicer Advance Agency Facility Indenture Trustee, the Prepetition Servicer Advance Facility Agency Agent, Fannie Mae and the other parties thereto; and (3) that certain Amended and Restated Acknowledgment Agreement dated as of February 9, 2018 (as amended), by and among the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, RMS, and Fannie Mae ((1), (2), and (3), collectively, the "**Fannie Mae Acknowledgment Agreements**" and, each, a "**Fannie Mae Acknowledgment Agreement**").  Furthermore, notwithstanding anything to the contrary in the DIP Documents or this Interim Order, no lien or administrative expense claim is granted with respect to any right or asset of any Debtor or any non-Debtor affiliate under those certain Lender Contracts between Ditech and RMS and Fannie Mae, including (i) that certain Fannie Mae Mortgage Selling and Servicing Contract dated as of March 23, 2005, including that certain Selling Guide: Fannie Mae Single Family and that certain Servicing Guide:  Fannie Mae Single Family, (ii) that certain Fannie Mae Mortgage Selling and Servicing Contract dated as of September 10, 2007, including that certain Selling Guide: Fannie Mae Single Family and that certain Servicing Guide: Fannie Mae Single Family and that certain Fannie Mae Reverse Mortgage Loan Servicing Manual ((i) and (ii) together with all supplements, addendums, modifications, amendments, and related agreements, the "**Fannie Selling and Servicing Contracts**"), (iii) that certain Subservicing Agreement effective as of December 22, 2010 (together with all supplements, addendums, modifications, amendments, and related agreements, the "**Fannie Mae Subservicing Agreement**"), and (iv) that certain Pledge and Security Agreement effective as of December 19, 2014 (together with all supplements, addendums,

modifications, amendments, and related agreements, the "**Fannie Mae Pledge Agreement**" and together with the Fannie Mae Selling and Servicing Contracts and the Fannie Mae Subservicing Agreement, the "**Fannie Mae Lender Contracts**"), except as expressly in an applicable Fannie Mae Acknowledgment Agreement executed by Fannie Mae, and in all cases subject to the terms of such Fannie Mae Acknowledgment Agreement (including any terms related to subordination or setoff). For the avoidance of doubt, and without limiting the foregoing, nothing in the DIP Documents or this Interim Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Fannie Mae's interest in, or rights to, any collateral held or required to be held by the Debtors, the non-Debtor affiliates, Fannie Mae, or any other party in connection with the Fannie Mae Lender Contracts, including without limitation the Collateral and the Custody Account as those terms are defined under the Fannie Mae Pledge Agreement. Furthermore, none of (i) the principal, interest, and funds for the payment of property taxes and insurance premiums collected by Ditech Financial or RMS in connection with its performance of its servicing or subservicing obligations under the applicable Fannie Mae Selling and Servicing Contract or Fannie Mae Subservicing Agreement and (ii) the sale proceeds collected by RMS in its capacity as REO Manager for HECMs guaranteed by Fannie Mae and held in the Mortgage Equity Conversion Trust 2011-1 (the "MECA REO Sale Proceeds") are property of the Debtors' estates under section 541 of the Bankruptcy Code. Fannie Mae reserves all rights in and under all of its agreements with the Debtors and the non-Debtor affiliates, including the Fannie Mae Lender Contracts, none of which is impaired by the DIP Documents, the First Lien Loan Credit Agreement or this Interim Order.

   b. ***Freddie Mac; Servicing Rights and Reservation***. Notwithstanding anything to the contrary contained in the DIP Documents or this Interim Order, no lien or security

interest granted by the DIP Documents or this Interim Order (including any Adequate Protection Liens) shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Federal Home Loan Mortgage Corporation ("**Freddie Mac**") or the "Servicing Collateral" (as defined and referenced in, and except as otherwise expressly authorized by that certain Second Amended and Restated Acknowledgment Agreement, dated as of October 30, 2015, among Freddie Mac, Ditech, and Credit Suisse AG, Cayman Islands Branch, as may be amended or modified pursuant to its express provisions (the "**Freddie Mac Acknowledgment Agreement**"), (b) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Amended and Restated Collateral Account Control Agreement, dated as of January 17, 2014, and the Amended and Restated Collateral Pledge Agreement, dated as of January 17, 2014, between Freddie Mac and Ditech (the "**Freddie Mac Pledge Agreement**"), or (c) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, no lien or administrative expense claim is granted with respect to any right or asset of the Debtors or any non-Debtor affiliate under (a) that certain Amended and Restated Master Agreement #MA16090866, initially entered into as of August 1, 2014, by and between Freddie Mac and Ditech, as amended and restated as of October 6, 2017 (the "**Freddie Mac Master Agreement**") and (b) that certain Purchase Agreement for PI M18101766, dated as of November 7, 2018 (the "**Freddie Mac Purchase Agreement**"), except as expressly provided in the Freddie Mac Acknowledgment Agreement and in all cases subject to the terms of such agreement.

c.    ***Ginnie Mae Reservation.*** Notwithstanding anything to the contrary contained in the DIP Documents or this Interim Order no lien or security interest granted by the DIP Documents or this Interim Order (including any Adequate Protection Lien) shall (a) attach to, modify, include or otherwise affect the mortgages as defined in the Ginnie Mae Agreements, including, but not limited to, the related mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their respective affiliates) that back Government National Mortgage Association ("**Ginnie Mae**") securities, except as expressly consented to by Ginnie Mae pursuant to that certain Acknowledgment Agreement dated May 21, 2014  between RMS, Ditech Financial, Credit Suisse AG and Ginnie Mae ("**Acknowledgment Agreement**").   For the avoidance of doubt, and without limiting the foregoing, nothing in the DIP Documents or this Interim Order subordinates, primes, grants a lien or administrative claim in, or otherwise impairs Ginnie Mae's interest in, or rights to, the mortgages backing the Ginnie Mae securities and any related collateral, including, but not limited to, cash, account or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Ginnie Mae, or any other party in connection with the Ginnie Mae Guaranty Agreement, including without limitation the Principal and Interest Custodial Accounts and Taxes and Insurance Custodial Accounts, established in accordance with the Ginnie Mae program requirements. Ginnie Mae reserves all rights pursuant to 12 U.S.C. § 1721(g), and all rights in all of its agreements with the Debtors and the non-Debtor affiliates, including the Ginnie Mae Agreements (as defined in the motions for entry of the Chapter 11 Operating Orders (as defined below)), none of which is impaired by the DIP Documents, the Prepetition Credit Agreement or the Interim Order.

K.    ***Permitted Prior Liens.*** Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Warehouse Lien, Permitted First Lien Term Loan Prior

Lien, or Permitted Second Lien Notes Prior Lien is valid, senior, enforceable, prior, perfected, or

non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest to challenge

the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged

Permitted Prior Warehouse Lien, Permitted First Lien Term Loan Prior Lien, Permitted Second

Lien Notes Prior Lien and/or security interests.

      **L.**     ***Transactions in the Ordinary Course of Business.***

      a.     Prior to the Petition Date, in the ordinary course of their businesses, Ditech

Financial and RMS sold and repurchased mortgage loans and related assets pursuant to the

Prepetition Repo Facilities.  From and after the entry of this Interim Order, Ditech Financial's and

RMS's sales and repurchases of mortgage loans and related assets pursuant to the DIP Repo

Facilities shall constitute transactions in the ordinary course of Ditech Financial's and RMS's

businesses within the meaning of section 363(c)(1) of the Bankruptcy Code.

      b.     Prior to the Petition Date, in the ordinary course of its business, Ditech

Financial sold Servicer Advances to the Depositors, which in turn sold them to the Non-Debtor

SPV Issuers.  From and after the entry of this Interim Order, Ditech Financial's sales of Servicer

Advances to the Depositors under the DIP Servicer Advance Facilities shall constitute

transactions in the ordinary course of Ditech Financial's business within the meaning of section

363(c)(1) of the Bankruptcy Code.

      c.     Prior to the Petition Date, in the ordinary course of Business, Ditech

Financial entered into transactions under the Prepetition MSFTAs for the purchase or sale of

mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced,"

"dollar roll" and other transactions.  From and after the date of this Interim Order, Ditech

Financial's entry into such transactions under the DIP MSFTAs shall constitute transactions in

the ordinary course of Ditech Financial's business within the meaning of section 363(c)(1) of the Bankruptcy Code.

M.      *Safe Harbors*.  The DIP Repo Facilities, the DIP Netting Agreement and the DIP MSFTAs each constitute, as applicable, a "repurchase agreement," a "securities contract," a "forward contract," a "swap agreement," and a "master netting agreement," as such terms are defined in sections 101(47), 741(7)(A), 101(25), 101(53B), and 101(38) of the Bankruptcy Code, respectively, and each non-Debtor party thereto, including the DIP Agent and the other DIP Credit Parties, is a "financial institution" within the meaning of section 101(22) of the Bankruptcy Code, a "financial participant" within the meaning of section 101(22A) of the Bankruptcy Code, and/or a "repo participant" within the meaning of section 101(46) of the Bankruptcy Code, and is and shall be entitled to the safe harbor protections, rights, and remedies set forth in the Bankruptcy Code, including, but not limited to, sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(j), 548(d)(2), 555, 556, 559, 560, and 561 of the Bankruptcy Code, in these Chapter 11 Cases, subject to the terms of this Interim Order.  No action of any DIP Credit Party, including any determination to provide any funding prior to entry of this Interim Order or the Final Order, shall constitute a waiver by such DIP Credit Party of any rights and remedies under the safe harbor protections of the Bankruptcy Code.

N.      *True Sales*.

a.      The postpetition transfers of REO Assets (as defined in the Prepetition Reverse Repo Facility Documents) from (i) the CS REO Subsidiaries to RMS pursuant to the Prepetition Exit Reverse Repo Facility and the DIP REO Subsidiary to RMS pursuant to the Prepetition Bilateral Reverse Repo Facility, and (ii) RMS to the DIP REO Subsidiary pursuant to the DIP Reverse Repo Facility, shall constitute "true sales" and shall not be subject to

recharacterization as secured loans.  Notwithstanding any other provisions of this Interim Order, the DIP Reverse Repo Facility Agent and the DIP Reverse Repo Facility Purchasers have agreed to enter into the DIP Reverse Repo Facility Documents in express reliance on the foregoing postpetition transfers of REO Assets as described in this sub-clause (a) pursuant to the DIP Reverse Repo Facility constituting "true sales" and not being subject to recharacterization as secured loans.

b.      The Debtors' postpetition transfers of Servicer Advances to the Depositors pursuant to the DIP Servicer Advance Facilities shall constitute "true sales" and shall not be subject to recharacterization as secured loans.  Notwithstanding any other provisions of this Interim Order, the DIP Servicer Advance Facility Indenture Trustees, the DIP Servicer Advance Facility Agents, and the DIP Servicer Advance Facility VFN Noteholders have agreed to enter into the DIP Servicer Advance Facility Documents in express reliance on the Debtors' postpetition transfers of Servicer Advances to the Depositors pursuant to the DIP Servicer Advance Facilities constituting "true sales" and not being subject to recharacterization as secured loans.

O.      *Non-Consolidation*.  The performance by the Debtors, the Depositors, and the Non-Debtor SPV Issuers of their respective obligations under the DIP Servicer Advance Facility Documents, the consummation of the transactions contemplated by the DIP Servicer Advance Facility Documents, and the conduct of the Debtors, the Depositors, and the Non-Debtor SPV Issuers of their respective businesses, do not, and shall not, provide a basis for substantive consolidation of the assets and liabilities of the Depositors and the Non-Debtor SPV Issuers, or any of them, on the one hand, with the assets and liabilities of the Debtors, or any of them, on the other hand, or a finding that the separate corporate identities of the Debtors, on the one hand, and the Depositors and the Non-Debtor SPV Issuers, on the other hand, may be ignored.

Notwithstanding any other provisions of this Interim Order, the DIP Servicer Advance Facility Indenture Trustees, the DIP Servicer Advance Facility Agents, and the DIP Servicer Advance Facility VFN Noteholders have agreed to enter into the DIP Servicer Advance Facility Documents in express reliance on the Debtors, on the one hand, and the Depositors and the Non-Debtor SPV Issuers, on the other hand, being separate and distinct legal entities, with assets and liabilities separate and distinct from one another.

P.   *No Waiver*.  The Prepetition Forward Repo Facility Agent, the Prepetition Reverse Repo Facility Agents, the Prepetition VFN Noteholders, the Prepetition MSFTA Counterparties, and the Prepetition Netting Buyers have agreed to not exercise remedies after the occurrence of (a) events of default under their respective Prepetition Warehouse Facilities[20] caused by (i) the failure of Ditech to make an interest payment with respect to the Second Lien Notes and (ii) Ditech, Ditech Financial and RMS commencing these Chapter 11 Cases, and (b) the occurrence of a maturity date under certain of their respective Prepetition Warehouse Facilities, for a period not to exceed five (5) business days after the Petition Date (the "**Bridge Period**") unless this Interim Order is entered on or before the expiration of such Bridge Period.  Such forbearance is not be construed as a waiver by the Prepetition Forward Repo Facility Agent, the Prepetition Reverse Repo Facility Agents, the Prepetition VFN Noteholders, the Prepetition MSFTA Counterparties, or the Prepetition Netting Buyers of any of their respective rights or remedies under the Prepetition Warehouse Facilities.

Q.   *Interim Relief*.  Interim relief is necessary to avoid immediate and irreparable harm. The Prepetition Forward Repo Facility Agent under the Prepetition Forward Repo Facility, the

---

[20]   For purposes herein, the "**Prepetition Warehouse Facilities**" means (a) the Prepetition Forward Repo Facility, (b) the Prepetition Reverse Repo Facilities, (c) the Prepetition Servicer Advance Facilities, (d) the Prepetition MSFTAs, and (e) the Prepetition Netting Agreement.

Prepetition Reverse Repo Facility Agents under the Prepetition Reverse Repo Facilities, the Prepetition MSFTA Counterparties under the Prepetition MSFTAs, and the Prepetition Netting Parties under the Prepetition Netting Agreement, have the right to terminate such facilities under sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 559, 560 and 561 of the Bankruptcy Code, but have agreed to refrain from doing so pending entry of this Interim Order upon the terms and conditions set forth herein and in the DIP Documents.   In addition, the Prepetition VFN Noteholders are not obligated to continue purchasing the variable funding notes and have the right to declare a default and enforce their liens against the Non-Debtor SPV Issuers, but have agreed to refrain from doing so conditioned upon entry of this Interim Order upon the terms and conditions set forth herein and in the DIP Documents.   The First Lien Term Loan Parties and National Founders Facility Parties are not prepared to consent to the Debtors' use of the Prepetition 1L/2L Collateral and National Founders Facility Prepetition Collateral, respectively (in each case, including Cash Collateral), absent entry of this Interim Order upon the terms and conditions set forth herein. Accordingly, good cause has been shown for the entry of this Interim Order.

