Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
Robert B. Orgel, Esq.
Steven W. Golden, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

*Proposed Counsel to the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **DITECH HOLDING CORPORATION, et al.,**[1] | : | **Case No. 19-10412 (JLG)** |
|  | : |  |
|  | : | **(Jointly Administered)** |
| Debtors. | : |  |

---------------------------------------------------------------x

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES
WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED
JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS
AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN
DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

Dated: April 4, 2019

New York, New York

Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Proposed Counsel for the Official Committee
of Unsecured Creditors of Ditech Holding
Corporation, et al.*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     BACKGROUND ........................................................................................... 5

III.    OBJECTION................................................................................................... 7

        A.      The Plan is Unconfirmable. .............................................................. 7

                1.      Where a Plan is Patently Unconfirmable, a Disclosure Statement Should not be Approved. ........................................................ 7

                2.      The Plan Violates the "Best Interest of Creditors Test." ........................... 8

                3.      The Plan Improperly Intermingles the Assets and Liabilities of the Debtors Resulting in a *De Facto* Substantive Consolidation Without an Assessment of Whether Consolidation is Appropriate. ........ 11

                4.      The Distribution to Class 3 Creditors May Violate the Absolute Priority Rule. .............................................................................. 13

                5.      The Plan Discriminates Unfairly between Similar Classes of Creditors. ............................................................................. 14

                6.      Even if the Holders of the Term Loan Claims are Undersecured, the Gifting Provisions of the Plan Violate the Absolute Priority Rule. ............................................................................... 15

        B.      The Disclosure Statement Does Not Contain Adequate Information and Cannot be Approved. ................................................................. 18

                1.      Numerous Critical Exhibits are Missing from the Disclosure Statement. ........................................................................... 18

                2.      The Disclosure Statement Fails to Disclose the Nature and Purpose of each Debtor Entity and Affiliates, their Assets and Liabilities. .......... 22

                3.      There is Inadequate Disclosure Regarding the Basis for Consolidating the Debtor Entities Under the Plan. ................................. 23

                4.      There is Inadequate Disclosure Regarding the Plan Releases. ............... 23

                5.      The Disclosures Relating to Go-Forward Trade Creditors are Inadequate. .......................................................................... 25

6.      Further Disclosure Regarding Management Incentives is
        Necessary. ............................................................................ 25

7.      Other Missing Disclosures ................................................... 26

8.      The Disclosure Statement Fails to Meet the Standards of Section
        1125 of the Bankruptcy Code. .............................................. 27

C.      The Bidding and Sale Procedures Proposed in the Solicitation Procedures
        Motion Should be Revised ............................................................... 30

1.      The Proposed Solicitation and Bidding Procedures Timeline
        Should Be Extended .............................................................. 30

2.      Credit Bidding Rights are Overbroad and Will Chill Bidding. ............. 31

3.      Any Stalking Horse Must be Approved on Notice and Hearing. ........... 32

4.      Any Sale Transaction Must Comply with Section 363(o) of the
        Bankruptcy Code. .................................................................. 32

5.      The Contract and Cure Schedule Cannot be Changed at Any Time
        Until the Eve of the Plan Confirmation Hearing. ..................... 33

D.      The Solicitation and Voting Procedures Cannot Be Approved as they
        Disenfranchise Unsecured Creditors ............................................... 33

1.      The General Unsecured Creditors and the Go-Forward Trade
        Creditors are Not Deemed to have Rejected the Plan and are
        Entitled to Vote. ................................................................... 34

2.      The Debtors Cannot Seek Solicitation until After the Bar Date. ........... 35

3.      Voting and Vote Tabulation Must Take Place on a Debtor-by-
        Debtor Basis. ........................................................................ 37

E.      The Disclosure Statement Contains Other Misstatements and Errors. ............... 38

F.      Reservation of Rights ...................................................................... 38

IV.     CONCLUSION ............................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Compton (In re Bonham),*
    229 F.3d 750, 765 (9th Cir. 2000) ......................................................... 12

*Augie/Restivo,*
    860 F.2d at 518 ........................................................................................ 13

*Colonial Realty*, 966 F.2d. at 61 (*quoting Chemical Bank N.Y. Trust Co. v. Kheel,*
    369 F.2d 845, 847 (2d Cir.1966) ............................................................ 13

*Czyzewski v. Jevic Holding Corp.,*
    137 S. Ct. 973 (2017) ............................................................................. 17

*Dish Network Corp. v. DBSD N.Am., Inc. (In re DBSD N.Am., Inc.),*
    634 F.3d 79 (2d Cir. 2010) ............................................................... 16, 34

*Everett v. Perez (In re Perez),*
    30 F.3d 1209, 1217 (9th Cir. 1994) ....................................................... 27

*FDIC v. Colonial Realty Co.,*
    966 F.2d 57, 61 (2d Cir. 1992) (*quoting In re Augie/Restivo Baking Co., Ltd.* ,
    860 F.2d 515, 518 (2d Cir. 1988)) ......................................................... 12

*Global Ocean Carriers,*
    251 B.R. at 46 ........................................................................................... 9

*In re 266 Washington Assoc.,*
    141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y. 1992) ........ 8

*In re Applegate Prop., Ltd.,*
    133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) .......................................... 27

*In re Atlanta West VI,*
    91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) ............................................... 8

*In re Bonham,*
    229 F.3d at 765 (*quoting Colonial Realty*, 966 F.2d at 61) ................... 12

*In re Cardinal Congregate I,*
    121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) ......................................... 19

*In re Continental Vending Machine Corp.,*
    517 F.2d at 1001 .................................................................................... 13

*In re Copy Crafters Quickprint, Inc.,*
    92 B.R. 973, 981 .................................................................................... 18

*In re Dakota Rail, Inc.,*
    104 B.R. 138, 142 (Bankr. D. Minn. 1989) .......................................... 27

*In re Diversified Inv'rs Fund XVII,*

91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) .......................................................................... 19

*In re Divine Ripe, L.L.C.,*
554 B.R. 395, 407 (Bankr. S.D. Tex. 2016) ...................................................................... 18

*In re Felicity Assocs.,*
197 B.R. 12, 14 (Bankr. D.R.I. 1996) .................................................................................. 8

*In re Ferretti,*
128 B.R. 16, 19 (Bankr. D.N.H. 1991) ........................................................................ 18, 28

*In re Filcas of America, Inc.,*
147 B.R. 297 (Bankr. D.N.H. 1992) ..................................................................................... 7

*In re Flora Mir Candy Corp.,*
432 F.2d 1060, 1062-63 (2d Cir.1970) ............................................................................... 13

*In re Future Energy Corp.,*
83 B.R. 470, 489 (Bankr. S.D. Ohio 1998) ......................................................................... 9

*In re Global Ocean Carriers Ltd.,*
251 B.R. 31, 46 (Bankr. D. Del. 2000) ................................................................................ 9

*In re Jeppson,*
66 B.R. 269, 292 (Bankr. D. Utah 1986) ........................................................................... 28

*In re Johns-Manville Corp.,*
68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986*), aff'd in part, rev'd in part on other
grounds* ............................................................................................................................. 14

*In re Market Square Inn, Inc.,*
163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ............................................................................. 7

*In re McLean Indus.,*
87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ......................................................................... 18

*In re Monnier Bros.,*
755 F.2d 1336, 1342 (8th Cir. 1985) .................................................................................. 27

*In re Monroe Well Service, Inc.,*
80 B.R. 324 (Bankr. E.D. Pa. 1987) ..................................................................................... 8

*In re Moshe,*
567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) ......................................................................... 7

*In re Owens Corning,*
419 F.3d 195, 205–06 (3d Cir. 2005) ................................................................................. 13

*In re Phoenix Petroleum Co.,*
278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (citations omitted) ............................................ 8

*In re Pine Lake Village Apartment Co.,*
19 B.R. 819 (Bankr. S.D.N.Y. 1982) ................................................................................. 14

iv

*In re Quigley Co.*,
    377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ................................................................. 7
*In re Radco Properties, Inc.*,
    402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) ............................................................... 18
*In re Trevarrow Lanes, Inc.*,
    183 B.R. 475, 479 (Bankr. E.D. Mich. 1995) ............................................................. 9
*In re Zaleha*,
    162 B.R. 309, 316 (Bankr. D. Idaho 1993)
*Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*,
    157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) ............................................................. 27

## STATUTES

11 U.S.C. § 1129(a)(7)(A) ........................................................................................... 8
11 U.S.C. § 1129(b)(2)(B)(ii) ............................................................................... 16, 17
11 U.S.C. § 363(o) ..................................................................................................... 33
1126(g) of the Bankruptcy Code ............................................................................... 34
Bankruptcy Code § 1129(b)(1) ..................................................................... 14, 15, 18
Bankruptcy Code § 1129(b)(2)(B) ............................................................................. 15
Bankruptcy Code Section 1129(b)(2)(B)(ii) .............................................................. 34
Fed. R. Bankr. P. 2002(b) .......................................................................................... 36
Fed. R. Bankr. P. 3018(a) ..................................................................................... 35, 37
Federal Rule of Bankruptcy Procedure Rule 2002(b) ................................................. 5
Section 1125 of the Bankruptcy Code ....................................................................... 28
Section 1126(g) ......................................................................................................... 34
Section 1126(g) ......................................................................................................... 34
Section 1129 of the Bankruptcy Code ......................................................................... 5
Section 1129(a)(7) ....................................................................................................... 5
Section 1129(a)(7) of the Bankruptcy Code ............................................................ 8, 9
Section 1129(b)(1) of the Bankruptcy Code ............................................................... 5
Section 1129(b)(2)(B)(ii) ........................................................................................... 34
Section 363(f) of the Bankruptcy Code ..................................................................... 32
Section 363(o) of the Bankruptcy Code ............................................................... 29, 32
Section 363(o) of the Bankruptcy Code ..................................................................... 33

## OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th rev. ed. 2009 ..................................... 5
7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][b] (15th rev. ed. 2009) ............................... 9

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Ditech

Holding Corporation, *et al.* (the "<u>Debtors</u>") hereby objects (the "<u>Objection</u>") to the *Motion of*

*Debtors for Entry of an Order (I) Approving Disclosure Statement and Notice of Disclosure*

*Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale*

*and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and*

*Notice of Sale and Confirmation Heating, (V) Approving Bidding Procedure, (VI Approving*

*Assumption and Assignment Procedures, and (VII) Granting Related Relief* (ECF No. 147) (the

"<u>Solicitation Procedures Motion</u>") and the *Disclosure Statement for Joint Chapter 11 Plan of*

*Ditech Holding Corporation and its Affiliated Debtors* (ECF No. 146) (the "<u>Disclosure</u>

<u>Statement</u>") in support of the *Joint Chapter 11 Plan of Ditech Holding Corporation and its*

*Affiliated Debtor*s (ECF No. 145) (the "<u>Plan</u>").[1]  In support of the Objection, the Committee

respectfully states as follows:

## I.    <u>PRELIMINARY STATEMENT</u>

1.      Upon its appointment, the Committee was presented with a plan process

that was already under way, as prepetition the Debtors had entered into a Restructuring Support

Agreement ("<u>RSA</u>") with their Term Lenders, which dictates the terms of the Plan and

solicitation process.  It is readily apparent from the Plan documents that no input was given or

received from representatives of the Debtors' many unsecured creditors, who are left with no

recovery under the Plan and, adding insult to injury are completely disenfranchised in the

proposed Plan voting process.  The Plan mandated by the RSA contemplates that among all of

the creditors in the Debtors' far flung capital structure, only the Term Lenders will be entitled to

vote on the Plan, which happens to gives them ownership of the Reorganized Debtors or all of

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the

the sale proceeds in the event of a sale of the Debtors' assets, with all other creditors getting

nothing.  The sole exceptions to that outcome for creditors are (a) that administrative and priority

claims are being paid, as they have to be to confirm any plan, and (b) a putative "gift" of an

undisclosed dollar amount to an unidentified subset of general unsecured creditors to satisfy in

part their claims (making them impaired), but yet those creditors, like all others except the Term

Lenders, are not entitled to vote on the Plan.

2.      The Committee objects to the approval of the Disclosure Statement and

the Solicitation Procedures Motion on three principal grounds:  (i) the Plan described by the

Disclosure Statement is patently unconfirmable on multiple bases, including without limitation,

that the Plan (a) violates the "best interest of creditors test," (b) unfairly discriminates among

unsecured creditors, (c) fails to allow for voting by creditors entitled to vote on the Plan, and (d)

contains inappropriate blanket direct and third party-releases of the Debtors' insiders and others;

(ii) the Disclosure Statement is materially lacking in relevant information necessary for it to

contain "adequate information," including without limitation, the extent to which the Debtors'

assets are unencumbered such that unsecured creditors would fare better in a chapter 7

liquidation; and (iii) the proposed solicitation procedures are violative of the rights of creditors

entitled to vote on the Plan, and further fail to address the flaws in the Debtors' proposed

commencement of solicitation of votes prior the Bar Date established by the Court.

3.      Primary among the Plan's patent defects rendering it unconfirmable is that

it assumes that the Term Lenders have a perfected lien on <u>every</u> asset of <u>every</u> Debtors' estates,

such that no other creditor is entitled to any distribution but for the largesse of the Term Lenders

making a gift to a select, but undisclosed, few.  The Committee's Professionals' investigation to

---

Disclosure Statement, as amended from time to time, and the Solicitation Procedures Motion.

date reveals that there are, in fact, very valuable unencumbered assets in the estates as of the

Petition Date, which the Debtors are seeking to encumber through their DIP Financing Motion

(which encumbrance the Committee has strenuously opposed).[2]  Unencumbered assets include

certain assets (the "Excluded Assets") that were excluded from lenders' prepetition security

interests (which may be of substantial value), including excess equity in at least three non-Debtor

special purpose vehicles (as discussed in more detail below), commercial tort claims, and

avoidance actions, as well as the excess value of collateral pledged to the DIP Lenders.  The

Disclosure Statement fails to make any disclosure regarding such unencumbered assets that,

along with any recovery from the Committee's lien challenges, could provide value for

unsecured creditors at one or more Debtor entities.  In this regard, the Disclosure Statement

conceals, rather than informs creditors of adequate information regarding, the Plan's violation of

the "best interest of creditors test" for confirmation.

4.      Moreover, the Plan improperly consolidates claims against and aggregates

assets among all Debtors, regardless of the relative solvency of or unencumbered assets at a

given Debtor entity.  The Plan purports not to substantively consolidate the Debtors.  However,

by comingling all assets and liabilities of the Debtors, the Plan implements a *de facto* substantive

consolidation without any showing in the Disclosure Statement that creditors are not harmed by

such comingling or that the standards for substantive consolidation have been met.  In the

absence of true substantive consolidation, the Plan violates the absolute priority rule, transferring

value to structurally junior creditors and, on this independent ground, fails to meet the "best

---

[2] *See Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Enter into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and  Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F)*

interest of creditors test" on a Debtor-by-Debtor basis.  The Disclosure Statement contains no
description of the Debtors' corporate structure, the purpose of the 26 separate entities listed on
the Debtors' organizational chart, their debt structure, or why only 13 of them are Debtors.
Without any valuations (as the Auction has not taken place and the Disclosure Statement has
excluded the Debtors' valuation analysis) or description of unencumbered assets, the Disclosure
Statement fails to provide any foundation for the Plan's assumptions that there is no value for
unsecured creditors either within the Debtors' estates or as a result of excess value at one or
more non-Debtor entity.  Unless the Debtors can show the foundation for their treatment of
creditors under the Plan, including, without limitation, that substantive consolidation is
warranted in these cases and that unsecured creditors are entitled to no consideration whatsoever,
the Plan is unconfirmable on its face.

5.      The Disclosure Statement is materially lacking in other significant
respects, not the least of which is that the Debtors have not concluded their Marketing Process
and thus cannot inform creditors of the most basic fact—their path to exit chapter 11, whether by
way of a sale and liquidating plan or an internal plan of reorganization.  The Marketing Process
is not complete and the Election Date for the Electing Term Lenders to elect a transaction has not
passed.  Thus, the Debtors have not and cannot inform creditors whether a Reorganization
Transaction or a Sale Transaction will be implemented or what creditors' resulting treatment will
be under the Plan.  Purportedly because of the ongoing Marketing Process, Debtors have not and
do not intend to include their liquidation analysis, Plan recovery estimates or valuations in their
Disclosure Statement.[3]  Instead, the Debtors propose to file all of these analyses much later in

---

*Scheduling a Final [Insert name of pleading objecting to debtors' DIP financing] Hearing; and (G) Granting
Related Relief* (ECF No. 213) (the "<u>DIP Financing Objection</u>").

[3] See Proposed Order (as hereinafter defined) at paragraph 6.

their Plan Supplement, which is not due until one-week before the voting and Plan objection

deadline.  And, the Debtors propose to serve these documents only on holders of the Term Loan

Claims in Class 3, so they are essentially providing this information to no other creditors in the

case.[4]  These exhibits are essential for creditors to determine, among other things, whether to

object to the Plan on the basis that it fails to meet the "best interest of creditors test"[5] and the

"fair and equitable test"[6] or whether the Plan overcompensates the holders of Class 3 Claims.

Where a Disclosure Statement does not disclose such fundamental information as the source of

plan distributions, what creditors will receive and whether the treatment of creditors complies

with the requirements of Section 1129 of the Bankruptcy Code, it cannot contain adequate

information and must not be approved.

6.    For the reasons set forth below, the Committee respectfully urges the

Court to deny approval of the Debtors' Disclosure Statement unless material changes warranted

by the Committee's objections are made to the Disclosure Statement and the Plan itself.

## II.    BACKGROUND

7.    On February 8, 2019, the Debtors and the Consenting Term Lenders

entered into the RSA.  On February 11, 2019 (the "Petition Date"), the Debtors filed voluntary

petitions with this Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to

---

[4] This timeframe also violates Federal Rule of Bankruptcy Procedure Rule 2002(b), which requires that creditors receive 28 days' notice of the deadline for filing an objection to a plan.  Unsecured creditors are to receive no notice of the financial information that would inform them whether the Plan meets the requirements of Section 1129 of the Bankruptcy Code and, more specifically, whether they are receiving as much as they would in a liquidation.

[5] Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interest of creditors test".  Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests, (A) each holder of a claim or interest in such class (i) has accepted the plan, or (ii) will receive or retain under the plan property of a value that is not less than the amount that holder would receive or retain if the debtor liquidated under chapter 7.  The best interest test is based on a hypothetical liquidation.  7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th rev. ed. 2009) ("This means that, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution….").

