| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date: April 11, 2019<br>Hearing Time: 11:00 a.m. |

-----------------------------------------------------------x

In re                                              Chapter 11

DITECH HOLDING CORPORATION. *et al.,*              Case No. 19-10412 (JLG)

                Debtors.            (Jointly Administered)

-----------------------------------------------------------x

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE APPROVAL
OF THE DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF
DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS**

      William K. Harrington, the United States Trustee for Region 2 (the "**United States Trustee**"), hereby submits his objection (the "**Objection**") to the approval of the Amended Disclosure Statement [ECF Doc. No. 315] (the "**Disclosure Statement**") for the Amended Joint Chapter 11 [ECF Doc. No. 314] (the "**Plan**")  of Ditech Holding Corporation and its Affiliated Debtors (collectively, the "**Debtors**").[1]  In support thereof, the United States Trustee respectfully states:

**PRELIMINARY STATEMENT**

      The Disclosure Statement fails to provide adequate information regarding the scope of the Plan's discharge, release, and injunction provisions.  The facts of these cases demand a simple, clear explanation of what is being discharged, released, and enjoined and why, particularly with respect to consumer claims.  The Debtors' schedules list *thousands* of unsecured litigation claims held by individuals with minimal additional information.  As recently as the April 4, 2019 meeting of creditors, the Debtors were still "evaluating" the scope of the Plan's proposed discharge with respect to these and other claims.  If the Debtors are unable to articulate the full scope of the proposed discharge on the vast number of claims in this case,

---

[1] Unless otherwise indicated, capitalized terms shall have the same meaning as in the Disclosure Statement.

creditors cannot possibly be expected to understand these provisions.  The Disclosure Statement cannot be approved without a clear explanation of the impact of the discharge, release, and injunction provisions.

Additionally, adequate disclosure cannot be effected without appropriate notice.  The Debtors are deeming unsecured creditors to reject the Plan and are not proposing to solicit their votes.  In effect, the Debtors are seeking to discharge or release a vast number of claims, including consumer borrower claims, without appropriate notice.

For these and additional reasons as detailed below, the Disclosure Statement cannot be approved.

## BACKGROUND

### A.    General Background

1. On February 11, 2019 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  ECF Doc. No. 1.

2. The cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  ECF Doc. No. 50.

3. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") on February 27, 2019.  *See* ECF Doc. No. 127.

5. The Debtors, together with their non-Debtor subsidiaries (collectively, the "**Company**"), operate as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.  The Company originates and services a wide array of loans for its own portfolio and for GSEs (as defined in the First Day Declaration), government agencies,

third-party securitization trusts, and other credit owners. The Company originates and purchases residential loans through consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities. The Company also operates two additional businesses: (i) asset receivables management and (ii) real estate owned property management and disposition. *See* Declaration of Gerald A. Lombardo, dated February 11, 2019, ECF Doc. No. 2 (the "**First Day Declaration**") at ¶ 6; *See* Disclosure Statement at 6.

6. As of December 31, 2018, one of the Debtors serviced approximately 1.4 million residential loans with an unpaid principal balance of $170.1 billion. As of December 31, 2018, another Debtor serviced or subserviced approximately 88,000 reverse mortgage loans with an unpaid principal balance of $17.1 billion. Disclosure Statement at 19-20.

7. On the Petition Date, the Debtors filed certain "first day motions," including, *inter alia*, a motion for authority to pay employee obligations and to continue employee benefit obligations, ECF Doc. No. 13 (the "**Wage Motion**"), a motion to approve debtor in possession financing, ECF Doc. No. 26 (the "**DIP Motion**"), a motion to continue origination and servicing of forward mortgage loans, ECF Doc. No. 9 (the "**Forward OCB Motion**"), and a motion to continue honoring reverse issuer and servicing obligations, ECF Doc. No. 10 (the "**Reverse OCB Motion**" and together with the Forward OCB Motion, the "**OCB Motions**").

8. The Debtors obtained final relief to continue to conduct their forward and reverse mortgage businesses in the ordinary course when the Court entered orders approving the OCB Motions (the "**Final OCB Orders**"). ECF Nos. 224 and 229.

