WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                                                           :
**In re**                                                  :    **Chapter 11**
                                                           :
**DITECH HOLDING CORPORATION**, *et al.*,                  :    **Case No. 19-10412 (JLG)**
                                                           :
             **Debtors.[1]**                               :    **(Jointly Administered)**
                                                           :
-----------------------------------------------------------X

# NOTICE OF FILING OF AMENDED
## DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN
## OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

    **PLEASE TAKE NOTICE** that on March 5, 2019, Ditech Holding Corporation

(f/k/a/ Walter Investment Management Corp.) and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed the

*Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Ditech Holding*

*Corporation and Its Affiliated Debtors* (ECF No. 146)[2] (the "**Original Disclosure Statement**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Fourth Amended Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that on March 28, 2019, the Debtors filed the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 315).

**PLEASE TAKE FURTHER NOTICE** that on April 26, 2019, the Debtors filed the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 470).

**PLEASE TAKE FURTHER NOTICE** that on April 26, 2019, the Debtors filed the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 516) (the "**Third Amended Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Affiliated Debtors*, annexed hereto as **Exhibit A** (the "**Fourth Amended Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that a blackline (the "**Incremental Blackline**") reflecting the changes from the Third Amended Disclosure Statement is annexed hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that a blackline (the "**Cumulative Blackline**") reflecting the changes from the Original Disclosure Statement is annexed hereto as **Exhibit C**.

WEIL:\97029773\1\41703.0011

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held on **May 10, 2019 at 11:00 a.m. (Prevailing Eastern Time)**, before the Honorable James L. Garrity, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court, in Courtroom 601, One Bowling Green, New York, New York, 10004, on the Debtors' request for approval of the Fourth Amended Disclosure Statement.

Dated: May 9, 2019
      New York, New York

<div style="margin-left:40%">

/s/ Sunny Singh          
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

</div>

WEIL:\97029773\1\41703.0011

## Exhibit A

### Fourth Amended Disclosure Statement

WEIL:\97029773\1\41703.0011

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                        :
In re                                                   :      Chapter 11
                                                        :
DITECH HOLDING CORPORATION, *et al.*,                   :      Case No. 19-10412 (JLG)
                                                        :
              Debtors.[1]                               :      (Jointly Administered)
                                                        :
------------------------------------------------------------------ X

## AMENDED DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Counsel for Debtors*
*and Debtors in Possession*

Dated:    May 9, 2019
          New York, New York

THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech
Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree
Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing
Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions,
LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and
Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia Drive, Suite
100, Fort Washington, Pennsylvania 19034.

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS.**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING EASTERN TIME, ON JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MAY 8, 2019 (THE "<u>VOTING RECORD DATE</u>").**

---

**RECOMMENDATION BY THE DEBTORS AND CREDITORS' COMMITTEE**

**The Board of Directors of Ditech Holding Corporation and the board of directors, managers or members, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan (as defined herein) and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan. Holders of approximately 80.38% of the Term Loan Claims (as defined herein) have already agreed to vote in favor of the Plan. The Creditors' Committee also recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.**

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF NEW COMMON STOCK (AS DEFINED HEREIN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.  THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b)(1) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.  THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE (AS DEFINED IN THE PLAN).

THE NEW COMMON STOCK TO BE ISSUED ON THE EFFECTIVE DATE HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN DITECH HOLDING CORPORATION'S FILINGS WITH THE SEC.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION IX OF THIS DISCLOSURE STATEMENT.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED ALSO INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE

DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE ANNUAL AND QUARTERLY REPORTS OF DITECH HOLDING CORPORATION, INCLUDING AMENDMENTS THERETO, AND ITS OTHER FILINGS WITH THE SEC.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS ATTACHED HERETO AS EXHIBITS D AND E, RESPECTIVELY.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 6

II.     OVERVIEW OF COMPANY'S OPERATIONS.............................................. 16
        A.    Debtors' Business ......................................................................................... 16
        B.    Debtors' Organizational Structure ............................................................... 23
        C.    Directors and Officers .................................................................................. 24
        D.    Regulation of Company's Business .............................................................. 24
        E.    Debtors' Existing Capital Structure ............................................................. 26

III.    KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ................. 29
        A.    Background and Prior Restructuring ............................................................. 29
        B.    Events Leading to Commencement of these Chapter 11 Cases ..................... 29
        C.    Prepetition Marketing Process and Negotiations with Stakeholders ............. 30
        D.    Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse
              Facilities ..................................................................................................... 32

IV.     OVERVIEW OF THE CHAPTER 11 CASES ........................................... 33
        A.    Commencement of Chapter 11 Cases and First-Day Motions ...................... 33
        B.    Procedural Motions and Retention of Professionals .................................... 36
        C.    KEIP Motion ............................................................................................... 36
        D.    Lease Rejection Motion ............................................................................... 36
        E.    Bar Date ...................................................................................................... 37
        F.    Appointment of the Creditors' Committee .................................................. 37
        G.    Appointment of the Consumer Creditors' Committee .................................. 37
        H.    Statements and Schedules, and Rule 2015.3 Financial Reports.................... 38
        I.    Litigation Matters ........................................................................................ 39
        J.    Marketing Process and Bidding Procedures ................................................ 40
        K.    U.S. Trustee's Objections to Plan ............................................................... 41
        L.    Plan Settlement Negotiations and the Global Plan Settlement ..................... 42

V.      SUMMARY OF PLAN.................................................................................... 44
        A.    Administrative Expenses and Priority Claims .............................................. 44
        B.    Classification of Claims and Interests.......................................................... 46
        C.    Treatment of Claims and Interests ............................................................... 47
        D.    Means for Implementation ........................................................................... 53
        E.    Distributions................................................................................................ 68
        F.    Procedures for Disputed Claims .................................................................. 73

|      | G.   | Executory Contracts and Unexpired Leases ............................................................. | 75 |
|      | H.   | Conditions Precedent to Confirmation of Plan and Effective Date .................................. | 79 |
|      | I.   | Effect of Confirmation of Plan ........................................................................... | 81 |
|      | J.   | Retention of Jurisdiction .................................................................................. | 86 |
|      | K.   | Miscellaneous Provisions ................................................................................. | 88 |
| **VI.**  | | **VALUATION ANALYSIS** ................................................................................. | **92** |
| **VII.** | | **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** ........................... | **93** |
| **VIII.** | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN** ............................... | **94** |
|      | A.   | Consequences to the Debtors ............................................................................. | 95 |
|      | B.   | Consequences to Holders of Term Loan Claims ........................................................ | 98 |
|      | C.   | Disposition of New Common Stock ..................................................................... | 101 |
|      | D.   | Ownership and Disposition of the New Term Loan ................................................... | 102 |
|      | E.   | Information Reporting and Backup Withholding ...................................................... | 104 |
| **IX.**  | | **CERTAIN RISK FACTORS TO BE CONSIDERED** .............................................. | **106** |
|      | A.   | Certain Bankruptcy Law Considerations ............................................................... | 107 |
|      | B.   | Additional Factors Affecting Value of Reorganized Debtors ........................................ | 109 |
|      | C.   | Risks Relating to Debtors' Business and Financial Condition ...................................... | 109 |
|      | D.   | Factors Relating to Securities to be Issued Under Plan, Generally ................................ | 114 |
|      | E.   | Risk Related to Obtaining Exit Financing .............................................................. | 115 |
|      | F.   | Risks Related to Investment in New Common Stock .................................................. | 115 |
|      | G.   | Additional Factors .......................................................................................... | 116 |
| **X.**   | | **VOTING PROCEDURES AND REQUIREMENTS** .............................................. | **117** |
|      | A.   | Voting Deadline ............................................................................................. | 117 |
|      | B.   | Voting Procedures .......................................................................................... | 118 |
|      | C.   | Parties Entitled to Vote ................................................................................... | 118 |
| **XI.**  | | **CONFIRMATION OF PLAN** ........................................................................... | **120** |
|      | A.   | Confirmation Hearing ...................................................................................... | 120 |
|      | B.   | Objections to Confirmation ............................................................................... | 120 |
|      | C.   | Requirements for Confirmation of Plan ................................................................. | 122 |
| **XII.** | | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** ............... | **126** |
|      | A.   | Alternative Plan of Reorganization ...................................................................... | 126 |
|      | B.   | Sale Under Section 363 of Bankruptcy Code .......................................................... | 126 |

4

C.     Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law................................ 126

**XIII.   CONCLUSION AND RECOMMENDATION** ....................................................................... **128**

EXHIBIT A:     Joint Plan of Reorganization

EXHIBIT A-1   Borrower Non-Discharged Claims

EXHIBIT B:     Restructuring Support Agreement

EXHIBIT C:     Organizational Structure Chart

EXHIBIT D:     Financial Information and Projections

EXHIBIT E:     Liquidation Analysis[2]

---

[2]    The Debtors have sought authority from the Bankruptcy Court to file the Liquidation Analysis with the Plan Supplement to protect the integrity of their sale process.  Copies of the Liquidation Analysis will be available on the Voting Agent's website with the Plan Supplement upon its filing.

WEIL:\97028542\2\41703.0010

# I.
## INTRODUCTION

Ditech Holding Corporation (f/k/a Walter Investment Management Corp., "**DHCP**") and its affiliated debtors (collectively, the "**Debtors**" and together with their non-debtor affiliates, the "**Company**") submit this amended disclosure statement (as amended, modified, or supplemented, the "**Disclosure Statement**") pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the Amended *Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors*, dated May 9, 2019 (as amended, modified, or supplemented, the "**Plan**") [3] The Plan is annexed hereto as Exhibit A and is incorporated herein by reference. The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on February 11, 2019 (the "**Commencement Date**").

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

DHCP is the ultimate parent of twenty-six (26) direct and indirect subsidiaries and trust companies, thirteen (13) of which are Debtors in these Chapter 11 Cases. The Company is an independent servicer and originator of forward mortgage loans and a servicer of reverse mortgage loans. The Company is an integrated enterprise with primary day-to-day operations carried out at the subsidiary level and corporate and similar functions carried out at the DHCP level. In particular, Ditech Financial LLC ("**Ditech Financial**") primarily carries out the Company's forward mortgage origination and servicing operations and Reverse Mortgage Solutions, Inc. ("**RMS**") primarily carries out the Company's reverse mortgage servicing operations.

The Company services a wide array of loans across the credit spectrum for its own portfolio and for the GSEs (as defined below), government entities, third-party securitization trusts, and other credit owners. The Company originates and purchases residential loans through the consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities. The Company also operates two complimentary businesses: (i) asset receivables management and (ii) real estate owned property management and disposition.

Beginning in May 2018, the Company began its formal review of strategic alternatives, including a potential merger or sale of all or substantially all of the assets of the Company. As explained in more detail below, the Company was not able to consummate an out-of-court transaction with a third party purchaser. Accordingly, facing increased uncertainty in 2019, and an anticipated going-concern qualification from its auditors, the Company turned its focus toward planning for an in-court recapitalization transaction that would maximize value for creditors and preserve the enterprise as a going concern. To that end, in December 2018, the Company began in earnest negotiating with groups of holders of its corporate debt on the terms and implementation of an acceptable recapitalization structure, culminating in a restructuring support agreement (the "**Restructuring Support Agreement**") with the Term Loan Ad Hoc Group (as defined below)—the Company's senior creditors—holding, in the aggregate, approximately $722.8 million

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

of Prepetition Term Loans (as defined below).  A copy of the Restructuring Support Agreement is attached hereto as <u>Exhibit B</u>.[4]

By virtue of the Restructuring Support Agreement, the Company commenced the Chapter 11 Cases with a clear path to a confirmable chapter 11 plan of reorganization and a viable recapitalization—in which, among other things, over $800 million in funded debt would be extinguished, leaving a significantly deleveraged reorganized Company, wholly owned by the holders of the Prepetition Term Loans, with $400 million of new term loan debt, and an appropriately sized exit working capital facility or consummation of another liquidity enhancing transaction (the "**Reorganization Transaction**").  As a toggle to the Reorganization Transaction, the Restructuring Support Agreement also provides for the continuation of the Company's prepetition review of strategic alternatives whereby any and all bids for the Company or its assets will be evaluated as a precursor to confirmation of any chapter 11 plan of reorganization (the "**Marketing Process**").

Specifically, the Marketing Process will provide a public and comprehensive forum in which the Debtors seek bids or proposals for three (3) potential transactions that, if representing higher or better value, will either be incorporated into a Reorganization Transaction or pursued as an alternative to the Reorganization Transaction in consultation with and subject to the rights of the Term Loan Ad Hoc Group under the Restructuring Support Agreement and the DIP Lenders under the DIP Facilities (as defined below).  The two types of transactions for which bids will be solicited are:

- "**Sale Transaction**" meaning, a sale of substantially all of the Company's assets as provided in the Restructuring Support Agreement;

- "**Asset Sale Transaction**" meaning, the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders (as defined in the Plan); and

Although the Debtors will pursue the Marketing Process in earnest, the Reorganization Transaction will serve as a backstop and provide the Company the optionality to enter into such other transactions that can either augment the Reorganization Transaction (such as an Asset Sale Transaction) or, if representing higher or better value, replace the Reorganization Transaction (such as the Sale Transaction).  Further, if during the Marketing Process the Debtors receive separate bids for certain of their assets that represent higher or better value for the estate, the Debtors can elect to proceed with such Asset Sale Transaction in conjunction with either a Reorganization Transaction or a Sale Transaction, as applicable.

In recognition of the Prepetition Term Loan holders' position as the Debtors' fulcrum creditors, under the Restructuring Support Agreement, within five (5) business days following the earlier of (a) the conclusion of the Company's Marketing Process and (b) 95 days after the Commencement Date (the earliest such date, the "**Election Date**"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Prepetition Term Loans (the "**Electing Term Lenders**") may deliver a notice (the "**Election Notice**") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "**Elected Transaction**"), as follows:  (i) a Reorganization Transaction or (ii) a Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); <u>provided</u> that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected

---

[4]   The signature pages for the Consenting Term Lenders have been removed from Exhibit B.

7

transaction in (i) or (ii).[5]  If the Debtors do not proceed with the Elected Transaction, the Consenting Term Lenders can terminate the Restructuring Support Agreement.

As part of the restructuring contemplated by the Restructuring Support Agreement, the Company refinanced all of its prepetition warehouse and advance facilities by entering into the DIP Facilities, guaranteed by DHCP, which provide up to $1.9 billion in liquidity to Ditech Financial and RMS to support their operations and these Chapter 11 Cases.  The DIP Facilities will be paid or refinanced in full in cash under any Elected Transaction or combination of Elected Transactions.

The Restructuring Support Agreement contemplates the following treatment for certain key classes of creditors under the Reorganization Transaction[6]:

- Term Loan Claims. On the Effective Date, the holders of Term Loan Claims will receive their pro rata share of new term loans (the "**New Term Loan**") under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million and 100% of the New Common Stock.

- Second Lien Notes Claims. On the Effective Date, the holders of Second Lien Notes Claims will not receive any distribution.

- General Unsecured Claims.  On the Effective Date, the holders of General Unsecured Claims will not receive any distribution.

- Parent Equity Interests. On the Effective Date, Parent Equity Interests will be extinguished.

- All Priority Non-Tax Claims, Other Secured Claims, Intercompany Claims, and Intercompany Interests are Unimpaired under the Plan.

- Following the Effective Date, Reorganized DHCP will adopt a post-restructuring management incentive plan (the "**Management Incentive Plan**"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  The Management Incentive Plan will be included in the Plan Supplement.

Following feedback from the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") and consultation with the Term Loan Ad Hoc Group, the Plan has been modified to provide that certain borrower claims (as described below) will not be discharged in a Reorganization Transaction.

The Reorganization Transaction is expected to leave the Company's businesses intact and its balance sheet delevered.  It is also expected to enhance the Company's long-term growth prospects and to allow the Company's management team to increase its focus on operational performance and value creation.  In a sale scenario, the Plan contemplates that the asset sale proceeds remaining after the payment of administrative and priority claims will be distributed in accordance with the priority scheme of the Plan.

---

[5]    Although the Restructuring Support Agreement and Election Notice contemplate a master servicing transaction, the Debtors and the Consenting Term Lenders have determined that a master servicing transaction will no longer be pursued.

[6]    The Debtors have determined, in consultation with the Consenting Term Lenders, to remove separate classification and treatment of "Go-Forward Trade Claims."  Such claims will be addressed in the assumption/rejection process.

WEIL:\97028542\2\41703.0010

The Plan also incorporates a Global Plan Settlement (as defined herein) resolving all issues and objections that have been, or could be, asserted by the Creditors' Committee with respect to, among other things, (i) confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Debtor Affiliates*, dated as of April 26, 2019 (ECF No. 469) (the "**April 26, 2019 Plan**");[7] (ii) the releases and exculpations contemplated by the Plan; (iii) prospective lien challenges, claims, or causes of action that might be brought by or on behalf of the Debtors' Estates; and (iv) the Restructuring Support Agreement.  As described more fully below and set forth in the Plan, the Global Plan Settlement contemplates a distribution to holders of Allowed Second Lien Claims and General Unsecured Claims, as a carve out of Term Loan collateral, as follows:

- The holders of General Unsecured Claims shall be paid pursuant to a general unsecured claim recovery trust whereby the Debtors and the estates shall transfer assets to the trust free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the holders of Allowed General Unsecured Claims.

- Second Lien Noteholders shall be paid pursuant to a second lien recovery cash pool free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the Second Lien Noteholders.

The Global Plan Settlement results from vigorous, arm's-length negotiation among the Debtors, the Term Loan Ad Hoc Group and the Creditors' Committee, with the assistance of their advisors.  As a result of the modifications to the Plan implemented through the Plan, the Creditors' Committee supports confirmation of the Plan.

Accomplishing a speedy and efficient resolution of the Chapter 11 Cases is essential to maximizing the value of the Company.  Under the Restructuring Support Agreement and pursuant to the terms of the DIP Documents, the Debtors are obligated to meet certain milestones.  Specifically, the Restructuring Support Agreement and the DIP Facilities may be terminated if, among other things, the Debtors fail to satisfy the following milestones:

| Milestone | Deadline |
| --- | --- |
| File the Plan, Disclosure Statement, and Bidding Procedures Motion | March 5, 2019 |
| Entry of OCB Orders | March 21, 2019 |
| Entry of order approving Bidding Procedures | April 17, 2019 |
| Entry of Final DIP Order and Cash Management Order | April 19, 2019 |
| Entry of order approving Disclosure Statement | May 10, 2019 |
| Commence Auction (if necessary) | June 11, 2019 |
| Commence Sale and Confirmation Hearing | June 25, 2019 |
| Occurrence of Effective Date | July 9, 2019 |

---

[7]    For the avoidance of doubt, the Plan supersedes and replaces the April 26, 2019 Plan in its entirety.

9

WEIL:\97028542\2\41703.0010

> **THE DEBTORS AND CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL STAKEHOLDERS.**

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in Class 3 (Term Loan Claims) are the only Class being solicited under, and the only Class entitled to vote on, the Plan.

**THE PLAN PROVIDES THAT THE HOLDERS OF CLAIMS IN CLASS 3 WHO VOTE TO ACCEPT THE PLAN, OR WHO ABSTAIN FROM VOTING OR VOTE TO REJECT THE PLAN BUT DO NOT OPT-OUT OF THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN, ARE DEEMED TO HAVE GRANTED THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN.**

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Class is entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests in the Reorganization Transaction.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, see Article V—Summary of Plan below.  The Plan constitutes a separate plan for each Debtor.  Each class of Claims and Interests only address claims against or interest in a particular Debtor.  A discussion of the amount of Claims in each Class is set forth in Article II.E.1 hereof.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.<br><br>Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders. | Unimpaired | No (Presumed to accept) | 100% |
| 3 | Term Loan Claims[9] | Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive: | Impaired | Yes | <100% |

---

[8]    Approximate recovery in a Sale Transaction will be determined by the sale proceeds.

[9]    As discussed in further detail below, the Debtors are presently engaged in the Marketing Process.  To ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims is not, at this time, being disclosed herein by the Debtors.  The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing.

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | (i)      If the Sale Transaction occurs, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan). <br><br>(ii)      If the Reorganization Transaction occurs, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement. <br><br>In each case, any Term Loan Deficiency Claims shall be deemed waived; provided, that holders of Allowed Term Loan Claims shall be entitled to receive a Pro Rata share of fifty percent (50%) of the proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement. | | | |
| 4 | Second Lien Notes Claims | The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875.  Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive: <br><br>(i)      If the Sale Transaction occurs, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall | Impaired | No (Deemed to reject) | <1% |

12

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | be subject to the approval and consummation of the Global Settlement.<br><br>(ii)   If the Reorganization Transaction occurs, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.<br><br>(iii)   If either the Sale Transaction or the Reorganization Transaction occurs, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court. | | | |
| 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:<br><br>(i)   If the Sale Transaction occurs, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.<br><br>(ii)   If the Reorganization Transaction occurs, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement. | Impaired | No (Deemed to reject) | 13-15%[10] |
| 6 | Borrower Non-Discharged Claims[11] | Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:<br><br>(i)   If the Sale Transaction occurs, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.   For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed | Impaired | No (Deemed to reject) | 100% |

---

[10]   Based on the Debtors' estimates of the Allowed Prepetition General Unsecured Claims.  This number is subject to change based on the proofs of claim filed in these chapter 11 cases and administered pursuant to the Plan and any other changes or developments in these chapter 11 cases.

[11]   The definition and description of Borrower Non-Discharge Claims is set out in Exhibit A-1 to this Disclosure Statement.

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.<br><br>(ii)    If the Reorganization Transaction occurs, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan. | | | |
| 7 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims. | Unimpaired | No (Presumed to accept) | N/A |
| 8 | Intercompany Interests | On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests. | Unimpaired | No (Presumed to accept) | N/A |
| 9 | Parent Equity Interests | Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "*Single Share*") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements. The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) | Impaired | No (Deemed to reject) | 0% |

14

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent. (ii)    If the Reorganization Transaction occurs, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | | | |
| 10 | Subordinated Securities Claims | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims. On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | Impaired | No (Deemed to reject) | 0% |

**PLEASE TAKE NOTICE THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS, INCLUDING BORROWERS OF LOANS AND/OR MORTGAGORS OF MORTGAGES SERVICED BY THE DEBTORS, THAT HOLD PREPETITION CLAIMS AGAINST ONE OR MORE OF THE DEBTORS WILL BE SUBJECT TO THE BAR DATE ORDER.  IF YOU HOLD SUCH A CLAIM AND DO NOT FILE A PROOF OF CLAIM BY THE GENERAL BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER, YOUR CLAIM MAY BE DISCHARGED AND YOU MAY NOT BE ENTITLED TO A RECOVERY, IF ANY, ON SUCH CLAIM PURSUANT TO THE PLAN.**

**WHERE TO FIND ADDITIONAL INFORMATION:  DHCP files annual reports and quarterly reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is part of the Disclosure Statement:**

15

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the SEC on April 16, 2019;

- Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 filed with the SEC on June 6, 2018;

- Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 filed with the SEC on August 9, 2018;

- Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 14, 2018; and

- Current Reports on Form 8-K filed with the SEC on October 4, 2018; November 6, 2018; December 7, 2018; January 17, 2019; January 24, 2019; February 11, 2019; February 21, 2019; March 6, 2019; March 26, 2019; April 3, 2019; and April 17, 2019 (other than information furnished pursuant to Item 2.02 or 7.01 and any related exhibits of any Form 8-K, unless expressly stated otherwise therein).

**Any statement contained in a document incorporated or deemed to be incorporated herein by reference, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any other subsequently dated or filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.**

**You should carefully read the entire Disclosure Statement and the documents incorporated by reference herein.  Financial data included herein as of December 31, 2018 remains subject to the customary review procedures associated with the completion of the Company's public reporting requirements.**

<div align="center">

**II.**
**OVERVIEW OF COMPANY'S OPERATIONS**

</div>

**A.    Debtors' Business**

*1)    Business Operations*

The Debtors' business was established in 1958 and operated as a captive financing business of Walter Industries, Inc. (now known as Walter Energy, Inc., "**Walter Energy**") purchasing residential mortgage loans and consumer credit obligations and then securitizing and servicing those to maturity.  In 1997, DHCP's predecessor, Hanover Capital Mortgage Holdings, Inc., a qualified real estate investment trust, was incorporated in Maryland.  In April 2009, Walter Investment Management LLC spun off from Walter Energy, merged into Hanover Capital Mortgage Holdings, Inc., changed the newly merged entity's name to Walter Investment Management Corp. ("**WIMC**"), and began operating as an independent, publicly traded company.  After the spin-off, WIMC acquired Marix Servicing LLC, a high-touch specialty mortgage servicer, in 2010 and acquired GTCS Holdings LLC ("**Green Tree**") in 2011, a leading independent mortgage loan servicer that provided high-touch servicing of GSE, government agency, and third-party mortgage loans.  WIMC subsequently acquired RMS, which resulted in the addition of 330 employees and four offices in three states.  As a result of the Green Tree acquisition, WIMC no longer qualified as a real estate investment trust.  As discussed more fully in Article III hereof, WIMC commenced

<div align="center">16</div>

a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York on November 30, 2017 and emerged from chapter 11 on February 9, 2018 as Ditech Holding Corporation.

The Company's businesses are comprised of three primary segments: (i) forward mortgage originations; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing. Following an extensive review and diligence process, the Company and its advisors determined that certain non-debtor affiliates should not be included as Debtors in these Chapter 11 Cases because they were either bankruptcy remote entities, inactive, and/or not obligated on the Company's funded debt. A description of each of the Debtors and non-Debtor affiliates and their primary functions is listed below:

| Debtor/Non-Debtor Affiliate | Services Provided |
|---|---|
| **Debtors** | |
| Ditech Holding Corporation | Parent holding company for other Debtors and non-Debtor affiliates. |
| Ditech Financial LLC[12] | As described in further detail below, Ditech Financial originates and purchases residential mortgage loans that are predominantly sold to GSEs and government agencies. Ditech Financial also services a wide array of loans across the credit spectrum for its own portfolios as well as for GSEs, government agencies, third party securitization trusts, and other credit owners. |
| Reverse Mortgage Solutions, Inc. | As described in further detail below, RMS services loans for the Company's reverse mortgage portfolio and subservices loan portfolios on behalf of third-party credit owners of reverse loans. Its subsidiaries also provide real estate owned property asset management services, securitizations, and technology services. |
| REO Management Solutions, LLC | A subsidiary of RMS that performs real estate owned property management services. |
| Mortgage Asset Systems, LLC | Provides technology services for REO Management Solutions, LLC. |
| DF Insurance Agency LLC | A licensed insurance agency that performs marketing services for a third-party insurance business with respect to voluntary insurance policies and receives premium-based commissions for its services. |

---

[12] As discussed further herein, the Company's payroll processor, Ceridian drafts the required funds for payroll and payroll taxes from the Ditech Financial LLC Citibank account ending in #5011. Intercompany accounting entries are created to record the expense and liabilities on the appropriate entity's books.

17

| Green Tree Credit LLC | An inactive entity that was formed on May 20, 2003 and is the surviving entity of a merger with Conseco Finance Credit Corp. |
|---|---|
| Green Tree Credit Solutions LLC | An intermediate holding company and subsidiary of Ditech Holding Corporation. |
| Green Tree Insurance Agency of Nevada, Inc. | An inactive entity that is an insurance agency and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Investment Holdings III LLC | An inactive entity and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Servicing Corp. | The managing member of Ditech Financial LLC. |
| Marix Servicing LLC | A subsidiary of Ditech Holding Corporation. |
| Walter Management Holding Company LLC | An intermediate holding company and member of Ditech Financial LLC, a licensed origination and servicing company, and Green Tree Credit LLC, an inactive company. |
| Walter Reverse Acquisition LLC | An intermediate holding company of Reverse Mortgage Solutions, Inc. |
| **Non-Debtor Affiliates** | |
| Ditech Agency Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae loans under a trust. |
| Ditech Agency Advance Trust | A statutory trust that was formed to fund Fannie Mae (GSE) advances. |
| Ditech PLS Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances under certain PLS securitizations. |
| Ditech PLS Advance Trust II | A statutory trust that was formed to fund PLS (non-GSE) advances. |
| Green Tree Advance Receivables III LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae and Freddie Mac loans. |
| Hanover SPC-A, Inc. | An inactive entity that holds interests of Hanover securitizations. |

18

| Mid-State, Capital, LLC | A bankruptcy remote entity. |
|---|---|
| RMS REO BRC, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO BRC II, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO CS, LLC | Holds OREO property acquired in foreclosures. |
| RMS 2018-09, LLC | A special purpose vehicle that handles financing of HECM loans. |
| WIMC Real Estate Investment LLC | An inactive entity. |

a.   Forward Mortgage Origination Business (Ditech Financial)

The Company originates forward mortgage loans and consumer credit transactions exclusively through Ditech Financial.  Virtually all of the loans that Ditech Financial originates are loans eligible for securitization by government-sponsored enterprises, such as Fannie Mae and Freddie Mac,[13] or federally insured or guaranteed and eligible for Ginnie Mae securitization as mortgage-backed securities ("**MBS**").[14] Ditech Financial sells substantially all of the mortgage loans it originates into Fannie Mae- and Freddie Mac-sponsored securitizations or into mortgage pools insured by Ginnie Mae.

Ditech Financial originates or acquires mortgage loans through the following channels:

a.   <u>Consumer Lending</u>:  contacts and solicits (i) consumers within its existing servicing portfolio, and (ii) referrals and leads generated through direct mail, internet, telephone, and general advertising campaigns;

b.   <u>Correspondent Lending</u>:  purchases closed mortgage loans from a network of lenders in the marketplace; and

c.   <u>Wholesale Lending</u>:  originates mortgage loans identified through a network of approved brokers.

In 2018, Ditech Financial originated or purchased over $12.6 billion in mortgage loans.  Of these loans approximately 30% were originated through the consumer lending channel, approximately 6% were originated through the wholesale lending channel, and approximately 64% were purchased in the correspondent lending channel.  Based on the unpaid principal balance ("**UPB**") of the loans originated by

---

[13]   As used herein, "**Fannie Mae**" means the Federal National Mortgage Association, and "**Freddie Mac**" means the Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "**GSE**" and collectively the "**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities.

[14]   As used herein, "**Ginnie Mae**" means the Government National Mortgage Association.  Ginnie Mae is a federal corporation within the U.S. Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**") or the Department of Agriculture ("**USDA**").

WEIL:\97028542\2\41703.0010

Ditech Financial during this time period, approximately 30% were eligible for securitization by Fannie Mae, approximately 13% were eligible for securitization by Freddie Mac, and approximately 57% were eligible for private securitization guaranteed by Ginnie Mae. To the extent that Ditech Financial identifies a loan ineligible for GSE securitization and/or securitization and Ginnie Mae guarantee during its origination process, it may elect to close and fund such loan as long as it lines up a private buyer for such loan at the pre-closing stage of the process. Such loans constitute a relatively small percentage of all loans originated by Ditech Financial.

Ditech Financial's consumer originations operations offer a range of home purchase and refinance mortgage options, including fixed and adjustable rate conforming, Ginnie Mae, FHA, VA, USDA, retail installment financing, and jumbo products. A conforming loan is a mortgage loan that conforms to GSE guidelines, which include, but are not limited to, limits on loan amount, loan-to-value ratios, debt-to-income ratios, and minimum credit scores. The mortgage loans that Ditech Financial funds are generally eligible for sale to GSEs or insured by government agencies.

Ditech Financial underwrites the mortgage loans it originates generally to secondary market standards, including the standards set by Fannie Mae, Freddie Mac, Ginnie Mae, the FHA, the USDA, the VA, and jumbo loan investor programs. Loans are reviewed by Ditech Financial's underwriters in an attempt to ensure each mortgage loan is documented according to, and its terms comply with, the applicable secondary market standard. Ditech Financial's underwriters determine loan eligibility based on specific loan product requirements, such as loan-to-value, FICO, or maximum loan amount. Third-party diligence tools are utilized by Ditech Financial's underwriters to validate data supplied by the potential borrower and to uncover potential discrepancies. Ditech Financial conducts audits on its underwriters to confirm proper adherence to its internal guidelines and polices, which audits are in addition to Ditech Financial's standard quality control review. These audits are designed to provide an additional layer of internal review in an attempt to further mitigate quality defects and repurchase risk in the originations process.

Within its correspondent lending channel, Ditech Financial generally purchases the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Correspondent lenders with which Ditech Financial does business agree to comply with Ditech Financial's client guide, which sets forth the terms and conditions for selling loans to Ditech Financial and generally governs the business relationship. Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial acquires through its correspondent lending channel by conducting quality control reviews of correspondent lenders, reviewing compliance by correspondent lenders with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of correspondent lenders on a periodic basis. In 2018, the Company correspondent lending channel purchased loans from 452 lenders in the marketplace, of which 38 were associated with approximately half of Ditech Financial's purchases.

Within its wholesale lending channel, Ditech Financial originates loans through mortgage brokers. Loans sourced by mortgage brokers are underwritten and funded by Ditech Financial and generally close in Ditech Financial's name. Through the wholesale channel, Ditech Financial generally originates the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Ditech Financial underwrites and processes all loan applications submitted by the mortgage brokers in a manner consistent with that described above for the consumer originations channel. Mortgage brokers with whom Ditech Financial does business agree to comply with its client guide, which sets forth the terms and conditions for brokering loans to Ditech Financial and generally governs the business relationship. Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial originates through its wholesale lending channel by conducting quality control reviews of mortgage brokers, reviewing compliance by brokers with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of brokers on a periodic basis.

Ditech Financial's capital markets group is responsible for pricing loans and managing the interest rate risk through the time a loan is sold to third parties and managing the risk (which Ditech Financial calls the "pull-through risk") that loans Ditech Financial has locked will not be closed and funded in an attempt to maximize loan sale profitability through Ditech Financial's various originations channels.  The capital markets group uses models and hedging analysis in an attempt to maximize profitability while minimizing the risks inherent in the originations business.

Ditech Financial's originations segment revenue, which is primarily net gains on sales of loans, is impacted by interest rates and the volume of loans locked and sold.  The margins earned by Ditech Financial's originations segment are impacted by its cost to originate the loans including underwriting, fulfillment and lead costs.

As a Fannie Mae- and Freddie Mac-approved seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE, which agreements generally incorporate the applicable GSE selling and servicing guidelines (such agreements, together with the addenda and amendments thereto, respectively, the "**Fannie Sales Agreements**" and "**Freddie Sales Agreements**," and collectively, the "**GSE Sales Agreements**").  In general, when Ditech Financial originates a mortgage loan it funds the loan utilizing borrowings under a master repurchase agreement ("**MRA**"), pledges the loan as security for such borrowings, subsequently sells the loans into a GSE-sponsored securitization, and uses the proceeds from the sale of the mortgage backed securities to repay the borrowings under the MRA.

As a Ginnie Mae issuer, Ditech Financial pools and securitizes certain mortgage loans conforming to the requirements of the Ginnie Mae Mortgage-Backed Securities Guide and all special announcements, agreements, and other written communications made by Ginnie Mae to Ditech Financial (collectively, the "**Ginnie Agreements**").  The Ginnie Agreements employ a custodial account mechanism whereby the issuer, such as Ditech Financial, forwards to an eligible document custodian approved by Ginnie Mae all of the loan documentation.  After the pool of mortgages is approved by a Ginnie Mae pool processing agent, it directs Ditech Financial to issue MBS to third-party investors.  In connection with the approval process, Ditech Financial remits guarantee fees and base servicing fees to Ginnie Mae.

The Ginnie Agreements provide for continuing recourse obligations on Ginnie Mae-approved issuers, such as Ditech Financial.  Specifically, upon the discovery of a defective loan within four months after the mortgage origination date, the issuer is required either to cure the defect or purchase the loan from the mortgage pool at the outstanding principal balance (such loans, the "**Ginnie Buyouts**").

For the year ended December 31, 2018, Ditech Financial sold mortgage loans of $12.4 billion in UPB, consisting of approximately (i) $5.4 billion in Fannie Mae/Freddie Mac conventional conforming loans, (ii) $7.0 billion of Ginnie Mae loans, and (iii) $28.3 million of jumbo and other loans.  On average, Ditech Financial sells or securitizes loans funded through warehouse borrowings in approximately 20 days from the date of origination.  As of December 31, 2018, the total UPB of the warehoused loans held by Ditech Financial and awaiting securitization was approximately $746.2 million.

b.   Forward Mortgage Servicing Business

Ditech Financial, a debtor in these Chapter 11 Cases, performs loan servicing of mortgage loans that fall into two categories:  (i) mortgage loans for which Ditech Financial owns the mortgage service rights ("**MSRs**"), and (ii) subservicing for third party owners of MSRs.  With respect to mortgage loans for which Ditech Financial owns the MSRs, Ditech Financial performs mortgage servicing primarily in accordance with Fannie Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable.  Ditech Financial typically originates the mortgage loans associated with such MSRs and sells them into securitization trusts owned by Fannie Mae or Freddie Mac or into mortgage pools insured by Ginnie Mae.  The servicing

21

segment also operates complementary businesses including a collections agency that performs collections of post charge-off deficiency balances for third parties and Ditech Financial. The subservicing contracts pursuant to which Ditech Financial is retained to subservice mortgage loans generally provide that the customer, the owner of the subserviced MSR, can terminate Ditech Financial as subservicer with or without cause. Each such subservicing contract has unique terms establishing the fees that Ditech Financial will be paid for Ditech Financial's work under the contract or upon the termination of the contract, if any. The standards of performance that Ditech Financial is required to meet in servicing the relevant mortgage loans and the profitability of the subservicing activity may vary among different contracts.

As of December 31, 2018, Ditech Financial serviced approximately 1.4 million residential loans with UPB of $170.1 billion. Of those, Ditech Financial was the subservicer for 0.7 million accounts with an unpaid principal loan balance of $104.3 billion. These subserviced accounts represented approximately 58% of its total servicing portfolio based on unpaid principal loan balance at that date. Ditech Financial's largest subservicing customer, New Residential Mortgage LLC ("**NRM**"), represented approximately 78% of its total subservicing portfolio and 48% of its total servicing portfolio based on unpaid principal loan balance on December 31, 2018. The Company's next largest subservicing customer represented approximately 17% of its total subservicing portfolio based on unpaid principal loan balance on December 31, 2018. For additional information about the Debtors relationship with NRM, see Article III.C below.

c. Reverse Mortgage Servicing Business

RMS, a debtor in these Chapter 11 Cases, primarily focuses on servicing and subservicing reverse mortgage loans, also known as a home equity conversion mortgage ("**HECM**"). A HECM is a type of loan that allows homeowners aged sixty-two (62) or older to borrow money against the equity value of their homes. Unlike traditional home equity loans, HECMs are non-recourse loans without a fixed term and the balance increases over time as interest and other fees, such as servicing-related advances, are added to the borrower's total obligations. HECMs are insured by the FHA.

A borrower under a HECM does not make monthly mortgage payments—rather, the borrower receives cash in monthly installments or a lump sum up to a principal limit, which limit is calculated based on, among other things, the age of the borrower, the appraisal value of the borrower's home, and the loan interest rate. Generally, a borrower is obligated to repay the HECM when the borrower no longer uses the home as his or her principal residence, upon the death of the borrower, if title to the property is transferred, or if the borrower fails to meet certain requirements of the loan (*e.g.*, paying property taxes, insurance, or homeowners association fees) or otherwise defaults under the loan.

RMS began originating HECMs in 2010 and exited the origination business effective as of January 2017. Although RMS does not have any reverse loans remaining in its originations pipeline, RMS has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans. In addition, RMS performs loan servicing for mortgage loans that fall into two categories: (i) mortgage loans originated by RMS, for which RMS acts as a servicer, and (ii) mortgage loans owned by third parties, for which RMS acts as a subservicer. Reverse mortgage servicing accounts for approximately thirteen percent 13% of the Debtors' revenues. RMS performs mortgage servicing in accordance with HUD servicing guidelines[15] and performs securitization activities in accordance with Ginnie Mae guidelines. RMS also provides management and disposition services in connection with real

---

[15]    The U.S. Department of Housing and Urban Development servicing guidelines (the "**HUD Guide**") is available at https://www.hud.gov/programoffices/housing/sfh/hecm. The Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**") is available at https://www.ginniemae.gov.

WEIL:\97028542\2\41703.0010

estate owned property ("**REO Property**") of the Debtors or third-party reverse mortgage servicers or investors.

RMS is an issuer of Ginnie Mae-guaranteed HECM Mortgage Backed Securities ("**HMBS**") and virtually all loans RMS originated were sold into HMBS. Under the HMBS program, RMS is required to repurchase loans from the securitization when the loans reach 98% of the maximum claim amount (which is established at origination to reflect the value of the property subject to federal limits). Performing repurchased loans are conveyed to HUD, and a payment is received from HUD typically within a short time of repurchase. Nonperforming loans are either cured or liquidated through foreclosure and subsequent sale of REO Property. RMS typically files a claim with HUD for reimbursement of costs associated with nonperforming loans shortly after such sales occur, or, in any event, no later than approximately six months after foreclosing and obtaining marketable title on the property.

As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with an unpaid principal balance of $17.1 billion.

    *2)*    *Employees*

As of the Commencement Date, the Debtors employed approximately 2,900 full-time employees, ten (10) part-time employees, and fifteen (15) temporary employees who perform a variety of critical functions, including administrative, legal, accounting, finance, and management-related tasks. In addition, the Debtors rely on services from a supplemental workforce comprised of approximately 1,300 independent contractors and consultants that provide services related to the Debtors' operations. Specifically, the supplemental workforce provides consulting services with respect to financial services, information technology, claims management, and other shared services.

    *3)*    *Competition*

The Company competes with a number of institutions in the mortgage banking market for both the servicing and originations businesses as well as in the reverse mortgage and complementary businesses. In the servicing area, the Company competes with other servicers to acquire MSR and for the right to subservice mortgages for others. Competitive factors in the servicing business include: a servicer's scale of operations and financial strength; a servicer's access to capital to fund acquisitions of MSR; a servicer's ability to meet contractual and regulatory obligations and to achieve favorable performance (*e.g.*, in default management) relative to other servicers; a servicer's ability to provide a favorable experience for the borrower; a servicer's ability to recapture borrowers as they refinance; and a servicer's cost to service or subservice. In the mortgage originations area, the Company competes to refinance or provide new mortgage loans to borrowers whose mortgages are in the Company's existing servicing portfolio. In this area, the price and variety of the Company's mortgage products are important factors of competition, as is the reputation of the Company's servicing business and the quality of the experience the borrower may have had with the Company's servicing business. Since mid-2015, the Company's forward loan origination and servicing businesses have operated under a single "Ditech" brand. The Company also competes, principally on the basis of price and process efficiency, to acquire mortgages from correspondent lenders. In the future, the Company will also increasingly compete on the basis of brand awareness.

Across the Company's servicing and originations businesses, technology is an important competitive factor. In particular, the Company believes it will be increasingly important to enable servicing and originations customers to access the Company's services through its website and mobile devices.

    **B.**    **Debtors' Organizational Structure**.

DHCP owns, directly or indirectly, 100% of the ownership interest in each of the Debtors and their non-debtor affiliates. The organizational chart, attached hereto as Exhibit C, illustrates the Debtors' organizational structure, as of the date hereof.

### C.    Directors and Officers.

The following table sets forth the names of the members of DHCP's current Board of Directors:

| Name | Director Since | Position |
|---|---|---|
| Thomas F. Marano | February 2018 | CEO, President & Chairman of the Board |
| David S Ascher | February 2018 | Director |
| George M. Awad | June 2016 | Director |
| Seth L. Bartlett | February 2018 | Lead Independent Director |
| Daniel G. Beltzman | December 2015 | Director |
| John R. Brecker | February 2018 | Director |
| Neal P. Goldman | January 2017 | Director |
| Thomas G. Miglis | February 2018 | Director |
| Samuel T. Ramsey | February 2018 | Director |

The following table sets forth the names of DHCP's current executive officers:

| Name | Position |
|---|---|
| Thomas F. Marano | CEO and President |
| Gerald A. Lombardo | Chief Financial Officer |
| John J. Haas | General Counsel, Chief Legal Officer and Secretary |
| Alfred W. Young, Jr. | Chief Risk and Compliance Officer |
| Elizabeth F. Monahan | Chief Human Resources Officer |
| Jeffrey P. Baker | President of Reverse Mortgage Solutions, Inc. |

The composition of the board of directors of the reorganized DHCP will be disclosed prior to the entry of the order confirming the Plan in accordance with section 1129(a)(5) of the Bankruptcy Code.

### D.    Regulation of Company's Business

The Company's operations are conducted in the United States and are subject to extensive regulation by federal, state and local authorities, including the Consumer Financial Protection Bureau ("**CFPB**"), HUD, VA, the SEC and various state agencies that license, audit and conduct examinations of the Company's mortgage servicing and mortgage originations businesses. The Company is also subject to a variety of regulatory and contractual obligations imposed by credit owners, investors, insurers, and guarantors of the mortgages the Company originates and services, including, but not limited to, Fannie Mae, Freddie Mac, Ginnie Mae, FHFA, USDA, VA, and the FHA. Furthermore, the industry has been under scrutiny by federal and state regulators over the past several years, and the Company expects this scrutiny to continue. Laws, rules, regulations, and practices that have been in place for many years may be changed, and new laws, rules, regulations, and administrative guidance have been, and may continue to be, introduced in order to address real and perceived problems in the industry's history. The Company expects to incur ongoing operational, legal, and system costs in order to comply with these rules and regulations.

For example, the Company is required to comply with federal consumer protection and other laws, including, but not limited to:

- The Gramm-Leach-Bliley Act and Regulation P, which require initial and periodic communication with consumers on privacy matters and the maintenance of privacy matters and the maintenance of privacy regarding certain consumer data in the Debtor's possession.

- The Fair Debt Collection Practices Act, which regulates the timing and content of communications on debt collections.

- The Truth in Lending Act, including Home Ownership and Equity Protection Act and Regulation Z, which regulate mortgage loan origination activities, require certain disclosures be made to mortgagors regarding terms of mortgage financing, regulate certain high-cost mortgages, mandate home ownership counseling for mortgage applicants and regulate certain mortgage servicing activities.

- The Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, and Regulation V, which collectively regulate the use and reporting of information related to the credit history of consumers.

- The Equal Credit Opportunity Act and Regulation B, which prohibit discrimination on the basis of age, race, and certain other characteristics in the extension of credit and require certain disclosures to applicants for credit.

- The Homeowners Protection Act, which requires the cancellation of mortgage insurance once certain equity levels are reached.

- The Home Mortgage Disclosure Act and Regulation C, which require reporting of certain public loan data.

- The Fair Housing Act and its implementing regulations, which prohibit discrimination in housing on the basis of race, sex, national origin, and certain other characteristics.

- The Service members Civil Relief Act, as amended, which provides certain legal protections and relief to members of the military.

- The Real Estate Settlement Procedures Act and Regulation X, which govern certain mortgage loan origination activities and practices and related disclosures and the actions of servicers related to various items, including escrow accounts, servicing transfers, lender-placed insurance, loss mitigation, error resolution, and other customer communications.

- Regulation AB under the Securities Act, which requires registration, reporting, and disclosure for mortgage-backed securities.

- Certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which among other things, created the CFPB and prohibits unfair, deceptive or abusive acts or practices.

- The Federal Trade Commission Act, the FTC Credit Practices Rules, and the FTC Telemarketing Sales Rule, which prohibit unfair and certain related practices.

- The Telephone Consumer Protection Act, which restricts telephone solicitations and automatic telephone equipment.

- Regulation N, which prohibits certain unfair and deceptive acts and practices related to mortgage advertising.

- The Bankruptcy Code and bankruptcy injunctions and stays, which can restrict collection of debts.

- The Secure and Fair Enforcement for Mortgage Licensing Act.

- Various federal flood insurance laws that require the lender and servicer to provide notice and ensure appropriate flood insurance is maintained when required.

### E.   **Debtors' Existing Capital Structure**

#### 1.   **Prepetition Indebtedness**

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

#### (a)   Prepetition Credit Agreement

As of the Commencement Date, the Debtors have outstanding first lien secured debt obligations in the aggregate principal amount of approximately $961.4 million, which amount consists of secured term loan borrowings (the "**Prepetition Term Loans**") under the Second Amended and Restated Credit Agreement (as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) among DHCP, each of the other loan parties named therein, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other lenders party thereto, dated as of February 9, 2018 (the "**Prepetition Credit Agreement**"), plus interest, fees and other expenses arising thereunder.  The Prepetition Credit Agreement is secured by a lien on substantially all the assets of the Debtors.

#### (b)   Prepetition Second Lien Notes Indenture

As of the Commencement Date, the Debtors have outstanding second lien note obligations consisting of $253.9 million plus accrued and unpaid interest in aggregate outstanding principal of 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to that certain Second Lien Notes Indenture by and between DHCP (f/k/a WIMC), certain other debtors as guarantors, and Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral agent, dated as of February 9, 2018 (the "**Second Lien Notes Indenture**").  The Second Lien Notes Indenture is secured on a second-lien basis on substantially all the assets of the Debtors.

WEIL:\97028542\2\41703.0010

(c)   Prepetition Warehouse Facilities

As of the Commencement Date, the Debtors were party to the following agreements with respect to the following facilities:[16]

A.   *Mortgage Loan Warehouse Facility:*

- Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a buyer and other Buyers from time to time, and Ditech Financial LLC, as seller, with a committed capacity level of $1 billion (the "**Prepetition Forward MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Reverse MRA, DPAT II Facility, and DAAT Facility (each as defined below).

B.   *Reverse Mortgage Facilities:*

- Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a committed buyer and other Buyers from time to time, and Reverse Mortgage Solutions, Inc., as a seller, RMS REO CS, LLC, and RMS REO BRC, LLC, with a committed capacity level of $800 million (the "**Prepetition Reverse MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, DPAT II Facility, and DAAT Facility; and

- Master Repurchase Agreement, dated April 23, 2018 (as may be amended, restated, supplemented, or otherwise modified), between Barclays Bank PLC, as purchaser and agent and Reverse Mortgage Solutions, Inc., as seller, with a committed capacity level of $412 million.

- Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among RMS and a non-debtor subsidiary, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP (together with its affiliates, "**National Founders**" and, such facility, the "**National Founders Facility**").

C.   *Mortgage Loan Servicing Facilities:*

- Ditech PLS Advance Trust II Advance Receivables Backed Notes, Issuable in Series (the "**DPAT II Notes**") issued pursuant to that certain Indenture between Ditech PLS Advance Trust II ("**DPAT II**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $85 million (the "**DPAT II Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DAAT Facility; and

---

[16]   As of the Commencement Date, the Debtors were also party to the Prepetition MSFTAs and the Prepetition Netting Agreement (each as defined in the DIP Orders).

WEIL:\97028542\2\41703.0010

- Ditech Agency Advance Trust Advance Receivables Backed Notes, Issuable in Series (the "**DAAT Notes**") issued pursuant to that certain Indenture between Ditech Agency Advance Trust ("**DAAT**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $465 million (the "**DAAT Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DPAT II Facility.

(d)     General Unsecured Claims

General Unsecured Claims consist of any Claims against the Debtors (other than any Intercompany Claims) existing as of the Commencement Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code (or any order of the Bankruptcy Court).

2.      **Equity Ownership**

DHCP is a public company that files annual reports with, and furnishes other information to, the SEC. As of December 31, 2018, 90 million shares of DHCP $0.01 par value common stock had been authorized with 5,328,417 shares of common stock issued and outstanding. As of December 31, 2018, there were 87 record holders of DCHP's common stock. As of December 31, 2018, 91,408 shares of mandatorily convertible preferred stock were issued and outstanding. DHCP's common stock was delisted from the New York Stock Exchange on December 1, 2018 and currently trades over-the-counter.

3.      **Unencumbered Assets**

Substantially all of the Debtors' assets are subject to the secured of the Debtors' prepetition secured lenders and the DIP Lenders, with limited carve-outs for *de minimis* assets and value. The Creditors' Committee alleges that there may be significant unencumbered assets of the Debtors or their non-Debtor affiliates which may inure to the benefit of the General Unsecured Claims in these chapter 11 cases. The Debtors do not agree with the Creditors' Committee's position. The Debtors anticipate that once the Marketing Process and Liquidation Analysis are finalized, the outcome of that analysis and process will demonstrate that there remains no expected recovery for General Unsecured Claims on account of unencumbered assets.

Following review of their purported unencumbered assets, the Debtors believe that certain claims of the Creditors' Committee with respect to unencumbered assets are speculative and, even if successful, any such value would nevertheless be exhausted following (i) its application to the costs of these chapter 11 cases and administrative expenses, and/or (ii) upon accounting for the currently contemplated Restructuring Transactions and the anticipated General Unsecured Claims against each Debtor on a Debtor-by-Debtor basis.

For example, in any Restructuring Transaction a significant portion of General Unsecured Claims are expected to be satisfied as either assumed liabilities or assumed contracts, rendering them Unimpaired. Additionally, current estimates suggest that the Term Loan Claims will have a significant deficiency claim (the "**Term Loan Deficiency Claim**") in any Restructuring Transaction. The Term Loan Deficiency Claim may be asserted against each of the Debtors for the full amount of the Term Loan Deficiency Claim; whereas, the entirety of the Second Lien Notes Claim is payment and lien subordinated to the Term Loan Deficiency Claim. Accordingly, when accounting on a Debtor-by-Debtor basis, unencumbered value, if any, is expected to inure almost entirely to the benefit of the Term Loan Deficiency Claim on the Debtors.

28

### 4.    Intercompany Claims

The Debtors have evaluated and determined that there will likely be no recovery to General Unsecured Claims, and thus, there will likely be no recovery to Intercompany Claims in a sale scenario.  Pursuant to a plan, in a Reorganization Transaction, the Intercompany Claims will likely be either reinstated for administrative purposes or cancelled so long as such cancellation does not have an adverse effect on the Debtors but not paid.

### III.
### KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    Background and Prior Restructuring

In the beginning of the third quarter of 2016, the Company engaged Houlihan Lokey Capital, Inc. as investment banker ("**Houlihan**") and Weil, Gotshal & Manges LLP as legal counsel ("**Weil**") and, on November 30, 2017, WIMC commenced a prepackaged chapter 11 case (*In re Walter Investment Management Corp.*, 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017)) (the "**WIMC Chapter 11 Case**") with the Bankruptcy Court to address its overleveraged capital structure.  The plan of reorganization in the WIMC Chapter 11 Case had the overwhelming support of its creditors.  In less than two months, WIMC confirmed its plan of reorganization, eliminating more than $800 million in funded debt.  On February 9, 2018, WIMC emerged from the WIMC Chapter 11 Case as Ditech Holding Corporation, and a final decree was entered closing the WIMC Chapter 11 Case on August 14, 2018.  The goal of the WIMC Chapter 11 Case was to deleverage the capital structure sufficiently to enable the reorganized debtor to implement its business plan.  As set out below, due to circumstances largely out of the control of the Debtors, the Company has faced significant hardships and must again address its capital structure through these Chapter 11 Cases.

### B.    Events Leading to Commencement of these Chapter 11 Cases

In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained its liquidity and ability to implement much needed operational initiatives.  In an effort to address the burden of its overleveraged capital structure—a remnant of its historical acquisitions—the Company consummated a fully consensual prepackaged chapter 11 plan on February 8, 2018.  Given the significant liquidity and operational headwinds facing the Company in 2019, it became clear to the Company's new senior management team that additional relief was needed.

Notwithstanding the Company's efforts to implement its business plan, which included further cost reductions, operational enhancements and streamlining of its business, following emergence from the WIMC Chapter 11 Case, the Company continued to face liquidity and performance challenges that were more persistent and widespread than anticipated.  Coupled with the industry and market factors, these performance challenges have resulted in less liquidity than projected, making the implementation of key operational enhancements more difficult, and in certain cases, resulting in their postponement.

In addition, a number of industry factors have caused the Company increased uncertainty with respect to its future performance, including the projected decrease in total originations, and for reverse mortgages, the impact of changes in HUD regulations, among other things.  The increase in interest rates has also negatively impacted mortgage originators and servicers generally—the Debtors are no exception.  As interest rates have risen, fewer borrowers are refinancing loans in a higher interest rate environment, resulting in lower origination volume for the Company.

The Company's liquidity has also suffered from burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties.  In the normal course of business, the

WEIL:\97028542\2\41703.0010

Company utilizes its mortgage loan servicing advance facilities and master repurchase agreements to finance, on a short-term basis, mortgage loan related servicing advances, the repurchase of HECMs out of Ginnie Mae securitization pools, and funding of newly originated mortgage loans.  These facilities are typically subject to annual renewal requirements and typically contain provisions that, in certain circumstances, prevent the Company from utilizing unused capacity under the facility and/or accelerate the repayment of amounts under the facility.

The Company's ability to fund its business operations is a significant factor that affects its liquidity and ability to operate and grow.  The Company is dependent on the ability to secure these types of arrangements on acceptable terms and to renew, replace or resize existing financing facilities as they expire.  Continued growth in Ginnie Buyouts activity have required the Company to continue to seek additional financing for Ginnie Buyouts or to otherwise sell or securitize Ginnie Mae buyout assets, and the Company entered into a number of transactions relating to these types of assets during the past year.

The Company has taken a number of measures to address forecasted reductions in liquidity and compliance with its various facilities, including entry into amendments under its Prepetition Credit Agreement, the DAAT Facility, the DPAT II Facility, and each of Ditech Financial's and RMS's master repurchase agreements.

The Company has entered into new agreements or transactions to generate additional liquidity.  In April 2018, the Company entered into an additional master repurchase agreement that, as of December 31, 2018, provides up to $412 million in total capacity, and a minimum of $400 million in committed capacity to fund the repurchase of certain HECMs and real estate owned from Ginnie Mae securitization pools for a period of one year.  In June 2018, the Company sold a pool of defaulted reverse Ginnie Buyouts owned by the Company and financed under an existing master repurchase agreement for a sales price of $241.3 million. The proceeds from the sale were used to repay the related amount financed under the master repurchase agreement and to fund additional Ginnie Buyouts.  The Company continues to service these loans on behalf of the purchaser under a servicing agreement.  In June 2018, the Company agreed to sell to New Penn Financial additional MSRs relating to mortgage loans having an aggregate unpaid principal balance of approximately $4.7 billion, and received approximately $56.7 million in cash proceeds.  The proceeds from the sale were used primarily to make mandatory principal payments under the Prepetition Credit Agreement.  In addition, in October 2018, pursuant to the National Founders Facility, the Company executed a transaction that provided $230 million of additional secured financing for certain HECMs and owned real estate.

Notwithstanding these liquidity initiatives, the Company still faced scheduled amortization payments of approximately $110 million in 2019.  Accordingly, the Company was at significant risk of receiving a going-concern qualification from its auditors, which would have triggered a domino effect of defaults and terminations throughout its corporate debt and working capital facilities.  Instead, the Company has sought to forge a different path with the cooperation of the Term Loan Ad Hoc Group and its major stakeholders— a path that will lead either to a significantly deleveraged and recapitalized Company through a Reorganization Transaction or, if it provides higher or better return to creditors, one of the three types of transactions as contemplated by the Restructuring Support Agreement, consistent with the goals of the Company's strategic alternatives review process discussed below.

### C.      Prepetition Marketing Process and Negotiations with Stakeholders

In May 2018, the Company initiated a process to evaluate strategic alternatives to enhance stockholder value and re-engaged Houlihan and Weil to assist in such process.  Subsequently, in October 2018, the Company engaged AlixPartners, LLP to assist and advise in its contingency planning process,

acknowledging at that time that it may ultimately become necessary to implement a transaction through an in-court process.

The Company's efforts were overseen by the Board of Directors of DHCP and a Special Committee of the Board (the "**Special Committee**"), which is composed of four (4) DHCP independent directors. The Special Committee, with the assistance of Houlihan and Weil, evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity.

The Company undertook an extensive marketing effort (the "**Prepetition Marketing Process**"), including soliciting interest from thirty-three (33) potentially interested parties including strategic and financial buyers with the financial and operational wherewithal to complete a transaction. The Company formally engaged with multiple potential bidders, executing ten (10) confidentiality agreements and providing a Confidential Information Memorandum, financial projections and data room access to such potential bidders.

The deadline for interested parties to submit initial bids was July 17, 2018. The Company received four (4) indications of interest ("**IOIs**"). Following extensive discussions with the Board, the Special Committee and its legal and financial advisors, the Company selected three (3) bidders to proceed to a second round of negotiations and diligence, including onsite management presentations during the last week of July 2018. Following the management presentations, the Company and its advisors continued to facilitate due diligence with the remaining bidders in advance of the second round of IOIs. The Company received three (3) second round IOIs on or about August 21, 2018, two (2) of which were bids for the sale of certain servicing and reverse assets with subservicing retained by the Company (the "**Alternative Bids**") and one (1) of which was a bid for substantially all of the Company's net assets as a going concern (the "**All-Company Bid**"). Over the course of September and October 2018, the Company and its advisors engaged in extensive discussions with the final three bidders.

In October 2018, it became clear that (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Company's Second Lien Notes. As a result, the Company decided to engage with an ad hoc group of second lien noteholders (the "**Second Lien Ad Hoc Group**") to explore the Company's strategic alternatives and solicit input with respect to the All-Company Bid and the Alternative Bids. On October 8, 2018, the Second Lien Ad Hoc Group signed a confidentiality agreement and began engaging with the Company to evaluate the sale alternatives and develop a competing potential recapitalization transaction. The Company continued to have periodic discussions with the Second Lien Ad Hoc Group as it analyzed the sale options and various recapitalization scenarios. In November 2018, the Second Lien Ad Hoc Group retained Centerview Partners ("**Centerview**") and Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") to assist with its analysis of the potential strategic alternatives and to assist in preparing a recapitalization transaction proposal supported by the Second Lien Ad Hoc Group.

The Company's financial and legal advisors engaged with the Second Lien Ad Hoc Group's advisors to develop potential viable alternatives to an All-Company Bid. Among other things, the Second Lien Ad Hoc Group proposed equitizing a portion of the Second Lien Notes and obtaining amortization relief from the Term Lenders under the Prepetition Credit Agreement (the "**Second Lien Proposal**").

In December 2018, the Company engaged in parallel discussions with an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**") to discuss the Prepetition Marketing Process and the Second Lien Proposal. The Term Loan Ad Hoc Group retained FTI Consulting ("**FTI**") and Kirkland & Ellis LLP ("**Kirkland**") as its advisors. The Debtors and their advisors held in-person meetings

in December 2018 with each of the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group and their respective advisors to discuss strategic alternatives, including analyzing the All-Company Bid.

Despite extensive negotiations with the bidder who submitted the All-Company Bid, such bidder ultimately rescinded the All-Company Bid in late December 2018, immediately after the Company had utilized the grace period with respect to its Second Lien Notes (explained in more detail below). Following such rescission, the Company re-engaged a previous bidder in connection with a potential bid for substantially all of the Company's assets. After several weeks of negotiations with such bidder, and after consultation with the Term Loan Ad Hoc Group and its advisors, the Company ultimately decided not to pursue the sale transaction.

In early January 2019, the Term Loan Ad Hoc Group submitted a proposal for a recapitalization transaction, pursuant to which a portion of the Prepetition Term Loan would be equitized and incremental liquidity would be provided through, among other things, a new revolving credit facility and a reduction in scheduled amortization payments. Shortly thereafter, the Second Lien Ad Hoc Group submitted a revised Second Lien Proposal. Over the course of several weeks, the Company, with the assistance of its financial and legal advisors, engaged in extensive discussions with the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group regarding the competing recapitalization transactions proposed by such parties. Following extensive diligence and numerous meetings with the Company's management and advisors, the advisors to the Term Loan Ad Hoc Group provided the Company with a proposal for the recapitalization of the Company. As a precondition to seeking the approval of the Board for such terms, the Company agreed with the Term Loan Ad Hoc Group to share the proposal with certain of the Company's key counterparties, including NRM.

Notwithstanding the Debtors' good faith efforts to cooperate with NRM throughout the Company's strategic alternatives review process, NRM asserted that it had the right to issue a termination notice based on the occurrence of certain alleged termination events under its Subservicing Agreement with the Company, dated August 8, 2016 (as amended) (the "**Subservicing Agreement**") while simultaneously participating as a bidder in the Company's sale process. Ultimately, on January 17, 2019—the morning after the Company shared with NRM a recapitalization proposal from the Term Loan Ad Hoc Group— NRM issued a notice purporting to terminate the Subservicing Agreement and directing the Company to remit certain transfer fees and costs to NRM in accordance with the terms of the Subservicing Agreement ("**Termination Notice**"). On January 23 and 29, 2019, NRM sent additional letters to the Company which purported to confirm the Termination Notice and to identify certain additional termination events. The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. The Debtors are, however, cooperating with NRM to transition the servicing of the loans under the Subservicing Agreement. NRM asserts that the Termination Notice was properly issued, based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement. The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.

### D.    Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities

On December 17, 2018, the Company elected not to make the approximately $9 million cash interest payment (the "**Interest Payment**") due and payable on December 17, 2018 with respect to the Company's outstanding Second Lien Notes and entered the 30-day grace period. Although the Company had sufficient liquidity to make the Interest Payment, the Company elected not to make the payment as discussions were still ongoing with various stakeholders regarding the Company's strategic alternatives. The Company's failure to make the Interest Payment within thirty days after it was due and payable constitutes an "event

32

of default" under the Second Lien Notes Indenture. As active discussions were still ongoing, the Board determined that the Company would not make the Interest Payment prior to the expiration of the grace period, even though it had sufficient liquidity to do so, resulting in an event of default under the Second Lien Notes Indenture. An event of default under the Indenture also constitutes an "event of default" under the Prepetition Credit Agreement and certain of the Company's warehouse facility agreements (the "**Warehouse Facility Agreements**"), among others.

On January 16, 2019, the Company and, as applicable, certain of its subsidiaries, entered into forbearance agreements (each a "**Forbearance Agreement**" and collectively the "**Forbearance Agreements**") with (i) certain holders of greater than 75% of the aggregate principal amount of the outstanding Second Lien Notes (the "**Notes Forbearing Parties**"), (ii) certain lenders holding greater than 50% of the sum of (a) the Term Loans outstanding, (b) letter of credit exposure, and (c) unused commitments under the Prepetition Credit Agreement at such time and the administrative agent and collateral agent under the Prepetition Credit Agreement (collectively, the "**Credit Agreement Forbearing Parties**"), and (iii) the requisite buyers and variable funding noteholders, as applicable, under the Warehouse Facility Agreements (collectively, the "**Warehouse Lenders Forbearing Parties**").

Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the Notes Forbearing Parties, Credit Agreement Forbearing Parties and Warehouse Lenders Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they may have in respect of the aforementioned events of default or other defaults or events of default arising out of or in connection therewith.

The deadline of the Forbearance Agreements was tied to the maturity date of certain of the Company's repurchase loan agreements with the Warehouse Lenders Forbearing Parties. Without a viable recapitalization of the Company in hand, the Warehouse Lenders Forbearing Parties were not in a position to commit to a significant extension of their facilities with the Company. As noted above, these facilities are critical to the Company's ordinary course of business operations. Accordingly, the Company focused instead on obtaining the DIP Facilities to refinance such obligations, and will, during the Marketing Process, continue to seek commitments for post-emergence facilities.

Before the termination of the Forbearance Agreements on February 8, 2019, the Company entered into new forbearance agreements with the Credit Agreement Forbearing Parties and the Warehouse Lenders Forbearing Parties (the "**Forbearance Extension**"). The Forbearance Extension was scheduled to terminate on February 11, 2019.

## IV.
## OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases and First-Day Motions

On February 11, 2019, the Debtors commenced the Chapter 11 Cases. The Debtors continue to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To that end, the Debtors filed various motions seeking relief from the Bankruptcy Court to promote a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth restructuring through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "**First Day Motions**"). At the second day hearing held on March 14, 2019, the Bankruptcy Court granted substantially all of the relief requested in the First Day Motions on a final basis and entered various final orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits (ECF No. 207);

- Continue insurance programs and the workers' compensation program, the processing of workers' compensation claims, and continue the Debtors' surety bond program (ECF No. 205);

- Continue to pay all taxes, fees, and similar charges and assessments, whether arising prepetition or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course (ECF No. 230);

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing services (ECF No. 128); and

- Continue to conduct their forward and reverse mortgage businesses in the ordinary course, as discussed in more detail below in Section 2 (ECF Nos. 224 and 229).

The Debtors' request to continue to use their cash management system, bank accounts, and business forms and to obtain debtor-in-possession financing have been approved on a final basis (ECF No. 478). The Debtors' motion to continue to use their cash collateral has been approved on an interim basis (ECF No. 53), and in accordance with the Global Settlement, the Creditors' Committee objections to entry of a final order for use of cash collateral will be resolved and the use of cash collateral will be authorized on a final basis.

### 1.      DIP Facilities and Cash Collateral

(a)      DIP Facilities:

To address the working capital needs of the Debtors and support the transactions contemplated by the Restructuring Support Agreement, the Debtors filed a motion (the "**DIP Motion**") (ECF No. 26) to enter into the DIP Facilities, which provide the Debtors' two primary operating entities, Ditech Financial and RMS, as applicable, (a) up to $1.9 billion in warehouse financing under three master repurchase agreements and two advance facilities and (b) access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "**DIP Facilities**"). The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted. The interim order granting the relief requested in the DIP Motion can be found at ECF No. 53 ("**Interim DIP Order**"), and the final order granting the relief request in the DIP Motion with respect to the DIP Facilities can be found at ECF No. 422 (the "**Final DIP Order**").

The DIP Facilities provide the Debtors with the flexibility to use the commitment amount in the manner that best suits their capital needs. Specifically, during the Chapter 11 Cases, (i) up to $650 million will be available to fund Ditech Financial's origination business, (ii) up to $1.0 billion will be available to RMS, and (iii) up to $250 million will be available to finance the advance receivables related to Ditech Financial's servicing activities. In addition, the lenders under the DIP Facilities will provide Ditech Financial up to $1.9 billion in trading capacity to hedge its interest rate exposure with respect to the loans in its origination pipeline, as well as those loans that will be subject to repurchase obligations with the DIP Facilities lenders prior to being securitized.

(b)      Cash Collateral

In addition, the Debtors are authorized, on an interim basis, to consensually use the cash collateral of the Prepetition Term Lenders for the duration of the Chapter 11 Cases. In exchange, the Debtors are providing the Prepetition Term Lenders, with the consent of the Prepetition Administrative Agent, acting at the direction of the Required Term Lenders with the following:

Adequate Protection Lien. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive a replacement security interest in and lien on the same property of the Debtors on which the Prepetition Administrative Agent has a perfected, first-priority security interest and lien prior to the Commencement Date pursuant to the Prepetition Credit Agreement and related security documents, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to Permitted Liens (as defined in the Prepetition Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the obligations under the Prepetition Credit Agreement, and a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "**Carve Out**").  The adequate protection liens shall not be (i) subject, or junior to, any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the interim and final orders (collectively, the "**DIP Orders**").

507(b) Claim. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b), subject to the Carve Out and the priorities set out in the DIP Facilities.

Adequate Protection Payments. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Prepetition Administrative Agent (in accordance with the Prepetition Credit Agreement, including, without limitation, the reasonable fees, costs, and expenses of Davis Polk & Wardwell LLP, as counsel to the Prepetition Administrative Agent) and the Term Loan Ad Hoc Group.

Financial Reporting. The Debtors will, until the Effective Date, continue to provide the Term Loan Ad Hoc Group and the Prepetition Administrative Agent, and their advisors, financial and other reporting on a monthly basis in a form and substance reasonably acceptable to them.

(c)    National Founders Facility

The Debtors are also providing, among other things, the following adequate protection to National Founders, the Debtors' existing lender under the National Founder Facility, including:

- Reimbursement of reasonable and documented fees and expenses of National Founders;

- Covenant by RMS to perform under the existing servicing agreement, and stipulation and agreement by Debtors that any Claim for actual damages arising from RMS's failure to perform or otherwise breach the existing servicing agreement shall constitute superpriority Administrative Expense Claims against RMS, subject to subordination as expressly provided in the DIP Orders; and

- Superpriority administrative claim against RMS for all draws on advance account funds, which Claims shall be subordinated in priority and payment to the DIP Lender's superpriority Claims.

In exchange for the adequate protection provided to National Founders, the Debtors received assurances for the continuation of the National Founders Facility and the continued use of National Founders' cash collateral for the duration of these Chapter 11 Cases, as well as assurances that National Founders will not declare an event of default or servicer termination event as a result of the commencement of the Chapter 11 Cases or the insolvency of RMS.

### 2.    Operations in the Ordinary Course for Ditech Financial and RMS

To avoid any disruption to their business operations, the Debtors have obtained final relief to continue to conduct their forward and reverse mortgage businesses in the ordinary course (the "**Final OCB Orders**") (ECF Nos. 224 and 229).  As discussed above, RMS no longer originates reverse mortgage loans, but it has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans.  The Debtors will also continue to comply with their obligations to Fannie Mae, Freddie Mac, and Ginnie Mae, and to continue their securitization activities and servicing businesses in the ordinary course to avoid disruption and uncertainty in the market.  As part of this relief, the Debtors have agreed to provide Fannie Mae, Freddie Mac, and Ginnie Mae certain undertakings for assurance of performance of the obligations ("**Operating Undertakings**") and to seek Bankruptcy Court approval of the Operating Undertakings.[17]

### B.    Procedural Motions and Retention of Professionals

The Debtors have also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.  The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders with respect to such relief.

### C.    KEIP Motion

On April 18, 2019, the Court approved a motion (the "**KEIP Motion**") seeking authority to implement a key employee incentive program as modified (the "**Proposed KEIP**") (ECF No. 228) and letter to the Bankruptcy Court (ECF No. 417).  Under the Proposed KEIP, thirty-one (31) of the Debtors' key employees (collectively, the "**KEIP Participants**"), who are largely responsible for the continuity of the Debtors' day-to-day operations, will be eligible to collectively receive up to $2.5 million.  In the event of a Sale (as defined in the KEIP Motion), KEIP Participants will remain eligible to receive the first $2.5 million of any award granted under the Proposed KEIP subject to meeting certain performance metrics.  In addition, under the Proposed KEIP, a subset of KEIP Participants (twelve (12) key employees) will be entitled to an incremental award tied directly to the recoveries for the Term Lenders in recognition of their integral role and ability to drive value in the Marketing Process.

### D.    Lease Rejection Motion

On February 11, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 6) seeking authority to (i) reject certain unexpired leases of nonresidential real property and related subleases in (a) St. Paul, Minnesota; Houston, Texas; and Maryland Heights, Missouri as of the Commencement Date and (b) Fort Worth, Texas; Irving, Texas; and Palm Beach Gardens, Florida as of February 28, 2019; and (ii) abandon certain property in connection therewith.  The Bankruptcy Court granted this motion at the second day hearing held on March 14, 2019 (ECF No. 204).

On March 28, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 320) seeking authority to (i) reject a certain unexpired lease of nonresidential real property in Rapid City, South Dakota as of April 5, 2019 and (ii) abandon certain property in connection therewith.  The Bankruptcy Court granted this motion at the hearing held on April 11, 2019 (ECF No. 481).

---

[17]    Ginnie Mae sent a Notice of Violation on February 8, 2019 and stated that it would forbear from taking any action for 125 days through June 13, 2019.  On April 10, 2019, Ginnie Mae extended the forbearance period by thirty (30) days through July 13, 2019.

### E.    Bar Date

On February 22, 2019, the Bankruptcy Court entered an order, which, among other things, (i) established April 1, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) established August 10, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) established the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedule as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) established the later of (y) the General Bar Date or the Governmental Bar Date, as applicable, and (z) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases.

On March 27, 2019, the Bankruptcy Court entered an order which extended the General Bar Date to April 25, 2019, at 5:00 p.m., prevailing Eastern Time (ECF No. 272).

On May 2, 2019, the Bankruptcy Court entered an order further extending the General Bar Date to June 3, 2019 at 5:00 p.m., prevailing Eastern Time for consumer borrowers (i.e., individual borrowers whose home mortgage loans (including reverse mortgages) are or were originated, serviced, or owned by one or more of the Debtors) (ECF No. 496).

### F.    Appointment of the Creditors' Committee

On February 27, 2019, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases (ECF No. 127).

The members of the Creditors' Committee are Safeguard Properties Management, LLC, Wilmington Savings Fund Society, FSB, Lee Kamimura, ISGN Solutions, Inc., Black Knight Financial Technology Solutions, LLC, Cognizant Technology Solutions, and Deutsche Bank National Trust Company as RMBS Trustee.

The Creditors' Committee retained Pachulski Stang Ziehl & Jones LLP and Rich Michaelson Magaliff, LLP as its attorneys and Goldin Associates, LLC as its financial advisor.  On April 22, 2019, the U.S. Trustee appointed two additional members to the Creditors' Committee: Stephen Kulzyck and Sarah White and Jose Martinez.  Subsequently, these two (2) individuals resigned from the Creditors' Committee.

### G.    Appointment of the Consumer Creditors' Committee

On May 2, 2019, the Official Committee of Consumer Creditors (the "**Consumer Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent the interests of consumer creditors in the Chapter 11 Cases (ECF No. 498).  The Creditors' Committee did not oppose the appointment of the Consumer Creditors' Committee in these Chapter 11 Cases.

The members of the Consumer Creditors' Committee are Stephen Kulzyck, Jose Martinez, LeRon Harris, Melinda Hopkins, and D.C. Randall.  Four of the five members are represented by counsel for non-profit

legal services organizations or legal aid entities.  On May 6, 2019, the Consumer Creditors' Committee retained Quinn Emanuel Urquhart & Sullivan, LLP as its attorneys.

On May 8, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Disbanding the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limiting the Scope of such Committee and Capping the Fees and Expenses which may be Incurred by such Committee* (ECF No. 522).  The motion will be heard by the Bankruptcy Court on May 14, 2019 at 11:00 a.m. prevailing Eastern Time.

H.    **Consumer Creditors' Committee's Position With Regard to Treatment of Consumer Borrowers' Claims in the Sale Process and Under the Plan**

The Consumer Creditors' Committee has requested that the Debtors include the following language in this Disclosure Statement; however, its inclusion should not be conceived as, nor is it, an endorsement by the Debtors of the position of the Consumer Creditors' Committee.

Upon retaining counsel, the Consumer Creditors' Committee immediately engaged in discussions with the Debtors regarding its concerns about the treatment of consumer creditors under the Plan and the consumer-related disclosures in the Disclosure Statement.  The Consumer Creditors' Committee represents the interests of all consumer creditors in these cases who have claims against the Debtors.  Such claims include affirmative claims for violation of state and federal laws, claims on account of misstated and inflated accounts, and other claims in connection with their mortgages in which the Debtors hold an interest (including ownership, servicing interests, or otherwise) and may be subject to the sale contemplated by the Plan.  The Consumer Creditors' Committee's position is that the proposed Plan cannot be confirmed unless claims held by consumer borrowers in connection with their mortgages (both against any of the Debtors and any non-debtor third parties) are fully preserved, and may be brought against any purchaser of the Debtors' assets associated with such claims.

Specifically, the Consumer Creditors' Committee agrees with the U.S. Trustee's position that section 363(o) of the Bankruptcy Code prohibits a free and clear sale of any interests associated with the consumer creditor claims, that such a sale cannot be effectuated without preserving the consumer creditors' claims and defenses, and that any purchaser of assets must be subject to such claims and defenses.  And even notwithstanding the application of section 363(o), the Consumer Creditors' Committee maintains that any reorganization transaction or sale (whether through a Plan or otherwise) cannot ratify the validity, authenticity, or accuracy of any borrower account records, and any Plan must preserve consumer creditors' rights to challenge misstated amounts under their accounts.  Under section 541 of the Bankruptcy Code, for example, the Debtors cannot include in any sale, under the Plan or otherwise, assets that are not property of the estate.  Insofar as a sale under the Plan purports to include amounts due that are inappropriately misstated or inflated and to which the Debtors do not have a legal or equitable interest, such a sale should be denied by this Court.

The Consumer Creditors' Committee also submits that notwithstanding any proposed free and clear sale, discharge, or release granted under the Plan, the Plan cannot discharge any setoff claims or recoupment rights or other defenses of the consumer creditors and cannot effectuate any sale free and clear of such setoff rights or recoupment rights or other defenses.  Such rights include the right to commence litigation, or to file counterclaims or cross-claims, on account of claims asserting statutory and/or common law claims contesting the status of their account, application of payments, escrow accounting (including disbursements), or disputing any fees, charges, expenses, corporate advances of any nature, and seeking compensation for all damages and attorneys' fees that would otherwise be recoverable.

WEIL:\97028542\2\41703.0010

Moreover, the Consumer Creditors' Committee questions the legal basis for certain Final OCB Orders entered in these chapter 11 cases that appear to suggest that the automatic stay applies to any rights of recoupment of any of the consumer borrowers (including, purportedly, counterclaims or cross-claims that arise under the same transaction as the amounts owed by the consumer borrower to the Debtors).  In the Consumer Creditors' Committee's view, these orders, through their vague and restrictive language and improper application of the automatic stay to recoupment rights (which include, among other things, the right to file a counterclaim for affirmative relief or to recover legal fees that arise from defending a foreclosure action or correcting a misstated and inflated account) have caused significant confusion among the Consumer Creditors' Committee's constituents.  As such, the Consumer Creditors' Committee is considering a motion for reconsideration of the Final OCB Orders to ensure that the automatic stay applies only to the extent appropriate under the Bankruptcy Code.  The Debtors will oppose any such motion.

Finally, the Consumer Committee is concerned that notice to consumer borrowers in these cases has been inadequate and, as such, consumer borrowers' claims cannot be discharged under any Plan under established Second Circuit law.  In addition to the above concerns, the Consumer Creditors' Committee reserves its rights to object to the Plan on any other basis, including any purported release of any consumer creditor claims or defenses against any non-debtors parties, including any purchaser of any of the Debtors' assets.

The Consumer Creditors' Committee intends to participate constructively in these chapter 11 proceedings to protect these consumer creditor rights, and hopes to have the Debtors' cooperation, including honoring the Consumer Creditors' Committee's rights to the same information as the Creditors' Committee and other parties in interest with regard to the sale of the Debtors' assets.  Access to this information is vital for the Consumer Creditors' Committee to appropriately evaluate the effect of any sale on consumer rights and to potentially resolve issues related to any such sale with the Debtors.

## I.    Statements and Schedules, and Rule 2015.3 Financial Reports

On March 27, 2019, the Debtors each filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") (ECF Nos. 286–313).  The Schedules and Statements, as amended will be incorporated into the Disclosure Statement by reference.  The Debtors intend to file a Rule 2015.3 financial report by May 9, 2019.

## J.    Litigation Matters

In the ordinary course of business, the Debtors are defendants in, or parties to, pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants.  Many of these actions and proceedings are based on alleged violations of consumer protection laws governing the Company's servicing and origination activities, and in certain instances, claims for substantial monetary damages are asserted against the Company.  The Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings.  In connection with formal and informal inquiries, the Company receives numerous requests in connection with various aspects of the Company's activities.

### 1.    Courtney Elkin, *et al*. vs. Walter Investment Management Corp., *et al*.

A federal securities fraud complaint was filed against the Company, George M. Awad, Denmar J. Dixon, Anthony N. Renzi, and Gary L. Tillett on March 16, 2017.  The case, captioned *Courtney Elkin, et al. vs. Walter Investment Management Corp., et al.*, Case No. 2:17-cv-02025-JCJ, is pending in the Eastern District of Pennsylvania.  An amended complaint was filed on September 15, 2017 by the court-appointed lead plaintiff, and the amended complaint sought monetary damages and asserted claims under Section

39

10(b) and 20(a) of the Securities Exchange Act of 1934 during a class period alleged to begin on August 9, 2016 and conclude on August 1, 2017. From December 1, 2017 to February 9, 2018, the action was stayed pursuant to section 362 of the Bankruptcy Code, and on July 13, 2018, the parties entered into a formal settlement agreement to settle the action for $2.95 million, subject to notice to the alleged class and court approval. On December 18, 2018, the court approved the settlement on a final basis. The settlement was paid by the Company's directors' and officers' insurance carrier.

### 2.    Michael E. Vacek, Jr., *et al.* vs. George M. Awad, *et al.*

A stockholder derivative suit was filed against current and former members of the Board on June 22, 2017. The case, captioned *Michael E. Vacek, Jr., et al. vs. George M. Awad, et al.*, Case No. 2:17-cv-02820-JCJ, is pending in the Eastern District of Pennsylvania. An amended complaint was filed on September 13, 2017, which sought monetary damages for the Company and equitable relief and asserted a claim for breach of fiduciary duty arising out of: (i) a material weakness in the Company's internal controls over financial reporting related to operation processes associated with Ditech Financial's default servicing activities; (ii) an accounting error that caused an overstatement of the value of the Company's deferred tax assets; and (iii) subpoenas seeking documents relating to RMS's origination and underwriting of reverse mortgages and loans. On October 17, 2018, the parties entered into a formal settlement agreement to settle the action based on the Company's adoption of certain corporate governance measures. On December 3, 2018, the court issued an order preliminarily approving the proposed settlement, and on February 1, 2019, the court approved the proposed settlement on a final basis. The Company's directors' and officers' insurance carrier has agreed to pay $257,500 in attorneys' fees to plaintiff's counsel. The implementation of corporate governance measures has been stayed by the automatic stay under section 362 of the Bankruptcy Code.

### 3.    Other Litigation

As mentioned above, in the ordinary course of business, the Company is involved in numerous pending and threatened legal actions and proceedings, as well as in routine proceedings such as foreclosures, evictions, title disputes, collection actions, and borrower bankruptcy cases. All actions and claims interposed against the Debtors in such actions are stayed pursuant to section 362 of the Bankruptcy Code during the pendency of the Chapter 11 Cases, subject to the limited stay relief granted under the Final OCB Orders.

The Debtors are involved in over one hundred (100) actions ("**Third Party Actions**") in which they owe indemnification and/or defense obligations to non-Debtor third parties including without limitation (a) private investors and securitization trustees; (b) Fannie Mae; (c) Freddie Mac; and (d) Mortgage Electronic Registration System, Inc. (collectively, "**Indemnified Parties**"). The Third Party Actions fall into a number of categories, including commercial litigation and claims, cross-claims, third-party claims, and counterclaims by various parties for monetary damages against the Debtors and/or Indemnified Parties.

### K.    Marketing Process and Bidding Procedures

In support of the Debtors' Marketing Process, the Debtors and their advisors have developed bidding and auction procedures for the marketing and sale of their assets in these Chapter 11 Cases in an orderly and value maximizing manner (the "**Bidding Procedures**"). Under the Bidding Procedures, parties may submit bids for the purchase and sale of any and all of the Debtors' assets in accordance with the terms of the Bidding Procedures. The Bidding Procedures are designed to promote a competitive and expedient bidding process, and are intended to generate the greatest level of interest in the Debtors' assets. The Bidding Procedures are intended to provide the Debtors with flexibility to solicit proposals, negotiate transactions, provide stalking horse protections (if necessary and appropriate), hold an auction (if necessary and appropriate) and consummate a Sale Transactions for the highest and best value, all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review

and consider proposed transactions.   The Bidding Procedures are filed at ECF No. 147.   Below are the proposed dates related to the Bidding Procedures.

| Key Event | Proposed Date |
|---|---|
| Deadline to Submit Non-Binding Indications of Interest | No later than May 6, 2019 at 4:00 p.m. (ET) |
| Deadline to Submit Bids | May 28, 2019 at 4:00 p.m. (ET) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | May 29, 2019 at 4:00 p.m. (ET) |
| Auction, if necessary, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | May 30/May 31 2019 at 10:00 a.m. (ET) |
| Deadline to File Notice of (a) Successful Bid and Back-Up Bid and (b) Identity of Successful Bidder and Back-Up Bidder | June 3, 2019 at 4:00 p.m. (ET) |
| Deadline to File Objections to Sale Transaction or Asset Sale Transaction | June 10, 2019 at 4:00 p.m. (ET) |
| Sale Hearing | June 20, 2019 |

### L.      U.S. Trustee's Objections to Disclosure Statement

On April 5, 2019, the U.S. Trustee filed an objection to the disclosure statement (ECF No. 348).  With regards to section 363(o) claims, the U.S. Trustee requested that the Plan explicitly provide that, in the event of a sale of the Debtors' assets under section 363 of the Bankruptcy Code, the successor in interest to the Debtors must be liable for consumer claims.  The U.S. Trustee further stated that to the extent the Debtor reorganizes without a sale, analogous language should be incorporated into the Plan.  (ECF No. 348, ¶ 40).  The Debtors disagree with the U.S. Trustee's position concerning section 363(o) of the Bankruptcy Code.  The Debtors' position is that section 363(o) does not apply to asset sales under the Plan.

With regard to releases, the U.S. Trustee argued that the scope of the Plan's release provisions are not adequately explained and stated.   "This Disclosure Statement needs a simple, clear, plan-English explanation of how the Plan's release, discharge, and injunction provisions will affect claims, particularly consumer claims.  To the extent claims may be unaffected by the discharge and ride through the bankruptcy, this needs to be explained.  Any explanation should be appropriately tailored to a creditor body that may not understand legal jargon."  (ECF No. 348, ¶ 42-44).

The third party releases provided in the Plan are consensual in nature.  As a result, consumer borrowers are unaffected by and not subject to the releases in section 10.6 of the Plan.  Additionally, the Plan has been amended to include a new class of Borrower Non-Discharged Claims that addresses the discharge of certain consumer claims.  A simplified description of the types of borrower claims in this class can be found in Schedule A to the Plan.

As reflected therein, the claims identified on Schedule 1 will not be discharged in a Reorganization Transaction.  In a sale transaction, the Debtors are not requesting a discharge.  However, any recovery to

WEIL:\97028542\2\41703.0010

consumer borrowers (just like all creditors) will be dictated by the amount of proceeds received from the sale, which will be distributed in accordance with the priority scheme under the Bankruptcy Code. In addition, potential buyers may choose to assume certain liabilities which will be identified in an asset purchase agreement. The Debtors have prepared a notice tailored to consumer borrowers that will provide such parties with relevant information about the confirmation hearing and the Plan, including its release and discharge provisions. The notice also provides instructions to access the webpage created by Epiq designed specifically for consumer borrowers. The notice includes a plain-English explanation of Borrower Non-Discharged Claims. A copy of the proposed notice is annexed to the revised proposed *Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, and (V) Granting Related Relief.*

## M.    Plan Settlement Negotiations and the Global Plan Settlement

The Debtors filed their initial chapter 11 plan on March 5, 2019 (ECF No. 145) (the "**Initial Plan**"), filed an amended plan of reorganization on March 28, 2019 (ECF No. 314) (the "**Amended Plan**") and subsequently filed the April 26, 2019 Plan on April 26, 2019, each with the support of the Term Loan Ad Hoc Group. The Creditors' Committee raised a number of formal and informal objections and issues with respect to the Initial Plan and the Debtors' restructuring, including:

- Value attributable to the Debtors' unencumbered assets and the proposed treatment of unsecured creditors and the Initial Plan and the Amended Plan;

- The treatment of intercompany claims and interests; and

- The releases and exculpations contemplated by the Initial Plan and the Amended Plan.

The Debtors, the Creditors' Committee, and the Term Loan Ad Hoc Group, with the assistance of their advisors, engaged in vigorous, arm's-length negotiations to resolve all their respective issues on a consensual basis.

These negotiations were successful, and the modifications to the Initial Plan described herein resolve each of those issues and objections of the Creditors' Committee (collectively, the "**Global Plan Settlement**"). In particular, the Global Plan Settlement significantly improves recoveries for General Unsecured Claims under the Plan, compared to the Initial Plan. These improved recoveries are being carved out of the collateral securing Term Loan Claims by agreement of the Term Loan Ad Hoc Group. Given the Debtors' valuation, recoveries of this size to general unsecured creditors would be impossible absent the Global Plan Settlement. In particular, the modified General Unsecured Claim recoveries provided on account of the Global Plan Settlement include:

- On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust: (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of

the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

- On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

- On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

- The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing). The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

- On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

- On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

- The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

- The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

- On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates,

WEIL:\97028542\2\41703.0010

whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

- On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

- On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

- As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

## V.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as Exhibit A.

### A.    Administrative Expenses and Priority Claims

#### 1.    Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

#### 2.    Treatment of Fee Claims

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date. Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than twenty-one (21)

WEIL:\97028542\2\41703.0010

calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)    Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)    On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

(d)    The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 3.    Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### 4.    Treatment of DIP Claims

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs.  The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement and indemnity obligations

WEIL:\97028542\2\41703.0010

under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision thereof to the contrary.

### 5. Restructuring Expenses

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### B. Classification of Claims and Interests

### 1. Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2. Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

### 3. Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

46

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | Borrower Non-Discharged Claims | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired) | Reorganization Transaction (Presumed to Accept)<br><br>Sale Transaction (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

### 4.    Special Provision Governing Unimpaired Claims

Nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5.    Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### C.    Treatment of Claims and Interests

### 1.    Priority Non-Tax Claims (Class 1)

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

47

(c)  *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

## 2.    Other Secured Claims (Class 2)

(a)  *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)  *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)  *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

## 3.    Term Loan Claims (Class 3)

(a)  *Classification*:  Class 3 consists of Term Loan Claims.

(b)  *Allowance*:  The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement.  The Prepetition Administrative Agent and the Term Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)  *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

48

(i) **If the Sale Transaction occurs**, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan).

(ii) **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d) *Voting*: Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

**4.     Second Lien Notes Claims (Class 4).**

(a) *Classification*: Class 4 consists of Second Lien Notes Claims.

(b) *Treatment*: The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i) **If the Sale Transaction occurs**, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii) **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

(iii) **If either the Sale Transaction or the Reorganization Transaction occurs**, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court.

49

(c)    *Voting*:    Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

### 5.    General Unsecured Claims (Class 5)

(a)    *Classification*:    Class 5 consists of General Unsecured Claims.

(b)    *Treatment*:    Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)    *Voting*:    Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

### 6.    Borrower Non-Discharged Claims (Class 6)

(a)    *Classification*:    Class 7 consists of Borrower Non-Discharged Claims.

(b)    *Treatment*:    Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.

(ii)    **If the Reorganization Transaction occurs**, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan.

(c)    *Voting*:

(i)    **If the Sale Transaction occurs**, Class 6 is Impaired, and holders of Borrower Non-Discharged Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(ii)    **If the Reorganization Transaction occurs**, Class 6 is Unimpaired, and holders of Borrower Non-Discharged Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of Borrower Non-Discharged Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Borrower Non-Discharged Claims.

7.    **Intercompany Claims (Class 7)**

(a)    *Classification*:  Class 7 consists of Intercompany Claims.

(b)    *Treatment*:  On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

(c)    *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

8.    **Intercompany Interests (Class 8)**

(a)    *Classification*:  Class 8 consists of Intercompany Interests.

(b)    *Treatment:*  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests.

(c)    *Voting:*  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

WEIL:\97028542\2\41703.0010

9.      **Parent Equity Interests (Class 9)**

(a)      *Classification*:  Class 9 consists of Parent Equity Interests.

(b)      *Treatment*:  Except to the extent that a holder of an Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

(i)      **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements.  The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)      **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)      *Voting*:  Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

10.      **Subordinated Securities Claims (Class 10)**

(a)      *Classification*: Class 10 consists of Subordinated Securities Claims.

(b)      *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the

Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

## D.    **Means for Implementation**

### 1.    **No Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 2.    **Compromise and Settlement of Claims, Interests, and Controversies**

(a)    Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan and the Global Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee, the Second Lien Noteholders, and the Consenting Term Lenders (the "**Global Settlement**").  The following constitutes the provisions and conditions of the Global Settlement:

(i)    On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors.  Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

53

Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(ii)     On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)    On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders.  In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)    The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing).  The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)     On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)    On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

(vii)   The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

(viii)  The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

(ix)    On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under

54

chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(x)      On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

(xi)     On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xii)    As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

## 3.      Marketing Process

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale Transaction, and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae. The Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction, or Asset Sale Transaction. The Debtors, the Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders. The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

## 4.      Election Notice.

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "*Election Date*"), holders of at least $66^{2/3}\%$ in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "*Electing Term Lenders*") shall deliver a notice (the "*Election Notice*") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "*Elected Transaction*"), being a:  (i) Reorganization Transaction or (ii) Sale Transaction, and, if applicable, (iii) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i) or (ii).

55

5.    **Sources of Consideration for Plan Distributions**

(a)    ***Sale Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

(b)    ***Reorganization Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

6.    **Sale Transaction**

(a)    *Closing of Sale Transaction (If Any)*

On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant to Section 1141 of the Bankruptcy Code, be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

(b)    *Wind Down and Dissolution of the Debtors*

(i)    The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims; (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims and GUC Recovery Trust Causes of Action.

WEIL:\97028542\2\41703.0010

(iii)     Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(iv)     Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(v)     The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(vi)     The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

**7.     Reorganization Transaction.**

(a)     If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth in the Plan.

(a)     *Amended and Restated Credit Facility*

(i)     On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

(ii)     Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents. All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, the Reorganized Debtors, and the Entities granted such

57

Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

(iii)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(b)    *Exit Warehouse Facilities*

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(c)    *Authorization and Issuance of New Plan Securities*

(i)    On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action.  All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)    The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(d)    *Continued Corporate Existence*

(i)    The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan.

58

(ii)     On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(e)     *Officers and Board of Directors*

(i)     Upon the Effective Date, the New Board shall consist of five (5) directors. Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("**CEO**") of Reorganized DHCP, who shall be Thomas F. Marano.  The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(f)     *Reorganized Debtors' Authority*

(i)     The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)     After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**8.     Fannie Mae; Freddie Mac; Ginnie Mae**

(a)     *Fannie Mae.*  Notwithstanding anything in the Disclosure Statement, the Plan or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to

59

Fannie Mae shall not be transferred by the Debtors to a Successful Bidder (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction  repayment in full of the Cure Amounts; or (3) such other treatment of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

(b)     *Freddie Mac.*

(i)     Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "**Servicing Collateral**" (as defined and referenced in, and except as otherwise

WEIL:\97028542\2\41703.0010

expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the Debtors to a Successful Bidder (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance. The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)    *Ginnie Mae.* Notwithstanding anything in the Plan to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to a Successful Bidder without the express prior written consent of Ginnie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion. The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

## 9.    Employee Matters

(a)    Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "**Employee Arrangements**"). Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the

Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)    Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)    For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)    In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

## 10.    Effectuating Documents; Further Transactions

(a)    On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)    Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects,

in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)    In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)    The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, and the Global Settlement, including the creation of the GUC Recovery Trust, in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)    All matters provided for in the Plan involving the corporate structure of the Debtors. Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

## 11.    Section 1145 Exemption

(a)    The offer, issuance, and distribution of the New Common Stock hereunder to holders of the Term Loan Claims under Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)    The New Common Stock shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock, (iv) applicable regulatory approval, and (v) the Stockholders Agreement.

## 12.    Cancellation of Existing Securities and Agreements

(a)    Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  In a Reorganization Transaction, notwithstanding anything to the contrary in the Plan, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)     Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

(d)     Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)     Notwithstanding anything to the contrary in the Plan, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

WEIL:\97028542\2\41703.0010

(f)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 13.    Cancellation of Liens

Except as otherwise specifically provided in the Plan, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 14.    Subordination Agreements

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreements' terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

### 15.    Nonconsensual Confirmation

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 16.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 17.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 18.    Separability

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

19.     **GUC Recovery Trust**

(a)     *Creation and Governance of the GUC Recovery Trust*.  On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19.  The GUC Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement.  Other rights and duties of the GUC Trustee shall be as set forth in the GUC Recovery Trust Agreement.  After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)     *GUC Trustee and GUC Recovery Trust Agreement*.  The GUC Recovery Trust Agreement generally will provide for, among other things:  (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) make distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement.  The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust.  Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)     *Cooperation of Reorganized Debtors*.  Subject to subsection (d) of this Section 5.19, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, upon reasonable notice, shall provide reasonable cooperation with the GUC Trustee in the administration of the GUC Recovery Trust, including providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder.  The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Recovery Trust, including, providing reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims, in each case, the GUC Recovery Trust agrees to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses.  The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Recovery Trust.

WEIL:\97028542\2\41703.0010

(d)     *Preservation of Privilege*.  The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets.  The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)     *GUC Recovery Trust Assets*.  The GUC Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement.  From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Trustee deems necessary.

(f)     *GUC Recovery Trust Fees and Expenses*.  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.  The Reorganized Debtors or the Wind Down Estates, as applicable, shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)     *Tax Treatment*.  In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims and the GUC Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims

and GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)    *Non-Transferability of Interests in GUC Recovery Trust*.  Any and all interests in the GUC Recovery Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(i)    *Dissolution of the GUC Litigation Trust*.  The GUC Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement as appropriate.

(j)    *Single Satisfaction of Allowed General Unsecured Claims*.  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

## E.    Distributions

### 1.    Distributions Generally

Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 2.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date. For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the Prepetition Second Lien Notes Indenture, including, without limitation, subject to the application of the charging lien of the Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

WEIL:\97028542\2\41703.0010

3.       **Date of Distributions**

(a)       Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of **Error! Reference source not found.** of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)       In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

4.       **Disbursing Agent**

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.   The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records.  The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

5.       **Rights and Powers of Disbursing Agent**

(a)       From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)       A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

WEIL:\97028542\2\41703.0010

6.      **Expenses of Disbursing Agent**

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement.

7.      **No Postpetition Interest on Claims**

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

8.      **Delivery of Distributions**

(a)      Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)      Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture. All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture. To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)      As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan. All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and

70

documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

### 9.    Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10.    Unclaimed Property

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 11.    Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12.    Manner of Payment under Plan

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 13.    Satisfaction of Claims

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 14.    Fractional Stock and Notes

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary

71

to account for the rounding provided for in this Section 6.14. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors, Wind Down Estates, nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock.

## 15. Minimum Cash Distributions

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

## 16. Setoffs and Recoupments

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

## 17. Allocation of Distributions between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

## 18. No Distribution in Excess of Amount of Allowed Claim

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

## 19. Withholding and Reporting Requirements

(a)    *Withholding Rights*. In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making

72

any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)      *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors or Wind Down Estates or GUC Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  If such request is made by the GUC Trustee, or such other Entity designated by the GUC Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Trustee, the GUC Recovery Trust, or its respective property.

### 20.     Hart-Scott-Rodino Antitrust Improvements Act

Any New Common Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

### F.     Procedures for Disputed Claims

### 1.     Objections to Claims

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall exclusively be entitled to object to Claims.  After the Effective Date, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.  The expiration of such period shall not limit or affect the Debtors', Reorganized Debtors', Plan Administrators', or GUC Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

### 2.     Resolution of Disputed Administrative Expenses and Disputed Claims

On and after the Effective Date, the Debtors, (a) the Reorganized Debtors, or the Plan Administrator, as applicable, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Recovery Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court.  The Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the GUC Trustee shall cooperate with respect to any objections to Claims

73

that seek to convert Claims into General Unsecured Claims or General Unsecured Claims into other senior Claims, and the Debtors' rights and defenses to any such objections are fully preserved.

### 3.    Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 4.    Distributions after Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 5.    Disallowance of Claims

Except to the extent otherwise agreed to by the Debtors, Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable. All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 6.    Estimation of Claims

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee as to General Unsecured Claims, as applicable, may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

74

### 7. No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 8. Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 9. Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 10. Insured Claims

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## G. Executory Contracts and Unexpired Leases

### 1. General Treatment

(a)     As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of the Plan; (v) is identified in section 8.4 of the Plan; (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Solely with respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected by the Successful Bidder in accordance with the applicable purchase agreement.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Successful Bidder, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Successful Bidder, as

applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

### 2.    Determination of Assumption Disputes and Deemed Consent

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**.  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

WEIL:\97028542\2\41703.0010

(e)        Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 3.        Rejection Damages Claims

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).  Such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### 4.        Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) be rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

### 5. Intellectual Property Licenses and Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted in the Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 6. Tax Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted in the Plan, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 7. Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 8. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other

WEIL:\97028542\2\41703.0010

document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 9. Reservation of Rights

(a)    The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

(c)    Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

### H.    Conditions Precedent to Confirmation of Plan and Effective Date

### 1.    Conditions Precedent to Confirmation of Plan

The following are conditions precedent to confirmation of the Plan:

(a)    the Disclosure Statement Order shall have been entered;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)    the RSA shall not have been terminated and shall be in full force and effect; and

(d)    the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

### 2.    Conditions Precedent to Effective Date

(a)    The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

WEIL:\97028542\2\41703.0010

(i)        the Confirmation Order (in form and substance reasonably acceptable to the Creditors' Committee) shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)        an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)        all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)        all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(v)        the Creditors' Committee shall not have objected to or taken any other action that was inconsistent with or that would reasonably be expected to have prevented, interfered with, delayed, or impeded the confirmation and consummation of the Plan or approval of the Global Settlement; and

(vi)        all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

(b)        The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)        the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)        the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement, shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)        The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)        the applicable purchase agreement(s) shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(d)      Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### 3.      Waiver of Conditions Precedent

(a)      Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 1 and Section V.H.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Section 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; provided that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Creditors' Committee.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 4.      Effect of Failure of a Condition

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

### I.      Effect of Confirmation of Plan

### 1.      Vesting of Assets

(a)      On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates shall vest in the Reorganized Debtors or the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, Amended and Restated Credit Facility Documents, the Exit Warehouse Facilities Documents, or the Exit Working Capital Facility Documents.  On and after the Effective Date, the Reorganized Debtor may take any action,

including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)     On the Effective Date and solely with respect to the Sale Transaction, all property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, and the applicable purchase agreement.

## 2.     Binding Effect

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

## 3.     Discharge of Claims and Termination of Interests

In a Reorganization Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date; provided that Borrower Non-Discharged Claims shall not be discharged.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

## 4.     Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

## 5.     Injunction

(a)     **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

82

(b)        Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or against property or interests in property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)        By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

(d)        The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

6.        **Releases**

(a)        **Estate Releases**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in

83

their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, and the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order.

(b)        **Third-Party Releases**

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

(i)        the holders of Impaired Claims who voted to accept the Plan;

(ii)       the Consenting Term Lenders;

(iii)      holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots;

(iv)      the Creditors' Committee and each of its members in their capacity as such; and

(v)       with respect to any Entity in the foregoing clauses (i) through (iv), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or

84

contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.  The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

<p style="text-align:center">7.    Exculpation</p>

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

<p style="text-align:center">8.    Subordinated Claims</p>

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Trustee, solely with respect to Allowed General Unsecured Claims) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

<p style="text-align:center">9.    Retention of Causes of Action/Reservation of Rights</p>

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code.  The Reorganized Debtors or the GUC Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other

<p style="text-align:center">85</p>

legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

### 10. Solicitation of Plan

As of and subject to the occurrence of the Confirmation Date:  (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 11. Corporate and Limited Liability Company Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents; (iv) the Exit Working Capital Facility Documents; (v) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction; (vi) the GUC Recovery Trust Agreement; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 10.11 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### J. Retention of Jurisdiction

### 1. Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)      to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)      to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)      to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      to hear and determine all Fee Claims and Restructuring Expenses;

(i)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Global Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)      to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to resolve disputes concerning Disputed Claims or the administration thereof;

WEIL:\97028542\2\41703.0010

(o)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 2.      Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### K.      Miscellaneous Provisions

### 1.      Payment of Statutory Fees

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

### 2.      Substantial Consummation of the Plan

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.      Plan Supplement

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

WEIL:\97028542\2\41703.0010

### 4.  Request for Expedited Determination of Taxes

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

### 5.  Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness  by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 6.  Amendments

(a)     *Plan Modifications*.  Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Creditors' Committee, solely as it pertains to the Global Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)     *Other Amendments*.  Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

WEIL:\97028542\2\41703.0010

### 7. Effectuating Documents and Further Transactions

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8. Revocation or Withdrawal of Plan

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity. This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

### 9. Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Creditors' Committee and each professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Creditors' Committee.

### 10. Severability of Plan Provisions

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 11. Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties,

WEIL:\97028542\2\41703.0010

and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

### 12.    Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 13.    Dates of Actions to Implement the Plan

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 14.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 15.    Deemed Acts

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 16.    Successor and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

### 17.    Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 18.    Exhibits to Plan

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

WEIL:\97028542\2\41703.0010

**19.    Notices**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors or the Reorganized Debtors:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
Email: JHaas@ditech.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
        sunny.singh@weil.com

(b)    If to the Consenting Term Lenders:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 60654
Attn: Patrick J. Nash Jr., P.C.
Email:  patrick.nash@kirkland.com
Attn: John R. Luze
Email: john.luze@kirkland.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VI.
## VALUATION ANALYSIS

As described above, the Debtors are presently engaged in the Marketing Process.  The Debtors believe that the Marketing Process is the best method of valuing their business as it allows the market to speak as to their value.  The Marketing Process is a comprehensive and arm's length process with the goal of identifying counterparties for a potential transaction.  Accordingly, to ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims are

WEIL:\97028542\2\41703.0010

not, at this time, being disclosed herein and the Debtors are not filing a valuation analysis. *See* Section 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282). The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing. Further, if necessary, the Debtors will file, no later than the date that the Plan Supplement is filed, a valuation analysis and will serve notice thereon on holders of Claims in the Voting Class as promptly as practicable upon filing.

## VII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The issuance of and the distribution under the Plan of the New Common Stock shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. In reliance upon this exemption, the New Common Stock will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer. Further, based on the legislative history of Section 1145 of the Bankruptcy Code, a creditor who owns 10% or more of the voting securities of a reorganized debtor and/or has the right to appoint a director to the board of directors of a reorganized debtor may be presumed to be a control person, and therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of New Common Stock issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability. In order to preserve the ability to utilize tax attributes following the Effective Date, the charter, bylaws, and other organizational

WEIL:\97028542\2\41703.0010

documents, as applicable, of the Reorganized Debtors may restrict certain transfers of the New Common Stock.

_Legends_.  To the extent certificated, certificates evidencing the New Common Stock held by holders of 10% or more of the outstanding New Common Stock, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SHARES OF NEW COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE DEBTOR RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors (including the Reorganized Debtors) and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or equity interests who are unimpaired or deemed to reject the Plan and does not address the consequences of a Sale Transaction.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the "Medicare" tax on net investment income, persons subject to special accounting rules under Section 451(b) of the Code, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquired any of the New Common Stock or New Term Loan in the secondary market, unless otherwise provided herein.  This discussion assumes that the New Common Stock and the New Term Loans will be held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form.

94

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your own tax advisor for the U.S. federal, state, local, non-U.S., and other tax consequences applicable under the Plan.

## A.    Consequences to the Debtors

For U.S. federal income tax purposes, DHCP is a common parent of an affiliated group of corporations which files a single consolidated U.S. federal income tax return (the "**Ditech Group**"). The Debtors estimate that, as of January 1, 2019, the Ditech Group had incurred, for U.S. federal income tax purposes, a consolidated NOL (defined below) in excess of $20 million. In addition, the Ditech Group has substantial other deferred tax assets, including substantial tax basis in excess of the fair market value of its assets based upon the valuation of the Debtors. The amount of any such NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS. As discussed below, such NOL carryforwards and other tax attributes could, depending on the treatment under section 382 of the prior ownership change which occurred in connection with the WIMC Chapter 11 Case, be subject to current limitation. In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of DHCP independent of the Plan which could adversely affect the ability to fully utilize the Ditech Group's NOLs. In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing a protective equity trading order.

The U.S. federal income tax consequences to the Debtors with respect to the implementation of the Plan depend in part on whether the Debtors, in connection with Consenting Term Lenders, elects to consummate a potential Sale Transaction (as provided in the Restructuring Service Agreement). Absent such an election, the Plan provides for a Reorganization Transaction in which the holders of Term Loan Claims would receive New Common Stock and New Term Loans in satisfaction of the Term Loan Claims. As discussed below, in connection with the implementation of the Plan, the Debtors expect the amount of the Ditech Group's NOL carryforwards would be eliminated, and that other tax attributes (in particular, the adjusted basis in the Debtors' assets) will be reduced. In addition, the subsequent utilization of any loss and possibly other tax attributes remaining following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange. Because the Plan provides that holders of Term Loans will receive New Common Stock and New Term Loans, the amount of COD will depend in part on the fair market value of the New Common Stock and the issue price of the New Term Loan. This value, and, consequently, the amount of COD that will be realized by the Debtors as a result of the Plan, cannot be determined at this time.

Under section 108 of the Tax Code, any COD of a debtor is excluded from gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD that it excluded from gross income. As noted above, the amount of COD, and accordingly the amount of tax attributes required to be reduced, cannot be determined at this

95

time.  In general, tax attributes of the debtor will be reduced in the following order:  (a) net operating loss ("**NOLs**") and NOL carryovers; (b) general business credit carryovers; (c) alternative minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with excluded COD income may elect first to reduce the basis of its depreciable assets.  The reduction of the debtor's tax attributes occurs at the end of the tax year for which the excluded COD income is realized, but only after the tax for the year of the debt discharge has been determined; in this way, the attribute reduction is generally effective as of the start of the year following the discharge.  If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

<div align="center">

**2.**        **Limitation of NOL Carryforwards and Other Tax Attributes**

</div>

The WIMC Chapter 11 Case resulted in an "ownership change" of the Debtors under sections 382 and 383 of the Tax Code. With respect to that restructuring, Debtors will apply one of two special rules available under section 382 of the Tax Code in connection with an ownership change resulting from a court-ordered restructuring under chapter 11.  See general discussion of section 382 rules below.  A decision regarding which of those special rules Debtors will choose for the WIMC Chapter 11 Case must be made by the Reorganized Debtors in connection with filing their 2018 federal income tax return.  Until this point in time, the Debtors have planned to apply the rule in section 382(l)(5) (as generally described below), but have not finally decided which of the rules to apply to the WIMC Chapter 11 Case; that decision will be made based on further development and analysis of relevant facts.  The decision to use one or the other of these special rules under section 382 in respect of the WIMC Chapter 11 Case will affect both the ability to use the Debtors' NOLs and other attributes from the time of the 2018 emergence as well as the availability and ability to use such NOLs and other attributes following the Effective Date. If Debtors decide to have section 382(l)(5) apply to the WIMC Chapter 11 Case, then in connection with the ownership change of the Debtors which will result from the implementation of the Plan, the Debtors' NOLs and other tax attributes (that remain) may be rendered effectively useless for all future taxable periods following the Effective Date. If instead Debtors elect to have section 382(l)(6) (as generally described below) apply to the WIMC Chapter 11 Case, then the Debtors' NOLs and other attributes would be subject to limitation from the time of the 2018 emergence, and the attributes (that remain) may be even further limited as a result of the ownership change of the Debtors which will result from the implementation of the Plan.

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (collectively, "**Pre-Change Losses**") will be subject to additional limitations under section 382 and 383 of the Tax Code.  Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD income arising in connection with the Plan.

If a corporation undergoes an ownership change, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  The Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of its Pre-Change Losses will be subject to further limitation unless an exception to the general rules of section 382 and 383 of the Tax Code applies.

Generally, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the sixty (60) month period following the "ownership change" (up to the

<div align="center">

96

</div>

amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses, the deductibility of which will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change. It is currently uncertain whether the Ditech Group will have a net unrealized built-in loss or a net unrealized built-in gain as of the Effective Date.

<div align="center">(a)    <u>General Annual Limitation</u></div>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.51 percent for February, 2019).  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation (or the parent of the consolidated group) is generally determined immediately after (rather than before) the ownership change, but subject to certain adjustments (the "**382(l)(6) Exception**"); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any unused annual limitation may be carried forward and therefore available to be utilized in a subsequent taxable year. Where a corporation is subject to a prior annual limitation, both annual limitations apply, effectively subjecting any Pre-Change Losses which pre-date the prior ownership change to the more restrictive of the limitations.

<div align="center">(b)    <u>Section 382(l)(5) Bankruptcy Exception</u></div>

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). The IRS has in private letter rulings applied the 382(l)(5) Exception on a consolidated basis where the parent corporation is in bankruptcy.  Generally, qualified creditors are creditors who (1) hold their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and thereafter, (2) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred, or (3) in certain cases, do not become five percent (5%) shareholders of the reorganized corporation.

Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if the 382(l)(5) Exception applies, the Ditech Group's NOL carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two (2) years after the Effective Date, any further ownership change of the Ditech Group within a two-year period after the Effective Date would preclude the Ditech Group's utilization of any Pre-Change Losses at the time of the subsequent ownership change against future income. A future "ownership change" after such two-year period would subject the Reorganized Debtors to the general limitations under section 382.  A debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation described above (as to the prior ownership change in connection with the WIMC Chapter 11 Case, the Debtors have

<div align="center">97</div>

until the time for filing the federal income tax return for the Ditech Group for 2018 to decide about making such an election).

In order to preserve the potential to qualify for the 382(l)(5) Exception, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing certain procedures and potential restrictions on the accumulation of Claims with persons who are or will be substantial claimholders.

<div align="center">(c)    Section 382(l)(6) Bankruptcy Exception</div>

As described above, where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), the 382(l)(6) Exception will generally apply.  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering a complete elimination of its Pre-Change Losses.

### 3.    Transfer of GUC Recovery Trust Causes of Actions and other GUC Recovery Trust Assets

Pursuant to the Plan, on or before the Effective Date, the GUC Recovery Trust will be established, and on the Effective Date, all of the GUC Recovery Trust Assets will be transferred to the Liquidating Trust and a 50% undivided interest in the GUC Recovery Trust Causes of Actions will be distributed to the holders of the Term Loan Claims.  For U.S. federal income tax purposes, such transfers generally will be treated as if the Debtors sold such assets and causes of actions at then fair market value.  *See* Section E — "Tax Treatment of The GUC Recovery Trust," below.

### B.    Consequences to Holders of Term Loan Claims

This summary discusses the U.S. federal income tax consequences to holders of Term Loan Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders. The discussion below generally assumes that holders of Term Loan Claims will, as a class, vote to accept the Plan.  As used herein, the term "U.S. Holder" means a beneficial owner of Term Loan Claims, New Term Loans, or New Common Stock, that is for U.S. federal income tax purposes:

- •    an individual who is a citizen or resident of the United States;

- •    a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- •    an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- •    a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial

WEIL:\97028542\2\41703.0010

decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Term Loan Claims, New Term Loans, or New Common Stock, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

### 1.    Holders of Term Loan Claims

Pursuant to the Plan, and assuming a Reorganization Transaction occurs, holders of Allowed Term Loan Claims will receive New Common Stock, New Term Loans, and a Pro Rata share of a fifty percent (50%) undivided interest in (and thus in the net proceeds from) the GUC Recovery Trust Causes of Action (the "**50% Interest**"), in complete and final satisfaction of their Term Loan Claims.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of Term Loan Claims depends, in part, on whether the holders' Claim constitutes a "security" of the Debtors for U.S. federal income tax purposes. If a Term Loan Claim constitutes a security of the Debtors, then the receipt of New Term Loans, New Common Stock, and the 50% Interest should be treated as part of a tax "reorganization" for U.S. federal income tax purposes, in each case, with the consequences described below. If, on the other hand, a Term Loan Claim does not constitute a security of the Debtors, then the receipt of the consideration in exchange therefor will be treated as a fully taxable transaction.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. A holder of a Term Loan Claim is urged to consult its own tax advisor regarding the appropriate status for U.S. federal income tax purposes of its Term Loan Claim.

If each of the Term Loan Claims constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Stock, New Term Loans and the 50% Interest in exchange for Term Loan Claims would qualify for reorganization exchange treatment for U.S. federal income tax purposes. The classification as a reorganization exchange generally serves to defer the recognition of any taxable gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain to the extent the holder receives "boot" in the reorganization exchange, *i.e.,* consideration other than stock or "securities" of the exchanging company – namely, the 50% Interest and, if the New Term Loans are not considered "securities" for this purpose, the New Term Loans. Accordingly, a U.S. Holder will recognize any realized gain up to the total amount of boot received in exchange, which would equal the sum of the fair market value as of the Effective Date of the portion of the 50% Interest and the issue price of the New Term Loans received by the U.S. Holder in the exchange in respect of its Term Loans Claim (other than any portion received in respect of a Claim for for accrued but unpaid interest and possibly accrued original issue discount, or "**OID**"). In addition, even within an otherwise tax-free exchange, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not

99

previously included in income.  *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

If an exchange of Term Loan Claims treated as a reorganization, a U.S. Holder's aggregate tax basis in the New Term Loans (if such loans constitute "securities" for U.S. federal income tax purposes) and New Common Stock will equal such holder's aggregate adjusted tax basis in the Term Loan Claims exchanged therefor, increased by any gain or interest income recognized in the exchange, and decreased by the fair market value of the portion of the 50% Interest and, if the New Term loans do not constitute "securities," the issue price of the New Term Loans received in the exchange.  Such aggregate tax basis should be allocated among the New Common Stock and (if they constitute "securities") the New Term Loans in accordance with their relative fair market values.  In an exchange treated as a reorganization, a U.S. Holder's holding period in such carryover basis property will include its holding period in the Term Loan Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest and possibly accrued OID).  If the New Term Loans do not constitute "securities," then a U.S. Holder will have tax basis in the New Term Loan received equal to its issue price, and its holding period in such New Term Loan received should begin on the day following the exchange date.

If the exchange of a Term Loan Claim does not constitute a reorganization, the exchange will be taxable and the U.S. Holder of a Term Loan Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the issue price of the New Term Loans, the fair market value of the New Common Stock, and the fair market value of the portion of the 50% Interest received (other than any consideration received in respect of a Term Loan Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Term Loan Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* Section B.1(b)— "Character of Gain or Loss," below.  In addition, a U.S. Holder of a Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income.  *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

In the case of a taxable exchange, a U.S. Holder of Term Loan Claims will have a tax basis in the New Term Loans received equal to its issue price and a tax basis in the New Common Stock received equal to its fair market value.  The U.S. Holder's holding period in such New Term Loans and New Common Stock received should begin on the day following the exchange date.

The tax characterization of the 50% Interest as either an equity-type interest in the GUC Recovery Trust (even though receiving a direct undivided interest in the GUC Recovery Trust Causes of Action) or a separate property right is uncertain, and may depend in part on the terms and provisions of the GUC Recovery Trust Agreement.  Accordingly, each holder of a Term Loan Claim is urged to consult its tax adviser regarding the receipt and ownership of a portion of the 50% Interest, including the tax treatment of any income, loss and distributions from the GUC Recovery Trust.  *See* Section E — "Tax Treatment of The GUC Recovery Trust," below.  A U.S. Holder will have an aggregate tax basis in its undivided interest in the causes of action received equal to its fair market value, and the holder's holding period should begin on the day following the exchange date.

(a)    <u>Distributions in Discharge of Accrued Interest</u>

In general, to the extent that any exchange consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full.  However, the IRS has privately

ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Term Loan Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), consideration received in respect of a Term Loan Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remaining portion of such Allowed Claim, if any. *See* Section 6.17 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

(b)      Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Term Loan Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Term Loan Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Term Loan Claims from a prior holder at a "market discount" (relative to the principal amount of the Term Loan Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount. Under these rules, any gain recognized on the exchange of Term Loan Claims (other than in respect of a Term Loan Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Loan Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Term Loan Claim, such deferred amounts would become deductible at the time of the exchange but, if the exchange is a reorganization exchange, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of a Term Loan Claim that qualifies as a reorganization exchange, the Tax Code indicates that any accrued market discount in respect of the Term Loan Claim should not be currently includible in income under Treasury regulations to be issued, except to the extent of any gain recognized due to the receipt of boot. Any accrued market discount that is not included in income should carry over to any nonrecognition property received in exchange therefor (*i.e.,* for New Common Stock and, if treated as a "security" for U.S. federal income tax purposes, New Term Loans). Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Stock or New Term Loans should be treated as ordinary income to the extent of any accrued market discount carried over to such stock or loans not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

C.      **Disposition of New Common Stock**

WEIL:\97028542\2\41703.0010

Unless a nonrecognition provision applies and subject to the discussion above with respect to market discount and the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Stock in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Stock held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period for its New Common Stock is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Common Stock (or any stock or property received for such New Common Stock in a later tax-free exchange) received in exchange for a Term Loan Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Term Loan Claim, decreased by any income (other than interest income) recognized by the holder upon exchange of the Term Loan Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Term Loan Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### D.    Ownership and Disposition of the New Term Loan

The U.S. federal income tax consequences to a holder of a New Term Loan may depend on certain terms of the New Term Loan which have not yet been finalized. The final terms of the New Term Loan will be described at a later date in a Plan Supplement. Accordingly, depending on the final terms of the New Term Loan, the U.S. federal income tax consequences of owning and disposing of a New Term Loan may differ from that described below.

### 1.    Payment of Interest and OID on the New Term Loan

Stated interest paid on the New Term Loan will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received, in accordance with its method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Thus, the cash interest payable on the New Term Loan is expected to be treated as qualified stated interest. The remainder of the stated interest payable on the New Term Loan is payable by the issuance of additional notes ("**PIK interest**"); the amount of PIK interest payable on the New Term Loan will be included in the determination of the OID on such debt, as discussed below. Accordingly, the New Term Loan will be issued with OID to the extent of the PIK interest and, depending on the issue price of the New Term Loan, the New Term Loan may be issued with additional OID.

If the principal amount of the New Term Loan exceeds its issue price by more than a de minimis amount, then the New Term Loan will be considered to have been issued with OID for U.S. federal income tax purposes in the amount of such excess. For these purposes, the PIK interest will be included in the principal amount of the New Term Loan at maturity and taxed as part of OID. A U.S. Holder will be required to include any such OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

If the New Term Loan is not considered to be publicly traded, but a substantial portion of the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will be determined by reference to the fair market value of such publicly traded Term Loan Claims on the Effective Date. If the

102

New Term Loan is publicly traded, the issue price of the New Term Loan is its fair market value. If neither the New Term Loan nor the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will equal their stated principal amount. The determination of whether a debt instrument is "publicly traded" for these purposes depends on whether such instrument is traded on an established market. A debt instrument is traded on an established market for U.S. federal income tax purposes only if they are traded on an established market during the 31-day period ending 15 days after the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the debt instrument, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury regulations.

Under the applicable Treasury regulations, the Reorganized Debtors are required to determine whether the New Term Loan is publicly traded and, if so, the fair market value of the New Term Loan, and make these determinations available to holders in a commercially reasonable fashion, including by electronic publication, within ninety (90) days of the issue date of the New Term Loan. The Debtors intend to make this information available on our website. Our determination is binding on a U.S. Holder unless a U.S. Holder explicitly discloses on its tax return that its determination is different and the reasons for its determination (including how it determined the fair market value of its New Term Loan or Term Loan Claims, if applicable). The Debtors expect that the New Term Loan will be considered to be "publicly traded" for U.S. federal income tax purposes and that, accordingly, the issue price of the New Term Loan will equal their fair market value on the Effective Date.

### 2.   Market Discount on the New Term Loan

A U.S. Holder will have market discount with respect to a New Term Loan if its initial basis in any portion of the New Term Loan is less than the issue price of such portion of the New Term Loan, unless the difference is less than a specified de minimis amount. If a U.S. Holder's New Term Loan has market discount with respect to any portion of such New Term Loan and, if such holder so elects or has so elected, it will be required to include the market discount as ordinary income as it accrues, either on a ratable basis or on the basis of a constant-yield method. Any such election applies to all debt instruments with market discount that the U.S. Holder acquires on or after the first day of the first taxable year to which the election applies. In addition, the U.S. Holder may be required to defer, until the maturity of the New Term Loan, as applicable, or its earlier disposition (including in one of certain nontaxable transactions), the deduction of all or a portion of the interest expense on any indebtedness incurred or maintained to purchase or carry any portion of such New Term Loan with respect of which the U.S. Holder has market discount.

### 3.   Acquisition and Bond Premium on the New Term Loan

A U.S. Holder will have acquisition premium with respect to a New Term Loan if its initial basis in any portion of the New Term Loan, as applicable, exceeds the issue price of such portion of the New Term Loan but does not exceed the stated redemption price at maturity of such portion of the New Term Loan. If a U.S. Holder has acquisition premium with respect to a portion of the New Term Loan, it may reduce the amount of any OID accruing on such portion of the New Term Loan for any taxable year by a portion of the acquisition premium properly allocable to that year.

If a U.S. Holder's initial basis in any portion of the New Term Loan exceeds the stated redemption price at maturity of such portion of the New Term Loan, the excess generally will constitute amortizable bond premium and the U.S. Holder will not be required to include any OID attributable to its income with respect to such portion of the New Term Loan. Generally a U.S. Holder may elect to amortize this bond premium over the remaining term of such portion of the New Term Loan using a constant yield method and apply

103

the amortization to offset stated interest otherwise required to be included in income with respect to such portion of the New Term Loan.

### 4.    Disposition of the New Term Loan

Upon the sale or other taxable disposition of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the New Term Loan. A U.S. Holder's adjusted tax basis in a New Term generally will equal its initial tax basis in the New Term Loan, increased by any OID or market discount previously included in income with respect to the New Term Loan and decreased by payments on the New Term Loan other than payments of stated interest and any previously amortized bond premium. For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income. Except to the extent attributable to any accrued market discount not previously included in income, gain or loss recognized on the sale or other taxable disposition of a New Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the New Term Loan is treated as held for more than one year. Any gain attributable to accrued market discount not previously included in income will be recharacterized as ordinary income. Long-term capital gains recognized by non-corporate taxpayers are subject to reduced tax rates. The deductibility of capital losses is subject to significant limitations.

### E.    <u>Tax Treatment of The GUC Recovery Trust</u>

As indicated above, the Debtors will transfer the GUC Recovery Trust Assets to the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.

### 1.    Classification of the GUC Recovery Trust

The GUC Recovery Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.,* a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Recovery Trust will be structured with the intention of complying with such general criteria. In conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee and GUC Recovery Trust beneficiaries) will be required to treat the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust as (1) a transfer of the GUC Recovery Trust Assets (subject to any obligations relating to those assets) directly to GUC Recovery Trust beneficiaries (other than to the extent any GUC Recovery Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the GUC Recovery Trust of GUC Recovery Trust Assets in exchange for GUC Recovery Trust Interests. Accordingly, except in the event of contrary definitive guidance, GUC Recovery Trust beneficiaries as determined for U.S. federal income tax purposes – which, as discussed above and subject to the provisions of the GUC Recovery Trust Agreement, potentially could include holders of Term Loan Claims – will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of GUC Recovery Trust Assets (other than such GUC Recovery Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the GUC Recovery Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Recovery Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Recovery Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Recovery Trust and the holders of Claims could vary from those discussed herein.

WEIL:\97028542\2\41703.0010

     **2.**        **General Tax Reporting by the GUC Recovery Trust and GUC Recovery Trust Beneficiaries**

For all U.S. federal income tax purposes, all parties must treat the GUC Recovery Trust as a grantor trust of which holders of Claims who become GUC Recovery Trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors. Accordingly, GUC Recovery Trust beneficiaries are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the GUC Recovery Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The GUC Trustee will file tax returns for the GUC Recovery Trust treating the GUC Recovery Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury regulations. The GUC Trustee also shall annually send to each GUC Recovery Trust beneficiary a separate statement regarding the receipts and expenditures of the GUC Recovery Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the GUC Recovery Trust will be allocated among, and treated as directly earned and incurred by, the GUC Recovery Trust beneficiaries with respect to such GUC Recovery Trust beneficiary's undivided interest in the GUC Recovery Trust Assets (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income and the character and ability to use any loss will depend on the particular situation of the GUC Recovery Trust beneficiary.

In accordance with the GUC Recovery Trust Agreement, the GUC Trustee will make a good faith valuation of the GUC Recovery Trust Assets. All parties to the GUC Recovery Trust must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a GUC Recovery Trust beneficiary is not dependent on the GUC Recovery Trust distributing any Cash or other proceeds. Thus, a holder of a beneficial interest may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Recovery Trust's income even if the GUC Recovery Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Term Loan Claims), a distribution of Cash by the GUC Recovery Trust will not be separately taxable to a GUC Recovery Trust beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Recovery Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the GUC Recovery Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements (*see* section 6.19 of the Plan). Thus, in the case of any GUC Recovery Trust beneficiaries that are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the GUC Recovery Trust.

     **3.**        **Tax Reporting for Assets Allocable to Disputed Claims**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of an IRS private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (A) may elect to treat any GUC Recovery Trust Assets allocable to, or retained on account of,

WEIL:\97028542\2\41703.0010

Disputed Claims (a "**Disputed Claims Reserve**") as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the GUC Recovery Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the GUC Trustee and the GUC Recovery Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

### F.    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally will be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Term Loan Claim. All holders of Term Loan Claims are urged to consult their tax advisors concerning the federal, state, local, non U.S., and other tax consequences applicable under the Plan.

### IX.
### CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. ADDITIONAL RISK FACTORS IDENTIFIED IN THE COMPANY'S PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN DHCP'S ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017 FILED WITH THE SEC ON APRIL 16, 2018, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2018 FILED WITH THE SEC ON JUNE 6, 2018, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2018 FILED WITH THE SEC ON AUGUST 9, 2018, AND THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2018 FILED WITH THE SEC ON NOVEMBER 14, 2018 ARE HEREBY INCORPORATED BY REFERENCE. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.     Certain Bankruptcy Law Considerations

#### 1.     General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Company's business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Company's relationships with its key customers and employees. In addition, the bankruptcy proceedings may divert some of the attention of the Debtors' management away from business operations and the Company will incur additional expenses.

#### 2.     Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that it will receive the requisite acceptances to confirm the Plan, and even if the Voting Class (defined below) voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

#### 3.     Risk of Failing to Satisfy Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Class, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such

107

alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims and Parent Equity Interests as those proposed in the Plan.

### 4.    Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Parent Equity Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 5.    Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 9.3 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 6.    Risk of Termination of Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied. As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with GSEs, regulators, government agencies, vendors, suppliers, employees, and major customers. If the Restructuring Support Agreement is terminated, each vote or any consent given by any Consenting Term Lender prior to such termination will be deemed null and void *ab initio*. If the termination of the Restructuring Support Agreement takes place when Bankruptcy Court approval is required for a Consenting Term Lender to change or withdraw its vote to accept the Plan, the Company has agreed to support and not oppose any such attempt to change or withdraw a vote. Future termination of the Restructuring Support Agreement is an "Event of Default" under the Debtors' DIP Facilities. If the Debtors lose access to their DIP Facilities it may force the Debtors to liquidate the Company.

### 7.    Risk Related to Parties in Interest Objecting to Debtors' Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 8.    Risk Related to Possible Objections to Plan

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan. While the Debtors believe that the proposed Plan complies

with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

9.      Conversion to Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Article XII hereof, as well as the liquidation analysis, which will be filed no later than the date on which the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing (the "**Liquidation Analysis**"), for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests on a Debtor-by-Debtor basis.

B.      **Additional Factors Affecting Value of Reorganized Debtors**

1.      **Claims Could be More than Projected**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.    Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' Financial Projections and feasibility analysis, and that variation may be material.

2.      **Projections and Other Forward-Looking Statements are not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.  The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project.  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

C.      **Risks Relating to Debtors' Business and Financial Condition**

1.      **Risks Associated with Debtors' Business and Industry**

The Debtors' business is subject to extensive regulation by federal, state and local governmental and regulatory authorities. Further, in recent years the policies, laws, rules and regulations applicable to the Debtors' business have been rapidly evolving.  Such changes, as well as the actual or alleged failure to comply with applicable federal, state, and local laws and regulations, GSE, Ginnie Mae and other business counterparty requirements, or to implement and adhere to adequate remedial measures designed to address any identified compliance deficiencies, may have an adverse consequence on the Company or its business, in addition to the following factors, risks or uncertainties that may affect the Company or its business:

- Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

- Damage to the Debtors' reputation;

- Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

- The substantial resources (including senior management time and attention) the Company devotes to, and the significant compliance costs the Company incurs in connection with, regulatory compliance and regulatory examinations and inquiries, and any consume redress, fines, penalties or similar payments made in connection with resolving such matters;

- Uncertainties relating to interest curtailment obligations and any related financial and litigation exposure (including exposure relating to false claims);

- Potential costs and uncertainties, including the effect on future revenues, associated with and arising from litigation, regulatory investigations, and other legal proceedings, and uncertainties relating to the reaction of key counterparties to the announcement of any such matters;

- Dependence on GSEs and agencies (especially Fannie Mae, Freddie Mac and Ginnie Mae) and their residential loan programs and the Company's ability to maintain relationships with such entities, and uncertainties relating to the status and future role of GSEs and agencies;

- Ability to remain qualified as a GSE and agency approved seller, servicer or component servicer, including the ability to continue to comply with the GSEs' and agencies' respective residential loan selling and servicing guides;

- The ability to maintain the loan servicing, loan origination or collection agency licenses and/or third-party default specialists, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

- The ability to comply with the terms of the stipulated order resolving allegations arising from an Federal Trade Commission and CFPB investigation of Ditech Financial and RMS;

- The ability to comply with HUD Guidelines or VA regulations regarding mortgage loan conditions;

- Operational risks inherent in the mortgage servicing and mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

- Risks related to a significant amount of senior management turnover and employee reductions;

- Risks related to the substantial level of indebtedness, including ability to comply with covenants contained in debt agreements or obtain any necessary waivers or amendments, generate sufficient cash to service such indebtedness and refinance such indebtedness on favorable terms, if at all, as well as the ability to incur substantially more debt;

- The ability to maintain or grow the residential loan servicing or subservicing business and the mortgage loan originations business;

- The ability to achieve the Company's strategic initiatives, particularly the ability to: enter into new subservicing arrangements; improve servicing performance, successfully develop origination capabilities; and execute and realize planned operational improvements and efficiencies;

- The success of the business strategy in returning to sustained profitability;

- Changes in prepayment rates and delinquency rates on the loans serviced and subserviced;

- A downgrade of, other adverse change, relating to, or the Company's inability to improve the servicer rating or credit ratings;

- The Company's ability to collect reimbursements for servicing advances and earn and timely receive incentive payments and ancillary fees on the servicing portfolio;

- The ability to collect indemnification payments and enforce repurchase obligations relating to mortgage loans the Company purchases from correspondent clients and the ability to collect in a timely manner indemnification payments relating to servicing rights purchased from prior servicers;

- Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

- Risks associated with the reverse mortgage business, including changes to reverse mortgage programs operated by FHA, HUD, or Ginnie Mae; the Company's ability to accurately estimate interest curtailment liabilities; the Company's ability to fund HECM repurchase obligations; the Company's ability to fund principal additions on the HECM loans, and the Company's ability to securitize the HECM tails;

- Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;

- Risks and potential costs associated with technology and cybersecurity, including: the risks of technology failures and of cyber-attacks against us or our vendors; our ability to adequately respond to actual or attempted cyber-attacks; and our ability to implement adequate internal security measures and protect confidential borrower information;

- Risks and potential costs associated with the implementation of new or more current technology, the use of vendors, or the transfer of the Company's servers or other infrastructure to new data center facilities;

- Risks related to the Company's deferred tax asset, risk of an "ownership change," including uncertainties as to the Company's ability to preserve the tax assets through and after a bankruptcy filing;

- The ability to renew advance financing facilities or warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities;

- Risks related to the concentration of the Company's subservicing portfolio and the ability of the Company's subservicing clients to terminate the Company as a subservicer;

- The ability of Fannie Mae, Freddie Mac and Ginnie Mae, as well as other clients and credit owners, to transfer or otherwise terminate our servicing or subservicing rights, with or without cause;

- The effects of competition on existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

- The expiration of, or changes to, government mortgage modification, refinancing or other programs;

- The ability to comply with evolving and complex accounting rules, many of which involve significant judgment and assumptions;

- The ability to implement and maintain effective internal controls over financial reporting and disclosure controls and procedures;

- Uncertainties regarding impairment charges relating to the intangible assets of the Company;

- Risks related to the Company's relationship with Walter Energy;

111

- Administrative fines and financial penalties;
- Litigation, including class action lawsuits; and
- Civil and criminal liability.

## 2.    Loss of Subservicing Clients

The Company, as of December 31, 2018, subserviced 0.8 million forward and reverse loan accounts with an unpaid principal balance of $111.7 billion.  Under the Company's subservicing contracts, the primary servicers for whom the Company conducts subservicing activities have the right to terminate such contracts, with or without cause, with generally 60-90 days' notice.  In some instances, the subservicing contracts require payment to the Company of deboarding, deconversion or other fees in connection with any termination thereof, while in other instances there is little to no consideration owed to the Company in connection with the termination of subservicing contract.  The Company's business may suffer significant hardship if these subservicing contracts are terminated.

As described above, on January 17, 2019, the Company received notice from NRM, its largest subservicing customer, terminating the Subservicing Agreement for cause.  The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice.  NRM asserts that the Termination Notice was properly issued, was based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement.  The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.  The Company is evaluating the impact, if any, of any fees and costs payable in connection with the termination of the Subservicing Agreement.

## 3.    Downgrade in the Company's Servicer Ratings

Standard & Poor's and Moody's rate the Company as a residential loan servicer.  Certain of these ratings have been downgraded in the past, and any of these ratings may be downgraded in the future.  Any such downgrade could adversely affect the Company, financial condition, or results of operations, as well as the Company's ability to finance servicing advances and maintain the Company's status as an approved servicer by Fannie Mae, Freddie Mac, and Ginnie Mae.  The Company's failure to maintain favorable or specified ratings may cause the Company's termination as servicer and further impair the Company's ability to consummate future servicing transactions.

## 4.    Risk of Ginnie Mae, Fannie Mae, and Freddie Mac Termination

Under the terms of the Ginnie MBS Guide and the required Ginnie Mae Guaranty Agreement that is executed in connection with each GMBS the Company issues (together with related documents, the "**Ginnie Mae Guaranty Agreement**"), Ginnie Mae may terminate Ditech Financial for cause as the issuer of GMBS and as servicer of the underlying mortgage loans, and transfer all of Ditech Financial's rights as issuer and servicer, including the servicing rights relating to the mortgage loans underlying the GMBS issued by the Company, to a third party without payment to the Company of any consideration in connection therewith.  Events that could allow Ginnie Mae to terminate the Company as issuer and servicer include, without limitation, the impending or actual insolvency of Ditech Financial; any withdrawal or suspension of Ditech Financial's status as an approved mortgagee by FHA or an approved seller/servicer by Fannie Mae or Freddie Mac; or any change to Ditech Financial's business condition which materially and adversely affects its ability to carry out its obligations as an approved Ginnie Mae issuer.  A default by Ditech Financial's affiliate, RMS, under RMS's Ginnie Mae Guaranty Agreements may also result in an event of default under Ditech Financial's Ginnie Mae Guaranty Agreement under a cross-default agreement among Ginnie Mae, Ditech Financial, and RMS, which could result in the Company's termination as issuer and servicer of all

112

GMBS and HMBS. If the Company were to have the Ginnie Mae issuer and servicing rights transferred or otherwise terminated, this could materially and adversely affect the Company's business, financial condition, liquidity and results of operations.

Under the terms of Ditech Financial's master servicing agreement (including any amendments and addendums thereto) with Fannie Mae, Fannie Mae has the ability to terminate Ditech Financial as servicer for some or all of the Fannie Mae loans it services, with or without cause. In connection with such termination by Fannie Mae without cause, Ditech Financial would have a right to a specified termination fee; however, in connection with such termination by Fannie Mae for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer. Events that could allow Fannie Mae to terminate Ditech Financial for cause as servicer of some or all of the Fannie Mae loans include, without limitation, a breach of the mortgage selling and servicing contract by Ditech Financial; unacceptable performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things, servicer performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things, servicer performance measurements and any written performance improvement plan; Ditech Financial's insolvency, the adjudication of Ditech Financial as bankrupt or the execution by Ditech Financial of a general assignment for the benefit of its creditors; any change in Ditech Financial's financial status that, in Fannie Mae's opinion, materially and adversely affects Ditech Financial's ability to provide satisfactory servicing of mortgages; the sale of a majority interest in Ditech Financial without Fannie Mae's prior written consent; a change in Ditech Financial's financial or business condition, or in its operations, which, in Fannie Mae's sole judgment, is material and adverse; Ditech Financial has certain delinquency rates or REO Property rates more than 50% higher than the average of such rates for certain specified Fannie Mae portfolios; and any judgment, order, finding, or regulatory action to which Ditech Financial is subject that would materially and adversely affect Ditech Financial's ability to comply with the terms or conditions of its Fannie Mae contract. In addition, a default by Ditech Financial's affiliate, RMS, under RMS's agreements with Fannie Mae may also result in an event of default under Ditech Financial's Fannie Mae contract under a cross-default agreement.

Under the terms of Ditech Financial's master servicing agreement and the Freddie Mac Seller/Servicer Guide (including any amendments and addendums thereto), Freddie Mac has the ability to terminate Ditech Financial as servicer for some or all of the Freddie Mac loans it services, with or without cause. If Freddie Mac terminated Ditech Financial without cause, Ditech Financial would have a right to a specified termination fee; however, if Freddie Mac terminates Ditech Financial as servicer for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer. Events that could allow Freddie Mac to terminate Ditech Financial for cause as servicer of some or all of the Freddie Mac loans include, without limitation, the impending or actual insolvency of Ditech Financial or an affiliate thereof; the filing of a voluntary petition by Ditech Financial or an affiliate thereof under federal bankruptcy or state insolvency laws; Ditech Financial's failure to maintain qualified staff and/or adequate facilities to assure the adequacy of servicing Freddie Mac loans; any weakness or notable change in the financial or organizational status or management of Ditech Financial or an affiliate thereof, including any adverse change in profitability or liquidity that, in the opinion of Freddie Mac, could adversely affect Freddie Mac; Ditech Financial's failure to meet any eligibility requirement, including failure to maintain acceptable net worth or other indicia of financial soundness; Ditech Financial having delinquency rates or REO rates higher than certain averaged; and Freddie Mac's determination that Ditech Financial's overall performance is unacceptable (taking into account, among other things, scorecard results that rate absolute and comparative performance with respect to various measures such as loss mitigation, workout effectiveness, default timeline management, data integrity, investor reporting, and alternatives to foreclosure).

113

### 5. DIP Facilities

The DIP Facilities are intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

Relatedly, the continuation of the National Founders Facility is necessary for RMS's servicing activities during the Chapter 11 Cases. There can be no assurance that National Founders will continue to provide RMS access to postpetition credit for servicing advances or that it would agree to forbear from seeking to enforce remedies against RMS's non-debtor affiliate, each of which would materially disrupt the Debtors' business.

### 6. Post-Effective Date Indebtedness

Following the Effective Date, in the Reorganization Transaction only, the Reorganized Debtors expect to have outstanding funded debt of up to approximately $550 million. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Debtors' compliance with affirmative and negative covenants, the Debtors' future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D. Factors Relating to Securities to be Issued Under Plan, Generally

### 1. Market for Securities

There is currently no market for the New Common Stock and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

### 2. Potential Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including under the Management Incentive Plan.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock. The amount and dilutive effect of any of the foregoing could be material.

114

E.        **Risk Related to Obtaining Exit Financing**

During the course of these Chapter 11 Cases, the Debtors will solicit commitments to provide exit financing to refinance the DIP Facilities prior to the Effective Date.  However, there is no assurance that such commitments will be obtained, which will hinder the Debtors' ability to consummate the Reorganization Transaction.  As of the date of this Disclosure Statement, the Debtors have not received any commitment for an Exit Working Capital Facility.  Even if the Debtors are able to obtain a commitment for an Exit Working Capital Facility, there can be no assurance that the Reorganized Debtors will be able to meet the terms of such exit facility and there is a risk that the Reorganized Debtors default thereunder and the lenders take enforcement action against the Reorganized Debtors, including execution or foreclosure against assets of the Reorganized Debtors.

F.        **Risks Related to Investment in New Common Stock**

1.        **Significant Holders**

Pursuant to the Plan, certain holders of Term Loan Claims may acquire a significant ownership interest in the New Common Stock.  If such holders of New Common Stock were to act as a group, such holders would be in a position to control all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

2.        **Equity Interests Subordinated to Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock will rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to its debt holders have been satisfied.

3.        **Implied Valuation of New Common Stock Not Intended to Represent Trading Value of New Common Stock**

The valuation of the Reorganized Debtors may not represent the trading value of the New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities.  The actual market price of the New Common Stock is likely to be volatile.  Many factors including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

4.        **No Intention to Pay Dividends**

The Reorganized Debtors do not anticipate paying any dividends on the New Common Stock as they expect to retain any future cash flows for debt reduction and to support operations.  As a result, the success of an

115

investment in the New Common Stock will depend entirely upon any future appreciation in the value of the New Common Stock. There is, however, no guarantee that the New Common Stock will appreciate in value or even maintain its initial value.

### 5. The New Common Stock May be Subject to Further Dilution

The New Common Stock to be issued on the Effective Date is subject to dilution from the Management Incentive Plan. In addition, in the future, the Company may issue equity securities in connection with future investments, acquisitions or capital rising transactions. Such issuances or grants could constitute a significant portion of the then-outstanding common stock, which may result in a dilution in ownership of common stock, including shares of New Common Stock issued pursuant to the Plan.

### G. Additional Factors

### 1. Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2. Debtors Have no Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside Disclosure Statement are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VIII hereof.

**X.**
**VOTING PROCEDURES AND REQUIREMENTS**

A.   **Voting Deadline**

Before voting to accept or reject the Plan, each Eligible Holder (defined below) as of the Voting Record Date should carefully review the Plan attached hereto as Exhibit A.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots will be provided for holders of Voting Claims as of the Voting Record Date (May 8, 2019) to vote to accept or reject the Plan (a "**Ballot**").  Only holders of Class 3 Claims (Term Loan Claims) (the "**Eligible Holders**") are entitled to vote to accept or reject the Plan.  Because Classes 1, 2, 6 (in a Reorganization Transaction), 7, and 8 are unimpaired and deemed to accept, and Classes 4, 5, 6 (in a Sale Transaction), 9, and 10 are conclusively deemed to reject, only Class 3 is entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

The Debtor has engaged Epiq Corporate Restructuring, LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

THE VOTING DEADLINE IS 4:00 P.M., PREVAILING EASTERN TIME, ON JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

CLASS 3:  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.

Delivery of a Ballot must conform to the instructions on the Ballot.  Mailed Ballots must be returned by the Voting Deadline with an original signed copy to:

By Overnight Courier or Hand Delivery:

**DITECH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING, LLC**
**10300 SW ALLEN BOULEVARD**
**BEAVERTON, OREGON 97005**

By First Class Mail:

**DITECH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING, LLC**
**P.O. BOX 4422**
**BEAVERTON, OREGON 97076-4422**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE APPLICABLE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.  THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS.  THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.   AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

### B. <u>Voting Procedures</u>

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record holders of the Term Loan Claims.  In order to vote, holders of Term Loan Claims should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

### C.     Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of:  (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Class 3 (Term Loan Claims) is impaired under the Plan and the only Class of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Class**" or the "**Voting Claims**").

Claims in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article I of this Disclosure Statement.

118

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject, Parent Equity Interests, and Subordinated Securities Claims. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article XI of this Disclosure Statement.

### 1.    Miscellaneous

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, will supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of the Term Loan Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 2.    Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORs RESERVE THE RIGHT, IN their SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 3. Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept:  (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, and 10.7 of the Plan.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

### 4. Change of Vote

Subject to the terms of the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### 5. Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## XI.
## CONFIRMATION OF PLAN

### A. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

### B. Objections to Confirmation

WEIL:\97028542\2\41703.0010

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (d) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York; (e) be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof; and (f) be served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)     **The Debtor at:**

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn:  John Haas, General Counsel, Chief Legal Officer and Secretary

(b)     **Office of the U.S. Trustee at:**

William K. Harrington, U.S. Department of Justice
Office of the U.S. Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Attn:    Greg M. Zipes, Esq.
         Benjamin J. Higgins, Esq.

(c)     **Counsel to the Debtors at:**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh, Esq.

(d)     **Counsel to the Prepetition Administrative Agent at:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York, 10017
Attn:    Brian M. Resnick, Esq.
         Michelle M. McGreal, Esq.

(e)     **Counsel to the Term Loan Ad Hoc Group at:**

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:    Patrick J. Nash Jr., P.C.
         John Luze, Esq.

(f)     **Counsel to the DIP Agent and DIP Lender at:**

121

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attn:   Sarah M. Ward, Esq.
        Mark A. McDermott, Esq.
        Melissa Tiarks, Esq.

(g)     **Counsel to Nomura Corporate Funding Americas, LLC at:**

Jones Day
250 Vesey Street
New York, New York 10281
Attn:  Ben Rosenblum, Esq.

(h)     **Counsel to the Creditors' Committee at:**

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attn:   Robert J. Feinstein, Esq.
        Bradford J. Sandler, Esq.s
        Steven W. Golden, Esq.

        - and -

Rich Michaelson Megaliff, LP
335 Madison Avenue, 9th Floor
New York, New York 10017
Attn:   Robert N. Michaelson, Esq.
        Elwood F. Collins, Esq.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.      <u>**Requirements for Confirmation of Plan**</u>

1.      **Requirements of Section 1129(a) of Bankruptcy Code**

(a)     <u>General Requirements</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)      the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

WEIL:\97028542\2\41703.0010

(iii)     the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)     any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)     <u>Best Interests Test</u>

123

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis (which will be filed no later than the date the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing).[18]

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis will be provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and will be on a Debtor-by-Debtor basis with a summary on a consolidated basis. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as Exhibit D.[19] Based upon the Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that

---

[18]    Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process. *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process).

[19]    The Debtors will file updated projections in the event of the occurrence of unanticipated events that result in material changes to the projections.

confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Section VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)    Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2.    Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 9 (Parent Equity Interests) and Claims in Class 4 (Second Lien Note Claims), Class 5 (General Unsecured Claims), and Class 9 (Subordinated Securities Claims) will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

(a)    Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

(i)    *Other Secured Creditors*

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments

having a value, as of the effective date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)    *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.  The Plan provides that the holders of General Unsecured Claims in Class 5 will receive the treatment summarized above in Article V of this Disclosure Statement.

(iii)    *Equity Interests*

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, all Intercompany Equity Interests will be cancelled, reinstated, or receive such other treatment as is determined by the Debtors and the Requisite Term Lenders and the holders of Parent Equity Interests will neither receive nor retain any property on account of such interests.

## XII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either:  (i) a reorganization and continuation of the Debtors' business or (ii) an orderly liquidation of the Debtors' assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets through a stand-alone alternative transaction under section 363 of the Bankruptcy Code.  Upon analysis and consideration of this alternative, the Debtors do not believe that a stand-alone alternative sale of their assets under section 363 of the Bankruptcy Code (as opposed to the consummation of the Sale Transaction pursuant to the Plan) would yield a higher recovery for holders of Claims and Interests than the Plan.

### C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

126

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis that the Debtors will file no later than the date that the Plan Supplement is filed.

As noted in Article XII of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

WEIL:\97028542\2\41703.0010

# XIII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 to vote in favor thereof.

Dated: May 9, 2019

**DEBTORS**

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By:  /s/ Kimberly Perez
      Name: Kimberly Perez

      Title:   Senior Vice President and Chief
      Accounting Officer

128

**<u>DEBTORS</u>**

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By:  /s/ Laura Reichel
      Name: Laura Reichel

      Title:  President

**<u>DEBTOR</u>**

**MARIX SERVICING LLC**

By:   /s/ Clinton Hodder
      Name: Clinton Hodder

      Title:   President

**<u>DEBTORS</u>**

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By:   /s/ Jeanetta Brown
           Name: Jeanetta Brown

           Title:   Vice President

**Exhibit A**

**The Joint Chapter 11 Plan**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                            :
In re                                       :    Chapter 11
                                            :
DITECH HOLDING CORPORATION, *et al.*,       :    Case No. 19-10412 (JLG)
                                            :
                Debtors.[1]                 :    (Jointly Administered)
                                            :
---------------------------------------------------------------X

## AMENDED JOINT CHAPTER 11 PLAN OF DITECH
## HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated:  May 9, 2019
            New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

## Table of Contents

<div align="right">Page</div>

**ARTICLE I**   DEFINITIONS AND INTERPRETATION. ................................................................ 1

    A.    Definitions ................................................................................................ 1
    B.    Interpretation; Application of Definitions and Rules of Construction............................ 14
    C.    Reference to Monetary Figures. ................................................................... 14
    D.    Controlling Document. ............................................................................... 15
    E.    Certain Consent Rights. .............................................................................. 15

**ARTICLE II**   ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS..................................... 15

    2.1.    Administrative Expense Claims. .................................................................. 15
    2.2.    Fee Claims. ............................................................................................. 15
    2.3.    Priority Tax Claims. .................................................................................. 16
    2.4.    DIP Claims. ............................................................................................. 16
    2.5.    Restructuring Expenses. ............................................................................. 17

**ARTICLE III**   CLASSIFICATION OF CLAIMS AND INTERESTS. ........................................ 17

    3.1.    Classification in General. ........................................................................... 17
    3.2.    Grouping of Debtors for Convenience Only. .................................................. 17
    3.3.    Summary of Classification. ......................................................................... 17
    3.4.    Special Provision Governing Unimpaired Claims............................................. 18
    3.5.    Elimination of Vacant Classes. .................................................................... 18

**ARTICLE IV**   TREATMENT OF CLAIMS AND INTERESTS. ............................................... 18

    4.1.    Priority Non-Tax Claims (Class 1).............................................................. 18
    4.2.    Other Secured Claims (Class 2).................................................................. 19
    4.3.    Term Loan Claims (Class 3)....................................................................... 19
    4.4.    Second Lien Notes Claims (Class 4). ........................................................... 20
    4.5.    General Unsecured Claims (Class 5). ........................................................... 21
    4.6.    Borrower Non-Discharged Claims (Class 6)................................................... 21
    4.7.    Intercompany Claims (Class 7). .................................................................. 22
    4.8.    Intercompany Interests (Class 8). ................................................................ 22
    4.9.    Parent Equity Interests (Class 9) ................................................................. 23
    4.10.    Subordinated Securities Claims (Class 10)..................................................... 23

**ARTICLE V**   MEANS FOR IMPLEMENTATION. ............................................................... 24

    5.1.    No Substantive Consolidation. ..................................................................... 24
    5.2.    Compromise and Settlement of Claims, Interests, and Controversies............................ 24
    5.3.    Marketing Process. .................................................................................... 26
    5.4.    Election Notice. ....................................................................................... 26
    5.5.    Sources of Consideration for Plan Distributions. ............................................. 27
    5.6.    Sale Transaction. ...................................................................................... 27
    5.7.    Reorganization Transaction. ....................................................................... 28
    5.8.    Fannie Mae; Freddie Mac; Ginnie Mae......................................................... 31
    5.9.    Employee Matters..................................................................................... 33

i

Table of Contents
(continued)

| | | |
|---|---|---|
| 5.10. | Effectuating Documents; Further Transactions. | 33 |
| 5.11. | Section 1145 Exemption. | 34 |
| 5.12. | Cancellation of Existing Securities and Agreements. | 34 |
| 5.13. | Cancellation of Liens. | 36 |
| 5.14. | Subordination Agreements. | 36 |
| 5.15. | Nonconsensual Confirmation. | 36 |
| 5.16. | Closing of Chapter 11 Cases. | 36 |
| 5.17. | Notice of Effective Date. | 37 |
| 5.18. | Separability. | 37 |
| 5.19. | GUC Recovery Trust. | 37 |

**ARTICLE VI  DISTRIBUTIONS. ............ 39**

| | | |
|---|---|---|
| 6.1. | Distributions Generally. | 39 |
| 6.2. | Distribution Record Date. | 39 |
| 6.3. | Date of Distributions. | 40 |
| 6.4. | Disbursing Agent. | 40 |
| 6.5. | Rights and Powers of Disbursing Agent. | 40 |
| 6.6. | Expenses of Disbursing Agent. | 41 |
| 6.7. | No Postpetition Interest on Claims. | 41 |
| 6.8. | Delivery of Distributions. | 41 |
| 6.9. | Distributions after Effective Date. | 42 |
| 6.10. | Unclaimed Property. | 42 |
| 6.11. | Time Bar to Cash Payments. | 42 |
| 6.12. | Manner of Payment under Plan. | 43 |
| 6.13. | Satisfaction of Claims. | 43 |
| 6.14. | Fractional Stock and Notes. | 43 |
| 6.15. | Minimum Cash Distributions. | 43 |
| 6.16. | Setoffs and Recoupments. | 43 |
| 6.17. | Allocation of Distributions between Principal and Interest. | 43 |
| 6.18. | No Distribution in Excess of Amount of Allowed Claim. | 44 |
| 6.19. | Withholding and Reporting Requirements. | 44 |
| 6.20. | Hart-Scott-Rodino Antitrust Improvements Act. | 44 |

**ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS. ............ 45**

| | | |
|---|---|---|
| 7.1. | Objections to Claims. | 45 |
| 7.2. | Resolution of Disputed Administrative Expenses and Disputed Claims. | 45 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 45 |
| 7.4. | Distributions after Allowance. | 45 |
| 7.5. | Disallowance of Claims. | 45 |
| 7.6. | Estimation of Claims. | 46 |
| 7.7. | No Distributions Pending Allowance. | 46 |
| 7.8. | Claim Resolution Procedures Cumulative. | 46 |
| 7.9. | Interest. | 46 |

Table of Contents
(continued)

Page

7.10.    Insured Claims. ................................................................ 46

**ARTICLE VIII**  EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ................................... 47

8.1.    General Treatment. ................................................................ 47
8.2.    Determination of Assumption Disputes and Deemed Consent. .................... 47
8.3.    Rejection Damages Claims. ................................................................ 48
8.4.    Insurance Policies. ................................................................ 49
8.5.    Intellectual Property Licenses and Agreements. ................................ 49
8.6.    Tax Agreements. ................................................................ 49
8.7.    Assignment. ................................................................ 50
8.8.    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements. ................................................................ 50
8.9.    Reservation of Rights. ................................................................ 50

**ARTICLE IX**  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
        EFFECTIVE DATE. ................................................................ 51

9.1.    Conditions Precedent to Confirmation of Plan. ................................ 51
9.2.    Conditions Precedent to Effective Date. ................................ 51
9.3.    Waiver of Conditions Precedent. ................................ 52
9.4.    Effect of Failure of a Condition. ................................ 53

**ARTICLE X**  EFFECT OF CONFIRMATION OF PLAN. ................................ 53

10.1.    Vesting of Assets. ................................................................ 53
10.2.    Binding Effect. ................................................................ 53
10.3.    Discharge of Claims and Termination of Interests. ................ 54
10.4.    Term of Injunctions or Stays. ................................ 54
10.5.    Injunction. ................................................................ 54
10.6.    Releases. ................................................................ 55
10.7.    Exculpation. ................................................................ 56
10.8.    Subordinated Claims. ................................................................ 57
10.9.    Retention of Causes of Action/Reservation of Rights. ................ 57
10.10.   Solicitation of Plan. ................................................................ 57
10.11.   Corporate and Limited Liability Company Action. ................ 58

**ARTICLE XI**  RETENTION OF JURISDICTION. ................................ 58

11.1.    Retention of Jurisdiction. ................................ 58
11.2.    Courts of Competent Jurisdiction. ................................ 60

**ARTICLE XII**  MISCELLANEOUS PROVISIONS. ................................ 60

12.1.    Payment of Statutory Fees. ................................ 60
12.2.    Substantial Consummation of the Plan. ................................ 60
12.3.    Plan Supplement. ................................................................ 60

iii

## Table of Contents
(continued)

| | | |
|---|---|---|
| 12.4. | Request for Expedited Determination of Taxes. | 60 |
| 12.5. | Exemption from Certain Transfer Taxes. | 60 |
| 12.6. | Amendments. | 61 |
| 12.7. | Effectuating Documents and Further Transactions. | 61 |
| 12.8. | Revocation or Withdrawal of Plan. | 61 |
| 12.9. | Dissolution of Creditors' Committee. | 62 |
| 12.10. | Severability of Plan Provisions. | 62 |
| 12.11. | Governing Law. | 62 |
| 12.12. | Time. | 62 |
| 12.13. | Dates of Actions to Implement the Plan. | 63 |
| 12.14. | Immediate Binding Effect. | 63 |
| 12.15. | Deemed Acts. | 63 |
| 12.16. | Successor and Assigns. | 63 |
| 12.17. | Entire Agreement. | 63 |
| 12.18. | Exhibits to Plan. | 63 |
| 12.19. | Notices. | 63 |

WEIL:\97029875\1\41703.0011

Each of Ditech Holding Corporation, DF Insurance Agency LLC, Ditech Financial LLC, Green Tree Credit LLC, Green Tree Credit Solutions LLC, Green Tree Insurance Agency of Nevada, Inc., Green Tree Investment Holdings III LLC, Green Tree Servicing Corp., Marix Servicing LLC, Mortgage Asset Systems, LLC, REO Management Solutions, LLC, Reverse Mortgage Solutions, Inc., Walter Management Holding Company LLC, and Walter Reverse Acquisition LLC (each, a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.

## ARTICLE I    DEFINITIONS AND INTERPRETATION.

A.    **Definitions.**  The following terms shall have the respective meanings specified below:

1.1    *Accepting Class* means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

1.2    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; (d) the DIP Claims; and (e) any other such claims expressly provided under the DIP Order.

1.3    *Affiliates* means "Affiliates" as such term is defined in section 101(2) of the Bankruptcy Code.

1.4    *Allowed* means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, Reorganized Debtors, GUC Trustee, or Plan Administrator, as applicable; (c) as to which the liability of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors or GUC Recovery Trust, as applicable, shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.5    *Amended and Restated Credit Facility* means, solely with respect to the Reorganization Transaction, the credit facility available under the Amended and Restated Credit Facility Agreement in an aggregate principal amount equal to $400,000,000 with Reorganized Ditech, as borrower, in accordance with and subject to the terms and conditions of the Amended and Restated Credit Facility Documents.

1.6    *Amended and Restated Credit Facility Agent* means an Entity appointed to serve as the administrative agent and collateral agent under the Amended and Restated Credit Facility Agreement, and its successors and assigns, solely in its capacity as such.

1.7 ***Amended and Restated Credit Facility Agreement*** means, solely with respect to the Reorganization Transaction, that certain credit agreement that amends and restates the Prepetition Credit Agreement, dated as of the Effective Date, among Reorganized Ditech, as borrower, the Amended and Restated Credit Facility Agent, solely in its capacity as administrative agent and collateral agent, and the Term Lenders, which shall be consistent with the terms in the RSA.

1.8 ***Amended and Restated Credit Facility Documents*** means, solely with respect to the Reorganization Transaction, collectively, the Amended and Restated Credit Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time.

1.9 ***Amended Organizational Documents*** means, solely with respect to the Reorganization Transaction, the forms of certificates of incorporation, certificates of formation, limited liability company agreements, or other forms of organizational documents and bylaws, as applicable, of the Reorganized Debtors.

1.10 ***Asset*** means all of the right, title, and interest of the Debtors in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

1.11 ***Asset Sale Proceeds*** means the net proceeds of an Asset Sale Transaction.

1.12 ***Asset Sale Transaction*** means the sale of a portion of the Debtors' assets consummated on or as soon as reasonably practicable after the Effective Date other than (i) a sale in the ordinary course of business, (ii) in connection with the Exit Working Capital Facility, or (iii) a Sale Transaction; *provided*, that such sale shall be conducted in accordance with the terms of the RSA and the DIP Order.

1.13 ***Assumption Dispute*** means a pending objection relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.14 ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan that will be included in the Plan Supplement.

1.15 ***Ballot*** means the form(s) distributed to holders of Impaired Claims entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

1.16 ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.17 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

1.18 ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.19    ***Benefit Plans*** means each (a) "employee benefit plan," as defined in section 3(3) of ERISA and (b) all other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of its current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests or consideration based on the value of Interests, in the Debtors.

1.20    ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction or Asset Sale Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise in accordance with the RSA and the DIP Order.

1.21    ***Bidding Procedures Order*** means the *Order (I) Approving Bidding Procedures, (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* (ECF No. 456).

1.22    ***Borrower*** means any individual, as of the Commencement Date, whose current or former mortgage loan or reverse mortgage was originated, serviced, sold, consolidated, or owned by any of the Debtors.

1.23    ***Borrower Non-Discharged Claims*** means a Claim of a Borrower of the kind set forth on Schedule 1 of this Plan.

1.24    ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.25    ***Cash*** means legal tender of the United States of America.

1.26    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.27    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court.

1.28    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.29    ***Class*** means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

WEIL:\97029875\1\41703.0011

1.30     ***Commencement Date*** means the date on which the Debtors commenced the Chapter 11 Cases.

1.31     ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.32     ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.33     ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.34     ***Consenting Term Lenders*** means the Term Lenders that are party to the RSA together with their respective successors and permitted assigns and any subsequent Term Lenders that become party to the RSA in accordance with the terms of the RSA.

1.35     ***Contributed Sale Proceeds*** means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), an amount of Cash equal to one and a half percent (1.5%) of Net Cash Proceeds distributed to the holders of Allowed Term Loan Claims in excess of seventy percent (70%) of Allowed Term Loan Claims, excluding distributions on account of proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement.  For the avoidance of doubt, when calculating Contributed Sale Proceeds, the Contributed Sale Proceeds shall not be subtracted from the Net Cash Proceeds notwithstanding anything to the contrary in the Plan.

1.36     ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.37     ***Creditors' Committee Budget*** means the reasonable and documented fees and expenses in an amount not exceeding $300,000 per month incurred by the Creditors' Committee's advisors from the date of entry of the Disclosure Statement Order through and including the Effective Date; provided, that any amounts incurred by the Creditors' Committee's advisors in connection with (i) defending against objections to or prosecuting the approval of the Global Settlement shall be excluded from such calculation and (ii) preserving the economic benefits contemplated in the Global Settlement.

1.38     ***Cure Amount*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.39     ***Debtor or Debtors*** has the meaning set forth in the introductory paragraph of the Plan.

1.40     ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.41     ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Restructuring Transaction or the Sale Transaction, including, but not limited to: (a) the Plan; (b) the Bidding Procedures; (c) the Disclosure Statement; (d) any motion seeking approval of the adequacy of the Disclosure Statement, solicitation of the Plan, and the Bidding Procedures; (e) the Disclosure Statement Order; (f) the Bidding Procedures Order; (g) the DIP Order; (h) each of the documents comprising the Plan Supplement; (i) the Confirmation Order; (j) the GUC Recovery Trust Agreement; (k) the

WEIL:\97029875\1\41703.0011

Management Incentive Plan Term Sheet; and (l) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction.

1.42    **DIP Agent** means "DIP Agent" as defined in the DIP Order.

1.43    **DIP Claims** means all Claims held by the DIP Credit Parties on account of, arising under or relating to the DIP Documents or the DIP Order, which for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Order.

1.44    **DIP Credit Parties** means "DIP Credit Parties" as defined in the DIP Order.

1.45    **DIP Documents** means "DIP Documents" as defined in the DIP Order.

1.46    **DIP Facilities** means "DIP Facilities" as defined in the DIP Order.

1.47    **DIP Lenders** means "DIP Lenders" as defined in the DIP Order.

1.48    **DIP Motion** means the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* (ECF No. 26).

1.49    **DIP Order** means the final order approving the DIP Motion (ECF No. 422).

1.50    **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.51    **Disbursing Agent** means (a) solely with respect to the Reorganization Transaction, the Reorganized Debtors; and (b) solely with respect to the Sale Transaction, the Plan Administrator; provided, that with respect to distributions to holders of Allowed General Unsecured Claims, the GUC Trustee shall distribute the GUC Recovery Trust Assets as and when provided for in the GUC Recovery Trust Agreement.

1.52    **Disclosure Statement** means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.53    **Disclosure Statement Motion** means the *Motion of Debtors For Entry of an Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, (V) Approving Bidding Procedures, (VI) Approving Assumption and Assignment Procedures, and (VII) Granting Related Relief* (ECF No. 147).

1.54    **Disclosure Statement Order** means the order entered by the Bankruptcy Court (a) finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; (b) authorizing solicitation of the Plan; and (c) approving the Bidding Procedures.

WEIL:\97029875\1\41703.0011

1.55    *Disputed* means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors do not dispute, and Disputed as to the balance of such Claim.

1.56    *Distribution Record Date* means the Effective Date (or as soon as practicable thereafter) or such other date as agreed upon among the Debtors, the Requisite Term Lenders, and the Prepetition Administrative Agent.

1.57    *Ditech* means Ditech Holding Corporation.

1.58    *Ditech Financial* means Ditech Financial LLC.

1.59    *DTC* means the Depository Trust Company.

1.60    *Effective Date* means the date on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.61    *Elected Transaction* shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.62    *Electing Term Lenders* shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.63    *Election Date* shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.64    *Election Notice* shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.65    *Employee Arrangements* shall have the meaning ascribed to such term in Section 5.9 of the Plan.

1.66    *Entity* means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.67    *ERISA* means the Employee Retirement Income Security Act of 1974, as amended.

1.68    *Estate or Estates* means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.69    *Exchange Act* means the Securities Exchange Act of 1934, as amended.

1.70    *Exculpated Parties* means collectively the: (a) Debtors; (b) Reorganized Debtors; (c) Plan Administrator; (d) the Wind Down Estates; (e) Consenting Term Lenders; (f) Prepetition Administrative Agent; (g) Prepetition Warehouse Parties, (h) DIP Credit Parties; (i) Creditors' Committee and each of its members in their capacity as such; (j) Exit Warehouse Facilities Lenders; (k) National Founders; (l) GUC Trustee; and (m) with respect to each of the foregoing Entities in clauses (a) through

(l), all Persons and Entities who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.71    *Exit Warehouse Facilities* means, solely with respect to the Reorganization Transaction, the facilities to be entered into by the Reorganized Debtors and the Exit Warehouse Facilities Lenders on the Effective Date.

1.72    *Exit Warehouse Facilities Documents* means, solely with respect to the Reorganization Transaction, collectively, each agreement, security agreement, pledge agreement, collateral assignments, mortgages, control agreements, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time that shall govern the Exit Warehouse Facilities.

1.73    *Exit Warehouse Facilities Lenders* means the Persons party to the Exit Warehouse Facilities Documents as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.74    *Exit Working Capital Facility* means, solely with respect to the Reorganization Transaction, (a) the facility to be entered into by Reorganized Ditech, as borrower, and the Exit Working Capital Facility Lenders on the Effective Date, in accordance with the terms of the Exit Working Capital Facility Agreement, or (b) an asset sale or financing transaction to enhance the liquidity of the Reorganized Debtors, including a sale of mortgage servicing rights, that is designated by the Debtors and Requisite Term Lenders as an "Exit Working Capital Facility."

1.75    *Exit Working Capital Facility Agreement* means, solely with respect to the Reorganization Transaction, the agreement to be entered into by Reorganized Ditech on the Effective Date, that shall govern the Exit Working Capital Facility.

1.76    *Exit Working Capital Facility Documents* means, solely with respect to the Reorganization Transaction, collectively, the Exit Working Capital Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time, that shall govern the Exit Working Capital Facility.

1.77    *Exit Working Capital Facility Lenders* means the Persons party to the Exit Working Capital Facility Agreement as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.78    *Fannie Mae* means the Federal National Mortgage Association.

1.79    *Fannie Mae Acknowledgement Agreement* means "Fannie Mae Acknowledgement Agreements" as defined in the DIP Order.

1.80    *Fannie Mae Lender Contracts* means "Fannie Mae Lender Contracts" as defined in the DIP Order.

1.81    *Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or

7

the Creditors' Committee by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Cases.

1.82    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.83    ***Freddie Mac*** means the Federal Home Loan Mortgage Corporation.

1.84    ***Freddie Mac Agreements*** means the (a) Freddie Mac Acknowledgment Agreement; (b) Freddie Mac Pledge Agreement; (c) Freddie Mac Master Agreement; (d) Freddie Mac Purchase Agreement (items (a) through (d), as defined in the DIP Order); and (e) Freddie Mac Single-Family Seller/Servicer Guide.

1.85    ***General Unsecured Claim*** means any Claim against the Debtors (other than any Intercompany Claims or Borrower Non-Discharged Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court; provided, that a General Unsecured Claim shall not include the Term Loan Deficiency Claim or a deficiency Claim on account of Second Lien Notes Claims.

1.86    ***GUC Recovery Trust*** means the trust established pursuant to the GUC Recovery Trust Agreement.

1.87    ***GUC Recovery Trust Agreement*** means the trust agreement by and among the Debtors and the GUC Trustee, substantially in the form included in the Plan Supplement and consistent with Section 5.2(b) of the Plan; provided, that the GUC Recovery Trust Agreement shall be in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, and the Requisite Term Lenders.

1.88    ***GUC Recovery Trust Assets*** shall consist of (a) Cash in the amount of $4,000,000 less (i) the Remaining IT Fees payable on the Effective Date pursuant to Section 5.2(b)(v) of the Plan and (ii) any fees and expenses of the Creditors' Committee's advisors in excess of the Creditors' Committee Budget; (b) a fifty percent (50%) undivided interest in the GUC Recovery Trust Causes of Action and the net proceeds thereof; and (c) Contributed Sale Proceeds less any Contributed Sale Proceeds paid to holders of Allowed Second Lien Notes Claims in accordance with Section 4.4(b) of the Plan.

1.89    ***GUC Recovery Trust Causes of Action*** means all Causes of Action of the Debtors under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, and commercial tort law, except any such Causes

of Action against any (a) Released Party that are released pursuant to the Plan; (b) landlords; and (c) third party vendors providing services or goods to the Debtors in the ordinary course of business.

1.90    **GUC Trustee** means the Person selected by the Creditors' Committee that is reasonably acceptable to the Debtors and the Requisite Term Lenders, and identified in the Plan Supplement, to serve as the trustee of the GUC Recovery Trust, and any successor thereto in accordance with the GUC Recovery Trust Agreement.

1.91    **Ginnie Mae** means the Government National Mortgage Association.

1.92    **Ginnie Mae Agreements** means "Ginnie Mae Agreements" as defined in the DIP Order.

1.93    **Global Settlement** shall have the meaning ascribed to such term in Section 5.2(b) of the Plan.

1.94    **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.95    **Insured Claims** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.96    **Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

1.97    **Intercompany Interest** means an Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude a Parent Equity Interest.

1.98    **Interests** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.99    **KEIP Order** means the *Order Approving Key Employee Incentive Program* (ECF No. 450).

1.100    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.101    **Management Incentive Plan** means, solely with respect to the Reorganization Transaction, a post-emergence management incentive plan, under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards on terms and conditions described in and consistent with the Management Incentive Plan Term Sheet.

1.102    **Management Incentive Plan Term Sheet** means, solely with respect to the Reorganization Transaction, the term sheet for the Management Incentive Plan included in the Plan Supplement.

WEIL:\97029875\1\41703.0011

1.103    **MBS Trustee** means Deutsche Bank National Trust Company, in its capacity as an indenture trustee or trustee under certain indentures, pooling and servicing agreements, or other trust governing agreements pursuant to which certain mortgage-backed securities were issued.

1.104    **National Founders** means "National Founders Facility Parties" as defined in the DIP Order.

1.105    **National Founders Facility** means "National Founders Facility" as defined in the DIP Order.

1.106    **National Founders Facility Agreement** means "National Founders Facility Agreement" as defined in the DIP Order.

1.107    **National Founders Facility Claim** means all Claims held by National Founders on account of, arising under or relating to the National Founders Facility Agreement.

1.108    **Net Cash Proceeds** means (a) all Cash of the Debtors realized from their business operations, the Sale Transaction Proceeds, and the Asset Sale Proceeds less (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Priority Tax Claims, DIP Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) contributed on the Effective Date to the GUC Recovery Trust or the Second Lien Recovery Cash Pool; (iii) constituting Contributed Sale Proceeds; and (iv) estimated and reserved by the Debtors or the Plan Administrator to adequately fund the Wind Down of the Estates.

1.109    **New Board** means, solely with respect to the Reorganization Transaction, the new board of directors of Reorganized Ditech.

1.110    **New Common Stock** means, solely with respect to the Reorganization Transaction, the shares of common stock, par value $.01 per share to be issued by Reorganized Ditech authorized pursuant to the Amended Organizational Documents of Reorganized Ditech, and all of which shall be deemed validly issued, fully-paid, and non-assessable.

1.111    **Other Secured Claim** means a Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, a Term Loan Claim, or a Second Lien Notes Claim.

1.112    **Parent Equity Interests** means any Interest in Ditech.

1.113    **Person** means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other Entity.

1.114    **Plan** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the RSA, DIP Order, the provisions of the Bankruptcy Code and the terms hereof.

1.115    **Plan Administrator** means, solely with respect to the Sale Transaction, a Person or Entity selected by the Debtors and the Requisite Term Lenders to serve as plan administrator for each of the Debtors and their Estates.

WEIL:\97029875\1\41703.0011

1.116    ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws); (b) Amended and Restated Credit Facility Agreement; (c) Exit Working Capital Facility Agreement; (d) Stockholders Agreement; (e) Exit Warehouse Facilities Documents; (f) Management Incentive Plan Term Sheet; (g) Assumption Schedule; (h) Rejection Schedule; (i) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; and (j) GUC Recovery Trust Agreement; provided, that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the RSA.  The Plan Supplement shall be filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.  The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article IX of the Plan (including, for the avoidance of doubt, to reflect the terms and conditions of the Sale Transaction).

1.117    ***Prepetition Administrative Agent*** means Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), solely in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement, and its successors and assigns.

1.118    ***Prepetition Credit Agreement*** means that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018), among Ditech, as the borrower, the Prepetition Administrative Agent and the other lenders party thereto, as amended, modified, or supplemented from time to time prior to the Commencement Date.

1.119    ***Prepetition Intercreditor Agreement*** means "Intercreditor Agreement" as defined in the Prepetition Credit Agreement.

1.120    ***Prepetition Second Lien Notes Indenture*** means that certain indenture dated as of February 9, 2018, between Ditech, the guarantors named therein, and the Prepetition Second Lien Notes Trustee, as amended, modified, or supplemented from time to time prior to the Commencement Date.

1.121    ***Prepetition Second Lien Notes Trustee*** means Wilmington Savings Fund Society, FSB, solely in its capacity as trustee under the Prepetition Second Lien Notes Indenture, and its successors and assigns.

1.122    ***Prepetition Term Loans*** means "Term Loans" as defined in the Prepetition Credit Agreement.

1.123    ***Prepetition Warehouse Parties*** means "Prepetition Warehouse Parties" as defined in the DIP Order.

1.124    ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.125    ***Priority Tax Claim*** means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

WEIL:\97029875\1\41703.0011

1.126    ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.127    ***Reinstate, Reinstated, or Reinstatement*** means leaving a Claim Unimpaired under the Plan.

1.128    ***Rejection Schedule*** means the schedule of certain specific executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan.

1.129    ***Related Parties*** means with respect to any Exculpated Party or any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.130    ***Released Parties*** means collectively the: (a) Debtors; (b) Reorganized Debtors; (c) the Wind Down Estates (if applicable); (d) Consenting Term Lenders; (e) Prepetition Administrative Agent; (f) Prepetition Warehouse Parties; (g) DIP Credit Parties; (h) National Founders; (i) Creditors' Committee and each of its members in their capacity as such; (j) GUC Trustee; and (k) Related Parties for each of the foregoing.

1.131    ***Remaining IT Fees*** means, collectively, the reasonable and documented costs and expenses by the Prepetition Second Lien Notes Trustee and the MBS Trustee not payable as Administrative Expense Claims or as a cure of any assumed or assumed and assigned contracts.

1.132    ***Reorganization Transaction*** means, collectively, (a) issuance of the New Common Stock; (b) entry into the Amended and Restated Credit Facility Agreement; (c) entry into the Exit Working Capital Facility Agreement; (d) entry into the Exit Warehouse Facilities Documents; (e) execution of the Amended Organizational Documents; (f) vesting of the Debtors' assets in the Reorganized Debtors, in each case, in accordance with the Plan; and (g) the other transactions that the Debtors and the Requisite Term Lenders reasonably determine are necessary or appropriate to implement the foregoing, in each case, in accordance with the Plan, RSA, and the DIP Order.

1.133    ***Reorganized Debtors*** means, solely with respect to the Reorganization Transaction, the Debtors, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.134    ***Reorganized Ditech*** means, solely with respect to the Reorganization Transaction, Ditech, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.135    ***Requisite Term Lenders*** means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Prepetition Term Loans held by the Consenting Term Lenders as of such date.

1.136    ***Restructuring Expenses*** means with respect to (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; and (b) the Prepetition Administrative Agent, the

12

reasonable fees, costs, and expenses of (i) the Prepetition Administrative Agent, (ii) Davis Polk & Wardwell LLP, and (iii) one law firm acting as local counsel (if any), in each case, in accordance with the Prepetition Credit Agreement.

1.137    *RMS* means Reverse Mortgage Solutions, Inc.

1.138    *RSA* means that certain restructuring support agreement, dated as of February 8, 2019, by and among the Debtors and the Consenting Term Lenders (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof) annexed to the Disclosure Statement as Exhibit B.

1.139    *Sale Incentive Awards* means "Sale Incentive Awards" as defined in the KEIP Order.

1.140    *Sale Transaction* means the sale of all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, contemplated by the Successful Bid.

1.141    *Sale Transaction Proceeds* means the net proceeds of a Sale Transaction.

1.142    *Second Lien Noteholders* means the holders of Second Lien Notes in their respective capacities as such.

1.143    *Second Lien Notes* means the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to the Prepetition Second Lien Notes Indenture.

1.144    *Second Lien Notes Claims* means any Claims arising from or in connection with the Prepetition Second Lien Notes Indenture.

1.145    *Second Lien Recovery Cash Pool* means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), Cash in the amount of $1,500,000, for distribution to holders of Allowed Second Lien Notes Claims in accordance with Section 4.4(b).

1.146    *Secured Claim* means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.  For the avoidance of doubt, the National Founders Facility Claim shall be deemed a Secured Claim.

1.147    *Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

1.148    *Stockholders Agreement* means, solely with respect to the Reorganization Transaction, that certain Stockholders Agreement substantially in the form included in the Plan Supplement.

1.149    *Subordinated Securities Claims* means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.150    *Successful Bid* means one or more bids to purchase all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, that the Debtors determine, in an exercise of their business judgment and subject to the RSA, constitutes the highest or best bid.

WEIL:\97029875\1\41703.0011

1.151    ***Successful Bidder*** means the bidder(s) who submit(s) a Successful Bid.

1.152    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.153    ***Term Lenders*** means "Term Lenders" as defined in the Prepetition Credit Agreement.

1.154    ***Term Loan Claims*** mean any Claims arising from or in connection with the Prepetition Credit Agreement, other than Restructuring Expenses.

1.155    ***Term Loan Deficiency Claim*** means the deficiency Claims on account of the indebtedness under the Prepetition Credit Agreement under section 506(a) of the Bankruptcy Code.

1.156    ***Unimpaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.157    ***U.S. Trustee*** means the United States Trustee for the Southern District of New York.

1.158    ***Voting Deadline*** means the date by which all persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.

1.159    ***Wind Down*** means, following the closing of the Sale Transaction, the process to wind down, dissolve and liquidate the Estates and distribute any remaining assets in accordance with the Plan.

1.160    ***Wind Down Budget*** means an amount set forth in the Plan Supplement to be agreed between the Debtors and the Requisite Term Lenders for the purpose of effectuating the Wind Down.

1.161    ***Wind Down Estates*** means, solely with respect to the Sale Transaction, the Debtors pursuant to and under the Plan on or after the Effective Date.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

WEIL:\97029875\1\41703.0011

D.      **Controlling Document.**

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan (including any Restructuring Document or Sale Transaction Document), or any order (other than the Confirmation Order or the DIP Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that, in the event of a conflict between the DIP Order, on the one hand, and any of the Plan, the Plan Supplement, or the Definitive Documents, on the other hand, the DIP Order shall govern and control in all respects; provided, further, that in the event of a conflict between Confirmation Order, on the one hand, and any of the Plan, the Plan Supplement, the Definitive Documents, or the DIP Order on the other hand, the Confirmation Order shall govern and control in all respects.

E.      **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of any of the DIP Credit Parties and the parties to the RSA as set forth in the RSA and the DIP Documents with respect to the form and substance of the Plan, the Plan Supplement, and any Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA (with respect to the parties to the RSA) or the DIP Documents (with respect to the DIP Credit Parties) is terminated in accordance with its terms.

## ARTICLE II   ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.

2.1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2.    *Fee Claims.*

(a)     All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than

twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)     Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable. Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)     On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim. When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

(d)     The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

2.4.    *DIP Claims.*

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs. The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement

WEIL:\97029875\1\41703.0011

and indemnity obligations under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

2.5.    *Restructuring Expenses.*

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors, or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    *Grouping of Debtors for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.   To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

3.3.    *Summary of Classification.*

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to

WEIL:\97029875\1\41703.0011

accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | Borrower Non-Discharged Claims | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired) | Reorganization Transaction (Presumed to Accept)<br><br>Sale Transaction (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

3.4.    *Special Provision Governing Unimpaired Claims.*

Nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.    *Elimination of Vacant Classes.*

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS.

4.1.    *Priority Non-Tax Claims (Class 1).*

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

WEIL:\97029875\1\41703.0011

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.    ***Term Loan Claims (Class 3).***

(a)    *Classification*:  Class 3 consists of Term Loan Claims.

(b)    *Allowance*:  The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement.  The Prepetition Administrative Agent and the Term Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

WEIL:\97029875\1\41703.0011

(i)      **If the Sale Transaction occurs**, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in Cash.   On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 hereof).

(ii)      **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.   On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 hereof) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the net proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d)      *Voting*:   Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4.      ***Second Lien Notes Claims (Class 4).***

(a)      *Classification*:   Class 4 consists of Second Lien Notes Claims.

(b)      *Treatment*:   The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i)      **If the Sale Transactions occurs**, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)      **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

**If either the Sale Transaction or the Reorganization Transaction occurs**, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court.

(c)     *Voting*:  Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

4.5.     *General Unsecured Claims (Class 5)*.

(a)     *Classification*:  Class 5 consists of General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)     **If the Sale Transaction occurs**, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)     **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)     *Voting*:  Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.6.     *Borrower Non-Discharged Claims (Class 6)*.

(a)     *Classification*:  Class 6 consists of Borrower Non-Discharged Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:

(i)     **If the Sale Transaction occurs**, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed

WEIL:\97029875\1\41703.0011

General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.

(ii)     **If the Reorganization Transaction occurs**, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan.

(c)     *Voting*:

(i)     **If the Sale Transaction occurs**, Class 6 is Impaired, and holders of Borrower Non-Discharged Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(ii)     **If the Reorganization Transaction occurs**, Class 6 is Unimpaired, and holders of Borrower Non-Discharged Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of Borrower Non-Discharged Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Borrower Non-Discharged Claims.

4.7.     *Intercompany Claims (Class 7).*

(a)     *Classification*:  Class 7 consists of Intercompany Claims.

(b)     *Treatment*:  On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

(c)     *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

4.8.     *Intercompany Interests (Class 8).*

(a)     *Classification*:  Class 8 consists of Intercompany Interests.

(b)     *Treatment:*  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests.

(c)     *Voting:*  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

WEIL:\97029875\1\41703.0011

Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

### 4.9. *Parent Equity Interests (Class 9).*

(a)  *Classification*:  Class 9 consists of Parent Equity Interests.

(b)  *Treatment*:  Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

(i)  **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements.  The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)  **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)  *Voting*:  Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

### 4.10. *Subordinated Securities Claims (Class 10).*

(a)  *Classification*: Class 10 consists of Subordinated Securities Claims.

WEIL:\97029875\1\41703.0011

(b)     *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)     *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

5.1.    ***No Substantive Consolidation.***

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

5.2.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

(a)     Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan and the Global Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)     The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee, and the Consenting Term Lenders (the "Global Settlement").  The following constitutes the provisions and conditions of the Global Settlement:

(i)     On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may

be set off against the debts of any of the other Debtors.  Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(ii)    On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)    On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders.  In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)    The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing).  The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)    On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)    On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

(vii)    The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

(viii)    The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

WEIL:\97029875\1\41703.0011

(ix)    On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(x)    On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

(xi)    On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xii)    As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

5.3.    *Marketing Process.*

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale Transaction and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae.  The Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction or Asset Sale Transaction.  The Debtors, the Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders.  The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

5.4.    *Election Notice.*

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "*Election Date*"), holders of at least $66^{2/3}\%$ in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "*Electing Term Lenders*") shall deliver a notice (the "*Election Notice*") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "*Elected Transaction*"), being a:  (i) Reorganization Transaction or (ii) Sale Transaction, and, if applicable, (iii) in connection and together with an election of

WEIL:\97029875\1\41703.0011

(i) or (ii), any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i) or (ii).

5.5.    ***Sources of Consideration for Plan Distributions.***

(a)    ***Sale Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

(b)    ***Reorganization Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

5.6.    ***Sale Transaction.***

(a)    ***Closing of Sale Transaction (If Any).***

(i)    On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant to Section 1141 of the Bankruptcy Code, be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

(b)    ***Wind Down and Dissolution of the Debtors.***

(i)    The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims; (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid

WEIL:\97029875\1\41703.0011

without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims and GUC Recovery Trust Causes of Action.

(iii)    Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(iv)    Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(v)    The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(vi)    The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

5.7.    ***Reorganization Transaction.***

(a)    If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth herein.

(b)    ***Amended and Restated Credit Facility***.

(i)    On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

(ii)    Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents. All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under

WEIL:\97029875\1\41703.0011

applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

(iii)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(c)    *Exit Warehouse Facilities*.

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(d)    *Authorization and Issuance of New Plan Securities*.

(i)    On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action.  All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)    The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(e)    *Continued Corporate Existence*.

(i)    The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the

WEIL:\97029875\1\41703.0011

Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan.

(ii)  On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(f)  **_Officers and Board of Directors_**.

(i)  Upon the Effective Date, the New Board shall consist of five (5) directors.  Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("**_CEO_**") of Reorganized Ditech, who shall be Thomas F. Marano.  The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)  Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(g)  **_Reorganized Debtors' Authority._**

(i)  The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)  After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

WEIL:\97029875\1\41703.0011

5.8.    *Fannie Mae; Freddie Mac; Ginnie Mae.*

(a)    ***Fannie Mae.***    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to Fannie Mae shall not be transferred by the Debtors to a Successful Bidder (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; and (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction repayment in full of the Cure Amounts; or (3) such other treatment of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

(b)    ***Freddie Mac.***

(i)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives,

WEIL:\97029875\1\41703.0011

remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "*Servicing Collateral*" (as defined and referenced in, and except as otherwise expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the Debtors to a Successful Bidder (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance. The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)    *Ginnie Mae.* Notwithstanding anything herein to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to a Successful Bidder without the express prior written consent of Ginnie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion. The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

5.9.    *Employee Matters.*

(a)    Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "*Employee Arrangements*").  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)    Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)    For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)    In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

5.10.    *Effectuating Documents; Further Transactions.*

(a)    On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)      Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)      In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)      The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, and the Global Settlement, including the creation of the GUC Recovery Trust, in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)      All matters provided for herein involving the corporate structure of the Debtors, Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

5.11.   *Section 1145 Exemption.*

(a)      The offer, issuance, and distribution of the New Common Stock hereunder to holders of the Term Loan Claims under Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)      The New Common Stock shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock, (iv) applicable regulatory approval, and (v) the Stockholders Agreement.

5.12.   *Cancellation of Existing Securities and Agreements.*

(a)      Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including

with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  In a Reorganization Transaction, notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)     Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

WEIL:\97029875\1\41703.0011

(d)       Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)       Notwithstanding anything to the contrary herein, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

(f)       Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.13.    *Cancellation of Liens.*

Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

5.14.    *Subordination Agreements.*

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreements' terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

5.15.    *Nonconsensual Confirmation.*

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

5.16.    *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

5.17.   *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.18.   *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

5.19.   *GUC Recovery Trust.*

(a)   *Creation and Governance of the GUC Recovery Trust.*  On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19.  The GUC Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement.  Other rights and duties of the GUC Trustee shall be as set forth in the GUC Recovery Trust Agreement.  After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)   *GUC Trustee and GUC Recovery Trust Agreement.*  The GUC Recovery Trust Agreement generally will provide for, among other things:  (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) make distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement.  The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust.  Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust

WEIL:\97029875\1\41703.0011

and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)    *Cooperation of Reorganized Debtors*.  Subject to subsection (d) of this Section 5.19, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, upon reasonable notice, shall provide reasonable cooperation with the GUC Trustee in the administration of the GUC Recovery Trust, including providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder.  The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Recovery Trust, including, providing reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims, in each case, the GUC Recovery Trust agrees to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses.  The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Recovery Trust.

(d)    *Preservation of Privilege*.  The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets.  The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)    *GUC Recovery Trust Assets*.  The GUC Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement.  From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Trustee deems necessary.

(f)    *GUC Recovery Trust Fees and Expenses*.  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.  The Reorganized Debtors or the Wind Down Estates, as applicable, shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)    *Tax Treatment*.  In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the

WEIL:\97029875\1\41703.0011

GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims and the GUC Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims and GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)      *Non-Transferability of Interests in GUC Recovery Trust*.  Any and all interests in the GUC Recovery Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(i)      *Dissolution of the GUC Litigation Trust*.  The GUC Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement as appropriate.

(j)      *Single Satisfaction of Allowed General Unsecured Claims*.  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

## ARTICLE VI  DISTRIBUTIONS.

6.1.    **Distributions Generally.**

Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2.    **Distribution Record Date.**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders

WEIL:\97029875\1\41703.0011

or the permitted designees of any such Claims or Interests. The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date. For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the Prepetition Second Lien Notes Indenture, including, without limitation, subject to the application of the charging lien of the Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

6.3.   *Date of Distributions.*

(a)   Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)   In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

6.4.   *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records. The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

6.5.   *Rights and Powers of Disbursing Agent.*

(a)   From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred

upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)     A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement.

6.7.    ***No Postpetition Interest on Claims.***

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.    ***Delivery of Distributions.***

(a)     Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)     Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit

WEIL:\97029875\1\41703.0011

Agreement and the Prepetition Second Lien Notes Indenture. All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture. To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)    As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan. All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

6.9.    *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.10.    *Unclaimed Property.*

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

6.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

WEIL:\97029875\1\41703.0011

6.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14.    *Fractional Stock and Notes.*

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors, Wind Down Estates, nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock.

6.15.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.16.    *Setoffs and Recoupments.*

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

6.17.    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.18.    ***No Distribution in Excess of Amount of Allowed Claim.***

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

6.19.    ***Withholding and Reporting Requirements.***

(a)    *Withholding Rights*.    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.    Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors or Wind Down Estates or GUC Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  If such request is made by the GUC Trustee, or such other Entity designated by the GUC Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Trustee, the GUC Recovery Trust, or its respective property.

6.20.    ***Hart-Scott-Rodino Antitrust Improvements Act.***

Any New Common Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

WEIL:\97029875\1\41703.0011

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1.    *Objections to Claims.*

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall exclusively be entitled to object to Claims.  After the Effective Date, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.  The expiration of such period shall not limit or affect the Debtors', Reorganized Debtors', Plan Administrators', or GUC Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

7.2.    *Resolution of Disputed Administrative Expenses and Disputed Claims.*

On and after the Effective Date, (a) the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Recovery Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court.  The Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the GUC Trustee shall cooperate with respect to any objections to Claims that seek to convert Claims into General Unsecured Claims or General Unsecured Claims into other senior Claims, and the Debtors' rights and defenses to any such objections are fully preserved.

7.3.    *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.    *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.5.    *Disallowance of Claims.*

Except to the extent otherwise agreed to by the Debtors, Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to

the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable. All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

7.6.    ***Estimation of Claims.***

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee as to General Unsecured Claims, as applicable, may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

7.7.    ***No Distributions Pending Allowance.***

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.8.    ***Claim Resolution Procedures Cumulative.***

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.9.    ***Interest.***

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

7.10.    ***Insured Claims.***

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such

WEIL:\97029875\1\41703.0011

Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of the Plan; (v) is identified in section 8.4 of the Plan; (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Solely with respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected by the Successful Bidder in accordance with the applicable purchase agreement.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Successful Bidder, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Successful Bidder, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

8.2.    *Determination of Assumption Disputes and Deemed Consent.*

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree. The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that

WEIL:\97029875\1\41703.0011

purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

8.3.    ***Rejection Damages Claims.***

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).  Such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

WEIL:\97029875\1\41703.0011

8.4.    *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) if rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

8.5.    *Intellectual Property Licenses and Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.6.    *Tax Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as

executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.7.    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

8.8.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.9.    *Reservation of Rights.*

(a)    The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

WEIL:\97029875\1\41703.0011

(c)    Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

9.1.    ***Conditions Precedent to Confirmation of Plan.***

The following are conditions precedent to confirmation of the Plan:

(a)    the Disclosure Statement Order shall have been entered;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)    the RSA shall not have been terminated and shall be in full force and effect; and

(d)    the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

9.2.    ***Conditions Precedent to Effective Date.***

(a)    The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

(i)    the Confirmation Order (in form and substance reasonably acceptable to the Creditors' Committee) shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)    an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

51

(v)     the RSA shall not have been terminated and shall be in full force and effect; and

(vi)     all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

(b)     The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)     the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)     the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)     The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)     the applicable purchase agreement(s) shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(d)     Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.     *Waiver of Conditions Precedent.*

(a)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Section 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; provided, that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents. If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors. Notwithstanding anything to the contrary herein, any condition precedent

WEIL:\97029875\1\41703.0011

pertaining to the Global Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Creditors' Committee.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4.    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

## ARTICLE X    EFFECT OF CONFIRMATION OF PLAN.

### 10.1.    *Vesting of Assets.*

(a)    On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates shall vest in the Reorganized Debtors or the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, Amended and Restated Credit Facility Documents, the Exit Warehouse Facilities Documents, or the Exit Working Capital Facility Documents.  On and after the Effective Date, the Reorganized Debtor may take any action, including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)    On the Effective Date and solely with respect to the Sale Transaction, all property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, and the applicable purchase agreement.

### 10.2.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

WEIL:\97029875\1\41703.0011

10.3.    *Discharge of Claims and Termination of Interests.*

In a Reorganization Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date; provided, that Borrower Non-Discharged Claims shall not be discharged. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.4.    *Term of Injunctions or Stays.*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5.    *Injunction.*

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or the property of any of the**

54

Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or against property or interests in property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)    The injunctions in this Section 10.5 shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

10.6.    *Releases.*

(a)    <u>Estate Releases</u>.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, and the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order.

WEIL:\97029875\1\41703.0011

(b) **Third-Party Releases**.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

(i) the holders of Impaired Claims who voted to accept the Plan;

(ii) the Consenting Term Lenders;

(iii) holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots;

(iv) the Creditors' Committee and each of its members in their capacity as such; and

(v) with respect to any Entity in the foregoing clauses (i) through (iv), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.  The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

10.7. *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation,

WEIL:\97029875\1\41703.0011

**suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.**

10.8.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Trustee, solely with respect to Allowed General Unsecured Claims) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code. The Reorganized Debtors or the GUC Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

10.10.    *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants,

and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11. *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents; (iv) the Exit Working Capital Facility Documents; (v) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction; (vi) the GUC Recovery Trust Agreement; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section 10.11 shall be effective notwithstanding any requirements under non-bankruptcy law.

## ARTICLE XI  RETENTION OF JURISDICTION.

11.1. *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

WEIL:\97029875\1\41703.0011

(e) to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f) to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h) to hear and determine all Fee Claims and Restructuring Expenses;

(i) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Global Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j) to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m) to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n) to resolve disputes concerning Disputed Claims or the administration thereof;

(o) to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p) to enter one or more final decrees closing the Chapter 11 Cases;

(q) to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(r) to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)        to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)        to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 11.2.    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

### 12.1.    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

### 12.2.    *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.    *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

### 12.4.    *Request for Expedited Determination of Taxes.*

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

### 12.5.    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any

WEIL:\97029875\1\41703.0011

deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

12.6.   *Amendments.*

(a)   *Plan Modifications.*   Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Creditors' Committee, solely as it pertains to the Global Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)   *Other Amendments.*   Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

12.7.   **Effectuating Documents and Further Transactions.**

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.8.   **Revocation or Withdrawal of Plan.**

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory

contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity.  This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

### 12.9. *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Creditors' Committee and each professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Creditors' Committee.

### 12.10. *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 12.11. *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

### 12.12. *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

WEIL:\97029875\1\41703.0011

12.13.    *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.14.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.15.    *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.16.    *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.17.    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.18.    *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.19.    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors or the Reorganized Debtors:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985

WEIL:\97029875\1\41703.0011

Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
Email: JHaas@ditech.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
          Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
          sunny.singh@weil.com

(b)    If to the Consenting Term Lenders:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 60654
Attn: Patrick J. Nash Jr., P.C.
Email:  patrick.nash@kirkland.com
Attn: John R. Luze
Email: john.luze@kirkland.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WEIL:\97029875\1\41703.0011

Dated:   May 9, 2019

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF
NEVADA, INC.**

By:    /s/ Kimberly Perez
       Name:  Kimberly Perez
       Title:   Senior Vice President and
              Chief Accounting Officer

Dated:  May 9, 2019

                                        **GREEN TREE CREDIT LLC**

                                        **GREEN TREE CREDIT SOLUTIONS LLC**

                                        **GREEN TREE INVESTMENT HOLDINGS III LLC**

                                        **GREEN TREE SERVICING CORP.**

                                        **WALTER MANAGEMENT HOLDING COMPANY LLC**

                                        **WALTER REVERSE ACQUISITION LLC**


                                        By:    /s/ Laura Reichel
                                               Name: Laura Reichel
                                               Title:  President

Dated:  May 9, 2019

**MARIX SERVICING LLC**

By:   /s/ Clinton Hodder
     Name: Clinton Hodder
     Title:   President

Dated:  May 9, 2019

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**


By:     /s/ Jeanetta Brown
        Name: Jeanetta Brown
        Title:   Vice President

## **Schedule 1**

**Borrower Non-Discharged Claims**

*WEIL:\97029875\1\41703.0011*

"**Borrower Non-Discharged Claims**" shall mean, Claims of Borrowers, to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) do not result in any order, judgment, verdict, decree, or arbitration award against the Debtors or Reorganized Debtors entitling any party to an award of monetary damages, including, without limitation, attorneys' fees or costs, penalties or fines (including, for the avoidance of doubt, statutory penalties and fines) but excluding restitution, reimbursement, refunds, or account credits relating solely to a final, non-appealable judgment that a Debtor made a servicing or origination error, or committed fraud, and (b) are necessary for the resolution of the following actions:

1. A claim or defense involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages (including reverse mortgages) owned or serviced by the Debtors, including quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action;

2. A claim or defense brought by a bankrupt Borrower (including any heir, non-borrowing spouse, estate, and/or other successor in interest) who has sought, or may seek, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**") to:

    a) assert a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure;

    b) assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

    c) assert appeals with respect to items (a) and (b); or

    d) seek accounting from the Debtors with respect to the underlying reverse mortgage loan;

3. A claim or defense that is the subject of § 363(o) of the Bankruptcy Code; or

4. A claim or defense brought by a Borrower on account of a Debtor's alleged prepetition:

    a) failure to comply with loan modification obligations;

    b) improper assignment of deeds of trust;

    c) violation of the Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681), and/or the Truth in Lending Act (12 C.F.R. § 1026);

    d) failure to remit payment to the taxing authority that results in penalties to the Borrower;

e) failure to remit payment to insurance authorities, the consequence of which includes both a lapse in coverage and actual pecuniary harm to the Borrower; or

f) servicing errors directly relating to Debtors' prepetition:

    i. misapplication of borrower payments;

    ii. miscalculations of loan principal amounts;

    iii. miscalculations of loan interest amounts; or

    iv. failure to credit funds to the correct account.

**<u>Exhibit A-1</u>**

**Borrower Non-Discharged Claims**

## BORROWER NON-DISCHARGED CLAIMS
## FOR NON-MONETARY DAMAGES AND OTHER RELIEF

Pursuant to the Plan, on the Effective Date, unless assumed in full by a purchaser, certain claims against or liabilities of the Debtors will be discharged.  However, as described more fully below, the Reorganized Debtors will continue to be liable for certain consumer borrower claims other than Claims for monetary damages (including penalties and fines) relating to certain prepetition acts or omissions of any Debtor in connection with the origination or servicing of a forward or reverse mortgage loan, as described below.

In the event of a Reorganization Transaction (unless assumed by a purchaser as an assumed liability in any Asset Sale Transaction), Claims for monetary damages against the Debtors or Reorganized Debtors shall be discharged except as expressly provided for herein.  As described in more detail below and as provided for in, and subject to the terms of, the Plan, certain consumer borrower claims for non-monetary damages shall be Unimpaired and shall not be discharged by the Plan upon the Effective Date.

In the event of a Reorganization Transaction, following the Effective Date, to the extent described below and provided for in, and subject to, the Plan, holders of such Claims (as set out below) shall be entitled to defend, assert, and prosecute claims, cross-claims, third-party claims, and counter-claims, including the appeal or settlement of such claims **to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) do not result in any order, judgment, verdict, decree or arbitration award against the Debtors or Reorganized Debtors entitling any party to an award of monetary damages, including, without limitation, attorneys' fees or costs, penalties or fines (including, for the avoidance of doubt, statutory penalties and fines) but excluding restitution, reimbursement, refunds, or account credits relating solely to a final, non-appealable judgment that a Debtor made a servicing or origination error, or committed fraud, and (b) are necessary for the resolution of the following actions** ("**Borrower Non-Discharged Claims**"):

1.  A claim or defense involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages (including reverse mortgages) owned or serviced by the Debtors, including quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action;

2.  A claim or defense brought by a bankrupt Borrower (including any heir, non-borrowing spouse, estate, and/or other successor in interest) who has sought, or may seek, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**") to:

    a)  assert a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure;

b)  assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

c)  assert appeals with respect to items (a) and (b); or

d)  seek accounting from the Debtors with respect to the underlying reverse mortgage loan;

3.  A claim or defense that is the subject of § 363(o) of the Bankruptcy Code; or

4.  A claim or defense brought by a Borrower on account of a Debtor's alleged prepetition:

a)  failure to comply with loan modification obligations;

b)  improper assignment of deeds of trust;

c)  violation of the Real Estate Settlement Procedures Act of 1974 (RESPA)(12 U.S.C. § 2601 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681), and/or the Truth in Lending Act (12 C.F.R. § 1026);

d)  failure to remit payment to the taxing authority that results in penalties to the Borrower;

e)  failure to remit payment to insurance authorities, the consequence of which includes both a lapse in coverage and actual pecuniary harm to the Borrower; or

f)  servicing errors directly relating to Debtors' prepetition:

   i.  misapplication of borrower payments;

   ii.  miscalculations of loan principal amounts;

   iii.  miscalculations of loan interest amounts; or

   iv.  failure to credit funds to the correct account.

Therefore, on or after the Effective Date holders of Borrower Non-Discharged Claims shall be entitled to defend and assert and prosecute claims, cross-claims, third-party claims, and counter-claims, including the appeal or settlement of such claims (x) in a Sale Transaction, against the Wind Down Estate, in accordance with section 4.6(b)(i) of the Plan, or (y) in a Reorganization Transaction, in the ordinary course of business, in accordance with section 4.6(b)(ii) of the Plan. **The Debtors reserve all rights to defend such Borrower Non-Discharged Claims on all grounds (including that any such Claim is not entitled to be classified as or is not an Allowed Borrower Non-Discharged Claim) other than on the basis that such Claims are discharged.**

In the event of a Sale Transaction (unless a Claim is assumed by a purchaser as an assumed liability), the Debtors do not anticipate obtaining a discharge of any Borrower Non-Discharged Claim. Accordingly, Borrower Non-Discharged Claims shall receive the recovery to which they

2

are entitled from the proceeds of any Sale Transaction in accordance with the Plan, which provides that they will receive the same treatment as General Unsecured Claims, and as administered in the Wind Down Estates.

**Exhibit B**

**Restructuring Support Agreement**

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits or schedules hereto, this "*Agreement*"), dated as of February 8, 2019, is entered into by and between:

(i)    Ditech Holding Corporation and its direct and indirect subsidiaries (the "*Company*"); and

(ii)    each undersigned entity, in each such entity's respective capacity as lender under, or as nominee, investment adviser, sub-adviser, or investment manager, as applicable, to certain funds, accounts, and other entities (including subsidiaries and affiliates of such funds, accounts, and entities) that is a lender (in its respective capacity as such, each, a "*Term Lender*," and, collectively, the "*Term Lenders*" and, together with their respective successors and permitted assigns and any subsequent Term Lender that becomes party hereto in accordance with the terms hereof, each, a "*Consenting Term Lender*," and, collectively, the "*Consenting Term Lenders*") party to that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "*Credit Agreement*," and the term loan facility thereunder, the "*Term Loan Facility*"), by and among the Company, as the borrower, Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), as administrative agent (together with any successor administrative agent, in each case, in such capacity, the "*Administrative Agent*"), the other term lenders party thereto and the other lenders party thereto.

The Company, each Consenting Term Lender, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "*Parties*" and individually as a "*Party*."

**WHEREAS**, the Parties have agreed to the Restructuring consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet, which are the product of arm's-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Term Lenders in the aggregate hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, as of the date hereof, more than $66^{2/3}\%$ of the aggregate outstanding principal amount of the Loans and Commitments (each as defined in the Credit Agreement);

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    Certain Definitions.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the restructuring term sheet attached hereto as **Exhibit A** (together with all schedules, exhibits, and annexes attached thereto, and as may be modified in accordance with <u>Section 9</u> hereof, the "***Term Sheet***"), or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

(a)    ***"Alternative Transaction"*** means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or its assets other than the Restructuring, as set forth herein, including in the Term Sheet;

(b)    "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

(c)    "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the Southern District of New York.

(d)    "***Bidding Procedures Motion***" means a motion filed by the Debtors with the Bankruptcy Court for entry of a Bidding Procedures Order.

(e)    "***Bidding Procedures Order***" means any order (1) approving Bidding Procedures, and (2) setting dates for the submission of bids and the auction (if any), and (3) granting related relief.

(f)    ***Commencement Date***" means the date that Debtors commence the Chapter 11 Cases.

(g)    "***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan.

(h)    "***Definitive Documents***" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring and the Restructuring Transactions, including:  (A) the Plan; (B) the Bidding Procedures; (C) the Bidding Procedures Motion; (D) the Bidding Procedures Order; (E) each of the documents comprising the Plan Supplement; (F) the Disclosure Statement; (G) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (H) the Confirmation Order; (I) the motion for use of cash collateral and to incur postpetition financing and any credit agreement with

2

respect thereto (the "*Financing Motion*"); (J) any Financing Orders, and (K) any asset purchase agreement for the Sale Transaction or an Asset Sale Transaction. Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet, and, except to the extent such Definitive Documents must be acceptable to the Requisite Term Lenders in accordance with the Term Sheet, shall otherwise be reasonably acceptable in all material respects to the Required Parties, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Support Period; provided, that the terms of the Plan and Confirmation Order with respect to the treatment of the Term Loans and the treatment of any matters with respect to the Credit Agreement or any economic interest of the Term Lenders, and the Financing Motion and the Financing Orders shall be acceptable in all material respects to the Requisite Term Lenders.

(i)        "*Effective Date*" means the date on which the Plan is consummated.

(j)        "*Financing Orders*" means any orders authorizing Debtors to continue to access cash collateral and incur any postpetition financing on an interim basis or final basis consistent with the Term Sheet.

(k)        "*Outside Commencement Date*" means February 15, 2019.

(l)        "*Person*" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(m)        "*Plan Supplement*" means the plan supplement to the Plan, comprising the following documents, as applicable:  (A) the Amended and Restated Credit Facility Agreement, (B) new organizational documents, (C) the Exit Working Capital Facility documentation, (D) the Management Incentive Plan, (E) shareholders agreement, (F) a schedule of executory contracts and unexpired leases to be assumed and an associated notice of cure amount, (G) a schedule of retained causes of action, (H) any other documents the Company and the Requisite Term Lenders agree shall comprise the Plan Supplement.

(n)        "*Required Lenders*" means the "Required Lenders" as defined in the Credit Agreement.

(o)        "*Required Parties*" means each of (A) the Company and (B) the Requisite Term Lenders.

(p)        "*Requisite Term Lenders*" means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Term Loans held by the Consenting Term Lenders as of such date.

3

(q)      "**_Restructuring Transactions_**" means all acts, events, and transactions contemplated by, required for, and taken to implement the Restructuring, the Definitive Documents, the Plan Supplement, this Agreement, and the Elected Transaction (as defined below), each in the singular and collectively, as applicable.

(r)      "**_SEC_**" means the Securities & Exchange Commission.

(s)      "**_Securities Act_**" means the Securities Act of 1933, as amended.

(t)      "**_Support Effective Date_**" means the date on which the counterpart signature pages to this Agreement shall have been executed and delivered by the Company and Consenting Term Lenders (A) holding at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans and (B) representing the Required Lenders.

(u)      "**_Support Period_**" means the period commencing on the Support Effective Date and ending on the earlier of the (A) date on which this Agreement is terminated in accordance with Section 5 hereof and (B) the Effective Date.

## 2.      Term Sheet and Plan.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Term Sheet, the Term Sheet shall control.

## 3.      Agreements of the Consenting Term Lenders.

(a)      Agreement to Support.  During the Support Period, subject to the terms and conditions hereof, each of the Consenting Term Lenders agrees, severally and not jointly, that it shall:

(i)      use its commercially reasonable efforts to support the Restructuring and the Restructuring Transactions, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring and the Restructuring Transactions, in a manner consistent with this Agreement;

(ii)      refrain from initiating (or directing or encouraging the Administrative Agent or any other party to initiate) any actions, including legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation, as applicable, of the Restructuring or Restructuring Transactions;

(iii)      timely vote (pursuant to the Plan) or cause to be voted all of its Claims (including on account of the Second Lien Notes, or any securities, owned or controlled by such Consenting Term Lender) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely

4

basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iv)    negotiate in good faith with the Company the forms of the Definitive Documents (to the extent such Consenting Term Lender is a party thereto) and subject to the consent thresholds specified herein execute the Definitive Documents;

(v)    not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote shall, without any further action by the applicable Consenting Term Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Term Lender at any time following the expiration of the Support Period with respect to such Consenting Term Lender;

(vi)    not directly or indirectly, through any Person, take any action that would reasonably be expected to prevent, interfere with, delay or impede the consummation of the Restructuring or Restructuring Transactions, including the approval of any Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Disclosure Statement, or the solicitation of votes on, and confirmation of, the Plan;

(vii)    use its commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate for such Consenting Term Lender to obtain any and all required regulatory and/or third-party approvals for such Consenting Term Lender to consummate the Restructuring Transactions; and

(viii)    support and take all reasonable actions necessary or reasonably requested by the Company to confirm such Consenting Term Lender's support for the Bankruptcy Court's approval of the Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Plan and Disclosure Statement, the solicitation of votes on the Plan by the Company, and the confirmation and consummation of the Plan and the Restructuring Transactions.

(b)    Transfers.

(i)    Each Consenting Term Lender agrees that, for the duration of the Support Period, such Consenting Term Lender shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of its Claims, including any beneficial ownership in any such Claims,[1] or any option thereon or any right or interest therein, unless the transferee thereof either (A) is a Consenting Term Lender (with respect to a transfer by a Consenting Term Lender) or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a

---

[1] As used herein, the term "*beneficial ownership*" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

WEIL:\96911452\1\41703.0010

Consenting Term Lender and to be bound by all of the terms of this Agreement applicable to Consenting Term Lenders (including with respect to any and all Claims it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil, Gotshal and Manges LLP ("*Weil*"), as counsel to the Company, (2) Kirkland & Ellis LLP, as counsel to an ad hoc group of Consenting Term Lenders ("*Kirkland*"), and (3) Davis Polk & Wardwell LLP ("*Davis Polk*"), as counsel to the Administrative Agent, in which event (x) the transferee shall be deemed to be a Consenting Term Lender hereunder to the extent of such transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims (such transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*").  Each Consenting Term Lender agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Term Lender shall have the right to enforce the voiding of such Transfer.

(ii)    Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims subject to this Agreement held by a Consenting Term Lender with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to become a party to this Agreement as a Consenting Term Lender, if (x) such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the transfer otherwise is a Permitted Transfer and (y) such Consenting Term Lender shall be solely responsible for the Qualified Marketmaker's failure to comply with this Section 3(b) and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of Claims that is not a Consenting Term Lender to a transferee that is not a Consenting Term Lender at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)    This Section 3(b) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Term Lender to Transfer any Claims.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

---

[2] As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public, the syndicated loan market, and/or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, and/or equity interests in, the Company, including Term Loans, or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, and/or debt or equity securities).

6

(c)     Additional Claims.    This Agreement shall in no way be construed to preclude the Consenting Term Lenders from acquiring additional Claims; provided that, to the extent any Consenting Term Lender (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan or (iii) holds or acquires any equity interests in the Company entitled to vote on the Plan, then, in each case, each such Consenting Term Lender shall promptly notify Weil, Kirkland and Davis Polk, and each such Consenting Term Lender agrees that all such Claims shall be subject to this Agreement, and agrees that, for the duration of the Support Period and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or equity interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof.  For the avoidance of any doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(d)     Preservation of Rights.    Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Term Lender, nor the acceptance of the Plan by any Consenting Term Lender, shall:  (i) be construed to limit consent and approval rights provided in this Agreement, the Term Sheet, and the Definitive Documentation; (ii) be construed to prohibit any Consenting Term Lender from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (iii) be construed to prohibit any Consenting Term Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring Transactions; (iv) impair or waive the rights of any Consenting Term Lender to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan; or (v) subject to Section 3(f), limit the ability of any Consenting Term Lender to assert any rights, claims, and/or defenses under the Credit Agreement, the Security Agreement (as defined in the Credit Agreement), and any related documents or agreements (including, without limitation, the right of any Consenting Term Lender to assert that any potential action of the Company or any Credit Party (as defined in the Credit Agreement) that is inconsistent with, or any potential omission of the Company or any Credit Party (as defined in the Credit Agreement) to take any action required, by the Credit Agreement and/or that a potential Default or Event of Default has occurred under the Credit Agreement).

(e)     Negative Covenants.    The Consenting Term Lenders agree that, for the duration of the Support Period, each Consenting Term Lender shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

7

## 4.      **Agreements of the Company.**

(a)      Covenants.  The Company agrees that, for the duration of the Support Period, the Company shall:

(i)      (A) support and use commercially reasonable efforts to consummate and complete the Restructuring, the Restructuring Transactions, and all transactions contemplated under this Agreement (including, without limitation, those described in the Term Sheet and once filed, any Bidding Procedures Motion, and the Plan) including, without limitation, (1) take any and all reasonably necessary actions in furtherance of the Restructuring, the Restructuring Transactions, and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet and, once filed, any Bidding Procedures Motion and the Plan, (2) commence the Chapter 11 Cases on or before the Outside Commencement Date and complete and file, within the timeframes contemplated herein, the Plan, the Disclosure Statement, and the other Definitive Documents, and (3) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving any Bidding Procedures Motion, and the Disclosure Statement and confirming the Plan within the timeframes contemplated by this Agreement; (B) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring Transactions embodied in the Definitive Documents, including the Plan; and (C) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of any Bidding Procedures Order, or the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring Transactions, in the case of each of clauses (A) through (C) to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors of the Company;

(ii)      not commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the Term Loans or obligations under the Credit Agreement;

(iii)      if the Company receives an unsolicited bona fide proposal or expression of interest in undertaking an Alternative Transaction that the boards of directors, members, or managers (as applicable) of the Company, determine in their good-faith judgment provides a higher or better economic recovery to the Company's stakeholders than that set forth in this Agreement and such Alternative Transaction is from a proponent that the boards of directors, members, or managers (as applicable) of the Company has reasonably determined is capable of timely consummating such Alternative Transaction, the Company will within 48 hours of the receipt of such proposal or expression of interest, notify Kirkland and Davis Polk of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved;

(iv)      provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, any Bidding Procedures Motion, any Bidding Procedures Order, the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the

8

Confirmation Order) the Debtors intend to file with the Bankruptcy Court to Kirkland and to Davis Polk, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than any Bidding Procedures Motion, the Plan, the Disclosure Statement, the Confirmation Order or an adequate protection order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)    file such "first day" motions and pleadings reasonably determined by the Debtors, in form and substance reasonably acceptable to the Requisite Term Lenders, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Debtors and the Requisite Term Lenders, from the Bankruptcy Court approving the relief requested in such "first day" motions;

(vi)    subject to appropriate confidentiality arrangements, provide to the Consenting Term Lenders' professionals, upon reasonable advance notice to the Company:  (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, and facilities; (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring or Restructuring Transactions; (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any debtor-in-possession and/or exit financing); and (D) prompt and reasonable responses to all reasonable diligence requests;

(vii)    use their commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring;

(viii)    promptly pay all prepetition and postpetition reasonable and documented fees and expenses of (x) Kirkland, FTI Consulting Inc. ("**FTI**"), and one firm acting as local counsel for the Requisite Term Lenders, if required, in each case in accordance with the terms of their respective engagement letters with the Company and (y) the Administrative Agent, Davis Polk, and one firm acting as local counsel for the Administrative Agent, if required, in each case, in accordance with the Credit Agreement and the Term Sheet;

(ix)    not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring;

9

(x)    subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring and the Restructuring Transactions, preserve intact in all material respects the current business operations of the Company (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, including the warehouse lenders, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties);

(xi)    provide prompt written notice to the Requisite Term Lenders between the date hereof and the Effective Date of (A) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions, (B) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions, and (C) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; and

(xii)    unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Commencement Date, pay to (A) Kirkland, (B) one firm acting as local counsel for the Requisite Term Lenders, if any, (C) FTI, (D) the Administrative Agent, (E) Davis Polk and (F) one firm acting as local counsel for the Administrative Agent, if any, in each case (x) all reasonable and documented fees and expenses accrued but unpaid as of such date, whether or not such fees and expenses are then due, outstanding, or otherwise payable in connection with this matter and (y) fund or replenish, as the case may be, any retainers reasonably requested by Kirkland or FTI, in each case in accordance with the terms of their respective engagement letters with the Company.

(b)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); <u>provided</u> that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)    <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Term Sheet, the Plan or any of the other Definitive Documents.

10

### 5.    Termination of Agreement.

(a)    This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with Section 19 hereof, from (x) the Requisite Term Lenders at any time after and during the continuance of any Lender Termination Event or (y) the Company at any time after and during the continuance of any Company Termination Event, as applicable.

(b)    A "*Lender Termination Event*" shall mean any of the following:

(i)    the breach by the Company of (a) any covenant contained in this Agreement or (b) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of five (5) business days following the Company's receipt of written notice pursuant to Sections 5(a) and 19 hereof (as applicable);

(ii)    any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereof (as applicable);

(iii)    the Definitive Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are materially inconsistent with the Term Sheet and are not otherwise acceptable to the Requisite Term Lenders, and such event remains unremedied for a period of three (3) business days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(iv)    a Definitive Document alters the treatment of the Term Lenders specified in the Term Sheet without complying with Section 9 hereof and the Requisite Term Lenders have not otherwise consented to such Definitive Document;

(v)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}\%$ in aggregate principal amount outstanding of the Term Loans;

(vi)    the Company, after delivery of an Election Notice (as defined below), fails to pursue consummation of the Elected Transaction or pursues consummation of a transaction other than the Elected Transaction;

(vii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

11

(viii)   the Support Effective Date shall not have occurred on or before the Commencement Date;

(ix)   the Commencement Date shall not have occurred on or before the Outside Commencement Date;

(x)   the Debtors shall not have complied with Milestones set out in the Term Sheet;

(xi)   the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein or (E) granting relief that is inconsistent with this Agreement or the Plan in any materially adverse respect to the Consenting Term Lenders, in each case;

(xii)   the Confirmation Order is reversed or vacated by a Final Order;

(xiii)   any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(xiv)   if either (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of, the obligations or Claims under the Credit Agreement or (2) challenging the seniority of the obligations or Claims under the Credit Agreement over any obligations or Claims under the Second Lien Notes Indenture or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Term Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Credit Agreement;

(xv)   the terms and conditions of the debtor-in-possession financing (including, but not limited to, any Definitive Documents memorializing such facility) are not acceptable to the Requisite Term Lenders in all material respects;

(xvi)   the debtor-in-possession financing contemplated by the Term Sheet is not approved by the Bankruptcy Court or terminated;

(xvii)   the Company (unless the Company is acting at the direction or instruction or with the consent of the Requisite Term Lenders, including any of their respective employees, agents, or representatives) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction;

WEIL:\96911452\1\41703.0010

(xviii) the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xix)    if the Company (A) withdraws the Plan, (B) publicly announces its intention not to support the Restructuring or the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction;

(xx)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan); or

(xxi)    if the Company or any other Credit Party (as defined in the Credit Agreement) makes, or causes to be made, any payment of principal or interest on any indebtedness constituting Second Lien Notes.

(c)    A "*Company Termination Event*" shall mean any of the following:

(i)    the breach in any material respect by one or more of the Consenting Term Lenders, of any of the undertakings, representations, warranties, or covenants of the Consenting Term Lenders set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 5(a) and 19 hereof (as applicable), but only if the non-breaching Consenting Term Lenders own less than $66^{2/3}$% of the Claims;

(ii)    the board of directors, members, or managers (as applicable) of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company shall provide notice of such determination to Kirkland and Davis Polk via email within one (1) business day after the date thereof;

(iii)    the Company shall not have obtained votes accepting the Plan from holders of the Term Loans sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(iv)    the Support Effective Date shall not have occurred on or before the Commencement Date;

(v)    if the Effective Date shall not have occurred on or before 125 days following the Commencement Date;

13

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance; or

(vii)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}\%$ in aggregate principal amount outstanding of the Term Loans;

(d)    <u>Mutual Termination</u>.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Term Lenders upon the receipt of written notice delivered in accordance with <u>Section 19</u> hereof.

(e)    <u>Automatic Termination</u>.    This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.

(f)    <u>Effect of Termination</u>.    Upon the termination of this Agreement in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) if the Restructuring has not been consummated, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    Upon any such termination of this Agreement, each vote or any consents given by any Consenting Term Lender prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Term Lender.    If this Agreement has been terminated as to any Consenting Term Lender in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) at a time when permission of the Bankruptcy Court shall be required for a Consenting Term Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall support and not oppose any attempt by such Consenting Term Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 12</u> hereof.    The Consenting Term Lender shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this <u>Section 5</u> and <u>Section 19</u> hereof.

14

(g)    If the Restructuring has not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

### 6.    Definitive Documents; Good Faith Cooperation; Further Assurances.

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.    Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided that no Consenting Term Lender shall be required to incur any material cost, expense, or liability in connection therewith.

### 7.    Representations and Warranties.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Term Lender that becomes a party hereto after the date hereof, as of the date such Consenting Term Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

15

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Term Lender severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Term Lender becomes a party hereto), such Consenting Term Lender (i) is the beneficial owner of the aggregate principal amount of Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Term Lender that becomes a party hereto after the date hereof) and does not beneficially own any other Term Loans and/or (ii) has, with respect to the beneficial owners of such Term Loans, (A) sole investment or voting discretion with respect to such Term Loans, (B) full power and authority to vote on and consent to matters concerning such Term Loans or to exchange, assign and transfer such Term Loans and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Term Lender severally (and not jointly) makes the representations and warranties set forth in this Section 7, in each case, to the other Parties.

**8.    Disclosure; Publicity.**

(a)    Subject to the provisions set forth in Section 8(b) hereof, the Company shall disseminate publication on Form 8-K or a press release disclosing the existence of this Agreement and the terms hereof (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Commencement Date) with such redactions as may be reasonably requested by Kirkland to maintain the confidentiality of the items identified in Section 8(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Term Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 8 hereof), and the Company hereby waives any claims against the Consenting Term Lenders arising as a result of such disclosure by a Consenting Term Lender in compliance with this Agreement.

(b)    The Company shall submit drafts to Kirkland of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or any

16

other matter relating to the Term Loans, at least one (1) business day prior to making any such disclosure, and any such press releases, public documents, and other SEC filings shall be reasonably acceptable in all material respects to the Requisite Term Lenders. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Term Lender, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Term Lender), other than advisors to the Company, the principal amount of the Term Loans held by the Consenting Term Lender, without such Consenting Term Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Term Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Term Lender) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Term Loans held by all the Consenting Term Lenders collectively.

### 9.    Amendments and Waivers; Term Lender Election.

(a)    This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company and the Requisite Term Lenders; provided, however, that any waiver, modification, amendment or supplement to this Section 9 shall require the written consent of all of the Parties; provided, further, that any modification, amendment or change to the definition of Requisite Term Lenders shall require the written consent of each Consenting Term Lender; provided, further, that any change, modification or amendment to this Agreement, the Term Sheet, or the Plan that treats or affects any Consenting Term Lender in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Term Lenders are treated (after taking into account each of the Consenting Term Lender's respective holdings and interests in the Company and the recoveries contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Term Lender; provided, further, that if any change, modification or amendment to this Agreement, the Term Sheet or the Plan does not materially, adversely affect the rights of a Consenting Term Lender, the consent of such Consenting Term Lender shall not be required.  In the event that an adversely affected Consenting Term Lender ("***Non-Consenting Term Lender***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Term Lender, but such waiver, change, modification or amendment receives the consent of Consenting Term Lenders owning at least $66^{2/3}$% of the aggregate outstanding principal amount of the Term Loans, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Term Lender, but this Agreement shall continue in full force and effect in respect to all other Consenting Term Lenders who have so consented, in a way consistent with (or otherwise reasonably acceptable to the Requisite Term Lenders) this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

17

(b)    Unless extended by the Company, within five (5) business days following the earlier of (a) the conclusion of the Company's post-Commencement Date marketing and sale process and (b) 95 days after the Commencement Date (the earliest such date, the "*Election Date*"), holders of at least 662/3% in aggregate principal amount outstanding of the Term Loans (the "Electing Term Lenders") shall deliver a notice (the "*Election Notice*") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "*Elected Transaction*"), being a: (i) Reorganization Transaction, or (ii) Master Servicing Transaction (as part of a Reorganization Transaction), or (iii) Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), (ii), or (iii), any Asset Sale Transaction(s); provided that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected transaction in (i), (ii), or (iii).

10.    **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Support Effective Date, and not before such date; provided that signature pages executed by Consenting Term Lenders shall be delivered to (a) the other Consenting Term Lenders in a redacted form that removes such Consenting Term Lenders' holdings of the Term Loans or any other Claims against or interests in the Company and any schedules to such Consenting Term Lenders' holdings (if applicable) and (b) the Company, Weil and Kirkland in an unredacted form (and to be kept confidential by the Company, Weil and Kirkland).

11.    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of

18

notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

(c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.      Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 13.      Survival.

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 13, and Sections 4(b), 5(f), 8, 10, 11, 12, 14, 15, 16, 17, 18, 19, and 20 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 14.      Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

## 15.      Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives;

provided, however, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Term Loans or claims arising under the Term Loans other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

## 16.     No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

## 17.     Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Term Lender shall continue in full force and effect.

## 18.     Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile or by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

## 19.     Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)     If to the Company or Debtors, to:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn:  John Haas, General Counsel, Chief Legal Officer and Secretary

Email:  JHaas@ditech.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Ray C. Schrock, P.C.
Email:  Ray.Schrock@weil.com
Attn:  Sunny Singh, Esq.
Email:  Sunny.Singh@weil.com
Attn: Alexander Welch, Esq.
Email: Alexander.Welch@weil.com

(2)    If to a Consenting Term Lender, or a transferee thereof, to the addresses or
facsimile numbers set forth below following the Consenting Term
Lender's signature (or as directed by any transferee thereof), as the case
may be, with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 606545
Attn:  Patrick J Nash Jr., P.C.
Email:  Patrick.Nash@kirkland.com
Attn:  John Luze
Email:  John.Luze@kirkland.com

(3)    If to the Administrative Agent:

Credit Suisse AG
11 Madison Avenue,
New York, NY 10010
Attn:  Megan Kane
Email:  Megan.Kane@credit-suisse.com
Attn:  Peter Winstanley
Email:  Peter.Winstanley@credit-suisse.com

With a copy to (which shall not constitute notice):

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Brian M. Resnick
Email:  Brian.Resnick@davispolk.com
Attn: Michelle McGreal
Email:  Michelle.Mcgreal@davispolk.com

21

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**20.    Reservation of Rights; No Admission.**

(a)    Nothing contained herein shall:  (i) limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder, or under the terms of the Plan; (ii) limit the ability of any Consenting Term Lender to sell or enter into any transactions in connection with the Second Lien Notes owned or controlled by such Consenting Term Lender, or any other claims against or interests in the Company, subject to the terms of Section 3(b) hereof; (iii) limit the rights of any Consenting Term Lender under the Credit Agreement or any agreements executed in connection with the Credit Agreement; or (iv) constitute a waiver or amendment of any provision of the Credit Agreement or any agreements executed in connection with the Credit Agreement.

(b)    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  This Agreement, the Term Sheet and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

**21.    Relationship Among Consenting Term Lenders.**

It is understood and agreed that no Consenting Term Lender has any duty of trust or confidence in any kind or form with any other Consenting Term Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Term Lender may trade in the Second Lien Notes or other debt of the Company without the consent of the Company or any other Consenting Term Lender, subject to applicable securities laws, the terms of this Agreement, and any confidentiality agreement entered into with the Company; provided that no Consenting Term Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement.   No prior history, pattern, or practice of sharing

22

confidences among or between the Consenting Term Lender shall in any way affect or negate this understanding and agreement.

### 22.    No Solicitation; Representation by Counsel; Adequate Information.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Term Lenders or a solicitation to tender or exchange any of the Term Loans.  The acceptances of the Consenting Term Lenders with respect to the Plan will not be solicited until such Consenting Term Lender has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Term Lender acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act), (iii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Term Lender's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Term Lender is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

23

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

Dated: February 8, 2019

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By: _____

Name: Joanna Colaneri

Title:   Senior Vice President and
         Treasurer

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

Dated: February 8, 2019

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By: _____

Name: Laura Reichel

Title:   President

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

Dated: February 8, 2019

**MARIX SERVICING LLC**

By: _____
Name: Clinton Hodder
Title:   President

WEIL:\96908887\2\41703.0010

Dated:  February   8, 2019

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By: _____

Name: Jeanetta Brown
Title:  Vice President

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

## EXHIBIT A

## RESTRUCTURING TERM SHEET

EXECUTION VERSION

## DITECH HOLDING CORPORATION
## RESTRUCTURING TERM SHEET

**This Term Sheet is attached as <u>Exhibit A</u> to the restructuring support agreement dated February 8, 2019 (as amended and restated), by and among holders (the "*Consenting Term Lenders*") of outstanding Term Loans (as defined in the Credit Agreement (defined below)) and Ditech Holding Corporation (the "*RSA*"). Capitalized terms used in this Term Sheet not defined shall have the meaning ascribed to them in <u>Annex A</u>.**

**This Term Sheet is not an offer or a solicitation with respect to any securities of the Company, nor is it a solicitation of acceptances of a plan of reorganization as contemplated by sections 1125 and/or 1126 of the Bankruptcy Code. Any such offer or solicitation shall comply with all applicable securities laws and/or provisions of the Bankruptcy Code.**

**This Term Sheet is a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet is protected by rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions.**

**This Term Sheet is for discussion purposes only and does not purport to summarize all of the terms, conditions, representations, warranties, and other provisions with respect to the transactions described herein, which transactions will be subject to the completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such definitive documents. No binding obligations will be created by this Term Sheet unless and until binding definitive documents are executed and delivered by all applicable parties.**

| Introduction | |
|---|---|
| **Overview** | This Term Sheet summarizes the terms of a restructuring (the "***Restructuring***") of the Company to be effectuated pursuant to the Plan. |
| **The Company** | Ditech Holding Corporation ("***Ditech***") and its subsidiaries that will be debtors and debtors in possession (the "***Debtors***" or collectively, the "***Company***"). |
| **Claims and Interests to be Restructured** | <u>First Lien Senior Secured Term Loan Claims</u>: Claims on account of term loans ("***Term Loan Claims***") under that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) (the "***Credit Agreement***"), among Ditech, the lenders party thereto (each, a "***Term Lender***"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the Term Lenders (the "***Administrative Agent***"). Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus any amounts owing on account of call protections contained in the Credit Agreement, plus all accrued interest, costs, fees, and expenses under the Credit Agreement. <br><br> <u>Second Lien Notes Claims</u>: Claims on account of the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 (the "***Second Lien Notes***"), |

| Introduction | |
|---|---|
| | issued by Ditech pursuant to the Indenture dated as of the Effective Date (as amended, restated, supplemented or otherwise modified from time to time), under which the Second Lien Notes were issued, among Ditech, as issuer, certain of the subsidiary guarantors party thereto, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (the "***Second Lien Notes Trustee***"). |
| | <u>General Unsecured Claims</u>: Consisting of any Claim against the Company (other than any Intercompany Claims or Go-Forward Trade Claims (as defined below) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court including any deficiency claim under section 506(a) of the Bankruptcy Code (collectively, the "***General Unsecured Claims***"). |
| | <u>Go-Forward Trade Claims</u>: Consisting of any Claim against the Company (other than any Intercompany Claims or General Unsecured Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of New Ditech (the "***Go-Forward Trade Claims***"). |
| | <u>Existing Equity Interests</u>: Consisting of any common stock, preferred stock, warrants, or other ownership interest of or in Ditech pursuant to the Ditech Certificate of Incorporation or otherwise that are issued and outstanding as of the Commencement Date (the "***Existing Equity Interests***"). |
| **Transaction Overview** | |
| **Implementation** | The Company will commence the Chapter 11 Cases and implement the Restructuring pursuant to the Plan as provided in the RSA. The transactions in this Term Sheet may be effectuated pursuant to the Plan as (a) a standalone reorganization and/or credit bid of Allowed Term Loan Claims by the Term Lenders; or (b) a sale to a third party. |
| **DIP Financing** | The Company will execute certain new refinancing agreements to be entered into by Ditech Financial LLC and Reverse Mortgage Solutions Inc., as borrowers (the "***DIP Warehouse Facility***"), which shall provide for the refinancing of existing warehouse, repurchase, and advance facilities of Ditech Financial LLC and Reverse Mortgage Solutions Inc., including the Existing Warehouse and Repurchase Facilities; *provided* that, the terms and conditions of the DIP Warehouse Facility (including, but not limited to, any Definitive Documents memorializing the DIP Warehouse Facility) shall be acceptable to the Requisite Term Lenders in all material respects; *provided further*, that, exit financing refinancing the DIP Warehouse Facility shall be raised following the Commencement Date but prior to the Effective Date (if necessary). |
| **Exit Working Capital Facility** | On the Effective Date, the Company, subject to the consent of the Requisite Term Lenders, shall enter into a new-money revolver or delayed-draw term loan facility in an amount equal to $150 million (the "***Exit Working Capital*** |

2

| Introduction | |
|---|---|
| | *Facility*"), or such lesser amount as is acceptable to the Company and the Requisite Term Lenders; *provided*, that, $30 million of the Exit Working Capital Facility may be reserved for a letter of credit sub-facility or synthetic letter of credit sub-facility (or shall have a reserve for any separately incurred letter of credit facility not to exceed $30 million). The terms of the Exit Working Capital Facility shall be otherwise in form and substance acceptable to the Requisite Term Lenders and the Company; provided, that, the Exit Working Capital Facility shall be co-terminus with the Amended and Restated Term Loan Facility.<br><br>The Exit Working Capital Facility will be funded by: (i) some or all of the Term Lenders providing a revolving credit facility or similar financing, subject to ongoing diligence and acceptable documentation; (ii) third party senior financing; (iii) asset sales, or (iv) some combination of the foregoing (i), (ii) and (iii), each of (i)-(iv) on customary terms and otherwise acceptable to the Company and Requisite Term Lenders; *provided* that with respect to any third party senior financing, the Consenting Term Lenders shall have the option to fund any such financing on substantially the same terms in place of any third party financing source. |
| **Use of Cash Collateral** | The Company will be authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) of the Term Lenders with the consent of the Administrative Agent, acting at the direction of the Requisite Term Lenders, subject to the following terms and conditions and such other terms and conditions that are mutually acceptable to the Company and the Requisite Term Lenders; provided that notwithstanding anything to the contrary herein, the following shall be subject in all respects to the terms of the orders approving the DIP Warehouse Facility:<br><br>• <u>Adequate Protection Lien</u>. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive a replacement security interest in and lien on (the "**Term Loan AP Liens**") all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to (i) Permitted Liens (as defined in the Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the Obligations under the Credit Agreement and (ii) the liens granted under the DIP Warehouse Facility (the "**DIP Liens**") and (iii) a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "*Carve Out*"). The Term Loan AP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | • **507(b) Claim**. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b) with priority over all other administrative expenses, subject to the Carve Out and adequate protection granted on account of the DIP Warehouse Facility.<br><br>• **Adequate Protection Payments**. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Administrative Agent (in accordance with the Credit Agreement), including but not limited to Kirkland and FTI, as provided herein; *provided*, that, subject to the terms of the Intercreditor Agreement, the right of any party in interest (other than, so long as the RSA is in effect, the Company) to file a complaint with the Bankruptcy Court to recharacterize any such payments as payments against principal on the ground that the Allowed Term Loans are under-collateralized is reserved, subject to the rights of the Administrative Agent and Term Lenders to oppose such complaint and raise any and all defenses thereto.<br><br>• **Financial Reporting**. Until the Effective Date, the Debtors shall continue to provide the Administrative Agent, Kirkland, and FTI with financial and other reporting in compliance with the Prepetition Documents and any reporting described in the Financing Orders, including monthly financial reporting in form and substance reasonably acceptable to the Requisite Term Lenders.<br><br>The Company will be authorized to use any collateral, including cash collateral (as defined in section 363(a) of the Bankruptcy Code), of the holders of Second Lien Notes, and the Second Lien Notes Trustee (on behalf of itself and the holders of Second Lien Notes) shall receive a replacement security interest in and lien on all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate to (i) the DIP Liens; (ii) the Term Lenders AP Liens; (iii) the prepetition liens of the Term Lenders; (iv) permitted liens under the indenture governing the Second Lien Notes to the extent any such liens are senior in priority under applicable non-bankruptcy law to the liens securing the Second Lien Notes and (v) the Carve Out. The second lien adequate protection liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. Neither the Second Lien Notes Trustee nor holders of Second Lien Notes shall receive any other form of adequate protection. |
| **Amended and Restated Credit Facility Agreement** | On the Effective Date, New Ditech and the Term Lenders will enter into or shall be deemed to have entered into, pursuant to the Plan, the Third Amended and Restated Credit Facility Agreement, included as an exhibit to the Plan Supplement in form and substance consistent with this Term Sheet and otherwise acceptable to the Requisite Term Lenders and the Company (the |

4

| Introduction |
|---|

| | "**Amended and Restated Credit Facility Agreement**"). |
|---|---|
| | The Amended and Restated Credit Facility Agreement shall provide for new term loans (the "**New Term Loans**"), which New Term Loans shall provide for the following material terms:<br><br>• Principal Amount:  $400,000,000<br><br>• Maturity Date:  5 Years post-Effective Date.<br><br>• Interest Rate:  LIBOR + 6.0% cash interest per annum, plus 2.0% PIK interest per annum.<br><br>• Amortization:<br>  ○ 2019: None<br>  ○ 2020: [TBD]<br>  ○ 2021: [TBD]<br><br>• Call Protection: callable at 103%, 102%, 101% for the first, second, and third years, respectively, following the Effective Date.<br><br>• Covenants:  no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company, and to include the following:<br><br>  ○ Minimum Tangible Net Worth: [TBD]<br><br>  ○ Asset Coverage Tests: [TBD]<br><br>  ○ Monthly MSR Detailed Information: [TBD]<br><br>  ○ All covenant levels and thresholds to be otherwise acceptable to the Requisite Term Lenders and the Company.<br><br>• Cash Sweep:  [TBD]<br><br>• Closing Conditions: customary closing conditions (including, but not limited to, customary legal opinions from borrower's counsel (including local counsel)) and otherwise as acceptable to the Requisite Term Lenders and the Company.<br><br>The Amended and Restated Credit Facility Agreement shall provide for other financial covenants, other covenants, representations, warranties, and Events of Default (taken as a whole) no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company. |
| **New Common Stock** | On the Effective Date, New Ditech will issue new common stock of the Company (the "**New Common Stock**"), and which will be in a form and manner acceptable to the Requisite Term Lenders. |
| **No Substantive Consolidation** | The Plan will be implemented without any substantive consolidation. |

WEIL:\96911480\1\41703.0010

| Introduction |
| --- |

| | |
| --- | --- |
| **Marketing Process** | "**Reorganization Transaction**" means, collectively, (a) the issuance of the New Common Stock; (b) the entry into the New Term Loans; (c) the entry into the Exit Working Capital Facility; (d) the execution of any new organizational documents; (e) the vesting of the Company's assets in New Ditech pursuant to the Plan; (f) the consummation of any transactions with respect to the foregoing, as determined by the Requisite Term Lenders in their reasonable discretion in accordance with the RSA; and (g) if applicable and only if the terms there of are acceptable to the Requisite Term Lenders, a Master Servicing Transaction. |
| | "**Master Servicing Transaction**" means, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (the "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer. The Debtors shall conduct request for proposal process for the Master Servicing Transaction in accordance with the Bid Procedures. |
| | "*Sale Transaction*" means the sale of substantially all of the Company's assets, as contemplated by one or more Successful Bids, in each case, as provided in the RSA. |
| | "*Successful Bid*" means one or more bids to purchase all or substantially all of the Company's assets that the Company determines, in an exercise of its business judgment: (a) provides sufficient cash consideration to satisfy the following Claims in full in cash in accordance with the priorities set forth in the plan: (i) Allowed Other Secured Claims (except to the extent the applicable purchase agreement provides for a different method of rendering such Claims unimpaired); (ii) Allowed Administrative Claims; (iii) Allowed Professional Fee Claims; (iv) Allowed Priority Tax Claims (unless paid in another manner permitted by section 1129(a)(9)(c) of the Bankruptcy Code); (v) Allowed Other Priority Claims; (vi) pays in full in cash the prepetition warehouse facilities and the DIP Warehouse Facility Claims; and (vii) Allowed Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion); (b) provides consideration that the Company and the Requisite Term Lenders determine is sufficient to pay or reserve for payments pursuant to and in accordance with the Plan, including consideration sufficient to wind down the estates following the closing of the Sale Transaction; and (c) includes such other terms and conditions as the Company and the Requisite Term Lenders may reasonably require. |
| | "*Asset Sale Transaction*" means the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders. Net proceeds of any Asset Sale Transaction shall be "*Asset Sale Proceeds*." |
| | Following the Commencement Date, the Company shall oversee and manage the sale process and solicit bids for a potential Sale Transaction, Master Servicing Transaction, and if applicable, an Asset Sale Transaction, in good- |

6

| Introduction | |
|---|---|
| | faith consultation with the Requisite Term Lenders.  The sale and plan solicitation process shall generally be conducted in accordance with the procedures and timeline set forth on in the Bidding Procedures and the order approving the Disclosure Statement, subject to approval of the Bankruptcy Court.  The Requisite Term Lenders and their advisors shall have the right to review all information, diligence, and materials provided by the investment banker retained by the Company to any bidder or prospective bidder with respect to the sale and to consult with such investment banker with respect to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction. The Company and the advisors for the Requisite Term Lenders shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders and their advisors with respect thereto. |
| | The Company shall solicit bids on any and all bases, including soliciting bids that do not pay Allowed Term Loans in full.  The Company shall only consummate the Sale Transaction on the Effective Date, if the Company receives a bid with respect to a possible Sale Transaction that would satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion) in full in Cash and would satisfy the DIP Warehouse Facility in full in Cash. |
| **Milestones** | The Consenting Term Lenders' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "***Milestones***"), which may be extended with the prior written consent of the Requisite Term Lenders: |
| | •     File the Plan, Disclosure Statement, and a motion seeking Bankruptcy Court approval of the Bidding Procedures:  not later than 15 days after the Commencement Date; |
| | •     Entry of Orders approving the Disclosure Statement and Bidding Procedures:  not later than 50 days after the Commencement Date; |
| | •     Deadline to commence the Auction:  not later than 95 days after the Commencement Date; |
| | •     Deadline to commence the Confirmation Hearing:  not later than 115 days after the Commencement Date; and |
| | •     Deadline for Effective Date under the Plan to Occur; not later than 125 days from the Commencement Date. |
| **Treatment of Claims and Interests** | |
| **Class** | **Treatment** |
| **DIP Warehouse** | **Unimpaired; Non-Voting**.  The DIP Warehouse Facility Claim shall be paid |

WEIL:\96911480\1\41703.0010

| Introduction |
|---|
| **Facility Claims** | in full in Cash on the Effective Date. |
| **Other Priority Claims, Priority Tax Claims, Other Secured Claims** | **Unimpaired; Non-Voting.** All Priority Tax Claims, other priority Claims, and other secured Claims, other than those Claims otherwise referenced herein, will be unimpaired under the Plan and/or paid in full in the ordinary course of business. |
| **Term Loan Claims** | **Impaired; Voting.** Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of (i) New Term Loans under the Amended and Restated Credit Facility Agreement; (ii) 100% of the New Common Stock; *provided* that the New Common Stock will be subject to dilution by the Management Incentive Plan, and (iii) if applicable, Asset Sale Proceeds; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of Cash in an amount equal to all Allowed Term Loan Claims, and if applicable, Asset Sale Proceeds. |
| **Second Lien Notes Claims** | **Impaired; Non-Voting**.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, the holders of such Claims will not receive any distribution; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date the holders of Second Lien Notes will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to under applicable nonbankruptcy law (subject to the Intercreditor Agreement) after the Term Loan Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **General Unsecured Creditors** | **Impaired; Non-Voting**. Holders of all General Unsecured Claims shall not be entitled to any recovery under the Plan; provided, that, in a Sale Transaction, holders of General Unsecured Claims will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to receive after the Term Loan Claims and Second Lien Notes Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **Go-Forward Trade Claims** | **Impaired; Non-Voting**.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, holders of |

8

| Introduction | |
|---|---|
| | all Go-Forward Trade Claims shall receive a distribution in Cash in an amount equaling not less than [●]% of their Claim, subject to an aggregate cap of $[●], after which any further payments on account of Go-Forward Trade Claims will be subject to the consent of the Requisite Term Lenders; or |
| | b) **If the Company consummates the Sale Transaction**, holders of Go-Forward Trade Claims shall receive the same treatment as General Unsecured Creditors. |
| **Intercompany Claims** | **Impaired or Unimpaired; Non-Voting**.   Intercompany Claims shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Intercompany Interests** | **Impaired or Unimpaired; Non-Voting**. Intercompany Interests shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Subordinated Security Claims** | **Impaired; Deemed to Reject**.  Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan. |
| **Existing Equity Interests** | **Impaired; Deemed to Reject**.  Holders of Existing Equity Interests issued and outstanding as of the Effective Date will not receive any recovery on account of their Existing Equity Interests under the Plan and such Existing Equity Interests shall be cancelled and deemed to reject the Plan. |

| Other Key Terms | |
|---|---|
| **Term** | **Description** |
| **Management Incentive Plan** | Following the Effective Date, New Ditech will enter into a post-Restructuring management incentive plan ("**Management Incentive Plan**"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  If the Company pursues a Reorganization Transaction, the Company shall file a term sheet with proposed terms of the Management Incentive Plan, including initial allocations, no later than the Plan Supplement filing date. |
| **Private Company** | New Ditech will be privately held and shall not be subject to any United States Securities and Exchange Commission reporting obligations. |
| **Government Entities Contracts** | All contracts with government entities such as Ginnie Mae, FNMA, and FHLMC will be assumed or honored as part of the Company's first day relief. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Intercreditor Agreement** | The Intercreditor Agreement shall remain in full force and effect and shall be fully enforceable according to its terms. |
| **Credit Bidding** | Upon the direction of the Term Lenders, the Administrative Agent or its designee shall have the right to credit bid all or any portion of the Term Loan Claims in accordance with section 363(k) of the Bankruptcy Code in connection with any transaction, including a Sale Transaction or the Reorganization Transaction, if structured as a sale transaction. |
| **Executory Contracts** | Unless the Company is pursuing a Sale Transaction, subject to the prior written consent of the Requisite Term Lenders, all executory contracts and unexpired leases, other than those expressly identified by the Company for assumption, will be deemed rejected. |
| **Employee Compensation and Benefit Plans** | To be discussed. |
| **Board of Directors of New Ditech** | Upon the Effective Date, the Board of New Ditech will consist of five (5) members, four (4) of whom shall be nominated by the Requisite Term Lenders and one (1) of whom shall be the chief executive officer of New Ditech, Thomas F. Marano.<br><br>Corporate governance for New Ditech, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with this Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable) and documentation therefor shall be otherwise acceptable to the Requisite Term Lenders. |
| **Charter; Bylaws** | The charter, bylaws, limited liability company agreements and other organizational documents of New Ditech and each of its subsidiaries will be amended or amended and restated by New Ditech consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and otherwise in accordance with the Plan, and the RSA. |
| **Cancellation of Notes, Interest, Instruments, Certificates and other Documents** | Except as provided herein and in connection with the Credit Agreement, on the Effective Date, all notes, instruments, certificates evidencing debt to, or Interests in, the Company, including, without limitation, the Second Lien Notes and Existing Equity Interests, will be cancelled and obligations of the Company thereunder will be discharged.  In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets** | On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Company's Estate will vest in New Ditech free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Compromise and Settlement** | The Plan will contain provisions for the compromise and settlement of Claims stating that, except as provided herein, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Released Parties** | "***Released Parties***" means, collectively:  (a) the Consenting Term Lenders; (b) the Administrative Agent; (c) such other entities as agreed between the Company and the Requisite Term Lenders; and (d) with respect to each of the Company, New Ditech, and each of the foregoing entities in clauses (a) through (c), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees. |
| **Releases** | To the extent the Restructuring is consummated, the Plan will provide for releases with language substantially to the effect of the following:

Releases by the Company:  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the confirmation order for the Plan, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Company, New Ditech, and Estate and all affiliates or subsidiaries managed or controlled thereby, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Company, or New Ditech (as the case may be), or the Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company, or New Ditech (as the case may be), or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or other person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Company, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or contractual arrangements between any of the Company and any Released Party, the Restructuring, the restructuring of any Claim or interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, and the Plan |

11

| Introduction |
| --- |

| | and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than claims or causes of action arising out of or related to any act or omission of a Released Party that constitutes fraud or willful misconduct, as determined by a Final Order.

Releases by holders of Impaired Claims: As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in confirmation order for the Plan, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by

(1)      the holders of Impaired Claims who voted to accept the Plan;

(2)      the parties to the RSA, in accordance with and subject to the terms of the RSA; and

(3)      with respect to any entity in the foregoing clauses (1) and (2), such Entity's (a) predecessors, successors and assigns, (b) any subsidiaries, affiliates, managed accounts or funds, managed or controlled by such entity and (c) all persons entitled to assert claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases,

in each case, from any and all Claims, interests or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or New Ditech, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided* that nothing in this the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Injunction** | The Plan will provide for an injunction solely with respect to any Claim or Interest extinguished, discharged, or released pursuant to the Plan, with language substantially to the effect of the following:<br><br>(a)       Upon entry of the confirmation order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.<br><br>(b)       Except as expressly provided in the Plan, the confirmation order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.<br><br>(c)       By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in the Plan.<br><br>(d)       The injunctions in the Plan shall extend to any successors of the Debtors and New Ditech and their respective property and interests in property. |
| **Exculpation** | The Plan will provide that "***Exculpated Parties***" will have the same meaning as Released Parties. |

WEIL:\96911480\1\41703.0010

| Introduction |
|---|
| | The Plan will contain exculpation provisions with language substantially to the effect of the following:<br><br>To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company; the negotiation and pursuit of the Disclosure Statement, the RSA, the Restructuring Transactions, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Tax Treatment** | The Restructuring contemplated by this Term Sheet shall be structured, with the reasonable consent of the RSA Parties, (1) to preserve favorable tax attributes of the Company to the extent practicable and (2) in a tax efficient manner for the Consenting Term Lenders and the Company. |
| **Conditions to Effectiveness** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are reasonably satisfactory to the Company and the Requisite Term Lenders including the following:<br><br>1.  the Definitive Documents will contain terms and conditions consistent in all respects with this Term Sheet and the RSA and will otherwise be satisfactory or reasonably satisfactory in form and substance to the Requisite Term Lenders and the Company to the extent set forth in the RSA or this Term Sheet;<br><br>2.  the Bankruptcy Court will have entered the confirmation order for the Plan, and such confirmation order will not have been reversed, stayed or modified;<br><br>3.  the RSA will not have been terminated, and will be in full force and effect;<br><br>4.  all Restructuring Expenses will have been paid in full in Cash;<br><br>5.  the conditions to closing of the Amended and Rested Credit Facility Agreement and Exit Working Capital Facility shall have been satisfied; and<br><br>6.  all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable |

14

| Introduction | |
|---|---|
| | waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.<br><br>The conditions to effectiveness may be waived in writing by the Company together with the Requisite Term Lenders. |
| **Securities Exemptions** | The issuance and distribution under the Plan of the New Common Stock, if applicable, to the Term Lenders will be exempt from registration under the Securities Act or other applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code and/or any other applicable exemptions. |
| **Fees and Expenses** | The Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Commencement Date) of Kirkland & Ellis LLP and FTI Consulting, in connection with the subject matter of this Term Sheet and the Restructuring pursuant to the economic terms of their respective engagement letters. The Company will also pay the fees and expenses of the Administrative Agent (including its counsel) in the manner set forth in, and to the extent required by, the Credit Agreement. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements and (e) other purposes. |
| **Resolution of Disputed Claims** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court. Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their Allowed Claim. |
| **Definitive Documents** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet, and in accordance with the RSA. |
| **Other Terms** | Acceptable to the RSA Parties in accordance with the RSA. |

WEIL:\96911480\1\41703.0010

**ANNEX A**

**Certain Defined Terms**

16

| Defined Terms | |
|---|---|
| **"*Administrative Expense Claim*"** | Means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) any Claim under the DIP Warehouse Facility, against a Debtor. |
| **"*Allowed*"** | Means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or New Ditech, (c) as to which the liability of the Debtors or New Ditech, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) New Ditech shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| **"*Bankruptcy Code*"** | Has the same meaning as in the RSA. |
| **"*Bankruptcy Court*"** | Has the same meaning as in the RSA. |
| **"*Bidding Procedures*"** | Means the procedures governing the auction and sale process relating to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise as acceptable to the Company and the Requisite Term Lenders. |
| **"*Cash*"** | Means legal tender of the United States of America. |
| **"*Cause of Action*"** | Means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or |

WEIL:\96911480\1\41703.0010

| Defined Terms | |
|---|---|
| | unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim. |
| *"Chapter 11 Cases"* | Means the cases under chapter 11 of the Bankruptcy Code to be commenced by the Company by no later than the Outside Commencement Date, in the Bankruptcy Court and styled *In re Ditech Holding Corp.*; *provided*, that, to the extent that any other subsidiary or affiliate of the Company commences a case under chapter 11 of the Bankruptcy Code, the Company will seek to have such case jointly administered on a procedural basis with the Company's chapter 11 cases, and any reference to the Chapter 11 Cases shall be deemed to include such other cases (if any) filed by the Company's subsidiaries and affiliates. |
| *"Claim"* | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| *"Class"* | Any group of Claims or Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *"Confirmation Hearing"* | A hearing at which the Bankruptcy Court will confirm the Plan, as applicable. |
| *"Definitive Documents"* | Shall have the same meaning as in the RSA, as applicable. |
| *"Disclosure Statement"* | The disclosure statement filed by the Debtors in support of the Plan. |
| *"Effective Date"* | Shall have the same meaning as in the RSA. |
| *"Estate(s)"* | Individually or collectively, the estate or estates of a Debtor created under section 541 of the Bankruptcy Code. |
| *"Existing Warehouse and Repurchase Facilities"* | Means, each of and collectively, the (i) Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017, by and among Reverse Mortgage Solutions, Inc., as seller, the seller parties party thereto, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party thereto, (ii) Amended and Restated Master Repurchase Agreement, dated November 18, 2016, by and among Ditech Financial LLC, as seller, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party |

WEIL:\96911480\1\41703.0010

| **Defined Terms** |
|---|
| | thereto, (iii) Master Repurchase Agreement, dated as of April 23, 2018, between Reverse Mortgage Solutions, Inc. as seller and Barclays Bank PLC, as purchaser and agent, (iv) Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among Reverse Mortgage Solutions, Inc. and one of its subsidiaries, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP, (v) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech Agency Advance Trust, Wells Fargo, as indenture agent, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent and (vi) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech DPAT II Advance Trust II, Wells Fargo, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent (in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time). |
| *"Fee Claim"* | Means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case. |
| *"Final Order"* | Means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| *"Impaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the |

19

| Defined Terms |
|---|
| Bankruptcy Code. |
| **"Intercompany Claim"** — Any Claim against any of the Company's entities held by another of the Company's entities. |
| **"Intercompany Interest"** — An Interest in any of the Company's direct or indirect subsidiaries held by another of the Company's entities or an Interest in the Company held by an affiliate of the Company (other than any Preferred Stock or Existing Equity Interest in Holdings). |
| **"Intercreditor Agreement"** — Shall have the same meaning as ascribed to it in the Credit Agreement. |
| **"Interests"** — Means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date. |
| **"New Ditech"** — Means, on or after the Effective Date, Ditech and each of the other Debtors, as reorganized, pursuant to and under the Plan or any successor thereto, and/or one or more acquiring entities, in each case, after giving effect to the Reorganization Transaction, whether structured as a debt-for-equity exchange or credit bid and asset sale transaction. |
| **"Other Secured Claim"** — Means a Secured Claim, other than an Administrative Expense Claim, a Claim in connection with the DIP Warehouse Facility, a Priority Tax Claim, or a Term Loan Claim. |
| **"Commencement Date"** — Has the same meaning as in the RSA. |
| **"Plan Supplement"** — Has the same meaning as in the RSA. |
| **"Priority Non-Tax Claim"** — Means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| **"Priority Tax Claim"** — Means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| **"Reinstate", "Reinstated", or** — Means leaving a Claim Unimpaired under the Plan. |

WEIL:\96911480\1\41703.0010

| Defined Terms | |
|---|---|
| *"Reinstatement""*' | |
| *"Rejecting Class"* | Means a Class that does not vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code. |
| *"Requisite Term Lenders"* | Has the same meaning as in the RSA. |
| *"Restructuring Expenses"* | Means, with respect to, (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; (b) the Administrative Agent, to the extent provided under the Credit Agreement, pursuant to the economic terms of their respective engagement letters with the Company or, in the case of the Administrative Agent, the Credit Agreement. |
| *"Restructuring Transactions"* | Has the same meaning as in the RSA. |
| *"RSA Parties"* | Means the Consenting Term Lenders (as defined in the RSA). |
| *"Unimpaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |

21

**<u>EXHIBIT B</u>**

**<u>FORM OF JOINDER AGREEMENT FOR CONSENTING TERM LENDERS</u>**

       This Joinder Agreement to the Restructuring Support Agreement, dated as of [●] (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among Ditech Holding Corporation, and the holders of the Term Loans (together with their respective successors and permitted assigns, the "***Consenting Term Lenders***" and each, a "***Consenting Term Lender***") is executed and delivered by _____ (the "***Joining Party***") as of _____ __, 2019. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

       1.   <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Term Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

       2.   <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Term Loans set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Term Lenders set forth in <u>Section 7</u> of the Agreement to each other Party to the Agreement.

       3.   <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

<div align="center">[Signature Page Follows]</div>

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING TERM LENDER**

By:_____

Name:

Title:

Notice Address:

_____

_____

_____

Fax: _____

Attention:

Email:    _____

_____

Acknowledged:

**DITECH HOLDING CORPORATION**
on its own behalf and on behalf of its direct and indirect subsidiaries

By:_____

Name:
Title:

SIGNATURE PAGE TO JOINDER AGREEMENT

## EXHIBIT C

**Organizational Structure Chart**



Ditech Holding Corporation
Mid-State Capital, LLC
Walter Reverse Acquisition LLC
Hanover SPC-A, Inc.
Green Tree Credit Solutions LLC
Marix Servicing LLC
WIMC Real Estate Investment LLC
Reverse Mortgage Solutions, Inc.
Green Tree Insurance Agency of Nevada, Inc.
Walter Management Holding Company LLC
DF Insurance Agency LLC
Green Tree Investment Holdings III LLC
Mortgage Asset Systems, LLC
Green Tree Credit LLC
REO Management Solutions, LLC
Green Tree Servicing Corp.
(non-economic member of Ditech Financial LLC)
RMS REO BRC, LLC
Ditech Financial LLC
RMS REO CS, LLC
Green Tree Advance Receivables III LLC
RMS REO BRC II, LLC
Ditech Agency Advance Depositor LLC
RMS 2018-09, LLC
Ditech PLS Advance Depositor LLC

**<u>EXHIBIT D</u>**

**Financial Information and Projections**

## FINANCIAL INFORMATION AND PROJECTIONS

The Debtors[1] prepared the financial projections set forth herein (the "**Financial Projections**") based on, among other things, the anticipated future financial condition and results of operations of the Debtors in a recapitalization scenario.  In conjunction with the Debtors' advisors, the Debtors' management team developed and refined the Debtors' business plan and prepared consolidated financial projections[2] for fiscal year 2019 through fiscal year 2021 (the "**Projection Period**").

As described in Article X, Section C.1(c) of the Disclosure Statement, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code as confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors or any successors under the Plan.  In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections assume that the Effective Date of the Plan will occur in June 2019.  Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher Administrative Expense Claims, Fee Claims, and Restructuring Expenses, which could also impact the Financial Projections.

Although the Financial Projections represent the Debtors' commercially reasonable estimates and good faith judgment of the results of the Debtors' future operations, financial position, and cash flows, they are only estimates and actual results may vary considerably from the Financial Projections.  Consequently, the inclusion of the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of the Debtors' operations, financial position, and cash flows presented herein will be achieved.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in interest rates, further competition within the mortgage industry, changes in terms with material vendors and service providers, and/or a variety of other factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.

The Debtors do not, as a matter of course, publish their business plan, financial projections, or anticipated financial position.  In connection with the planning and development of the Plan, these Financial Projections were prepared by the Debtors, with the assistance of their advisors, to present the anticipated impact of the Plan.  The Debtors do not intend, and disclaim any obligation, to further update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.  Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS.  THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES

---

[1]    Unless otherwise defined herein, capitalized terms used in this Exhibit shall have the meaning ascribed to such terms in the Disclosure Statement or the Plan, as applicable, or as the context otherwise requires.

[2]    A breakdown of the consolidated financial projections by business segment is attached hereto as **Schedule 1**.

GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

THE FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7 "FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE." THE IMPACT OF FRESH START REPORTING AT THE EFFECTIVE DATE MAY HAVE AN IMPACT ON ASSETS, LIABILITIES, AND SHAREHOLDER EQUITY AS REFLECTED ON THE REORGANIZED DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING RELATED TO THE IMPLEMENTATION OF THE PLAN, THE CHAPTER 11 CASES, MANAGEMENT'S STRATEGY, ACHIEVING OPERATING EFFICIENCIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" IN SECTION VIII OF THE DISCLOSURE STATEMENT AND UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE DEBTORS' ANNUAL AND QUARTERLY REPORTS, AND OTHER FILINGS WITH THE SEC. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' OR REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS

2

OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS IN THE VOTING CLASS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

## General Assumptions and Methodology

### 1.   General Assumptions/Overview

The Financial Projections assume Ditech will continue its business strategy consistent with current operations. This strategy includes originating and servicing forward mortgage loans and servicing reverse mortgage loans.

The Financial Projections reflect the continuation of many of the Debtors' improvement initiatives, including improving the customer experience, right sizing the organization, improving servicing performance and costs, and consolidating sites. The attached segment-level breakdown offers insight into which lines of businesses are benefitting from the Debtors' improvement initiatives. The details or savings estimates for these initiatives are not disclosed because of their proprietary nature and because of ongoing negotiations with third-parties.

The Financial Projections also reflect the purported termination of the subservicing agreement with New Residential Mortgage LLC ("**NRM**") and the subservicing of those loans moving to other mortgage servicers in Q2 2019 primarily.

The Financial Projections do not reflect any projected fair value adjustments to MSRs after January 2019.

The Financial Projections reflect recognition of an economic gain of approximately $770 million, related primarily to the cancellation of debt.

The Financial Projections do not anticipate a material net impact due to the recent decline in the interest rates as any increase in originations revenue from new loan activity will likely be offset by a decrease in servicing revenue due to increased payoffs of existing loans that are refinanced. However, the decline in interest rates may have a material impact on the fair value of the MSRs. The Company does not forecast changes to the fair value of the MSRs.

The interest rate assumptions used in the Financial Projections are based on the 1-month LIBOR, 3-month LIBOR, and 30-year forward interest rate curves as of November 30, 2018.

### 2.   Projected Income Statement Assumptions

The Projected Income Statement assumes that no income tax will be payable due to the Debtors' accumulated tax losses. This assumption is subject to change, pending the outcome of the analysis by the Debtors' tax team, which is currently in process.

(a)  Servicing Segment

3

The servicing segment reflects the servicing of GSE, Ginnie Mae and private label residential mortgages. Revenues are comprised of direct servicing fees, incentive fees, ancillary fees, and other servicing fees.

The Financial Projections assume the NRM Subservicing Agreement is terminated and that the number of loans subserviced by the Debtors is further reduced.[3]

The servicing segment is projected to benefit from several cost improvement initiatives, including technology investments to improve customer experience and consolidate back-end systems, lower third-party vendor costs due to recently completed contract negotiations, enhanced quality reviews of processes, and the outsourcing of services to lower cost providers. These initiatives are expected to result in a lower cost to service per loan.

The servicing portfolio will benefit from a reduction in the amount of MSR sales. Servicing retained MSR sales are projected to account for 50% of the Debtors' Fannie Mae eligible originations in 2019, 25% in 2020, and 0% in 2021. No MSR sales of Ginnie Mae eligible loans are projected.

The Financial Projections include revenue from new subservicing clients, as the Debtors' lower servicing costs combined with even stronger customer service is projected to position the Debtors to attract new business.

(b) Origination Segment

The origination segment reflects the origination of GSE and Ginnie Mae eligible mortgages through the direct-to-consumer channel, as well as the correspondent and warehouse lending channels. Revenues are comprised of gains on sale revenue, as well as interest and other fee income.

The Financial Projections primarily reflect a return to the level of the origination volumes achieved in Q4 2018.

Adjustments include a reduction in consumer volumes related to the loss of the NRM loans from the servicing portfolio, and the corresponding reduction in recapture opportunities. In addition, correspondent volumes are projected to be negatively impacted in the short term by the Chapter 11 Cases, but are then expected to return close to Q4 2018 levels in late 2019.

The Financial Projections reflect costs consistent with cost reductions taken in Q4 2018.

The origination segment is projected to benefit from several cost improvement initiatives, including the organizational changes that took place in Q4 2018, and enhanced website and mobile capabilities. These initiatives, together with prior targeted efforts, significantly improved closing cycle times during the second half of 2018. In addition, stronger customer service within the servicing segment is projected to support a stronger recapture rate for the origination segment due to higher customer satisfaction.

(c) Reverse Segment

The reverse segment reflects the servicing of reverse mortgage loans.

The Financial Projections reflect a continuation of the cost reduction initiatives undertaken in 2018, as well as an increase in new subservicing business, primarily from existing customers, once the Debtors' restructuring is completed and their financial condition is improved.

---

[3]    As noted in the Disclosure Statement, certain of the loans that Ditech historically subserviced for NRM have already been offboarded and transitioned to alternative subservicers.

4

### 3.  Balance Sheet and Liquidity Assumptions

The projected balance sheet and liquidity projections reflect a post-emergence restructured capital structure for the Debtors consisting of (i) a $150 million Exit Working Capital Facility, (ii) a $400 million Amended and Restated Credit Facility ("**New Term Loans**") and (iii) New Common Stock which will be in a form and manner acceptable to the Requisite Term Lenders.

The accounting for HMBS buyouts involves recording Residential Loans, net as an asset and the corresponding HMBS Related Obligations at Fair Value as a liability on the balance sheet.  Excluding this impact, the balance sheet is relatively unchanged over the forecast period.

**Projected Income Statement**
($ in millions)

| | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|
| Revenue | $ 702.2 | $ 678.4 | $ 686.3 |
| Operating Expense | (454.8) | (362.4) | (341.0) |
|    Operating Margin | 247.4 | 316.0 | 345.3 |
| Direct Support | (86.2) | (76.0) | (77.7) |
| Corporate Overhead | (55.5) | (41.1) | (43.8) |
| **AEBITDA** | **105.7** | **198.9** | **223.7** |
| Depeciation and Amortization | (144.1) | (136.0) | (148.7) |
| Prov for Purch Oblig & Rep & Warrants | (4.0) | (6.0) | (7.0) |
| Non-Cash & Corporate Interest Expense | (47.3) | (52.7) | (55.1) |
| Fair Value Adjustment | (14.8) | - | - |
| Reorganization Gain | 770.0 | - | - |
| Recovery & Transformation | (22.9) | (11.8) | (4.8) |
| Other Expenses | (59.8) | (4.5) | (6.8) |
| **Pre-tax Income** | **582.9** | **(12.0)** | **1.4** |
| Income Tax (1) | - | - | - |
| **Net Income** | **$ 582.9** | **(12.0) $** | **1.4** |

(1) - Per preliminary advice of tax group. Subject to change.

5

**Projected Liquidity**

($ in millions)

| | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|
| Adjusted EBITDA | $ 105.7 | $ 198.9 | $ 223.7 |
| Less: Non-Cash OMSR | (150.7) | (193.7) | (216.0) |
| **Total Adj EBITDA less Capitalized OMSRs** | **(45.0)** | **5.3** | **7.7** |
| | | | |
| Cash Taxes | 13.2 | - | - |
| Cash Interest on Corporate Debt | (29.1) | (40.2) | (44.4) |
| Capital Expenditures | (11.1) | (12.0) | (10.0) |
| Reverse GNMA Buyouts (Net of Financing) | 55.3 | 16.9 | (22.0) |
| Forward GNMA Buyouts (Net of Financing) | (1.9) | 0.4 | 0.8 |
| Servicing Advances (Net of Financing) | (22.3) | (6.0) | (5.5) |
| HFS Loans (Net of Financing) and Cash Adj for Derivatives | 32.3 | (13.6) | (4.9) |
| Other Changes in Assets, Accruals and Reserves | (78.5) | 10.4 | 14.0 |
| **Operating Cash Flows** | **(42.0)** | **(44.1)** | **(72.1)** |
| | | | |
| OMSR Flow Sales | 50.7 | 19.8 | - |
| Other MSR Sales | 3.9 | 0.7 | 0.7 |
| **Investing Cash Flows** | **54.7** | **20.4** | **0.7** |
| | | | |
| New Term Loan Payments | (0.3) | (0.5) | (0.5) |
| Revolver Draw (Repayment) | 45.6 | 19.7 | 64.7 |
| Financing Fees | (0.7) | (0.7) | (0.5) |
| **Financing Cash Flows** | **44.6** | **18.5** | **63.7** |
| | | | |
| Change in Cash and Cash Equivalents | 12.3 | (0.0) | - |
| Beginning Cash and Cash Equivalents | 187.7 | 200.0 | 200.0 |
| **Ending Cash and Cash Equivalents** | **$ 200.0** | **$ 200.0** | **$ 200.0** |

6

**Projected Balance Sheet**
($ in millions)

| | 12/31/2019 | 12/31/2020 | 12/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and Cash Equivalents | $ 200.0 | $ 200.0 | $ 200.0 |
| Restricted Cash | 101.8 | 105.6 | 109.3 |
| Residential Loans, Net | 7,397.1 | 6,212.7 | 5,703.2 |
| Receivables, Net | 91.3 | 91.6 | 91.0 |
| Servicer and Protective Advances, Net | 319.5 | 257.6 | 208.8 |
| Servicing Rights, Net | 587.7 | 655.6 | 748.1 |
| Intangible Asset, Net | 20.3 | 17.1 | 16.2 |
| Premises and Equipment, Net | 54.3 | 43.7 | 34.4 |
| Other Assets | 125.9 | 125.4 | 127.6 |
| **Total Assets** | **8,898.1** | **7,709.4** | **7,238.7** |
| | | | |
| **Liabilities** | | | |
| Payables and Accrued Liabilities | 945.7 | 934.8 | 923.1 |
| Servicer Payables | 115.5 | 118.6 | 121.8 |
| Servicing Advance Liabilities | 134.1 | 98.6 | 75.9 |
| Warehouse Borrowings | 1,391.6 | 1,483.1 | 1,601.0 |
| New Term Loan | 396.0 | 406.8 | 417.8 |
| Working Capital Line | 45.6 | 65.2 | 130.0 |
| Mortgage-Backed Debt | 54.6 | 46.8 | 40.5 |
| HMBS Related Obligations at Fair Value | 5,231.7 | 3,979.7 | 3,345.0 |
| Deferred Tax Liability, Net | 2.4 | 2.4 | 2.4 |
| **Total Liabilities** | **8,317.1** | **7,136.2** | **6,657.5** |
| Stockholders' Equity | 581.0 | 573.2 | 581.2 |
| **Total Liabilities and Equity** | **$ 8,898.1** | **$ 7,709.4** | **$ 7,238.7** |

7

## **Schedule 1**

WEIL:\96988187\4\41703.0010

# 2019 – 2021 Budget Overview

| | 2018A | | | | | 2019B | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | a | b | c | d | e | f | g | h | i | j |
| $ millions | Orig. | Servicing | RMS | Corporate | Cons. | Orig. | Servicing | RMS | Corporate | Cons. |
| (1) Revenue | $219.7 | $577.7 | $128.3 | $1.2 | $926.9 | $159.9 | $425.3 | $117.0 | - | $702.2 |
| (2) Operating Expense | (186.3) | (330.3) | (114.6) | (0.6) | (631.9) | (121.5) | (213.4) | (119.8) | (0.0) | (454.8) |
| (3) **Operating Margin** | **$33.4** | **$247.4** | **$13.7** | **$0.6** | **$295.1** | **$38.3** | **$212.0** | **($2.9)** | **($0.0)** | **$247.4** |
| (4) Direct Support | (27.7) | (81.6) | (14.5) | - | (123.8) | (16.5) | (61.5) | (8.2) | | (86.2) |
| (5) Corporate Overhead | - | - | - | (76.0) | (76.0) | - | - | - | (55.5) | (55.5) |
| (6) **AEBITDA** | **$5.7** | **$165.8** | **($0.8)** | **($75.4)** | **$95.3** | **$21.8** | **$150.5** | **($11.1)** | **($55.5)** | **$105.7** |
| (7) Depreciation and Amortization | (16.0) | (119.0) | (4.1) | (1.0) | (140.1) | (14.8) | (125.8) | (3.1) | (0.3) | (144.1) |
| (8) Prov for Purch Oblig & Rep & Warr | 4.0 | | | | 4.0 | (4.0) | | | | (4.0) |
| (9) Non-Cash & Corporate Interest Expense | (6.6) | (5.5) | (7.1) | (119.2) | (138.5) | (1.5) | (0.1) | (1.8) | (43.8) | (47.3) |
| (10) Fair Value Adjustment | - | 97.6 | (38.1) | | 59.5 | - | (13.2) | (1.6) | | (14.8) |
| (11) Reorganization Gain/Expense | - | - | - | 384.6 | 384.6 | - | - | - | 770.0 | 770.0 |
| (12) Recovery & Transformation | (6.7) | (9.3) | (1.3) | (9.3) | (26.6) | (2.2) | (8.6) | (0.9) | (11.3) | (22.9) |
| (13) Stock Based Comp, & Other | (0.6) | 17.0 | 7.3 | 66.4 | 90.1 | (0.0) | (0.3) | (0.0) | (59.5) | (59.8) |
| (14) **Pre-tax Income** | **($20.1)** | **$146.5** | **($44.1)** | **$246.0** | **$328.4** | **($0.7)** | **$2.5** | **($18.5)** | **$599.6** | **$582.9** |
| (15) plus: non-cash & corporate interest | 6.6 | 5.5 | 7.1 | 119.2 | 138.5 | 1.5 | 0.1 | 1.8 | 43.8 | 47.3 |
| (16) **EBIT** | **($13.5)** | **$152.1** | **($36.9)** | **$365.2** | **$466.9** | **$0.8** | **$2.6** | **($16.7)** | **$643.5** | **$630.2** |

| | 2020B | | | | | 2021B | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| $ millions | Orig. | Servicing | RMS | Corp. | Cons. | Orig. | Servicing | RMS | Corp. | Cons. |
| (17) Revenue | $171.4 | $395.4 | $111.7 | - | $678.4 | $180.3 | $412.7 | $93.3 | - | $686.3 |
| (18) Operating Expense | (118.0) | (142.3) | (102.1) | (0.0) | (362.4) | (124.2) | (128.9) | (87.9) | - | (341.0) |
| (19) **Operating Margin** | **$53.4** | **$253.1** | **$9.6** | **($0.0)** | **$316.0** | **$56.1** | **$283.8** | **$5.4** | **-** | **$345.3** |
| (20) Direct Support | (14.9) | (53.1) | (8.0) | - | (76.0) | (14.8) | (54.6) | (8.4) | - | (77.7) |
| (21) Corporate Overhead | - | - | - | (41.1) | (41.1) | - | - | - | (43.8) | (43.8) |
| (22) **AEBITDA** | **$38.5** | **$200.0** | **$1.5** | **($41.1)** | **$198.9** | **$41.3** | **$229.2** | **($3.0)** | **($43.8)** | **$223.7** |
| (23) Depreciation and Amortization | (10.7) | (122.4) | (2.5) | (0.4) | (136.0) | (8.3) | (138.9) | (1.5) | | (148.7) |
| (24) Prov for Purch Oblig & Rep & Warr | (6.0) | | | | (6.0) | (7.0) | | | | (7.0) |
| (25) Non-Cash & Corporate Interest Expense | - | - | - | (52.7) | (52.7) | - | - | - | (55.1) | (55.1) |
| (26) Fair Value Adjustment | - | - | - | - | - | - | - | - | - | - |
| (27) Reorganization Gain/Expense | - | - | - | - | - | - | - | - | - | - |
| (28) Recovery & Transformation | (4.1) | (1.6) | (0.1) | (6.0) | (11.8) | (1.2) | (1.2) | - | (2.4) | (4.8) |
| (29) Stock Based Comp, & Other | - | (0.2) | - | (4.3) | (4.5) | - | (0.2) | - | (6.6) | (6.8) |
| (30) **Pre-tax Income** | **$17.8** | **$75.8** | **($1.1)** | **($104.5)** | **($12.0)** | **$24.8** | **$88.9** | **($4.5)** | **($107.9)** | **$1.4** |
| (31) plus: non-cash & corporate interest | - | - | - | 52.7 | 52.7 | - | - | - | 55.1 | 55.1 |
| (32) **EBIT** | **$17.8** | **$75.8** | **($1.1)** | **($51.9)** | **$40.6** | **$24.8** | **$88.9** | **($4.5)** | **($52.8)** | **$56.4** |

**Note:** 2018 amounts are preliminary and unaudited

12

DITECH HOLDING CORPORATION

**EXHIBIT E**[1]

**Liquidation Analysis**

**To Be Filed Separately**

---

[1] Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process. *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process). The Debtors will file, no later than the date that the Plan Supplement is filed, the Liquidation Analysis and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing on a Debtor-by-Debtor basis.

**<u>Exhibit B</u>**

**Incremental Blackline**

WEIL:\97029773\1\41703.0011

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X
                                                                    :
In re                                                               :        **Chapter 11**
                                                                    :
**DITECH HOLDING CORPORATION**, *et al.*,                           :        **Case No. 19-10412 (JLG)**
                                                                    :
            Debtors.[1]                                             :        **(Jointly Administered)**
                                                                    :
------------------------------------------------------------------- X

## AMENDED DISCLOSURE STATEMENT FOR
## AMENDED JOINT CHAPTER 11 PLAN OF DITECH
## HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Counsel for Debtors*
*and Debtors in Possession*

Dated:    May 89, 2019
          New York, New York

---

**THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE
PLAN.    ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC
(6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC
(1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC
(1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC
(8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter
Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).  The Debtors'
principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS ~~5~~4:00 P.M., PREVAILING EASTERN TIME, ON JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MAY 8, 2019 (THE "VOTING RECORD DATE").

RECOMMENDATION BY THE DEBTORS AND CREDITORS' COMMITTEE

The Board of Directors of Ditech Holding Corporation and the board of directors, managers or members, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan (as defined herein) and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan. Holders of approximately 80.38% of the Term Loan Claims (as defined herein) have already agreed to vote in favor of the Plan. The Creditors' Committee also recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF NEW COMMON STOCK (AS DEFINED HEREIN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b)(1) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE (AS DEFINED IN THE PLAN).

THE NEW COMMON STOCK TO BE ISSUED ON THE EFFECTIVE DATE HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN DITECH HOLDING CORPORATION'S FILINGS WITH THE SEC.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION VIII OF THIS DISCLOSURE STATEMENT. IMPORTANT

ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED ALSO INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE ANNUAL AND QUARTERLY REPORTS OF DITECH HOLDING CORPORATION, INCLUDING AMENDMENTS THERETO, AND ITS OTHER FILINGS WITH THE SEC.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS ATTACHED HERETO AS EXHIBITS D AND E, RESPECTIVELY.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

WEIL:\97028542\1\41703.0010WEIL:\97028542\2\41703.0010

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | **INTRODUCTION** | **6** |
| II. | **OVERVIEW OF COMPANY'S OPERATIONS** | **16** |
| | A. Debtors' Business | 16 |
| | B. Debtors' Organizational Structure | 23 |
| | C. Directors and Officers | 23 |
| | D. Regulation of Company's Business | 24 |
| | E. Debtors' Existing Capital Structure | 25 |
| III. | **KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES** | **28** |
| | A. Background and Prior Restructuring | 29 |
| | B. Events Leading to Commencement of these Chapter 11 Cases | 29 |
| | C. Prepetition Marketing Process and Negotiations with Stakeholders | 30 |
| | D. Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities | 32 |
| IV. | **OVERVIEW OF THE CHAPTER 11 CASES** | **33** |
| | A. Commencement of Chapter 11 Cases and First-Day Motions | 33 |
| | B. Procedural Motions and Retention of Professionals | 36 |
| | C. KEIP Motion | 36 |
| | D. Lease Rejection Motion | 36 |
| | E. Bar Date | 36 |
| | F. Appointment of the Creditors' Committee | 37 |
| | G. Appointment of the Consumer Creditors' Committee | 37 |
| | H. Statements and Schedules, and Rule 2015.3 Financial Reports | 37 |
| | I. Litigation Matters | 37 |
| | J. Marketing Process and Bidding Procedures | 39 |
| | K. U.S. Trustee's Objections to Plan | 39 |
| | L. Plan Settlement Negotiations and the Global Plan Settlement | 40 |
| V. | **SUMMARY OF PLAN** | **41** |
| | A. Administrative Expenses and Priority Claims | 41 |
| | B. Classification of Claims and Interests | 43 |
| | C. Treatment of Claims and Interests | 44 |
| | D. Means for Implementation | 50 |
| | E. Distributions | 61 |

| | | | |
|---|---|---|---|
| F. | Procedures for Disputed Claims | | 65 |
| G. | Executory Contracts and Unexpired Leases | | 67 |
| H. | Conditions Precedent to Confirmation of Plan and Effective Date | | 71 |
| I. | Effect of Confirmation of Plan | | 74 |
| J. | Retention of Jurisdiction | | 78 |
| K. | Miscellaneous Provisions | | 80 |
| **VI.** | **VALUATION ANALYSIS** | | **84** |
| **VII.** | **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** | | **85** |
| **VIII.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN** | | **86** |
| A. | Consequences to the Debtors | | 87 |
| B. | Consequences to Holders of Term Loan Claims | | 90 |
| C. | Disposition of New Common Stock | | 93 |
| D. | Ownership and Disposition of the New Term Loan | | 93 |
| E. | Information Reporting and Backup Withholding | | 95 |
| **IX.** | **CERTAIN RISK FACTORS TO BE CONSIDERED** | | **96** |
| A. | Certain Bankruptcy Law Considerations | | 96 |
| B. | Additional Factors Affecting Value of Reorganized Debtors | | 98 |
| C. | Risks Relating to Debtors' Business and Financial Condition | | 99 |
| D. | Factors Relating to Securities to be Issued Under Plan, Generally | | 104 |
| E. | Risk Related to Obtaining Exit Financing | | 104 |
| F. | Risks Related to Investment in New Common Stock | | 104 |
| G. | Additional Factors | | 105 |
| **X.** | **VOTING PROCEDURES AND REQUIREMENTS** | | **106** |
| A. | Voting Deadline | | 106 |
| B. | Voting Procedures | | 107 |
| C. | Parties Entitled to Vote | | 107 |
| **XI.** | **CONFIRMATION OF PLAN** | | **110** |
| A. | Confirmation Hearing | | 110 |
| B. | Objections to Confirmation | | 110 |
| C. | Requirements for Confirmation of Plan | | 112 |
| **XII.** | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** | | **116** |
| A. | Alternative Plan of Reorganization | | 116 |

WEIL:\97028542\1\41703.0010 WEIL:\97028542\2\41703.0010

B.    Sale Under Section 363 of Bankruptcy Code .................................... 116

C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ......... 116

**XIII.    CONCLUSION AND RECOMMENDATION** ........................................... **118**

EXHIBIT A:    Joint Plan of Reorganization

EXHIBIT A-1    Borrower Non-Discharged Claims

EXHIBIT B:    Restructuring Support Agreement

EXHIBIT C:    Organizational Structure Chart

EXHIBIT D:    Financial Information and Projections

EXHIBIT E:    Liquidation Analysis[2]

---

[2]    The Debtors have sought authority from the Bankruptcy Court to file the Liquidation Analysis with the Plan Supplement to protect the integrity of their sale process.  Copies of the Liquidation Analysis will be available on the Voting Agent's website with the Plan Supplement upon its filing.

WEIL:\97028542\1\41703.0010WEIL:\97028542\2\41703.0010

# I.
# INTRODUCTION

Ditech Holding Corporation (f/k/a Walter Investment Management Corp., "**DHCP**") and its affiliated debtors (collectively, the "**Debtors**" and together with their non-debtor affiliates, the "**Company**") submit this amended disclosure statement (as amended, modified, or supplemented, the "**Disclosure Statement**") pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the Amended *Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors*, dated May 8~~9~~, 2019 (as amended, modified, or supplemented, the "**Plan**") .[3] The Plan is annexed hereto as Exhibit A and is incorporated herein by reference. The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on February 11, 2019 (the "**Commencement Date**").

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

DHCP is the ultimate parent of twenty-six (26) direct and indirect subsidiaries and trust companies, thirteen (13) of which are Debtors in these Chapter 11 Cases. The Company is an independent servicer and originator of forward mortgage loans and a servicer of reverse mortgage loans. The Company is an integrated enterprise with primary day-to-day operations carried out at the subsidiary level and corporate and similar functions carried out at the DHCP level. In particular, Ditech Financial LLC ("**Ditech Financial**") primarily carries out the Company's forward mortgage origination and servicing operations and Reverse Mortgage Solutions, Inc. ("**RMS**") primarily carries out the Company's reverse mortgage servicing operations.

The Company services a wide array of loans across the credit spectrum for its own portfolio and for the GSEs (as defined below), government entities, third-party securitization trusts, and other credit owners. The Company originates and purchases residential loans through the consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities. The Company also operates two complimentary businesses: (i) asset receivables management and (ii) real estate owned property management and disposition.

Beginning in May 2018, the Company began its formal review of strategic alternatives, including a potential merger or sale of all or substantially all of the assets of the Company. As explained in more detail below, the Company was not able to consummate an out-of-court transaction with a third party purchaser. Accordingly, facing increased uncertainty in 2019, and an anticipated going-concern qualification from its auditors, the Company turned its focus toward planning for an in-court recapitalization transaction that would maximize value for creditors and preserve the enterprise as a going concern. To that end, in December 2018, the Company began in earnest negotiating with groups of holders of its corporate debt on the terms and implementation of an acceptable recapitalization structure, culminating in a restructuring support agreement (the "**Restructuring Support Agreement**") with the Term Loan Ad Hoc Group (as defined below)—the Company's senior creditors—holding, in the

---

[3]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

aggregate, approximately $722.8 million of Prepetition Term Loans (as defined below).  A copy of the Restructuring Support Agreement is attached hereto as <u>Exhibit B</u>.[4]

By virtue of the Restructuring Support Agreement, the Company commenced the Chapter 11 Cases with a clear path to a confirmable chapter 11 plan of reorganization and a viable recapitalization—in which, among other things, over $800 million in funded debt would be extinguished, leaving a significantly deleveraged reorganized Company, wholly owned by the holders of the Prepetition Term Loans, with $400 million of new term loan debt, and an appropriately sized exit working capital facility or consummation of another liquidity enhancing transaction (the "**Reorganization Transaction**").  As a toggle to the Reorganization Transaction, the Restructuring Support Agreement also provides for the continuation of the Company's prepetition review of strategic alternatives whereby any and all bids for the Company or its assets will be evaluated as a precursor to confirmation of any chapter 11 plan of reorganization (the "**Marketing Process**").

Specifically, the Marketing Process will provide a public and comprehensive forum in which the Debtors seek bids or proposals for three (3) potential transactions that, if representing higher or better value, will either be incorporated into a Reorganization Transaction or pursued as an alternative to the Reorganization Transaction in consultation with and subject to the rights of the Term Loan Ad Hoc Group under the Restructuring Support Agreement and the DIP Lenders under the DIP Facilities (as defined below).  The two types of transactions for which bids will be solicited are:

- "**Sale Transaction**" meaning, a sale of substantially all of the Company's assets as provided in the Restructuring Support Agreement;

- "**Asset Sale Transaction**" meaning, the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders (as defined in the Plan); and

Although the Debtors will pursue the Marketing Process in earnest, the Reorganization Transaction will serve as a backstop and provide the Company the optionality to enter into such other transactions that can either augment the Reorganization Transaction (such as an Asset Sale Transaction) or, if representing higher or better value, replace the Reorganization Transaction (such as the Sale Transaction).  Further, if during the Marketing Process the Debtors receive separate bids for certain of their assets that represent higher or better value for the estate, the Debtors can elect to proceed with such Asset Sale Transaction in conjunction with either a Reorganization Transaction or a Sale Transaction, as applicable.

In recognition of the Prepetition Term Loan holders' position as the Debtors' fulcrum creditors, under the Restructuring Support Agreement, within five (5) business days following the earlier of (a) the conclusion of the Company's Marketing Process and (b) 95 days after the Commencement Date (the earliest such date, the "**Election Date**"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Prepetition Term Loans (the "**Electing Term Lenders**") may deliver a notice (the "**Election Notice**") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "**Elected Transaction**"), as follows:  (i) a Reorganization Transaction or (ii) a Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); <u>provided</u> that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of

---

[4]    The signature pages for the Consenting Term Lenders have been removed from Exhibit B.

the elected transaction in (i) or (ii).[5]  If the Debtors do not proceed with the Elected Transaction, the Consenting Term Lenders can terminate the Restructuring Support Agreement.

As part of the restructuring contemplated by the Restructuring Support Agreement, the Company refinanced all of its prepetition warehouse and advance facilities by entering into the DIP Facilities, guaranteed by DHCP, which provide up to $1.9 billion in liquidity to Ditech Financial and RMS to support their operations and these Chapter 11 Cases.  The DIP Facilities will be paid or refinanced in full in cash under any Elected Transaction or combination of Elected Transactions.

The Restructuring Support Agreement contemplates the following treatment for certain key classes of creditors under the Reorganization Transaction[6]:

- Term Loan Claims. On the Effective Date, the holders of Term Loan Claims will receive their pro rata share of new term loans (the "**New Term Loan**") under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million and 100% of the New Common Stock.

- Second Lien Notes Claims. On the Effective Date, the holders of Second Lien Notes Claims will not receive any distribution.

- General Unsecured Claims.  On the Effective Date, the holders of General Unsecured Claims will not receive any distribution.

- Parent Equity Interests. On the Effective Date, Parent Equity Interests will be extinguished.

- All Priority Non-Tax Claims, Other Secured Claims, Intercompany Claims, and Intercompany Interests are Unimpaired under the Plan.

- Following the Effective Date, Reorganized DHCP will adopt a post-restructuring management incentive plan (the "**Management Incentive Plan**"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  The Management Incentive Plan will be included in the Plan Supplement.

Following feedback from the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") and consultation with the Term Loan Ad Hoc Group, the Plan has been modified to provide that certain borrower claims (as described below) will not be discharged in a Reorganization Transaction.

The Reorganization Transaction is expected to leave the Company's businesses intact and its balance sheet delevered.  It is also expected to enhance the Company's long-term growth prospects and to allow the Company's management team to increase its focus on operational performance and value creation.  In

---

[5]    Although the Restructuring Support Agreement and Election Notice contemplate a master servicing transaction, the Debtors and the Consenting Term Lenders have determined that a master servicing transaction will no longer be pursued.

[6]    The Debtors have determined, in consultation with the Consenting Term Lenders, to remove separate classification and treatment of "Go-Forward Trade Claims."  Such claims will be addressed in the assumption/rejection process.

WEIL:\97028542\2\41703.0010

a sale scenario, the Plan contemplates that the asset sale proceeds remaining after the payment of administrative and priority claims will be distributed in accordance with the priority scheme of the Plan.

The Plan also incorporates a Global Plan Settlement (as defined herein) resolving all issues and objections that have been, or could be, asserted by the Creditors' Committee with respect to, among other things, (i) confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Debtor Affiliates*, dated as of April 26, 2019 (ECF No. 469) (the "**April 26, 2019 Plan**");[7] (ii) the releases and exculpations contemplated by the Plan; (iii) prospective lien challenges, claims, or causes of action that might be brought by or on behalf of the Debtors' Estates; and (iv) the Restructuring Support Agreement.   As described more fully below and set forth in the Plan, the Global Plan Settlement contemplates a distribution to holders of Allowed Second Lien Claims and General Unsecured Claims, as a carve out of Term Loan collateral, as follows:

- The holders of General Unsecured Claims shall be paid pursuant to a general unsecured claim recovery trust whereby the Debtors and the estates shall transfer assets to the trust free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the holders of Allowed General Unsecured Claims.

- Second Lien Noteholders shall be paid pursuant to a second lien recovery cash pool free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the Second Lien Noteholders.

The Global Plan Settlement results from vigorous, arm's-length negotiation among the Debtors, the Term Loan Ad Hoc Group and the Creditors' Committee, with the assistance of their advisors.   As a result of the modifications to the Plan implemented through the Plan, the Creditors' Committee supports confirmation of the Plan.

Accomplishing a speedy and efficient resolution of the Chapter 11 Cases is essential to maximizing the value of the Company.   Under the Restructuring Support Agreement and pursuant to the terms of the DIP Documents, the Debtors are obligated to meet certain milestones.   Specifically, the Restructuring Support Agreement and the DIP Facilities may be terminated if, among other things, the Debtors fail to satisfy the following milestones:

| Milestone | Deadline |
|---|---|
| File the Plan, Disclosure Statement, and Bidding Procedures Motion | March 5, 2019 |
| Entry of OCB Orders | March ~~19~~21, 2019 |
| Entry of order approving Bidding Procedures | April 17, 2019 |
| Entry of Final DIP Order and Cash Management Order | April ~~17~~19, 2019 |
| Entry of order~~(s)~~ approving Disclosure Statement ~~and Bid Procedures~~ | May 10, 2019 |
| Commence Auction (if necessary) | June 11, 2019 |

---

[7]    For the avoidance of doubt, the Plan supersedes and replaces the April 26, 2019 Plan in its entirety.

| Milestone | Deadline |
|---|---|
| Commence Sale and Confirmation Hearing | June 25, 2019 |
| Occurrence of Effective Date | July 9, 2019 |

**THE DEBTORS AND CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL STAKEHOLDERS.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in Class 3 (Term Loan Claims) are the only Class being solicited under, and the only Class entitled to vote on, the Plan.

**THE PLAN PROVIDES THAT THE HOLDERS OF CLAIMS IN CLASS 3 WHO VOTE TO ACCEPT THE PLAN, OR WHO ABSTAIN FROM VOTING OR VOTE TO REJECT THE PLAN BUT DO NOT OPT-OUT OF THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN, ARE DEEMED TO HAVE GRANTED THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN.**

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Class is entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests in the Reorganization Transaction. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article V—Summary of Plan below. The Plan constitutes a separate plan for each Debtor. Each class of Claims and Interests only address claims against or interest in a particular Debtor. A discussion of the amount of Claims in each Class is set forth in Article II.E.1 hereof.

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable: (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100~~0~~% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders. | Unimpaired | No (Presumed to accept) | 100~~0~~% |
| 3 | Term Loan Claims[9] | | Impaired | Yes | |

---

[8]     Approximate recovery in a Sale Transaction will be determined by the sale proceeds.

[9]     As discussed in further detail below, the Debtors are presently engaged in the Marketing Process.  To ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims is not, at this time, being disclosed herein by the Debtors.  The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing.

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:<br><br>(i)       If the Sale Transaction occurs, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan).<br><br>(ii)      If the Reorganization Transaction occurs, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.<br><br>In each case, any Term Loan Deficiency Claims shall be deemed waived; provided, that holders of Allowed Term Loan Claims shall be entitled to receive a Pro Rata share of fifty percent (50%) of the proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement. | | | <100~~%~~% |
| 4 | Second Lien Notes Claims | The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875.  Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:<br><br>(i)       If the Sale Transaction occurs, such | Impaired | No (Deemed to reject) | ~~[0%~~0~~0~~ ≤1% |

12

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    If the Reorganization Transaction occurs, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

(iii)    If either the Sale Transaction or the Reorganization Transaction occurs, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court. | | | |
| 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)    If the Sale Transaction occurs, such holder's Pro Rata share of (y) the GUC Recovery | Impaired | No (Deemed to reject) | |

13

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.<br><br>(ii)    If the Reorganization Transaction occurs, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement. | | | ~~>[•]<~~ 13-15%[10] |
| 6 | Borrower Non-Discharged Claims[10][11] | Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.<br><br>(ii)    If the Reorganization Transaction occurs, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan. | Impaired | No (Deemed to reject) | ~~[•][•][•][•]~~ 100% |
| 7 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, | Unimpaired | No (Presumed to accept) | N/A |

---

[10]   Based on the Debtors' estimates of the Allowed Prepetition General Unsecured Claims.  This number is subject to change based on the proofs of claim filed in these chapter 11 cases and administered pursuant to the Plan and any other changes or developments in these chapter 11 cases.

[10][11]   The definition and description of Borrower Non-Discharge Claims is set out in Exhibit A-1 to this Disclosure Statement.

14

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims. | | | |
| 8 | Intercompany Interests | On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests. | Unimpaired | No (Presumed to accept) | N/A |
| 9 | Parent Equity Interests | Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Parent Equity Interests, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements. The Single Share shall be recorded on the books and records maintained by the Plan Administrator. To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately | Impaired | No (Deemed to reject) | 0⇌% |

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent. | | | |
| | | (ii)       If the Reorganization Transaction occurs, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | | | |
| 10 | Subordinated Securities Claims | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | Impaired | No (Deemed to reject) | 0% |

**PLEASE TAKE NOTICE THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS, INCLUDING BORROWERS OF LOANS AND/OR MORTGAGORS OF MORTGAGES SERVICED BY THE DEBTORS, THAT HOLD PREPETITION CLAIMS AGAINST ONE OR**

16

**MORE OF THE DEBTORS WILL BE SUBJECT TO THE BAR DATE ORDER.  IF YOU HOLD SUCH A CLAIM AND DO NOT FILE A PROOF OF CLAIM BY THE GENERAL BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER, YOUR CLAIM MAY BE DISCHARGED AND YOU MAY NOT BE ENTITLED TO A RECOVERY, IF ANY, ON SUCH CLAIM PURSUANT TO THE PLAN.**

**WHERE TO FIND ADDITIONAL INFORMATION**:  **DHCP files annual reports and quarterly reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is part of the Disclosure Statement:**

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the SEC on April 16, 2019;

- Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 filed with the SEC on June 6, 2018;

- Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 filed with the SEC on August 9, 2018;

- Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 14, 2018; and

- Current Reports on Form 8-K filed with the SEC on October 4, 2018; November 6, 2018; December 7, 2018; January 17, 2019; January 24, 2019; February 11, 2019; February 21, 2019; March 6, 2019; March 26, 2019; April 3, 2019; and April 17, 2019 (other than information furnished pursuant to Item 2.02 or 7.01 and any related exhibits of any Form 8-K, unless expressly stated otherwise therein).

**Any statement contained in a document incorporated or deemed to be incorporated herein by reference, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any other subsequently dated or filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.**

**You should carefully read the entire Disclosure Statement and the documents incorporated by reference herein.  Financial data included herein as of December 31, 2018 remains subject to the customary review procedures associated with the completion of the Company's public reporting requirements.**

## II.
## OVERVIEW OF COMPANY'S OPERATIONS

### A.    Debtors' Business

#### 1)    Business Operations

The Debtors' business was established in 1958 and operated as a captive financing business of Walter Industries, Inc. (now known as Walter Energy, Inc., "**Walter Energy**") purchasing residential mortgage loans and consumer credit obligations and then securitizing and servicing those to maturity.  In 1997, DHCP's predecessor, Hanover Capital Mortgage Holdings, Inc., a qualified real estate investment trust, was incorporated in Maryland.  In April 2009, Walter Investment Management LLC spun off from Walter Energy, merged into Hanover Capital Mortgage Holdings, Inc., changed the newly merged entity's name to Walter Investment Management Corp. ("**WIMC**"), and began operating as an independent, publicly traded company.  After the spin-off, WIMC acquired Marix Servicing LLC, a high-touch specialty mortgage servicer, in 2010 and acquired GTCS Holdings LLC ("**Green Tree**") in 2011, a leading independent mortgage loan servicer that provided high-touch servicing of GSE, government agency, and third-party mortgage loans.  WIMC subsequently acquired RMS, which resulted in the addition of 330 employees and four offices in three states.  As a result of the Green Tree acquisition, WIMC no longer qualified as a real estate investment trust.  As discussed more fully in Article III hereof, WIMC commenced a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York on November 30, 2017 and emerged from chapter 11 on February 9, 2018 as Ditech Holding Corporation.

The Company's businesses are comprised of three primary segments:  (i) forward mortgage originations; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing.  Following an extensive review and diligence process, the Company and its advisors determined that certain non-debtor affiliates should not be included as Debtors in these Chapter 11 Cases because they were either bankruptcy remote entities, inactive, and/or not obligated on the Company's funded debt.  A description of each of the Debtors and non-Debtor affiliates and their primary functions is listed below:

| Debtor/Non-Debtor Affiliate | Services Provided |
|---|---|
| **Debtors** | |
| Ditech Holding Corporation | Parent holding company for other Debtors and non-Debtor affiliates. |
| Ditech Financial LLC[11][12] | As described in further detail below, Ditech Financial originates and purchases residential mortgage loans that are predominantly sold to GSEs and government agencies. Ditech Financial also services a wide array of loans across the credit spectrum for its own portfolios as well as |

---

[11][12] As discussed further herein, the Company's payroll processor, Ceridian drafts the required funds for payroll and payroll taxes from the Ditech Financial LLC Citibank account ending in #5011.  Intercompany accounting entries are created to record the expense and liabilities on the appropriate entity's books.

WEIL:\97028542\2\41703.0010

| | for GSEs, government agencies, third party securitization trusts, and other credit owners. |
| --- | --- |
| Reverse Mortgage Solutions, Inc. | As described in further detail below, RMS services loans for the Company's reverse mortgage portfolio and subservices loan portfolios on behalf of third-party credit owners of reverse loans. Its subsidiaries also provide real estate owned property asset management services, securitizations, and technology services. |
| REO Management Solutions, LLC | A subsidiary of RMS that performs real estate owned property management services. |
| Mortgage Asset Systems, LLC | Provides technology services for REO Management Solutions, LLC. |
| DF Insurance Agency LLC | A licensed insurance agency that performs marketing services for a third-party insurance business with respect to voluntary insurance policies and receives premium-based commissions for its services. |
| Green Tree Credit LLC | An inactive entity that was formed on May 20, 2003 and is the surviving entity of a merger with Conseco Finance Credit Corp. |
| Green Tree Credit Solutions LLC | An intermediate holding company and subsidiary of Ditech Holding Corporation. |
| Green Tree Insurance Agency of Nevada, Inc. | An inactive entity that is an insurance agency and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Investment Holdings III LLC | An inactive entity and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Servicing Corp. | The managing member of Ditech Financial LLC. |
| Marix Servicing LLC | A subsidiary of Ditech Holding Corporation. |
| Walter Management Holding Company LLC | An intermediate holding company and member of Ditech Financial LLC, a licensed origination and servicing company, and Green Tree Credit LLC, an inactive company. |
| Walter Reverse Acquisition LLC | An intermediate holding company of Reverse Mortgage Solutions, Inc. |
| **Non-Debtor Affiliates** | |

WEIL:\97028542\2\41703.0010

| | |
|---|---|
| Ditech Agency Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae loans under a trust. |
| Ditech Agency Advance Trust | A statutory trust that was formed to fund Fannie Mae (GSE) advances. |
| Ditech PLS Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances under certain PLS securitizations. |
| Ditech PLS Advance Trust II | A statutory trust that was formed to fund PLS (non-GSE) advances. |
| Green Tree Advance Receivables III LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae and Freddie Mac loans. |
| Hanover SPC-A, Inc. | An inactive entity that holds interests of Hanover securitizations. |
| Mid-State, Capital, LLC | A bankruptcy remote entity. |
| RMS REO BRC, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO BRC II, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO CS, LLC | Holds OREO property acquired in foreclosures. |
| RMS 2018-09, LLC | A special purpose vehicle that handles financing of HECM loans. |
| WIMC Real Estate Investment LLC | An inactive entity. |

a.  Forward Mortgage Origination Business (Ditech Financial)

The Company originates forward mortgage loans and consumer credit transactions exclusively through Ditech Financial.  Virtually all of the loans that Ditech Financial originates are loans eligible for securitization by government-sponsored enterprises, such as Fannie Mae and Freddie Mac,¹²–¹³ or federally

---

¹²¹³  As used herein, "**Fannie Mae**" means the Federal National Mortgage Association, and "**Freddie Mac**" means the Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "**GSE**" and collectively the "**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities.

WEIL:\97028542\2\41703.0010

insured or guaranteed and eligible for Ginnie Mae securitization as mortgage-backed securities ("**MBS**").[13][14] Ditech Financial sells substantially all of the mortgage loans it originates into Fannie Mae- and Freddie Mac-sponsored securitizations or into mortgage pools insured by Ginnie Mae.

Ditech Financial originates or acquires mortgage loans through the following channels:

    a. <u>Consumer Lending</u>:  contacts and solicits (i) consumers within its existing servicing portfolio, and (ii) referrals and leads generated through direct mail, internet, telephone, and general advertising campaigns;

    b. <u>Correspondent Lending</u>:  purchases closed mortgage loans from a network of lenders in the marketplace; and

    c. <u>Wholesale Lending</u>:  originates mortgage loans identified through a network of approved brokers.

In 2018, Ditech Financial originated or purchased over $12.6 billion in mortgage loans.  Of these loans approximately 30% were originated through the consumer lending channel, approximately 6% were originated through the wholesale lending channel, and approximately 64% were purchased in the correspondent lending channel.  Based on the unpaid principal balance ("**UPB**") of the loans originated by Ditech Financial during this time period, approximately 30% were eligible for securitization by Fannie Mae, approximately 13% were eligible for securitization by Freddie Mac, and approximately 57% were eligible for private securitization guaranteed by Ginnie Mae.  To the extent that Ditech Financial identifies a loan ineligible for GSE securitization and/or securitization and Ginnie Mae guarantee during its origination process, it may elect to close and fund such loan as long as it lines up a private buyer for such loan at the pre-closing stage of the process.  Such loans constitute a relatively small percentage of all loans originated by Ditech Financial.

Ditech Financial's consumer originations operations offer a range of home purchase and refinance mortgage options, including fixed and adjustable rate conforming, Ginnie Mae, FHA, VA, USDA, retail installment financing, and jumbo products.  A conforming loan is a mortgage loan that conforms to GSE guidelines, which include, but are not limited to, limits on loan amount, loan-to-value ratios, debt-to-income ratios, and minimum credit scores.  The mortgage loans that Ditech Financial funds are generally eligible for sale to GSEs or insured by government agencies.

Ditech Financial underwrites the mortgage loans it originates generally to secondary market standards, including the standards set by Fannie Mae, Freddie Mac, Ginnie Mae, the FHA, the USDA, the VA, and jumbo loan investor programs.  Loans are reviewed by Ditech Financial's underwriters in an attempt to ensure each mortgage loan is documented according to, and its terms comply with, the applicable secondary market standard.  Ditech Financial's underwriters determine loan eligibility based on specific loan product requirements, such as loan-to-value, FICO, or maximum loan amount.  Third-party diligence tools are utilized by Ditech Financial's underwriters to validate data supplied by the potential borrower and to uncover potential discrepancies.  Ditech Financial conducts audits on its underwriters to confirm

---

[13][14] As used herein, "**Ginnie Mae**" means the Government National Mortgage Association.  Ginnie Mae is a federal corporation within the U.S. Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**") or the Department of Agriculture ("**USDA**").

proper adherence to its internal guidelines and polices, which audits are in addition to Ditech Financial's standard quality control review. These audits are designed to provide an additional layer of internal review in an attempt to further mitigate quality defects and repurchase risk in the originations process.

Within its correspondent lending channel, Ditech Financial generally purchases the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Correspondent lenders with which Ditech Financial does business agree to comply with Ditech Financial's client guide, which sets forth the terms and conditions for selling loans to Ditech Financial and generally governs the business relationship. Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial acquires through its correspondent lending channel by conducting quality control reviews of correspondent lenders, reviewing compliance by correspondent lenders with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of correspondent lenders on a periodic basis. In 2018, the Company correspondent lending channel purchased loans from 452 lenders in the marketplace, of which 38 were associated with approximately half of Ditech Financial's purchases.

Within its wholesale lending channel, Ditech Financial originates loans through mortgage brokers. Loans sourced by mortgage brokers are underwritten and funded by Ditech Financial and generally close in Ditech Financial's name. Through the wholesale channel, Ditech Financial generally originates the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Ditech Financial underwrites and processes all loan applications submitted by the mortgage brokers in a manner consistent with that described above for the consumer originations channel. Mortgage brokers with whom Ditech Financial does business agree to comply with its client guide, which sets forth the terms and conditions for brokering loans to Ditech Financial and generally governs the business relationship. Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial originates through its wholesale lending channel by conducting quality control reviews of mortgage brokers, reviewing compliance by brokers with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of brokers on a periodic basis.

Ditech Financial's capital markets group is responsible for pricing loans and managing the interest rate risk through the time a loan is sold to third parties and managing the risk (which Ditech Financial calls the "pull-through risk") that loans Ditech Financial has locked will not be closed and funded in an attempt to maximize loan sale profitability through Ditech Financial's various originations channels. The capital markets group uses models and hedging analysis in an attempt to maximize profitability while minimizing the risks inherent in the originations business.

Ditech Financial's originations segment revenue, which is primarily net gains on sales of loans, is impacted by interest rates and the volume of loans locked and sold. The margins earned by Ditech Financial's originations segment are impacted by its cost to originate the loans including underwriting, fulfillment and lead costs.

As a Fannie Mae- and Freddie Mac-approved seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE, which agreements generally incorporate the applicable GSE selling and servicing guidelines (such agreements, together with the addenda and amendments thereto, respectively, the "**Fannie Sales Agreements**" and "**Freddie Sales Agreements**," and collectively, the "**GSE Sales Agreements**"). In general, when Ditech Financial originates a mortgage loan it funds the loan utilizing borrowings under a master repurchase agreement ("**MRA**"), pledges the loan as security for such borrowings, subsequently sells the loans into a GSE-sponsored securitization, and uses the proceeds from the sale of the mortgage backed securities to repay the borrowings under the MRA.

22

As a Ginnie Mae issuer, Ditech Financial pools and securitizes certain mortgage loans conforming to the requirements of the Ginnie Mae Mortgage-Backed Securities Guide and all special announcements, agreements, and other written communications made by Ginnie Mae to Ditech Financial (collectively, the "**Ginnie Agreements**").  The Ginnie Agreements employ a custodial account mechanism whereby the issuer, such as Ditech Financial, forwards to an eligible document custodian approved by Ginnie Mae all of the loan documentation.  After the pool of mortgages is approved by a Ginnie Mae pool processing agent, it directs Ditech Financial to issue MBS to third-party investors.  In connection with the approval process, Ditech Financial remits guarantee fees and base servicing fees to Ginnie Mae.

The Ginnie Agreements provide for continuing recourse obligations on Ginnie Mae-approved issuers, such as Ditech Financial.  Specifically, upon the discovery of a defective loan within four months after the mortgage origination date, the issuer is required either to cure the defect or purchase the loan from the mortgage pool at the outstanding principal balance (such loans, the "**Ginnie Buyouts**").

For the year ended December 31, 2018, Ditech Financial sold mortgage loans of $12.4 billion in UPB, consisting of approximately (i) $5.4 billion in Fannie Mae/Freddie Mac conventional conforming loans, (ii) $7.0 billion of Ginnie Mae loans, and (iii) $28.3 million of jumbo and other loans.  On average, Ditech Financial sells or securitizes loans funded through warehouse borrowings in approximately 20 days from the date of origination.  As of December 31, 2018, the total UPB of the warehoused loans held by Ditech Financial and awaiting securitization was approximately $746.2 million.

### b.   Forward Mortgage Servicing Business

Ditech Financial, a debtor in these Chapter 11 Cases, performs loan servicing of mortgage loans that fall into two categories:  (i) mortgage loans for which Ditech Financial owns the mortgage service rights ("**MSRs**"), and (ii) subservicing for third party owners of MSRs.  With respect to mortgage loans for which Ditech Financial owns the MSRs, Ditech Financial performs mortgage servicing primarily in accordance with Fannie Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable.  Ditech Financial typically originates the mortgage loans associated with such MSRs and sells them into securitization trusts owned by Fannie Mae or Freddie Mac or into mortgage pools insured by Ginnie Mae.  The servicing segment also operates complementary businesses including a collections agency that performs collections of post charge-off deficiency balances for third parties and Ditech Financial.  The subservicing contracts pursuant to which Ditech Financial is retained to subservice mortgage loans generally provide that the customer, the owner of the subserviced MSR, can terminate Ditech Financial as subservicer with or without cause.  Each such subservicing contract has unique terms establishing the fees that Ditech Financial will be paid for Ditech Financial's work under the contract or upon the termination of the contract, if any.  The standards of performance that Ditech Financial is required to meet in servicing the relevant mortgage loans and the profitability of the subservicing activity may vary among different contracts.

As of December 31, 2018, Ditech Financial serviced approximately 1.4 million residential loans with UPB of $170.1 billion.  Of those, Ditech Financial was the subservicer for 0.7 million accounts with an unpaid principal loan balance of $104.3 billion.  These subserviced accounts represented approximately 58% of its total servicing portfolio based on unpaid principal loan balance at that date.  Ditech Financial's largest subservicing customer, New Residential Mortgage LLC ("**NRM**"), represented approximately 78% of its total subservicing portfolio and 48% of its total servicing portfolio based on unpaid principal loan balance on December 31, 2018.  The Company's next largest subservicing customer represented approximately 17% of its total subservicing portfolio based on unpaid principal loan balance on December 31, 2018.  For additional information about the Debtors relationship with NRM, see Article III.C below.

23

c.   Reverse Mortgage Servicing Business

RMS, a debtor in these Chapter 11 Cases, primarily focuses on servicing and subservicing reverse mortgage loans, also known as a home equity conversion mortgage ("**HECM**"). A HECM is a type of loan that allows homeowners aged sixty-two (62) or older to borrow money against the equity value of their homes. Unlike traditional home equity loans, HECMs are non-recourse loans without a fixed term and the balance increases over time as interest and other fees, such as servicing-related advances, are added to the borrower's total obligations. HECMs are insured by the FHA.

A borrower under a HECM does not make monthly mortgage payments—rather, the borrower receives cash in monthly installments or a lump sum up to a principal limit, which limit is calculated based on, among other things, the age of the borrower, the appraisal value of the borrower's home, and the loan interest rate. Generally, a borrower is obligated to repay the HECM when the borrower no longer uses the home as his or her principal residence, upon the death of the borrower, if title to the property is transferred, or if the borrower fails to meet certain requirements of the loan (*e.g.*, paying property taxes, insurance, or homeowners association fees) or otherwise defaults under the loan.

RMS began originating HECMs in 2010 and exited the origination business effective as of January 2017. Although RMS does not have any reverse loans remaining in its originations pipeline, RMS has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans. In addition, RMS performs loan servicing for mortgage loans that fall into two categories: (i) mortgage loans originated by RMS, for which RMS acts as a servicer, and (ii) mortgage loans owned by third parties, for which RMS acts as a subservicer. Reverse mortgage servicing accounts for approximately thirteen percent 13% of the Debtors' revenues. RMS performs mortgage servicing in accordance with HUD servicing guidelines[14 15] and performs securitization activities in accordance with Ginnie Mae guidelines. RMS also provides management and disposition services in connection with real estate owned property ("**REO Property**") of the Debtors or third-party reverse mortgage servicers or investors.

RMS is an issuer of Ginnie Mae-guaranteed HECM Mortgage Backed Securities ("**HMBS**") and virtually all loans RMS originated were sold into HMBS. Under the HMBS program, RMS is required to repurchase loans from the securitization when the loans reach 98% of the maximum claim amount (which is established at origination to reflect the value of the property subject to federal limits). Performing repurchased loans are conveyed to HUD, and a payment is received from HUD typically within a short time of repurchase. Nonperforming loans are either cured or liquidated through foreclosure and subsequent sale of REO Property. RMS typically files a claim with HUD for reimbursement of costs associated with nonperforming loans shortly after such sales occur, or, in any event, no later than approximately six months after foreclosing and obtaining marketable title on the property.

As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with an unpaid principal balance of $17.1 billion.

2)   *Employees*

---

[14 15] The U.S. Department of Housing and Urban Development servicing guidelines (the "**HUD Guide**") is available at https://www.hud.gov/programoffices/housing/sfh/hecm. The Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**") is available at https://www.ginniemae.gov.

As of the Commencement Date, the Debtors employed approximately 2,900 full-time employees, ten (10) part-time employees, and fifteen (15) temporary employees who perform a variety of critical functions, including administrative, legal, accounting, finance, and management-related tasks.  In addition, the Debtors rely on services from a supplemental workforce comprised of approximately 1,300 independent contractors and consultants that provide services related to the Debtors' operations.  Specifically, the supplemental workforce provides consulting services with respect to financial services, information technology, claims management, and other shared services.

### 3)    Competition

The Company competes with a number of institutions in the mortgage banking market for both the servicing and originations businesses as well as in the reverse mortgage and complementary businesses. In the servicing area, the Company competes with other servicers to acquire MSR and for the right to subservice mortgages for others.  Competitive factors in the servicing business include: a servicer's scale of operations and financial strength; a servicer's access to capital to fund acquisitions of MSR; a servicer's ability to meet contractual and regulatory obligations and to achieve favorable performance (*e.g.*, in default management) relative to other servicers; a servicer's ability to provide a favorable experience for the borrower; a servicer's ability to recapture borrowers as they refinance; and a servicer's cost to service or subservice.  In the mortgage originations area, the Company competes to refinance or provide new mortgage loans to borrowers whose mortgages are in the Company's existing servicing portfolio.  In this area, the price and variety of the Company's mortgage products are important factors of competition, as is the reputation of the Company's servicing business and the quality of the experience the borrower may have had with the Company's servicing business.  Since mid-2015, the Company's forward loan origination and servicing businesses have operated under a single "Ditech" brand.  The Company also competes, principally on the basis of price and process efficiency, to acquire mortgages from correspondent lenders.  In the future, the Company will also increasingly compete on the basis of brand awareness.

Across the Company's servicing and originations businesses, technology is an important competitive factor.  In particular, the Company believes it will be increasingly important to enable servicing and originations customers to access the Company's services through its website and mobile devices.

### B.    **Debtors' Organizational Structure**.

DHCP owns, directly or indirectly, 100% of the ownership interest in each of the Debtors and their non-debtor affiliates.  The organizational chart, attached hereto as <u>Exhibit C</u>, illustrates the Debtors' organizational structure, as of the date hereof.

### C.    **Directors and Officers**.

WEIL:\97028542\2\41703.0010

The following table sets forth the names of the members of DHCP's current Board of Directors:

| Name | Director Since | Position |
|---|---|---|
| Thomas F. Marano | February 2018 | CEO, President & Chairman of the Board |
| David S Ascher | February 2018 | Director |
| George M. Awad | June 2016 | Director |
| Seth L. Bartlett | February 2018 | Lead Independent Director |
| Daniel G. Beltzman | December 2015 | Director |
| John R. Brecker | February 2018 | Director |
| Neal P. Goldman | January 2017 | Director |
| Thomas G. Miglis | February 2018 | Director |
| Samuel T. Ramsey | February 2018 | Director |

The following table sets forth the names of DHCP's current executive officers:

| Name | Position |
|---|---|
| Thomas F. Marano | CEO and President |
| Gerald A. Lombardo | Chief Financial Officer |
| John J. Haas | General Counsel, Chief Legal Officer and Secretary |
| Alfred W. Young, Jr. | Chief Risk and Compliance Officer |
| Elizabeth F. Monahan | Chief Human Resources Officer |
| Jeffrey P. Baker | President of Reverse Mortgage Solutions, Inc. |

The composition of the board of directors of the reorganized DHCP will be disclosed prior to the entry of the order confirming the Plan in accordance with section 1129(a)(5) of the Bankruptcy Code.

### D.    Regulation of Company's Business

The Company's operations are conducted in the United States and are subject to extensive regulation by federal, state and local authorities, including the Consumer Financial Protection Bureau ("**CFPB**"), HUD, VA, the SEC and various state agencies that license, audit and conduct examinations of the Company's mortgage servicing and mortgage originations businesses.  The Company is also subject to a variety of regulatory and contractual obligations imposed by credit owners, investors, insurers, and guarantors of the mortgages the Company originates and services, including, but not limited to, Fannie Mae, Freddie Mac, Ginnie Mae, FHFA, USDA, VA, and the FHA.  Furthermore, the industry has been under scrutiny by federal and state regulators over the past several years, and the Company expects this scrutiny to continue.  Laws, rules, regulations, and practices that have been in place for many years may be changed, and new laws, rules, regulations, and administrative guidance have been, and may continue to be, introduced in order to address real and perceived problems in the industry's history.  The Company expects to incur ongoing operational, legal, and system costs in order to comply with these rules and regulations.

For example, the Company is required to comply with federal consumer protection and other laws, including, but not limited to:

26

- The Gramm-Leach-Bliley Act and Regulation P, which require initial and periodic communication with consumers on privacy matters and the maintenance of privacy matters and the maintenance of privacy regarding certain consumer data in the Debtor's possession.

- The Fair Debt Collection Practices Act, which regulates the timing and content of communications on debt collections.

- The Truth in Lending Act, including Home Ownership and Equity Protection Act and Regulation Z, which regulate mortgage loan origination activities, require certain disclosures be made to mortgagors regarding terms of mortgage financing, regulate certain high-cost mortgages, mandate home ownership counseling for mortgage applicants and regulate certain mortgage servicing activities.

- The Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, and Regulation V, which collectively regulate the use and reporting of information related to the credit history of consumers.

- The Equal Credit Opportunity Act and Regulation B, which prohibit discrimination on the basis of age, race, and certain other characteristics in the extension of credit and require certain disclosures to applicants for credit.

- The Homeowners Protection Act, which requires the cancellation of mortgage insurance once certain equity levels are reached.

- The Home Mortgage Disclosure Act and Regulation C, which require reporting of certain public loan data.

- The Fair Housing Act and its implementing regulations, which prohibit discrimination in housing on the basis of race, sex, national origin, and certain other characteristics.

- The Service members Civil Relief Act, as amended, which provides certain legal protections and relief to members of the military.

- The Real Estate Settlement Procedures Act and Regulation X, which govern certain mortgage loan origination activities and practices and related disclosures and the actions of servicers related to various items, including escrow accounts, servicing transfers, lender-placed insurance, loss mitigation, error resolution, and other customer communications.

- Regulation AB under the Securities Act, which requires registration, reporting, and disclosure for mortgage-backed securities.

- Certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which among other things, created the CFPB and prohibits unfair, deceptive or abusive acts or practices.

- The Federal Trade Commission Act, the FTC Credit Practices Rules, and the FTC Telemarketing Sales Rule, which prohibit unfair and certain related practices.

- The Telephone Consumer Protection Act, which restricts telephone solicitations and automatic telephone equipment.

WEIL:\97028542\2\41703.0010

- Regulation N, which prohibits certain unfair and deceptive acts and practices related to mortgage advertising.

- The Bankruptcy Code and bankruptcy injunctions and stays, which can restrict collection of debts.

- The Secure and Fair Enforcement for Mortgage Licensing Act.

- Various federal flood insurance laws that require the lender and servicer to provide notice and ensure appropriate flood insurance is maintained when required.

### E.    Debtors' Existing Capital Structure

#### 1.    Prepetition Indebtedness

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

(a)    Prepetition Credit Agreement

As of the Commencement Date, the Debtors have outstanding first lien secured debt obligations in the aggregate principal amount of approximately $961.4 million, which amount consists of secured term loan borrowings (the "**Prepetition Term Loans**") under the Second Amended and Restated Credit Agreement (as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) among DHCP, each of the other loan parties named therein, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other lenders party thereto, dated as of February 9, 2018 (the "**Prepetition Credit Agreement**"), plus interest, fees and other expenses arising thereunder.  The Prepetition Credit Agreement is secured by a lien on substantially all the assets of the Debtors.

(b)    Prepetition Second Lien Notes Indenture

As of the Commencement Date, the Debtors have outstanding second lien note obligations consisting of $253.9 million plus accrued and unpaid interest in aggregate outstanding principal of 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to that certain Second Lien Notes Indenture by and between DHCP (f/k/a WIMC), certain other debtors as guarantors, and Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral agent, dated as of February 9, 2018 (the "**Second Lien Notes Indenture**").  The Second Lien Notes Indenture is secured on a second-lien basis on substantially all the assets of the Debtors.

(c)    Prepetition Warehouse Facilities

28

As of the Commencement Date, the Debtors were party to the following agreements with respect to the following facilities:[1516]

A.    *Mortgage Loan Warehouse Facility:*

- Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a buyer and other Buyers from time to time, and Ditech Financial LLC, as seller, with a committed capacity level of $1 billion (the "**Prepetition Forward MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Reverse MRA, DPAT II Facility, and DAAT Facility (each as defined below).

B.    *Reverse Mortgage Facilities:*

- Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a committed buyer and other Buyers from time to time, and Reverse Mortgage Solutions, Inc., as a seller, RMS REO CS, LLC, and RMS REO BRC, LLC, with a committed capacity level of $800 million (the "**Prepetition Reverse MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, DPAT II Facility, and DAAT Facility; and

- Master Repurchase Agreement, dated April 23, 2018 (as may be amended, restated, supplemented, or otherwise modified), between Barclays Bank PLC, as purchaser and agent and Reverse Mortgage Solutions, Inc., as seller, with a committed capacity level of $412 million.

- Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among RMS and a non-debtor subsidiary, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP (together with its affiliates, "**National Founders**" and, such facility, the "**National Founders Facility**").

C.    *Mortgage Loan Servicing Facilities:*

- Ditech PLS Advance Trust II Advance Receivables Backed Notes, Issuable in Series (the "**DPAT II Notes**") issued pursuant to that certain Indenture between Ditech PLS Advance Trust II ("**DPAT II**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $85 million (the "**DPAT II Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DAAT Facility; and

---

[1516] As of the Commencement Date, the Debtors were also party to the Prepetition MSFTAs and the Prepetition Netting Agreement (each as defined in the DIP Orders).

- Ditech Agency Advance Trust Advance Receivables Backed Notes, Issuable in Series (the "**DAAT Notes**") issued pursuant to that certain Indenture between Ditech Agency Advance Trust ("**DAAT**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $465 million (the "**DAAT Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DPAT II Facility.

<div align="center">

(d)    <u>General Unsecured Claims</u>

</div>

General Unsecured Claims consist of any Claims against the Debtors (other than any Intercompany Claims) existing as of the Commencement Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code (or any order of the Bankruptcy Court).

<div align="center">

**2.**      **Equity Ownership**

</div>

DHCP is a public company that files annual reports with, and furnishes other information to, the SEC. As of December 31, 2018, 90 million shares of DHCP $0.01 par value common stock had been authorized with 5,328,417 shares of common stock issued and outstanding. As of December 31, 2018, there were 87 record holders of DCHP's common stock. As of December 31, 2018, 91,408 shares of mandatorily convertible preferred stock were issued and outstanding. DHCP's common stock was delisted from the New York Stock Exchange on December 1, 2018 and currently trades over-the-counter.

<div align="center">

**3.**      **Unencumbered Assets**

</div>

Substantially all of the Debtors' assets are subject to the secured of the Debtors' prepetition secured lenders and the DIP Lenders, with limited carve-outs for *de minimis* assets and value. The Creditors' Committee alleges that there may be significant unencumbered assets of the Debtors or their non-Debtor affiliates which may inure to the benefit of the General Unsecured Claims in these chapter 11 cases. The Debtors do not agree with the Creditors' Committee's position. The Debtors anticipate that once the Marketing Process and Liquidation Analysis are finalized, the outcome of that analysis and process will demonstrate that there remains no expected recovery for General Unsecured Claims on account of unencumbered assets.

Following review of their purported unencumbered assets, the Debtors believe that certain claims of the Creditors' Committee with respect to unencumbered assets are speculative and, even if successful, any such value would nevertheless be exhausted following (i) its application to the costs of these chapter 11 cases and administrative expenses, and/or (ii) upon accounting for the currently contemplated Restructuring Transactions and the anticipated General Unsecured Claims against each Debtor on a Debtor-by-Debtor basis.

For example, in any Restructuring Transaction a significant portion of General Unsecured Claims are expected to be satisfied as either assumed liabilities or assumed contracts, rendering them Unimpaired. Additionally, current estimates suggest that the Term Loan Claims will have a significant deficiency claim (the "**Term Loan Deficiency Claim**") in any Restructuring Transaction. The Term Loan Deficiency Claim may be asserted against each of the Debtors for the full amount of the Term Loan Deficiency Claim; whereas, the entirety of the Second Lien Notes Claim is payment and lien subordinated to the Term Loan Deficiency Claim. Accordingly, when accounting on a Debtor-by-Debtor basis,

<div align="center">

30

</div>

unencumbered value, if any, is expected to inure almost entirely to the benefit of the Term Loan Deficiency Claim on the Debtors.

### 4.    Intercompany Claims

The Debtors have evaluated and determined that there will likely be no recovery to General Unsecured Claims, and thus, there will likely be no recovery to Intercompany Claims in a sale scenario.  Pursuant to a plan, in a Reorganization Transaction, the Intercompany Claims will likely be either reinstated for administrative purposes or cancelled so long as such cancellation does not have an adverse effect on the Debtors but not paid.

### III.
### KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    Background and Prior Restructuring

In the beginning of the third quarter of 2016, the Company engaged Houlihan Lokey Capital, Inc. as investment banker ("**Houlihan**") and Weil, Gotshal & Manges LLP as legal counsel ("**Weil**") and, on November 30, 2017, WIMC commenced a prepackaged chapter 11 case (*In re Walter Investment Management Corp.*, 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017)) (the "**WIMC Chapter 11 Case**") with the Bankruptcy Court to address its overleveraged capital structure.  The plan of reorganization in the WIMC Chapter 11 Case had the overwhelming support of its creditors.  In less than two months, WIMC confirmed its plan of reorganization, eliminating more than $800 million in funded debt.  On February 9, 2018, WIMC emerged from the WIMC Chapter 11 Case as Ditech Holding Corporation, and a final decree was entered closing the WIMC Chapter 11 Case on August 14, 2018.  The goal of the WIMC Chapter 11 Case was to deleverage the capital structure sufficiently to enable the reorganized debtor to implement its business plan.  As set out below, due to circumstances largely out of the control of the Debtors, the Company has faced significant hardships and must again address its capital structure through these Chapter 11 Cases.

### B.    Events Leading to Commencement of these Chapter 11 Cases

In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained its liquidity and ability to implement much needed operational initiatives.  In an effort to address the burden of its overleveraged capital structure—a remnant of its historical acquisitions—the Company consummated a fully consensual prepackaged chapter 11 plan on February 8, 2018.  Given the significant liquidity and operational headwinds facing the Company in 2019, it became clear to the Company's new senior management team that additional relief was needed.

Notwithstanding the Company's efforts to implement its business plan, which included further cost reductions, operational enhancements and streamlining of its business, following emergence from the WIMC Chapter 11 Case, the Company continued to face liquidity and performance challenges that were more persistent and widespread than anticipated.  Coupled with the industry and market factors, these performance challenges have resulted in less liquidity than projected, making the implementation of key operational enhancements more difficult, and in certain cases, resulting in their postponement.

In addition, a number of industry factors have caused the Company increased uncertainty with respect to its future performance, including the projected decrease in total originations, and for reverse mortgages, the impact of changes in HUD regulations, among other things.  The increase in interest rates has also negatively impacted mortgage originators and servicers generally—the Debtors are no exception.  As

31

interest rates have risen, fewer borrowers are refinancing loans in a higher interest rate environment, resulting in lower origination volume for the Company.

The Company's liquidity has also suffered from burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties. In the normal course of business, the Company utilizes its mortgage loan servicing advance facilities and master repurchase agreements to finance, on a short-term basis, mortgage loan related servicing advances, the repurchase of HECMs out of Ginnie Mae securitization pools, and funding of newly originated mortgage loans. These facilities are typically subject to annual renewal requirements and typically contain provisions that, in certain circumstances, prevent the Company from utilizing unused capacity under the facility and/or accelerate the repayment of amounts under the facility.

The Company's ability to fund its business operations is a significant factor that affects its liquidity and ability to operate and grow. The Company is dependent on the ability to secure these types of arrangements on acceptable terms and to renew, replace or resize existing financing facilities as they expire. Continued growth in Ginnie Buyouts activity have required the Company to continue to seek additional financing for Ginnie Buyouts or to otherwise sell or securitize Ginnie Mae buyout assets, and the Company entered into a number of transactions relating to these types of assets during the past year.

The Company has taken a number of measures to address forecasted reductions in liquidity and compliance with its various facilities, including entry into amendments under its Prepetition Credit Agreement, the DAAT Facility, the DPAT II Facility, and each of Ditech Financial's and RMS's master repurchase agreements.

The Company has entered into new agreements or transactions to generate additional liquidity. In April 2018, the Company entered into an additional master repurchase agreement that, as of December 31, 2018, provides up to $412 million in total capacity, and a minimum of $400 million in committed capacity to fund the repurchase of certain HECMs and real estate owned from Ginnie Mae securitization pools for a period of one year. In June 2018, the Company sold a pool of defaulted reverse Ginnie Buyouts owned by the Company and financed under an existing master repurchase agreement for a sales price of $241.3 million. The proceeds from the sale were used to repay the related amount financed under the master repurchase agreement and to fund additional Ginnie Buyouts. The Company continues to service these loans on behalf of the purchaser under a servicing agreement. In June 2018, the Company agreed to sell to New Penn Financial additional MSRs relating to mortgage loans having an aggregate unpaid principal balance of approximately $4.7 billion, and received approximately $56.7 million in cash proceeds. The proceeds from the sale were used primarily to make mandatory principal payments under the Prepetition Credit Agreement. In addition, in October 2018, pursuant to the National Founders Facility, the Company executed a transaction that provided $230 million of additional secured financing for certain HECMs and owned real estate.

Notwithstanding these liquidity initiatives, the Company still faced scheduled amortization payments of approximately $110 million in 2019. Accordingly, the Company was at significant risk of receiving a going-concern qualification from its auditors, which would have triggered a domino effect of defaults and terminations throughout its corporate debt and working capital facilities. Instead, the Company has sought to forge a different path with the cooperation of the Term Loan Ad Hoc Group and its major stakeholders—a path that will lead either to a significantly deleveraged and recapitalized Company through a Reorganization Transaction or, if it provides higher or better return to creditors, one of the three types of transactions as contemplated by the Restructuring Support Agreement, consistent with the goals of the Company's strategic alternatives review process discussed below.

32

### C.    Prepetition Marketing Process and Negotiations with Stakeholders

In May 2018, the Company initiated a process to evaluate strategic alternatives to enhance stockholder value and re-engaged Houlihan and Weil to assist in such process.  Subsequently, in October 2018, the Company engaged AlixPartners, LLP to assist and advise in its contingency planning process, acknowledging at that time that it may ultimately become necessary to implement a transaction through an in-court process.

The Company's efforts were overseen by the Board of Directors of DHCP and a Special Committee of the Board (the "**Special Committee**"), which is composed of four (4) DHCP independent directors.  The Special Committee, with the assistance of Houlihan and Weil, evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity.

The Company undertook an extensive marketing effort (the "**Prepetition Marketing Process**"), including soliciting interest from thirty-three (33) potentially interested parties including strategic and financial buyers with the financial and operational wherewithal to complete a transaction.  The Company formally engaged with multiple potential bidders, executing ten (10) confidentiality agreements and providing a Confidential Information Memorandum, financial projections and data room access to such potential bidders.

The deadline for interested parties to submit initial bids was July 17, 2018.  The Company received four (4) indications of interest ("**IOIs**").  Following extensive discussions with the Board, the Special Committee and its legal and financial advisors, the Company selected three (3) bidders to proceed to a second round of negotiations and diligence, including onsite management presentations during the last week of July 2018.  Following the management presentations, the Company and its advisors continued to facilitate due diligence with the remaining bidders in advance of the second round of IOIs.  The Company received three (3) second round IOIs on or about August 21, 2018, two (2) of which were bids for the sale of certain servicing and reverse assets with subservicing retained by the Company (the "**Alternative Bids**") and one (1) of which was a bid for substantially all of the Company's net assets as a going concern (the "**All-Company Bid**").  Over the course of September and October 2018, the Company and its advisors engaged in extensive discussions with the final three bidders.

In October 2018, it became clear that (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Company's Second Lien Notes.  As a result, the Company decided to engage with an ad hoc group of second lien noteholders (the "**Second Lien Ad Hoc Group**") to explore the Company's strategic alternatives and solicit input with respect to the All-Company Bid and the Alternative Bids.  On October 8, 2018, the Second Lien Ad Hoc Group signed a confidentiality agreement and began engaging with the Company to evaluate the sale alternatives and develop a competing potential recapitalization transaction.  The Company continued to have periodic discussions with the Second Lien Ad Hoc Group as it analyzed the sale options and various recapitalization scenarios.  In November 2018, the Second Lien Ad Hoc Group retained Centerview Partners ("**Centerview**") and Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") to assist with its analysis of the potential strategic alternatives and to assist in preparing a recapitalization transaction proposal supported by the Second Lien Ad Hoc Group.

The Company's financial and legal advisors engaged with the Second Lien Ad Hoc Group's advisors to develop potential viable alternatives to an All-Company Bid.  Among other things, the Second Lien Ad

33

Hoc Group proposed equitizing a portion of the Second Lien Notes and obtaining amortization relief from the Term Lenders under the Prepetition Credit Agreement (the "**Second Lien Proposal**").

In December 2018, the Company engaged in parallel discussions with an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**") to discuss the Prepetition Marketing Process and the Second Lien Proposal. The Term Loan Ad Hoc Group retained FTI Consulting ("**FTI**") and Kirkland & Ellis LLP ("**Kirkland**") as its advisors. The Debtors and their advisors held in-person meetings in December 2018 with each of the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group and their respective advisors to discuss strategic alternatives, including analyzing the All-Company Bid.

Despite extensive negotiations with the bidder who submitted the All-Company Bid, such bidder ultimately rescinded the All-Company Bid in late December 2018, immediately after the Company had utilized the grace period with respect to its Second Lien Notes (explained in more detail below). Following such rescission, the Company re-engaged a previous bidder in connection with a potential bid for substantially all of the Company's assets. After several weeks of negotiations with such bidder, and after consultation with the Term Loan Ad Hoc Group and its advisors, the Company ultimately decided not to pursue the sale transaction.

In early January 2019, the Term Loan Ad Hoc Group submitted a proposal for a recapitalization transaction, pursuant to which a portion of the Prepetition Term Loan would be equitized and incremental liquidity would be provided through, among other things, a new revolving credit facility and a reduction in scheduled amortization payments. Shortly thereafter, the Second Lien Ad Hoc Group submitted a revised Second Lien Proposal. Over the course of several weeks, the Company, with the assistance of its financial and legal advisors, engaged in extensive discussions with the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group regarding the competing recapitalization transactions proposed by such parties. Following extensive diligence and numerous meetings with the Company's management and advisors, the advisors to the Term Loan Ad Hoc Group provided the Company with a proposal for the recapitalization of the Company. As a precondition to seeking the approval of the Board for such terms, the Company agreed with the Term Loan Ad Hoc Group to share the proposal with certain of the Company's key counterparties, including NRM.

Notwithstanding the Debtors' good faith efforts to cooperate with NRM throughout the Company's strategic alternatives review process, NRM asserted that it had the right to issue a termination notice based on the occurrence of certain alleged termination events under its Subservicing Agreement with the Company, dated August 8, 2016 (as amended) (the "**Subservicing Agreement**") while simultaneously participating as a bidder in the Company's sale process. Ultimately, on January 17, 2019—the morning after the Company shared with NRM a recapitalization proposal from the Term Loan Ad Hoc Group—NRM issued a notice purporting to terminate the Subservicing Agreement and directing the Company to remit certain transfer fees and costs to NRM in accordance with the terms of the Subservicing Agreement ("**Termination Notice**"). On January 23 and 29, 2019, NRM sent additional letters to the Company which purported to confirm the Termination Notice and to identify certain additional termination events. The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. The Debtors are, however, cooperating with NRM to transition the servicing of the loans under the Subservicing Agreement. NRM asserts that the Termination Notice was properly issued, based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement. The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.

### D.      Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities

On December 17, 2018, the Company elected not to make the approximately $9 million cash interest payment (the "**Interest Payment**") due and payable on December 17, 2018 with respect to the Company's outstanding Second Lien Notes and entered the 30-day grace period.  Although the Company had sufficient liquidity to make the Interest Payment, the Company elected not to make the payment as discussions were still ongoing with various stakeholders regarding the Company's strategic alternatives. The Company's failure to make the Interest Payment within thirty days after it was due and payable constitutes an "event of default" under the Second Lien Notes Indenture.  As active discussions were still ongoing, the Board determined that the Company would not make the Interest Payment prior to the expiration of the grace period, even though it had sufficient liquidity to do so, resulting in an event of default under the Second Lien Notes Indenture.  An event of default under the Indenture also constitutes an "event of default" under the Prepetition Credit Agreement and certain of the Company's warehouse facility agreements (the "**Warehouse Facility Agreements**"), among others.

On January 16, 2019, the Company and, as applicable, certain of its subsidiaries, entered into forbearance agreements (each a "**Forbearance Agreement**" and collectively the "**Forbearance Agreements**") with (i) certain holders of greater than 75% of the aggregate principal amount of the outstanding Second Lien Notes (the "**Notes Forbearing Parties**"), (ii) certain lenders holding greater than 50% of the sum of (a) the Term Loans outstanding, (b) letter of credit exposure, and (c) unused commitments under the Prepetition Credit Agreement at such time and the administrative agent and collateral agent under the Prepetition Credit Agreement (collectively, the "**Credit Agreement Forbearing Parties**"), and (iii) the requisite buyers and variable funding noteholders, as applicable, under the Warehouse Facility Agreements (collectively, the "**Warehouse Lenders Forbearing Parties**").

Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the Notes Forbearing Parties, Credit Agreement Forbearing Parties and Warehouse Lenders Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they may have in respect of the aforementioned events of default or other defaults or events of default arising out of or in connection therewith.

The deadline of the Forbearance Agreements was tied to the maturity date of certain of the Company's repurchase loan agreements with the Warehouse Lenders Forbearing Parties.  Without a viable recapitalization of the Company in hand, the Warehouse Lenders Forbearing Parties were not in a position to commit to a significant extension of their facilities with the Company.  As noted above, these facilities are critical to the Company's ordinary course of business operations.  Accordingly, the Company focused instead on obtaining the DIP Facilities to refinance such obligations, and will, during the Marketing Process, continue to seek commitments for post-emergence facilities.

Before the termination of the Forbearance Agreements on February 8, 2019, the Company entered into new forbearance agreements with the Credit Agreement Forbearing Parties and the Warehouse Lenders Forbearing Parties (the "**Forbearance Extension**").  The Forbearance Extension was scheduled to terminate on February 11, 2019.

### IV.
### OVERVIEW OF THE CHAPTER 11 CASES

### A.      Commencement of Chapter 11 Cases and First-Day Motions

35

On February 11, 2019, the Debtors commenced the Chapter 11 Cases. The Debtors continue to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To that end, the Debtors filed various motions seeking relief from the Bankruptcy Court to promote a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth restructuring through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "**First Day Motions**"). At the second day hearing held on March 14, 2019, the Bankruptcy Court granted substantially all of the relief requested in the First Day Motions on a final basis and entered various final orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits (ECF No. 207);

- Continue insurance programs and the workers' compensation program, the processing of workers' compensation claims, and continue the Debtors' surety bond program (ECF No. 205);

- Continue to pay all taxes, fees, and similar charges and assessments, whether arising prepetition or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course (ECF No. 230);

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing services (ECF No. 128); and

- Continue to conduct their forward and reverse mortgage businesses in the ordinary course, as discussed in more detail below in Section 2 (ECF Nos. 224 and 229).

The Debtors' request to continue to use their cash management system, bank accounts, and business forms and to obtain debtor-in-possession financing have been approved on a final basis (ECF No. 478). The Debtors' motion to continue to use their cash collateral has been approved on an interim basis (ECF No. 53), and in accordance with the Global Settlement, the Creditors' Committee objections to entry of a final order for use of cash collateral will be resolved and the use of cash collateral will be authorized on a final basis.

1.      **DIP Facilities and Cash Collateral**

(a)      DIP Facilities:

To address the working capital needs of the Debtors and support the transactions contemplated by the Restructuring Support Agreement, the Debtors filed a motion (the "**DIP Motion**") (ECF No. 26) to enter into the DIP Facilities, which provide the Debtors' two primary operating entities, Ditech Financial and RMS, as applicable, (a) up to $1.9 billion in warehouse financing under three master repurchase agreements and two advance facilities and (b) access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "**DIP Facilities**"). The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted. The interim order granting the relief requested in the DIP Motion can be found at ECF No. 53 ("**Interim DIP Order**"), and the final order granting the relief request in the DIP Motion with respect to the DIP Facilities can be found at ECF No. 422 (the "**Final DIP Order**").

The DIP Facilities provide the Debtors with the flexibility to use the commitment amount in the manner that best suits their capital needs. Specifically, during the Chapter 11 Cases, (i) up to $650 million will be available to fund Ditech Financial's origination business, (ii) up to $1.0 billion will be available to RMS, and (iii) up to $250 million will be available to finance the advance receivables related to Ditech

36

Financial's servicing activities.  In addition, the lenders under the DIP Facilities will provide Ditech Financial up to $1.9 billion in trading capacity to hedge its interest rate exposure with respect to the loans in its origination pipeline, as well as those loans that will be subject to repurchase obligations with the DIP Facilities lenders prior to being securitized.

<center>(b)     Cash Collateral</center>

In addition, the Debtors are authorized, on an interim basis, to consensually use the cash collateral of the Prepetition Term Lenders for the duration of the Chapter 11 Cases.  In exchange, the Debtors are providing the Prepetition Term Lenders, with the consent of the Prepetition Administrative Agent, acting at the direction of the Required Term Lenders with the following:

Adequate Protection Lien. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive a replacement security interest in and lien on the same property of the Debtors on which the Prepetition Administrative Agent has a perfected, first-priority security interest and lien prior to the Commencement Date pursuant to the Prepetition Credit Agreement and related security documents, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to Permitted Liens (as defined in the Prepetition Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the obligations under the Prepetition Credit Agreement, and a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "**Carve Out**"). The adequate protection liens shall not be (i) subject, or junior to, any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the interim and final orders (collectively, the "**DIP Orders**").

507(b) Claim.   The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b), subject to the Carve Out and the priorities set out in the DIP Facilities.

Adequate Protection Payments. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Prepetition Administrative Agent (in accordance with the Prepetition Credit Agreement, including, without limitation, the reasonable fees, costs, and expenses of Davis Polk & Wardwell LLP, as counsel to the Prepetition Administrative Agent) and the Term Loan Ad Hoc Group.

Financial Reporting. The Debtors will, until the Effective Date, continue to provide the Term Loan Ad Hoc Group and the Prepetition Administrative Agent, and their advisors, financial and other reporting on a monthly basis in a form and substance reasonably acceptable to them.

<center>(c)     National Founders Facility</center>

The Debtors are also providing, among other things, the following adequate protection to National Founders, the Debtors' existing lender under the National Founder Facility, including:

- Reimbursement of reasonable and documented fees and expenses of National Founders;

- Covenant by RMS to perform under the existing servicing agreement, and stipulation and agreement by Debtors that any Claim for actual damages arising from RMS's failure to perform or otherwise breach the existing servicing agreement shall constitute superpriority

<center>37</center>

Administrative Expense Claims against RMS, subject to subordination as expressly provided in the DIP Orders; and

- Superpriority administrative claim against RMS for all draws on advance account funds, which Claims shall be subordinated in priority and payment to the DIP Lender's superpriority Claims.

In exchange for the adequate protection provided to National Founders, the Debtors received assurances for the continuation of the National Founders Facility and the continued use of National Founders' cash collateral for the duration of these Chapter 11 Cases, as well as assurances that National Founders will not declare an event of default or servicer termination event as a result of the commencement of the Chapter 11 Cases or the insolvency of RMS.

### 2.    Operations in the Ordinary Course for Ditech Financial and RMS

To avoid any disruption to their business operations, the Debtors have obtained final relief to continue to conduct their forward and reverse mortgage businesses in the ordinary course (the "**Final OCB Orders**") (ECF Nos. 224 and 229).  As discussed above, RMS no longer originates reverse mortgage loans, but it has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans.  The Debtors will also continue to comply with their obligations to Fannie Mae, Freddie Mac, and Ginnie Mae, and to continue their securitization activities and servicing businesses in the ordinary course to avoid disruption and uncertainty in the market.  As part of this relief, the Debtors have agreed to provide Fannie Mae, Freddie Mac, and Ginnie Mae certain undertakings for assurance of performance of the obligations ("**Operating Undertakings**") and to seek Bankruptcy Court approval of the Operating Undertakings.[16 17]

### B.    Procedural Motions and Retention of Professionals

The Debtors have also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.  The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders with respect to such relief.

### C.    KEIP Motion

On April 18, 2019, the Court approved a motion (the "**KEIP Motion**") seeking authority to implement a key employee incentive program as modified (the "**Proposed KEIP**") (ECF No. 228) and letter to the Bankruptcy Court (ECF No. 417).  Under the Proposed KEIP, thirty-one (31) of the Debtors' key employees (collectively, the "**KEIP Participants**"), who are largely responsible for the continuity of the Debtors' day-to-day operations, will be eligible to collectively receive up to $2.5 million.  In the event of a Sale (as defined in the KEIP Motion), KEIP Participants will remain eligible to receive the first $2.5 million of any award granted under the Proposed KEIP subject to meeting certain performance metrics.  In addition, under the Proposed KEIP, a subset of KEIP Participants (twelve (12) key employees) will be

---

[16 17]  Ginnie Mae sent a Notice of Violation on February 8, 2019 and stated that it would forbear from taking any action for 125 days through June 13, 2019.  On April 10, 2019, Ginnie Mae extended the forbearance period by thirty (30) days through July 13, 2019.

38

entitled to an incremental award tied directly to the recoveries for the Term Lenders in recognition of their integral role and ability to drive value in the Marketing Process.

### D.     Lease Rejection Motion

On February 11, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 6) seeking authority to (i) reject certain unexpired leases of nonresidential real property and related subleases in (a) St. Paul, Minnesota; Houston, Texas; and Maryland Heights, Missouri as of the Commencement Date and (b) Fort Worth, Texas; Irving, Texas; and Palm Beach Gardens, Florida as of February 28, 2019; and (ii) abandon certain property in connection therewith.  The Bankruptcy Court granted this motion at the second day hearing held on March 14, 2019 (ECF No. 204).

On March 28, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 320) seeking authority to (i) reject a certain unexpired lease of nonresidential real property in Rapid City, South Dakota as of April 5, 2019 and (ii) abandon certain property in connection therewith.  The Bankruptcy Court granted this motion at the hearing held on April 11, 2019 (ECF No. 481).

### E.     Bar Date

On February 22, 2019, the Bankruptcy Court entered an order, which, among other things, (i) established April 1, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) established August 10, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) established the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedule as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) established the later of (y) the General Bar Date or the Governmental Bar Date, as applicable, and (z) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases.

On March 27, 2019, the Bankruptcy Court entered an order which extended the General Bar Date to April 25, 2019, at 5:00 p.m., prevailing Eastern Time (ECF No. 272).

On May 2, 2019, the Bankruptcy Court entered an order further extending the General Bar Date to June 3, 2019 at 5:00 p.m., prevailing Eastern Time for consumer borrowers (i.e., individual borrowers whose home mortgage loans (including reverse mortgages) are or were originated, serviced, or owned by one or more of the Debtors) (ECF No. 496).

### F.     Appointment of the Creditors' Committee

On February 27, 2019, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases (ECF No. 127).

The members of the Creditors' Committee are Safeguard Properties Management, LLC, Wilmington Savings Fund Society, FSB, Lee Kamimura, ISGN Solutions, Inc., Black Knight Financial Technology

39

Solutions, LLC, Cognizant Technology Solutions, and Deutsche Bank National Trust Company as RMBS Trustee.

The Creditors' Committee retained Pachulski Stang Ziehl & Jones LLP and Rich Michaelson Magaliff, LLP as its attorneys and Goldin Associates, LLC as its financial advisor. On April 22, 2019, the U.S. Trustee appointed two additional members to the Creditors' Committee: Stephen Kulzyck and Sarah White and Jose Martinez. Subsequently, these two (2) individuals resigned from the Creditors' Committee.

### G.    Appointment of the Consumer Creditors' Committee

On May 2, 2019, the Official Committee of Consumer Creditors (the "**Consumer Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent the interests of consumer creditors in the Chapter 11 Cases (ECF No. 498). The Creditors' Committee did not oppose the appointment of the Consumer Creditors' Committee in these Chapter 11 Cases.

The members of the Consumer Creditors' Committee are Stephen Kulzyck, Jose Martinez, LeRon Harris, Melinda Hopkins, and D.C. Randall. Four of the five members are represented by counsel for non-profit legal services organizations or legal aid entities. On May 6, 2019, the Consumer Creditors' Committee retained Quinn Emanuel Urquhart & Sullivan, LLP as its attorneys.

On May 8, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Disbanding the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limiting the Scope of such Committee and Capping the Fees and Expenses which may be Incurred by such Committee* (ECF No. 522). The motion will be heard by the Bankruptcy Court on May 14, 2019 at 11:00 a.m. prevailing Eastern Time.

### H.    Consumer Creditors' Committee's Position With Regard to Treatment of Consumer Borrowers' Claims in the Sale Process and Under the Plan

The Consumer Creditors' Committee has requested that the Debtors include the following language in this Disclosure Statement; however, its inclusion should not be conceived as, nor is it, an endorsement by the Debtors of the position of the Consumer Creditors' Committee.

Upon retaining counsel, the Consumer Creditors' Committee immediately engaged in discussions with the Debtors regarding its concerns about the treatment of consumer creditors under the Plan and the consumer-related disclosures in the Disclosure Statement. The Consumer Creditors' Committee represents the interests of all consumer creditors in these cases who have claims against the Debtors. Such claims include affirmative claims for violation of state and federal laws, claims on account of misstated and inflated accounts, and other claims in connection with their mortgages in which the Debtors hold an interest (including ownership, servicing interests, or otherwise) and may be subject to the sale contemplated by the Plan. The Consumer Creditors' Committee's position is that the proposed Plan cannot be confirmed unless claims held by consumer borrowers in connection with their mortgages (both against any of the Debtors and any non-debtor third parties) are fully preserved, and may be brought against any purchaser of the Debtors' assets associated with such claims.

Specifically, the Consumer Creditors' Committee agrees with the U.S. Trustee's position that section 363(o) of the Bankruptcy Code prohibits a free and clear sale of any interests associated with the consumer creditor claims, that such a sale cannot be effectuated without preserving the consumer creditors' claims and defenses, and that any purchaser of assets must be subject to such claims and

40

defenses.    And even notwithstanding the application of section 363(o), the Consumer Creditors' Committee maintains that any reorganization transaction or sale (whether through a Plan or otherwise) cannot ratify the validity, authenticity, or accuracy of any borrower account records, and any Plan must preserve consumer creditors' rights to challenge misstated amounts under their accounts.  Under section 541 of the Bankruptcy Code, for example, the Debtors cannot include in any sale, under the Plan or otherwise, assets that are not property of the estate.  Insofar as a sale under the Plan purports to include amounts due that are inappropriately misstated or inflated and to which the Debtors do not have a legal or equitable interest, such a sale should be denied by this Court.

The Consumer Creditors' Committee also submits that notwithstanding any proposed free and clear sale, discharge, or release granted under the Plan, the Plan cannot discharge any setoff claims or recoupment rights or other defenses of the consumer creditors and cannot effectuate any sale free and clear of such setoff rights or recoupment rights or other defenses.  Such rights include the right to commence litigation, or to file counterclaims or cross-claims, on account of claims asserting statutory and/or common law claims contesting the status of their account, application of payments, escrow accounting (including disbursements), or disputing any fees, charges, expenses, corporate advances of any nature, and seeking compensation for all damages and attorneys' fees that would otherwise be recoverable.

Moreover, the Consumer Creditors' Committee questions the legal basis for certain Final OCB Orders entered in these chapter 11 cases that appear to suggest that the automatic stay applies to any rights of recoupment of any of the consumer borrowers (including, purportedly, counterclaims or cross-claims that arise under the same transaction as the amounts owed by the consumer borrower to the Debtors).  In the Consumer Creditors' Committee's view, these orders, through their vague and restrictive language and improper application of the automatic stay to recoupment rights (which include, among other things, the right to file a counterclaim for affirmative relief or to recover legal fees that arise from defending a foreclosure action or correcting a misstated and inflated account) have caused significant confusion among the Consumer Creditors' Committee's constituents.  As such, the Consumer Creditors' Committee is considering a motion for reconsideration of the Final OCB Orders to ensure that the automatic stay applies only to the extent appropriate under the Bankruptcy Code.  The Debtors will oppose any such motion.

Finally, the Consumer Committee is concerned that notice to consumer borrowers in these cases has been inadequate and, as such, consumer borrowers' claims cannot be discharged under any Plan under established Second Circuit law.  In addition to the above concerns, the Consumer Creditors' Committee reserves its rights to object to the Plan on any other basis, including any purported release of any consumer creditor claims or defenses against any non-debtors parties, including any purchaser of any of the Debtors' assets.

The Consumer Creditors' Committee intends to participate constructively in these chapter 11 proceedings to protect these consumer creditor rights, and hopes to have the Debtors' cooperation, including honoring the Consumer Creditors' Committee's rights to the same information as the Creditors' Committee and other parties in interest with regard to the sale of the Debtors' assets.  Access to this information is vital for the Consumer Creditors' Committee to appropriately evaluate the effect of any sale on consumer rights and to potentially resolve issues related to any such sale with the Debtors.

## I.    ~~II.~~ Statements and Schedules, and Rule 2015.3 Financial Reports

On March 27, 2019, the Debtors each filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") (ECF Nos. 286–313).  The Schedules and Statements, as

amended will be incorporated into the Disclosure Statement by reference. The Debtors intend to file a Rule 2015.3 financial report by May 9, 2019.

### J.    ~~I.~~ Litigation Matters

In the ordinary course of business, the Debtors are defendants in, or parties to, pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants. Many of these actions and proceedings are based on alleged violations of consumer protection laws governing the Company's servicing and origination activities, and in certain instances, claims for substantial monetary damages are asserted against the Company. The Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with formal and informal inquiries, the Company receives numerous requests in connection with various aspects of the Company's activities.

### 1.    Courtney Elkin, *et al.* vs. Walter Investment Management Corp., *et al.*

A federal securities fraud complaint was filed against the Company, George M. Awad, Denmar J. Dixon, Anthony N. Renzi, and Gary L. Tillett on March 16, 2017. The case, captioned *Courtney Elkin, et al. vs. Walter Investment Management Corp., et al.*, Case No. 2:17-cv-02025-JCJ, is pending in the Eastern District of Pennsylvania. An amended complaint was filed on September 15, 2017 by the court-appointed lead plaintiff, and the amended complaint sought monetary damages and asserted claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 during a class period alleged to begin on August 9, 2016 and conclude on August 1, 2017. From December 1, 2017 to February 9, 2018, the action was stayed pursuant to section 362 of the Bankruptcy Code, and on July 13, 2018, the parties entered into a formal settlement agreement to settle the action for $2.95 million, subject to notice to the alleged class and court approval. On December 18, 2018, the court approved the settlement on a final basis. The settlement was paid by the Company's directors' and officers' insurance carrier.

### 2.    Michael E. Vacek, Jr., *et al.* vs. George M. Awad, *et al.*

A stockholder derivative suit was filed against current and former members of the Board on June 22, 2017. The case, captioned *Michael E. Vacek, Jr., et al. vs. George M. Awad, et al.*, Case No. 2:17-cv-02820-JCJ, is pending in the Eastern District of Pennsylvania. An amended complaint was filed on September 13, 2017, which sought monetary damages for the Company and equitable relief and asserted a claim for breach of fiduciary duty arising out of: (i) a material weakness in the Company's internal controls over financial reporting related to operation processes associated with Ditech Financial's default servicing activities; (ii) an accounting error that caused an overstatement of the value of the Company's deferred tax assets; and (iii) subpoenas seeking documents relating to RMS's origination and underwriting of reverse mortgages and loans. On October 17, 2018, the parties entered into a formal settlement agreement to settle the action based on the Company's adoption of certain corporate governance measures. On December 3, 2018, the court issued an order preliminarily approving the proposed settlement, and on February 1, 2019, the court approved the proposed settlement on a final basis. The Company's directors' and officers' insurance carrier has agreed to pay $257,500 in attorneys' fees to plaintiff's counsel. The implementation of corporate governance measures has been stayed by the automatic stay under section 362 of the Bankruptcy Code.

### 3.    Other Litigation

As mentioned above, in the ordinary course of business, the Company is involved in numerous pending and threatened legal actions and proceedings, as well as in routine proceedings such as foreclosures, evictions, title disputes, collection actions, and borrower bankruptcy cases. All actions and claims

interposed against the Debtors in such actions are stayed pursuant to section 362 of the Bankruptcy Code during the pendency of the Chapter 11 Cases, subject to the limited stay relief granted under the Final OCB Orders.

The Debtors are involved in over one hundred (100) actions ("**Third Party Actions**") in which they owe indemnification and/or defense obligations to non-Debtor third parties including without limitation (a) private investors and securitization trustees; (b) Fannie Mae; (c) Freddie Mac; and (d) Mortgage Electronic Registration System, Inc. (collectively, "**Indemnified Parties**"). The Third Party Actions fall into a number of categories, including commercial litigation and claims, cross-claims, third-party claims, and counterclaims by various parties for monetary damages against the Debtors and/or Indemnified Parties.

## K.    ~~J.~~ Marketing Process and Bidding Procedures

In support of the Debtors' Marketing Process, the Debtors and their advisors have developed bidding and auction procedures for the marketing and sale of their assets in these Chapter 11 Cases in an orderly and value maximizing manner (the "**Bidding Procedures**"). Under the Bidding Procedures, parties may submit bids for the purchase and sale of any and all of the Debtors' assets in accordance with terms of the Bidding Procedures. The Bidding Procedures are designed to promote a competitive and expedient bidding process, and are intended to generate the greatest level of interest in the Debtors' assets. The Bidding Procedures are intended to provide the Debtors with flexibility to solicit proposals, negotiate transactions, provide stalking horse protections (if necessary and appropriate), hold an auction (if necessary and appropriate) and consummate a Sale Transactions for the highest and best value, all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review and consider proposed transactions. The Bidding Procedures are filed at ECF No. 147. Below are the proposed dates related to the Bidding Procedures.

| Key Event | Proposed Date |
|-----------|---------------|
| Deadline to Submit Non-Binding Indications of Interest | No later than May 6, 2019 at 4:00 p.m. (ET) |
| Deadline to Submit Bids | May 28, 2019 at 4:00 p.m. (ET) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | May 29, 2019 at 4:00 p.m. (ET) |
| Auction, if necessary, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | May 30/May 31 2019 at 10:00 a.m. (ET) |
| Deadline to File Notice of (a) Successful Bid and Back-Up Bid and (b) Identity of Successful Bidder and Back-Up Bidder | June 3, 2019 at 4:00 p.m. (ET) |
| Deadline to File Objections to Sale Transaction or Asset Sale Transaction | June 10, 2019 at 4:00 p.m. (ET) |
| Sale Hearing | June 20, 2019 |

### L. ~~K.~~ U.S. Trustee's Objections to Disclosure Statement

On April 5, 2019, the U.S. Trustee filed an objection to the disclosure statement (ECF No. 348). With regards to section 363(o) claims, the U.S. Trustee requested that the Plan explicitly provide that, in the event of a sale of the Debtors' assets under section 363 of the Bankruptcy Code, the successor in interest to the Debtors must be liable for consumer claims. The U.S. Trustee further stated that to the extent the Debtor reorganizes without a sale, analogous language should be incorporated into the Plan. (ECF No. 348, ¶ 40). The Debtors disagree with the U.S. Trustee's position concerning section 363(o) of the Bankruptcy Code. The Debtors' position is that section 363(o) does not apply to asset sales under the Plan.

With regard to releases, the U.S. Trustee argued that the scope of the Plan's release provisions are not adequately explained and stated. "This Disclosure Statement needs a simple, clear, plan-English explanation of how the Plan's release, discharge, and injunction provisions will affect claims, particularly consumer claims. To the extent claims may be unaffected by the discharge and ride through the bankruptcy, this needs to be explained. Any explanation should be appropriately tailored to a creditor body that may not understand legal jargon." (ECF No. 348, ¶ 42-44).

The third party releases provided in the Plan are consensual in nature. As a result, consumer borrowers are unaffected by and not subject to the releases in section 10.6 of the Plan. Additionally, the Plan has been amended to include a new class of Borrower Non-Discharged Claims that addresses the discharge of certain consumer claims. A simplified description of the types of borrower claims in this class can be found in Schedule A to the Plan.

As reflected therein, the claims identified on Schedule 1 will not be discharged in a Reorganization Transaction. In a sale transaction, the Debtors are not requesting a discharge. However, any recovery to consumer borrowers (just like all creditors) will be dictated by the amount of proceeds received from the sale, which will be distributed in accordance with the priority scheme under the Bankruptcy Code. In addition, potential buyers may choose to assume certain liabilities which will be identified in an asset purchase agreement. The Debtors have prepared a notice tailored to consumer borrowers that will provide such parties with relevant information about the confirmation hearing and the Plan, including its release and discharge provisions. The notice also provides instructions to access the webpage created by Epiq designed specifically for consumer borrowers. The notice includes a plain-English explanation of Borrower Non-Discharged Claims. A copy of the proposed notice is annexed to the revised proposed *Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, and (V) Granting Related Relief*.

### M. ~~L.~~ Plan Settlement Negotiations and the Global Plan Settlement

The Debtors filed their initial chapter 11 plan on March 5, 2019 (ECF No. 145) (the "**Initial Plan**"), filed an amended plan of reorganization on March 28, 2019 (ECF No. 314) (the "**Amended Plan**") and subsequently filed the April 26, 2019 Plan on April 26, 2019, each with the support of the Term Loan Ad Hoc Group. The Creditors' Committee raised a number of formal and informal objections and issues with respect to the Initial Plan and the Debtors' restructuring, including:

- Value attributable to the Debtors' unencumbered assets and the proposed treatment of unsecured creditors and the Initial Plan and the Amended Plan;

- The treatment of intercompany claims and interests; and

- The releases and exculpations contemplated by the Initial Plan and the Amended Plan.

The Debtors, the Creditors' Committee, and the Term Loan Ad Hoc Group, with the assistance of their advisors, engaged in vigorous, arm's-length negotiations to resolve all their respective issues on a consensual basis.

These negotiations were successful, and the modifications to the Initial Plan described herein resolve each of those issues and objections of the Creditors' Committee (collectively, the "**Global Plan Settlement**"). In particular, the Global Plan Settlement significantly improves recoveries for General Unsecured Claims under the Plan, compared to the Initial Plan. These improved recoveries are being carved out of the collateral securing Term Loan Claims by agreement of the Term Loan Ad Hoc Group. Given the Debtors' valuation, recoveries of this size to general unsecured creditors would be impossible absent the Global Plan Settlement. In particular, the modified General Unsecured Claim recoveries provided on account of the Global Plan Settlement include:

- On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust: (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

- On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

- On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets, and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

WEIL:\97028542\2\41703.0010

- The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing). The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

- On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

- On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien ~~Noteholders~~Notes Trustee to be distributed in accordance with the Plan.

- The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

- The Creditors' Committee's ~~shall, at all times, comply with~~previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

- On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under ~~unexpired~~ leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

- On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

- On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

- As a condition precedent to consummation of the Global Settlement, the ~~Prepetition Second Lien Notes Trustee and the~~ Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

46

- ~~As a result of the Global Plan Settlement, the Creditors' Committee now supports the Plan. The Plan is also supported by the Term Loan Ad Hoc Group.~~

- ~~The terms of the Global Plan Settlement have been embodied in the Plan and the parties will seek approval of the as Global Settlement as part of the Plan pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code via the Confirmation Order.~~

- ~~The Debtors believe that the Plan, as modified to implement the Global Plan Settlement, represents the best available path for the Debtors to reorganize and maximize value for their stakeholders' benefit. The Debtors therefore seek Confirmation of the value maximizing Restructuring Transaction encompassed in the Plan and described herein.~~

## V.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as Exhibit A.

### A.    Administrative Expenses and Priority Claims

#### 1.    Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

#### 2.    Treatment of Fee Claims

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date. Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)    Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized

WEIL:\97028542\2\41703.0010

Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)     On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

(d)     The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 3.     Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### 4.     Treatment of DIP Claims

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs.  The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement and indemnity obligations under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision thereof to the contrary.

WEIL:\97028542\2\41703.0010

### 5. Restructuring Expenses

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### B. Classification of Claims and Interests

#### 1. Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

#### 2. Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

#### 3. Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | Borrower Non-Discharged Claims | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired) | Reorganization Transaction (Presumed to Accept)<br><br>Sale Transaction (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

### 4.    Special Provision Governing Unimpaired Claims

Nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5.    Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### C.    Treatment of Claims and Interests

### 1.    Priority Non-Tax Claims (Class 1)

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

WEIL:\97028542\2\41703.0010

Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

### 2. Other Secured Claims (Class 2)

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

### 3. Term Loan Claims (Class 3)

(a)    *Classification*:  Class 3 consists of Term Loan Claims.

(b)    *Allowance*:  The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement.  The Prepetition Administrative Agent and the Term Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full

51

in cash.   On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan).

(ii)      **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.   On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d)      *Voting*:  Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

**4.      Second Lien Notes Claims (Class 4).**

(a)      *Classification*:  Class 4 consists of Second Lien Notes Claims.

(b)      *Treatment*:  The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i)      **If the Sale Transaction occurs**, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)      **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

(iii)      **If either the Sale Transaction or the Reorganization Transaction occurs**, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except

WEIL:\97028542\2\41703.0010

as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court.

(c)    *Voting*:  Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

### 5.    General Unsecured Claims (Class 5)

(a)    *Classification*:  Class 5 consists of General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)    *Voting*:  Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

### 6.    Borrower Non-Discharged Claims (Class 6)

(a)    *Classification*:  Class 7 consists of Borrower Non-Discharged Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed

WEIL:\97028542\2\41703.0010

General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.

(ii)     **If the Reorganization Transaction occurs**, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan.

(c)     *Voting*:

(i)     **If the Sale Transaction occurs**, Class 6 is Impaired, and holders of Borrower Non-Discharged Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(ii)     **If the Reorganization Transaction occurs**, Class 6 is Unimpaired, and holders of Borrower Non-Discharged Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of Borrower Non-Discharged Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Borrower Non-Discharged Claims.

### 7.     **Intercompany Claims (Class 7)**

(a)     *Classification*:  Class 7 consists of Intercompany Claims.

(b)     *Treatment*:  On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

(c)     *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

### 8.     **Intercompany Interests (Class 8)**

(a)     *Classification*:  Class 8 consists of Intercompany Interests.

(b)     *Treatment:*  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests.

(c)     *Voting:*  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

9.    **Parent Equity Interests (Class 9)**

(a)    *Classification*: Class 9 consists of Parent Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of an Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "*Single Share*") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements.  The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)    **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

10.    **Subordinated Securities Claims (Class 10)**

(a)    *Classification*: Class 10 consists of Subordinated Securities Claims.

(b)    *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

## D.    Means for Implementation

### 1.    No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 2.    Compromise and Settlement of Claims, Interests, and Controversies

(a)    Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan and the Global Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee, the Second Lien Noteholders, and the Consenting Term Lenders (the "**Global Settlement**").  The following constitutes the provisions and conditions of the Global Settlement:

(i)    On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other

provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(ii)        (i) On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)       (ii) On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets, and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)       (iii) The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing). The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)        On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)       (iv) On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Noteholders Notes Trustee to be distributed in accordance with the Plan.

(vii)      (v) The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

WEIL:\97028542\2\41703.0010

(viii)   (vi) The Creditors' Committee's shall, at all times, comply with previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

(ix)   (vii) On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under unexpired leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(x)   (viii) On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

(xi)   (ix) On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xii)   (x) As a condition precedent to consummation of the Global Settlement, the Prepetition Second Lien Notes Trustee and the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

3.      **Marketing Process**

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale Transaction, and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae.  The Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction, or Asset Sale Transaction.  The Debtors, the Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders. The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

WEIL:\97028542\2\41703.0010

4.       **Election Notice.**

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "*Election Date*"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "*Electing Term Lenders*") shall deliver a notice (the "*Election Notice*") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "*Elected Transaction*"), being a: (i) Reorganization Transaction or (ii) Sale Transaction, and, if applicable, (iii) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i) or (ii).

5.       **Sources of Consideration for Plan Distributions**

(a)       *Sale Transaction*.   The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

(b)       *Reorganization Transaction*.   The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

6.       **Sale Transaction**

(a)       *Closing of Sale Transaction (If Any)*

On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant to Section 1141 of the Bankruptcy Code, be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

(b)       *Wind Down and Dissolution of the Debtors*

(i)       The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims; (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in

59

performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)      After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims and GUC Recovery Trust Causes of Action.

(iii)      Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(iv)      Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(v)      The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(vi)      The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

**7.      Reorganization Transaction.**

(a)      If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth in the Plan.

(a)      ***Amended and Restated Credit Facility***

(i)      On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

(ii)      Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term

60

Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents.  All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

(iii)     The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(b)     *Exit Warehouse Facilities*

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(c)     *Authorization and Issuance of New Plan Securities*

(i)     On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action.  All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)     The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of

WEIL:\97028542\2\41703.0010

New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(d)    ***Continued Corporate Existence***

(i)    The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan.

(ii)    On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(e)    ***Officers and Board of Directors***

(i)    Upon the Effective Date, the New Board shall consist of five (5) directors. Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("**CEO**") of Reorganized DHCP, who shall be Thomas F. Marano. The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)    Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(f)    ***Reorganized Debtors' Authority***

(i)    The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the

62

Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)     After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 8.     Fannie Mae; Freddie Mac; Ginnie Mae

(a)     *Fannie Mae.*  Notwithstanding anything in the Disclosure Statement, the Plan or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to Fannie Mae shall not be transferred by the Debtors to a Successful Bidder (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance. Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction  repayment in full of the Cure Amounts; or (3) such other treatment

of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

(b)     *Freddie Mac*.

(i)     Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "**Servicing Collateral**" (as defined and referenced in, and except as otherwise expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)     Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the Debtors to a Successful Bidder (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.   The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)     *Ginnie Mae*.   Notwithstanding anything in the Plan to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to a Successful Bidder without the express prior written consent of Ginnie Mae in its sole

64

and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion.  The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

## 9.    Employee Matters

(a)    Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "**Employee Arrangements**").  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)    Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)    For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)    In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

## 10.    Effectuating Documents; Further Transactions

(a)    On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the

65

applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)    Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)    In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)    The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, and the Global Settlement, including the creation of the GUC Recovery Trust, in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)    All matters provided for in the Plan involving the corporate structure of the Debtors. Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

## 11.    Section 1145 Exemption

(a)    The offer, issuance, and distribution of the New Common Stock hereunder to holders of the Term Loan Claims under Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)    The New Common Stock shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an

66

underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock, (iv) applicable regulatory approval, and (v) the Stockholders Agreement.

### 12.    Cancellation of Existing Securities and Agreements

(a)    Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors. In a Reorganization Transaction, notwithstanding anything to the contrary in the Plan, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order. Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes

WEIL:\97028542\2\41703.0010

Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)     Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

(d)     Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)     Notwithstanding anything to the contrary in the Plan, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

(f)     Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 13.    Cancellation of Liens

Except as otherwise specifically provided in the Plan, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 14.    Subordination Agreements

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreements' terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

WEIL:\97028542\2\41703.0010

### 15.    Nonconsensual Confirmation

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 16.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 17.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 18.    Separability

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### 19.    GUC Recovery Trust

(a)    *Creation and Governance of the GUC Recovery Trust*.  On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19.  The GUC Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement.  Other rights and duties of the GUC Trustee shall be as set forth in the GUC Recovery Trust Agreement.  After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

69

(b)    *GUC Trustee and GUC Recovery Trust Agreement*.  The GUC Recovery Trust Agreement generally will provide for, among other things:  (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) make distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement.  The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust.  Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)    *Cooperation of Reorganized Debtors*.  Subject to subsection (d) of this Section 5.19, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, upon reasonable notice, shall provide reasonable cooperation with the GUC Trustee in the administration of the GUC Recovery Trust, including providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder.  The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Recovery Trust, including, providing reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims, in each case, the GUC Recovery Trust agrees to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses.  The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Recovery Trust.

(d)    *Preservation of Privilege*.  The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets.  The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)    *GUC Recovery Trust Assets*.  The GUC Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement.  From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Trustee deems necessary.

(f)    *GUC Recovery Trust Fees and Expenses*.  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the

70

GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement. The Reorganized Debtors or the Wind Down Estates, as applicable, shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)     *Tax Treatment*.  In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims and the GUC Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims and GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)     *Non-Transferability of Interests in GUC Recovery Trust*.  Any and all interests in the GUC Recovery Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(i)     *Dissolution of the GUC Litigation Trust*.  The GUC Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement as appropriate.

(j)     *Single Satisfaction of Allowed General Unsecured Claims*.  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

### E.     **Distributions**

### 1. Distributions Generally

Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 2. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests. The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date. For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the ~~Indenture~~Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the ~~applicable~~Prepetition Second Lien Notes Indenture, including, without limitation, subject to the application of the charging lien of the ~~Indenture~~Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

### 3. Date of Distributions

(a)    Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

### 4. Disbursing Agent

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors)

WEIL:\97028542\2\41703.0010

with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records. The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

### 5.        Rights and Powers of Disbursing Agent

(a)        From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)        A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 6.        Expenses of Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement.

### 7.        No Postpetition Interest on Claims

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

### 8.        Delivery of Distributions

(a)        Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned

as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)    Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture. All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture. To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)    As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan. All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

### 9.    Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10.    Unclaimed Property

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, or Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors or, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

WEIL:\97028542\2\41703.0010

### 11.    Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12.    Manner of Payment under Plan

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 13.    Satisfaction of Claims

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 14.    Fractional Stock and Notes

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors, Wind Down Estates, nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock.

### 15.    Minimum Cash Distributions

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

### 16.    Setoffs and Recoupments

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims,

75

rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 17. Allocation of Distributions between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 18. No Distribution in Excess of Amount of Allowed Claim

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 19. Withholding and Reporting Requirements

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors or Wind Down Estates or GUC Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  If such request is made by the GUC Trustee, or such other Entity designated by the GUC Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Trustee, the GUC Recovery Trust, or its respective property.

WEIL:\97028542\2\41703.0010

### 20. Hart-Scott-Rodino Antitrust Improvements Act

Any New Common Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

### F. Procedures for Disputed Claims

#### 1. Objections to Claims

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall exclusively be entitled to object to Claims. After the Effective Date, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause. The expiration of such period shall not limit or affect the Debtors', Reorganized Debtors', Plan Administrators', or GUC Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

#### 2. Resolution of Disputed Administrative Expenses and Disputed Claims

On and after the Effective Date, the Debtors, (a) the Reorganized Debtors, or the Plan Administrator, as applicable, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Recovery Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court. The Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the GUC Trustee shall cooperate with respect to any objections to Claims that seek to convert Claims into General Unsecured Claims or General Unsecured Claims into other senior Claims, and the Debtors' rights and defenses to any such objections are fully preserved.

#### 3. Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

#### 4. Distributions after Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

WEIL:\97028542\2\41703.0010

5.      **Disallowance of Claims**

Except to the extent otherwise agreed to by the Debtors, Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable.  All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

6.      **Estimation of Claims**

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee as to General Unsecured Claims, as applicable, may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

7.      **No Distributions Pending Allowance**

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

8.      **Claim Resolution Procedures Cumulative**

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 9.    Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 10.    Insured Claims

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### G.    Executory Contracts and Unexpired Leases

### 1.    General Treatment

(a)    As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of the Plan; (v) is identified in section 8.4 of the Plan; (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  Solely with respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected by the Successful Bidder in accordance with the applicable purchase agreement.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Successful Bidder, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Successful Bidder, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

### 2.    Determination of Assumption Disputes and Deemed Consent

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

WEIL:\97028542\2\41703.0010

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 3.        Rejection Damages Claims

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).  Such Claim shall be forever barred and shall not be enforceable against the Debtors or, the Reorganized Debtors, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, noby the later thanof (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### 4.        Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) be rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

### 5.        Intellectual Property Licenses and Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court

WEIL:\97028542\2\41703.0010

or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted in the Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 6.    Tax Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted in the Plan, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 7.    Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 8.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 9.    Reservation of Rights

(a)    The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a

WEIL:\97028542\2\41703.0010

period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)     Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

(c)     Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)     Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

**H.     Conditions Precedent to Confirmation of Plan and Effective Date**

**1.     Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)     the Disclosure Statement Order shall have been entered;

(b)     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)     the RSA shall not have been terminated and shall be in full force and effect; and

(d)     the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

**2.     Conditions Precedent to Effective Date**

(a)     The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

(i)     the Confirmation Order (in form and substance reasonably acceptable to the Creditors' Committee) shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)     an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(v)    the Creditors' Committee shall not have objected to or taken any other action that was inconsistent with or that would reasonably be expected to have prevented, interfered with, delayed, or impeded the confirmation and consummation of the Plan or approval of the Global Settlement; and

(vi)    all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

(b)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)    the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)    the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement, shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)    the applicable purchase agreement(s) shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(d)    Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

WEIL:\97028542\2\41703.0010

3.      **Waiver of Conditions Precedent**

(a)      Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Section 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; <u>provided</u> that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Creditors' Committee.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

4.      **Effect of Failure of a Condition**

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

I.      **Effect of Confirmation of Plan**

1.      **Vesting of Assets**

(a)      On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates shall vest in the Reorganized Debtors or the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, Amended and Restated Credit Facility Documents, the Exit Warehouse Facilities Documents, or the Exit Working Capital Facility Documents.  On and after the Effective Date, the Reorganized Debtor may take any action, including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan.  Without limiting the foregoing, the Reorganized Debtors may pay the

charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)      On the Effective Date and solely with respect to the Sale Transaction, all property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, and the applicable purchase agreement.

## 2.      Binding Effect

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

## 3.      Discharge of Claims and Termination of Interests

In a Reorganization Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date; provided that Borrower Non-Discharged Claims shall not be discharged.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

## 4.      Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

## 5.      Injunction

(a)      **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)      **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their**

86

respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust or the property of any of the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust or against property or interests in property of any of the Debtors or, the Reorganized Debtors, or the GUC Recovery Trust, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

(d)    The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

6.    Releases

(a)    Estate Releases

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, and the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order.

(b)      **Third-Party Releases**

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

(i)      the holders of Impaired Claims who voted to accept the Plan;

(ii)      the Consenting Term Lenders;

(iii)      holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots;

(iv)      the Creditors' Committee and each of its members in their capacity as such; and

(v)    with respect to any Entity in the foregoing clauses (i) through (iv), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.  The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

### 7.    Exculpation

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

### 8.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Trustee, solely with respect to Allowed General Unsecured Claims) reserve the

WEIL:\97028542\2\41703.0010

right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 9.      Retention of Causes of Action/Reservation of Rights

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code. The Reorganized Debtors or the GUC Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

### 10.      Solicitation of Plan

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 11.      Corporate and Limited Liability Company Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents;

(iv) the Exit Working Capital Facility Documents; (v) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction; (vi) the GUC Recovery Trust Agreement; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 10.11 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### J.    Retention of Jurisdiction

#### 1.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims and Restructuring Expenses;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Global Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)      to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to resolve disputes concerning Disputed Claims or the administration thereof;

(o)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

## 2.      Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## K.      Miscellaneous Provisions

92

1.    **Payment of Statutory Fees**

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

2.    **Substantial Consummation of the Plan**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

3.    **Plan Supplement**

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

4.    **Request for Expedited Determination of Taxes**

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

5.    **Exemption from Certain Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

WEIL:\97028542\2\41703.0010

6.    **Amendments**

(a)    *Plan Modifications*.  Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to ~~this~~the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Creditors' Committee, solely as it pertains to the Global Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

7.    **Effectuating Documents and Further Transactions**

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

8.    **Revocation or Withdrawal of Plan**

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity.  This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

9.    **Dissolution of Creditors' Committee**

On the Effective Date, the Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Creditors' Committee and each professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the

Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Creditors' Committee.

### 10.      Severability of Plan Provisions

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 11.      Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

### 12.      Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 13.      Dates of Actions to Implement the Plan

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 14.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

95

15.    **Deemed Acts**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

16.    **Successor and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

17.    **Entire Agreement**

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

18.    **Exhibits to Plan**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

19.    **Notices**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors or the Reorganized Debtors:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
Email: JHaas@ditech.com

-and-

96

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
            Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
            sunny.singh@weil.com

(b)        If to the Consenting Term Lenders:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 60654
Attn: Patrick J. Nash Jr., P.C.
Email:  patrick.nash@kirkland.com
Attn: John R. Luze
Email: john.luze@kirkland.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VI.
## VALUATION ANALYSIS

As described above, the Debtors are presently engaged in the Marketing Process.  The Debtors believe that the Marketing Process is the best method of valuing their business as it allows the market to speak as to their value.  The Marketing Process is a comprehensive and arm's length process with the goal of identifying counterparties for a potential transaction.  Accordingly, to ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims are not, at this time, being disclosed herein and the Debtors are not filing a valuation analysis.  *See* Section 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282).  The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing.  Further, if necessary, the Debtors will file, no later than the date that the Plan Supplement is filed, a valuation analysis and will serve notice thereon on holders of Claims in the Voting Class as promptly as practicable upon filing.

## VII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The issuance of and the distribution under the Plan of the New Common Stock shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

WEIL:\97028542\2\41703.0010

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, the New Common Stock will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer. Further, based on the legislative history of Section 1145 of the Bankruptcy Code, a creditor who owns 10% or more of the voting securities of a reorganized debtor and/or has the right to appoint a director to the board of directors of a reorganized debtor may be presumed to be a control person, and therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of New Common Stock issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.  In order to preserve the ability to utilize tax attributes following the Effective Date, the charter, bylaws, and other organizational documents, as applicable, of the Reorganized Debtors may restrict certain transfers of the New Common Stock.

_Legends_.  To the extent certificated, certificates evidencing the New Common Stock held by holders of 10% or more of the outstanding New Common Stock, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SHARES OF NEW COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE DEBTOR RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

WEIL:\97028542\2\41703.0010

# VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors (including the Reorganized Debtors) and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or equity interests who are unimpaired or deemed to reject the Plan and does not address the consequences of a Sale Transaction.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the "Medicare" tax on net investment income, persons subject to special accounting rules under Section 451(b) of the Code, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquired any of the New Common Stock or New Term Loan in the secondary market, unless otherwise provided herein.  This discussion assumes that the New Common Stock and the New Term Loans will be held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your own tax advisor for the U.S. federal, state, local, non-U.S., and other tax consequences applicable under the Plan.

WEIL:\97028542\2\41703.0010

### A.    Consequences to the Debtors

For U.S. federal income tax purposes, DHCP is a common parent of an affiliated group of corporations which files a single consolidated U.S. federal income tax return (the "**Ditech Group**"). The Debtors estimate that, as of January 1, 2019, the Ditech Group had incurred, for U.S. federal income tax purposes, a consolidated NOL (defined below) in excess of $20 million. In addition, the Ditech Group has substantial other deferred tax assets, including substantial tax basis in excess of the fair market value of its assets based upon the valuation of the Debtors. The amount of any such NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS.  As discussed below, such NOL carryforwards and other tax attributes could, depending on the treatment under section 382 of the prior ownership change which occurred in connection with the WIMC Chapter 11 Case, be subject to current limitation. In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of DHCP independent of the Plan which could adversely affect the ability to fully utilize the Ditech Group's NOLs.  In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing a protective equity trading order.

The U.S. federal income tax consequences to the Debtors with respect to the implementation of the Plan depend in part on whether the Debtors, in connection with Consenting Term Lenders, elects to consummate a potential Sale Transaction (as provided in the Restructuring Service Agreement).  Absent such an election, the Plan provides for a Reorganization Transaction in which the holders of Term Loan Claims would receive New Common Stock and New Term Loans in satisfaction of the Term Loan Claims. As discussed below, in connection with the implementation of the Plan, the Debtors expect the amount of the Ditech Group's NOL carryforwards would be eliminated, and that other tax attributes (in particular, the adjusted basis in the Debtors' assets) will be reduced.  In addition, the subsequent utilization of any loss and possibly other tax attributes remaining following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange. Because the Plan provides that holders of Term Loans will receive New Common Stock and New Term Loans, the amount of COD will depend in part on the fair market value of the New Common Stock and the issue price of the New Term Loan. This value, and, consequently, the amount of COD that will be realized by the Debtors as a result of the Plan, cannot be determined at this time.

Under section 108 of the Tax Code, any COD of a debtor is excluded from gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD that it excluded from gross income. As noted above, the amount of COD, and accordingly the amount of tax attributes required to be reduced, cannot be determined at this time.  In general, tax attributes of the debtor will be reduced in the following order:  (a) net operating loss ("**NOLs**") and NOL carryovers; (b) general business credit carryovers; (c) alternative minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.

WEIL:\97028542\2\41703.0010

Alternatively, a debtor with excluded COD income may elect first to reduce the basis of its depreciable assets. The reduction of the debtor's tax attributes occurs at the end of the tax year for which the excluded COD income is realized, but only after the tax for the year of the debt discharge has been determined; in this way, the attribute reduction is generally effective as of the start of the year following the discharge. If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

## 2.    Limitation of NOL Carryforwards and Other Tax Attributes

The WIMC Chapter 11 Case resulted in an "ownership change" of the Debtors under sections 382 and 383 of the Tax Code. With respect to that restructuring, Debtors will apply one of two special rules available under section 382 of the Tax Code in connection with an ownership change resulting from a court-ordered restructuring under chapter 11. See general discussion of section 382 rules below. A decision regarding which of those special rules Debtors will choose for the WIMC Chapter 11 Case must be made by the Reorganized Debtors in connection with filing their 2018 federal income tax return. Until this point in time, the Debtors have planned to apply the rule in section 382(l)(5) (as generally described below), but have not finally decided which of the rules to apply to the WIMC Chapter 11 Case; that decision will be made based on further development and analysis of relevant facts. The decision to use one or the other of these special rules under section 382 in respect of the WIMC Chapter 11 Case will affect both the ability to use the Debtors' NOLs and other attributes from the time of the 2018 emergence as well as the availability and ability to use such NOLs and other attributes following the Effective Date. If Debtors decide to have section 382(l)(5) apply to the WIMC Chapter 11 Case, then in connection with the ownership change of the Debtors which will result from the implementation of the Plan, the Debtors' NOLs and other tax attributes (that remain) may be rendered effectively useless for all future taxable periods following the Effective Date. If instead Debtors elect to have section 382(l)(6) (as generally described below) apply to the WIMC Chapter 11 Case, then the Debtors' NOLs and other attributes would be subject to limitation from the time of the 2018 emergence, and the attributes (that remain) may be even further limited as a result of the ownership change of the Debtors which will result from the implementation of the Plan.

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (collectively, "**Pre-Change Losses**") will be subject to additional limitations under section 382 and 383 of the Tax Code. Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD income arising in connection with the Plan.

If a corporation undergoes an ownership change, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of its Pre-Change Losses will be subject to further limitation unless an exception to the general rules of section 382 and 383 of the Tax Code applies.

Generally, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the sixty (60) month period following the "ownership change" (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses, the deductibility of which will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net

101

unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change. It is currently uncertain whether the Ditech Group will have a net unrealized built-in loss or a net unrealized built-in gain as of the Effective Date.

<div align="center">(a)     <u>General Annual Limitation</u></div>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.51 percent for February, 2019). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation (or the parent of the consolidated group) is generally determined immediately after (rather than before) the ownership change, but subject to certain adjustments (the "**382(l)(6) Exception**"); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any unused annual limitation may be carried forward and therefore available to be utilized in a subsequent taxable year. Where a corporation is subject to a prior annual limitation, both annual limitations apply, effectively subjecting any Pre-Change Losses which pre-date the prior ownership change to the more restrictive of the limitations.

<div align="center">(b)     <u>Section 382(l)(5) Bankruptcy Exception</u></div>

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). The IRS has in private letter rulings applied the 382(l)(5) Exception on a consolidated basis where the parent corporation is in bankruptcy. Generally, qualified creditors are creditors who (1) held their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and thereafter, (2) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred, or (3) in certain cases, do not become five percent (5%) shareholders of the reorganized corporation.

Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if the 382(l)(5) Exception applies, the Ditech Group's NOL carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two (2) years after the Effective Date, any further ownership change of the Ditech Group within a two-year period after the Effective Date would preclude the Ditech Group's utilization of any Pre-Change Losses at the time of the subsequent ownership change against future income. A future "ownership change" after such two-year period would subject the Reorganized Debtors to the general limitations under section 382. A debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation described above (as to the prior ownership change in connection with the WIMC Chapter 11 Case, the

<div align="center">102</div>

Debtors have until the time for filing the federal income tax return for the Ditech Group for 2018 to decide about making such an election).

In order to preserve the potential to qualify for the 382(l)(5) Exception, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing certain procedures and potential restrictions on the accumulation of Claims with persons who are or will be substantial claimholders.

<div align="center">(c)    Section 382(l)(6) Bankruptcy Exception</div>

As described above, where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), the 382(l)(6) Exception will generally apply.  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering a complete elimination of its Pre-Change Losses.

### 3.    Transfer of GUC Recovery Trust Causes of Actions and other GUC Recovery Trust Assets

Pursuant to the Plan, on or before the Effective Date, the GUC Recovery Trust will be established, and on the Effective Date, all of the GUC Recovery Trust Assets will be transferred to the Liquidating Trust and a 50% undivided interest in the GUC Recovery Trust Causes of Actions will be distributed to the holders of the Term Loan Claims.  For U.S. federal income tax purposes, such transfers generally will be treated as if the Debtors sold such assets and causes of actions at then fair market value.  *See* Section E — "Tax Treatment of The GUC Recovery Trust," below.

### B.    Consequences to Holders of Term Loan Claims

This summary discusses the U.S. federal income tax consequences to holders of Term Loan Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders. The discussion below generally assumes that holders of Term Loan Claims will, as a class, vote to accept the Plan.  As used herein, the term "U.S. Holder" means a beneficial owner of Term Loan Claims, New Term Loans, or New Common Stock, that is for U.S. federal income tax purposes:

- •    an individual who is a citizen or resident of the United States;

- •    a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- •    an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- •    a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial

<div align="center">103</div>

decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Term Loan Claims, New Term Loans, or New Common Stock, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such partnership holding any of such instruments, you should consult your own tax advisor.

### 1.    Holders of Term Loan Claims

Pursuant to the Plan, and assuming a Reorganization Transaction occurs, holders of Allowed Term Loan Claims will receive New Common Stock, New Term Loans, and a Pro Rata share of a fifty percent (50%) undivided interest in (and thus in the net proceeds from) the GUC Recovery Trust Causes of Action (the "**50% Interest**"), in complete and final satisfaction of their Term Loan Claims.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of Term Loan Claims depends, in part, on whether the holders' Claim constitutes a "security" of the Debtors for U.S. federal income tax purposes. If a Term Loan Claim constitutes a security of the Debtors, then the receipt of New Term Loans, New Common Stock, and the 50% Interest should be treated as part of a tax "reorganization" for U.S. federal income tax purposes, in each case, with the consequences described below. If, on the other hand, a Term Loan Claim does not constitute a security of the Debtors, then the receipt of the consideration in exchange therefor will be treated as a fully taxable transaction.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. A holder of a Term Loan Claim is urged to consult its own tax advisor regarding the appropriate status for U.S. federal income tax purposes of its Term Loan Claim.

If each of the Term Loan Claims constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Stock, New Term Loans and the 50% Interest in exchange for Term Loan Claims would qualify for reorganization exchange treatment for U.S. federal income tax purposes. The classification as a reorganization exchange generally serves to defer the recognition of any taxable gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain to the extent the holder receives "boot" in the reorganization exchange, *i.e.*, consideration other than stock or "securities" of the exchanging company – namely, the 50% Interest and, if the New Term Loans are not considered "securities" for this purpose, the New Term Loans. Accordingly, a U.S. Holder will recognize any realized gain up to the total amount of boot received in exchange, which would equal the sum of the fair market value as of the Effective Date of the portion of the 50% Interest and the issue price of the New Term Loans received by the U.S. Holder in the exchange in respect of its Term Loans Claim (other than any portion received in respect of a Claim for for accrued but unpaid interest and possibly accrued

104

original issue discount, or "**OID**"). In addition, even within an otherwise tax-free exchange, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income. *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

If an exchange of Term Loan Claims treated as a reorganization, a U.S. Holder's aggregate tax basis in the New Term Loans (if such loans constitute "securities" for U.S. federal income tax purposes) and New Common Stock will equal such holder's aggregate adjusted tax basis in the Term Loan Claims exchanged therefor, increased by any gain or interest income recognized in the exchange, and decreased by the fair market value of the portion of the 50% Interest and, if the New Term loans do not constitute "securities," the issue price of the New Term Loans received in the exchange. Such aggregate tax basis should be allocated among the New Common Stock and (if they constitute "securities") the New Term Loans in accordance with their relative fair market values. In an exchange treated as a reorganization, a U.S. Holder's holding period in such carryover basis property will include its holding period in the Term Loan Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest and possibly accrued OID). If the New Term Loans do not constitute "securities," then a U.S. Holder will have tax basis in the New Term Loan received equal to its issue price, and its holding period in such New Term Loan received should begin on the day following the exchange date.

If the exchange of a Term Loan Claim does not constitute a reorganization, the exchange will be taxable and the U.S. Holder of a Term Loan Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the issue price of the New Term Loans, the fair market value of the New Common Stock, and the fair market value of the portion of the 50% Interest received (other than any consideration received in respect of a Term Loan Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Term Loan Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section B.1(b)— "Character of Gain or Loss," below. In addition, a U.S. Holder of a Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income. *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

In the case of a taxable exchange, a U.S. Holder of Term Loan Claims will have a tax basis in the New Term Loans received equal to its issue price and a tax basis in the New Common Stock received equal to its fair market value. The U.S. Holder's holding period in such New Term Loans and New Common Stock received should begin on the day following the exchange date.

The tax characterization of the 50% Interest as either an equity-type interest in the GUC Recovery Trust (even though receiving a direct undivided interest in the GUC Recovery Trust Causes of Action) or a separate property right is uncertain, and may depend in part on the terms and provisions of the GUC Recovery Trust Agreement. Accordingly, each holder of a Term Loan Claim is urged to consult its tax adviser regarding the receipt and ownership of a portion of the 50% Interest, including the tax treatment of any income, loss and distributions from the GUC Recovery Trust. *See* Section E — "Tax Treatment of The GUC Recovery Trust," below. A U.S. Holder will have an aggregate tax basis in its undivided interest in the causes of action received equal to its fair market value, and the holder's holding period should begin on the day following the exchange date.

(a)    Distributions in Discharge of Accrued Interest

In general, to the extent that any exchange consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will

105

be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Term Loan Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), consideration received in respect of a Term Loan Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remaining portion of such Allowed Claim, if any. *See* Section 6.17 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

<div align="center">(b)    Character of Gain or Loss</div>

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Term Loan Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Term Loan Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Term Loan Claims from a prior holder at a "market discount" (relative to the principal amount of the Term Loan Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount. Under these rules, any gain recognized on the exchange of Term Loan Claims (other than in respect of a Term Loan Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Loan Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Term Loan Claim, such deferred amounts would become deductible at the time of the exchange but, if the exchange is a reorganization exchange, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of a Term Loan Claim that qualifies as a reorganization exchange, the Tax Code indicates that any accrued market discount in respect of the Term Loan Claim should not be currently includible in income under Treasury regulations to be issued, except to the extent of any gain recognized due to the receipt of boot. Any accrued market discount that is not included in income should carry over to any nonrecognition property received in exchange therefor (*i.e.,* for New Common Stock and, if treated as a "security" for U.S. federal income tax purposes, New Term Loans). Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Stock or New Term Loans should be treated as ordinary income to the extent of any accrued market discount carried over to

<div align="center">106</div>

such stock or loans not previously included in income.   To date, specific Treasury regulations implementing this rule have not been issued.

### C.        Disposition of New Common Stock

Unless a nonrecognition provision applies and subject to the discussion above with respect to market discount and the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Stock in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Stock held and (ii) the sum of the cash and the fair market value of any property received from such disposition.   Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period for its New Common Stock is more than one year at that time.   A reduced tax rate on long-term capital gain may apply to non-corporate holders.   The deductibility of capital loss is subject to significant limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Common Stock (or any stock or property received for such New Common Stock in a later tax-free exchange) received in exchange for a Term Loan Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Term Loan Claim, decreased by any income (other than interest income) recognized by the holder upon exchange of the Term Loan Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Term Loan Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### D.        Ownership and Disposition of the New Term Loan

The U.S. federal income tax consequences to a holder of a New Term Loan may depend on certain terms of the New Term Loan which have not yet been finalized.   The final terms of the New Term Loan will be described at a later date in a Plan Supplement.   Accordingly, depending on the final terms of the New Term Loan, the U.S. federal income tax consequences of owning and disposing of a New Term Loan may differ from that described below.

### 1.        Payment of Interest and OID on the New Term Loan

Stated interest paid on the New Term Loan will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received, in accordance with its method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest."   Stated interest is "qualified stated interest" if it is payable in cash at least annually. Thus, the cash interest payable on the New Term Loan is expected to be treated as qualified stated interest.   The remainder of the stated interest payable on the New Term Loan is payable by the issuance of additional notes ("**PIK interest**"); the amount of PIK interest payable on the New Term Loan will be included in the determination of the OID on such debt, as discussed below.   Accordingly, the New Term Loan will be issued with OID to the extent of the PIK interest and, depending on the issue price of the New Term Loan, the New Term Loan may be issued with additional OID.

If the principal amount of the New Term Loan exceeds its issue price by more than a de minimis amount, then the New Term Loan will be considered to have been issued with OID for U.S. federal income tax purposes in the amount of such excess.   For these purposes, the PIK interest will be included in the principal amount of the New Term Loan at maturity and taxed as part of OID.   A U.S. Holder will be required to include any such OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash

WEIL:\97028542\2\41703.0010

payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

If the New Term Loan is not considered to be publicly traded, but a substantial portion of the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will be determined by reference to the fair market value of such publicly traded Term Loan Claims on the Effective Date. If the New Term Loan is publicly traded, the issue price of the New Term Loan is its fair market value. If neither the New Term Loan nor the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will equal their stated principal amount. The determination of whether a debt instrument is "publicly traded" for these purposes depends on whether such instrument is traded on an established market. A debt instrument is traded on an established market for U.S. federal income tax purposes only if they are traded on an established market during the 31-day period ending 15 days after the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the debt instrument, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury regulations.

Under the applicable Treasury regulations, the Reorganized Debtors are required to determine whether the New Term Loan is publicly traded and, if so, the fair market value of the New Term Loan, and make these determinations available to holders in a commercially reasonable fashion, including by electronic publication, within ninety (90) days of the issue date of the New Term Loan. The Debtors intend to make this information available on our website. Our determination is binding on a U.S. Holder unless a U.S. Holder explicitly discloses on its tax return that its determination is different and the reasons for its determination (including how it determined the fair market value of its New Term Loan or Term Loan Claims, if applicable). The Debtors expect that the New Term Loan will be considered to be "publicly traded" for U.S. federal income tax purposes and that, accordingly, the issue price of the New Term Loan will equal their fair market value on the Effective Date.

## 2.    Market Discount on the New Term Loan

A U.S. Holder will have market discount with respect to a New Term Loan if its initial basis in any portion of the New Term Loan is less than the issue price of such portion of the New Term Loan, unless the difference is less than a specified de minimis amount. If a U.S. Holder's New Term Loan has market discount with respect to any portion of such New Term Loan and, if such holder so elects or has so elected, it will be required to include the market discount as ordinary income as it accrues, either on a ratable basis or on the basis of a constant-yield method. Any such election applies to all debt instruments with market discount that the U.S. Holder acquires on or after the first day of the first taxable year to which the election applies. In addition, the U.S. Holder may be required to defer, until the maturity of the New Term Loan, as applicable, or its earlier disposition (including in one of certain nontaxable transactions), the deduction of all or a portion of the interest expense on any indebtedness incurred or maintained to purchase or carry any portion of such New Term Loan with respect of which the U.S. Holder has market discount.

## 3.    Acquisition and Bond Premium on the New Term Loan

A U.S. Holder will have acquisition premium with respect to a New Term Loan if its initial basis in any portion of the New Term Loan, as applicable, exceeds the issue price of such portion of the New Term Loan but does not exceed the stated redemption price at maturity of such portion of the New Term Loan. If a U.S. Holder has acquisition premium with respect to a portion of the New Term Loan, it may reduce

108

the amount of any OID accruing on such portion of the New Term Loan for any taxable year by a portion of the acquisition premium properly allocable to that year.

If a U.S. Holder's initial basis in any portion of the New Term Loan exceeds the stated redemption price at maturity of such portion of the New Term Loan, the excess generally will constitute amortizable bond premium and the U.S. Holder will not be required to include any OID attributable to its income with respect to such portion of the New Term Loan. Generally a U.S. Holder may elect to amortize this bond premium over the remaining term of such portion of the New Term Loan using a constant yield method and apply the amortization to offset stated interest otherwise required to be included in income with respect to such portion of the New Term Loan.

### 4.    Disposition of the New Term Loan

Upon the sale or other taxable disposition of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the New Term Loan. A U.S. Holder's adjusted tax basis in a New Term generally will equal its initial tax basis in the New Term Loan, increased by any OID or market discount previously included in income with respect to the New Term Loan and decreased by payments on the New Term Loan other than payments of stated interest and any previously amortized bond premium. For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income. Except to the extent attributable to any accrued market discount not previously included in income, gain or loss recognized on the sale or other taxable disposition of a New Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the New Term Loan is treated as held for more than one year. Any gain attributable to accrued market discount not previously included in income will be recharacterized as ordinary income. Long-term capital gains recognized by non-corporate taxpayers are subject to reduced tax rates. The deductibility of capital losses is subject to significant limitations.

### E.    Tax Treatment of The GUC Recovery Trust

As indicated above, the Debtors will transfer the GUC Recovery Trust Assets to the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.

### 1.    Classification of the GUC Recovery Trust

The GUC Recovery Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.,* a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Recovery Trust will be structured with the intention of complying with such general criteria. In conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee and GUC Recovery Trust beneficiaries) will be required to treat the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust as (1) a transfer of the GUC Recovery Trust Assets (subject to any obligations relating to those assets) directly to GUC Recovery Trust beneficiaries (other than to the extent any GUC Recovery Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the GUC Recovery Trust of GUC Recovery Trust Assets in exchange for GUC Recovery Trust Interests. Accordingly, except in the event of contrary definitive guidance, GUC Recovery Trust beneficiaries as determined for U.S. federal income tax purposes – which, as discussed above and subject to the provisions of the GUC Recovery Trust Agreement, potentially could include

109

holders of Term Loan Claims – will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of GUC Recovery Trust Assets (other than such GUC Recovery Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the GUC Recovery Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Recovery Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Recovery Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Recovery Trust and the holders of Claims could vary from those discussed herein.

## 2.    General Tax Reporting by the GUC Recovery Trust and GUC Recovery Trust Beneficiaries

For all U.S. federal income tax purposes, all parties must treat the GUC Recovery Trust as a grantor trust of which holders of Claims who become GUC Recovery Trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors. Accordingly, GUC Recovery Trust beneficiaries are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the GUC Recovery Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The GUC Trustee will file tax returns for the GUC Recovery Trust treating the GUC Recovery Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury regulations. The GUC Trustee also shall annually send to each GUC Recovery Trust beneficiary a separate statement regarding the receipts and expenditures of the GUC Recovery Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the GUC Recovery Trust will be allocated among, and treated as directly earned and incurred by, the GUC Recovery Trust beneficiaries with respect to such GUC Recovery Trust beneficiary's undivided interest in the GUC Recovery Trust Assets (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income and the character and ability to use any loss will depend on the particular situation of the GUC Recovery Trust beneficiary.

In accordance with the GUC Recovery Trust Agreement, the GUC Trustee will make a good faith valuation of the GUC Recovery Trust Assets. All parties to the GUC Recovery Trust must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a GUC Recovery Trust beneficiary is not dependent on the GUC Recovery Trust distributing any Cash or other proceeds. Thus, a holder of a beneficial interest may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Recovery Trust's income even if the GUC Recovery Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Term Loan Claims), a distribution of Cash by the GUC Recovery Trust will not be separately taxable to a GUC Recovery Trust beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Recovery Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the GUC Recovery Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements (*see* section 6.19 of the Plan). Thus, in the case of any GUC Recovery Trust beneficiaries that are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty

WEIL:\97028542\2\41703.0010

rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the GUC Recovery Trust.

### 3.        Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of an IRS private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (A) may elect to treat any GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims (a "**Disputed Claims Reserve**") as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the GUC Recovery Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the GUC Trustee and the GUC Recovery Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

### F.        Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the

contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Term Loan Claim. All holders of Term Loan Claims are urged to consult their tax advisors concerning the federal, state, local, non U.S., and other tax consequences applicable under the Plan.

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  ADDITIONAL RISK FACTORS IDENTIFIED IN THE COMPANY'S PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE.  THE RISK FACTORS SET FORTH IN DHCP'S ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017 FILED WITH THE SEC ON APRIL 16, 2018, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2018 FILED WITH THE SEC ON JUNE 6, 2018, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2018 FILED WITH THE SEC ON AUGUST 9, 2018, AND THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2018 FILED WITH THE SEC ON NOVEMBER 14, 2018 ARE HEREBY INCORPORATED BY REFERENCE.  NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.    Certain Bankruptcy Law Considerations

#### 1.    General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Company's business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Company's relationships with its key customers and employees.  In addition, the bankruptcy proceedings may divert some of the attention of the Debtors' management away from business operations and the Company will incur additional expenses.

#### 2.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not

112

necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that it will receive the requisite acceptances to confirm the Plan, and even if the Voting Class (defined below) voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3.      Risk of Failing to Satisfy Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Class, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims and Parent Equity Interests as those proposed in the Plan.

### 4.      Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Parent Equity Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 5.      Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 9.3 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

WEIL:\97028542\2\41703.0010

### 6. Risk of Termination of Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with GSEs, regulators, government agencies, vendors, suppliers, employees, and major customers.  If the Restructuring Support Agreement is terminated, each vote or any consent given by any Consenting Term Lender prior to such termination will be deemed null and void *ab initio*.  If the termination of the Restructuring Support Agreement takes place when Bankruptcy Court approval is required for a Consenting Term Lender to change or withdraw its vote to accept the Plan, the Company has agreed to support and not oppose any such attempt to change or withdraw a vote.  Future termination of the Restructuring Support Agreement is an "Event of Default" under the Debtors' DIP Facilities.  If the Debtors lose access to their DIP Facilities it may force the Debtors to liquidate the Company.

### 7. Risk Related to Parties in Interest Objecting to Debtors' Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 8. Risk Related to Possible Objections to Plan

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan.  While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 9. Conversion to Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Article XI hereof, as well as the liquidation analysis, which will be filed no later than the date on which the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing (the "**Liquidation Analysis**"), for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests on a Debtor-by-Debtor basis.

### B. Additional Factors Affecting Value of Reorganized Debtors

### 1. Claims Could be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and

114

circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' Financial Projections and feasibility analysis, and that variation may be material.

### 2.    Projections and Other Forward-Looking Statements are not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

### C.    Risks Relating to Debtors' Business and Financial Condition

### 1.    Risks Associated with Debtors' Business and Industry

The Debtors' business is subject to extensive regulation by federal, state and local governmental and regulatory authorities. Further, in recent years the policies, laws, rules and regulations applicable to the Debtors' business have been rapidly evolving. Such changes, as well as the actual or alleged failure to comply with applicable federal, state, and local laws and regulations, GSE, Ginnie Mae and other business counterparty requirements, or to implement and adhere to adequate remedial measures designed to address any identified compliance deficiencies, may have an adverse consequence on the Company or its business, in addition to the following factors, risks or uncertainties that may affect the Company or its business:

- Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

- Damage to the Debtors' reputation;

- Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

- The substantial resources (including senior management time and attention) the Company devotes to, and the significant compliance costs the Company incurs in connection with, regulatory compliance and regulatory examinations and inquiries, and any consume redress, fines, penalties or similar payments made in connection with resolving such matters;

- Uncertainties relating to interest curtailment obligations and any related financial and litigation exposure (including exposure relating to false claims);

- Potential costs and uncertainties, including the effect on future revenues, associated with and arising from litigation, regulatory investigations, and other legal proceedings, and uncertainties relating to the reaction of key counterparties to the announcement of any such matters;

- Dependence on GSEs and agencies (especially Fannie Mae, Freddie Mac and Ginnie Mae) and their residential loan programs and the Company's ability to maintain relationships with such entities, and uncertainties relating to the status and future role of GSEs and agencies;

115

- Ability to remain qualified as a GSE and agency approved seller, servicer or component servicer, including the ability to continue to comply with the GSEs' and agencies' respective residential loan selling and servicing guides;

- The ability to maintain the loan servicing, loan origination or collection agency licenses and/or third-party default specialists, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

- The ability to comply with the terms of the stipulated order resolving allegations arising from an Federal Trade Commission and CFPB investigation of Ditech Financial and RMS;

- The ability to comply with HUD Guidelines or VA regulations regarding mortgage loan conditions;

- Operational risks inherent in the mortgage servicing and mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

- Risks related to a significant amount of senior management turnover and employee reductions;

- Risks related to the substantial level of indebtedness, including ability to comply with covenants contained in debt agreements or obtain any necessary waivers or amendments, generate sufficient cash to service such indebtedness and refinance such indebtedness on favorable terms, if at all, as well as the ability to incur substantially more debt;

- The ability to maintain or grow the residential loan servicing or subservicing business and the mortgage loan originations business;

- The ability to achieve the Company's strategic initiatives, particularly the ability to: enter into new subservicing arrangements; improve servicing performance, successfully develop origination capabilities; and execute and realize planned operational improvements and efficiencies;

- The success of the business strategy in returning to sustained profitability;

- Changes in prepayment rates and delinquency rates on the loans serviced and subserviced;

- A downgrade of, other adverse change, relating to, or the Company's inability to improve the servicer rating or credit ratings;

- The Company's ability to collect reimbursements for servicing advances and earn and timely receive incentive payments and ancillary fees on the servicing portfolio;

- The ability to collect indemnification payments and enforce repurchase obligations relating to mortgage loans the Company purchases from correspondent clients and the ability to collect in a timely manner indemnification payments relating to servicing rights purchased from prior servicers;

- Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

- Risks associated with the reverse mortgage business, including changes to reverse mortgage programs operated by FHA, HUD, or Ginnie Mae; the Company's ability to accurately estimate interest curtailment liabilities; the Company's ability to fund HECM repurchase obligations; the Company's ability to fund principal additions on the HECM loans, and the Company's ability to securitize the HECM tails;

116

- Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;

- Risks and potential costs associated with technology and cybersecurity, including: the risks of technology failures and of cyber-attacks against us or our vendors; our ability to adequately respond to actual or attempted cyber-attacks; and our ability to implement adequate internal security measures and protect confidential borrower information;

- Risks and potential costs associated with the implementation of new or more current technology, the use of vendors, or the transfer of the Company's servers or other infrastructure to new data center facilities;

- Risks related to the Company's deferred tax asset, risk of an "ownership change," including uncertainties as to the Company's ability to preserve the tax assets through and after a bankruptcy filing;

- The ability to renew advance financing facilities or warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities;

- Risks related to the concentration of the Company's subservicing portfolio and the ability of the Company's subservicing clients to terminate the Company as a subservicer;

- The ability of Fannie Mae, Freddie Mac and Ginnie Mae, as well as other clients and credit owners, to transfer or otherwise terminate our servicing or subservicing rights, with or without cause;

- The effects of competition on existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

- The expiration of, or changes to, government mortgage modification, refinancing or other programs;

- The ability to comply with evolving and complex accounting rules, many of which involve significant judgment and assumptions;

- The ability to implement and maintain effective internal controls over financial reporting and disclosure controls and procedures;

- Uncertainties regarding impairment charges relating to the intangible assets of the Company;

- Risks related to the Company's relationship with Walter Energy;

- Administrative fines and financial penalties;

- Litigation, including class action lawsuits; and

- Civil and criminal liability.

### 2.    Loss of Subservicing Clients

The Company, as of December 31, 2018, subserviced 0.8 million forward and reverse loan accounts with an unpaid principal balance of $111.7 billion.  Under the Company's subservicing contracts, the primary servicers for whom the Company conducts subservicing activities have the right to terminate such contracts, with or without cause, with generally 60-90 days' notice.  In some instances, the subservicing contracts require payment to the Company of deboarding, deconversion or other fees in connection with any termination thereof, while in other instances there is little to no consideration owed to the Company in connection with the termination of subservicing contract.  The Company's business may suffer significant hardship if these subservicing contracts are terminated.

117

As described above, on January 17, 2019, the Company received notice from NRM, its largest subservicing customer, terminating the Subservicing Agreement for cause. The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. NRM asserts that the Termination Notice was properly issued, was based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement. The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof. The Company is evaluating the impact, if any, of any fees and costs payable in connection with the termination of the Subservicing Agreement.

### 3.    Downgrade in the Company's Servicer Ratings

Standard & Poor's and Moody's rate the Company as a residential loan servicer. Certain of these ratings have been downgraded in the past, and any of these ratings may be downgraded in the future. Any such downgrade could adversely affect the Company, financial condition, or results of operations, as well as the Company's ability to finance servicing advances and maintain the Company's status as an approved servicer by Fannie Mae, Freddie Mac, and Ginnie Mae. The Company's failure to maintain favorable or specified ratings may cause the Company's termination as servicer and further impair the Company's ability to consummate future servicing transactions.

### 4.    Risk of Ginnie Mae, Fannie Mae, and Freddie Mac Termination

Under the terms of the Ginnie MBS Guide and the required Ginnie Mae Guaranty Agreement that is executed in connection with each GMBS the Company issues (together with related documents, the "**Ginnie Mae Guaranty Agreement**"), Ginnie Mae may terminate Ditech Financial for cause as the issuer of GMBS and as servicer of the underlying mortgage loans, and transfer all of Ditech Financial's rights as issuer and servicer, including the servicing rights relating to the mortgage loans underlying the GMBS issued by the Company, to a third party without payment to the Company of any consideration in connection therewith. Events that could allow Ginnie Mae to terminate the Company as issuer and servicer include, without limitation, the impending or actual insolvency of Ditech Financial; any withdrawal or suspension of Ditech Financial's status as an approved mortgagee by FHA or an approved seller/servicer by Fannie Mae or Freddie Mac; or any change to Ditech Financial's business condition which materially and adversely affects its ability to carry out its obligations as an approved Ginnie Mae issuer. A default by Ditech Financial's affiliate, RMS, under RMS's Ginnie Mae Guaranty Agreements may also result in an event of default under Ditech Financial's Ginnie Mae Guaranty Agreement under a cross-default agreement among Ginnie Mae, Ditech Financial, and RMS, which could result in the Company's termination as issuer and servicer of all GMBS and HMBS. If the Company were to have the Ginnie Mae issuer and servicing rights transferred or otherwise terminated, this could materially and adversely affect the Company's business, financial condition, liquidity and results of operations.

Under the terms of Ditech Financial's master servicing agreement (including any amendments and addendums thereto) with Fannie Mae, Fannie Mae has the ability to terminate Ditech Financial as servicer for some or all of the Fannie Mae loans it services, with or without cause. In connection with such termination by Fannie Mae without cause, Ditech Financial would have a right to a specified termination fee; however, in connection with such termination by Fannie Mae for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer. Events that could allow Fannie Mae to terminate Ditech Financial for cause as servicer of some or all of the Fannie Mae loans include, without limitation, a breach of the mortgage selling and servicing contract by Ditech Financial; unacceptable performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things, servicer performance as determined by Fannie Mae with regard to Ditech Financial's compliance with,

118

among other things, servicer performance measurements and any written performance improvement plan; Ditech Financial's insolvency, the adjudication of Ditech Financial as bankrupt or the execution by Ditech Financial of a general assignment for the benefit of its creditors; any change in Ditech Financial's financial status that, in Fannie Mae's opinion, materially and adversely affects Ditech Financial's ability to provide satisfactory servicing of mortgages; the sale of a majority interest in Ditech Financial without Fannie Mae's prior written consent; a change in Ditech Financial's financial or business condition, or in its operations, which, in Fannie Mae's sole judgment, is material and adverse; Ditech Financial has certain delinquency rates or REO Property rates more than 50% higher than the average of such rates for certain specified Fannie Mae portfolios; and any judgment, order, finding, or regulatory action to which Ditech Financial is subject that would materially and adversely affect Ditech Financial's ability to comply with the terms or conditions of its Fannie Mae contract.  In addition, a default by Ditech Financial's affiliate, RMS, under RMS's agreements with Fannie Mae may also result in an event of default under Ditech Financial's Fannie Mae contract under a cross-default agreement.

Under the terms of Ditech Financial's master servicing agreement and the Freddie Mac Seller/Servicer Guide (including any amendments and addendums thereto), Freddie Mac has the ability to terminate Ditech Financial as servicer for some or all of the Freddie Mac loans it services, with or without cause.  If Freddie Mac terminated Ditech Financial without cause, Ditech Financial would have a right to a specified termination fee; however, if Freddie Mac terminates Ditech Financial as servicer for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer.  Events that could allow Freddie Mac to terminate Ditech Financial for cause as servicer of some or all of the Freddie Mac loans include, without limitation, the impending or actual insolvency of Ditech Financial or an affiliate thereof; the filing of a voluntary petition by Ditech Financial or an affiliate thereof under federal bankruptcy or state insolvency laws; Ditech Financial's failure to maintain qualified staff and/or adequate facilities to assure the adequacy of servicing Freddie Mac loans; any weakness or notable change in the financial or organizational status or management of Ditech Financial or an affiliate thereof, including any adverse change in profitability or liquidity that, in the opinion of Freddie Mac, could adversely affect Freddie Mac; Ditech Financial's failure to meet any eligibility requirement, including failure to maintain acceptable net worth or other indicia of financial soundness; Ditech Financial having delinquency rates or REO rates higher than certain averaged; and Freddie Mac's determination that Ditech Financial's overall performance is unacceptable (taking into account, among other things, scorecard results that rate absolute and comparative performance with respect to various measures such as loss mitigation, workout effectiveness, default timeline management, data integrity, investor reporting, and alternatives to foreclosure).

### 5.        DIP Facilities

The DIP Facilities are intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing.  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise.  In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

Relatedly, the continuation of the National Founders Facility is necessary for RMS's servicing activities during the Chapter 11 Cases.  There can be no assurance that National Founders will continue to provide RMS access to postpetition credit for servicing advances or that it would agree to forbear from seeking to enforce remedies against RMS's non-debtor affiliate, each of which would materially disrupt the Debtors' business.

### 6.    Post-Effective Date Indebtedness

Following the Effective Date, in the Reorganization Transaction only, the Reorganized Debtors expect to have outstanding funded debt of up to approximately $550 million.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Debtors' compliance with affirmative and negative covenants, the Debtors' future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.    Factors Relating to Securities to be Issued Under Plan, Generally

### 1.    Market for Securities

There is currently no market for the New Common Stock and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

### 2.    Potential Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including under the Management Incentive Plan.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock.  The amount and dilutive effect of any of the foregoing could be material.

### E.    Risk Related to Obtaining Exit Financing

During the course of these Chapter 11 Cases, the Debtors will solicit commitments to provide exit financing to refinance the DIP Facilities prior to the Effective Date.  However, there is no assurance that such commitments will be obtained, which will hinder the Debtors' ability to consummate the Reorganization Transaction.  As of the date of this Disclosure Statement, the Debtors have not received any commitment for an Exit Working Capital Facility.  Even if the Debtors are able to obtain a commitment for an Exit Working Capital Facility, there can be no assurance that the Reorganized Debtors will be able to meet the terms of such exit facility and there is a risk that the Reorganized Debtors default thereunder and the lenders take enforcement action against the Reorganized Debtors, including execution or foreclosure against assets of the Reorganized Debtors.

WEIL:\97028542\2\41703.0010

**F.      Risks Related to Investment in New Common Stock**

 **1.      Significant Holders**

Pursuant to the Plan, certain holders of Term Loan Claims may acquire a significant ownership interest in the New Common Stock.  If such holders of New Common Stock were to act as a group, such holders would be in a position to control all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

 **2.      Equity Interests Subordinated to Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock will rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to its debt holders have been satisfied.

 **3.      Implied Valuation of New Common Stock Not Intended to Represent Trading Value of New Common Stock**

The valuation of the Reorganized Debtors may not represent the trading value of the New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities. The actual market price of the New Common Stock is likely to be volatile.  Many factors including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

 **4.      No Intention to Pay Dividends**

The Reorganized Debtors do not anticipate paying any dividends on the New Common Stock as they expect to retain any future cash flows for debt reduction and to support operations.  As a result, the success of an investment in the New Common Stock will depend entirely upon any future appreciation in the value of the New Common Stock.  There is, however, no guarantee that the New Common Stock will appreciate in value or even maintain its initial value.

 **5.      The New Common Stock May be Subject to Further Dilution**

The New Common Stock to be issued on the Effective Date is subject to dilution from the Management Incentive Plan.  In addition, in the future, the Company may issue equity securities in connection with future investments, acquisitions or capital rising transactions.  Such issuances or grants could constitute a significant portion of the then-outstanding common stock, which may result in a dilution in ownership of common stock, including shares of New Common Stock issued pursuant to the Plan.

WEIL:\97028542\2\41703.0010

### G.    Additional Factors

#### 1.    Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

#### 2.    Debtors Have no Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.    No Representations Outside Disclosure Statement are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 4.    No Legal or Tax Advice is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

#### 5.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

#### 6.    Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII hereof.

## X.
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Voting Deadline

Before voting to accept or reject the Plan, each Eligible Holder (defined below) as of the Voting Record Date should carefully review the Plan attached hereto as <u>Exhibit A</u>. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots will be provided for holders of Voting Claims as of the Voting Record Date (~~April 26~~May 8, 2019) to vote to accept or reject the Plan (a "**Ballot**"). Only holders of Class 3 Claims (Term Loan Claims) (the "**Eligible Holders**") are entitled to vote to accept or reject the Plan. Because Classes 1, 2, 6 (in a Reorganization Transaction), 7, and 8 are unimpaired and deemed to accept, and Classes 4, 5, 6 (in a Sale Transaction), 9, and 10 are conclusively deemed to reject, only Class 3 is entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

The Debtor has engaged Epiq Corporate Restructuring, LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

THE VOTING DEADLINE IS ~~5~~4:00 P.M., PREVAILING EASTERN TIME, ON ~~MAY 24~~JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

CLASS 3:   IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.

Delivery of a Ballot must conform to the instructions on the Ballot. Mailed Ballots must be returned by the Voting Deadline with an original signed copy to:

By ~~First Class Mail,~~ Overnight Courier~~,~~ or Hand Delivery:

<div align="center">

**DITECH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING~~.~~, LLC**
**10300 SW ALLEN BOULEVARD**
**BEAVERTON, OREGON 97005**

</div>

By First Class Mail:

<div align="center">

**DITECH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING, LLC**
**P.O. BOX 4422**
**BEAVERTON, OREGON 97076-4422**

</div>

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE APPLICABLE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

### B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record holders of the Term Loan Claims.  In order to vote, holders of Term Loan Claims should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of:  (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Class 3 (Term Loan Claims) is impaired under the Plan and the only Class of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Class**" or the "**Voting Claims**").

Claims in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article I of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject, Parent Equity Interests, and Subordinated Securities Claims.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article X of this Disclosure Statement.

WEIL:\97028542\2\41703.0010

### 1. Miscellaneous

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, will supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of the Term Loan Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 2. Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORs RESERVE THE RIGHT, IN their SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 3. Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth

WEIL:\97028542\2\41703.0010

in Sections 10.5, 10.6, and 10.7 of the Plan. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

### 4.    Change of Vote

Subject to the terms of the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### 5.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### XI.
### CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (d) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

WEIL:\97028542\2\41703.0010

Southern District of New York; (e) be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof; and (f) be served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)     **The Debtor at:**

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary

(b)     **Office of the U.S. Trustee at:**

William K. Harrington, U.S. Department of Justice
Office of the U.S. Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Attn:    Greg M. Zipes, Esq.
         Benjamin J. Higgins, Esq.

(c)     **Counsel to the Debtors at:**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh, Esq.

(d)     **Counsel to the Prepetition Administrative Agent at:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York, 10017
Attn:    Brian M. Resnick, Esq.
         Michelle M. McGreal, Esq.

(e)     **Counsel to the Term Loan Ad Hoc Group at:**

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:    Patrick J. Nash Jr., P.C.
         John Luze, Esq.

(f)     **Counsel to the DIP Agent and DIP Lender at:**

127

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attn:    Sarah M. Ward, Esq.
            Mark A. McDermott, Esq.
            Melissa Tiarks, Esq.

(g)    **Counsel to Nomura Corporate Funding Americas, LLC at:**

Jones Day
250 Vesey Street
New York, New York 10281
Attn:  Ben Rosenblum, Esq.

(h)    **Counsel to the Creditors' Committee at:**

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attn:    Robert J. Feinstein, Esq.
            Bradford J. Sandler, Esq.s
            Steven W. Golden, Esq.

- and -

Rich Michaelson Megaliff, LP
335 Madison Avenue, 9th Floor
New York, New York 10017
Attn:    Robert N. Michaelson, Esq.
            Elwood F. Collins, Esq.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.    **Requirements for Confirmation of Plan**

1.    **Requirements of Section 1129(a) of Bankruptcy Code**

(a)    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

128

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)    all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

WEIL:\97028542\2\41703.0010

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis (which will be filed no later than the date the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing).[17][18]

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis will be provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and will be on a Debtor-by-Debtor basis with a summary on a consolidated basis.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    Feasibility

---

[17][18] Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process.  *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process).

WEIL:\97028542\2\41703.0010

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as Exhibit D.[18][19] Based upon the Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Section VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)     Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2.     Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 9 (Parent Equity Interests) and Claims in Class 4 (Second Lien Note Claims), Class 5 (General Unsecured Claims), and Class 9 (Subordinated Securities Claims) will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

(a)     Unfair Discrimination Test

---

[18][19]  The Debtors will file updated projections in the event of the occurrence of unanticipated events that result in material changes to the projections.

WEIL:\97028542\2\41703.0010

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

(i)    *Other Secured Creditors*

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)    *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization. The Plan provides that the holders of General Unsecured Claims in Class 5 will receive the treatment summarized above in Article V of this Disclosure Statement.

(iii)    *Equity Interests*

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan. Pursuant to the Plan, all Intercompany Equity Interests will be cancelled, reinstated, or receive such other treatment as is determined by the Debtors and the Requisite Term Lenders and the holders of Parent Equity Interests will neither receive nor retain any property on account of such interests.

# XII.
# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest,

WEIL:\97028542\2\41703.0010

assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either:  (i) a reorganization and continuation of the Debtors' business or (ii) an orderly liquidation of the Debtors' assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.      Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets through a stand-alone alternative transaction under section 363 of the Bankruptcy Code.  Upon analysis and consideration of this alternative, the Debtors do not believe that a stand-alone alternative sale of their assets under section 363 of the Bankruptcy Code (as opposed to the consummation of the Sale Transaction pursuant to the Plan) would yield a higher recovery for holders of Claims and Interests than the Plan.

### C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis that the Debtors will file no later than the date that the Plan Supplement is filed.

As noted in Article XI of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

WEIL:\97028542\2\41703.0010

## XIII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 to vote in favor thereof.

Dated:  May 79, 2019

**DEBTORS**

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By:  /s/ Kimberly Perez
Name: Kimberly Perez

Title:  Senior Vice President and Chief Accounting Officer

134

**<u>DEBTORS</u>**

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By:  /s/ Laura Reichel
      Name: Laura Reichel

      Title:   President

SIGNATURE PAGE TO DISCLOSURE STATEMENT

**<u>DEBTOR</u>**

**MARIX SERVICING LLC**

By:  /s/ Clinton Hodder
          Name: Clinton Hodder

          Title:   President

WEIL:\97028542\1\41703.0010 WEIL:\97028542\2\41703.0010

**<u>DEBTORS</u>**

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By:   /s/ Jeanetta Brown
      Name: Jeanetta Brown

      Title:   Vice President

SIGNATURE PAGE TO DISCLOSURE STATEMENT

SIGNATURE PAGE TO DISCLOSURE STATEMENT

WEIL:\97028542\1\41703.0010WEIL:\97028542\2\41703.0010

**Exhibit A**

**The Joint Chapter 11 Plan**

**Exhibit A-1**

**Borrower Non-Discharged Claims**

**Exhibit B**

**Restructuring Support Agreement**

**<u>EXHIBIT C</u>**

**Organizational Structure Chart**

## **EXHIBIT D**

**Financial Information and Projections**

S<small>IGNATURE</small> P<small>AGE TO</small> D<small>ISCLOSURE</small> S<small>TATEMENT</small>

**EXHIBIT E**[1]

**Liquidation Analysis**

**To Be Filed Separately**

---

[1] Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process. *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process). The Debtors will file, no later than the date that the Plan Supplement is filed, the Liquidation Analysis and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing on a Debtor-by-Debtor basis.

**<u>Exhibit C</u>**

**Cumulative Blackline**

WEIL:\97029773\1\41703.0011

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
                                                          :
In re                                                     :       **Chapter 11**
                                                          :
**DITECH HOLDING CORPORATION**, *et al.*,                 :       **Case No. 19-10412 (JLG)**
                                                          :
        **Debtors.**[1]                                   :       **(Jointly Administered)**
                                                          :
---------------------------------------------------------------- X


## AMENDED DISCLOSURE STATEMENT FOR
## AMENDED JOINT CHAPTER 11 PLAN OF DITECH
## HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007


*Proposed* Counsel for Debtors
and Debtors in Possession

Dated:    ~~March 5~~May 9, 2019
          New York, New York

---

**THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE PLAN.   ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS.

---

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS ~~5~~4:00 P.M., PREVAILING EASTERN TIME, ON ~~MAY 24~~JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS ~~APRIL 9~~MAY 8, 2019 (THE "VOTING RECORD DATE").

---

RECOMMENDATION BY THE DEBTORS AND CREDITORS' COMMITTEE

The Board of Directors of Ditech Holding Corporation and the board of directors, managers or members, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan (as defined herein) and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.  Holders of approximately 80.38% of the Term Loan Claims (as defined herein) have already agreed to vote in favor of the Plan.  The Creditors' Committee also recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF NEW COMMON STOCK (AS DEFINED HEREIN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b)(1) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE (AS DEFINED IN THE PLAN).

THE NEW COMMON STOCK TO BE ISSUED ON THE EFFECTIVE DATE HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN DITECH HOLDING CORPORATION'S FILINGS WITH THE SEC.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION VIII OF THIS DISCLOSURE STATEMENT. IMPORTANT

ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED ALSO INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE ANNUAL AND QUARTERLY REPORTS OF DITECH HOLDING CORPORATION, INCLUDING AMENDMENTS THERETO, AND ITS OTHER FILINGS WITH THE SEC. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS ATTACHED HERETO AS EXHIBITS D AND E, RESPECTIVELY.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

WEIL:\96859831\26\41703.0010 WEIL:\97028542\2\41703.0010

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| I. | INTRODUCTION | 6 |
| II. | OVERVIEW OF COMPANY'S OPERATIONS | ~~14~~**16** |
| A. | Debtors' Business | ~~14~~16 |
| B. | Debtors' Organizational Structure~~.~~ | ~~19~~23 |
| C. | Directors and Officers~~.~~ | ~~19~~23 |
| D. | Regulation of Company's Business | ~~20~~24 |
| E. | Debtors' Existing Capital Structure | ~~22~~25 |
| III. | KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES | ~~24~~**28** |
| A. | Background and Prior Restructuring | ~~24~~29 |
| B. | Events Leading to Commencement of ~~T~~these Chapter 11 Cases | ~~24~~29 |
| C. | ~~The~~ Prepetition Marketing Process and Negotiations with Stakeholders | ~~25~~30 |
| D. | Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities | ~~27~~32 |
| IV. | OVERVIEW OF THE CHAPTER 11 CASES | ~~28~~**33** |
| A. | Commencement of Chapter 11 Cases and First-Day Motions | ~~28~~33 |
| B. | Procedural Motions and Retention of Professionals | ~~31~~36 |
| C. | KEIP Motion | 36 |
| D. | Lease Rejection Motion | 36 |
| ~~C~~E. | Bar Date | ~~31~~36 |
| ~~D~~F. | Appointment of the Creditors' Committee | ~~31~~37 |
| G. | Appointment of the Consumer Creditors' Committee | 37 |
| ~~E~~H. | Statements and Schedules, and Rule 2015.3 Financial Reports | ~~32~~37 |
| ~~F~~I. | Litigation Matters | ~~32~~37 |
| ~~G~~J. | Marketing Process and Bidding Procedures | ~~33~~39 |
| K. | U.S. Trustee's Objections to Plan | 39 |
| L. | Plan Settlement Negotiations and the Global Plan Settlement | 40 |
| V. | SUMMARY OF PLAN | ~~33~~**41** |
| A. | Administrative Expenses and Priority Claims | ~~34~~41 |
| B. | Classification of Claims and Interests | ~~35~~43 |
| C. | Treatment of Claims and Interests | ~~36~~44 |
| D. | Means for Implementation | ~~41~~50 |
| E. | Distributions | ~~52~~61 |

F.      Procedures for Disputed Claims ................................................................. 5765

G.      Executory Contracts and Unexpired Leases ............................................... 5967

H.      Conditions Precedent to Confirmation of Plan and Effective Date ........... 6271

I.      Effect of Confirmation of Plan .................................................................. 6474

J.      Retention of Jurisdiction ........................................................................... 6978

K.      Miscellaneous Provisions .......................................................................... 7180

**VI.     VALUATION ANALYSIS** ............................................................................... **84**

**VII.**~~-~~    **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
        SECURITIES LAWS** .................................................................................. ~~75~~**85**

**VIII.**~~-~~   **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN** ... ~~76~~**86**

A.      Consequences to the Debtors ..................................................................... ~~77~~**87**

B.      Consequences to Holders of Term Loan Claims ........................................ ~~80~~**90**

C.      Disposition of New Common Stock ........................................................... ~~83~~**93**

D.      Ownership and Disposition of the New Term Loan ................................... ~~83~~**93**

E.      Information Reporting and Backup Withholding ........................................ ~~85~~**95**

~~VIII~~**IX.**~~-~~   **CERTAIN RISK FACTORS TO BE CONSIDERED** ................................. ~~86~~**96**

A.      Certain Bankruptcy Law Considerations .................................................... ~~86~~**96**

B.      Additional Factors Affecting Value of Reorganized Debtors ..................... ~~88~~**98**

C.      Risks Relating to Debtors' Business and Financial Condition .................... ~~89~~**99**

D.      Factors Relating to Securities to be Issued Under Plan, Generally ............ ~~94~~**104**

E.      Risk Related to Obtaining Exit Financing .................................................. ~~94~~**104**

F.      Risks Related to Investment in New Common Stock .................................. ~~94~~**104**

G.      Additional Factors ..................................................................................... ~~95~~**105**

~~IX~~**X.**~~-~~    **VOTING PROCEDURES AND REQUIREMENTS** ................................... ~~96~~**106**

A.      Voting Deadline ......................................................................................... ~~96~~**106**

B.      Voting Procedures ...................................................................................... ~~97~~**107**

C.      Parties Entitled to Vote .............................................................................. ~~97~~**107**

~~X~~**XI.**~~-~~    **CONFIRMATION OF PLAN** ...................................................................... ~~100~~**110**

A.      Confirmation Hearing ................................................................................ ~~100~~**110**

B.      Objections to Confirmation ........................................................................ ~~100~~**110**

C.      Requirements for Confirmation of Plan ..................................................... ~~102~~**112**

**XII.**~~-~~    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** ... ~~105~~**116**

A.      Alternative Plan of Reorganization ............................................................ ~~106~~**116**

~~WEIL:\96859831\26\41703.0010~~WEIL:\97028542\2\41703.0010

B.      Sale Under Section 363 of Bankruptcy Code .................................... ~~106~~116

C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law .................................... ~~106~~116

**XIII.    CONCLUSION AND RECOMMENDATION** .................................... ~~107~~**118**

EXHIBIT A:    Joint Plan of Reorganization
EXHIBIT A-1    Borrower Non-Discharged Claims
EXHIBIT B:    Restructuring Support Agreement
EXHIBIT C:    Organizational Structure Chart
EXHIBIT D:    Financial Information and Projections
EXHIBIT E:    Liquidation Analysis[2]

---

[2]    The Debtors have sought authority from the Bankruptcy Court to file the Liquidation Analysis with the Plan Supplement to protect the integrity of their sale process.  Copies of the Liquidation Analysis will be available on the Voting Agent's website with the Plan Supplement upon its filing.

WEIL:\96859831\26\41703.0010 WEIL:\97028542\2\41703.0010

# I.
## INTRODUCTION

Ditech Holding Corporation (f/k/a Walter Investment Management Corp., "**DHCP**") and its affiliated debtors (collectively, the "**Debtors**" and together with their non-debtor affiliates, the "**Company**") submit this amended disclosure statement (as amended, modified, or supplemented, the "**Disclosure Statement**") pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the Amended *Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors*, dated ~~March 5~~May 9, 2019 (as amended, modified, or supplemented, the "**Plan**").²³ The Plan is annexed hereto as Exhibit A and is incorporated herein by reference.  The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on February 11, 2019 (the "**Commencement Date**").

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

DHCP is the ultimate parent of twenty-six (26) direct and indirect subsidiaries and trust companies, thirteen (13) of which are Debtors in these Chapter 11 Cases.  The Company is an independent servicer and originator of forward mortgage loans and a servicer of reverse mortgage loans.  The Company is an integrated enterprise with primary day-to-day operations carried out at the subsidiary level and corporate and similar functions carried out at the DHCP level.  In particular, Ditech Financial LLC ("**Ditech Financial**") primarily carries out the Company's forward mortgage origination and servicing operations and Reverse Mortgage Solutions, Inc. ("**RMS**") primarily carries out the Company's reverse mortgage servicing operations.

The Company services a wide array of loans across the credit spectrum for its own portfolio and for the GSEs (as defined below), government entities, third-party securitization trusts, and other credit owners.  The Company originates and purchases residential loans through the consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities.  The Company also operates two complimentary businesses: (i) asset receivables management and (ii) real estate owned property management and disposition.

Beginning in May 2018, the Company began its formal review of strategic alternatives, including a potential merger or sale of all or substantially all of the assets of the Company.  As explained in more detail below, the Company was not able to consummate an out-of-court transaction with a third party purchaser.  Accordingly, facing increased uncertainty in 2019, and an anticipated going-concern qualification from its auditors, the Company turned its focus toward planning for an in-court recapitalization transaction that would maximize value for creditors and preserve the enterprise as a going concern.  To that end, in December 2018, the Company began in earnest negotiating with groups of holders of its corporate debt on the terms and implementation of an acceptable recapitalization structure, culminating in a restructuring support agreement (the "**Restructuring Support Agreement**") with the Term Loan Ad Hoc Group (as defined below)—the Company's senior creditors—holding, in the

---

²³ Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

aggregate, approximately $722.8 million of Prepetition Term Loans (as defined below). A copy of the Restructuring Support Agreement is attached hereto as Exhibit B.<sup>3 4</sup>

By virtue of the Restructuring Support Agreement, the Company commenced the Chapter 11 Cases with a clear path to a confirmable chapter 11 plan of reorganization and a viable recapitalization—in which, among other things, over $800 million in funded debt would be extinguished, leaving a significantly deleveraged reorganized Company, wholly owned by the holders of the Prepetition Term Loans, with $400 million of new term loan debt, and an appropriately sized exit working capital facility or consummation of another liquidity enhancing transaction (the "**Reorganization Transaction**"). As a toggle to the Reorganization Transaction, the Restructuring Support Agreement also provides for the continuation of the Company's prepetition review of strategic alternatives whereby any and all bids for the Company or its assets will be evaluated as a precursor to confirmation of any chapter 11 plan of reorganization (the "**Marketing Process**").

Specifically, the Marketing Process will provide a public and comprehensive forum in which the Debtors seek bids or proposals for three (3) potential transactions that, if representing higher or better value, will either be incorporated into a Reorganization Transaction or pursued as an alternative to the Reorganization Transaction in consultation with and subject to the rights of the Term Loan Ad Hoc Group under the Restructuring Support Agreement and the DIP Lenders under the DIP Facilities (as defined below). The ~~three~~two types of transactions for which bids will be solicited are:

- "**Sale Transaction**" meaning, a sale of substantially all of the Company's assets as provided in the Restructuring Support Agreement;

- "**Asset Sale Transaction**" meaning, the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders (as defined in the Plan); and

- ~~"**Master Servicing Transaction**" meaning, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (a "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer.~~

Although the Debtors will pursue the Marketing Process in earnest, the Reorganization Transaction will serve as a backstop and provide the Company the optionality to enter into such other transactions that can either augment the Reorganization Transaction (such as ~~the Master Servicing~~an Asset Sale Transaction) or, if representing higher or better value, replace the Reorganization Transaction (such as the Sale Transaction). Further, if during the Marketing Process the Debtors receive separate bids for certain of their assets that represent higher or better value for the estate, the Debtors can elect to proceed with such Asset Sale Transaction in conjunction with either a Reorganization Transaction or a Sale Transaction, as applicable.

In recognition of the Prepetition Term Loan holders' position as the Debtors' fulcrum creditors, under the Restructuring Support Agreement, within five (5) business days following the earlier of (a) the conclusion of the Company's Marketing Process and (b) 95 days after the Commencement Date (the earliest such

---

<sup>3 4</sup>   The signature pages for the Consenting Term Lenders have been removed from Exhibit B.

date, the "**Election Date**"), holders of at least 66$^{2/3}$% in aggregate principal amount outstanding of the Prepetition Term Loans (the "**Electing Term Lenders**") may deliver a notice (the "**Election Notice**") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "**Elected Transaction**"), as follows:  (i) a Reorganization Transaction, or (ii) a Master Servicing Transaction (as part of a Reorganization Transaction), or (iii) a Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), or (ii), or (iii), any Asset Sale Transaction(s); provided that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected transaction in (i), or (ii), or (iii),[5]  If the Debtors do not proceed with the Elected Transaction, the Consenting Term Lenders can terminate the Restructuring Support Agreement.

As part of the restructuring contemplated by the Restructuring Support Agreement, the Company refinanced all of its prepetition warehouse and advance facilities by entering into the DIP Facilities, guaranteed by DHCP, which provide up to $1.9 billion in liquidity to Ditech Financial and RMS to support their operations and these Chapter 11 Cases.  The DIP Facilities will be paid or refinanced in full in cash under any Elected Transaction or combination of Elected Transactions.

The Restructuring Support Agreement presently contemplates the following treatment for certain key classes of creditors under the Reorganization Transaction[6]:

- Term Loan Claims. On the Effective Date, the holders of Term Loan Claims will receive their pro rata share of new term loans (the "**New Term Loan**") under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million and 100% of the New Common Stock.

- Second Lien Notes Claims. On the Effective Date, the holders of Second Lien Notes Claims will not receive any distribution.

- Go-Forward Trade Claims. On the Effective Date, holders of Go-Forward Trade Claims (*i.e.*, trade creditors identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of reorganized DHCP ("**Reorganized DHCP**")) will receive a distribution in Cash in an amount equaling a certain percentage of their Claim, subject to an aggregate cap.

- General Unsecured Claims.  On the Effective Date, the holders of General Unsecured Claims will not receive any distribution.

- Parent Equity Interests. On the Effective Date, Parent Equity Interests will be extinguished.

- All Priority Non-Tax Claims, Other Secured Claims, Intercompany Claims, and Intercompany Interests are Unimpaired under the Plan.

---

[5]  Although the Restructuring Support Agreement and Election Notice contemplate a master servicing transaction, the Debtors and the Consenting Term Lenders have determined that a master servicing transaction will no longer be pursued.

[6]  The Debtors have determined, in consultation with the Consenting Term Lenders, to remove separate classification and treatment of "Go-Forward Trade Claims."  Such claims will be addressed in the assumption/rejection process.

WEIL:\97028542\2\41703.0010

- Following the Effective Date, Reorganized DHCP will adopt a post-restructuring management incentive plan (the "**Management Incentive Plan**"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan. The Management Incentive Plan will be included in the Plan Supplement.

Following feedback from the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") and consultation with the Term Loan Ad Hoc Group, the Plan has been modified to provide that certain borrower claims (as described below) will not be discharged in a Reorganization Transaction.

The Reorganization Transaction is expected to leave the Company's businesses intact and its balance sheet delevered. It is also expected to enhance the Company's long-term growth prospects and to allow the Company's management team to increase its focus on operational performance and value creation. In a sale scenario, the Plan contemplates that the asset sale proceeds remaining after the payment of administrative and priority claims will be distributed in accordance with the priority scheme of the Plan.

The Plan also incorporates a Global Plan Settlement (as defined herein) resolving all issues and objections that have been, or could be, asserted by the Creditors' Committee with respect to, among other things, (i) confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Debtor Affiliates*, dated as of April 26, 2019 (ECF No. 469) (the "**April 26, 2019 Plan**");[7] (ii) the releases and exculpations contemplated by the Plan; (iii) prospective lien challenges, claims, or causes of action that might be brought by or on behalf of the Debtors' Estates; and (iv) the Restructuring Support Agreement. As described more fully below and set forth in the Plan, the Global Plan Settlement contemplates a distribution to holders of Allowed Second Lien Claims and General Unsecured Claims, as a carve out of Term Loan collateral, as follows:

- The holders of General Unsecured Claims shall be paid pursuant to a general unsecured claim recovery trust whereby the Debtors and the estates shall transfer assets to the trust free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the holders of Allowed General Unsecured Claims.

- Second Lien Noteholders shall be paid pursuant to a second lien recovery cash pool free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the Second Lien Noteholders.

The Global Plan Settlement results from vigorous, arm's-length negotiation among the Debtors, the Term Loan Ad Hoc Group and the Creditors' Committee, with the assistance of their advisors. As a result of the modifications to the Plan implemented through the Plan, the Creditors' Committee supports confirmation of the Plan.

Accomplishing a speedy and efficient resolution of the Chapter 11 Cases is essential to maximizing the value of the Company. Under the Restructuring Support Agreement and pursuant to the terms of the DIP Documents, the Debtors are obligated to meet certain milestones. Specifically, the Restructuring Support Agreement and the DIP Facilities may be terminated if, among other things, the Debtors fail to satisfy the following milestones:[4]

---

[7] For the avoidance of doubt, the Plan supersedes and replaces the April 26, 2019 Plan in its entirety.

[4] At the hearing held on February 13, 2019, the Bankruptcy Court declined to approve at that time certain of the milestones set forth in the DIP Documents. The Debtors have agreed with the DIP Lenders to request that each of the milestones set forth in the DIP Documents be approved in the final DIP Order.

WEIL:\97028542\2\41703.0010

| Milestone | Deadline |
|---|---|
| File the Plan, Disclosure Statement, and Bidding Procedures Motion | ~~Within 22 Days of the Commencement Date (~~March 5, 2019~~).~~ |
| Entry of OCB Orders | March 21, 2019 |
| Entry of order approving Bidding Procedures | April 17, 2019 |
| Entry of Final DIP Order~~, OCB Orders,~~ and Cash Management Order | ~~Within 35 Days of the entry of the Interim DIP Order (March 20~~April 19, 2019~~).~~ |
| Entry of order~~(s)~~ approving Disclosure Statement ~~and Bid Procedures~~ | ~~Within 65 Days of the Commencement Date (April 17~~May 10, 2019~~).~~ |
| Commence Auction (if necessary) | ~~Within 95 Days of the Commencement Date (May 17~~June 11, 2019~~).~~ |
| Commence Sale and Confirmation Hearing | ~~Within 115 Days of the Commencement Date (~~June 6̶25, 2019~~).~~ |
| Occurrence of Effective Date | ~~Within 125 Days of the Commencement Date (~~June 16̶July 9, 2019~~).~~ |

---

**THE DEBTORS AND CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL STAKEHOLDERS.**

---

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in Class 3 (Term Loan Claims) are the only Class being solicited under, and the only Class entitled to vote on, the Plan.

**THE PLAN PROVIDES THAT THE HOLDERS OF CLAIMS IN CLASS 3 WHO VOTE TO ACCEPT THE PLAN, OR WHO ABSTAIN FROM VOTING OR VOTE TO REJECT THE PLAN BUT DO NOT OPT-OUT OF THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN, ARE DEEMED TO HAVE GRANTED THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN.**

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Class is entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests in the Reorganization Transaction. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article V—Summary of Plan below. The Plan constitutes a separate plan for each Debtor. Each class of Claims and Interests only address claims against or interest in a particular Debtor. A discussion of the amount of Claims in each Class is set forth in Article II.E.1 hereof.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable: (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the | Unimpaired | No (Presumed to accept) | 100% |

---

[58]   Approximate recovery in a Sale Transaction will be determined by the sale proceeds.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
| | | National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders. | | | |
| 3 | Term Loan Claims[9] | Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:<br><br>(i)      If the Sale Transaction occurs, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan).<br><br>(ii)      If the Reorganization Transaction occurs, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.<br><br>In each case, any Term Loan Deficiency Claims shall be deemed waived; provided, that holders of Allowed Term Loan Claims shall be entitled to | Impaired | Yes | [●]≤≤100% |

---

[9]    As discussed in further detail below, the Debtors are presently engaged in the Marketing Process.  To ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims is not, at this time, being disclosed herein by the Debtors.  The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing.

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
| | | receive a Pro Rata share of fifty percent (50%) of the proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement. | | | |
| 4 | Second Lien Notes Claims | The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, on the Effective Date, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law (subject to the Credit Agreement) after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.<br><br>(ii)    If the Reorganization Transaction occurs, such holder's Pro Rata share of the Second Lien Notes Claims shall not receive or retain any property under the Plan on account of such Claims Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.<br><br>(iii)    If either the Sale Transaction or the Reorganization Transaction occurs, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 of the Plan hereof) without further action by or order of the Bankruptcy Court. | Impaired | No (Deemed to reject) | 0% <1% |
| 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, on the Effective Date, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the | Impaired | No (Deemed to reject) | |

13

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
| | | Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement. (ii) If the Reorganization Transaction occurs, holders of General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement. | | | 0% 13-15%[10] |
| 6 | Go Forward Trade Borrower Non-Discharged Claims[11] | Except to the extent that a holder of an Allowed Go Forward Trade Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Go Forward Trade Claim, each such holder thereof shall receive, on the Effective Date or as soon as practicable thereafter, with a carve out from the collateral (or value of such collateral) securing the Term Loan Claims, distribution in Cash in an amount equaling not less than a percentage of such holder's Claim to be identified in the solicitation documents, subject to an aggregate cap to be agreed to by the Debtors and the Requisite Term Lenders, which shall be identified in the solicitation documents; provided, that any further payments in excess of such cap on account of an Allowed Go Forward Trade Claim shall be subject to the consent of the Requisite Term Lenders. Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive: (i) If the Sale Transaction occurs, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability. For the | Impaired | No (Deemed to reject) | [●]% 100% |

---

[10] Based on the Debtors' estimates of the Allowed Prepetition General Unsecured Claims. This number is subject to change based on the proofs of claim filed in these chapter 11 cases and administered pursuant to the Plan and any other changes or developments in these chapter 11 cases.

[11] The definition and description of Borrower Non-Discharge Claims is set out in Exhibit A-1 to this Disclosure Statement.

14

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
| | | avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.<br><br>(ii)    If the Reorganization Transaction occurs, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan. | | | |
| 7 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims. | Unimpaired | No (Presumed to accept) | N/A |
| 8 | Intercompany Interests | On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests. | Unimpaired | No (Presumed to accept) | N/A |
| 9 | Parent Equity Interests | Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in | Impaired | No (Deemed to reject) | 0% |

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
|  |  | exchange for Parent Equity Interests, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of ~~Parent Equity Interest~~Ditech common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of ~~DHCP~~Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements. The Single Share shall be recorded on the books and records maintained by the Plan Administrator. To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of ~~DHCP's~~Ditech's common stock and suspending ~~DHCP's~~Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest~~s~~ (through their interest in the Single Share), as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of ~~DHCP~~Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that ~~DHCP's~~Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) ~~T~~the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.<br><br>(ii)    If the Reorganization Transaction occurs, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |  |  |  |

16

WEIL:\97028542\2\41703.0010

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[58] |
|---|---|---|---|---|---|
| 10 | Subordinated Securities Claims | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims. On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | Impaired | No (Deemed to reject) | 0~% |

**PLEASE TAKE NOTICE THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS, INCLUDING BORROWERS OF LOANS AND/OR MORTGAGORS OF MORTGAGES SERVICED BY THE DEBTORS, THAT HOLD PREPETITION CLAIMS AGAINST ONE OR MORE OF THE DEBTORS WILL BE SUBJECT TO THE BAR DATE ORDER. IF YOU HOLD SUCH A CLAIM AND DO NOT FILE A PROOF OF CLAIM BY THE GENERAL BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER, YOUR CLAIM MAY BE DISCHARGED AND YOU MAY NOT BE ENTITLED TO A RECOVERY, IF ANY, ON SUCH CLAIM PURSUANT TO THE PLAN.**

**WHERE TO FIND ADDITIONAL INFORMATION**: DHCP files annual reports and quarterly reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. Each of the following filings is incorporated as if fully set forth herein and is part of the Disclosure Statement:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the SEC on April 16, 2019;

- Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 filed with the SEC on June 6, 2018;

- Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 filed with the SEC on August 9, 2018;

- Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 14, 2018; and

- Current Reports on Form 8-K filed with the SEC on October 4, 2018; November 6, 2018; December 7, 2018; January 17, 2019; January 24, 2019; February 11, 2019; February 21, 2019; March 6, 2019; March 26, 2019; April 3, 2019; and April 17, 2019 (other than information furnished pursuant to Item 2.02 or 7.01 and any related exhibits of any Form 8-K, unless expressly stated otherwise therein).

**Any statement contained in a document incorporated or deemed to be incorporated herein by reference, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any other subsequently dated or filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.**

17

**You should carefully read the entire Disclosure Statement and the documents incorporated by reference herein.  Financial data included herein as of December 31, 2018 remains subject to the customary review procedures associated with the completion of the Company's public reporting requirements.**

<div align="center">

**II.**
**OVERVIEW OF COMPANY'S OPERATIONS**

</div>

A.     **Debtors' Business**

1)     *Business Operations*

The Debtors' business was established in 1958 and operated as a captive financing business of Walter Industries, Inc. (now known as Walter Energy, Inc. (, "**Walter Energy**"), originating and purchasing residential mortgage loans and consumer credit obligations and then securitizing and servicing those loans to maturity.  In 1997, DHCP's predecessor, Hanover Capital Mortgage Holdings, Inc., a qualified real estate investment trust, was incorporated in Maryland.  In April 2009, Walter Investment Management LLC spun off from Walter Energy, merged into Hanover Capital Mortgage Holdings, Inc., changed the newly merged entity's name to Walter Investment Management Corp. ("**WIMC**"), was incorporated in Maryland.  In April 2009, WIMC spun off from Walter Energy, merged with Hanover Capital Mortgage Holdings, Inc., qualified as a real estate investment trust, and began operating as an independent, publicly traded company.  After the spin-off, WIMC acquired Marix Servicing LLC, a high-touch specialty mortgage servicer, in 2010 and acquired GTCS Holdings LLC ("**Green Tree**") in 2011, a leading independent mortgage loan servicer that provided high-touch servicing of GSE, government agency, and third-party mortgage loans.  WIMC subsequently acquired RMS, which resulted in the addition of 330 employees and four offices in three states.  As a result of the Green Tree acquisition, WIMC no longer qualified as a real estate investment trust.  As discussed more fully in Article III hereof, WIMC commenced a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York on November 30, 2017 and emerged from chapter 11 on February 9, 2018 as Ditech Holding Corporation.

The Company's businesses are comprised of three primary segments:  (i) forward mortgage originations; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing.  Following an extensive review and diligence process, the Company and its advisors determined that certain non-debtor affiliates should not be included as Debtors in these Chapter 11 Cases because they were either bankruptcy remote entities, inactive, and/or not obligated on the Company's funded debt.  A description of each of the Debtors and non-Debtor affiliates and their primary functions is listed below:

| Debtor/Non-Debtor Affiliate | Services Provided |
|---|---|
| **Debtors** | |
| Ditech Holding Corporation | Parent holding company for other Debtors and non-Debtor affiliates. |
| Ditech Financial LLC[12] | |

---

[12]    As discussed further herein, the Company's payroll processor, Ceridian drafts the required funds for payroll and payroll taxes from the Ditech Financial LLC Citibank account ending in #5011.  Intercompany accounting entries are created to record the expense and liabilities on the appropriate entity's books.

<div align="center">18</div>

|  | As described in further detail below, Ditech Financial originates and purchases residential mortgage loans that are predominantly sold to GSEs and government agencies. Ditech Financial also services a wide array of loans across the credit spectrum for its own portfolios as well as for GSEs, government agencies, third party securitization trusts, and other credit owners. |
| --- | --- |
| Reverse Mortgage Solutions, Inc. | As described in further detail below, RMS services loans for the Company's reverse mortgage portfolio and subservices loan portfolios on behalf of third-party credit owners of reverse loans. Its subsidiaries also provide real estate owned property asset management services, securitizations, and technology services. |
| REO Management Solutions, LLC | A subsidiary of RMS that performs real estate owned property management services. |
| Mortgage Asset Systems, LLC | Provides technology services for REO Management Solutions, LLC. |
| DF Insurance Agency LLC | A licensed insurance agency that performs marketing services for a third-party insurance business with respect to voluntary insurance policies and receives premium-based commissions for its services. |
| Green Tree Credit LLC | An inactive entity that was formed on May 20, 2003 and is the surviving entity of a merger with Conseco Finance Credit Corp. |
| Green Tree Credit Solutions LLC | An intermediate holding company and subsidiary of Ditech Holding Corporation. |
| Green Tree Insurance Agency of Nevada, Inc. | An inactive entity that is an insurance agency and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Investment Holdings III LLC | An inactive entity and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Servicing Corp. | The managing member of Ditech Financial LLC. |
| Marix Servicing LLC | A subsidiary of Ditech Holding Corporation. |
| Walter Management Holding Company LLC | An intermediate holding company and member of Ditech Financial LLC, a licensed origination and servicing company, and Green Tree Credit LLC, an inactive company. |

WEIL:\97028542\2\41703.0010

| Walter Reverse Acquisition LLC | An intermediate holding company of Reverse Mortgage Solutions, Inc. |
|---|---|
| **Non-Debtor Affiliates** | |
| Ditech Agency Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae loans under a trust. |
| Ditech Agency Advance Trust | A statutory trust that was formed to fund Fannie Mae (GSE) advances. |
| Ditech PLS Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances under certain PLS securitizations. |
| Ditech PLS Advance Trust II | A statutory trust that was formed to fund PLS (non-GSE) advances. |
| Green Tree Advance Receivables III LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae and Freddie Mac loans. |
| Hanover SPC-A, Inc. | An inactive entity that holds interests of Hanover securitizations. |
| Mid-State, Capital, LLC | A bankruptcy remote entity. |
| RMS REO BRC, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO BRC II, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO CS, LLC | Holds OREO property acquired in foreclosures. |
| RMS 2018-09, LLC | A special purpose vehicle that handles financing of HECM loans. |
| WIMC Real Estate Investment LLC | An inactive entity. |

a.   Forward Mortgage Origination Business (Ditech Financial)

The Company originates forward mortgage loans and consumer credit transactions exclusively through Ditech Financial.  Virtually all of the loans that Ditech Financial originates are loans eligible for securitization by government-sponsored enterprises, such as Fannie Mae and Freddie Mac,[6][13] or federally

---

[6][13]   As used herein, "**Fannie Mae**" means the Federal National Mortgage Association, and "**Freddie Mac**"

WEIL:\97028542\2\41703.0010

insured or guaranteed and eligible for Ginnie Mae securitization as mortgage-backed securities ("**MBS**").[7] [14] Ditech Financial sells substantially all of the mortgage loans it originates into Fannie Mae- and Freddie Mac-sponsored securitizations or into mortgage pools insured by Ginnie Mae.

Ditech Financial originates or acquires mortgage loans through the following channels:

   a. <u>Consumer Lending</u>: contacts and solicits (i) consumers within its existing servicing portfolio, and (ii) referrals and leads generated through direct mail, internet, telephone, and general advertising campaigns;

   b. <u>Correspondent Lending</u>: purchases closed mortgage loans from a network of lenders in the marketplace; and

   c. <u>Wholesale Lending</u>: originates mortgage loans identified through a network of approved brokers.

In 2018, Ditech Financial originated or purchased over $12.6 billion in mortgage loans. Of these loans approximately 30% were originated through the consumer lending channel, approximately 6% were originated through the wholesale lending channel, and approximately 64% were purchased in the correspondent lending channel. Based on the unpaid principal balance ("**UPB**") of the loans originated by Ditech Financial during this time period, approximately 30% were eligible for securitization by Fannie Mae, approximately 13% were eligible for securitization by Freddie Mac, and approximately 57% were eligible for private securitization guaranteed by Ginnie Mae. To the extent that Ditech Financial identifies a loan ineligible for GSE securitization and/or securitization and Ginnie Mae guarantee during its origination process, it may elect to close and fund such loan as long as it lines up a private buyer for such loan at the pre-closing stage of the process. Such loans constitute a relatively small percentage of all loans originated by Ditech Financial.

Ditech Financial's consumer originations operations offer a range of home purchase and refinance mortgage ~~loan~~ options, including fixed and adjustable rate conforming, Ginnie Mae, FHA, VA, USDA, retail installment financing, and jumbo products. A conforming loan is a mortgage loan that conforms to GSE guidelines, which include, but are not limited to, limits on loan amount, loan-to-value ratios, debt-to-income ratios, and minimum credit scores. The mortgage loans that Ditech Financial funds are generally eligible for sale to GSEs or insured by government agencies.

Ditech Financial underwrites the mortgage loans it originates generally to secondary market standards, including the standards set by Fannie Mae, Freddie Mac, Ginnie Mae, the FHA, the USDA, the VA, and jumbo loan investor programs. Loans are reviewed by Ditech Financial's underwriters in an attempt to

---

means the Federal Home Loan Mortgage Corporation. Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "**GSE**" and collectively the "**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities.

[7][14] As used herein, "**Ginnie Mae**" means the Government National Mortgage Association. Ginnie Mae is a federal corporation within the U.S. Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**") or the Department of Agriculture ("**USDA**").

WEIL:\97028542\2\41703.0010

ensure each mortgage loan is documented according to, and its terms comply with, the applicable secondary market standard. Ditech Financial's underwriters determine loan eligibility based on specific loan product requirements, such as loan-to-value, FICO, or maximum loan amount. Third-party diligence tools are utilized by Ditech Financial's underwriters to validate data supplied by the potential borrower and to uncover potential discrepancies. Ditech Financial conducts audits on its underwriters to confirm proper adherence to its internal guidelines and polices, which audits are in addition to Ditech Financial's standard quality control review. These audits are designed to provide an additional layer of internal review in an attempt to further mitigate quality defects and repurchase risk in the originations process.

Within its correspondent lending channel, Ditech Financial generally purchases the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Correspondent lenders with which Ditech Financial does business agree to comply with Ditech Financial's client guide, which sets forth the terms and conditions for selling loans to Ditech Financial and generally governs the business relationship. Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial acquires through its correspondent lending channel by conducting quality control reviews of correspondent lenders, reviewing compliance by correspondent lenders with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of correspondent lenders on a periodic basis. In 2018, the Company correspondent lending channel purchased loans from 452 lenders in the marketplace, of which 38 were associated with approximately half of Ditech Financial's purchases.

Within its wholesale lending channel, Ditech Financial originates loans through mortgage brokers. Loans sourced by mortgage brokers are underwritten and funded by Ditech Financial and generally close in Ditech Financial's name. Through the wholesale channel, Ditech Financial generally originates the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Ditech Financial underwrites and processes all loan applications submitted by the mortgage brokers in a manner consistent with that described above for the consumer originations channel. Mortgage brokers with whom Ditech Financial does business agree to comply with its client guide, which sets forth the terms and conditions for brokering loans to Ditech Financial and generally governs the business relationship. Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial originates through its wholesale lending channel by conducting quality control reviews of mortgage brokers, reviewing compliance by brokers with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of brokers on a periodic basis.

Ditech Financial's capital markets group is responsible for pricing loans and managing the interest rate risk through the time a loan is sold to third parties and managing the risk (which Ditech Financial calls the "pull-through risk") that loans Ditech Financial has locked will not be closed and funded in an attempt to maximize loan sale profitability through Ditech Financial's various originations channels. The capital markets group uses models and hedging analysis in an attempt to maximize profitability while minimizing the risks inherent in the originations business.

Ditech Financial's originations segment revenue, which is primarily net gains on sales of loans, is impacted by interest rates and the volume of loans locked and sold. The margins earned by Ditech Financial's originations segment are impacted by its cost to originate the loans including underwriting, fulfillment and lead costs.

As a Fannie Mae- and Freddie Mac-approved seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE, which agreements generally incorporate the applicable GSE selling and servicing guidelines (such agreements, together with the addenda and amendments thereto, respectively, the "**Fannie Sales Agreements**" and "**Freddie Sales Agreements**," and collectively, the "**GSE Sales Agreements**"). In general, when Ditech Financial originates a mortgage loan it funds the

22

loan utilizing borrowings under a master repurchase agreement ("**MRA**"), pledges the loan as security for such borrowings, subsequently sells the loans into a GSE-sponsored securitization, and uses the proceeds from the sale of the mortgage backed securities to repay the borrowings under the MRA.

As a Ginnie Mae issuer, Ditech Financial pools and securitizes certain mortgage loans conforming to the requirements of the Ginnie Mae Mortgage-Backed Securities Guide and all special announcements, agreements, and other written communications made by Ginnie Mae to Ditech Financial (collectively, the "**Ginnie Agreements**"). The Ginnie Agreements employ a custodial account mechanism whereby the issuer, such as Ditech Financial, forwards to an eligible document custodian approved by Ginnie Mae all of the loan documentation. After the pool of mortgages is approved by a Ginnie Mae pool processing agent, it directs Ditech Financial to issue MBS to third-party investors. In connection with the approval process, Ditech Financial remits guarantee fees and base servicing fees to Ginnie Mae.

The Ginnie Agreements provide for continuing recourse obligations on Ginnie Mae-approved issuers, such as Ditech Financial. Specifically, upon the discovery of a defective loan within four months after the mortgage origination date, the issuer is required either to cure the defect or purchase the loan from the mortgage pool at the outstanding principal balance (such loans, the "**Ginnie Buyouts**").

For the year ended December 31, 2018, Ditech Financial sold mortgage loans of $12.4 billion in UPB, consisting of approximately (i) $5.4 billion in Fannie Mae/Freddie Mac conventional conforming loans, (ii) $7.0 billion of Ginnie Mae loans, and (iii) $28.3 million of jumbo and other loans. On average, Ditech Financial sells or securitizes loans funded through warehouse borrowings in approximately 20 days from the date of origination. As of December 31, 2018, the total UPB of the warehoused loans held by Ditech Financial and awaiting securitization was approximately $746.2 million.

### b. Forward Mortgage Servicing Business

Ditech Financial, a debtor in these Chapter 11 Cases, performs loan servicing of mortgage loans that fall into two categories: (i) mortgage loans for which Ditech Financial owns the mortgage service rights ("**MSRs**"), and (ii) subservicing for third party owners of MSRs. With respect to mortgage loans for which Ditech Financial owns the MSRs, Ditech Financial performs mortgage servicing primarily in accordance with Fannie Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable. Ditech Financial typically originates the mortgage loans associated with such MSRs and sells them into securitization trusts owned by Fannie Mae or Freddie Mac or into mortgage pools insured by Ginnie Mae. The servicing segment also operates complementary businesses including a collections agency that performs collections of post charge-off deficiency balances for third parties and Ditech Financial. The subservicing contracts pursuant to which Ditech Financial is retained to subservice mortgage loans generally provide that the customer, the owner of the subserviced MSR, can terminate Ditech Financial as subservicer with or without cause. Each such subservicing contract has unique terms establishing the fees that Ditech Financial will be paid for Ditech Financial's work under the contract or upon the termination of the contract, if any. The standards of performance that Ditech Financial is required to meet in servicing the relevant mortgage loans and the profitability of the subservicing activity may vary among different contracts.

As of December 31, 2018, Ditech Financial serviced approximately 1.4 million residential loans with UPB of $170.1 billion. Of those, Ditech Financial was the subservicer for 0.7 million accounts with an unpaid principal loan balance of $104.3 billion. These subserviced accounts represented approximately 58% of its total servicing portfolio based on unpaid principal loan balance at that date. Ditech Financial's largest subservicing customer, New Residential Mortgage LLC ("**NRM**"), represented approximately 78% of its total subservicing portfolio and 48% of its total servicing portfolio based on unpaid principal loan balance on December 31, 2018. The Company's next largest subservicing customer represented approximately

23

17% of its total subservicing portfolio based on unpaid principal loan balance on December 31, 2018. For additional information about the Debtors relationship with NRM, see ~~Section~~Article III.C below.

### c.    Reverse Mortgage Servicing Business

RMS, a debtor in these Chapter 11 Cases, primarily focuses on servicing and subservicing reverse mortgage loans, also known as a home equity conversion mortgage ("**HECM**"). A HECM is a type of loan that allows homeowners aged sixty-two (62) or older to borrow money against the equity value of their homes. Unlike traditional home equity loans, HECMs are non-recourse loans without a fixed term and the balance increases over time as interest and other fees, such as servicing-related advances, are added to the borrower's total obligations. HECMs are insured by the FHA.

A borrower under a HECM does not make monthly mortgage payments—rather, the borrower receives cash in monthly installments or a lump sum up to a principal limit, which limit is calculated based on, among other things, the age of the borrower, the appraisal value of the borrower's home, and the loan interest rate. Generally, a borrower is obligated to repay the HECM when the borrower no longer uses the home as his or her principal residence, upon the death of the borrower, if title to the property is transferred, or if the borrower fails to meet certain requirements of the loan (*e.g.*, paying property taxes, insurance, or homeowners association fees) or otherwise defaults under the loan.

RMS began originating HECMs in 2010 and exited the origination business effective as of January 2017. Although RMS does not have any reverse loans remaining in its originations pipeline, RMS has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans. In addition, RMS performs loan servicing for mortgage loans that fall into two categories: (i) mortgage loans originated by RMS, for which RMS acts as a servicer, and (ii) mortgage loans owned by third parties, for which RMS acts as a subservicer. Reverse mortgage servicing accounts for approximately thirteen percent 13% of the Debtors' revenues. RMS performs mortgage servicing in accordance with HUD servicing guidelines~~8~~15 and performs securitization activities in accordance with Ginnie Mae guidelines. RMS also provides management and disposition services in connection with real estate owned property ("**REO Property**") of the Debtors or third-party reverse mortgage servicers or investors.

RMS is an issuer of Ginnie Mae-guaranteed HECM Mortgage Backed Securities ("**HMBS**") and virtually all loans RMS originated were sold into HMBS. Under the HMBS program, RMS is required to repurchase loans from the securitization when the loans reach 98% of the maximum claim amount (which is established at origination to reflect the value of the property subject to federal limits). Performing repurchased loans are conveyed to HUD, and a payment is received from HUD typically within a short time of repurchase. Nonperforming loans are either cured or liquidated through foreclosure and subsequent sale of REO Property. RMS typically files a claim with HUD for reimbursement of costs associated with nonperforming loans shortly after such sales occur, or, in any event, no later than approximately six months after foreclosing and obtaining marketable title on the property.

---

~~8~~15    The U.S. Department of Housing and Urban Development servicing guidelines (the "**HUD Guide**") is available at https://www.hud.gov/programoffices/housing/sfh/hecm. The Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**") is available at https://www.ginniemae.gov.

WEIL:\97028542\2\41703.0010

As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with an unpaid principal balance of $17.1 billion.

2)    *Employees*

As of the Commencement Date, the Debtors employed approximately 2,900 full-time employees, ten (10 ) part-time employees, and fifteen (15 ) temporary employees who perform a variety of critical functions, including administrative, legal, accounting, finance, and management-related tasks. In addition, the Debtors rely on services from a supplemental workforce comprised of approximately 1,300 independent contractors and consultants that provide services related to the Debtors' operations. Specifically, the supplemental workforce provides consulting services with respect to financial services, information technology, claims management, and other shared services.

3)    *Competition*

The Company competes with a number of institutions in the mortgage banking market for both the servicing and originations businesses as well as in the reverse mortgage and complementary businesses. In the servicing area, the Company competes with other servicers to acquire MSR and for the right to subservice mortgages for others. Competitive factors in the servicing business include: a servicer's scale of operations and financial strength; a servicer's access to capital to fund acquisitions of MSR; a servicer's ability to meet contractual and regulatory obligations and to achieve favorable performance (*e.g.*, in default management) relative to other servicers; a servicer's ability to provide a favorable experience for the borrower; a servicer's ability to recapture borrowers as they refinance; and a servicer's cost to service or subservice. In the mortgage originations area, the Company competes to refinance or provide new mortgage loans to borrowers whose mortgages are in the Company's existing servicing portfolio. In this area, the price and variety of the Company's mortgage products are important factors of competition, as is the reputation of the Company's servicing business and the quality of the experience the borrower may have had with the Company's servicing business. Since mid-2015, the Company's forward loan origination and servicing businesses have operated under a single "Ditech" brand. The Company also competes, principally on the basis of price and process efficiency, to acquire mortgages from correspondent lenders. In the future, the Company will also increasingly compete on the basis of brand awareness.

Across the Company's servicing and originations businesses, technology is an important competitive factor. In particular, the Company believes it will be increasingly important to enable servicing and originations customers to access the Company's services through its website and mobile devices.

**B.    Debtors' Organizational Structure**.

DHCP owns, directly or indirectly, 100% of the ownership interest in each of the Debtors and their non-debtor affiliates. The organizational chart, attached hereto as Exhibit C, illustrates the Debtors' organizational structure, as of the date hereof.

**C.    Directors and Officers**.

WEIL:\97028542\2\41703.0010

The following table sets forth the names of the members of DHCP's current Board of Directors:

| Name | Director Since | Position |
|------|----------------|----------|
| Thomas F. Marano | February 2018 | CEO, President & Chairman of the Board |
| David S Ascher | February 2018 | Director |
| George M. Awad | June 2016 | Director |
| Seth L. Bartlett | February 2018 | Lead Independent Director |
| Daniel G. Beltzman | December 2015 | Director |
| John R. Brecker | February 2018 | Director |
| Neal P. Goldman | January 2017 | Director |
| Thomas G. Miglis | February 2018 | Director |
| Samuel T. Ramsey | February 2018 | Director |

The following table sets forth the names of DHCP's current executive officers:

| Name | Position |
|------|----------|
| Thomas F. Marano | CEO and President |
| Gerald A. Lombardo | Chief Financial Officer |
| John J. Haas | General Counsel, Chief Legal Officer and Secretary |
| Alfred W. Young, Jr. | Chief Risk and Compliance Officer |
| Elizabeth F. Monahan | Chief Human Resources Officer |
| Jeffrey P. Baker | President of Reverse Mortgage Solutions, Inc. |

The composition of the board of directors of the reorganized DHCP will be disclosed prior to the entry of the order confirming the Plan in accordance with section 1129(a)(5) of the Bankruptcy Code.

### D.    Regulation of Company's Business

The Company's operations are conducted in the United States and are subject to extensive regulation by federal, state and local authorities, including the Consumer Financial Protection Bureau ("**CFPB**"), HUD, VA, the SEC and various state agencies that license, audit and conduct examinations of the Company's mortgage servicing and mortgage originations businesses.  The Company is also subject to a variety of regulatory and contractual obligations imposed by credit owners, investors, insurers, and guarantors of the mortgages the Company originates and services, including, but not limited to, Fannie Mae, Freddie Mac, Ginnie Mae, FHFA, USDA, VA, and the FHA.  Furthermore, the industry has been under scrutiny by federal and state regulators over the past several years, and the Company expects this scrutiny to continue.  Laws, rules, regulations, and practices that have been in place for many years may be changed, and new laws, rules, regulations, and administrative guidance have been, and may continue to be, introduced in order to address real and perceived problems in the industry's history.  The Company expects to incur ongoing operational, legal, and system costs in order to comply with these rules and regulations.

For example, the Company is required to comply with federal consumer protection and other laws, including, but not limited to:

26

- The Gramm-Leach-Bliley Act and Regulation P, which require initial and periodic communication with consumers on privacy matters and the maintenance of privacy matters and the maintenance of privacy regarding certain consumer data in the Debtor's possession.

- The Fair Debt Collection Practices Act, which regulates the timing and content of communications on debt collections.

- The Truth in Lending Act, including Home Ownership and Equity Protection Act and Regulation Z, which regulate mortgage loan origination activities, require certain disclosures be made to mortgagors regarding terms of mortgage financing, regulate certain high-cost mortgages, mandate home ownership counseling for mortgage applicants and regulate certain mortgage servicing activities.

- The Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, and Regulation V, which collectively regulate the use and reporting of information related to the credit history of consumers.

- The Equal Credit Opportunity Act and Regulation B, which prohibit discrimination on the basis of age, race, and certain other characteristics in the extension of credit and require certain disclosures to applicants for credit.

- The Homeowners Protection Act, which requires the cancellation of mortgage insurance once certain equity levels are reached.

- The Home Mortgage Disclosure Act and Regulation C, which require reporting of certain public loan data.

- The Fair Housing Act and its implementing regulations, which prohibit discrimination in housing on the basis of race, sex, national origin, and certain other characteristics.

- The Service members Civil Relief Act, as amended, which provides certain legal protections and relief to members of the military.

- The Real Estate Settlement Procedures Act and Regulation X, which govern certain mortgage loan origination activities and practices and related disclosures and the actions of servicers related to various items, including escrow accounts, servicing transfers, lender-placed insurance, loss mitigation, error resolution, and other customer communications.

- Regulation AB under the Securities Act, which requires registration, reporting, and disclosure for mortgage-backed securities.

- Certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which among other things, created the CFPB and prohibits unfair, deceptive or abusive acts or practices.

- The Federal Trade Commission Act, the FTC Credit Practices Rules, and the FTC Telemarketing Sales Rule, which prohibit unfair and certain related practices.

- The Telephone Consumer Protection Act, which restricts telephone solicitations and automatic telephone equipment.

27

- Regulation N, which prohibits certain unfair and deceptive acts and practices related to mortgage advertising.

- The Bankruptcy Code and bankruptcy injunctions and stays, which can restrict collection of debts.

- The Secure and Fair Enforcement for Mortgage Licensing Act.

- Various federal flood insurance laws that require the lender and servicer to provide notice and ensure appropriate flood insurance is maintained when required.

### E.    Debtors' Existing Capital Structure

#### 1.    Prepetition Indebtedness

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

(a)    Prepetition Credit Agreement

As of the Commencement Date, the Debtors have outstanding first lien secured debt obligations in the aggregate principal amount of approximately $961.4 million, which amount consists of secured term loan borrowings (the "**Prepetition Term Loans**") under the Second Amended and Restated Credit Agreement (as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) among DHCP, each of the other loan parties named therein, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other lenders party thereto, dated as of February 9, 2018 (the "**Prepetition Credit Agreement**"), plus interest, fees and other expenses arising thereunder.  The Prepetition Credit Agreement is secured by a lien on substantially all the assets of the Debtors.

(b)    Prepetition Second Lien Notes Indenture

As of the Commencement Date, the Debtors have outstanding second lien note obligations consisting of $253.9 million plus accrued and unpaid interest in aggregate outstanding principal of 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to that certain Second Lien Notes Indenture by and between DHCP (f/k/a WIMC), certain other debtors as guarantors, and Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral agent, dated as of February 9, 2018 (the "**Second Lien Notes Indenture**").  The Second Lien Notes Indenture is secured on a second-lien basis on substantially all the assets of the Debtors.

(c)    Prepetition Warehouse Facilities

As of the Commencement Date, the Debtors were party to the following agreements with respect to the following facilities:[916]

A.    *Mortgage Loan Warehouse Facility:*

- Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a buyer and other Buyers from time to time, and Ditech Financial LLC, as seller, with a committed capacity level of $1 billion (the "**Prepetition Forward MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Reverse MRA, DPAT II Facility, and DAAT Facility (each as defined below).

B.    *Reverse Mortgage Facilities:*

- Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a committed buyer and other Buyers from time to time, and Reverse Mortgage Solutions, Inc., as a seller, RMS REO CS, LLC, and RMS REO BRC, LLC, with a committed capacity level of $800 million (the "**Prepetition Reverse MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, DPAT II Facility, and DAAT Facility; and

- Master Repurchase Agreement, dated April 23, 2018 (as may be amended, restated, supplemented, or otherwise modified), between Barclays Bank PLC, as purchaser and agent and Reverse Mortgage Solutions, Inc., as seller, with a committed capacity level of $412 million.

- Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among RMS and a non-debtor subsidiary, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP (together with its affiliates, "**National Founders**" and, such facility, the "**National Founders Facility**").

C.    *Mortgage Loan Servicing Facilities:*

- Ditech PLS Advance Trust II Advance Receivables Backed Notes, Issuable in Series (the "**DPAT II Notes**") issued pursuant to that certain Indenture between Ditech PLS Advance Trust II ("**DPAT II**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $85 million (the "**DPAT II Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DAAT Facility; and

---

[916]    As of the Commencement Date, the Debtors were also party to the Prepetition MSFTAs and the Prepetition Netting Agreement (each as defined in the DIP Orders).

WEIL:\97028542\2\41703.0010

- Ditech Agency Advance Trust Advance Receivables Backed Notes, Issuable in Series (the "**DAAT Notes**") issued pursuant to that certain Indenture between Ditech Agency Advance Trust ("**DAAT**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $465 million (the "**DAAT Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DPAT II Facility.

(d)    ~~Go Forward Trade~~General Unsecured Claims

~~Go Forward Trade Claims consisting of any Claims against the Debtors (other than any Intercompany Claims or General Unsecured Claims) existing as of the Commencement Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code (or any order of the Bankruptcy Court) and are identified by the Debtors (with the consent of the Requisite term Lenders) as being integral to and necessary for the ongoing operations of the Reorganized Debtors.~~

~~(e)~~ General Unsecured Claims

consist ~~General Unsecured Claims consisting~~ of any Claims against the Debtors (other than any Intercompany Claims ~~or Go Forward Trade Claims~~) existing as of the Commencement Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code (or any order of the Bankruptcy Court).

## 2.    Equity Ownership

DHCP is a public company that files annual reports with, and furnishes other information to, the SEC. As of December 31, 2018, 90 million shares of DHCP $0.01 par value common stock had been authorized with 5,328,417 shares of common stock issued and outstanding.  As of December 31, 2018, there were 87 record holders of DCHP's common stock.  As of December 31, 2018, 91,408 shares of mandatorily convertible preferred stock were issued and outstanding.  DHCP's common stock was delisted from the New York Stock Exchange on December 1, 2018 and currently trades over-the-counter.

## 3.    Unencumbered Assets

Substantially all of the Debtors' assets are subject to the secured of the Debtors' prepetition secured lenders and the DIP Lenders, with limited carve-outs for *de minimis* assets and value.  The Creditors' Committee alleges that there may be significant unencumbered assets of the Debtors or their non-Debtor affiliates which may inure to the benefit of the General Unsecured Claims in these chapter 11 cases.  The Debtors do not agree with the Creditors' Committee's position.  The Debtors anticipate that once the Marketing Process and Liquidation Analysis are finalized, the outcome of that analysis and process will demonstrate that there remains no expected recovery for General Unsecured Claims on account of unencumbered assets.

Following review of their purported unencumbered assets, the Debtors believe that certain claims of the Creditors' Committee with respect to unencumbered assets are speculative and, even if successful, any such value would nevertheless be exhausted following (i) its application to the costs of these chapter 11 cases and administrative expenses, and/or (ii) upon accounting for the currently contemplated

WEIL:\97028542\2\41703.0010

Restructuring Transactions and the anticipated General Unsecured Claims against each Debtor on a Debtor-by-Debtor basis.

For example, in any Restructuring Transaction a significant portion of General Unsecured Claims are expected to be satisfied as either assumed liabilities or assumed contracts, rendering them Unimpaired. Additionally, current estimates suggest that the Term Loan Claims will have a significant deficiency claim (the "**Term Loan Deficiency Claim**") in any Restructuring Transaction. The Term Loan Deficiency Claim may be asserted against each of the Debtors for the full amount of the Term Loan Deficiency Claim; whereas, the entirety of the Second Lien Notes Claim is payment and lien subordinated to the Term Loan Deficiency Claim. Accordingly, when accounting on a Debtor-by-Debtor basis, unencumbered value, if any, is expected to inure almost entirely to the benefit of the Term Loan Deficiency Claim on the Debtors.

**4.** **Intercompany Claims**

The Debtors have evaluated and determined that there will likely be no recovery to General Unsecured Claims, and thus, there will likely be no recovery to Intercompany Claims in a sale scenario. Pursuant to a plan, in a Reorganization Transaction, the Intercompany Claims will likely be either reinstated for administrative purposes or cancelled so long as such cancellation does not have an adverse effect on the Debtors but not paid.

**III.**
**KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES**

**A.** **Background and Prior Restructuring**

In the beginning of the third quarter of 2016, the Company engaged Houlihan Lokey Capital, Inc. as investment banker ("**Houlihan**") and Weil, Gotshal & Manges LLP as legal counsel ("**Weil**") and, on November 30, 2017, WIMC commenced a prepackaged chapter 11 case (*In re Walter Investment Management Corp.*, 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017)) (the "**WIMC Chapter 11 Case**") with the Bankruptcy Court to address its overleveraged capital structure. The plan of reorganization in the WIMC Chapter 11 Case had the overwhelming support of its creditors. In less than two months, WIMC confirmed its plan of reorganization, eliminating more than $800 million in funded debt. On February 9, 2018, WIMC emerged from the WIMC Chapter 11 Case as Ditech Holding Corporation, and a final decree was entered closing the WIMC Chapter 11 Case on August 14, 2018. The goal of the WIMC Chapter 11 Case was to deleverage the capital structure sufficiently to enable the reorganized debtor to implement its business plan. As set out below, due to circumstances largely out of the control of the Debtors, the Company has faced significant hardships and must again address its capital structure through these Chapter 11 Cases.

**B.** **Events Leading to Commencement of Tthese Chapter 11 Cases**

In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained its liquidity and ability to implement much needed operational initiatives. In an effort to address the burden of its overleveraged capital structure—a remnant of its historical acquisitions—the Company consummated a fully consensual prepackaged chapter 11 plan on February 8, 2018. Given the significant liquidity and operational headwinds facing the Company in 2019, it became clear to the Company's new senior management team that additional relief was needed.

WEIL:\97028542\2\41703.0010

Notwithstanding the Company's efforts to implement its business plan, which included further cost reductions, operational enhancements and streamlining of its business, following emergence from the WIMC Chapter 11 Case, the Company continued to face liquidity and performance challenges that were more persistent and widespread than anticipated. Coupled with the industry and market factors, these performance challenges have resulted in less liquidity than projected, making the implementation of key operational enhancements more difficult, and in certain cases, resulting in their postponement.

In addition, a number of industry factors have caused the Company increased uncertainty with respect to its future performance, including the projected decrease in total originations, and for reverse mortgages, the impact of changes in HUD regulations, among other things. The increase in interest rates has also negatively impacted mortgage originators and servicers generally—the Debtors are no exception. As interest rates have risen, fewer borrowers are refinancing loans in a higher interest rate environment, resulting in lower origination volume for the Company.

The Company's liquidity has also suffered from burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties. In the normal course of business, the Company utilizes its mortgage loan servicing advance facilities and master repurchase agreements to finance, on a short-term basis, mortgage loan related servicing advances, the repurchase of HECMs out of Ginnie Mae securitization pools, and funding of newly originated mortgage loans. These facilities are typically subject to annual renewal requirements and typically contain provisions that, in certain circumstances, prevent the Company from utilizing unused capacity under the facility and/or accelerate the repayment of amounts under the facility.

The Company's ability to fund its business operations is a significant factor that affects its liquidity and ability to operate and grow. The Company is dependent on the ability to secure these types of arrangements on acceptable terms and to renew, replace or resize existing financing facilities as they expire. Continued growth in Ginnie Buyouts activity have required the Company to continue to seek additional financing for Ginnie Buyouts or to otherwise sell or securitize Ginnie Mae buyout assets, and the Company entered into a number of transactions relating to these types of assets during the past year.

The Company has taken a number of measures to address forecasted reductions in liquidity and compliance with its various facilities, including entry into amendments under its Prepetition Credit Agreement, the DAAT Facility, the DPAT II Facility, and each of Ditech Financial's and RMS's master repurchase agreements.

The Company has entered into new agreements or transactions to generate additional liquidity. In April 2018, the Company entered into an additional master repurchase agreement that, as of December 31, 2018, provides up to $412 million in total capacity, and a minimum of $400 million in committed capacity to fund the repurchase of certain HECMs and real estate owned from Ginnie Mae securitization pools for a period of one year. In June 2018, the Company sold a pool of defaulted reverse Ginnie Buyouts owned by the Company and financed under an existing master repurchase agreement for a sales price of $241.3 million. The proceeds from the sale were used to repay the related amount financed under the master repurchase agreement and to fund additional Ginnie Buyouts. The Company continues to service these loans on behalf of the purchaser under a servicing agreement. In June 2018, the Company agreed to sell to New Penn Financial additional MSRs relating to mortgage loans having an aggregate unpaid principal balance of approximately $4.7 billion, and received approximately $56.7 million in cash proceeds. The proceeds from the sale were used primarily to make mandatory principal payments under the Prepetition Credit Agreement. In addition, in October 2018, pursuant to the National Founders Facility, the Company executed a transaction that provided $230 million of additional secured financing for certain HECMs and owned real estate.

32

Notwithstanding these liquidity initiatives, the Company still faced scheduled amortization payments of approximately $110 million in 2019.  Accordingly, the Company was at significant risk of receiving a going-concern qualification from its auditors, which would have triggered a domino effect of defaults and terminations throughout its corporate debt and working capital facilities.  Instead, the Company has sought to forge a different path with the cooperation of the Term Loan Ad Hoc Group and its major stakeholders—a path that will lead either to a significantly deleveraged and recapitalized Company through a Reorganization Transaction or, if it provides higher or better return to creditors, one of the three types of transactions as contemplated by the Restructuring Support Agreement, consistent with the goals of the Company's strategic alternatives review process discussed below.

### C.    ~~The~~ Prepetition Marketing Process and Negotiations with Stakeholders

In May 2018, the Company initiated a process to evaluate strategic alternatives to enhance stockholder value and re-engaged Houlihan and Weil to assist in such process.  Subsequently, in October 2018, the Company engaged AlixPartners, LLP to assist and advise in its contingency planning process, acknowledging at that time that it may ultimately become necessary to implement a transaction through an in-court process.

The Company's efforts were overseen by the Board of Directors of DHCP and a Special Committee of the Board (the "**Special Committee**"), which is composed of four (4) DHCP independent directors.  The Special Committee, with the assistance of Houlihan and Weil, evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity.

The Company undertook an extensive marketing effort (the "**Prepetition Marketing Process**"), including soliciting interest from thirty-three (33) potentially interested parties including strategic and financial buyers with the financial and operational wherewithal to complete a transaction.  The Company formally engaged with multiple potential bidders, executing ten (10) confidentiality agreements and providing a Confidential Information Memorandum, financial projections and data room access to such potential bidders.

The deadline for interested parties to submit initial bids was July 17, 2018.  The Company received four (4) indications of interest ("**IOIs**").  Following extensive discussions with the Board, the Special Committee and its legal and financial advisors, the Company selected three (3) bidders to proceed to a second round of negotiations and diligence, including onsite management presentations during the last week of July 2018.  Following the management presentations, the Company and its advisors continued to facilitate due diligence with the remaining bidders in advance of the second round of IOIs.  The Company received three (3) second round IOIs on or about August 21, 2018, two (2) of which were bids for the sale of certain servicing and reverse assets with subservicing retained by the Company (the "**Alternative Bids**") and one (1) of which was a bid for substantially all of the Company's net assets as a going concern (the "**All-Company Bid**").  Over the course of September and October 2018, the Company and its advisors engaged in extensive discussions with the final three bidders.

In October 2018, it became clear that (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Company's Second Lien Notes.  As a result, the Company decided to engage with an ad hoc group of second lien noteholders (the "**Second Lien Ad Hoc Group**") to explore the Company's strategic alternatives and solicit input with respect to the All-Company Bid and the Alternative Bids.  On October 8, 2018, the Second Lien Ad Hoc Group signed a confidentiality agreement and began engaging with the Company to evaluate the sale alternatives and develop a competing potential recapitalization transaction.  The Company continued to have periodic

33

discussions with the Second Lien Ad Hoc Group as it analyzed the sale options and various recapitalization scenarios. In November 2018, the Second Lien Ad Hoc Group retained Centerview Partners ("**Centerview**") and Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") to assist with its analysis of the potential strategic alternatives and to assist in preparing a recapitalization transaction proposal supported by the Second Lien Ad Hoc Group.

The Company's financial and legal advisors engaged with the Second Lien Ad Hoc Group's advisors to develop potential viable alternatives to an All-Company Bid. Among other things, the Second Lien Ad Hoc Group proposed equitizing a portion of the Second Lien Notes and obtaining amortization relief from the Term Lenders under the Prepetition Credit Agreement (the "**Second Lien Proposal**").

In December 2018, the Company engaged in parallel discussions with an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**") to discuss the Prepetition Marketing Process and the Second Lien Proposal. The Term Loan Ad Hoc Group retained FTI Consulting ("**FTI**") and Kirkland & Ellis LLP ("**Kirkland**") as its advisors. The Debtors and their advisors held in-person meetings in December 2018 with each of the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group and their respective advisors to discuss strategic alternatives, including analyzing the All-Company Bid.

Despite extensive negotiations with the bidder who submitted the All-Company Bid, such bidder ultimately rescinded the All-Company Bid in late December 2018, immediately after the Company had utilized the grace period with respect to its Second Lien Notes (explained in more detail below). Following such rescission, the Company re-engaged a previous bidder in connection with a potential bid for substantially all of the Company's assets. After several weeks of negotiations with such bidder, and after consultation with the Term Loan Ad Hoc Group and its advisors, the Company ultimately decided not to pursue the sale transaction.

In early January 2019, the Term Loan Ad Hoc Group submitted a proposal for a recapitalization transaction, pursuant to which a portion of the Prepetition Term Loan would be equitized and incremental liquidity would be provided through, among other things, a new revolving credit facility and a reduction in scheduled amortization payments. Shortly thereafter, the Second Lien Ad Hoc Group submitted a revised Second Lien Proposal. Over the course of several weeks, the Company, with the assistance of its financial and legal advisors, engaged in extensive discussions with the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group regarding the competing recapitalization transactions proposed by such parties. Following extensive diligence and numerous meetings with the Company's management and advisors, the advisors to the Term Loan Ad Hoc Group provided the Company with a proposal for the recapitalization of the Company. As a precondition to seeking the approval of the Board for such terms, the Company agreed with the Term Loan Ad Hoc Group to share the proposal with certain of the Company's key counterparties, including NRM.

Notwithstanding the Debtors' good faith efforts to cooperate with NRM throughout the Company's strategic alternatives review process, NRM ~~repeatedly threatened~~ asserted that it had the right to issue a termination notice based on the occurrence of certain alleged termination events under its Subservicing Agreement with the Company, dated August 8, 2016 (as amended) (the "**Subservicing Agreement**") while simultaneously participating as a bidder in the Company's sale process. Ultimately, on January 17, 2019—the morning after the Company shared with NRM a recapitalization proposal from the Term Loan Ad Hoc Group—NRM issued a notice purporting to terminate the Subservicing Agreement and directing the Company to remit certain transfer fees and costs to NRM in accordance with the terms of the Subservicing Agreement ("**Termination Notice**"). On January 23 and 29, 2019, NRM sent additional letters to the Company which purported to confirm the Termination Notice and to identify certain additional termination events. The Debtors have disputed NRM's basis for termination and intend to

explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. The Debtors are, however, cooperating with NRM to transition the servicing of the loans under the Subservicing Agreement. NRM asserts that the Termination Notice was properly issued, based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement. The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.

### D.    Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities

On December 17, 2018, the Company elected not to make the approximately $9 million cash interest payment (the "**Interest Payment**") due and payable on December 17, 2018 with respect to the Company's outstanding Second Lien Notes and entered the 30-day grace period. Although the Company had sufficient liquidity to make the Interest Payment, the Company elected not to make the payment as discussions were still ongoing with various stakeholders regarding the Company's strategic alternatives. The Company's failure to make the Interest Payment within thirty days after it was due and payable constitutes an "event of default" under the Second Lien Notes Indenture. As active discussions were still ongoing, the Board determined that the Company would not make the Interest Payment prior to the expiration of the grace period, even though it had sufficient liquidity to do so, resulting in an event of default under the Second Lien Notes Indenture. An event of default under the Indenture also constitutes an "event of default" under the Prepetition Credit Agreement and certain of the Company's warehouse facility agreements (the "**Warehouse Facility Agreements**"), among others.

On January 16, 2019, the Company and, as applicable, certain of its subsidiaries, entered into forbearance agreements (each a "**Forbearance Agreement**" and collectively the "**Forbearance Agreements**") with (i) certain holders of greater than 75% of the aggregate principal amount of the outstanding Second Lien Notes (the "**Notes Forbearing Parties**"), (ii) certain lenders holding greater than 50% of the sum of (a) the Term Loans outstanding, (b) letter of credit exposure, and (c) unused commitments under the Prepetition Credit Agreement at such time and the administrative agent and collateral agent under the Prepetition Credit Agreement (collectively, the "**Credit Agreement Forbearing Parties**"), and (iii) the requisite buyers and variable funding noteholders, as applicable, under the Warehouse Facility Agreements (collectively, the "**Warehouse Lenders Forbearing Parties**").

Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the Notes Forbearing Parties, Credit Agreement Forbearing Parties and Warehouse Lenders Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they may have in respect of the aforementioned events of default or other defaults or events of default arising out of or in connection therewith.

The deadline of the Forbearance Agreements was tied to the maturity date of certain of the Company's repurchase loan agreements with the Warehouse Lenders Forbearing Parties. Without a viable recapitalization of the Company in hand, the Warehouse Lenders Forbearing Parties were not in a position to commit to a significant extension of their facilities with the Company. As noted above, these facilities are critical to the Company's ordinary course of business operations. Accordingly, the Company focused instead on obtaining the DIP Facilities to refinance such obligations, and will, during the Marketing Process, continue to seek commitments for post-emergence facilities.

Before the termination of the Forbearance Agreements on February 8, 2019, the Company entered into new forbearance agreements with the Credit Agreement Forbearing Parties and the Warehouse Lenders

WEIL:\97028542\2\41703.0010

Forbearing Parties (the "**Forbearance Extension**").    The Forbearance Extension was scheduled to terminate on February 11, 2019.

## IV.
## OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases and First-Day Motions

On February 11, 2019, the Debtors commenced the Chapter 11 Cases.  The Debtors continue to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To that end, the Debtors filed various motions seeking relief from the Bankruptcy Court to promote a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth restructuring through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").  At the ~~first~~second day hearing held on ~~February 13~~March 14, 2019, the Bankruptcy Court granted substantially all of the relief requested in the First Day Motions on a final basis and entered various final orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits (ECF No. 207);

- ~~Continue to use the Debtors' cash management system, bank accounts, and business forms;~~

- Continue insurance programs and the workers' compensation program, the processing of workers' compensation claims, and continue the Debtors' surety bond program (ECF No. 205);

- Continue to pay all taxes, fees, and similar charges and assessments, whether arising prepetition or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course (ECF No. 230);

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing services (ECF No. 128); and

- Continue to conduct their forward and reverse mortgage businesses in the ordinary course, as discussed in more detail below in Section 2~~;~~ (ECF Nos. 224 and 229).

- ~~Obtain debtor-in-possession financing and use of cash collateral, as discussed in more detail below in Section 1.~~

The Debtors' request to continue to use their cash management system, bank accounts, and business forms and to obtain debtor-in-possession financing have been approved on a final basis (ECF No. 478).  The Debtors' motion to continue to use their cash collateral has been approved on an interim basis (ECF No. 53), and in accordance with the Global Settlement, the Creditors' Committee objections to entry of a final order for use of cash collateral will be resolved and the use of cash collateral will be authorized on a final basis.

### 1.    DIP Facilities and Cash Collateral

(a)    DIP Facilities:

To address the working capital needs of the Debtors and support the transactions contemplated by the Restructuring Support Agreement, the Debtors filed a motion (the "**DIP Motion**") (ECF No. 26) to enter into the DIP Facilities, which provide the Debtors' two primary operating entities, Ditech Financial and

RMS, as applicable, (a) up to $1.9 billion in warehouse financing under three master repurchase agreements and two advance facilities and (b) access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "**DIP Facilities**"). The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted. The interim order granting the relief requested in the DIP Motion can be found at ECF No. 53 ("**Interim DIP Order**"), and the final order granting the relief request in the DIP Motion with respect to the DIP Facilities can be found at ECF No. 422 (the "**Final DIP Order**").

The DIP Facilities provide the Debtors with the flexibility to use the commitment amount in the manner that best suits their capital needs. Specifically, during the Chapter 11 Cases, (i) up to $650 million will be available to fund Ditech Financial's origination business, (ii) up to $1.0 billion will be available to RMS, and (iii) up to $250 million will be available to finance the advance receivables related to Ditech Financial's servicing activities. In addition, the lenders under the DIP Facilities will provide Ditech Financial up to $1.9 billion in trading capacity to hedge its interest rate exposure with respect to the loans in its origination pipeline, as well as those loans that will be subject to repurchase obligations with the DIP Facilities lenders prior to being securitized.

(b)     Cash Collateral

In addition, the Debtors are authorized, on an interim basis, to consensually use the cash collateral of the Prepetition Term Lenders for the duration of the Chapter 11 Cases. In exchange, the Debtors are providing the Prepetition Term Lenders, with the consent of the Prepetition Administrative Agent, acting at the direction of the Required Term Lenders with the following:

Adequate Protection Lien. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive a replacement security interest in and lien on the same property of the Debtors on which the Prepetition Administrative Agent has a perfected, first-priority security interest and lien prior to the Commencement Date pursuant to the Prepetition Credit Agreement and related security documents, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to Permitted Liens (as defined in the Prepetition Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the obligations under the Prepetition Credit Agreement, and a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "**Carve Out**"). The adequate protection liens shall not be (i) subject, or junior to, any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the interim and final orders (collectively, the "**DIP Orders**").

507(b) Claim. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b), subject to the Carve Out and the priorities set out in the DIP Facilities.

Adequate Protection Payments. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Prepetition Administrative Agent (in accordance with the Prepetition Credit Agreement, including, without limitation, the reasonable fees, costs, and expenses of Davis Polk & Wardwell LLP, as counsel to the Prepetition Administrative Agent) and the Term Loan Ad Hoc Group.

- Financial Reporting. The Debtors will, until the Effective Date, continue to provide the Term Loan Ad Hoc Group and the Prepetition Administrative Agent, and their advisors, financial and other reporting on a monthly basis in a form and substance reasonably acceptable to them.

    (c)  National Founders Facility

The Debtors are also providing, among other things, the following adequate protection to National Founders, the Debtors' existing lender under the National Founder Facility, including:

- Reimbursement of reasonable and documented fees and expenses of National Founders;

- Covenant by RMS to perform under the existing servicing agreement, and stipulation and agreement by Debtors that any Claim for actual damages arising from RMS's failure to perform or otherwise breach the existing servicing agreement shall constitute superpriority Administrative Expense Claims against RMS, subject to subordination as expressly provided in the DIP Orders; and

- Superpriority administrative claim against RMS for all draws on advance account funds, which Claims shall be subordinated in priority and payment to the DIP Lender's superpriority Claims.

In exchange for the adequate protection provided to National Founders, the Debtors received assurances for the continuation of the National Founders Facility and the continued use of National Founders' cash collateral for the duration of these Chapter 11 Cases, as well as assurances that National Founders will not declare an event of default or servicer termination event as a result of the commencement of the Chapter 11 Cases or the insolvency of RMS.

    2.  **Operations in the Ordinary Course for Ditech Financial and RMS**

To avoid any disruption to their business operations, the Debtors have obtained ~~interim~~final relief to continue to conduct their forward and reverse mortgage businesses in the ordinary course (the "~~Interim~~Final **OCB Orders**") (ECF Nos. ~~54, 55~~224 and 229). As discussed above, RMS no longer originates reverse mortgage loans, but it has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans. The Debtors will also continue to comply with their obligations to Fannie Mae, Freddie Mac, and Ginnie Mae, and to continue their securitization activities and servicing businesses in the ordinary course to avoid disruption and uncertainty in the market. As part of this relief, the Debtors have agreed to provide Fannie Mae, Freddie Mac, and Ginnie Mae certain undertakings for assurance of performance of the obligations ("**Operating Undertakings**") and to seek Bankruptcy Court approval of the Operating Undertakings.[17]

    B.  **Procedural Motions and Retention of Professionals**

---

[17] Ginnie Mae sent a Notice of Violation on February 8, 2019 and stated that it would forbear from taking any action for 125 days through June 13, 2019. On April 10, 2019, Ginnie Mae extended the forbearance period by thirty (30) days through July 13, 2019.

WEIL:\97028542\2\41703.0010

The Debtors have also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders with respect to such relief.

### C.      KEIP Motion

On April 18, 2019, the Court approved a motion (the "**KEIP Motion**") seeking authority to implement a key employee incentive program as modified (the "**Proposed KEIP**") (ECF No. 228) and letter to the Bankruptcy Court (ECF No. 417). Under the Proposed KEIP, thirty-one (31) of the Debtors' key employees (collectively, the "**KEIP Participants**"), who are largely responsible for the continuity of the Debtors' day-to-day operations, will be eligible to collectively receive up to $2.5 million. In the event of a Sale (as defined in the KEIP Motion), KEIP Participants will remain eligible to receive the first $2.5 million of any award granted under the Proposed KEIP subject to meeting certain performance metrics. In addition, under the Proposed KEIP, a subset of KEIP Participants (twelve (12) key employees) will be entitled to an incremental award tied directly to the recoveries for the Term Lenders in recognition of their integral role and ability to drive value in the Marketing Process.

### D.      Lease Rejection Motion

On February 11, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 6) seeking authority to (i) reject certain unexpired leases of nonresidential real property and related subleases in (a) St. Paul, Minnesota; Houston, Texas; and Maryland Heights, Missouri as of the Commencement Date and (b) Fort Worth, Texas; Irving, Texas; and Palm Beach Gardens, Florida as of February 28, 2019; and (ii) abandon certain property in connection therewith. The Bankruptcy Court granted this motion at the second day hearing held on March 14, 2019 (ECF No. 204).

On March 28, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 320) seeking authority to (i) reject a certain unexpired lease of nonresidential real property in Rapid City, South Dakota as of April 5, 2019 and (ii) abandon certain property in connection therewith. The Bankruptcy Court granted this motion at the hearing held on April 11, 2019 (ECF No. 481).

### E.      ~~C.~~ Bar Date

On February 22, 2019, the Bankruptcy Court entered an order, which, among other things, (i) established April 1, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) established August 10, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) established the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedule as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) established the later of (y) the General Bar Date or the Governmental Bar Date, as applicable, and (z) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases.

WEIL:\97028542\2\41703.0010

On March 27, 2019, the Bankruptcy Court entered an order which extended the General Bar Date to April 25, 2019, at 5:00 p.m., prevailing Eastern Time (ECF No. 272).

On May 2, 2019, the Bankruptcy Court entered an order further extending the General Bar Date to June 3, 2019 at 5:00 p.m., prevailing Eastern Time for consumer borrowers (i.e., individual borrowers whose home mortgage loans (including reverse mortgages) are or were originated, serviced, or owned by one or more of the Debtors) (ECF No. 496).

## F.    ~~D.~~ Appointment of the Creditors' Committee

On February 27, 2019, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the ~~Office of the United States Trustee for Region 2 (the "~~U.S. Trustee~~")~~ pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases (ECF No. 127).

The members of the Creditors' Committee are Safeguard Properties Managm~~me~~ent, LLC, Wilmington Savings Fund Society, FSB, Lee Kamimura, ISGN Solutions, Inc., Black Knight Financial Technology Solutions, LLC, Cognizant Technology Solutions, and Deutsche Bank National Trust Company as RMBS Trustee.

The Creditors' Committee retained Pachulski Stang Ziehl & Jones LLP and Rich Michaelson Magaliff, LLP as its attorneys and Goldin ~~&~~ Associates~~,~~ LLC as its financial advisor.  On April 22, 2019, the U.S. Trustee appointed two additional members to the Creditors' Committee: Stephen Kulzyck and Sarah White and Jose Martinez.  Subsequently, these two (2) individuals resigned from the Creditors' Committee.

## G.    Appointment of the Consumer Creditors' Committee

On May 2, 2019, the Official Committee of Consumer Creditors (the "**Consumer Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent the interests of consumer creditors in the Chapter 11 Cases (ECF No. 498).  The Creditors' Committee did not oppose the appointment of the Consumer Creditors' Committee in these Chapter 11 Cases.

The members of the Consumer Creditors' Committee are Stephen Kulzyck, Jose Martinez, LeRon Harris, Melinda Hopkins, and D.C. Randall.  Four of the five members are represented by counsel for non-profit legal services organizations or legal aid entities.  On May 6, 2019, the Consumer Creditors' Committee retained Quinn Emanuel Urquhart & Sullivan, LLP as its attorneys.

On May 8, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Disbanding the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limiting the Scope of such Committee and Capping the Fees and Expenses which may be Incurred by such Committee* (ECF No. 522).  The motion will be heard by the Bankruptcy Court on May 14, 2019 at 11:00 a.m. prevailing Eastern Time.

### H.    Consumer Creditors' Committee's Position With Regard to Treatment of Consumer Borrowers' Claims in the Sale Process and Under the Plan

The Consumer Creditors' Committee has requested that the Debtors include the following language in this Disclosure Statement; however, its inclusion should not be conceived as, nor is it, an endorsement by the Debtors of the position of the Consumer Creditors' Committee.

Upon retaining counsel, the Consumer Creditors' Committee immediately engaged in discussions with the Debtors regarding its concerns about the treatment of consumer creditors under the Plan and the consumer-related disclosures in the Disclosure Statement.  The Consumer Creditors' Committee represents the interests of all consumer creditors in these cases who have claims against the Debtors.  Such claims include affirmative claims for violation of state and federal laws, claims on account of misstated and inflated accounts, and other claims in connection with their mortgages in which the Debtors hold an interest (including ownership, servicing interests, or otherwise) and may be subject to the sale contemplated by the Plan.  The Consumer Creditors' Committee's position is that the proposed Plan cannot be confirmed unless claims held by consumer borrowers in connection with their mortgages (both against any of the Debtors and any non-debtor third parties) are fully preserved, and may be brought against any purchaser of the Debtors' assets associated with such claims.

Specifically, the Consumer Creditors' Committee agrees with the U.S. Trustee's position that section 363(o) of the Bankruptcy Code prohibits a free and clear sale of any interests associated with the consumer creditor claims, that such a sale cannot be effectuated without preserving the consumer creditors' claims and defenses, and that any purchaser of assets must be subject to such claims and defenses.  And even notwithstanding the application of section 363(o), the Consumer Creditors' Committee maintains that any reorganization transaction or sale (whether through a Plan or otherwise) cannot ratify the validity, authenticity, or accuracy of any borrower account records, and any Plan must preserve consumer creditors' rights to challenge misstated amounts under their accounts.  Under section 541 of the Bankruptcy Code, for example, the Debtors cannot include in any sale, under the Plan or otherwise, assets that are not property of the estate.  Insofar as a sale under the Plan purports to include amounts due that are inappropriately misstated or inflated and to which the Debtors do not have a legal or equitable interest, such a sale should be denied by this Court.

The Consumer Creditors' Committee also submits that notwithstanding any proposed free and clear sale, discharge, or release granted under the Plan, the Plan cannot discharge any setoff claims or recoupment rights or other defenses of the consumer creditors and cannot effectuate any sale free and clear of such setoff rights or recoupment rights or other defenses.  Such rights include the right to commence litigation, or to file counterclaims or cross-claims, on account of claims asserting statutory and/or common law claims contesting the status of their account, application of payments, escrow accounting (including disbursements), or disputing any fees, charges, expenses, corporate advances of any nature, and seeking compensation for all damages and attorneys' fees that would otherwise be recoverable.

Moreover, the Consumer Creditors' Committee questions the legal basis for certain Final OCB Orders entered in these chapter 11 cases that appear to suggest that the automatic stay applies to any rights of recoupment of any of the consumer borrowers (including, purportedly, counterclaims or cross-claims that arise under the same transaction as the amounts owed by the consumer borrower to the Debtors).  In the Consumer Creditors' Committee's view, these orders, through their vague and restrictive language and improper application of the automatic stay to recoupment rights (which include, among other things, the right to file a counterclaim for affirmative relief or to recover legal fees that arise from defending a foreclosure action or correcting a misstated and inflated account) have caused significant confusion among the Consumer Creditors' Committee's constituents.  As such, the Consumer Creditors' Committee is considering a motion for reconsideration of the Final OCB Orders to ensure that the automatic stay

applies only to the extent appropriate under the Bankruptcy Code.  The Debtors will oppose any such motion.

Finally, the Consumer Committee is concerned that notice to consumer borrowers in these cases has been inadequate and, as such, consumer borrowers' claims cannot be discharged under any Plan under established Second Circuit law.  In addition to the above concerns, the Consumer Creditors' Committee reserves its rights to object to the Plan on any other basis, including any purported release of any consumer creditor claims or defenses against any non-debtors parties, including any purchaser of any of the Debtors' assets.

The Consumer Creditors' Committee intends to participate constructively in these chapter 11 proceedings to protect these consumer creditor rights, and hopes to have the Debtors' cooperation, including honoring the Consumer Creditors' Committee's rights to the same information as the Creditors' Committee and other parties in interest with regard to the sale of the Debtors' assets.  Access to this information is vital for the Consumer Creditors' Committee to appropriately evaluate the effect of any sale on consumer rights and to potentially resolve issues related to any such sale with the Debtors.

## I.    ~~E.~~ Statements and Schedules, and Rule 2015.3 Financial Reports

~~[Reserved]~~

On March 27, 2019, the Debtors each filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") (ECF Nos. 286–313).  The Schedules and Statements, as amended will be incorporated into the Disclosure Statement by reference.  The Debtors intend to file a Rule 2015.3 financial report by May 9, 2019.

## J.    ~~F.~~ Litigation Matters

In the ordinary course of business, the Debtors are defendants in, or parties to, pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants.  Many of these actions and proceedings are based on alleged violations of consumer protection laws governing the Company's servicing and origination activities, and in certain instances, claims for substantial monetary damages are asserted against the Company.  The Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings.  In connection with formal and informal inquiries, the Company receives numerous requests in connection with various aspects of the Company's activities.

### 1.    Courtney Elkin, *et al*. vs. Walter Investment Management Corp., *et al*.

A federal securities fraud complaint was filed against the Company, George M. Awad, Denmar J. Dixon, Anthony N. Renzi, and Gary L. Tillett on March 16, 2017.  The case, captioned *Courtney Elkin, et al. vs. Walter Investment Management Corp., et al.*, Case No. 2:17-cv-02025-JCJ, is pending in the Eastern District of Pennsylvania.  An amended complaint was filed on September 15, 2017 by the court-appointed lead plaintiff, and the amended complaint sought monetary damages and asserted claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 during a class period alleged to begin on August 9, 2016 and conclude on August 1, 2017.  From December 1, 2017 to February 9, 2018, the action was stayed pursuant to section 362 of the Bankruptcy Code, and on July 13, 2018, the parties entered into a formal settlement agreement to settle the action for $2.95 million, subject to notice to the alleged class and court approval.  On December 18, 2018, the court approved the settlement on a final basis.  The settlement was paid by the Company's directors' and officers' insurance carrier.

### 2.    Michael E. Vacek, Jr., *et al*. vs. George M. Awad, *et al*.

A stockholder derivative suit was filed against current and former members of the Board on June 22, 2017.  The case, captioned *Michael E. Vacek, Jr., et al. vs. George M. Awad, et al.*, Case No. 2:17-cv-02820-JCJ, is pending in the Eastern District of Pennsylvania.  An amended complaint was filed on September 13, 2017, which sought monetary damages for the Company and equitable relief and asserted a claim for breach of fiduciary duty arising out of:  (i) a material weakness in the Company's internal controls over financial reporting related to operation processes associated with Ditech Financial's default servicing activities; (ii) an accounting error that caused an overstatement of the value of the Company's deferred tax assets; and (iii) subpoenas seeking documents relating to RMS's origination and underwriting of reverse mortgages and loans.  On October 17, 2018, the parties entered into a formal settlement agreement to settle the action based on the Company's adoption of certain corporate governance measures.  On December 3, 2018, the court issued an order preliminarily approving the proposed settlement, and on February 1, 2019, the court approved the proposed settlement on a final basis.  The Company's directors' and officers' insurance carrier has agreed to pay $257,500 in attorneys' fees to plaintiff's counsel.  The implementation of corporate governance measures has been stayed by the automatic stay under section 362 of the Bankruptcy Code.

### 3.    Other Litigation

As mentioned above, in the ordinary course of business, the Company is involved in numerous pending and threatened legal actions and proceedings. ~~Such litigation is~~, as well as in routine proceedings such as foreclosures, evictions, title disputes, collection actions, and borrower bankruptcy cases.  All actions and claims interposed against the Debtors in such actions are stayed pursuant to section 362 of the Bankruptcy Code during the pendency of the Chapter 11 Cases, subject to the limited stay relief granted under the ~~Interim~~Final OCB Orders.

The Debtors are involved in over one hundred (100) actions ("**Third Party Actions**") in which they owe indemnification and/or defense obligations to non-Debtor third parties including without limitation (a) private investors and securitization trustees; (b) Fannie Mae; (c) Freddie Mac; and (d) Mortgage Electronic Registration System, Inc. (collectively, "**Indemnified Parties**").  The Third Party Actions fall into a number of categories, including commercial litigation and claims, cross-claims, third-party claims, and counterclaims by various parties for monetary damages against the Debtors and/or Indemnified Parties.

### K.    ~~G.~~ Marketing Process and Bidding Procedures

In support of the Debtors' Marketing Process, the Debtors and their advisors have developed bidding and auction procedures for the marketing and sale of their assets in these Chapter 11 Cases in an orderly and value maximizing manner (the "**Bidding Procedures**").  Under the Bidding Procedures, parties may submit bids for the purchase and sale of any and all of the Debtors' assets in accordance with the terms of the Bidding Procedures.  The Bidding Procedures are designed to promote a competitive and expedient bidding process, and are intended to generate the greatest level of interest in the Debtors' assets.  The Bidding Procedures are intended to provide the Debtors with flexibility to solicit proposals, negotiate transactions, provide stalking horse protections (if necessary and appropriate), hold an auction (if necessary and appropriate) and consummate a Sale Transactions for the highest and best value, all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review and consider proposed transactions.   The Bidding Procedures are filed at ECF No. [●]147.   Below are the proposed dates related to the Bidding Procedures.

| Key Event | Proposed Date |
|---|---|
| Deadline to Submit Non-Binding Indications of Interest | No later than ~~April 15~~May 6, 2019 at 4:00 p.m. (ET) |
| Deadline to Submit Bids | May ~~6~~28, 2019 at 4:00 p.m. (ET) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | May ~~10~~29, 2019 at 4:00 p.m. (ET) |
| Auction, if necessary, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | May 30/May 31~~3~~ ~~,~~2019 at 10:00 a.m. (ET) |
| Deadline to File Notice of (a) Successful Bid and Back-Up Bid and (b) Identity of Successful Bidder and Back-Up Bidder | ~~One (1) business day following conclusion of the Auction~~June 3, 2019 at 4:00 p.m. (ET) |
| Deadline to File Objections to ~~(a) ~~Sale Transaction~~, (b) Cure Costs, and (c) Adequate Assurance of Future Performance~~ or Asset Sale Transaction ~~(same as Plan Confirmation Objection Deadline)~~ | ~~May 24~~June 10, 2019 at 4:00 p.m. (ET) |
| Sale ~~and Confirmation ~~Hearing | June ~~5~~20, 2019 ~~at 11:00 a.m. (ET)~~ |

**L.      U.S. Trustee's Objections to Disclosure Statement**

On April 5, 2019, the U.S. Trustee filed an objection to the disclosure statement (ECF No. 348).  With regards to section 363(o) claims, the U.S. Trustee requested that the Plan explicitly provide that, in the event of a sale of the Debtors' assets under section 363 of the Bankruptcy Code, the successor in interest to the Debtors must be liable for consumer claims.  The U.S. Trustee further stated that to the extent the Debtor reorganizes without a sale, analogous language should be incorporated into the Plan.  (ECF No. 348, ¶ 40).  The Debtors disagree with the U.S. Trustee's position concerning section 363(o) of the Bankruptcy Code.  The Debtors' position is that section 363(o) does not apply to asset sales under the Plan.

With regard to releases, the U.S. Trustee argued that the scope of the Plan's release provisions are not adequately explained and stated.  "This Disclosure Statement needs a simple, clear, plan-English explanation of how the Plan's release, discharge, and injunction provisions will affect claims, particularly consumer claims.  To the extent claims may be unaffected by the discharge and ride through the bankruptcy, this needs to be explained.  Any explanation should be appropriately tailored to a creditor body that may not understand legal jargon."  (ECF No. 348, ¶ 42-44).

The third party releases provided in the Plan are consensual in nature.  As a result, consumer borrowers are unaffected by and not subject to the releases in section 10.6 of the Plan.  Additionally, the Plan has been amended to include a new class of Borrower Non-Discharged Claims that addresses the discharge of certain consumer claims.  A simplified description of the types of borrower claims in this class can be found in Schedule A to the Plan.

As reflected therein, the claims identified on Schedule 1 will not be discharged in a Reorganization Transaction. In a sale transaction, the Debtors are not requesting a discharge. However, any recovery to consumer borrowers (just like all creditors) will be dictated by the amount of proceeds received from the sale, which will be distributed in accordance with the priority scheme under the Bankruptcy Code. In addition, potential buyers may choose to assume certain liabilities which will be identified in an asset purchase agreement. The Debtors have prepared a notice tailored to consumer borrowers that will provide such parties with relevant information about the confirmation hearing and the Plan, including its release and discharge provisions. The notice also provides instructions to access the webpage created by Epiq designed specifically for consumer borrowers. The notice includes a plain-English explanation of Borrower Non-Discharged Claims. A copy of the proposed notice is annexed to the revised proposed *Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, and (V) Granting Related Relief.*

### M.      Plan Settlement Negotiations and the Global Plan Settlement

The Debtors filed their initial chapter 11 plan on March 5, 2019 (ECF No. 145) (the "**Initial Plan**"), filed an amended plan of reorganization on March 28, 2019 (ECF No. 314) (the "**Amended Plan**") and subsequently filed the April 26, 2019 Plan on April 26, 2019, each with the support of the Term Loan Ad Hoc Group. The Creditors' Committee raised a number of formal and informal objections and issues with respect to the Initial Plan and the Debtors' restructuring, including:

- Value attributable to the Debtors' unencumbered assets and the proposed treatment of unsecured creditors and the Initial Plan and the Amended Plan;

- The treatment of intercompany claims and interests; and

- The releases and exculpations contemplated by the Initial Plan and the Amended Plan.

The Debtors, the Creditors' Committee, and the Term Loan Ad Hoc Group, with the assistance of their advisors, engaged in vigorous, arm's-length negotiations to resolve all their respective issues on a consensual basis.

These negotiations were successful, and the modifications to the Initial Plan described herein resolve each of those issues and objections of the Creditors' Committee (collectively, the "**Global Plan Settlement**"). In particular, the Global Plan Settlement significantly improves recoveries for General Unsecured Claims under the Plan, compared to the Initial Plan. These improved recoveries are being carved out of the collateral securing Term Loan Claims by agreement of the Term Loan Ad Hoc Group. Given the Debtors' valuation, recoveries of this size to general unsecured creditors would be impossible absent the Global Plan Settlement. In particular, the modified General Unsecured Claim recoveries provided on account of the Global Plan Settlement include:

- On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust: (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated

45

filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

- On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

- On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

- The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing). The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

- On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

- On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

- The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

- The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

46

- On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

- On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

- On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

- As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

## V.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as Exhibit A.

### A.    Administrative Expenses and Priority Claims

#### 1.    Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

47

2.    **Treatment of Fee Claims**

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)    Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)    On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

(d)    The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

3.    **Treatment of Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at

the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### 4. Treatment of DIP Claims

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs. The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement and indemnity obligations under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision thereof to the contrary.

### 5. Restructuring Expenses

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, the Reorganized Debtors or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

## B. Classification of Claims and Interests

### 1. Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2. Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation

of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

### 3. ~~2.~~ Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | ~~Go Forward Trade~~Borrower Non-Discharged Claims | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired~~-~~) | Reorganization Transaction (Presumed to Accept)<br><br>~~No~~Sale Transaction (Deemed to ~~r~~Reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

### 4. ~~3.~~ Special Provision Governing Unimpaired Claims

Nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5. ~~4.~~ Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### C.    Treatment of Claims and Interests

### 1.    Priority Non-Tax Claims (Class 1)

(a)    *Classification*: Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

### 2.    Other Secured Claims (Class 2)

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

### 3.    Term Loan Claims (Class 3)

(a)    *Classification*:  Class 3 consists of Term Loan Claims.

(b)    *Allowance*:  The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus

51

amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement. The Prepetition Administrative Agent and the Term ~~Loan~~ Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)    *Treatment*: Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan).

(ii)    **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d)    *Voting*: Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.    **Second Lien Notes Claims (Class 4).**

(a)    *Classification*: Class 4 consists of Second Lien Notes Claims.

(b)    *Treatment*: The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, ~~on the Effective Date,~~ such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law ~~(subject to the Intercreditor Agreement)~~ after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in

52

full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    **If the Reorganization Transaction occurs,** such holder's Pro Rata share of the Second Lien Notes Claims shall not receive or retain any property under the Plan on account of such ClaimsRecovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

(iii)    **If either the Sale Transaction or the Reorganization Transaction occurs,** on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 of the Planhereof) without further action by or order of the Bankruptcy Court.

(c)    *Voting*:  Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

**5.    General Unsecured Claims (Class 5)**

(a)    *Classification*:  Class 5 consists of General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs,** on the Effective Date, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    **If the Reorganization Transaction occurs,** holders of General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims.such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)    *Voting*:  Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

WEIL:\97028542\2\41703.0010

**6.** ~~Go-Forward Trade~~**Borrower Non-Discharged** Claims (Class 6)

(a)     *Classification*:     Class ~~6~~7 consists of ~~Go-Forward Trade~~Borrower Non-Discharged Claims.

(b)     *Treatment*:   Except to the extent that a holder of an Allowed ~~Go-Forward Trade~~Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed ~~Go-Forward Trade~~Borrower Non-Discharged Claim, each such holder thereof shall receive~~, on the Effective Date or as soon as practicable thereafter, with a carve-out from the collateral (or value of such collateral) securing the Term Loan Claims, distribution in Cash in an amount equaling not less than a percentage of such holder's Claim to be identified in the solicitation documents, subject to an aggregate cap to be agreed to by the Debtors and the Requisite Term Lenders, which shall be identified in the solicitation documents; provided, that any further payments in excess of such cap on account of an Allowed Go-Forward Trade Claim shall be subject to the consent of the Requisite Term Lenders.~~:

(i)     **If the Sale Transaction occurs**, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.

(ii)     **If the Reorganization Transaction occurs**, on or after the Effective Date, as a carve-out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan.

(c)     *Voting*:

(i)     ~~(c)   *Voting*:~~**If the Sale Transaction occurs**, Class 6 is Impaired, and holders of ~~Go-Forward Trade~~Borrower Non-Discharged Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(ii)     **If the Reorganization Transaction occurs**, Class 6 is Unimpaired, and holders of Borrower Non-Discharged Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of ~~Go-Forward Trade~~Borrower Non-Discharged Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such ~~Go-Forward Trade~~Borrower Non-Discharged Claims.

**7.     Intercompany Claims (Class 7)**

(a)     *Classification*:  Class 7 consists of Intercompany Claims.

(b)     *Treatment*:   On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their

WEIL:\97028542\2\41703.0010

respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

(c)    *Voting*:    Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

### 8.    Intercompany Interests (Class 8)

(a)    *Classification*:  Class 8 consists of Intercompany Interests.

(b)    *Treatment:*  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests.

(c)    *Voting*:  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

### 9.    Parent Equity Interests (Class 9)

(a)    *Classification*:  Class 9 consists of Parent Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of an Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of ~~Parent Equity Interest~~Ditech common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of ~~DHCP~~Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements. The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of ~~DHCP's~~Ditech's common stock and suspending ~~DHCP's~~Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest~~s~~ (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of ~~DHCP~~Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that ~~DHCP's~~Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further

WEIL:\97028542\2\41703.0010

force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) ~~T~~the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)    **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

10.    **Subordinated Securities Claims (Class 10)**

(a)    *Classification*: Class 10 consists of Subordinated Securities Claims.

(b)    *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

D.    **Means for Implementation**

1.    **No Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

2.    **Compromise and Settlement of Claims, Interests, and Controversies**

(a)    Pursuant to section~~s 363 and~~ 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan and the Global Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well

WEIL:\97028542\2\41703.0010

as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee, the Second Lien Noteholders, and the Consenting Term Lenders (the "**Global Settlement**").  The following constitutes the provisions and conditions of the Global Settlement:

(i)    On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors.  Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(ii)    On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)    On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)    The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing).  The Reorganized Debtors and the Plan Administrator, as applicable,

57

WEIL:\97028542\2\41703.0010

shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)    On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)    On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

(vii)    The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

(viii)    The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

(ix)    On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(x)    On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

(xi)    On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xii)    As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with

58

or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

### 3.        Marketing Process

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale ~~Transaction, Master Servicing~~ Transaction, and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae.  The Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction, ~~Master Servicing Transaction,~~ or Asset Sale Transaction.  The Debtors, the Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders.  The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

### 4.        Election Notice.

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "***Election Date***"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "***Electing Term Lenders***") shall deliver a notice (the "***Election Notice***") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "***Elected Transaction***"), being a:  (i) Reorganization Transaction~~, or~~ (ii) ~~Master Servicing Transaction (as part of a Reorganization Transaction), or (iii)~~ Sale Transaction, and, if applicable, ~~(iv~~(iii) in connection and together with an election of (i)~~,~~ or (ii)~~, or (iii)~~, any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i)~~,~~ or (ii)~~, or (iii)~~.

### 5.        Sources of Consideration for Plan Distributions

    (a)        ***Sale Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

    (b)        ***Reorganization Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

### 6.        Sale Transaction

    (a)        *Closing of Sale Transaction (If Any)*

    On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant to Section 1141 of the

59

Bankruptcy Code, be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

(b)    *Wind Down and Dissolution of the Debtors*

(i)    The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims; (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims and GUC Recovery Trust Causes of Action.

(iii)    Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(iv)    Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(v)    The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

60

(vi)      The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

**7.      Reorganization Transaction.**

(a)      If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth in the Plan.

(a)      (b) *Amended and Restated Credit Facility*

(i)      On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

(ii)      Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents. All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties. For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

WEIL:\97028542\2\41703.0010

(iii)     The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(b)     ~~(c)~~ *Exit Warehouse Facilities*

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(c)     ~~(d)~~ *Authorization and Issuance of New Plan Securities*

(i)     On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action. All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)     The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(d)     ~~(e)~~ *Continued Corporate Existence*

(i)     The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan.

(ii)     On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(e)     ~~(f)~~ *Officers and Board of Directors*

(i)     Upon the Effective Date, the New Board shall consist of five (5) directors. Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("**CEO**") of Reorganized DHCP, who shall be Thomas F. Marano. The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on

WEIL:\97028542\2\41703.0010

and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(f)    ~~(g)~~ *Reorganized Debtors' Authority*

(i)    The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

~~(h) *Master Servicing Transaction*~~

~~(i) On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Master Servicing Agreements without the need for any further corporate action and without further action by the holders of Claims or Interests.~~

**8.    Fannie Mae; Freddie Mac; Ginnie Mae**

(a)    *Fannie Mae.*  Notwithstanding anything in the Disclosure Statement, the Plan or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to Fannie Mae shall not be transferred by the Debtors to a Successful Bidder (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without

WEIL:\97028542\2\41703.0010

limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance. Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction  repayment in full of the Cure Amounts; or (3) such other treatment of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

    (b)    *Freddie Mac.*

        (i)    Notwithstanding ~~any other provision of the Plan or any~~anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the~~se~~ Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "**Servicing Collateral**" (as defined and referenced in, and except as otherwise expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any

WEIL:\97028542\2\41703.0010

other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)     Notwithstanding ~~any other provision of the Plan or any~~anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the~~se~~ Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the Debtors to a Successful Bidder (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; ~~and,~~ (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)     *Ginnie Mae.*  Notwithstanding anything in the Plan to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to a Successful Bidder without the express prior written consent of Ginnie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion.  The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

9.     **Employee Matters**

(a)     Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "**Employee Arrangements**").  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)     Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)     For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)     In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

## 10.     Effectuating Documents; Further Transactions

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)     Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

66

(c)      In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)      The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, and the Global Settlement, including the creation of the GUC Recovery Trust, in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)      All matters provided for in the Plan involving the corporate structure of the Debtors. Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

## 11.      Section 1145 Exemption

(a)      The offer, issuance, and distribution of the New Common Stock hereunder to holders of the Term Loan Claims under Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)      The New Common Stock shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock, (iv) applicable regulatory approval, and (v) the Stockholders Agreement.

## 12.      Cancellation of Existing Securities and Agreements

(a)      Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)      Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes

WEIL:\97028542\2\41703.0010

Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  In a Reorganization Transaction, notwithstanding anything to the contrary in the Plan, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)    Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

(d)    Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)    Notwithstanding anything to the contrary in the Plan, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

(f)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction,

68

releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 13.    Cancellation of Liens

Except as otherwise specifically provided in the Plan, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 14.    Subordination Agreements

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreement's terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

### 15.    Nonconsensual Confirmation

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 16.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 17.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 18.    Separability

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

**19.    GUC Recovery Trust**

(a)    *Creation and Governance of the GUC Recovery Trust.*  On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19.  The GUC Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement.  Other rights and duties of the GUC Trustee shall be as set forth in the GUC Recovery Trust Agreement.  After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)    *GUC Trustee and GUC Recovery Trust Agreement.*  The GUC Recovery Trust Agreement generally will provide for, among other things:  (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) make distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement.  The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust.  Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)    *Cooperation of Reorganized Debtors.*  Subject to subsection (d) of this Section 5.19, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, upon reasonable notice, shall provide reasonable cooperation with the GUC Trustee in the administration of the GUC Recovery Trust, including providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder.  The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Recovery Trust, including, providing reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims, in each case, the GUC Recovery Trust agrees to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses.  The collection, review, and preservation of

WEIL:\97028542\2\41703.0010

documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Recovery Trust.

(d)     *Preservation of Privilege.*  The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets.  The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)     *GUC Recovery Trust Assets.*  The GUC Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement.  From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Trustee deems necessary.

(f)     *GUC Recovery Trust Fees and Expenses.*  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.  The Reorganized Debtors or the Wind Down Estates, as applicable, shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)     *Tax Treatment.*  In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims and the GUC Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund"

WEIL:\97028542\2\41703.0010

governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims and GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)    *Non-Transferability of Interests in GUC Recovery Trust*.  Any and all interests in the GUC Recovery Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(i)    *Dissolution of the GUC Litigation Trust*.  The GUC Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement as appropriate.

(j)    *Single Satisfaction of Allowed General Unsecured Claims*.  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

### E.    Distributions

#### 1.    Distributions Generally

Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, ~~O~~one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

#### 2.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.   The Debtors, the Reorganized Debtors, ~~or~~ the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.  For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution ~~(if any),~~ in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date.~~-~~ For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the ~~Indenture~~Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the ~~applicable~~Prepetition Second Lien Notes Indenture, including, without limitation, subject to the

application of the charging lien of the ~~Indenture~~Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

### 3.    Date of Distributions

(a)    Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of ~~Article IV~~ Article IV of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors ~~or~~, the Plan Administrator, or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

### 4.    Disbursing Agent

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records. The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

### 5.    Rights and Powers of Disbursing Agent

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing

Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 6.    Expenses of Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement.

### 7.    No Postpetition Interest on Claims

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

### 8.    Delivery of Distributions

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)    Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture.  All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture.  To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)    As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and

such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan. All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

### 9.       Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10.      Unclaimed Property

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, or Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors or, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 11.      Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12.      Manner of Payment under Plan

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, or the Plan Administrator, or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 13.      Satisfaction of Claims

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 14.    Fractional Stock and Notes

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors, Wind Down Estates, nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock.

### 15.    Minimum Cash Distributions

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

### 16.    Setoffs and Recoupments

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 17.    Allocation of Distributions between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 18.    No Distribution in Excess of Amount of Allowed Claim

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 19.    Withholding and Reporting Requirements

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property

76

to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors or Wind Down Estates or GUC Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8. If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. If such request is made by the GUC Trustee, or such other Entity designated by the GUC Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Trustee, the GUC Recovery Trust, or its respective property.

## 20.    Hart-Scott-Rodino Antitrust Improvements Act

Any New Common Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

### F.    Procedures for Disputed Claims

#### 1.    Objections to Claims

The Debtors, the Reorganized Debtors, or the Plan Administrator, or the GUC Trustee, as applicable, shall exclusively be entitled to object to Claims. After the Effective Date, the Reorganized Debtors or, the Plan Administrator, or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause. The expiration of such period shall not limit or affect the Debtors', the Reorganized Debtors', or the Plan Administrators', or GUC Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

2.      **Resolution of Disputed Administrative Expenses and Disputed Claims**

On and after the Effective Date, the Debtors, (a) the Reorganized Debtors, or the Plan Administrator, as applicable, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Recovery Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court. The Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the GUC Trustee shall cooperate with respect to any objections to Claims that seek to convert Claims into General Unsecured Claims or General Unsecured Claims into other senior Claims, and the Debtors' rights and defenses to any such objections are fully preserved.

3.      **Payments and Distributions with Respect to Disputed Claims**

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

4.      **Distributions after Allowance**

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

5.      **Disallowance of Claims**

Except to the extent otherwise agreed to by the Debtors, the Reorganized Debtors, or the Plan Administrator, or GUC Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, or the Plan Administrator, or the GUC Trustee, as applicable.  All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

6.      **Estimation of Claims**

The Debtors, the Reorganized Debtors, or the Plan Administrator, or the GUC Trustee as to General Unsecured Claims, as applicable, may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the

Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, ~~or~~ the Plan Administrator, or the GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### 7.    No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 8.    Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 9.    Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 10.    Insured Claims

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### G.    Executory Contracts and Unexpired Leases

#### 1.    General Treatment

(a)    As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of the Plan; (v) is identified in section 8.4 of the Plan; ~~or~~ (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Solely with

WEIL:\97028542\2\41703.0010

respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected by the Successful Bidder in accordance with the applicable purchase agreement.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Successful Bidder, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.    Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Successful Bidder, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

### 2.    Determination of Assumption Disputes and Deemed Consent

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**.  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be

heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 3.    Rejection Damages Claims

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims). Such Claim shall be forever barred and shall not be enforceable against the Debtors or, the Reorganized Debtors, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, no by the later than of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### 4.    Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, all insurance policies pursuant to which the Debtors have any obligations in effect as of; on the Effective Date shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance

WEIL:\97028542\2\41703.0010

policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) be rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

### 5.     Intellectual Property Licenses and Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted in the Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 6.     Tax Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted in the Plan, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 7.     Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of

WEIL:\97028542\2\41703.0010

the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

**8.      Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

**9.      Reservation of Rights**

(a)      The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)      Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

(c)      Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

**H.      Conditions Precedent to Confirmation of Plan and Effective Date**

WEIL:\97028542\2\41703.0010

1.      **Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)      the Disclosure Statement Order shall have been entered;

(b)      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)      the RSA shall not have been terminated and shall be in full force and effect; and

(d)      the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

2.      **Conditions Precedent to Effective Date**

(a)      The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

(i)      the Confirmation Order (in form and substance reasonably acceptable to the Creditors' Committee) shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)      an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)      all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(v)      the ~~RSA~~Creditors' Committee shall not have ~~been terminated and shall be in full force and effect; and~~objected to or taken any other action that was inconsistent with or that would reasonably be expected to have prevented, interfered with, delayed, or impeded the confirmation and consummation of the Plan or approval of the Global Settlement; and

(vi)      all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

WEIL:\97028542\2\41703.0010

(b)      The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)      the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)      the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement, and, if applicable, the Master Servicing Agreements, shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)      The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)      the applicable purchase agreement(s) shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(d)      Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### 3.      Waiver of Conditions Precedent

(a)      Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Section 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; provided that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Creditors' Committee.

WEIL:\97028542\2\41703.0010

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**4.    Effect of Failure of a Condition**

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

**I.    Effect of Confirmation of Plan**

**1.    Vesting of Assets**

(a)    On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates shall vest in the Reorganized Debtors or the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, Amended and Restated Credit Facility Documents, the Exit Warehouse Facilities Documents, or the Exit Working Capital Facility Documents.    On and after the Effective Date, the Reorganized Debtor may take any action, including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan.    Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)    On the Effective Date and solely with respect to the Sale Transaction, all property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, and the applicable purchase agreement.

**2.    Binding Effect**

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

**3.    Discharge of Claims and Termination of Interests**

In a Reorganization Transaction, Uupon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any

representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date; provided that Borrower Non-Discharged Claims shall not be discharged.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 4.    Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.    Injunction

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust or the property of any of the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the ~~Released Parties or the~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust or against property or interests in property of any of the ~~Released Parties~~Debtors, the Reorganized Debtors, or the GUC Recovery Trust, except as**

WEIL:\97028542\2\41703.0010

contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

(d)    The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

6.    Releases

(a)    Estate Releases

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, ~~and~~ the Wind Down Estates, and the GUC Recovery Trust from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, and the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(a) ~~of the Plan~~ shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order.

(b)    Third-Party Releases

WEIL:\97028542\2\41703.0010

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

(i)        the holders of Impaired Claims who voted to accept the Plan;

(ii)       the Consenting Term Lenders;

(iii)      holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots; and

(iv)       the Creditors' Committee and each of its members in their capacity as such; and

(v)       (iv) with respect to any Entity in the foregoing clauses (i) through (iiiiv), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.  The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

7.        Exculpation

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection

**with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 8.      Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Trustee, solely with respect to Allowed General Unsecured Claims) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 9.      Retention of Causes of Action/Reservation of Rights

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code. The Reorganized Debtors or the GUC Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

### 10.      Solicitation of Plan

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on

90

account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 11.  Corporate and Limited Liability Company Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents; (iv) the Exit Working Capital Facility Documents; (v) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction; ~~and~~ (vi) the GUC Recovery Trust Agreement; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 10.11 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### J.  Retention of Jurisdiction

#### 1.  Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims and Restructuring Expenses;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Global Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)    to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)    to resolve disputes concerning Disputed Claims or the administration thereof;

(o)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)    to enter one or more final decrees closing the Chapter 11 Cases;

(q)    to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(r)    to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

WEIL:\97028542\2\41703.0010

(s)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)    to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 2.    Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### K.    Miscellaneous Provisions

### 1.    Payment of Statutory Fees

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

### 2.    Substantial Consummation of the Plan

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.    Plan Supplement

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

### 4.    Request for Expedited Determination of Taxes

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

### 5.    Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other

93

instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness  by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 6.      Amendments

(a)      *Plan Modifications*.  Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to ~~this~~the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Creditors' Committee, solely as it pertains to the Global Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)      *Other Amendments*.  Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

### 7.      Effectuating Documents and Further Transactions

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8.      Revocation or Withdrawal of Plan

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an

amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity.  This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

### 9.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Creditors' Committee and each professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Creditors' Committee.

### 10.    Severability of Plan Provisions

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 11.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

### 12.    Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

WEIL:\97028542\2\41703.0010

### 13.    Dates of Actions to Implement the Plan

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 14.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 15.    Deemed Acts

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 16.    Successor and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

### 17.    Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 18.    Exhibits to Plan

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 19.    Notices

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors or the Reorganized Debtors:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
Email: JHaas@ditech.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
        sunny.singh@weil.com

(b)    If to the Consenting Term Lenders:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 60654
Attn: Patrick J. Nash Jr., P.C.
Email:  patrick.nash@kirkland.com
Attn: John R. Luze
Email: john.luze@kirkland.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

# VI.
## VALUATION ANALYSIS

As described above, the Debtors are presently engaged in the Marketing Process.  The Debtors believe that the Marketing Process is the best method of valuing their business as it allows the market to speak as to their value.  The Marketing Process is a comprehensive and arm's length process with the goal of identifying counterparties for a potential transaction.  Accordingly, to ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims are not, at this time, being disclosed herein and the Debtors are not filing a valuation analysis.  *See* Section 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282).  The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing.  Further, if necessary, the

Debtors will file, no later than the date that the Plan Supplement is filed, a valuation analysis and will serve notice thereon on holders of Claims in the Voting Class as promptly as practicable upon filing.

## VII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The issuance of and the distribution under the Plan of the New Common Stock shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, the New Common Stock will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer. Further, based on the legislative history of Section 1145 of the Bankruptcy Code, a creditor who owns 10% or more of the voting securities of a reorganized debtor and/or has the right to appoint a director to the board of directors of a reorganized debtor may be presumed to be a control person, and therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of New Common Stock issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.  In order to preserve the ability to utilize tax attributes following the Effective Date, the charter, bylaws, and other organizational documents, as applicable, of the Reorganized Debtors may restrict certain transfers of the New Common Stock.

WEIL:\97028542\2\41703.0010

_Legends_.  To the extent certificated, certificates evidencing the New Common Stock held by holders of 10% or more of the outstanding New Common Stock, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SHARES OF NEW COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE DEBTOR RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VIII.~~VII.~~
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors (including the Reorganized Debtors) and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or equity interests who are unimpaired or deemed to reject the Plan and does not address the consequences of a Sale Transaction.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury ~~R~~regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the "Medicare" tax on net investment income, persons subject to special accounting rules under Section 451(b) of the Code, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquired any of the New Common Stock or New Term Loan in the secondary market, unless otherwise provided herein.  This discussion assumes that the New Common Stock and the New Term Loans will be held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.

99

You are urged to consult your own tax advisor for the U.S. federal, state, local, non-U.S., and other tax consequences applicable under the Plan.

### A.    Consequences to the Debtors

For U.S. federal income tax purposes, DHCP is a common parent of an affiliated group of corporations which files a single consolidated U.S. federal income tax return (the "**Ditech Group**"). The Debtors estimate that, as of January 1, 2019, the Ditech Group had incurred, for U.S. federal income tax purposes, a consolidated NOL (defined below) in excess of $20 million. In addition, the Ditech Group has substantial other deferred tax assets, including substantial tax basis in excess of the fair market value of its assets based upon the valuation of the Debtors. The amount of any such NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS.  As discussed below, such NOL carryforwards and other tax attributes could, depending on the treatment under section 382 of the prior ownership change which occurred in connection with the WIMC Chapter 11 Case, be subject to current limitation. In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of DHCP independent of the Plan which could adversely affect the ability to fully utilize the Ditech Group's NOLs.  In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing a protective equity trading order.

The U.S. federal income tax consequences to the Debtors with respect to the implementation of the Plan depend in part on whether the Debtors, in connection with Consenting Term Lenders, elects to consummate a potential Sale Transaction (as provided in the Restructuring Service Agreement).  Absent such an election, the Plan provides for a Reorganization Transaction in which the holders of Term Loan Claims would receive New Common Stock and New Term Loans in satisfaction of the Term Loan Claims. As discussed below, in connection with the implementation of the Plan, the Debtors expect the amount of the Ditech Group's NOL carryforwards would be eliminated, and that other tax attributes (in particular, the adjusted basis in the Debtors' assets) will be reduced.  In addition, the subsequent utilization of any loss and possibly other tax attributes remaining following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange. Because the Plan provides that holders of Term Loans will receive New Common Stock and New Term Loans, the amount of COD will depend in part on the fair market value of the New Common Stock and the issue price of the New Term Loan.  This value, and, consequently, the amount of COD that will be realized by the Debtors as a result of the Plan, cannot be determined at this time.

Under section 108 of the Tax Code, any COD of a debtor is excluded from gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD that it excluded from gross income. As noted above, the amount of COD, and accordingly the amount of tax attributes required to be reduced, cannot be determined at this time.  In general, tax attributes of the debtor will be reduced in the following order:  (a)

net operating loss ("**NOLs**") and NOL carryovers; (b) general business credit carryovers; (c) alternative minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with excluded COD income may elect first to reduce the basis of its depreciable assets.  The reduction of the debtor's tax attributes occurs at the end of the tax year for which the excluded COD income is realized, but only after the tax for the year of the debt discharge has been determined; in this way, the attribute reduction is generally effective as of the start of the year following the discharge.  If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Rregulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

## 2.        Limitation of NOL Carryforwards and Other Tax Attributes

The WIMC Chapter 11 Case resulted in an "ownership change" of the Debtors under sections 382 and 383 of the Tax Code. With respect to that restructuring, Debtors will apply one of two special rules available under section 382 of the Tax Code in connection with an ownership change resulting from a court-ordered restructuring under chapter 11.  See general discussion of section 382 rules below.  A decision regarding which of those special rules Debtors will choose for the WIMC Chapter 11 Case must be made by the Reorganized Debtors in connection with filing their 2018 federal income tax return.  Until this point in time, the Debtors have planned to apply the rule in section 382(l)(5) (as generally described below), but have not finally decided which of the rules to apply to the WIMC Chapter 11 Case; that decision will be made based on further development and analysis of relevant facts. Depending upon that decision, it is possible that Debtors' NOLs and other tax attributes may be currently subject to limitation The decision to use one or the other of these special rules under section 382 in connection with the WIMC Chapter 11 Case, or, alternatively, if no section 382 annual limitation currently applies as a resultrespect of the WIMC Chapter 11 Case will affect both the ability to use the Debtors' NOLs and other attributes from the time of the 2018 emergence as well as the availability and ability to use such NOLs and other attributes following the Effective Date. If Debtors decide to have section 382(l)(5) apply to the WIMC Chapter 11 Case, then in connection with the ownership change of the Debtors which will result from the implementation of the Plan, the Debtors' NOLs and other tax attributes (that remain) may be rendered effectively useless for all future taxable periods following the Effective Date. If instead Debtors elect to have section 382(l)(6) (as generally described below) apply to the WIMC Chapter 11 Case, then the Debtors' NOLs and other attributes would be subject to limitation from the time of the 2018 emergence, and the attributes (that remain) may be even further limited as a result of the ownership change of the Debtors which will result from the implementation of the Plan.

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (collectively, "**Pre-Change Losses**") will be subject to additional limitations under section 382 and 383 of the Tax Code.  Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD income arising in connection with the Plan.

If a corporation undergoes an ownership change, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  The Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of its Pre-Change Losses will be subject to further limitation unless an exception to the general rules of section 382 and 383 of the Tax Code applies.

WEIL:\97028542\2\41703.0010

Generally, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the sixty (60) month period following the "ownership change" (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses, the deductibility of which will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) ~~15~~fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change. It is currently uncertain whether the Ditech Group will have a net unrealized built-in loss or a net unrealized built-in gain as of the Effective Date.

<div align="center">

(a)    General Annual Limitation

</div>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month with the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.51 percent for February, 2019). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation (or the parent of the consolidated group) is generally determined immediately after (rather than before) the ownership change, but subject to certain adjustments the ("**382(l)(6) Exception**"); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any unused annual limitation may be carried forward and therefore available to be utilized in a subsequent taxable year. Where a corporation is subject to a prior annual limitation, both annual limitations apply, effectively subjecting any Pre-Change Losses which pre-date the prior ownership change to the more restrictive of the limitations.

<div align="center">

(b)    Section 382(l)(5) Bankruptcy Exception

</div>

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least ~~50~~fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). The IRS has in private letter rulings applied the 382(l)(5) Exception on a consolidated basis where the parent corporation is in bankruptcy. Generally, qualified creditors are creditors who (1) held their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and thereafter, (2) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred, or (3) in certain cases, do not become five percent (5%) shareholders of the reorganized corporation.

Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if the 382(l)(5) Exception applies, the Ditech Group's NOL carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two (2) years after the Effective Date, any further ownership change of the Ditech Group within a two-year period after the Effective Date would preclude the Ditech Group's

<div align="center">

102

</div>

utilization of any Pre-Change Losses at the time of the subsequent ownership change against future income. A future "ownership change" after such two-year period would subject the Reorganized Debtors to the general limitations under section 382._ A debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation described above (as to the prior ownership change in connection with the WIMC Chapter 11 Case, the Debtors have until the time for filing the federal income tax return for the Ditech Group for 2018 to decide about making such an election).

In order to preserve the potential to qualify for the 382(l)(5) Exception, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing certain procedures and potential restrictions on the accumulation of Claims with persons who are or will be substantial claimholders.

       (c)    Section 382(l)(6) Bankruptcy Exception

As described above, where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), the 382(l)(6) Exception will generally apply. When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering a complete elimination of its Pre-Change Losses.

       **3.**    **Transfer of GUC Recovery Trust Causes of Actions and other GUC Recovery Trust Assets**

Pursuant to the Plan, on or before the Effective Date, the GUC Recovery Trust will be established, and on the Effective Date, all of the GUC Recovery Trust Assets will be transferred to the Liquidating Trust and a 50% undivided interest in the GUC Recovery Trust Causes of Actions will be distributed to the holders of the Term Loan Claims. For U.S. federal income tax purposes, such transfers generally will be treated as if the Debtors sold such assets and causes of actions at then fair market value. *See* Section E — "Tax Treatment of The GUC Recovery Trust," below.

    **B.**    **Consequences to Holders of Term Loan Claims**

This summary discusses the U.S. federal income tax consequences to holders of Term Loan Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders. The discussion below generally assumes that holders of Term Loan Claims will, as a class, vote to accept the Plan. As used herein, the term "U.S. Holder" means a beneficial owner of Term Loan Claims, New Term Loans, or New Common Stock, that is for U.S. federal income tax purposes:

      •    an individual who is a citizen or resident of the United States;

      •    a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

WEIL:\97028542\2\41703.0010

• an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

• a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Term Loan Claims, New Term Loans, or New Common Stock, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

### 1. Holders of Term Loan Claims

Pursuant to the Plan, and assuming a Reorganization Transaction occurs, holders of Allowed Term Loan Claims will receive New Common Stock and, New Term Loans, and a Pro Rata share of a fifty percent (50%) undivided interest in (and thus in the net proceeds from) the GUC Recovery Trust Causes of Action (the "50% Interest"), in complete and final satisfaction of their Term Loan Claims.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of Term Loan Claims depends, in part, on whether the holders' Claim constitutes a "security" of the Debtors for U.S. federal income tax purposes. If a Term Loan Claim constitutes a security of the Debtors, then the receipt of New Term Loans and, New Common Stock, and the 50% Interest should be treated as part of a tax "reorganization" for U.S. federal income tax purposes, in each case, with the consequences described below. If, on the other hand, a Term Loan Claim does not constitute a security of the Debtors, then the receipt of the consideration in exchange therefor will be treated as a fully taxable transaction.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. A holder of a Term Loan Claim is urged to consult its own tax advisor regarding the appropriate status for U.S. federal income tax purposes of its Term Loan Claim.

If each of the Term Loan Claims constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Stock, New Term Loans and New Common Stock the 50% Interest in exchange for Term Loan Claims would qualify for reorganization exchange treatment for U.S. federal income tax purposes. The classification as a reorganization exchange generally serves to defer the recognition of any taxable gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain to the extent the holder receives "boot" in the reorganization exchange, i.e., consideration other than stock or "securities" of the exchanging company. If – namely, the 50% Interest and, if the New Term Loans are

104

not considered "securities" for this purpose, the New Term Loans. Accordingly, a U.S. Holder will recognize any realized gain up to the extent of the aggregate total amount of boot received in exchange, which would equal the sum of the fair market value as of the Effective Date of the portion of the 50% Interest and the issue price of the New Term Loans (namely, the "boot") received by the U.S. Holder in the exchange in respect of its Term Loans Claim (other than any portion received in respect of a Claim for for accrued but unpaid interest and possibly accrued original issue discount, or "OID"). In addition, even within an otherwise tax-free exchange, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income. *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

In If an exchange of Term Loan Claims treated as a reorganization, a U.S. Holder's aggregate tax basis in the New Term Loans (if such loans constitute "securities" for U.S. federal income tax purposes) and New Common Stock will equal such holder's aggregate adjusted tax basis in the Term Loan Claims exchanged therefor, increased by any gain or interest income recognized in the exchange, and decreased by the amount of boot fair market value of the portion of the 50% Interest and, if the New Term loans do not constitute "securities," the issue price of the New Term Loans received in the exchange. Such aggregate tax basis should be allocated among the New Term Loans (if applicable) and New Common Stock and (if they constitute "securities") the New Term Loans in accordance with their relative fair market values. In an exchange treated as a reorganization, a U.S. Holder's holding period in such carryover basis property will include its holding period in the Term Loan Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest (and possibly "original issue discount" or "accrued OID"). If the New Term Loans do not constitute "securities," then a U.S. Holder will have tax basis in the New Term Loan received equal to its issue price, and its holding period in such New Term Loan received should begin on the day following the exchange date.

If the exchange of a Term Loan Claim does not constitute a reorganization, the exchange will be taxable and the U.S. Holder of a Term Loan Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the issue price of the New Term Loans and, the fair market value of the New Common Stock, and the fair market value of the portion of the 50% Interest received (other than any consideration received in respect of a Term Loan Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Term Loan Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section B.1(b)— "Character of Gain or Loss," below. In addition, a U.S. Holder of a Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income. *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

In the case of a taxable exchange, a U.S. Holder of Term Loan Claims will have a tax basis in the New Term Loans received equal to its issue price and a tax basis in the New Common Stock received equal to its fair market value. The U.S. Holder's holding period in such New Term Loans and New Common Stock received should begin on the day following the exchange date.

The tax characterization of the 50% Interest as either an equity-type interest in the GUC Recovery Trust (even though receiving a direct undivided interest in the GUC Recovery Trust Causes of Action) or a separate property right is uncertain, and may depend in part on the terms and provisions of the GUC Recovery Trust Agreement. Accordingly, each holder of a Term Loan Claim is urged to consult its tax adviser regarding the receipt and ownership of a portion of the 50% Interest, including the tax treatment of any income, loss and distributions from the GUC Recovery Trust. *See* Section E — "Tax Treatment of The GUC Recovery Trust," below. A U.S. Holder will have an aggregate tax basis in its undivided

interest in the causes of action received equal to its fair market value, and the holder's holding period should begin on the day following the exchange date.

(a)    Distributions in Discharge of Accrued Interest

In general, to the extent that any exchange consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of ~~interest~~ accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or ~~amortized~~ OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Term Loan Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), consideration received in respect of a Term Loan Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to ~~any Claim for accrued but unpaid interest~~the remaining portion of such Allowed Claim, if any. *See* Section 6.17 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

(b)    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Term Loan Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Term Loan Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Term Loan Claims from a prior holder at a "market discount" (relative to the principal amount of the Term Loan Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount. Under these rules, any gain recognized on the exchange of Term Loan Claims (other than in respect of a Term Loan Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Loan Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Term Loan Claim, such deferred amounts would become deductible at the time of the exchange but, if the exchange is a reorganization exchange, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of a Term Loan Claim that qualifies as a reorganization exchange, the Tax Code indicates that any accrued market discount in respect of the Term Loan Claim should not be currently includible in income under Treasury regulations to be issued, except to the extent of any gain recognized due to the receipt of boot. Any accrued market discount that is not included in income should carry over to any nonrecognition property received in exchange therefor (*i.e.,* for New ~~Term Loans~~Common Stock and, if ~~also~~ treated as a "security" for U.S. federal income tax purposes, ~~and~~ New ~~Common Stock in the case of~~ Term Loan~~s Claims~~). Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Stock or New Term Loans should be treated as ordinary income to the extent of any accrued market discount carried over to such stock or loans not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

### C.    Disposition of New Common Stock

Unless a nonrecognition provision applies and subject to the discussion above with respect to market discount and the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Stock in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Stock held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period for its New Common Stock is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Common Stock (or any stock or property received for such New Common Stock in a later tax-free exchange) received in exchange for a Term Loan Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Term Loan Claim, decreased by any income (other than interest income) recognized by the holder upon exchange of the Term Loan Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Term Loan Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### D.    Ownership and Disposition of the New Term Loan

The U.S. federal income tax consequences to a holder of a New Term Loan may depend on certain terms of the New Term Loan which have not yet been finalized. The final terms of the New Term Loan will be described at a later date in a Plan Supplement. Accordingly, depending on the final terms of the New Term Loan, the U.S. federal income tax consequences of owning and disposing of a New Term Loan may differ from that described below.

#### 1.    Payment of Interest and OID on the New Term Loan

Stated interest paid on the New Term Loan will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received, in accordance with its method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Thus, the cash interest payable on the New Term Loan is expected to be treated as qualified stated interest. The remainder of the stated interest payable on the New Term Loan is payable by the issuance of additional notes ("**PIK interest**"); the amount of PIK interest payable on the New Term Loan will be included in the determination of the OID on such debt, as discussed below. Accordingly, the New Term Loan will be issued with OID to the extent of the PIK

interest and, depending on the issue price of the New Term Loan, the New Term Loan may be issued with additional OID.

If the principal amount of the New Term Loan exceeds its issue price by more than a de minimis amount, then the New Term Loan will be considered to have been issued with OID for U.S. federal income tax purposes in the amount of such excess. For these purposes, the PIK interest will be included in the principal amount of the New Term Loan at maturity and taxed as part of OID. A U.S. Holder will be required to include any such OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

If the New Term Loan is not considered to be publicly traded, but a substantial portion of the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will be determined by reference to the fair market value of such publicly traded Term Loan Claims on the Effective Date. If the New Term Loan is publicly traded, the issue price of the New Term Loan is its fair market value. If neither the New Term Loan nor the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will equal their stated principal amount. The determination of whether a debt instrument is "publicly traded" for these purposes depends on whether such instrument is traded on an established market. A debt instrument is traded on an established market for U.S. federal income tax purposes only if they are traded on an established market during the 31-day period ending 15 days after the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the debt instrument, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury regulations.

Under the applicable Treasury regulations, the Reorganized Debtors are required to determine whether the New Term Loan is publicly traded and, if so, the fair market value of the New Term Loan, and make these determinations available to holders in a commercially reasonable fashion, including by electronic publication, within ninety (90) days of the issue date of the New Term Loan. The Debtors intend to make this information available on our website. Our determination is binding on a U.S. Holder unless a U.S. Holder explicitly discloses on its tax return that its determination is different and the reasons for its determination (including how it determined the fair market value of its New Term Loan or Term Loan Claims, if applicable). The Debtors expect that the New Term Loan will be considered to be "publicly traded" for U.S. federal income tax purposes and that, accordingly, the issue price of the New Term Loan will equal their fair market value on the Effective Date.

### 2.        Market Discount on the New Term Loan

A U.S. Holder will have market discount with respect to a New Term Loan if its initial basis in any portion of the New Term Loan is less than the issue price of such portion of the New Term Loan, unless the difference is less than a specified de minimis amount. If a U.S. Holder's New Term Loan has market discount with respect to any portion of such New Term Loan and, if such holder so elects or has so elected, it will be required to include the market discount as ordinary income as it accrues, either on a ratable basis or on the basis of a constant-yield method. Any such election applies to all debt instruments with market discount that the U.S. Holder acquires on or after the first day of the first taxable year to which the election applies. In addition, the U.S. Holder may be required to defer, until the maturity of the New Term Loan, as applicable, or its earlier disposition (including in one of certain nontaxable transactions), the deduction of all or a portion of the interest expense on any indebtedness incurred or

WEIL:\97028542\2\41703.0010

maintained to purchase or carry any portion of such New Term Loan with respect of which the U.S. Holder has market discount.

### 3.       Acquisition and Bond Premium on the New Term Loan

A U.S. Holder will have acquisition premium with respect to a New Term Loan if its initial basis in any portion of the New Term Loan, as applicable, exceeds the issue price of such portion of the New Term Loan but does not exceed the stated redemption price at maturity of such portion of the New Term Loan. If a U.S. Holder has acquisition premium with respect to a portion of the New Term Loan, it may reduce the amount of any OID accruing on such portion of the New Term Loan for any taxable year by a portion of the acquisition premium properly allocable to that year.

If a U.S. Holder's initial basis in any portion of the New Term Loan exceeds the stated redemption price at maturity of such portion of the New Term Loan, the excess generally will constitute amortizable bond premium and the U.S. Holder will not be required to include any OID attributable to its income with respect to such portion of the New Term Loan. Generally a U.S. Holder may elect to amortize this bond premium over the remaining term of such portion of the New Term Loan using a constant yield method and apply the amortization to offset stated interest otherwise required to be included in income with respect to such portion of the New Term Loan.

### 4.       Disposition of the New Term Loan

Upon the sale or other taxable disposition of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the New Term Loan. A U.S. Holder's adjusted tax basis in a New Term generally will equal its initial tax basis in the New Term Loan, increased by any OID or market discount previously included in income with respect to the New Term Loan and decreased by payments on the New Term Loan other than payments of stated interest and any previously amortized bond premium. For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income. Except to the extent attributable to any accrued market discount not previously included in income, gain or loss recognized on the sale or other taxable disposition of a New Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the New Term Loan is treated as held for more than one year. Any gain attributable to accrued market discount not previously included in income will be recharacterized as ordinary income. Long-term capital gains recognized by non-corporate taxpayers are subject to reduced tax rates. The deductibility of capital losses is subject to significant limitations.

### E.       Tax Treatment of The GUC Recovery Trust

As indicated above, the Debtors will transfer the GUC Recovery Trust Assets to the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.

### 1.       Classification of the GUC Recovery Trust

The GUC Recovery Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Recovery Trust will be structured with the intention of complying with such general criteria. In

WEIL:\97028542\2\41703.0010

conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee and GUC Recovery Trust beneficiaries) will be required to treat the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust as (1) a transfer of the GUC Recovery Trust Assets (subject to any obligations relating to those assets) directly to GUC Recovery Trust beneficiaries (other than to the extent any GUC Recovery Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the GUC Recovery Trust of GUC Recovery Trust Assets in exchange for GUC Recovery Trust Interests.  Accordingly, except in the event of contrary definitive guidance, GUC Recovery Trust beneficiaries as determined for U.S. federal income tax purposes – which, as discussed above and subject to the provisions of the GUC Recovery Trust Agreement, potentially could include holders of Term Loan Claims – will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of GUC Recovery Trust Assets (other than such GUC Recovery Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the GUC Recovery Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Recovery Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Recovery Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Recovery Trust and the holders of Claims could vary from those discussed herein.

### 2. General Tax Reporting by the GUC Recovery Trust and GUC Recovery Trust Beneficiaries

For all U.S. federal income tax purposes, all parties must treat the GUC Recovery Trust as a grantor trust of which holders of Claims who become GUC Recovery Trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors.  Accordingly, GUC Recovery Trust beneficiaries are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the GUC Recovery Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The GUC Trustee will file tax returns for the GUC Recovery Trust treating the GUC Recovery Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury regulations.  The GUC Trustee also shall annually send to each GUC Recovery Trust beneficiary a separate statement regarding the receipts and expenditures of the GUC Recovery Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the GUC Recovery Trust will be allocated among, and treated as directly earned and incurred by, the GUC Recovery Trust beneficiaries with respect to such GUC Recovery Trust beneficiary's undivided interest in the GUC Recovery Trust Assets (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims.  The character of any income and the character and ability to use any loss will depend on the particular situation of the GUC Recovery Trust beneficiary.

In accordance with the GUC Recovery Trust Agreement, the GUC Trustee will make a good faith valuation of the GUC Recovery Trust Assets.  All parties to the GUC Recovery Trust must consistently use such valuation for all U.S. federal income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a GUC Recovery Trust beneficiary is not dependent on the GUC Recovery Trust distributing any Cash or other proceeds.  Thus, a holder of a beneficial interest may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Recovery Trust's income even if the GUC Recovery Trust does not make a concurrent distribution to the holder.  In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Term Loan Claims), a distribution of Cash by the GUC Recovery Trust will not be separately taxable to a GUC

WEIL:\97028542\2\41703.0010

Recovery Trust beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Recovery Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the GUC Recovery Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements (*see* section 6.19 of the Plan). Thus, in the case of any GUC Recovery Trust beneficiaries that are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the GUC Recovery Trust.

### 3. Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of an IRS private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (A) may elect to treat any GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims (a "**Disputed Claims Reserve**") as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the GUC Recovery Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the GUC Trustee and the GUC Recovery Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

### F. ~~E.~~ Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt

recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Term Loan Claim. All holders of Term Loan Claims are urged to consult their tax advisors concerning the federal, state, local, non U.S., and other tax consequences applicable under the Plan.

## IX.VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. ADDITIONAL RISK FACTORS IDENTIFIED IN THE COMPANY'S PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN DHCP'S ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017 FILED WITH THE SEC ON APRIL 16, 2018, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2018 FILED WITH THE SEC ON JUNE 6, 2018, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2018 FILED WITH THE SEC ON AUGUST 9, 2018, AND THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2018 FILED WITH THE SEC ON NOVEMBER 14, 2018 ARE HEREBY INCORPORATED BY REFERENCE. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.    Certain Bankruptcy Law Considerations

### 1.    General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Company's business. Among other things, it is possible that

bankruptcy proceedings could adversely affect the Company's relationships with its key customers and employees.  In addition, the bankruptcy proceedings may divert some of the attention of the Debtors' management away from business operations and the Company will incur additional expenses.

### 2.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that it will receive the requisite acceptances to confirm the Plan, and even if the Voting Class (defined below) voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3.    Risk of Failing to Satisfy Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Class, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims and Parent Equity Interests as those proposed in the Plan.

### 4.    Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Parent Equity Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 5.    Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 9.3 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

WEIL:\97028542\2\41703.0010

### 6.    Risk of Termination of Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with GSEs, regulators, government agencies, vendors, suppliers, employees, and major customers.  If the Restructuring Support Agreement is terminated, each vote or any consent given by any Consenting Term Lender prior to such termination will be deemed null and void *ab initio*.  If the termination of the Restructuring Support Agreement takes place when Bankruptcy Court approval is required for a Consenting Term Lender to change or withdraw its vote to accept the Plan, the Company has agreed to support and not oppose any such attempt to change or withdraw a vote.  Future termination of the Restructuring Support Agreement is an "Event of Default" under the Debtors' DIP Facilities.  If the Debtors lose access to their DIP Facilities it may force the Debtors to liquidate the Company.

### 7.    Risk Related to Parties in Interest Objecting to Debtors' Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 8.    Risk Related to Possible Objections to Plan

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan.  While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 9.    Conversion to Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Article XI hereof, as well as the liquidation analysis, which will be filed no later than the date on which the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing (the "**Liquidation Analysis** attached hereto as Exhibit E"), for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests on a Debtor-by-Debtor basis.

### B.    Additional Factors Affecting Value of Reorganized Debtors

### 1.    Claims Could Bebe More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and

WEIL:\97028542\2\41703.0010

circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' Financial Projections and feasibility analysis, and ~~the~~that variation may be material.

### 2. Projections and Other Forward-Looking Statements ~~A~~are ~~N~~not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.  The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project.  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

### C. Risks Relating to Debtors' Business and Financial Condition

### 1. Risks Associated with Debtors' Business and Industry

The Debtors' business is subject to extensive regulation by federal, state and local governmental and regulatory authorities.  Further, in recent years the policies, laws, rules and regulations applicable to the Debtors' business have been rapidly evolving.  Such changes, as well as the actual or alleged failure to comply with applicable federal, state, and local laws and regulations, GSE, Ginnie Mae and other business counterparty requirements, or to implement and adhere to adequate remedial measures designed to address any identified compliance deficiencies, may have an adverse consequence on the Company or its business, in addition to the following factors, risks or uncertainties that may affect the Company or its business:

- Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

- Damage to the Debtors' reputation;

- Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

- The substantial resources (including senior management time and attention) the Company devotes to, and the significant compliance costs the Company incurs in connection with, regulatory compliance and regulatory examinations and inquiries, and any consume redress, fines, penalties or similar payments made in connection with resolving such matters;

- Uncertainties relating to interest curtailment obligations and any related financial and litigation exposure (including exposure relating to false claims);

- Potential costs and uncertainties, including the effect on future revenues, associated with and arising from litigation, regulatory investigations, and other legal proceedings, and uncertainties relating to the reaction of key counterparties to the announcement of any such matters;

- Dependence on GSEs and agencies (especially Fannie Mae, Freddie Mac and Ginnie Mae) and their residential loan programs and the Company's ability to maintain relationships with such entities, and uncertainties relating to the status and future role of GSEs and agencies;

115

- Ability to remain qualified as a GSE and agency approved seller, servicer or component servicer, including the ability to continue to comply with the GSEs' and agencies' respective residential loan selling and servicing guides;

- The ability to maintain the loan servicing, loan origination or collection agency licenses and/or third-party default specialists, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

- The ability to comply with the terms of the stipulated order resolving allegations arising from an Federal Trade Commission and CFPB investigation of Ditech Financial and RMS;

- The ability to comply with HUD Guidelines or VA regulations regarding mortgage loan conditions;

- Operational risks inherent in the mortgage servicing and mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

- Risks related to a significant amount of senior management turnover and employee reductions;

- Risks related to the substantial level of indebtedness, including ability to comply with covenants contained in debt agreements or obtain any necessary waivers or amendments, generate sufficient cash to service such indebtedness and refinance such indebtedness on favorable terms, if at all, as well as the ability to incur substantially more debt;

- The ability to maintain or grow the residential loan servicing or subservicing business and the mortgage loan originations business;

- The ability to achieve the Company's strategic initiatives, particularly the ability to: enter into new subservicing arrangements; improve servicing performance, successfully develop origination capabilities; and execute and realize planned operational improvements and efficiencies;

- The success of the business strategy in returning to sustained profitability;

- Changes in prepayment rates and delinquency rates on the loans serviced and subserviced;

- A downgrade of, other adverse change, relating to, or the Company's inability to improve the servicer rating or credit ratings;

- The Company's ability to collect reimbursements for servicing advances and earn and timely receive incentive payments and ancillary fees on the servicing portfolio;

- The ability to collect indemnification payments and enforce repurchase obligations relating to mortgage loans the Company purchases from correspondent clients and the ability to collect in a timely manner indemnification payments relating to servicing rights purchased from prior servicers;

- Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

- Risks associated with the reverse mortgage business, including changes to reverse mortgage programs operated by FHA, HUD, or Ginnie Mae; the Company's ability to accurately estimate interest curtailment liabilities; the Company's ability to fund HECM repurchase obligations; the Company's ability to fund principal additions on the HECM loans, and the Company's ability to securitize the HECM tails;

116

- Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;

- Risks and potential costs associated with technology and cybersecurity, including: the risks of technology failures and of cyber-attacks against us or our vendors; our ability to adequately respond to actual or attempted cyber-attacks; and our ability to implement adequate internal security measures and protect confidential borrower information;

- Risks and potential costs associated with the implementation of new or more current technology, the use of vendors, or the transfer of the Company's servers or other infrastructure to new data center facilities;

- Risks related to the Company's deferred tax asset, risk of an "ownership change," including uncertainties as to the Company's ability to preserve the tax assets through and after a bankruptcy filing;

- The ability to renew advance financing facilities or warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities;

- Risks related to the concentration of the Company's subservicing portfolio and the ability of the Company's subservicing clients to terminate the Company as a subservicer;

- The ability of Fannie Mae, Freddie Mac and Ginnie Mae, as well as other clients and credit owners, to transfer or otherwise terminate our servicing or subservicing rights, with or without cause;

- The effects of competition on existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

- The expiration of, or changes to, government mortgage modification, refinancing or other programs;

- The ability to comply with evolving and complex accounting rules, many of which involve significant judgment and assumptions;

- The ability to implement and maintain effective internal controls over financial reporting and disclosure controls and procedures;

- Uncertainties regarding impairment charges relating to the intangible assets of the Company;

- Risks related to the Company's relationship with Walter Energy;

- Administrative fines and financial penalties;

- Litigation, including class action lawsuits; and

- Civil and criminal liability.

### 2.    Loss of Subservicing Clients

The Company, as of December 31, 2018, subserviced 0.8 million forward and reverse loan accounts with an unpaid principal balance of $111.7 billion. Under the Company's subservicing contracts, the primary servicers for whom the Company conducts subservicing activities have the right to terminate such contracts, with or without cause, with generally 60-90 days' notice. In some instances, the subservicing contracts require payment to the Company of deboarding, deconversion or other fees in connection with any termination thereof, while in other instances there is little to no consideration owed to the Company in connection with the termination of subservicing contract. The Company's business may suffer significant hardship if these subservicing contracts are terminated.

117

~~On~~As described above, on January 17, 2019, the Company received notice from NRM, its largest subservicing customer, ~~initiating the process of termination under their~~terminating the ~~s~~Subservicing ~~a~~Agreement ~~with the Company~~for cause.  The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice.  NRM asserts that the Termination Notice was properly issued, was based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement.  The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.  The Company is evaluating the impact, if any, of any fees and costs payable in connection with the termination of the ~~s~~Subservicing ~~a~~Agreement.

### 3.    Downgrade in the Company's Servicer Ratings

Standard & Poor's and Moody's rate the Company as a residential loan servicer.  Certain of these ratings have been downgraded in the past, and any of these ratings may be downgraded in the future.  Any such downgrade could adversely affect the Company, financial condition, or results of operations, as well as the Company's ability to finance servicing advances and maintain the Company's status as an approved servicer by Fannie Mae, Freddie Mac, and Ginnie Mae.  The Company's failure to maintain favorable or specified ratings may cause the Company's termination as servicer and further impair the Company's ability to consummate future servicing transactions.

### 4.    Risk of Ginnie Mae, Fannie Mae, and Freddie Mac Termination

Under the terms of the Ginnie MBS Guide and the required Ginnie Mae Guaranty Agreement that is executed in connection with each GMBS the Company issues (together with related documents, the "**Ginnie Mae Guaranty Agreement**"), Ginnie Mae may terminate Ditech Financial for cause as the issuer of GMBS and as servicer of the underlying mortgage loans, and transfer all of Ditech Financial's rights as issuer and servicer, including the servicing rights relating to the mortgage loans underlying the GMBS issued by the Company, to a third party without payment to the Company of any consideration in connection therewith.  Events that could allow Ginnie Mae to terminate the Company as issuer and servicer include, without limitation, the impending or actual insolvency of Ditech Financial; any withdrawal or suspension of Ditech Financial's status as an approved mortgagee by FHA or an approved seller/servicer by Fannie Mae or Freddie Mac; or any change to Ditech Financial's business condition which materially and adversely affects its ability to carry out its obligations as an approved Ginnie Mae issuer.  A default by Ditech Financial's affiliate, RMS, under RMS's Ginnie Mae Guaranty Agreements may also result in an event of default under Ditech Financial's Ginnie Mae Guaranty Agreement under a cross-default agreement among Ginnie Mae, Ditech Financial, and RMS, which could result in the Company's termination as issuer and servicer of all GMBS and HMBS.  If the Company were to have the Ginnie Mae issuer and servicing rights transferred or otherwise terminated, this could materially and adversely affect the Company's business, financial condition, liquidity and results of operations.

Under the terms of Ditech Financial's master servicing agreement (including any amendments and addendums thereto) with Fannie Mae, Fannie Mae has the ability to terminate Ditech Financial as servicer for some or all of the Fannie Mae loans it services, with or without cause.  In connection with such termination by Fannie Mae without cause, Ditech Financial would have a right to a specified termination fee; however, in connection with such termination by Fannie Mae for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer.  Events that could allow Fannie Mae to terminate Ditech Financial for cause as servicer of some or all of the Fannie Mae loans include, without limitation, a breach of the mortgage selling and servicing contract by Ditech Financial; unacceptable performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things,

118

servicer performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things, servicer performance measurements and any written performance improvement plan; Ditech Financial's insolvency, the adjudication of Ditech Financial as bankrupt or the execution by Ditech Financial of a general assignment for the benefit of its creditors; any change in Ditech Financial's financial status that, in Fannie Mae's opinion, materially and adversely affects Ditech Financial's ability to provide satisfactory servicing of mortgages; the sale of a majority interest in Ditech Financial without Fannie Mae's prior written consent; a change in Ditech Financial's financial or business condition, or in its operations, which, in Fannie Mae's sole judgment, is material and adverse; Ditech Financial has certain delinquency rates or REO Property rates more than 50% higher than the average of such rates for certain specified Fannie Mae portfolios; and any judgment, order, finding, or regulatory action to which Ditech Financial is subject that would materially and adversely affect Ditech Financial's ability to comply with the terms or conditions of its Fannie Mae contract. In addition, a default by Ditech Financial's affiliate, RMS, under RMS's agreements with Fannie Mae may also result in an event of default under Ditech Financial's Fannie Mae contract under a cross-default agreement.

Under the terms of Ditech Financial's master servicing agreement and the Freddie Mac Seller/Servicer Guide (including any amendments and addendums thereto), Freddie Mac has the ability to terminate Ditech Financial as servicer for some or all of the Freddie Mac loans it services, with or without cause. If Freddie Mac terminated Ditech Financial without cause, Ditech Financial would have a right to a specified termination fee; however, if Freddie Mac terminates Ditech Financial as servicer for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer. Events that could allow Freddie Mac to terminate Ditech Financial for cause as servicer of some or all of the Freddie Mac loans include, without limitation, the impending or actual insolvency of Ditech Financial or an affiliate thereof; the filing of a voluntary petition by Ditech Financial or an affiliate thereof under federal bankruptcy or state insolvency laws; Ditech Financial's failure to maintain qualified staff and/or adequate facilities to assure the adequacy of servicing Freddie Mac loans; any weakness or notable change in the financial or organizational status or management of Ditech Financial or an affiliate thereof, including any adverse change in profitability or liquidity that, in the opinion of Freddie Mac, could adversely affect Freddie Mac; Ditech Financial's failure to meet any eligibility requirement, including failure to maintain acceptable net worth or other indicia of financial soundness; Ditech Financial having delinquency rates or REO rates higher than certain averaged; and Freddie Mac's determination that Ditech Financial's overall performance is unacceptable (taking into account, among other things, scorecard results that rate absolute and comparative performance with respect to various measures such as loss mitigation, workout effectiveness, default timeline management, data integrity, investor reporting, and alternatives to foreclosure).

### 5.    DIP Facilities

The DIP Facilities are intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

Relatedly, the continuation of the National Founders Facility is necessary for RMS's servicing activities during the Chapter 11 Cases. There can be no assurance that National Founders will continue to provide RMS access to postpetition credit for servicing advances or that it would agree to forbear from seeking to enforce remedies against RMS's non-debtor affiliate, each of which would materially disrupt the Debtors' business.

6.    **Post-Effective Date Indebtedness**

Following the Effective Date, in the Reorganization Transaction only, the Reorganized Debtors expect to have outstanding funded debt of up to approximately $550 million.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Debtors' compliance with affirmative and negative covenants, the Debtors' future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.   The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

D.    **Factors Relating to Securities to be Issued Under Plan, Generally**

1.    **Market for Securities**

There is currently no market for the New Common Stock and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

2.    **Potential Dilution**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including under the Management Incentive Plan.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock.  The amount and dilutive effect of any of the foregoing could be material.

E.    **Risk Related to Obtaining Exit Financing**

During the course of these Chapter 11 Cases, the Debtors will solicit commitments to provide exit financing to refinance the DIP Facilities prior to the Effective Date.  However, there is no assurance that such commitments will be obtained, which will hinder the Debtors' ability to consummate the Reorganization Transaction.  As of the date of this Disclosure Statement, the Debtors have not received any commitment for an Exit Working Capital Facility.  Even if the Debtors are able to obtain a commitment for an Exit Working Capital Facility, there can be no assurance that the Reorganized Debtors will be able to meet the terms of such exit facility and there is a risk that the Reorganized Debtors default thereunder and the lenders take enforcement action against the Reorganized Debtors, including execution or foreclosure against assets of the Reorganized Debtors.

WEIL:\97028542\2\41703.0010

F.      **Risks Related to Investment in New Common Stock**

1.      **Significant Holders**

Pursuant to the Plan, certain holders of Term Loan Claims may acquire a significant ownership interest in the New Common Stock. If such holders of New Common Stock were to act as a group, such holders would be in a position to control all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

2.      **Equity Interests Subordinated to Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock will rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to its debt holders have been satisfied.

3.      **Implied Valuation of New Common Stock Not Intended to Represent Trading Value of New Common Stock**

The valuation of the Reorganized Debtors may not represent the trading value of the New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities. The actual market price of the New Common Stock is likely to be volatile. Many factors including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

4.      **No Intention to Pay Dividends**

The Reorganized Debtors do not anticipate paying any dividends on the New Common Stock as they expect to retain any future cash flows for debt reduction and to support operations. As a result, the success of an investment in the New Common Stock will depend entirely upon any future appreciation in the value of the New Common Stock. There is, however, no guarantee that the New Common Stock will appreciate in value or even maintain its initial value.

5.      **The New Common Stock May be Subject to Further Dilution**

The New Common Stock to be issued on the Effective Date is subject to dilution from the Management Incentive Plan. In addition, in the future, the Company may issue equity securities in connection with future investments, acquisitions or capital rising transactions. Such issuances or grants could constitute a significant portion of the then-outstanding common stock, which may result in a dilution in ownership of common stock, including shares of New Common Stock issued pursuant to the Plan.

WEIL:\97028542\2\41703.0010

### G.    Additional Factors

#### 1.    Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

#### 2.    Debtors Have ~~No~~no Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.    No Representations Outside Disclosure Statement are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 4.    No Legal or Tax Advice is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

#### 5.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

#### 6.    Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII hereof.

## X.~~IX.~~
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Voting Deadline

Before voting to accept or reject the Plan, each Eligible Holder (defined below) as of the Voting Record Date should carefully review the Plan attached hereto as Exhibit A.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

122

Ballots will be provided for holders of Voting Claims as of the Voting Record Date (~~April 9~~May 8, 2019) to vote to accept or reject the Plan (a "**Ballot**"). Only holders of Class 3 Claims (Term Loan Claims) (the "**Eligible Holders**") are entitled to vote to accept or reject the Plan. Because Classes 1, 2, 6 (in a Reorganization Transaction), 7, and 8 are unimpaired and deemed to accept, and Classes 4, 5, 6 (in a Sale Transaction), 9, and 10 are conclusively deemed to reject, only Class 3 is entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

The Debtor has engaged Epiq Corporate Restructuring, LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

THE VOTING DEADLINE IS ~~5~~4:00 P.M., PREVAILING EASTERN TIME, ON ~~MAY 24~~JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

CLASS 3: IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.

Delivery of a Ballot must conform to the instructions on the Ballot. Mailed Ballots must be returned by the Voting Deadline with an original signed copy to:

By ~~First Class Mail,~~ Overnight Courier~~,~~ or Hand Delivery:

<div align="center">

**DITECH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING~~.~~, LLC**
**10300 SW ALLEN BOULEVARD**
**BEAVERTON, OREGON 97005**

</div>

By First Class Mail:

<div align="center">

**DITECH BALLOT PROCESSING**
**C/O EPIQ CORPORATE RESTRUCTURING, LLC**
**P.O. BOX 4422**
**BEAVERTON, OREGON 97076-4422**

</div>

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE APPLICABLE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

B.    **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record holders of the Term Loan Claims.  In order to vote, holders of Term Loan Claims should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

C.    **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of:  (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Class 3 (Term Loan Claims) is impaired under the Plan and the only Class of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Class**" or the "**Voting Claims**").

Claims in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article I of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject, Parent Equity Interests, and Subordinated Securities Claims.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article X of this Disclosure Statement.

### 1. Miscellaneous

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any bBallot marked to both accept and reject the Plan will not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, will supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of the Term Loan Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 2. Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORs RESERVE THE RIGHT, IN their SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 3. Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth

in Sections 10.5, 10.6, and 10.7 of the Plan.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

### 4.       Change of Vote

Subject to the terms of the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### 5.       Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## XI.~~X.~~
## CONFIRMATION OF PLAN

### A.       Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

### B.       Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (d) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

Southern District of New York; (e) be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof; and (f) be served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)　　**The Debtor at:**

　　　　Ditech Holding Corporation
　　　　3000 Bayport Drive, Suite 985
　　　　Tampa, FL 33607
　　　　Attn:  John Haas, General Counsel, Chief Legal Officer and Secretary

(b)　　**Office of the U.S. Trustee at:**

　　　　William K. Harrington, U.S. Department of Justice
　　　　Office of the U.S. Trustee for Region 2
　　　　U.S. Federal Office Building
　　　　201 Varick Street, Suite 1006
　　　　New York, New York 10014
　　　　Attn:　Greg M. Zipes, Esq.
　　　　　　　Benjamin J. Higgins, Esq.

(c)　　**Counsel to the Debtors at:**

　　　　Weil, Gotshal & Manges LLP
　　　　767 Fifth Avenue
　　　　New York, New York 10153
　　　　Attn:　Ray C. Schrock, P.C.
　　　　　　　Sunny Singh, Esq.

(d)　　**Counsel to the Prepetition Administrative Agent at:**

　　　　Davis Polk & Wardwell LLP
　　　　450 Lexington Avenue
　　　　New York, New York, 10017
　　　　Attn:　Brian M. Resnick, Esq.
　　　　　　　Michelle M. McGreal, Esq.

(e)　　**Counsel to the Term Loan Ad Hoc Group at:**

　　　　Kirkland & Ellis LLP
　　　　300 North LaSalle
　　　　Chicago, IL 60654
　　　　Attn:　Patrick J. Nash Jr., P.C.
　　　　　　　John Luze, Esq.

(f)　　**Counsel to the DIP Agent and DIP Lender at:**

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attn:   Sarah M. Ward, Esq.
        Mark A. McDermott, Esq.
        Melissa Tiarks, Esq.

(g)    **Counsel to Nomura Corporate Funding Americas, LLC at:**

Jones Day
250 Vesey Street
New York, New York 10281
Attn:  Ben Rosenblum, Esq.

(h)    **Counsel to the Creditors' Committee at:**

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attn:   Robert J. Feinstein, Esq.
       Bradford J. Sandler, Esq.s
       Steven W. Golden, Esq.

- and -

Rich Michaelson Megaliff, LP
335 Madison Avenue, 9th Floor
New York, New York 10017
Attn:   Robert N. Michaelson, Esq.
       Elwood F. Collins, Esq.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.    **Requirements for Confirmation of Plan**

1.    **Requirements of Section 1129(a) of Bankruptcy Code**

(a)    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)       the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)       any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)       the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)       with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)       except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)       except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)       at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)       confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)       all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

129

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis. (which will be filed no later than the date the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing).[18]

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis iswill be provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and will be on a Debtor-by-Debtor basis with a summary on a consolidated basis. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    Feasibility

---

[18] Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process. *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process).

WEIL:\97028542\2\41703.0010

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections ~~provided in Section VI~~attached here~~of~~to ~~as Exhibit D.~~[19]  Based upon ~~such~~the Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Section ~~X~~VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)    Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

**2.    Additional Requirements for Non-Consensual Confirmation**

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 9 (Parent Equity Interests) and Claims in Class 4 (Second Lien Note Claims), Class 5 (General Unsecured Claims), ~~Class 6 (Go Forward Trade Claims),~~ and Class ~~10~~9 (Subordinated Securities Claims) will not receive a distribution and are thereby deemed to reject the Plan.  However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

(a)    Unfair Discrimination Test

---

[19]    The Debtors will file updated projections in the event of the occurrence of unanticipated events that result in material changes to the projections.

131

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

(i)     *Other Secured Creditors*

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)     *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization. The Plan provides that the holders of General Unsecured Claims in Class ~~6 and Go Forward Trade Claims in Class 7~~5 will receive the treatment summarized above in Article V of this Disclosure Statement.

(iii)     *Equity Interests*

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan. Pursuant to the Plan, all ~~Existing~~Intercompany Equity Interests will be cancelled, reinstated, or receive such other treatment as is determined by the Debtors and the Requisite Term Lenders and the holders of Parent Equity Interests will neither receive nor retain any property on account of such interests.

## XII.~~XI.~~
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest,

assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

## A.     Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (i) a reorganization and continuation of the Debtors' business or (ii) an orderly liquidation of the Debtors' assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

## B.     Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets through a stand-alone alternative transaction under section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, the Debtors do not believe that a stand-alone alternative sale of their assets under section 363 of the Bankruptcy Code (as opposed to the consummation of the Sale Transaction pursuant to the Plan) would yield a higher recovery for holders of Claims and Interests than the Plan.

## C.     Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is will be set forth in the Liquidation Analysis attached hereto as Exhibit Ethat the Debtors will file no later than the date that the Plan Supplement is filed.

As noted in Article XI of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WEIL:\97028542\2\41703.0010

~~XII.~~

### XIII.
### CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 to vote in favor thereof.

Dated: ~~March 5~~May 9, 2019

**DEBTORS**

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By:    /s/ Kimberly Perez
Name: Kimberly Perez

Title:   Senior Vice President and Chief Accounting Officer

134

**<u>DEBTORS</u>**

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By:  /s/ Laura Reichel
 Name: Laura Reichel

 Title:  President

SIGNATURE PAGE TO DISCLOSURE STATEMENT

**<u>DEBTOR</u>**

**MARIX SERVICING LLC**

By:  /s/ Clinton Hodder
        Name: Clinton Hodder

        Title:   President

**DEBTORS**

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By:  /s/ Jeanetta Brown
    Name: Jeanetta Brown

    Title:   Vice President

SIGNATURE PAGE TO DISCLOSURE STATEMENT

**Exhibit A**

**The Joint Chapter 11 Plan**

**Exhibit A-1**

**Borrower Non-Discharged Claims**

**Exhibit B**

**Restructuring Support Agreement**

**<u>EXHIBIT C</u>**

**Organizational Structure Chart**

## **EXHIBIT D**

**Financial Information and Projections**

WEIL:\96859831\26\41703.0010

~~To Be Filed Separately~~

**EXHIBIT E**[1]
~~**EXHIBIT E**~~

**Liquidation Analysis**


**To Be Filed Separately**

---

[1] Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process. *See In re LBI Media, Inc*., Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process). The Debtors will file, no later than the date that the Plan Supplement is filed, the Liquidation Analysis and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing on a Debtor-by-Debtor basis.