KELLETT & BARTHOLOW PLLC
11300 N. Central Expy., Suite 301
Dallas, TX 75243
Tel: (214) 696-9000
Fax: (214) 696-9001
Theodore O. Bartholow, III ("Thad")
thad@kblawtx.com

CONSUMER LITIGATION ASSOCIATES
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (504) 442-7702
Thomas D. Domonoske
tom@clalegal.com

*Attorneys for Plaintiff*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DITECH HOLDING CORPORATION, et al., | : | Case No. 19-10412 (JLG) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| JOSE ANGEL MARTINEZ, JR. on behalf of himself and all others similarly situated | : | |
| | : | |
| | : | Adv. No. _____ |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| DITECH FINANCIAL LLC f/k/a GREEN TREE SERVICING, LLC, | : | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

|  |  |
|---|---|
| DITECH HOLDING CORPORATION, | : |
|  | : |
| BLACK KNIGHT FINANCIAL SERVICES, INC. | : |
|  | : |
| AND | : |
|  | : |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION | : |
|  | : |
| Defendants | : |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Plaintiff Jose Angel Martinez, Jr., on behalf of himself and all others similarly situated, files this Original Complaint complaining of and about Ditech Financial LLC f/k/a Green Tree Servicing LLC, Ditech Holding Corporation (for purposes of this complaint, except to the extent their separate conduct is at issue, Ditech Financial LLC and Ditech Holding Corporation shall be collectively referred to as "Ditech"), Black Knight Financial Services, Inc. ("Black Knight"), and Federal National Mortgage Association ("Fannie Mae"), (collectively "Defendants"):

## I. INTRODUCTION

1.     For years, Ditech, a home mortgage servicing business, has been harming consumers by assessing, demanding, and/or collecting illegal, improper, discharged, and non-recoverable fees and charges from discharged former Chapter 13 debtors in connection with the administration of their home mortgage loans.  Ditech continues to engage in these practices with knowledge that the amounts of and reasons for charges included in the borrowers' accounts are overstated, inaccurate, and indicate that borrowers are considered liable for amounts that were paid and/or discharged in borrowers' Chapter 13 bankruptcy cases.

2.      In this Chapter 11 bankruptcy, Ditech is now attempting to use the Bankruptcy

Court to ratify these improper loan accounting practices in order to obtain the ability for itself

and/or its successors to collect money from consumers that they legally do not owe with

Bankruptcy Court-sanctioned impunity.

3.      Since the 1990s, and possibly even earlier, mortgage servicers have been notorious

for failing to disclose fees and charges assessed to accounts of borrowers in active Chapter 13

bankruptcy cases, and, more generally, for misapplying Chapter 13 debtors' payments so that

borrowers emerge from bankruptcy with delinquent mortgage loans despite receiving a Chapter 13

discharge after making all required payments to cure their pre-petition arrearage and maintain their

ongoing post-petition monthly mortgage payment obligations.

4.      The mortgage servicing industry's abuses of discharged Chapter 13 debtors were so

pervasive and persistent that the National Conference of Bankruptcy Judges' Rules Committee

proposed, the Supreme Court approved, and in 2011 Congress added Fed. R Bankr. P. 3002.1 and

modified Fed. R. Bankr. P. 3001 specifically to address this problem by providing

reporting/disclosure obligations applicable to mortgage creditors, as well as remedies to consumer

debtors in the event of violation of these rules.  The Advisory Committee's Note to the new Fed.

R. Bankr. P. 3002.1 states "This rule is new.  It is added to aid in the implement of § 1322(b)(5),

which permits a chapter 13 debtor to cure a default and maintain payments on a home mortgage

over the course of the debtor's plan."  *See* Fed. R. Bankr. P. 3002.1 advisory committee's note.[2]

---

[2] "[A] primary purpose of chapter 13 is to enable debtors to receive a 'fresh start.'  The fresh start:
[G]ives the honest but unfortunate debtor who surrenders for distribution the property which he
owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort,
unhampered by the pressure and discouragement of pre-existing debt.  The various provisions of the
Bankruptcy Act were adopted in the light of the view and are to be construed when reasonable
possible in harmony with it so as to effectuate the general purpose and policy of the act."

5.      Even earlier, the 2005 amendments to the Bankruptcy Code added § 524(i), which expressly brought the protections of the discharge injunction to otherwise non-discharged home mortgage obligations that debtors cure and maintain pursuant to the terms of their confirmed Chapter 13 plans.

6.      As this lawsuit reveals, despite these changes to the Bankruptcy Code and Rules, despite opinions by court after court confirming the fundamental importance of these protections for consumer debtors who obtain Chapter 13 discharges, and despite being under active scrutiny and monitoring by the Executive Office of the United States Trustee, Ditech, its business partners, vendors, and affiliates continue to deny honest but unfortunate Chapter 13 debtors the fresh start that Chapter 13 of the Bankruptcy Code promised to them, which they worked for years under the supervision of Chapter 13 trustees and bankruptcy courts to obtain.

7.      In further rebuke of the Bankruptcy Code and Rules and of the discharge orders of bankruptcy courts around the nation, Ditech is now attempting to use this Chapter 11 case to override consumers' discharges by proposing to sell mortgage servicing rights for discharged Chapter 13 debtors' accounts "free and clear" of pre-petition claims and defenses.

8.      Defendants' handling of Plaintiff Jose "Joe" Martinez's mortgage loan account exemplifies the serious threat that Defendants' current bankruptcy and past loan servicing practices present for the members of the class.

9.      During Mr. Martinez's Chapter 13 bankruptcy, Ditech f/k/a Green Tree and its

---

*Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 421 B.R. 356, 366 (Bankr. S.D. Tex. 2009) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244-245 (1934).

"In the mortgage context, homeowners receive a fresh start through the ability to stave off foreclosure, cure arrearages, and maintain mortgage payments. This gives home-owners the opportunity to remain in their homes and emerge from bankruptcy current on their mortgage payments." *Id.*

vendors failed to prepare and file monthly mortgage payment change notices reflecting changes in

Mr. Martinez's monthly mortgage payment due to annual escrow analyses for taxes and insurance,

in clear violation of Fed. R. Bankr. P. 3002.1.

10.     Ditech f/k/a Green Tree and its vendors also failed to file notices of post-petition

fees and charges that would have alerted Mr. Martinez to the possibility that escrow deficiencies

could be accumulating on his mortgage loan account during his bankruptcy.

11.     Ditech f/k/a Green Tree also violated Fed. R. Bankr. P. 3002.1 when it failed to

respond to the Chapter 13 Trustee's notice of final cure for Mr. Martinez's Chapter 13 case, which

required Ditech f/k/a Green Tree to state whether it agreed that Mr. Martinez had cured his pre-

petition arrearage and maintained his post-petition ongoing monthly mortgage payments.

12.     Because Ditech f/k/a Green Tree never filed any of the notices and responses

required by Fed. R. Bankr. P. 3002.1 with respect to Mr. Martinez's loan, Mr. Martinez was also

unaware that Green Tree/Ditech, as Bank of America had also done before transferring servicing,

had been misapplying his post-petition payments and thus was allowing an escrow shortage that

was supposed to have been cured in Mr. Martinez's bankruptcy to accumulate, contrary to the

provisions and purpose of Mr. Martinez's confirmed Chapter 13 plan and Chapter 13 of the

Bankruptcy Code.

13.     By completing his Chapter 13 plan and making all required post-petition monthly

mortgage payments, Mr. Martinez cured his pre-petition mortgage arrears and received his

Chapter 13 discharge.  As a result, Mr. Martinez should have had a current mortgage loan with a

fully-funded escrow account upon completion of his Chapter 13 case.

14.     Yet, even though Mr. Martinez paid his pre-bankruptcy arrears in full, was making

his monthly mortgage payments each month, and received his Chapter 13 discharge, he was hit

years later with bills from Ditech demanding that he pay a massive escrow shortage that he did not

owe.

15.     Mr. Martinez's circumstances are not unique.  Rather, they are sadly common with

respect to mortgages of borrowers in Chapter 13 bankruptcy.  This is especially true with respect

to the Fannie Mae and Freddie Mac accounts for which Ditech acquired servicing rights from Bank

of America and Res Cap in 2013.

16.     By way of example, several former Chapter 13 debtor borrowers with claims filed in

this case have alleged that Ditech engaged in similar conduct with respect to their mortgage loan

accounts, including Dawn Davis (also in TXNB), Ricardo Orozco (CANB), Chris and Samantha

Prior (VTB), Ricardo and Delia Ramos (TXSB), and upon information and belief, numerous others

have been similarly harmed.

17.     Further, in at least four cases identified by Plaintiff's counsel, the United States

Trustee has raised this issue with Ditech and filed motions regarding Ditech's escrow accounting

and requesting relief for failure to comply with Fed. R. Bankr. P. 3002.1.  *See In re Barrion*, No. 13-

52304 (M.D. Ga. filed Aug. 30, 2013); *In re Guzman*, No. 13-31893 (N.D. Ca. filed Aug. 21, 2013);

*In re Lane*, No. 14-70541 (M.D. Ga. Filed May 1, 2014); *In re Rojas*, No. 15-20461 (D. Co. filed

Sep. 17, 2015).  *See also* **Exhibit 1**.

18.     Because of its failure to properly apply discharged Chapter 13 debtors' payments,

Ditech has misrepresented the status of consumers' mortgage loan accounts post-discharge to

credit reporting agencies, transforming what should be one of the few positive trade lines remaining

on discharged Chapter 13 debtors' credit reports into major derogatory trade-lines.  This false

credit reporting obliterates debtors' fresh start by giving the appearance that they re-defaulted on their mortgages despite having a recent bankruptcy discharge and having brought their mortgage loans current.

19.     Ditech has also delayed for years before performing post-discharge escrow analyses on borrowers' mortgage loan accounts, causing escrow shortages to accumulate, at which point Ditech tries to recover these manufactured, overstated, and false escrow 'shortages' from borrowers like Mr. Martinez by radically increasing their monthly mortgage payments, by threatening foreclosure, and by attempting to coerce borrowers into unfavorable loan modification agreements that recapitalize Ditech's unlawful charges.

20.     Upon information and belief, Ditech has actually foreclosed on borrowers as a consequence of its own failure to maintain effective and accurate payment application systems and servicing records, its failure to perform timely and accurate annual escrow analyses, its failure to perform appropriate discharge reconciliations on discharged former Chapter 13 debtors' mortgage loan accounts, and its failure to credit borrower payments properly during and after borrowers' Chapter 13 cases.

21.     Ditech engaged in, and continues to engage in, these illegal and improper practices despite being subject to active scrutiny by the United States Trustee's Office since at least 2014, including servicing related to this type of loan servicing misconduct, among others.

22.     A preliminary investigation of Ditech's practices based on a sampling of recently discharged Chapter 13 cases reveals that the scale and extent of the harm Ditech is causing and threatening to cause discharged Chapter 13 debtors is likely to be massive.

23.     Attached hereto as **Appendix 1** is a chart compiling a list of nearly 50 borrowers with

mortgage loans serviced by Ditech who received Chapter 13 discharges in various jurisdictions nationwide in the three months ending February 11, 2019.

