**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                            :

In re                        :        **Chapter 11**
                            :

**DITECH HOLDING CORPORATION**, *et al.*,   :     **Case No. 19-10412 (JLG)**
                            :

               **Debtors.**[1]    :     **(Jointly Administered)**
                            :
-------------------------------------------------------------X

## NOTICE OF DESIGNATION OF STALKING HORSE BID AND REQUEST FOR APPROVAL OF STALKING HORSE BID PROTECTIONS (REVERSE BUSINESS)

**PLEASE TAKE NOTICE THAT:**

On April 23, 2019, the Court entered an *Order (I) Approving the Bidding Procedures, (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* (ECF No. 456) (the "**Bidding Procedures Order**"),[2] in connection with the sale of the Debtors' assets, which authorized the Debtors to, among other things, (i) designate one or more Stalking Horse Bidders for the Debtors' assets, (ii) enter into Stalking Horse Agreements with Stalking Horse Bidders, and (iii) offer Stalking Horse Bid Protections, in each case where the Debtors determine, in the exercise of their reasonable business judgment, that setting a floor price for the relevant assets at auction is in the best interests of their estates and creditors.

### Stalking Horse Bids

The Debtors have accepted a stalking horse bid (the "**Stalking Horse Bid**") submitted by Mortgage Assets Management, LLC and SHAP 2018-1, LLC (together, the "**Stalking Horse Bidder**"), and Ditech Holding Corporation, Walter Reverse Acquisition LLC, and Reverse Mortgage Solutions, Inc. ("**Sellers**") and the Stalking Horse Bidder have executed a *Stock and*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008);Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order and the Bidding Procedures approved therein or the Stalking Horse Agreement (as defined herein), as applicable. Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any inconsistency between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

*Asset Purchase Agreement* (the "**Stalking Horse Agreement**")[3] for the purchase of certain of the Debtors' assets. The material terms of the Stalking Horse Bid are identified in the summary attached as **Exhibit A** hereto. The Stalking Horse Bid is subject to higher or better offers to the extent such offers are determined by the Debtors to constitute Qualified Bids in accordance with the Bidding Procedures. The estimated Purchase Price payable to the Debtors under the Stalking Horse Agreement, assuming the Debtors' March 31, 2019 balance sheet, is currently estimated to be approximately $762 million, based upon management's estimates, approximately $616 million of which would be available to pay the DIP Obligations.

## Bid Protections

In accordance with the Bidding Procedures, the Debtors have agreed to provide the Stalking Horse Bidder with certain protections (the "**Stalking Horse Bid Protections**"), as set forth in Sections 6.4(a) and 9.2 of the Stalking Horse Agreement. The Stalking Horse Bid Protections for the Stalking Horse Bidder include:

- Reimbursement up to $4 million of the Stalking Horse Bidder's reasonable and documented expenses incurred in connection with the transactions (the "**Expense Reimbursement**"); plus

- A fee of $4 million (the "**Initial Break-Up Fee**"); plus

- A deposit of $8,500,000 (the "**Remaining Break-Up Fee**" and, together with the Initial Break-Up Fee, the "**Break-Up Fee**") by the Sellers into an escrow account.

- If Sellers have exercised their option under the Stalking Horse Agreement (the "**Ginnie Option**") to require the Stalking Horse Bidder to purchase all of Sellers rights and obligations in connection with administering and servicing any forward residential mortgage loans secured by a 1-4 family residential property that is guaranteed by Ginnie Mae, and the related advances, the Stalking Horse Bidder shall be entitled to have the (i) Expense Reimbursement increased to up to $4,250,000; (ii) Initial Break-Up Fee increased to $5,250,000; and (iii) Remaining Break-Up Fee increased to $9,750,000.

The Expense Reimbursement and Initial Break-Up Fee are payable to the Stalking Horse Bidder if the Stalking Horse Agreement is terminated pursuant to Sections 9.1(b)(iii), 9.1(c)(i)(A), 9.1(c)(iii)(A), or 9.1(c)(v) and the Stalking Horse Bidder is not then in breach of any of its obligations under the Stalking Horse Agreement that would result in the failure of specified conditions to Closing being satisfied. The Remaining Break-Up Fee will be disbursed

---

[3]    Any summary of the Stalking Horse Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions of the Stalking Horse Agreement, the actual terms and conditions shall control. A copy of the Stalking Horse Agreement is attached hereto as **Exhibit C**.

WEIL:\97066518\6\41703.0011

to the Stalking Horse Bidder if an Alternative Transaction[4] is consummated within twelve (12) months following the date of the Stalking Horse Agreement (the "**Tail Period**").

If the Stalking Horse Agreement is terminated pursuant to Section 9.1(c)(i)(B) and the Stalking Horse Bidder is not then in breach of any of its obligations under the Stalking Horse Agreement that would result in a failure of specified conditions to Closing to be satisfied, then Sellers shall pay the Stalking Horse Bidder the Expense Reimbursement and, if an Alternative Transaction is consummated during the Tail Period, the Break-Up Fee.

### Objections to Stalking Horse Bid Protections

Parties in interest may file an objection to the proposed Stalking Horse Bid Protections (a "**Stalking Horse Objection**") by no later than June 28, 2019 at 4:00 p.m. (prevailing Eastern Time) (the "**Stalking Horse Objection Deadline**"). If a timely Stalking Horse Objection is filed and served in accordance with the Bidding Procedures, the proposed Stalking Horse Bid Protections will not be approved until either the Stalking Horse Objection is resolved by agreement of the objecting party and the Debtors or by order of the Court. If no Stalking Horse Objection is timely filed and served in accordance with the Bidding Procedures, the Stalking Horse Bid Protections may be approved by the Court upon the expiration of the Stalking Horse Objection Deadline and the Court may enter an order approving the Stalking Horse Bid Protections in the form attached hereto as **Exhibit B** (the "**Proposed Order**") without further notice or hearing.

### Important Dates and Deadlines

- *__Bid Deadline__*. The deadline to submit higher or better bids on any of the Debtors' assets and deliver electronic copies of such bid in accordance with the Bidding Procedures is **July 8, 2019 at 4:00 p.m. (prevailing Eastern Time)**.

- *__Auction__*. The Auction, if necessary, has been scheduled for **July 11, 2019, at 10:00 a.m. (prevailing Eastern Time)** and will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153. The Debtors have the right, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, to adjourn or cancel the Auction.

- *__Sale Objection Deadline__*. Objections to a proposed Sale Transaction, including any objection to the sale of the Debtors' assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a sale order must be filed with the Court in accordance with the Bidding Procedures Order and

---

[4]    "Alternative Transaction" is defined in the Stalking Horse Agreement as the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction, including any plan of reorganization or plan of liquidation approved by the Bankruptcy Court, or resulting from the Auction, of any material portion of the assets or equity interests of the Company or any Subsidiary of the Company (to the extent such assets or equity interests would constitute Acquired Assets), in a single transaction or a series of transactions, with one or more Persons other than Buyers and/or their Affiliates.

WEIL:\97066518\6\41703.0011

served on the objection recipients by no later than **July 18, 2019, at 4:00 p.m. (prevailing Eastern Time).**[5]

- ***Sale and Confirmation Hearing***. The Sale and Confirmation Hearing is scheduled for **August 7, 2019, at 11:00 a.m. (prevailing Eastern Time)** before the Honorable James L. Garrity, Jr., United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, NY 10004.

### Additional Information

Parties interested in purchasing any of the Debtors' assets should contact the Debtors' investment bankers, Houlihan Lokey (Attn: Reid Snellenbarger (RSnellenbarger@HL.com), Jeff Levine (JMLevine@HL.com), Jimmy Page (JPage@HL.com), and Dan Martin (DMartin@JL.com), and Ditechbids@weil.com.

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Stalking Horse Agreement may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Epiq Corporate Restructuring LLC, located at https://dm.epiq11.com/Ditech.

*[Remainder of page intentionally left blank]*

---

[5]     The Debtors have requested permission to extend the Sale Objection Deadline, the deadline to object to confirmation of the Plan, and the Voting Deadline to July 22, 2019 at 4:00 p.m. (prevailing Eastern Time), solely in the event that an Auction is held.

WEIL:\97066518\6\41703.0011

Dated: June 18, 2019
        New York, NY

/s/ Sunny Singh
Ray C. Schrock, P.C.
Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors
and Debtors in Possession*

WEIL:\97066518\6\41703.0011

**<u>Exhibit A</u>**

**Material Terms of the Stalking Horse Bid**

## Material Terms of the Stalking Horse Bid

*The following chart contains a summary of certain material terms of the Stalking Horse Agreement, together with references to the applicable sections of the Stalking Horse Agreement. The summary set forth below does not contain all of the terms of the Stalking Horse Agreement and should not be used or relied upon as a substitute for the full terms and conditions set forth in the Stalking Horse Agreement. The summary of the Stalking Horse Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.*

| SUMMARY OF MATERIAL TERMS OF THE STALKING HORSE BID[6] | |
|---|---|
| **Sellers** | Ditech Holding Corporation ("**Ditech**"), Walter Reverse Acquisition LLC ("**Parent**") and Reverse Mortgage Solutions, Inc. (the "**Company**", and together with Ditech and Parent, the "**Sellers**" and each a "**Seller**"). |
| **Buyers** | Mortgage Assets Management, LLC (the "**Platform Buyer**") and SHAP 2018-1, LLC (together with Platform Buyer, the "**Buyers**" and each a "**Buyer**"). |
| **Acquired Assets** (*Definition of Acquired Assets*) | The Stalking Horse Agreement provides for the purchase of Sellers' right, title, and interest in and to (i) the shares of the Company (the "**Company Purchased Shares**") (which, following the Closing, will continue to hold all licenses required to purchase, hold, originate, sell and service reverse mortgage loans (the "**Licenses**")), (ii) all of the Company's right, title and interest in and to the REO Property[7] (which shall remain an asset of the Company at and after the Closing), (iii) all of REO Management Solutions, LLC's ("**REO Management Solutions**") right, title and interest in and to the REO License[8] (which shall remain an asset of REO Management Solutions at and after the Closing), (iv) all of Parent's and Ditech's right, title, and interest in and to all assets, properties, contractual rights, intellectual property, goodwill, rights and claims at the Closing that are primarily related to the Business and (v) all of the  assets, properties, contractual rights, |

---

[6]    Capitalized terms used in this section but not defined therein shall have the respective meanings ascribed to such terms in the Stalking Horse Agreement. Article and Section references in this summary are to Articles and Sections of the Stalking Horse Agreement unless otherwise provided.

[7]    Under the Stalking Horse Agreement, "**REO Property**" means "all real property the title to which is held by the Company or the RMS Entities (other than RMS 2018-09, LLC) as a result of foreclosure proceedings or deeds in lieu of foreclosure, in each case in the Ordinary Course of Business; provided, that such REO Property will be held by the Company at the Closing."

[8]    Under the Stalking Horse Agreement, "**REO License**" means "the Real Estate Broker License held by REO Management Solutions certifying that REO Management Solutions is authorized to transact real estate business in Texas."

intellectual property, goodwill, rights and claims of the Company and its subsidiaries (the "**RMS Entities**" (which entities (other than Mortgage Asset Systems, LLC ("**Mortgage Asset Systems**") and REO Management Solutions) will not be acquired by Buyers, but instead will be transferred by the Company to Parent or an affiliate of Parent at the Closing)) at the Closing, other than the Excluded Assets, including:

a. the Contracts, Leases, IP Licenses and Securitization Instruments set forth on Section 1.1 of the Disclosure Schedule (the "**Disclosure Schedule**") to the Stalking Horse Agreement (collectively, the "**Transferred Contracts**"), subject to Bankruptcy Court approval;

b. all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses (including all lease and rental payments) that have been prepaid by the Company or any of the RMS Entities and are associated with the Transferred Contracts, other than (i) any deposits or prepaid or deferred charges and expenses to the extent paid in connection with or relating to any Excluded Assets or (ii) any deposits or prepaid or deferred charges and expenses to the extent paid in connection with or relating to adequate assurance deposits posted pursuant to the Utility Order;

c. to the extent transferable, all rights of the Company and any of the RMS Entities under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees or agents of the Company or any of the RMS Entities or with third parties, in each case other than to the extent primarily related to any Excluded Assets;

d. all rights of the Company and any of the RMS Entities under or pursuant to all warranties, representations and guarantees made by vendors, sellers of assets or other counterparties to the extent relating to any Acquired Assets, to the extent transferable, other than any warranties, representations and guarantees primarily relating to any Excluded Assets or rights and defenses primarily relating to any Excluded Liabilities;

e. all Intellectual Property and Information Technology owned or purported to be owned by the Company or an RMS Entity;

f. to the extent transferable, all regulatory licenses, registrations and permits (including environmental permits) of the Company and any of the RMS Entities set forth on Section 1.1 of the Disclosure Schedule;

g. all books and records (including, for the avoidance of doubt, Tax Returns) of (i) the Company and the RMS Entities and (ii) Ditech and Parent to the extent primarily relating to the Business including any and all Personal Data, in each case except for specified Excluded Assets;

h. all personal property of the Company and any of the RMS Entities and interests therein, including furniture, furnishings, office equipment, technology, communications equipment, vehicles and other tangible personal property, except to the extent primarily related to the Excluded

Assets;

i.  all post-Petition Date accounts receivable of the Company or any of the RMS Entities and other amounts owed to the Company or any of the RMS Entities, including assignment claims, in each case, other than to the extent related to any Excluded Assets;

j.  all unrestricted cash and Cash Equivalents of the Company and the RMS Entities;

k.  in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option, the Ginnie Portfolio;

l.  all Mortgage Loans, and all Servicing Rights (including all Fannie Mortgage Servicing Rights and Ginnie HMBS Servicing Rights) owned by the Company or an RMS Entity;

m.  all outstanding equity interests of each of Mortgage Asset Systems and REO Management Solutions; and

n.  other than any Excluded Assets, all other assets or rights of the Company and the RMS Entities of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible.

| | |
|---|---|
| **Purchase Price; Purchase Price Escrow** (*Section 2.2; Section 2.3, Section 2.7*); | The consideration to be paid by Buyers for the Acquired Assets and the Company Purchased Shares shall be an aggregate dollar amount equal to the net value, as of 11:59 p.m. Eastern Time on the day before the Closing Date, of the assets and liabilities of the Sellers reflected in the specified rows of the illustrative purchase price calculation set forth on Section 2.2 of the Disclosure Schedule (such calculation, the "**Illustrative Purchase Price Calculation**"), as calculated in accordance with the Transaction Accounting Principles and in a manner consistent with the Illustrative Purchase Price Calculation.

Upon the execution of the Stalking Horse Agreement, Buyers shall, on the date of the Stalking Horse Agreement (or, if the Stalking Horse Agreement has not been executed by the parties by 2:00 p.m. (New York City time) on such date, on the following Business Day) deposit with the Escrow Agent $35 million by wire transfer of immediately available funds (such amount, the "**Deposit Escrow Amount**") to be released by the Escrow Agent and delivered to either Buyers or Sellers, in accordance with the provisions of the Escrow Agreement.

The Deposit Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows (and in accordance with the terms of the Escrow Agreement): (i) if the Closing occurs, the Deposit Escrow Amount (and all accrued investment income thereon, if any) shall be applied toward the Purchase Price, (ii) if the Stalking Horse Agreement is terminated by any Seller pursuant to Section 9.1(d)(i) or Section 9.1(d)(ii) (or in accordance with any other provision of Section 9.1 if at the time of such termination a Seller could have terminated the Stalking Horse Agreement in accordance with Section 9.1(d)(i) or Section 9.1(d)(ii)), the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Parent, (iii) if the conditions to the |

obligations of Sellers and Buyers to consummate the transactions contemplated by this Agreement set forth in Article VIII (other than conditions that by their nature are to be satisfied at the Closing itself, but which would be capable of being satisfied if the Closing were to occur) have been satisfied or waived, Buyers do not consummate the Closing on the date and at the time provided in Section 2.6, and Sellers validly terminate the Stalking Horse Agreement pursuant to Article IX, then the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Parent; and (iv) if the Stalking Horse Agreement is terminated for any reason (other than in the circumstances described in Section 2.3(b) or Section 2.3(c)), then the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall in each case be returned to Buyers.

Payment and delivery of the Deposit Escrow Amount pursuant to Section 2.3(b) or Section 2.3(c) will constitute liquidated damages and be the sole and exclusive remedy of Sellers and their respective Representatives and Affiliates, whether at Law or in equity, in the event of termination of the Stalking Horse Agreement in the circumstances described in Section 2.3(b) and Section 2.3(c).

At the Closing, Buyers shall pay the Purchase Price set forth in the Estimated Closing Statement by wire transfer of immediately available funds into an account designated by Sellers in the Estimated Closing Statement *less* the Deposit Escrow Amount and all accrued investment income thereon, if any, which shall be released to Parent by the Escrow Agent and *less* $20 million (the "**Purchase Price Escrow Amount**"), which shall be deposited into the Purchase Price Escrow Account. The Purchase Price Escrow Account will serve as Buyers' sole source of recovery for any downward adjustment of the Purchase Price. The funds in the Purchase Price Escrow Account will be distributed to Sellers and/or Buyers in accordance with the terms of the Stalking Horse Agreement following conclusion of the post-Closing purchase price adjustment period.

| | |
|---|---|
| **Assumption of Liabilities**<br>(*Definition of Assumed Liabilities*) | The Stalking Horse Agreement provides for the assumption of the following Liabilities of the Parent, the Company and each RMS Entity:<br><br>a.  all Liabilities arising under any of the Transferred Contracts, *excluding* all Cure Costs payable with respect thereto;<br><br>b.  half of all transfer taxes imposed or arising with respect to the transactions contemplated by the Stalking Horse Agreement;<br><br>c.  all Liabilities related to Buyers' ownership or operation of the Acquired Assets, arising out of events, facts or circumstances that occur from and after the Closing (including under Environmental Laws);<br><br>d.  all post-Petition Date accounts payable of the Company and the RMS Entities existing on the Closing Date (including (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), other than accounts payable to the extent related to the Excluded Assets;<br><br>e.  obligations with respect to the replacement by Buyers of Bonding Requirements; |

|  | |
|---|---|
|  | f.   specified employee Liabilities, including severance in excess of $1.7 million for employees not offered employment by Sellers; |
|  | g.   all Liabilities of the Business in respect of HMBS; |
|  | h.   the Assumed Claims[9]; |
|  | i.   amounts payable to borrowers pursuant to hazard insurance claims pending satisfactory completion of repairs, to the extent the amounts held by the Company for the benefit of the borrower in connection with such hazard insurance claims are not reflected on the Balance Sheet; and |
|  | j.   all other Liabilities primarily related to the Acquired Assets and the Business, to the extent such Liabilities arise from and after the Closing. |
| **Excluded Assets** (*Definition of Excluded Assets*) | The Stalking Horse Agreement excludes from Buyers' purchase the following assets of the Sellers and the RMS Entities: |
|  | a.   all Contracts Leases, IP Licenses and Securitization Instruments of the Company and the RMS Entities other than the Transferred Contracts; |
|  | b.   the equity interests of the RMS Entities (other than  Mortgage Asset Systems and REO Management Solutions); |
|  | c.   (i) all post-Petition Date accounts receivable of the Company and the RMS Entities, including assignment claims, to the extent related to any Excluded Asset and (ii) all other accounts receivable of the Company and the RMS Entities to the extent related to any Excluded Asset; |
|  | d.   all causes of action and defenses to the extent related to Excluded Assets, and all causes of action and claims under chapter 5 of the Bankruptcy Code; |
|  | e.   all Tax Returns of the Sellers and the RMS Entities (other than Tax Returns related exclusively to the Company); |
|  | f.   all rights and interests of Parent and Ditech under the Stalking Horse Agreement and the Related Agreements; |
|  | g.   all non-transferable regulatory licenses, registrations and permits (including environmental permits) of the Company and the RMS Entities, other than the Licenses and the REO License; |
|  | h.   (i) all books and records to the extent primarily relating to the Excluded Assets, (ii) all books and records of the Company or the RMS Entities, in |

---

[9]   Under the Stock and Asset Purchase Agreement, "**Assumed Claim**" means "claims brought by a consumer borrower or any other Person claiming servicing errors directly related to Sellers' (A) misapplication of borrower payments, (B) miscalculation of Mortgage Loan principal amounts, (C) miscalculation of Mortgage Loan interest amounts or (D) failure to credit funds to the correct account shall in any way be Consumer Claims hereunder, and no Buyer shall have any claim, or right to bring a claim, against any Seller or any Affiliate of any Seller in connection therewith."

each case, that (x) Parent or any of its affiliates other than the Company, Mortgage Asset Systems or REO Management Solutions is required by law or by order of the Bankruptcy Court to retain or (y) are prohibited by law or Contract from being delivered to Buyers and (iii) copies of books and records that have been delivered to Buyers;

i. (i) all records and reports prepared or received by any Seller or any of its affiliates primarily in connection with the sale of the Business, the Stalking Horse Agreement, any Related Agreement, or the transactions contemplated thereby, (ii) all bids and expressions of interest received from third parties with respect to the Business, and (iii) all privileged materials of a Seller or any of its affiliates to the extent primarily relating to the Excluded Assets;

j. all director and officer insurance policies, including any tail insurance policies, and all rights of any nature with respect to any such insurance policies, including any recoveries thereunder and any rights to assess claims seeking any such recoveries;

k. any warranties, representations and guarantees primarily pertaining to any Excluded Asset or rights and defenses primarily pertaining to any Excluded Liability;

l. all outstanding litigation;

m. any deposits or prepaid or deferred charges and expenses, including all lease and rental payments, to the extent paid in connection with (i) or relating to any Excluded Assets or (ii) adequate assurance deposits posted pursuant to the Utility Order;

n. any Tax refunds, credits or other Tax receivables of Sellers (other than those of the Company for which the Tax was imposed and paid on a separate company basis and not as a member of a consolidated group);

o. any assets or other funding vehicle related to a Parent Benefit Plan;

p. all assets related to deferred debt issuance costs;

q. the MECA Trust 2010-1 and all rights related thereto;

r. all mortgage loans or other extensions of credit secured by interests in real estate other than Mortgage Loans; and

s. all additional assets set forth on a schedule to the Stalking Horse Agreement.

| | |
|---|---|
| **Excluded Liabilities** (*Definition of Excluded Liabilities*) | The Stalking Horse Agreement provides that Buyers will not assume any Liabilities of Sellers and the RMS Entities other than the Assumed Liabilities. Excluded Liabilities include, among other Liabilities: <br><br> a.   any debt for borrowed money of Sellers or the RMS Entities; |

WEIL:\97066518\6\41703.0011

|  |  |
|---|---|
|  | b. all Cure Costs payable with respect to any Contracts; |
|  | c. any Liability to the extent related to any Excluded Asset; |
|  | d. any Tax Liability associated with Walter Energy, Inc.; |
|  | e. Employee Excluded Liabilities; and |
|  | f. any Liabilities arising out of facts, events or circumstances that occur prior to the Closing under Environmental Laws. |
| **Assumption and Assignment of Contracts** (*Definition of Acquired Assets*; *Section 7.8*) | Buyers will assume all rights under the Transferred Contracts (i) subject to the approval by the Bankruptcy Court of the assumption and assignment thereof and (ii) other than any rights under any Contracts or licenses that are Excluded Assets. In addition, until five (5) Business Days prior to the Confirmation Hearing (or two (2) Business Days, with respect to a certain real property lease), Buyers may (in their sole discretion) designate any transferable regulatory licenses, registrations and permits (including environmental permits) of the Company and the RMS Entities (such licenses, registrations and permits, "**Regulatory Licenses**") or Executory Contract (other than any subservicing agreements) not considered an Acquired Asset or a Transferred Contract, respectively, under the Stalking Horse Agreement as of the date thereof to be an Acquired Asset or a Transferred Contract. Until two (2) days prior to the Confirmation Hearing, Buyers may remove any Regulatory License or Executory Contract from the list of designated Regulatory Licenses or Transferred Contracts, as applicable. |
| **Interim Operating Covenants** (*Section 6.2*) | During the period between the date of the Stalking Horse Agreement and the Closing, the Sellers are required (i) to use commercially reasonable efforts to operate the Business in the ordinary course of business and preserve the present business operations, organization, business relationships and goodwill of the Business and (ii) not to take certain specified actions in operating the Business without the prior written consent of Buyers, subject to certain exceptions, in relation to, among other things, employees and compensation, intellectual property, assets and properties, loans and advances, litigation, capital expenditures, Material Contracts, equity interests, governance documents, dividends, tax matters, insurance policies, accounting policies and accounts payable and receivable. |
| **Regulatory** (*Section 6.3*) | Each of the parties to the Stalking Horse Agreement is required to cooperate with each other and use their respective reasonable best efforts to take all actions necessary, proper or advisable to consummate the transactions contemplated by the Stalking Horse Agreement including to obtain necessary consents from Governmental Authorities and Mortgage Agencies. Notwithstanding the foregoing, no party to the Stalking Horse Agreement is required to (i) agree to the sale of any entities or assets of any of the Acquired Assets, the Company or Buyers, (ii) create or terminate existing relationships, contractual rights or obligations of any of the Acquired Assets, the Company or Buyers, (iii) amend, assign or terminate existing licenses or other agreements, (iv) litigate or defend any lawsuits or other legal proceedings challenging the Stalking Horse Agreement or the consummation of the transactions, (v) otherwise take any action that would limit Buyers' freedom of action with respect to any businesses, assets, products, or equity interests of Buyers or any of the Acquired Assets or (vi) enter into any Governmental Order, consent |

| | decree or other agreement to effectuate any of the foregoing. |
|---|---|
| **Offers of Employment** (*Section 7.3*) | Buyers will make offers of ongoing employment to those employees on a list which may be updated by Buyers until July 30, 2019, which list shall include more than 67.4% of the full-time Company Employees as of the Closing. |
| **Ginnie Option** (*Section 7.10*) | Within fifteen (15) days after the date of the Stalking Horse Agreement, Buyers are required to submit a proposal (the "**Ginnie Purchase Proposal**") to Sellers for the purchase of all rights and obligations in connection with administering and servicing any forward residential mortgage loan secured by a 1-4 family residential property that is guaranteed by Ginnie Mae, and the advances related thereto (collectively, the "**Ginnie Portfolio**").  Sellers must accept or reject the Ginnie Purchase Proposal within three (3) Business Days following Sellers' receipt of the Ginnie Purchase Proposal.  In the event that Sellers accept the Ginnie Purchase Proposal, (a) Buyers and Sellers will negotiate the terms of a purchase agreement with respect to the Ginnie Portfolio, and (b) each Seller shall have the option (the "**Ginnie Option**"), in its sole discretion, at any time prior to forty-eight (48) hours following the later of (a) the Bankruptcy Court ruling on the Plan and (b) entry of the Confirmation Order, to require Buyers to purchase the Ginnie Portfolio.  Upon the exercise by any Seller of the Ginnie Option, Buyers will purchase from Ditech and any of its subsidiaries the Ginnie Portfolio, as if the assets and liabilities comprising the Ginnie Portfolio were Acquired Assets and Assumed Liabilities, respectively.  Additionally, upon the exercise of the Ginnie Option, the Purchase Price to be paid at Closing shall be increased by the value of the Ginnie Portfolio in accordance with the Illustrative Purchase Price Calculation.  Within one (1) Business Day of the exercise of the Ginnie Option, Buyers shall deposit into the Deposit Escrow Account an additional $5 million. |
| **Settlement of Consumer Claims** (*Section 7.13*) | Sellers are required to use reasonable best efforts to pursue a settlement prior to Closing with the Official Committee of Consumer Creditors that is acceptable to Buyers with respect to all Consumer Claims relating to the Business.  Sellers are not permitted to enter into any such settlement with the Official Committee of Consumer Creditors without the prior written consent of Buyers and, in connection therewith, Sellers are required to use their reasonable best efforts to include representatives of Paul, Weiss, Rifkind, Wharton & Garrison LLP, legal counsel to Buyers, in such settlement discussions. Buyers and Sellers are also obligated to cooperate with each other in connection with such discussions and negotiations.<br><br>For any settlement with the Official Committee of Consumer Creditors effected prior to Closing in respect of any Consumer Claims relating to the Business, the purchase price shall be increased by the sum of (i) the amount of such settlement up to an aggregate cap of $10 million, plus (ii) only in the event that Sellers settle prior to Closing all of the Consumer Claims relating to the Business, $750,000. The portion of any settlement in excess of $10 million shall be the sole responsibility of Buyers, and shall have no impact on the Purchase Price.<br><br>Prior to Closing, Sellers have an obligation to seek an order from the Bankruptcy Court providing for a sale free and clear of Consumer Claims.  Such an order is not a condition to Closing. |

| | |
|---|---|
| **Closing Conditions**<br>(*Article VIII*) | <u>Buyers' Closing Conditions</u>. The Stalking Horse Agreement includes the following conditions to the Buyers' obligation to consummate the transactions thereunder:<br><br>a. (i) each of the representations and warranties set forth in Article III and Article IV (other than as set forth in clause (ii) below) shall be true and correct on the date of the Stalking Horse Agreement and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) would not reasonably be likely to result in a Material Adverse Effect and (ii) each of the Parent Fundamental Representations[10] and Company Fundamental Representations[11] shall be true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date of the Stalking Horse Agreement and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);<br><br>b. Sellers shall have performed and complied in all material respects with all covenants and agreements under the Stalking Horse Agreement required to be performed or complied with by them prior to the Closing;<br><br>c. Buyers shall have received a certificate signed by an authorized officer of each Seller, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (a) and (b);<br><br>d. any plan filed and prosecuted by Sellers in the Bankruptcy Cases (including the provisions providing for the discharge of Excluded Liabilities in accordance with the Stalking Horse Agreement and the estate release for Buyers and provisions providing for the sale free and clear of liabilities to the maximum extent permitted by the Bankruptcy Code, including, for the avoidance of doubt, to the maximum extent permitted by the Bankruptcy Code, the discharge of any and all claims, defenses and liabilities brought or asserted by a consumer borrower on account of Consumer Claims) shall include provisions providing for the discharge of Excluded Liabilities and all Liabilities relating to the Consumer Claims to the maximum extent permitted by the Bankruptcy Code and shall be in form and substance reasonably acceptable to Buyers as to provisions related to the Stalking Horse Agreement; <u>provided</u>, that, an exclusion to such "free and clear" sale for Consumer Claims shall be deemed to be acceptable to Buyers;<br><br>e. any Confirmation Order shall be in form and substance reasonably |

---

[10]    Includes the representations and warranties set forth in Section 3.1 (Organization and Authority), Section 3.2 (Purchased Shares) and Section 3.5 (Brokers' Fees).

[11]    Includes the representations and warranties set forth in Section 4.1 (Organization; Good Standing), Section 4.2 (Authorization of Transaction), Section 4.4(a) (Title to Assets), Section 4.4(b) (Sufficiency), Section 4.4(d) (Absence of Certain Changes) and Section 4.9 (Brokers' Fees).

acceptable to Buyers as to provisions related to the Stalking Horse Agreement; provided, that an exclusion to a sale "free and clear" for Consumer Claims shall be deemed to be acceptable to Buyers;

f.    each delivery contemplated by Section 2.7(b) to be delivered to Buyers shall have been delivered.

Seller Closing Conditions.  The Stalking Horse Agreement includes the following conditions to the Sellers' obligations to consummate the transactions thereunder:

a.    the representations and warranties set forth in Article V shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date of the Stalking Horse Agreement and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

b.    Buyers shall have performed and complied in all material respects with all covenants and agreements under the Stalking Horse Agreement required to be performed or complied with by Buyers prior to the Closing;

c.    Parent shall have received a certificate signed by an authorized officer of each Buyer, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (a) and (b); and

d.    each payment and delivery contemplated by Section 2.7(a) to be made to Parent shall have been made, and each delivery contemplated by Section 2.7(a) to be delivered to Sellers shall have been delivered.

Mutual Closing Conditions.  The Stalking Horse Agreement includes the following conditions to the Buyers' and Sellers' obligations to consummate the transactions thereunder:

a.    the Bankruptcy Court shall have entered the Confirmation Order, and no order staying, reversing, or modifying the Confirmation Order shall be in effect on the Closing Date;

b.    (i) the approvals of each of Ginnie Mae and Fannie Mae shall have been received, and shall not have been conditioned on any limitations on the Business or Buyers other than capital or liquidity requirements equaling one hundred and fifty percent (150%) or less of any published Ginnie Mae or Fannie Mae guidelines and (ii) the approval of HUD shall have been received and such approval shall not have been conditioned on any limitations on the Business or Buyers following the Closing that would reasonably be expected to impair the economic value to Buyers of the transactions contemplated by the Stalking Horse Agreement in any material respect (the **Regulatory Condition**"); and

c.    no Decree or Law of a Governmental Authority of competent jurisdiction shall be in effect that prohibits consummation of the transactions contemplated by the Stalking Horse Agreement, including the transfer or

| | |
|---|---|
| | assignment of the Licenses or the Company Purchased Shares to Buyers. |
| **Termination**<br>(*Section 9.1*) | This Stalking Horse Agreement may be terminated at any time prior to the Closing as follows:<br><br>Mutual Consent.  Upon the mutual written consent of the Parties.<br><br>Mutual Termination Rights.  By Buyers or Sellers if:<br><br>a. Section 9.1(b)(i): any court of competent jurisdiction or other competent Governmental Authority takes any action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by the Stalking Horse Agreement which shall have become final and non-appealable;<br><br>b. Section 9.1(b)(ii): the Closing shall not have occurred prior to the close of business on the one hundred and twentieth (120th) calendar day following the date of the Stalking Horse Agreement (the "**Initial Outside Date**"); provided, however, that if the Closing shall not have occurred due the Regulatory Condition (as defined above) remaining unsatisfied or being unable to be lawfully waived (and all other conditions are capable of being satisfied), then Parent or Buyers may extend the Initial Outside Date for two additional thirty (30)-day periods (in each case, the Initial Outside Date as extended in the manner described above, the "**Outside Date**"); or<br><br>c. Section 9.1(b)(iii): (i) an Alternative Transaction is approved by the Bankruptcy Court other than in connection with the Auction or pursuant to a plan of reorganization that is in form and substance reasonably acceptable to Buyers; (ii) if there is an Auction, Buyers are not declared the prevailing bidder at the Auction and Buyers are not required to serve as the Back-Up Bidder; or (iii) if there is an Auction, Buyers are not declared the prevailing bidder at the Auction and Buyers are required to serve as the Back-Up Bidder pursuant to the Stalking Horse Agreement; provided, that any such termination pursuant to clause (ii) or (iii) shall not be effective until the consummation of the transaction with the prevailing bidder at the Auction.<br><br>Buyers' Termination Rights.  By Buyers if:<br><br>a. Section 9.1(c)(i)(A): there has been a Willful Breach by any Seller of specified sections of the Stalking Horse Agreement, and  such breach, if curable, has not been cured by such Seller prior to the earlier to occur of (i) ten (10) Business Days after receipt of Buyers' notice of such breach and (ii) the Outside Date;<br><br>b. Section 9.1(c)(i)(B): there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in the Stalking Horse Agreement, which would result in a failure of a condition to the obligations of Buyers set forth in Section 8.1(a) or Section 8.1(b) to be satisfied, and such breach, if curable, has not been cured by such Seller prior to the earlier to occur of (i) ten (10) Business Days after receipt of |

Buyers' notice of such breach and (ii) the Outside Date;

c. <u>Section 9.1(c)(ii)</u>: one or more of the Bankruptcy Cases is converted to cases under chapter 7 of the Bankruptcy Code, one or more of the Bankruptcy Cases is dismissed, or a trustee or examiner with powers to operate any Seller in the Bankruptcy Cases is appointed;

d. <u>Section 9.1(c)(iii)</u>: if (i) Sellers do not hold an Auction as provided in the Bidding Procedures Order (unless (x) the Auction is cancelled because Buyers are the Prevailing Bidder or no competing bid has been submitted or (y) the Auction is adjourned or postponed in accordance with the Bidding Procedures Order); (ii) the designation of the Buyers as Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement and the Termination Payment contemplated in the Stalking Horse Agreement have not been approved by the Bankruptcy Court on or prior to June 30, 2019; or (iii) Sellers withdraw or seek to withdraw a notice or motion to approve the Termination Payment and do not cure within two (2) Business Days;

e. <u>Section 9.1(c)(iv)</u>: if (i) the Confirmation Order is not entered on or prior to August 15, 2019, or (ii) following its entry, the Confirmation Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of a Buyer; or

f. <u>Section 9.1(c)(v)</u>: if Sellers announce or file a chapter 11 plan: (i) exclusively contemplating the reorganization or sale of all or any part of Sellers inconsistent with the Stalking Horse Agreement or the transactions contemplated thereby, or (ii) that does not transfer to Buyers free and clear of any curtailment and any similar liabilities to the maximum extent permitted by the Bankruptcy Code and provide an estate release for Buyers; <u>provided</u>, that an exclusion to such discharge for Consumer Claims shall not give rise to a right to termination by Buyers.

<u>Seller Termination Rights</u>.  By Sellers if:

a. there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in the Stalking Horse Agreement, which would result in a failure of a condition to the obligations of Sellers set forth in Section 8.2(a) or Section 8.2(b), and such breach, if curable, has not been cured by Buyers prior to the earlier to occur of (i) ten (10) Business Days after receipt of such Seller's notice of such breach and (ii) the Outside Date;

b. (i) all of the conditions to the obligations of Buyers to consummate the transactions set forth in Section 8.1 and Section 8.3 have been satisfied or waived, (ii) the Company has confirmed in writing to Buyers that it is ready, willing and able to consummate the transactions contemplated by the Stalking Horse Agreement, and (iii) Buyers fail to consummate the transactions within three (3) Business Days following the date on which the Closing should have occurred; or

c. any of Ginnie Mae, Fannie Mae or HUD notifies Buyers or Sellers in

| | |
|---|---|
| | writing that it has made a final determination that it will not approve the transactions contemplated by the Stalking Horse Agreement in a manner that satisfies the Regulatory Condition; provided, that such termination right may only be exercised on or after the third (3rd) Business Day following the receipt of such notice and the delivery of a copy of such notice to the non-receiving Parties. |
| **Termination Fee; Expense Reimbursement** (*Section 6.4(a); Section 9.2*) | If the Stalking Horse Agreement is terminated pursuant to Section 9.1(b)(iii), Section 9.1(c)(i)(A), Section 9.1(c)(iii)(A), or Section 9.1(c)(v), and Buyers are not then in breach of any of their obligations under the Stalking Horse Agreement that would result in specified conditions to Closing to be satisfied, then Sellers shall (x) pay Buyers up to $4 million (or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option, $4,250,000) of its reasonable and documented expenses incurred in connection with the transactions (the "**Expense Reimbursement**") and a fee equal to $4 million (or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option, $5,250,000) (the "**Initial Break-Up Fee**"), and (y) deposit into an escrow account $8,500,000 (or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option, $9,750,000) (together with the Initial Break-Up Fee, the "**Break-Up Fee**"), to be released to Buyers in the event that an Alternative Transaction[12] is consummated within twelve (12) months following the date of the Stalking Horse Agreement (the "**Tail Period**"). <br><br> If the Stalking Horse Agreement is terminated pursuant to Section 9.1(c)(i)(B) and Buyers are not then in breach of any of their obligations under the Stalking Horse Agreement that would result in specified conditions to Closing to be satisfied, then Sellers shall pay Buyers the Expense Reimbursement and, if an Alternative Transaction is consummated within the Tail Period, the Break-Up Fee. |
| **Limitation on Liability** (*Section 9.2*) | Subject to certain exceptions, if any party terminates the Stalking Horse Agreement, all rights and obligations of the parties thereunder shall terminate upon such termination and shall become null and void and no party shall have any Liability to the other parties thereunder other than Liabilities arising from a Willful Breach. In addition, absent Willful Breach, (i) the maximum Liability of Sellers under the Stalking Horse Agreement shall not exceed an aggregate amount equal to the Termination Payment and (ii) the maximum Liability of Buyers under the Stalking Horse Agreement shall not exceed an aggregate amount equal to the Deposit Escrow Amount. In no event shall any party to the Stalking Horse Agreement have any liability for consequential, special, incidental, indirect, or punitive damages, lost profits, or similar Liabilities. |

---

[12] "Alternative Transaction" is defined in the Stalking Horse Agreement as the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction, including any plan of reorganization or plan of liquidation approved by the Bankruptcy Court, or resulting from the Auction, of any material portion of the assets or equity interests of the Company or any Subsidiary of the Company (to the extent such assets or equity interests would constitute Acquired Assets), in a single transaction or a series of transactions, with one or more Persons other than Buyers and/or their Affiliates.

**<u>Exhibit B</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                          :
In re                                     :   **Chapter 11**
                                          :
**DITECH HOLDING CORPORATION,** *et al.*, :   **Case No. 19-10412 (JLG)**
                                          :
              Debtors.[1]                 :   **(Jointly Administered)**
                                          :   **Related Docket Nos. 456 and [_]**
---------------------------------------------------------------X

## ORDER APPROVING STALKING HORSE BID PROTECTIONS

In accordance with the *Order (I) Approving Bidding Procedures, (II) Approving*

*Assumption and Assignment Procedures, and (III) Granting Related Relief* [ECF No. 456]

(the "**Bidding Procedures Order**")[2] approving, among other things, bidding procedures

(the "**Bidding Procedures**") for the sale of any or all of the Debtors' assets; and upon

consideration of the *Notice of Designation of Stalking Horse Bid and Request for Approval of*

*Stalking Horse Bid Protections (Reverse Business)*, dated as of June 18, 2019 [ECF No. [_]]

(the "**Notice of Stalking Horse Bid**") and the relevant terms and conditions of the *Stock and*

*Asset Purchase Agreement* (the "**Stalking Horse Agreement**") appended thereto; and due and

proper notice of the Bidding Procedures Order and Notice of Stalking Horse Bid having been

provided as set forth in the affidavits of service filed with respect thereto [ECF Nos. [_]]; and

such notice having been adequate and appropriate under the circumstances; [and no objections to

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order.

the Notice of Stalking Horse Bid having been filed;] and the Court having determined that the

legal and factual bases set forth in the Motion and Notice of Stalking Horse Bid establish just

cause for the relief granted herein, and the relief granted herein is in the best interests of the

Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had

before the Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    <u>Jurisdiction and Venue</u>.  This matter is a core proceeding pursuant to 28

U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The Court has jurisdiction to consider the relief requested in accordance with 28 U.S.C. §§ 157

and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.).

B.    <u>Designation of Stalking Horse Bidder</u>.    Pursuant to the Bidding

Procedures Order, the Debtors are authorized to, in the exercise of their reasonable business

judgment, designate one or more Stalking Horse Bidders for one or more of their assets and to

enter into the Stalking Horse Agreement for the sale of any assets or equity, subject to Court

approval.

C.    <u>Stalking Horse Bid Protections</u>.    Pursuant to the Bidding Procedures

Order, the Debtors are further authorized, in consultation with the Consultation Parties (as

defined in the Bidding Procedures), to (a) establish initial overbid minimum and subsequent

bidding increment requirements; (b) offer each Stalking Horse Bidder a break-up fee and

expense reimbursement in an amount agreed to by the Debtors in consultation with the Term

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To
the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Loan Ad Hoc Group and the official committee of unsecured creditors; (c) provide that, if the Stalking Horse Bidder bids on certain assets at the Auction, the Stalking Horse Bidder will be entitled to a credit, in the amount of its Termination Payment, against the increased purchase price for the assets; and (d) provide other appropriate and customary protections to a Stalking Horse Bidder.  The stalking horse bid protections provided to the Stalking Horse Bidder are set forth in Sections 6.4 and 9.2 of the Stalking Horse Agreement (the "**Stalking Horse Bid Protections**").

D.     <u>Notice of Stalking Horse Bid</u>.  On June [_], 2019, the Debtors (a) filed the Notice of Stalking Horse Bid, disclosing the designation of Mortgage Assets Management, LLC and SHAP 2018-1, LLC as Stalking Horse Bidder in accordance with the Bidding Procedures Order, (b) served it on the Objection Notice Parties, and (c) caused it to be published on the website maintained by the Debtors' claims and noticing agent in these chapter 11 cases, in accordance with the Bidding Procedures Order.  No further notice of the relief granted herein is required.

E.     <u>No Objections to Stalking Horse Bid Protections</u>.  No timely Stalking Horse Objection was filed and served in accordance with the Bidding Procedures.

F.     <u>Relief is Warranted</u>.  The legal and factual bases set forth in the Motion, Bidding Procedures Order, and Notice of Stalking Horse Bid establish just and sufficient cause to grant the relief requested therein.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     The designation of Mortgage Assets Management, LLC and SHAP 2018-1, LLC as Stalking Horse Bidder is hereby approved.

2.      The Stalking Horse Bid Protections are approved and shall be payable by the Debtors in accordance with Sections 6.4(a) and 9.2 of the Stalking Horse Agreement.

3.      If payable, the Break-Up Fee and Expense Reimbursement shall be treated as an allowed administrative expense claim against the Debtors.

4.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, or any applicable provisions of the Local Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

5.      The Debtors are authorized to take all steps necessary or appropriate to carry out this Order.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated:  _____, 2019
        New York, New York

        _____
        THE HONORABLE JAMES L. GARRITY, JR.
        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit C</u>**

**Stalking Horse Agreement**

EXECUTION VERSION

**STOCK AND ASSET PURCHASE AGREEMENT**

---

**BY AND AMONG**

**DITECH HOLDING CORPORATION,**

**WALTER REVERSE ACQUISITION LLC,**

**REVERSE MORTGAGE SOLUTIONS, INC.,**

**MORTGAGE ASSETS MANAGEMENT, LLC,**

**AND**

**SHAP 2018-1, LLC**

**June 17, 2019**

---

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................2

    Section 1.1    Definitions.......................................................2
    Section 1.2    Interpretations ...............................................25

ARTICLE II PURCHASE AND SALE ..........................................................26

    Section 2.1    Purchase and Sale of Assets and Purchased Shares; Assumed
        Liabilities and Excluded Liabilities ...............................26
    Section 2.2    Consideration ................................................28
    Section 2.3    Deposit; Escrows ...........................................28
    Section 2.4    Estimated Closing Statement; Cut-Off Date Portfolio Tape...................29
    Section 2.5    Proposed Final Closing Statement; Final Closing Statement; Post-
        Closing Adjustment ........................................29
    Section 2.6    Closing .......................................................32
    Section 2.7    Closing Payments and Deliveries ...........................33
    Section 2.8    Consent to Certain Assignments ............................34
    Section 2.9    Tax Treatment ...............................................35
    Section 2.10    Allocation....................................................35
    Section 2.11    Withholding Rights .........................................36

ARTICLE III PARENT'S REPRESENTATIONS AND WARRANTIES................36

    Section 3.1    Organization and Authority ................................36
    Section 3.2    Purchased Shares ...........................................37
    Section 3.3    Noncontravention; Government Filings .................37
    Section 3.4    Executory Contract List ....................................38
    Section 3.5    Brokers' Fees ................................................38

ARTICLE IV THE COMPANY'S REPRESENTATIONS AND WARRANTIES ..................38

    Section 4.1    Organization; Good Standing ..............................38
    Section 4.2    Authorization of Transaction...............................38
    Section 4.3    Noncontravention; Government Filings .................39
    Section 4.4    Title to Assets; Sufficiency; Financial Statements; Absence of
        Certain Changes ............................................39
    Section 4.5    Transferred Contracts.......................................41
    Section 4.6    Real Property ................................................42
    Section 4.7    Litigation; Decrees; Liabilities ............................43
    Section 4.8    Labor Matters................................................43
    Section 4.9    Brokers' Fees ................................................44
    Section 4.10    Taxes.........................................................44
    Section 4.11    Tangible Personal Property.................................46
    Section 4.12    Employee Benefits ..........................................46
    Section 4.13    Intellectual Property .........................................47
    Section 4.14    Compliance with Laws; Permits ..........................48
    Section 4.15    Environmental Matters......................................49

i

Section 4.16    Mortgage Business................................................................49
Section 4.17    Insurance.............................................................................53
Section 4.18    Disclaimer of Other Representations and Warranties............53

ARTICLE V BUYERS' REPRESENTATIONS AND WARRANTIES................54

Section 5.1    Organization of Buyers; Good Standing...............................54
Section 5.2    Authorization of Transaction ..............................................54
Section 5.3    Noncontravention................................................................54
Section 5.4    Litigation; Decrees..............................................................55
Section 5.5    Operation of the Business ....................................................55
Section 5.6    Brokers' Fees .......................................................................55
Section 5.7    Sufficient Funds; Adequate Assurances ...............................55
Section 5.8    Certain Qualifications ..........................................................55
Section 5.9    Disclaimer of Other Representations and Warranties............55

ARTICLE VI PRE-CLOSING COVENANTS .............................................56

Section 6.1    Efforts; Cooperation; Financing Cooperation......................56
Section 6.2    Conduct of the Business Pending the Closing ......................58
Section 6.3    Filings; Other Actions..........................................................61
Section 6.4    Bankruptcy Court Matters....................................................64
Section 6.5    Notices and Consents...........................................................67
Section 6.6    Notice of Developments.......................................................68
Section 6.7    Access; No Contact..............................................................68
Section 6.8    Bulk Transfer Laws..............................................................68
Section 6.9    Replacement Bonding Requirements.....................................69

ARTICLE VII OTHER COVENANTS.........................................................69

Section 7.1    Further Assurances...............................................................69
Section 7.2    Access; Enforcement; Record Retention ..............................70
Section 7.3    Employee Matters ................................................................70
Section 7.4    Certain Tax Matters .............................................................74
Section 7.5    Insurance Matters.................................................................75
Section 7.6    Acknowledgements..............................................................75
Section 7.7    Press Releases and Public Announcements ..........................76
Section 7.8    Transferred Contracts; Executory Contracts; Other Agreements ..........76
Section 7.9    Other Intellectual Property Matters .....................................77
Section 7.10    Purchase of Ginnie Portfolio...............................................78
Section 7.11    Transition Services Agreement.............................................78
Section 7.12    Interim Date Portfolio Tape.................................................78
Section 7.13    Settlement of Consumer Claims. .........................................78

ARTICLE VIII CONDITIONS TO OBLIGATION TO CLOSE .............................79

Section 8.1    Conditions to Buyers' Obligations........................................79
Section 8.2    Conditions to Sellers' Obligations........................................80
Section 8.3    Conditions Precedent to Sellers' and Buyers' Obligations....................81

Section 8.4       No Frustration of Closing Conditions ....................................................81

ARTICLE IX TERMINATION.............................................................................................81
Section 9.1       Termination of Agreement...................................................................81
Section 9.2       Effect of Termination..........................................................................84

ARTICLE X MISCELLANEOUS .........................................................................................85
Section 10.1      Survival ................................................................................................85
Section 10.2      Expenses ..............................................................................................85
Section 10.3      Entire Agreement ................................................................................85
Section 10.4      Incorporation of Exhibits and Disclosure Schedule.............................85
Section 10.5      Amendments and Waivers ...................................................................85
Section 10.6      Succession and Assignment.................................................................85
Section 10.7      Notices .................................................................................................86
Section 10.8      Governing Law ....................................................................................87
Section 10.9      Submission to Jurisdiction; Service of Process ...................................87
Section 10.10     Waiver of Jury Trial ............................................................................87
Section 10.11     Specific Performance ..........................................................................88
Section 10.12     Severability .........................................................................................88
Section 10.13     No Third Party Beneficiaries ...............................................................88
Section 10.14     Non-Recourse .....................................................................................88
Section 10.15     Mutual Drafting ..................................................................................89
Section 10.16     Disclosure Schedule............................................................................89
Section 10.17     Headings; Table of Contents................................................................89
Section 10.18     Counterparts; Facsimile and Electronic Signatures .............................89

Exhibit A – Escrow Agreement
Exhibit B – Transaction Accounting Principles
Exhibit C – Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit D – Form of Transition Services Agreement

## STOCK AND ASSET PURCHASE AGREEMENT

This Stock and Asset Purchase Agreement (this "Agreement") is entered into as of June 17, 2019, by and between Ditech Holding Corporation, a Maryland corporation ("Ditech"), Walter Reverse Acquisition LLC, a Delaware limited liability company ("Parent"), Reverse Mortgage Solutions, Inc., a Delaware corporation (the "Company", and together with Ditech and Parent, the "Sellers" and each a "Seller"), and Mortgage Assets Management, LLC, a Delaware limited liability company (the "Platform Buyer") and SHAP 2018-1, LLC a Delaware limited liability company (the "Loan Buyer", and together with Platform Buyer, "Buyers" and each a "Buyer"). Sellers and Buyers are referred to herein each as a "Party" and together as the "Parties".

## WITNESSETH

WHEREAS, Sellers and certain of their Affiliates are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), pursuant to voluntary petitions for relief filed under chapter 11 of the Bankruptcy Code on February 11, 2019 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court" and, such cases the "Bankruptcy Cases");

WHEREAS, the Company and its Subsidiaries engage in the business of (i) owning and servicing certain reverse mortgage loans, (ii) subservicing for third-party credit owners of reverse loans, and (iii) providing other services for the reverse mortgage market, including real estate owned property management and disposition (collectively, the "Business");

WHEREAS, Parent is the direct owner of one hundred percent (100%) of the outstanding shares of capital stock of the Company (such shares of capital stock, the "Company Purchased Shares") and the Company is the direct owner of one hundred percent (100%) of the outstanding membership interests of each of Mortgage Asset Systems, LLC, a Delaware limited liability company ("Mortgage Asset Systems", and such membership interests, the "Mortgage Asset Purchased Interests") and REO Management Solutions, LLC, a Delaware limited liability company ("REO Management Solutions", and such membership interests, the "REO Management Purchased Interests", and together with the Company Purchased Shares and the Mortgage Asset Purchased Interests, the "Purchased Shares");

WHEREAS, subject to the terms and upon the conditions set forth herein, Sellers and the RMS Entities desire to sell, transfer and assign to Buyers, and Buyers desire to purchase, acquire and assume from Sellers and the RMS Entities, all of the Acquired Assets and Assumed Liabilities, all as more specifically provided herein;

WHEREAS, subject to the terms and upon the conditions set forth herein, Parent desires to sell, transfer, assign, convey, and deliver to Buyers, and Buyers desire to purchase, acquire and accept from Parent, the Company Purchased Shares, free and clear of all Liens other than Permitted Liens to the maximum extent permitted by the Bankruptcy Code, all as more specifically provided for herein;

WHEREAS, the Parties desire and intend to sell, transfer, assign, convey, and deliver the Company Purchased Shares to Buyers with the Acquired Assets (other than the Mortgage Loans

owned by the Company and reflected on the Balance Sheet and the Owned Loan Servicing Rights) including, in the event of the exercise of the Ginnie Option pursuant to <u>Section 7.10</u>, the Ginnie Portfolio, but in order to transfer such assets free and clear of all Liens (other than Permitted Liens) to the maximum extent permitted by the Bankruptcy Code, the Parties are required to effect such transfer in steps, with the Platform Purchase serving as a transitory and interim step to be followed immediately (upon completion of the Share Purchase) by a contribution of the assets purchased in the Platform Purchase to the Company, all as more specifically provided herein;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition to Buyers' willingness to enter into this Agreement, Sellers have delivered the Signing Date Portfolio Tape to Buyers;

WHEREAS, on February 8, 2019, the Consenting Lenders, Sellers and certain of Sellers' debtor affiliates entered into a Restructuring Support Agreement (the "<u>RSA</u>") to be implemented through a prearranged chapter 11 plan filed with the Bankruptcy Court in connection with the Bankruptcy Cases on February 11, 2019 by Ditech and its affiliated debtors (the "<u>Plan</u>"); and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.1**     <u>Definitions</u>.  For purposes of this Agreement:

"<u>Acceptable Liquidity Condition</u>" means any condition(s) to the approval of Ginnie Mae or Fannie Mae with respect to the transactions contemplated by this Agreement providing for the implementation with respect to the Business or Buyers of any capital or liquidity requirements equaling one hundred and fifty percent (150%) or less of any published Ginnie Mae or Fannie Mae guidelines.

"<u>Access Period</u>" has the meaning set forth in <u>Section 7.2</u>.

"<u>Accrued Bonus Amount</u>" has the meaning set forth in <u>Section 7.3(h)</u>.

"<u>Acquired Assets</u>" means, without duplication, (i) all of Parent's and the Company's, as applicable, right, title and interest in and to the Licenses (which shall remain assets of the Company at and after the Closing), (ii) all of the Company's right, title and interest in and to the REO Property (which shall remain an asset of the Company at and after the Closing), (iii) all of REO Management Solutions' right, title and interest in and to the REO License (which shall remain an asset of REO Management Solutions at and after the Closing), (iv) all of Parent's and Ditech's right, title, and interest in and to all assets, properties, contractual rights, intellectual property, goodwill, rights and claims at the Closing that are primarily related to the Business and

2

(v) all of the Company's and the RMS Entities' right, title, and interest in and to all of the assets, properties, contractual rights, intellectual property, goodwill, rights and claims of the Company and the RMS Entities at the Closing, other than the Excluded Assets (which shall be transferred to Parent or a Subsidiary of Parent pursuant to Section 2.1(d)), including (and, for the avoidance of doubt, subject to the limitations set forth in the following clauses (a)-(n)):

(a)      the Contracts, Leases, IP Licenses and Securitization Instruments set forth on Section 1.1 of the Disclosure Schedule under the heading "Transferred Contracts" (together, the "Transferred Contracts"), in each case, subject to the approval by the Bankruptcy Court of the assumption and assignment thereof;

(b)      all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses (including all lease and rental payments) that have been prepaid by the Company or any of the RMS Entities and are associated with the Transferred Contracts, other than (A) any deposits or prepaid or deferred charges and expenses to the extent paid in connection with or relating to any Excluded Assets or (B) any deposits or prepaid or deferred charges and expenses to the extent paid in connection with or relating to adequate assurance deposits posted pursuant to the Utility Order;

(c)      to the extent transferable, all rights of the Company and any of the RMS Entities under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees or agents of the Company or any of the RMS Entities or with third parties, in each case other than to the extent primarily related to the Excluded Assets;

(d)      all rights of the Company and any of the RMS Entities under or pursuant to all warranties, representations and guarantees made by vendors, sellers of assets or other counterparties to the extent relating to any Acquired Assets, to the extent transferable, other than any warranties, representations and guarantees primarily relating to any Excluded Assets or rights and defenses primarily relating to any Excluded Liabilities;

(e)      all Intellectual Property and Information Technology owned or purported to be owned by the Company or a RMS Entity, including all Registered IP set forth on Section 4.13(a) of the Disclosure Schedule;

(f)      to the extent transferable, all regulatory licenses, registrations and permits (including environmental permits) of the Company and any of the RMS Entities set forth under the heading "Acquired Assets" on Section 1.1 of the Disclosure Schedule;

(g)      all books and records (including, for the avoidance of doubt, Tax Returns) of (A) the Company and the RMS Entities and (B) Ditech and Parent to the extent primarily relating to the Business including any and all Personal Data, in each case except as set forth in clauses (h) or (i) of the definition of Excluded Assets;

(h)      all personal property of the Company and any of the RMS Entities and interests therein, including furniture, furnishings, office equipment, technology, communications equipment, vehicles and other tangible personal property, except to the extent primarily related to the Excluded Assets;

3

(i)      all post-Petition Date accounts receivable of the Company or any of the RMS Entities and other amounts owed to the Company or any of the RMS Entities, including assignment claims, in each case, other than to the extent related to any Excluded Assets;

(j)      all unrestricted cash and Cash Equivalents of the Company and the RMS Entities;

(k)      in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option pursuant to Section 7.10, the Ginnie Portfolio;

(l)      all Mortgage Loans and all Servicing Rights (including all Fannie Mortgage Servicing Rights and Ginnie HMBS Servicing Rights) owned by the Company or a RMS Entity;

(m)      the Mortgage Asset Purchased Interests and the REO Management Purchased Interests; and

(n)      other than any Excluded Assets, all other assets or rights of the Company and the RMS Entities of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible.

"Additional Contract" has the meaning set forth in Section 4.5(b).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Assets" has the meaning set forth in Section 2.10.

"Allocation Consideration" has the meaning set forth in Section 2.10.

"Allocation Objections Notice" has the meaning set forth in Section 2.10.

"Allocation Principles" has the meaning set forth in Section 2.10.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction, including any plan of reorganization or plan of liquidation approved by the Bankruptcy Court, or resulting from the Auction, of any material portion of the assets or equity interests of the Company or any Subsidiary of the Company (to the extent such assets or equity interests would constitute Acquired Assets), in a single transaction or a series of transactions, with one or more Persons other than Buyers and/or their Affiliates.

"Antitrust Law" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or

lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"Applicable Requirements" means, as of the time of reference, as applicable with respect to any Mortgage Loan (a) all applicable Mortgage Agency requirements, including applicable HUD HECM Guidelines, (b) all applicable Laws relating to the origination and/or servicing of the Mortgage Loans, including the Fair Housing Act, the Equal Credit Opportunity Act and Regulation B, the Real Estate Settlement Procedures Act and Regulation X, the Truth in Lending Act and Regulation Z, the Fair Debt Collection Practices Act and applicable state debt collection Laws, applicable state usury and real property Laws, prohibitions against unfair, deceptive or abusive acts or practices, know-your-customer, anti-money laundering, foreign corrupt practices and anti-terrorism Laws, (c) with respect to matters or circumstances as to which no such standard or procedure applies, the Prudent Mortgage Servicer Standard and (d) all legal obligations to, or Contracts (including any representations or warranties incorporated into any such Contract) with, any insurer, investor or Mortgage Agency, including any applicable Guides and other binding requirements of any Mortgage Agency.

"Asset Purchase" has the meaning set forth in Section 2.1(b).

"Assumed Benefit Plan" has the meaning set forth in Section 7.3(b)(ii).

"Assumed Claims" has the meaning set forth in the definition of Consumer Claim.

"Assumed Liabilities" means all of the following Liabilities of Parent, the Company and each RMS Entity:

(a)    all Liabilities arising under any of the Transferred Contracts, excluding all Cure Costs payable with respect thereto;

(b)    all Liabilities for any Transfer Taxes allocated to Buyers under Section 7.4(a).

(c)    all Liabilities related to Buyers' ownership or operation of the Acquired Assets, arising out of events, facts or circumstances that occur from and after the Closing (including under Environmental Laws);

(d)    all post-Petition Date accounts payable of the Company and the RMS Entities existing on the Closing Date primarily related to the Business (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), other than accounts payable to the extent related to the Excluded Assets;

(e)    all Liabilities assumed pursuant to Section 6.9;

(f)    all Liabilities assumed pursuant to Section 7.3;

(g)    the Liabilities of the Business in respect of HMBS;

(h)    the Assumed Claims;

(i)    amounts payable to borrowers pursuant to hazard insurance claims pending satisfactory completion of repairs, to the extent the amounts held by the Company for the benefit of the borrower in connection with such hazard insurance claims are not reflected on the Balance Sheet; and

(j)    all other Liabilities primarily related to the Acquired Assets and the Business, to the extent such Liabilities arise from and after the Closing.

"Assumed PTO" has the meaning set forth in Section 7.3(g).

"Assumption of Liabilities" has the meaning set forth in Section 2.1(c).

"Assumption of Platform Assumed Liabilities" has the meaning set forth in Section 2.1(c).

"Auction" means the auction undertaken pursuant to the Bidding Procedures Order.

"Back-Up Bidder" has the meaning set forth in Section 6.4(d).

"Back-Up Termination Date" means the earlier to occur of (a) consummation of the transaction with the winning bidder at the Auction and (b) Buyers' receipt of notice from Sellers of the release by Sellers of Buyers' obligations under Section 6.4(d); provided, however, that in no event shall the Back-Up Termination Date be later than ninety (90) days following the date hereof.

"Balance Sheet" has the meaning set forth in Section 4.4(c).

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" means each "employee benefit plan," as defined in section 3(3) of ERISA and each other employee benefit plan or arrangement (other than any governmental plan or statutorily required benefit arrangement), including any bonus or incentive plan, retention, change of control, deferred compensation arrangement, equity or equity based compensation, severance pay, policy or practice, sick leave, vacation pay, disability, medical insurance and life insurance.

"Bidding Procedures Order" means that certain order of the Bankruptcy Court approving bidding procedures as entered by the Bankruptcy Court in the Bankruptcy Cases on April 23, 2019 (Docket No. 456) that, among other things, establishes: (a) the procedures for the Auction process; (b) the date for the Auction; and (c) the procedure for approving the Termination Payment.

"Bill of Sale" has the meaning set forth in Section 2.7(a)(iii).

6

"Bonding Requirements" means all standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of the Company or any of the RMS Entities or their respective Affiliates regarding any of the Acquired Assets.

"Break-Up Fee" has the meaning set forth in Section 6.4(a)(i).

"Break-Up Fee Escrow Account" means an account, established pursuant to the Escrow Agreement, in which the Remaining Break-Up Fee is held for disbursement by the Escrow Agent.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer" and "Buyers" have the meanings set forth in the preamble.

"Buyer 401(k) Plan" has the meaning set forth in Section 7.3(e).

"Buyer Flexible Benefits Plan" has the meaning set forth in Section 7.3(f).

"Cash Equivalents" means checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Closing" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.6.

"COBRA" has the meaning set forth in Section 4.12(f).

"Company" has the meaning set forth in the preamble.

"Company Benefit Plan" means each Benefit Plan that is sponsored, maintained or entered into by the Company, Mortgage Asset Systems or REO Management Solutions and under which the Company, Mortgage Asset Systems or REO Management Solutions has any Liability to provide compensation or benefits to or for the benefit of any Covered Employee, excluding any Parent Benefit Plan.

"Company Employee" means an employee of the Company, Mortgage Asset Systems or REO Management Solutions at the Closing, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Company Fundamental Representations" means the representations and warranties set forth in Section 4.1 (Organization; Good Standing), Section 4.2 (Authorization of Transaction),

7

Section 4.4(a) (Title to Assets), Section 4.4(b) (Sufficiency), Section 4.4(d) (Absence of Certain Changes) and Section 4.9 (Brokers' Fees).

"Company Originated Mortgage Loan" means any Mortgage Loan originated by the Company at any time and any Company Purchased Mortgage Loan.

"Company Purchased Mortgage Loan" means any Mortgage Loan (other than any Mortgage Loan constituting an Excluded Asset) purchased by the Company at any time.

"Company Purchased Shares" has the meaning set forth in the recitals.

"Company Serviced Mortgage Loan" means any Mortgage Loan serviced or subserviced by the Company or any of its Subsidiaries pursuant to a Servicing Agreement.

"Confidentiality Agreement" means the confidentiality agreement, dated as of February 1, 2019, by and between Ditech and Waterfall Asset Management, LLC.

"Confirmation Hearing" means the hearing to consider confirmation of the plan, including approval of this Agreement.

"Confirmation Order" means an order of the Bankruptcy Court in form and substance reasonably acceptable to Buyers and Sellers confirming a chapter 11 plan consistent with this Agreement, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby and, for the avoidance of doubt, providing for a sale free and clear of all curtailment and other similar liabilities to the maximum extent permitted by the Bankruptcy Code; provided, that an exclusion to such "free and clear" sale for Consumer Claims shall be deemed to be acceptable to Buyers.

"Consenting Lenders" means the lenders under the Credit Agreement that are party to the RSA.

"Consultation Period" has the meaning set forth in Section 2.5(c).

"Consumer Claim" means (a) any claim relating to conduct prior to Closing brought by a consumer borrower against any Seller for the violation of (i) The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.), (ii) The Fair Credit Reporting Act (15 U.S.C. § 1681), (iii) The Truth in Lending Act (12 C.F.R. § 1026), (iv) The Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p) and (v) any and all state law equivalents of the foregoing clauses (i) through (iv) and (b) any other claim for fraudulent inducement of a consumer borrower to enter into a loan.  For the avoidance of doubt, it is understood and agreed that no claims brought by a consumer borrower or any other Person claiming servicing errors directly related to Sellers' (A) misapplication of borrower payments, (B) miscalculation of Mortgage Loan principal amounts, (C) miscalculation of Mortgage Loan interest amounts or (D) failure to credit funds to the correct account shall in any way be Consumer Claims hereunder, and no Buyer shall have any claim, or right to bring a claim, against any Seller or any Affiliate of any Seller in connection therewith (clauses (A) through (D), collectively, the "Assumed Claims").

"Contract" means any written agreement, contract, mortgage, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding or legally binding commitment.

"Contracting Parties" has the meaning set forth in Section 10.14.

"Covered Employee" means each Company Employee and Parent Group Employee.

"Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018, by and among the Company, as the borrower, the lenders party thereto, and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Sellers (or the applicable Subsidiary thereof) and assignment to Buyers of the Transferred Contracts.

"Cut-Off Date Portfolio Information" means with respect to each Mortgage Loan on the Cut-Off Date Portfolio Tape, the Portfolio Information.

"Cut-Off Date Portfolio Tape" means the computer disk, computer tape or other electronic data format delivered to Buyers pursuant to Section 2.4 setting forth, as of the close of business on the date that is the last day of the month prior to the day that is thirty (30) days prior to the Closing Date, the Cut-Off Date Portfolio Information for each Mortgage Loan included in the Signing Date Portfolio Tape (other than any of the foregoing loans that have been repaid or prepaid in full).

"Data Room" means the electronic data rooms maintained by the Sellers or their Affiliates, made available to Buyers and their Affiliates, hosted by Intralinks, Inc., titled "Project Phoenix" and Box Inc., titled "Project Phoenix – WAM Data Room".

"Debt Financing" has the meaning set forth in Section 6.1(c).

"Debt Financing Sources" means the agents, arrangers, lenders and other Persons that have committed to provide or have otherwise entered into agreements in connection with the Debt Financing, and any joinder agreements, indentures or credit agreements entered into pursuant thereto or relating thereto, together with their respective Affiliates, and the respective officers, directors, employees, partners, trustees, shareholders, controlling persons, agents and representatives of the foregoing, and their respective successors and assigns.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Deficit" has the meaning set forth in Section 2.5(g)(ii).

"Deposit Escrow Account" means an account, established pursuant to the Escrow Agreement, in which the Deposit Escrow Amount is held for disbursement by the Escrow Agent.

"Deposit Escrow Amount" has the meaning set forth in Section 2.3 as it may be increased by the Ginnie Escrow Amount.

"Disclosure Schedule" has the meaning set forth in Article III.

"Ditech" has the meaning set forth in the preamble.

"Ditech Agreements" has the meaning set forth in Section 7.8(c).

"Ditech Agreements List" has the meaning set forth in Section 7.8(c).

"Employee Excluded Liabilities" means, except as provided in Section 7.3, all (i) payments or entitlements that Sellers, the RMS Entities or any of their Affiliates may owe or have promised to pay to any current or former employees, officers, directors or consultants of the Business, including wages, other remuneration, holiday or vacation pay, bonus, change of control, retention, key employee incentive plan payments, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions, insurance premiums, taxes, and any other liability, payment or obligations related to such current or former employees, officers, directors and consultants including any liability arising under the Worker Adjustment and Retraining Notification Act of 1988 and any similar state or local law (collectively, "WARN"), any liability for COBRA coverage, labor or similar law, if any, any withdrawal liability related to any Benefit Plan that is a "multiemployer plan" (as such term is defined under Section 3(37) of ERISA), and any such liabilities arising out of or resulting in connection with the consummation of the transactions contemplated by this Agreement, in the case of each of the foregoing, to the extent incurred, accrued or arising on or prior to the Closing, (ii) ERISA Affiliate Liability, (iii) any liability relating to a current or former employee, officer, director or consultant of the Business and his or her employment or service with Sellers or any ERISA Affiliate, (iv) any Liability of any Covered Employee or former employee that does not become a Transferred Employee, (v) any obligation, liability or expense relating to any collective bargaining agreement in connection with or related to the Business, and (vi) any obligation, liability or expense relating to or arising out of the employment practices of Sellers, the RMS Entities or any of their Affiliates in connection with or related to the Business occurring prior to the Closing, including any violation by Sellers, the RMS Entities or their Affiliates of any labor or employment agreement in connection with or related to the Business.

"Environmental Law" means any federal, state, local or foreign Law, statute, code, ordinance, rule or regulation relating to pollution, the protection of the environment or natural resources, or exposure to hazardous or toxic substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is or at any applicable time was treated as a single employer with Sellers or the RMS Entities under Section 414(b), (c), (m) or (o) of the IRC or Section 4001(b) of ERISA.

"ERISA Affiliate Liability" means any obligation, liability, or expense of Sellers or the RMS Entities which arises under or relates to any Benefit Plan that is subject to (i) Title IV of ERISA, Section 302 of ERISA, Section 412 of the IRC, or (ii) COBRA or any other statute or regulation that imposes liability on a "controlled group" basis pursuant to  Section 414(b), (c), (m), or (o) of the IRC or Section 4001(b) of ERISA.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among the Company, Buyers, and the Escrow Agent, a copy of which is attached hereto as Exhibit A.

"Estimated Closing Statement" has the meaning set forth in Section 2.4.

"Estimated Net Asset Amount" has the meaning set forth in Section 2.4.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Asset and Subsidiary Interest Transfer" has the meaning set forth in Section 2.1(d).

"Excluded Assets" are limited to the following assets of Parent, Sellers and the RMS Entities as of the Closing:

(a)     all Contracts, Leases, IP Licenses and Securitization Instruments of the Company and the RMS Entities other than the Transferred Contracts, including the Contracts set forth on Section 1.1 of the Disclosure Schedule under the heading "Excluded Assets" (collectively, the "Excluded Contracts");

(b)     the equity interests of the Subsidiaries of the Company, including those set forth under the heading "Excluded Assets" on Section 1.1 of the Disclosure Schedule (such Subsidiaries, the "Excluded Entities" and such equity interests, the "Excluded Subsidiary Interests");

(c)     (i) all post-Petition Date accounts receivable of the Company or any of the RMS Entities and other amounts owed to the Company or any of the RMS Entities, including assignment claims, in each case, to the extent related to any Excluded Asset and (ii) all other accounts receivable of the Company or any of the RMS Entities and other amounts owed to the Company or any of the RMS Entities, in each case to the extent related to any Excluded Asset (including any Excluded Contract);

(d)     all causes of action (including counterclaims) and defenses to the extent related to Excluded Assets, and all causes of action and claims under chapter 5 of the Bankruptcy Code;

(e)     all Tax Returns of Sellers and the RMS Entities (other than Tax Returns related exclusively to the Company);

11

(f)      all rights and interests of Parent and Ditech under this Agreement and each Related Agreement;

(g)      all non-transferable regulatory licenses, registrations and permits (including environmental permits) of the Company and any of the RMS Entities, other than the Licenses and the REO License;

(h)      (A) all books and records to the extent primarily relating to the Excluded Assets, (B) all books and records or other materials of or in the possession of the Company or the RMS Entities, in each case, that (x) Parent or any of its Affiliates other than the Company, Mortgage Asset Systems or REO Management Solutions is required by Law or by order of the Bankruptcy Court to retain (copies of which, to the extent permitted by applicable Law, will be made available to Buyers upon Buyers' reasonable request) or (y) are prohibited by Law or Contract from being delivered to Buyers (including confidential and personal medical records to the extent such books, records or materials are prohibited by Law or Contract from being delivered to Buyers) and (C) with respect to any books, records or other materials that have been delivered to Buyers, copies of such books, records or other materials;

(i)      (A) all records and reports prepared or received by any Seller or any of its Affiliates primarily in connection with the sale of the Business, this Agreement, any Related Agreement, or the transactions contemplated hereby or thereby, including all analyses relating to the Business or Buyers so prepared or received, (B) all bids and expressions of interest received from third parties with respect to the Business and (C) all privileged materials, documents and records of a Seller or any of its Affiliates to the extent primarily relating to the Excluded Assets, including any privileged materials, documents and records that are in the possession of the Company or any RMS Entity to the extent primarily relating to the Excluded Assets;

(j)      all director and officer insurance policies, including any tail insurance policies, and all rights of any nature with respect to any such insurance policies, including any recoveries thereunder and any rights to assess claims seeking any such recoveries;

(k)      any warranties, representations and guarantees primarily pertaining to any Excluded Asset or rights and defenses primarily pertaining to any Excluded Liability;

(l)      all outstanding Litigation, other than Litigation specifically related to the Acquired Assets or the Transferred Employees set forth under the heading "Excluded Assets" on Section 1.1 of the Disclosure Schedule;

(m)      any deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, to the extent paid in connection with (A) or relating to any Excluded Assets or (B) adequate assurance deposits posted pursuant to the Utility Order;

(n)      any Tax refunds, credits or other Tax receivables of Sellers (other than those of the Company for which the Tax was imposed and paid on a separate company basis and not as a member of an affiliated, consolidated, combined, unitary or aggregate group);

(o)      any assets or other funding vehicle related to a Parent Benefit Plan;

12

(p)      all assets related to deferred debt issuance costs;

(q)      the MECA Trust 2010-1 and all rights related thereto;

(r)      all mortgage loans or other extensions of credit secured by interests in real estate other than Mortgage Loans; and

(s)      all assets set forth on <u>Section 1.1</u> of the Disclosure Schedule under the heading "Excluded Assets."

"<u>Excluded Contracts</u>" has the meaning set forth in the definition of "Excluded Assets".

"<u>Excluded Entities</u>" has the meaning set forth in the definition of "Excluded Assets".

"<u>Excluded Liabilities</u>" means all Liabilities of Sellers and the RMS Entities other than the Assumed Liabilities.  For the avoidance of doubt, and without limiting the foregoing, Buyers shall not be obligated to assume, and Buyers do not assume, and hereby disclaim all of the following Liabilities of Sellers and the RMS Entities (any such Liabilities shall be considered Excluded Liabilities for purposes of this Agreement):

(a)      except as set forth on <u>Section 1.1</u> of the Disclosure Schedule under the heading "Excluded Liabilities," any debt for borrowed money of Sellers or the RMS Entities;

(b)      all Cure Costs payable with respect to any Contracts (including the Transferred Contracts);

(c)      any Liability to the extent related to any Excluded Asset;

(d)      any Tax Liability associated with Walter Energy, Inc.;

(e)      Employee Excluded Liabilities;

(f)      any Liabilities set forth on <u>Section 1.1</u> of the Disclosure Schedule under the heading "Excluded Liabilities";

(g)      any Liabilities arising out of facts, events or circumstances that occur prior to the Closing Date under Environmental Laws; and

(h)      all other Liabilities of Sellers and the RMS Entities other than the Assumed Liabilities.

"<u>Excluded Liability Transfer</u>" has the meaning set forth in <u>Section 2.1(e)</u>.

"<u>Excluded Subsidiary Interests</u>" has the meaning set forth in the definition of "Excluded Assets".

"<u>Executory Contract</u>" has the meaning set forth in <u>Section 3.4</u>.

"<u>Executory Contract List</u>" has the meaning set forth in <u>Section 3.4</u>.

13

"Existing Warehouse Financing" has the meaning set forth in Section 6.1(c)(ii).

"Expense Reimbursement" has the meaning set forth in Section 6.4(a)(i).

"Fannie Mae" means the Federal National Mortgage Association, or any successor thereto.

"Fannie Mortgage Servicing Rights" means all rights and obligations in connection with administering and servicing any reverse residential mortgage loan secured by a 1-4 family residential property, whether in the form of a mortgage, deed of trust, or other equivalent security instrument that is held by Fannie Mae, and listed on the Portfolio Tapes.

"FHA" has the meaning set forth in Section 4.16(a).

"Final Net Asset Amount" has the meaning set forth in Section 2.5(e).

"Final Statement" has the meaning set forth in Section 2.5(e).

"Financial Information" has the meaning set forth in Section 4.4(c).

"Fraud" or "Fraudulent" means, in the making by the applicable Party of any representation or warranty set forth in Article III, Article IV or Article V, or in any certificate delivered pursuant to this Agreement, the misrepresentation by such Party, with the intent to deceive another Party and to induce that Party to enter into this Agreement, that consists of: (a) a false representation of material fact made in this Agreement; (b) knowledge that such representation is false; (c) an intention to induce the Party to whom such representation is made to act or refrain from acting in reliance upon it; (d) causing that Party, in justifiable reliance upon such false representation and with ignorance to the falsity of such representation, to take or refrain from taking action; and (e) causing such Party to suffer damage by reason of such reliance, in each case as finally determined by a court of competent jurisdiction in accordance with Delaware Law.

"Freddie Mac" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Ginnie Escrow Amount" has the meaning set forth in Section 7.10.

"Ginnie HMBS Servicing Rights" means all rights and obligations in connection with administering and servicing any reverse residential mortgage loan secured by a 1-4 family residential property, whether in the form of a mortgage, deed of trust, or other equivalent security instrument that is securitized through Ginnie Mae HMBS and listed on the Portfolio Tapes.

"Ginnie Mae" has the meaning set forth in Section 4.16(a).

14

"Ginnie Mortgage Servicing Rights" means all rights and obligations in connection with administering and servicing any forward residential mortgage loan secured by a 1-4 family residential property, whether in the form of a mortgage, deed of trust, or other equivalent security instrument that is guaranteed by Ginnie Mae.

"Ginnie Option" has the meaning set forth in Section 7.10.

"Ginnie Portfolio" means the Ginnie Mortgage Servicing Rights and advances related thereto as listed and described in the Ginnie Purchase Agreement.

"Ginnie Purchase Agreement" has the meaning set forth in Section 7.10.

"Ginnie Purchase Proposal" has the meaning set forth in Section 7.10.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity (not including, for the avoidance of doubt, Fannie Mae, Freddie Mac and Ginnie Mae).

"Guides" means any and all applicable rules, regulations, requirements and guidelines of any Mortgage Agency, insurer or investor, as the same may be amended from time to time, including, the HUD Handbook, the HUD and Fannie Mae mortgagee letters, the Fannie Mae Seller/Servicer Guide and the Ginnie Mae Mortgage-Backed Securities Guide, and Ginnie Mae All Participant Memorandums, as applicable.

"Hazardous Substances" means substances defined or regulated as toxic, hazardous, a pollutant or contaminant, or otherwise deleterious by Environmental Laws.

"HECM Loan" means a Mortgage Loan under FHA's "Home Equity Conversion Mortgage" program administered by FHA.

"HMBS" means a Ginnie Mae security backed by a pool of participations in HECM Loans issued under the umbrella of the Ginnie Mae II Custom Mortgage-Backed Securities program.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HUD" means the United States Department of Housing and Urban Development, or any successor thereto.

"HUD Handbook" means the HUD Home Equity Conversion Mortgage Handbook 4235.1 REV-1, or any other handbook issued by HUD governing the origination or servicing of Home Equity Conversion Mortgages, and any subsequent revisions thereto.

"HUD HECM Guidelines" means the guidelines promulgated by HUD governing the origination or servicing of Home Equity Conversion Mortgages, including the HUD Handbook and any mortgagee letters issued pursuant thereto.

15

"Illustrative Purchase Price Calculation" has the meaning set forth in Section 2.2.

"Independent Accounting Firm" has the meaning set forth in Section 2.5(d).

"Information Technology" means computers, software, databases, hardware, servers, workstations, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment (including communications equipment, terminals and hook-ups that interface with third party software or systems) owned, licensed, leased or otherwise used by the Company or the RMS Entities in the operation of the Business or otherwise relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of data and information (including Personal Data).

"Initial Break-Up Fee" has the meaning set forth in Section 6.4(a)(i).

"Initial List" has the meaning set forth in Section 7.3(a).

"Initial Outside Date" has the meaning set forth in Section 9.1(b)(ii).

"Initial Statement" has the meaning set forth in Section 2.5(a).

"Insurance Policies" has the meaning set forth in Section 4.17.

"Intellectual Property" means, collectively, all U.S. and foreign intellectual property rights, including (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, taglines, social media identifiers (such as a Twitter® Handle) and related accounts, corporate names, logos, designs, symbols, trade dress, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of same; (b) patents, patentable inventions and other patent rights, patent applications, and invention disclosures, including divisions, continuations, continuations-in-part, extensions, reissues, reexaminations, and any other governmental grant for the protection of inventions or industrial designs; (c) trade secrets, know-how, inventions, processes, procedures, databases, confidential business information and other proprietary information and rights; (d) copyrights, mask works, designs, and registrations and applications thereof, and all renewals, extensions, restorations and reversions thereof; (e) computer software programs, including all source code, object code, specifications, designs and documentation related thereto; and (f) domain names, Internet addresses and other computer identifiers.

"Interim Date Portfolio Information" means with respect to each Mortgage Loan on the Interim Data Portfolio Tape, the Portfolio Information.

"Interim Date Portfolio Tape" means the computer disk, computer tape or other electronic data format delivered to Buyers setting forth, as of the close of business on May 31, 2019, the Interim Data Portfolio Information for each Mortgage Loan.

"IP License" means (i) license agreements pursuant to which the Company or any RMS Entity receives a license to use any Intellectual Property that is used in the Business or (ii)

16

license agreements pursuant to which the Company or any RMS Entity grants to a third party a license to use any Intellectual Property that is used in the Business.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of the Company (and other words of similar import) means the actual knowledge of those individuals listed under the heading "Company Knowledge Parties" on Section 1.1 of the Disclosure Schedule.  "Knowledge" of Buyers (and other words of similar import) means the actual knowledge of those individuals listed under the heading "Buyer Knowledge Parties" on Section 1.1 of the Disclosure Schedule.

"Labor Laws" means all Laws relating to employment, employment practices, wages, equal employment opportunity, affirmative action and other hiring practices (including, timing and usage of criminal conviction information for job applicants), immigration, workers' compensation, unemployment, the payment of social security and other employment-related taxes, employment standards, employment of minors, health and safety, labor relations, unions, withholdings, payment of wages and overtime of any kind, meal and rest periods, workplace safety, insurance, employee benefits, pay equity, employee classification, family and medical leave including the National Labor Relations Act, the Labor Management Relations Act, the Occupational Safety and Health Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, the Fair Labor Standards Act, the Equal Pay Act, the Rehabilitation Act, the Employee Retirement Income Security Act, the Uniform Services Employment and Reemployment Rights Act, the Genetic Information Nondiscrimination Act, 42 U.S.C. §§ 1981, 1983, 1985, and 1986, the Sarbanes-Oxley Act and the Immigration Reform and Control Act.

"Law" means any U.S., federal, state, local or foreign law, statute, code, ordinance, rule, regulation, order, writ, injunction, directive, judgement, Decree, policy, or guideline having the force of law or other requirement (including the Bankruptcy Code).

"Lease" has the meaning set forth in Section 4.6.

"Liability" means any indebtedness, liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether matured or unmatured, whether determined or determinable and whether due or to become due) regardless of when arising.

"Licenses" means any license, approval (including any Mortgage Agency approval currently held by the Company), notification, registration, permit, authorization or bond obtained, maintained or held by the Company and required to permit the Company or the RMS Entities to purchase, hold, originate, sell and service Mortgage Loans, as currently purchased, held, originated, sold or serviced, in any state or locality in which the Company currently conducts such activities.

17

"Lien" means any mortgage, pledge, lien, charge, deed of trust, claim, lease, license, security interest, option, right of first refusal, easement, covenant, condition, encroachment or survey, defect, title defect, security agreement or other encumbrance or restriction on the use or transfer of any property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at Law or in equity and whether or not before any Governmental Authority.

"Loan Buyer" has the meaning set forth in the preamble.

"Loan Purchase" has the meaning set forth in Section 2.1(b).

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that has had, or would reasonably be likely to have, individually or in the aggregate, a material adverse effect on the business, operation, condition (financial or otherwise) or results of operation of the Business, the Company or the Acquired Assets, in each case taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (1) changes in, or events generally affecting, the financial, securities, credit or capital markets, (2) general economic or political conditions (including results of elections) in the United States or any foreign jurisdiction in which Sellers or the Business operate, including changes in currency exchange rates, interest rates, monetary policy or inflation, (3) changes in, or events generally affecting, the industries in which Sellers or the Business operate, (4) outbreak or escalation of hostilities, or any acts of war (whether or not declared), sabotage, civil disobedience, terrorism or natural disasters (including epidemics, hurricanes, tornadoes, floods or earthquakes), (5) any failure by the Company to meet any internal or published budgets, projections, forecasts or predictions in respect of financial performance or results of operations for any period, (6) a decline in the price of, or a change in the trading volume of, the common stock of Ditech, provided, that the exceptions in clauses (5) and (6) shall not prevent or otherwise affect a determination that any change, effect, circumstance or development underlying such failure, decline, change, delisting or bankruptcy (if not otherwise falling within any of the exclusions pursuant to the other clauses of this definition) has resulted in, or contributed to, a Material Adverse Effect, (7) changes in Law, (8) changes in GAAP (or authoritative interpretations thereof), (9) the taking of any action expressly required by this Agreement or taken with Buyers' written consent or the failure to take any action expressly prohibited by this Agreement, (10) the announcement or pendency (but, for the avoidance of doubt, not the consummation) of this Agreement and the transactions contemplated by this Agreement, including the impact thereof on the relationships with customers, suppliers, distributors, Mortgage Agencies, investors, insurers, partners or employees of the Company (provided, that the exception in this clause (10) does not apply to the use of Material Adverse Effect in Section 4.3), (11) any litigation brought by stockholders of Buyers' or holders of equity of Ditech or Parent (other than Ditech or any Subsidiary of Ditech) alleging a breach or violation of applicable Law relating to this Agreement or any of the transactions contemplated by this Agreement, (12) the departure or threatened departure of any employees of the Company, or any adverse change or threatened adverse change in the relationship of the Company with its employees, (13) any effects or changes arising from or related to the breach of the Agreement by Buyers, or (14) any effect resulting from the filing of the Bankruptcy Cases; provided, however

18

that the effects, changes, conditions, circumstances, developments or events set forth in the foregoing clauses (1), (2), (3), (4), (7) and (8) shall be taken into account in determining whether a "Material Adverse Effect" has occurred to the extent such effects, changes, conditions, circumstances, developments or events have, or would reasonably be likely to have, a disproportionate adverse effect on the Company and the RMS Entities, taken as a whole, relative to other participants in the industries in which the Company and the RMS Entities operate, but, in such event, only the incremental disproportionate impact of such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether a "Material Adverse Effect" has occurred.

"Material Contracts" has the meaning set forth in Section 4.5(a)(xii).

"Mortgage Agency" has the meaning set forth in Section 4.16(a).

"Mortgage Asset Purchased Interests" has the meaning set forth in the recitals.

"Mortgage Asset Systems" has the meaning set forth in the recitals.

"Mortgage Loan" means any reverse residential mortgage loan secured by a 1-4 family residential property, whether in the form of a mortgage, deed of trust, or other equivalent security instrument that was originated, purchased, serviced or subserviced by the Company, and listed on the Portfolio Tapes.

"Net Asset Amount" has the meaning set forth in Section 2.2.

"Non-Party Affiliates" has the meaning set forth in Section 10.14.

"Notice of Disagreement" has the meaning set forth in Section 2.5(b).

"Official Committee of Consumer Creditors" means that certain committee of consumer creditors appointed in the Bankruptcy Cases on May 2, 2019 as described in the *Notice of Appointment of Official Committee of Consumer Creditors* (Docket No. 498).

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with either past practice or the Prudent Mortgage Servicer Standard; provided, that acts taken by Sellers pursuant to an order of the Bankruptcy Court or in accordance with the Bankruptcy Code shall be deemed "Ordinary Course of Business", so long as such acts are not materially inconsistent with Sellers' obligations under this Agreement.

"Outside Date" has the meaning set forth in Section 9.1(b)(ii).

"Owned Loan Servicing Rights" has the meaning set forth in Section 2.1(a).

"Parent" has the meaning set forth in the preamble.

"Parent 401(k) Plan" has the definition set forth in Section 7.3(e).

19

"<u>Parent Benefit Plan</u>" means each Benefit Plan that is sponsored, maintained or entered into by a member of the Parent Group under which the Parent Group has any Liability to provide compensation or benefits to or for the benefit of Covered Employees.

"<u>Parent Flexible Benefits Plan</u>" has the definition set forth in <u>Section 7.3(f)</u>.

"<u>Parent Fundamental Representations</u>" means the representations and warranties set forth in <u>Section 3.1</u> (Organization and Authority), <u>Section 3.2</u> (Purchased Shares) and <u>Section 3.5</u> (Brokers' Fees).

"<u>Parent Group</u>" means Parent and any of its Affiliates (other than the Company or any of the RMS Entities), <u>provided</u>, that references to the Parent Group as it exists post-Closing shall include the Excluded Entities.

"<u>Parent Group Employee</u>" means an employee of a member of the Parent Group who provides all or substantially all of his or her services to the Business, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"<u>Party</u>" and "<u>Parties</u>" have the meanings set forth in the preamble.

"<u>Paul Weiss</u>" has the meaning set forth in <u>Section 7.13</u>.

"<u>Permit</u>" means any franchise, approval, permit, license, authorization, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"<u>Permitted Lien</u>" means: (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings, in each case in respect of which adequate reserves have been established on the Balance Sheet if and to the extent required under GAAP; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business that are not yet delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established on the Balance Sheet if and to the extent required under GAAP; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not materially violated by the current use, occupancy or operation of such real property; (e) easements, covenants, conditions, restrictions and other similar non-monetary matters affecting title to real property and other encroachments and title and survey defects that do not or would not reasonably be likely to affect the current occupancy or use of such real property in any manner that would reasonably be likely to materially impair the Business; (f) any non-exclusive license, covenant or other right to or under Intellectual Property granted to others in the Ordinary Course of Business; (g) any other Liens which do not or would not reasonably be likely to adversely affect the current occupancy or use of any real property underlying a Lease in any manner that would reasonably be likely to materially impair the Business; and (h) Liens arising as a result of a Mortgage Agency's claims, rights of set-off or other contractual rights.

20

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Data" means (1) any information that, alone or in combination with other information, identifies or can be used to identify a natural person (whether directly or indirectly), including any Person's name, street address, telephone number, e-mail address, photograph, social security number or tax identification number, driver's license number, passport number, credit card number, bank information, or biometric identifiers or (2) any other data or information that constitutes personal data or personal information as defined under any applicable Law, the Privacy Policy or a Seller's privacy policy.

"Personal Property Leases" has the meaning set forth in Section 4.11.

"Petition Date" has the meaning set forth in the recitals.

"Plan" has the meaning set forth in the recitals.

"Platform Assumed Liabilities" has the meaning set forth in Section 2.1(c).

"Platform Buyer" has the meaning set forth in the preamble.

"Platform Purchase" has the meaning set forth in Section 2.1(a).

"Portfolio Information" means with respect to each loan or other obligation on the Portfolio Tapes, the information from the fields of the Portfolio Tapes set forth on Section 4.16(m) of the Disclosure Schedule.

"Portfolio Tapes" means the Signing Date Portfolio Tape, the Interim Date Portfolio Tape and the Cut-Off Date Portfolio Tape.

"Post-Closing Adjustment" has the meaning set forth in Section 2.5(h).

"Prevailing Bidder" has the meaning set forth in Section 6.4(d).

"Privacy Policy" has the meaning set forth in Section 4.13(f).

"Proration Period" has the meaning set forth in Section 7.4(b).

"Prudent Mortgage Servicer Standard" means a prudent mortgage servicer employing reasonable, customary and usual mortgage servicing practices; provided, however, that without limiting the foregoing, such standards shall be at least equal to the standard of care, level of diligence and attention and methods employed by Sellers or their agents (including any subservicer of any Mortgage Loans) in the Ordinary Course of Business prior to the date hereof to service similar types of mortgage loans, including for the accounts of Buyers or their Affiliates; provided, further, that notwithstanding anything herein to the contrary, Prudent Mortgage Servicer Standard shall include servicing and otherwise administering Mortgage Loans in compliance in all material respects with all Applicable Requirements.

21

"Purchase Price" has the meaning set forth in Section 2.2.

"Purchase Price Allocation" has the meaning set forth in Section 2.10.

"Purchase Price Escrow Account" means an account, established pursuant to the Escrow Agreement, in which the Purchase Price Escrow Amount is held for disbursement by the Escrow Agent.

"Purchase Price Escrow Amount" means twenty million dollars ($20,000,000).

"Purchased Shares" has the meaning set forth in the recitals.

"Registered IP" has the meaning set forth in Section 4.13(a).

"Regulation RR" has the meaning set forth in Section 4.16(k).

"Regulatory Licenses" has the meaning set forth in Section 7.8(b).

"Related Agreements" means the Transition Services Agreement and Bill of Sale.

"Remaining Break-Up Fee" has the meaning set forth in Section 6.4(a).

"REO License" means the Real Estate Broker License held by REO Management Solutions certifying that REO Management Solutions is authorized to transact real estate business in Texas.

"REO Management Purchased Interests" has the meaning set forth in the recitals.

"REO Management Solutions" has the meaning set forth in the recitals.

"REO Property" means all real property the title to which is held by the Company or the RMS Entities (other than RMS 2018-09, LLC) as a result of foreclosure proceedings or deeds in lieu of foreclosure, in each case in the Ordinary Course of Business; provided, that such REO Property will be held by the Company at the Closing.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Review Period" has the meaning set forth in Section 2.5(b).

"RMS Entities" means Mortgage Asset Systems, REO Management Solutions, RMS REO BRC, LLC, RMS REO CS, LLC, RMS REO BRC II, LLC and RMS 2018-09, LLC.

"RSA" has the meaning set forth in the recitals.

"Scheduled Benefit Plans" has the meaning set forth in Section 4.12(a).

22

"SEC" means the United States Securities and Exchange Commission.

"Securitization Instrument" means any indenture, note transfer agreement, loan agreement, note purchase agreement, custodial agreement, backup servicing agreement, escrow and closing agreement, lockbox agreement, deposit account control agreement, intercreditor agreement, note funding agreement, collateral and security agreement, purchase agreement, sale agreement, servicing agreement, organizational documents of any Securitization SPVs, guaranty or other contract entered into by the Company, a RMS Entity or an Affiliate thereof in connection with a Securitization Transaction, including any amendments, waivers or supplements thereto, in each case to the extent a Transferred Contract.

"Securitization SPV" means each Person that is a special purpose vehicle (whether a limited liability company, corporation, trust or other entity) that is utilized in Securitization Transactions involving assets of the Company or any of the RMS Entities.

"Securitization Transaction" means any transaction (i) sponsored by the Company or any RMS Entity under which any such Person issues securities backed by, or other interests secured by, Mortgage Loans sold to such Person, and which securities were sold to third party investors and remain outstanding or (ii) pursuant to which the Company or any RMS Entity serves as servicer and with respect to which securities or other interests in the serviced assets remain outstanding.  For the avoidance of doubt, "Securitization Transaction" shall include any credit facility, including any Warehouse Financing or warehouse credit facility entered into pursuant to a Securitization Transaction described in the foregoing sentence.

"Seller" and "Sellers" have the meanings set forth in the preamble.

"Servicing Agreement" means any Contract pursuant to which the Company is obligated to a Mortgage Agency, investor or other third party to service or subservice Mortgage Loans.

"Servicing Rights" means (a) all rights and obligations in connection with administering and servicing Mortgage Loans, including any required repurchases pursuant to Applicable Requirements, (b) all rights to receive fees and income, including any servicing fees, with respect to a Mortgage Loan, (c) the right to collect, hold and disburse escrow payments or other payments with respect to a Mortgage Loan and any amounts collected with respect thereto and to receive interest income on such amounts to the extent permitted by applicable Laws, Decrees or Contracts, (d) all accounts and other rights to payment related to any of the property described in this definition, including all rights to expenses, indemnities, penalties, premiums, damages and other similar amounts with respect to a Mortgage Loan, (e) possession and use of any and all credit and servicing files and other books and records pertaining to a Mortgage Loan, (f) to the extent applicable, all rights and benefits relating to the direct solicitation of the obligor under a Mortgage Loan for refinance or modification of such Mortgage Loan and for other ancillary products and (g) all rights, powers and privileges incident to any of the foregoing, in each case, pursuant to a Servicing Agreement or a Mortgage Loan, and, in the case of each of the foregoing clauses (a) through (g), to the extent listed and described on the Portfolio Tapes.

"Severance Expenses" has the meaning set forth in Section 7.3(a).

"Share Purchase" has the meaning set forth in Section 2.1(f).

23

"Signing Date Portfolio Information" means with respect to each Mortgage Loan on the Signing Date Portfolio Tape, the Portfolio Information.

"Signing Date Portfolio Tape" means the computer disk, computer tape or other electronic data format delivered to Buyers on the date of this Agreement and setting forth, as of March 31, 2019, the Signing Date Portfolio Information for each Mortgage Loan.

"Subsidiary" means with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such first Person and/or by one or more of its Subsidiaries.

"Surplus" has the meaning set forth in Section 2.5(g)(i).

"Tail Period" has the meaning set forth in Section 6.4(a)(i).

"Tax" or "Taxes" means (i) any and all United States federal, state, local, foreign or other income, gross receipts, license, branch, payroll, employment, excise, stamp, occupation, premium, windfall profits, customs duties, capital gains, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, goods and services, use, transfer, registration, ad valorem, value added, alternative or add-on minimum, estimated or other taxes of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not, (ii) any and all liabilities of the Company for the payment of any items described in clause (i) above as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary or aggregate group (or being included (or being required to be included) in any Tax Return related to such group), including pursuant to Treasury Regulation Section 1.1502-6 (or comparable provision of state, local or foreign Tax law) and (iii) any and all liabilities of the Company for the payment of any amounts described in clause (i) or (ii) above as a result of any express or implied obligation to indemnify any other person, or any successor or transferee liability in an agreement the primary purpose of which is the sharing or allocation of Tax.

"Tax Return" means any and all returns, declarations, reports, claims for refund, or information returns or reports or statements relating to Taxes filed or required to be filed with any Governmental Authority, including any schedule or attachment thereto, and including any amendment thereof.

"Tax Sharing Agreements" has the meaning set forth in Section 4.10(g).

"Termination Payment" has the meaning set forth in Section 6.4(a)(i).

"Transaction Accounting Principles" means the transaction accounting principles set forth in Exhibit B.

"Transfer Taxes" has the meaning set forth in Section 7.4(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

"Transferred Employee" has the meaning set forth in Section 7.3(a).

"Transition Services Agreement" has the meaning set forth in Section 7.11.

"Utility Order" means the order approving, among other things, Sellers' proposed form of adequate assurance of payment for utility services (Docket No. 128).

"Warehouse Financing" means financing arrangements to finance Mortgage Loans and related assets contemplated to be securitized (in each case, to be effective upon the Closing Date) with existing or new lenders on behalf of the Company and its Affiliates.

"WARN" has the meaning set forth in the definition of Employee Excluded Liabilities.

"Willful Breach" means a material breach of this Agreement that is a consequence of an intentional act or intentional failure to act with the actual knowledge that the taking of the act or failure to act would result in a material breach of this Agreement.

Section 1.2    **Interpretations**.    Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

25

(h)    References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)    Buyers acknowledge and agree that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyers shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)    References in this Agreement to materials or information "furnished to Buyers" and other phrases of similar import include all materials or information made available to Buyers or their Representatives in the Data Room or provided to Buyers or their Representatives in response to requests for materials or information.

(l)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Assets and Purchased Shares; Assumed Liabilities and Excluded Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the following transactions shall occur in the following order:

(a)    Platform Buyer shall purchase, acquire and accept from the Company and the RMS Entities, and the Company shall, and shall cause the RMS Entities to, sell, transfer, assign, convey, and deliver to Platform Buyer, all of the Company's and the RMS Entities' right, title and interest in, to and under the Acquired Assets (other than the Mortgage Loans owned by the Company and reflected on the Balance Sheet and the related Servicing Rights (the "Owned Loan Servicing Rights"), which will be acquired pursuant to the Loan Purchase in Section 2.1(b), and the Licenses and the REO Property, which will be acquired pursuant to the Share Purchase in Section 2.1(f)) including, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option pursuant to Section 7.10, the Ginnie Portfolio, free and clear of all Liens other than Permitted Liens to the maximum extent permitted by the Bankruptcy Code (such transaction, the "Platform Purchase").  Nothing contained in this Agreement shall be deemed to sell, transfer, assign or convey any Excluded Assets to Platform Buyer, and Parent and the Excluded Entities shall retain all right, title and interest in, to and under the Excluded Assets.

(b)    Concurrently with the Platform Purchase, Loan Buyer shall purchase, acquire and accept from the Company and the RMS Entities, and the Company shall, and shall cause the RMS Entities to, sell, transfer, assign, convey, and deliver to Loan Buyer, all of the Company's and the RMS Entities' right, title and interest in, to and under the Mortgage Loans

26

owned by the Company and reflected on the Balance Sheet and the Owned Loan Servicing Rights, free and clear of all Liens other than Permitted Liens to the maximum extent permitted by the Bankruptcy Code (such transaction, the "Loan Purchase" and, together with the Platform Purchase, the "Asset Purchase").  Nothing contained in this Agreement shall be deemed to sell, transfer, assign or convey any Excluded Assets to Loan Buyer, and Parent and the Excluded Entities shall retain all right, title and interest in, to and under the Excluded Assets.

(c)     Immediately following the Asset Purchase, the Company shall, and shall cause the RMS Entities to, transfer and assign to Platform Buyer, and Platform Buyer shall assume and become responsible for, all Assumed Liabilities (other than the Assumed Liabilities relating to the Mortgage Loans owned by the Company and reflected on the Balance Sheet and the Owned Loan Servicing Rights) (the "Platform Assumed Liabilities"), effective as of the Closing (such transaction, the "Assumption of Platform Assumed Liabilities").  Concurrently with the Assumption of Platform Assumed Liabilities, the Company shall, and shall cause the RMS Entities to, transfer and assign to Loan Buyer, and Loan Buyer shall assume and become responsible for, all of the Assumed Liabilities other than the Platform Assumed Liabilities, effective as of the Closing (such transaction, together with the Assumption of Platform Assumed Liabilities, the "Assumption of Liabilities").  Buyers agree to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.  Neither Buyers nor their Affiliates shall assume or become responsible for, and each of them shall be deemed not to have assumed or become responsible for, any Excluded Liabilities.

(d)     Immediately following the consummation of the Assumption of Liabilities, the Company shall, and shall cause the RMS Entities to, sell, transfer, assign, convey and deliver to Parent or a Subsidiary thereof, as directed by Parent, and Parent or its designated Subsidiary, as applicable, shall purchase, acquire and accept from the Company or such RMS Entity, as applicable, the Excluded Assets and Excluded Subsidiary Interests, and Parent or its designated Subsidiary, as applicable, shall be the legal, record and beneficial owner of the Excluded Assets and Excluded Subsidiary Interests (such transaction, the "Excluded Asset and Subsidiary Interest Transfer").

(e)     Immediately following the consummation of the Excluded Asset and Subsidiary Interest Transfer, the Company shall, and shall cause the RMS Entities to, transfer and assign to Parent or a Subsidiary thereof, as directed by Parent, and Parent or its designated Subsidiary, as applicable, shall assume and become responsible for, the Excluded Liabilities, and Parent or its designated Subsidiary, as applicable, shall be solely responsible for such Excluded Liabilities from and after the Closing in the same order and priority under the Bankruptcy Code and subject to the same treatment under a chapter 11 plan, applicable to such Excluded Liabilities when they remained liabilities of the Company immediately prior to the transfer (such transaction, the "Excluded Liability Transfer").

(f)     Immediately following the consummation of the Excluded Liability Transfer, Platform Buyer shall purchase, acquire and accept from Parent, and Parent shall sell, transfer, assign, convey, and deliver to Platform Buyer, all of Parent's right, title and interest in, to and under the Company Purchased Shares, free and clear of all Liens other than Permitted

27

Liens to the maximum extent permitted by the Bankruptcy Code (such transaction, the "Share Purchase").

(g)     Immediately following the consummation of the Share Purchase, Platform Buyer shall contribute the assets acquired pursuant to the Platform Purchase, including for the avoidance of doubt the Servicing Rights (including the Fannie Mortgage Servicing Rights and the Ginnie HMBS Servicing Rights, but excluding the Owned Loan Servicing Rights), the Mortgage Asset Purchased Interests and the REO Management Purchased Interests, and the Platform Assumed Liabilities to the Company.

Section 2.2    Consideration.  The consideration for the Acquired Assets and the Company Purchased Shares shall be an aggregate dollar amount equal to the net value, as of 11:59 p.m. Eastern Time on the day before the Closing Date, of the assets and liabilities of Sellers reflected in category twenty-two (22) of the illustrative purchase price calculation set forth on Section 2.2 of the Disclosure Schedule (such total value, the "Net Asset Amount", and such calculation, the "Illustrative Purchase Price Calculation"), in each case calculated in accordance with the Transaction Accounting Principles and in a manner consistent with the Illustrative Purchase Price Calculation (the amount calculated pursuant to the formula set forth in this Section 2.2, the "Purchase Price").

Section 2.3    Deposit; Escrows.    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyers shall, on the date of this Agreement (or, if this Agreement has not been executed by the Parties by 2:00 p.m. (New York City time) on such date, on the following Business Day) deposit with the Escrow Agent thirty five million dollars ($35,000,000) by wire transfer of immediately available funds (the "Deposit Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyers or Sellers, in accordance with the provisions of the Escrow Agreement.  Pursuant to the Escrow Agreement, the Deposit Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

(a)     if the Closing shall occur, the Deposit Escrow Amount and all accrued investment income thereon, if any, shall be applied towards the Purchase Price payable by Buyers to Parent under Section 2.2 and the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Parent at the Closing;

(b)     if this Agreement is terminated by any Seller pursuant to Section 9.1(d)(i) or Section 9.1(d)(ii) (or in accordance with any other provision of Section 9.1 if at the time of such termination a Seller could have terminated this Agreement in accordance with Section 9.1(d)(i) or Section 9.1(d)(ii)), the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Parent;

(c)     if the conditions to the obligations of Sellers and Buyers to consummate the transactions contemplated by this Agreement set forth in Article VIII (other than conditions that by their nature are to be satisfied at the Closing itself, but which would be capable of being satisfied if the Closing were to occur) have been satisfied or waived, Buyers do not consummate the Closing on the date and at the time provided in Section 2.6, and Sellers validly terminate this

28

Agreement pursuant to <u>Article IX</u>, then the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Parent;

(d)    if this Agreement is terminated for any reason (other than in the circumstances described in <u>Section 2.3(b)</u> or <u>Section 2.3(c)</u>), then the Deposit Escrow Amount, together with all accrued investment income thereon, if any, shall in each case be returned to Platform Buyer;

(e)    at Closing, Buyers (in accordance with <u>Section 2.7(a)</u>) will deliver to the Escrow Agent the Purchase Price Escrow Amount to be held in escrow in the Purchase Price Escrow Account pursuant to the Escrow Agreement and to be disbursed in accordance with the terms of this Agreement and the Escrow Agreement; and

(f)    Sellers acknowledge and agree that, absent Buyer's Fraud or willful misconduct, payment and delivery of the Deposit Escrow Amount pursuant to <u>Section 2.3(b)</u> or <u>Section 2.3(c)</u> will constitute liquidated damages and be the sole and exclusive remedy of Sellers and their respective Representatives and Affiliates, whether at Law or in equity, in the event of termination of this Agreement in the circumstances described in <u>Section 2.3(b)</u> and <u>Section 2.3(c)</u> and upon the payment and delivery thereof to Sellers, Sellers and their respective Representatives and Affiliates will be deemed to have fully released and discharged Buyers and their Representatives and Affiliates from any Liability resulting from the termination of this Agreement or breach hereof and none of Sellers, their Representatives or Affiliates shall have any other remedy or cause of action under or relating to this Agreement or any applicable Law.

**Section 2.4    Estimated Closing Statement; Cut-Off Date Portfolio Tape**. Not fewer than five (5) Business Days prior to the Closing Date, Parent shall provide Buyers with (i) the Cut-Off Date Portfolio Tape, and (ii) a statement (the "<u>Estimated Closing Statement</u>"), prepared in accordance with the Transaction Accounting Principles and in a manner consistent with the Illustrative Purchase Price Calculation, setting forth (a) Parent's good faith estimate of the Net Asset Amount as of 11:59 p.m. Eastern Time on the last day of the month in which the Closing Date will occur (the "<u>Estimated Net Asset Amount</u>") and the Purchase Price resulting therefrom, in each case, including reasonable support for the calculations reflected thereon, and (b) the wire transfer information for the account or accounts to which Buyers shall pay the Purchase Price.

**Section 2.5    Proposed Final Closing Statement; Final Closing Statement; Post-Closing Adjustment**.

(a)    As soon as reasonably practicable following the Closing Date (and in no event later than one hundred (100) days following the Closing Date), Buyers shall deliver to Parent a statement, setting forth a reasonably detailed calculation of each of the Net Asset Amount and the Purchase Price resulting therefrom, in each case prepared from the books and records of the Company in accordance with the Transaction Accounting Principles (and, to the extent not set forth therein, in accordance with GAAP) and in a manner consistent with the Illustrative Purchase Price Calculation, as of 11:59 p.m. Eastern Time on the day prior to the Closing Date, and based on facts and circumstances existing as of the Closing (and, for the avoidance of doubt, excluding the effects of any act, decision, change in circumstances or event

29

arising or occurring at or after the Closing) (the "Initial Statement").  The Parties agree that the purpose of preparing the Initial Statement and determining the Final Net Asset Amount and resulting Purchase Price in accordance with this Section 2.5 is solely to accurately measure changes (if any) in the Final Net Asset Amount and resulting Purchase Price from the Estimated Net Asset Amount and resulting Purchase Price in order to determine the payments to be made pursuant to Section 2.5(g), and not to permit the introduction of principles, policies, practices, procedures, methodologies, classifications, methods, conventions, assumptions, judgments or estimation techniques different from those used in the calculation of the preparation of the Illustrative Purchase Price Calculation and as set forth in the Transaction Accounting Principles (and, to the extent not set forth therein, in accordance with GAAP).  Each Party shall, upon reasonable prior notice, provide the other Party and its Representatives with reasonable access to such Party's work papers, and all books and records of the Company and the RMS Entities transferred to Buyers and all books and records of Parent and its Affiliates to the extent related to the Company, the RMS Entities or the Business, as applicable, used or useful in the preparation or review of the Initial Statement  and the resolution of any disputes that may arise under this Section 2.5, and each Party shall make available the individuals in its employ responsible for and knowledgeable about the information used in the preparation or review of the Initial Statement to respond to the reasonable requests of the other Party. Buyers agree that, following the Closing through the date that the Final Statement becomes final and binding in accordance with the terms of this Agreement, they will not take any actions that would materially impede or delay the determination of the Purchase Price or the preparation of the Notice of Disagreement or the Final Statement in the manner and utilizing the methods required by this Agreement.

(b)     Parent shall notify Buyers in writing (the "Notice of Disagreement") prior to the expiration of the sixty (60) day period immediately following Parent's receipt of the Initial Statement (the "Review Period") to the extent Parent disagrees with the Initial Statement (including the Purchase Price set forth therein) and such disagreement, if it were to be resolved in favor of Parent, would result in a Post-Closing Adjustment; provided, that it is understood and agreed that any items in dispute set forth in such Notice of Disagreement must be calculated in accordance with the Transaction Accounting Principles and consistent with the Illustrative Purchase Price Calculation.  The Notice of Disagreement shall set forth in reasonable detail the basis for such disagreement, the amounts involved and Parent's determination of the Purchase Price.  If Parent does not deliver a Notice of Disagreement prior to the expiration of the Review Period, then the Initial Statement shall be deemed to be the Final Statement.

(c)     During the thirty (30) day period immediately following the delivery of a Notice of Disagreement (the "Consultation Period"), Buyers and Parent shall seek in good faith to resolve any differences that they may have with respect to the matters specified in the Notice of Disagreement, and all discussions related thereto will be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the date of this Agreement) and any applicable similar state rule, unless otherwise agreed in writing by the Parties. If Buyers and Parent are able to resolve their differences, then the Initial Statement, as modified by agreement of Buyers and Parent, shall be deemed to be the Final Statement.

(d)     If, at the end of the Consultation Period, Buyers and Parent have been unable to resolve any differences that they may have with respect to the matters specified in the Notice of Disagreement, then Buyers and Parent shall each have the right to submit all matters

30

that remain in dispute with respect to the Notice of Disagreement (along with a copy of the Initial Statement marked to indicate those line items that are not in dispute) to Grant Thornton LLP or such other independent certified public accounting firm in the United States of international recognition reasonably acceptable to Buyers and Parent and agreed to by them in writing (the "Independent Accounting Firm").  Buyers and Parent will execute a customary engagement letter and will cooperate with the Independent Accounting Firm during the terms of its engagement.  Buyers and Parent shall instruct the Independent Accounting Firm to make a final determination as promptly as practicable, and in any event within thirty (30) Business Days after its engagement, of the proper amount (determined in accordance with the terms of this Agreement) of each of the line items in the Initial Statement as to which Buyers and Parent disagree as set out in the Notice of Disagreement.  In making its determination pursuant to this Section 2.5(d), the Independent Accounting Firm shall act as an expert and not as an arbitrator, base its determination solely on written presentations of Buyers and Parent and not by independent review, and limit its scope of determination to those items that are identified as items and amounts to which the Parties have been unable to agree, and whether there were mathematical errors in the Initial Statement and whether the calculations set forth therein were performed in accordance with the Transaction Accounting Principles and in a manner consistent with the Illustrative Purchase Price Calculation and this Section 2.5.  Such determination shall be final and binding on, and non-appealable by, the Parties absent manifest mathematical error.  A copy of all materials submitted to the Independent Accounting Firm pursuant to the immediately preceding sentence shall be provided by Buyers or Parent, as applicable, to the other Party concurrently with the submission thereof to the Independent Accounting Firm.  In resolving each disputed line item, the Independent Accounting Firm shall be bound by the provisions of this Section 2.5 and may not assign a value to any disputed line item greater than the greatest value for such line item (or less than the smallest value for such line item) claimed by Buyers in the Initial Statement or Parent in the Notice of Disagreement, respectively.

(e)     The statement setting forth the calculation of the Net Asset Amount and resulting Purchase Price that is final and binding on the Parties, as determined either through agreement of the Parties pursuant to Section 2.5(b) or Section 2.5(c) or through the action of the Independent Accounting Firm pursuant to Section 2.5(d), is referred to as the "Final Statement", and the Net Asset Amount set forth therein is referred to as the "Final Net Asset Amount".

(f)     The terms of appointment and engagement of the Independent Accounting Firm shall be as agreed upon between Parent and Buyers, and any associated engagement fees shall be borne by Parent, on the one hand, and Buyers, on the other hand, in proportion to the differences between the Purchase Price as determined by the Independent Accounting Firm and the asserted Purchase Price set forth in the Initial Statement and the Notice of Disagreement, respectively.  For example, if Parent claims that the appropriate adjustments are $1,000 greater than the amount determined by Buyers and if the Independent Accounting Firm ultimately resolves the dispute by awarding to Parent $300 of the $1,000 contested, then the fees, costs and expenses of the Independent Accounting Firm will be allocated thirty percent (30%) (i.e., 300 ÷ 1,000) to Buyers and seventy percent (70%) (i.e., 700 ÷ 1,000) to Parent.  During the review by the Independent Accounting Firm, Buyers and Parent and their accountants will each make available to the Independent Accounting Firm interviews with such individuals, and such information, books and records and work papers, as may be reasonably required by the Independent Accounting Firm to fulfill its obligations under Section 2.5(d); provided, however,

31

that their respective accountants shall not be obliged to make any work papers available to the Independent Accounting Firm except in accordance with such accountants' normal disclosure procedures and then only after such firm has signed a customary non-disclosure agreement relating to such access to work papers in form and substance reasonably acceptable to such accountants.

(g)     If the value of the Final Net Asset Amount *minus* the value of the Estimated Net Asset Amount equals:

(i)     a positive amount ("Surplus"), then (1) Buyers shall wire such Surplus in immediately available funds to Parent to an account designated by Parent in writing, and (2) Buyers and Sellers party to the Escrow Agreement shall provide a joint written instruction to the Escrow Agent to release the amounts in the Purchase Price Escrow Account to Parent to an account designated by Parent in writing;

(ii)    a negative amount ("Deficit"), then Buyers and Sellers party to the Escrow Agreement shall provide a joint written instruction to the Escrow Agent to release (1) to Buyers to an account designated by Buyers in writing the Deficit from the Purchase Price Escrow Account and (2) to Parent to an account designated by Parent in writing all of the funds remaining in the Purchase Price Escrow Account following such release to Buyers; or

(iii)   zero, then the Buyers and Sellers party to the Escrow Agreement shall provide a joint written instruction to the Escrow Agent to release all the funds in the Purchase Price Escrow Account to Parent to an account designated by Parent in writing.

(h)     The Parties agree that (i) payment of the Deficit (if any) from the available amounts in the Purchase Price Escrow Account pursuant to this Section 2.5 will be the sole and exclusive remedy and source of recovery for payment of the Deficit (if any) and (ii) payment of the Surplus (if any) pursuant to this Section 2.5 will be the sole and exclusive remedy and source of recovery for payment of the Surplus (if any). The amount of any Surplus or Deficit being herein referred to as the "Post-Closing Adjustment". Payment of any Post-Closing Adjustment shall be made within five (5) Business Days after the Final Statement becomes such.

Section 2.6    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyers) commencing at 10:00 a.m. local time on a date (the "Closing Date") that is the last Business Day of the month during which all of the conditions to the obligations of Sellers and Buyers to consummate the transactions contemplated by this Agreement set forth in Article VIII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Parent and Buyers prior thereto. For purposes of this Agreement and the transactions contemplated by this Agreement, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

**Section 2.7**     **Closing Payments and Deliveries**.

(a)     At the Closing, Buyers shall deliver or cause to be delivered to Parent:

(i)     the Purchase Price set forth in the Estimated Closing Statement (*less* the Deposit Escrow Amount and all accrued investment income thereon, if any, which shall be released to Parent by the Escrow Agent and *less* the Purchase Price Escrow Amount, which shall be paid by wire transfer of immediately available funds to the Escrow Agent for deposit into the Purchase Price Escrow Account), which shall be paid by wire transfer of immediately available funds into an account designated by Parent in the Estimated Closing Statement;

(ii)     a counterpart of the Joint Written Instructions, duly executed by the Buyers party to the Escrow Agreement, directing the Escrow Agent to deliver to Parent the Deposit Escrow Amount and all accrued investment income thereon, if any;

(iii)     a duly executed Bill of Sale and Assignment and Assumption Agreement substantially in the form of Exhibit C (the "Bill of Sale");

(iv)     a duly executed Transition Services Agreement;

(v)     the officer's certificate required to be delivered to Parent pursuant to Section 8.2(c); and

(vi)     such other documents, instruments and certificates of transfer as Sellers may reasonably request.

(b)     At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i)     a counterpart of the Joint Written Instructions, duly executed by Sellers party to the Escrow Agreement, directing the Escrow Agent to deliver to Parent the Deposit Escrow Amount and all accrued investment income thereon, if any;

(ii)     a duly executed Bill of Sale;

(iii)     certificates, or if uncertificated, other evidence of ownership representing the Company Purchased Shares;

(iv)     a duly executed Transition Services Agreement;

(v)     the officer's certificate required to be delivered to Buyers pursuant to Section 8.1(c);

(vi)     a certificate from each Seller, dated as of the Closing Date, that satisfies the requirements set forth in Treasury Regulation Section 1.1445-2, attesting that such Seller is not a "foreign person" for U.S. federal income tax purposes; and

33

(vii)    such other documents, instruments and certificates of transfer as Buyers may reasonably request.

### Section 2.8    Consent to Certain Assignments.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer (in whole or, to the extent relevant, in part) thereof, without the consent of a third party, would constitute a breach or other contravention or a violation under any Contract or Law to which the Company is a party or by which it is bound, unless the Bankruptcy Code, applicable nonbankruptcy Law, or the Confirmation Order authorizes or permits the assumption and assignment (in whole or, to the extent relevant, in part) of such asset, claim, or right irrespective of the consent or lack thereof of a third party.  If, with respect to any Acquired Asset, such consent is not obtained or such assignment (in whole or, to the extent relevant, in part) is not attainable pursuant to the Bankruptcy Code or the Confirmation Order, then such Acquired Asset shall not be transferred hereunder and shall be considered an Excluded Asset, and the Closing shall proceed with respect to the remaining Acquired Assets for the full Purchase Price and Parent shall use its reasonable best efforts (at Parent's expense), and Buyers shall cooperate with Parent, to obtain any such consent after the Closing; provided, that none of Parent, any Affiliate of Parent, or Buyers, shall be required to pay any consideration or incur any Liabilities therefor. If, with respect to any Excluded Asset proposed to be transferred pursuant to Section 2.1(d), such consent is not obtained or such assignment (in whole or, to the extent relevant, in part) is not attainable pursuant to the Bankruptcy Code or the Confirmation Order, then such Excluded Asset shall not be transferred hereunder and shall be considered an Acquired Asset, and the Company's transfer of Excluded Assets to Parent as provided herein shall proceed with respect to the remaining Excluded Assets and Buyers and the Company shall use their reasonable best efforts (at Parent's expense), and Parent shall cooperate with Buyers and the Company, to obtain any such consent after the Closing.

(b)    If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Confirmation Order and the reasonable best efforts of Sellers, any consent is not obtained prior to the Closing and as a result thereof Buyers or Parent shall be prevented by a third party from receiving the rights and benefits with respect to an Acquired Asset or Excluded Asset, respectively, intended to be transferred hereunder, or (ii) any Acquired Asset or Excluded Asset is not otherwise capable of sale and/or assignment (after giving effect to the Confirmation Order and the Bankruptcy Code), then, in each such case, (y) with respect to Acquired Assets, Parent shall (at Parent's expense), subject to any approval of the Bankruptcy Court that may be required, at the request of a Buyer, reasonably cooperate with Buyers in any lawful and commercially reasonable arrangement under which Buyers would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to a Buyer, and (z) with respect to Excluded Assets, Buyers shall (at Parent's expense), subject to any approval of the Bankruptcy Court that may be required, at the request of Parent, reasonably cooperate with Parent in any lawful and commercially reasonable arrangement under which Parent would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the

34

economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to Parent. Parent shall promptly pay to Buyers when received all monies received by Parent under such Acquired Asset or any claim or right or any benefit arising thereunder and Buyers shall promptly pay Parent for all Liabilities of Sellers associated with such arrangement, if requested, and Buyers (and the Company) shall promptly pay to Parent when received all monies received by Buyers (or the Company) under such Excluded Asset or any claim or right or any benefit arising thereunder and Parent shall promptly pay Buyers for all Liabilities of Parent associated with such arrangement, if requested; provided, however, that nothing in this Section 2.8 shall entitle Buyers to reduce the Purchase Price.

Section 2.9   **Tax Treatment**.  The Parties agree, except as otherwise required by applicable Law, that for U.S. federal, state and local income tax purposes, (i) the Loan Purchase shall be treated as a purchase of assets of the Company by Loan Buyer, (ii) the Platform Purchase shall be disregarded, and (iii) the Share Purchase shall be treated as a purchase of equity of the Company by Platform Buyer at a time when the Company owned the Acquired Assets, including for the avoidance of doubt the Mortgage Asset Purchased Interests and the REO Management Purchased Interests (other than the Mortgage Loans owned by the Company and reflected on the Balance Sheet and the Owned Loan Servicing Rights).

Section 2.10   **Allocation**.  To the extent it is paid in respect of the Mortgage Loans owned by the Company and reflected on the Balance Sheet and the Owned Loan Servicing Rights (the "Allocation Assets"), Buyers and Sellers agree to allocate the Purchase Price allocated to the Allocation Assets (as finally determined hereunder) and other amounts treated as consideration for the Allocation Assets for federal income tax purposes (the "Allocation Consideration") in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than ninety (90) days after the calculation of the Net Asset Amount and resulting Purchase Price are final and binding on the Parties, as set forth in the Final Statement pursuant to Section 2.5, Buyers shall deliver to Parent an allocation of the Allocation Consideration as of the Closing Date among the Allocation Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Parent's review and comment. Parent shall have a period of sixty (60) days following Buyers' delivery of the Purchase Price Allocation to present in writing to Buyers notice of any objections Parent may have to the allocations set forth therein (an "Allocation Objections Notice").  If Parent shall raise any objections within such sixty (60) day period, Sellers and Buyers shall negotiate in good faith and use their reasonable best efforts to resolve such dispute.  If within thirty (30) days following the delivery of the Allocation Objections Notice by Parent, Parent and Buyers are unable to resolve such dispute, Parent and Buyers shall each be entitled to adopt their own positions regarding the allocation of the Allocation Consideration among the Allocation Assets for federal income tax purposes.  If Parent accepts the Purchase Price Allocation prepared by Buyers (or does not within the sixty (60) day period described above deliver an Allocation Objections Notice), such Purchase Price Allocation shall be binding on the Parties without further adjustment.  If the Parties agree on the Purchase Price Allocation (or such is deemed accepted and rendered final), (i) Buyers and Parent agree that the Purchase Price Allocation as finally determined hereunder shall be conclusive and binding on the Parties; (ii) Buyers and Parent agree (and agree to cause their respective Subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent

with the Purchase Price Allocation; and (iii) none of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.10 shall survive the Closing without limitation.

Section 2.11 **Withholding Rights**.  Buyers shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as Buyers are required to deduct and withhold with respect to the making of such payment under the IRC, or any provision of state, local or non-U.S. Tax Law; provided, however, that in the event Buyers determine such withholding is required, Buyers shall promptly notify Sellers of such determination (to the extent reasonably practicable, no fewer than ten (10) days prior to the Closing Date) and shall reasonably cooperate with Sellers to claim any benefits or reduce and/or eliminate any such withholding Taxes.  To the extent that such amounts are so withheld, Buyers remit such amounts to the appropriate Tax Authority, and Buyers provide Sellers with evidence reasonably satisfactory to Sellers with respect thereto, such withheld and paid over amounts will be treated for all purposes of this Agreement as having been paid to the Persons in respect of which such deduction and withholding was made by Buyers.

# ARTICLE III
## PARENT'S REPRESENTATIONS AND WARRANTIES

Parent represents and warrants to Buyers that the statements contained in this Article III are true and correct as of the date of this Agreement, except as (i) set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), (ii) disclosed in any forms, statements, or other documents filed with the Bankruptcy Court, or (iii) disclosed in any documents filed by or on behalf of Sellers or any of their Affiliates with the SEC and publicly available after December 31, 2017 (excluding any disclosures in any risk factors section, in any section related to forward-looking statements, and any other disclosures that are predictive or forward-looking in nature).

Section 3.1 **Organization and Authority**.  Parent is a limited liability company organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of formation and has, subject to the necessary authority from the Bankruptcy Court, all necessary power to enter into, consummate the transactions contemplated by, and carry out its obligations under, this Agreement and the Related Agreements to which it is a party.  The execution and delivery by Parent of this Agreement and the Related Agreements to which it is a party and the consummation by Parent of the transactions contemplated by, and the performance by Parent of its obligations under, this Agreement and the Related Agreements to which it is a party have been duly authorized by all requisite action on the part of Parent.  Subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Confirmation Order, and any other necessary order to close the sale of the Acquired Assets, Parent has full power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Parent is a party have been duly authorized by Parent.  Upon due execution hereof by Parent, this Agreement, the Related Agreements and all other agreements contemplated hereby to which

Parent is a party (assuming due authorization, execution and delivery by Buyers) shall constitute, subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Confirmation Order, and any other necessary order to close the sale of the Acquired Assets, a valid and legally binding obligation of Parent, enforceable against Parent in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.2    **Purchased Shares**.    Parent has good and valid title to the Company Purchased Shares, free and clear of any Liens, other than Liens on transfer imposed under applicable securities Laws.    Parent is the legal, record and beneficial owner of the Company Purchased Shares.    All of the Company Purchased Shares are fully paid and nonassessable, have been legally and validly authorized and issued, and have not been issued in violation of any preemptive rights, rights of first refusal or similar rights.    Assuming Buyers have the requisite power and authority to be the lawful owner of the Company Purchased Shares at the Closing subject to the terms and conditions hereof, including, upon receipt of the Purchase Price payable to Parent pursuant to this Agreement, good and valid title to the Company Purchased Shares will pass to a Buyer, free and clear of any Liens, other than Liens on transfer imposed under applicable securities Laws.

Section 3.3    **Noncontravention; Government Filings**.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of Parent, (b) subject to the entry of the Confirmation Order, conflict with, or result in any violation or breach of or default (with or without notice or lapse of time, or both) under any Law or Decree to which Parent is subject in respect of the Acquired Assets, or (c) subject to the entry of the Confirmation Order, conflict with, result in a breach or violation of, constitute a default under (with or without notice or lapse of time or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, create a Lien on any Acquired Asset, or require any notice under any Material Contract, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.    Other than the necessary filings, notices, reports, consents, registrations, approvals, permits, expirations of waiting periods or authorizations required to comply with (w) applicable Antitrust Laws and the Exchange Act, (x) the Bankruptcy Code or the Confirmation Order, (y) state securities or "blue-sky" Laws, and (z) the requirements of any investor, insurer, Mortgage Agency, or Governmental Authority in respect of any Mortgage Loan or other loan or instrument owned or serviced by the Company, including the origination, sale, servicing or subservicing thereof, Parent is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except, in each case, where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect or prevent or materially impair or delay Parent's ability to consummate the transactions contemplated by this Agreement or the Related Agreements or perform its obligations hereunder on a timely basis.

37

**Section 3.4**     **Executory Contract List**.  Sellers shall have provided to Buyers by June 21, 2019, a true, correct and complete list (as amended from time to time, the "Executory Contract List") of all Contracts primarily related to the Acquired Assets or otherwise primarily used, or held for use, in connection with the Business as it is conducted by Sellers (each, an "Executory Contract").  The Executory Contract List shall have described the monetary amounts that must be paid, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyers to assume the Transferred Contracts pursuant to this Agreement. Sellers shall use reasonable best efforts to provide Buyers with true, correct and complete copies of each such Executory Contract.

**Section 3.5**     **Brokers' Fees**.  Neither Parent nor its Affiliates have entered into any Contract to pay any fees or commissions to any investment bank, broker, finder, or agent with respect to the transactions contemplated by this Agreement or the Related Agreements for which Sellers or Buyers or any of their respective Affiliates could become liable or obligated to pay.

## ARTICLE IV
## THE COMPANY'S REPRESENTATIONS AND WARRANTIES

The Company represents and warrants to Buyers that the statements contained in this Article IV are true and correct as of the date of this Agreement, except as (i) set forth in the Disclosure Schedule, (ii) disclosed in any forms, statements, or other documents filed with the Bankruptcy Court, or (iii) disclosed in any documents filed by or on behalf of Sellers or any of their Affiliates with the SEC and publicly available after December 31, 2016 (excluding any disclosures in any risk factors section, in any section related to forward-looking statements, and any other disclosures that are predictive or forward-looking in nature).

**Section 4.1**     **Organization; Good Standing**.  The Company and each RMS Entity is a legal entity duly organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation or organization and has, subject to the necessary authority from the Bankruptcy Court, all requisite organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be likely to have a Material Adverse Effect. Section 4.1 of the Disclosure Schedule sets forth, as of the date of this Agreement each of the Company's Subsidiaries and the ownership interest of the Company in each such Subsidiary. Other than the Company's Subsidiaries, as of the date of this Agreement neither the Company nor any of its Subsidiaries owns, directly or indirectly, any capital stock or other equity interest in any Person (other than securities held by any employee benefit plan of the Company or any of its Subsidiaries or any trustee, agent or other fiduciary in such capacity under any such employee benefit plan).

**Section 4.2**     **Authorization of Transaction**.  Subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Confirmation Order, and any other necessary order to close the sale of the Acquired Assets, the Company has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The

execution, delivery, and performance of this Agreement and the Related Agreements to which the Company is a party have been duly authorized by the Company.  Upon due execution hereof by the Company, this Agreement, the Related Agreements and all other agreements contemplated hereby to which Parent is a party (assuming due authorization, execution and delivery by Buyers) shall constitute, subject to the Bankruptcy Court's entry of the Bidding Procedures Order, the Confirmation Order, and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

       **Section 4.3    <u>Noncontravention; Government Filings</u>**.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of the Company or the RMS Entities, (b) subject to the entry of the Confirmation Order, conflict with, or result in any violation or breach of or default (with or without notice or lapse of time, or both) under any Law or Decree to which the Company or the RMS Entities are subject in respect of the Acquired Assets, or (c) subject to the entry of the Confirmation Order, conflict with, result in a breach or violation of, constitute a default under (with or without notice or lapse of time or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, create a Lien on any Acquired Asset, or require any notice under any Material Contract, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.  Other than the necessary filings, notices, reports, consents, registrations, approvals, permits, expirations of waiting periods or authorizations required to comply with (v) applicable Antitrust Laws and the Exchange Act, (w) the Bankruptcy Code or the Confirmation Order, (x) state securities or "blue-sky" Laws, (y) the regulatory body of any state or locality that governs the issuance and maintenance of a Servicing Agreement and (z) the requirements of any investor, insurer, Mortgage Agency, or Governmental Authority in respect of any Mortgage Loan or other loan or instrument owned or serviced by the Company or the RMS Entities, including the origination, sale, servicing or subservicing thereof, neither the Company nor the RMS Entities are required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except, in each case, where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect or prevent or materially impair or delay the Company's ability to consummate the transactions contemplated by this Agreement or the Related Agreements or perform its obligations hereunder on a timely basis.

       **Section 4.4    <u>Title to Assets; Sufficiency; Financial Statements; Absence of Certain Changes</u>**.

       (a)    At the Closing, subject to any Permitted Liens and Liens pursuant to a debtor in possession credit agreement that will be released simultaneously with Closing, the Company and the RMS Entities, as applicable, will have good and valid title to, or a valid or

binding license, lease the right to use or similar interest in, all tangible Acquired Assets. Pursuant to the Confirmation Order, the Company and the RMS Entities will transfer and convey to Buyers such title to, license, lease, rights to use or similar interest in, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens) on the Closing Date. The Company has good and valid title to the Mortgage Asset Purchased Interests and the REO Management Purchased Interests, free and clear of any Liens, other than Liens on transfer imposed under applicable securities Laws.  The Company is the legal, record and beneficial owner of the Mortgage Asset Purchased Interests and the REO Management Purchased Interests. All of the Mortgage Asset Purchased Interests and the REO Management Purchased Interests have been legally and validly authorized and issued, and have not been issued in violation of any preemptive rights, rights of first refusal or similar rights.  Assuming Buyers have the requisite power and authority to be the lawful owner of the Mortgage Asset Purchased Interests and the REO Management Purchased Interests at the Closing subject to the terms and conditions hereof, including, upon receipt of the Purchase Price payable to Parent pursuant to this Agreement, good and valid title to the Mortgage Asset Purchased Interests and the REO Management Purchased Interests will pass to a Buyer, free and clear of any Liens, other than Liens on transfer imposed under applicable securities Laws.

(b)    Assuming receipt of all required approvals and third party consents, the Acquired Assets will, taking into account the rights granted and services to be performed under the TSA, constitute all of the assets, properties and rights as are necessary and sufficient for the Company and the RMS Entities to operate the Business in all material respects as it is operated as of the date of this Agreement and as of the Closing Date, assuming the Company and the RMS Entities did not own and had no rights to use any of the Excluded Assets or any other assets (other than the Acquired Assets) of Sellers and their Affiliates; provided, however, that nothing in this Section 4.4(b) shall be deemed to constitute a representation as to the adequacy of amounts of cash or working capital (or the availability of the same); provided, further, that this Section 4.4(b) shall not be deemed to be breached as a result of any action for which a Buyer has provided its written consent, including pursuant to Section 6.2.

(c)    Section 4.4(c) of the Disclosure Schedule sets forth (i) the unaudited consolidated income statement for the Company and its consolidated Subsidiaries for the twelve months ended December 31, 2018, and (ii) the unaudited balance sheet of the Company and its consolidated Subsidiaries as of December 31, 2018 (clauses (i) and (ii), collectively, the "Financial Information").  The balance sheet as of December 31, 2018 included in the Financial Information is referred to as the "Balance Sheet".  The Financial Information (i) has been prepared solely for the purpose of this Agreement, (ii) has been prepared in good faith from the books and records of the Company and in all material respects in accordance with GAAP consistently applied during the periods involved, except as may be noted therein or in the notes thereto, and (iii) fairly presents in all material respects the financial condition and results of operations of the Company and its consolidated Subsidiaries as of the respective dates thereof and for the respective periods covered therein.

(d)    Since December 31, 2018, there has not been any change, effect, circumstance or development, which has had or would, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

40

(e)     Since December 31, 2018 and through the date of this Agreement, except for events giving rise to, and the discussion and negotiation of, this Agreement, the Bankruptcy Cases and negotiation with other potential purchasers of Sellers' assets and the Business, Sellers have conducted their respective businesses, in all material respects, in the Ordinary Course of Business.

**Section 4.5    Transferred Contracts**.

(a)     Section 4.5 of the Disclosure Schedule sets forth a list as of the date of this Agreement of each Transferred Contract to which the Company or any RMS Entity is a party or bound, which:

(i)     provides that the Company or any RMS Entity will not compete with any other Person, or grants "most favored nation" protections to the counterparty to such Contract, in each case that is material to the Company and the RMS Entities, taken as a whole;

(ii)     purports to limit in any material respect either the type of business in which the Company or a RMS Entity may engage or the manner or locations in which the Company or a RMS Entity may so engage in any business;

(iii)     requires the Company or a RMS Entity to deal exclusively with any Person or group of related Persons which Contract is material to the Company or such RMS Entity (other than any licenses or other Contracts entered into in the Ordinary Course of Business);

(iv)     contains a put, call or similar right pursuant to which the Company or a RMS Entity would be required to purchase or sell, as applicable, any equity interests of any Person or assets at a purchase price which would reasonably be likely to exceed, or the fair market value of the equity interests or assets would be reasonably likely to exceed $500,000;

(v)     was entered into with Affiliates of the Company (other than the RMS Entities) that is not a Benefit Plan or that was entered into other than on arms'-length terms;

(vi)     grants to any Person any right of first refusal, right of first offer or similar right with respect to, or that limits the ability of the Company or any RMS Entity to transfer, pledge or otherwise dispose of, any asset or business of the Business in any material respect;

(vii)     is a settlement, conciliation or similar agreement with respect to any Litigation, pursuant to which the Company or any RMS Entity will have any material payment obligation, or will be subject to any material limitations on the conduct of operations, after the Closing

(viii)     involves the creation or governance of a joint venture or partnership agreement;

41

(ix)     is a participation agreement or financing agreement, other than Securitization Instruments;

(x)     is a Servicing Agreement;

(xi)     is a material IP License that is neither granted nor received in the Ordinary Course of Business; and

(xii)     is a Contract not of a type (disregarding any dollar thresholds, materiality or other qualifiers, restrictions or other limitations applied to such Contract type) described in the foregoing clauses (i) through (xi) that has or would reasonably be likely to, either pursuant to its own terms or the terms of any related Contracts, involve payments or receipts in excess of $750,000 in any year (such Contracts required to be listed pursuant to clauses (i)-(xii), the "Material Contracts").  A true and complete copy of each Material Contract, as amended as of the date of this Agreement, including all attachments, schedules and exhibits thereto, has been made available to Buyers prior to the date of this Agreement.

(b)     Each of the Material Contracts, and each Contract entered into after the date hereof that would have been a Material Contract if entered into prior to the date hereof (each, an "Additional Contract") is (or if entered into after the date hereof, will be), subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Bankruptcy Case, (i) assuming due authorization, execution and delivery by the other party thereto, valid and binding on the Company or RMS Entity party thereto and, to the Company's Knowledge, the counterparty thereto, enforceable against the Company or such RMS Entity and, to Company's Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity and (ii) in full force and effect, except for such failures to be valid and binding or to be in full force and effect as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.  Neither the Company nor, to the Knowledge of the Company, any other party is in breach of or in default under any Material Contract or Additional Contract, and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute a default thereunder by the Company or any RMS Entity, in each case, except for such breaches and defaults as (x) have arisen as a result of the Bankruptcy Cases or (y) would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

**Section 4.6     Real Property**.     Other than the REO Property, neither the Company nor the RMS Entities own any real property.  Section 4.6 of the Disclosure Schedule sets forth a list of all leases, subleases or licenses pursuant to which the Company or the RMS Entities have real property interests as lessee, sublessee or licensee (each a "Lease").  The Company has made available to Buyers a true and complete copy of each Lease, together with all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto.  The Company or a RMS Entity, as applicable, has a valid leasehold estate in each parcel of leased real property, free and clear of all Liens other than Permitted Liens and Liens pursuant to a debtor in possession credit agreement. With respect to each Lease, (a) assuming due authorization, execution and delivery by the other party thereto, such Lease is valid and binding

42

on the Company or a RMS Entity, as applicable, and, to the Company's Knowledge, the counterparty thereto, enforceable against the Company or a RMS Entity, as applicable, and, to the Company's Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity, and (b) none of the Company, any RMS Entity or, to the Company's Knowledge, the counterparty thereto is in breach or default under such Lease, except (i) for those defaults that will be cured in accordance with the Confirmation Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be likely to be material to the Business, taken as a whole. The leased real property constitutes all of the real property that the Company and the RMS Entities use or occupy in connection with the operation of the Business.

**Section 4.7**    **Litigation; Decrees; Liabilities**.

(a)    Other than the Bankruptcy Case, there is no Litigation pending or, to the Knowledge of the Company, threatened in writing against the Company or the RMS Entities, except for those (i) arising in the Ordinary Course of Business, including foreclosure proceedings, Litigation involving homeowners' associations in which Sellers or the RMS Entities seek to establish that their security interests were not extinguished by homeowners' association foreclosure sales under applicable Law and class actions alleging servicing or origination errors or violations of consumer financial statutes, in each case that would not, individually or in the aggregate, reasonably be likely to be material to the Business, taken as a whole, and (ii) that would not, individually or in the aggregate, reasonably be likely to be material to the Business, taken as a whole.

(b)    Other than the Bankruptcy Case, the Company and the RMS Entities are not subject to any outstanding Decree that (i) would, individually or in the aggregate, reasonably be likely to be material to the Business, taken as a whole or (ii) would prevent or materially delay the Company's ability consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

(c)    As of the date of this Agreement, there are no Liabilities of the Company or the RMS Entities, other than (i) Liabilities disclosed, reflected, reserved against or otherwise provided for in the Balance Sheet; (ii) Liabilities incurred in the Ordinary Course of Business since December 31, 2018; (iii) Liabilities associated with the Bankruptcy Case or arising out of this Agreement or the transactions contemplated by this Agreement; and (iv) Liabilities that would not, individually or in the aggregate, reasonably be likely to be material to the Business, taken as a whole.

**Section 4.8**    **Labor Matters**.   Neither the Company nor any RMS Entity is a party to or otherwise bound by any collective bargaining agreement or other Contract with a labor union or labor organization, nor is the Company or any RMS Entity the subject of any material proceeding that asserts that the Company or any RMS Entity has committed an unfair labor practice or that seeks to compel the Company or any RMS Entity to bargain with any labor union or labor organization nor is there pending or, to the Knowledge of the Company, threatened in writing, nor has there been during the three (3) year period prior to the date of this

43

Agreement, any labor strike, dispute, walk-out, work stoppage, slow-down or lockout involving the Company or any RMS Entity.  To the Knowledge of the Company, the Company and each RMS Entity are in material compliance with all Labor Laws with respect to all Covered Employees and former employees or service providers, and no Covered Employee or former employee or service provider has been improperly included or excluded in any Benefit Plan. Section 4.8 of the Disclosure Schedule sets forth a redacted list of each Covered Employee, including date of hire, position, wage rate, bonus amount, location, and classification as exempt vs. non-exempt as well as the date of any approved leave and the estimated return date from such approved leave.

Section 4.9   **Brokers' Fees**.   Neither the Company nor any RMS Entity has entered into any Contract to pay any fees or commissions to any investment bank, broker, finder, or agent with respect to the transactions contemplated by this Agreement or the Related Agreements for which Sellers or Buyers or any of their respective Affiliates could become liable or obligated to pay.

Section 4.10   **Taxes**.   Except for matters that would not be reasonably likely to result in a Material Adverse Effect:

(a)     The Company has timely filed all Tax Returns required to be filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of the Company, as applicable), and all such Tax Returns (including information provided therewith or with respect thereto) are true, complete and correct in all respects.

(b)     The Company and the RMS Entities have fully and timely paid all Taxes shown on any such Tax Return and all other material amounts of Taxes (other than any Taxes not due as of the date of the filing of the Bankruptcy Cases as to which subsequent payment was prohibited by reason of the Bankruptcy Cases).

(c)     There are no outstanding agreements that will remain in effect with respect to the Company after the Closing Date extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes of the Company and no written request for any such waiver or extension is currently pending;

(d)     No audit or other proceeding by any Governmental Authority is pending or  has been threatened in writing with respect to any Taxes of the Company or, to the Company's Knowledge with respect to the Acquired Assets, Assumed Liabilities or the Business, no Governmental Authority has given written notice of any intention to assert any deficiency or claim for additional Taxes against the Company, and no claim in writing has been made by any Governmental Authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction, and all deficiencies for Taxes of the Company asserted or assessed in writing have been fully and timely paid, settled or properly reflected in the Financial Information.

(e)     There are no Liens for Taxes upon the assets or properties of the Company or upon the Acquired Assets, except for Permitted Liens.

(f)     The Company has not (A) participated in any listed transaction within the meaning of Treasury Regulation Section 1.6011-4(b) (or any similar provision of state, local or non-U.S. Tax law) or (B) taken any reporting position on a Tax Return, which reporting position (i) if not sustained would be reasonably likely, absent disclosure, to give rise to a penalty for substantial understatement of federal income Tax under Section 6662 of the IRC (or any similar provision of state, local, or non-U.S. Tax law), and (ii) has not adequately been disclosed on such Tax Return in accordance with Section 6662(d)(2)(B) of the IRC (or any similar provision of state, local, or non-U.S. Tax law).

(g)     The Company is not a party to any agreement that will remain in effect with respect to the Company after the Closing Date relating to the sharing, allocation or indemnification of Taxes, or any similar agreement, contract or arrangement (collectively, "Tax Sharing Agreements") (excluding agreements entered into in the ordinary course of business the primary purpose of which is not related to Taxes) or has any liability for Taxes of any Person (other than members of the affiliated group, within the meaning of Section 1504(a) of the IRC, filing consolidated federal income Tax returns of which Ditech is the common parent) under Treasury Regulation Section 1.1502-6 or similar provision of state, local or non-U.S. Tax law, as a transferee or successor, by contract, or otherwise.

(h)     The Company has withheld (or will withhold) from its employees, independent contractors, creditors, stockholders and third parties, and timely paid to the appropriate Governmental Authority, proper and accurate amounts in all material respects for all taxable periods ending on or before the Closing Date, to the extent due and payable, in compliance with all Tax withholding and remitting provisions of applicable Laws, and has complied in all material respects with all Tax information reporting provisions of all applicable Laws.

(i)     The Company will not be required to include in a taxable period ending after the Closing Date taxable income attributable to income that accrued in a taxable period ending prior to the Closing Date but was not recognized for Tax purposes in such prior taxable period (or to exclude from taxable income in a taxable period ending after the Closing Date any deduction the recognition of which was accelerated from such taxable period to a taxable period prior to the Closing Date) as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting, or Section 481 of the IRC or comparable provisions of state, local or non-U.S. Tax law.

(j)     The Company has not executed or entered into a closing agreement pursuant to Section 7121 of the IRC or any similar provision of state, local or non-U.S. Tax law that will remain in effect with respect to the Company after the Closing Date, and the Company is not subject to any private letter ruling of the IRS or comparable ruling of any other Governmental Authority.

(k)      Each of Mortgage Assets Systems and REO Management Solutions is treated as a disregarded entity of the Company for U.S. federal income tax purposes.

**Section 4.11   Tangible Personal Property**.   Section 4.11 of the Disclosure Schedule sets forth all Transferred Contracts that constitute leases of tangible personal property ("Personal Property Leases") used by Sellers or the RMS Entities in the Business.   To the Knowledge of the Company, no Seller or RMS Entity has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by a Seller or a RMS Entity under any of the Personal Property Leases.

**Section 4.12   Employee Benefits**.

(a)      Section 4.12(a) of the Disclosure Schedule lists all Company Benefit Plans and material Parent Benefit Plans (in each case, other than any offer letter (i) for a Covered Employee with current annual base salary of less than $100,000 or (ii) that does not provide for severance obligations or retention, transaction-based or other special bonus or compensation payments) (the "Scheduled Benefit Plans"). True, correct and complete copies of the following documents, with respect to each of the Scheduled Benefit Plans, have been made available to Buyers (i) any plan documents, and all material amendments thereto, (ii) the most recent Forms 5500 and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(b)      No Company Benefit Plan is an "employee benefit plan" within the meaning of Section 3(3) of ERISA.

(c)      The Scheduled Benefit Plans have been established, maintained and operated in compliance, in form and operation with applicable Laws (including ERISA, the IRC, COBRA, Section 409A and the Affordable Care Act), except as would not be reasonably likely to result in any liability that is material to the Company. There are no actions, lawsuits or complaints with respect to any Scheduled Benefit Plan pending or to Parent's knowledge threatened, except as would not be reasonably likely to, individually or in the aggregate, result in any material Liability to the Business.

(d)      No Scheduled Benefit Plan is (i) subject to Title IV of ERISA or (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA).

(e)      Each Scheduled Benefit Plan intended to be qualified under Section 401(a) of the IRC, has received a favorable determination letter from the IRS and, to the Knowledge of the Company, circumstances do not exist that are likely to result in the loss of the qualification of such plan under Section 401(a) of the IRC.

(f)      The Company has not incurred any current or projected Liability in respect of post-employment health, medical or life insurance benefits for any Covered Employee or former employee of the Business, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), and at the sole expense of such Covered Employee, except as would not be reasonably likely to result in any Liability that is material to the Company.

46

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement would reasonably be likely to, either alone or in combination with any other event, (i) result in any material payment (including severance) becoming due to any Covered Employee or satisfy any prerequisite to any payment or benefit to any Covered Employee, (ii) increase any benefits under any Company Benefit Plan, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefits or (iv) result in the payment of any amount that could, individually or in combination with any other payment, constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the IRC).

## Section 4.13   **Intellectual Property**.

(a)     Section 4.13(a) of the Disclosure Schedule sets forth a true, correct and complete list of all material Intellectual Property that is registered, issued or the subject of a pending application ("Registered IP").

(b)     All Registered IP is owned by the Company and the RMS Entities, is subsisting in all material respects, and, in the jurisdiction(s) where such Registered IP is issued or registered has not expired or been cancelled, abandoned or otherwise terminated and payment of all renewal and maintenance fees and expenses in respect thereof, and all filings related thereto, have been duly made and, to the Knowledge of the Company, is valid and enforceable. The Company and the RMS Entities own, or have sufficient rights to use, all Intellectual Property included in the Acquired Assets, free and clear of all Liens, except for Permitted Liens and Liens pursuant to a debtor in possession credit agreement.

(c)     The Company and the RMS Entities have not, during the three (3) year period prior to the date of this Agreement, and do not, infringe, misappropriate or otherwise violate the Intellectual Property rights of any third party and, to the Knowledge of the Company, no third party is infringing, misappropriating or otherwise violating any Intellectual Property owned by the Company and the RMS Entities and included in the Acquired Assets. There are no pending or, to the Knowledge of the Company, threatened interferences, re-examinations, oppositions or cancellation proceedings before any Governmental Authority alleging that the operation of the Business infringes, misappropriates or otherwise violates the Intellectual Property rights of any third party.

(d)     The Information Technology used in the Business (i) operates and performs in all material respects as required to permit the Company and the RMS Entities to conduct the Business as currently conducted and (ii) to the Knowledge of the Company, does not contain any material faults, viruses, malware, hardware components, or other devices or code designed or intended, or that could reasonably be expected, to disrupt, permit unauthorized access to, disable, or otherwise harm the normal and authorized operation of any computer systems, network, hardware or software.  To the Knowledge of the Company, the Information Technology has not suffered a material malfunction or failure during the three (3) year period prior to the date of this Agreement and during the three (3) year period prior to the date of this Agreement, no third party has gained unauthorized access to the Information Technology of the Company or any RMS Entity in a manner that has resulted, or could reasonably be expected to result, in liability to the Company or any RMS Entity.  The Company and the RMS Entities have

47

taken all actions and implemented administrative, technical, and physical safeguards, in each case consistent with standard practices in the industry and all applicable Laws, necessary and appropriate to protect the integrity and security of the Information Technology and the data and other information stored or processed thereon (including Personal Data).

(e)    The Company and the RMS Entities have implemented backup, security, business continuity, and disaster recovery technology, plans, and procedures, which technology, plans, and procedures are commercially reasonable in the industries of the Business, and the Company and the RMS Entities act in compliance therewith and test such technology, plans, and procedures on a regular basis.

(f)    The Company and the RMS Entities have a privacy policy (the "Privacy Policy") regarding the collection, disclosure, processing and use of Personal Data, in the possession, custody, or control of, or otherwise held or processed by or on behalf of, the Company or any RMS Entity.  A true, correct and complete copy of the Privacy Policy has been provided to Buyers prior to the date hereof.  The execution, delivery and performance of this Agreement and the Related Agreements and the consummation of the transactions contemplated hereby and thereby do not violate any applicable Laws, any privacy and data security requirements imposed on the Company or any RMS Entity pursuant to any Contracts, or the Privacy Policy as it currently exists or as it existed at any time during which any Personal Data was collected, disclosed, processed, or obtained by or on behalf of the Company or the RMS Entities.  The Company and the RMS Entities have at all times complied and are in compliance in all material respects with all applicable Laws and orders regarding the collection, use, processing, retention, transfer, disposal, privacy, or security of Personal Data and are compliant in all material respects with the Privacy Policy and the terms of all Contracts to which the Company or any RMS Entity is a party relating to data privacy, security, or breach notification (including provisions that impose conditions or restrictions on the collection, use, processing, retention, transfer, disposal, privacy, or security of Personal Data).  To the Knowledge of the Company, there have not been any incidents of, or third party claims related to, any loss, damage, breach of security, or unauthorized access, disclosure or use of any Personal Data collected, disclosed, processed, or obtained by or on behalf of the Company or any RMS Entity.  Neither the Company nor the RMS Entities have received during the three (3) year period prior to the date of this Agreement any written notice of any complaint, proceedings, investigation, or alleged violations of any Laws and orders with respect to Personal Data possessed, collected, disclosed, processed, or obtained by or on behalf of the Company or the RMS Entities (including, in each case, by any Governmental Authority), except as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

**Section 4.14    Compliance with Laws; Permits**.

(a)    The Company and the RMS Entities are, and since December 31, 2016 have been, in compliance with all Laws and Applicable Requirements applicable to the Business and the Acquired Assets, except for such violations that would not, individually or in the aggregate, reasonably be likely to be material to the Business, taken as a whole.  Except for any inspections by a Governmental Authority occurring in the Ordinary Course of Business, no investigation by any Governmental Authority with respect to the Company or any RMS Entity is pending or, as of the date of this Agreement and to the Knowledge of the Company, threatened

48

in writing, nor has any Governmental Authority indicated an intention to conduct the same, except for such investigations the outcome of which would not, individually or in the aggregate, reasonably be likely to be material to the Business, taken as a whole.

(b)        The Company and each RMS Entity has all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not reasonably be likely to have a Material Adverse Effect.  The Company and the RMS Entities are not, and since December 31, 2016 have not been, in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is party, except where such default or violation has been waived or excepted by the applicable Governmental Authority or would not reasonably be likely to be material to the Business taken as a whole.

(c)        Notwithstanding the foregoing, this <u>Section 4.14</u> shall not apply with respect to Taxes, which shall be covered exclusively by <u>Section 4.10</u> or Environmental Laws, which shall be covered exclusively by <u>Section 4.15</u>.

**Section 4.15    <u>Environmental Matters</u>**.    Except as would not be reasonably likely to be material, individually or in the aggregate, to the Company and the RMS Entities, taken as a whole:

(a)        the operations of the Company and the RMS Entities are, and during the three (3) year period prior to the date of this Agreement have been, in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business;

(b)        neither the Company nor any RMS Entity is the subject of any outstanding Litigation with any Governmental Authority or any other Person with respect to Environmental Laws;

(c)        neither the Company nor any RMS Entity is the subject of any pending, or to the Knowledge of the Company, threatened Litigation alleging that the Company or any RMS Entity may (i) be in violation of any Environmental Law, or any Permit issued pursuant to Environmental Law, or (ii) have any liability under any Environmental Law or in connection with exposure to Hazardous Substances; and

(d)        to the Knowledge of the Company, there are no pending or threatened investigations of the Company or any RMS Entity, or of any currently or previously owned, operated or leased property of the Company or any RMS Entity, which would reasonably be likely to result in the Company or any RMS Entity incurring liability pursuant to any Environmental Law.

**Section 4.16    <u>Mortgage Business</u>**.

(a)        The Company is approved as an issuer of mortgage-backed securities guaranteed by the Government National Mortgage Association, or any successor thereto ("<u>Ginnie Mae</u>"), an approved servicer of reverse mortgages of Fannie Mae, and an approved

49

Title I and Title II mortgagee of the United States Federal Housing Administration, or any successor thereto (the "FHA") (each of the forgoing entities, a "Mortgage Agency"). To the Knowledge of the Company, the Company has not received any written notice of any cancellation or suspension of, or material limitation on, its status as an approved issuer/servicer, seller/servicer, mortgagee, lender or participant, as applicable, by any of the Mortgage Agencies. All information provided by the Company to the FHA with respect to the Mortgage Loans being acquired by Buyers was true and correct except as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

(b)     Except as would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect: (A) each Company Originated Mortgage Loan was underwritten, originated, funded and delivered in accordance with all Laws and Applicable Requirements in effect at the time such Company Originated Mortgage Loan was underwritten, originated, funded or delivered, as applicable; (B) each Company Originated Mortgage Loan was eligible for insurance or guaranty by the applicable insurer and pooling to back securities issued or guaranteed by Ginnie Mae as of the date of insurance, guaranty or pooling, as applicable; (C) the Company is not otherwise in material default with respect to its obligations under the Applicable Requirements with respect to the related Company Originated Mortgage Loan, except, in each case, where such failure to confirm or ineligibility or lack of compliance would not be the contractual or legal responsibility of Buyers as transferee under the Servicing Agreement or would not result in any material financial penalty, loss, indemnity obligation, offset, clawback or other payment by Buyers; and (D) each Company Originated Mortgage Loan that is required to be insured by the FHA has such FHA insurance in accordance with FHA requirements and an accurate holder identification for purposes of filing claims, and all provisions of such FHA insurance policies have been and are being complied with in all material respects, all premiums due thereunder have been paid, and such policies are in full force and effect; provided, that in the event any such representations are not accurate with respect to a Company Purchased Mortgage Loan, then the Company or the RMS Entity, as applicable, has the right to require the applicable counterparty from which it acquired the Company Purchased Mortgage Loan to repurchase such Company Purchased Mortgage Loan. All Contracts pursuant to which a Company Purchased Mortgage Loan was purchased are set forth on Section 1.1 of the Disclosure Schedule (under the heading Transferred Contracts), as such schedule exists on the date hereof, other than any omissions that would not reasonably be expected to be material to the Business.

(c)     Except as would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect, the Company owns the entire right, title and interest in and to the Servicing Rights of the Mortgage Loans currently being serviced by the Company, subject to Applicable Requirements and the rights of the applicable insurer, investor or Mortgage Agency. The Company owns all of the Servicing Rights with respect to each Company Originated Mortgage Loan. Except as would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect: (A) each servicing advance made by the Company as servicer or subservicer was made using reasonable efforts to ensure that it was made in accordance with the applicable Servicing Agreement and the related Mortgage Loan documentation and is reimbursable to the extent set forth in the applicable Servicing Agreement and in accordance with Applicable Requirements, in each case except to the extent appropriate reserves in respect of such advances have been recorded in the Financial Information and (B) the

50

Company has not received any written notice from an investor, insurer, Mortgage Agency or other party in which such investor, insurer, Mortgage Agency or other party disputes or denies any claim by or on behalf of the Company for reimbursement in connection with a servicing advance, in each case except to the extent appropriate reserves in respect of such claims have been recorded in the Financial Information.

(d)    (A) Except as would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect, the Company is in compliance with all Applicable Requirements and the Prudent Mortgage Servicer Standard in respect of the Company's servicing or, as applicable, subservicing, of Company Serviced Mortgaged Loans, including with respect to, as applicable, the collection and application of payments to mortgagors and (B) through the date of this Agreement, the Company has not received written notice of any pending or threatened cancellation or partial termination of any Servicing Agreement due to a breach by the Company. Each Servicing Agreement is a valid and binding obligation of the Company and is enforceable by the Company in accordance with its terms subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

(e)    Except as would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect (A) the collateral file for each Company Originated Mortgage Loan owned, and the servicing file for each Company Serviced Mortgage Loan serviced, by the Company as of the date of this Agreement is complete in all material respects, except for any documents that have been submitted for recording and have not yet been returned, or documents held by any counsel, vendor, service provider, agent or Representative in accordance with Applicable Requirements, and complies in all material respects with all Applicable Requirements, (B) there has been no servicer termination event or uncured default or breach by the Company under any Servicing Agreement that gives rise to a right of full or partial termination under the Servicing Agreement or any indemnity or financial claim against the Company and (C) no event, condition, or omission has occurred or exists that with or without the passage of time or the giving of notice or both would: (1) constitute a default or breach by the Company under any such Servicing Agreement so as to permit full or partial termination of any such Servicing Agreement by a third party without the consent of the Company or any indemnity or financial claim against the Company; or (2) rescind any insurance policy or reduce insurance benefits in respect of the underlying Mortgage Loans to which any Servicing Agreement relates.

(f)    In connection with securitizations of the Mortgage Loans, except as would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect, the Company has provided all servicer reports, certifications, attestations, certificates and information that were required to be prepared or otherwise provided by the Company, as applicable (including as required under Regulation AB), pursuant to any Servicing Agreement, to the Person designated for receipt in the applicable Servicing Agreement on a timely basis.

(g)    Section 4.16(g) of the Disclosure Schedule lists all Securitization Transactions (other than Ginnie Mae HMBS II securitizations) with related outstanding debt (by tranche or class, if applicable, for each such transaction), and any applicable ratings and ratings actions (including any "shadow ratings," "negative watch" status, evidence of any recently

confirmed ratings and/or downgrades or knowledge of the Company that an applicable ratings agency is considering the same).

(h)     Section 4.16(h) of the Disclosure Schedule lists all Securitization Instruments (other than in connection with Ginnie Mae HMBS II securitizations). The Company has made available to Buyers all Securitization Instruments for the transactions referenced in clause (g) above (including any derivatives contracts (i.e., swaps, hedges or other derivatives), deposit account control agreements, sale and purchase agreements, repurchase agreements, credit enhancement and intercreditor agreements). The Company has made available true, correct and complete copies of each such Securitization Instrument to Buyer.

(i)     All Securitization Instruments (A) are, assuming due authorization, execution and delivery by the other party thereto, legal, valid and binding obligations and (B) are in full force and effect and enforceable in accordance with their terms against the Company and/or its Subsidiaries party thereto (except, in each case, (i) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally, or, as to enforceability, by general principles of equity and (ii) for such failures to be valid and binding or to be in full force and effect as would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect). The RMS Entities are in compliance with the terms of each Securitization Instrument (including with respect to any such party's role as Servicer or performance guarantor) except for any lack of compliance (x) arising as a result of the Bankruptcy Cases or (y) which would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect. No event, condition or omission has occurred and is continuing that would constitute a breach, violation or default (whether by lapse of time or notice or both), rapid amortization event, funding termination event, cash accumulation event, event of default or servicer event of default (whether by lapse of time or notice or both), in each case, under any Securitization Instrument except, in each case, for any event, condition or omission (x) arising as a result of the Bankruptcy Cases or (y) which would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect. The Company has not received any notice or communication in writing from any person asserting (y) any event described in the preceding sentence, or (z) that any provision of a Securitization Instrument is not effective or is not a legally valid, binding and enforceable obligation of any party thereto (except (1) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or affecting creditors' rights generally, or, as to enforceability by general principles of equity or (2) as would not reasonably be expected to have a Material Adverse Effect).

(j)     Section 4.16(j) of the Disclosure Schedule lists all Ginnie Mae HMBS II Securitizations to which Company Mortgage Loans are subject.

(k)     The Company is exempt from or otherwise in compliance with all risk retention requirements with respect to all Securitization Transactions pursuant to 17 C.F.R. Section 246.1-246.22 ("Regulation RR"). Section 4.16(k) of the Disclosure Schedule lists all retained interests required to be retained by the Company pursuant to Regulation RR, if any, with respect to all such Securitization Transactions, whether such retained interest is horizontal, vertical or a combination.

(l)      Each mortgage loan, whether in the form of a mortgage, deed of trust, or other equivalent security instrument, that is included in the Acquired Assets is a Mortgage Loan.

(m)      The Signing Date Portfolio Information set forth in the Signing Date Portfolio Tape is true, correct, complete and accurate in all material respects as of the Signing Date.  The Interim Date Portfolio Information to be set forth in the Interim Date Portfolio Tape shall be true, correct, complete and accurate in all material respects as of the close of business on May 31, 2019. The Cut-Off Date Portfolio Information to be set forth in the Cut-Off Date Portfolio Tape shall be true, correct, complete and accurate in all material respects as of the close of business on the date thereof.

**Section 4.17    Insurance**.  All of Sellers' material polices of insurance by which the Company, the RMS Entities, the Company Purchased Shares or the Acquired Assets (the "Insurance Policies") are covered are in full force and effect.  All premiums due on such Insurance Policies have been paid or, if due and payable prior to the Closing, will be paid prior to the Closing in accordance with the payment terms of such Insurance Policies.  All such Insurance Policies are valid and binding in accordance with their terms and have not been subject to a lapse in coverage.  Neither Sellers nor any of the RMS Entities have received any written notice of cancellation or non-renewal of any such Insurance Policy.  There are no material claims related to the Business pending under such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.  No Seller or RMS Entity is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy.

**Section 4.18    Disclaimer of Other Representations and Warranties**.  Except for the representations and warranties contained in Article III or this Article IV (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, none of Parent, the Company or any other Person makes, or shall be deemed to have made, and none of Buyers or their Representatives is relying on, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding Parent, the Company, any Acquired Assets, any Assumed Liabilities or any other matter.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in Article III or this Article IV or any Related Agreement, NO SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyers or their Affiliates or Representatives (including any opinion, information, projection, or advice) that may have been or may be provided to Buyers by any director, officer, employee, agent, consultant, or Representative of Sellers or any of their Affiliates.

# ARTICLE V
## BUYERS' REPRESENTATIONS AND WARRANTIES

Buyers represent and warrant to each Seller that the statements contained in this Article V are true and correct as of the date of this Agreement.

**Section 5.1    Organization of Buyers; Good Standing**.  Each Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease, and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, in good standing or to have such power and authority would not, individually or in the aggregate, prevent or materially impair or delay such Buyer's ability to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement on a timely basis.

**Section 5.2    Authorization of Transaction**.  Each Buyer has full power and authority to execute and deliver this Agreement and the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and the Related Agreements to which each Buyer is a party (a) have been duly authorized by each Buyer and (b) do not require the consent of any other Person. This Agreement (assuming due authorization, execution and delivery by Sellers) constitutes the valid and legally binding obligation of each Buyer, enforceable against each Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

**Section 5.3    Noncontravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach of the organizational documents of any Buyer, (b) conflict with, or result in any violation or breach of or default (with or without notice or lapse of time, or both) under, any Law or Decree to which any Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach or violation of, constitute a default under (with or without notice or lapse of time or both), result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, create any Lien or require any notice under any Contract to which any Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement or perform its obligations hereunder on a timely basis.  Other than the necessary filings, notices, reports, consents, registrations, approvals, permits, expirations of waiting periods or authorizations required to comply with (v) applicable Antitrust Laws and the Exchange Act, (w) the Bankruptcy Code or the Confirmation Order, (x) state securities or "blue-sky" Laws, (y) the regulatory body of any state or locality that governs the issuance and maintenance of a Servicing Agreement and (z) the requirements of any investor, insurer, Mortgage Agency, or Governmental Authority in respect of any Mortgage Loan or other loan or instrument owned or serviced by the Company, including the origination, sale, servicing or subservicing thereof, Buyers are not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the

Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyers' ability to consummate the transactions contemplated by this Agreement or the Related Agreements or perform its obligations hereunder on a timely basis.

Section 5.4   **Litigation; Decrees**.  There is no Litigation pending or, to Buyers' Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated by this Agreement. Neither Buyers nor any of their Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyers' ability to consummate the transactions contemplated by this Agreement or perform its obligations hereunder on a timely basis.

Section 5.5   **Operation of the Business**.  Buyers intend to own and manage the Acquired Assets in compliance with all Laws and Applicable Requirements applicable to the Business, except for such violations that would not, individually or in the aggregate, reasonably be likely to be material.  Buyers intend to own and maintain all Licenses and Permits which are required for the operation of the Business as presently conducted, except where the failure to do so would not reasonably be likely to be material.

Section 5.6   **Brokers' Fees**.  Other than the fees and expenses payable to Barclays PLC in connection with the transactions contemplated by this Agreement, Buyers have not entered into any Contract to pay any fees or commissions to any investment bank, broker, finder or agent with respect to the transactions contemplated by this Agreement or the Related Agreements for which Buyers or Sellers or any of their respective Affiliates could become liable or obligated to pay.

Section 5.7   **Sufficient Funds; Adequate Assurances**.  Buyers have access to committed funds as of the date hereof, and upon the Closing will have immediately available funds, in each case, in an amount sufficient for the satisfaction of all of Buyers' obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyers in connection with the transactions contemplated by this Agreement.  Buyers are and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 5.8   **Certain Qualifications**. As of the Closing Date, Buyers will be duly qualified to acquire the Mortgage Loans and Servicing Rights in each jurisdiction in which such qualification is necessary and have all related licenses, registrations, permits, and approvals required to perform such obligations in accordance with Applicable Requirements or will be exempt from such requirements.

Section 5.9   **Disclaimer of Other Representations and Warranties**.  Except for the representations and warranties contained in this Article V or expressly contained in any Related Agreement, neither Buyers nor any other Person makes, or shall be deemed to have made, and none of Sellers or their Representatives are relying on, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding

Buyers or any other matter.   Buyers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Affiliates or Representatives (including any opinion, information, projection, or advice) that may have been or may be provided to any Seller by any director, officer, employee, agent, consultant, or Representative of Buyers or any of their Affiliates.

## ARTICLE VI
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 6.1    Efforts; Cooperation; Financing Cooperation**.

(a)    Upon the terms and subject to the conditions set forth in this Agreement (including Section 6.4), each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable and in no event later than the Outside Date, the transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, (i) each Seller shall use its reasonable best efforts to cause the conditions set forth in Section 8.1 and Section 8.3 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyers shall use their reasonable best efforts to cause the conditions set forth in Section 8.2 and Section 8.3 that are within their control or influence to be satisfied or fulfilled.

(b)    Without limiting the generality of Section 6.1(a), no Party shall take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially impair, delay or impede any Party's ability to consummate, the transactions contemplated by this Agreement, including any action that is intended to, or would reasonably be likely to, result in any of the conditions to any Party's obligations to consummate the transactions contemplated by this Agreement set forth in Article VIII to not be satisfied.

(c)    Until the earlier of the (x) the Closing Date and (y) the date this Agreement is terminated in accordance with its terms, each Seller shall use its reasonable best efforts to, and to cause its Representatives, including its legal and accounting advisors, to, provide all customary and necessary cooperation reasonably requested by Buyers in connection with any debt or securitization facilities to be obtained, arranged or committed to on or prior to the Closing Date to finance the transactions contemplated by this Agreement to occur on the Closing Date, if any (any such facility, the "Debt Financing"), including using reasonable best efforts in respect of the following:

(i)    participating in a reasonable number of lender meetings, lender calls, lender presentations, drafting sessions, sessions with rating agencies and due diligence sessions, including direct contact between senior management and representatives and advisors of the Company and the Debt Financing Sources and

56

potential lenders in the Debt Financing, in each case, upon reasonable advance notice and at mutually agreed times;

      (ii)    upon reasonable request, furnishing Buyers and the Debt Financing Sources with financial statements regarding the Company, the Acquired Assets, related liabilities and expenses, as are customary for the Debt Financing and may be reasonably requested by Buyers (provided, however, that there shall be no obligation to prepare any financial statements, reports or other information or documents other than such financial statements, reports or other information prepared by the Company (x) in the ordinary course of business or (y) pursuant to the warehouse financing arrangements to finance Mortgage Loans and related assets to which the Company or its Subsidiaries are party as of the date hereof (each, an "Existing Warehouse Financing")));

      (iii)    assisting Buyers and the Debt Financing Sources in the preparation of customary marketing materials (if any) for the Debt Financing and customary materials for rating agency presentations and providing reasonable and customary authorization letters to the Debt Financing Sources authorizing the distribution of information to prospective lenders;

      (iv)    executing and delivering as of (but not before) the Closing any customary guarantee, pledge and security documents, other definitive financing documents, or other certificates (including customary opinion certificates from the Company and its Subsidiaries (other than RMS Entities) in connection with the preparation of customary legal opinions from local or specialty counsel to Buyer) or documents as may be reasonably requested by Buyers and otherwise facilitating the pledging of collateral, including facilitating delivery of possessory collateral, if any; and

      (v)    providing all customary documentation and other information as is required by applicable "know your customer" and anti-money laundering rules and regulations including the USA PATRIOT Act and Financial Crimes Enforcement Network (FinCEN) regulations to the extent reasonably requested in writing at least ten (10) Business Days prior to the Closing Date by Buyers or the Debt Financing Sources;

provided, that, (A) no Seller, none of their respective Subsidiaries nor any of their respective Representatives shall be required to take any action that (I) would reasonably be expected to conflict with, violate, breach or otherwise contravene their respective organizational documents or any applicable Law or material Contracts, (II) would, in the good faith determination of such Seller or Subsidiary, as applicable, interfere unreasonably with the business or operations of such Seller or Subsidiary, (III) cause any condition to Closing set forth in Article VIII to not be satisfied or otherwise cause any breach of this Agreement, (IV) require the delivery of any projections or pro forma financial information to any third parties (it being understood that upon the written request of Buyers, Sellers shall provide such customary information as Buyers may reasonably request to facilitate its preparation of projections and pro forma financial information), (V) require the delivery of any financial statements in a form or subject to a standard different than those provided to Buyers on or prior to the date hereof or in connection with the Existing Warehouse Financings, (VI) require delivery of any legal opinions or accountants' cold comfort letters or reliance letters, (VII) subject any director, manager, officer

57

or employee of a Seller or any of its Affiliates to any actual or potential personal liability and/or (VIII) provide any information consisting of attorney work product or to the extent the provision thereof would reasonably be expected to result in the waiver of legal privilege, (B) no Seller, any Subsidiary thereof nor any of their respective Representatives shall be required to take or commit to take any action (including the payment of commitment fees or other fees or have any Liability or obligation, including any indemnification obligation) in connection with the Debt Financing that is not contingent upon the Closing (including the approval of or entry into any agreement). Promptly following the request of any Seller, Buyers will reimburse Sellers for any out-of-pocket expenses (including attorneys' fees) incurred by such Seller or its Affiliates in connection with the assistance required by this Section 6.1(c).  Buyers shall indemnify and hold harmless each Seller, their respective Subsidiaries and their respective Representatives from and against any and all Liabilities or losses suffered or incurred by them in connection with the cooperation provided pursuant to this Section 6.1(c) or any information provided in connection therewith, except to the extent such Liabilities or losses arise out of or result directly from the Fraud of Sellers, their respective Subsidiaries or their respective Representatives.  Nothing contained in this Section 6.1 or otherwise shall require any Seller, prior to the Closing, to be an issuer or other obligor with respect to the Debt Financing.

(d)    Buyers acknowledge and agree that the obtaining of any Debt Financing is not a condition to the Closing and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of any Debt Financing, as, if and when required by the terms of this Agreement.

**Section 6.2    Conduct of the Business Pending the Closing**.

(a)    Prior to the Closing, except (i) as set forth on Section 6.2(a) of the Disclosure Schedule, (ii) as required by applicable Law, Applicable Requirement or order of the Bankruptcy Court, or pursuant to the pendency of the Bankruptcy Cases, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Buyers (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall, and shall cause the RMS Entities to, use its commercially reasonable efforts to conduct the Business only in the Ordinary Course of Business and use its commercially reasonable efforts to preserve the present business operations, organization, business relationships and goodwill of the Business.

(b)    Except (i) as set forth on Section 6.2(b) of the Disclosure Schedule, (ii) as required by applicable Law, Applicable Requirement or order of the Bankruptcy Court, or pursuant to the pendency of the Bankruptcy Cases, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyers (which consent shall not be unreasonably withheld, conditioned or delayed), neither Parent nor the Company shall, and shall cause the RMS Entities not to:

(A)    (1) other than in an immaterial manner, increase the compensation or benefits (including severance) payable to any employee of the Company or any RMS Entity other than pursuant to the terms of any Scheduled Benefit Plan in effect on the date hereof (or as modified after the date of this Agreement in accordance with the terms of this Agreement); provided, that notwithstanding the foregoing, the Company shall not

58

and shall not permit the RMS Entities to, other than as required by applicable Law, amend or modify the Company's key employee incentive program approved by the Bankruptcy Court, (2) grant any new equity-based awards, or amend or modify the terms of any such outstanding awards, under any Scheduled Benefit Plan, (3) increase the compensation or benefits payable to any executive officers of the Company, (4) amend any severance plan or agreement as in effect on the date hereof, (5) make any change to any Scheduled Benefit Plan that is an "employee welfare benefit plan" (within the meaning of Section 3(1) of ERISA) that would materially increase the costs to the Company in respect of such Scheduled Benefit Plan or adopt any new plan or arrangement that would be a Scheduled Benefit Plan, (6) hire any employee with an aggregate annual compensation in excess of $100,000 who would be a Covered Employee, other than to fill a position that is open on the date of this Agreement or that opens following the date of this Agreement as a result of the cessation of employment of a Covered Employee and prior to hiring any such replacement employee the Company shall consult with the Buyers and any compensation for such replacement employee shall be on terms materially comparable to the Covered Employee that such new employee is replacing or (7) terminate, or take any action primarily intended to cause the resignation of, more than twenty percent (20%) of the full-time Covered Employees listed on <u>Section 6.2(b)(A)</u> of the Disclosure Schedule.

(B)    solely with respect to the Business, the Acquired Assets, the Company and the RMS Entities, transfer, lease, license, sell, assign, let lapse, abandon, cancel, mortgage, pledge, place a Lien (other than a Permitted Lien or Liens pursuant to a debtor in possession credit agreement or arising as a result of a Mortgage Agency's claims, rights of set-off or other contractual rights) upon or otherwise dispose of any Intellectual Property; <u>provided</u>, that this clause (B) shall not restrict (1) any of the foregoing that occur in the Ordinary Course of Business, or to the extent applicable, among the Company and the RMS Entities, (2) the granting of any licenses, covenants, and releases of or under Intellectual Property in the Ordinary Course of Business or (3) transfers, leases, sales, assignments, lapses, abandonments, cancellations, Liens, or other dispositions of Intellectual Property (other than licenses, covenants and releases) with a fair market value less than $250,000 or that is otherwise immaterial or obsolete;

(C)    (i) sell or transfer any of the properties or assets that would constitute Acquired Assets in a bulk sale or transfer or (ii) other than in the Ordinary Course of Business, transfer, lease, license, sell, assign, let lapse, abandon, cancel, place a Lien (other than a Permitted Lien or Liens pursuant to a debtor in possession credit agreement or arising as a result of a Mortgage Agency's claims, rights of set-off or other contractual rights) upon, or otherwise dispose of any properties or assets that would otherwise constitute, Acquired Assets (other than any Intellectual Property, which is governed by <u>Section 6.2(b)(B))</u>, other than transactions among the Company and the RMS Entities;

(D)    other than as contemplated by this Agreement or in connection with the Bankruptcy Cases, issue, sell, pledge or dispose of, or agree to issue, sell, pledge or dispose of, any equity interests (including the Company Purchased Shares) or other securities of, or any options, warrants or rights of any kind to acquire any equity interests

59

(including the Company Purchased Shares) or other securities of the Company, or any debt or equity securities convertible into, exchangeable for or exercisable for such equity interests (including the Company Purchased Shares) or other securities;

(E)     other than as contemplated by this Agreement or in connection with the Bankruptcy Cases, split, combine or reclassify any of the equity interests in the Company, or issue any other security in respect of, in lieu of or in substitution for the equity interests of the Company;

(F)     make any loans, advances (except as may otherwise be required by the applicable Servicing Agreement) or capital contributions to, or investments in, any Person (other than (1) loans, advances or capital contributions to the Company or (2) Mortgage Loans in the Ordinary Course of Business);

(G)     waive, release, settle or compromise any Litigation relating to the Business, the RMS Entities, the Company Purchased Shares, the Acquired Assets or the Assumed Liabilities, other than settlements (1) not in excess of $150,000 individually or $750,000 in the aggregate; provided, that any such settlement does not involve any non-*de minimis* injunctive or equitable relief or impose non-*de minimis* restrictions on the business activities of Sellers or the RMS Entities or (2) for amounts not in excess of the Company's or the RMS Entities' available insurance coverage as of the date hereof;

(H)     make or commit to any capital expenditures other than (1) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident or (2) in the Ordinary Course of Business and which do not exceed during the 2019 fiscal year one-hundred and twenty percent (120%) of the amounts reflected in the Company's capital expenditure budget for 2019 as provided on Section 6.2(b)(H) of the Disclosure Schedule;

(I)     enter into, amend or modify in any material respect or terminate (excluding terminations upon expiration of the term thereof in accordance with the terms thereof) any Material Contract, Securitization Instrument or Lease or waive, release or assign any material rights, claims or benefits under any Material Contract, Securitization Instrument or Lease, other than in the Ordinary Course of Business; provided, that, for the avoidance of doubt, this Section 6.2(b)(I) shall not prohibit or restrict the Scheduled Benefit Plans;

(J)     amend its articles of incorporation or bylaws (or comparable governing documents) (other than amendments to the governing documents that would not reasonably be likely to be material to Buyers);

(K)     other than as contemplated by this Agreement, declare, set aside or pay any dividend or distribution payable in cash, stock or property (or any combination thereof) in respect of any shares of its capital stock (except for any dividends or distributions paid by any RMS Entity to the Company or any other RMS Entity);

(L)     make any material change in the accounting methods used by the Business, unless required by GAAP;

60

(M)     in each case in respect of the Company, (1) make, change, revoke, or modify any material Tax election, (2) enter into any Tax Sharing Agreement or agreement with any Governmental Authority in respect of Taxes, (3) commence any material Tax action or settle or compromise any material Tax action, (4) adopt or change any method of Tax accounting in respect of a material amount of Taxes, (5) change the Company's accounting policies, methodologies, forecasting models or procedures, other than (y) as required by changes in GAAP or (z) as otherwise required for compliance with GAAP (in the case of clause (z), solely to the extent determined in good faith by the Company, following discussion with Ditech's independent accountants) or (6) surrender or compromise any right to claim a material Tax refund of the Company; provided, and it being understood, that nothing in this Agreement precludes the use or reattribution of the tax losses or other tax attributes of the Company by Sellers; or

(N)     authorize or agree to do anything prohibited by this Section 6.2.

**Section 6.3    Filings; Other Actions.**

(a)     Each of the Parties shall cooperate with each other and use, and shall cause their respective Subsidiaries to use, their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement on the terms and subject to the conditions herein as promptly as practicable, and in any case, prior to the Outside Date.  Each of the Parties and their respective Affiliates, shall use reasonable best efforts to obtain the consents of all Governmental Authorities and/or Mortgage Agencies necessary to consummate the transactions contemplated by this Agreement.   Each Party shall make an appropriate filing, if necessary, pursuant to the HSR Act within five (5) Business Days after the date of this Agreement (unless otherwise mutually agreed), and shall make all other filings required under the Antitrust Laws of the foreign jurisdiction(s) listed on Section 6.3(a) of the Disclosure Schedule as promptly as practicable following the date of this Agreement.  Each Party shall use its reasonable best efforts to supply as promptly as practicable to the appropriate Governmental Authorities and/or Mortgage Agencies any additional information and documentary material that may be requested pursuant to the HSR Act or Antitrust Laws of any foreign jurisdiction or in connection with obtaining any required approvals of any Mortgage Agencies, in each case subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege.  Without limiting the foregoing, (i) the Parties and their respective Affiliates shall not voluntarily extend any waiting period or other applicable time period under the HSR Act or Antitrust Laws of any foreign jurisdiction or enter into any agreement with any Governmental Authority and/or Mortgage Agency to delay, or otherwise not to consummate as soon as practicable the transactions contemplated hereby, except with the prior written consent of the other Parties, which consent shall not be unreasonably withheld by the non-requesting party and (ii) the Parties agree to use reasonable best efforts to take any and all actions that are necessary or reasonably advisable to consummate the transactions contemplated by this Agreement on the terms and subject to the conditions herein as promptly as reasonably practicable, and in any event prior to the Outside Date, including  (A) cooperating with each other by providing information regarding Sellers or Buyers, as applicable, and each of their respective control persons, officers, directors, Representatives and agents that is required to be included in connection with any such notices or approvals from any insurer, investor, Mortgage

Agency, Governmental Authority or other Person as promptly as practicable after the same is requested, and to promptly review and provide any comments on all such notices or applications to be filed (or any related correspondence sent to any insurer, investor, Mortgage Agency, Governmental Authority or other Person), and (B) cooperating with each other in obtaining any consent, approval of, waiver or any exemption by, any non-governmental third party, in each case, to the extent necessary, proper or advisable in connection with the transactions contemplated by this Agreement. Notwithstanding anything in this Section 6.3 to the contrary, nothing in this Agreement shall require, or be deemed to require, any Party to, or to cause any of such Party's Affiliates or Subsidiaries to, whether prior to, at, after or conditioned upon, the Closing, (1) propose, negotiate, commit to, effect and agree to, by consent decree, hold separate order, or otherwise, the sale, divestiture, license, hold separate, and other disposition of, any entities, operations, assets, divisions, businesses, product lines, customers or facilities of any of the Acquired Assets, the Company or Buyers, or their respective Affiliates, (2) create, terminate, amend or assign existing relationships, ventures, contractual rights, or obligations of any of the Acquired Assets, the Company or Buyers, (3) amend, assign, or terminate existing licenses or other agreements (and enter into such new licenses or other agreements), (4) litigate or defend any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, (5) otherwise take or commit to any action that would limit Buyers' freedom of action with respect to, or its ability to retain or hold, directly or indirectly, any businesses, assets, products, or equity interests of Buyers, any of the Acquired Assets, or their respective Affiliates, or (6) enter into any Governmental Order, consent decree or other agreement to effectuate any of the foregoing. All filing fees incurred in connection with the HSR Act or competition Laws of any foreign jurisdiction or paid by any Party to the Mortgage Agencies shall be borne fifty percent (50%) by Parent, on the one hand, and fifty percent (50%) by Buyers, on the other hand; provided that Parent shall in no event pay more than $500 in the aggregate in connection with such fees.

(b)     In connection with the efforts referenced in Section 6.1 and this Section 6.3, and in furtherance of Section 6.3(a), to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law, any state Law or any Applicable Requirement, the Parties shall use reasonable best efforts to: (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private Party; (ii) keep each other informed in all material respects of any material communication received by such Party from, or given by such Party to, any Mortgage Agency or Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated by this Agreement; and (iii) permit each other to review any material communication given to it by, and consult with each other in advance of any meeting or conference with, any Mortgage Agency or Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable Mortgage Agency or Governmental Authority, provide the opportunity to each other to attend or participate in such meeting, conference, or proceeding.  The foregoing obligations in this Section 6.3(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege.  The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement to allow for the exchange of such privileged materials without waiving any such privilege.

(c)      With respect to decision making authority, but without limiting Buyers' and Sellers' obligations under this <u>Section 6.3</u>:

(i)      Buyers and Sellers shall have joint decision making authority with respect to the appropriate course of action with respect to, and shall cooperate with each other in connection with, obtaining the consents, approvals, permits, waiting period expirations or authorizations of any Governmental Authority required under any Antitrust Laws to consummate the transactions contemplated by this Agreement.  No Party or its counsel shall independently participate in any substantive call or meeting relating to the Antitrust Laws with any Governmental Authority in respect of any filings, investigations, or other inquiries without giving the other Party or its counsel prior notice of such call or meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate. In furtherance of the foregoing and to the extent permitted by applicable Law, (A) each Party shall notify the others, as far in advance as practicable, of any filing or material or substantive communication or inquiry it or any of its Subsidiaries intends to make with any Governmental Authority relating to the matters that are the subject of this <u>Section 6.3</u> in respect of Antitrust Laws, (B) prior to submitting any such filing or making any such communication or inquiry, such Party shall provide the other Parties and its counsel a reasonable opportunity to review, and shall consider in good faith the comments of the other Parties in connection with, any such filing, communication or inquiry, (C) promptly following the submission of such filing or making such communication or inquiry, provide the other Parties with a copy of any such filing or, if in written form, communication or inquiry and (D) consult with the other Party in connection with any inquiry, hearing, investigation or litigation by, or negotiations with, any Governmental Authority relating to the transactions contemplated by this Agreement, including the scheduling of, and strategic planning for, any meetings with any Governmental Authority relating thereto.   In exercising the foregoing cooperation rights, Sellers and Buyers each shall act reasonably and as promptly as reasonably practicable.

(ii)      Buyers and Sellers shall have joint decision making authority with respect to the appropriate course of action with respect to, and shall cooperate with each other in connection with, obtaining the consents, approvals, permits, waiting period expirations or authorizations of any insurer, investor, Mortgage Agency or applicable Governmental Authority required to consummate the transactions contemplated by this Agreement, in each case, for the avoidance of doubt, other than in respect of Antitrust Laws (which shall be governed by clause (i) above).  No Party or its counsel shall independently participate in any substantive call or meeting with any insurer, investor, Mortgage Agency or Governmental Authority in connection with obtaining any approvals required to consummate the transactions contemplated by this Agreement, and each Party shall provide the other Parties with the opportunity to attend and/or participate in any meetings with such insurer, investor, Mortgage Agency or Governmental Authority, as the case may be. In furtherance of the foregoing and to the extent permitted by applicable Law, (A) each Party shall notify the others, as far in advance as practicable, of any filing or material or substantive written communication or inquiry it or any of its Subsidiaries intends to make with any insurer, investor, Mortgage Agency or applicable Governmental Authority relating to the matters that are the subject of this <u>Section 6.3</u> other than in

respect of matters related to Antitrust Laws (which shall be governed by clause (i) above) and (B) each Party shall consult with the other Parties in connection with any inquiry, hearing, investigation or litigation by, or negotiations with, any insurer, investor, Mortgage Agency or applicable Governmental Authority relating to the transactions contemplated by this Agreement, including the scheduling of, and strategic planning for, any meetings with such persons relating thereto.

Notwithstanding the foregoing, materials provided pursuant to this Section 6.3 may be reasonably redacted (A) to remove references concerning the valuation of the Company and the transactions contemplated by this Agreement, (B) as necessary to comply with contractual arrangements, (C) as necessary to address reasonable privilege concerns or (D) as otherwise required by Law.

### Section 6.4     Bankruptcy Court Matters.

(a)     Approval of Break-Up Fee and Expense Reimbursement.

(i)     In the event that this Agreement is terminated pursuant to Section 9.1(b)(iii), Section 9.1(c)(i)(A), Section 9.1(c)(iii)(A) or Section 9.1(c)(v), in consideration for Buyers having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers shall, immediately upon termination of this Agreement, in accordance with the terms hereof and subject to advance Bankruptcy Court approval in accordance with the Bidding Procedures Order, pay or cause to be paid to Buyers to an account designated by a Buyer in writing (i) the amount of the reasonable and documented expenses of Buyers and Buyers' Affiliates incurred in connection with their investigation (including due diligence), preparation, negotiation and attempted consummation of the transactions contemplated by this Agreement (including performance of the obligations hereunder), up to an aggregate amount of four million dollars ($4,000,000) or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option pursuant to Section 7.10, four million two hundred fifty thousand dollars ($4,250,000) (the "Expense Reimbursement"), *plus* (ii) an initial break-up fee in an amount equal to four million dollars ($4,000,000) or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option pursuant to Section 7.10, five million two hundred fifty thousand dollars ($5,250,000) (the "Initial Break-Up Fee").  In addition, in accordance with the terms hereof (including Article IX) and subject to advance Bankruptcy Court approval in accordance with the Bidding Procedures Order, Sellers shall, upon termination of this Agreement pursuant to the sections set forth above, deliver to the Escrow Agent an amount equal to eight million five hundred thousand dollars ($8,500,000) or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option pursuant to Section 7.10, nine million seven hundred fifty thousand dollars ($9,750,000) (the "Remaining Break-Up Fee" and with the Initial Break-Up Fee, the "Break-Up Fee" and, together with the Expense Reimbursement, the "Termination Payment") to be held in escrow in the Break-Up Fee Escrow Account pursuant to the Escrow Agreement, which amount shall be disbursed to Buyers upon consummation of an Alternative Transaction only if Sellers consummate an Alternative Transaction within twelve (12) months of the date hereof (the "Tail Period");

provided, however, that if consummation of an Alternative Transaction does not occur within the Tail Period, the Remaining Break-Up Fee shall be disbursed to Sellers.

(ii)     In the event that Buyers terminate this Agreement pursuant to Section 9.1(c)(i)(B), in consideration for Buyers having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers shall, immediately upon termination of this Agreement, in accordance with the terms hereof (including Article IX) and subject to advance Bankruptcy Court approval in accordance with the Bidding Procedures Order, pay or cause to be paid to Buyers, to an account designated by a Buyer in writing, the Expense Reimbursement; provided, that if Sellers consummate an Alternative Transaction within the Tail Period, Sellers shall pay or cause to be paid to Buyers the Break-Up Fee.

(iii)     The Termination Payment (or any portion thereof, as applicable) shall be payable as set forth in Section 9.2(b).  Nothing in this Section 6.4 shall relieve Buyers or Sellers of any Liability for a breach of this Agreement prior to the date of termination; provided, that absent Willful Breach, Sellers' Liability under this Agreement for any and all such breaches shall be capped at an amount equal to the Termination Payment.  Upon payment to Buyers of the Termination Payment, or any applicable portion thereof to which Buyers are entitled to receive in accordance with the terms of this Section 6.4, Sellers and their respective Representatives and Affiliates, on the one hand, and Buyers and their Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and, absent Willful Breach, neither Sellers, their Representatives or Affiliates, on the one hand, nor Buyers, their Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses. Without limiting the foregoing or Section 10.11, Buyers acknowledge and agree that, absent Willful Breach, termination of this Agreement in accordance with the applicable provisions of Article IX and payment and delivery of the Termination Payment (if any) in accordance with this Section 6.4 will be the sole and exclusive remedy of Buyers, and their Representatives and Affiliates, whether at Law or in equity, with respect to any termination of this Agreement or any breach hereof, and upon the payment and delivery of the Termination Payment (if any) in accordance with this Section 6.4 (which will constitute liquidated damages) to Buyers, Buyers and their Representatives and Affiliates will be deemed to have fully released and discharged Sellers and their respective Representatives and Affiliates from any Liabilities resulting from the termination of this Agreement or any breach hereof. The obligations of Sellers to pay the Initial Break-Up Fee, the Remaining Break-Up Fee and/or Expense Reimbursement (A) shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and under an order to that effect issued by the Bankruptcy Court and (B) shall survive the termination of this Agreement.

(b)     Competing Bid.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of Alternative Transactions.  Until the date of the entry of the Confirmation Order, Sellers are permitted to and permitted to cause their Representatives and

65

Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyers and their Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets. From the date of approval of the Termination Payment (and at any prior time) and until the transactions contemplated hereby are consummated, Sellers are permitted to and permitted to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyers and their Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets. In addition, Sellers shall have the authority to respond to any inquiries or offers to purchase all or any part of the Acquired Assets (whether in combination with other assets of Sellers or their Affiliates or otherwise) and perform any and all other acts related thereto.

(c)    <u>Bankruptcy Court Filings</u>.

(i)    Within one (1) day following the execution and delivery of this Agreement, in accordance with the Bidding Procedures Order, Sellers shall: (a) designate Buyers as Stalking Horse Bidder and file with the Bankruptcy Court a Notice of Stalking Horse Bidder (as defined in the Bidding Procedures Order) setting forth the material terms of this Agreement, including the Termination Payment; <u>provided</u>, that certain confidential information may be filed under seal at the reasonable request of any Party and approval of the Bankruptcy Court; (b) in consultation with Buyers, use their reasonable best efforts to respond to and timely resolve all objections related to the entry or approval of Buyers as Stalking Horse Bidder and Confirmation Order. Buyers agree that they promptly will take such actions as are reasonably requested by Sellers to assist in obtaining approval of this Agreement, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court. In the event approval of the Buyers as Stalking Horse Bidder in accordance with this Agreement or the Confirmation Order shall be appealed, Sellers and Buyers shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    Sellers and Buyers acknowledge that this Agreement and the transactions contemplated by this Agreement are subject to entry and approval of, as applicable, the Termination Payment and the Confirmation Order. In the event of any discrepancy between this Agreement, the Bidding Procedures Order, and the Confirmation Order, the Confirmation Order shall govern.

(iii)    Buyers agree that they will take actions that are reasonably requested by Sellers to assist in obtaining entry of the Confirmation Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyers under this Agreement. Buyers shall not, without the prior written consent of Sellers (which shall not be unreasonably withheld), file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder, unless Sellers have taken action inconsistent with this Agreement. In the event the entry of the Confirmation Order shall be appealed in relation to this Agreement, Sellers and Buyers shall use their respective commercially reasonable efforts to defend such appeal.

(iv)     From and after the date hereof, Sellers will, and will cause their Affiliates to, provide reasonable prior notice (in no event less than two (2) Business Days) before filing any materials with the Bankruptcy Court that relate in any material respect to this Agreement, the transactions contemplated herein, Buyers, Buyers' Affiliates, the Bidding Procedures Order or the Confirmation Order, and shall consult in good faith with Buyers regarding the content of such materials and whether portions of such materials should be redacted prior to any such filing and consider in good faith Buyers' reasonable comments.  Sellers will, and will cause their Affiliates to (a) provide reasonable notice to Buyers with respect to the filing and prosecution of any plan in the Bankruptcy Cases and (b) use reasonable best efforts to ensure that any such plan shall be in form and substance reasonably acceptable to Buyers as it relates to this Agreement and the transactions contemplated hereby (including the estate release and provisions providing for the sale free and clear of liabilities to the maximum extent permitted by the Bankruptcy Code). Sellers and Sellers' Affiliates shall not file with the Bankruptcy Court (except under seal) or otherwise make public any unredacted documents provided by Buyers without the prior written consent of the Buyers (which shall not be unreasonably withheld).

(d)     Back-Up Bidder.  Sellers and Buyers agree that, in the event that Buyers are not the successful bidders at the Auction (such prevailing party, the "Prevailing Bidder"), if and only if (i) Buyers submit the second highest or best bid at the Auction for the Acquired Assets or the terms of this Agreement constitute the second highest or best bid for the Acquired Assets at the Auction, Buyers shall be required to serve as back-up bidder and shall receive notice thereof within five (5) days of the Auction (the "Back-Up Bidder"), and (ii) Sellers give written notice to Buyers on or before the Back-Up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyers shall consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyers at the Auction.  Buyers shall not be required to serve as the Back-Up Bidder beyond the Back-Up Termination Date as such date may be extended pursuant to the terms of this Agreement.

(e)     Discharge of Liabilities.  Prior to the Closing, Sellers shall use reasonable best efforts to obtain an order of the Bankruptcy Court that provides for the discharge of all Liabilities (including all Liabilities relating to the Consumer Claims) of the Business, the Company, Mortgage Asset Systems and REO Management Solutions other than the Assumed Liabilities, in each case to the maximum extent permitted by the Bankruptcy Code.

**Section 6.5     Notices and Consents**.

(a)     Prior to the Closing, Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts, to the extent reasonably practicable, to cooperate with each other Party, to obtain any third party consents or sublicenses reasonably requested by Buyers, in connection with the matters referred to in Section 6.5(a) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated by this Agreement; provided, however, that (i) Sellers shall conduct all correspondence and negotiations with third parties regarding any such

67

matters, (ii) none of Parent, the Company or any Subsidiary of Parent or the Company, or Buyers, shall be required to pay any consideration therefor or incur any expenses in connection therewith and (iii) Sellers shall not be obligated to initiate any Litigation to obtain such consent or approval; provided, that there shall be no adjustment to the Purchase Price on account of the exclusion of any Acquired Asset as a result of not obtaining any such consent.

(b)      Without limiting Section 6.3, each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities as are necessary and appropriate to consummate the transactions contemplated by this Agreement.

Section 6.6      **Notice of Developments**.  Each Seller and each Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge, that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated by this Agreement set forth in Article VIII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 6.6 shall not be deemed to amend or supplement this Agreement and the failure to deliver such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party. Sellers shall provide Buyers (i) any notices of default to given to or received from, or any exercise on collateral granted to, the agent or any lender under a debtor in possession credit agreement approved in the Bankruptcy Cases and (ii) all material reports, notices or documents promptly following delivery of the same to the agent under such facility.

Section 6.7      **Access; No Contact**.  Upon the reasonable request of Buyers, Sellers will permit Buyers and their Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; provided, however, that, for the avoidance of doubt, the foregoing shall not require any Person to (a) waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto, (b) take any action that would conflict with confidentiality obligations to which any Seller is bound or (c) take any action that involves any sampling or analysis of soil, groundwater, building materials or other environmental media, including such investigations of the sort generally referred to as a Phase II environmental assessment, without the prior written consent of Sellers.  Prior to the Closing, Buyers shall not, and shall direct and use their reasonable best efforts to cause their Representatives not to, contact employees, vendors, suppliers, landlords, or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement without the prior written consent of Sellers; provided, however, that prior to the Closing, each Seller shall use its commercially reasonable efforts to facilitate contact and communication between Buyers and such Seller's employees, vendors, suppliers, landlords, and licensors at Buyers' reasonable request and assist Buyers with any such contact or communication.

Section 6.8      **Bulk Transfer Laws**.  Buyers acknowledge that Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws of any jurisdiction in

connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

**Section 6.9    Replacement Bonding Requirements**.    Section 6.9 of the Disclosure Schedule sets forth the material Bonding Requirements in existence on the date of this Agreement.  On or prior to the Closing Date, Buyers shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Buyers and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyers and Sellers with respect to all Bonding Requirements.  To the extent Buyers are unable to make such arrangements with respect to any Bonding Requirements prior to the Closing, with Sellers' consent in lieu thereof, Buyers shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Parent in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Parent.

## ARTICLE VII
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

**Section 7.1    Further Assurances**.

(a)    In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including (i) the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, and providing materials and information as the other Party may reasonably request to the extent reasonably necessary to transfer, convey or assign to Buyers all of the Acquired Assets or the Company Purchased Shares or to confirm Buyers' assumption of the Assumed Liabilities, (ii) transferring to Parent or its designated Affiliates any asset or Liability contemplated by this Agreement to be an Excluded Asset or Excluded Liability, respectively, that was inadvertently transferred to Buyers and (iii) transferring to Buyers or their designated Affiliates (and having Buyers and their Affiliates assume) any asset or Liability contemplated by this Agreement to be an Acquired Asset or Assumed Liability which was inadvertently transferred to or assumed by Parent or one of its Affiliates (other than the Company, Mortgage Asset Systems or REO Management Systems)).

(b)    If Parent receives any payment related to any Acquired Assets after the Closing, Parent agrees to promptly remit (or cause to be promptly remitted) such funds to Buyers to the extent related to such Acquired Asset, and Buyers shall reimburse Parent for their reasonable expenses incurred in connection therewith.  If Buyers or any Affiliate of Buyers receive any payment related to any Excluded Asset after the Closing, Buyers agree to promptly remit (or cause to be promptly remitted) such funds to Parent to the extent related to such Excluded Asset, and Parent shall reimburse Buyers for their reasonable expenses incurred in connection therewith.

(c)     For the avoidance of doubt, the Parties acknowledge and agree that, except as otherwise set forth in this Agreement, (i) Ditech, Parent and the Excluded Entities shall not have any Liability with respect to the ownership, operation or use by Buyers of the Acquired Assets from and after the Closing, including related to Buyers' or their Affiliates' application for, or receipt of, any approvals of any Governmental Authority or Mortgage Agency and (ii) Buyers shall not have any Liability with respect to the Excluded Assets or Excluded Liabilities. Notwithstanding the foregoing, or anything to the contrary set forth in this Agreement, the Parties acknowledge that (A) to the extent, prior to the Closing, the Consumer Claims or any other alleged claims against the Company, REO Management Solutions or Mortgage Asset Systems are not discharged under the Plan and Confirmation Order, the Company, REO Management Solutions or Mortgage Asset Systems, as applicable, shall remain subject to such Consumer Claims or such other alleged claims following the Closing and (B) under no circumstances and in no event shall a Buyer or any of its Affiliates seek, attempt to seek or directly induce or encourage anyone else to seek, recourse against Parent or any of its Affiliates for Consumer Claims relating to the Business following the Closing.

Section 7.2     Access; Enforcement; Record Retention.   From and after the Closing until the fifth (5th) anniversary of the Closing Date, upon any reasonable request by a Party or its Representatives, each Party will permit the other Party or its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the Party granting such access, to all premises, properties, personnel, books and records, and Contracts of the Party granting such access, in each case to the extent related to the Business, the RMS Entities, the Purchased Shares, the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of the Parties under this Agreement or any of the Related Agreements, (c) any other legitimate business purpose or (d) complying with the requirements of any Governmental Authority; provided, however, that, for the avoidance of doubt, the foregoing shall not require any Party to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be likely to result in violation of applicable Law, or (iii) providing such access or information would be reasonably likely to be disruptive to its normal business operations. Buyers agree to maintain the files or records which are contemplated by the first sentence of this Section 7.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for five (5) years following the Closing (such period of time, the "Access Period"). If Parent provides Buyers with written notice within ninety (90) days prior to the expiration of the Access Period, Parent shall have the right prior to the expiration of the Access Period, at its option and expense, to take possession of any such files or records that Buyers wish to destroy following the expiration of the Access Period.

Section 7.3     Employee Matters.

(a)     Employment of All Covered Employees.   Effective as of the Closing Date, (i) each Company Employee set forth on Section 7.3(a) of the Disclosure Schedule (which schedule shall collectively constitute more than 67.4% of full-time Company Employees as of the Closing Date) shall become an employee of Buyers or an Affiliate of Buyers (including the Company) (the "Initial List")  as a matter of Law and (ii) each Parent Group Employee set forth on Section 7.3(a) of the Disclosure Schedule shall be provided with a written offer of

employment by Buyers or an Affiliate of Buyers on terms consistent with <u>Section 7.3(c)</u> no later than twenty (20) days prior to the Closing Date; <u>provided</u>, that any Severance Expenses in excess of $1,700,000 incurred and paid by a Seller, a RMS Entity or any of their respective Affiliates as a result of a Company Employee or a Parent Group Employee not being offered employment by Buyers, shall be borne by Buyers, subject to a full release of claims in favor of Buyers and their affiliates in a form reasonably satisfactory to Buyers. For purposes of the preceding sentence "<u>Severance Expenses</u>" shall mean the actual cash cost of severance upon a termination of employment on the Closing Date for any such Company Employee or Parent Group Employee in the amount set forth for such employee on <u>Section 7.3(a)</u> of the Disclosure Schedule, for each such individual. For purposes of this <u>Section 7.3</u>, any individual who becomes employed by Buyers, or an Affiliate of Buyers, in accordance with this <u>Section 7.3(a)</u> is referred to as a "<u>Transferred Employee</u>." It is acknowledged and agreed that Buyers can update <u>Section 7.3(a)</u> of the Disclosure Schedule until July 30, 2019; <u>provided</u>, that the Company Employees set forth on <u>Section 7.3(a)</u> of the Disclosure Schedule shall at all times constitute more than 67.4% of full-time Company Employees as of the Closing Date, and it is further acknowledged and agreed that any Company Employees that were on the Initial List and are not on the updated <u>Section 7.3(a)</u> of the Disclosure Schedule shall not become Transferred Employees and Sellers or an Affiliate of a Seller shall either terminate the employment of such individuals prior to the Closing, or ensure that such individuals are employed by Parent or one of its Affiliates, other than the Company, Mortgage Asset Systems or REO Management Solutions. Buyers and Sellers agree to cooperate together in good faith in order to eliminate any potential WARN liability. Buyers acknowledge and agree that, from the Closing until the date that is the ninety-first (91st) day following the Closing, neither Buyers nor any of their Affiliates shall terminate any Transferred Employee other than for cause.

(b)    <u>Employees and Benefit Plans</u>.

(i)    <u>Liabilities</u>.  Effective as of the Closing, Buyers shall, or shall cause one of their Affiliates to, assume or retain, as the case may be, any and all Liabilities relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Transferred Employee, to the extent such Liabilities arise from and after the Closing including, for purposes of clarity, any Liabilities related to any Assumed Benefit Plans as provided in <u>Section 7.3(b)(ii)</u>. Parent or its applicable Subsidiary shall retain as Excluded Liabilities any and all Liabilities relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of (x) any Company Employee or Parent Group Employee who is a Transferred Employee to the extent such Liabilities arise prior to the Closing and (y) any Parent Group Employee who is not a Transferred Employee.

(ii)    <u>Benefit Plans</u>.  Effective as of the Closing, Parent or the applicable member of the Parent Group shall terminate the participation of each Transferred Employee and such Transferred Employee's eligible dependents in each Parent Benefit Plan, other than (A) any Parent Benefit Plan listed on <u>Section 7.3(b)(ii)</u> of the Disclosure Schedule that will be assumed by Buyers or an Affiliate of Buyers and (B) any Company Benefit Plan that will automatically be transferred to or continued by Buyers or an Affiliate of Buyers (including the Company) as a matter of Law (each of (A) and (B), an

71

"Assumed Benefit Plan"). All Assumed Benefit Plans are listed on <u>Section 7.3(b)(ii)</u> of the Disclosure Schedule.

    (c)    <u>Transferred Employees – Additional Employment Terms</u>.

    (i)    <u>Terms and Conditions of Employment</u>.  For a period of twelve (12) months following the Closing Date, each Transferred Employee shall be entitled to receive or continue to receive, while in the employ of Buyers or an Affiliate of Buyers, (A) at least the same base salary or wages, as applicable, and target cash incentive opportunity with respect to such Transferred Employee as in effect immediately prior to the Closing and (B) employee benefits (subject to <u>Section 7.3(d)</u>) that are substantially comparable in the aggregate to those provided to similarly situated employees of Buyers and their Affiliates (in each case excluding any defined benefit pension, retiree medical, equity or equity based compensation, and change of control or retention compensation).

    (ii)    <u>Credit for Service</u>.  Buyers shall, and shall cause their Affiliates to, credit Transferred Employees for service earned on and prior to the Closing Date with the Parent Group or Company, as applicable, (A) to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or the calculation of benefits under any employee benefit plan, program or arrangement of Buyers or any of their Affiliates (including the Assumed Benefit Plans) for the benefit of the Transferred Employees on or after the Closing Date to the same extent and for the same purpose as such service was credited to such Transferred Employee under the applicable Parent Benefit Plan or Company Benefit Plan as of the Closing and (B) for such additional purposes as may be required by applicable Law; <u>provided</u>, <u>however</u>, that nothing herein shall result in a duplication of benefits with respect to the Transferred Employees.

    (iii)    <u>Pre-existing Conditions; Coordination</u>.  Buyers shall, and shall cause their Affiliates to, use commercially reasonable efforts to waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Transferred Employees and their eligible spouses and dependents under any group health plan of Buyers or any of their Affiliates for the benefit of the Transferred Employees on or after the Closing Date to the same extent waived for such person under the corresponding Parent Benefit Plan or Company Benefit Plan as of the Closing Date. Buyers shall, and shall cause their Affiliates to, use commercially reasonable efforts to credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Transferred Employees, deductibles, co-insurance, co-pays and out-of-pocket expenses paid by Transferred Employees and their respective spouses and dependents under Parent Group health plans in the calendar year in which the Closing Date occurs.

    (d)    <u>Severance Benefits</u>.  With respect to any Transferred Employee who is terminated by Buyers or their Affiliates prior to the first anniversary of the Closing Date, Buyers or an Affiliate of Buyers shall provide severance pay and benefits as set forth on <u>Section 7.3(d)</u> of the Disclosure Schedule; subject to the terms and conditions set forth on <u>Section 7.3(d)</u> of the

72

Disclosure Schedule including, the execution of a release of claims and compliance with post-employment restrictive covenants to the extent applicable.

(e)     401(k) Plan.  Each Transferred Employee shall be eligible to participate in a defined contribution plan sponsored by Buyers or an affiliate of a Buyer that is intended to be qualified under Section 401(a) of the IRC (a "Buyer 401(k) Plan").  Effective as of the Closing, Sellers shall cause the account balances (including any outstanding loan balances) in the tax-qualified defined contribution plan maintained by the Parent Group (the "Parent 401(k) Plan") that are attributable to the Transferred Employees who were participants in the Parent 401(k) Plan immediately prior to Closing to be fully vested (and Seller shall make any required Company match to such Transferred Employees to be fully vested) and such Transferred Employees shall be entitled to effect a direct rollover of any eligible rollover distributions (as defined in Section 402(c)(4) of the IRC), including any outstanding loans, to the Buyer 401(k) Plan.

(f)     Flexible Spending Accounts.  Effective as of the Closing Date, Sellers shall transfer, or cause to be transferred, to Buyers an amount, in cash, representing the aggregate 2019 contributions of each Transferred Employee then participating in a Parent Benefit Plan that is flexible benefits plan (the "Parent Flexible Benefits Plan"), net of reimbursements (but not less than zero).  Buyers shall cause such amounts to be credited to each such employee's accounts under Buyers' (or one of its Affiliate's) corresponding health care spending account plan (the "Buyer Flexible Benefits Plan") in effect for such employees as of the Closing Date, and all claims for reimbursement which have not been paid as of the date of the transfer to Buyers and credited under the Buyer Flexible Benefits Plan shall be paid pursuant to and under the terms of the Buyer Flexible Benefits Plan.  In connection with such transfer, Buyers shall deem that such employees' deferral elections made under the Parent Flexible Benefits Plan for the 2019 calendar year shall continue in effect under the Buyer Flexible Benefits Plan for the remainder of the 2019 calendar year following the Closing Date.

(g)     Accrued Vacation and Sick Leave.  Effective as of the Closing, to the extent consented to by the applicable Transferred Employee or otherwise permitted by applicable Law, Buyers shall, and shall cause their applicable Affiliates (including the Company) to, recognize, assume the Liability with respect to, and honor each Transferred Employee's vacation, paid time off and sick leave (including personal leave) accrued but unused through the Closing Date to the extent reflected on the Final Statement (as assumed by Buyers and their applicable Affiliates, the "Assumed PTO").  Transferred Employees shall be permitted to use their Assumed PTO in a manner consistent with Buyers' policies applicable to similarly situated employees of Buyers and to accrue additional vacation and other paid-time-off in accordance with Buyers' policies and procedures, as in effect from time to time.  Buyers and their Affiliates shall recognize the Transferred Employees' service with Sellers and their Affiliates (including the RMS Entities) (and their predecessors) prior to the Closing for the purposes of accruals and usage of vacation and paid-time-off following the Closing. Buyers shall reimburse Parent for any portion of the Assumed PTO that is forfeited by any Transferred Employee prior to January 1, 2020 by no later than January 30, 2020.

(h)     Accrued Bonuses.  Buyers shall assume and pay to the Transferred Employees any accrued bonuses under Parent Group or Company bonus plans for the portion of

73

the applicable bonus period through the Closing Date and any bonus amounts set forth on Section 7.3(h) of the Disclosure Schedule to the extent reflected on the Final Statement (the "Accrued Bonus Amount").  The Accrued Bonus Amount shall be paid to the applicable Transferred Employee at such time as such bonuses are traditionally paid under such plan, in accordance with the terms and conditions of such plan and such terms and the timing is set forth on Section 7.3(h) of the Disclosure Schedule. Buyers shall reimburse Parent for any portion of the Accrued Bonus Amount that is not paid to any Transferred Employee within ten (10) Business Days of the date that the Accrued Bonus Amount is paid to Transferred Employees.

(i)      W-2 Matters.  Pursuant to IRS Revenue Procedure 2004-53, the Company and Buyers shall apply the "alternative" method for purposes of employee payroll reporting with respect to Transferred Employees.

(j)      No Third Party Beneficiaries.   Notwithstanding the provisions of this Section 7.3, nothing in this Section 7.3 is intended to and shall not (i) create any third party rights, (ii) amend any Benefit Plan or other employee benefit plan, program, policy or arrangement, (iii) require Buyers or any of its Affiliates or Sellers or any of their Affiliates to continue any employee benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified or as otherwise required herein or (iv) provide any Covered Employee or any Transferred Employee with any rights to continued employment or alter such Covered Employee or Transferred Employee's at-will status.

### Section 7.4   Certain Tax Matters.

(a)      Transfer Taxes.  Any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other similar Taxes ("Transfer Taxes") imposed under applicable Law in connection with the transactions contemplated by this Agreement, including the transfer of any Excluded Assets to  Parent, shall be borne fifty percent (50%) by Buyers, on the one hand, and fifty percent (50%) by Sellers, on the other hand. The Party primarily responsible as a matter of Law for filing any Tax Returns with respect to Transfer Taxes shall, at its expense, timely prepare and file such Tax Returns and other documents required to be filed with respect to such Transfer Taxes, and the other Party shall promptly reimburse such Party for fifty percent (50%) of the amount of such Transfer Taxes actually paid by such Party (including any additional Transfer Taxes resulting from such reimbursement). Each of Parent and Buyers shall, upon the other party's reasonable request and at such requesting party's sole expense, provide such requesting party with any non-confidential documentation in its possession (as reasonably determined by the providing party) in connection with such requesting party's claim of exemption from any Transfer Taxes. The non-filing Party shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the other Party, but not less than ten (10) Business Days prior to the due date of such Tax Returns (to the extent reasonably practicable), and such Tax Returns and other documentation shall be subject to the other Party's approval, which shall not be unreasonably withheld, delayed, or conditioned. The Parties shall cooperate to permit the filing party to prepare and timely file any such Tax Returns.

(b)      Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes, personal property Taxes and similar Taxes) for the Tax period in which the Closing occurs (the "Proration Period")

74

will be apportioned and prorated between Parent and Buyers as of the Closing Date with Buyers bearing the expense of Buyers' proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Parent shall bear the remaining portion of such Taxes. If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period.

Section 7.5   **Insurance Matters**.   Buyers acknowledge that, upon Closing, all insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyers, the Company and the Acquired Assets and no further coverage shall be available to Buyers, the Company or the Acquired Assets under any such policies.

Section 7.6   **Acknowledgements**.

(a)   Buyers acknowledges that Buyers have received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyers acknowledge that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyers are familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; (iii) Buyers have not relied upon, and to the Knowledge of Buyers, none of its Representatives have relied upon, such projections, forecasts and information, and (iv) neither Buyers nor any other Person shall have any claim against any Seller or any of their Affiliates or any of their respective directors, officers, employees, stockholders, members, managers, partners, Affiliates, agents, or other Representatives with respect thereto. Accordingly, without limiting the generality of <u>Section 4.18</u> or <u>Section 10.1</u>, Buyers acknowledge that none of Sellers nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)   Buyers acknowledge that, except for the representations and warranties expressly set forth in <u>Article III</u> and <u>Article IV</u>, as modified by the Disclosure Schedule (which representations and warranties shall terminate and be of no further force or effect as of the Closing), or expressly contained in any Related Agreement, and without limiting the generality of <u>Section 4.18</u>, (i) none of Sellers nor any other Person has made, or shall be deemed to have made, and none of Buyers or their Representatives is relying on, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any of Sellers, any Acquired Assets, any Assumed Liabilities or any other matter, and no Seller nor any other Person will be subject to any Liability to Buyers or any other Person resulting from such matters or the distribution to Buyers, or the use of, any such information and (ii) SHOULD THE CLOSING OCCUR, BUYERS WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL,

HEALTH OR SAFETY MATTERS).  Further, without limiting any representation, warranty, or covenant of any Seller expressly set forth herein, Buyers acknowledges that they have waived and hereby waive, as a condition to the Closing, any further due diligence reviews, inspections, or examinations with respect to any Seller, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

(c)     Sellers acknowledge that, except for the representations and warranties expressly set forth in Article V (which representations and warranties shall terminate and be of no further force or effect as of the Closing), or expressly contained in any Related Agreement, and without limiting the generality of Section 5.9,  none of Buyers nor any other Person has made, or shall be deemed to have made, and none of Sellers or their Representatives is relying on, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding Buyers or any other matter, and none of Buyers nor any other Person will be subject to any Liability to Sellers or any other Person resulting from such matters or the distribution to Buyers, or the use of, any such information.

**Section 7.7     Press Releases and Public Announcements**.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court (including a direction given by the Bankruptcy Court or the Bidding Procedures Order).  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties reasonable prior notice of, and an opportunity to comment on, the proposed disclosure, which shall be acceptable to the nondisclosing Parties (whose acceptance shall not be unreasonably withheld, conditioned or delayed except that Buyers may choose to withhold, condition or delay their consent for any reason (in their sole discretion) with respect to any disclosure (i) identifying the name of any Affiliate of Buyers or (ii) identifying the Purchase Price in a form or substance that is inconsistent with the Illustrative Purchase Price Calculation, in each case except as required by the Bankruptcy Court or applicable Law). Subject to the restrictions set forth in the immediately preceding sentence, the nondisclosing Party shall be deemed to have consented to any announcement or other disclosure that is substantially similar to a prior disclosure previously agreed by the nondisclosing Party.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with the Notice of Stalking Horse Bidder (and to the extent that any such other filings are required pursuant to any listing exchange or other applicable Law).

**Section 7.8     Transferred     Contracts;     Executory     Contracts;     Other Agreements**.

(a)     Until two (2) Business Days prior to the Confirmation Hearing, Sellers shall use their commercially reasonable efforts (at Buyers' expense) to renegotiate the Lease.  If Sellers renegotiate the Lease to contain provisions and terms acceptable in form and substance to Buyers in their sole discretion prior to two (2) Business Days prior to the commencement of the Confirmation Hearing, the Lease shall be considered a Transferred Contract under this Agreement and Buyers and Sellers shall amend Section 1.1 of the Disclosure Schedule prior to

Closing to reflect the inclusion of the Lease under the heading "Transferred Contracts"; provided that there shall be no adjustment to the Purchase Price on account of the inclusion of the Lease as a Transferred Contract.

(b)      Until the date that is five (5) Business Days prior to the Confirmation Hearing, Buyers may (in their sole discretion) designate any transferable regulatory licenses, registrations and permits (including environmental permits) of the Company and any of the RMS Entities (such licenses, registrations and permits, "Regulatory Licenses") or Executory Contract (other than any subservicing agreements) not considered an Acquired Asset or a Transferred Contract, respectively, under this Agreement as of the date hereof to be an Acquired Asset or a Transferred Contract under this Agreement, and Buyers and Sellers shall amend Section 1.1 of the Disclosure Schedule prior to the Confirmation Hearing to reflect the inclusion of such Regulatory License or Executory Contract under the heading "Acquired Assets" or "Transferred Contracts," as applicable.  Buyers shall not assume any Cure Costs payable with respect to such Executory Contracts and all Cure Costs with respect to such Executory Contracts shall be considered "Excluded Liabilities" under this Agreement.  Until the date that is two (2) days prior to the Confirmation Hearing, Buyers may (in their sole discretion) remove any Regulatory License or Executory Contract from the list of designated contracts on Section 1.1 of the Disclosure Schedule under the heading "Acquired Assets" or "Transferred Contracts," as applicable, and Buyers and Sellers shall amend Section 1.1 of the Disclosure Schedule prior to the Confirmation Hearing to reflect the removal of such Regulatory License or Executory Contract from the list of designated Regulatory Licenses or contracts on Section 1.1 of the Disclosure Schedule under the heading "Acquired Assets" or "Transferred Contracts," as applicable.

(c)      Prior to Closing, Sellers shall use their commercially reasonable efforts (at Buyers' request and expense) to assist Buyers in negotiating (and entering into agreements with the counterparties of) any vendor agreements, master services agreements, subcontractor agreements or other agreements held by Ditech or any of its Subsidiaries other than the Company and the RMS Entities (the "Ditech Agreements") that are related to the Business and are unable to be transferred to Buyers as Transferred Contracts. Sellers shall use reasonable best efforts to provide Buyers with a list of all Ditech Agreements by June 21, 2019 (such list, the "Ditech Agreements List"). Following June 21, 2019, Sellers shall use reasonable best efforts to identify any Ditech Agreements that were not included on the Ditech Agreements List and promptly notify Buyers of the same.

Section 7.9      Other Intellectual Property Matters.  Parent and its Affiliates acknowledge that, as of the Closing, the name "Reverse Mortgage Solutions, Inc." or any similar derivation thereof, including "RMS" and all rights therein and thereto and the goodwill pertaining thereto belong exclusively to Buyer.  Promptly after the Closing (but in any event no later than thirty (30) days following the Closing), Parent and its Affiliates shall change their corporate names (including legal, registered, assumed, trade and "doing business as" names, as applicable) to names that begin with "RMS Liquidation" and shall (a) change the caption of the applicable Bankruptcy Cases to reflect such revised corporate names and (b) record evidence thereof with the applicable Secretary of State.

**Section 7.10    Purchase of Ginnie Portfolio**.  Within fifteen (15) days after the date of this Agreement, Buyers shall submit a proposal to Sellers for the purchase of the Ginnie Portfolio (such proposal, the "Ginnie Purchase Proposal").  The Ginnie Purchase Proposal shall include a revised Illustrative Purchase Price Calculation and Transaction Accounting Principles (revised solely to reflect the addition of the Ginnie Portfolio), a proposed draft of the Ginnie Purchase Agreement and other supporting documentation.  Sellers shall accept or reject the Ginnie Purchase Proposal within three (3) Business Days following Sellers' receipt of the Ginnie Purchase Proposal.  In the event that Sellers accept the Ginnie Purchase Proposal, (a) Buyers' and Sellers' shall negotiate the terms of a purchase agreement with respect to the Ginnie Portfolio in a form similar to the "Bulk Agreement for the Purchase and Sale of Servicing Rights" agreement located in the Data Room as of the date of this Agreement (the "Ginnie Purchase Agreement"), and (b) each Seller shall have the option (the "Ginnie Option"), in its sole discretion, at any time prior to forty-eight (48) hours following the later of (a) the Bankruptcy Court ruling on the Plan and (b) entry of the Confirmation Order, to require Buyers to purchase the Ginnie Portfolio at the Closing.  Upon the exercise by any Seller of the Ginnie Option, Buyers hereby agree to purchase, acquire, accept and assume from Ditech and any of its Subsidiaries, and Ditech agrees to, and to cause its Subsidiaries to, sell, transfer, assign, convey and deliver, the Ginnie Portfolio, in each case in accordance with the terms of the Ginnie Purchase Agreement and Section 2.1(a), Section 2.1(b) and Section 2.1(c) as if the assets and liabilities comprising the Ginnie Portfolio were Acquired Assets and Assumed Liabilities, respectively.  Additionally, upon the exercise by any Seller of the Ginnie Option and the entry by the Parties (or their Affiliates) into the Ginnie Purchase Agreement, the term "Acquired Assets" shall be deemed to include the Ginnie Portfolio and the Purchase Price to be paid at Closing shall be increased by the value of the Ginnie Portfolio in accordance with the Illustrative Purchase Price Calculation (as amended to reflect the addition of the Ginnie Purchase Proposal).  Within one (1) Business Day of the acceptance by Sellers of the Ginnie Purchase Proposal, Buyers shall deposit into the Deposit Escrow Account an additional five million dollars ($5,000,000) (the "Ginnie Escrow Amount").

**Section 7.11    Transition Services Agreement**.  The Parties shall work together in good faith and use their respective reasonable best efforts to agree as to the terms of, and execute, a transition services agreement pursuant to which Sellers shall provide Buyers and Buyers shall provide Sellers, as applicable, with terms and conditions substantially consistent with those set forth on Exhibit D, pursuant to which Sellers shall provide Buyers certain services for a transitional period following the Closing Date (the "Transition Services Agreement").

**Section 7.12    Interim Date Portfolio Tape**.  No later than thirty (30) days after the date of this Agreement, Sellers shall provide Buyers with the Interim Date Portfolio Tape.

**Section 7.13    Settlement of Consumer Claims**.

(a)    Sellers shall use their reasonable best efforts to pursue a settlement prior to Closing with respect to all Consumer Claims relating to the Business with the Official Committee of Consumer Creditors that is acceptable to Buyers. Sellers shall use their reasonable best efforts to include representatives of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") in settlement discussions with respect to any settlement of Consumer Claims relating to the Business prior to Closing and, to the extent practicable, to allow representatives of Paul

Weiss to participate in all substantive communications, calls, meetings or discussions with respect to any such settlements with the Official Committee of Consumer Creditors. In furtherance of the foregoing and to the extent permitted by applicable Law, each Party shall (i) cooperate with each other Party in connection with such discussions and negotiations, (ii) notify each other Party, as far in advance as practicable, of any material or substantive communications, calls, meetings or discussions regarding any settlement with the Official Committee of Consumer Creditors and (iii) provide each other Party a reasonable opportunity to review, and shall consider in good faith, the comments of the other in connection with any settlement agreement with the Official Committee of Consumer Creditors; provided, that nothing in this Section 7.13 or otherwise in this Agreement shall obligate Buyers or Sellers to effect a settlement with the Official Committee of Consumer Creditors. In performing the foregoing obligations, each Party shall act reasonably and as promptly as reasonably practicable.

(b)     Without the prior written consent of Buyers, prior to the Closing, Sellers shall not enter into any settlement with the Official Committee of Consumer Creditors with respect to Consumer Claims relating to the Business.

(c)     For any settlement with the Official Committee of Consumer Creditors effected prior to Closing in respect of any Consumer Claims relating to the Business, the Purchase Price shall be increased by the sum of (i) the amount of such settlement up to an aggregate cap of ten million dollars ($10,000,000), *plus* (ii) only in the event that Sellers settle prior to Closing all of the Consumer Claims relating to the Business, seven hundred fifty thousand dollars ($750,000).  The portion of any settlement in excess of ten million dollars ($10,000,000) shall be the sole responsibility of Buyers, and shall have no impact on the Purchase Price.

## ARTICLE VIII
## CONDITIONS TO OBLIGATION TO CLOSE

**Section 8.1     Conditions to Buyers' Obligations**.  Buyers' obligation to consummate the transactions contemplated by this Agreement in connection with the Closing is subject to the satisfaction or, to the extent permitted by applicable Law, waiver of the following conditions:

(a)     (i) each of the representations and warranties set forth in Article III and Article IV (other than as set forth in clause (ii) of this Section 8.1(a)) shall be true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) would not reasonably be likely to result in a Material Adverse Effect and (ii) each of Parent Fundamental Representations and Company Fundamental Representations shall be true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)      Sellers shall have performed and complied in all material respects with all covenants and agreements hereunder required to be performed or complied with by them prior to the Closing;

(c)      Buyers shall have received a certificate signed by an authorized officer of each Seller, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (a) and (b);

(d)      any plan filed and prosecuted by Sellers with the Bankruptcy Court in the Bankruptcy Cases (including the provisions providing for the discharge of Excluded Liabilities in accordance with this Agreement and the estate release for Buyers and provisions providing for the sale free and clear of liabilities to the maximum extent permitted by the Bankruptcy Code, including, for the avoidance of doubt, to the maximum extent permitted by the Bankruptcy Code, the discharge of any and all claims, defenses and liabilities brought or asserted by a consumer borrower on account of (i) Sellers' alleged prepetition violation of (a) The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.); (b) The Fair Credit Reporting Act (15 U.S.C. § 1681); (c) The Truth in Lending Act (12 C.F.R. § 1026); (d) The Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p); and (e) any and all state law equivalents of the foregoing (i)(a)-(d); and (ii) any other claim for fraudulent inducement of a consumer borrower to enter into a loan) shall include provisions providing for the discharge of Excluded Liabilities and all Liabilities relating to the Consumer Claims to the maximum extent permitted by the Bankruptcy Code and shall be in form and substance reasonably acceptable to Buyers as to provisions related to this Agreement and the transactions contemplated hereby; provided, that an exclusion to such "free and clear" sale for Consumer Claims shall be deemed to be acceptable to Buyers;

(e)      any Confirmation Order shall be in form and substance reasonably acceptable to Buyers as to provisions related to this Agreement and the transactions contemplated hereby; provided, that an exclusion to such "free and clear" sale for Consumer Claims shall be deemed to be acceptable to Buyers; and

(f)      each delivery contemplated by Section 2.7(b) to be delivered to Buyers shall have been delivered.

**Section 8.2      Conditions to Sellers' Obligations**.   Sellers' obligations to consummate the transactions contemplated by this Agreement in connection with the Closing are subject to the satisfaction or, to the extent permitted by applicable Law, waiver of the following conditions:

(a)      the representations and warranties set forth in Article V shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)      Buyers shall have performed and complied in all material respects with all covenants and agreements hereunder required to be performed or complied with by Buyers prior to the Closing;

(c)      Parent shall have received a certificate signed by an authorized officer of each Buyer, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (a) and (b); and

(d)      each payment and delivery contemplated by Section 2.7(a) to be made to Parent shall have been made, and each delivery contemplated by Section 2.7(a) to be delivered to Sellers shall have been delivered.

**Section 8.3      Conditions Precedent to Sellers' and Buyers' Obligations**.  The respective obligations of Buyers and Sellers to consummate the transactions contemplated by this Agreement in connection with the Closing are also subject to the satisfaction or, to the extent permitted by applicable Law, waiver of the following conditions:

(a)      the Bankruptcy Court shall have entered the Confirmation Order, and no order staying, reversing, or modifying the Confirmation Order shall be in effect on the Closing Date;

(b)      (i) each of Ginnie Mae and Fannie Mae shall have approved the transactions contemplated by this Agreement and such approval shall not have been conditioned on any limitations on the Business or Buyers other than Acceptable Liquidity Conditions and (ii) HUD shall have approved the transactions contemplated by this Agreement and such approval shall not have been conditioned on any limitations on the Business or Buyers following the Closing that would reasonably be expected to impair the economic value to Buyers of the transactions contemplated by this Agreement in any material respect; and

(c)      no Decree or Law of a Governmental Authority of competent jurisdiction shall be in effect that prohibits consummation of the transactions contemplated by this Agreement, including the transfer or assignment of the Licenses or the Company Purchased Shares to Buyer.

**Section 8.4      No Frustration of Closing Conditions**.   Neither Buyers nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated by this Agreement set forth in Section 8.1, Section 8.2 or Section 8.3, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to comply with any provision of this Agreement or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE IX
## TERMINATION

**Section 9.1      Termination of Agreement**.  This Agreement may be terminated at any time prior to the Closing as provided below:

(a)      by the mutual written consent of the Parties;

81

(b)       by any Party by giving written notice to the other Parties if:

(i)       any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 9.1(b)(i) shall not be available to Buyers or Parent, as applicable, if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyers or Parent, as applicable, to have fulfilled any of its obligations under this Agreement;

(ii)       the Closing shall not have occurred prior to the close of business on the one hundred and twentieth (120th) calendar day following the date hereof (the "Initial Outside Date"); provided, however, that if (A) the Closing shall not have occurred due the conditions to Closing set forth in Section 8.3(b) remaining unsatisfied or being unable to be lawfully waived and (B) all other conditions to the respective obligations of the Parties to close hereunder that are capable of being fulfilled by the Outside Date shall have been so fulfilled or lawfully waived, then Parent or Buyers may, in their sole discretion, extend the Initial Outside Date for two additional thirty (30)-day periods by delivery of written notice of such extension to Buyers or Parent, as applicable, no fewer than three (3) Business Days before the Initial Outside Date or the end of the first thirty (30)-day extension period, as applicable (in each case, the Initial Outside Date as extended pursuant to this Section 9.1(b)(ii), the "Outside Date"); provided, further, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyers or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 9.1(b)(ii); or

(iii)       (A) an Alternative Transaction is approved by the Bankruptcy Court other than in connection with the Auction or pursuant to a plan of reorganization that is in form and substance reasonably acceptable to Buyers; (B) if there is an Auction, Buyers are not declared the Prevailing Bidder at the Auction and Buyers are not required to serve as the Back-Up Bidder pursuant to this Agreement; or (C) if there is an Auction, Buyers are not declared the Prevailing Bidder at the Auction and Buyers are required to serve as the Back-Up Bidder pursuant to this Agreement; provided, that any termination pursuant to clause (B) or (C) shall not be effective until the consummation of the transaction with the Prevailing Bidder.

(c)       by Buyers by giving written notice to each Seller if:

(i)       (A) there has been a Willful Breach by any Seller of (w) Section 4.4(b), (x) Section 6.2(b)(A) through Section 6.2(b)(H) or Section 6.2(b)(J) through Section 6.2(b)(M) or (y) Section 7.13(b) or (B) there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement, which would result in a failure of a condition to the obligations of Buyers set forth in Section 8.1(a) or Section 8.1(b) to be satisfied, and, in the case of each of clauses

82

(A) and (B), such breach, if curable, has not been cured by such Seller prior to the earlier to occur of (1) ten (10) Business Days after receipt of Buyers' notice of such breach and (2) the Outside Date;

(ii)     one or more of the Bankruptcy Cases is converted to cases under chapter 7 of the Bankruptcy Code, one or more of the Bankruptcy Cases is dismissed, or a trustee or examiner with powers to operate any Seller in the Bankruptcy Cases is appointed;

(iii)     if (A) Sellers do not hold an Auction as provided in the Bidding Procedures Order (unless (x) the Auction is cancelled because Buyers are the Prevailing Bidder or no competing bid has been submitted or (y) the Auction is adjourned or postponed in accordance with the Bidding Procedures Order); (B) the designation of the Buyers as Stalking Horse Bidder pursuant to the terms of this Agreement and the Termination Payment contemplated in this Agreement have not been approved by the Bankruptcy Court on or prior to June 30, 2019; or (C) Sellers withdraw or seek to withdraw a notice or motion to approve the Termination Payment and do not cure within two (2) Business Days;

(iv)     if (A) the Confirmation Order is not entered on or prior to August 15, 2019, or (B) following its entry, the Confirmation Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of a Buyer; or

(v)     if Sellers announce or file a chapter 11 plan: (1) exclusively contemplating the reorganization or sale of all or any part of Sellers inconsistent with this Agreement or the transactions contemplated hereby or (2) that does not transfer to Buyers free and clear of any curtailment and any similar liabilities to the maximum extent permitted by the Bankruptcy Code and provide an estate release for Buyers; provided, that an exclusion to such discharge for Consumer Claims shall not give rise to a right to termination by Buyers hereunder.

(d)     by any Seller by giving written notice to Buyers and the other Seller if:

(i)     there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in this Agreement which would result in a failure of a condition to the obligations of Sellers set forth in Section 8.2(a) or Section 8.2(b), and such breach, if curable, has not been cured by Buyers prior to the earlier to occur of (A) ten (10) Business Days after receipt of such Seller's notice of such breach and (B) the Outside Date;

(ii)     (A) all of the conditions set forth in Section 8.1 and Section 8.3 have been satisfied or waived (other than those conditions which by their terms cannot be satisfied until the Closing, but which conditions at the time of termination shall be capable of being satisfied), (B) the Company has confirmed in writing to Buyers that it is ready, willing and able to consummate the transactions contemplated by this Agreement, and (C) Buyers fail to consummate the transactions contemplated hereby within three (3)

Business Days following the date on which the Closing should have occurred pursuant to Section 2.6; or

(iii)     any of Ginnie Mae, Fannie Mae or HUD notifies Buyers or Sellers in writing that it has made a final determination that it will not approve the transactions contemplated by this Agreement in a manner that satisfies the condition to Closing described in Section 8.3(b); provided, that such termination right may only be exercised on or after the third (3rd) Business Day following the receipt of such notice and the delivery of a copy of such notice to the non-receiving Parties.

**Section 9.2      Effect of Termination**.

(a)     If any Party terminates this Agreement pursuant to Section 9.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 4.18, Section 7.7, Article X (solely with respect to the other covenants and agreements hereunder that expressly survive such termination), and this Section 9.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 6.4) to the other Parties hereunder; provided, however, that nothing in this Section 9.2 shall relieve any Party from Liability for any breach of this Agreement occurring prior to any such termination (but solely to the extent such breach constituted a Willful Breach); provided, further, that, other than as provided in Section 6.4 or this Section 9.2, notwithstanding anything to the contrary contained in this Agreement (but subject to the right of any Party to seek specific performance pursuant to Section 10.11), and absent Willful Breach, (i) the maximum Liability of Sellers under this Agreement (including for any and all such breaches or if this Agreement is terminated by a Buyer pursuant to Section 9.1) shall not exceed an aggregate amount equal to the Termination Payment and (ii) the maximum Liability of Buyers under this Agreement (including for any and all such breaches or if this Agreement is terminated by a Seller pursuant to Section 9.1) shall not exceed an aggregate amount equal to the Deposit Escrow Amount.  In no event shall any Party have any liability for consequential, special, incidental, indirect, or punitive damages, lost profits, or similar Liabilities.

(b)     If this Agreement is terminated pursuant to Section 9.1(b)(iii), Section 9.1(c)(i)(A), Section 9.1(c)(iii)(A) or Section 9.1(c)(v), and Buyers are not then in breach of any of their obligations under this Agreement which would result in the failure of a condition to the obligations of Sellers set forth in Section 8.2(a) or Section 8.2(b) to be satisfied, then Sellers shall pay Buyers the Termination Payment (or a portion thereof) as provided in (and subject to the terms of) Section 6.4(a)(i).

(c)     If Buyers terminate this Agreement pursuant to Section 9.1(c)(i)(B) and Buyers are not then in breach of any of their obligations under this Agreement which would result in the failure of a condition to the obligations of Sellers set forth in Section 8.2(a) or Section 8.2(b) to be satisfied, then Sellers shall pay Buyers the Expense Reimbursement and, if applicable, the Break-Up Fee, as provided in (and subject to the terms of) Section 6.4(a)(ii).

(d)     The Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms, and nothing in this Section 9.2 shall relieve the parties thereto of their respective obligations under the Confidentiality Agreement.

84

# ARTICLE X
## MISCELLANEOUS

**Section 10.1**   **Survival**.  Except to the extent that any covenant that by its terms is to be performed by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement, any Related Agreement or in any certificate delivered pursuant to Section 2.7(a)(v) or Section 2.7(b)(v) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

**Section 10.2**   **Expenses**.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  Sellers shall pay the first one hundred thousand dollars ($100,000) in recording fees arising from the transfer of the Acquired Assets and Buyers shall pay any additional such fees.

**Section 10.3**   **Entire Agreement**.  This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

**Section 10.4**   **Incorporation of Exhibits and Disclosure Schedule**.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 10.5**   **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 10.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 10.6**   **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties; provided, however, that Buyers may assign this Agreement and any or all rights or obligations hereunder (including Buyers' rights to purchase the Acquired Assets and the Company Purchased Shares and assume the Assumed

Liabilities) to any Affiliate of Buyers; <u>provided</u>, that any such assignment shall not relieve Buyers of their obligations under this Agreement. Upon any such permitted assignment, the references in this Agreement to Buyers shall also apply to any such assignee unless the context otherwise requires.

   **Section 10.7   <u>Notices</u>**.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller: Reverse Mortgage Solutions, Inc.
     c/o Ditech Holding Corporation
     3000 Bayport Drive, Suite 985
     Tampa, FL 33607
     Attention:   John Haas, General Counsel,
          Chief Legal Officer and Secretary
     E-mail: JHaas@ditech.com

     With a copy (which shall not constitute notice to Sellers) to:

     Weil, Gotshal & Manges LLP
     767 Fifth Avenue
     New York, New York 10153
     Attention:   Frederick S. Green
          Ray C. Schrock, P.C.
          Gavin Westerman
          Sunny Singh
     Facsimile:   (212) 310-8007
     E-mail: Frederick.Green@weil.com
          Ray.Schrock@weil.com
          Gavin.Westerman@weil.com
          Sunny.Singh@weil.com

If to Buyer: Mortgage Assets Management, LLC
     SHAP 2018-1, LLC
     c/o Waterfall Asset Management, LLC
     1140 Avenue of Americas, 7th Floor
     New York, NY 10036
     Attention: Kenneth Nick, General Counsel
     Facsimile:  (212) 257-4699
     E-mail: notices@waterfallam.com

     With a copy (which shall not constitute notice to Buyers) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Robert A. Britton
            Jeffrey D. Marell
Facsimile: (212) 757-3990
E-mail:    rbritton@paulweiss.com
           jmarell@paulweiss.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 10.7.

      **Section 10.8**  **Governing Law**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

      **Section 10.9**  **Submission to Jurisdiction; Service of Process**.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated by this Agreement or thereby and agrees that all claims in respect of such Litigation may be heard and determined in such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 10.7; provided, however, that nothing in this Section 10.9 shall affect the right of any Party to serve legal process in any other manner permitted by Law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by Law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

      **Section 10.10 Waiver of Jury Trial**.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 10.11 **Specific Performance**.  Each Party acknowledges and agrees that the other Party and their respective estates would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that each Party may have under Law or equity, any Party shall be entitled, without the requirement of posting a bond or other security or proof of damages or otherwise, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.  The remedies available to the Parties pursuant to this Section 10.11 will be in addition to any other remedy to which they were entitled at Law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages that such Party is entitled to seek or collect.

Section 10.12 **Severability**.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 10.13 **No Third Party Beneficiaries**.  Except as otherwise expressly provided in Section 10.14, this Agreement shall not confer any rights or remedies upon any Person other than each Buyer, each Seller, and their respective successors and permitted assigns.

Section 10.14 **Non-Recourse**.  All claims or causes of action (whether in contract or in tort, in Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or other Representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in Law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or Affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law: (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each

88

Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 10.14</u>.

Section 10.15 **Mutual Drafting**.   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.16 **Disclosure Schedule**.   All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.   Any disclosure set forth in one section or subsection of the Disclosure Schedule shall be deemed disclosed with respect to, and shall be deemed to apply to and qualify, the section or subsection of this Agreement to which it corresponds in number and each other section or subsection of this Agreement to the extent the qualifying nature of such disclosure with respect to such other section or subsection is reasonably apparent on the face of such disclosure, notwithstanding the absence of a specific cross-reference.   The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 10.17 **Headings; Table of Contents**.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 10.18 **Counterparts; Facsimile and Electronic Signatures**.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

[Remainder of page intentionally left blank.]

89

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DITECH HOLDING CORPORATION

By: _____
      Name:  Gerald Lombardo
      Title:   Chief Financial Officer

[Signature Page to Stock and Asset Purchase Agreement]

WALTER REVERSE ACQUISITION LLC

By: _____
Name: Jeanetta Brown
Title:   Secretary

[Signature Page to Stock and Asset Purchase Agreement]

REVERSE MORTGAGE SOLUTIONS, INC.


By: _____
    Name:  Alan Clark
    Title:   Vice President, General Counsel &
             Secretary

[Signature Page to Stock and Asset Purchase Agreement]

MORTGAGE ASSETS MANAGEMENT, LLC

By: _____
    Name: Thomas Capasse
    Title: Authorized Person

SHAP 2018-1, LLC

By: _____
    Name: Thomas Capasse
    Title: Authorized Person

**EXHIBIT A**

**Escrow Agreement**

**EXECUTION VERSION**
**CONFIDENTIAL**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of June 17, 2019, by and among Walter Reverse Acquisition LLC, a Delaware limited liability company ("Seller"), Mortgage Assets Management, LLC, a Delaware limited liability company (the "Platform Buyer") and SHAP 2018-1, LLC, a Delaware limited liability company (the "Loan Buyer", and together with Platform Buyer, "Buyers", each a "Buyer", together with Seller, sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent").

## RECITALS

WHEREAS, this Agreement is being entered into in connection with that certain Stock and Asset Purchase Agreement (as amended, supplemented or otherwise modified from time, the "Purchase Agreement"), dated as of June 17, 2019, by and among Ditech Holding Corporation, a Maryland corporation, Seller, Reverse Mortgage Solutions, Inc., a Delaware corporation ("RMS"), Platform Buyer and Loan Buyer, pursuant to which, subject to certain conditions specified therein, Buyers have agreed to purchase, acquire and assume from Seller and RMS all of the Acquired Assets and Assumed Liabilities, as defined in the Purchase Agreement (the "Transaction"). Solely between and among Buyers and Seller, any discrepancy, inconsistency, difference or dispute as to the meaning or impact of any terms, provisions or directions between this Agreement (including all schedules), on the one hand, and the Purchase Agreement on the other, shall be resolved in favor of the Purchase Agreement. No provision of this Agreement (including all schedules) shall limit or alter any term or obligations of Buyers and Seller created, originating or referred to in the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

WHEREAS, the parties hereto have agreed to establish an escrow arrangement for the purposes set forth in the Purchase Agreement; and

WHEREAS, the Purchase Agreement contemplates that there shall be up to four (4) deposits with the Escrow Agent as follows:

(i) concurrently with the execution of the Purchase Agreement (or, if the Purchase Agreement has not been executed by the parties thereto by 2:00 p.m. (New York City time) on such date, then on the following Business Day), Buyers shall deposit an amount equal to thirty five million dollars ($35,000,000) (the "Deposit Escrow Amount") via wire transfer of immediately available funds to the Escrow Agent to be held in an escrow account (the "Deposit Escrow Account");

(ii) at the Closing, Buyers shall deposit an amount equal to $20,000,000 (the "Purchase Price Escrow Amount") via wire transfer of immediately available funds to the Escrow Agent to be held in a separate escrow account (the "Purchase Price Escrow Account");

(iii) within one (1) Business Day of the acceptance by Sellers of the Ginnie Purchase Proposal pursuant to Section 7.10 of the Purchase Agreement, Buyers shall deposit an amount equal to five million dollars ($5,000,000) (the "Ginnie Escrow Amount") via wire transfer of immediately available funds to the Escrow Agent to be held in the Deposit Escrow Account; and

(iv) upon the termination of the Purchase Agreement by any Seller pursuant to Section 9.1(b)(iii), Section 9.1(c)(i)(A), Section 9.1(c)(iii)(A) or Section 9.1(c)(v) therein and in accordance with Section 6.4(a) of the Purchase Agreement, Seller shall deposit an amount equal to eight million five hundred thousand dollars ($8,500,000) or, in the event that Sellers accept the Ginnie Purchase Proposal and exercise the Ginnie Option pursuant to Section 7.10 of the Purchase Agreement, nine million seven hundred fifty thousand dollars ($9,750,000) (the "Remaining Break-Up Fee Escrow Amount") via wire transfer of immediately available funds to the Escrow Agent to be held in a separate escrow account (the "Remaining Break-Up Fee Escrow Account," and, collectively with the Deposit Escrow Account, and the Purchase Price Escrow Account, the "Escrow Accounts").

The amount of all deposits in each of the Escrow Accounts, and the interest (if any), net of realized gains and other earnings accrued on such deposits (if any), minus any distributions therefrom hereunder are each referred to as the "Deposit Escrow Funds," the "Purchase Price Escrow Funds," the "Ginnie Escrow Funds," and the "Remaining Break-Up Fee Escrow Funds," respectively, and collectively as the "Escrow Funds".

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.     Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, to open and maintain up to three (3) Escrow Accounts upon the terms and conditions set forth in this Agreement.  The Escrow Agent hereby accepts such appointment and agrees to open and maintain the Escrow Accounts and to act as escrow agent in accordance with the terms and conditions set forth herein. The Escrow Agent shall not disburse or release any of the Escrow Funds except in accordance with the terms of this Agreement.

2.     Escrow Funds.

(a)     Concurrently with the execution of the Purchase Agreement (or, if the Purchase Agreement has not been executed by the parties thereto by 2:00 p.m. (New York City time) on such date, then on the following Business Day), Buyers shall deposit with the Escrow Agent the Deposit Escrow Amount in immediately available funds to be held in the Deposit Escrow Account.

(b)     At the Closing, Buyers shall deposit with the Escrow Agent the Purchase Price Escrow Amount in immediately available funds to be held in the Purchase Price Escrow Account.

(c)     Within one (1) Business Day of the acceptance by Sellers of the Ginnie Purchase Proposal pursuant to Section 7.10 of the Purchase Agreement, Buyers shall deposit with

the Escrow Agent the Ginnie Escrow Amount in immediately available funds to be held in the Deposit Escrow Account.

(d)      Upon the termination of the Purchase Agreement by any Seller pursuant to Section 9.1(b)(iii), Section 9.1(c)(i)(A), Section 9.1(c)(iii)(A) or Section 9.1(c)(v) therein and in accordance with Section 6.4(a) of the Purchase Agreement, Seller shall deposit with the Escrow Agent the Remaining Break-Up Fee Escrow Amount in immediately available funds to be held in the Remaining Break-Up Fee Escrow Account.

(e)      All products and proceeds of the Escrow Funds, including all interest, dividends, gains and other income earned with respect thereto, shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement. The Escrow Agent shall promptly acknowledge receipt of the Deposit Escrow Amount and the Purchase Price Escrow Amount, and if applicable, the Ginnie Escrow Amount and the Remaining Break-Up Fee Escrow Amount, in writing to Buyers and Seller.

3.      Investment of Escrow Funds.

(a)      The Escrow Agent shall invest each of the Deposit Escrow Amount, the Purchase Price Escrow Amount, and, if applicable, the Ginnie Escrow Amount and the Remaining Break-Up Fee Escrow Amount, in an interest-bearing deposit obligation of Citibank N.A. insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits with an initial rate of 1.0%.  The Parties acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)      The Escrow Agent shall prepare and send an account statement to all parties listed as recipients of such statements and in the "Notice Section" on a monthly basis reflecting activity in the Escrow Accounts for the preceding month.

(c)      The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.      Disposition and Termination of the Escrow Funds.

(a)      Escrow Funds.  The Parties shall act, and the Escrow Agent shall hold and release the Escrow Funds in accordance with, the following:

(i)      Upon receipt by the Escrow Agent of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse, as directed in such Joint Release Instruction, all or part of the Escrow Funds from the Escrow Account specified in such Joint Release Instruction.

3

(ii)    Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the fifth (5th) Business Day following receipt of such determination, disburse, as directed in such Final Determination, all or part of the Escrow Funds from the Escrow Account specified in such Final Determination, but only to the extent funds are available. The Escrow Agent will act on such Final Determination without further inquiry.

(iii)    All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable.

(iv)    Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1, Exhibit A-2 and Exhibit A-3 and delivered to the Escrow Agent either (x) by confirmed facsimile only at the fax number set forth in Section 11 below or (y) attached to an e-mail received on a Business Day from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibits A-1, Exhibit A-2 and/or A-3 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved, it being understood that the Escrow Agent shall use its reasonable best efforts to resolve all such issues.  The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of applicable Party set forth on Exhibit A-1, Exhibit A-2 or Exhibit A-3, actually received and acknowledged by the Escrow Agent.

(b)    Certain Definitions.

(i)    "Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

(ii)    "Final Determination" means, with respect to the disposition of the Escrow Funds in any Escrow Account, a final non-appealable order of any court of competent jurisdiction, including the United States Bankruptcy Court for the Southern District of New York, which may be issued, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order.

(iii)    "Joint Release Instruction" means the joint written instruction executed by an authorized signer of each of Buyers and Seller in the form attached as Exhibit B directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

4

(iv)    "<u>Laws</u>" means any U.S., federal, state, local or foreign law, statute, code, ordinance, rule, regulation, order, writ, injunction, directive, judgement, Decree, policy, or guideline having the force of law or other requirement (including the Bankruptcy Code).

(v)    "<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at Law or in equity and whether or not before any Governmental Authority.

(vi)    "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

5.    <u>Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied.  The Escrow Agent shall neither be responsible for, nor chargeable with knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of the Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties.  Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit A-1</u>, <u>Exhibit A-2</u> and <u>Exhibit A-3</u> attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds.  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination.  The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party.  To the extent reasonably practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same (other than with respect to a dispute involving the Escrow Agent).  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable

for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action, except in the case of the Escrow Agent's fraud, gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction.

6.    <u>Resignation and Removal of Escrow Agent</u>.  The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving sixty (60) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Buyers and Seller acting jointly at any time by providing written notice to the Escrow Agent; provided that any such resignation or removal shall not relieve the Escrow Agent from any liability that arose from any action or inaction that occurred prior to the effective date of such resignation or removal. Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent's sole responsibility after such sixty (60) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of sixty (60) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.    <u>Fees and Expenses</u>.  All fees and expenses of the Escrow Agent are described in <u>Schedule 1</u> attached hereto and shall be paid fifty percent (50%) by Buyers and fifty percent (50%) by Seller. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent's services as contemplated by this Agreement.

8.    <u>Indemnity</u>.  Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>")  from and against and with respect to, any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") actually incurred in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee in connection with this Agreement, except to the extent that such Escrow Agent Losses, as determined by a court of competent jurisdiction, in a final non-appealable judgement, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from the Parties received in accordance with this Agreement.

6

Notwithstanding anything to the contrary herein, Buyers and Seller agree, solely as between themselves, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction in a final non-appealable judgement to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one half by Buyers and one half by Seller. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.    <u>Tax Matters.</u>

(a)    The Loan Buyer shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Deposit Escrow Funds, the Purchase Price Escrow Funds and the Ginnie Escrow Funds for the calendar year in which such interest or income is earned. Seller shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Remaining Break-Up Fee Escrow Funds for the calendar year in which such interest or income is earned. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing correct, duly completed, dated and executed current IRS Forms W-9 or W-8, as applicable and including such other supporting forms and documents that the Escrow Agent may reasonably request to validate the form provided. If the Escrow Agent has not received such IRS Forms W-9 or W-8 five (5) days prior to the date hereof, the Escrow Agent shall request such forms from the Parties.

(b)    The Escrow Agent shall be responsible for satisfying any applicable tax reporting requirements (including any applicable IRS Form 1099) in accordance with this Section 9. The Escrow Agent shall withhold any taxes required to be withheld by applicable Law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.  Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    <u>Covenant of Escrow Agent</u>.  The Escrow Agent hereby agrees and covenants with Buyers and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by Law.

11.    <u>Notices</u>.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the party/parties hereto to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight

delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given two (2) Business Days after the date such notice is deposited with the United States Postal Service. If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to Seller, then to:

Walter Reverse Acquisition LLC
c/o Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607

| | |
|---|---|
| Attention: | John Haas, General Counsel, |
| | Chief Legal Officer and Secretary |
| E-mail: | JHaas@ditech.com |
| Telephone: | (813) 421-7620 |
| Facsimile: | (813) 286-2028 |

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

| | |
|---|---|
| Attention: | Frederick S. Green |
| | Ray C. Schrock, P.C. |
| | Gavin Westerman |
| | Sunny Singh |
| E-mail: | Frederick.Green@weil.com |
| | Ray.Schrock@weil.com |
| | Gavin.Westerman@weil.com |
| | Sunny.Singh@weil.com |
| Telephone: | (212) 310-8524 |
| | (212) 310-8210 |
| | (212) 310-8747 |
| | (212) 310-8457 |
| Facsimile: | (212) 310-8007 |

8

> or, if to Buyers, then to:

>> Mortgage Assets Management, LLC
>> SHAP 2018-1, LLC
>> c/o Waterfall Asset Management, LLC
>> 1140 Avenue of Americas, 7th Floor
>> New York, NY 10036
>> Attention:    Kenneth Nick, General Counsel
>> E-mail:        notices@waterfallam.com
>> Facsimile:    (212) 257-4699

>> with a copy (which shall not constitute notice) to:

>> Paul, Weiss, Rifkind, Wharton & Garrison LLP
>> 1285 Avenue of the Americas
>> New York, New York 10019
>> Attention:    Robert A. Britton
>>                     Jeffrey D. Marell
>> E-mail:        rbritton@paulweiss.com
>>                     jmarell@paulweiss.com
>> Facsimile:    (212) 757-3990

> or, if to the Escrow Agent, then to:

>> Citibank, N.A.
>> Citi Private Bank
>> 388 Greenwich Street, 29th Floor
>> New York, NY  10013
>> Attn:          William T. Lynch
>> Telephone:  212-783-7108
>> Facsimile:    212-783-7131
>> E-mail:        william.lynch@citi.com

Any party hereto may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other party notice in the manner set forth in this Section 11. Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination.    This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement (it being agreed and understood that this Agreement shall not terminate if (i) on the Closing Date, all of the Escrow Funds in the Deposit Escrow Account are released from such account prior to receipt by

the Escrow Agent on that same date any of the Purchase Price Escrow Amount for deposit into the Purchase Price Escrow Account, or (ii) upon termination of the Purchase Agreement by any Seller pursuant to Section 9.1(b)(iii), Section 9.1(c)(i)(A), Section 9.1(c)(iii)(A) or Section 9.1(c)(v) therein, all of the Escrow Funds then in the Deposit Escrow Account are released from such account prior to receipt by the Escrow Agent of the Remaining Break-Up Fee Escrow Amount for deposit into the Remaining Break-Up Fee Escrow Account) or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by Seller and Buyers after which this Agreement shall be of no further force and effect except that the provisions of <u>Section 8</u> hereof shall survive termination.

13. <u>Miscellaneous.</u>  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each party hereto except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code. Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement and agrees that all claims in respect of such Litigation may be heard and determined in such court.  Each party hereto also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the parties hereto irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any party hereto may make service on any other party hereto by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in <u>Section 11</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 13</u> shall affect the right of any party hereto to serve legal process in any other manner permitted by Law or in equity.  Each party hereto agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by Law or in equity.  The parties hereto intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable Laws and regulations. Where, however, the conflicting provisions of any such applicable Law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by Law, to the end that this Agreement shall be enforced as written.  Except as expressly

10

provided in <u>Section 8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.   <u>Compliance with Court Orders</u>.   In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding that such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.   <u>Further Assurances</u>.   Following the date hereof, each party hereto shall deliver to the other parties hereto such further information and documents and shall execute and deliver to the other parties hereto such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.   <u>Assignment</u>.   No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld).   Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.   <u>Force Majeure.</u>   The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.   <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.   For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.   The Escrow Agent may also ask to see financial statements, licenses, and identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

11

19.     <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by the Parties, or on any Party's behalf, without the prior written consent of the Escrow Agent.

\*   \*   \*   \*   \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

SELLER:

**WALTER REVERSE ACQUISITION LLC**

By: _____
Name: Jeanetta Brown
Its:    Secretary

*Signature Page to Escrow Agreement*

PLATFORM BUYER:

**MORTGAGE ASSETS MANAGEMENT, LLC**

By: _____
Name: _____
Its: _____

LOAN BUYER:

**SHAP 2018-1, LLC**

By: _____
Name: _____
Its: _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name: ___William T. Lynch_____

Its: ___Director_____

*Signature Page to Escrow Agreement*

**EXHIBIT B**

**Transaction Accounting Principles**

# Project Phoenix

REVERSE TRANSACTION PURCHASE PRICE SUPPORT

JUNE 2019 | CONFIDENTIAL

# Introduction

- Consistent with the terms of the Stock and Asset Purchase Agreement (the "SAPA"), a closing balance sheet (the "Transaction Balance Sheet") will be prepared in accordance with GAAP at Closing, consistent with historical accounting practices[1] and will reflect the net amount of Acquired Assets and Assumed Liabilities (the "Net Asset Amount")
  - The Transaction Balance Sheet will be calculated in accordance with the methodologies presented herein on page 4 and 5, including the amount of Excluded Assets and Excluded Liabilities
  - Excluded Assets and Excluded Liabilities will not be included in any calculation of the Net Asset Amount
  - The Transaction Balance Sheet will then be converted into the format of the purchase price formula (the "Purchase Price Schedule") to calculate the Purchase Price
  - The Purchase Price Schedule will reflect the valuation for each category of Acquired Asset and Assumed Liability
- No fewer than five (5) business days prior to the Closing Date, an Estimated Closing Statement will be prepared reflecting the estimated asset and liability balances for the Closing Date[2]
  - The Initial Statement will be prepared within ten (10) days following the 90th day after the Closing Date (i.e. day 100) and will reflect the Transaction Balance Sheet and Purchase Price Schedule as of the Closing Date
- The unaudited Transaction Balance Sheet for 3/31/19 and the Purchase Price are detailed herein

(1)   For avoidance of doubt, the Transaction Balance Sheet and Purchase Price Schedule will continue to use the Company's historical accounting policies including the use of accrual and cash basis accounting
(2)   See page 12 for detail on the source and date of information to be included on the Estimated Closing Statement

# Transaction Balance Sheet

## Unaudited Transaction Balance Sheet (as of 3/31/19)

$ 000s

|  |  | Unaudited Reverse Balance Sheet (3/31/19) | | Total Acquired Assets / Assumed Liabilities |
|---|---|---|---|---|
|  | **Assets:** |  |  |  |
| 1 | Unrestricted and restricted cash[1] | $ | 142,542 | $ 123,280 |
| 2 | Reverse mortgage loans |  | 7,623,811 | 7,435,549 |
| 3 | Receivables, net |  | 37,134 | 34,531 |
| 4 | Servicer and protective advances, net |  | 42,737 | 37,598 |
| 5 | Servicing rights |  | 2,593 | 2,593 |
| 6 | Goodwill |  | - | - |
| 6 | Intangible assets |  | - | - |
| 7 | Premises and equipment[2] |  | 8,561 | 4,792 |
| 8 | Deferred tax asset |  | - | - |
| 9 | Real estate owned |  | 65,087 | 52,539 |
| 10 | Other assets |  | 1,804 | 761 |
| **11** | **Total assets** |  | **7,924,269** | **7,691,643** |
|  |  |  |  |  |
|  | **Liabilities:** |  |  |  |
| 12 | Payables and accrued liabilities[2] | $ | 104,080 | $ 58,384 |
| 13 | Warehouse borrowings |  | 821,982 | - |
| 15 | Debt, net |  | - | - |
| 14 | HMBS related obligations |  | 6,751,936 | 6,751,936 |
| 15 | Due to Affiliates |  | 1,962 | - |
| 16 | Liabilities subject to compromise[2] |  | 6,937 | - |
| 17 | Liabilities due to affiliates subject to compromise |  | 87,164 | - |
| **18** | **Total liabilities** |  | **7,774,061** | **6,810,320** |
|  |  |  |  |  |
| **19** | **Net Assets** | $ | **150,208** | $ **881,323** |

Note: Unaudited financial statements as of 3/31/19
(1)  Excluded Assets includes $15 million of restricted cash and cash equivalents related to the DIP warehouse financing facility
(2)  The Company's balance sheet contains PP&E assets and offsetting lease liabilities related to real estate leases. Since the purchase price formula does not provide any value for this lease related PP&E, both the asset and liability shall be excluded for purposes of the Transaction Balance Sheet and Purchase Price Schedule

3

# Acquired Assets Adjustments Support

| Balance Sheet Account | Acquired Assets | Excluded Assets[1][2] |
|---|---|---|
| Cash and Cash Equivalents | All Cash and Cash Equivalents except for Excluded Assets | None |
| Restricted Cash and Cash Equivalents | All Restricted Cash and Cash Equivalents except for Excluded Assets | Restricted cash for RMS warehouse DIP facility ($15 million) |
| Reverse Mortgage Loans | All Reverse Mortgage Loans except for Excluded Assets | None |
| Servicer and Protective Advances, Net | All Servicer and Protective Advances except for Excluded Assets | None |
| Receivables | All Receivables except for Excluded Assets | Receivables related to excluded servicing contracts<br>Receivables related to any Excluded Assets |
| Servicing Rights | All Mortgage Servicing Rights except for the Excluded Assets | MSRs for MECA Trust 2010-1 |
| Goodwill / Intangible Assets | All Goodwill / Intangible Assets | None |
| Premises and Equipment | All PP&E except for Excluded Assets | Any assets related to GAAP accounting for real estate leases (to the extent the corresponding liability is an Excluded Liability) |
| Deferred Tax Asset | None | All tax assets |
| Real Estate Owned | All REO | None |
| Other Assets | All Other Assets except for Excluded Assets | Deferred debt issuance costs<br>Prepaid expenses, deposits, deferred charges related to Excluded Assets |

(1)  Legal entity RMS 2018-09, LLC is an Excluded Asset and therefore any assets and liabilities held at this entity will not be an Acquired Asset or Assumed Liability. Excluded Assets and Excluded Liabilities will not be included in any calculation of the Net Asset Amount
(2)  For avoidance of doubt, any assets and liabilities related to non-transferred contracts, including subservicing contracts, will be an Excluded Asset and an Excluded Liability in this transaction.  The Company and Buyer will continue to work to identify the assets and liabilities related to the non-transferred contracts and any related adjustments will be reflected on the Estimated Closing Statement

4

# Assumed Liabilities Adjustments Support

| Balance Sheet Account | Assumed Liabilities | Excluded Liabilities[1][2] |
|---|---|---|
| **Accounts Payable and Accrued Liabilities** | ▪ The Company and Buyer to determine which remaining Accounts Payable and Accrued Liabilities should be Assumed by Buyers vs. retained by Sellers based on (i) contract assumption, (ii) transition planning, and (iii) transferred employees, among other factors and work streams | ▪ General unsecured claims including (i) uncertain tax positions, (ii) unclaimed property, and (iii) other pre-petition liabilities<br><br>▪ Curtailment and other liabilities related to FNMA servicing to be settled in conjunction with or prior to closing<br><br>▪ Curtailment and other liabilities related to non-transferred servicing contracts[3]<br><br>▪ Employee related liabilities for non-transferred employees (TBD; subject to employee transfer list)<br><br>▪ LSTC Lease Liabilities<br><br>▪ Contract Cure Costs<br><br>▪ Other liabilities identified by the Company as available for compromise through the bankruptcy process (subject to Buyer agreement / approval) |
| **Warehouse Borrowing** | ▪ None | ▪ All warehouse borrowing and any related liabilities |
| **Corporate Debt** | ▪ N/A | ▪ N/A |
| **HMBS Related Obligations** | ▪ All HMBS obligations | ▪ None |
| **Liabilities Due to Affiliates** | ▪ None | ▪ All intercompany payables and liabilities due to affiliates |
| **Liabilities Subject to Compromise[4]** | ▪ None | ▪ All liabilities subject to compromise[4] |

(1)  Legal entity RMS 2018-09, LLC is an Excluded Asset and therefore any assets and liabilities held at this entity will not be an Acquired Asset or Assumed Liability. Excluded Assets and Excluded Liabilities will not be included in any calculation of the Net Asset Amount
(2)  For avoidance of doubt, any assets and liabilities related to non-transferred contracts, including subservicing contracts, will be an Excluded Asset and an Excluded Liability in this transaction.  The Company and Buyer will continue to work to identify the assets and liabilities related to the non-transferred contracts and any related adjustments will be reflected on the Estimated Closing Statement
(3)  May be reclassified as a liability subject to compromise
(4)  As a result of the bankruptcy filing, the Company has setup a Liabilities Subject to Compromise account which primarily includes liabilities related to the Company's corporate debt, rejected leases, and other Accounts Payable and Accrued Expenses, among others, that are considered General Unsecured Claims in the case

5

| | | Page |
|---|---|---|
| 1. | Purchase Price Schedule | 7 |

# Purchase Price Schedule

### Illustrative Purchase Price Calculation (as of 3/31/19)

$ millions

| Group # | Variable/ Fixed | Purchase Price (% of Metric) | Purchase Price ($) |
|---|---|---|---|
| 1 | Var | 100.0% | $ 123.3 |
| 2 | Var | 97.5% | 75.1 |
| 3 | Var | 94.0% | 79.2 |
| 4 | Var | 90.0% | 192.2 |
| 5 | Var | 85.5% | 353.4 |
| 6 | Var | 101.0% | 12.7 |
| 7 | Var | 85.5% | 6.5 |
| 8 | Var | 33.0% | 1.7 |
| 9 | Var | 100.0% | 0.3 |
| 10 | Var | 100.0% | 29.3 |
| 11 | Var | 75.0% | 36.1 |
| 12 | Fix | N/A | 1.0 |
| 13 | Fix | N/A | - |
| 14 | Var | 70.0% | 18.6 |
| 15 | Var | 100.0% | 1.0 |
| 16 | Var | 100.0% | 2.0 |
| 17 | Var | 100.0% | (34.7) |
| 18 | Var | 100.0% | (23.7) |
| 19 | Fix / Var | N/A[1] | (83.2) |
| 20 | N/A | N/A | - |
| 21 | Var | N/A[2] | (28.5) |
| 22 | | **Total Purchase Price    $** | **762.4** |

*(1) Calculated as the GAAP UPB of Residential Loans in the securitization x (80)bps - $31.5 million*
*(2) Calculated as the sum of: (i) $(20,329,375) minus (ii) the purchase price reduction amount from non-transferred contracts detailed on page 12 minus (iii) $250,000 in the event that the Ginnie Option is exercised but the Ginnie Portfolio is sold away plus (iv) any purchase price increase in connection with settlements as detailed in Section 7.13(b) of the SAPA*

# Purchase Price Group Definitions

| Group # | Balance Sheet Reference | Grouping Name | Grouping Definition |
|---|---|---|---|
| 1 | 1 | Cash | Cash held on the balance sheet |
| 2 | 2 | Group 1 | Includes:<br>(i) Active loans that are less than 99.5% of the Maximum Claim Amount on the Closing Date and have been assigned or are "immediately assignable"[1] to HUD during the 90 days between closing and delivery of the Final Statement; and<br>(ii) Buyout loans that have been paid in full during the 90 days between the Closing Date and delivery of the Final Statement. |
| 3 | 2 | Group 2 | Includes: (i) Active loans that are more than 99.5% MCA on the Closing Date and have been assigned or are "immediately assignable"[1] to HUD during the 90 days between closing and delivery of the Final Statement |
| 4 | 2 | Group 3 | Includes inactive buyouts that are "readily securitizable". Attributes include:<br>(i) no damage,<br>(ii) no litigation, or in foreclosure > 3 years,<br>(iii) no tax/title issues,<br>(iv) complete mortgage files including final title policy, original note, recorded mortgage, proper assignment of mortgage/endorsements (as identified by Custodian),<br>(v) not in purgatory/impaired loans as detailed in the Company's reporting,<br>(vii) no Puerto Rico loans |
| 5 | 2 | Group 4 | Includes all other active and inactive buyout loans not included in Group 1, Group 2 or Group 3 |
| 6 | 2 | Reverse Mortgage Loans - Active | Equal to the unpaid principal balance of active reverse mortgage loans currently being held for securitization |
| 7 | 2 | Reverse Mortgage Loans - Inactive | Equal to the unpaid principal balance of inactive reverse mortgage loans currently being held for securitization |
| 8 | 3 | Receivables (Buyouts Only) | The gross book value of the receivables bought out of the GNMA securitization trust |

(1)  *Immediately Assignable loans are Active Navigator substatus loans that are reported as (i) completed, (ii) QC in process and/or (iii) QC transfer to onshore on the LLSR report*

# Purchase Price Group Definitions (cont.)

| Group # | Balance Sheet Reference | Grouping Name | Grouping Definition |
|---|---|---|---|
| 9 | 3 | Receivables | Equal to principal balance of the receivables currently being held for securitization |
| 10 | 3 | Receivables | Unsecuritized receivables currently held on the balance sheet excluding receivables held in the RMS 2018-09, LLC entity, receivables bought out of the GNMA trust and receivables held for securitization |
| 11 | 4 | Advances | Advances held on the balance sheet |
| 12 | 5 | MSRs | Mortgage Servicing Rights held on the balance sheet |
| 13 | 7 | Fixed Assets | All fixed assets of the Company |
| 14 | 9 | REO | Owned real estate bought out of the GNMA securitization trust |
| 15 | 9 | REO | Owned real estate currently being held for securitization |
| 16 | 10 | Other Assets | Other Assets held on the balance sheet |
| 17 | 12 | Assumed Accounts Payable & Accruals | All payables and accrued liabilities on the balance sheet |
| 18 | 12 | Curtailment Reserve | Curtailment reserves held on the balance sheet |
| 19 | N/A | Reverse Mortgage Loans (Securitized, net) | The book value of the assets held in the GNMA securitization trust minus the book value of the liabilities held in the GNMA securitization trust |
| 20 | N/A | RMS 2018-09, LLC Entity | Net book value of the assets held in the RMS 2018-09, LLC entity |
| 21 | N/A | Purchase Price Adjustments | Equal to (i) $(20,329,375) *minus* (ii) the purchase price reduction from non-transferred contracts detailed on page 12 *minus* (iii) $250,000 in the event that the Ginnie Option is exercised but the Ginnie Portfolio is sold away *plus* (iv) any purchase price increase in connection with settlements as detailed in Section 7.13(b) of the SAPA |

# Estimated Closing Statement Methodology and Timing

- As detailed in Section 2.4 of the SAPA, the Estimated Closing Statement will reflect the Company's good faith estimate of the of the Net Asset Amount and resulting Purchase Price on the last day of the month in which the Closing Date will occur

  - Excluded Assets and Excluded Liabilities will not be included in any calculation of the Net Asset Amount or the Final Net Asset Amount

- Based on the information available to the Company, the most reliable estimate for asset and liability values for the Closing Date will include a combination of (i) UPB and advance information from a current data tape, (ii) latest available cash balance and (iii) net book value amounts from the prior month close or a roll-forward of the net book value from the prior month close (if appropriate).

| Group # | Grouping Name | Pricing Metric (UPB / Gross BV / Net BV) | Date and Source of Estimated Closing Statement  information |
|---|---|---|---|
| 1 | Cash | Net Book Value | Balance sheet cash amount based on treasury balances and estimates on the Closing Date |
| 2 | Group 1 | UPB | UPB on the data tape dated within five business days of the Closing Date |
| 3 | Group 2 | UPB | UPB on the data tape dated within five business days of the Closing Date |
| 4 | Group 3 | UPB | UPB on the data tape dated within five business days of the Closing Date |
| 5 | Group 4 | UPB | UPB on the data tape dated within five business days of the Closing Date |
| 6 | Reverse Mortgage Loans - Active | UPB | Prior month end net book value |
| 7 | Reverse Mortgage Loans - Inactive | UPB | Prior month end net book value |
| 8 | Receivables (Buyouts) | Gross Book Value | UPB on the data tape dated within five business days of the Closing Date |
| 9 | Receivables | Gross Book Value | Prior month end net book value |

# Estimated Closing Statement Methodology and Timing (cont.)

| Group # | Grouping Name | Pricing Metric (UPB / Gross BV / Net BV) | Date and Source of Estimated Closing Statement information |
|---|---|---|---|
| 10 | Receivables | Net Book Value | Prior month end net book value |
| 11 | Advances | Gross Book Value | UPB on the data tape dated within five business days of the Closing Date |
| 12 | MSRs | Net Book Value | Prior month end net book value |
| 13 | Fixed Assets | Net Book Value | Prior month end net book value |
| 14 | REO | UPB | UPB on the data tape dated within five business days of the Closing Date |
| 15 | REO | UPB | Prior month end net book value |
| 16 | Other Assets | Net Book Value | Prior month end net book value |
| 17 | Assumed Accounts Payable & Accruals | Net Book Value | Prior month end net book value |
| 18 | Curtailment Reserve | Net Book Value | Prior month end net book value |
| 19 | Reverse Mortgage Loans (Securitized, net) | UPB | UPB on the data tape dated within five business days of the Closing Date |
| 20 | RMS 2018-09, LLC Entity | Net Book Value | N/A; Prior month end net book value |
| 21 | Purchase Price Adjustments | N/A | N/A; Curtailment adjustment based on balances from prior month end net book value |

# Purchase Price Schedule Support (cont.)

## Contract and Curtailment Summary

$

| Payee / Investor | Category | 2018 Total Loan Units | Curtailment Loan Count | RMS Curtailment Total (1) | Purchase Price Formula | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total Excluded Curtailment Liability | Purchase Price Adjustment % | Total Purchase Price Adj. |
| Category A: Total Owned Servicing | Acquired Asset | 47,872 | 1,670 | $ 23,651,513 | $         - | N/A | $         - |
| Category B: Excluded Assets (Owned Servicing) | Excluded Asset | 140 | 268 | 6,197,631 | 6,197,631 | N/A | - |
| Category C: Excluded Assets (Non-Transferred Contracts)[2] | Excluded Contract | 1,106 | 376 | 5,451,617 | 5,451,617 | N/A | - |
| Category D: Excluded Assets (Non-Transferred Contracts)[3] | Excluded Contract | 32,408 | 1,817 | 32,683,668 | 32,683,668 | 25% | 8,170,917 |
| **Total** | | **81,526** | **4,131** | **$ 67,984,429** | **$ 44,332,916** | | **$ 8,170,917** |

*Note: RMS has acquisition holdback receivables on its books from counterparties whose curtailment liabilities are planning to be rejected, these receivables will likely be offset against the curtailment rejection and will be an excluded asset. As of 3/31/19, the value of these receivables was approximately $3.3 million*

(1)   *Subject to change based on certain reclasses that may be made between curtailment to HUD and Investors*
(2)   *Category C includes contract servicing counter-parties with no ongoing operations and residual curtailment and other liabilities*
(3)   *Category D includes contract servicing counter-parties with active ongoing subservicing operations*

**EXHIBIT C**

**Form of Bill of Sale and Assignment and Assumption Agreement**

EXHIBIT C

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [●], 2019, by and among Ditech Holding Corporation, a Maryland corporation ("Ditech"), Walter Reverse Acquisition LLC, a Delaware limited liability company ("Parent"), Reverse Mortgage Solutions, Inc., a Delaware corporation (the "Company", together with Ditech and Parent, the "Assignors"), Mortgage Assets Management, LLC, a Delaware limited liability company (the "Platform Buyer") and SHAP 2018-1, LLC, a Delaware limited liability company (the "Loan Buyer", and together with Platform Buyer, the "Assignees" and together with Assignors, the "Parties"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in that certain Stock and Asset Purchase Agreement (the "Purchase Agreement"), dated as of June 17, 2019, by and among Assignors and the Assignees.

**WHEREAS**, Assignors and the Assignees have entered into the Purchase Agreement pursuant to which the Assignees have agreed to purchase the Acquired Assets and assume the Assumed Liabilities;

**WHEREAS**, pursuant to this Agreement, the Assignors shall sell, transfer, assign, convey and deliver to the Assignees, and the Assignees shall purchase, acquire and accept from the Assignors, in each case as provided below, all of the Assignors' right, title and interest in, to, and under the Acquired Assets, subject to the conditions set forth in the Purchase Agreement (including Section 2.8 thereof); and

**WHEREAS**, pursuant to this Agreement, the Assignees shall assume and become responsible for the Assumed Liabilities, subject to the conditions set forth in the Purchase Agreement (including Section 2.8 thereof).

**NOW, THEREFORE**, in consideration of the premises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Purchase Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties desire to enter into this Agreement on the terms set forth herein.

Intending to be legally bound, the Parties agree as follows:

1.      Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.8 thereof), the Assignors hereby sell, transfer, assign, convey and deliver to the Assignees, and the Assignees hereby purchase, acquire and accept from the Assignors, all of the Assignors' right, title and interest in, to and under, the Acquired Assets (which, for the avoidance of doubt, shall not include any Excluded Assets).

2.      Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.8 thereof), the Assignees hereby assume and become responsible for and agree to timely pay, discharge and perform in accordance with their terms, all of the Assumed Liabilities; provided, that, for the avoidance of doubt, the Assignees are not assuming or agreeing to pay, discharge or perform any Excluded Liabilities.

3.      The respective rights of the Parties with respect to the Acquired Assets sold, transferred, assigned, conveyed and delivered hereby to the Assignees and the Assumed Liabilities assumed by the Assignees hereby shall be governed exclusively by the Purchase Agreement, and nothing in this Agreement shall alter any Liability or other obligations arising under the Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the Parties with respect to such Acquired Assets and such Assumed Liabilities. If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern.

4.      This Agreement shall be binding upon and inure to the benefit of the Assignees and Assignors and their respective successors and permitted assigns (subject to Section 10.6 of the Purchase Agreement).    The sole and exclusive remedy of the Parties with respect to a breach of this Agreement shall be as set forth in the Purchase Agreement.    This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns (subject to Section 10.6 of the Purchase Agreement).

5.      This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

6.      No amendment, waiver, modification or change of any of the provisions of this Agreement shall be valid unless in writing and signed by the Party against whom such claimed waiver, modification or charge is sought to be enforced.

7.      EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

8.      This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.    This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**ASSIGNORS**:

DITECH HOLDING CORPORATION

By:_____
    Name:
    Title:

WALTER REVERSE ACQUISITION LLC

By:_____
    Name:
    Title:

REVERSE MORTGAGE SOLUTIONS, INC.

By:_____
    Name:
    Title:

**ASSIGNEES**:


MORTGAGE ASSETS MANAGEMENT, LLC


By:_____
    Name:
    Title:


SHAP 2018-1, LLC


By:_____
    Name:
    Title:

**EXHIBIT D**

**Form of Transition Services Agreement**

EXECUTION VERSION

**EXHIBIT D**

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement (this "Agreement") is entered into as of [●], 2019 (the "Effective Date"), by and between Ditech Holding Corporation, a Maryland corporation ("Ditech") and Walter Reverse Acquisition LLC, a Delaware limited liability company (together with Ditech, the "Sellers" and each a "Seller"), and Reverse Mortgage Solutions, Inc., a Delaware corporation (the "Company"), Mortgage Assets Management, LLC, a Delaware limited liability company (the "Platform Buyer") and SHAP 2018-1, LLC a Delaware limited liability company (the "Loan Buyer", and together with the Company and Platform Buyer, "Buyers" and each a "Buyer"). Sellers and Buyers are each individually referred to herein as a "Party" and are collectively herein referred to as "Parties." Certain terms are defined below, other terms are defined in Annex I (Defined Terms) and all other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Stock and Asset Purchase Agreement, dated as of June 17, 2019 by and between Sellers and Buyers (the "Purchase Agreement").

**RECITALS**

**WHEREAS**, this Agreement constitutes the "Transition Services Agreement" referred to in the Purchase Agreement and is a "Related Agreement" pursuant to the Purchase Agreement; and

**WHEREAS**, in connection with the Purchase Agreement, the Parties desire to enter into this Agreement to set forth the terms and conditions pursuant to which the Buyers shall provide or cause to be provided Services to the Sellers and their Affiliates, and the Sellers shall provide or cause to be provided Services to the Buyers and their Affiliates, for a period from and after the Closing Date.

**NOW, THEREFORE**, in consideration of the promises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties desire to enter into this Agreement on the terms set forth herein.

Intending to be legally bound, the Parties agree as follows:

**ARTICLE I**

**SERVICES**

Section 1.1    Services to be Provided. Subject to the terms and conditions of this Agreement, during the Service Period, Sellers shall provide, or cause their Affiliates or a Vendor contracted by Sellers pursuant to Section 1.7 to provide, to Buyer and its Affiliates directly or indirectly wholly-owned by Buyers' parent, the services described on Schedule A-1

attached hereto (each, a "<u>Seller Service</u>", and collectively, the "<u>Seller Services</u>").  Subject to the terms and conditions of this Agreement, during the Service Period, Buyers shall provide, or cause its Affiliates or a Vendor contracted by Buyers pursuant to <u>Section 1.7</u> to provide, to Sellers and their Affiliates directly or indirectly wholly-owned by Sellers' parent, the services described on <u>Schedule A-2</u> attached hereto (each, a "<u>Buyer Service</u>", and collectively, the "<u>Buyer Services</u>"). The Seller Services and the Buyer Services shall together be known as the "<u>Services</u>," and <u>Schedule A-1</u> and <u>Schedule A-2</u> shall together be known as "<u>Schedule A</u>."  For each Service, <u>Schedule A</u> shall identify the Person who will provide such Service from and after the Effective Date (whether Seller, Buyer, an Affiliate or a Vendor).  "<u>Service Period</u>" means the period commencing as of the Effective Date and, subject to earlier termination pursuant to <u>Article III</u>, continuing until the date indicated for each such Service on <u>Schedule A</u> (which such date in no event will be a date beyond the expiration of the Term).  Unless otherwise specified in <u>Schedule A</u>, neither Party shall have the right to renew or extend the Service Period without the written consent of the other Party.  Unless otherwise agreed in writing by the Parties, the Services to be provided by Service Provider under this Agreement are limited to those expressly stated herein, subject to any subsequent changes or additions to the Services pursuant to <u>Section 1.3</u>.

Section 1.2    <u>Quality and Nature of Services</u>.

(a)    Except as otherwise provided in this Agreement, Service Provider shall provide, or shall cause to be provided, the Services using substantially the same manner, nature, detail and attention, quality, standard of care and at a level of service that is substantially the same (and in no case materially lower or worse than) with which such Services were provided to Service Recipient, its Affiliates or predecessors in interest (including, in the case of Buyer as Service Recipient, the Business) during the six (6) months prior to the Closing Date.  If a Service was provided during the six (6) months prior to the Closing Date by a third party, and such Service will continue to be provided by such third party on behalf of Service Provider, Service Provider shall use its reasonable efforts so that the quality and availability of such Service is provided to Service Recipient in a manner substantially similar with the applicable agreement pursuant to which such third party provided the Service to the Business immediately prior to the Closing Date.  Except as set forth in the Purchase Agreement or any other Related Agreement, there shall be no material change in the scope or level of, or use by Service Recipient or its Affiliates, as applicable, of the Services during the Service Period without the mutual written agreement of the Parties.  Subject to the first sentence of this <u>Section 1.2(a)</u> and to <u>Section 1.7</u>, Service Provider may make changes from time to time in the manner of performing Services without Service Recipient's consent (including changes to its, its Affiliates' and its Personnel's systems) if (i) Service Provider is making similar changes in the manner that it provides substantially similar services to itself and its Affiliates, (ii) Service Provider provides Service Recipient with reasonable prior written notice of any material change in the manner of providing Services and (iii) Service Provider consults with Service Recipient in good faith to minimize any adverse effect of such changes on the provision of such Services. Buyer acknowledges and agrees that Seller and certain of its subsidiaries are debtors in the Bankruptcy Case and that, as such, it and such subsidiaries are subject to limitations on debtors under chapter 11 of the Bankruptcy Code and subject to any orders of the Bankruptcy Court and its debtor-in-possession financing, and that, in addition, the Seller may have further limitations on its resources.  Buyer agrees that the obligations and efforts (including commercially reasonable efforts) herein of the

-2-

Seller and its subsidiaries are qualified accordingly. In providing the Services the Service Provider shall not be obligated to: (i) hire any replacement employees (except to the extent necessary to provide a Service); (ii) maintain the employment of any specific employee; (iii) purchase, lease or license any additional equipment or software; (iv) create or supply any documentation or information not currently existing or available without commercially unreasonable effort; (v) pay any costs related to the transfer or conversion of data or other information to Service Recipient (except to the extent necessary to provide a Service and reimbursed by Service Recipient); or (vi) enter into additional contracts or agreements or change the scope of current contracts or agreements (except to the extent necessary to provide a Service and in accordance with <u>Section 1.2(b)</u> and <u>Section 1.6</u>).

(b)     Notwithstanding anything to the contrary contained in this Agreement (but subject to <u>Section 1.6</u>), Service Provider shall not be obligated to provide any Service to the extent the provision of such Service would violate (i) any agreement or license with a third party or other contractual obligation, in each case, to which Service Provider or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law; <u>provided</u>, <u>however</u>, that Service Provider shall provide Service Recipient written notice as promptly as practicable (and no later than ten (10) days) after Service Provider becomes aware of any Service that cannot be provided, which notice shall include an explanation of the violation.  In the event Service Provider is unable to provide a Service pursuant to the foregoing clauses <u>(i)</u> or <u>(ii)</u>, Service Provider shall, if requested by Service Recipient, use its commercially reasonable efforts to determine an alternate method to provide such Service; <u>provided</u>, <u>however</u>, that Service Provider shall have no obligation to incur additional costs to provide such Service unless Service Recipient agrees in advance to reimburse Service Provider for such costs.  To the knowledge of the Sellers (without any inquiry being undertaken), there are no material Contracts or licenses with any third party under which such third party would be prohibited from providing all or a portion of any Seller Service to Buyers; provided that consent may be required from any such third party.

(c)     Notwithstanding anything in this Agreement to the contrary, Service Provider will not provide any legal services or legal advice to Service Recipient, and Service Recipient is not entitled to rely on Service Provider for legal advice or counsel, and any advisory communications given by Service Provider to Service Recipient are not to be construed as legal advice.  Service Recipient shall not resell any Services, provide the Services to any Person that is not an Affiliate directly or indirectly wholly-owned by Service Recipient's parent, or otherwise use the Services in a manner that differs in any material respect from the manner in which the Services were used by the Business, or the applicable businesses of the Seller and its Affiliates other than the Business, during the six (6) months prior to the Closing Date.

Section 1.3     <u>Changes in the Services</u>. To the extent mutually agreed by the Parties in writing, any Service may be reasonably modified and additional services not specified on <u>Schedule A</u> may be added that (i) during the six (6) month period prior to the Closing Date, were used in the operation of the Business or (ii) are reasonably requested by Service Recipient with such request not unreasonably withheld, conditioned or delayed (each such modification or addition described in this first sentence of <u>Section 1.3</u>, a "<u>Service Change</u>"), it being understood that (i) no Party is under any obligation to agree to any such proposed modification or addition, and (ii) prior to any such agreement to modify or add any service, the Parties shall negotiate in

-3-

good faith the fees for such modified or added services. Upon any such Service Change, Schedule A shall be automatically deemed to be modified to reflect the Service Change and the Service Provider shall proceed to perform the Services, as changed, in accordance with the Service Change and all other requirements, terms, conditions and provisions of this Agreement.

Section 1.4    Standard of Care.  Except as otherwise set forth in this Agreement, Service Provider does not assume any responsibility under this Agreement other than to render the Services in good faith and in compliance with all applicable Laws, without fraud, willful misconduct or gross negligence. EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER MAKES NO, AND SERVICE RECIPIENT REPRESENTS THAT IT HAS NOT RECEIVED OR RELIED UPON ANY, OTHER GUARANTEE, REPRESENTATION OR WARRANTY OF ANY KIND (WHETHER EXPRESS OR IMPLIED) REGARDING ANY OF THE SERVICES PROVIDED HEREUNDER. EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS ALL, AND SERVICE RECIPIENT EXPRESSLY REPRESENTS THAT IT HAS NOT AND IS NOT RELYING UPON ANY, GUARANTEES, REPRESENTATIONS AND WARRANTIES OF ANY NATURE WHATSOEVER, WHETHER STATUTORY, ORAL, WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

Section 1.5    Responsibility for Errors; Delays.  Without limiting Section 5.2, in the event there is any error or omissions in Services caused by Service Provider or Vendor, and to the extent any such error or omission was within the control of Service Provider or Vendor at the time of performance, as a non-exclusive remedy to Service Recipient for such error or omission, Service Provider shall use its commercially reasonable efforts to re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services, in each case at no additional cost or expense to Service Recipient if Service Recipient promptly advises Service Provider of such error or omission. Notwithstanding the foregoing, but without limiting Section 5.2, Service Provider shall not be obligated to re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services if the error or omission was directly or indirectly caused by the (i) provision of significantly inaccurate or incomplete information by, or (ii) gross negligence or willful misconduct of, Service Recipient, its Affiliates or its or their Personnel.

Section 1.6    Cooperation; Alternatives.  Unless otherwise provided for in this Agreement, Service Provider and Service Recipient shall use commercially reasonable efforts to cooperate with each other in all matters relating to the provision and receipt of the Services, and Service Provider and Service Recipient shall each use their respective commercially reasonable efforts to cause each of their respective employees and contractors to reasonably cooperate to the extent required for effective delivery of the Services. Service Recipient shall provide such reasonable advance notice and forecasts of Services as are requested in writing by Service Provider performing the Services from time to time. To the extent any consents or licenses from Third Parties are reasonably necessary for the provision or receipt of any Service, the Parties will work together in good faith to seek such consents or licenses; provided that, Service Provider shall not be required to incur any additional costs in order to obtain such consents or licenses unless Service Recipient agrees in advance to reimburse Service Provider for such costs.

-4-

Section 1.7   Use of Affiliates and Vendors.  Service Provider may use (a) any Affiliate or (b) a qualified third party provider ("Vendor"), to provide the Services; provided, however, that (i) Service Provider shall remain responsible at all times for the performance of Services by its Affiliates or any Vendor under this Agreement and (ii) a Vendor may only be used by Service Provider following the written consent of Service Recipient, such consent not to be unreasonably withheld, delayed or conditioned.  Service Recipient's prior written consent of a Vendor designation will not be required, however, if (x) the Vendor provided those Services to the Business or the businesses of the Service Recipient, as applicable, prior to the Closing Date; (y) the Vendor is a third party who provided the same services to Service Provider prior to the Closing Date; or (z) Service Provider changes the Vendor used to provide such Services or substantially similar services to Service Provider.

Section 1.8   Intellectual Property.

(a)   Except as otherwise provided in Section 1.8(b), neither Party shall acquire under this Agreement any right, title or interest in any asset or Intellectual Property that is owned or licensed by the other Party or its Affiliates. To the extent the provision of any Service involves Intellectual Property, each Party agrees that it and its Affiliates shall not copy, modify, reverse engineer, decompile or in any way alter any of such material, or otherwise use such material in a manner inconsistent with the terms and provisions of this Agreement or the Purchase Agreement without the express written consent of the other Party.

(b)   Solely during the Service Period, and solely to the extent required for the provision or receipt, as applicable, of Services in accordance with this Agreement, each Party ("Licensor"), for itself and on behalf of its Affiliates, hereby grants to the other Party and its Affiliates ("Licensee") a non-exclusive, non-transferable, royalty-free, worldwide license for the Term, to use any Intellectual Property (and any tangible embodiments thereof) owned by Licensor or its Affiliates, subject to any applicable restrictions, limitations and other instructions provided in writing to Licensee. Notwithstanding anything to the contrary contained in this Agreement, including in this Section 1.8, neither Party shall be obligated to license any Intellectual Property to the extent such license would violate (i) any agreement, license or other contractual obligation, in each case, with a third party to which such Party or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law.

(c)   To the extent any work product (including all Intellectual Property therein) is created or developed by the Service Provider at the request of the Service Recipient in connection with the provision of the Services ("Work Product"), all such Work Product shall be owned by, and shall be the exclusive property of, the Service Recipient. The Service Provider acknowledges and agrees that, to the fullest extent allowed by applicable Law, all of the Work Product shall be deemed "work made for hire," as that phrase is defined in the Copyright Act of 1976 (17 U.S.C. § 101), for the Service Recipient. To the extent that any Work Product does not qualify in the United States for any reason as a "work made for hire", the Service Provider hereby irrevocably assigns to the Service Recipient any and all of its right, title and interest in and to such Work Product.  The Service Provider further agrees to execute and deliver to the Service Recipient any and all further documents and instruments, and to do all further acts which the Service Recipient (or its agents or designees) reasonably requests, at the Service Recipient's cost and expense, to carry out this Section 1.8(c).

-5-

Section 1.9    Ownership of the Data.  All data provided by or on behalf of a Party to the other Party or its Affiliates for the purpose of providing or receiving the Services shall remain the property of the Party providing such data unless otherwise specified herein.

Section 1.10    Data Privacy.  Each Party shall, and shall cause its Affiliates and Personnel to, comply with all applicable data protection, privacy and similar applicable Laws (including all applicable statutes, enacting instruments, common law, regulations and directives) (the "Data Protection Laws") with respect to the provision of the Services under this Agreement. Each Party shall, and shall cause its Affiliates or Personnel to, comply with all applicable Data Protection Laws in relation to all information that is considered "personally identifiable information," "personal information," "nonpublic personal information" or "personal data" under applicable Laws (the "Protected Data") it acquires, accesses, discloses, uses, processes, sells or maintains in the course of performing its obligations under this Agreement.  If in connection with this Agreement or the Services provided hereunder, either Party acquires, accesses, discloses, uses, processes, sells or maintains any Protected Data provided by or collected for the other Party, such Party shall, and shall cause each of its relevant Affiliates and Personnel to, (a) implement and maintain appropriate technical and organization measures and security procedures and practices in respect of the Protected Data to prevent unauthorized or unlawful acquisition, access, disclosure, use, processing, sale or maintenance of the Protected Data that (i) comply with all applicable Data Protection Laws and (ii) are in no event less protective than those used by such Party in the ordinary course of business, (b) keep records which are accurate in all material respects relating to the acquisition, access, disclosure, use, processing, sale and maintenance of Protected Data in accordance with its applicable procedures and practices and all applicable Data Protection Laws and, upon reasonable advanced written notice, permit the other Party to examine or audit such records with respect to compliance with Data Protection Laws, (c) reasonably cooperate with the other Party in connection with any complaints or investigations related to unauthorized or unlawful acquisition, access, disclosure, use, processing, sale or maintenance of the Protected Data, (d) use such Protected Data solely for the purposes of performing its obligations under this Agreement or as otherwise required by applicable Law (subject to providing to the other Party prior notice of any use other than for the purpose(s) of this Agreement), (e) comply with all reasonable restrictions on the acquisition of, access to, use, processing, sale, maintenance and disclosure of Protected Data imposed by the other Party or by applicable Law, (f) notify the other Party in writing as soon as reasonably practicable, but in any event within forty-eight (48) hours after becoming aware of any unauthorized or unlawful acquisition, access, disclosure, use, processing, sale or maintenance of Protected Data (to the extent not prohibited under applicable Law) and take reasonable actions to prevent further unauthorized or unlawful acquisition, access, disclosure, use, processing, sale or maintenance and (g) use, access, process, sell, maintain and disclose the Protected Data in a manner that is consistent in all material respects with the other Party's privacy notices and policies, upon reasonable advanced written notice of such privacy notices and policies.  To the extent required by applicable Data Protection Laws or as deemed necessary by the Parties, the Parties (or their respective Affiliates) will enter into additional agreements with respect to the processing of Protected Data.

Section 1.11    Single Point of Contact.  Each Party shall designate a contact person (each, a "Single Point of Contact"), as set forth on Schedule B, to facilitate communications and performance with respect to this Agreement and the Services, including

-6-

operational matters.  Unless otherwise authorized in writing or specified in the specific Schedule related to a Service, the Parties shall direct all communications relating to this Agreement and the Services to the Single Point of Contact for the other Party.  Each Party shall have the right at any time and from time to time to replace its Single Point of Contact by written notice to the other Party in accordance with <u>Section 6.3</u>, following which <u>Schedule B</u> shall be automatically amended to reflect such Party's new Single Point of Contact.

Section 1.12   <u>Records</u>.  During the Term and for five (5) years thereafter (or such longer period as may be required by applicable Law), Service Provider and Service Recipient shall each use commercially reasonable efforts to maintain complete and accurate records related to any Service provided, Fees invoiced and payments made hereunder (the "<u>Service Records</u>"); <u>provided</u>, that if Service Provider at any time offers in writing to transfer the Service Records in Service Provider's possession to Service Recipient, Service Recipient shall have ninety (90) days thereafter to take possession of the Service Records, after which Service Provider shall no longer have an obligation to retain, and may thereafter delete or destroy, such Service Records.  Upon reasonable advance notice, and subject to <u>Article IV</u>, each Party in possession of Service Records shall use commercially reasonable efforts to permit the other Party or its Representatives, as applicable, reasonable access to or, at the requesting Party's expense, copies of, such Service Records during regular business hours; <u>provided</u>, that (a) such access shall not disrupt the normal operations of such first Party's business and (b) nothing herein shall require any Party to provide to the other Party, its Affiliates or its Representatives with access to or copies of any information to the extent that such access to or the provision of such information would violate any applicable Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information); <u>provided</u>, that such Party and its Affiliates shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law or is in accordance with such agreement.

Section 1.13   <u>Employees and Contractors</u>.  As between Service Provider and Service Recipient, at all times during the provision of Services, such Personnel shall continue to be solely an employee, agent or contractor, as applicable, of Service Provider and shall not, unless otherwise agreed in writing by Service Provider and Service Recipient, become an employee, agent or contractor of Service Recipient, and such Personnel shall not be entitled to receive any compensation, benefits, perquisites or privileges from Service Recipient <u>provided</u>, that, the foregoing shall not prevent such Personnel from leaving the employment of Service Provider, either at the discretion of such individual Personnel or at Service Provider's discretion. Service Provider or one or more of its Affiliates, as applicable, shall be responsible for paying all necessary employment taxes, salary and incidental appointment and employment costs, if any, as may be required by applicable Law with respect to any such Personnel.

Section 1.14   <u>Access to Facilities</u>.  If either Party, its Affiliates or its Personnel require access to the facilities of the other Party or its Affiliates (collectively, the "<u>Facilities</u>") in order to receive or perform Services, then the Party controlling such access shall reasonably allow the other Party, its Affiliates or their respective Personnel such access in accordance with this <u>Section 1.14</u> and <u>Section 1.15</u>, as applicable.  The Party to whom such access is given shall (a) limit such access to those of its and its Affiliates' Personnel who reasonably require such access in connection with this Agreement, (b) advise the other Party in writing in advance of

-7-

such access of the name of each such Personnel who shall require such access, (c) follow, and cause its Affiliates and their respective Personnel to follow, all rules and procedures for use of such Facilities, provided such rules and procedures are communicated to such Party in writing in advance, (d) not attempt to obtain access to, use or interfere with any systems or resources of the other Party, except to the extent permitted by the other Party and required to do so to provide or receive the Services and (e) not intentionally damage, disrupt or impair the normal operation of the Facilities.  Any evidenced damage caused by a Party, its Affiliates or their respective Personnel or agents in the Facilities of the other Party shall be repaired to the condition prior to such damage by or on behalf of such Party, in each case, at the damaging Party's sole cost and expense.

Section 1.15    Computer Access.  If either Party, its Affiliates or its Personnel are given access, whether on-site or through remote facilities, to any communications, computer, or electronic data storage systems (each, an "Electronic Resource") of the other Party, its Affiliates or its Personnel in connection with this Agreement, then the Party to whom such access is given shall ensure that its Personnel's use of such access shall be solely limited to performance or exercise of such Party's duties and rights under this Agreement, and that such Personnel shall not attempt to access any Electronic Resources other than those specifically required for the performance of such duties or exercise of such rights.  The Party given access shall (a) limit such access to those of its and its Affiliates' Personnel who reasonably require such access in connection with this Agreement, (b) advise the other Party in writing in advance of such access of the name of each of such Personnel who shall require such access, (c) follow, and cause its Affiliates and its and Affiliates' Personnel to follow, all security rules and procedures for use of such Electronic Resources, provided such rules and procedures are communicated to such Party in writing, (d) not attempt to obtain access to, use or interfere with any Electronic Resource of the other Party, or any data owned, used or processed by the other Party, except to the extent permitted by the other Party and required to do so to provide or receive the Services and (e) not disable, damage or erase or disrupt or impair the normal operation of the Electronic Resource. All user identification numbers and passwords disclosed to a Party's or its Affiliates' Personnel and any information obtained by such Party's or its Affiliates' Personnel as a result of its access to, and use of the other Party's, its Affiliates' or its Personnel's Electronic Resources shall be deemed to be, and shall be treated as, Confidential Information of the Party on behalf of whom such access is granted.  Each Party shall reasonably cooperate with the other Party in the investigation of any apparent unauthorized access by the other Party, its Affiliates or its Personnel to any Electronic Resources or unauthorized release of Confidential Information and take reasonable actions to prevent any further unauthorized access to any Electronic Resources or other unauthorized or unlawful conduct or activities related to the Electronic Resources.  Each Party shall notify the other Party in writing within forty-eight (48) hours of discovery of any actual or suspected unauthorized access to or disclosure of any Electronic Resource of the other Party, its Affiliates or its Personnel, to the extent reasonably practicable and not prohibited under applicable Law or recommendation of a Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, nothing in this Section 1.15 shall in any way limit the obligations of either Party or any of its Affiliates or Personnel set forth in Section 1.10.

WEIL:\97074189\1\41703.0011

## ARTICLE II

## CHARGES AND PAYMENTS FOR SERVICES

Section 2.1    Compensation.  As consideration for the provision of Services, Service Recipient shall pay, or cause to be paid, to Service Provider or its designee(s) the fees for the Services specified on Schedule A (the "Fees"), payable in accordance with Schedule A, for the duration of such Services as set forth on Schedule A. Such Fees shall be calculated in accordance with the cost allocation principles set forth in Schedule C. Service Recipient shall pay a pro rata portion of the applicable Fee specified on Schedule A for any partial months of Service, to the extent the Fees specified on Schedule A are calculated on a monthly basis. The total cost of Fees payable by Service Recipient in each calendar month during the Term shall not exceed seven hundred fifty thousand U.S. dollars ($750,000); provided, that this cap may be exceeded in any given calendar month solely to the extent as a result of a Service Change made in accordance with Section 1.3 or as a result of increased Vendor's fees (as described in this Section 2.1).  If the Fees include charges for Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Service Provider shall be entitled to pass through the increased fees as an increase in the Fees; provided, that to the extent that Service Provider uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor. In the event of any such increase in a Vendor's fees, Service Provider shall provide Service Recipient with prompt written notice thereof (to the extent reasonably practicable, at least thirty (30) days' prior to such increase going into effect) and following receipt of such written notice, Service Recipient may, reduce or terminate any Service affected by such an increase in fees in accordance with Section 3.2.

Section 2.2    Payments.  Service Recipient shall pay (or shall cause to be paid) the Fees in accordance with Section 2.1 and this Section 2.2. During the Term, within ten (10) Business Days prior to the first Business Day of each calendar month, Service Provider shall provide to Service Recipient a reasonable written estimate of the Fees predicted for the Services for the first two weeks of the upcoming calendar month (the "First Semi-Monthly Predicted Fees") and the remaining weeks of the upcoming calendar month (the "Second Semi-Monthly Predicted Fees", together with the First Semi-Monthly Predicted Fees, the "Monthly Predicted Fees"). Service Provider may revise the Monthly Predicted Fees for a given calendar month at any point up until Service Recipient has actually made payment for such month's Monthly Predicted Fees.  Unless otherwise mutually agreed in writing or otherwise set forth on Schedule A, Service Recipient shall pay Service Provider or, if applicable, its designee(s), Affiliates or Vendors, by electronic transfer of immediately available funds to a bank account designated by such Person from time to time, (i) the First Semi-Monthly Predicted Fees at least five (5) Business Days prior to the fifteenth (15th) day of the relevant calendar month during the Term in which such First Semi-Monthly Predicted Fees are incurred and (ii) the Second Semi-Monthly Predicted Fees at least five (5) Business Day prior to the last day of the relevant calendar month during the Term in which such Second Semi-Monthly Predicted Fees are incurred. Within ten (10) Business Days after the end of each calendar month during the Term, Service Provider shall provide Service Recipient with an invoice of all Fees relevant to the Services during the preceding month actually paid or payable by Service Recipient and the Parties shall promptly

-9-

reconcile the difference between the total of the month's Monthly Predicted Fees and the invoiced Fees (the "Reconciliation Amount"), if any.  A Party who owes monies to the other Party as a result of such reconciliation shall pay the undisputed Reconciliation Amount within thirty (30) days following Service Provider's dated invoice of Fees actually paid or payable.  All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) set forth in an invoice statement shall accrue two percent (2%) interest per month until paid in full.

Section 2.3    Taxes.  The Parties hereby acknowledge that the Fees specified in Schedule A do not include applicable Taxes. Subject to Section 1.13, Service Recipient shall be responsible for the payment of all Taxes payable in connection with the Services, including sales, use, excise, value-added, business, service, goods and services, consumption, stamp, stamp duty, documentary registration, withholding and other similar gross receipts-based Taxes or duties, including such Taxes incurred on transactions between and among Service Provider, its Affiliates and its Vendors, imposed on or payable with respect to the Fees, along with any related interest and penalties, in each case, imposed, assessed or payable with respect to such taxes in accordance with applicable Law (together, such amounts, the "Service Provision Taxes") (which shall not be subject to or taken into account with respect to the cap on Fees pursuant to Section 2.1).  On a monthly basis, (i) Service Provider will deliver to Service Recipient an invoice (or other valid and customary documentation) reflecting such Service Provision Taxes imposed, assessed, or payable, and (ii) Service Recipient shall reimburse Service Provider for any Service Provision Taxes that are Service Recipient's responsibility under this Agreement.  In accordance with applicable Law, Service Provider will timely remit amounts due to the applicable Governmental Authority and promptly provide reasonable documentary evidence of the timely and proper remittance of such amount.  Notwithstanding anything in this Agreement to the contrary, each Party shall be responsible for its own income and franchise Taxes, employment Taxes (for the avoidance of doubt, non-reimbursable employment taxes include only the employer's portion of payroll taxes) and real or personal property Taxes, except as provided in the Purchase Agreement or any other Related Agreement.  The Parties shall cooperate and take any reasonable requested action in order to minimize Service Provision Taxes to the extent legally permissible.  Each Party shall provide to the other Party any resale exemption, multiple points of use certificates, treaty certification and other exemption information reasonably requested by the other Party.

Section 2.4    No Off-Set.  Except as otherwise expressly provided in this Agreement or as required by Law, Service Recipient shall timely pay the full amount of the Fees and shall not set-off, counterclaim or otherwise withhold any amount owed to Service Provider under this Agreement on account of any obligation owed by Service Provider to Service Recipient under this Agreement or any Related Agreement.  To the extent Service Recipient is required to deduct and withhold any amounts in respect of Taxes of Service Provider from any amounts payable pursuant to this Agreement under any provision of U.S. federal, state, local or foreign Tax Law, the sum payable by the Service Recipient shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.4), the Service Provider receives an amount equal to the sum it would have received had no such deduction or withholding been made and the Service Recipient shall indemnify and hold harmless, the Service Provider on an after-tax basis, with respect thereto. The Parties shall cooperate and take any

-10-

reasonable requested action to ensure that any withholding tax is deducted at the lowest applicable rate, including completing all necessary forms and making all necessary returns.  Any Party that deducts and withholds amounts pursuant to this <u>Section 2.4</u> shall, upon the request of the other Party, provide reasonable documentary evidence of the timely and proper remittance of such amounts.

## ARTICLE III

## TERMINATION

Section 3.1    <u>Term</u>. The term of this Agreement shall commence immediately upon the Effective Date and terminate on the date which is six (6) months following the Closing Date (the "<u>Term</u>").

Section 3.2    <u>Termination of an Individual Service for Convenience by Service Recipient</u>.  Except as otherwise set forth on <u>Schedule A</u> and subject to the next sentence, Service Recipient, upon thirty (30) days' prior written notice to Service Provider, may reduce or terminate for Service Recipient's convenience any individual Service.  Service Recipient may not reduce or terminate an individual Service if such early reduction or termination would prevent Service Provider, its Affiliates or Vendors from performing another Service that is not also being terminated.  If Service Recipient's early reduction or termination of any Service results in Service Provider having to pay any out-of-pocket fees or expenses to a third party (including termination charges), Service Recipient shall reimburse Service Provider for such charges, if Service Recipient is notified prior to the incurrence of such charges. Upon notification of such charges, Service Recipient, at its sole discretion, may choose to continue, reduce or terminate the applicable Service.  In connection with any early reduction or termination of Services by Service Recipient in accordance with the provisions of this <u>Section 3.2</u>, Service Recipient and Service Provider shall coordinate in good faith regarding the early termination or continuation of preexisting service contracts with Vendors.

Section 3.3    <u>Termination of this Agreement</u>.

(a)    Subject to the next sentence, either Party may terminate this Agreement in the event of (i) a material breach of this Agreement by the other Party, if such material breach is curable by the breaching Party and the breaching Party fails to cure the breach within thirty (30) days following its receipt of written notice of the breach from the non-breaching Party or (ii) an assignment with respect to which the non-assigning Party has not consented in accordance with <u>Section 6.2</u>.  If a material breach is not curable by the breaching Party, the non-breaching Party may immediately terminate this Agreement following the non-breaching Party's delivery of notice to the breaching Party pursuant to <u>Section 6.3</u>.  Notwithstanding anything herein to the contrary, Service Recipient's failure to pay any Fees when due and payable shall not constitute a breach of the terms of this Agreement if there exists a good faith disagreement regarding such Fees and Service Recipient pays all Fees for which no good faith dispute exists.

(b)    Except as otherwise provided herein, the obligation of Service Provider to provide, or cause to be provided, any Service shall cease on the earliest to occur of (i) the expiration of the Term, (ii) the expiration of the Service Period applicable to such Service or (iii)

-11-

the date on which such Service is terminated in accordance with the terms of this <u>Article III</u>. This Agreement shall automatically terminate without notice, and all provisions of this Agreement shall become null and void and of no further force and effect, except for the provisions set forth in <u>Section 6.5</u>, on the date on which neither Party has any obligations to provide any Service under this Agreement.

Notwithstanding the foregoing, if this Agreement is terminated pursuant to this Section 3.3, then the Parties shall, for a period not to exceed thirty (30) calendar days, use commercially reasonable efforts to assist each other in transitioning the performance or provision of any Services remaining under this Agreement (as of the date of such termination) to the Service Recipient or such other third party that the Service Recipient chooses to replace the Service Provider to perform such remaining or unfulfilled Services.

Section 3.4    <u>Obligations on Termination or Expiration</u>.  Upon termination or expiration of this Agreement or any Service hereunder, Service Provider shall invoice Service Recipient for all outstanding Fees for Services rendered through the effective date of termination or expiration of this Agreement, or with respect to any terminated Service, all outstanding fees for such Service rendered through the effective date of termination for such terminated Service, and, within thirty (30) days following receipt of such invoice, Service Recipient shall pay all outstanding Fees for such Services.  Undisputed payments not made within thirty (30) days after termination or expiration of this Agreement shall be subject to the late charges as provided in <u>Section 2.2</u>.

Section 3.5    <u>Reduction or Termination of an Individual Service by Vendor</u>.  If (a) a Vendor of Service Provider that provides a Service is unwilling or unable to provide the Service, (b) Service Provider is unable to retain a replacement Vendor to provide the Service on terms that are reasonably comparable to the terms of this Agreement, after using commercially reasonable efforts to find such replacement and (c) neither Service Provider nor any of its Affiliates are able to provide the Service using commercially reasonable efforts, Service Provider, upon providing thirty (30) days' prior written notice to Service Recipient, may terminate the affected Service. Such termination of the affected Service shall have no effect upon the provision of the other Services to Service Recipient unless other Services are dependent on that terminated Service, in which case the Parties will cooperate and use commercially reasonable efforts to promptly determine and implement a reasonable alternative arrangement for the affected Services.

**ARTICLE IV**

**CONFIDENTIALITY**

Section 4.1    Confidential Information.  "<u>Confidential Information</u>" means any nonpublic information whether disclosed in oral, written, visual, electronic or other form, that (a) one Party or one of its Affiliates (the "<u>Disclosing Party</u>") discloses to the other Party or one of its Affiliates (the "<u>Receiving Party</u>"), including information received as a result of data or system access during the Term, (b) relates to or is disclosed in connection with this Agreement and (c) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to

-12-

the Disclosing Party (whether or not such information is marked "Confidential" or "Proprietary").

Section 4.2    Treatment of Confidential Information.  The Receiving Party shall (a) restrict disclosure of the Disclosing Party's Confidential Information to its and its Affiliates' Personnel with a need to know such Confidential Information to fulfill its obligations under this Agreement, (b) instruct those Personnel of their obligation not to disclose the Confidential Information or use the Confidential Information except to fulfill the Receiving Party's obligations under this Agreement and (c) protect the Confidential Information, and require those Personnel to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care.  The Receiving Party shall notify the Disclosing Party as soon as reasonably practicable after obtaining knowledge of any disclosure, or suspected disclosure, of any Confidential Information to a third party in a manner prohibited by applicable Law or the terms of this Agreement.

Section 4.3    Liability for Unauthorized Disclosure.  The Receiving Party shall be liable to the Disclosing Party for any unauthorized disclosure of Confidential Information in violation of this Agreement by it, its Affiliates and any of its or its Affiliates' current or former Personnel.

Section 4.4    Destruction.  Without limiting the foregoing, when any Confidential Information is no longer needed for the purposes contemplated by this Agreement, the Receiving Party shall, as promptly as practicable upon the request of the Disclosing Party, either return such Confidential Information in tangible form or certify to the other Party that it has destroyed such Confidential Information.

Section 4.5    Exceptions to Confidential Treatment.  The obligations under Section 4.2 do not apply to any information that the Receiving Party can demonstrate (a) was disclosed to the Receiving Party by a third party without an obligation of confidentiality to the Disclosing Party, its Affiliates or any other third party, as applicable, (b) is or becomes available to the public other than by disclosure by the Receiving Party or its Affiliates in violation of this Agreement or (c) was or is independently developed by the Receiving Party or its Affiliates without use of the Disclosing Party's Confidential Information.  Notwithstanding anything to the contrary, Confidential Information relating to the Business that existed as of the Effective Date shall not be subject to the foregoing exceptions (a) and (c).

Section 4.6    Protective Arrangement.  A Receiving Party may disclose the Disclosing Party's Confidential Information if (a) such information is required to be disclosed by Law or the rules and regulations of any applicable Governmental Authority or (b) such information is required to be disclosed in response to a valid subpoena or Order of a court or other Governmental Authority of competent jurisdiction or other valid legal process, and the Receiving Party has complied with this Section 4.6.  Prior to any such disclosure, the Receiving Party shall give the Disclosing Party, to the extent legally permitted and reasonably practicable, prompt prior written notice of such disclosure and an opportunity to contest such disclosure, and the Receiving Party shall use commercially reasonable efforts to cooperate, at the expense of the Receiving Party, in seeking any reasonable protective arrangements requested by the Disclosing Party.  If such appropriate protective order or other remedy is not obtained, the Receiving Party

-13-

may furnish, or cause to be furnished, only that portion of such information that the Receiving Party is legally required to be disclosed.  The Receiving Party shall take commercially reasonable steps to ensure that confidential treatment is accorded such information.

Section 4.7   Ownership of Information.  Except as otherwise provided in this Agreement, all Confidential Information provided by or on behalf of a Party (or its Affiliates) that is provided to the other Party or its Affiliates shall remain the property of the Disclosing Party and nothing herein shall be construed as granting or conferring rights of license or otherwise in any such Confidential Information.

## ARTICLE V

## INDEMNIFICATION; LIMITATION OF LIABILITY

Section 5.1   Indemnification by Service Recipient. Notwithstanding anything to the contrary in Section 5.5, Service Recipient shall defend, indemnify and hold harmless Service Provider and its Affiliates and its Vendors and Personnel (each, a "Service Provider Indemnitee") from and against any and all Losses actually incurred or suffered by Service Provider Indemnitee to the extent related to or arising out of: (a) a material breach of any provision of this Agreement by Service Recipient or its Affiliates, its Vendors or its or their respective Personnel; or (b) the gross negligence, willful misconduct or fraud of Service Recipient or its Affiliates or its or their respective Personnel during receipt of the Services (together the "Service Recipient Claims"). Notwithstanding the obligations set forth above in this Section 5.1, Service Recipient shall not defend, indemnify or hold harmless Service Provider Indemnitees to the extent that such Service Recipient Claims were caused by: (i) a material breach of any provision of this Agreement by Service Provider, its Affiliates, its Vendors or its or their respective Personnel; or (ii) the gross negligence, willful misconduct or fraud of Service Provider, its Affiliates, its Vendors or its or their respective Personnel during the performance (or non-performance) of this Agreement.

Section 5.2   Indemnification by Service Provider. Notwithstanding anything to the contrary in Section 5.5, Service Provider shall defend, indemnify and hold harmless Service Recipient and its Affiliates and Personnel (each, a "Service Recipient Indemnitee") from and against any and all Losses actually incurred or suffered by Service Recipient Indemnitee to the extent related to or arising out of: (a) a material breach of any provision of this Agreement by Service Provider, its Affiliates, its Vendors or its or their respective Personnel; or (b) the gross negligence, willful misconduct or fraud of Service Provider, its Affiliates, its Vendors or its or their respective Personnel during the performance (or non-performance) of the Services (together, the "Service Provider Claims"). Notwithstanding the obligations set forth above in this Section 5.2, Service Provider shall not defend, indemnify or hold harmless Service Recipient Indemnitees to the extent that such Service Provider Claims were caused by: (i) a material breach of any provision of this Agreement by Service Recipient, its Affiliates or its or their respective Personnel; or (ii) the gross negligence, willful misconduct or fraud of Service Recipient, its Affiliates, or its or their respective Personnel in the performance (or non-performance) of this Agreement. Service Recipient Claims and Service Provider Claims are each individually referred to as a "Claim."

-14-

Section 5.3    Procedure.  In the event of a Claim that arises from a third party claim, the indemnified Party shall give the indemnifying Party prompt notice in writing of the Claim; but the failure to provide such notice shall not release the indemnifying Party from any of its obligations under this Article V, except to the extent the indemnifying Party is materially prejudiced by such failure.  Upon receipt of such notice, the indemnifying Party shall be entitled to assume and control the defense of the Claim at its expense and through counsel of its choice that is reasonably satisfactory to the indemnified Party, and shall give notice of its intention to do so to the indemnified Party within thirty (30) days of the receipt of such notice from the indemnified Party; provided, however, that the indemnifying Party shall not, without the prior written consent of the indemnified Party, (a) enter into any settlement or compromise with respect to any Claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the indemnified Party of a written release from all liability in respect of the Claim or (b) enter into any settlement or compromise with respect to any Claim in any manner that may adversely affect the indemnified Party other than as a result of money damages or other monetary payments that are indemnified hereunder.  Notwithstanding anything to the contrary contained in this Agreement, the indemnifying Party shall not be entitled to assume or continue control of the defense of any Claim if (a) such Claim relates to or arises in connection with any criminal proceeding or (b) the indemnified Party's counsel advises that a conflict of interest exists or would reasonably be expected to arise in the event the indemnifying Party elects to control or defend such Claim.  The indemnified Party shall have the right at its own cost and expense to employ separate counsel and participate in the defense of any Claim.

Section 5.4    Independent Obligation.  The obligations of each Party to defend, indemnify and hold harmless, the other Parties' indemnified Parties under this Article V are independent of each other and any other obligation of the Parties under this Agreement.

Section 5.5    Limitation of Liability.  EXCEPT (A) LIABILITIES THAT ARE PAYABLE BY THE APPLICABLE INDEMNIFIED PARTY IN CONNECTION WITH A THIRD PARTY CLAIM OR (B) FOR A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PRIVACY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, NOR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES, BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES OR LOST PROFITS HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING IN ANY WAY OUT OF THIS AGREEMENT.  EXCEPT AS OTHERWISE LIMITED IN THIS SECTION 5.5, THE LIABILITY(IES) OF EACH PARTY AND ITS AFFILIATES UNDER THIS AGREEMENT SHALL BE LIMITED TO (1) SERVICE PROVIDER'S OBLIGATION TO RE-PERFORM A SERVICE (IF SERVICE PROVIDER IS THEN CAPABLE OF PROVIDING SUCH SERVICE PURSUANT TO THE TERMS OF THIS AGREEMENT) OR FURNISH CORRECT INFORMATION, PAYMENT OR ADJUSTMENT IN THE SERVICES AT NO ADDITIONAL COST OR EXPENSE TO SERVICE RECIPIENT IF SERVICE RECIPIENT PROMPTLY ADVISES SERVICE PROVIDER OF SUCH ERROR OR OMISSION, IN EACH CASE IN ACCORDANCE WITH SECTION 1.5, (2) OTHER SPECIFIC PERFORMANCE (OR OTHER EQUITABLE RELIEF) AS PROVIDED IN SECTION 6.9, AND (3) THE PAYMENT OF MONETARY DAMAGES, NOT TO EXCEED, FOR ALL CLAIMS IN THE AGGREGATE, THE AGGREGATE

-15-

AMOUNT OF FEES ACTUALLY PAID (OR OTHERWISE PAYABLE) TO SUCH PARTY AS SERVICE PROVIDER UNDER THIS AGREEMENT FOR THE PARTICULAR SERVICE ON WHICH THE CLAIM IS BASED. THE REMEDIES SET FORTH IN THIS <u>ARTICLE V</u> AND <u>SECTION 5.5</u> SHALL BE THE SOLE AND EXCLUSIVE REMEDIES OF THE PARTIES WITH RESPECT TO ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT.

<h2 style="text-align:center">ARTICLE VI</h2>

<h2 style="text-align:center">MISCELLANEOUS</h2>

Section 6.1     <u>Amendment; Waiver</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 6.1</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 6.2     <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that Buyers may assign this Agreement and any or all rights or obligations hereunder to any Affiliate of Buyers; <u>provided</u>, that any such assignment shall not relieve Buyers of their obligations under this Agreement. Upon any such permitted assignment, the references in this Agreement to Buyers shall also apply to any such assignee unless the context otherwise requires.

Section 6.3     <u>Notices</u>.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller, to:

-16-

Reverse Mortgage Solutions, Inc.
c/o Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attention: John Haas, General Counsel, Chief Legal Officer and Secretary
E-mail: JHaas@ditech.com

with a copy (which shall not constitute notice to Sellers) to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:      Frederick S. Green
                Ray C. Schrock, P.C.
                Gavin Westerman
                Sunny Singh
Facsimile:      (212) 310-8007
E-mail:          Frederick.Green@weil.com
                Ray.Schrock@weil.com
                Gavin.Westerman@weil.com
                Sunny.Singh@weil.com


If to Buyer, to:

Mortgage Assets Management, LLC
SHAP 2018-1, LLC
c/o Waterfall Asset Management, LLC
1140 Avenue of Americas, 7th Floor
New York, NY 10036
Attention:  Kenneth Nick, General Counsel
Facsimile:  (212) 257-4699
E-mail: notices@waterfallam.com

With a copy (which shall not constitute notice to Buyers) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:  Robert A. Britton
                Jeffrey D. Marell
Facsimile:  (212) 757-3990
E-mail: rbritton@paulweiss.com
             jmarell@paulweiss.com


Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 6.3.

-17-

Section 6.4    Press Releases and Public Announcements.  All press releases and public announcements regarding this Agreement are subject to Section 7.7 of the Purchase Agreement.

Section 6.5    Survival.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of Section 1.5 (Responsibility for Errors; Delays),  Section 1.8(a) (Intellectual Property); Section 1.9 (Ownership of Data); Section 1.10 (Data Privacy) Section 1.12 (Records); Section 3.4 (Obligations on Termination or Expiration); Article IV (Confidentiality); Article V (Indemnification; Limitation of Liability); Section 6.3 (Notices); Section 6.4 (Press Releases and Public Announcements); Section 6.5 (Survival); Section 6.6 (No Third Party Beneficiaries); Section 6.7 (Severability); Section 6.8 (Entire Agreement); Section 6.9 (Specific Performance); Section 6.11 (No Agency); Section 6.12 (Construction and Interpretation); Section 6.14 (Precedence of Agreements) and Section 6.15 (Governing Law; Submission to Jurisdiction; Service of Process; Waiver of Jury Trial).

Section 6.6    No Third Party Beneficiaries.  Except for (i) the indemnification rights under this Agreement of any Service Provider Indemnitee or Service Recipient Indemnitee in their respective capacities as such, or unless otherwise specified herein, no provision of this Agreement is intended to confer upon any Person (other than the Parties) and (ii) as otherwise expressly provided in Section 6.8, in each case of (i) and (ii), this Agreement shall not confer any rights or remedies upon any Person other than each Buyer, each Seller, and their respective successors and permitted assigns.

Section 6.7    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 6.8    Entire Agreement. This Agreement, the Purchase Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 6.9    Specific Performance.  Each Party acknowledges and agrees that the other Party and their respective estates would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that each Party may have under Law or equity, any Party shall be entitled, without the requirement of posting a bond or other security or proof of damages or otherwise, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.  The remedies available to the Parties pursuant to this Section 6.9

-18-

will be in addition to any other remedy to which they were entitled at Law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages that such Party is entitled to seek or collect.

Section 6.10    Force Majeure.  Service Provider shall use commercially reasonable efforts to provide, or cause to be provided, the Services without interruption. Notwithstanding the foregoing, neither Party shall be responsible to the other for any delay in or failure of performance of its obligations under this Agreement, to the extent such delay or failure is caused by events or circumstances outside of such Party's control which could not be avoided or otherwise mitigated using commercially reasonable efforts to perform, including if attributable to any act of God, act of terrorism, fire, accident, war, embargo or other governmental act or riot (each, a "Force Majeure Event"); provided, however, that the Party affected thereby shall give the other Party prompt written notice of the occurrence of any event which is likely to cause (or has caused) any delay or failure setting forth its best estimate of the length of any delay and any possibility that it shall be unable to resume performance; provided, further, that said affected Party shall use its commercially reasonable efforts to prevent, mitigate and expeditiously overcome the effects of that event and resume performance.  Neither Party is required to pay for those Services that are not performed, to the extent such Services are not performed due to excused performance in a Force Majeure Event or otherwise.

Section 6.11    No Agency.  Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership or employer/employee between Service Provider and Service Recipient and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

Section 6.12    Construction and Interpretation.  For purposes of this Agreement, (a) the words "hereof," "herein," "hereby," "hereto" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) whenever the words "include," "includes" or "including" (or any variation thereof) are used in this Agreement, they shall be deemed to be followed by the words "without limitation"; (c) references herein to "days," unless indicated otherwise, are to consecutive calendar days; (d) references to specific Articles and Sections are to the Articles and Sections of this Agreement, unless specifically stated otherwise; (e) the terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa, and words denoting any gender shall include all genders; (f) all references to "dollars" or "$" shall mean "U.S. dollars" unless specifically stated otherwise; (g) all references to "written" or "in writing" shall include in electronic form; (h) all references herein to a particular "Schedule" shall mean such schedule as it is attached hereto; (i) all references herein to a particular "Annex" shall mean such annex as it is attached hereto; (j) references to "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not mean "if," references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or" unless otherwise specified; (k) references to "ordinary course of business" or "ordinary course" shall mean "ordinary course of business consistent with past practice"; and (l) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period

-19-

shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

Section 6.13    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 6.14    Precedence of Agreements.  Each Schedule attached to or referenced in this Agreement is hereby incorporated into and shall form a part of this Agreement by reference; provided, that the terms contained in such Schedule shall only apply with respect to the Service(s) provided under that Schedule.  In the event of a conflict between the terms contained in an individual Schedule and the terms in the body of this Agreement, the terms in the individual Schedule shall take precedence with respect to the Service(s) under such Schedule.

Section 6.15    Governing Law; Submission to Jurisdiction; Service of Process; Waiver of Jury Trial.  Sections 11.8 through 11.10 of the Purchase Agreement shall apply to this Agreement as if set forth herein, *mutatis mutandis*.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

-20-

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

DITECH HOLDING CORPORATION

By: _____
    Name:
    Title:

WALTER REVERSE ACQUISITION LLC

By: _____
    Name:
    Title:

REVERSE MORTGAGE SOLUTIONS, INC.

By: _____
    Name:
    Title:

MORTGAGE ASSETS MANAGEMENT, LLC

By: _____
    Name:
    Title:

[Signature Page to Services Agreement]

SHAP 2018-1, LLC


By: _____
Name:
Title:

[Signature Page to Services Agreement]

**<u>Section 1.1 of Disclosure Schedule</u>**

**Acquired Assets (Transferred Contracts)**

# Section 1.1

## Acquired Assets

(a)

1. All origination-related Contracts as listed in the "1.1 RMS Origination Contracts Index" attachment, incorporated by reference herein.
2. The following Contracts:

| Debtor | Counterparty | Date |
|---|---|---|
| Reverse Mortgage Solutions, Inc. | 365 Data Centers | 10/27/2014 |
| DITECH FINANCIAL LLC / REVERSE MORTGAGE SOLUTIONS INC / WALTER INVESTMENT MANAGEMENT CORP | AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA | 2/1/2017 |
| Reverse Mortgage Solutions, Inc. | Bank of America, NA (successor to BAC Home Loans Servicing, LP), Nationstar Mortgage LLC, Mortgage Equity Conversion Asset Trust 2011-1, Federal National Mortgage Association and US Bank | 6/29/2012 |
| Reverse Mortgage Solutions, Inc. | Bloomberg L.P. | 8/3/2011 |
| Reverse Mortgage Solutions, Inc. | Bloomberg L.P. | 8/3/2011 |
| Reverse Mortgage Solutions, Inc. | Bloomberg L.P. | 8/3/2011 |
| Reverse Mortgage Solutions, Inc. | Bloomberg L.P. | 11/1/2018 |
| Reverse Mortgage Solutions, Inc | Cameo Solutions, Inc | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Charles A Brown & Associates P.L.L.C | 10/31/2014 |
| Reverse Mortgage Solutions, Inc. | Charles A Brown & Associates P.L.L.C | 2/6/2015 |
| Reverse Mortgage Solutions, Inc. | Charles A Brown & Associates P.L.L.C | 2/6/2015 |
| Reverse Mortgage Solutions, Inc. | Charles A Brown & Associates P.L.L.C | 3/2/2016 |
| Reverse Mortgage Solutions, Inc. | Charles A Brown & Associates P.L.L.C | 9/6/2016 |
| Reverse Mortgage Solutions, Inc. | Charles A Brown & Associates P.L.L.C | 4/3/2017 |
| REVERSE MORTAGE SOLUTIONS INC | Charles A Brown & Associates P.L.L.C | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | ConQuest Technology Services Corp., A UDT Company | 2/19/2018 |
| REVERSE MORTGAGE SOLUTIONS INC | CONQUEST TECHNOLOGY SERVICES CORPORATION | 2/4/2019 |
| Reverse Mortgage Solutions, Inc.; REO Management Solutions, Inc. | Continental Real Estate Services, Inc. | 3/31/2016 |
| REO Management Solutions, Inc. | Continental Real Estate Services, Inc. | 3/31/2016 |
| REO MANAGEMENT SOLUTIONS INC | Continental Real Estate Services, Inc. | 2/4/2019 |
| REVERSE MORTAGE | Continental Real Estate Services, Inc. | 10/11/2018 |

3

| Debtor | Counterparty | Date |
|---|---|---|
| SOLUTIONS INC | | |
| REO Management Solutions, LLC | Continental Real Estate Services, Inc. | 2/13/2019 |
| Reverse Mortgage Solutions, Inc. | Continental Real Estate Services, Inc. | 2/13/2019 |
| REO Management Solutions, LLC | Continental Real Estate Services, Inc. | 2/28/2019 |
| Reverse Mortgage Solutions, Inc. | CoreLogic Flood Services | 12/1/2010 |
| Reverse Mortgage Solutions, Inc. | CoreLogic Flood Services | 10/29/2015 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 3/1/2017 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 7/12/2007 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 8/1/2008 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 8/1/2008 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 3/14/2011 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 11/1/2011 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 4/1/2012 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 4/1/2012 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 5/1/2013 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 8/1/2014 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 8/1/2015 |
| Reverse Mortgage Solutions, Inc. | Corelogic Tax Services, LLC | 2/22/2016 |
| REVERSE MORTGAGE SOLUTIONS, INC | Data Foundry, Inc. | 3/20/2013 |
| Reverse Mortgage Solutions | Digital DataVoice Corporation | 5/16/2017 |
| Reverse Mortgage Solutions, LLC | DiscoverReady, LLC | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Fannie Mae | |
| Reverse Mortgage Solutions, Inc. | Fannie Mae | 3/18/2015 |
| Reverse Mortgage Solutions, Inc. | Fannie Mae | 12/19/2018 |
| REO Management Solutions, LLC | FC Loan, Inc. | 6/1/2016 |
| REO Management Solutions, LLC | FC Loan, Inc. | 6/1/2016 |
| REO MANAGEMENT SOLUTIONS INC | FC Loan, Inc. | 10/22/2018 |
| REO Management Solutions, Inc. | FC Loan, Inc. | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Ginnie Mae | |
| Reverse Mortgage Solutions, Inc. | Ginnie Mae; HUD | |
| Reverse Mortgage Solutions, Inc. | Gregg & Valby, PC | 6/1/2016 |
| Reverse Mortgage Solutions, Inc. | Gregg & Valby, PC | 6/1/2016 |
| Reverse Mortgage Solutions, Inc. | Gregg & Valby, PC | 9/21/2017 |
| Reverse Mortgage Solutions, Inc. | Gregg & Valby, PC | 4/1/2019 |
| Reverse Mortgage Solutions, Inc. | Gregg & Valby, PC | 4/1/2019 |
| Reverse Mortgage Solutions, Inc. | Guardian Asset Management | 5/17/2017 |
| Reverse Mortgage Solutions, Inc. | Guardian Asset Management | 5/17/2017 |
| REVERSE MORTGAGE SOLUTIONS, INC | Guardian Asset Management | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Innovative Tax Solutions LLC | 11/1/2012 |
| Reverse Mortgage Solutions, Inc. | Innovative Tax Solutions LLC | 11/1/2018 |
| Reverse Mortgage Solutions, Inc. | Innovative Tax Solutions LLC | 9/6/2016 |

| Debtor | Counterparty | Date |
|---|---|---|
| Reverse Mortgage Solutions, Inc. | Innovative Tax Solutions LLC | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Innovative Tax Solutions LLC | 11/25/2014 |
| Reverse Mortgage Solutions, Inc. | Innovative Tax Solutions LLC | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Inter Kleen, Inc. | 3/29/2017 |
| Reverse Mortgage Solutions, Inc. | Keymark | |
| Reverse Mortgage Solutions, Inc. | Kofax | |
| Reverse Mortgage Solutions, Inc. | Kofax, Inc. | 4/2/2019 |
| Reverse Mortgage Solutions, Inc. | Kofax, Inc. | 4/2/2019 |
| Reverse Mortgage Solutions, Inc. | KPMG LLP | 2/13/2019 |
| Reverse Mortgage Solutions | Lanvera Ltd. | 2/4/2019 |
| Reverse Mortgage Solutions | LaSalle Systems Leasing, Inc. | 5/15/2017 |
| REVERSE MORTGAGE SOLUTIONS, INC | LERETA, LLC | 2/4/2019 |
| REVERSE MORTGAGE SOLUTIONS, INC | LERETA, LLC | 2/4/2019 |
| REVERSE MORTGAGE SOLUTIONS INC | LERETA, LLC | 1/1/2019 |
| REVERSE MORTGAGE SOLUTIONS INC | LERETA, LLC | 1/1/2019 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 2/11/2014 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 2/11/2014 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 7/15/2016 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 9/1/2016 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 8/8/2017 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 8/8/2017 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 8/8/2017 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 8/8/2017 |
| Reverse Mortgage Solutions. Inc. | LexisNexis Risk Solutions FL Inc. | 12/8/2017 |
| Reverse Mortgage Solutions, Inc. | LRES Corporation | 4/12/2016 |
| Reverse Mortgage Solutions, Inc. | LRES Corporation | 11/9/2016 |
| Reverse Mortgage Solutions, Inc. | LRES Corporation | 2/13/2019 |
| Reverse Mortgage Solutions, Inc. | LRES Corporation | 2/13/2019 |
| Reverse Mortgage Solutions, Inc. | Manna Distributors | 3/27/2017 |
| Reverse Mortgage Solutions | Microsoft Corporation | 3/27/2017 |
| Reverse Mortgage Solutions, Inc. | Mortgage Contracting Services | 8/29/2016 |
| Reverse Mortgage Solutions, Inc. | Mortgage Equity Conversion Asset Trust 2011-1, US Bank NA, Federal National Mortgage Association, BAC Home Loans Servicing, LP | 5/1/2011 |
| Reverse Mortgage Solutions, Inc. | National Creditors Connection Inc | 6/1/2016 |
| Reverse Mortgage Solutions, Inc. | National Creditors Connection Inc | 6/20/2016 |
| REVERSE MORTGAGE SOLUTIONS INC | National Creditors Connection Inc | 10/31/2018 |
| REVERSE MORTGAGE | National Field Representatives, Inc. | 9/29/2017 |

| Debtor | Counterparty | Date |
|---|---|---|
| SOLUTIONS, INC | | |
| REVERSE MORTGAGE SOLUTIONS, INC | National Field Representatives, Inc. | 9/29/2017 |
| REVERSE MORTGAGE SOLUTIONS, INC | National Field Representatives, Inc. | 2/4/2019 |
| REVERSE MORTGAGE SOLUTIONS, INC | National Field Representatives, Inc. | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | NewCourse Communications, Inc. | 10/9/2014 |
| Reverse Mortgage Solutions, Inc. | NewCourse Communications, Inc. | 3/17/2016 |
| RMS REVERSE MORTGAGE SOLUTIONS | NICE Uptivity | 12/24/2018 |
| REO Management Solutions, LLC | Overby-Seawall Company | 7/12/2016 |
| REO Management Solutions, LLC | Overby-Seawall Company | 7/12/2016 |
| REO MANAGEMENT SOLUTIONS LLC | Overby-Seawall Company | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Pension Benefit Information, Inc. | 10/10/2014 |
| Reverse Mortgage Solutions, Inc. | Pension Benefit Information, Inc. | 2/4/2016 |
| Reverse Mortgage Solutions, Inc. | Pension Benefit Information, Inc. | 6/7/2016 |
| Reverse Mortgage Solutions, Inc. | Pension Benefit Information, Inc. | 3/29/2018 |
| REVERSE MORTGAGE SOLUTIONS INC | PITNEY BOWES GLOBAL FINANCIAL SERIVCES LLC | 10/30/2013 |
| REVERSE MORTGAGE SOLUTIONS INC | PITNEY BOWES GLOBAL FINANCIAL SERIVCES LLC | 10/30/2013 |
| Reverse Mortgage Solutions, Inc. | Prime Legal Staffing Corporation | 6/21/2017 |
| Reverse Mortgage Solutions, Inc. | R2 Unified Technologies | 7/20/2015 |
| REVERSE MORTGAGE SOLUTIONS INC | R2 Unified Technologies | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | R2 Unified Technologies | 5/17/2017 |
| Reverse Mortgage Solutions, Inc. | R2 Unified Technologies | 4/2/2019 |
| Reverse Mortgage Solutions, Inc. | Reliable Tax Data Corp. | 8/1/2008 |
| Reverse Mortgage Solutions, Inc. | Reliable Tax Data Corp. | 8/1/2008 |
| Reverse Mortgage Solutions, Inc. | Reliable Tax Data Corp. | 12/1/2013 |
| REO Management Solutions, LLC; Ditech Financial LLC | REO Management Solutions, LLC | 4/4/2016 |
| REO Management Solutions, LLC; Ditech Financial LLC | REO Management Solutions, LLC | 4/4/2016 |
| Reverse Mortgage Solutions, Inc. | Reverse Techonology Group LLC | 11/29/2016 |
| Reverse Mortgage Solutions, Inc. | Reverse Techonology Group LLC | 12/5/2016 |
| Reverse Mortgage Solutions, Inc. | Reverse Techonology Group LLC | 12/5/2016 |
| REVERSE MORTGAGE SOLUTIONS INC | ReverseVision, Inc. | 5/5/2015 |
| REVERSE MORTGAGE SOLUTIONS INC | ReverseVision, Inc. | 2/4/2019 |
| REVERSE MORTGAGE | ReverseVision, Inc. | 2/4/2019 |

| Debtor | Counterparty | Date |
|---|---|---|
| SOLUTIONS INC | | |
| Reverse Mortgage Solutions, Inc. | Salesforce.com, Inc. | 2/29/2016 |
| Reverse Mortgage Solutions, Inc. | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 8/12/2015 |
| Reverse Mortgage Solutions, Inc. | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 7/30/2015 |
| REO Management Solutions, Inc. | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 8/12/2015 |
| REO Management Solutions, LLC | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 12/6/2016 |
| REO MANAGEMENT SOLUTIONS, LLC | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 11/16/2017 |
| REO Management Solutions LLC | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 2/4/2019 |
| REO MANAGEMENT SOLUTIONS LLC | SOLIDIFI TITLE & CLOSING, LLC (fka. Linear Settlement Services, LLC) | 2/13/2019 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 9/30/2014 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 6/11/2015 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 6/11/2015 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 1/5/2016 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 3/1/2017 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 5/26/2016 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 12/19/2016 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 1/29/2017 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 3/20/2017 |
| Reverse Mortgage Solutions, INC | Southwest Business Corporation | 2/4/2019 |
| Reverse Mortgage Solutions, INC | Southwest Business Corporation | 2/4/2019 |
| Reverse Mortgage Solutions, INC | Southwest Business Corporation | 2/4/2019 |
| Reverse Mortgage Solutions, INC | Southwest Business Corporation | 2/4/2019 |
| REVERSE MORTGAGE SOLUTIONS INC | Southwest Business Corporation | 2/27/2018 |
| REVERSE MORTGAGE SOLUTIONS INC | Southwest Business Corporation | 2/27/2018 |
| Reverse Mortgage Solutions, Inc. | Southwest Business Corporation | 2/28/2019 |
| Reverse Mortgage Solutions | The Western Union Company | 3/20/2019 |
| Reverse Mortgage Solutions, Inc. | United Data Technologies Inc. | 2/4/2019 |
| Reverse Mortgage Solutions, INC | United Parcel Service Inc. | 2/4/2019 |
| REVERSE MORTGAGE SOLUTIONS INC | United Parcel Service Inc. | 10/11/2018 |
| DITECH FINANCIAL LLC / DITECH HOLDING CORPORATION / REVERSE MORTGAGE SOLUTIONS INC / REO MANAGEMENT | United States Postal Service | 11/8/2018 |

7

| Debtor | Counterparty | Date |
|---|---|---|
| SOLUTIONS LLC | | |
| REO Management Solutions | US Real Estate Services, Inc. (USRES, Inc.) | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Vendor Connect, LLC | 8/14/2015 |
| Reverse Mortgage Solutions, Inc. | Vendor Connect, LLC | 8/14/2015 |
| Reverse Mortgage Solutions, Inc | Vendor Connect, LLC | 2/4/2019 |
| REVERSE MORTGAGE SOLUTIONS INC | Vendor Connect, LLC | 10/11/2018 |
| REO Management Solutions, LLC | Vendor Connect, LLC | 2/28/2019 |
| Reverse Mortgage Solutions, Inc. | Voice Print International | |
| Reverse Mortgage Solutions, Inc. | Windstream Corporation | 11/7/2014 |
| Reverse Mortgage Solutions, Inc. | CoreLogic Solutions, LLC CoreLogic Flood Services, LLC | 11/16/2015 |
| Reverse Mortgage Solutions, Inc. | LexisNexis Risk Solutions | 11/1/2015 |
| Reverse Mortgage Solutions, Inc. | LexisNexis Risk Solutions | 3/29/2016 |
| Reverse Mortgage Solutions, Inc. | LexisNexis Risk Solutions | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | GODADDY.COM LLC | 2/4/2019 |
| Reverse Mortgage Solutions, Inc. | Wells Fargo Custody | |
| Reverse Mortgage Solutions, Inc. | Bank of New York Mellon | |
| Reverse Mortgage Solutions, Inc. | Wells Fargo Cash Management | |
| Reverse Mortgage Solutions, Inc. | Wells Fargo Document Custody | |
| Reverse Mortgage Solutions, Inc. | Deutsche Bank Document Custody | |
| Reverse Mortgage Solutions, Inc. | BNY Mellon - Global Corporate Trust | |
| Reverse Mortgage Solutions, Inc. | US Bank Document Custody | |
| Reverse Mortgage Solutions, Inc. | Recon Trust Document Custody | |
| Reverse Mortgage Solutions, Inc. | Vendor Connect | |
| Reverse Mortgage Solutions, Inc. | MERSCORP Holding Inc | |
| REO Management Solutions | Alaska Fine Homes & Real Estate LLC | |
| REO Management Solutions | Keller Williams Realty Alaska Group | |
| REO Management Solutions | AlaHomes Realty | |
| REO Management Solutions | At Home Realty Services | |
| REO Management Solutions | Butler Realty | |
| REO Management Solutions | Divine Realty, LLC | |
| REO Management Solutions | DSEAYCOM | |
| REO Management Solutions | Exit Realty Lyon and Associates Fairhope | |
| REO Management Solutions | eXp Realty, LLC | |
| REO Management Solutions | EXP Realty, LLC | |
| REO Management Solutions | Keller Williams Realty River Cities | |
| REO Management Solutions | Lucas & Associates | |
| REO Management Solutions | Main Street Realty Plus LLC | |
| REO Management Solutions | MarMac Real Estate | |
| REO Management Solutions | Montgomery Metro Realty | |
| REO Management Solutions | Pope Realty & Appraisal | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Remax Preferred | |
| REO Management Solutions | Remax Southern Homes | |
| REO Management Solutions | The Cummings Company | |
| REO Management Solutions | Advanced Real Estate Services | |
| REO Management Solutions | Advanced Real Estate Services | |
| REO Management Solutions | Apex Real Estate | |
| REO Management Solutions | CENTURY 21 Legacy Realty, Inc. | |
| REO Management Solutions | Lindsey & Associates, Inc | |
| REO Management Solutions | REmax Solutions | |
| REO Management Solutions | Trammell & Co Realtors | |
| REO Management Solutions | A Z & Associates Real Estate Group | |
| REO Management Solutions | Desert Gateway Realty | |
| REO Management Solutions | Legion Realty | |
| REO Management Solutions | Paul McComb Realty | |
| REO Management Solutions | RE/MAX PRECISION | |
| REO Management Solutions | Realty Executives | |
| REO Management Solutions | Ace Realty | |
| REO Management Solutions | Ashmun and Associates, Inc. | |
| REO Management Solutions | Bill Pfeif and Associates | |
| REO Management Solutions | Century 21 Jordan-Link & Company | |
| REO Management Solutions | Century 21 M&M and Associates | |
| REO Management Solutions | Chico Homes Real Estate Sales Inc. | |
| REO Management Solutions | Coldwell Banker Residential Brokerage | |
| REO Management Solutions | Coldwell Banker Residential Brokerage | |
| REO Management Solutions | Coldwell Banker Residential Brokerage | |
| REO Management Solutions | Expert Real Estate & Investment | |
| REO Management Solutions | Foothill Real Estate Incorporated | |
| REO Management Solutions | Forward Real Estate Group Inc | |
| REO Management Solutions | Golden West Realty | |
| REO Management Solutions | Hamilton Landon Real Estate | |
| REO Management Solutions | Keller Williams Realty | |
| REO Management Solutions | Keller Williams Realty | |
| REO Management Solutions | Keller Williams Realty | |
| REO Management Solutions | Keller Williams Realty | |
| REO Management Solutions | Keller Williams Realty | |
| REO Management Solutions | L.A. Real Estate Network Group Inc. | |
| REO Management Solutions | Oak Valley Financial Services Inc, dba Oak Valley Realty | |
| REO Management Solutions | Outland and Associates Real Estate | |
| REO Management Solutions | Real Estate Source Inc | |
| REO Management Solutions | Realty World-Selzer Realty | |
| REO Management Solutions | Remax Champions | |
| REO Management Solutions | Richard Realty Group, Inc | |
| REO Management Solutions | Robin Ronay | |

| Debtor | Counterparty | Date |
|--------|--------------|------|
| REO Management Solutions | Robin Ronay | |
| REO Management Solutions | San Diego Real Estate Connection Inc. | |
| REO Management Solutions | Sheldon Largent Realty | |
| REO Management Solutions | Silver Lining Realty | |
| REO Management Solutions | SIlver Lining Realty | |
| REO Management Solutions | Susan River Realty | |
| REO Management Solutions | Victoria Properties | |
| REO Management Solutions | Windermere Homes & Estates | |
| REO Management Solutions | Berkshire Hathaway HomeServices Innovative Real Estate | |
| REO Management Solutions | Jake Norton Realty, Inc | |
| REO Management Solutions | Keller Williams Colorado West Realty, LLC | |
| REO Management Solutions | RE/MAX Alliance | |
| REO Management Solutions | Reeves Real Estate, LLC | |
| REO Management Solutions | AGNELLI REAL ESTATE LLC | |
| REO Management Solutions | AGNELLI REAL ESTATE LLC | |
| REO Management Solutions | DB Associates of CT LLC   NE Asset Pros | |
| REO Management Solutions | Gower-Spadaccino Asset Management LLC | |
| REO Management Solutions | Property Works CT | |
| REO Management Solutions | Property Works New England | |
| REO Management Solutions | Property Works New England | |
| REO Management Solutions | REO Real Estate Connection | |
| REO Management Solutions | Sell Some Property LLC | |
| REO Management Solutions | Daniels Realty,LLC | |
| REO Management Solutions | Daniels Realty,LLC | |
| REO Management Solutions | RE/MAX Distinctive Real Estate Inc | |
| REO Management Solutions | RE/MAX Professionals | |
| REO Management Solutions | RE/MAX Professionals | |
| REO Management Solutions | Coldwell Banker Resort Realty | |
| REO Management Solutions | Luke Real Estate | |
| REO Management Solutions | Luke Real Estate | |
| REO Management Solutions | 1st Choice Real Estate | |
| REO Management Solutions | American Real Estate Services Inc. | |
| REO Management Solutions | Charles Rutenberg Realty | |
| REO Management Solutions | Clear Vision Real Estate, LLC | |
| REO Management Solutions | Core Realty LLC | |
| REO Management Solutions | Diagnault Realty, Inc. | |
| REO Management Solutions | Duval Realty of Jax | |
| REO Management Solutions | Equity Realty of Pinellas Inc | |
| REO Management Solutions | ERA American Real Estate | |
| REO Management Solutions | ERA Grizzard Real Estate | |
| REO Management Solutions | EXIT King Realty | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Exit Realty N.F.I. | |
| REO Management Solutions | Gulf Coastal Properties, Inc.  dba Coastal Realty Group | |
| REO Management Solutions | Harris and Hyde, LLC | |
| REO Management Solutions | Horizon Realty of Alachua, Inc | |
| REO Management Solutions | I Deal Real Estate, Inc. | |
| REO Management Solutions | Indian Springs Real Estate | |
| REO Management Solutions | Julie's Realty | |
| REO Management Solutions | Keller Williams Realty of WH | |
| REO Management Solutions | KEYES REAL ESTATE | |
| REO Management Solutions | Kiefer Realty PA | |
| REO Management Solutions | LA ROSA REALTY, LLC | |
| REO Management Solutions | Menu Realty | |
| REO Management Solutions | Modern Realty of Putnam Inc. | |
| REO Management Solutions | NuFront International Realty | |
| REO Management Solutions | On The Move Real Estate Group, LLC | |
| REO Management Solutions | Property Marketers, LLC | |
| REO Management Solutions | RE/MAX of Stuart | |
| REO Management Solutions | Real Estate Home Sales | |
| REO Management Solutions | Real Estate Services, Inc. | |
| REO Management Solutions | Realty Exchange, LLC. | |
| REO Management Solutions | REMAX  AFFINITY | |
| REO Management Solutions | Results Realty Of Northern Florida Inc | |
| REO Management Solutions | Sand Castle Homes Realty | |
| REO Management Solutions | SunSational Realty Group | |
| REO Management Solutions | The Wilmoth Group | |
| REO Management Solutions | Tropic Shores Realty, LLC | |
| REO Management Solutions | Trust Realty | |
| REO Management Solutions | Twin Metro Realty, LLC | |
| REO Management Solutions | Van Horn Realty, LLC | |
| REO Management Solutions | Waterman Real Estate Inc | |
| REO Management Solutions | Westlake Real Estate | |
| REO Management Solutions | Wright At Home Realty, LLC | |
| REO Management Solutions | Yialouris Group Realty | |
| REO Management Solutions | Atlanta Intown Real Estate Services | |
| REO Management Solutions | Brenda Cadle Realty INC | |
| REO Management Solutions | Century 21 Durden and Kornegay | |
| REO Management Solutions | Century21 Jeff Keller Realty | |
| REO Management Solutions | Century21 Jeff Keller Realty | |
| REO Management Solutions | Compass360 Realty, Inc. | |
| REO Management Solutions | Lakeshore Real Estate, Inc. | |
| REO Management Solutions | Norris Bishop Realty, LLC | |
| REO Management Solutions | Peach Realty, Inc. | |
| REO Management Solutions | RE/MAX Complete | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | SCOTT REALTY PROFESSIONALS, LLC | |
| REO Management Solutions | SCOTT REALTY PROFESSIONALS, LLC | |
| REO Management Solutions | SCREOEXPERT.COM | |
| REO Management Solutions | SCREOEXPERT.COM | |
| REO Management Solutions | Seger Realty Inc. | |
| REO Management Solutions | Stewart Brokers | |
| REO Management Solutions | The Brokery LLC | |
| REO Management Solutions | Worthmoore Realty | |
| REO Management Solutions | Kohala Resort Realty LLC | |
| REO Management Solutions | BERKSHIRE HATHAWAY HomeServices Ambassador Real Estate | |
| REO Management Solutions | BERKSHIRE HATHAWAY HomeServices Ambassador Real Estate | |
| REO Management Solutions | Fusion Realtor | |
| REO Management Solutions | Fusion Realtors | |
| REO Management Solutions | Coldwell Banker Tomlinson Group | |
| REO Management Solutions | Edge Real Estate | |
| REO Management Solutions | Salt Creek Realty | |
| REO Management Solutions | Windermere Real Estate | |
| REO Management Solutions | Windermere Real Estate | |
| REO Management Solutions | American Realty Group | |
| REO Management Solutions | American Realty Group | |
| REO Management Solutions | Applebrook Realty, Inc. | |
| REO Management Solutions | AREA WIDE REALTY | |
| REO Management Solutions | Chuck Baer Realty | |
| REO Management Solutions | Coldwell Banker | |
| REO Management Solutions | Coldwell Banker | |
| REO Management Solutions | Coldwell Banker | |
| REO Management Solutions | Crosstown Realtors Inc | |
| REO Management Solutions | Crosstown Realtors Inc | |
| REO Management Solutions | Findlay Real Estate Group Inc | |
| REO Management Solutions | Hamilton Realtor Group, LLC | |
| REO Management Solutions | Hometown Realty | |
| REO Management Solutions | Hometown Realty | |
| REO Management Solutions | JPK Capital LTD | |
| REO Management Solutions | keller williams realty Greater Quad Cities | |
| REO Management Solutions | Landmark Realty of Illinois LLC | |
| REO Management Solutions | Lincoln National Realty Inc,  - DBA - Century 21 Lincoln National Realty | |
| REO Management Solutions | Mel Foster Company | |
| REO Management Solutions | RNP Real Estate Group | |
| REO Management Solutions | Ruhl and Ruhl Real Estate | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Smith Partners & Associates | |
| REO Management Solutions | Smith Partners & Associates  DBA RE/Max Properties | |
| REO Management Solutions | Su Familia Real Estate Inc | |
| REO Management Solutions | Sunshine Realty Solutions | |
| REO Management Solutions | Twin City Realty | |
| REO Management Solutions | Vesta Preferred LLC | |
| REO Management Solutions | Arnold Real Estate North DK, Inc. | |
| REO Management Solutions | Exit Realty Crutcher | |
| REO Management Solutions | Exit Realty Crutcher | |
| REO Management Solutions | Lighthouse Realty Group, Inc. | |
| REO Management Solutions | RE/MAX Integrity | |
| REO Management Solutions | Remax 100 | |
| REO Management Solutions | Sell4Free Welsh Realty | |
| REO Management Solutions | Wilmoth Group | |
| REO Management Solutions | Allen County Realty, Inc | |
| REO Management Solutions | Chaney Realty, Inc | |
| REO Management Solutions | Coldwell Banker Wood-Dulohery Real Estate | |
| REO Management Solutions | EnVest LLC dba NextHome Professionals | |
| REO Management Solutions | Fred Pratt Realty & Auction | |
| REO Management Solutions | Keller Real Estate & Insurance Agency, Inc. | |
| REO Management Solutions | Option Real Estate Services Inc. | |
| REO Management Solutions | Option Real Estate Services Inc. | |
| REO Management Solutions | RE/MAX Premier | |
| REO Management Solutions | Realty Executives of Kansas City | |
| REO Management Solutions | Realty Executives of Kansas City | |
| REO Management Solutions | SalinaHomes.com | |
| REO Management Solutions | Weichert Realtors Advantage Professionals | |
| REO Management Solutions | Dexter & Associates | |
| REO Management Solutions | Dwight Vance Real Estate | |
| REO Management Solutions | Hensley Realty Co. | |
| REO Management Solutions | HER Realtors | |
| REO Management Solutions | HER Realtors | |
| REO Management Solutions | Keystone Real Estate Associates | |
| REO Management Solutions | Keystone Real Estate Associates | |
| REO Management Solutions | Lois Ann Disponett Real Estate | |
| REO Management Solutions | Purchase Realty Group | |
| REO Management Solutions | Purchase Realty Group | |
| REO Management Solutions | Realty World - Adams & Associates | |
| REO Management Solutions | South Fourth Realty | |
| REO Management Solutions | The Mountain Real Estate Company | |
| REO Management Solutions | Bayou State R.E. Group, LLC | |

13

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Bayou State R.E. Group, LLC | |
| REO Management Solutions | Bobby Drude & Associates | |
| REO Management Solutions | Brandon E Breaux Real Estate Inc | |
| REO Management Solutions | CENTURY 21 Action Realty | |
| REO Management Solutions | Coldwell Banker Group One Realty, LLC> | |
| REO Management Solutions | Keller Williams Parishwide Partners | |
| REO Management Solutions | Latter & Blum | |
| REO Management Solutions | Re Max Real Estate Services | |
| REO Management Solutions | Specialized Real Estate Services | |
| REO Management Solutions | The Realty Company of Louisiana, LLC | |
| REO Management Solutions | Exit Realty All Stars | |
| REO Management Solutions | Ideal Real estate Services | |
| REO Management Solutions | Keller Williams South Watuppa | |
| REO Management Solutions | Keller Williams South Watuppa | |
| REO Management Solutions | Marty's Real Estate | |
| REO Management Solutions | Mass Realty Advisors | |
| REO Management Solutions | New Neighbor Realty, LLC/Exit | |
| REO Management Solutions | Proper Results, LLC | |
| REO Management Solutions | Remax Insight | |
| REO Management Solutions | Remax Insight | |
| REO Management Solutions | Today Real Estate | |
| REO Management Solutions | 212 Degrees Realty, LLC | |
| REO Management Solutions | Equity Realty, Inc., T/A Century 21 The Real Estate Centre | |
| REO Management Solutions | Exit Landmark Realty | |
| REO Management Solutions | Featherstone & Co | |
| REO Management Solutions | Hutfinder.com Inc. Realtors | |
| REO Management Solutions | Julian Agency Real Estate | |
| REO Management Solutions | KELLER WILLIAMS EXCELLENCE | |
| REO Management Solutions | Keller Williams of Delmarva | |
| REO Management Solutions | Keller Williams of Southern Maryland | |
| REO Management Solutions | Long & Foster Real Estate | |
| REO Management Solutions | Maryland REO Connection, LLC | |
| REO Management Solutions | Metropol Realty | |
| REO Management Solutions | Powerhouse Realty LLC | |
| REO Management Solutions | RE/MAX Community Real Estate | |
| REO Management Solutions | Re/Max First Choice | |
| REO Management Solutions | Real Estate Professionals Inc | |
| REO Management Solutions | REO Real Estate | |
| REO Management Solutions | REO Real Estate | |
| REO Management Solutions | REO Real Estate | |
| REO Management Solutions | Star Realty, Inc | |
| REO Management Solutions | Dan the Man Real Estate | |
| REO Management Solutions | Active Realtors | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | All Star Real Estate | |
| REO Management Solutions | American Real Estate | |
| REO Management Solutions | Bellabay Realty LLC | |
| REO Management Solutions | Bellabay Realty LLC | |
| REO Management Solutions | Century 21 Affiliated | |
| REO Management Solutions | Century 21 Affiliated | |
| REO Management Solutions | Century 21 Allstars | |
| REO Management Solutions | Detrich Real Estate | |
| REO Management Solutions | GERWECK REAL ESTATE | |
| REO Management Solutions | Keller Williams Of Lakeside | |
| REO Management Solutions | Keller Williams Royal Oak | |
| REO Management Solutions | Kolehmainen Real Estate | |
| REO Management Solutions | McFarlane Group Real Estate | |
| REO Management Solutions | Preferred Realty Pros, LLC | |
| REO Management Solutions | Preferred Realty Pros, LLC | |
| REO Management Solutions | RE/MAX Central | |
| REO Management Solutions | Remax Finest | |
| REO Management Solutions | ReMax Leading Edge | |
| REO Management Solutions | Remax Perrett | |
| REO Management Solutions | Coldwell Banker Burnet | |
| REO Management Solutions | Counselor Realty Inc of Alexandria | |
| REO Management Solutions | Countryside Realty | |
| REO Management Solutions | Grimes Realty | |
| REO Management Solutions | Northland Realty, LLC | |
| REO Management Solutions | Port Cities Realty, LLC | |
| REO Management Solutions | Premier Estates Inc | |
| REO Management Solutions | Remax Lakes Area Realty | |
| REO Management Solutions | TM Listings LLC | |
| REO Management Solutions | Twin Oaks Realty | |
| REO Management Solutions | WMD Realty LLC | |
| REO Management Solutions | C21/Smith And Associates | |
| REO Management Solutions | Heartland Town & Country Real Estate,Inc | |
| REO Management Solutions | Mid America Property Partners | |
| REO Management Solutions | Murney Associates | |
| REO Management Solutions | Realty Exchange | |
| REO Management Solutions | Wynn Realty | |
| REO Management Solutions | Agner & Associates, LLC, Realtors | |
| REO Management Solutions | Agner & Associates, LLC, Realtors | |
| REO Management Solutions | America's Realty Universal | |
| REO Management Solutions | Berkshire Hathaway Home Services | |
| REO Management Solutions | Betsy Smith Properties | |
| REO Management Solutions | Century 21 J Carter & Company | |
| REO Management Solutions | Coldwell Banker Country Properties | |
| REO Management Solutions | Crye-Leike Properties Brokerage | |

| Debtor | Counterparty | Date |
|--------|-------------|------|
| REO Management Solutions | Crye-Leike, Realtors | |
| REO Management Solutions | Fast Track Realty, Llc | |
| REO Management Solutions | Fast Track Realty, Llc | |
| REO Management Solutions | HILL REAL ESTATE GOUP, LLC | |
| REO Management Solutions | Hill Real Estate Group, LLC | |
| REO Management Solutions | Powers Properties | |
| REO Management Solutions | Real Estate Prof Of The P.B. | |
| REO Management Solutions | Sims Realty | |
| REO Management Solutions | 360 Realty | |
| REO Management Solutions | Addison Insurance and Realty Co | |
| REO Management Solutions | Bohlmann & Bohlmann LLC | |
| REO Management Solutions | Carolina East Realty | |
| REO Management Solutions | Chris Johnson Realty | |
| REO Management Solutions | Coldwell Banker Advantage | |
| REO Management Solutions | Covenant Realty of NC | |
| REO Management Solutions | ELITE PROEPRTIES | |
| REO Management Solutions | ERA Strother Real Estate | |
| REO Management Solutions | Four Seasons Realty Group | |
| REO Management Solutions | Gibbs Realty and Auction Co Inc | |
| REO Management Solutions | Gibbs Realty and Auction Co Inc | |
| REO Management Solutions | Homestead Realty | |
| REO Management Solutions | Homestead Realty | |
| REO Management Solutions | Howard Hanna William E Wood | |
| REO Management Solutions | Leonard Ryden Burr Real Estate | |
| REO Management Solutions | List & Sell Realty | |
| REO Management Solutions | Live Oak Real Estate | |
| REO Management Solutions | Live Oak Real Estate | |
| REO Management Solutions | Nancie Lyons Realty | |
| REO Management Solutions | Showcase Realty LLC | |
| REO Management Solutions | SKB Global Enterprises Inc. | |
| REO Management Solutions | SKB Global Enterprises Inc. | |
| REO Management Solutions | Stan Byrd Realtors | |
| REO Management Solutions | Jim Jensen Real Estate Inc. | |
| REO Management Solutions | Keller Williams Inspire Realty | |
| REO Management Solutions | NP Realty, Inc | |
| REO Management Solutions | R.H. Thackston & Company - Realtors | |
| REO Management Solutions | R.H. Thackston & Company - Realtors | |
| REO Management Solutions | AJC Realty Exchange LLC | |
| REO Management Solutions | AT BROKERS LLC | |
| REO Management Solutions | Beacon Properties | |
| REO Management Solutions | Berkshire Hathaway Home Services Healy Realtors | |
| REO Management Solutions | Berkshire Hathaway HomeServices | |
| REO Management Solutions | Bruce Associates, Inc | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | C21 Charles Smith Agency, Inc. | |
| REO Management Solutions | Cambridge Homes Realty | |
| REO Management Solutions | CENTURY 21 ADVANTAGE GOLD | |
| REO Management Solutions | Garden State Properties Group - Medford | |
| REO Management Solutions | Home Alliance Realty | |
| REO Management Solutions | Keller Williams Midtown REO Division | |
| REO Management Solutions | KW Moorestown | |
| REO Management Solutions | McHugh Realty Inc. | |
| REO Management Solutions | Nylund Realty, LLC | |
| REO Management Solutions | Option 1 Realty Group | |
| REO Management Solutions | Pinnacle Realty Associates LLC | |
| REO Management Solutions | Prime Network Realty | |
| REO Management Solutions | Re/Max At The Shore | |
| REO Management Solutions | RE/MAX SOLUTIONS  REO Division | |
| REO Management Solutions | Remax Villa Realtors Edgewater | |
| REO Management Solutions | REO Complete Real Estate, Inc | |
| REO Management Solutions | Striker Realty | |
| REO Management Solutions | Terrie O'Conner Realtors | |
| REO Management Solutions | Veltri & Associates Realtors | |
| REO Management Solutions | VRI Homes | |
| REO Management Solutions | Albuquerque House Hunting | |
| REO Management Solutions | ASRNM Inc. | |
| REO Management Solutions | Carson Real Estate, Inc. | |
| REO Management Solutions | Fisher Real Estate LLC | |
| REO Management Solutions | KELLER WILLIAMS/GALLUP LIVING TEAM | |
| REO Management Solutions | Logic Real Estate | |
| REO Management Solutions | Logic Real Estate | |
| REO Management Solutions | Housing Hustler Team of Robinson Realty & Management | |
| REO Management Solutions | Keller Williams Realty The Marketplace | |
| REO Management Solutions | Orange Realty Group | |
| REO Management Solutions | Reno/Tahoe Realty Group, LLC | |
| REO Management Solutions | Agnelli New York Real Estate LLC | |
| REO Management Solutions | ARC Realty # 1 in Sales | |
| REO Management Solutions | Brandon Nielsen, Licensed Real Estate Broker | |
| REO Management Solutions | Callahan & Hooey, Inc | |
| REO Management Solutions | CEM Properties LLC | |
| REO Management Solutions | Century 21 American Homes | |
| REO Management Solutions | CENTURY 21 Millennium Realty | |
| REO Management Solutions | Cornerstone Properties | |
| REO Management Solutions | Dominion Homes | |
| REO Management Solutions | East End Luxury Ltd. | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Elliott & Pomeroy Inc. | |
| REO Management Solutions | EXIT Realty Homeward Bon | |
| REO Management Solutions | EXIT Realty Homeward Bound | |
| REO Management Solutions | Gehlco Realty | |
| REO Management Solutions | Gilbo Realty | |
| REO Management Solutions | Grist Mill Real Estate | |
| REO Management Solutions | Howard Hanna S. Tier, Inc | |
| REO Management Solutions | Island Advantage Realty, LLC | |
| REO Management Solutions | Keller Williams upstate NY Properties | |
| REO Management Solutions | Michael Wilson Realty | |
| REO Management Solutions | NYC Realty Brokers LLC | |
| REO Management Solutions | Re/Max Best | |
| REO Management Solutions | Real Estate Advantage | |
| REO Management Solutions | Real Estate Pros & More | |
| REO Management Solutions | REO Integration, Inc. | |
| REO Management Solutions | River Realty Services, Inc. | |
| REO Management Solutions | s & J Property Management | |
| REO Management Solutions | Towpath Homes | |
| REO Management Solutions | Trevett Group LLC | |
| REO Management Solutions | Vylla Homes | |
| REO Management Solutions | Alta Realty Company | |
| REO Management Solutions | Alta Realty Company | |
| REO Management Solutions | Century 21 HomeStar | |
| REO Management Solutions | Clearview Realty, LLC | |
| REO Management Solutions | Coldwell Banker King Thomspon | |
| REO Management Solutions | Coldwell Banker Routh Realty | |
| REO Management Solutions | DOLES REALTY, INC | |
| REO Management Solutions | GEM Real Estate | |
| REO Management Solutions | Irongate Realty | |
| REO Management Solutions | Keller Williams Realty  Greater Cleveland Northeas | |
| REO Management Solutions | KP Premier Realty | |
| REO Management Solutions | RE/MAX realty/findlay | |
| REO Management Solutions | Remax Valley Real Estate | |
| REO Management Solutions | Russell Real  Estate Services | |
| REO Management Solutions | Sibcy Cline | |
| REO Management Solutions | Solutions for Real Estate | |
| REO Management Solutions | All-Pro Realty,Inc | |
| REO Management Solutions | Coldwell Banker Select | |
| REO Management Solutions | Lake Country Real Estate Inc. | |
| REO Management Solutions | LBWS Owasso, Inc. | |
| REO Management Solutions | Realty Experts Inc | |
| REO Management Solutions | River City Realty LLC | |
| REO Management Solutions | Action Realty | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Century 21 team Realty | |
| REO Management Solutions | CORE Real Estate Services | |
| REO Management Solutions | Emerald Valley Real Estate | |
| REO Management Solutions | Enetra Real Estate | |
| REO Management Solutions | Home Quest Realty | |
| REO Management Solutions | John L Scott | |
| REO Management Solutions | John L Scott | |
| REO Management Solutions | John L Scott Newport | |
| REO Management Solutions | John L Scott Realty | |
| REO Management Solutions | John L Scott, Salem West | |
| REO Management Solutions | Keller Williams | |
| REO Management Solutions | Keller Williams | |
| REO Management Solutions | KELLER WILLIAMS | |
| REO Management Solutions | Ned Baker Real Estate, Inc. | |
| REO Management Solutions | Remington Real Estate LLC | |
| REO Management Solutions | Seaquist Real Estate | |
| REO Management Solutions | Seaquist Real Estate | |
| REO Management Solutions | Seashore Real Estate | |
| REO Management Solutions | Taylor & Taylor Realty | |
| REO Management Solutions | 1st Class Realty - PA | |
| REO Management Solutions | American Destiny Real Estate - Philadelphia | |
| REO Management Solutions | American Destiny Real Estate - Philadelphia | |
| REO Management Solutions | Elfant Wissahickon Realtors | |
| REO Management Solutions | ERA Meridian Real Estate Group | |
| REO Management Solutions | EXIT Preferred Realty | |
| REO Management Solutions | eXp Realty LLC | |
| REO Management Solutions | Foht Realtors | |
| REO Management Solutions | Forest Lake Real Estate Group LLC | |
| REO Management Solutions | Highland Realty Group LLC | |
| REO Management Solutions | Independence REO | |
| REO Management Solutions | O'Connor Real Estate | |
| REO Management Solutions | Powell and Associates Real Estate, LLC | |
| REO Management Solutions | preferred properties,inc | |
| REO Management Solutions | Premier RE | |
| REO Management Solutions | Priority Realty, LLC | |
| REO Management Solutions | R.E.O. Complete Real Estate, Inc. | |
| REO Management Solutions | Re/Max 1st Advantage | |
| REO Management Solutions | RE/MAX Prime Real Estate | |
| REO Management Solutions | RE/MAX Prime Real Estate | |
| REO Management Solutions | Remax Realty Services Inc. | |
| REO Management Solutions | Weichert Realtors, First Choice | |
| REO Management Solutions | JDS Realty Group | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | MARES Solutions LLC | |
| REO Management Solutions | Premier Properties | |
| REO Management Solutions | Quality Homes Real Estate | |
| REO Management Solutions | Universal Properties RE LLC | |
| REO Management Solutions | Universal Properties Realty Governemnt Services | |
| REO Management Solutions | Homistic Real Estate, Inc. | |
| REO Management Solutions | Carolina Pines Realty, Inc | |
| REO Management Solutions | Charles Sanford Realty | |
| REO Management Solutions | Coldwell Banker-1st Choice Realty, LLC | |
| REO Management Solutions | Covenant Properties DBA CENTURY 21 VANGUARD | |
| REO Management Solutions | Edgefield Southern Realty, LLC | |
| REO Management Solutions | Home & Land Pros LLC | |
| REO Management Solutions | Keller Williams Greenville Central | |
| REO Management Solutions | RE/MAX Advantage Group | |
| REO Management Solutions | Robinson Real Estate Services | |
| REO Management Solutions | Shelton Properties at KW | |
| REO Management Solutions | Keller Williams Realty Black Hills | |
| REO Management Solutions | Crye-Leike Lakeway Real Estate | |
| REO Management Solutions | Dwell Real Estate Company | |
| REO Management Solutions | Five Star Real Estate Services | |
| REO Management Solutions | LA Realty-Trenton, LLc | |
| REO Management Solutions | Park Hill Realty Group | |
| REO Management Solutions | Park Hill Realty Group | |
| REO Management Solutions | Preferred Properties of East Tennessee Inc. | |
| REO Management Solutions | Prestige Homes of the Tri Cities | |
| REO Management Solutions | Prestige Homes of the Tri Cities | |
| REO Management Solutions | Re/Max Elite | |
| REO Management Solutions | Real Estate Partners | |
| REO Management Solutions | Remax Pros | |
| REO Management Solutions | Russ Swanay Real Estate | |
| REO Management Solutions | The House Store | |
| REO Management Solutions | The Property Shoppe | |
| REO Management Solutions | The REAL ESTATE Office | |
| REO Management Solutions | A.M Real Estate, Inc. | |
| REO Management Solutions | Absolute Real Estate | |
| REO Management Solutions | AmeriStar Realtors, Inc | |
| REO Management Solutions | Ameristar Realtors, Inc. | |
| REO Management Solutions | Baxter Real Estate | |
| REO Management Solutions | Bay Prairie Investments Inc. | |
| REO Management Solutions | Browne Hollar Realty | |
| REO Management Solutions | Cagle Realtors, Inc. | |
| REO Management Solutions | Century 21 Cota Realty | |

| Debtor | Counterparty | Date |
|---|---|---|
| REO Management Solutions | Century 21 Olympian Area Specialist | |
| REO Management Solutions | Coldwell Banker Panian & Mash, REALTORS | |
| REO Management Solutions | Coldwell Banker United | |
| REO Management Solutions | Edmonson & Associates, Inc., Realtors | |
| REO Management Solutions | ERA | |
| REO Management Solutions | ERA Sellers Buyers Real Estate | |
| REO Management Solutions | Goodwin REO Group-Keller Williams Realty | |
| REO Management Solutions | Graham & Co. Realty Group | |
| REO Management Solutions | Graham & Co. Realty Group | |
| REO Management Solutions | Jentzen Excite Realty, LLC | |
| REO Management Solutions | Keller williams Realty-Waco | |
| REO Management Solutions | Lawrence Realty Group, LLC dba Trillionaire Realty | |
| REO Management Solutions | Metroplex Real Estate. Services, Inc | |
| REO Management Solutions | Mirabal Montalvo & Associates, LLC | |
| REO Management Solutions | NE Texas Regional Realty | |
| REO Management Solutions | One Stop Realty | |
| REO Management Solutions | Pat Holmes Real Estate | |
| REO Management Solutions | Paxton Real Estate | |
| REO Management Solutions | Soldbymv, LLC | |
| REO Management Solutions | Spyglass Realty and Investments | |
| REO Management Solutions | Strategic Realty | |
| REO Management Solutions | Superior Realty | |
| REO Management Solutions | Texas Premier Properties | |
| REO Management Solutions | Tijerina Group | |
| REO Management Solutions | Tommy L. McDowell, Realtors | |
| REO Management Solutions | Trinity Realty & Investments | |
| REO Management Solutions | Van Slyke Real Estate, LLC | |
| REO Management Solutions | Vortex Realty LLC | |
| REO Management Solutions | Will Clark Realty | |
| REO Management Solutions | XL Realty, Inc dba Excel Realty | |
| REO Management Solutions | Keller Williams Utah Realtors | |
| REO Management Solutions | Outland Real Estate Group | |
| REO Management Solutions | RE/MAX Metro | |
| REO Management Solutions | 804 Real Estate, LLC | |
| REO Management Solutions | Anderson Realty | |
| REO Management Solutions | Berkshire Hathaway HomeServices Select Realty | |
| REO Management Solutions | Brooke Madison & Associates | |
| REO Management Solutions | Century 21 All Service | |
| REO Management Solutions | Chantel Ray Real Estate | |
| REO Management Solutions | Clear Choice Realty, LLC | |

| Debtor | Counterparty | Date |
|--------|-------------|------|
| REO Management Solutions | Gracious Living Realty | |
| REO Management Solutions | Long and Foster | |
| REO Management Solutions | Massanutten Realty | |
| REO Management Solutions | Prime Location Realty, LLC | |
| REO Management Solutions | Prime Location Realty, LLC | |
| REO Management Solutions | Savage & Company Realtors at Keller Williams | |
| REO Management Solutions | Scott & Associates, Inc., Realtors | |
| REO Management Solutions | Wythe County Real Estate, LLC | |
| REO Management Solutions | Re/Max Northern Edge Realty LLC | |
| REO Management Solutions | A B C Properties | |
| REO Management Solutions | Coldwell Banker LaVigne | |
| REO Management Solutions | Hadlock Realty & Development | |
| REO Management Solutions | John L Scott Real Estate | |
| REO Management Solutions | John L Scott Real Estate Bellingham | |
| REO Management Solutions | John L. Scott Real Estate | |
| REO Management Solutions | Keller Williams Realty Bothell | |
| REO Management Solutions | Keller Williams Realty Spokane | |
| REO Management Solutions | Lakemont Real Estate, LLC | |
| REO Management Solutions | Systematic Property Mngmt LLC | |
| REO Management Solutions | Toril Sells Houses Team | |
| REO Management Solutions | Washington Realty Group | |
| REO Management Solutions | BayView Real Estate Inc. | |
| REO Management Solutions | Century 21 Tim Brandt Real Estate, LLC | |
| REO Management Solutions | Online Realty & Auctions LLC | |
| REO Management Solutions | REMAX Invest | |
| REO Management Solutions | The Professional, REALTORS | |
| REO Management Solutions | The Rosemont Group | |
| REO Management Solutions | I Spy Real Estate LLC | |
| REO Management Solutions | Re/Max Real Estate Unlimited | |
| REO Management Solutions | Rivermont Realty Group, LLC | |
| REO Management Solutions | The Property Shop, LLC | |
| REO Management Solutions | 1st Class Realty | |
| REO Management Solutions | B&B Realty | |
| REO Management Solutions | Coldwell Banker Sweetwater Realty | |
| Reverse Mortgage Solutions, Inc. | Alba Law Group, The | 4/23/2018 |
| Reverse Mortgage Solutions, Inc. | Aldridge Pite, LLP | 1/4/2017 |
| Reverse Mortgage Solutions, Inc. | Bell Carrington | 1/23/2017 |
| Reverse Mortgage Solutions, Inc. | BRADLEY ARANT BOULT CUMMINGS LLP | 1/18/2017 |
| Reverse Mortgage Solutions, Inc. | Brock & Scott, PLLC | 5/25/2017 |
| Reverse Mortgage Solutions, Inc. | Burke Costanza & Carberry LLP | |
| Reverse Mortgage Solutions, Inc. | BWW Law Group | 12/15/2016 |
| Reverse Mortgage Solutions, Inc. | Choice Legal Group, P.A. | 3/1/2017 |

| Debtor | Counterparty | Date |
|---|---|---|
| Reverse Mortgage Solutions, Inc. | Codilis and Associates - IL | 12/23/2016 |
| Reverse Mortgage Solutions, Inc. | Codilis Law, LLC | |
| Reverse Mortgage Solutions, Inc. | Codilis, Moody & Circelli, P.C. | 10/7/2016 |
| Reverse Mortgage Solutions, Inc. | Dean Morris L.L.C. | 1/31/2017 |
| Reverse Mortgage Solutions, Inc. | DUANE MORRIS LLP | |
| Reverse Mortgage Solutions, Inc. | Eric H Lindquist PC LLO | |
| Reverse Mortgage Solutions, Inc. | Galloway, Johnson, Tomkins, Burr & Smith APLC | 7/2/2018 |
| Reverse Mortgage Solutions, Inc. | GLS Legal Services | 9/26/2016 |
| Reverse Mortgage Solutions, Inc. | GREENBERG TRAURIG LLP | |
| Reverse Mortgage Solutions, Inc. | Greenspoon Marder | |
| Reverse Mortgage Solutions, Inc. | Gross Polowy | 9/23/2016 |
| Reverse Mortgage Solutions, Inc. | Halliday & Watkins | 3/1/2017 |
| Reverse Mortgage Solutions, Inc. | Herschel C. Adcock | 7/31/2017 |
| Reverse Mortgage Solutions, Inc. | Hughes Watters & Askanase, LLP | |
| Reverse Mortgage Solutions, Inc. | Jackson & McPherson, LLC | 12/20/2016 |
| Reverse Mortgage Solutions, Inc. | KML Law Group, P.C. | 9/15/2016 |
| Reverse Mortgage Solutions, Inc. | Mackie Wolf Zientz & Mann PC | 6/28/2017 |
| Reverse Mortgage Solutions, Inc. | Malcolm & Cisneros, a Law Corporation | 1/27/2017 |
| Reverse Mortgage Solutions, Inc. | Manley Deas & Kochalski LLC | 12/19/2016 |
| Reverse Mortgage Solutions, Inc. | Martin, Leigh, Laws & Fritzlen, P.C. | 2/3/2017 |
| Reverse Mortgage Solutions, Inc. | McCalla Raymer Pierce Liebert, LLC | 2/15/2017 |
| Reverse Mortgage Solutions, Inc. | McCarthy & Holthus, LLP | 9/11/2017 |
| Reverse Mortgage Solutions, Inc. | Mortgage Law Firm, The | 6/4/2018 |
| Reverse Mortgage Solutions, Inc. | Partridge Snow & Hahn LLP | 12/15/2015 |
| Reverse Mortgage Solutions, Inc. | PHILLIPS LYTLE LLP | |
| Reverse Mortgage Solutions, Inc. | QUILLING SELANDER LOWNDS WINSLETT | |
| Reverse Mortgage Solutions, Inc. | Randall S. Miller & Associates, P.C. | |
| Reverse Mortgage Solutions, Inc. | RAS Boriskin | 1/12/2017 |
| Reverse Mortgage Solutions, Inc. | RAS Citron | 1/12/2017 |
| Reverse Mortgage Solutions, Inc. | RAS Crane | 2/12/2017 |
| Reverse Mortgage Solutions, Inc. | Reisenfeld & Associates LPA, LLC | 4/25/2017 |
| Reverse Mortgage Solutions, Inc. | Robertson, Anschutz & Schneid, P.L. | 1/12/2017 |
| Reverse Mortgage Solutions, Inc. | Rogers Townsend & Thomas PC | 5/25/2017 |
| Reverse Mortgage Solutions, Inc. | Rubin Lublin, LLC | 9/15/2016 |
| Reverse Mortgage Solutions, Inc. | Sirote & Permutt, P.C. | 9/14/2017 |
| Reverse Mortgage Solutions, Inc. | Southlaw PC | 8/16/2017 |
| Reverse Mortgage Solutions, Inc. | SouthLaw, P.C. | 8/14/2017 |
| Reverse Mortgage Solutions, Inc. | Taherzadeh, PLLC | |
| Reverse Mortgage Solutions, Inc. | The Geheren Firm, P.C. | |
| Reverse Mortgage Solutions, Inc. | Tiffany & Bosco, PA | 10/6/2016 |
| Reverse Mortgage Solutions, Inc. | TMLF Hawaii LLC | 6/4/2018 |
| Reverse Mortgage Solutions, Inc. | Tromberg Law Group, P.A. | 8/9/2017 |

| Debtor | Counterparty | Date |
|---|---|---|
| Reverse Mortgage Solutions, Inc. | Trott Law, P.C. | 1/31/2017 |
| Reverse Mortgage Solutions, Inc. | TROUTMAN SANDERS LLP ACH | |
| Reverse Mortgage Solutions, Inc. | Usset, Weingarden & Liebo PLLP | 6/5/2018 |
| Reverse Mortgage Solutions, Inc. | WARGO & FRENCH LLP | |
| Reverse Mortgage Solutions, Inc. | WILLIAMS MULLEN CLARK & DOBBINS PC | |
| Reverse Mortgage Solutions, Inc. | Wilson & Associates, PLLC | 8/24/2017 |
| Reverse Mortgage Solutions, Inc. | Wright Finlay & Zak | 6/15/2017 |
| Reverse Mortgage Solutions, Inc. | Zieve, Brodnax and Steele | |
| Reverse Mortgage Solutions, Inc. | Barrett Daffin Frappier Turner & Engel, LLP | 5/13/2016 |
| Reverse Mortgage Solutions, Inc. | Bendett & McHugh, P.C. | 7/7/2016 |
| Reverse Mortgage Solutions, Inc. | BWW Law Group, LLC | 5/13/2016 |
| Reverse Mortgage Solutions, Inc. | Codilis & Associates PC - IL | 5/11/2016 |
| Reverse Mortgage Solutions, Inc. | Codilis, Moody & Circelli, P.C. | 4/3/2018 |
| Reverse Mortgage Solutions, Inc. | Gross Polowy, LLC | 5/18/2016 |
| Reverse Mortgage Solutions, Inc. | Heavner, Beyers & Mihlar, LLC | 5/9/2016 |
| Reverse Mortgage Solutions, Inc. | Herschel C. Adcock | 3/29/2018 |
| Reverse Mortgage Solutions, Inc. | KML Law Group, P.C. | 5/9/2016 |
| Reverse Mortgage Solutions, Inc. | Padgett Law Group | 5/13/2016 |
| Reverse Mortgage Solutions, Inc. | RAS Boriskin, LLC | 5/6/2016 |
| Reverse Mortgage Solutions, Inc. | RAS Citron, LLC | 5/6/2016 |
| Reverse Mortgage Solutions, Inc. | Robertson Anschutz Schneid PL | 5/6/2016 |
| Reverse Mortgage Solutions, Inc. | Rose L. Brand & Associates. P.C. | 5/6/2016 |
| Reverse Mortgage Solutions, Inc. | SouthLaw, P.C. | 5/6/2016 |
| Reverse Mortgage Solutions, Inc. | Tiffany & Bosco, P.A. | 5/10/2016 |
| Reverse Mortgage Solutions, Inc. | TMLF Hawaii LLLC | 3/12/2016 |
| Reverse Mortgage Solutions, Inc. | Tromberg Law Group, P.A. | 3/30/2018 |
| Reverse Mortgage Solutions, Inc. | Usset, Weingarden & Liebo PLLP | 5/6/2016 |
| Reverse Mortgage Solutions, Inc. | Baer & Timberlake, P.C. | 5/9/2016 |
| Reverse Mortgage Solutions, Inc. | Brock & Scott, PLLC | 3/30/2018 |
| Reverse Mortgage Solutions, Inc. | Jackson & McPherson, LLC | 5/10/2016 |
| Reverse Mortgage Solutions, Inc. | Samuel I. White, P.C. | 5/23/2016 |
| Reverse Mortgage Solutions, Inc. | BARRETT DAFFIN FRAPPIER TREDER & | 1/27/2017 |
| Reverse Mortgage Solutions, Inc. | First American Title Insurance Company, a Nebraska corporation | 8/8/2017 |
| Reverse Mortgage Solutions, Inc. | Codilis, Stawiarski & Moody, P.C. | 10/7/2016 |
| Reverse Mortgage Solutions, Inc. | Cohn, Goldberg & Deutsch, LLC | 12/19/2016 |
| Reverse Mortgage Solutions, Inc. | Dyke & Winzerling PLLC | 3/3/2017 |
| Reverse Mortgage Solutions, Inc. | Eric H. Lindquist P.C. | 4/18/2017 |
| Reverse Mortgage Solutions, Inc. | Gladstone Law Group, P.A. | 8/9/2017 |
| Reverse Mortgage Solutions, Inc. | Hughes Watters Askanase | 6/23/2017 |
| Reverse Mortgage Solutions, Inc. | Mercer Belanger | 3/7/2017 |

| Debtor | Counterparty | Date |
|---|---|---|
| Reverse Mortgage Solutions, Inc. | O'Dess | 9/29/2016 |
| Reverse Mortgage Solutions, Inc. | Padgett | 9/1/2017 |
| Reverse Mortgage Solutions, Inc. | Randall Miller | 8/11/2017 |
| Reverse Mortgage Solutions, Inc. | RAS FL | 1/12/2017 |
| Reverse Mortgage Solutions, Inc. | RAS Bosikin - NY | 1/12/2017 |
| Reverse Mortgage Solutions, Inc. | Robinson Tait, P.S. | 1/4/2017 |
| Reverse Mortgage Solutions, Inc. | Samuel White | 3/29/2017 |
| Reverse Mortgage Solutions, Inc. | Shechtman Halperin Savage, LLP | 6/6/2018 |
| Reverse Mortgage Solutions, Inc. | Sirote & Permutt, PC | 9/14/2017 |
| Reverse Mortgage Solutions, Inc. | SouthLaw, P.C. | 8/14/2017 |
| Reverse Mortgage Solutions, Inc. | The Mortgage Law Firm (OK) | 6/4/2018 |
| Reverse Mortgage Solutions, Inc. | The Mortgage Law Firm, LLC (OR) | 6/4/2018 |
| Reverse Mortgage Solutions, Inc. | The Mortgage Law Firm, PLLC (WA) | 6/4/2018 |
| Reverse Mortgage Solutions, Inc. | The Mortgage Law Firm, PLLC | 6/4/2018 |
| Reverse Mortgage Solutions, Inc. | Zieve Brodnax Steele | 10/7/2016 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|-------|
| 1.0 | RMS Origination Contracts |
| 1.1 | 1ST 2ND MORTGAGE COMPANY OF N.J., INC. #115981 |
| 1.2 | 1st Access Financial |
| 1.3 | 1st Constitution Bank  #433840 (S1L) |
| 1.4 | 1st Florida Lending Corp #359304 |
| 1.5 | 1st Residential Mortgage LLC #686693 |
| 1.6 | 1st Texas Reverse Mortgage, LLC #1497482 |
| 1.7 | 360 Mortgage Group, LLC (ELLY-QC reviews needed) #155922 |
| 1.8 | 3rd Financial Service Corporation #57962 |
| 1.9 | A & A Mortgage Funding, Inc #227399 |
| 1.10 | A & W Mortgage Services, Inc #130288 (S1L) |
| 1.11 | A Better Mortgage of Fort Collins, LLC #394637 |
| 1.12 | A New Mexico Reverse Mortgage of the Southwest, llc #1102656 |
| 1.13 | A-D Mortgage Loan Specialist #371848 |
| 1.14 | A.K.T. American Capital, Inc #264422(S1L) |
| 1.15 | AAA Southern New England Bank #179871(S1L) |
| 1.16 | Abaca Mortgage, Inc #67573 |
| 1.17 | ABC Bank #193697 |
| 1.18 | Absolute Home Mortgage Corp #176743 (S1L) |
| 1.19 | Academy Mortgage Corp #3113 |
| 1.20 | Accelerated Funding Government Loans Inc #288721 |
| 1.21 | Acceptance Capital Mortgage Corporation #2225 |
| 1.22 | Access Financial Mortgage Corp #1370402 |
| 1.23 | Access Reverse Mortgage #4566 |
| 1.24 | Ace Mortgage LLC #49604 |
| 1.25 | Acer Mortgage Company #51971 |
| 1.26 | Acre Mortgage & Financial, Inc. #13988 |
| 1.27 | Advanced Mortgage Planners, Inc #299329 |
| 1.28 | Advanced Mortgage Solutions of South Florida #282214 (S1L) |
| 1.29 | Advantage Star Mortgage Corp #1371924 |
| 1.30 | Advent Financial, Inc #129461 (S1L) |
| 1.31 | Advisors Mortgage Group, L.L.C. #33041 |
| 1.32 | Aegean Financial #157935 |
| 1.33 | AFC Reverse Mortgage, Inc #108404 (S1L) |
| 1.34 | Affinity Home Equity Solutions, LLC #1087529 |
| 1.35 | Affinity Home Lending, LLC #1181151 |
| 1.36 | Affinity Lending Solutions, LLC #292259 |
| 1.37 | Affordable Home Mortgage, Inc.  #122687 |
| 1.38 | Affordable Lending Group, LLC #856167 |
| 1.39 | AJR Mortgage Company, Inc.  #109652 |
| 1.40 | Alderus Funding and Investments, Inc #315722 |
| 1.41 | All Colorado Mortgage, Inc #967594 (S1L) |
| 1.42 | All Financial Services LLC #528105 |
| 1.43 | All Home Lending, Inc. #102179 |
| 1.44 | All Western Mortgage, Inc. #14210 |
| 1.45 | Allied Lending Group, Inc #1039188 (S1L) |
| 1.46 | ALLSTATE LENDING GROUP, INC #272985 |
| 1.47 | Alpine Realty & Finance Inc #340335 |
| 1.48 | ALV Enterprises, Inc. #888979 |
| 1.49 | Amazon Financial Group Inc #380733 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.50 | Amcap Mortgage, Ltd #129122 |
| 1.51 | America Gold Financial, Inc #353817 (S1L) |
| 1.52 | American Bancshares Mortgage, LLC  #217378 (S1L) |
| 1.53 | American Broker Services, Inc #237721 |
| 1.54 | American California Financial Services Inc #238008 |
| 1.55 | American Capital Finance, Inc #142029 |
| 1.56 | American Eagle Mortgage Co., Inc #232603 (S1L) |
| 1.57 | American Fidelity Mortgage Services Inc #179785 |
| 1.58 | American Financial Funding Corp. #143271 |
| 1.59 | American Financial Mortgage Services, Inc #226068 |
| 1.60 | American Financial Network, Inc. #237341 |
| 1.61 | American Financial Resources (Pending Renewal 9-8-13 #2826) |
| 1.62 | American First Business Services, Inc #359073 |
| 1.63 | American Liberty Mortgage, Incorporated #1462 |
| 1.64 | American Nationwide Mortgage Company, Inc #13392 |
| 1.65 | American Pacific Mortgage Corporation #1850 |
| 1.66 | American Patriot Bank #449552 |
| 1.67 | American Security Mortgage Corp #40561 |
| 1.68 | Amerifirst Financial, Inc. #145368 |
| 1.69 | AmeriPro Funding, Inc. #131699 |
| 1.70 | Ameristar Mortgage, LLC #1107126 |
| 1.71 | Anchor Funding dba John Edward Silvester #355602(S1L) |
| 1.72 | Approval First Home Loans Inc. #167443 |
| 1.73 | Aramco Mortgage, Inc #277316 |
| 1.74 | Arizona Lending Specialists, LLC #144271 |
| 1.75 | Arkright Financial Services, LLC #874637(S1L) |
| 1.76 | Arlington Financial Corporation #5722 (S1L) |
| 1.77 | Aspire Financial, Inc #137773 |
| 1.78 | Assent Inc #818108 |
| 1.79 | Associated Mortgage Group #86136 |
| 1.80 | Atik Inc #163052(S1L) |
| 1.81 | Atlantic Bay Mortgage Group, LLC  #72043(S1L) |
| 1.82 | Atlantic Mortgage Services Inc #353421(S1L) |
| 1.83 | Atlantic Pacific Mortgage Corp #1024 |
| 1.84 | Aurora Financial Group Inc #7096(S1L) |
| 1.85 | Axiom Financial LLC 4642 (S1L) |
| 1.86 | AZ LENDING EXPERTS, LLC #847182 |
| 1.87 | B.L.A. Properties & Loans, INC #1218624 |
| 1.88 | Banc of California, Nat'l Association #530611 |
| 1.89 | Barrons Mortgage Corporation #244384 |
| 1.90 | Bay Equity LLC #76988 |
| 1.91 | Bay-Valley Mortgage Group #192103 |
| 1.92 | BCI Financial Mortgage Corp #85688 (S1L) |
| 1.93 | BDCM Inc. #246510 |
| 1.94 | Belem Servicing LLC  #715386 |
| 1.95 | Berkshire Bank #506896 (S1L) |
| 1.96 | Best Mortgage Lending Corp #1040770 |
| 1.97 | Best Mortgage, Inc #112608 |
| 1.98 | Better Home Financial, Inc #244294 |
| 1.99 | Bicoastal Capital Lending Group, Inc.  #367968 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|-------|
| 1.100 | BJV Financial Services, Inc. #143978 (S1L) |
| 1.101 | Blue Ridge Mortgage, L.L.C. #393152 |
| 1.102 | Blue Shine Corporation #1532263 |
| 1.103 | Blue Skye Lending LLC #318098 |
| 1.104 | Blue Water Mortgage Corporation #1291 |
| 1.105 | bluegettyoxy Inc #1438777 |
| 1.106 | Bluestar Funding Corp #390361 |
| 1.107 | Blufi Lending Corporation #279622 (S1L) |
| 1.108 | Bolsa Financial, Inc. #246504 (S1L) |
| 1.109 | Borba Investments, Inc #76801 |
| 1.110 | Bridgelock Capital DBA- Peak Finance Company #252640 |
| 1.111 | Bright Vision Mortgage, Inc. #148966 |
| 1.112 | Brookstone Mortgage Corporation #915904 |
| 1.113 | Burnett Consulting Inc #305595 |
| 1.114 | Buy America Real Estate  #246497 (S1L) |
| 1.115 | C & E Financial Group, Inc #287106 |
| 1.116 | C&F Mortgage Corporation #147312 |
| 1.117 | C.E.F.S., Inc. #300316 |
| 1.118 | C2 Financial Corporation #135622 |
| 1.119 | Calculated Risk Analytics, Inc. #1165716 |
| 1.120 | Capital Financial Group, Inc #3146(S1L) |
| 1.121 | Capital Lending Group, Inc #146100(S1L) |
| 1.122 | Capital Plus Financial Corporation #618745 |
| 1.123 | Capstone Direct, Inc. #236109 |
| 1.124 | Cardenas, Marisela #1008730 |
| 1.125 | Carrollton Mortgage Co.  #235659 (S1L) |
| 1.126 | Cascade Northern Mortgage #106650 |
| 1.127 | Cason Jr, Raymond, Harold #396046 |
| 1.128 | Castle Financial, Inc #208458 |
| 1.129 | Castle Mortgage Corp. #90752 |
| 1.130 | CBC National Bank #402135 |
| 1.131 | Cendera Funding, Inc. #179242 (S1L) |
| 1.132 | Centennial Home Mortgage, LLC #1135081 |
| 1.133 | Century City Mortgage #366925 |
| 1.134 | Century Plaza Mortgage #320829(S1L) |
| 1.135 | Champion Bank #401942 |
| 1.136 | CHAND Mortgage LLC #271599 |
| 1.137 | Charis Loans, Inc #1133665 |
| 1.138 | Choice Lending Corp #236563 |
| 1.139 | Christensen Financial, Inc #112516 |
| 1.140 | Churchill Mortgage Corporation #1591 |
| 1.141 | Citizens First Bank #469329(S1L) |
| 1.142 | Citizens Lending Group #1109984 |
| 1.143 | City Lights Financial Express Inc. #271590 |
| 1.144 | CLARK, SCOTT GARLAND #344478 |
| 1.145 | CMG Mortgage, Inc.  #1820 |
| 1.146 | Coastal Capital Funding, Inc #962070(S1L) |
| 1.147 | Coastway Community Bank #418437 |
| 1.148 | Cobalt Mortgage, Inc.  #35653 (S1L) |
| 1.149 | COFMAR FINANCIAL INC #939554 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.150 | Colonial Savings, F.A. #401285 |
| 1.151 | Compass Mortgage, Inc #21808 |
| 1.152 | Concord Mortgage #132167 |
| 1.153 | Connecticut River Bank, N.A #440232(S1L) |
| 1.154 | Constant Funding, Inc. #329132 |
| 1.155 | Contempo Lending, Inc #287912(S1L) |
| 1.156 | Continental Funding Corp #2723(S1L) |
| 1.157 | Contour Mortgage Corporation #34384 |
| 1.158 | Copiague Funding Corp #1310 |
| 1.159 | Cornerstone Mortgage Solutions, llc #248711 |
| 1.160 | Corum Financial Services Inc #1105497 |
| 1.161 | Country West Financial Services, Inc #1229672 |
| 1.162 | Cox, Alicia #1263037 |
| 1.163 | Creative Capital (Nance, Terry Lee) #399174(S1L) |
| 1.164 | Creative Retirement Planning, Inc #1175810 |
| 1.165 | Credit Union Mortgage Association, Inc.  #296727 (S1L) |
| 1.166 | Crossmark Financial Corporation #217854 |
| 1.167 | CS Financial, Inc.  #31132 |
| 1.168 | Curran Mortgage Inc.  #1306112 |
| 1.169 | Customized Mortgage Solutions, LLC #214882 |
| 1.170 | Dailey, Dennis Shane (Smart Money Group #935144) |
| 1.171 | Darce Financial, Inc #829682 |
| 1.172 | DAS Acquisition Company, LLC #227262 |
| 1.173 | David Patrick Baron #394061 |
| 1.174 | Davis & Amaral Mortgage Consultants, Inc. #283350 |
| 1.175 | Declined  - Proficio Bank #555666 |
| 1.176 | Declined -  Affiliated Financial Services Inc #1062212 |
| 1.177 | Declined - Barradas, Karen #347992 |
| 1.178 | Declined - Best Finance Capital, Inc. #1444114 |
| 1.179 | Declined - Brighton Bank #892951 |
| 1.180 | Declined - Cstone Mortgage, Inc #173855 |
| 1.181 | Declined - Green Tree Lending, Inc #446265 |
| 1.182 | Declined - Holland Mortgage Services, Inc #1432962 |
| 1.183 | Declined - Leading Edge Mortgage Corp. #168668 |
| 1.184 | Declined - Mark 1 Real Estate, Inc #1126356 |
| 1.185 | Declined - Pennial Real Estate Services, Inc #931858 |
| 1.186 | Declined - Proficio Mortgage Ventures #7840 |
| 1.187 | Declined - Providian Mortgage Company Inc #401095 |
| 1.188 | Desert Springs Mortgage, LLC #794445 |
| 1.189 | Determan Paul Duane #850228 |
| 1.190 | Developers Mortgage Group LLC #374847 |
| 1.191 | DGH Corp, dba DGH Home Mortgage #234734 |
| 1.192 | Diamond Residential Mortgage Corporation #186805 |
| 1.193 | Direct Mortgage Loans, LLC #832799 |
| 1.194 | Directors Mortgage, Inc #3240 |
| 1.195 | Disney Financial Corporation #305991 |
| 1.196 | Division Mortgage Group, Inc #140614 |
| 1.197 | DMI Financial Inc #126035 |
| 1.198 | Dooley, Mary P #408302 |
| 1.199 | DRG Capital Inc #1160249 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.200 | Dyjero Corporation #976231 |
| 1.201 | Dynamic Funding Solutions, Inc #17144 |
| 1.202 | Dynasty Mortgage Network LLC #141917 |
| 1.203 | E Mortgage Management LLC #2926 |
| 1.204 | E. M. E. Funding Corp #102767 |
| 1.205 | Eagle Prime Lending, LLC (S1L) |
| 1.206 | East Coast Capital Corp #1403 (S1L) |
| 1.207 | Edgewater Funding Inc #116868 |
| 1.208 | Electra Mortgage Solutions Inc #208750 |
| 1.209 | Emery Federal Credit Union #401087 (S1L) |
| 1.210 | Empire Financial Services, Inc.  (MARCY) #7684 |
| 1.211 | EMPORIUM FINANCIAL GROUP, INC #358007 |
| 1.212 | Endeavor Mortgage Group, Inc #355050 |
| 1.213 | Enter Mortgage Inc #319482 |
| 1.214 | Envoy Mortgage Ltd #6666 |
| 1.215 | Ephesians Financial Corporation #1082040 |
| 1.216 | Equiloan, Inc. #376231 |
| 1.217 | Equinox Home Financing, Inc. #1212805 |
| 1.218 | Equity Financial Services, Inc. #324532 |
| 1.219 | Equity Loans LLC #21116 |
| 1.220 | Equity Smart Home Loans Inc #856170 |
| 1.221 | Evergreen Moneysource Mortgage Company #3182 |
| 1.222 | Excel Mortgage Servicing, Inc. (Pending Renewal #128231) |
| 1.223 | Express Loans & Investments, Inc #356747 |
| 1.224 | Express Mortgage Decisions, Inc. #221934 (S1L) |
| 1.225 | F&B Acquisition Group LLC #221646 |
| 1.226 | Fairway Independent Mortgage Corporation #2289 |
| 1.227 | Family First Funding LLC #810371 |
| 1.228 | Family Mortgage, Inc #343833 |
| 1.229 | FBC Mortgage, LLC #152859 |
| 1.230 | Federated Lending Corporation #112272 |
| 1.231 | Finance of America Mortgage LLC #1071 |
| 1.232 | Financial Funding Solutions, Inc. #109995 |
| 1.233 | First American Home Loans, Inc#197155 |
| 1.234 | First California Financial Inc #249189 |
| 1.235 | First Capital Trust Deeds #1165726 |
| 1.236 | First Choice Loan Services Inc. #210764 |
| 1.237 | First Colony Mortgage Corporation #3112 |
| 1.238 | First Federal Savings Bank #402963 |
| 1.239 | First Home Equity Loans,LLC #228446 |
| 1.240 | First Mortgage Group, Inc. #768057 |
| 1.241 | First Nations Home Mortgage, Inc. #845794 |
| 1.242 | First Nationwide Lending, Inc #367463 |
| 1.243 | FIRST RATE INC. #349319 |
| 1.244 | First Service Credit Union #411394 |
| 1.245 | First USA Mortgage, Inc. #234165 (S1L) |
| 1.246 | First World Mortgage Corproation #2643 |
| 1.247 | Five Star Partnership, LLC #245495 |
| 1.248 | Florida Community Mortgage (286705) |
| 1.249 | Florida Homeowners Advisors, Inc. #935620 |

| # | Title |
|---|---|
| | **Project Phoenix: RMS Origination Contracts Index** |
| | |
| 1.250 | Fort Funding Corp #39463 (S1L) |
| 1.251 | Frank J. Weaver Inc #126333 |
| 1.252 | Franklin Advantage, Inc #285786 |
| 1.253 | Freedom Mortgage Corporation #2767 |
| 1.254 | Freeman Webb Mortgage Corporation #157514 (S1L) |
| 1.255 | FundingUSA.com #276712 (S1L) |
| 1.256 | Garvens Mortgage Group, LLC #441338 |
| 1.257 | Gateway Mortgage Group, LLC #7233 |
| 1.258 | Genequity Mortgage, Inc #2236 |
| 1.259 | Geneva Financial, LLC #42056 |
| 1.260 | Gershman Investment Corp #138063 |
| 1.261 | Get Assured, Inc. #347589 (S1L) |
| 1.262 | Gillit Corporation #1547828 |
| 1.263 | Global Bancorp #1033770 |
| 1.264 | Global Direct Realty and Lending #1203655 |
| 1.265 | GLOBAL FUNDING SERVICE CORPORATION #342955 |
| 1.266 | GM Mortgage Co., Inc. #345992 |
| 1.267 | Go Lender Direct, Inc. #336731 |
| 1.268 | Gold Star Mortgage Financial Group, Corporation #3446 |
| 1.269 | gold, william alan #1438553 |
| 1.270 | Golden Age Financial Soultions, Inc #1445843 |
| 1.271 | Golden Empire Mortgage, Inc #2427 |
| 1.272 | Golden Mortgage, LLC #259358 |
| 1.273 | Golden Years Mortgage Solutions #1252409 |
| 1.274 | Goldmark Financial Corporate #102163 (S1L) |
| 1.275 | GotMortgage.com #245420 |
| 1.276 | Grandient Home Mortgage, LLC #192028 (S1L) |
| 1.277 | Great Mortgage, Inc #478647 |
| 1.278 | Green Monarch Mortgage, Inc. #305906 |
| 1.279 | Greenleaf Financial, LLC #173899 |
| 1.280 | Greenway Mortgage Funding Corp. #374480 |
| 1.281 | Group One Mortgage, Inc. #53185 |
| 1.282 | GSF Mortgage Corporation #1018 |
| 1.283 | Guardhill Financial Corp. #1609 (S1L) |
| 1.284 | Gulf South Lending Group #39606 (S1L) |
| 1.285 | H.O.M.E. COMPANIES LLC #217832 |
| 1.286 | Haddad, Leo Gus #357034 |
| 1.287 | Hancock Mortgage Partners, LLC #229844 (S1L) |
| 1.288 | Hanscom Federal Credit Union #410771 (S1L) |
| 1.289 | Hartleb-Prasad Corp. (#257572) (S1L) |
| 1.290 | Helping Hand Lending, Inc #1156897 |
| 1.291 | Hendry Home Mortgage, LLC #183363 |
| 1.292 | Home Funding Corporation #91487 |
| 1.293 | Home Mortgage Alliance Corporation #1165808 |
| 1.294 | HOME MORTGAGE ALLIANCE CORPORATION (HMAC) #1165808 |
| 1.295 | Home Point Financial Corporation #7706 |
| 1.296 | Home1st Lending, LLC #1418 |
| 1.297 | HomeBridge Financial Services, Inc #6521 |
| 1.298 | Homecorp Mortgage, Inc #289309 |
| 1.299 | Homeowners Mortgage and Equity, Inc #1229133 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.300 | HomePromise Corporation #102836 |
| 1.301 | Horizon Home Mortgage, LLC #69164 |
| 1.302 | Hypotec Inc. #331734 |
| 1.303 | i3 Lending, Inc #1020884 |
| 1.304 | iDream Loans, Inc #1132446 |
| 1.305 | IG & Associates International, Inc. #176731 (S1L) |
| 1.306 | Independence Home Mtg Corp (fka-Martin Green, Inc) #122142 |
| 1.307 | Indigo Mortgage, LLC #188348 |
| 1.308 | INFINITE QUALITY LENDING INC #348306 |
| 1.309 | Ingle,Gary Stephen #359109 |
| 1.310 | Inland Valley Home Loan, Inc. #235705 |
| 1.311 | Innovative Mortgage Services Inc #250769 |
| 1.312 | Integrated Financial Group #110645 (S1L) |
| 1.313 | Integrity 1st Mortgage, Inc #189535 |
| 1.314 | Integrity Financial LLC #222260 |
| 1.315 | Integrity First Financial Group, Inc #129777 |
| 1.316 | Integrity Mortgage & Financial Services, Inc #134378 |
| 1.317 | Integrity Mortgage Group #238109 |
| 1.318 | Intercap Lending, Inc #190465 |
| 1.319 | Intercontinental Capital Group, Inc. # 60134 |
| 1.320 | Interlinc Mortgage Services, LLC (Pending Renewal #205696) |
| 1.321 | Ironwood Financial Services, Inc #375434 |
| 1.322 | James Arthur Orsburn dba Family Home Financial #835206 |
| 1.323 | JB Associates, LLC #21751 |
| 1.324 | JC Financial Solutions Inc #365033 |
| 1.325 | Jefferson Bank of Florida #401468 |
| 1.326 | Jersey Mortgage Company of New Jersey, Inc. #2761 |
| 1.327 | JMJ Financial Group #167867 |
| 1.328 | Joseph H. Morningstar DBA  Morningstar Mortgage #375287 |
| 1.329 | JR Mortgage Corporation #197135 |
| 1.330 | K & B Capital Corp #166254 |
| 1.331 | K Pacific Group #1041553 |
| 1.332 | KAM Financial & Realty, Inc #1039324 |
| 1.333 | KC Mortgage LLC #374307 |
| 1.334 | KCGO Inc #349267 |
| 1.335 | Kelly Mortgage and Realty, Inc #3160 |
| 1.336 | Kevin Michael Melody #1409858 |
| 1.337 | Key West Funding, Inc #1233824 |
| 1.338 | Kortava Financial Network, Inc #1000517 |
| 1.339 | Kroboth & Helm Mortgage Company, Inc. #223332 |
| 1.340 | KRS Capital Partners #248216 |
| 1.341 | Landguard Eagle, L3C #1167252 |
| 1.342 | Lara Hanousek (Platinum Purpose #986374) |
| 1.343 | LeaderOne Financial Corporation #12007 |
| 1.344 | Legacy Group Lending, Inc. #4455 (S1L) |
| 1.345 | Legacy Home Financing, Inc. #129121 (S1L) |
| 1.346 | LegacyTexas Bank #440732 |
| 1.347 | Lend Smart Mortgage, LLC #4474 |
| 1.348 | LHN Financial Services, Inc. (#274336) (S1L) |
| 1.349 | LIDD ENTERPRISES INC. #281172 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.350 | Lincoln Lending Group #355238 |
| 1.351 | Lincoln Mortgage Company #97926 (S1L) |
| 1.352 | Lincoln United Mortgage Corp. #129275 |
| 1.353 | Loan Lynx, LLC #1238826 |
| 1.354 | Loan Outlet, Inc. #347063 |
| 1.355 | Loan Simple, Inc. #3032 |
| 1.356 | Loancorp Financial Inc #252737 |
| 1.357 | Loanlinq (dba for Scott Stockdale) #888205 |
| 1.358 | LoanSmart LLC #1013945 |
| 1.359 | LoanStar Home Loans, LLC #1094582 |
| 1.360 | Longbridge, LLC #957935 |
| 1.361 | LPMC, LLC #399162 |
| 1.362 | Magnet Mortgage Corporation #369476 |
| 1.363 | Main Bank  #403578 (s1l) |
| 1.364 | Main Street Mortgage #1108681 |
| 1.365 | Mainsail Capital Mortgage LLC #1193869 |
| 1.366 | MAK Financial Group, Inc. #283995 (S1L) |
| 1.367 | Makana Financial, Inc.  #377394 |
| 1.368 | Malibu Funding, Inc. #79620 |
| 1.369 | Malone Group, Inc. (The Malone Group) 343561) (S1L) |
| 1.370 | Manhattan Financial Group, Inc. #10095 |
| 1.371 | Manufacturers and Traders Trust CompanyM&T Bank #381076 |
| 1.372 | Marquis Lending Inc #209122 |
| 1.373 | MAS Associates, LLC #128519 |
| 1.374 | Mason McDuffie Mortgage Corporation #1141 |
| 1.375 | Masters Mortgage, Inc #215374 |
| 1.376 | McGowin King Mortgage, LLC #177691 |
| 1.377 | MCM Holdings, Inc. #213236 |
| 1.378 | Meredith Village Savings Bank #466022 |
| 1.379 | Meridian Bank #462854 |
| 1.380 | Merit Lending LLC #1133463 |
| 1.381 | Merlot Mortgage, Inc. #191695 (S1L) |
| 1.382 | Merrimack Mortgage Co., Inc.  #2561 |
| 1.383 | Metro Mortgage of Georgia, Inc #164803 |
| 1.384 | Metro Mortgage Of Georgia, Inc. #164803 |
| 1.385 | MFSTA Inc #222617 |
| 1.386 | Mid America Mortgage-Southwest Inc #317299 |
| 1.387 | Mid Valley Services Inc #219418 |
| 1.388 | Midwest Family Lending Corporation #4622 |
| 1.389 | Miller, Deanna B #1010020 |
| 1.390 | Miller,James,Arthur #329911 |
| 1.391 | Mitchell Funding of Valley Stream, Inc. #174714 (S1L) |
| 1.392 | MLD Mortgage Inc #1019 |
| 1.393 | MN Capital Inc #350430 |
| 1.394 | Mohave State Bank  #405866 (S1L) |
| 1.395 | Moria Development, Inc. #6274 |
| 1.396 | Mortgage Bank of California #38232 |
| 1.397 | Mortgage Enterprise, Ltd. #3727 |
| 1.398 | Mortgage Financial Group, Inc. #219650 |
| 1.399 | Mortgage Investors Group #34391 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.400 | Mortgage Lending Group LLC #1157983 |
| 1.401 | Mortgage Master Service Corporation #40445 (S1L) |
| 1.402 | Mortgage Mavens, Inc. #244299 |
| 1.403 | Mortgage Max #242175 |
| 1.404 | Mortgage Network Solutions, LLC #58096 |
| 1.405 | Mortgage Services (JoeDonna, Inc. dba MS #236217) |
| 1.406 | Mortgage Services III, LLC #172606 (S1L) |
| 1.407 | Mortgage Trust, Inc #3250 |
| 1.408 | Mortgages Unlimited, Inc. #225504 (S1L) |
| 1.409 | MortgageWorks, Inc #337037 |
| 1.410 | Mountain America Federal Credit Union #462815 |
| 1.411 | Movement Mortgage, LLC #39179 |
| 1.412 | MULTILINE MORTGAGE SERVICES, INC #158989 |
| 1.413 | National Pacific Lending #240639 |
| 1.414 | National-One Mortgage Banker, LLC #186802 |
| 1.415 | Nations Lending Corporation #32416 |
| 1.416 | Nations Reliable Lending, LLC #181407 |
| 1.417 | Nationwide Equities Corporation #1408 |
| 1.418 | Neighborhood Mortgage LLC #62776 |
| 1.419 | Net Equity Financial, Inc. #56465 (S1L) |
| 1.420 | Network Funding, LP  #2297 |
| 1.421 | New Castle Mortgage, LLC #165959 |
| 1.422 | New England Home Mortgage LLC #112216 |
| 1.423 | New Home Finance LLC #170058 |
| 1.424 | NFM, Inc #2893 |
| 1.425 | Northeast bancorp of America, Inc. #264881 |
| 1.426 | NUllennium Financial Corp #347794 |
| 1.427 | O Bee Credit Union #402662 |
| 1.428 | OAK CREEK INVESTMENTS #237499 |
| 1.429 | Oaktree Funding Corporation #71640 |
| 1.430 | Oasis Mortgage LLC #1186985 |
| 1.431 | Oceanfirst Bank  #409701 (S1L) |
| 1.432 | Oceanfront Mortgage, Inc #322028 |
| 1.433 | Odom, Jay Lang #344372 |
| 1.434 | OLES, DAVID, HARRISON #388387 |
| 1.435 | Omni-Fund, Inc.  #4869 |
| 1.436 | On Q Financial, Inc. #5645 |
| 1.437 | One Reverse Mortgage, LLC   #2052 |
| 1.438 | Open Mortgage, LLC #2975 |
| 1.439 | Opes Advisors, Inc #235584 |
| 1.440 | Option One Mortgage Lending Corp #1387059 |
| 1.441 | Options Mortgage Services LLC #844996 |
| 1.442 | Options Mortgage Services, LLC  #844996 |
| 1.443 | Ostronic, Inc #347821 |
| 1.444 | Own Again Inc #1124447 |
| 1.445 | Pacific Financial Mortgage & Real Estate Inc #328506 |
| 1.446 | Pacific Real Estate Group, Inc. #366387 (S1L) |
| 1.447 | Pacific Residential Mortgage Corp |
| 1.448 | Pacific Sun Mortgage Company, Inc #176779 |
| 1.449 | Palm Beach First Financial & Mortgage Co., LLC #282845 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.450 | Paperstack Inc #342287 |
| 1.451 | Par East Mortgage Co., Inc. #10098 (S1L) |
| 1.452 | Paragon Mortgage Services, Inc. #50139 |
| 1.453 | Park Place Reverse Mortgage, Inc. #151981 (S1L) |
| 1.454 | Patriot Mortgage LLC #1248884 |
| 1.455 | Pellegrino, Anthony Ray #401102 |
| 1.456 | Peoples Bank #690890 |
| 1.457 | Peoples Bank & Trust Company #412564 |
| 1.458 | Peoples State Bank #411594 (S1L) |
| 1.459 | Peterson,Roger,Dale #168363 |
| 1.460 | PFG Holdings, Inc. DBA HBT Mortgage #104187 |
| 1.461 | Pillar Mortgage LLC #330525 |
| 1.462 | Pilot Mortgage, LLC #393286 |
| 1.463 | PINEHURST FINANCIAL LLC #172424 |
| 1.464 | Pinnacle Capital Mortgage Corporation (81395) |
| 1.465 | Platinum Family of Companies, Inc. #365504 (S1L) |
| 1.466 | Platinum Mortgage, Inc. #864523 (S1L) |
| 1.467 | PLN Associates, Inc. #9250 |
| 1.468 | POINT MORTGAGE CORPORATION #231073 |
| 1.469 | Precise Investment Enterprises Inc #869164 |
| 1.470 | Preferred Home Mortgage, Inc #130967 |
| 1.471 | Preferred Mortgage Lenders & Associates, Inc.  #330863 (S1L) |
| 1.472 | Preferred Reverse LLC #1517893 |
| 1.473 | Premier Choice Funding Corporation #1124479 |
| 1.474 | Premier Funding Group, Inc. #340706 (S1L) |
| 1.475 | Premier Lending, LLC #41105 |
| 1.476 | Premier Mortgage Advisors, LLC #222955 (S1L) |
| 1.477 | Premier Mortgage Exchange, Inc. #170890 (S1L) |
| 1.478 | Premier Mortgage Resources, L.L.C #1169 |
| 1.479 | Premier Reverse Mortgage, LLC #876293 |
| 1.480 | Prime Lenders, LLC #306600 (S1L) |
| 1.481 | Prime Source Mortgage, Inc. #16981 (S1L) |
| 1.482 | Prime Source Reverse Mortgage, Inc. #887012 (S1L) |
| 1.483 | Princeton Mortgage Corporation #113856 |
| 1.484 | Priority Capital Corporation #235674 |
| 1.485 | Priority Financial Services, LLC #2558 (S1L) |
| 1.486 | Priority Lending Mortgage Corporation #69032 |
| 1.487 | Professional Financial Mortgage Consultants, Inc #351052 |
| 1.488 | Professional Mortgage Associates #815819 |
| 1.489 | Provident Lending Corporation #229099 |
| 1.490 | PS Financial Services, LLC #968090 |
| 1.491 | Pure Light Mortgage Inc #908937 |
| 1.492 | Quality One Mortgage, Inc. #327371 (S1L) |
| 1.493 | Quantam Mortgage Corporation |
| 1.494 | Rapid Mortgage Company #126841 |
| 1.495 | Raul Vasquez, Inc. #1098791 |
| 1.496 | Ready Mortgage Lenders, LLC #1100518 |
| 1.497 | Real Estate & Lending Solutions, Inc #1146862 |
| 1.498 | Red Wagon Mortgage, LLC #93443 (S1L) |
| 1.499 | Redwood Financial Services, Inc. #60627 (S1L) |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.500 | Refinow Financial, DBA Quality Reverse Mortgage #1108700 |
| 1.501 | Remington Mortgage, Inc. #108670 (S1L) |
| 1.502 | Republic Mortgage Home Loans, LLC #3148 |
| 1.503 | Residential Home Funding Corp. #34973 |
| 1.504 | Residential Mortgage Funding, Inc. #248337 |
| 1.505 | Resolute Bank #531629 |
| 1.506 | Responsible Reverse Mortgage Inc #1212765 |
| 1.507 | Reverse Mortgage Associates, LLC #393872 (S1L) |
| 1.508 | Reverse Mortgage Educators, Inc. #1064287 |
| 1.509 | Reverse Mortgage Educators, Inc. (1064287) (Mr. E. #366534) |
| 1.510 | Reverse Mortgage Lending, Inc #1436354 |
| 1.511 | Reverse Mortgage Only (#342659) (S1L) |
| 1.512 | Reverse Mortgage USA, Inc.  #112038 |
| 1.513 | Reverse Mortgages of Pennsylvania & NJ, Inc. #138462 |
| 1.514 | Reverse Mortgages.com, Inc. #1313859 |
| 1.515 | Reverse Tennessee, LLC (890446) (S1L) |
| 1.516 | ReverseMortgageOne, Inc. (370222) (S1L) |
| 1.517 | Ridgeview Mortgage, Inc. (286629) (S1L) |
| 1.518 | Right Start Mortgage, Inc #35960 |
| 1.519 | Right Trac Financial Group, Inc. #2709 |
| 1.520 | RM MORTGAGE COMPANY, INC. #320425 |
| 1.521 | RMS Hawaii Mortgage Resources, LLC (243743) (S1L) |
| 1.522 | Rocking Horse Ridge, LLC #120821 |
| 1.523 | Rokitto Enterprises (167922) (S1L) |
| 1.524 | ROM Real Estate & Consultants, Inc #1490308 |
| 1.525 | Royal Mortgage and Loans Corp #925463 |
| 1.526 | Royal United Mortgage, LLC #13390 |
| 1.527 | Sagamore Home Mortgage, LLC  #2062 |
| 1.528 | Saint Charles Mortgage LLC #1207949 |
| 1.529 | Salter Enterprises, Inc., dba Salter Mtg Group (221195) |
| 1.530 | Sanford Mortgage Corporation #224517 |
| 1.531 | Seafarer Home Corporation #1555606 |
| 1.532 | Seaside Lending Inc #302949 |
| 1.533 | Secure Lending Incorporated #1236405 |
| 1.534 | Security Home Mortgage LLC #178787 |
| 1.535 | Security Mortgage Corporation #135633 |
| 1.536 | Select Choice Mortgage #1113638 |
| 1.537 | Senior American Funding, Inc. #14065 |
| 1.538 | Senior Finance Center #234148 |
| 1.539 | Senior Freedom Inc  #1203862 |
| 1.540 | Senior Funding Associates #332523 |
| 1.541 | Senior Lending Corporation #1253328 |
| 1.542 | Senior Mortgage Solutions, LLC #1415090 |
| 1.543 | Senior Savings Reverse, Inc. #940613 (S1L) |
| 1.544 | Sente Mortgage, Inc. #132111 |
| 1.545 | Sequoia Pacific Mortgage Incorporated #252254 |
| 1.546 | Shea Mortgage #40397 |
| 1.547 | Shore Capital Corporation #275963 |
| 1.548 | Sierra Pacific Mortgage Company, Inc. #1788 |
| 1.549 | Sierra View Financial Corp. #282458 (S1L) |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.550 | Signet Mortgage Corporation #168365 |
| 1.551 | Silex Financial Group, Inc. #206605 (S1L) |
| 1.552 | Simonich Corp dba Commerce Home Mortgage, Inc #1839 |
| 1.553 | Siwell, Inc. #149169 |
| 1.554 | SJ Morgan Private Lending Exchange #1198748 |
| 1.555 | SKM Mortgage LLC #1197493 |
| 1.556 | SKY ENERGY R.E. SOURCES iNCORPORATED #1387898 |
| 1.557 | Skyline Financial Corp #12072 |
| 1.558 | Somerset Lending Corp. #133899 |
| 1.559 | Somerset Mortgage Corporation #133595 (S1L) |
| 1.560 | Sonoma County Grange Credit Union #729563 |
| 1.561 | Soriano, Tina, Lynne #948962 |
| 1.562 | Sound Financial Mortgage LLC  #1402215 |
| 1.563 | South Pacific Financial Corporation #8588 |
| 1.564 | SouthPoint Financial Services, Inc.  #32841 |
| 1.565 | Southwest Funding LP #32139 (Pending Renewal) |
| 1.566 | Standard Home Lending, Inc. #234141 (S1L) |
| 1.567 | STATELINE FUNDING INC #335665 |
| 1.568 | Steller Mortgage Corporation #235755 |
| 1.569 | Stepping Stone Mortgage, Inc. #235749 (S1L) |
| 1.570 | Sterling Savings Bank #401500 (S1L) |
| 1.571 | Success Mortgage Partners, Inc. (Pending Renewal #130562) |
| 1.572 | Sullivan Financial Services, Inc. #204030 (S1L) |
| 1.573 | Summit Mortgage Corporation #3236 |
| 1.574 | Sun Capital Mortgage, Inc. #1241587 |
| 1.575 | Suspended - 1st Rate Home Mortgage, Inc #37411 |
| 1.576 | Suspended - 1st Reliant Home Loans, Inc. #36659 |
| 1.577 | Suspended - 1st Reverse, Inc. #1321434 |
| 1.578 | Suspended - 212 Mortgage Group Inc #177325 |
| 1.579 | Suspended - A 1, Inc #298191 |
| 1.580 | Suspended - Access Equity Mortgage #1178230 |
| 1.581 | Suspended - Affinity Home Mortgage, LLC #145969 |
| 1.582 | Suspended - AFFLUENT HOME LOAN #835552 |
| 1.583 | Suspended - Allied Financial LLC #1029(S1L) |
| 1.584 | Suspended - American Preferred Lending #71394 |
| 1.585 | Suspended - Ameriloan Mortgage Corporation #133946 |
| 1.586 | Suspended - BCB Community Bank #761971 |
| 1.587 | Suspended - Broker Settlement services inc #1103157 |
| 1.588 | Suspended - Broker Solutions, Inc #6606 |
| 1.589 | Suspended - Cabrillo Mortgage and Realty Services #292211 |
| 1.590 | Suspended - Caliber Home Loans, Inc #15622 |
| 1.591 | Suspended - Capital City Mortgage Corp #170244 |
| 1.592 | Suspended - Capital Funding (SNS Investments, Inc.) #330902 |
| 1.593 | Suspended - Colonial  Mortgage Corp. of Sarasota #280523 |
| 1.594 | Suspended - Craig Edward Maltman #873846 |
| 1.595 | Suspended - Crestline Funding Corporation #1978 |
| 1.596 | Suspended - Diversified Lending Group, LLC #1018322 |
| 1.597 | Suspended - DKF Enterprise, Inc. #335063 |
| 1.598 | Suspended - E&S Financial Group, Inc #245744 |
| 1.599 | Suspended - ENTER HOME MORTGAGE, LLC #168822 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.600 | Suspended - Fairview Lending Inc #230610 |
| 1.601 | Suspended - First Bank #472433 |
| 1.602 | Suspended - First Liberty Funding Corporation #305360 (S1L) |
| 1.603 | Suspended - First Option Lending International Inc. #990550 |
| 1.604 | Suspended - FIRST PLACE MORTGAGE, LLC #142437 |
| 1.605 | Suspended - First Priority Financial, Inc. #3257 |
| 1.606 | Suspended - Florida Capital Bank, N.A. #790396 |
| 1.607 | Suspended - Georgetown Mortgage, LLC #268552 |
| 1.608 | Suspended - GMAX Properties Inc #1031988 |
| 1.609 | Suspended - GMFS LLC #64997 |
| 1.610 | Suspended - GREAT PLAINS NATIONAL BANK # 458937 |
| 1.611 | Suspended - Greenback Capital Mortgage Corporation #5668 |
| 1.612 | Suspended - Haddon Mortgage 7-15-15 #201404 |
| 1.613 | Suspended - Harry A Mechanick Inc. #233267 |
| 1.614 | Suspended - HARTFORD FINANCIAL SERVICES, INC #2557 |
| 1.615 | Suspended - Heft, Janine #303676 |
| 1.616 | Suspended - High Desert Home Lending, LLC #274033 |
| 1.617 | Suspended - HighTechLending Inc #7147 |
| 1.618 | Suspended - HML INVESTMENTS #1202436 |
| 1.619 | Suspended - Homestead Funding Corp. #3232 |
| 1.620 | Suspended - Hometown Financial Services, LLC #1041632 |
| 1.621 | Suspended - Joshua Massieh #1451873 |
| 1.622 | Suspended - LA Top Broker, Inc #1180446 |
| 1.623 | Suspended - Land Home Financial Services, Inc #1796 |
| 1.624 | Suspended - Leissos, Peter #358365 |
| 1.625 | Suspended - LONE STAR REVERSE MORTGAGE, INC. #769381 |
| 1.626 | Suspended - Lothian Mortgage Centre, LLC #1148012 |
| 1.627 | Suspended - Market Place Mortgage Corp. #169740 |
| 1.628 | Suspended - Metuchen Savings Bank  #405423 (S1L) |
| 1.629 | Suspended - MMO, LLC #331178 |
| 1.630 | Suspended - Mortgage South of Tennessee, Inc.  #112281 (S1L) |
| 1.631 | Suspended - Mutual Federal Bank #627900 |
| 1.632 | Suspended - New Heights Lending, LLC #1160570 |
| 1.633 | Suspended - Nue Resource Funding, L.L.C. #690864 |
| 1.634 | Suspended - Park Avenue Lending, LLC #1251153 |
| 1.635 | Suspended - PMF,INC #1980 |
| 1.636 | Suspended - Primus Lending Corp #245412 |
| 1.637 | Suspended - Priority Lending, LLC #142706 |
| 1.638 | Suspended - Radius Financial Group Inc. #1846 |
| 1.639 | Suspended - Rancho Vista Mortgage Corporation #241748 |
| 1.640 | Suspended - Reliance First Capital, LLC #58775 (S1L) |
| 1.641 | Suspended - Reverse Mortgage Corporation #1133268 |
| 1.642 | Suspended - RSI Bank (409467) (S1L) |
| 1.643 | Suspended - Secure Funding Group #329246 |
| 1.644 | Suspended - Senior Reverse Mortgage Services, Inc. #257913 |
| 1.645 | Suspended - SHH Finance #306273 |
| 1.646 | Suspended - Southern Trust Mortgage, LLC #2921 |
| 1.647 | Suspended - Spectra Capital, Inc #86442 |
| 1.648 | Suspended - Sunrise Financial Services, Inc #215785 |
| 1.649 | Suspended - Sunrise Investment Capital, Inc #807286 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.650 | Suspended - Superior Mortgage Lending, LLC #372130 |
| 1.651 | Suspended - TAM Lending Center, Inc #984914 |
| 1.652 | Suspended - The Guilford Savings Bank #517294 |
| 1.653 | Suspended - The Malone Group, Inc.  #343561 |
| 1.654 | Suspended - The Medical Advantage, Inc #187595 |
| 1.655 | Suspended - Top Flite Financial, Inc #4181 |
| 1.656 | Suspended - Top Vine Mortgage Services LLC #1390034 |
| 1.657 | Suspended - Village Mortgage, Inc #91658 |
| 1.658 | Suspended - VP Partners, Inc #2794 |
| 1.659 | Suspended - Western Washington Mortgage Inc #67846 |
| 1.660 | Suspended - Williams Financial Services Inc #279703 |
| 1.661 | Synergy One Lending, Inc #1025894 |
| 1.662 | T&G Financial, Inc. DBA Cornerstone Home Mtg #47795 |
| 1.663 | Tapie, David William DBA THe Money Market #323020 |
| 1.664 | Telluride Mortgage Corp DBA Inter-Mountain Funding #336336 |
| 1.665 | Terminated  - Frazier Mortgage Services #1182926 |
| 1.666 | Terminated  - Residential  Mortgage Services, Inc. #1760 |
| 1.667 | Terminated  - Vanleeuwen, Pye & Associates, Inc. #237421 |
| 1.668 | Terminated  -Stone Street Mortgage Corp. #34593 |
| 1.669 | Terminated - 1-866-Reverse Mortgage #1253881 |
| 1.670 | Terminated - 1st Access Financial #1030349 (S1L) |
| 1.671 | Terminated - Accutrust Mortgage (S1L) #2409 |
| 1.672 | Terminated - Allied Mortgage Group, Inc #1067 |
| 1.673 | Terminated - America One Mortgage Corporation #79460 |
| 1.674 | Terminated - American Housing Capital LLC #34976 |
| 1.675 | Terminated - Arizona Wholesale Mortgage, Inc #19254 |
| 1.676 | Terminated - Atlantic Residential Mortgage LLC #75687(S1L) |
| 1.677 | Terminated - Bayshore Mortgage Funding, LLC #196858 |
| 1.678 | Terminated - Beck Finance Group, LLC #390675 |
| 1.679 | Terminated - Bic Mortgage Company, LLC - JK #1203087 |
| 1.680 | Terminated - BONDCORP REALTY SERVICES INC. #170710 |
| 1.681 | Terminated - California Capital, Inc #322860 |
| 1.682 | Terminated - Campbell Financial Services, Inc #56435(S1L) |
| 1.683 | Terminated - Central Pacific Bank #416603 |
| 1.684 | Terminated - Cherry Creek Mortgage Co., Inc #3001 |
| 1.685 | Terminated - City First Mortgage Services, LLC #3117 (S1L) |
| 1.686 | Terminated - Coast To Coast Enterprises #276575(S1L) |
| 1.687 | Terminated - Community Home Equity Conversion Corp #65203 |
| 1.688 | Terminated - Cornerstone Reverse Mortgage, LLC #978884(S1L) |
| 1.689 | Terminated - CTC Mortgage Company, LLC #371182 |
| 1.690 | Terminated - Cyprus Federal Credit Union #666254(S1L) |
| 1.691 | Terminated - DG PINNACLE FUNDING LLC #1433994 |
| 1.692 | Terminated - Draper & Kramer Mortgage Corp #2551 |
| 1.693 | Terminated - East Coast Mortgage Corp #2785 (S1L) |
| 1.694 | Terminated - Federal Mortgage & Investment Corp #2719 (S1L) |
| 1.695 | Terminated - Fidelis Mortgage, LLC #190121 (S1L) |
| 1.696 | Terminated - Financial Resource Affiliates, Inc #157994 |
| 1.697 | Terminated - First Federal Savings Bank #604659 |
| 1.698 | Terminated - Firstar Bank, N.A. #458906 |
| 1.699 | Terminated - Fountain City Funding, Inc #133884 |

| # | Title |
|---|-------|
| | **Project Phoenix: RMS Origination Contracts Index** |
| 1.700 | Terminated - Franklin Loan Corporation #237653 (S1L) |
| 1.701 | Terminated - Fusion Financial, Inc. #440089 (S1L) |
| 1.702 | Terminated - G.W. Jones Exchange Bank #467054 |
| 1.703 | Terminated - General Realty Group, Inc. #335745( S1L) |
| 1.704 | Terminated - Golden Years Reverse Mortgage, Inc. #7555 (S1L) |
| 1.705 | Terminated - Heartland Mortgage, Inc. #161945 (S1L) |
| 1.706 | Terminated - Heritage Mortgage Banking Corp #1205 |
| 1.707 | Terminated - Home Financial Group, LLC #305389 |
| 1.708 | Terminated - Home Financing Center, Inc #378507 |
| 1.709 | Terminated - HOME LOAN PROS, INC. #397243 |
| 1.710 | Terminated - Home Solutions Group, Inc. #270277 (S1L) |
| 1.711 | Terminated - HOME STATE BANKNATIONAL ASSOCIATION #478452 |
| 1.712 | Terminated - Integrity First Financial, Inc. #249981 (S1L) |
| 1.713 | Terminated - Integrity Home Loan of Central Florida#161433 |
| 1.714 | Terminated - Ironwood Financial Services Inc. #375434 |
| 1.715 | Terminated - ISB Mortgage Company (#60061) (S1L) |
| 1.716 | Terminated - JTS & Company #55275 (S1L) |
| 1.717 | Terminated - Legacy Home Financing Inc.  #129121 |
| 1.718 | Terminated - Lindstrand Holding & Investments, Inc. #280454 |
| 1.719 | Terminated - Long Street Home Equity Corp. #360015 (S1L) |
| 1.720 | Terminated - Lund Mortgage Team, Inc. #162701 (S1L) |
| 1.721 | Terminated - Mahalo Mortgage Corp #317240 |
| 1.722 | Terminated - Market Mortgage Co., LTD #206916 (S1L) |
| 1.723 | Terminated - MCS Mortgage Bankers, Inc. #8115 |
| 1.724 | Terminated - Mortgage Shop, LLC #139414 |
| 1.725 | Terminated - Nationwide Mortgage Lending Solutions#996606 |
| 1.726 | Terminated - Naugatuck Valley Savings & Loan  #230907 (S1L) |
| 1.727 | Terminated - New Horizon Mortgage Concepts  #329381 (S1L) |
| 1.728 | Terminated - Nova Financial & Investment Corporation #3087 |
| 1.729 | Terminated - Option Funding, Inc. #163400 |
| 1.730 | Terminated - Police Mortgage, LLC #138300 |
| 1.731 | Terminated - Rausch, Michael, Steven #1444826 |
| 1.732 | Terminated - Redwood Mortgage Company, LLC #1015953 (S1L) |
| 1.733 | Terminated - Residential Finance Corporation #1652 |
| 1.734 | Terminated - Retirement Life Funding, LLC #153309 (S1L) |
| 1.735 | Terminated - Reverse Mortgage Answers, LLC #179014 (S1L) |
| 1.736 | Terminated - RJS, Inc. dba West Coast Mortgage #282098 |
| 1.737 | Terminated - Roya Nasr (SP) 7-22-14 #393047 |
| 1.738 | Terminated - Seacoast Family Mortgage LLC (238258) |
| 1.739 | Terminated - Security National Lending Group (#1016100) |
| 1.740 | Terminated - Senior Funding Advisors, Inc.  #1094586 |
| 1.741 | Terminated - Senior Rewards Now #365034 (S1L) |
| 1.742 | Terminated - SGI Mortgage, LLC #56400 |
| 1.743 | Terminated - Silverline Corp. #983696 (S1L) |
| 1.744 | Terminated - Simple Reverse Mortgage Solutions, Inc. #363205 |
| 1.745 | Terminated - Spectra Funding, Inc. (Pending Renewal #4917) |
| 1.746 | Terminated - STAR FIRST MORTGAGE SERVICES, INC #207500 |
| 1.747 | Terminated - State Bank of Southern Utah #469373 (S1L) |
| 1.748 | Terminated - Stearns Lending, Inc. #1854 |
| 1.749 | Terminated - Terra Nova Capital, Inc. - jk #925640 |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.750 | Terminated - TerraVista Mortgage L.P #261757 |
| 1.751 | Terminated - The Equitable Mortgage Corporation #39843 |
| 1.752 | Terminated - THE MONEY SOURCE INC #6289 |
| 1.753 | Terminated - The Patapsco Bank #786174 (S1L) |
| 1.754 | Terminated - Vertical Lending Services, LLC #342544 (S1L) |
| 1.755 | Terminated - White Pine Funding, LLC #289343 |
| 1.756 | The Federal Savings Bank #411500 |
| 1.757 | The First State Bank #462675 |
| 1.758 | The Great American Mortgage Company, LLC #349667 |
| 1.759 | The Loan Arrangers, LLC #150085 |
| 1.760 | The Loan Brokers Group, Inc. #289383 (S1L) |
| 1.761 | The Malvern National Bank  #772848 (S1L) |
| 1.762 | THE MONEY HOUSE, INC #169716 |
| 1.763 | The Mortgage Firm, Inc #189233 |
| 1.764 | The Senior Equity Group, Inc. #253749 |
| 1.765 | Tidewater Mortgage Services, Inc. #71158 |
| 1.766 | TJC Mortgage, Inc #2239 |
| 1.767 | Toluca Associates, DBA Golden State Lending Services #230954 |
| 1.768 | Tonchev, Nick #456767 |
| 1.769 | Total Media Management #1018333 |
| 1.770 | Total Mortgage Services, LLC #2764 |
| 1.771 | Towne & Country Mortgage Services, Inc. #2896 (S1L) |
| 1.772 | TowneBank #512138 |
| 1.773 | Travis Mortgage-875 Travis LLC #627407 (S1L) |
| 1.774 | Trinity Reverse Mortgage #313571 |
| 1.775 | Tripoint Mortgage Group, Inc. #1153 |
| 1.776 | TriStar Finance Inc #43583 |
| 1.777 | Turn Key Home Loans, Inc #399255 |
| 1.778 | Tuskegee Enterprises LLC #217890 |
| 1.779 | U.V.S., Inc. #331734 |
| 1.780 | United Funding Group, LLC  #1113196 |
| 1.781 | United Mortgage Corp. #1330 |
| 1.782 | United Mortgage Finance Group, Inc. #99256 (S1L) |
| 1.783 | United Pacific Realty and Investment, Inc. #118004 |
| 1.784 | United Southwest Mortgage Corporation, Inc. (#13999) (S1L) |
| 1.785 | Universal American Mortgage Company of Calif #252392 (S1L) |
| 1.786 | Universal American Mortgage Company, LLC #1058 |
| 1.787 | Universal Lending Corporation #2996 |
| 1.788 | Universal Mortgage & Finance, Inc. #118030 |
| 1.789 | US Mortgage Corporation #3901 |
| 1.790 | USA MORTGAGE INC #144722 |
| 1.791 | Utah Mortgage Loan Corp #149160 |
| 1.792 | V.I.P. Mortgage, Inc #145502 |
| 1.793 | Valley West Corporation #65506 |
| 1.794 | Value Financial Mortgage Services, Inc #148142 |
| 1.795 | Vanguard Funding LLC #2675 |
| 1.796 | VC Corp #840965 |
| 1.797 | Verano -Hartung , Olenka #528174 |
| 1.798 | Veritas Funding, LLC #252108 |
| 1.799 | Viking Mortgage Co (Leo Goetz #395450) (S1L) |

**Project Phoenix: RMS Origination Contracts Index**

| # | Title |
|---|---|
| 1.800 | VIKING MORTGAGE CORP #917435 |
| 1.801 | Vintage Land Investments, Inc. #311104 |
| 1.802 | Vision Mortgage Company, Ltd. #338634 |
| 1.803 | Vitek Real Estate Industries Group, Inc. #37408 (S1L) |
| 1.804 | Vogler Mortgage, LLC #1164470 |
| 1.805 | Volunteer Mortgage, Inc. #546098 (S1L) |
| 1.806 | Wainwright, Richard Eugene #447017 |
| 1.807 | Wall Street Lending Corporation #175675 |
| 1.808 | Watermark Capital, Inc #1838 |
| 1.809 | WCS Lending, LLC #4260 |
| 1.810 | West One Capital Group, Inc #982017 |
| 1.811 | Westcorp Capital, Inc. #257456 |
| 1.812 | Western Capital Mortgage, Inc #310821 |
| 1.813 | Western Mortgage Brokers, Inc. #220343 |
| 1.814 | Western Ohio Mortgage Corporation #9601 |
| 1.815 | WHOLESALE CAPITAL CORPORATION #9873 |
| 1.816 | William L. Awty #360191 |
| 1.817 | Willow Bend Mortgage Company, LLC |
| 1.818 | Wilmington Savings Fund Society, FSB #417673 |
| 1.819 | Wilshire Capital Group, Inc. #327231 |
| 1.820 | Windom Mortgage Services, Inc #376916 |
| 1.821 | Worldwide Capital Mortgage Corp. #2642 (S1L) |
| 1.822 | WSFS-Wilmington Savings Fund Society, FSB #417673 (S1L) |
| 1.823 | Yadkin Bank #522448 |
| 1.824 | Young, Kerry, Lee #303620 |
| 1.825 | Z(Cancelled) The First Nat'l Bank of Layton #405871 |
| 1.826 | Z(Pending Renewal) Allied Mortgage Group, Inc. #1067 |
| 1.827 | Z(Pending Renewal) American Portfolio Mortgage Corp #175656 |
| 1.828 | Z(Pending Suspended) Live Well Financial, Inc. #1177 |
| 1.829 | Zaragoza, Hector Medina #389969 |
| 1.830 | Zeman Mortgage, Inc. #280113 (S1L) |