```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re                                                        :    Chapter 11
                                                             :
DITECH HOLDING CORPORATION, et al.,                          :    Case No. 19-10412 (JLG)
                                                             :
Debtors.¹                                                    :    (Jointly Administered)
                                                             :
-------------------------------------------------------------x
```

**MEMORANDUM DECISION AND ORDER DENYING MOTION OF
DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a)
AND 345(b) WAIVING REQUIREMENTS OF 11 U.S.C. § 345(b) WITH
RESPECT TO CERTAIN DEBTOR ACCOUNTS**

**A P P E A R A N C E S**:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
By:   Ray C. Schrock, P.C.
      Sunny Singh, Esq.

*Attorneys for Debtors*


WILLIAM K. HARRINGTON
United States Trustee for Region 2
201 Varick Street, Suite 1006
New York, New York 10014
By:   Greg M. Zipes, Esq.

*Office of the United States Trustee, Region 2*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

**HONORABLE JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

Ditech Holding Corp. (f/k/a Walter Investment Management Corp.) and its debtor affiliates (collectively, the "Debtors"), together with their non-Debtor subsidiaries (collectively, the "Company"), operate as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans. The Debtors' cash management system (the "Cash Management System") consists of approximately 1,200 bank accounts, including their five primary operating accounts (the "Citibank Accounts") that they maintain at Citibank, N.A. ("Citibank"). The average daily balances in the Citibank Accounts aggregate approximately $95 million. Citibank is designated as an Authorized Depository (defined below) by the United States Trustee (the "U.S. Trustee") pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "UST Guidelines"). Nonetheless, to date, Citibank has not collateralized those accounts as section 345(b) of the Bankruptcy Code mandates. The matter before the Court is the Debtors' motion (the "Motion") for an order pursuant to sections 105 and 345(b) of the Bankruptcy Code waiving the requirements of section 345(b) with respect to the Citibank Accounts.[2] The U.S. Trustee objects to the Motion (the "Objection").[3] The Debtors filed a reply to the Objection (the "Reply").[4] The Court conducted an evidentiary hearing on the Motion.

---

[2]  *See Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b) Waiving Requirements of 11 U.S.C. § 345(b) With Respect to Certain Debtor Accounts* [ECF No. 598]. Citations "ECF No. ___" refer to filings in this case on the Court's electronic docket, Case No. 19-11650.

[3]  *See Objection of the United States Trustee to the Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b) Waiving Requirements of 11 U.S.C. § 345(b) With Respect to Certain Debtor Accounts* [ECF No. 611].

[4]  *See Reply to U.S. Trustee's Objection to the Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b) Waiving Requirements of 11 U.S.C. § 345(b) With Respect to Certain Debtor Accounts* [ECF No. 626].

For the reasons discussed below, the Motion is denied. The Debtor is directed to bring the Citibank Accounts into compliance with section 345(b) within five business days from the date of this Memorandum Decision and Order.

## Jurisdiction

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

On February 11, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. Since the Petition Date, the Debtors have remained in possession and control of their business and assets as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 27 and May 2, 2019, respectively, the U.S. Trustee appointed an official committee of unsecured creditors and an official committee of consumer creditors. *See* ECF Nos. 127 & 498. No trustee or examiner has been appointed in these chapter 11 cases. Pursuant to an order of this Court, the Debtors' cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. *See* ECF No. 50.

The Debtors commenced these chapter 11 cases on a prearranged basis and have the support of more than eighty percent (80%) of their term loan lenders, who have committed to support a chapter 11 plan that contemplates a debt-to-equity recapitalization transaction and provides for the simultaneous marketing of all or substantially all of the Debtors' assets to the extent such sale represents higher or better value than the recapitalization transaction. *See* Motion ¶ 4. On March 5, 2019, the Debtors filed the *Joint Chapter 11 Plan of Ditech Holding*

2

*Corporation and its Affiliated Debtors* [ECF No. 145] (as amended, modified, and supplemented, the "Plan"). On May 10, 2019, the Court entered an order approving the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 543]. The Debtors commenced solicitation of the Plan on May 13, 2019. The Plan confirmation hearing is scheduled for August 7, 2019. *See Notice of Sale and Confirmation Deadlines* [ECF No. 748].