 **R.** ***Findings Regarding the DIP Facilities and Cash Collateral.***

  a. ***Good Cause.*** Good cause has been shown for the entry of this Interim Order.

  b. ***Immediate Need for Postpetition Liquidity.*** An immediate need exists for the Debtors to obtain access to liquidity, including Cash Collateral, in order to continue their operations and to administer and preserve the value of their estates.   The ability of the Debtors to maximize value for all stakeholders requires the availability of the DIP Facilities and the other financial accommodations pursuant to the DIP Documents and the availability of the Cash Collateral.   Given the unique nature of the Debtors' capital requirements, in the absence of the

availability of such funds and liquidity in accordance with the terms of the DIP Documents and this Interim Order, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur.   The Debtors do not have sufficient available sources of working capital or other liquidity to operate their businesses in the ordinary course without access to the DIP Facilities, the other financial accommodations pursuant to the DIP Documents, and the Cash Collateral.   Consummation of the transactions contemplated by the DIP Documents (including immediate repayment of the Prepetition Warehouse Obligations) pursuant to the terms of this Interim Order and use of Cash Collateral, also pursuant to the terms of this Interim Order, therefore are in the best interests of the Debtors' estates.

c.      *No Liquidity Available on More Favorable Terms*.   Given their financial condition and capital structure, despite diligent efforts, the Debtors are unable to reasonably obtain postpetition liquidity from sources other than the DIP Credit Parties on terms more favorable than those set forth in this Interim Order and the DIP Documents.   The Debtors have been unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtors have also been unable to obtain secured credit from other sources (i) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (ii) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (iii) secured solely by a junior lien on property of the Debtors and their estates that is already subject to a lien.   Liquidity on a postpetition basis is not otherwise available without (x) granting to the DIP Credit Parties, the DIP Superpriority Claims and the DIP Liens as set forth herein; (y) upon entry of this Interim Order, providing for the repurchase and repayment of the assets subject to

the Prepetition Repo Facilities and the Prepetition Servicer Advance Facilities, thereby repaying all of the Prepetition Warehouse Obligations; and (z) the other protections set forth in this Interim Order and the DIP Documents.    Granting the DIP Superpriority Claims and DIP Liens and allowing the repurchase and repayment pursuant to the DIP Repo Facilities and the DIP Servicer Advance Facilities as described herein are conditions to the DIP Credit Parties' agreements to provide the Debtors with the necessary liquidity they need under the DIP Documents.    The Prepetition 1L/2L Parties (in the case of the First Lien Term Loan Agent, acting at the direction of the First Lien Term Loan Lenders) and the National Founders Facility Parties are not willing to allow the Debtors to use the Prepetition 1L/2L Collateral and the National Founders Facility Collateral, respectively, (in each case, including Cash Collateral) without the Adequate Protection Liens, Adequate Protection Superpriority Claims, the Adequate Protection Payments (each as defined herein), the National Founders Facility Adequate Protection, and the other terms and conditions set forth herein.

        d.    ***Willingness to Provide Liquidity.*** The DIP Credit Parties and the First Lien Term Loan Parties and the National Founders Facility Parties have indicated a willingness to engage in the transactions contemplated by the DIP Facilities, the DIP Documents and this Interim Order in reliance on, among other things, (i) the entry by the Bankruptcy Court of this Interim Order and the Final Order, (ii) approval by the Bankruptcy Court of the terms and conditions of the DIP Documents with respect to the DIP Obligations, and (iii) entry of findings of the Bankruptcy Court that, among other things, (A) the DIP Facilities and the other financial accommodations pursuant to the DIP Documents are essential to the Debtors' estates and are being extended in good faith, (B) the DIP Superpriority Claims and the DIP Liens will have the protections provided for in sections 363(m) and 364(e) of the Bankruptcy Code, and (C) the

Adequate Protection Liens, the Adequate Protection Superpriority Claims, the Adequate Protection Payments, the National Founders Facility Adequate Protection Liens, the National Founders Superpriority Claims, and all other terms of this Interim Order will have the protections provided for in section 363(m) of the Bankruptcy Code.

      e.    ***Good Faith (§§ 363(m) & 364(e)).***

    (i)    The DIP Documents and the terms of this Interim Order were negotiated in good faith and at arm's length among the Debtors, the DIP Credit Parties,[21] the Prepetition Warehouse Parties,[22] the First Lien Term Loan Parties and the National Founders Facility Parties.

    (ii)    The DIP Forward Repo Facility Parties and the DIP Reverse Repo Facility Parties are entering into the transactions pursuant to the DIP Forward Repo Facility and DIP Reverse Repo Facility, respectively, in good faith and are good faith purchasers within the meaning of section 363(m) and, to the extent applicable, section 364(e), of the Bankruptcy Code, and are therefore entitled to the full protection of section 363(m) and, to the extent applicable, section 364(e), of the Bankruptcy Code with respect to all aspects of the transactions contemplated by the DIP Forward Repo Facility and the DIP Reverse Repo Facility.

    (iii)    The DIP Servicer Advance Facility Parties are entering into the transactions pursuant to the DIP Servicer Advance Facilities in good faith and are good faith purchasers within the meaning of section 363(m) and, to the extent applicable, section 364(e), of the Bankruptcy Code, and are therefore entitled to the full protection of section 363(m) and, to the extent applicable, section 364(e), of the Bankruptcy Code with respect to all aspects of the transactions contemplated by the DIP Servicer Advance Facilities.

    (iv)    The liquidity to be provided under the DIP Documents shall be deemed to have been extended in good faith and for valid business purposes and uses, within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code. The DIP Credit Parties are therefore

---

[21] For purposes herein, the "**DIP Credit Parties**" means (a) the DIP Repo Facility Parties, (b) the DIP Servicer Advance Facility Parties, (c) the DIP MSFTA Counterparties, (d) the DIP Netting Parties, (e) the DIP Agent, and (f) the DIP Lenders, in each case, in their respective capacities as such.

[22] For purposes herein, the "**Prepetition Warehouse Parties**" means (a) the Prepetition Repo Facility Parties, (b) the Prepetition Servicer Advance Facility Parties, (c) the Prepetition MSFTA Parties, and (d) the Prepetition Netting Parties, in each case, in their respective capacities as such.

entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code and this Interim Order to the extent applicable.

(v)     The liquidity provided by the Debtors' use of the Prepetition 1L/2L Collateral and the National Founders Facility Prepetition Collateral (each including Cash Collateral) pursuant to the terms of this Interim Order shall be deemed to have been provided in good faith and for valid business purposes, within the meaning of section 363(m) of the Bankruptcy Code.   The Prepetition 1L/2L Parties and the National Founders Facility Parties are entitled to the protection and benefits of section 363(m) of the Bankruptcy Code and this Interim Order.

f.     ***Findings Regarding Adequate Protection***.  The Debtors have satisfied their

burden of demonstrating their entitlement to use the Prepetition 1L/2L Collateral and the National

Founders Facility Prepetition Collateral (each including Cash Collateral) of the Prepetition 1L/2L

Parties and the National Founders Facility Parties, respectively, and that the Prepetition 1L/2L

Parties and the National Founders Facility Parties are adequately protected by, among other

things, the Forms of Adequate Protection and the National Founders Facility Adequate Protection,

respectively, (each as defined below).   The Forms of Adequate Protection and the National

Founders Facility Adequate Protection set forth herein are fair, reasonable and sufficient to protect

the interests of the Prepetition 1L/2L Parties and the National Founders Facility Parties,

respectively.  Furthermore, the Forms of Adequate Protection (including the Adequate Protection

Obligations (as defined below)) are consistent with the terms of the Prepetition 1L/2L

Intercreditor Agreement.  The First Lien Term Loan Agent and the requisite First Lien Term Loan

Lenders, on behalf of all First Lien Term Loan Parties, consent to the use of the Prepetition 1L/2L

Collateral (including Cash Collateral), which consent shall be the requisite consent under the

Prepetition 1L/2L Intercreditor Agreement.  Additionally, the National Founders Facility Parties

consent to the use of the National Founders Facility Prepetition Collateral (including Cash

Collateral).

g.    ***Final Hearing.***  At the Final Hearing, the Debtors will seek final approval of the proposed DIP Facilities, the other financial accommodations pursuant to the DIP Documents, the proposed use of the Prepetition 1L/2L Collateral and the National Founders Facility Prepetition Collateral (each including Cash Collateral), and the waivers and protections set forth in Paragraphs 49-51 herein, pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Parties, and the National Founders Facility Parties, in their sole and absolute discretion or as otherwise required under the relevant documents governing the parties' respective rights.  Notice of the Final Hearing and the Final Order will be provided in accordance with this Interim Order and no further notice, except as provided by this Interim Order, shall be required.

h.    ***Immediate Entry.***  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and Local Bankruptcy Rule 4001-2 and, to the extent applicable, Bankruptcy Rule 4001(c)(2).  The authorization granted herein on an interim basis to enter into the DIP Documents, to enter into the transactions under or contemplated by the DIP Documents and for use of the Prepetition 1L/2L Collateral and the National Founders Facility Collateral (each including Cash Collateral), is necessary to avoid immediate and irreparable harm to the Debtors and their estates during the period beginning on the date hereof through and including the date of the entry of the Final Order by this Court.  This Court concludes that the entry of this Interim Order is in the best interests of the Debtors and their estates and creditors because it will, among other things, allow the Debtors to meet payroll and other critical expenses and thereby maximize the value of their estates.

i.    ***Notice.***  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email overnight courier or

hand delivery, to certain parties as set forth in the Motion.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and the Interim Hearing constitutes adequate notice thereof and complies with the Bankruptcy Rules and Local Bankruptcy Rules, and no further notice of the relief granted herein is necessary or required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     ***Motion Granted.***  The Motion is granted on an interim basis to the extent set forth herein.  The Debtors are hereby authorized to enter into the DIP Documents and the DIP Documents are hereby approved as described further below.[23]

2.     All objections to and reservations of rights with respect to the interim relief sought in the Motion and to the entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled on the merits in their entirety.

**Provisions Relating to the DIP Repo Facilities**

3.     ***Authorizations to Enter Into the DIP Forward Repo Facility, the DIP Reverse Repo Facility and the DIP HMBS Repo Facilities.***

a.     Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Ditech Financial is immediately authorized and empowered to (i) enter into and perform its obligations under the DIP Forward Repo Facility Agreement, (ii) execute and deliver all other DIP Forward Repo Facility Documents and the other DIP Documents required or advisable to

---

[23]   The documents and agreements set forth on Schedule II to the Master Refinancing Agreement are deemed amended and restated so as to be part of the applicable DIP Facility and shall constitute "DIP Documents".  In no event shall the foregoing amendment and restatement be deemed to be an assumption by the Debtors of any such documents or agreements or any prepetition liabilities or obligations thereunder or related thereto.

effect the DIP Forward Repo Facility, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP Forward Repo Facility Documents.

b.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, RMS is immediately authorized and empowered to (i) enter into and perform its obligations under the DIP Reverse Repo Facility Agreement, (ii) execute and deliver all other DIP Reverse Repo Facility Documents and the other DIP Documents required or advisable to effect the DIP Reverse Repo Facility, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP Reverse Repo Facility Documents.

c.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, RMS is authorized and empowered to (i) enter into and perform its obligations under the DIP HMBS Repo Facility Agreements, (ii) execute and deliver all other DIP HMBS Repo Facility Documents and the other DIP Documents required or advisable to effect the DIP HMBS Repo Facilities, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP HMBS Repo Facility Documents.   The Debtors shall file a copy of the DIP HMBS Repo Facility Agreement by no later than the Final Hearing.

4.      ***Ordinary Course Transactions Approved***.  Pursuant to sections 105(a), 363(c)(1) and 363(f) of the Bankruptcy Code, Ditech Financial is authorized to sell and repurchase mortgage loans and related assets pursuant to the DIP Forward Repo Facility in the ordinary course of business, free and clear of any and all liens, claims, encumbrances or other interests with any liens to attach to the proceeds thereof.  Pursuant to sections 105(a), 363(c)(1) and 363(f) of the Bankruptcy Code, RMS is authorized to sell and repurchase mortgage loans and related assets pursuant to the DIP Reverse Repo Facility in the ordinary course of business, free and clear of any

and all liens, claims, encumbrances or other interests with any liens to attach to the proceeds thereof.

     5.     ***Repurchase and Repayment/Refinancing of Prepetition Repo Facilities Approved.***

     a.     Pursuant to sections 362(b)(6), 362(b)(7), 555, and 559 of the Bankruptcy Code, the Prepetition Forward Repo Facility and any related program documents are deemed terminated and closed out as of the date of the entry of this Interim Order, thereby triggering Ditech Financial's repurchase obligations. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, Ditech Financial is authorized to repurchase all assets sold pursuant to the terms of the Prepetition Forward Repo Facility, and to sell all such assets pursuant to the terms of the DIP Forward Repo Facility Documents, thereby repurchasing and repaying the Prepetition Forward Repo Facility with proceeds from the sale of such assets under the DIP Forward Repo Facility. Upon the repurchase and repayment of the Prepetition Forward Repo Facility (including, without limitation, the fees and expenses of any agents or custodians with respect thereto), any existing liens securing the Prepetition Forward Repo Facility shall be deemed irrevocably released and terminated, and the Prepetition Forward Repo Master Repurchase Agreement shall be deemed terminated.

     b.     Pursuant to sections 362(b)(6), 362(b)(7), 555, and 559 of the Bankruptcy Code, the Prepetition Reverse Repo Facilities and any related program documents are deemed terminated and closed out as of the date of the entry of this Interim Order, thereby triggering RMS's repurchase obligations. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, RMS is authorized to repurchase all assets sold pursuant to the terms of the Prepetition Reverse Repo Facilities, and to sell all such assets pursuant to the terms of the DIP

Reverse Repo Facility Documents, thereby repurchasing and repaying the Prepetition Reverse Repo Facilities with proceeds from the sale of such assets under the DIP Reverse Repo Facility Documents. Upon the repurchase and repayment of the Prepetition Reverse Repo Facilities (including, without limitation, the fees and expenses of any agents or custodians with respect thereto), any existing liens securing the Prepetition Reverse Repo Facilities shall be deemed irrevocably released and terminated and the Prepetition Exit Reverse Repo Master Repurchase Agreement shall be deemed terminated.

6. ***Transfer of CS REO Assets and Prepetition DIP REO Assets to the DIP REO Subsidiary***. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, RMS is authorized (a) to cause (i) the CS REO Subsidiaries to transfer all of their REO Property (as defined in the Prepetition Exit Reverse Repo Master Purchase Agreement) (collectively, the "**CS REO Assets**") to RMS and (ii) the DIP REO Subsidiary to transfer all of its prepetition assets (the "**Prepetition DIP REO Assets**") to RMS, and (b) immediately following such transfers, to transfer all such CS REO Assets and Prepetition DIP REO Assets to the DIP REO Subsidiary.

7. ***Backup Security for the DIP Forward Repo Facility Parties and the DIP Reverse Repo Facilities Parties Approved***.

a. Effective immediately upon entry of this Interim Order, the Bankruptcy Court hereby grants the following valid, binding, enforceable, non-avoidable, automatically and properly perfected, postpetition security interests and liens (collectively, the "**DIP Repo Facility Backup Liens**"):

(i)    to the DIP Agent, for the benefit of itself and the other DIP Forward Repo Facility Parties, in each case, to secure Ditech Financial's obligations under the DIP Forward Repo Facility Documents:[24]

(A)    a first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the following:

(1)    the Purchased Mortgage Loans, any Agency Security or right to receive such Agency Security when issued to the extent backed by any of the Purchased Mortgage Loans, the Records, and all related Servicing Rights, the Program Agreements (to the extent such Program Agreements and Ditech Financial's right thereunder relate to the Purchased Mortgage Loans), any related Take-out Commitments, any Property relating to the Purchased Mortgage Loans, all insurance policies and insurance proceeds relating to any Purchased Mortgage Loan or the related Mortgaged Property, including but not limited to, any payments or proceeds under any related primary insurance, hazard insurance and FHA Mortgage Insurance Contracts and VA Loan Guaranty Agreements (if any), Income, the Collection Account, Interest Rate Protection Agreements, accounts (including any interest of Ditech Financial in escrow accounts) and any other contract rights, instruments, accounts, payments, rights to payment (including payments of interest or finance charges), general intangibles and other assets, in each case, relating to the Purchased Mortgage Loans (including, without limitation, any other accounts) or any interest in the Purchased Mortgage Loans, and any proceeds (including the related securitization proceeds) and distributions with respect to any of the foregoing and any other property, rights, title or interests as are specified on a Transaction Notice and/or Trust Receipt, in all instances, whether now owned or hereafter acquired, now existing or hereafter created; and

(2)    in the event that Ditech Financial is deemed to retain any residual Servicing Rights, the Servicing Rights and proceeds related thereto and in all instances, whether now owned or hereafter acquired, now existing or hereafter created (the foregoing (1) through (2), collectively, the "**DIP Forward Repo Facility Backup Collateral**");

(B)    a second-priority lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on the following:

---

[24]    Capitalized terms used but not otherwise defined in this sub-clause (i) shall have the meanings ascribed to such terms in the applicable DIP Repo Facility Agreements.