[6] See Section 1129(b)(1) of the Bankruptcy Code.

operate their businesses and manage their properties as debtors in possession pursuant to section

1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these

chapter 11 cases.

8.    On February 26, 2019, the Office of the United States Trustee appointed

the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of the

following seven (7) members: (i) Safeguard Properties Management, LLC; (ii) Wilmington

Savings Fund Society, FSB; (iii) Lee Kamimura; (iv) ISGN Solutions, Inc. (n/k/a Sourcepoint,

Inc.); (v) Black Knight Financial Technology Solutions, LLC; (vi) Cognizant Technology

Solutions; and (vii) Deutsche Bank National Trust Company as RMBS Trustee.

9.    On March 5, 2019, the Debtors filed (i) the Joint Chapter 11 Plan of

Ditech Holding Corporation and its Affiliated Debtors (ECF No. 145) (the "Plan"), (ii) the

Disclosure Statement for Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated

Debtors (ECF No. 146) (the "Disclosure Statement"), and (iii) Motion of Debtors for Entry of an

Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II)

Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation

Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and

Confirmation Heating, (V) Approving Bidding Procedure, (VI Approving Assumption and

Assignment Procedures, and (VII) Granting Related Relief (ECF No. 147) (the "Solicitation

Procedures Motion").  On March 6, 2019, Debtors filed the proposed Order (I) Approving

Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation

and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale

and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, (V)

Approving Bidding Procedures, (VI) Approving Assumption and Assignment Procedures, and

(VII) Granting Related Relief (ECF No. 150) (the "Proposed Order").  The hearing to consider

approval of the Solicitation Procedures Motion is scheduled for April 11, 2019 (the "Disclosure

Statement Hearing").

> 10.    On March 28, 2019, Debtors filed (a) an Amended Plan (ECF No. 314),

(b) an Amended Disclosure Statement (ECF No. 315), and a Revised Proposed Order (ECF No.

316).  The Revised Proposed Order includes a new paragraph 6, that states:

> The Debtors are authorized to not include the recoveries to
> creditors under the Plan or a liquidation analysis in the Disclosure
> Statement; provided that, the Debtors shall file no later than the
> date that the Plan Supplement (as defined in the Plan) is filed, (a)
> the expected recoveries to creditors under the Plan, (b) a
> liquidation analysis, and (c) if necessary, a valuation analysis, each
> of which shall be served on holders of Claims in the Voting Class
> as promptly as practicable upon filing.

The Voting Class is limited to holders of Class 3 Term Loan Claims.  Unsecured creditors are

not slated to receive the financial information that they need to analyze or to prepare an objection

to the Plan.

### III.    OBJECTION

### A.    The Plan is Unconfirmable.[7]

### 1.    Where a Plan is Patently Unconfirmable, a Disclosure Statement Should not be Approved.

> 11.    The Disclosure Statement should not be approved because the Plan is not

capable of being confirmed.  *See In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017); *In re

Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007); *In re Market Square Inn, Inc.*, 163 B.R.

64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of

confirmation, it is appropriate to refuse the approval of the disclosure statement.") (citing *In re

Filcas of America, Inc.*, 147 B.R. 297 (Bankr. D.N.H. 1992); *In re 266 Washington Assoc.*, 141

---

[7] The Committee reserves the right to present additional confirmation objections if the Debtors are able to obtain approval of the Disclosure Statement.

B.R. 275 (Bankr. E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y. 1992); *In re Monroe Well Service,*

*Inc.*, 80 B.R. 324 (Bankr. E.D. Pa. 1987).  "If the disclosure statement describes a plan that is so

fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to

consider the adequacy of disclosures.  Such an exercise of discretion is appropriate because

undertaking the burden and expense of plan distribution and vote solicitation is unwise and

inappropriate if the proposed plan could never legally be confirmed."  *In re Phoenix Petroleum*

*Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (citations omitted).  *See also In re Felicity*

*Assocs.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that

'when an objection raises substantive plan issues that are normally addressed at confirmation, it

is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is

arguably unconfirmable on its face.'").  The primary reason to evaluate confirmability is to

"avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to

creditors and soliciting votes on the proposed Plan when the plan is unconfirmable on its face.

Such an exercise in futility only serves to further delay a debtor's attempts to reorganize."  *In re*

*Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

　　　　　12.　　　The Solicitation Procedures Motion should be denied because the

Disclosure Statement describes a Plan put forward by the Debtors that is unconfirmable on its

face as set forth below.

　　　　　**2.**　　　**The Plan Violates the "Best Interest of Creditors Test."**

　　　　　13.　　　Section 1129(a)(7) of the Bankruptcy Code, often referred to as the "best

interest of creditors test," requires that with respect to each impaired class of claims or interests

each holder of a claim or interest in such class (i) has accepted the plan, or (ii) will receive or

retain under the plan property of a value that is not less than the amount that holder would

receive or retain if the debtor liquidated under chapter 7.  11 U.S.C. § 1129(a)(7)(A).  The best

interest of creditors test is based on a hypothetical liquidation[8] and the Debtors have the burden

of establishing that the best interest of creditors test is satisfied.[9]  To carry their burden, the

Debtors must produce sufficient financial information about their assets and liabilities to the

bankruptcy court to judge whether the best interest of creditors test for confirmation has been

satisfied.  *See Global Ocean Carriers*, 251 B.R. at 46.

14.    Unless the Debtor entities are substantively consolidated, the best interest

of creditors test must be met by each Debtor; a liquidation analysis must be provided on a

Debtor-by-Debtor basis.  Without that information, creditors cannot determine whether they are

receiving as much as they would in a chapter 7 liquidation, as required by Section 1129(a)(7) of

the Bankruptcy Code.

15.    Any liquidation analysis must include a comprehensive schedule of assets

and liabilities of each Debtor including the value of unencumbered assets (of which there is no

mention in the Disclosure Statement).  The Committee's professionals believe there are (a)

unencumbered assets as of the Petition Date including equity in certain special purpose

vehicles—Ditech Agency Advance Depositor LLC, Ditech PLS Advance Depositor LLC, and

RMS 2018-09, LLC—avoidance recoveries,[10] commercial tort claims, and recoveries from the

Committee's challenge of liens, and (b) potentially underencumbered assets as of and after the

Petition Date (*e.g.*, any residual value in the loans and other collateral of the DIP Lenders).

---

[8] 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][b] (15th rev. ed. 2009) ("This means that, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution").

[9] *See, e.g., In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000); *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr. E.D. Mich. 1995); *In re Zaleha*, 162 B.R. 309, 316 (Bankr. D. Idaho 1993); *In re Future Energy Corp.*, 83 B.R. 470, 489 (Bankr. S.D. Ohio 1998).

[10] In their Statements of Financial Affairs filed on March 27, 2019, Debtors list hundreds of payments made to insiders ("Insider Transfers") during the year preceding the bankruptcy filings.  Payments made by Reverse Mortgage Solutions, Inc. alone totaled $28.9 million, which would be pursued in a liquidation by a chapter 7 trustee.

Additionally, the Debtors have not provided a valuation analysis of the assets of Ditech Financial and RMS or the Debtor parties to the DIP Netting Agreement in order for creditors to determine if these entities have value beyond their respective secured obligations. The Committee has requested that the Court preserve the status quo as of the Petition Date with respect to Debtors' unencumbered assets and has filed an objection to the encumbrance (adequate protection to lenders or otherwise) of those assets by the Debtors in connection with DIP Financing.[11]

16.    The Plan at Section 5.1 states that it does not substantively consolidate the Debtors. However, under the Plan, claims are not allocated between Debtors nor are Debtor valuations taken into account in the treatment of those claims. To the extent of excess value under a Sale Transaction and/or the existence of unencumbered assets at one or more Debtor entity, creditors of a more solvent entity or an entity with unencumbered assets are not being paid an amount consistent with what they would receive if the entity against which they hold a claim were liquidated. In a Reorganization Transaction, there is no recovery to holders of Class 5 claims and in a Sale Transaction, the recovery of all Class 5 Claims against any Debtor is subordinate to the payment of secured claims against every other Debtor, even, though (i) in a chapter 7 liquidation there may be unencumbered assets that would provide a distribution to a particular Debtor's creditors, (ii) the Debtors have provided no estimate of the value of the Debtors, much less each individual Debtor, and (iii) certain Class 5 Claims may have a structurally senior claim to certain assets. The Debtors' financial projections are similarly not segregated by entity, forestalling any attempt by creditors to estimate value themselves.

---

[11] *See* DIP Financing Objection.

17.     The Plan's treatment of Intercompany Claims and receivables will also lead to a violation of the best interest of creditors test.  While postpetition intercompany claims are to be afforded administrative expense priority under Debtors' cash management order,[12] the Plan does not take into account the value of pre-or postpetition intercompany claims and receivables of each Debtor.  Instead, under the Plan, Intercompany Claims are "adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors."  Plan at pp 19-20.  There is no description in the Disclosure Statement concerning how the treatment alternatives of Intercompany Claims will be determined or how such treatment will affect creditor recoveries.  The value of Intercompany Claims and receivables to and from each Debtor and non-Debtor entity must be calculated and included in each Debtor's liquidation analysis to show the appropriate treatment of each individual Debtor's creditors.  The Disclosure Statement also fails to disclose upon what basis it will decide how to treat Intercompany Interests, which under the Plan shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors.