9. Also, on the Petition Date, the Debtors filed a Restructuring Support Agreement (the "**RSA**") that the Debtors entered into on February 8, 2019 with certain of their Term Lenders providing for a recapitalization in which, among other things, over $800 million in funded debt would be extinguished, leaving the reorganized Company wholly owned by the

Term Lenders, with $400 of term loan debt and an exit working capital facility or consummation of another liquidity enhancing transaction (the "**Reorganization Transaction**"). RSA, Exhibit A to First Day Declaration; *see also* First Day Decl. at ¶ 9.

10.     As a "toggle to the Reorganization Transaction," the Debtors are conducting a marketing process for bids for the Company or its assets (the "**Marketing Process**"). First Day Decl. at ¶¶ 9-10. The Reorganization Transaction provided for in the RSA "will serve as a backstop" in the event the Marketing Process does not produce a transaction (or transactions) representing higher or better value. *See* First Day Decl. at ¶ 11.

11.     The Debtors filed an initial joint chapter 11 plan and a disclosure statement on March 5, 2019. ECF Doc. Nos. 145 and 146, respectively. The Debtors filed the current Plan and Disclosure Statement on March 28, 2019. ECF Doc. Nos. 314 and 315, respectively.

12.     According to the Disclosure Statement, the Debtors are soliciting bids for the Company and its assets as part of the Marketing Process with a May 6, 2019 deadline to submit bids and an auction to be held, if necessary, on May 13, 2019. Disclosure Statement at 34.

13.     Both the RSA and the DIP Documents contain certain milestones that "the Debtors are obligated to meet," including deadlines for entry of orders approving a disclosure statement and bid procedures, for commencement of sale and confirmation hearing, and for occurrence of a plan effective date. The RSA and the DIP Facilities may be terminated if the Debtors fail to satisfy these milestones. The Debtors have agreed to seek approval of the milestones in the final DIP Order. Disclosure Statement at 9.

      B.    **<u>The Prior Restructuring of the Parent Company</u>**

14.     On November 30, 2017, Walter Investment Management Corporation ("**WIMC**"), the Company's parent company, commenced a prepackaged chapter 11 bankruptcy case (*In re Walter Investment Management* Corp., 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30,

2017)) (the "**WIMC Case**"). First Day Decl. at ¶ 54. Unlike the current cases, none of the Company's operating subsidiaries filed chapter 11 petitions in connection with the WIMC case. WIMC confirmed a plan of reorganization (WIMC Case at Doc. No. 169) (the "**WIMC Plan**") on January 18, 2018. WIMC Case at Doc. No. 172. On February 9, 2018, the WIMC Plan went effective and WIMC emerged from the WIMC Case as Ditech Holding Corporation. WIMC Case at Doc. No. 193. A final decree was entered closing the WIMC Case on August 14, 2018. WIMC Case at Doc. No. 257.

15. Despite the stated goal of deleveraging the Company's capital structure to enable the reorganized debtor to implement a business plan, after emerging from the WIMC Case, the Company continued to face "significant hardships" including "liquidity and performance challenges that were more persistent and widespread than anticipated." First Day Decl. at ¶¶ 54-55.

16. The Debtor's common stock was delisted on the New York Stock Exchange on December 1, 2018. First Day Decl. at ¶ 53.

C.    **Retention and Incentive Payments to Key Employees**

17. The Debtors have filed a motion (the "**KEIP Motion**") seeking approval of certain payments to key employees, including insiders, under a Key Employee Incentive Plan (the "**KEIP**"). ECF Doc. No. 228.

18. In June 2018, the Company adopted the KEIP. Wage Motion ¶ 41. The KEIP, as initially adopted, was payable in two installments with no additional milestones or targets built in: 50% payable upon the Company's execution of definitive documentation that would constitute a change for control; and 50% payable on the date 30 days after a the closing of a change in control transaction.

19. During the fall of 2018, as it became more likely that a chapter 11 filing was

5

imminent, the Company began to reformulate the KEIP to add additional milestones. *See* KEIP Motion at ¶ 27. Around this same time, in September 2018, the Debtors adopted a retention bonus plan (the "**2018 Bonus Retention Plan**") under which they made one-time cash payments totaling approximately $11.1 million, over and above base salaries, to approximately 60 employees, including insiders, prior to the Petition Date. Wage Motion at ¶ 40. Based on information provided to the United States Trustee, of this amount, approximately $10.8 million was paid to KEIP Participants (as defined in the KEIP Motion) and more than $7.3 million was paid to the eight admitted statutory insiders who are KEIP Participants.