24.    As Appendix 1 reflects, in each of these cases, Ditech failed to file annual notices of mortgage payment changes as required by Fed. R. Bankr. P. 3002.1, despite the fact that the borrowers' mortgage payment included an escrow component.  This failure to file notices of mortgage payment change allows escrow shortages to accrue on such accounts since the escrow component of the borrowers' payments stays static even though the actual amounts owed for taxes and insurance generally increase each year.

25.    Appendix 1 also indicates that Ditech frequently fails to file responses to Trustees' notices of final cure payment and, when it does, its responses to the notice of final cure often confirm that Ditech allowed an undisclosed arrearage to accrue[3] on borrowers' mortgage loan accounts.[4]

26.    In its current Chapter 11 case, Ditech is now seeking to sell, "free and clear" of borrower claims related to its servicing misconduct, its portfolio of mortgage servicing rights. Ditech's portfolio of mortgage servicing rights includes servicing rights for hundreds of thousands of loans, many of which Ditech and its predecessors-in-interest have loaded with illegal and/or discharged amounts.

27.    In short, Ditech is attempting to use the bankruptcy system to affirmatively *create assets* by transforming illegal and/or legally uncollectible fees and charges assessed to

---

[3] In one case as much as $26,000.

[4] This is not a comprehensive list, and upon information and belief, the total number of similarly-situated borrowers is in the thousands.  The chart provided is based on an informal sampling of discharged cases and is only intended to be illustrative of the problem's scale.

unsuspecting, vulnerable borrowers' mortgage loan accounts into legally enforceable obligations.

28.    This abuses the bankruptcy system and misleadingly seeks to expand Ditech's and its affiliated entities' estates to include borrowers' mortgage loan *accounts*, which, for purposes of the accounts at issue and relief sought in this lawsuit, are not actually property of Ditech's bankruptcy estate.  This is because, as is the case for the vast majority of the loans Ditech services, Ditech's "property" interest relative to Plaintiff's and the other putative class members' loans is only the right to service such loans ("Mortgage Servicing Rights" or "MSR") on behalf of and as agent for the loans' owners.

29.    Ditech's pecuniary interest in those accounts lies in the value of the mortgage servicing rights, plus the servicing fees they generate.

30.    The value of the MSR is determined by the present value of the projected servicing fees for each loan, plus the amount of unpaid recoverable advances that appear on the borrower's mortgage loan account.

31.    As a result, Ditech's MSR portfolio's valuation is misleadingly overstated to the extent it includes illegal and/or non-recoverable charges and advances assessed to borrowers' mortgage loans.

32.    Prospective purchasers of MSR consider such advances to be a profit source to the extent they can be acquired at a discount, pursuant to the terms of virtually every servicing agreement, including Ditech's agreements with Fannie Mae, since these amounts are paid on a priority basis upon liquidation of the property, reinstatement, or payoff.

33.    Ditech's duty is to the loan's owner as its agent, although Ditech's servicing misconduct on behalf of the loans' owner harms borrowers by overstating the amounts owed on

their accounts.

34.     Accordingly, purchasers of MSR are incentivized to collect these advances and dis-incentivized to write them off after paying to acquire them with the expectation that they would eventually be recovered for a profit.

35.     The Bankruptcy Courts and the Bankruptcy Code should not be used to authorize, enable, or encourage conversion, misrepresentation, fraud, or contempt of prior Bankruptcy Courts' orders.

36.     Plaintiff and the other putative class members have no ability to protect their credit ratings, avoid harassment for money not owed, and/or to keep Ditech from collecting unlawful fees and charges unless their accounts are corrected.

37.     Plaintiff and the other putative class members are entitled to an order from this Court requiring Ditech to correct its account records, and fix errors in its servicing system and dispute resolution processes  that have caused these issues and/or prevented their proper resolution.

## II.  PARTIES

38.     Plaintiff Jose Angel Martinez, Jr. ("Mr. Martinez") is a resident of the Northern District of Texas.  Mr. Martinez was the debtor in *In re Martinez*, Case No. 11-33750 (Chapter 13), filed in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

39.     Ditech Financial LLC f/k/a Green Tree Servicing LLC ("Ditech") is a Delaware limited liability company with headquarters located in Saint Paul, Minnesota.  Ditech may be served with process through its registered agent, CT Corporation System, at 28 Liberty St., New York, New York 10005.

40.    Ditech Holding Corporation ("Ditech Holding," together with Ditech Financial LLC, the "Ditech Defendants") is a Maryland corporation.  Ditech Holding Corporation does not maintain a registered agent in the State of New York.  Ditech Holding Corporation may be served through Thomas Marano, its Chief Executive Officer, at 1100 Virginia Drive, Suite 100, Fort Washington, PA 19034.

41.    As of September 30, 2018, Ditech serviced approximately 1,500,000 residential loans, and its business model included the buying and selling of servicing rights and performing subservicing for other owners of servicing rights.  (Data from page 72 of Ditech Holding Corp. 10-K filed on November 14, 2018).

42.    For the three months ending September 30, 2018, Ditech made $100,038,000.00 in net revenue from servicing and fees, (*id.,* page 5), or approximately $1,087,000 per day, which is more than $75,000.00 per hour.

43.    Rather than invest the resources to correct known errors in its loan servicing, Ditech chose to profit from the continuation of those errors at the expense of and to the detriment of the homeowners whose loans it services.

44.    Black Knight Financial Services, Inc. ("Black Knight") is a corporation that is "a leading provider of integrated technology, data and analytics solutions that facilitate and automate many of the business processes across the mortgage lifecycle." **Exhibit 2**.  Black Knight does not maintain a registered agent in the State of New York.  Black Knight may be served through Anthony Jabbour, its Chief Executive Officer, at 601 Riverside Avenue, Jacksonville, Florida 32204.

45.    To increase its profits, Ditech uses Black Knight's servicing software and other

services, as well as a variety of unknown vendors and sub-servicers to work on the accounts that Ditech services.

46.     Federal National Mortgage Association ("Fannie Mae") is a government-sponsored enterprise headquartered in Washington, D.C.  Defendant Fannie Mae is an entity that, since September 6, 2008, has been under the conservatorship of the Federal Housing Finance Authority, an agency of the United States, and that conservator has authorized Fannie Mae to sue and be sued in its own name.  Fannie Mae does not maintain a registered agent in the State of New York.  Fannie Mae may be served through Hugh R. Frater, its Chief Executive Officer, at 1100 15th Street, NW, Washington, D.C. 20005.

47.     For its own profit, Fannie Mae continues to use Ditech to service the loans Fannie Mae owns despite being on actual and constructive notice of defects in it servicing practices that harm consumer borrowers with Fannie Mae loans serviced by Ditech.

## III.  JURISDICTION, AUTHORITY, AND VENUE

48.     This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

49.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

50.     Pursuant to Fed. R. Bankr. P. 7008(a), Plaintiff states that to the extent the Court determines that any portion of this complaint is non-core, Plaintiff consents to the entry of final orders or judgment in this adversary proceeding by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.  Further, to the extent that any court determines that the Bankruptcy Court does not have the authority to enter a final judgment on any

cause of action set forth herein, Plaintiff requests that the Bankruptcy Court issue a report and recommendation to the United States District Court for the Southern District of New York for entry of a judgment on any such cause of action.

## IV. FACTS

### 1) Mr. Martinez's Bankruptcy

51.     Mr. Martinez filed his Chapter 13 bankruptcy case on June 6, 2011 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 11-33750. **Exhibit 3.**

52.     On his schedules, Mr. Martinez listed his home as real property valued at $313,000.00, which was secured by a first and a second mortgage that together totaled $284,801.41. **Exhibit 4**.

53.     Thus, Mr. Martinez had approximately $28,000.00 in equity in his home when he filed for Chapter 13 bankruptcy on June 6, 2011, according to his schedules.

54.     At the time Mr. Martinez filed his Chapter 13 bankruptcy, Bank of America serviced his first mortgage loan.

55.     On October 6, 2011, Bank of America filed Proof of Claim 22 in Case No. 11-33750, asserting a secured claim in the amount of $211,637.61. **Exhibit 5**. This claim included an unpaid principal balance of $153,624.99, which accrued annual interest of 6.625%, and alleged pre-petition arrearages of $63,861.76. *Id.*

56.     The arrearage portion of Bank of America's proof of claim was comprised of $16,741.05 in past-due principal and interest payments, $300.00 in post-petition bankruptcy attorney fees, $55.80 in uncollected late charges, and an escrow shortage of $47,880.91. *Id.*

57.     Bank of America's Proof of Claim 22 also indicated that Mr. Martinez's monthly

mortgage payment would increase from $1,116.07 to $2,045.17, beginning with the July 1, 2011 payment. *Id.* The new post-petition payment included $655.77 for taxes and $273.33 for insurance. *Id.*

58.     Mr. Martinez filed his amended Chapter 13 plan on November 16, 2011, which proposed to pay the full arrearage claim on the first mortgage over the life of the plan and for Mr. Martinez to make his ongoing monthly mortgage payments directly to Bank of America. **Exhibit 6**.

59.     On January 3, 2012, the Bankruptcy Court entered an order confirming Mr. Martinez's Chapter 13 plan. **Exhibit 7**.[5]

60.     On November 6, 2012, the Chapter 13 Trustee filed his Recommendation Concerning Claims ("TRCC"), which recommended allowance of Bank of America's arrearage claim in the amount of $63,861.76. **Exhibit 8**. The Bankruptcy Court entered an order approving the TRCC on February 12, 2013. **Exhibit 9**.[6]

61.     Upon information and belief, servicing of Mr. Martinez's mortgage loan account was transferred to Green Tree n/k/a Ditech during Mr. Martinez's bankruptcy, and Green Tree commenced servicing Mr. Martinez's mortgage loan account effective May 1, 2013.

62.     Green Tree never filed a notice of transfer of claim in Mr. Martinez's bankruptcy case, despite receiving payments from the Chapter 13 Trustee and related case notices. Green Tree also never filed a notice of monthly mortgage payment change or any other document in Mr.

---

[5] Mr. Martinez subsequently modified his Chapter 13 plan to pay Trustee arrears and to provide for the payment of an additional claim. The plan modification did not change the treatment of Bank of America's arrearage claim.

[6] The order approving the TRCC was subsequently amended, but the amendment did not change the treatment of the arrearage claim.

Martinez's bankruptcy case.

63.     Despite Green Tree's failure to file a notice of transfer of claim, the Chapter 13 Trustee did direct the payments on Mr. Martinez's mortgage loan to Green Tree and began sending notices to Green Tree.

64.     Mr. Martinez received unsolicited correspondence dated November 6, 2013 from Green Tree supposedly "approving" him for a permanent loan modification set to begin December 1, 2013, once accepted by Mr. Martinez. **Exhibit 10**.

65.     The unsolicited modification offer proposed to extend Mr. Martinez's loan term to 40 years from the modification date and would have recapitalized the arrearage balance that Mr. Martinez was already repaying under his confirmed Chapter 13 plan. *Id.*

66.     Upon information and belief, Ditech calculated the terms of the unsolicited proposed modification for Mr. Martinez's loan using Black Knight's systems and with Black Knight's support and assistance.