On the Petition Date, and as part of their "first day" motions, the Debtors filed their *Motion Requesting Authority to (I) Continue Using Existing Cash Management Systems, Bank Accounts and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (iii) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Transactions, (V) Extend Time to Comply With or Seek Waiver of, 11 U.S.C. § 345(b), and (VI) Granting Related Relief* [ECF No. 4] (the "Cash Management Motion"). As described therein, the Debtors' business operation is comprised of three primary segments: (i) the Debtors originate mortgage loans exclusively through Ditech Financial LLC ("Ditech Financial"); (ii) Ditech Financial performs loan servicing for mortgage loans; and (iii) Reverse Mortgage Solutions, Inc. ("RMS") performs loan servicing and subservicing for reverse mortgage loans. *Id.* ¶¶ 9-11. In connection with the operation of their business, the Debtors utilize a complex, integrated, centralized Cash Management System to collect, concentrate, and disburse funds generated by their operations. *See id.* ¶¶ 12-17. As of the Petition Date, the Debtors had 1,196 bank accounts (the "Bank Accounts") housed among Citibank, EverBank, N.A. ("EverBank"), Bank of America, N.A. ("Bank of America"), Bank of New York Mellon Corporation, Texas Bank, N.A., and Wells Fargo Bank, N.A. *Id.* ¶ 13. As relevant here, the Debtor held two of those accounts at EverBank (*see id.*), and maintains 532

3

accounts at Citibank—consisting of the Debtors' five main operating accounts (i.e., the Citibank Accounts) and 527 custodial accounts.[5] *See* Motion ¶ 11. The Citibank Accounts are generally described as follows:

> Ditech Origination Account. Ditech Financial maintains this operating account in connection with its mortgage origination activities. Ditech Financial uses the account to fund its portion of the mortgage loan purchase price when originating mortgage loans by transferring funds on deposit in this account into the so-called "Haircut Account." Ditech Financial also uses the account to (i) collect collateral from and post collateral to various counterparties in connection with its margin agreements, (ii) pay fees and interest to the warehouse lenders, and (iii) pay miscellaneous fees and expenses on a daily basis. The Ditech Origination Account is subject to a deposit account control agreement ("DACA") in favor of the Debtors' term loan lenders. The average daily deposit held in the Ditech Origination Account is approximately $46.8 million.
>
> Ditech Servicing Account. In connection with its mortgage loan servicing obligations and the payment of the Company's general corporate expenses, this account receives, on a daily basis, servicing advances, reimbursement funds from Fannie Mae, Freddie Mac, and Ginnie Mae, and borrower payments of principal, interest, taxes, and insurance relating to mortgage loans. This account is subject to a DACA in favor of the Debtors' term loan lenders. The average daily deposit held in the Ditech Servicing Account is approximately $13.3 million.
>
> DHC Operating Account. This account receives funds from the Ditech Servicing Account and the RMS operating account as needed to remit necessary payments, such as principal and interest payments on funded indebtedness. The account holds a relatively small balance at any given time. To satisfy minimum deposit requirements and avoid the incurrence of bank fees, Ditech Financial transfers funds from the Ditech Servicing Account to the RMS operating account as necessary through this account and vice versa. The account is subject to a DACA in favor of the Debtors' term loan lenders. The average daily deposit held in the DHC Operating Account is approximately $300,000.
>
> Other Operating Accounts. Ditech Financial maintains an operating account at Citibank in connection with certain servicing obligations, which processes daily activity between the lockbox and payment clearing, commissions, and trailing payments. DF Insurance Agency LLC also maintains an operating account at Citibank, which holds commission payments in connection with certain vendors.

---

[5] In connection with their servicing activities, Ditech Financial and RMS hold borrower payments that are due to various third parties such as securitization trusts, taxing authorities, and insurance companies. Such funds do not represent assets or liabilities of the Company and are maintained in custodial accounts that are segregated from the Company's other Bank Accounts. *See* Cash Management Motion at ¶ 21.

4

> Both of the accounts are subject to a DACA in favor of the Debtors' term loan lenders. The average daily deposit in both these accounts is approximately $34.6 million.

*See id.* ¶ 11.