(1)      (a) each Eligible Mortgage subject to a Transaction, and (b) each Ginnie Mae Tail HMBS subject to a Transaction and the REO Asset;

(2)      the right, title and interest of the RMS in, under and to the following, whether now existing or hereafter acquired: (a) the Mortgage Loans subject to a Transaction, (b) the Servicing Rights related to the Mortgage Loans subject to a Transaction, (c) RMS's rights under any related Hedge Instruments to the extent related to the Mortgage Loans subject to a Transaction, (d) such other Property, rights, titles or interest as are specified on the related Seller Mortgage Loan Schedule that are related to the Mortgage Loans subject to a Transaction, (e) rights to payment under all mortgage guarantees and insurance relating to the individual Mortgage Loans subject to a Transaction (issued by governmental agencies or otherwise) or the related Mortgaged Property and any mortgage insurance certificate or other document evidencing such mortgage guarantees or insurance and all claims and payments related to the Mortgage Loans subject to a Transaction, (f) all guarantees or other support for the Mortgage Loans subject to a Transaction, (g) all rights to Income (including all sale proceeds and all other proceeds as defined in Section 9-102(a)(64) of the Uniform Commercial Code and all other collections and distributions thereon (including, without limitation, any proceeds received in respect of mortgage insurance)) and (h) the rights to enforce such payments arising from the Mortgage Loans subject to a Transaction and any other contract rights, payments, rights to payment (including payments of interest or finance charges) with respect thereto and all rights to proceeds as defined in Section 9-102(a)(64) of the Uniform Commercial Code; and

(3)      the right, title and interest of RMS in, under and to the following, whether now existing or hereafter acquired: (a) the REO Asset and the REO Property File with respect to any REO Property held by RMS or REO Subsidiary, as applicable, (b) the Collection Account and all amounts on deposit therein, (c) all Additional Purchased Mortgage Loans, (d) any master repurchase agreements with respect to Ginnie Mae Tail HMBS subject to a transaction; (e) all "accounts," "deposit accounts," "securities accounts," "chattel paper," "deposit accounts," "documents," "general intangibles," "instruments," "investment property," and "securities accounts," relating to the foregoing as each of those terms is defined in the Uniform Commercial Code and all cash and Cash Equivalents and all other products and proceeds relating to or constituting any or all of the foregoing, (f) any purchase agreements or other agreements or contracts relating to or constituting any or all of the foregoing, (g)

any other collateral pledged or otherwise relating to any or all of the foregoing, together with all files, material documents, instruments, surveys (if available), certificates, correspondence, appraisals, computer records, computer storage media, accounting records and other books and records relating to the foregoing, (h) any rights retained by RMS in any Mortgage Loans that it transfers to the REO Subsidiary, (i) all FHA Mortgage Insurance Contracts relating to such Mortgage Loans and (j) any and all replacements, substitutions, distributions on, or proceeds with respect to, any of the foregoing, and Additional Purchased Mortgage Loans delivered pursuant to Section 7(b) of the DIP Reverse Repo Facility Agreement (the foregoing (1) through (3), collectively, the "**DIP Reverse Repo Facility Backup Collateral**" and, together with the DIP Forward Repo Facility Backup Collateral, the "**DIP Repo Facility Backup Collateral**");

(ii)   to the DIP Agent, for the benefit of itself and the other DIP Reverse Repo Facility Parties, in each case, to secure the obligations of RMS under the DIP Reverse Repo Facility Documents:

(A)   a first-priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on the DIP Reverse Repo Facility Backup Collateral, and

(B)   a second-priority lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on the DIP Forward Repo Facility Backup Collateral.

b.   The DIP Repo Facility Backup Liens are granted on the DIP Repo Facility Backup Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other DIP Credit Party. As set forth below in Paragraph 44 of this Interim Order, the DIP Agent or any other DIP Credit Party may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP Repo Facility Backup Liens, or possess or control the

DIP Repo Facility Backup Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

8.      ***Pledge of Equity Interests of Depositors.***   Pursuant to sections 105(a), 363(b) and 364(c)(2) of the Bankruptcy Code, the Bankruptcy Court hereby grants a valid, binding, enforceable, non-avoidable, automatically and properly perfected first-priority lien and security interest on the equity interests of the Depositors, their wholly-owned subsidiaries, any distributions on account of such equity interests, and all other rights to payment that Ditech Financial has with respect to the Depositors, to the DIP Agent, for the benefit of the DIP Netting Parties, to secure Ditech Financial's obligations under the DIP Forward Repo Facility Documents, the obligations of RMS and the DIP REO Subsidiary under the DIP Reverse Repo Facility Documents and all other DIP Obligations (other than obligations under any of the DIP Servicer Advance Facility Documents).

**Provisions Relating to the DIP Servicer Advance Facilities**

9.      ***Authorizations Regarding the DIP Servicer Advance Facilities.***   Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Ditech Financial is authorized and directed to cause the Non-Debtor SPV Issuers to (a) enter into and perform their obligations under the DIP Servicer Advance Facilities, including to cause the Non-Debtor SPV Issuers to enter into and execute the DIP Servicer Advance Facility Supplements and effectuate the issuance of the DIP Servicer Advance Facility VFNs, (b) execute and deliver all other DIP Servicer Advance Facility Documents and the other DIP Documents required or advisable to effect the DIP Servicer Advance Facilities, and (c) take all actions which may be necessary or advisable for the performance by the Debtors or the Non-Debtor SPV Issuers (at Ditech Financial's direction) under the DIP Servicer Advance Facilities, including without limitation replacing the existing administrative agents under

the Prepetition Servicer Advance Facility Agreements with the DIP Servicer Advance Facility

Agents.

10.      ***Ordinary Course Transactions Approved***.    Pursuant to sections 105(a),

363(c)(1) and 363(f) of the Bankruptcy Code, Ditech Financial is authorized to sell Servicer

Advances to the Non-Debtor SPV Issuers in the ordinary course of business, free and clear of all

liens, claims, encumbrances and other interests.    Pursuant to sections 105(a) and 363(b) of the

Bankruptcy Code, Ditech Financial is authorized and directed to cause such Non-Debtor SPV

Issuers to issue DIP Servicer Advance Facility VFNs to finance the purchase of such Servicer

Advances referred to in the immediately preceding sentence.

11.      ***Repurchase and Repayment of Prepetition Servicer Advance Facilities***

***Approved***.    Pursuant to sections 105(a), 363(b), 363(f) of the Bankruptcy Code, Ditech Financial

is authorized and directed to cause the Non-Debtor SPV Issuers to purchase all of the outstanding

Prepetition Servicer Advance Facility VFNs by utilizing proceeds from the DIP Servicer Advance

Facility VFNs to be issued upon entry of this Interim Order pursuant to the terms of the DIP

Servicer Advance Facilities.    The Debtors shall deliver or cause to be delivered any termination

statements, releases and/or other documents necessary to effectuate and/or evidence the release

and termination of any liens on or security interests in any portion of the outstanding Prepetition

Servicer Advance Facility VFNs.

**Provisions Relating to DIP MSFTAs**

12.      ***Authorizations Regarding the DIP MSFTAs.***    Pursuant to sections 105(a)

and 363(b) of the Bankruptcy Code, Ditech Financial is immediately authorized and empowered

to (a) enter into and perform its obligations under the DIP MSFTAs, (b) execute and deliver all

other DIP Documents required or advisable to effect any DIP MSFTA, and (c) take all actions

which may be necessary or advisable for the performance by the Debtors under the DIP MSFTAs.

The Prepetition MSFTAs, as amended on the DIP Closing Date, shall constitute the DIP MSFTAs

and the Debtors shall continue to honor all obligations thereunder and under this Interim Order

with respect thereto.  The Debtors are authorized to enter into any other Master Securities Forward

Transaction Agreement with any DIP Forward Repo Facility Purchaser (for as long as such

counterparty continues to be a DIP Forward Repo Facility Purchaser) on terms and conditions no

less favorable to Ditech Financial in any material respect, when taken as a whole, than the terms

and conditions set forth in the DIP Barclays MSFTA or the DIP Nomura MSFTA.

13.     ***Security for the DIP MSFTA Counterparties***.

a.     Effective immediately upon entry of this Interim Order, the

Bankruptcy Court hereby grants valid, binding, enforceable, non-avoidable, automatically and

properly perfected, postpetition first-priority liens and security interests, pursuant to section

364(c)(2) of the Bankruptcy Code (collectively, the "**DIP MSFTA Liens**") to the DIP MSFTA

Counterparties, in each case, to secure Ditech Financial's obligations under the DIP MSFTAs in,

and right of setoff against, all Forward Collateral (as defined in the DIP MSFTAs) and all

securities, money and other property, then or thereafter delivered by or on behalf of Ditech

Financial under such DIP MSFTA to or for the benefit of the DIP MSFTA Counterparties in

connection with such DIP MSFTA or any Transaction (as defined in the DIP MSFTAs), or then

or thereafter held or carried by or on behalf of Ditech Financial in connection with the DIP

MSFTA or any Transaction (as defined in the DIP MSFTAs) and, in each case, all proceeds of

any of the foregoing (collectively, the "**DIP MSFTA Collateral**").

b.     The DIP MSFTA Liens are granted on the DIP MSFTA Collateral

*nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or

recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other DIP Credit Party.  As set forth below in Paragraph 44 of this Interim Order, the DIP Agent or any other DIP Credit Party may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP MSFTA Liens, or possess or control the DIP MSFTA Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

**Provisions Relating to DIP Netting Agreement**

14.    ***Authorizations Regarding the DIP Netting Agreement.***    Pursuant to sections 362(b)(27) and 561 of the Bankruptcy Code, the Prepetition Netting Agreement is deemed terminated and closed out as of the date of the entry of this Interim Order, and the Prepetition Netting Liens shall be deemed irrevocably released and terminated.  Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, Ditech, Ditech Financial and RMS are immediately authorized and empowered to (a) enter into and perform their obligations under the DIP Netting Agreement, (b) execute and deliver all other DIP Documents required or advisable to effect the DIP Netting Agreement, and (c) take all actions which may be necessary or advisable for the performance by the Debtors under the DIP Netting Agreement.

15.    ***Security for the DIP Netting Parties***.

a.    Effective immediately upon entry of this Interim Order, the Bankruptcy Court hereby grants valid, binding, enforceable, non-avoidable, automatically and properly perfected, postpetition first-priority liens and security interests, pursuant to section

364(c)(2) of the Bankruptcy Code (collectively, the "**DIP Netting Liens**" and, together with the

DIP Repo Facility Backup Liens and the DIP MSFTA Liens, the "**DIP Liens**") to the DIP Agent,

for the benefit of itself and the other DIP Netting Parties, in each case, to secure Ditech's, Ditech

Financial's and RMS's obligations under the DIP Netting Agreement, as applicable, on the

security identified and described in the DIP Netting Agreement, and, in each case, all proceeds of

any of the foregoing (collectively, the "**DIP Netting Collateral**" and, together with the DIP Repo

Facility Backup Collateral and the DIP MSFTA Collateral, the "**DIP Collateral**").

      b.     The DIP Netting Liens are granted on the DIP Netting Collateral

*nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or

recordation or other filing or notice) of security agreements, control agreements, pledge

agreements, financing statements, mortgages, schedules or other similar documents, or the

possession or control by the applicable agents or any other DIP Credit Party.  As set forth below

in Paragraph 44 of this Interim Order, the DIP Agent or any other DIP Credit Party may, but shall

not be obligated to, execute, record, file, or notice such security agreements, control agreements,

pledge agreements, financing statements, mortgages, schedules or other similar documents with

respect to the DIP Netting Liens, or possess or control the DIP Netting Collateral, and the

automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary

to implement the foregoing.

**Provisions Relating to the Master Refinancing Agreement and DIP Guaranty**

      16.     ***Authorizations Regarding the Master Refinancing Agreement***.  Pursuant

to sections 105(a) and 363(b) and, to the extent applicable, section 364, of the Bankruptcy Code,

Ditech, Ditech Financial and RMS are immediately authorized and empowered to (a) enter into

and perform their obligations under the Master Refinancing Agreement, (b) execute and deliver

all other DIP Documents required or advisable to effect the Master Refinancing Agreement, and
(c) take all actions which may be necessary or advisable for the performance by the Debtors under
the Master Refinancing Agreement.

17.     ***Authorizations Regarding the DIP Guaranty***.  Pursuant to sections 105(a)
and 363(b) and, to the extent applicable, section 364, of the Bankruptcy Code, Ditech is
immediately authorized and empowered to (a) enter into and perform its obligations under the DIP
Guaranty, (b) execute and deliver all other DIP Documents required or advisable to effect the DIP
Guaranty, and (c) take all actions which may be necessary or advisable for the performance by the
Debtors under the DIP Guaranty.

**DIP Superpriority Claims**

18.     The DIP Agent, on behalf of itself and the DIP Credit Parties, is hereby
granted superpriority administrative expense claims pursuant to sections 364(c)(1), 503(b) and
507(b) of the Bankruptcy Code against (a) each of Ditech Financial and RMS to secure such
Debtor's DIP Obligations, on a joint and several basis, and (b) Ditech to secure Ditech's DIP
Obligations under the DIP Guaranty and the other DIP Documents to which it is a party.  The DIP
MSFTA Counterparties are hereby granted superpriority administrative expense claims pursuant
to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code against Ditech Financial to secure
Ditech Financial's DIP Obligations under the DIP MSFTAs *pari passu* with the superpriority
administrative expense claims against Ditech Financial granted in the preceding sentence (all of
the foregoing claims in this Paragraph, collectively, the "**DIP Superpriority Claims**").  The DIP
Superpriority Claims shall be senior to all other administrative expense or other claims, including
those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726,
1113, and 1114 of the Bankruptcy Code and shall have the relative priorities with respect to the

Forms of Adequate Protection granted to the Prepetition 1L/2L Parties as provided for in Paragraph 32 of this Interim Order and the National Founders Facility Adequate Protection granted to the National Founders Facility Parties as provided for in Paragraph 38 of this Interim Order. Notwithstanding the foregoing, the DIP Superpriority Claims shall be subject and subordinate in all respects to: (a) the Carve-Out; and (b) the First Lien Term Loan Obligations as they relate to and against the First Lien Term Loan Collateral only.

**<u>Other Provisions Relating to the DIP Documents</u>**

19.    ***Authorized Action***.   In furtherance of the foregoing, and without further approval of this Court, each Debtor is authorized and directed to perform all acts, and to make, execute and deliver all instruments and documents, that may be necessary or required by the performance by the Debtors under the DIP Documents, including, without limitation, the creation and perfection of the DIP Liens described in, provided for and perfected by this Interim Order and the DIP Documents.

20.    ***Transfer of Mortgagee ID Numbers***.    The DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents) in their sole discretion) shall have the right, following the occurrence of an event of default under the DIP Documents to transfer the existing HUD mortgagee ID numbers for no less than all of the mortgage loans that are subject to the DIP Reverse Repo Facility Agreement to the HUD mortgagee ID number specified by the DIP Agent; *provided* that such transfer shall be subject to HUD approval.  The DIP Agent, the initial DIP Lenders, Ditech Financial and RMS shall negotiate in good faith to modify and supplement the DIP Documents within thirty (30) days of the DIP Closing Date to reflect certain sub-agency and similar provisions that would apply in the event any such transfer is made to Nomura's HUD mortgagee ID number pursuant to this Paragraph, which modifications shall be in

form and substance reasonably satisfactory to the DIP Agent.  The DIP Agent shall have the option

in its sole discretion for such transfer to be made to either Nomura's or Barclays' HUD mortgagee

ID number.

21.     ***Validity of DIP Obligations***.   Upon entry of this Interim Order, the DIP

Documents shall represent valid, binding, and unavoidable obligations of the Debtors, enforceable

against the Debtors and their estates in accordance with their terms, subject to the terms of this

Interim Order.  The DIP Documents and this Interim Order constitute and evidence the validity

and binding effect of the DIP Obligations of the Debtors, which DIP Obligations shall be

enforceable against the Debtors, their estates and any successors thereto, including any trustee or

other estate representative appointed in the Chapter 11 Cases or any case under chapter 7 of the

Bankruptcy Code upon the conversion of any of the Chapter 11 Cases (each, a "**<u>Successor Case</u>**").

No obligation, payment or transfer to the DIP Agent, any other DIP Credit Party, or any other party

to the DIP Documents under the DIP Documents or this Interim Order shall be stayed, restrained,

voidable, or recoverable under the Bankruptcy Code or any applicable law (including under

sections 502(d), 544, 548, or 549 of the Bankruptcy Code), or subject to any defense, reduction,

set-off, recoupment, claim or counterclaim, except as otherwise expressly permitted herein.