18.     Absent seeking and obtaining approval to substantively consolidate their estates, the treatment of claims under the Plan violates the best interest of creditors test on a Debtor-by-Debtor basis.

3.     **The Plan Improperly Intermingles the Assets and Liabilities of the Debtors Resulting in a _De Facto_ Substantive Consolidation Without an Assessment of Whether Consolidation is Appropriate.**

19.     While the Debtors' cases are jointly administered, the Debtors have not moved for substantive consolidation and their Plan expressly states that they are not doing so.

---

[12] _See Interim Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, Bank Accounts and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition_

Yet while the Debtors' bankruptcy estates technically remain separate, the Plan comingles the assets and liabilities of all Debtors, failing to account for the value of each Debtor and the separate debtor-creditor relationships.  By doing so, the Plan effectuates a *de facto* substantive consolidation of the Debtors' estates.[13]  The Debtors have not shown that substantive consolidation meets the requisite legal standards, which is a fact intensive inquiry.  *See Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 765 (9th Cir. 2000) ("[O]nly through a searching review of the record, on a case-by-case basis, can a court ensure that substantive consolidation effects its sole aim: fairness to all creditors." (quoting *FDIC v. Colonial Realty Co.,* 966 F.2d 57, 61 (2d Cir. 1992).")

20.    To determine whether substantive consolidation is appropriate, a bankruptcy court evaluates "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."  *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992) (*quoting In re Augie/Restivo Baking Co., Ltd.* , 860 F.2d 515, 518 (2d Cir. 1988) ) (internal quotation marks omitted); *see also In re Bonham*, 229 F.3d at 766 (adopting the Second Circuit's test for substantive consolidation).  The "sole aim" of this analysis is "fairness to all creditors."  *In re Bonham*, 229 F.3d at 765 (*quoting Colonial Realty*, 966 F.2d at 61).  The Second Circuit has insisted that substantive consolidation be invoked "sparingly because of the possibility of unfair treatment of creditors."  *Colonial Realty*, 966 F.2d.

---

*Intercompany Claims, (V) Extend Time to Comply with, or Sees Waiver of, 11 U.S.C. § 345(b), and (VI) Granting Related Relief* [ECF No. 51].

[13] *See JPMCC 2007- C1Grasslawn Lodging, LLC v. Transwest Resort Props. Inc.* (*In re Transwest Resort Props., Inc.*), 881 F.3d 724 (9th Circuit 2018) (*Concurrence of Judge Friedland* "[I]f a creditor believes that a reorganization improperly intermingles different estates, the creditor can and should object that the plan . . . results in de facto substantive consolidation.  Such an approach would allow this issue to be assessed on a case-by-case basis, which would be appropriate given the fact-intensive nature of the substantive consolidation inquiry").

at 61 (*quoting Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir.1966));

*Augie/Restivo*, 860 F.2d at 518; *In re Continental Vending Machine Corp.*, 517 F.2d at 1001; *In re Flora Mir Candy Corp.*, 432 F.2d 1060, 1062-63 (2d Cir.1970).  That threat of unfairness

arises when "the entities to be consolidated . . . have different debt-to-asset ratios [which

effectively and] 'almost invariably redistributes wealth among the creditors of the various

entities.' " *In re Owens Corning*, 419 F.3d 195, 205–06 (3d Cir. 2005); *Augie/Restivo Baking

Co.*, 860 F.2d at 518.  The Disclosure Statement fails to provide any information that would

support substantive consolidation of Debtors' assets and liabilities under the Plan.

4. **The Distribution to Class 3 Creditors May Violate the Absolute Priority Rule.**

21.    The Plan purports to treat the Class 3 Term Loan Claims as over-secured.

Specifically, the Plan purports to include in the Allowed Amount of the Term Loan Claims all

accrued post-petition interest, costs, fees, and expenses which would only be allowable to a

secured creditor if the creditor were over-secured.  Paradoxically, however, the Plan

contemplates that Class 3 Creditors will receive the full value of the Debtors (and their non-

Debtor subsidiaries), stripped of all other pre-petition claims, in satisfaction of the Allowed Term

Loan Claims.  However, the Disclosure Statement contains no valuation of the Debtors, either on

an overall basis or on a Debtor-by-Debtor basis.  By the Proposed Order, the Debtors will not file

a liquidation analysis or recovery estimates until they file their Plan Supplement, and will only

file valuations "if necessary."  It is impossible to discern from the Disclosure Statement whether

or not the holders of Allowed Class 3 Claims are receiving more than the Allowed Amount of

their claims under the Plan, in violation of the absolute priority rule.[14]  Similarly, the Debtors

will not disclose the approximate recovery percentage for the Term Loan Claims until they file

their Plan Supplement, information not only required as a matter of adequate disclosure, but in

order to assure that, on its face, the Plan does not violate the absolute priority rule.  *See* Plan, p.

11.

## 5.    The Plan Discriminates Unfairly between Similar Classes of Creditors.

22.    In order to confirm the Plan over the rejection, or deemed rejection of a

class of creditors, the Debtors must also demonstrate that the Plan "does not discriminate

unfairly," as required by Bankruptcy Code § 1129(b)(1).  A plan proponent "may not segregate

two similar claims or groups of claims into separate classes and provide disparate treatment for

those classes."  *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986*), aff'd in*

*part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville*

Corp. 843 F.2d 636 (2d Cir. 1988) (*citing In re Pine Lake Village Apartment Co.*, 19 B.R. 819

(Bankr. S.D.N.Y. 1982)).  The burden is on a proponent to prove that the plan does not

discriminate unfairly.

23.    At each and every Debtor, the Plan contemplates distribution of an

unspecified amount or a maximum percentage distribution on account of the so-called "Go-

Forward Trade Claims," but no such gift or carve out is made in favor of General Unsecured

Claims (which are defined to exclude Go-Forward Trade Claims).  "Go-Forward Trade Claims"

---

[14] "It's undisputed that the 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more than full compensation for its claims.  Courts will deny confirmation if a plan undervalues a debtor and therefore would have resulted in paying senior creditors more than full compensation for their allowed claims." *In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010); *In re Granite Broadcasting Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

14

are defined as prepetition claims to be identified at some unspecified point in time by the Debtors

(with the consent of the Requisite Term Lenders):

> as being integral to and necessary for the ongoing operations of the
> Reorganized Debtors or, in the case of a Sale Transaction, integral
> to the Wind Down Estates for the transition or transfer of assets or
> services to a purchaser.

24.     The discrimination between the Go-Forward Trade Creditors (who receive

some unspecified distribution) and the General Unsecured Creditors (who receive nothing) is

unfair.  The determination of who is and who is not a Go-Forward Trade Creditor is based

exclusively on a subjective determination made by the Debtors (with the consent of the Requisite

Term Lenders) and is not subject to any oversight or scrutiny by this Court or any other party in

interest.  Neither the Plan nor the Disclosure Statement provides any basis for discriminating

between Go-Forward Trade Creditors and General Unsecured Creditors—because the rights of

these classes are identical and there is no basis for indiscriminate treatment.  Moreover, the Plan

purports to give the Debtors *carte blanche* in effecting this discriminatory treatment, picking

winners and losers in their sole discretion.  The Plan, on its face, sanctions unfair discrimination

between similarly situated creditors.[15]

**6.    Even if the Holders of the Term Loan Claims are Undersecured, the Gifting
        Provisions of the Plan Violate the Absolute Priority Rule.**

25.     In order to confirm the Plan over the objection, or deemed rejection of one

or more classes of creditors, the Debtors are required to satisfy the "fair and equitable" test set

forth in Bankruptcy Code § 1129(b)(1).  Pursuant to Bankruptcy Code § 1129(b)(2)(B), that test

requires that unless a senior class is paid in full, "the holder of any claim or interest that is junior

---

[15]  Conversely, if any Debtor's unsecured creditors were entitled to higher payment under a Sale Transaction than the Class 6 claims' designated percentage recovery, the Plan would unfairly discriminate in favor of Class 5 and fail the "best interest of creditors" and "unfair discrimination" tests as to Class 6.

19-10412-jlg    Doc 337    Filed 04/04/19    Entered 04/04/19 15:46:34    Main Document
Pg 23 of 46

to the claims of such class will not receive or retain under the plan on account of such junior

claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).

26.    While the Plan purports to present a plan of reorganization for all of the

Debtors and appears to treat each class of claims on a consolidated basis (irrespective of the

Debtor or Debtors against which such claims reside), section 5.1 of the Plan is explicit that no

substantive consolidation is contemplated by the Plan.

> The Plan is being proposed as a joint plan of reorganization of the
> Debtors for administrative purposes only and constitutes a separate
> chapter 11 plan of reorganization for each Debtor. The Plan is not
> premised upon the substantive consolidation of the Debtors with
> respect to the Classes of Claims or Interests set forth in the Plan.