20. In December 2018, Company approved the modifications to the KEIP. The KEIP was still payable in the two installments identified above, but now also subject to certain milestones as discussed below. KEIP Motion at ¶ 27. Under the KEIP, the KEIP Participants received a first installment payment, over and above base salaries, in the aggregate amount of approximately $2.4 million upon execution of the RSA on February 8, 2019, three days before the Petition Date. Motion at ¶ 27.

21. Under the KEIP Motion, the Debtors now seek to pay these same KEIP Participants up to $32.6 million in additional purported incentive payments over above base salaries. *See generally* KEIP Motion.

22. In the ordinary course of business, the Debtors maintain an annual incentive-based compensation program for purported non-insider employees (the "**Annual Incentive Program**"). Wage Motion at ¶ 42.

23. In the event a Reorganization Transaction is consummated, the Plan provides for a post-emergence management incentive plan under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards on terms and conditions described in and consistent with

6

the Management Incentive Plan Term Sheet. The terms of the Management Incentive Plan are not disclosed. If the Company pursues a Reorganization Transaction, the Company will file a term sheet when it files a Plan Supplement. Disclosure Statement at 9.

### D. Consumer Claims, Litigation, and Regulatory Matters

24. The Debtors' schedules list thousands of unsecured claims related to litigation as contingent, unliquidated, disputed claims in undetermined amounts listing the dates the claims were incurred as "unknown" and the account numbers as "not available." *See, e.g.*, Schedule E/F for Ditech Financial, Claims 3.1371 – 3.2621, ECF Doc. No. 290; Schedule E/F for Reverse Mortgage Solutions, Inc. Claims 3.521 – 3.1047, ECF Doc. No. 308. Presumably, a large portion of these unsecured claim holders are ordinary consumers whose residential mortgage loans or reverse mortgage loans were either originated or serviced by the Company.

25. The Debtors acknowledge:

> In the ordinary course of business, the Debtors are defendants in, or parties to, pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants. Many of these actions and proceedings are based on alleged violations of consumer protection laws governing the Company's servicing and origination activities, and in certain instances, claims for substantial monetary damages are asserted against the Company. The Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with formal and informal inquiries, the Company receives numerous requests in connection with various aspects of the Company's activities.

Disclosure Statement at 32.

26. The Debtors further acknowledge that "in the ordinary course of business, the Company is involved in numerous pending and threatened legal actions and proceedings, as well as in routine proceedings such as foreclosures, evictions, title disputes, collection actions, and borrower bankruptcy cases." Disclosure Statement at 32-33.

27. The Final OCB Orders allowed certain actions against the Debtors to proceed,

7

making clear that these matters did not violate the automatic stay. Specifically, borrowers and third parties may "assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure, eviction, replevin, actions on the note, and collection actions (each a "Default Action") brought by the Debtors under limited circumstances and also to continue with actions connected to abusive practices by the Debtors." *See* Final OCB Orders, ¶¶ 16-20.

28. The Company established prepetition reserves "for pending or threatened litigation, regulatory and governmental matters when it is probable that a loss has been incurred and the amount of such loss can be reasonably estimated." Quarterly Report on Form 10Q for the quarter ended September 30, 2018 filed with the Securities and Exchange Commission on November 14, 2018 ("**September 2018 Form 10Q**") at 64. "At September 30, 2018, the Company's recorded reserves associated with legal and regulatory contingencies for which a loss is probable and can be reasonably estimated were approximately $25 million." *Id.*

### E. Classification of Unsecured Creditors

29. The Debtors divided unsecured creditors into two groups.

30. First, the Debtors list an unidentified group of Go-Forward Trade Claims. *See* Disclosure Statement at 8. On the Effective Date, holders of Go-Forward Trade Claims (i.e., trade creditors identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of reorganized Debtors ("Reorganized Debtors")) will receive a distribution in Cash in an amount equaling a certain percentage of their Claim, subject to an aggregate cap. *See id.*

31. Second, the Debtors list General Unsecured Claims. *See* Disclosure Statement at 40. On the Effective Date, the holders of General Unsecured Claims will not receive any distribution if the Reorganization Transaction contemplated by the RSA is consummated. If a