67.     Mr. Martinez's bankruptcy counsel received a letter dated January 6, 2014 from Green Tree stating that Mr. Martinez was not eligible for a mortgage modification due to his failure to provide the final executed modification documents. **Exhibit 11**.

68.     Green Tree's January 6, 2014 letter also stated "in order to avoid the negative impact to your client's credit rating resulting from late payments and to avoid foreclosure, it is important that your client makes the full payment, if any payment is currently due, as soon as possible and continue to make their mortgage payment by the scheduled date." *Id.* The January 6, 2014 letter also offered other workout options such as a short-sale or deed-in-lieu of foreclosure. *Id.*

69.     Mr. Martinez did not request the loan modification offered by Green Tree, nor did Mr. Martinez ever consent to the loan modification offered by Green Tree.

70.     Despite knowing that Mr. Martinez was in an active Chapter 13 bankruptcy and performing his obligations under his confirmed Chapter 13 plan, Green Tree sent Mr. Martinez the January 6, 2014 letter demanding that, in order to avoid negative credit consequences and foreclosure, Mr. Martinez pay the amount currently due as soon as possible.

71.     Upon information and belief, Mr. Martinez made his monthly mortgage payments in the full amount due each month during the pendency of his Chapter 13 bankruptcy.

72.     On August 3, 2016, the Chapter 13 Trustee filed his Notice of Final Cure Payment pursuant to Fed. R. Bankr. P. 3002.1(f), which indicated that the Chapter 13 Trustee paid a total of $63,861.76 (i.e., the full arrearage claim listed on Claim 22) to Green Tree Servicing LLC related to Mr. Martinez's first mortgage loan. **Exhibit 12**.

73.     Green Tree/Ditech did not file a response to the Chapter 13 Trustee's August 3, 2016 Notice of Final Cure Payment.

74.     On August 31, 2016, Plaintiff received his Chapter 13 order of discharge. **Exhibit 13**.

## 2)  Mr. Martinez's Account Post-Chapter 13 Discharge

75.     Defendants are servicing Mr. Martinez's and the other class members' accounts using false and overstated account information loaded on to a servicing platform (MSP) that Defendants intentionally used to collect amounts borrowers did not owe.

76.     Ditech claims that, as part of its servicing process for borrower accounts in bankruptcy, it performs quality assurance reviews of court-filed documents pre- and post-filing.

Upon information and belief, this is either false, or the quality assurance reviews are fatally flawed and inadequate to prevent extreme and foreseeable harm to the borrowers whose mortgage loans Ditech services.

77.     Ditech also contends that its bankruptcy quality assurance group "reviews reconciliations" after discharge and monitors overall compliance with bankruptcy processes. Upon information and belief, these processes either are not actually followed by Ditech's personnel in practice, or these procedures, if followed, are fatally flawed and inadequate to prevent extreme and foreseeable harm to the borrowers whose loans Ditech services.

78.     After receiving his Chapter 13 discharge, Mr. Martinez continued to make his monthly mortgage payment to Ditech each month via autodraft.

79.     On March 13, 2017, the Chapter 13 Trustee filed his final report and account, which indicated that the Chapter 13 Trustee paid the pre-petition arrearage claimed by Bank of America/ Green Tree in Proof of Claim 22 in full.  **Exhibit 14**.

80.     Beginning in April 2018, more than a year and a half after Mr. Martinez received his Chapter 13 discharge, Ditech f/k/a Green Tree suddenly began demanding that Mr. Martinez pay in excess of $55,000 in alleged escrow shortages.

81.     Mr. Martinez's mortgage loan account should not have contained any escrow shortages in April 2018, as his monthly payments were current post-discharge, and his pre-bankruptcy arrearage (including escrow shortage) were cured in his Chapter 13 case.

82.     Nevertheless, Ditech demanded that Mr. Martinez pay substantial escrow shortage amounts in various correspondence, as follows:

| Date of Correspondence: | Type of Correspondence: | Amount of Escrow Shortage Indicated in Correspondence: |
|---|---|---|

| April 30, 2018 | 2017 Annual Tax & Interest Statement | $68,095.20 |
|---|---|---|
| June 13, 2018 | Payoff Statement | $57,300.67 |
| July 2, 2018 | Monthly Mortgage Statement | $56,371.57 |
| July 31, 2018 | Annual Escrow Account Disclosure Statement | $68,252.98 |
| August 28, 2018 | Payoff Statement | $55,442.47 |

*See* **Exhibit 15**.

83.     Mr. Martinez notified Ditech repeatedly that he did not owe the escrow shortages Ditech was demanding.

84.     Mr. Martinez received a letter from Ditech, dated April 13, 2018, that acknowledged that the escrow shortage was showed on his account after discharge but Ditech did not correct it. **Exhibit 16**.

85.     The April 13, 2018 letter alleged that, when Ditech (f/k/a Green Tree) acquired servicing of Mr. Martinez's loan account, it showed an escrow deficiency of $48,907.15. Ditech's April 13, 2018 letter also acknowledges that Mr. Martinez's escrow account had not been reanalyzed *since September 1, 2013. Id.*

86.     Mr. Martinez's counsel sent Ditech a Request for Information dated July 24, 2018, requesting information regarding Mr. Martinez's mortgage account, including a payoff statement, reinstatement quote, information regarding the owner of the mortgage loan, escrow analyses performed on Mr. Martinez's mortgage loan, and a transaction history from Ditech's system of record. **Exhibit 17**.

87.     Mr. Martinez received a letter from Ditech dated August 2, 2018, acknowledging receipt of his Request for Information and stating that Ditech expected to respond within 30 days. **Exhibit 18**.

88.    Ditech sent Mr. Martinez a payoff statement dated August 8, 2018, which claimed a total amount due of $170,061.12. **Exhibit 19**. The breakdown Ditech provided for the payoff balance in the August 8, 2018 payoff statement did not add up. It listed only an unpaid balance of $114,266.07 and accrued interest through August 8, 2018 in the amount of $352.58. *Id.*

89.    Ditech sent Mr. Martinez correspondence dated August 10, 2018, in response to Mr. Martinez's July 24, 2018 identifying "Fannie Mae" as the owner of his mortgage loan. **Exhibit 20**.

90.    Mr. Martinez's counsel sent a Notice of Error to Ditech dated August 21, 2018, informing Ditech that the August 8, 2018 payoff statement was miscalculated and requesting that Ditech provide an accurate payoff statement. **Exhibit 21.**

91.    In response to the August 21, 2018 Notice of Error, Ditech sent Mr. Martinez a revised payoff statement dated August 28, 2018, which alleged that there was an unpaid balance of $114,266.07, interest through September 27, 2018 of $1,170.08, and an alleged escrow shortage of $55,442.47, totaling $170,878.62. **Exhibit 22**.

92.    Ditech sent Mr. Martinez a letter dated September 6, 2018, responding to the July 24, 2018 Request for Information. The September 6, 2018 response provided by Ditech purported to provide a payment history, escrow analyses performed on the account, a copy of the August 10, 2018 letter providing owner information, and a copy of the August 28, 2018 payoff statement. **Exhibit 23**.

93.    There were only two escrow analyses attached to the September 6, 2018 correspondence from Ditech, one dated July 31, 2018 and another that is bizarrely scrambled and entirely illegible. *Id.*

94.    The July 31, 2018 escrow analysis indicated that Mr. Martinez's mortgage loan account had an escrow shortage in the amount of $68,252.98 and provided Mr. Martinez with two totally unrealistic and unreasonable options to repay the alleged escrow shortage (that Mr. Martinez did not actually owe): 1) pay the shortage amount in full by September 24, 2018 or 2) add $5,687.75 to Mr. Martinez's mortgage payment (totaling $8,052.87) for 12 months. **Exhibit 23.**

95.    The transaction history provided by Ditech in its September 6, 2018 RESPA response also purports to be a "Web History," and not a transaction history from Ditech's MSP servicing system of record, as Mr. Martinez requested. *Id.*

96.    However, the transaction history provided by Ditech indicates that Ditech did not apply Mr. Martinez's plan payments and post-petition monthly mortgage payments during his Chapter 13 bankruptcy to cure the arrearage claimed in Proof of Claim 22 and maintain ongoing post-petition payments as necessary to allow Mr. Martinez to emerge from his Chapter 13 bankruptcy with a current mortgage loan.

97.    Moreover, Equifax, TransUnion, and Experian are all reporting inaccurately that the outstanding balance on Mr. Martinez's mortgage loan is more than $180,000.00, an amount that presumably includes the entire alleged escrow shortage even though Mr. Martinez cured his pre-petition escrow arrears, made all post-petition mortgage payments, and received his Chapter 13 discharge.

98.    Fannie Mae requires servicers of its loans to report the loans' status to the credit reporting agencies each month, for its benefit.

99.    Fannie Mae monitors it servicers' operations and their compliance with applicable laws, including their accounting practices and credit reporting practices.

100.    Fannie Mae knew Ditech's portfolio was overstated and, for its benefit, allowed it.

101.    Finally, Defendants have actually attempted to collect amounts to pay down the escrow shortage from Mr. Martinez.  As stated above, Mr. Martinez was making his monthly mortgage payments to Ditech by auto-draft and, in October 2018, Ditech auto-drafted the $8,052.87 payment amount from Mr. Martinez's bank account, leaving insufficient funds for Mr. Martinez, a small business owner, to make payroll for his employees.

### 3) How the mortgage servicing business is structured

102.    In the primary mortgage lending market, lenders a/k/a "originators" make mortgage loans to borrowers, which are secured by property (home mortgage loans or "mortgages").  Originators can choose to hold these mortgages in their own portfolios or sell them into the secondary market.

103.    Originators also can "service"[7] mortgage loans that they originate or purchase, and they sometimes sell mortgage loans they originate while retaining the mortgage servicing rights, aka "MSRs," which is the right to administer/services loan on behalf of the loan owner, in exchange for a servicing fee tied to the unpaid balance of the loan, plus the right to recover certain expenses and advances on property loans at payoff, refinance, sale, or foreclosure.  Servicers sometimes also purchase MSRs for securitized loans they do not originate.

104.    "Servicing" entails several different components.  One component is billing and collecting payments from borrowers.  Servicers also perform loan management functions, send borrowers monthly account statements and tax documents, respond to customer service inquiries, maintain escrow accounts for property taxes and hazard insurance, and forward monthly mortgage

---

[7] Servicing is inherent in all mortgage loans, but the right to service a mortgage becomes a distinct asset — an MSR — when contractually separated from the loan when the loan is sold or securitized.

payments to loan owners, which are typically investment pools of loans managed by government sponsored entities ("GSEs") like Fannie Mae or private securitization trusts managed by securitization trustees like Deutsche Bank or Wilmington Savings Fund Society, among others.

105.    Servicers also perform collection and loss mitigation activities related to delinquent loans, including handling requests for modifications, overseeing foreclosures, responding to borrower disputes, litigation, and other related matters.

106.    Pursuant to most servicing agreements, including Fannie Mae's agreements with Ditech, servicers agree to pay the holder the monthly principal and interest payments to the loan owner each month, whether or not they are collected from the borrowers, so long as the servicer reasonably believes it will be able to recover its servicing fees and advances from the proceeds of a foreclosure sale after satisfaction of the principal and interest due on the loan.