Section 586(a)(3) of title 28 of the United States Code directs the U.S. Trustee to supervise the administration of all chapter 11 cases. Section 345(b) of the Bankruptcy Code mandates, among other things, that debtors and trustees deposit or invest estate money so as to safeguard the money for the benefit of the debtor's creditors. 11 U.S.C. § 345(b). To ensure that those parties meet their obligations under section 345, the U.S. Trustee monitors fiduciaries and depositories, and requires that chapter 11 estate assets be held in debtor-in-possession accounts at "Authorized Depositories"—*i.e.*, those that have entered into a Uniform Depository Agreement ("UDA") with the U.S. Trustee. *See* United States Trustee Program Policy and Practices Manual, Volume 7, "Banking and Bonding," (the "Manual"), § 7-1.1, pp. 1-2.[6] *See also* UST Guidelines at ¶ 5 (mandating that all debtor-in-possession bank accounts be opened at an Authorized Depository). The UDA requires the Authorized Depository to maintain collateral in

---

[6] The UDA between the depository and the United States Trustee requires the depository to maintain collateral, unless an order of the bankruptcy court provides otherwise, in an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit. *See* form UDA ¶ 3, available at: https://www.justice.gov/sites/default/files/ust-regions/legacy/2012/08/09/uniform_dep_agreement.pdf.

Under the FDIC's policy, the standard deposit insurance amount is $250,000 per depositor, per insured bank, for each account ownership category. *See* https://www.fdic.gov/deposit/deposits/brochures/your-insured-deposits-english.html.

Pursuant to the UDA, each authorized depository is required to provide quarterly reports for all bankruptcy estate accounts on deposit at all branches of the depository within the district. *See* Manual § 7- 1.3.2; §7-1.2.1. The Manual also states that under no circumstances should a chapter 11 debtor, trustee, or examiner establish accounts in financial institutions or depositories outside the United States without prior approval of the United States Trustee or the bankruptcy court. *See id.* § 7-1.2.3.

A copy of the Manual (vol. 7) can be found at:
https://www.justice.gov/ust/file/volume_7_banking_and_bonding.pdf/download.

5

an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit, unless otherwise provided for by an order of the bankruptcy court.  *See* UDA ¶ 3.[7]

On February 13, 2019, the Court entered an order approving the Cash Management Motion on an interim basis [ECF No. 51] (the "Interim Order").  EverBank is not an Authorized Depository under the UST Guidelines.  *See Southern District of New York, Authorized Bank Depositories* (April 1, 2019).[8]  Citibank is scheduled by the U.S. Trustee as an Authorized Depository with a notation instructing any debtor with accounts at Citibank to "check with [Citibank] to ensure that they will collateralize the funds with the Federal Reserve or obtain a surety bond to cover the funds."  *Id*.  Following the entry of the Interim Order, the Debtors and the U.S. Trustee had discussions concerning the application of section 345(b) to the EverBank Accounts.  Motion ¶ 12.  Prior to the final hearing on the Cash Management Motion, the Debtors closed those accounts.  *Id*.  On April 30, 2019, the Court entered an order approving the Cash Management Motion on a final basis (the "Final Order").[9]  As relevant, that order states:

> The Debtors shall have forty-five (45) days (or such additional time to which the U.S. Trustee may agree) from the entry of the Interim Order to either comply with section 345(b) of the Bankruptcy Code or to make such other arrangements as agreed to by the U.S. Trustee or approved by the Court; provided that such extension is without prejudice to the Debtors' right to request a further extension or the waiver of the requirements of section 345(b) of the Bankruptcy Code.

---

[7]   A copy of the Uniform Depository Agreement is available at: https://www.justice.gov/sites/default/files/ust-regions/legacy/2012/08/09/uniform_dep_agreement.pdf.

[8]   *See* https://www.justice.gov/ust-regions-r02/file/sdny_dep.pdf/download.

[9]   *See Final Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Case Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Post-Petition Intercompany Claims, (V) Extend Time to Comply With, or Seek Waiver of 11 U.S.C. § 345(b), and (VI) Granting Related Relief* [ECF No. 478].