22.     ***Treatment of DIP Liens***.  The DIP Liens shall not be made subject to or

*pari passu* with any lien or security interest heretofore or hereafter granted in the Chapter 11 Cases

or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other

estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the

conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or

in any Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor

Case.  No lien or interest avoided and preserved for the benefit of the Debtors' estates pursuant to

section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. Notwithstanding anything else herein to the contrary, in no event shall the First Lien Term Loan Collateral include, nor shall the First Lien Term Loan Security Interests attach to, collateral securing the DIP Obligations or any other Excluded Collateral, except to the extent set forth herein upon the indefeasible payment in full in cash of all DIP Obligations, Prepetition Warehouse Obligations, and Acceptable Refinancing, as applicable.

23. ***No Obligation to Make Purchases***. The DIP Credit Parties shall have no obligation to make purchases, enter into transactions, or otherwise extend any financial accommodation under the DIP Facilities unless and until the DIP Closing Date has occurred and the conditions precedent to the making of such purchases, entry into such other transactions or other extension of financial accommodation, as the case may be, under the relevant DIP Documents have been satisfied in full or waived in accordance with the terms of the relevant DIP Documents.

24. ***Use of DIP Proceeds.*** From and after the Petition Date, the Debtors are authorized, subject to the satisfaction of the terms and conditions set forth in this Interim Order and the DIP Documents, to use proceeds of the DIP Facilities (a) to pay the Prepetition Warehouse Obligations, (b) to effectuate (i) the sale and repurchase of mortgage loans and related assets pursuant to the DIP Forward Repo Facility and DIP Reverse Repo Facility and (ii) the sale and financing of the Servicer Advances pursuant to the DIP Servicer Advance Facilities, (c) for general working capital and operational expenses of the Debtors, and (d) to pay customary fees and closing costs in connection with the DIP Facilities and DIP Documents; *provided*, *that*, proceeds shall not be used for repayment of amounts owing under the National Founders Facility (as defined below),

and *provided further* that the use of such proceeds shall be restricted as provided for in Paragraphs 29 and 35 of this Interim Order.

25.    ***Costs, Fees, Expenses, and Indemnification***.

a.    The Debtors are authorized and directed to pay any and all reasonable and documented fees and expenses of the DIP Agent, the DIP Credit Parties and the other parties to the DIP Documents in connection with the DIP Documents, the Prepetition Warehouse Agents and the Prepetition Netting Buyers in connection with the Prepetition Warehouse Facilities, and the First Lien Term Loan Parties (subject to Paragraph 32(c) below), including administrative agent fees, custodial fees, and the fees and expenses of attorneys, advisors, accountants and other consultants, including pursuant to and in accordance with the RSA (as defined below), whether incurred before, on or after the Petition Date and whether or not the transactions contemplated hereby are consummated, including fees and expenses incurred in connection with (i) the preparation, negotiation and execution of this Interim Order and the DIP Documents; (ii) the syndication and funding of any of the DIP Facilities; (iii) the creation, perfection or protection of the DIP Liens (including all search, filing and recording fees); (iv) the on-going administration of the DIP Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Chapter 11 Cases (including the filing of any proofs of claim); (v) the enforcement of the DIP Documents or this Interim Order; (vi) any refinancing or restructuring of the DIP Facilities and the Prepetition 1L/2L Obligations; and (vii) any legal proceeding relating to or arising out of the DIP Facilities or the other transactions contemplated by the DIP Documents or this Interim Order, including the Chapter 11 Cases.  Payment of all such professional fees and expenses shall not be subject to allowance by the Bankruptcy Court or to the U.S. Trustee

guidelines; *provided* that requests for payment of such professional fees and expenses shall be provided to the Debtors, the U.S. Trustee and the Creditors' Committee on a 10 days' notice. Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

b.      The DIP Credit Parties, the First Lien Term Loan Parties, and the National Founders Facility Parties shall have no liability to any third party relating to the DIP Documents, the DIP Facilities, the First Lien Term Loan Obligations, the National Founders Facility Obligations, and the Debtors' use of the liquidity provided thereunder and hereunder and the use of the Prepetition 1L/2L Collateral and the National Founders Facility Collateral (each including Cash Collateral), and shall not, by virtue of entering into the transactions contemplated by the DIP Facilities or otherwise complying with the DIP Documents or this Interim Order, be deemed to be in control of the operations of the Debtors, to owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates or to be acting as a "responsible person" or managing agent with respect to the operation or management of the Debtors.  The Debtors shall, and are hereby authorized to, indemnify and hold harmless the DIP Credit Parties, the First Lien Term Loan Parties, and the National Founders Facility Parties, and their respective affiliates and Representatives from and against all losses, liabilities, claims, damages, penalties, actions, judgments, suits, expenses or disbursements of any nature whatsoever arising out of or relating to the DIP Documents or this Interim Order, including the syndication of any obligations thereunder, and the Debtors' use of the liquidity provided thereunder; *provided*, *however*, that the foregoing indemnity shall not apply to any actions of any indemnified parties determined in a final non-appealable judgment to constitute fraud or willful misconduct.  This indemnification shall survive and continue for the benefit of all such persons or entities.

26.    ***Modification of DIP Documents***.  The Debtors, the DIP Agent and the DIP

Credit Parties, as applicable, are authorized, subject to the DIP Documents, to implement, in

accordance with the terms of the respective DIP Documents, any amendments, waivers, consents

or other modifications to or under the DIP Documents (including any change to the number or

composition of DIP Repo Facility Purchasers, DIP Servicer Advance Facility VFN Noteholders,

or DIP MSFTA Counterparties) without further order of this Court unless such amendment,

waiver, consent or other modification (a) restricts, limits or prohibits any payments required

pursuant to Paragraph 25 of this Interim Order, or (b) shortens the maturity or the scheduled

termination date thereunder.

27.    ***Chapter 11 Milestones***.  The Debtors shall comply with the milestones set

forth in items a. and b. below; *provided* that, in the Final Order, the Debtors will request that

milestones identified below in items c. through g. shall apply upon entry of the Final Order (the

"**Chapter 11 Milestones**"):

> a.    on or before the date that is five (5) business days following the
> Petition Date, (1) the Bankruptcy Court shall have entered this
> Interim Order and (2) Ditech Financial, RMS, and SAF SPVs (as
> defined below) shall have entered into initial funding transactions
> under the DIP Repo Facilities and the DIP Servicer Advance
> Facilities;

> b.    on or before the date that is 35 days following the entry of this
> Interim Order, each of the following shall have been entered by the
> Bankruptcy Court:  (1) the Final Order, in form and substance
> satisfactory to the DIP Lenders, (2) final Chapter 11 Operating
> Orders[25] and (3) a final cash management order in form and

---

[25]    For purposes herein, "**Chapter 11 Operating Orders**" means interim orders (with respect to interim financing)
and final orders (with respect to final financing), in form and substance acceptable to the DIP Lenders:  (a)
authorizing Ditech Financial to continue in the ordinary course to perform its obligations under (x) that certain
Mortgage Selling and Servicing Contract with Fannie Mae (together with all addenda and amendments thereto
and incorporating all the applicable guides, the "**Ditech/Fannie Agreement**"), (y) that certain Master Agreement
with Freddie Mac (together with all addenda and amendments thereto and incorporating all the applicable guides,
the "**Ditech/Freddie Agreement**"), and (z) those certain Guaranty Agreements and Master Servicing Agreement
with Ginnie Mae (together with the cross default agreement, Acknowledgment Agreement, Escrow Agreement,

substance satisfactory to the DIP Lenders (the "**Final Cash Management Order**" and, together with any interim order approving cash management in form and substance satisfactory to the DIP Lenders (the "**Interim Cash Management Order**"), the "**Cash Management Orders**");

c.    on or before the date that is 15 days following the Petition Date, the Debtors shall have filed with the Bankruptcy Court a motion, in form and substance satisfactory to the Required Buyers and the Requisite Term Lenders, seeking entry of an order by the Bankruptcy Court approving bidding procedures in connection with a marketing and 363 sale process pursuant to one or more asset purchase agreements, merger agreements, or similar agreements that provide for repayment in full in cash of the obligations under the DIP Documents on the closing of such agreement;

d.    on or before the date that is 15 days following the Petition Date, the Debtors shall have filed with the Bankruptcy Court an acceptable plan of reorganization and a disclosure statement reasonably satisfactory to the Required Buyers and the Requisite Term Lenders with respect thereto;

e.    on or before the date that is 60 days following the Petition Date, the Bankruptcy Court shall have approved bidding procedures, in form and substance reasonably acceptable to the Required Buyers and the Requisite Term Lenders, and such approval shall be in full force and effect, and shall not have been (1) vacated, reversed or stayed or (2) amended or modified except as otherwise agreed to in writing by the Required Buyers and the Requisite Term Lenders;

f.    on or before the date that is 60 days following the Petition Date, the Debtors shall have obtained the Bankruptcy Court's approval of a disclosure statement for an acceptable plan of reorganization and solicitation procedures contemplating completion of a confirmation hearing with respect to an acceptable plan of reorganization no later than 115 days following the Petition Date, which disclosure statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to the Required Buyers and the Requisite Term Lenders, and the Bankruptcy Court's approval of such disclosure statement and solicitation procedures shall not have

---

Tri-party Agreement and the Corporate Guaranty, with all addenda and amendments thereto, and incorporating the applicable guides, the "**Ditech/Ginnie Agreement**"); and (b) authorizing RMS to perform under all applicable agreements with Ginnie Mae and HUD (collectively with the FHA, Ginnie Mae, Fannie Mae, and Freddie Mac, the "**GAs**") (together with all addenda and amendments thereto and incorporating all the applicable guides, the "**RMS Agreements**" and, together with the Ditech/Fannie Agreement, the Ditech/Freddie Agreement, and the Ditech/Ginnie Agreement, the "**GA Selling and Servicing Agreements**").

been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the Required Buyers and the Requisite Term Lenders; and

g.      one of the following milestones shall be satisfied on or before the date that is 125 days following the Petition Date:

(1)      the Debtors shall obtain entry of an order of the Bankruptcy Court confirming an acceptable plan of reorganization, which order (A) shall be (I) in form and substance satisfactory to the Required Buyers and the Requisite Term Lenders, to the extent relating to the termination of the commitments of the DIP Lenders under the DIP Documents, the payment in full in cash and full discharge of the obligations under the DIP Documents, and releases and other exculpatory provisions for the DIP Credit Parties and (II) otherwise in form and substance reasonably satisfactory to the Required Buyers and the Requisite Term Lenders, and (B) shall not have been amended, stayed or vacated other than as agreed to in writing by the Required Buyers and the Requisite Term Lenders; or

(2)      the Bankruptcy Court shall have entered an order approving one or more asset purchase agreements, merger agreements, or similar agreements that provides for repayment in full in cash of the obligations under the DIP Documents on the closing of such agreements (such order, the "**Sale Order**" and such agreements collectively, the "**Sale Agreement**"), in form and substance reasonably acceptable to the Required Buyers and the Requisite Term Lenders, and the Sale Order shall be in full force and effect, and shall not have been (A) vacated, reversed, or stayed or (B) amended or modified except as otherwise agreed to in writing by the Required Buyers and the Requisite Term Lenders;

*provided* that, in the event the board of directors of Ditech, Ditech Financial and RMS have determined to no longer pursue the Sale Agreement, then (x) Ditech, Ditech Financial and RMS shall notify the DIP Lenders thereof no later than the date that is the sum of (A) 95 days *plus* (B) five (5) business days following the Petition Date and (y) clause (g)(2) above shall cease to be an alternative and the Debtors shall be required to satisfy the Chapter 11 Milestone set forth in clause (g)(1) above.

28.      ***Rights and Remedies Following a DIP Termination Event***.

a.     The occurrence of any of the following events shall constitute an event of default (collectively, the "**DIP Events of Default**"):  (i) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order or any Final Order, or (ii) the occurrence of any events of default under Article V of the Master Refinancing Agreement, which include, among others:

(A)     failure to pay any payment obligation to any DIP Credit Party when due, including, without limitation, payment in full by the earliest of (1) the effective date of a plan of reorganization in any of the Chapter 11 Cases, (b) the consummation of a sale under section 363 of the Bankruptcy Code of all or substantially all of the assets of the Debtors, and (3) 180 days after the filing of the Chapter 11 Cases (such earlier date, the "**DIP Maturity Date**") or other termination date;

(B)     any representation or warranty of any Debtor, any Depositor, the DIP REO Subsidiary, any Non-Debtor SPV Issuer or any special purpose entity established by Ditech in connection with any DIP Servicing Advance Facility Agreement (together with the Non-Debtor SPV Issuers, the "**SAF SPVs**") made in the DIP Documents is found to be materially incorrect;

(C)     breach by the Debtors, the DIP REO Subsidiary, any Depositor or any SAF SPV of any covenant set forth in the DIP Documents;

(D)     occurrence of an event of default under any DIP Document or any breach or violation of the applicable DIP Orders or any Chapter 11 Operating Orders or the applicable Cash Management Order that, in each case, has not been cured or waived;

(E)     conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(F)     dismissal of any of the Chapter 11 Cases;

(G)     the appointment of a chapter 11 trustee, or a loss of exclusivity to file a chapter 11 plan of reorganization or solicit acceptances thereof;

(H)     failure to achieve the Chapter 11 Milestones in paragraph 27 a. and b.;

(I)     any reversal, revocation, or modification of any of the following orders without the consent of the DIP Lenders (in the case of subclause (5) below, other than a modification that is not adverse to any of the rights, claims or interests of any DIP Credit Party): (1) this Interim Order or any Final Order, (2) any Chapter 11 Operating Orders, (3) the Interim Cash Management Order or Final Cash Management Order, (4) after entry thereof, any order referred to in sub-clause (g) of Paragraph 27 above), or (5) after entry thereof, any of the other orders referred to in the Chapter 11 Milestones);

(J)     (1) loss or suspension of any of Ditech Financial's or RMS's status as an approved servicer or an approved issuer from any GA, (2) termination of any of the GA Selling and Servicing Agreements by their respective counterparties or (3) any GA engages in any setoff against any DIP Collateral;

(K)     entry of an order of the Bankruptcy Court granting any party other than the DIP Credit Parties relief from the automatic stay in any of the Chapter 11 Cases in a manner that is materially adverse to the rights, claims or interests of the DIP Credit Parties;

(L)     entry of an order of the Bankruptcy Court granting any party other than the DIP Credit Parties liens or claims on or against the DIP Collateral or any other material assets of the Debtors (except as provided in this Interim Order with respect to other material assets) the DIP REO Subsidiary, any Depositor or any SAF SPV (other than, solely with respect to assets that do not constitute DIP Collateral, (1) the existing liens granted to the First Lien Term Loan Agent and the Second Lien Notes Indenture Trustee on assets of the Debtors, (2) adequate protection liens granted to the First Lien Term Loan Agent and the Second Lien Notes Indenture Trustee in accordance with the DIP Orders and consistent with Schedule 3 to the DIP Term Sheet, (3) liens permitted under the First Lien Term Loan Credit Agreement (as amended and in effect on February 8, 2019) and the DIP Repo Facility Agreements and DIP Servicer Advance Facility Agreements);[26]

---

[26]  Provided, that, from the Petition Date until the DIP Maturity Date, no Debtor, SAF SPV, Depositor or DIP REO Subsidiary shall (i) issue or incur, or file a motion to issue or incur, any additional secured or unsecured term loan

(M)      the filing of any chapter 11 plan of reorganization (or a disclosure statement describing a chapter 11 plan of reorganization) in the Chapter 11 Cases or any motion to approve the Sale Agreement or any other asset purchase agreement or similar agreement, in any such case, that does not provide that all obligations of the Debtors with respect to the DIP Documents shall be paid in full in cash as per the terms of such agreements (other than with respect to any other asset purchase agreement relating to a sale or disposition on terms and conditions consented to by the DIP Lenders, subject to applicable prepayment requirements set forth in the DIP Documents);

(N)      (1) termination of the restructuring support agreement (the "**RSA**") between the Debtors and an ad hoc group of First Lien Term Loan Term Lenders (the "**Ad Hoc Term Loan Lenders**"), (2) the RSA is amended, waived or otherwise modified in a manner that is materially adverse to the rights, claims or interests of the DIP Credit Parties, or (3) the "Consenting Term Lenders" under and as defined in the RSA fail to hold at least two-thirds of the aggregate principal amount of loans outstanding under the First Lien Term Loan Credit Agreement and such failure continues unremedied for a period of five (5) business days;

(O)      exercise by First Lien Term Loan Lenders or any other creditor (other than DIP Agent and/or the Required Buyers, in any such case, in accordance with the DIP Documents) of remedies (1) against any DIP Collateral, or (2) in a manner that is materially adverse to the rights, claims or interests of the DIP Credit Parties;

(P)      [reserved];

(Q)      the Sale Agreement at any time after execution thereof, shall be (1) amended in a manner that results in such Sale Agreement no longer complying with the requirements under the DIP Documents or (2) withdrawn or terminated, unless such Sale Agreement is replaced within a period of time to be agreed by a new Sale Agreement that provides for repayment in full in cash of the obligations under the DIP Documents on the closing of such agreement, which agreement shall be in form and substance reasonably satisfactory to the DIP Lenders and the Requisite Term

---

debt, debt bonds or debt for borrowed money, or  (ii) enter into, or file a motion to approve, any other debt arrangements similar to the DIP Repo Facility Agreements and DIP Servicer Advance Facility Agreements.