27.    Assuming the Term Loan Claims are undersecured, the Plan contemplates

that part of the recovery attributable to the Term Loan Claims will be "gifted" in order to pay in

full all Administrative Claims and all Priority Claims, irrespective of the Debtor or the Debtors

that are liable for such claims. Further, the Plan expressly contemplates that the Holders of the

Term Loan Claims will "carve out from the collateral (or value of such collateral) securing the

Term Loan Claims" an unspecified amount of cash for distribution to the Class 6 Go-Forward

Trade Claims, irrespective of the Debtor or Debtors that are liable for said Allowed Go-Forward

Trade Claims. The Plan, therefore, provides that the Term Loan Creditors may carve out from

their collateral and "gift" cash to creditors of a structurally subordinate or insolvent Debtor even

though creditors of a structurally senior or solvent Debtor are not being paid in full under the

Plan. In the absence of substantive consolidation, the transfer of funds by and among Debtor

entities to pay certain Debtors' creditors (on a discriminatory basis) is also a transfer on account

of equity proscribed by the absolute priority rule.

28.    In *Dish Network Corp. v. DBSD N.Am., Inc. (In re DBSD N.Am., Inc.)*,

634 F.3d 79 (2d Cir. 2010), the Second Circuit Court of Appeals held that even though a

16

distribution to a creditor class is funded from a "gift" or a carve out from a secured creditor's

collateral, distributions of such gifts are subject to the "absolute priority rule."  In rejecting the

secured creditors' argument that it was at liberty to transfer a gift to whomsoever it chose under a

plan of reorganization, the Second Circuit found that:

> Most fatally, this interpretation does not square with the text of the
> Bankruptcy Code.  The Code extends the absolute priority rule to
> "any property," *11 U.S.C. § 1129(b)(2)(B)(ii)*, not "any property
> not covered by a senior creditor's lien."  The Code focuses entirely
> on who "receive[s]" or "retain[s]" the property "under the plan,"
> id., not on who *would* receive it under a liquidation plan.  And it
> applies the rule to any distribution "under the plan on account of a
> junior interest, id., regardless of whether the distribution could
> have been made outside the plan, and regardless of whether other
> reasons might support the distribution in addition to the junior
> interest.

*Id.*, at 97 – 98.  The Second Circuit concluded that, with respect to the absolute priority rule,

"Congress . . . did not create any exception for 'gifts' like the one at issue here [citation

omitted]."  *Id.*, at 100.  *See also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017)

(bankruptcy court cannot approve a plan deviating from ordinary bankruptcy priority rules

through collateral proceeds (*e.g.*, "gifting") without intervening class consent, nor can it do so

through a structured dismissal).

29.    Further, the Plan contemplates that New Common Stock will be issued to

undisclosed individuals pursuant to a Management Incentive Plan, the details of which will not

be disclosed until the Plan Supplement is filed, seven days prior to the deadline to object to the

Plan.  The Committee understands that many of the officers, directors, and managers of the

Debtors prepetition were also equity security holders and will be retained and allegedly

incentivized pursuant to this Management Incentive Plan.  Without knowing the terms of the

Management Incentive Plan and the intended beneficiaries, it is quite possible that some

members of management will be receiving shares in the Reorganized Debtor not on account of

17

future services but, rather, on account of their existing equity positions.  This further "carve out" in favor of existing shareholders also violates the absolute priority rule.[16]

**B.    The Disclosure Statement Does Not Contain Adequate Information and Cannot be Approved.**

**1.    Numerous Critical Exhibits are Missing from the Disclosure Statement.**

30.    The Disclosure Statement cannot be approved unless and until critical exhibits and information are filed on a Debtor-by-Debtor basis.  As one court aptly stated, "a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  *See also In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) (the disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . .").

31.    A disclosure statement must have a liquidation analysis reflecting what creditors will receive under a plan and a liquidation as well as adequate projections and the assumptions underlying those projections.  *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 407 (Bankr. S.D. Tex. 2016) (financial projections necessary); *In re Radco Properties, Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (assumptions underlying projections are necessary); *In re*

---

[16] To the extent that these shareholders are receiving value on account of their existing shareholdings, and other holders are receiving nothing under the Plan, the Plan may also violate the requirement of Bankruptcy Code § 1129(b)(1) that it "not discriminate unfairly."

*Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (financial projections and

underlying assumptions are necessary); *In re Diversified Inv'rs Fund XVII*, 91 B.R. 559, 561

(Bankr. C.D. Cal. 1988) (liquidation analysis is necessary).

            32.    The Debtors have failed to file important and material exhibits with the

Disclosure Statement for which they seek Court approval:

            (a)    <u>Projections</u>:  Projections are essential to creditors' abilities to assess the

feasibility of a plan and to evaluate non-cash recoveries.

            (i)    The Disclosure Statement does not attach adequate projections

regarding the future operations of the Reorganized Debtors under any, much less all the various

potential, Reorganization Transactions, which may or may not include an Asset Sale Transaction

or a Master Servicing Transaction.  Given the disastrous and almost immediate failure of the plan

of reorganization for Ditech Holdings Corporation's predecessor in interest, it is critical that

adequate projections be included as part of the Disclosure Statement so that creditors can

independently determine the feasibility of the Debtors' Plan and be apprised of the estimates of

projected cash flow (from which certain valuation determinations can be made).

            (ii)    The Disclosure Statement provides consolidated projections for

only two and a half years, far less than a typical five-year business plan.  The terms of the New

Term Loan are not disclosed and the Reorganized Debtors do not generate sufficient cash to

repay the New Term Loan and creditors are provided insufficient data to assess the business's

feasibility or viability.

            (iii)    As noted, the Financial Projections are presented on a consolidated

basis, without detail as to business line, much less corporate form. Creditors are given no

guidance to evaluate the value or viability of their individual account debtors.

            (iv)    Although the Financial Projections were filed only recently, the

19

interest rate environment has changed dramatically since the Financial Projections were

prepared.  The Debtors have cited the uptick in residential mortgage interest rates as a cause for

their financial distress.  Such mortgage rates have fallen substantially in the weeks since the

Petition Date and the Financial Projections must be adjusted to reflect such new economic

conditions. At a minimum, the Financial Projections' assumptions as to residential mortgage

interest rates should be disclosed.

(v)      The Reorganized Debtors project "the continuation of many of the

Debtors' improvement initiatives, including improving the customer experience, right sizing the

organization, improving servicing performance and costs, and consolidating sites," including

unspecified "technology investments to improve customer experience and consolidate back-end

systems, lower third-party vendor costs due to recently completed contract negotiations,

enhanced quality reviews of processes, and the outsourcing of services to lower cost

providers."[17]  The Financial Projections provide no detail on such initiatives or the impact

thereof. Given the substantial shift in the Debtors' business strategy and the potential for further

shifts, creditors must be able to evaluate the extent to which projected savings are appropriately

estimated.

(vi)      The Financial Projections fail to explain the assumptions behind

the confusing balance sheet projections. The Company's assets shrink 19% between December

31, 2019 and December 31, 2021.  Over the same period, the liabilities emerging from these

cases (Warehouse Borrowings, New Term Loan and Working Capital Line) grow by a total of

17%.  Meanwhile, accounts payable remain flat at a level more than ten times the Debtors'

estimate of pre-petition unsecured trade claims.  Further disclosure is necessary to understand

---

[17] Amended Disclosure Statement, Exh. D.

these Financial Projections.

(b)    Liquidation Analysis:  The Disclosure Statement does not attach a

liquidation analysis, from which creditors can determine whether or not they would be better off

under a straightforward chapter 7 liquidation.  Not only must the liquidation analysis be attached,

but it must be performed on a Debtor-by-Debtor basis, as the best interest of creditors test must

be satisfied for each and every Debtor sub-plan within the overall Plan.  There must be a

comprehensive breakdown of each entity's assets and liabilities, including the value of avoidance

claims against the Released Parties that would be available in chapter 7, which would allow for

an understanding by creditors of the relative solvency or insolvency of each entity.

Unencumbered assets as of the Petition Date must also be included and treated as such.  This

information must be disclosed to enable creditors to evaluate the Plan relative to a liquidation

alternative.  The Debtors' omission of a liquidation analysis obfuscates the fact that unsecured

creditors would clearly do better in a liquidation than the non-existent recoveries offered in the

Plan.

The Debtors will also have the burden of establishing that the Plan meets the "best

interest of creditors test."  The Disclosure Statement must include a liquidation valuation on a

Debtor-by-Debtor basis.  There is no way to determine whether a chapter 7 liquidation would

provide more favorable treatment under either of the Plan's restructuring alternatives,

particularly considering there were substantial insider transfers during the year before the

bankruptcy filings and there would be no third-party releases under a chapter 7 liquidation.

(c)    Valuations:  The Disclosure Statement is devoid of any valuation of the

Debtors' enterprise and assets, either on a consolidated or Debtor-by-Debtor basis.  This analysis

must be presented in order for creditors to assess the value that the Term Loan Creditors are

receiving under the Plan and the possibility of viable alternatives to the Plan.

(d)    <u>Estimates of Creditor Recoveries</u>.  The Disclosure Statement fails to

provide adequate information regarding potential creditor recoveries, which will only be

included in a Plan Supplement filed on the verge of the Plan voting and objection deadline, along

with a Liquidation Analysis and valuations ("if necessary").  Creditors have no insight into the

recoveries offered to them.[18]

33.    Without a liquidation analysis or financial projections, a creditor cannot

evaluate a debtor's plan and the very reason for requiring a disclosure statement is defeated.