Sale Transaction occurs, holders of General Unsecured Claims will receive a pro rata distribution of remaining proceeds after senior creditors are paid in full. *Id.*

        **F.**        <u>**Discharge, Release, Injunction, and Notice Provisions**</u>

32.      The Plan contains a broad discharge of claims and interests and provides that the holders of such claims and interests "shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code . . ." Disclosure Statement at 66. The Plan further provides that holders of such claims and interests "shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecution or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property . . ." *Id.*

33.      The Plan also contains Estate Releases and Third-Party Releases for certain Released Parties and a broad list of Related Parties that include the Debtors' current and former officers and directors. Disclosure Statement at 67; Plan at 11.

34.      The Plan also enjoins parties "from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released by the Plan." *Id*. at 66-67.

35.      The Disclosure Statement provides that because unsecured creditors, including holders of Go-Forward Trade Claims and General Unsecured Claims, are deemed to reject the Plan, their votes are not being solicited. Disclosure Statement at 12.

36.      Counsel for the United States Trustee convened a meeting of creditors on April 4, 2019 (the "**Meeting of Creditors**"). The Debtors' chief financial officer testified that the Debtors are still "evaluating" consumer litigation claims and how these claims will be treated under the Plan and how they will be impacted by the Plan's discharge provisions.

## ARGUMENT

A.   **Governing Law Regarding Adequate Disclosure**

37.   Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125. Adequate information is defined as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1); *see also In re BGI, Inc.*, 772 F.3d 102, 105 (2d Cir. 2014) (disclosure statement designed to permit interested parties to evaluate proposed plan); *Adelphia Recovery Trust v. Goldman Sachs & Co.*, 748 F.3d 110, 118 (2d Cir. 2014) (same); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (same).

38.   To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

39.   Section 1125 of the Bankruptcy Code is biased towards more disclosure rather

than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *In re Adelphia Commc'ns Corp.*, 352 B.R. at 596 (citing *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988)).

### B. Section 363(O) of the Bankruptcy Code

40. The United States Trustee requests that the Plan explicitly provide that, in the event of a sale of the Debtors' assets under section 363 of the Bankruptcy Code, the successor in interest to the Debtors must be liable for consumer claims. To the extent the Debtor reorganizes without a sale, analogous language should be incorporated into the Plan. Section 363(o) of the Bankruptcy Code provides unambiguous direction:

> Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract...and if any such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had no such interest been purchased at a sale not under this section.

11 U.S.C. § 363(o).

41. The Debtors have not provided authority for the modification of this important consumer protection, or explained any perceived inapplicability. *See, e.g.*, *In re Macneal*, 308 Fed. Appx. 311, 315-16 (11th Cir. 2009) (holding section 363(o) inapplicable because purchased interest was not a consumer credit transaction). If the Debtors are seeking to waive this important provision, the Debtors should provide broad notice and a detailed explanation of the effect of such a waiver of successor liability, with a full and fair opportunity for affected parties to be heard. *See In re Accredited Home Lenders Holding Co.*, 2010 WL 2821965, *9 (Bankr. Del. 2010)(sale order reflected that "[n]othing contained in this Sale Order shall alter the

11

provisions of section 363(o) of the Bankruptcy Code.").

### C. Inadequate Information Regarding the Plan's Discharge, Release, and Injunction Provisions

42. The Debtors' Plan contains a broad discharge provision that provides for a release and discharge of claims and interests, including possibly all general unsecured claims. *See* Disclosure Statement at 66. The scope of the Plan's discharge and release provisions are not adequately explained.

43. As recently as at the Meeting of Creditors held on April 4, 2019, the Debtors admitted they were still "evaluating" the scope of the discharge provisions on consumer claims. The Debtors' conduct in the mortgage servicing and origination business has given rise to numerous lawsuits and enforcement actions. *See* Disclosure Statement at 32-33. The Debtors' schedules list thousands of unsecured claims related to litigation as contingent, unliquidated, disputed claims in undetermined amounts listing the dates the claims were incurred as "unknown" and the account numbers as "not available." *See, e.g.*, Schedule E/F for Ditech Financial, Claims 3.1371 – 3.2621, ECF Doc. No. 290; Schedule E/F for Reverse Mortgage Solutions, Inc. Claims 3.521 – 3.1047, ECF Doc. No. 308. Presumably, a large portion of these unsecured claim holders are ordinary consumers whose residential mortgage loans or reverse mortgage loans were either originated or serviced by the Debtors. It is possible that the Debtors' creditor body includes many more potential claimholders who have not yet commenced litigation or who may be unaware of servicing errors or wrongful conduct by the Debtors in relation to their servicing and origination practices.