107.    This arrangement creates a conflict of interest between the loan owners, which benefit most from performing loans, and distressed loan servicers like Ditech whose business model relies on acquiring seasoned loan accounts for a discount below the amount of recoverable advances included on the borrower's mortgage loan account, which the servicer can convert to profit paid on a priority basis from the proceeds of a foreclosure sale.

### *Issues with servicing transfers are rampant in the distress loan servicing business.*

108.    In 2016, the Consumer Financial Protection Bureau ("CFPB") released a special edition of its Supervisory Highlights that includes explicit and detailed discussion of its concerns with servicers in the area of servicing transfers. The Transfer of Servicing Rules (Regulation X, Part 1024 of the Code of Federal Regulations and guidance from CFPB Bulletin 2-14-01) are intended to protect consumers from disruption in the application of their payments and other

common servicing breakdowns associated with MSR transfers.

109.    Among other requirements during the transfer process, servicers transferring borrowers' accounts must provide the successor-servicers with borrowers' complete loan account information and supporting documentation.

110.    Issues can emerge for borrowers when the transferor servicer fails to fulfill these requirements, and when other issues—such as incompatible technological systems—produce errors.

111.    As nonbanks engaged in significant acquisitions of MSR from other servicers during and after the financial crisis, a combination of errors and improper actions on the part of both transferring and receiving servicers led to borrowers experiencing harm, including losing their homes to foreclosure in some cases.

112.    As Ditech's current Chapter 11 bankruptcy filings reveal, when nonbank servicers attempt to cut operational costs in response to liquidity issues, these measures lessen servicers' ability to comply with consumer protection laws and regulations.

### 4)  Green Tree/Ditech's evolution and expansion in the aftermath of the financial crisis

113.    In the third quarter of September 2015, Walter Investment Management Corp. completed the consolidation of its originations and servicing businesses and changed the name to Ditech Financial LLC.

114.    As of March 2015, the company's servicing portfolio consisted of 2,104,196 loans for an unpaid principal balance of approximately $233.3 billion.

115.    In April 2015, Ditech f/k/a Green Tree Servicing LLC, the CFPB, and the Federal Trade Commission ("FTC") entered into a settlement focusing on its servicing and collection

practices.

116.    Green Tree Servicing and Ditech Mortgage Corp. merged to form Defendant Ditech Financial LLC, effective August 31, 2015.

117.    Green Tree, Ditech's predecessor entity, knew it was purchasing mortgage servicing rights for subprime, delinquent, and/or otherwise distressed loans when, in 2013, it acquired massive portfolios of Fannie Mae loans from Bank of America (successor to Countrywide) and from Res Cap (successor to GMAC).

118.    These pools of loans were available to Ditech f/k/a Green Tree at a great discount in the aftermath of the financial crisis due to their undesirable servicing history and Bank of America's and Res Cap's systemically flawed legacy mortgage servicing and accounting platforms.

119.    Ditech f/k/a Green Tree represented to its investors at the time of its acquisition of the Bank of America and Res Cap portfolios that it was well-situated to service these pools of non-performing and distressed mortgage loans, holding itself out as a "specialty" servicer employing a "high touch" servicing model.[8]

120.    Many of the loans in the Bank of America and Res Cap pools were loans owed by borrowers who were in active Chapter 13 cases at the time that they were service transferred to Green Tree.

121.    With respect to mortgage loans of borrowers in Chapter 13 bankruptcy, Bank of America and Res Cap's servicing systems prior to the time of these transactions with Ditech f/k/a Green Tree were known to be unable to properly account for and apply payments on loans of

---

[8] "High Touch" is mortgage servicing industry "speak" for aggressive, debt collection/recovery-focused servicing strategies, with collections and foreclosures taking priority over customer service and facilitating borrowers' efforts to get their loans back into performing/non-default status.

borrowers in Chapter 13 Bankruptcy, in violation of the requirements of the Bankruptcy Code. *See, e.g., Cano v. GMAC Mortgage Corp. (In re Cano)*, 410 B.R. 506 (Bankr. S.D. Tex. 2009)(GMAC/Res Cap); *Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 432 B.R. 671 (Bankr. S.D. Tex. 2010)(Bank of America/Countrywide).

122.    Plaintiff Joe Martinez's loan was among the loans that were service transferred from Bank of America to Ditech f/k/a Green Tree in 2013.

123.    Ditech f/k/a Green Tree underestimated the operational requirements that would result from its acquisition in 2013 of MSR portfolios for millions of mortgage loan accounts.

124.    Upon information and belief, Ditech f/k/a Green Tree's rapid growth occurred at a time when Ditech f/k/a Green Tree lacked advanced operating systems and/or effective internal controls to handle its suddenly significantly larger loan servicing portfolio—an issue identified by the CFPB and others as a substantial contributor to Ditech's deficient servicing practices.[9]

125.    Ditech's less mature infrastructures for managing regulatory compliance, risks, and internal controls made it more vulnerable to system breakdowns and violations of regulatory and other consumer protection laws and responsibilities.

126.    Similarly, Ditech's weak internal controls and compliance programs harmed consumers, especially after 2013, generating problems and errors with account transfers, payment processing, and loss mitigation processing.

127.    Issues related to Ditech's aggressive growth and insufficient infrastructure resulted in harm to consumers' accounts and has been complicated by data migration errors in connection with servicing transfers between institutions.

---

[9] The CFPB's examinations also found servicing problems at Ditech due to a lack of robust compliance systems.

128.    Moreover, because Green Tree used a different, proprietary mortgage servicing system ("GTA") than the systems held by Bank of America (AS-400) and Res Cap (Realserv/Loanserv), the problems with Bank of America's and Res Cap's already inadequate mortgage loan servicing systems were compounded by the complicated process of "migrating" electronic data from the prior servicers' systems and "on-boarding" the data for borrowers' loan accounts onto GTA.

## 5) Fannie Mae's role

129.    At some time between May of 2017 and June of 2018, Ditech ended a relationship with a prior bankruptcy vendor that had previously serviced all GSE bankruptcy loans.

130.    As of June 2018, Ditech had 'insourced' all bankruptcy loans, using Black Knight's LoanSphere system, for all GSE loans.

131.    Ditech f/k/a Green Tree and its business partners, including Fannie Mae and Black Knight, among others, are aware that Ditech's accounts are riddled with non-recoverable, illegal, and/or improper escrow 'advances' and other improper fees and charges, yet they allow Ditech to continue to attempt to collect these amounts from discharged debtors, in violation of Bankruptcy Code § 524's discharge injunction.  11 U.S.C. § 524(i).

132.    Through its contract with Fannie Mae to collect payments on the Plaintiff's and other putative class members' home loans, Ditech receives a benefit by, among other things, assessing fees and diverting money into its own account instead of applying principal and interest payments to the loan.  Ditech also benefits from these practices to the extent that the overstated escrow advance and other amounts improperly assessed as recoverable on borrowers' accounts increase the perceived value of its MSR portfolios.

133.    Fannie Mae knows of Ditech's systemic problems and continues to use it as its agent.

**6) Black Knight's role in servicing, boarding, migration, and in this bankruptcy case**

134.    Later, from 2014-2016, Ditech f/k/a Green Tree again migrated the loan account data for its entire portfolio of Fannie Mae, Freddie Mac, and Ginnie Mae loans from the GTA servicing system to Defendant Black Knight's MSP servicing platform.

135.    Ditech used Electric Loan Interface ("ELI") in order to upload some of its predecessor servicers' transferred servicing files, map data points from transferors' files to MSP data fields, and to board the transferred mortgage loan files to MSP using new account transactions. *See* Exhibit 24.

136.    For larger and/or more complex transfers, Ditech utilized Black Knight's Acquisition Service.  In these cases, Black Knight created a data definition document with data and mapping definitions from the transferors' files.  Black Knight would then upload the transferred mortgage loan account files to Ditech's MSP platform using the data definition document.  *Id.*

137.    On top of the already complex data migration process when transferring loan accounts between servicing systems, Ditech was also required to remain in compliance with the requirements of the Bankruptcy Code with respect to mortgage servicing rights acquired for loans of borrowers in Chapter 13 bankruptcy.

138.    Ditech and Black Knight knew (or should have known) that overcoming these technical challenges was a necessary component of their acquisition of Bank of America's and Res Cap's MSRs in 2013.

139.    With Black Knight's assistance, using Black Knight's systems and consultants,

Ditech nevertheless chose to convert more than one million mortgage loan accounts for GSE loans a second time, from GTA to MSP, without first correcting known errors in the loan accounts that were inherited when Ditech acquired the loans in the first place.

140.     Since 2013, Ditech f/k/a Green Tree has also consistently failed to comply with Fed. R. Bankr. P. 3002.1, which requires servicers to file notices of post-petition fees and charges, payment change notices, and responses to end-of-case final cure notices, all of which were implemented in 2011 for the purpose of allowing mortgage servicers and borrowers to be certain that all post-petition amounts are paid prior to discharge, so that the debtor emerges from his or her 3-5 year repayment plan with a current mortgage loan.

141.     Ditech's failure to file 3002.1 payment change notices was due, in part, to Black Knight's MSP system's limitations regarding historical escrow accounting analyses.

142.     Black Knight knew it was boarding loan portfolios for Ditech with the intention that Ditech would use and pay for its MSP system to service the loans and manage borrowers' escrow accounts, including management of accounts of borrowers in bankruptcy.

143.     Black Knight knew that the loan accounts it was boarding onto the MSP system included Chapter 13 debtors and former Chapter 13 debtors.

144.     With this knowledge, Black Knight did not set up its servicing system to distinguish between discharged and post-discharge escrow obligations.

145.     Knowing that Ditech was habitually failing to prepare annual escrow analyses of borrowers in bankruptcy, Black Knight provided Ditech access to its servicing systems and personnel to actively assist Ditech in maintaining and collecting on false and overstated loan accounts, in order to extract improper amounts and obtain revenue that Ditech used to pay Black

Knight for its assistance.

146.    Technology is also a large cost for nonbank servicers, and one of Ditech's most important and expensive vendors is Black Knight, which provides the foundational mortgage loan servicing software platform, known as MSP, Ditech uses to service the majority of the loans in its MSR and subservicing portfolio.

147.    Ditech relies upon Black Knight's mortgage processing technology to service loans, and Ditech cannot service these loans without access to Black Knight's technology platform. *See* Black Knight's motion to compel debtors to assume or reject executory contract, Docket No. 418.

148.    Ditech and Black Knight are parties to a Master Technology & Services Agreement pursuant to which Black Knight provides Ditech with Black Knight's MSP technology platform and related products, services, and work management as such are described in those Agreements.[10] *Id.* at ¶ 6.