Final Order ¶ 15. After entry of the Final Order, the U.S. Trustee discovered that Citibank did not collateralize the Citibank Accounts as called for under section 345(b). The Debtors had not made other arrangements with the U.S. Trustee and the U.S. Trustee contended that they were in violation of the Final Order. *See* Objection ¶ 10. Thereafter, at the U.S. Trustee's request, the Debtors engaged in discussions with Citibank regarding posting collateral or bonds on account of the funds held in the Citibank Accounts. *See* Motion ¶ 14. Citibank advised them that it was not willing to do so. *Id.* Immediately thereafter, the Debtors requested that the U.S. Trustee agree to permit them to leave the current deposit arrangement with Citibank in place. *Id.* In support of that request, the Debtors advised the U.S. Trustee that the cash held in the Citibank Accounts provides the liquidity to them that is critical to the successful management of their origination and servicing operations; and as a consequence, if they are forced to migrate the Citibank Accounts to another Authorized Depository they likely will disrupt the Cash Management System to their detriment and the detriment of their creditors. *Id.* The U.S. Trustee denied their request and, thereafter, the Debtors filed the Motion. In it, they contend that this Court should waive the requirements of section 345(b) with respect to the Citibank Accounts.

After the Debtors filed the Motion, Citibank agreed to collateralize the Citibank Accounts, provided that the Debtors underwrite Citibank's costs in doing so. The Debtors estimate that cost to be approximately $80,000/month. Notwithstanding Citibank's accommodation, the Debtors continue to press their Motion.

## Discussion

Section 345 of the Bankruptcy Code governs management of money of the estate by a trustee or debtor in possession. Section 345(a) permits a debtor to:

> make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment.

11 U.S.C. § 345(a).[10] While section 345(a) vests a debtor with some discretion in investing money of the estate, as a practical matter, section 345(b) of the Bankruptcy Code limits that discretion. It provides:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested—
>
> (1)     A bond—
>
>      (A)     in favor of the United States;
>      (B)     secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
>      (C)     conditioned on—
>           (i)     a proper accounting for all money so deposited or invested and for any return on such money;
>           (ii)     prompt repayment of such money and return; and
>           (iii)     faithful performance of duties as a depository; or
>
> (2)     the deposit of securities of the kind specified in section 9303 of title 31;
> *unless the court for cause orders otherwise.*

11 U.S.C. § 345(b) (emphasis added). Congress added the highlighted clause in the 1994 amendments to the Bankruptcy Code. *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 (codified as amended in sections of 11 U.S.C.). The legislative history is clear that in including that language, the draftsmen intended to afford courts with flexibility in addressing the challenges of strict compliance with the deposit and investment requirements of section 345. *See* H.R. Rep. 103-835, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994).[11] The statute does not define the

---

[10]     Section 1107(a) of the Bankruptcy Code makes section 345 applicable to debtors in possession.

[11]     The congressional record on section 345 contains the following comments:

8

term "cause."  The case of *In re Service Merchandise Co., Inc.*, 240 B.R. 894 (Bankr. M.D. Tenn. 1999) (hereinafter "*Service Merchandise*"), is instructive on its meaning.  In that case, the bankruptcy court granted the chapter 11 debtor's motion for relief from the deposit, investment and reporting requirements under section 345(b).  An appeal was taken.  The district court remanded the case to the bankruptcy court with instructions that the court "clarify the legal standard for determining 'cause' pursuant to 11 U.S.C. § 345(b)."  *Id*. at 895.  In response to that directive, the bankruptcy court propounded a "totality of the circumstances" test pursuant to which it considered the following factors:

(1) The sophistication of the debtor's business;

(2) The size of the debtor's business operations;

(3) The amount of investments involved;

(4) The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor-in-possession funds are held;

(5) The complexity of the case;

(6) The safeguards in place within the debtor's own business of insuring the safety of the funds;

(7) The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(8) The benefit to the debtor;

---

Section 345 of the Code governs investments of the funds of bankrupt estates. The purpose is to make sure that the funds of a bankrupt that are obligated to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, *it can work to needlessly handcuff larger, more sophisticated debtors*.  This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 1994 WL 46314 (3d Cir. Del).

H.R. Rep. 103-835, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994) (emphasis added).