Lenders; *provided* that this sub-clause (Q) shall cease to apply in the event that Paragraph 27(g)(2) of the Chapter 11 Milestones no longer applies pursuant to the proviso set forth at the end of this sub-clause (Q);

(R)    any sale, transfer or other disposition of (1) any servicing rights with respect to any mortgage loans or rights to reimbursement for advances related thereto or (2) any other assets of any Debtor, the DIP REO Subsidiary, any Depositor or any SAF SPV, in the case of this sub-clause (2), and the sale, transfer or other disposition of such other asset would materially impair the rights and claims of the DIP Credit Parties (as determined by the Required Buyers in their sole discretion) in and to the DIP Collateral (other than the sale, transfer or other disposition of such servicing rights or assets occurring in the ordinary course, *provided*, *that*, the outstanding repurchase price or loan amount (including any accrued and unpaid interest and fees with respect thereto) owed to DIP Lenders with respect to such sold mortgage servicing rights or rights to reimbursement for advances related thereto or, to the extent constituting DIP Collateral, other sold assets shall be repaid no later than substantially concurrently with such sale, transfer or other disposition;

(S)    entry of an unstayed postpetition judgment against the Debtors, the DIP REO Subsidiary, any Depositor or any SAF SPV in excess of $5 million;

(T)    the "Servicer" (as defined consistent with the Prepetition Forward Repo Facility Agreement and the Prepetition Reverse Repo Facility Agreements) of any mortgage loan held as Collateral has defaulted under the applicable "Servicer Agreement (as defined consistent with the Prepetition Forward Repo Facility Agreement and the Prepetition Reverse Repo Facility Agreements) and the applicable Seller has not, within thirty (30) days, (1) replaced such Servicer with a successor servicer approved by the DIP Agent in its sole discretion or (2) repurchased all purchased mortgage loans subject to such Servicing Agreement;

(U)    an "event of default" under any DIP Repo Facility Agreements, DIP Servicer Advance Facility Agreement, DIP MSFTA, or the DIP Guaranty;

(V)    Ditech Financial, RMS, any Debtor, the DIP REO Subsidiary, any Depositor or any SAF SPV shall admit its

inability to, or its intention not to, perform any of its obligations under the DIP Repo Facility Agreements or DIP Servicer Advance Facility Agreements to which it is a party; *provided* that the filing of the Chapter 11 Cases shall not, in and of itself, be deemed any admission of such party's inability to perform;

(W)     the occurrence of a Change in Control (as defined in the DIP Documents);

(X)     the occurrence of a Cash Collateral Termination Event (as defined below), subject to any cure period set forth in sub-clause (b) of Paragraph 31 below;

(Y)     any governmental authority or any person, agency or entity acting or purporting to act under governmental or regulatory authority (1) shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the property of any of Ditech, Ditech Financial, RMS or any affiliate thereof, (2) shall have taken action to displace the management of any of Ditech, Ditech Financial, RMS or any affiliate thereof, or (3) shall have taken any action to curtail its authority in any material respect in the conduct of the business of any of Ditech, Ditech Financial, RMS, or any affiliate thereof, or any enforcement action that either materially impairs the ability of any of Ditech, Ditech Financial or RMS to perform its obligations under the DIP Documents or prevents it from carrying on its business or substantial part thereof, and, in the case of this sub-clause (3), such action shall not have been discontinued or stayed within thirty (30) days;

(Z)     any of Ditech Financial or RMS fails to transfer Purchased Assets (as such term is defined in the applicable DIP Documents) to the DIP Agent or its designee on the applicable purchase date (provided that the applicable DIP Lenders (or the DIP Agent, on behalf of the applicable DIP Lenders) have tendered the related purchased price);

(AA)    an Act of Insolvency (as such term is to be defined in the DIP Documents) shall have occurred with respect to the DIP REO Subsidiary, any Depositor or any SAF SPV;

(BB)    assignment or attempted assignment by any of Ditech, Ditech Financial, RMS, any Depositor or any SAF SPV of any DIP Repo Facility Agreement or DIP Servicer Advance Facility Agreement to which it is a party or any of its rights

or obligations thereunder without first obtaining the specific written consent of DIP Agent (at the direction of the Required Buyers in their sole discretion), or the granting by any of Ditech Financial or RMS of any security interest, lien or other encumbrances on any Purchased Assets to any person other than a DIP Credit Party or any custodian or agent acting on their behalf;

(CC)    any of the DIP Repo Facility Agreements or the DIP Servicer Advance Facility Agreements shall for any reason cease to create a valid, first priority security interest in any material portion of the DIP Collateral purported to be covered thereby; and

(DD)    any of Ditech, Ditech Financial, RMS, or the DIP REO Subsidiary shall seek to disaffirm, terminate, limit, challenge, repudiate or reduce its obligations under any DIP Repo Facility Agreements or the DIP Servicer Advance Facility Agreements or otherwise challenge the ability of DIP Agent or any DIP Lender to enforce its rights and remedies thereunder or any DIP Repo Facility Agreements or the DIP Servicer Advance Facility Agreements at any time shall fail to be in full force and effect in all material respects in accordance with its terms or shall not be enforceable in all material respects in accordance with its terms.

b.    Upon the occurrence and during the continuation of a DIP Event of Default, the DIP Agent (at the direction of the Required Buyers in their sole discretion) shall:  (i) deliver a notice of DIP Event of Default; (ii) terminate any pending funding or transactions under any DIP Repo Facility Agreement, DIP Servicer Advance Facility Agreement or any DIP MSFTA; (iii) declare the principal of and accrued interest, fees, expenses and other amounts under the DIP Documents to be due and payable; (iv) place an administrative hold on any deposit account or securities account that constitutes DIP Collateral; and (v) upon three (3) business days' written notice to the Debtors (the "**DIP Forbearance Period**"), exercise all other rights and remedies available to the DIP Credit Parties; *provided*, *however*, that, with respect to any DIP Event of Default under sub-clauses (J), (I) (solely with respect to the loss of the status referred to

therein) or sub-clause (O) of Paragraph 28(a) or the failure to pay all obligations under the DIP

Documents in full in cash by the DIP Maturity Date, the DIP Agent (at the direction of the

Required Buyers in their sole discretion) may exercise all rights and remedies immediately upon

the occurrence of said default; *provided* that nothing herein affects (i) the rights, duties and

obligations of the parties to the Fannie Mae Acknowledgement Agreements,  (ii) the rights, duties

and obligations of the parties to the Freddie Mac Acknowledgement Agreements, or (iii) the

rights, duties and obligations of the parties to the Ginnie Mae Acknowledgment Agreements.

c.    Notwithstanding anything herein to the contrary, (i) if a DIP Event

of Default exists at the end of the DIP Forbearance Period, then the DIP Credit Parties shall be

permitted to immediately exercise all of their other rights and remedies under the DIP Documents,

*provided* that nothing herein affects (x) the rights, duties and obligations of the parties to the

Fannie Mae Acknowledgement Agreements or (y) the rights, duties and obligations of the parties

to the Freddie Mac Acknowledgement Agreements, and (ii) the DIP Credit Parties shall not be

required to permit any funding or other financial accommodation under the DIP Documents

during the DIP Forbearance Period unless and until the forgoing conditions shall have been

satisfied during such period.  The automatic stay provisions of section 362 of the Bankruptcy

Code are hereby vacated and modified to the extent necessary, without the need for any further

order of the Bankruptcy Court, to permit the DIP Credit Parties to exercise all rights and remedies

under the DIP Documents and under this Interim Order, in accordance with the terms of this

Interim Order.

d.    Upon the occurrence of a DIP Maturity Date Event of Default, the

exercise of remedies under any of the DIP Repo Facility Agreements or the DIP Servicer Advance

Facility Agreements may be commenced at the direction of either of the initial DIP Lenders;

*provided*, *however*, that to the extent that, and for so long as, the following conditions are satisfied

(but solely during the 45-day period immediately following the DIP Maturity Date) the exercise

of such remedies shall only be commenced at the direction of the Required Buyers:

(i)     the Debtors have filed with the Bankruptcy Court a plan of reorganization or asset purchase agreement in accordance with the DIP Orders (the "**Acceptable Plan**" or "**Acceptable Sale Agreement**", as applicable);

(ii)    (A) a confirmation or sale hearing, as applicable, has been scheduled for the confirmation or approval of such Acceptable Plan or Acceptable Sale Agreement and the Debtors are working to obtain Court confirmation or approval thereof, or (B) the Debtors have obtained entry of either an order of the Bankruptcy Court confirming such Acceptable Plan or the Sale Order approving such Acceptable Sale Agreement and are pursuing the effective date or consummation thereof, as applicable; and

(iii)   an updated DIP budget is delivered within ten (10) days prior to the DIP Maturity Date demonstrating sufficient liquidity for the Debtors and their non-Debtor subsidiaries to reach the expected effective date of such Acceptable Plan or consummation of the transactions under such Acceptable Sale Agreement, as applicable.

e.   In any hearing regarding any exercise of rights or remedies by the

DIP Agent or the DIP Credit Parties, the only issues that may be raised by the Debtors and any

party in interest shall be whether, in fact, one or more DIP Events of Default have occurred and

are continuing or the contested use of Cash Collateral of the Prepetition 1L/2L Parties pursuant

to Paragraph 31 of this Interim Order and Cash On Hand.

29.     ***Maintenance and Disposition of DIP Collateral and Cash Management***.

Until the indefeasible payment in full in cash of all DIP Obligations and the termination of the

obligation of the DIP Credit Parties to extend liquidity pursuant to the DIP Facilities, the Debtors

shall maintain their cash management system as in effect as of the Petition Date, (i) subject to the

DIP Documents, (ii) subject to the terms of this Interim Order, (iii) subject to any orders of the

Bankruptcy Court with respect to the Debtors' cash management system (which orders shall be in

form and substance acceptable to the DIP Agent and the other requisite DIP Credit Parties (determined in accordance with the DIP Documents) in their sole and absolute discretion), and (iv) in a manner which, in any event, shall be satisfactory to the DIP Agent and the other requisite DIP Credit Parties (determined in accordance with the DIP Documents). The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or the proceeds thereof) without the prior written consent of the DIP Agent in accordance with the DIP Documents or DIP MSFTA Counterparties, as applicable (and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or the DIP MSFTA Counterparties, or from any order of this Court), except as otherwise provided in the DIP Documents or otherwise ordered by the Bankruptcy Court.

30.    *Rights of Access and Information*.  Without limiting the rights of access and information afforded the DIP Credit Parties under the DIP Documents, the Prepetition 1L/2L Parties under the Prepetition 1L/2L Documents, and the National Founders Parties under the National Founders Facility, the Debtors shall be, and hereby are, required to afford Representatives, agents and/or employees of the DIP Agent, the DIP MSFTA Counterparties, the DIP Lenders, the First Lien Term Loan Agent, and the National Founders Facility Parties reasonable access to:  (a) the Debtors' premises, (b) knowledgeable officers of the Debtors, (c) the Debtors' books and records, and (d) the Debtors' properties and other collateral of any Debtor against whom such parties are granted DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Claims, the National Founders Facility Adequate Protection Liens, and the National Founders Superpriority Claims under this Interim Order, and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.

**Provisions Relating to Use of Cash Collateral of the Prepetition 1L/2L Parties**

31.    ***Cash Collateral Defined.***    For purposes of this Interim Order, the term "Cash Collateral", including, without limitation, all cash proceeds of the Prepetition 1L/2L Collateral of the Debtors, shall have the meaning ascribed in section 363(a) of the Bankruptcy Code, but shall in no event include the DIP Collateral or the Excluded Collateral (as such term is defined in the Prepetition 1L/2L Documents).

a.    ***Use of the Prepetition 1L/2L Collateral (Including Cash Collateral).*** The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use the Prepetition 1L/2L Collateral (including Cash Collateral), during the period from the Petition Date through the occurrence of the earliest of any of the following events (each, a "**Cash Collateral Termination Event**"), subject to any cure period set forth in sub-clause (b) of this Paragraph 31 below:

(i)    the termination of the RSA;

(ii)    the acceleration of Ditech's, Ditech Financial's, RMS's, or the Non-Debtor SPV's obligations under the DIP Forward Repo Facility, the DIP Reverse Repo Facility, the DIP Servicer Advance Facilities, the DIP MSFTAs, the DIP Guaranty, the DIP Netting Agreement, or the Master Refinancing Agreement;

(iii)    the failure of the Debtors to make Adequate Protection Payments (as defined below) as and when required under this Interim Order; *provided* that following receipt of the necessary notices, the Debtors shall have the benefit of a three (3) business day cure period with respect to this sub-clause (b)(iii);

(iv)    the failure of the Debtors to provide financial reporting in accordance with Paragraph 32(e) and the applicable agreements; *provided* that, notwithstanding anything to the contrary in this Interim Order or the applicable agreements, following receipt of the necessary notices, the Debtors shall have the benefit of a five (5) business day cure period with respect to this sub-clause (b)(iv); and

(v)    the dismissal of the Chapter 11 Cases, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee in these Chapter 11 Cases.

b.    ***Cure Period with Respect to Cash Collateral Termination Event.***  Upon the occurrence of a Cash Collateral Termination Event, the Debtors' right to use the Prepetition 1L/2L Collateral (including Cash Collateral) shall cease upon five (5) business days' (the "**Waiting Period**") written notice of such Cash Collateral Termination Event provided to the Carve-Out Notice Parties (as defined below), the DIP Agent and the DIP MSFTA Counterparties, by the First Lien Term Loan Agent, unless the Debtors have obtained an order from the Bankruptcy Court allowing use of the Prepetition 1L/2L Collateral (including Cash Collateral) on a non-consensual basis.  The automatic stay under section 362 of the Bankruptcy Code is hereby vacated and modified to the extent necessary to permit the First Lien Term Loan Agent to deliver such notice.  During the Waiting Period, except as may be otherwise ordered by the Bankruptcy Court, the Debtors shall not use any Prepetition 1L/2L Collateral (including Cash Collateral) to pay any expenses except those which are (a) necessary to preserve the value of the Debtors' estates or (b) necessary to contest in good faith whether a Cash Collateral Termination Event has occurred or is continuing.