34.    The Debtors' determination not to file these critical documents until the

Plan objection deadline is looming and not to serve those documents on unsecured creditors,

violates the requirements of Federal Rule of Bankruptcy Procedure 2002(b) and, even if Debtors

determine to serve all creditors, that will not retroactively cure the fact that the proposed

Disclosure Statement is inadequate.

**2.    <u>The Disclosure Statement Fails to Disclose the Nature and Purpose of each
Debtor Entity and Affiliates, their Assets and Liabilities.</u>**

35.    The Disclosure Statement also fails to provide material information

regarding the various Debtor entities, their purpose, the basis for the corporate structure,

intercompany claims and how funds will be transferred by and among the Debtor entities to fund

the Plan.  There is also no disclosure regarding the thirteen non-Debtor entities shown on the

Debtors' corporate chart, the purpose of those entities, their assets and debt structure, and why

they were not included in the chapter 11 filings.

36.    The Disclosure Statement fails to disclose the basis for transfers to non-

Debtor affiliates and the consideration for those transfers.  For example, the Reverse Mortgage

---

[18] The Plan provides that the recovery to Go-Forward Trade Claims will be specified in the "solicitation package," although the Disclosure Statement provides no disclosure of this amount and the Solicitation Motion provides for no alternative disclosure.

Solutions, Inc. Statement of Financial Affairs show transfers to non-Debtor subsidiaries during the 1-year prior to bankruptcy totaling close to $29 million.  (ECF No. 422).

3.   **There is Inadequate Disclosure Regarding the Basis for Consolidating the Debtor Entities Under the Plan.**

37.   As noted above, the Debtors' Plan effects a *de facto* substantive consolidation of the Debtors' estates by comingling all assets and liabilities of the Debtors without any disclosure concerning the basis for comingling and whether such a remedy is available for the Debtors under applicable authority.

38.   The Disclosure Statement must include additional information to support a showing that the Debtors meet the requisite legal standards for substantive consolidation of their cases.

4.   **There is Inadequate Disclosure Regarding the Plan Releases.**

39.   The Plan releases all claims and causes of action held by the Debtors and the Estates against the "Released Parties," which include, among others, the Debtors and all of their current and former officers and directors.  Plan at Article 10.6, p 47.  The Debtors' Statement of Financial Affairs show substantial insider transfers within the year prior to the bankruptcy filing, including nearly $11 million to the Debtors' officers and directors.  As the Debtors were clearly insolvent almost immediately after exiting their prior bankruptcy restructuring in February 2018, these transfers—in whole or in part—may be avoidable.  Any recoveries from the pursuit of such avoidance actions are potential assets that should inure to the benefit of unsecured creditors.[19]

40.   The Disclosure Statement does not identify the nature or amount of the Estate claims being released in the Plan.  Debtors fail to disclose the existence or scope of

insurance coverage for such claims, who would prosecute such claims if not released by the

Debtors, how such prosecution would be funded, which creditors would be beneficiaries of the

recovery on account of such claims, and how a hypothetical recovery on account of those claims

would impact the distributions to creditors under a liquidation analysis.

41.     The Disclosure Statement fails to identify what consideration is being

provided in exchange for the releases.  Current and former officers and directors, under whose

watch the Debtors' prior plan utterly failed, are being released.  There is no discussion of the

amounts paid to those parties, the nature of the Estate claims being released, their value and the

consideration for such releases.  Other than a vague reference to their contributions to the

reorganization and implementation of the reorganization under the Plan (for which general

unsecured creditors, who are to receive no distribution, received no value), there is no discussion

of any consideration being provided by current and former officers and directors for their

releases by the Estates.  The Disclosure Statement fails to include any information that would

support the Court's approval of the proposed plan releases under the circumstances of these

cases.  Absent full disclosure of the claims to be released and the consideration for such releases,

the Disclosure Statement should not be approved.

42.     By waiving Estate claims and causes of action against insiders, unsecured

creditors are effectively granting third-party releases without any consideration therefor.  The

Debtors should not be allowed to waive claims against insiders to the detriment of unsecured

creditors and the Committee will object to the Plan on this basis, among others.

---

[19] See Committee DIP Financing Objection.

5.    **The Disclosures Relating to Go-Forward Trade Creditors are Inadequate.**

43.    The Plan does not identify who the Go-Forward Trade Creditors are, when they will be identified, and how this category of claims will be determined other than by fiat. Further, the Plan neither identifies the estimated amount of Go-Forward Trade Claims, the cash allocated or the distributions to be made to them, whether all Go-Forward Trade Claims will receive the same percentage on their claims, nor the minimum and maximum percentages distributable to them. Debtors also fail to disclose whether the cash allocated and recovery percentages distributable to Go-Forward Trade Creditors will be the same or differ under a Reorganization Transaction versus a Sale Transaction or even whether the universe of claims classified as Go-Forward Trade Claims is entirely consistent in both a Reorganization Transaction and a Sale Transaction.

44.    Debtors also need to disclose how and why their disparate treatment of Go-Forward Trade Creditors from General Unsecured Creditors does not "unfairly discriminate" against the holders of general unsecured claims in violation of Section 1129(b)(1). Given that the holders of Go-Forward Trade Claims and General Unsecured Claims are not (but should be) entitled to vote on the Plan, as discussed below, creditors will need to know sooner, rather than later, when they will be designated into Class 6 Go-Forward Trade Claims versus Class 5 General Unsecured Claims. The failure to make these requisite disclosures renders the Disclosure Statement defective.

6.    **Further Disclosure Regarding Management Incentives is Necessary.**

45.    There is inadequate disclosure concerning which employee agreements will be assumed in a Reorganization Transaction, the nature of the Management Incentive Plan, and identification of the beneficiaries of those incentives. The cost of such employee agreements is entirely undisclosed. As noted above, the Committee understands that many of the officers,

directors, and managers of the Debtors prepetition were also equity security holders and will be

retained and allegedly incentivized pursuant to this Management Incentive Plan.  Without

knowing the terms of the Management Incentive Plan and the intended beneficiaries, it is quite

possible that some members of management will be receiving shares in the Reorganized Debtor

not on account of future services but, rather, on account of their existing equity positions.  This

further "carve out" in favor of existing shareholders also violates the absolute priority rule and

may be unfair discrimination under 1129(b)(1) of the Bankruptcy Code to the extent other

shareholders are receiving nothing under the Plan.

**7.      Other Missing Disclosures**

46.     The Disclosures of Risk Factors should be expanded to include the risk

related to the Post-Effective Date Indebtedness (risk, maturity and other factors) and with respect

to obtaining Exit Financing, the risk that the terms of financing may differ materially from those

contemplated.

47.     The Plan provides for a "Reorganization Transaction," a "Sale

Transaction" (a sale of substantially all of the Debtors' assets) or a "Master Servicing

Transaction" (as part of a Reorganization Transaction), any of the foregoing may also include an

"Asset Sale Transaction" (the sale of a portion of the company's assets), as well.  The Disclosure

Statement fails to disclose how the proceeds of an Asset Sale Transaction would be applied

under a Reorganization Transaction or how that would affect the new capitalization.  The

Disclosure Statement does not (and at this juncture in the case, where the outcome of the

Marketing Process is unknown, cannot) provide projections for the various potential case

outcomes, without which Plan feasibility cannot be judged.

48.     The disclosures regarding Certain U.S. Federal Income Tax Consequences

of the Plan in Article VIII of the Disclosure Statement fail to disclose that substantially all NOL

carryforwards will be used on or before the Plan Effective Date.  Nor does the Disclosure

Statement disclose that the Reorganized Debtors may be unable to utilize any remaining NOL

carryforwards as a result of 382(l)(5) limitations arising from this case being the second

restructuring in a two year period.

> **8.**   **The Disclosure Statement Fails to Meet the Standards of Section 1125 of the Bankruptcy Code.**

49.     A disclosure statement cannot be approved unless it contains "adequate

information."  The primary function of a disclosure statement is to provide creditors with

information necessary to determine whether to accept or reject a debtor's plan of reorganization.

*In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985); *In re Dakota Rail, Inc.*, 104 B.R. 138,

142 (Bankr. D. Minn. 1989).

50.     The obligation to provide adequate information is pivotal.  *See Westland*

*Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) (disclosure

is the "pivotal" concept in chapter 11 cases).  In determining whether a plan proponent has

provided "adequate information" to creditors and parties in interest, the standard is not whether

the failure to disclose information would harm creditors but whether "hypothetical reasonable

investors receive such information as will enable them to evaluate for themselves what impact

the information might have on their claims and on the outcome of the case, and to decide for

themselves what course of action to take."  *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831

(Bankr. W.D. Tex. 1991).  Significantly, even if more thorough disclosure would not have

affected an objecting creditor's vote, that creditor still has standing to object because inadequate

disclosure may have induced other creditors to approve the plan.  *Everett v. Perez (In re Perez)*,

30 F.3d 1209, 1217 (9th Cir. 1994).  For a creditor to fairly evaluate the results of a proposed

plan, the court must ensure that a disclosure statement sets forth "all those factors presently

27

known to the plan proponent to bear upon the success or failure of the proposals contained in the

plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986); *In re Ferretti*, 128 B.R. 16,

19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly

inform the average unsecured creditor what it is going to get, when it is going to get it, and what

contingencies there are to getting their [*sic*] distribution.").