44. This Disclosure Statement needs a simple, clear, plain-English explanation of how the Plan's release, discharge, and injunction provisions will affect claims, particularly consumer claims. To the extent claims may be unaffected by the discharge and ride through the

Pg 13 of 15

bankruptcy, this needs to be explained. Any explanation should be appropriately tailored to a creditor body that may not understand legal jargon.

45.     Additionally, the Plan contains releases by the Debtors and third parties of an extremely broad list of "Released Parties" and "Related Parties" associated with each of the Released Parties, including the Debtors' current and former officers and directors. *See* Disclosure Statement at 67; Plan at 11. The Disclosure Statement does not adequately explain the Debtors' basis for why these releases are necessary for such a large list of entities and individuals who are not even specifically identified and what, if any consideration, has been given by the parties receiving these releases.

### D.     **Insufficient Notice to Unsecured Creditors**

46.     The Disclosure Statement provides that because unsecured creditors are deemed to reject the Plan, their votes are not being solicited despite the fact their claims are impaired by the Plan. Disclosure Statement at 12. Despite the fact that ordinary consumers will be impacted by this Plan, it is unclear whether they will be served with copies of the Plan and Disclosure Statement. Further, it is unclear to what extent consumers of the Debtors who may have claims that have not ripened to the litigation stage are receiving notice of these proceedings. Unsecured creditors whose claims will be impaired by the Plan, and especially consumer creditors who may unaware that their claims will be impaired, should be properly served. In a situation where the Plan may impact or discharge thousands of consumer litigation claims (and possibly many more consumer claims where litigation has not yet commenced), appropriate notice and disclosure are absolutely fundamental to ensuring the integrity of the bankruptcy process. The Debtors must explicitly detail who will be served and how.

### E.     **Third Party Releases  - Impermissible Deemed Consent**

47.     Releases in favor of nondebtors in Chapter 11 cases have been allowed if the

affected parties have individually consented to them, and case law addresses how valid consent can be established. *See, e.g., Oneida, Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) ("'[n]ondebtor releases may also be tolerated if the affected creditors consent'") (*quoting In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005)). In *In re SunEdison*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017), the court recently held that creditor silence did not signify consent. The Court went on to state that the "meager recoveries (here, less than 3% for unsecured creditors) may explain their inaction without regard to the Release." *Id.* In holding that the nonvoting creditors did not consent, the Court stated that "[c]harging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id.* (*quoting In re Chassix Holdings*, 533 B.R. 64, 80-81 (Bankr. S.D.N.Y. 2015) (finding that creditors who "opted in" to a release clearly consented, while creditors who had taken no action at all did not)). *See also In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release").

48.    Here, with respect to the Third Party Releases, the Plan impermissibly deems the consent of holders of Term Loan Claims who abstain from voting on the Plan or vote to reject the Plan but do not opt of these release. Plan at 48. This treatment is impermissible under recent case law as detailed in *SunEdison* and *Chassix*. In order for parties to be bound by the Plan's Third Party Releases, they must demonstrate affirmative consent.

F.    **Unfair Discrimination**

49.    The Disclosure Statement does not adequately explain the Debtors' attempt to elevate the unidentified holders of Go-Forward Trade Claims above all other unsecured creditors. A plan proponent "may not segregate two similar claims or groups of claims into

14

separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986*), aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp*. 843 F.2d 636 (2d Cir. 1988) (*citing In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982)). The Disclosure Statement provides no justification for this unconfirmable provision.

## CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court deny the approval of the Disclosure Statement in its current form.

Dated: New York, New York
       March 5, 2019

        Respectfully submitted,

        WILLIAM K. HARRINGTON
        UNITED STATES TRUSTEE, Region 2

        By: */s/ Greg M. Zipes*
        Greg M. Zipes
        Benjamin J. Higgins
        Trial Attorneys
        Office of the United States Trustee
        201 Varick Street, Room 1006
        New York, New York 10014
        Tel. (212) 510-0500