149.    Black Knight's agreement with Ditech began on September 29, 2014 and is set to continue for 84 months. *Id.* Ditech's predecessors also operated under earlier versions of the agreements for several years prior to September 2014. *Id.*

150.    The agreements between Ditech and Black Knight are critical to Ditech's business and Ditech cannot operate in the ordinary course without them. *Id.* at ¶ 13. Ditech has relied on Black Knight's MSP technology platform for many years and continues to rely on the technology post-petition. *Id.*

151.    Under the terms of the agreement, Ditech is obligated to control access to Black Knight's technology platform, adhere to Black Knight's security and confidentiality policies, and

---

[10] Ditech and Black Knight are also parties to other agreements with varying terms. *Id.*

maintain an internal support system (help desk) for Ditech's end-users to address routine issues. *Id.* at ¶ 7.  Additionally, Ditech has ongoing obligations to ensure all data input is ready and transmitted for processing on agreed terms and timelines, and to correct and resubmit any transaction rejected during processing.  *Id.*  For its part, Black Knight is obligated to permit continued access to its technology systems and to timely process the data received from Ditech. *Id.*

152.    In connection with its work with and for Ditech, Black Knight provides the MSP software, as well as personnel, systems assistance with vendors, and various other services, including analytics, support teams, and LoanSphere, including LoanSphere Bankruptcy and Foreclosure, described as "an enterprise workflow application to support bankruptcy and foreclosure processes."  Black Knight thus participated actively (behind the scenes) in the servicing of loans in Ditech's MSR portfolio.

153.    Black Knight and its affiliated vendors and/or subsidiaries assisted Ditech with the data migration process for the loans that were transferred from the GTA servicing system to MSP. **Exhibit 24**.

154.    Upon information and belief, Black Knight and its affiliated vendors and/or subsidiaries knew that the accounts it was boarding onto the MSP system for Ditech were laden with illegal, improper, and/or non-recoverable fees and charges assessed to discharged Chapter 13 debtors' mortgage loan accounts.

155.    Black Knight knew that the escrow accounts of the loans it was boarding did not reflect recent escrow analyses.

156.    Black Knight knew that it was boarding loans of current and former Chapter 13

debtors for Ditech to service using its MSP and other systems.

157.    Black Knight marketed its software for use by servicers of loans of borrowers in bankruptcy at the time that it contracted with Ditech in 2013-2014.

158.    Black Knight knew that MSP stored loan information, including escrow account information, for only three years.  As a result, MSP could not accurately calculate borrowers' post-petition escrow payment.  Black Knight knew its systems could not reliably track and apply escrow payments for Chapter 13 debtors when it contracted with Ditech.

159.    Black Knight and its affiliated vendors and/or subsidiaries contracted with Ditech to provide it with servicing software and other systems, processes, training, and support in connection with its efforts to collect these illegal amounts assessed to the loan portfolio.

160.    At the time that Black Knight contracted with Ditech to provide systems and services to Ditech in connection with its servicing business, Black Knight knew that Ditech's portfolio consisted of Fannie Mae loans previously serviced by Bank of America/Countrywide and Res Cap/GMAC that had been servicing using other systemically flawed servicing platforms and included significant amounts of fees, charges, and other amounts included on accounts that were of dubious validity.

161.    Black Knight actively assisted Ditech with its use of Black Knight's systems, software, and services to collect on borrower accounts, including Mr. Martinez's account and the accounts of the other members of the putative class, despite knowing that discharged former Chapter 13 borrowers' accounts continued to include escrow shortages that accumulated prior to discharge without notice to Mr. Martinez.

**7) New Residential**

162.    In mid-2018, shortly after Ditech emerged from its first bankruptcy, but not before it became apparent to Ditech that another bankruptcy was likely, Ditech sold and New Residential Investments, Inc. ("NRZ") purchased nearly half of Ditech's entire mortgage servicing rights portfolio, which was riddled with non-recoverable, discharged, and/or illegal fees, charges, and advances.

163.    After the purchase, NRZ allowed Ditech to continue servicing these accounts in a sub-servicer capacity, despite Ditech's well-documented reputation for improper collections tactics and the unreliability and inaccuracy of its account records.

164.    NRZ acquired its own servicer, Shellpoint, in late 2018, to take over servicing of the Ditech portfolio, which it took over in January 2019.

165.    Thus, Ditech sold nearly half of its mortgage servicing rights portfolio, which at the time represented nearly half of the Debtors' principal assets, at a deep discount, to NRZ, with all parties having the initial expectation that Ditech would continue to attempt to collect the (improper) advances and other amounts assessed to the loans included in that portfolio.

## V. CLASS ALLEGATIONS

### 1)    Bankruptcy Court authority to adjudicate this matter as a nationwide class action

166.    28 U.S.C. § 1334(a) confers upon district courts the original and exclusive jurisdiction of all cases under Title 11.

167.    28 U.S.C. § 1334(b) provides that "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under Title 11."

168.    28 U.S.C. § 157(a) authorizes district courts to refer cases falling within the ambit

of § 1334 to bankruptcy judges for that district.

169.    The Order of Reference applicable in the United States District Court for the

Southern District of New York provides that "any or all proceedings arising under title 11 or arising

in or related to a case under title 11 are referred to the bankruptcy judges for this district." *In re*

*Standing Order of Reference Re: Title 11*, 12MISC00032 (S.D.N.Y. Feb. 1, 2012).

170.    Plaintiff's claims invoke substantive rights created by the Bankruptcy Code and

Rules and therefore fall within the Court's "arising under" jurisdiction. *See Jones v. Atlas*

*Acquisitions, LLC*, 16-03235, Order Denying Atlas Acquisitions LLC and Avi Schild's Motion to

Dismiss Plaintiff's Class Certification Claims (Bankr. S.D. Tex. May 19, 2017)(Bohm). **Exhibit 25**.

*See also, Cano v. GMAC Mortgage Corp. (In re Cano)*, 410 B.R. 506 (Bankr. S.D. Tex. 2009);

*Noletto v. Nationsbanc Mortgage Corp. (In re Noletto)*, 244 B.R. 845 (Bankr. S.D. Ala. 2000).

171.    This Court also has "arising in" jurisdiction in this case because Plaintiff's claims

can only arise in Bankruptcy Court.

172.    There is no question that Bankruptcy Courts are permitted to handle class actions

in adversary proceedings. Fed. R. Bankr. P. 7023 incorporates Fed. R. Civ. P. 23, which authorizes

courts to certify class actions. *In re Wilborn*, 609 F.3d 748, 754 (5th Cir. 2010); *In re Tate*, 253

B.R. 653, 663 (Bankr. W.D. N.C. 2000).

173.    Because the District Court for the Southern District of New York has jurisdiction

over a nationwide class of debtors, this Court, operating as a unit of the District Court for the

Southern District of New York, has the authority to adjudicate all matters that fall within the

District Court's bankruptcy jurisdiction. Thus, based on the language set forth in 28 U.S.C. §§

1334 and 157, and *In re Standing Order of Reference Re: Title 11*, 12MISC00032 (S.D.N.Y. Feb. 1,

2012), this Court may exercise jurisdiction over a nationwide class of debtors, including the class

for whom Plaintiff has filed this complaint, provided Plaintiff satisfies all other requirements of

Rule 23 for certification of class action.

## 2)    Class Definition

174.    Pursuant to Fed. R. Civ. P. 23(a), (b)(3), (b)(2) and (c)(4), Plaintiff brings this class

action on behalf of himself and all others similarly situated.

175.    Plaintiff proposes the following class definition for this case:

All former Chapter 13 debtors who have received a Chapter 13 discharge and whose loans were serviced by Ditech and/or Green Tree on behalf of Fannie Mae during their discharged Chapter 13 bankruptcy cases (excluding Judges of this Court, the Judges of the United States Court of Appeals, or the Justices of the United States Supreme Court), and as to whom one or more of the following criteria are satisfied:

(a) whose monthly mortgage payments while their Chapter 13 bankruptcy was pending included escrow for annual taxes and insurance, and

1.    who did not receive a Rule 3002.1 monthly mortgage payment change notice or annual escrow analysis from Ditech for a period of more than 365 days while their Chapter 13 bankruptcy case was pending; and/or

2.    whose loans continued to be serviced by Ditech after their Chapter 13 discharges and who did not receive an annual escrow analysis from Ditech for a period of more than 365 days after entry of the discharge order in their Chapter 13 case; and/or

3.    in whose bankruptcy cases Ditech filed either no response to the Trustee's final cure notice or filed a response to the Trustee's final cure notice that was inconsistent with the amounts Ditech or its successor in interest later alleged to be due and owing post-discharge; and/or

4.    whose monthly mortgage payment was increased by their mortgage servicer post-discharge to recover escrow shortages or other amounts advanced prior to the entry of the discharge order that were not the subject of a 3002.1 payment change notice, notice of post-petition fees, and/or

5.    whose escrow accounts included accumulated shortages that were not fully disclosed in response to the Chapter 13 Trustee's final cure notice.

(b) who received an unsolicited mortgage modification proposal from Ditech that sought to recapitalize amounts assessed to the borrower's account that accrued prior to and/or while the borrower's Chapter 13 case was pending.

176.    Members of this class can easily be identified through Defendants' records and can also be identified through this Court's records.

177.    The proposed class is so numerous that individual joinder of all members would be impracticable.

178.    Upon information and belief, based on a limited survey of recently discharged Chapter 13 cases involving loans serviced by Ditech/Green Tree, the subject of this case involves several thousands of class members.    While the identities of many of the class members are unknown to Plaintiff at this time, such information can be readily ascertained through appropriate investigation and discovery.    The disposition of the claims of the class members in a single action will provide substantial benefit to all parties and to the Court.

179.    Common questions of law and fact exist as to all members of the class and predominate over any questions affecting only individual class members.    The common legal and factual questions include, but are not limited to, the following:

a)    Whether Ditech and Black Knight had and followed proper procedures for preparing escrow analyses and calculating escrow payments;

b)    Whether Ditech had and followed proper procedures for filing Fed. R. Bankr. P. 3002.1 notices in borrowers' Chapter 13 bankruptcies;

c)    Whether Defendants Ditech, Black Knight, and Fannie Mae violated Fed. R. Bankr. P. 3002.1;

d)    Whether Defendants Ditech and Fannie Mae violated the automatic stay;

e)    Whether Defendant Ditech violated RESPA;

f)    Whether legal and/or equitable remedies should be allowed by the Court for these

violations, and if so, the amounts and nature of the relief needed to address these issues.

180.    Pursuant to Fed. R. Civ. P. 23(b)(2), as made applicable to this proceeding by Fed. R. Bankr. P. 7023, Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the class as a whole.

181.    Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff shares the aforementioned facts and legal claims or questions with class members, and Plaintiff and all class members have been similarly affected by Defendants' common course of conduct.

182.    Plaintiff will fairly and adequately represent and protect the interests of the class. Plaintiff has retained counsel with substantial experience in handling bankruptcy matters as well as complex class action litigation, including complex questions that arise in this type of financial and consumer protection litigation.

183.    Plaintiff and Plaintiff's counsel are committed to the vigorous protection of this class action.

184.    Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the members of the class.  Neither Plaintiff nor Plaintiff's counsel have any interests which might cause them not to vigorously pursue this action.