9

(9) The harm, if any, to the estate; and

(10) The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

*Id.* at 896. The bankruptcy court reaffirmed its determination that the debtor established "cause" for relief from the investment, deposit and reporting requirements of section 345(b). In finding that the debtor's request for relief was "reasonable and well founded," and that "the benefit to the debtor in waiving the § 345(b) requirements far outweighs any harm to the estate," the court noted that:

- the debtors were large and sophisticated, with a complex cash management system;

- the debtors relied on multiple banks and multiple accounts to handle millions of dollars which flowed through their bank accounts on a daily basis;

- the debtors had indicated that they had internal monitoring mechanisms in place that will detect the impending failure of any bank in which a large amount of funds is deposited;

- the debtors had the capacity to remove funds in excess of $100,000 at any bank where they suspected a problem; and

- the debtors' ability to reorganize would not be materially affected by the failure of any one financial institution.

*Id.* at 897. The court concluded that "failing to waive the § 345(b) requirements would 'needlessly handcuff' the debtors' reorganization efforts." *Id.* Nonetheless, the court barred the debtors from maintaining funds in excess of $100,000 per account in any bank with a demand deposit rating of less than Moody's P-3 and Standard & Poor's A–. *Id.*

The Debtors assert that the application of the *Service Merchandise* factors to this case supports their contention that there is "cause" to waive the Debtors' compliance with section 345(b) as to the Citibank Accounts. They contend that there is little risk to the security of the

10

deposits in those accounts because "Citibank is one of the largest financial institutions in the world with a strong credit rating," and as a federally chartered bank, it is subject to supervision the FDIC, which has strict guidelines to ensure the stability of its insured depository institutions. *See* Motion ¶ 18.  They also argue that they should not be forced to change their Cash Management System to address a "hypothetical risk" to the uncollateralized Citibank Accounts because it will be unduly burdensome for them to do so.  As support, they maintain that not only will the process of moving those accounts be expensive and time consuming, but that it will likely delay and impede their restructuring efforts since their already overburdened treasury department personnel will have to devote substantial time and resources to the transition, at a time that they are needed to address matters relating to the Debtors' restructuring.  Moreover, they say that the forced migration of the Citibank Accounts could result in significant disruptions to their business operations. *Id*. ¶¶ 18-21.

       The Debtors offered no evidence in support of the Motion, and their failure to do so was one of the grounds of the U.S. Trustee's Objection.  *See* Objection at 2 ("The Waiver Motion is not supported by competent evidence to warrant the Court's waiving the protections in Section 345(b) of the Bankruptcy Code.  Without more, the Debtor's request appears more convenience-based than based upon the requisite cause to waive the statutory requirements.").  In support of their Reply, the Debtors submitted the declaration of Joanna Colaneri (the "Colaneri Declaration").  Ms. Colaneri is employed as Senior Vice President and Treasurer of the Company.  At the hearing on the Motion, with the consent of the U.S. Trustee, the Debtors offered that declaration as Ms. Colaneri's direct testimony in support of the Motion, subject to the U.S. Trustee's right to cross-examine the witness.  The U.S. Trustee exercised that right and cross-examined Ms. Colaneri, and the Court asked its own questions of the witness.  The Debtors

11

redirected questions to Ms. Colaneri. The Debtor did not offer any other evidence in support of the Motion. The U.S. Trustee did not offer its own evidence. The Court found Ms. Colaneri to be a credible witness.

Principally based on Ms. Colaneri" testimony, the Debtors established the following facts:

<u>The Citibank Accounts Are Integral to the Debtors' Origination and Servicing Operations</u>

Ditech Financial maintains the Ditech Origination Account and the Ditech Servicing Account. Those accounts are the main operating accounts for the servicing and origination segments of the Debtors' business. These two operating accounts are linked to many of the Debtors' critical cash processes associated with originating and servicing mortgage loans, including transferring the requisite funds to customers on a daily basis and transferring borrower payments to applicable third parties (*e.g.*, taxing authorities, Fannie Mae, Freddie Mac, and Ginnie Mae).

<u>Moving the Citibank Accounts Will Be A Complex and Potentially Risky Undertaking</u>

Together, the Citibank Accounts are the principal source of the Debtors' liquidity. Moreover, they are linked to hundreds of other bank accounts that include servicing systems, treasury workstation, general ledger, payroll systems, accounts payable, and accounts for Fannie Mae, Ginnie Mae and Freddie Mac. Account transactions and bank feeds occur on a daily basis. Many of the payments and money transfers made through the system are time sensitive such that if issues arise in these processes and/or system feeds, the Debtors could have short-term liquidity challenges, resulting in increased operational risk, especially since they may not have ready access to another pool of cash out of which they can fund the required payments and money transfers. The Citibank Accounts are also linked to other bank accounts, including zero balance accounts that enable, among other things, cash sweeps, automatic clearing house transfers, wires, checking account services, and cashier check processing. Given this integrated banking structure, the Debtors' loss of access to the Citibank Accounts, even for a short period of time, would potentially cripple their business operations.