32.    ***Adequate Protection of the Prepetition 1L/2L Parties***.  The Prepetition 1L/2L Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition 1L/2L Collateral (including Cash Collateral) for, and equal in amount to, any diminution in the value of the Prepetition 1L/2L Parties' interests in the Prepetition 1L/2L Collateral, resulting from the sale, lease, or use by the Debtors of any of the Prepetition 1L/2L Collateral (including Cash Collateral) and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "**Diminution in Value**").  As adequate protection, the Prepetition 1L/2L Parties are hereby granted the following for, and in an

amount equal to, any Diminution in Value of the Prepetition 1L/2L Parties' interests in the

Prepetition 1L/2L Collateral (collectively, the "**Forms of Adequate Protection**"):

      a.     ***Adequate Protection Liens.***

      (i)     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the First Lien Term Loan Agent (on behalf of itself and the other First Lien Term Loan Parties), is hereby granted a replacement security interest in and lien on (the "**First Lien Term Loan Adequate Protection Liens**") the same property of the Debtors on which the First Lien Term Loan Agent (on behalf of itself and the other First Lien Term Loan Parties) has a perfected, first-priority security interest and lien prior to the Petition Date pursuant to First Lien Term Loan Documents as in effect on the date of the RSA, whether arising prepetition or postpetition (the "**First Lien Term Loan Adequate Protection Collateral**"), which liens and security interests shall be subordinate only to (A) Permitted First Lien Term Loan Prior Liens to the extent any such Permitted First Lien Term Loan Prior Liens are senior in priority under applicable non-bankruptcy law to the liens securing the First Lien Term Loan Obligations and (B) the Carve-Out; *provided that* in no event shall First Lien Term Loan Adequate Protection Collateral include, or any First Lien Term Loan Adequate Protection Liens attach to, DIP Collateral or any other Excluded Collateral until such time as it ceases to constitute Excluded Collateral (including, but not limited to, the Securitization Entities Collateral) or collateral for the DIP Obligations or any refinancing thereof acceptable to the DIP Lenders (any such refinancing, an "**Acceptable Refinancing**") after indefeasible payment in full in cash of all DIP Obligations, Prepetition Warehouse Obligations, and Acceptable Refinancing, as applicable.  The First Lien Term Loan Adequate Protection Liens shall not be (i) made subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code, or otherwise, except as expressly provided in this Interim Order or any Final Order. Upon indefeasible payment in full in cash of all DIP Obligations, Prepetition Warehouse Obligations, and Acceptable Refinancing, as applicable, the First Lien Term Loan Adequate Protection Liens shall also attach as a perfected, first-priority security interest in and against all property that would have constituted Excluded Collateral (as defined in the First Lien Term Loan Credit Documents) solely due to being subject to a lien securing such DIP Obligations, Prepetition Warehouse Obligations, and Acceptable Refinancing, as

applicable; *provided further*, that the First Lien Term Loan Adequate Protection Liens shall not attach to the proceeds of the Chapter 5 avoidance actions;

(ii)    Pursuant to section 361 and 363(e) of the Bankruptcy Code, the Second Lien Notes Indenture Trustee (on behalf of itself and the other Second Lien Notes Parties), is hereby granted a replacement security interest in and lien on (the "**Second Lien Notes Adequate Protection Liens**" and, together with the First Lien Term Loan Adequate Protection Liens, the "**Adequate Protection Liens**") the same property of the Debtors on which the Second Lien Notes Indenture Trustee (on behalf of itself and the other Second Lien Notes Parties) has a perfected, second-priority security interest and lien prior to the Petition Date pursuant to the Second Lien Notes Documents in effect on the date of the RSA, whether arising prepetition or postpetition (the "**Second Lien Notes Adequate Protection Collateral**" and, together with the First Lien Term Loan Adequate Protection Collateral, the "**Adequate Protection Collateral**"), which liens and security interests shall be subordinate only to (i) the First Lien Term Loan Adequate Protection Liens, (ii) the prepetition liens granted to the First Lien Term Loan Agent for the benefit of the First Lien Term Loan Parties, (iii) Permitted Second Lien Notes Prior Liens to the extent any such liens are senior in priority under applicable non-bankruptcy law to the liens securing the Second Lien Notes, and (iv) the Carve-Out; *provided* that (a) in no event shall Second Lien Notes Adequate Protection Collateral include, or any Second Lien Notes Adequate Protection Liens attach to, any DIP Collateral or any other Excluded Collateral, and (b) nothing in the DIP Orders shall be deemed to grant any interest in any DIP Collateral or other Excluded Collateral to the Second Lien Notes Parties.  The Second Lien Notes Adequate Protection Liens shall not be (i) made subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code, or otherwise, except as expressly provided in this Interim Order or any Final Order; *provided further*, that the Second Lien Notes Adequate Protection Liens shall not attach to the proceeds of the Chapter 5 avoidance actions.

b.    ***Section 507(b) Claims.***  Pursuant to sections 361 and 364(c)(1) of the Bankruptcy Code, the First Lien Term Loan Agent, on behalf of itself and the other First Lien Term Loan Parties, is hereby granted a superpriority administrative expense claim against each

of the Debtors solely to the extent of any Diminution in Value of the First Lien Term Loan Collateral, as provided for in section 507(b) of the Bankruptcy Code, which administrative expense claim in the Chapter 11 Cases or any Successor Cases shall be senior to all other administrative expense or other claims, including those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, other than (i) with respect to Ditech Financial, the DIP Superpriority Claims only with respect to assets that do not constitute First Lien Term Loan Collateral, and (ii) with respect to RMS, the DIP Superpriority Claims and the National Founders Superpriority Claims; in each case, only with respect to assets that do not constitute First Lien Term Loan Collateral, and in all events, shall be subject and subordinate to the Carve-Out (the "**Adequate Protection Superpriority Claims**").

c.      ***Adequate Protection Payments.***  Pursuant to sections 361 and 363 of the Bankruptcy Code, the Debtors shall promptly pay, whether incurred prior to or following the Petition Date, all reasonable fees and expenses of the First Lien Term Loan Agent (in accordance with the First Lien Term Loan Credit Agreement, including the fees and expenses of Davis Polk & Wardwell LLP as counsel to the First Lien Term Loan Agent and otherwise in accordance with the First Lien Loan Credit Agreement) and First Lien Lenders, but limited, in the case of fees and expenses of legal counsel and professional advisors, to the reasonable and documented fees and expenses of (i) Kirkland & Ellis LLP ("**Kirkland**") and (ii) FTI Consulting ("**FTI**"); *provided* that, subject to the terms of the Prepetition 1L/2L Intercreditor Agreement, the right of any party in interest (other than, so long as the RSA (as defined below) is in effect, the Debtors) to file a complaint with the Bankruptcy Court to recharacterize any such payments as payments against principal on the ground that the allowed claims of the First Lien Term Loan Parties are under-collateralized is reserved, subject to the rights of the First Lien Term Loan Agent

and First Lien Term Loan Lenders to oppose such complaint and raise any and all defenses thereto (the "**Adequate Protection Payments**" and, together with the Adequate Protection Liens and the Adequate Protection Superpriority Claims, the "**Adequate Protection Obligations**").

        d.     ***Priority of Claims and Liens.***   For the avoidance of doubt, nothing in this Interim Order is intended to, or shall operate to, create claims, liens, or security interests (a) in or against any First Lien Term Loan Collateral that in any way are senior to or have priority over the First Lien Term Loan Obligations, other than the First Lien Term Loan Adequate Protection Liens, or (b) in or against any DIP Collateral that in any way are senior to or have priority over the DIP Obligations.   Upon the indefeasible payment in full in cash of all DIP Obligations, Prepetition Warehouse Obligations and any Acceptable Refinancing, as applicable, the First Lien Term Loan Parties shall have a fully-perfected, first-priority lien and security interest on all property that previously constituted Excluded Collateral (as defined in the First Lien Term Loan Credit Documents) prior to repayment in full in cash of all DIP Obligations, Prepetition Warehouse Obligations, and Acceptable Refinancing, as applicable, without the need to take any further actions or execute, record, file, or notice any security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents.

        e.     ***Financial Reporting.***

    (i)     Until the effective date of a chapter 11 plan, the Debtors shall continue to provide the First Lien Term Loan Agent, Kirkland, and FTI with financial and other reporting in compliance with the First Lien Term Loan Credit Agreement and any other reporting described herein, including monthly financial reporting, including with respect to cash flow and liquidity forecasts, in form and substance reasonably acceptable to the Requisite Term Lenders (as defined in the RSA); *provided* that delivery of audited financial statements for the fiscal year most recently ended accompanied by an audit report with a "going concern" or similar qualification shall not constitute a breach of such reporting obligations. Additionally, on each

Wednesday following the entry of this Interim Order through the effective date of a chapter 11 plan, the Debtors shall provide (i) an estimated aggregate ending cash balance versus the aggregate forecasted cash balance and (ii) narrative explanations of key variances; *provided* that Kirkland and FTI may retain such budget on a professionals' eyes only basis.

(ii)   National Founders shall receive (i) the same financial reporting received by the DIP Lenders under the DIP Orders, (ii) the reporting National Founders is otherwise entitled to receive in accordance with the National Founders Facility, and (iii) such additional reporting agreed to by RMS upon reasonable request by National Founders.

33.   ***Sufficiency of Adequate Protection***.   Under the circumstances, and given that the Forms of Adequate Protection and the National Founders Facility Adequate Protection are consistent with the Bankruptcy Code, the Bankruptcy Court finds that such adequate protection is reasonable and sufficient to protect the interests of the Prepetition 1L/2L Parties and National Founders Facility Parties; *provided* that any of the Prepetition 1L/2L Parties and the National Founders Facility Parties, upon a material change in circumstances, may request further or different adequate protection.

**Provisions Relating to Use of Cash Collateral of the National Founders Parties**

34.   ***Cash Collateral Defined.***   For purposes of this Interim Order, the term "National Founders Facility Cash Collateral", including, without limitation, the Advance Account Funds and all cash proceeds of the National Founders Mortgage Assets, shall constitute "cash collateral" as described in section 363(a) of the Bankruptcy Code.

35.   ***Limitations on Use of the National Founders Facility Collateral (Including Cash Collateral).***   The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use the National Founders Collateral (as defined herein, including National Founders Facility Cash Collateral) solely for the purposes set forth in the National Founders Facility and to fulfill obligations to the National Founders Facility Parties under

this Interim Order; *provided*, *however*, that the National Founders Parties shall have consent rights

over any budget provided under the DIP Orders to the extent it includes use of Advance Account

Funds and then only to the extent of the use of such Advance Account Funds.

36.     ***National Founders Events of Default.*** The Debtors are hereby authorized,

subject to the terms and conditions of this Interim Order, to use the National Founders Collateral

(including National Founders Facility Cash Collateral), during the period from the Petition Date

through the occurrence of the earliest of any of the following events (each, a "**National Founders**

**Event of Default**"), subject to any cure period set forth in sub-clause (b) of this Paragraph 37

below:

    (i)    the occurrence of an Event of Default set forth in Section 5.1 of the National Founders NPA, other than with respect to any Event of Default under the National Founders NPA that would be triggered or otherwise breached as a result of the National Founders Insolvency Related Events or the failure to timely deliver any quarterly or annual financial statement of RMS in accordance with Section 6.3 of the National Founders Servicing Agreement (so long as such financial statements are delivered no later than the time frames set forth in the DIP Reverse Repo Facility Agreement);

    (ii)    the occurrence of a Servicer Termination Event (as defined in the National Founders Servicing Agreement) set forth in Section 7.1 of the National Founders Servicing Agreement, other than with respect to any Servicer Termination Event under the National Founders Servicing Agreement that would be triggered or otherwise breached as a result of the National Founders Insolvency Related Events or the timely failure to deliver any quarterly or annual financial statements of RMS in accordance with Section 6.3 of the Servicing Agreement (so long as such financial statements are delivered no later than the time frames set forth in the DIP Reverse Repo Facility Agreement);

    (iii)    suspension or loss of any RMS's status as either (x) an approved servicer or (y) an approved issuer, with Ginnie Mae, Fannie Mae, Freddie Mac, FHA or HUD (collectively, the "**GAs**");

    (iv)    termination of any of the RMS Agreements;

    (v)    any breach or violation of the DIP Orders or any Chapter 11 Operating Orders that, in each case, has not been cured or waived by National Founders;

    (vi)    conversion of any Chapter 11 Case to a case under Chapter 7 of the

Bankruptcy Code;

(vii)  dismissal of any of the Chapter 11 Cases;

(viii)  the appointment of a chapter 11 trustee in the Chapter Cases;

(ix)  any failure to achieve any of the National Founders Chapter 11 Milestones (as defined below);

(x)  any entry, reversal, revocation, or modification, in each case, that materially adversely affects National Founders, without the consent of National Founders, of (i) the DIP Orders, as determined by National Founders in its sole and reasonable discretion, (ii) any Chapter 11 Operating Order, or (iii) any order confirming a chapter 11 plan of reorganization or sale of all or substantially all of the assets of RMS;

(xi)  the filing of any motion or pleading seeking, or entry of an order approving, the transfer of the Participation Interest (as defined in the National Founders Participation Agreement), or any part thereof, to anyone other than the RMS SPV;

(xii)  entry of an order of the Bankruptcy Court granting any party other than National Founders relief from the automatic stay in any of the Chapter 11 Cases in a manner that is materially adverse to the rights, claims or interests of National Founders or the RMS SPV; and

(xiii)  termination of the RSA or the RSA is amended, waived or otherwise modified in a manner that is materially adverse to the rights, claims or interests of National Founders or the RMS SPV as determined by National Founders in its sole and absolute discretion.

37.  ***Cure Period with Respect to National Founders Cash Collateral Termination Events; Remedies.***  Upon five (5) business days' written notice to RMS and the RMS SPV of a continuing Event of Default, the automatic stay shall automatically be deemed lifted or modified without further relief from the Court to the extent necessary so that National Founders and the RMS SPV (at the direction of National Founders and in accordance with the National Founders Facility) may, as applicable, do any of the following:

(i)  terminate and cease to be bound by the National Founders Assurances;

(ii)  foreclose on the National Founders Facility Collateral;

(iii)  exercise all other rights and remedies available under the National Founders Facility;

(iv)  exercise all such other remedies agreed to by the Debtors.

*provided*, *however*, notwithstanding the foregoing, nothing herein shall prevent the Debtors' from

challenging the validity of any notice issued in relation thereto.

38.    ***Adequate Protection of the National Founders Facility Parties***.   The

National Founders Facility Parties are entitled, pursuant to sections 361 and 363(e) of the

Bankruptcy Code, to adequate protection (within the meaning of adequate protection under

sections 361, 362, 363, and 364 of the Bankruptcy Code) of their interests in the National Founders

Facility Collateral (including Cash Collateral), including the following (collectively, the "**National**

**Founders Facility Adequate Protection**"):

(i)    reimbursement of reasonable and documented fees and expenses of National Founders (including reimbursement of fees and expenses of National Founders' legal counsel) related the Chapter 11 Cases, including accrued pre-petition fees and expenses and post-petition fees and expenses; provided that such post-petition fees and expenses shall not be in excess of $110,000;

(ii)    covenant by RMS to perform under the National Founders Servicing Agreement and stipulation and agreement by Debtors that any claims for actual damages arising from RMS's failure to perform or otherwise breach the National Founders Servicing Agreement shall constitute superpriority administrative expense claims against RMS, which claims, for the avoidance of doubt, shall be subordinate in priority and payment to the Carve-out, the DIP Superpriority Claims, and the the Adequate Protection Superpriority Claims

(iii)    for National Founders, superpriority administrative claim against RMS for all draws on Advance Account Funds (collectively with the claims provided under in sub-paragraph 38(ii), the "**National Founders Superpriority Claims**"), which National Founders Superpriority Claims, for the avoidance of doubt, shall be subordinate in priority and payment to the Carve-out, the DIP Superpriority Claims, and the the Adequate Protection Superpriority Claims;

(iv)    for the RMS SPV (for the benefit of National Founders), superpriority administrative claim against RMS for any diminution in value of the National Founders Facility Collateral, which claims, for the avoidance of doubt, shall be subordinate in priority and payment to the Carve-out, the DIP Superpriority Claims, and the the Adequate Protection Superpriority Claims;

(v)    for National Founders and the RMS SPV (for the benefit of the National

Founders), replacement liens over the National Founders Facility Collateral, as applicable (the "**National Founders Facility Adequate Protection Liens**"), which National Founders Facility Adequate Protection Liens shall receive the same priority as they were intended to receive pre-petition; and

(vi)    for National Founders, a pledge of the equity of the RMS SPV (the "**SPV Equity**", and collectively with the National Founders Facility Pre-Petition Collateral and National Founders Facility Adequate Protection Liens, the "**National Founders Facility Collateral**"); *provided*, *that*, for the avoidance of doubt, such pledge shall be deemed extinguished on the Effective Date.