51.     The Disclosure Statement lacks adequate information necessary for

creditors to evaluate the Plan as required by Section 1125 of the Bankruptcy Code.  Among the

information missing from the Disclosure Statement is the following:

- The Disclosure Statement does not attach adequate business plan projections or assumptions regarding future operations under one or more Reorganization Transaction scenarios.  The Financial Projections are presented on a consolidated basis without adequate detail to assess the reasonableness of assumptions or the viability of the business operations as a whole, much less respecting individual Debtors. In addition, the Debtors' business environment and prospects are rapidly evolving and may not be properly captured in the Financial Projections (which lack sufficient disclosure to assess their assumptions). The Financial Projections do not capture an adequate time frame to assess Plan feasibility or for creditors to draw an informed view of the value of the Debtors.

- The Disclosure Statement is devoid of any valuations of the Debtors or their assets, either individually or on a consolidated basis.  It is impossible to determine whether Class 3 Claims are being overcompensated.

- There is no breakdown of assets and liabilities of the separate Debtors that would allow for any understanding by creditors of the relative recovery entitlement of creditors of each entity.

- There is no liquidation analysis from which creditors can determine whether they would be better off in a straight forward chapter 7 liquidation.  As the Plan does not purport to substantively consolidate the Debtors, a separate liquidation analysis is required for each Debtor.

- The Disclosure Statement fails to include any discussion of unencumbered assets or potential avoidance claims, notwithstanding that Debtors recently filed their Statements of Financial Affairs showing, among other things, that Ditech Financial and Reverse Mortgage Solutions, Inc., paid in excess

28

of $978 million and $112 million to insiders within one year of the
bankruptcy filings, respectively.

- The Disclosure Statement provides no description of each of the Debtor
entities, their purpose and debt structure, and no mention of why the
Debtors determined to include or exclude any or all of their 13 affiliated
entities as chapter 11 Debtors.

- The Disclosure Statement fails to describe the Intercompany Claims and
receivables by and among the Debtor and non-Debtor entities and how the
Plan's treatment of such Claims affects creditor recoveries on a Debtor-
by-Debtor basis.

- The Disclosure Statement fails to identify Class 6 Go-Forward Trade
Claims and fails to provide adequate information concerning the criteria
for designating creditors in Class 6, when and under what circumstances
they will be designated, their payout percentage, the capped amount to be
allocated to Class 6, or the grounds upon which Debtors determined not to
solicit their votes.

- There is inadequate disclosure concerning the employee agreements that
will be assumed in a Reorganization Transaction, the amount of
compensation encompassed in such agreements, the nature of management
incentives and identification of the beneficiaries of those incentives.

- The contract assumption and cure schedule may be changed at any time
until the eve of the Plan confirmation hearing, which will not provide
adequate notice to contract parties regarding the Debtors' intended
treatment of their contracts or cure payment proposals prior to the deadline
for voting or filing objections to the Plan.

- There is no discussion in the Disclosure Statement concerning the
"pending litigation" or other potential estate claims against the Released
Parties (including former and current officers and directors of the Debtors)
that are to be released by voting creditors, the value of those claims or the
consideration provided for the releases.

- There is inadequate disclosure regarding how or why the Debtors intend to
treat creditor claims on a consolidated basis absent substantive
consolidation and, as the Plan implements a *de facto* substantive
consolidation, how they meet the legal criteria for doing so.

- With respect to any Sale Transaction or Asset Sale Transaction, Debtors
fail to disclose that such sale cannot be free and clear of the claims of
creditors under Section 363(o) of the Bankruptcy Code.

29

52.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claim or interest holders with the ability to vote or take action on a Plan.  (As set forth below, creditors in Class 5 and Class 6 should be entitled to vote on the Plan.  Indisputably, they have standing to oppose the Plan.)  The Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code in numerous material respects.  It omits basic information about matters of primary concern to creditors as discussed herein.  Absent such disclosures, creditors simply have not been provided "adequate information" to make an informed decision as whether to accept, reject or oppose the Plan.  The Court should deny approval of the Disclosure Statement.

C.     **The Bidding and Sale Procedures Proposed in the Solicitation Procedures Motion Should be Revised.**

1.     **The Proposed Solicitation and Bidding Procedures Timeline Should Be Extended.**

53.     The currently scheduled Disclosure Statement Hearing, at which the Debtors seek approval of the Disclosure Statement, Solicitation and Voting Dates, Plan Confirmation timeline, and Bidding Procedures, is premature (and the proposed timelines are inadequate).  The Disclosure Statement cannot provide adequate information as to the value of the Debtors, creditor recoveries, or liquidation values until further along in the sale process, after Qualified Bids have been identified and, if applicable, an Auction is held.  The Disclosure Statement Hearing should be extended as necessary to permit a fair opportunity for further marketing and bidding to take place.  The Debtors' business is large, complex, highly regulated, and involves sensitive personal data.  The time required for a bidder to review and diligence the Debtors, their books and records (including the state of individual loan files), and their technology capabilities is substantial.

30

54.     Further, the Debtors and their Lenders have only recently settled upon a
proposed business plan, although the Bidding Procedures anticipate a sale of certain assets,
which would change that business plan.  The change in the Debtors' business effectuated by the
purported termination of a substantial portion of the Debtors' servicing business shortly before
the Petition Date renders the Debtors' prepetition marketing process an inadequate remedy for
the brief postpetition process.  Further, in light of the aforementioned business plan uncertainty
and business complexity, the proposed milestones simply do not allow sufficient time for a
robust marketing and diligence process.  Another thirty (30) days at the least is appropriate for
each of the bidding and approval of disclosure statement milestones.

55.     In light of the uncertain business plan and the need to be able to assess
potential values to distribute after seeing the results of any bidding, the timelines in the
Solicitation Procedures Motion (based on the deadlines set by the Term Lenders) are not
practical.  The Disclosure Statement Hearing and all of the timelines to be considered therein
should be continued for at least another thirty (30) days and in all events, Plan Confirmation
should be extended beyond the end of the Committee's lien challenge period.

## 2.     Credit Bidding Rights are Overbroad and Will Chill Bidding.

56.     The Committee is assessing the validity, priority and extent of the lenders'
liens and security interests and will continue to do so until the lien challenge deadline.  Pending
the completion of that investigation, the validity of the Term Lenders' alleged secured claims
should not be pre-judged by giving those lenders an absolute right to credit bid.  Moreover, an
excessive credit bid by either the DIP Lenders or the Prepetition Secured Lenders may chill a
robust bidding process.  As set forth in the DIP Motion Objection, the bankruptcy process is
being run for the benefit of the Lenders.  The Court should require that the Lenders promote the
very bidding that they are facilitating by agreeing not to credit bid at all, or to credit bid only

31

some amount materially less than the debt they hold.  Additionally, should the Court authorize the Debtors to enter into a Stalking Horse Agreement, the Prepetition Secured Lenders should not be allowed to credit bid against such Stalking Horse Bidder—such an outcome will both chill bidding and could strand the Estates with administrative claims for Stalking Horse Bid Protections.

### 3.    Any Stalking Horse Must be Approved on Notice and Hearing.

57.    The Bid Procedures allow the Debtors to unilaterally select a Stalking Horse Bidder and provide Stalking Horse Bid Protections, including a break-up fee, to such Bidder. The Debtors seek unfettered authority to provide such Stalking Horse Bid Protections; having provided no indication of value of the assets to be sold or proceeds to be received or the Stalking Horse Bid Protections to be granted, the Debtors have not established a basis to use their assets outside of the ordinary course of business by granting the Stalking Horse Bid Protections. While the Committee agrees that a Stalking Horse Bidder is likely to enhance the proceeds attained at an auction, the Stalking Horse Bid Protections must be evaluated on motion and notice.

### 4.    Any Sale Transaction Must Comply with Section 363(o) of the Bankruptcy Code.

58.    Under a Sale Transaction, the Plan provides that the Debtors' assets will be transferred and vest in the Successful Bidder free and clear of all Liens, Claims, charges or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.  Notwithstanding Section 363(f) of the Bankruptcy Code, claims and defenses under a consumer credit transactions cannot be transferred free and clear.  Section 363(o) of the Bankruptcy Code provides:

> Notwithstanding subsection (f), if a person purchases any interest
> in a consumer credit transaction that is subject to the Truth in

Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

11 U.S.C. § 363(o).  The Plan (and any purchase agreement entered into with a Successful Bidder) must incorporate the foregoing provisions of Section 363(o) of the Bankruptcy Code.

**5.** **The Contract and Cure Schedule Cannot be Changed at Any Time Until the Eve of the Plan Confirmation Hearing.**

59.  The Debtors propose to file a schedule of executory contracts to be assumed as part of their Plan Supplement, at least ten days prior to the Plan objection deadline and counterparties have ten days of service of the assumption notice to file an objection to the proposed assumption, assumption and assignment or the related Cure Amount.  Plan at p.40.  However, the Debtors reserve the right to revise that schedule up until the business day before the commencement of the Confirmation Hearing and shall provide notice of that amendment "as reasonably as practicable."  Plan at p. 42.  There is no provision for an extension of time for counterparties to address any amendment to the assumption Schedule.  Contract counterparties must be afforded an opportunity to object to any amendments to the Debtors' assumption schedule.

**D.** **The Solicitation and Voting Procedures Cannot Be Approved as they Disenfranchise Unsecured Creditors.**

60.  The Committee objects to the solicitation procedures proposed in the Solicitation Procedures Motion, as described below.  Some improperly disenfranchise creditors in violation of the Bankruptcy Rules and fail to provide adequate or sufficient notice concerning

solicitation procedures for the Plan. The Committee also requests that the Court approve the

additional provisions as set forth below.

1.    **The General Unsecured Creditors and the Go-Forward Trade Creditors are Not Deemed to have Rejected the Plan and are Entitled to Vote.**

61.    The Plan treats both the Class 5 General Unsecured Creditors and the

Class 6 Go-Forward Trade Creditors as impaired and "conclusively deemed to have rejected the

Plan pursuant to section 1126(g) of the Bankruptcy Code."  Section 1126(g) provides that:

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

62.    The Go-Forward Trade Claims are guaranteed some unspecified

distribution under the Plan.  While it is anticipated that the Debtors will argue that these creditors

will only be receiving a distribution as a result of a carve out of the Term Loan Claimants'

collateral, that argument misses the mark.  Courts have found that a distribution of "any

property" to a junior creditor, over the objection of a senior unpaid creditor, violates the absolute

priority rule set forth in Bankruptcy Code Section 1129(b)(2)(B)(ii), even if that property is a

"gift" from a secured creditor.  *See Dish Network Corp. v. DBSD N.Am., Inc. (In re DBSD*

*N.Am., Inc.)*, 634 F.3d 79 (2d Cir. 2010).  Section 1129(b)(2)(B)(ii) and section 1126(g) use

identical language and must be construed in the same manner.  Accordingly, the Go-Forward

Trade Claimants receive "property under the plan on account of such claims," even if the

distribution is carved out from Term Loan Creditors' collateral and section 1126(g) is

inapplicable.

63.    Further, holders of Allowed Class 5 Claims may, in fact, receive property

under the Plan under a Sale Transaction or from unencumbered assets and are, therefore,

34

impaired, but cannot be conclusively deemed to have rejected the Plan.  While holders of

General Unsecured Claims "shall not receive or retain any property under the Plan on account of

such Claims" if the Reorganization Transaction occurs, if the Sale Transaction occurs, they are

entitled to receive their Pro Rata Share of the Net Cash Proceeds (until their claims are paid in

full) after the Term Loan Claims and the Second Lien Notes Claims are satisfied in full.  Until

results of the Sale Transaction are known, it cannot be conclusively concluded that the General

Unsecured Creditors will receive nothing under the Plan and therefore they cannot be

"conclusively deemed" to have rejected the Plan.  Their votes must be solicited.

64.     In the Solicitation Procedures Motion at page 18 (footnote 4), Debtors

note that bankruptcy courts have approved prepackaged or prearranged chapter 11 plans where

the debtors did not solicit holders of general unsecured claims who received modest distributions

in the form of equity or warrants under a plan.  Those cases may be inapposite—at this time, the

recovery to unsecured creditors under a Sale Transaction is unknown and cannot conclusively

presumed to be "modest."

65.     As Holders of Class 5 and Class 6 Claims may receive property under the

Plan, they are entitled to vote and to receive solicitation packages from the Debtors.

**2.     The Debtors Cannot Seek Solicitation until After the Bar Date.**

66.     The Debtors seek to commence solicitation of votes within four days after

entry of an order approving the Disclosure Statement and intend to solicit only the holders of

Class 3 Claims.

67.     The Debtors have proposed that the Voting Record Date be April 9, 2019,

which is two days prior to the Disclosure Statement Hearing in contravention of the Bankruptcy

Rules, which states that the Voting Record Date is the date of entry of order on the Solicitation

Procedures Motion unless ordered otherwise for cause.  Fed. R. Bankr. P. 3018(a).  The Debtors

have not demonstrated "cause" under Bankruptcy Rule 3018 to set the Voting Record Date as April 9, 2019, particularly when the bar date is April 25, 2010.

68.    By Order signed March 27, 2019, the Court set the deadline for creditors to file proofs of claim against one or more of the Debtors (the "Bar Date") as April 25, 2019. Under the Debtors' proposed Plan Confirmation Timeline, creditors who file claims between April 9, 2019 and April 25, 2019 and who are not scheduled on the Debtors' Schedules will not be known or be entitled to vote on the Plan. Debtors also propose that with respect to claims listed in the Schedules as contingent, unliquidated, disputed, in the amount of $0.00, or unknown (a "Disputed Claim"), such Claim shall be entitled to vote in the amount of $1.00, unless a proof of Claim has been filed by the applicable bar date (of course, subject to the Voting Record Date). Solicitation Procedures Motion at ¶ 61(e). The Debtors only filed their Schedules on March 28, 2019. That was the first opportunity the Committee and the creditors it represents had to see how the Debtors assess their respective liability for individual claims. Notably, the vast majority of Claims of each of the Debtors are scheduled as Disputed Claims without a claim amount.

69.    If an unscheduled creditor or holder of a Disputed Claim fully complies with the Bar Date Order and timely files a claim by the Bar Date after April 9, 2019 and on or before April 25, 2019, that creditor will be deprived of its fundamental right to vote on the Plan. Even if such creditors were solicited after the Bar Date, Federal Rule of Bankruptcy Procedure 2002(b) requires that the Debtors provide at least 28 days' notice by mail of the time fixed for filing objections to the Plan. Fed. R. Bankr. P. 2002(b). Therefore, unless the Debtors are able to provide an unscheduled creditor or holder of a Disputed Claim with a copy of the Disclosure Statement, Plan, Ballot and other appropriate solicitation materials by overnight mail on April 26, 2019, those creditors will have less than the required statutorily prescribed time period in which to review and vote on or file an objection to the Plan.

36

70.    The Committee requests that the Debtors modify the solicitation procedures to (i) modify the Voting Record Day in accordance with Fed. R. Bankr. P. 3018(a), (ii) solicit the votes of Holders of Class 5 and Class 6 Claims, (iii) permit parties to vote who file proofs of claim between the Voting Record Date and the Bar Date for claims that, as of the Voting Record Date, are either not scheduled or are Disputed Claims, (iv) provide that the Debtors will mail solicitation packages (including ballots) to such parties one business day after the Bar Date, and (v) extend the voting and Plan objection deadline for such parties, if necessary.

### 3.    <u>Voting and Vote Tabulation Must Take Place on a Debtor-by-Debtor Basis.</u>

71.    As noted above, the Plan is represented not to be a substantively consolidating plan; rather, it is to be read as a series of standalone plans for each of the Debtors. Accordingly, tabulation of votes and determination of acceptance or rejection of the Plan must be conducted on a Debtor-by-Debtor basis. The Class 3 Ballot form indicates that the Debtors intend to apply the Class 3 vote to each Debtor entity, and it would appear that the Debtors do intend to tabulate votes of Class 3 on a Debtor-by-Debtor basis. They must do so as well for the holders of Class 5 and Class 6 claims, who are entitled to vote on the Plan.

72.    In filing their proofs of claim, individual creditors may take a different assessment than the Debtors as to their account debtor. Such differences may ultimately require rulings of this Court to determine where creditor claims reside and in which of the various sub-plans within the Plan certain creditors are entitled to vote. Neither the Disclosure Statement nor the voting or confirmation procedures contemplate any time or any mechanisms for resolving these issues, which are certain to arise during the plan confirmation process.

**E.**     **The Disclosure Statement Contains Other Misstatements and Errors.**

73.     Although Debtors claim they have no duty to update the Disclosure Statement,[20] it must be revised to ensure it is accurate when sent out to creditors.  The following sections of the Amended Disclosure Statement are inaccurate or outdated:

i)     The Committee's proposed financial advisors are Goldin Associates, LLC. Disclosure Statement p. 32.

ii)     Statements and Schedules, and Rule 2015.3 Financial Reports - This section should be updated to state that the Debtors' schedules and statements have been filed and to advise when the Rule 2015.3 Financial Report was or will be filed. Disclosure Statement at p. 33.

iii)     Financial Projections—Disclosure Statement (ECF 315 at p 242)—Debtors do not intend or undertake to update or otherwise revise the financial projections.  This section should be revised to state that the Debtors shall filed updated Financial Projections in the event of the occurrence of unanticipated events that result in material changes to the projections.

**F.**     **Reservation of Rights**

74.     The Committee reserves its right to supplement this Objection at or prior to the Disclosure Statement Hearing.

---

[20] Disclosure Statement at p. 97.

## IV.    **CONCLUSION**

Based on the foregoing, the Committee respectfully requests that this Court deny

approval of the Solicitation Procedures Motion and the Disclosure Statement absent the

significant changes and supplements thereto as set forth in this Objection and grant such other

and further relief as this Court deems appropriate.

Dated: April 4, 2019
New York, New York                        PACHULSKI STANG ZIEHL & JONES LLP


                                          */s/ Robert J. Feinstein*
                                          Robert J. Feinstein, Esq.
                                          Bradford J. Sandler, Esq.
                                          780 Third Avenue, 36th Floor
                                          New York, New York 10017
                                          Telephone:  (212) 561-7700
                                          Facsimile:  (212) 561-7777

                                          *Proposed Counsel for the Official Committee
                                          of Unsecured Creditors of Ditech Holding
                                          Corporation, et al.*