185.    A class action is superior to other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a)    The claims presented in this case predominate over questions of law or fact affecting individual class members;

b)    Individual joinder of all class members is impracticable;

c)  Absent a class, Plaintiff and class members will continue to suffer harm as a result of Defendant's unlawful conduct;

d)  Given Defendants' bankruptcy, few, if any, class members could afford to, or would, seek legal redress for the wrongs Defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

e)  Even if the individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

f)  Adjudication of individual class members' claims against Defendants would, as a practical matter, be dispositive of the interests of other class members who are not parties to the adjudication and may substantially impair or impede the ability of other class members to protect their interests;

g)  This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means to Plaintiff and the class members to seek redress for the harm caused by Defendants; and

h)  The claims consumer borrowers have filed in response to Ditech's claims bar date notice reveal that the notice process was inadequate and disallowance of consumer claims would unjustly harm consumers by denying them due process and a meaningful opportunity to be heard, and the proposed class would fill the gap so that the Debtors' Chapter 11 case and the class members' loans may move forward after this Chapter 11 bankruptcy case.

## VI. CAUSES OF ACTION

### COUNT I
### (VIOLATION OF FED. R. BANKR. P. 3002.1)
### (CLASS CLAIM AGAINST DITECH, AND FANNIE MAE)

186.  The allegations in this Complaint are re-alleged and incorporated herein by this reference.

187.  Fed. R. Bankr. P. 3002.1 became effective on December 1, 2011.

188.  Pursuant to Fed. R. Bankr. P. 3002.1(c), a creditor holding a claim secured by the debtor's principal residence is required to file a notice of fees, expenses, or charges that were incurred after a bankruptcy case is filed in connection with such claim to the extent the creditor

contends that such amounts are recoverable from the debtor or the debtor's principal residence. Rule 3002.1 requires that such notices must be filed within 180 days after the date on which the fees, expenses, or charges are incurred.

189.    Ditech never filed a notice of post-petition fees, expenses, or charges pursuant to Fed. R. Bankr. P. 3002.1(c) in Mr. Martinez's bankruptcy case.

190.    Fed. R. Bankr. P. 3002.1(b) also requires mortgage creditors to file payment change notices.

191.    Ditech never filed a payment change notice pursuant to Fed. R. Bankr. P. 3002.1(b) in Martinez's bankruptcy case to account for accrued escrow shortages on Mr. Martinez's account.

192.    Fed. R. Bankr. P. 3002.1(g) requires mortgage creditors to file a response to a notice of final cure payment within 21 days of service of such notice.  Fed. R. Bankr. P. 3002.1(g).  The response must state whether the debtor has paid the arrearage amount in full and whether the debtor is current on post-petition payments.  *Id.*

193.    Fed. R. Bankr. P. 3002.1(i) provides that if a holder of a claim fails to provide any information as required by subdivisions (b), (c), or (g) of this rule, the Court may, after notice and hearing, take either or both of the following actions:

  a.  Preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or

  b.  Award other appropriate relief, including reasonable expenses and attorneys' fees caused by the failure.

  Fed. R. Bankr. P. 3002.1(i).

194.    In Mr. Martinez's case, the Chapter 13 Trustee filed a notice of final cure payment pursuant to Fed. R. Bankr. P. 3002.1(f) on August 3, 2016.  **Exhibit 12**.

195.    Defendants never filed a response to the Trustee's notice of final cure payment
pursuant to Fed. R. Bankr. P. 3002.1(g).

196.    However, as described above, Defendants have asserted that an escrow shortage in
excess of $60,000 has accumulated on Mr. Martinez's mortgage loan account even though he
made all required payments under his Chapter 13 plan and continued making ongoing direct
mortgage payments throughout the pendency of his Chapter 13 case.  Mr. Martinez has continued
to make good faith monthly payments to Ditech, albeit not in the amount Ditech demanded in
order to recover the inaccurate and improper escrow shortage, which was nearly four times his
prior monthly payment of principal, interest, taxes, and insurance.

197.    Ditech's failure to respond to the Chapter 13 Trustee's notice of final cure payment
was not harmless, as Ditech misapplied Mr. Martinez's payments, reported to the credit reporting
agencies that Mr. Martinez owes approximately $60,000 more on his mortgage loan than he
actually owes, and nearly quadrupled Mr. Martinez's monthly mortgage payment in an effort to
recoup amounts that Ditech never disclosed to Mr. Martinez or the Bankruptcy Court during the
course of Mr. Martinez's Chapter 13 bankruptcy.

198.    Upon information and belief, Ditech's conduct as described herein is part of a
general pattern and practice of conduct by Ditech, which is either expressly authorized by, or not
specifically prohibited by, its policies and procedures.

199.    Additionally, or alternatively, not withstanding any policies and procedures to the
contrary, Ditech's conduct was consistent with its ordinary practices.

200.    Ditech has engaged in substantially the same conduct in numerous cases
throughout the country, including, among others, Ricardo Orozco, Chris and Samantha Prior,

Dawn Davis, Grace Carleton, and Ricardo and Delia Ramos, as well as various cases that have been discussed *supra* by United States Trustees around the country.

201.    Pursuant to Fed. R. Bankr. P. 3002.1(i), Defendants should be prohibited from introducing any evidence regarding any alleged post-petition default due to their failure to respond to the Chapter 13 Trustee's notice of final cure.  Further, the Court should order Defendants to correct their accounting with respect to Plaintiff's mortgage loan and the loans of the members of the class to reflect that such borrowers were current at the time of discharge.

202.    The Court should also sanction Defendants for their violations of Fed. R. Bankr. P. 3002.1(c) and (g) pursuant to Fed. R. Bankr. P. 3002.1(i).  As noted by the Bankruptcy Judge in *In re Gravel*, 556 B.R. 561 (Bankr. D. Vt. 2016), *vacated and remanded by PHH Mortgage Corp. v. Sensenich*, 2017 WL 6999820 (D. Vt. Dec. 18, 2017)(appeal to 2d Cir. pending), "Rule 3002.1(i) explicitly empowers a court to impose sanctions."  *Gravel*, 556 B.R. at 569 (citing Fed. R. Bankr. P. 3002.1 Advisory Committee Note (2011)("sanctions may be imposed if the holder of a claim fails to provide any of the information required under subdivision (b), (c) or (g).")).  The Court can and should also use its § 105(a) powers to sanction Defendants for their violations of Fed. R. Bankr. P. 3002.1 that occurred in consumers' bankruptcies throughout the United States.  *See id.* at 568-73.

203.    Mr. Martinez and the other members of the putative class have suffered harms and losses as a result of Defendants' misconduct and request that the Court allow appropriate and full compensation for such harms and losses, including monetary damages and equitable relief resulting from Defendants' actions for harms and losses of the class, including actual damages, necessary expenses, punitive damages/sanctions and other appropriate equitable relief, as well as reasonable

attorneys' fees for filing and prosecuting this action on behalf of Mr. Martinez and the members of the class pursuant to Fed. R. Bankr. P. 3002.1(i).

## COUNT II
### (VIOLATION OF THE AUTOMATIC STAY)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

204.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

205.    Defendants' unsolicited loan modification correspondence and coercive threats of foreclosure, credit damage, and other harms as well as its deceptive proposed recapitalization of amounts not owed and of amounts that were already paid by Plaintiff and similarly situated putative class members in confirmed Chapter 13 plans constitute willful violations of the automatic stay as set forth in 11 U.S.C. § 362(a)(3) and (6).

206.    Defendants sent this correspondence to Plaintiff and countless others during their Chapter 13 cases without obtaining prior Bankruptcy Court approval.    Defendants sent this correspondence for the purpose of recovering amounts the recipients did not owe, as well as to lock Plaintiff and other class members into a new forty-year loan term in order to increase interest recovery and prevent loan runoff, for the benefit of Ditech and its business partners, including, but not limited to, Fannie Mae and Black Knight.

207.    Upon information and belief, it was Defendants' practice to target borrowers like Mr. Martinez, who have substantial equity in their homes, for unsolicited modifications that recapitalize advances and extend loan terms for Chapter 13 debtors.

208.    Defendants had actual knowledge that Mr. Martinez was a debtor in a pending Chapter 13 case and that the automatic stay was in effect at the time they sent Mr. Martinez the

unsolicited proposed permanent loan modification agreement and related correspondence, as described *supra*.

209.    Upon information and belief, Defendants violated the automatic stay by communicating with, or attempting to communicate with, Mr. Martinez and other class members directly while their Chapter 13 bankruptcies were pending regarding unsolicited proposed streamlined loan modifications without first obtaining relief from the automatic stay or the consent of Mr. Martinez's counsel.

210.    Defendants violated the automatic stay by unilaterally applying Mr. Martinez's and other class members' loan payments toward an unauthorized trial modification, which frustrates the Chapter 13 Trustees' administration of Mr. Martinez's and other class members' Chapter 13 plans.

211.    Defendants' conduct as described herein is part of a general pattern and practice of conduct by Defendants, which is either expressly authorized by, or not specifically prohibited by, their policies and procedures.

212.    Mr. Martinez and the members of the class were injured by Defendants' violations of the automatic stay as set forth in this complaint.

213.    Defendants' acts constitute willful violations of the automatic stay.  Defendants knew the automatic stay was applicable to Mr. Martinez and the members of the class, their actions were intentional, and the acts alleged herein violated the provisions and purposes of the Bankruptcy Code's automatic stay, 11 U.S.C. § 362.

214.    As a result of the above violations of 11 U.S.C. § 362, and pursuant to 11 U.S.C. § 362(k) of the Bankruptcy Code, the Court's inherent powers, and its authority to enforce

provisions of the Bankruptcy Code pursuant to 11 U.S.C. § 105, Defendants are liable to Plaintiff and the class for actual damages, punitive damages, and reasonable attorneys' fees and costs resulting from Defendants' willful stay violations.

215.    Unless they first obtain relief from the automatic stay, the Court should further enjoin Defendants from sending unsolicited streamlined loan modification proposals to Chapter 13 debtors.

**COUNT III**
**(VIOLATION OF THE 11 U.S.C. § 524(i) DISCHARGE INJUNCTION / CONTEMPT OF THE ORDERS CONFIRMING PLAINTIFF'S CHAPTER 13 PLAN AND GRANTING PLAINTIFF'S CHAPTER 13 DISCHARGE)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

216.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

217.    Title 11 U.S.C. § 1322(b)(5) allows a Chapter 13 debtor to cure deficiencies and maintain regular monthly mortgage payments.

218.    Section 1327 of Title 11 of the United States Code provides: "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."

219.    Mr. Martinez's and the class members' confirmed Chapter 13 plans contained provisions regarding the funds received from the Chapter 13 Trustees during their Chapter 13 cases, as well as those received directly from the Plaintiff and putative class members during their bankruptcy cases.

220.    Defendants violated and continue to violate Mr. Martinez's and other class

members' plans and the Orders confirming the plans by failing to apply payments pursuant to the terms of Plaintiff's Chapter 13 plan and by their continued failure to correct the accounting on his and other class members' loan accounts to be consistent with the terms of their plans.

221.   Specifically, Defendants misapplied Mr. Martinez's and other class members' plan payments and post-petition monthly mortgage payments by failing to apply trustee distributions and ongoing post-petition monthly mortgage payments to bring the debtors' mortgage loan accounts current upon completion of their Chapter 13 plans.

222.   Defendants thus violated 11 U.S.C. § 1327 and other provisions of the Bankruptcy Code and Rules, Mr. Martinez's and the other class members' confirmed Chapter 13 plans, the orders confirming their plans, the discharge orders, and other motions, directives, and orders of the Bankruptcy Courts throughout the United States.