<u>The Process to Move the Accounts Will Be Costly and Time Consuming</u>

In 2017, the Debtors maintained their main operating accounts (i.e., the Citibank Accounts) at Bank of America. In December of 2017, Bank of America informed the Debtors that they were terminating their cash management services. As a consequence, the Debtors were forced to transition those accounts to another financial institution. The then existing cash management system largely resembles the current Cash Management System. After two months of diligence, the Debtors selected Citibank as the financial

12

institution to replace Bank of America, in part because it offered a favorable interest rate that the Debtors do not believe they will be able to obtain from another institution. The process of moving the operating accounts from Bank of America to Citibank took approximately nine months to complete and cost approximately $500,000. It is undisputed that if the Debtors are directed to move the Citibank Accounts, it likely will take months to select an Authorized Depository able to accommodate the Cash Management System, and thereafter the Debtors will be required to expend at least as much time and money to move the Citibank Accounts, as they spent moving the Bank of America accounts.

Implementing A Transfer Of The Accounts Will Stretch The Debtors Limited Resources

The Debtors' treasury team members currently are providing support services that are outside of the scope of their normal operations, and that are unique to the Debtors' chapter 11 cases. For example, they provide weekly reporting to the Debtor's secured creditors, the official creditors' committees and the U.S. Trustee. Members of the team also are providing services in connection with the Debtors' formulation and execution of their proposed Plan. Consequently, if the Debtors are required to transfer the Citibank Accounts to another institution, the treasury department team either will have less time and fewer resources to expend on selecting and implementing a transition to another financial institution, or the team will not be able to provide much needed assistance in connection with the chapter 11 process. Either way, the inefficiencies potentially will undermine the Debtors' business operations and their efforts to emerge from chapter 11. It is undisputed that any bank transfer process will also require extensive collaboration with the IT and accounting team, further stretching the Debtors' already limited resources.

There Is Not a Meaningful Risk of Loss to the Debtors If the Accounts Remain At Citibank

During the hearing, the Debtors and U.S. Trustee agreed that the Court may take judicial notice of Citibank's credit rating by Standard & Poor ("S&P"), which rated Citibank's Long-Term Bank Deposits as "A+".[12] The U.S. Trustee does not disagree with the Debtors that, in this light, the risk of loss to the Debtors if the Citibank Accounts remain at Citibank is minimal.

In determining whether there is "cause" to waive the account collateralization requirements under section 345(b), the Court will apply a totality of the circumstances test set like the one used by the court in *Service Merchandise,* although it will not be bound by the

---

[12]  See Motion ¶ 18, n.6.

13

factors considered by that court. The Debtors have established that their business is large and sophisticated, that the Cash Management System is complex, and that it will be costly, time consuming and risky to transfer it to another Authorized Depository. They have also demonstrated that they are receiving favorable interest rates at Citibank, which is partly why they selected Citibank as the replacement for Bank of America. In that light, this is exactly the type of scenario that Congress had foreseen in giving courts the flexibility to modify or waive the requirements of section 345(b). Those facts favor approving the Motion, as does the fact that S&P's credit rating for Citibank's Long-Term Bank Deposits is A+.[13] S&P reserves that rating for "Investment Grade" obligations; i.e., obligations by institutions that have a "strong capacity to meet financial commitments, but somewhat susceptible to adverse economic conditions and changes in circumstances."[14] That the Debtors are on track to seek Plan confirmation in early August of 2019, and that it will take six to nine months to move the accounts to another financial institution also favors the Debtors' request for relief. However, unlike the debtor in *Service Merchandise*—who did not house its cash management system in a single bank, whose money could be quickly moved out of the banks in which it was deposited, and for whom the loss of

---

[13]  S&P describes their credit ratings as follows:

> Credit ratings are opinions about credit risk. Our ratings express our opinion about the ability and willingness of an issuer, such as a corporation or state or city government, to meet its financial obligations in full and on time.
>
> Credit ratings can also speak to the credit quality of an individual debt issue, such as a corporate or municipal bond, and the relative likelihood that the issue may default.
>
> Credit ratings are not absolute measure of default probability. Since there are future events and developments that cannot be foreseen, the assignment of credit ratings is not an exact science. Credit ratings are not intended as guarantees of credit quality or as exact measures of the probability that a particular issuer or debt issue will default.

https://www.spratings.com/en_US/understanding-ratings#firstPage (last visited June 24, 2019).