39.    ***National Founders Assurances***.  In exchange for the National Founders Facility Adequate Protection, the Debtors shall receive from National Founders the following assurances (the "**National Founders Assurances**"):

(i)    agreement that National Founders shall not declare, and that there shall be no, Event of Default or Servicer Termination Event (as those terms are defined in the National Founders Facility), in each case, solely as a result of:  (i) Material Adverse Change or breach of any representation, warranty or covenant that customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by residential mortgage servicers or other companies operating under similar lines of business as the Debtors; (ii) the commencement of the Chapter 11 Cases or (ii) the insolvency of RMS (clauses (ii) and (iii) collectively, the "**National Founders Facility Insolvency Related Events**");

(ii)    agreement that National Founders shall not commence the exercise of remedies against RMS or the National Founders Facility Collateral under the National Founders Servicing Agreement or the National Founders NPA, as applicable, that would otherwise be available to National Founders as a result and on account of the National Founders Insolvency Related Events;

(iii)    so long as no Event of Default or Servicer Termination Event occurs, other than the National Founders Insolvency Related Events, agreement that National Founders shall continue advancing Advance Account Funding Amounts and Supplemental Advance Account Funding Amounts (as defined in the National Founders Servicing Agreement, and, collectively referred to herein as, the "**Advance Account Funds**") in accordance with Sections 3.8(a) and (b) of the Nation Founders Servicing Agreement; and

(iv)    upon the effective date of a chapter 11 plan, National Founders acknowledges and agrees that the National Founders Facility shall be reinstated and resume pursuant to its terms as in place before the commencement of the Chapter 11 Cases so long as (i) no Event of Default

or Servicer Termination Event has occurred, other than the National Founders Insolvency Related Events, and (ii) RMS has (x) assumed the National Founders Servicing Agreement, or (y) assumed and assigned the National Founders Servicing Agreement with consent of National Founders.

40.    ***National Founders Chapter 11 Milestones.*** As long as the National

Founders Assurances remain outstanding, the Debtors shall comply with the milestones set forth

in items (i) through (iii) below; *provided* that, in the Final Order, the Debtors will request that the

milestone identified in items (iv) below shall apply upon entry of the Final Order (the "**National**

**Founders Chapter 11 Milestones**"):

(i)    on or before the date that is five (5) business days following the Petition Date, entry of this Interim Order, which, for the avoidance of doubt, shall include the proposed National Founders Facility stipulations and waiver of any challenges thereto;

(ii)    on or before the date that is thirty-five (35) business days following the Petition Date, entry of the Final Order, which, for the avoidance of doubt, shall include the terms and conditions set forth therein with respect to the consensual use of the National Founders Facility Cash Collateral;

(iii)    on or before the date that is forty (40) business days following the Petition Date, entry of the Chapter 11 Operating Orders, in form and substance acceptable to National Founders; and

(iv)    the effective date of the Debtors' plan of reorganization shall not have occurred on or before the date that is 120 business days following the Petition Date

**Other Miscellaneous Provisions**

41.    ***Restrictions on Use of Proceeds of the DIP Facilities and Use of Cash***

***Collateral; Certain Restrictions on Subsequent Financing.***

a.    None of the DIP Facilities, the Prepetition 1L/2L Collateral, or the

National Founders Facility Prepetition Collateral (each including Cash Collateral), or any

proceeds of any of the foregoing, or any portion of the Carve-Out, may be used to pay, directly

or indirectly by the Debtors, non-Debtor affiliates, the Creditors' Committee, any trustee or other

estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other party

(or to pay any professional fees, disbursements, costs, or expenses incurred in connection

therewith) for any of the following actions or activities (collectively, the "**Proscribed Actions**")

without the written consent of the DIP Agent, the DIP MSFTA Counterparties, the First Lien

Term Loan Agent, the Prepetition Forward Repo Facility Parties, the Prepetition Reverse Repo

Facility Parties, the Prepetition Servicer Advance Facility Parties, the Prepetition MSFTA

Counterparties, the Prepetition Netting Parties, and the National Founders Facility Parties, as

applicable:  (a) to seek authorization to obtain liens or security interests on any asset of the Debtors

that are senior to, or on a parity with, the DIP Liens, the DIP Collateral, the DIP Superpriority

Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the

Prepetition 1L/2L Security Interests (other than Permitted Prior Warehouse Liens, Permitted First

Lien Term Loan Prior Liens, Permitted Second Lien Notes Prior Liens), or the National Founders

Facility Collateral; (b) to seek authorization to obtain claims against the Debtors or their property

that are senior to, or *pari passu* with, the liens and claims identified in the preceding sub-clause

(a); or (c) except as expressly set forth herein, directly or indirectly prepare, assert, join,

commence, support, or prosecute any action for any claim, counterclaim, action, proceeding,

application, motion, objection, defense, or other contested matter seeking any order, judgment,

determination, or any other relief against, or adverse to the interests of, the First Lien Term Loan

Parties, the National Founders Facility Parties, the Prepetition Warehouse Parties, or the DIP

Credit Parties, and any of their respective Representatives with respect to any transaction,

occurrence, omission, action, or other matter, including, without limitation, (i) any Avoidance

Action, (ii) any "lender liability" claims and causes of action, (iii) any action with respect to the

validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to,

the Prepetition 1L/2L Obligations, the Adequate Protection Liens, the Adequate Protection Superiority Claims, the National Founders Facility Obligations, the National Founders Facility Adequate Protection, the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations, (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid, or subordinate, in whole or in part, any of the obligations identified in the preceding clause (iii), (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the parties hereunder or under any of the documents referred to herein, including claims, proceedings, or actions that might prevent, hinder, or delay any of such parties' assertions, enforcement, realizations, or remedies on or against the their collateral and rights herein, or (vi) objecting to, contesting with, or interfering with, in any way, such parties' enforcement or realization upon any of their collateral or rights, once a DIP Event of Default or a Cash Collateral Termination Event has occurred; *provided* that the Debtors shall be permitted to challenge the validity of any alleged DIP Event of Default or Cash Collateral Termination Event.

b.        The Debtors are authorized and directed to cause the DIP REO Subsidiary, the Depositors and the SAF SPVs to not (i) issue or incur any additional secured or unsecured term loan debt, debt bonds or debt for borrowed money, (ii) enter into any other debt arrangements similar to the DIP Repo Facility Agreements and the DIP Servicer Advance Facility Agreements, or (iii) sell, transfer or otherwise dispose of any servicing rights with respect to any mortgage loans or rights to reimbursement for advances related thereto or any other assets of the DIP REO Subsidiary, any Depositor or any SAF SPV, which sale, transfer or other disposition of such other asset would materially impair the rights and claims of the DIP Credit Parties.

42.        ***Carve-Out***.

  a. *Carve Out*. As used in this Interim Order, the "**Carve-Out**" shall be comprised of the following components:

  (i) <u>Clerk and U.S. Trustee Fees.</u>  All fees required to be paid to the Clerk of this Court and to the Office of the United States Trustee (the "**U.S. Trustee**") under section 1930(a) of title 28 of the United States Code and 31 U.S.C. § 3717 (collectively, "**Clerk and UST Fees**").

  (ii) <u>Chapter 7 Trustee Fees.</u>  All reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7 Trustee Fee Cap**").

  (iii) <u>Allowed Professional Fees Incurred Prior to a Carve-Out Trigger Notice.</u> To the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid or paid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the date of delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice.  For purposes of the Carve-Out, Allowed Professional Fees shall include (i) any restructuring, sale, success or similar fee of any Professional Person and (ii) fees and expenses of any third party professionals employed by any individual member of the Creditors' Committee (collectively, the "**Pre-Termination Amount**").

  (iv) <u>Allowed Professional Fees Incurred After a Carve-Out Trigger Notice.</u> Allowed Professional Fees of Professional Persons incurred on and after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice shall be subject to an aggregate cap of $10 million (the "**Post Trigger Notice Carve-Out Fee Cap**").

  b. *Carve-Out Trigger Notice*.  Upon the occurrence and during the continuance of any DIP Event of Default, the DIP Agent (at the direction of the Required Buyers) may deliver a written notice invoking the Post Trigger Notice Carve-Out Fee Cap (the "**Carve-Out Trigger Notice**") to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee, and lead counsel for the Creditors' Committee.  The Carve-Out Trigger Notice may be delivered by email (or any other means permitted under the DIP Documents).

c.      *Delivery of Weekly Fee Estimates.*  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement (each such statement, a "**Weekly Statement**") setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**").  No later than one business day after the delivery of a Carve-Out Trigger Notice, each Professional Person shall deliver one additional statement (the "**Final Statement**") to the Debtors setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of the Carve-Out Trigger Notice.

d.      *Carve-Out Account.*  Upon the entry of this Interim Order, the Debtors shall establish a segregated account, which shall not be subject to control of the DIP Agent or the Prepetition 1L/2L Parties (the "**Carve-Out Account**"), and which shall be funded weekly in the amount of the Estimated Fees and Expenses (the "**Carve-Out Account Required Balance**") exclusively with cash on hand, including any remaining proceeds from extensions of credit under the DIP Facilities (after giving effect to the funding by Ditech Financial or RMS, as applicable, of the purchased mortgage loans or other DIP Collateral sold and transferred to the relevant DIP Credit Parties in connection with such extension of credit) (the "**Cash On Hand**"). In no event shall Cash On Hand include any of the following: (i) any DIP Collateral, any other Collateral (as defined in the Master Refinancing Agreement or any proceeds of the foregoing; (ii) any cash, cash equivalents or other assets in any bank accounts subject to DIP Liens or that are otherwise subject to a lien securing any DIP Obligations pursuant to the DIP Documents,

including, without limitation, the RMS DIP Liquidity Account (as defined in the Cash

Management Order) or any such bank accounts of any Non-Debtor SPV Issuer or Depositor

(collectively, "**DIP Accounts**"); or (iii) funds on deposit in, or being transferred through, any

unencumbered bank accounts (e.g., account(s) into which HUD deposits funds) but designated

for transfer or deposit into any DIP Account (the foregoing collectively, the "**DIP Lender Cash**").

Amounts in the Carve-Out Account shall be held in trust to pay all amounts included the Carve-

Out.   All Allowed Professional Fees of Professional Persons shall be paid to the applicable

Professional Person first from the Carve-Out Account in accordance with the order or orders of

the Court allowing such Allowed Professional Fees.   Notwithstanding anything to the contrary in

this or any other Court order, the Carve-Out Account and the amounts on deposit in the Carve-

Out Account shall be available and used only to satisfy obligations of Professionals Persons

benefitting from the Carve-Out.   The failure of the Carve-Out Account to satisfy Professional

Fees in full shall not affect the priority of the Carve-Out.

> e.      *Carve-Out Funding After a Carve-Out Trigger Notice*.      The

following provisions with respect to the Carve-Out Account shall apply only upon delivery of a

Carve-Out Trigger Notice:

> (i)      On the date of the Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall be deemed to constitute a demand to the Debtors to utilize all Cash On Hand as of such date to fund the Carve-Out Account in an amount equal to (A) the Chapter 7 Trustee Fee Cap, (B) any Pre-Termination Amount not already funded to the Carve-Out Account or paid, and (C) the Post Trigger Notice Carve-Out Fee Cap (the "**Aggregate Unfunded Amount**") to be held in trust to pay all amounts included the Carve-Out.

> (ii)      On or after the date of a Carve-Out Trigger Notice, the First Lien Term Loan Agent or the Second Lien Notes Indenture Trustee shall not foreclose on cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Account has been fully funded; *provided* that nothing herein shall restrict the DIP Agent from blocking or limiting withdrawals from or otherwise placing an administrative hold on any DIP Accounts (including, without limitation, by

sending any control activation notices to depository banks pursuant to any control agreement) or, subject to the DIP Forbearance Period, if applicable, foreclosing on DIP Lender Cash; *provided* that, for the avoidance of doubt, the DIP Agent shall not foreclose on the Carve-Out Account.

(iii)    All funds in the Carve-Out Account shall be used first to pay the obligations set forth in the definition of the Carve-Out set forth above until paid in full. All payments and reimbursements made from the Carve-Out Account shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

(iv)    To the extent any funds remain in the Carve-Out Account after payment of all amounts included in the Carve-Out, such funds be paid to the First Lien Term Loan Credit Parties in accordance with their rights and priorities under this Interim Order.

43.    ***No Direct Obligation to Pay Allowed Fees; No Waiver of Right to Object to Fees.***  The DIP Credit Parties, the First Lien Term Loan Parties, and the National Founders Facility Parties shall not be responsible for payment or reimbursement of any fees or disbursement of any Professional Person incurred in connection with these Chapter 11 Cases, any Successor Cases, or otherwise.  Nothing in this Interim Order or otherwise shall be construed: (a) to obligate the DIP Credit Parties, the First Lien Term Loan Parties, or the National Founders Facility Parties in any way, to pay compensation to, or reimburse expenses of, any Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (b) as consent to the allowance of any fees and expenses of Professionals; or (c) to affect the rights of the DIP Credit Parties or the First Lien Term Loan Parties, or any other party-in-interest to object to the allowance and payment of such fees and expenses.

44.    ***Automatic Perfection of DIP Liens and the Adequate Protection Liens.***

a.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens, the Adequate Protection Liens, and the National Founders Facility Adequate Protection Liens without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any

jurisdiction, taking possession of or control over any assets, or taking any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Adequate Protection Liens, or the National Founders Facility Adequate Protection Liens, or to entitle the DIP Credit Parties, the Prepetition 1L/2L Parties, or the National Founders Facility Parties to their respective priorities granted herein.

b.      Notwithstanding the foregoing, the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, and the National Founders Facility Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law, financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over any assets, or take any other action, as they may elect, in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, or a National Founders Facility Party chooses, in its sole discretion, to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over any assets, or otherwise confirm perfection of the liens and security interests granted to the DIP Credit Parties, the DIP MSFTA Counterparties, the First Lien Term Loan Parties, the Second Lien Notes Parties, and the National Founders Facility Parties hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order) immediately upon entry of this Interim Order.

c.      The DIP Agent, the DIP MSFTA Counterparties, the First Lien
Term Loan Agent, the Second Lien Notes Indenture Trustee, and the National Founders Facility
Parties may, but shall not be obligated to, obtain consents from any landlord, licensor, or any
other party in interest to file mortgages, financing statements, notices of lien or similar
instruments, or otherwise record or perfect their security interests and liens, in which case:  (i) all
such documents shall be deemed to have been recorded and filed as of the time and on the date
of entry of this Interim Order; and (ii) no defect in any such act shall affect or impair the validity,
perfection or enforceability of such liens.  The automatic stay of section 362(a) of the Bankruptcy
Code shall be modified to the extent necessary to permit the DIP Agent, the DIP MSFTA
Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, and
the National Founders Facility Parties to take all actions, as applicable, referenced in this sub-
clause (c).

d.      The Debtors are authorized to execute and deliver promptly upon
demand by the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, the
Second Lien Notes Indenture Trustee, or the National Founders Facility Parties, as applicable, all
such financing statements, mortgages, notices and other documents as the DIP Agent, the DIP
MSFTA Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture
Trustee, or the National Founders Facility Parties may reasonably request.  The Debtors are
authorized to, and shall, execute and deliver to the DIP Agent, the DIP MSFTA Counterparties,
the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, or the National
Founders Facility Parties,  as applicable, such agreements, financing statements, mortgages,
instruments and other documents as the DIP Agent, the DIP MSFTA Counterparties, the First
Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, or the National Founders

Facility Parties may reasonably request to evidence, confirm, validate, or perfect the DIP Liens, the Adequate Protection Liens, or the National Founders Facility Adequate Protection Liens and the failure by the Debtors to execute or deliver any documentation relating to the DIP Liens, the Adequate Protection Liens, or the National Founders Facility Adequate Protection Liens shall in no way affect the validity, enforceability, nonavoidability, perfection, or priority of such liens.

e.   In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, or the National Founders Facility Parties may, but shall not be obligated to, file a true and complete copy of this Interim Order and, following entry of the Final Order, the Final Order, in any place at which any such instruments would or could be filed, together with a description of the DIP Liens and DIP Collateral, the Adequate Protection Liens and the Adequate Protection Collateral, and the National Founders Facility Adequate Protection Liens and the National Founders Facility Collateral and such filings by the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, or the National Founders Facility Parties shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed as of the entry of this Interim Order.

f.   The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Bankruptcy Court, to permit the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, the Second Lien Notes Indenture Trustee, and the National Founders Facility Parties, as applicable, to exercise all rights and remedies under this Interim Order.