223.   Title 11 U.S.C. § 105(a) of the Bankruptcy Code grants power to the Court to remedy Defendants' violations by exercising its equitable powers where necessary or appropriate to facilitate implementation of Bankruptcy Code provisions, including the granting of sanctions for contempt, the granting of monetary relief for actual and statutory damages, punitive damages, attorneys' fees and costs, and the imposition of temporary and permanent injunctions.

224.   Defenddants had no "objectively reasonable basis" to conclude that their conduct did not violate the discharge injunctions in Plaintiff's and the other putative class members' Chapter 13 cases. *See In re Taggart* (*Taggart v. Lorenzen*), No. 18-489 (Sup. Ct. June 3, 2019).

225.   Defendants' acts in applying payments received from the Chapter 13 Trustee contrary to the provisions in Mr. Martinez's and other class members' Chapter 13 plans were willful violations of the plans, the orders confirming the plans, other orders of the Bankruptcy

Courts, the provisions of Chapter 13 of the Bankruptcy Code, and the Bankruptcy Rules. Defendants knew of the existence of these provisions, their acts were intentional, and the acts alleged herein violated the provisions and purposes of the Code set forth herein.

226.    Defendants' conduct as described herein is part of a general pattern and practice of conduct by Defendants, which is either expressly authorized by, or not specifically prohibited by, their policies and procedures.

227.    It is consistent with Defendants' policies and procedures to violate the directives and orders of Bankruptcy Courts and the Bankruptcy Code and Rules in the manner described in this complaint.

228.    Mr. Martinez and the other class members have suffered damages due to Defendants' actions.

229.    Accordingly, under 11 U.S.C. § 105 and/or the Court's inherent authority, Defendants should be sanctioned in an appropriate amount, made to pay Plaintiff's reasonable attorneys' fees for bringing this action, and the Court should enjoin Defendants from attempting to collect amounts from discharged Chapter 13 debtors that are inconsistent with debtors' Chapter 13 plans and applicable confirmation orders.

230.    Defendants violated 11 U.S.C. § 524(i) by failing to properly apply funds received from Chapter 13 Trustees and Mr. Martinez and the class members in accordance with the provisions of their confirmed Chapter 13 plans, and by instead applying funds received to satisfy unapproved and undisclosed fees and charges or other unauthorized amounts.

231.    Mr. Martinez and the other class members made all payments due under their plans and the terms of their notes and deeds of trust/mortgages.

232.    After Mr. Martinez and the other class members emerged from bankruptcy, Defendants began demanding and attempted to collect improper and undisclosed escrow "shortages" that accumulated in the borrowers' accounts only because Defendants failed to run annual escrow analyses and/or failed to file payment change notices, and/or failed to file responses to final cure notices when the borrowers made all required payments during their bankruptcy cases.

233.    Defendants' collection of these unauthorized amounts and willful failure to credit debtors' payments pursuant to their Chapter 13 plans has caused material injury to Mr. Martinez and the other class members.

234.    Through these tactics, Defendants, in essence, are attempting to steal Mr. Martinez's and other class members' home equity by allowing an undisclosed improper escrow shortage to accumulate on their mortgage loan accounts, contrary to the requirements of Mr. Martinez's and the other class members' confirmed plans.

235.    Defendants' conduct as described herein is part of a general pattern and practice of conduct by Defendants, which is either expressly authorized by, or not specifically prohibited by, their policies and procedures.

236.    Mr. Martinez and the other class members have been damaged by Defendants' conduct and therefore seek an award of sanctions, declaratory relief, injunctive relief, and all appropriate damages and other recovery, including but not limited to actual damages, punitive damages, and attorneys' fees and costs pursuant to the Court's inherent powers and its statutory 11 U.S.C. § 105(a) powers for Defendants' gross violations of the discharge injunction and orders of the Bankruptcy Courts.

## COUNT IV
### (VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT)

## (CLASS CLAIM AGAINST DITECH)

237.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

238.    In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), Public Law No. 111-203, 124 Stat. 1376 (2010).

239.    On February 14, 2013, the CFPB issued the Amended Real Estate Settlement Procedures Act (Regulation X)("RESPA"), 78 FR 10695 (Regulation X)(February 14, 2013), which became effective on January 10, 2014.

240.    Plaintiff's and other class members' mortgage loans at issue are "federally related mortgage loan[s]" as defined in 12 U.S.C. § 2602(1) subject to the provisions and requirements of RESPA and Regulation X.

241.    Ditech is subject to the Regulations and does not qualify for any of the "small servicer" exceptions in the Regulations.

242.    Ditech is not a "qualified lender," as defined in 12 CFR § 617.7000.

243.    As discussed in detail above, Plaintiff and his counsel sent multiple letters to Ditech disputing Ditech's accounting for Plaintiff's mortgage loan and demand for over $60,000 in alleged escrow shortages that Plaintiff did not owe.

244.    All letters sent to Ditech by Plaintiff and his counsel constitute Requests for Information under 12 C.F.R. § 1024.36 and/or Notices of Error under 12 C.F.R. § 1024.35.

245.    Ditech failed to conduct a meaningful investigation of and/or provide reasonably complete responses to each of Plaintiff's Requests for Information/Notices of Error.  Ditech failed

to provide the information Mr. Martinez reasonably requested in each letter, particularly with regard to Plaintiff's request to correct the accounting for the loan and to provide a transaction history from Ditech's servicing system of record.

246.    The information requested in Mr. Martinez's Requests for Information related to the servicing of his mortgage loan.

247.    Mr. Martinez's Requests for Information sought information that was easily accessible for Ditech and the information requested was not unduly or unreasonably burdensome for Ditech to provide.

248.    The information Mr. Martinez's Requests for Information requested was not confidential, proprietary, or privileged.

249.    Ditech's failure to respond appropriately to Plaintiff's Requests for Information and Notices of Error violates 12 U.S.C. § 2605.

250.    Ditech also failed to comply with its duties to(a) provide annual escrow statements to Mr. Martinez and other class members after they completed their Chapter 13 cases (12 C.F.R. § 1024.17(i)); (b) to perform annual escrow analyses and to calculate proper escrow payments both during and after Mr. Martinez's and other class members' Chapter 13 cases (12 C.F.R. § 1024.17(c)); and (c) to provide timely and accurate notices of escrow shortages or deficiencies (12 C.F.R. § 1024.17(f)(5)).

251.    Ditech has demonstrated a pattern and practice of failing to comply with the Regulations by failing to appropriately and fully respond to Plaintiff's Requests for Information and Notices of Error and by failing to fully comply with RESPA's requirements regarding maintenance of escrow accounts.

252.    On April 23, 2015, Green Tree Servicing LLC (Ditech's predecessor) entered into a stipulated order for permanent injunction and monetary judgment with the FTC and the CFPB regarding Green Tree's treatment of accounts in default.  In the settlement, Green Tree agreed to pay $48 million to consumers affected by Green Tree's practices, pay another $15 million to the CFPB's civil penalty fund, and take corrective actions, including putting an end to all mortgage servicing violations.

253.    Despite these penalties, Ditech continues to ignore and flaunt its responsibility to comply with RESPA/Reg. X's requirements.

254.    Plaintiff and the other putative class members have suffered actual damages, including damage to credit, reputational damage, overpayment of income taxes, overpayments on their mortgage loans, attorneys' fees, and out-of-pocket expenses, amongst others, as a result of Ditech's violations of RESPA.

255.    Accordingly, Ditech is liable to Plaintiff and the other class members for actual damages, costs, attorneys' fees, and statutory damages, pursuant to 12 U.S.C. § 2605.

<u>COUNT V</u>
(BREACH OF CONTRACT)
(CLASS CLAIM AGAINST FANNIE MAE)

256.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

257.    The notes and deeds of trust for Mr. Martinez's and the other class members' mortgage loans constitute contracts[11] between the borrowers and the loans' owners.

---

[11] Mr. Martinez's mortgage loan contract is based on Fannie Mae's uniform mortgage contract for the State of Texas. While the exact name and formatting of Fannie Mae's uniform mortgage contract for other states may vary (i.e. some states call the security instrument a mortgage while others call it a deed of trust), the contractual terms at issue in this

258.    For purposes of this case, Fannie Mae is considered the owner, whether it holds the loan in its capacity as owner of the loan or as the authorized representative of an investment pool of loans that owns the Plaintiff's and/or class members' loans.

259.    Mr. Martinez and the other class members tendered performance according to the terms of their mortgage loan contracts, including pursuant to the terms of the orders confirming their Chapter 13 bankruptcy plans.

260.    Defendants violated the terms of Mr. Martinez's and the other class members' notes and deeds of trust by attempting to collect and/or actually collecting amounts that Mr. Martinez and the other class members do not owe.

261.    Defendants also violated the terms of Mr. Martinez's and the other class members' notes and deeds of trust by failing to properly apply their payments in accordance with the application of payments provision in paragraph 2 of their deeds of trust.

262.    Moreover, Defendants violated paragraph 3 of Mr. Martinez's and the other class members' deeds of trust by failing to notify Mr. Martinez and the other class members of any escrow shortages or deficiencies in accordance with RESPA, which requires Defendants to perform escrow analyses annually and to notify Mr. Martinez and the other class members of any escrow shortage/deficiency.  *See* 12 C.F.R. § 1024.17(c), (f)(5), and (i).

263.    Mr. Martinez and the other class members have suffered actual damages, including overpayments on his mortgage loan, attorneys' fees, and out-of-pocket expenses, amongst others, as a result of Ditech's failure to properly apply their mortgage payments.

## COUNT VI
### (NEGLIGENCE)

case for class members outside of Texas are not materially different from the standard terms of Mr. Martinez's mortgage contract.

## (CLASS CLAIM AS TO ALL DEFENDANTS)

264.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

265.    In a mortgagor-mortgagee relationship, a lender owes a borrower the duty to exercise reasonable care to avoid a foreseeable risk of injury to the borrower. *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 2012)(citing *Thrash v. Ocwen Loan Servicing, LLC*, 433 B.R. 585, 598-97 (Bankr. N.D. Tex. 2010). *See also Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2008, no pet.)(citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)(Every person has a duty to exercise reasonable care to avoid foreseeable risk of injury to others.)); *Trevino v. HSBC Mortgage Services, Inc (In re Trevino)*, 533 B.R. 176, 216-217 (Bankr. S.D. Tex. 2015).

266.    Fannie Mae, through its agent, Ditech, breached this duty by failing to run an annual escrow analysis for Plaintiff and the class members' mortgage loan accounts, allowing significant and improper escrow shortages and other improper fees and charges to be added to Plaintiff's and the class members' mortgage loan accounts. Fannie Mae, through its agent, Ditech, also failed to disclose accumulated escrow advances and other fees and charges assessed to Plaintiff's and the class members' mortgage loan accounts as required by Fed. R. Bankr. P. 3002.1.

267.    Plaintiff and the other class members have suffered actual damages, including but not limited to being overcharged on their mortgage loans, out-of-pocket expenses, and attorneys' fees, amongst others, as a result of Fannie Mae's and Ditech's breach of its duty to exercise reasonable care to avoid a foreseeable risk of injury to Plaintiff.

268.    Plaintiff and the other class members would not have incurred the damages listed

above but for Ditech's breach of its duty as described herein.

269.    Fannie Mae has a duty to supervise and monitor its servicers' compliance with applicable laws and regulations.  Fannie Mae failed to reasonably supervise or monitor Ditech's servicing practices for loans involved in Chapter 13 bankruptcy.

270.    Black Knight's MSP system was not set up to properly onboard service-transferred loans from other servicing platforms, and Black Knight knew its MSP system was incapable of properly handling the accounting of service-transferred loans of borrowers in active Chapter 13 cases.

271.    Black Knight, as a provider of bankruptcy servicing software, had a duty not to allow its system to cause needless harm to discharged debtors.

272.    Black Knight knew its system had historical escrow accounting limitations that caused it to calculate borrowers' escrow accounts incorrectly when calculating escrow for service-transferred accounts of borrowers in Chapter 13 bankruptcy.

273.    It was foreseeable that consumer borrowers would be harmed as a result of the accounting limitations of Black Knight's systems.

274.    Plaintiff and the other class members were actually harmed by Black Knight's negligence.

275.    Fannie Mae and Ditech knew or should have known that Ditech's actions as described herein could cause injury to Plaintiff and the other class members.

276.    Plaintiff and the other class members seek to recover their general damages as well as exemplary damages related to Fannie Mae's, Ditech's, and Black Knight's negligence.

277.    Plaintiff and the other class members are entitled to actual damages, exemplary

damages, and their reasonable attorneys' fees and costs.

## COUNT VII
## (GROSS NEGLIGENCE)
## (CLASS CLAIM AS TO DITECH, BLACK KNIGHT, AND FANNIE MAE)

278.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

279.    Black Knight, Fannie Mae, and Ditech, as described *supra*, each breached its duty to exercise reasonable care in avoiding foreseeable injury to the Plaintiff and other class members by failing to run an annual escrow analysis for Plaintiff's and the class members' mortgage loan accounts during their Chapter 13 bankruptcy cases, allowing significant escrow shortages to accumulate and by charging other improper and/or undisclosed amounts to Plaintiff's and the class members' mortgage loan accounts and by creating and maintaining a servicing system that allowed pre-discharge escrow shortages to appear to be due and payable after a debtor's Chapter 13 discharge.

280.    Plaintiff and the other class members were damaged as a result of Ditech's breach of this duty.

281.    Black Knight's, Fannie Mae's, and Ditech's conduct as described herein could cause borrowers to lose their homes over debts they do not owe and therefore objectively involved an extreme degree of risk and a high probability of substantial financial harm to Plaintiff and the other class members.

282.    Black Knight, Fannie Mae, and Ditech were aware of the risks involved with regard to these actions and omissions and proceeded with conscious indifference to Plaintiff's and the other class members' rights and welfare.

283.   Plaintiff and the other class members seek to recover their general damages as well as exemplary damages related to Black Knight, Fannie Mae, and Ditech's gross negligence. Plaintiff and the other class members are entitled to actual damages, exemplary damages, and their reasonable attorneys' fees and costs.

## COUNT VIII
### (TORTIOUS INTERFERENCE WITH CONTRACT)
### (CLASS CLAIM AS TO DITECH AND BLACK KNIGHT)

284.   The allegations in this Complaint are re-alleged and incorporated herein by this reference.

285.   The note and deed of trust constitute valid contracts between Mr. Martinez and the other class members and Defendant Fannie Mae.

286.   Ditech and Black Knight willfully and intentionally interfered with Mr. Martinez's and the other class members' mortgage accounts by attempting to coerce these borrowers into unfavorable loan modifications, failing to perform timely escrow analyses, failing to disclose escrow shortages or file notices of payment change in the bankruptcy, and allowing large escrow shortages to accrue before disclosing the shortages to Mr. Martinez and the other class members, thereby making it significantly more burdensome for Mr. Martinez and the other class members to perform their obligations under the contract.

287.   Ditech's interference was the proximate cause of Mr. Martinez's and the other class members' injuries.

288.   Mr. Martinez and the other class members incurred actual damages, as described *supra*.

## COUNT IX
### (ATTORNEYS' FEES)

## (CLASS CLAIM AS TO ALL DEFENDANTS)

289.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

290.    Through the conduct described herein, Defendants have inflicted actual damages upon Plaintiff and the other class members.

291.    Moreover, Plaintiff and the other class members have been forced to retain legal counsel, who have incurred reasonable and necessary attorneys' fees on their behalf.

292.    Such fees are properly taxed against Defendants by virtue of the Court's inherent powers, 11 U.S.C. § 105(a), Fed. R. Bankr. P. 3002.1(i), 15 U.S.C. § 1692k (FDCPA), and 12 U.S.C. § 2605 (RESPA).

## VII.  REQUEST FOR DECLARATORY RELIEF

293.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

294.    As outlined in the preceding counts and the preceding factual allegations, Ditech has violated Fed. R. Bankr. P. 3002.1 and 4001(c), and 11 U.S.C. §§ 362, 1322(b)(5), and 1327. Plaintiff seeks a declaration that Ditech's conduct as described herein violates 11 U.S.C. §§ 362, 1322(b)(5), and 1327 and Fed. R. Bankr. P. 3002.1.

295.    Further, as outlined above, Defendants have collected, or attempted to collect, fees and advances from borrowers that are not legally recoverable from such borrowers.

296.    Plaintiff and the class members seek a declaration that such undisclosed fees and advances are not legally recoverable from Plaintiff or the class members.

297.    Plaintiff further seeks a declaratory judgment that any MSR sale transaction by

Ditech, whether pursuant to this bankruptcy or otherwise, has no effect on the account for class members' mortgage loan accounts.

298.    To the extent the accounting by Ditech of any other entity with respect to such loans gives rise to a cause of action for legal and/or equitable relief.  Plaintiff seeks a declaratory judgment that any transfer, sale, or assignment of MSR by Ditech has no effect on affected borrowers' legal and equitable rights and remedies against Ditech, its successor-in-interest, or any other responsible party.

## VIII.  REQUEST FOR PRELIMINARY INJUNCTION

299.    The allegations in this Complaint are re-alleged and incorporated herein by this reference.

300.    Plaintiff and the class members are entitled to a preliminary injunction, pursuant to Fed. R. Civ. P. 65 and 11 U.S.C. § 105(a), enjoining Defendants from collecting or attempting to collect fees and advances from Plaintiff or the class members that are not legally recoverable from Plaintiff or the class members.  Plaintiff and the other class members also seek a preliminary injunction preventing Defendants from foreclosing on Plaintiff's or any class members' homes during the pendency of this adversary proceeding.

301.    Plaintiff and the other class members assert that Defendants will continue to wrongfully collect or attempt to collect fees and advances from borrowers that are not legally recoverable from such borrowers.

302.    There is a substantial likelihood that Plaintiff and the other class members will prevail on the merits.  The Bankruptcy Code, Rules, and relevant precedent confirm that Defendants' conduct is unlawful and harmful to innocent consumers.

303.    The harm faced by the Plaintiff and the class members outweigh any "harm" that will be sustained by Ditech if the preliminary injunction were granted.  The panoply of the harms to debtors (and the entire bankruptcy system) are described above.  These far outweigh Ditech's interest in profiting through collecting or attempting to collect fees and advances that are not legally recoverable from Plaintiff and the class members.

304.    Issuing a preliminary injunction will not adversely affect the public interest but rather will enhance it.  The value of Defendant's loan portfolios are artificially bloated with illegal amounts assessed to borrowers' accounts, which is misleading to the market and makes the Defendants' MSRs' value inherently unreliable, which is dangerous to both consumers and the market.  Allowing these amounts to remain on accounts and allowing these accounts to be transferred only metastasizes the problem.

305.    The public has the right to expect that the courts will enforce the provisions of the Bankruptcy Code and will not allow lenders to illegally undermine and even destroy debtors' right to successfully complete their Chapter 13 plans and cure their mortgage arrears through their Chapter 13 plan.  Even though the Court should balance the threatened injury to Plaintiff and the other class members against any harm to the defendant, when balancing the hardships of the public interest against a private interest, the public interest should receive greater weight.  *See FTC v. World Wide Factors*, 882 F.2d 344, 346-47 (9th Cir. 1989).

306.    The posting of a bond is not a prerequisite to the issuance of a preliminary injunction in this case because Ditech cannot demonstrate that preserving the *status quo* will cause it cognizable economic harm.  *See FTC v. Southwest Sunsites, Inc.*, 665 F. 2d 711, 714 n.1 (5th Cir. 1982)(ruling that a temporary restraining order or preliminary injunction may be granted without

bond).

307.     In addition, or alternatively, the Court can issue a preliminary injunction to prevent Ditech from taking the actions Plaintiff and the class members seek to enjoin based on its 11 U.S.C. § 105(a) authority.  Plaintiff and the class members therefore request that the Court use its 11 U.S.C. § 105(a) authority to issue a preliminary injunction enjoining Ditech from engaging in the acts set forth above during the pendency of this case.

308.     Plaintiff and the other class members ask the Court to set this application for preliminary injunction for hearing if the parties are unable to agree to a preliminary injunction and, after hearing the request, issue a preliminary injunction against Ditech enjoining it from the actions set out above.

## IX. REQUEST FOR PERMANENT INJUNCTION

309.     The allegations in this Complaint are re-alleged and incorporated herein by this reference.

310.     Plaintiff and the class members are entitled to an injunction permanently enjoining Ditech from engaging in the acts and practices above as to any person who is a member, or could become a member, of the class of persons described in this suit.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff and the other class members respectfully pray that Defendants be cited to appear and answer these allegations and that, upon final trial of this cause, they be granted all relief to which they are justly entitled, including:

a.     Certification of the class of former bankruptcy debtors described *supra*;

b.     All actual damages, including attorneys' fees and costs (at trial and on appeal) to which Plaintiff is entitled;

c.      All compensatory damages to which Plaintiff is entitled, including attorneys' fees and costs, exemplary damages, and/or punitive damages and sanctions for Defendants' actions as described herein, and a finding of contempt;

d.      A declaration that Defendants' actions violate the Bankruptcy Code and Rules, RESPA, the terms of Plaintiff's note and deed of trust, etc.;

e.      A preliminary injunction preventing Defendants from engaging in the conduct described herein, enjoining Defendants from collecting the illegal advances described *supra* during the pendency of this adversary proceeding; and preventing Defendants from foreclosing on Plaintiff's and the putative class members' homes during the pendency of this adversary proceeding;

f.      A permanent injunction requiring Defendants to correct Plaintiff's and the class members' mortgage loan accounts to permanently remove the illegal and/or uncollectible escrow advances, fees, and other charges; and

g.      All such other and further relief as this Court may deem just and proper.

Respectfully submitted,

KELLETT & BARTHOLOW PLLC

*/s/ Theodore O. Bartholow, III ("Thad")*
Theodore O. Bartholow, III ("Thad")
State Bar No. 24062602
11300 N. Central Expressway
Suite 301
Dallas, TX 75243
Tel.: (214) 696-9000
Fax: (214) 696-9001
thad@kblawtx.com

CONSUMER LITIGATION ASSOCIATES
Thomas D. Domonoske (*admitted pro hac vice*)
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: (504) 442-7706
tom@clalegal.com

ATTORNEYS FOR PLAINTIFF