[14]  *See id.*

access to any one bank account would not derail its business—the Debtors maintain their Cash Management System at one bank where their daily deposits aggregate $95 million, well in excess of the FDIC insured deposit rate. The Debtors concede that even a minor disruption to their access to the funds in the Citibank Accounts (however unlikely that may be if they are not required to move the accounts to another bank) likely would have dire consequences to their business operations and their ability to reorganize under chapter 11. The substantial value of the funds in the Citibank Accounts, the structure of the Debtors' integrated Cash Management System, and the risk of severe negative effects on the Debtors' liquidity, business operations, and reorganization efforts in the event of any "hiccups" with the Citibank Accounts, are facts that weigh in favor of mandating compliance with the collateralization requirements under section 345(b), even as the Debtors project that they will exit chapter 11 in early August of 2019.

A factor not present in *Service Merchandise*, but that is important to the resolution of the Motion, is that in this case, the financial institution – Citibank – has agreed to collateralize the Citibank Accounts, provided that the Debtors underwrite the cost to Citibank to do so. Ms. Colaneri testified that she was able to reach that agreement with Citibank after the Debtors filed the Motion, and that the cost to the Debtors would be approximately $80,000/month. Thus, the Debtors are able to comply with the mandates of section 345(b) without moving the Citibank Accounts and without disrupting the Cash Management System – provided they are willing to accept the deal they cut with the bank. Given the projected early August exit from bankruptcy, the cost to the Debtors' to collateralize accounts that hold, in the aggregate, $95 million each day, could be less than $200,000. In any event, the tab to collateralize the accounts will be no more than $80,000/month. Ms. Colaneri testified that the Debtors are earning approximately 2.6% per month in interest paid on account of all funds on deposit with Citibank (i.e., the

15

Citibank Accounts and other Citibank custodial accounts). The estimated monthly fee to Citibank to collateralize the Citibank Accounts is a small fraction of the interest earnings paid by Citibank to the Debtors, and an even smaller fraction of the $95 million average aggregate daily balance in the Citibank Accounts that would be secured. Although it is understandable that the Debtors – like all debtors – do not wish to incur administrative expense liabilities that they can avoid, they do not complain that the fee to collateralize the funds is unreasonable or over market. In effect, they want this Court to excuse them from their statutory obligations under section 345(b), so that they can avoid the financial burden of the deal they negotiated with Citibank. That cuts against granting the Debtors' request to waive the requirements of section 345(b) of the Bankruptcy Code with respect to the Citibank Accounts.

The legislative purpose behind the enactment of section 345(b) was to ensure "that the funds of a bankrupt that are obligated to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate," while also giving bankruptcy courts the flexibility to modify such requirement for "just cause" where strict compliance might "work to needlessly handcuff larger, more sophisticated debtors." *See* H.R. Rep. 103-835, 103rd Cong., 2d Sess. 210 (Oct. 4, 1994), *supra* n.11. Collateralizing the Citibank Accounts clearly ensures the safety of the funds on deposit in those accounts and, under the facts of this case, the payment of a monthly fee to do so, does not "handcuff" the Debtors.

## Conclusion

Based upon the foregoing, the Court finds that on balance the Debtors have failed to establish "cause" to excuse them from collateralizing the Citibank Accounts, as required by section 345(b) of the Bankruptcy Code. The Motion is denied. The Court directs the Debtors to

16

bring the Citibank Accounts into compliance with section 345(b) within five business days from the date of this Memorandum Decision and Order.

    IT IS SO ORDERED.

Dated: New York, New York
       June 24, 2019

                                                  /s/ *James L. Garrity, Jr.*
                                                  Honorable James L. Garrity, Jr.
                                                  United States Bankruptcy Judge