45.     ***Good Faith***.  The DIP Credit Parties, the First Lien Term Loan Parties, and the National Founders Facility Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, in accordance with sections 363(m) and 364(e) of the Bankruptcy Code, as applicable, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of the Bankruptcy Court, or any other court, the DIP Credit Parties, the First Lien Term Loan Parties, and the National Founders Facility Parties are entitled to the protections provided in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the National Founders Facility Adequate Protection Liens, or the National Founders Facility Adequate Protection.  Any liens or claims granted to the DIP Credit Parties, the Prepetition 1L/2L Parties, or the National Founders Facility Parties hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

46.     ***Proofs of Claim***.  None of the DIP Credit Parties, the Prepetition Warehouse Parties, the Prepetition 1L/2L Parties, or the National Founders Facility Parties shall be required to file proofs of claim in the Chapter 11 Cases, and the Debtors' stipulations in this Interim Order or the Final Order shall be deemed to constitute a timely filed proof of claim.  Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any Successor Cases shall not

apply to the DIP Credit Parties, the Prepetition Warehouse Parties, the Prepetition 1L/2L Parties, or the National Founders Facility Parties.  The First Lien Term Loan Agent is authorized, but not directed, to file in the Debtors' lead chapter 11 case *In re Ditech Holding Corporation*., et al., Case No. 19-10412 (JLG), a single, master proof of claim on behalf of itself and the First Lien Term Loan Parties on account of any and all of their respective claims arising under the First Lien Term Loan Credit Documents and hereunder (the "**Master Proof of Claim**") against each of the Debtors. Upon the filing of the Master Proof of Claim against each of the Debtors, the First Lien Term Loan Agent and the other First Lien Term Loan Parties and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the First Lien Term Loan Credit Documents, and the claim of each First Lien Term Loan Party (and each of its respective successors and assigns), named in the Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases. The First Lien Term Loan Agent shall not be required to identify whether any First Lien Term Loan Party acquired its claim from another party and the identity of any such party or to amend the Master Proof of Claim to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this Paragraph and the Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each First Lien Term Loan Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The First Lien Term Loan Agent shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the

Debtors to the First Lien Term Loan Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the First Lien Term Loan Agent.

47.    ***Investigation Rights***.  Notwithstanding any other provisions of this Interim Order, the Creditors' Committee and any other party-in-interest (other than the Debtors) are permitted, by no later than (a) with respect to parties-in-interest other than the Creditors' Committee, 45 calendar days after entry of this Interim Order, and (b) with respect to the Creditors' Committee, 30 calendar days after the appointment of the Creditors' Committee (the "**Chapter 11 Challenge Period**") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, to seek to obtain standing to challenge, and to challenge, if standing is obtained (each, a "**Challenge**") the Debtors' Stipulations, or any other stipulations or findings contained in this Interim Order or any Final Order with respect to the Prepetition Warehouse Liens, the Prepetition Warehouse Obligations, the First Lien Term Loan Security Interests, the First Lien Term Loan Obligations, the National Founders Facility Prepetition Liens, or the National Founders Facility Obligations, including, without limitation, any challenge to the validity, priority or enforceability of the Prepetition Warehouse Liens, the Prepetition Warehouse Obligations, the First Lien Term Loan Obligations, the First Lien Term Loan Security Interests, the National Founders Facility Obligations, or the National Founders Facility Prepetition Liens to assert any claim or cause of action against the Prepetition Warehouse Parties, the First Lien Term Loan Parties, or the National Founders Facility Parties including, without limitation, whether in nature of a setoff, counterclaim, or defense; *provided* that if a Creditors' Committee is appointed, the Creditors' Committee shall be subject to a budget not to exceed $50,000 in connection with the investigation and prosecution of any Challenge (the "**Investigation Budget**"); *provided* that any fees, expenses or costs incurred by the Creditors'

Committee in excess of the Investigation Budget shall not constitute an allowable administrative

expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.  If any of

the Chapter 11 Cases are converted to a case under chapter 7 of the Bankruptcy Code prior to the

latest date by which the Chapter 11 Challenge Period would end pursuant to this Paragraph, then

any chapter 7 trustee appointed in such converted case shall have a maximum of thirty (30)

calendar days (the "**Chapter 7 Challenge Period**" and, together with the Chapter 11 Challenge

Period, the "**Challenge Period**") after the date that the Chapter 11 Case is converted to bring any

such Challenge.  The Challenge Period may only be extended:  (a) with the prior written consent

of the Prepetition Warehouse Agents, the First Lien Term Loan Agent, or the National Founders

Facility Parties, as applicable, with reference to such parties' respective liens and collateral only

or (b) pursuant to an order of the Bankruptcy Court, entered after notice and a hearing, and upon

a showing of good cause for such extension.  Except to the extent asserted in an adversary

proceeding or contested matter filed during the Challenge Period, the expiration of such Challenge

Period (to the extent not otherwise waived or barred), shall mean that (i) any and all Challenges or

potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements,

waivers, releases, affirmations, acknowledgements and stipulations contained in this Interim Order

and any Final Order shall be irrevocably and forever binding on the Debtors, the Creditors'

Committee and all parties-in-interest and any and all successors-in-interest as to any of the

foregoing, including any chapter 7 trustee, without further action by any party or the Bankruptcy

Court and all such parties shall be deemed to have absolutely and unconditionally released, waived,

and forever discharged and acquitted the Prepetition Warehouse Parties, the First Lien Term Loan

Parties, and the National Founders Facility Parties and any of their respective controlling persons,

affiliates or successors or assigns, and each of the respective officers, directors, employees, agents,

attorneys, or advisors of each of the foregoing (the "**Released Parties**") from any and all obligations and liabilities to the Debtor (and its successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, including, without limitation, any claims for recharacterization, subordination, or substantive consolidation, arising out of or relating to (as applicable) the Prepetition Warehouse Facilities, the First Lien Term Loans, or the National Founders Facility, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that any of the Debtors at any time had, now have or may have, or that their successor or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured or unmatured or known or unknown; and (iii) all of the Prepetition Warehouse Obligations, Prepetition 1L/2L Obligations, and the National Founders Facility Obligations shall be deemed allowed on a final basis, the Prepetition Warehouse Liens, the Prepetition 1L/2L Security Interests, and the National Founders Facility Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in this Interim Order or any Final Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such

Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.  Nothing in this Interim Order vests or confers on any person, including, without limitation, the Creditors' Committee or any other statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to directly or indirectly support or pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

48.     ***No Third Party Rights***.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

49.     ***Section 506(c) Waiver***.  In the Final Order, the Debtors will request that no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, against any of the DIP Credit Parties, or the First Lien Credit Parties, or the National Founders Facility Parties.

50.     ***Section 552(b)***.  In the Final Order, the Debtors will request that the "equities of the case" exception under section 552(b) shall not apply to the DIP Credit Parties (by its terms), the First Lien Credit Parties, or the National Founders Facility Parties.

51.     ***No Marshaling/Applications of Proceeds***.  In the Final Order, the Debtors will request that the DIP Credit Parties,the First Lien Credit Parties, and the National Founders Facility Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any obligations, liens or collateral acknowledged or approved pursuant to this Interim Order or the Final Order.

52.   ***Credit Bidding.***   The DIP Credit Parties and, subject to paragraph 40 herein, First Lien Term Loan Credit Parties, as applicable, shall have the right to credit bid up to the full amount of the DIP Obligations or First Lien Term Loan Obligations, as applicable, in any sale of applicable collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.   For the avoidance of doubt, no entity (including the First Lien Loan Parties) other than the DIP Credit Parties shall have a right to credit bid in connection with any sale that includes any DIP Collateral whatsoever, unless the DIP Obligations are indefeasibly paid in full in cash.

53.   ***Intercreditor Matters***.   Except as expressly provided herein, nothing in this Interim Order shall be construed to impair, modify or otherwise affect any intercreditor, subordination or similar agreement or arrangement in respect of the Prepetition 1L/2L Obligations, including the Prepetition 1L/2L Intercreditor Agreement, which are enforceable to the fullest extent provided by section 510(a) of the Bankruptcy Code and applicable law.   The Prepetition 1L/2L Intercreditor Agreement shall remain in full force and effect during the Chapter 11 Cases and nothing in this Interim Order, including the provision of the Second Lien Notes Adequate Protection Liens, shall alter, impair, or affect the rights and obligations arising under the Prepetition 1L/2L Intercreditor Agreement in any way.

54.   ***Ginnie Mae.***   Nothing in this Interim Order or the DIP Documents shall preclude or limit Ginnie Mae's rights pursuant to 12 U.S.C. § 1721(g) or the Ginnie Mae Agreements. Nothing in this Interim Order or the DIP Documents shall be construed to limit the right of any governmental unit to take any action not subject to the automatic stay.

55.   ***U.S. Government***.   In determining to make any loan under the DIP Documents or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., as amended, or any similar federal or state statute).   Nothing in this Interim Order or the DIP Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).   As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

56.   ***Authorizations Regarding the Non-DIP Hedges.***   Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are immediately authorized and empowered to enter into, perform its obligations under, and take all actions that may be necessary or advisable for the performance under (a) the Fannie Selling Guide with respect to the Fannie Hedges, (b) the Prepetition Other MSFTAs, and (c) the Postpetition Other MSFTAs; subject to the prior written consent of the DIP Agent (acting at the direction of the Required Buyers); *provided* that, for the avoidance of doubt, any such Fannie Hedges, Prepetition Other MSFTAs and Postpetition Other MSFTAs shall not constitute "DIP MSFTAs."

57.    ***Discharge Waiver***.  The Debtors expressly stipulate, and the Bankruptcy Court finds and adjudicates that, none of the obligations, liens or superpriority claims granted or approved by this Interim Order shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations, as applicable, have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.

58.    ***Modification of Automatic Stay***.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order.

59.    ***No Waiver by Failure to Seek Relief***.   The failure or delay of any DIP Credit Parties, the First Lien Credit Parties, or any National Founders Facility Party to seek relief or otherwise exercise their respective rights and remedies under this Interim Order or the documents governing such agreements or facilities, or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise.

60.    ***Binding Effect of Interim Order***.  Immediately upon entry by the Bankruptcy Court (notwithstanding any applicable Bankruptcy Rules or any other law or rule to the contrary), the terms and provisions of this Interim Order, including the liens granted herein, shall become valid and binding upon and inure to the benefit of all the parties hereto and their respective successors and assigns.  To the extent there is any applicable stay of this Interim Order, it is hereby waived.

61.    ***No Modification of Interim Order***.  The Debtors irrevocably waive the right to seek and shall not seek or consent, directly or indirectly without the prior written consent of the DIP Agent, the DIP MSFTA Counterparties, the First Lien Term Loan Agent, or the National

Founders Facility Parties, as applicable, which consent may be refused in their sole and absolute discretion: (a) any modification, stay, vacatur, amendment or extension of this Interim Order; (b) a priority claim for any administrative expense or unsecured claim against the Debtors to the fullest extent permitted under the Bankruptcy Code in the Chapter 11 Cases or any Successor Case, equal or superior to any lien or superpriority claim granted pursuant to this Interim Order.

62.     ***Interim Order Controls***.   In the event of any inconsistency between the terms and conditions of the DIP Documents, this Interim Order or the Cash Management Orders, the provisions of this Interim Order shall govern and control solely to the extent of the inconsistency; *provided* that in the event of any inconsistency between the DIP Events of Default set forth in Paragraph 28(a)(A) – (DD) of this Interim Order and Article V of the Master Refinancing Agreement, the Master Refinancing Agreement shall govern and control solely to the extent of the inconsistency**, except as to the Chapter 11 Milestones in Paragraph 28a.(H) [JLG]**.

63.     ***Survival***.   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Bankruptcy Court abstains from hearing the Chapter 11 Cases or any Successor Case.   The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided in this Interim Order until all obligations related thereto have been paid in full.

64.     ***Preservation of Rights Granted Under this Interim Order***.

a.      Without in any way limiting the preceding Paragraph, if an order

dismissing the Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise

is at any time entered, the Debtors shall request that such order shall provide (in accordance with

sections 105 and 349 of the Bankruptcy Code) that (i) the liens and superpriority claims granted

pursuant to this Interim Order shall continue in full force and effect, shall maintain their priority

as provided in this Interim Order and shall, notwithstanding such dismissal, remain binding on all

parties in interest until all obligations pertaining thereto shall have been indefeasibly paid in full

in cash (with interest) and the related commitments shall have been terminated in accordance with

their terms and (ii) the Bankruptcy Court shall retain non-exclusive jurisdiction, notwithstanding

such dismissal, for the purposes of enforcing such claims and obligations.

b.      If any or all of the provisions of this Interim Order are hereafter

reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity and enforceability of any obligations incurred prior to the actual receipt by the

affected parties of written notice of the effective date of such reversal, stay, modification or

vacation and (ii) the validity and enforceability of the liens and superpriority claims authorized

or created hereby.   Notwithstanding any such reversal, stay, modification or vacation, the

obligations incurred by the Debtors hereunder and under the applicable documents, prior to the

actual receipt of written notice of the effective date of such reversal, stay, modification or

vacation, shall be governed in all respects by the original provisions of this Interim Order, and

the parties shall be entitled to all the rights, remedies, privileges and benefits of sections 363(m)

and 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the applicable documents.

65.   ***Final Hearing.***   The Final Hearing is scheduled for March 14, 2019 at 11:00

a.m. (Eastern Time) before the Honorable James L. Garrity, United States Bankruptcy Judge, the

United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New

York, New York 10004-1408.   Any objections to the entry of the Final Order shall be filed and

served on the following parties so as to be received by March 7, 2019 at 4:00 p.m. (Eastern Time) :

(a) the Office of the United States Trustee for Region 2; (b) the Debtors' five (5) largest secured

creditors on a consolidated basis; (c) the Debtors' forty (40) largest unsecured creditors on a

consolidated basis; (d) the Internal Revenue Service; (e) the United States Attorney's Office for

the Southern District of New York; (f) counsel to the First Lien Term Loan Agent, Davis Polk &

Wardwell LLP, 450 Lexington Ave., New York, NY 10017 (Attn:  Brian M. Resnick, Esq. and

Michelle McGreal, Esq.); (g) counsel to the Ad Hoc Term Loan Lenders, Kirkland & Ellis LLP,

300 North LaSalle, Chicago, IL 60654 (Attn:  Patrick Nash, Jr., P.C. and John Luze, Esq.); (h)

Wilmington Savings Fund Society, FSB, as trustee under that certain Indenture for 9.0% Second

Lien Senior Subordinated PIK Toggle Notes due 2024, 500 Delaware Avenue, Wilmington,

Delaware 19801 (Attn: Corporate Trust, Walter Investment); (i) counsel to the ad hoc group of

holders of Second Lien Notes, Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East,

33rd Floor, Los Angeles, CA 90067 (Attn: Gregory Bray and Melainie K. Mansfield, Esq.); (j)

counsel to certain of the DIP Credit Parties, Skadden, Arps, Slate, Meagher & Flom, Four Times

Square, New York, NY 10036 (Attn.:  Sarah M. Ward, Esq. and Mark M. McDermott, Esq.); (k)

counsel to certain of the DIP Credit Parties, Alston & Bird LLP, 90 Park Avenue, New York, NY

10016 (Attn:  Karen Gelernt, Esq. and Ronald Klein, Esq.) and Jones Day, 250 Vesey Street, New

York, NY 10281 (Attn:  Scott J. Greenberg, Esq. and Benjamin Rosenblum, Esq.); (l) counsel to

Fannie Mae, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA

90071 (Attn:  Darren L. Patrick, Esq. and Steve Warren, Esq.), Two Embarcadero Center, 28th

Floor, San Francisco, CA 94111 (Attn:  Jennifer Taylor, Esq.); (m) counsel to Freddie Mac,

McKool Smith, 600 Travis Street, Suite 7000, Houston, TX 77002 (Attn:  Paul D. Moak, Esq.),

One Bryant Park, 47th Floor, New York, NY 10036 (Attn:  Kyle A. Lonergan, Esq.); (n U.S.

Department of Housing and Urban Development, 451 Seventh St., SW, Room 9250, Washington,

DC 20410 (Attn: Lisa Mulrain, Assistant General Counsel, Office of General Counsel, Finance

Division); (o) counsel to National Founders LP, Cadwalader, Wickersham & Taft LLP, 200

Liberty St., New York, NY 10281 (Attn: Ingrid Bagby, Esq. and Nicholas B. Vislocky, Esq.); (p)

the Depositors; (q) the Non-Debtor SPVs; and (r) known creditors who have or that the Debtors

reasonably believe may have a security interest in the Debtors' assets.

　　　　　66.　　**Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction

to enforce this Interim Order according to its terms to the fullest extent permitted by applicable

law.


Dated: February 13, 2019
　　　　New York, New York　　　　　　　　　/s/ *James L. Garrity, Jr.*
　　　　　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge