NOT FOR PUBLICATON

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                  :
In re                                             :          Chapter 11
                                                  :
DITECH HOLDING CORPORATION, *et al.*,             :          Case No. 19-10412 (JLG)
                                                  :
Debtors.[1]                                       :          (Jointly Administered)
                                                  :
------------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER ON MOTION OF DEBTORS
PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE FOR APPROVAL OF A SETTLEMENT AGREEMENT AND
MUTUAL RELEASE AMONG DEBTORS AND BANK OF AMERICA, N.A.**

**A P P E A R A N C E S**:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
By:    Ray C. Schrock, P.C.
       Sunny Singh

*Attorneys for the Debtors*

QUINN EMANUEL URQUHART &
  SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Susheel Kirpalani
       Benjamin I. Finestone
       Victor Noskov

*Counsel to the Official Committee of Consumer Creditors*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

KELLETT & BARTHOLOW PLLC
11300 N. Central Expressway, Suite 301
Dallas, Texas 75243
By:    Theodore O. Bartholow, III

*Attorneys for Creditors Richard Legans, Gail Legans,*
*Matthew Bennett, Jazmin Bennett, Dawn Davis,*
*Grace Carleton, Jose Martinez, Robert T. Hall, and Sally W. Hall*

**HON. JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

Before the Court is the motion (the "Motion")[2] of Ditech Holding Corp. (f/k/a Walter

Investment Management Corp.) and its debtor affiliates (collectively, the "Debtors"), for an

order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") approving a settlement agreement, dated as of May 20, 2019 (the "Second Settlement

Agreement"), among (i) Ditech Financial LLC ("Ditech Financial"), a debtor herein, and (ii)

Bank of America, N.A. ("BANA"). The Official Committee of Consumer Creditors (the

"Consumer Creditors Committee") filed a limited objection to the Motion (the "Objection")[3] in

which it: (i) contests the merits of the Motion, essentially on the grounds that the Debtor cannot

sustain its burden of proof under Rule 9019 since it submitted no evidence in support of the

Motion; (ii) objects to, and seeks to modify, the Court's order (the "Redaction Order"),[4] entered

*ex parte*, authorizing the Debtor to file a redacted copy of the Second Settlement Agreement as

an exhibit to the Motion, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code,

Bankruptcy Rule 9018, and Rule 9018-1 of the Local Rules of Bankruptcy Procedure for the

---

[2]    *See Motion of Debtors Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of a Settlement Agreement and Mutual Release Among Debtors and Bank of America, N.A.* [ECF No. 701]. Citations to "ECF No. ___" refer to filings in this case on the Court's electronic docket, Case No. 19-10412.

[3]    *See Limited Objection of the Official Committee of Consumer Creditors to Debtors' Motion Pursuant to the Federal Rule of Bankruptcy [Procedure] 9019 for Approval of a Settlement Agreement and Mutual Release Among Debtors and Bank of America* [ECF No. 739].

In response to the limited objection, the Debtors filed the *Reply to Limited Objection of the Official Committee of Consumer Creditors to Debtors' Motion Pursuant to the Federal Rule of Bankruptcy [Procedure] Rule 9019 for Approval of a Settlement Agreement and Mutual Release Among Debtors and Bank of America* [ECF No. 749] (the "Reply").

[4]    *See Order Authorizing Redaction of Commercially Sensitive Information in Debtors' Motion for Approval of Settlement and Mutual Release with Bank of America, N.A.* [ECF No. 694]. *See also Motion for Entry of Order Authorizing Redaction of Commercially Sensitive Information in Debtors' Motion for Approval of Settlement and Mutual Release with Bank of America, N.A.* [ECF No. 692] (the "Motion to Redact").

United States Bankruptcy Court for the Southern District of New York (the "Local Rules"); and (iii) seeks an order directing the Debtors to file Schedule A to the Second Settlement Agreement, and Schedule B to the First Settlement Agreement (defined below), both as redacted to exclude personal identifiable information ("PII") with respect to the mortgage loans listed in the Schedules.  A group of consumer creditors has joined in the Objection.[5]

For the reasons set forth below, the Court: (i) grants the Motion and approves the Second Settlement Agreement; (ii) grants the Consumer Creditors Committee's request to unseal the redacted information in the Second Settlement Agreement; and (iii) denies, as moot, the Consumer Creditors Committee's request that the Court compel the Debtors to file Schedule A to the Second Settlement Agreement, and denies its request to compel the Debtors to file Schedule B to the First Settlement Agreement.

## Jurisdiction

This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## Background

On February 11, 2019, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On

---

[5]    On June 19, 2019, consumer creditors Richard & Gail Legans, Matthew & Jazmin Bennett, Dawn Davis, Grace Carlton, Jose Martinez and Robert and Sally Hall, through their counsel, Theodore Bartholow, joined in that objection.  *See Notice of Joinder to the Objection of the Official Committee of Consumer Creditors to Debtors' Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of a Settlement Agreement and Mutual Release Among Debtors and Bank of America* [ECF No. 740].

February 27 and May 2, 2019, respectively, the U.S. Trustee appointed an Official Committee of

Unsecured Creditors (the "Unsecured Creditors Committee"), and the Consumer Creditors

Committee. *See* ECF Nos. 127 & 498, respectively. No trustee or examiner has been appointed

in these chapter 11 cases. Pursuant to an order of this Court, the Debtors' cases are being jointly

administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure. *See* ECF No. 50.

*The Debtors' Business*

The Debtors operate as an independent servicer and originator of mortgage loans and

servicer of reverse mortgage loans. Their business is comprised primarily of three segments: (i)

the Debtors originate mortgage loans exclusively through Ditech Financial; (ii) Ditech Financial

performs loan servicing for (forward) mortgage loans; and (iii) Reverse Mortgage Solutions, Inc.

("RMS"), a Debtor herein, performs loan servicing and subservicing for reverse mortgage loans.

*See* Lombardo Declaration ¶ 24.[6] Virtually all of the loans that Ditech Financial originates are

conventional conforming loans eligible for securitization by government-sponsored enterprises,

such as Fannie Mae and Freddie Mac, or guarantees by government agencies, such as Ginnie

Mae mortgage-backed securities. *See id.* ¶ 25.[7] Ditech Financial sells substantially all of the

mortgage loans it originates to Fannie Mae- and Freddie Mac- sponsored securitization or

mortgage pools insured by Ginnie Mae. *See id.* As a Fannie Mae- and Freddie Mac-approved

seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE,

---

[6]     *See Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* [ECF No. 2].

[7]     As used herein, "Ginnie Mae" means the Government National Mortgage Association, "Fannie Mae" means the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation. Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "GSE") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities. *See id.* ¶ 25.

which agreements generally incorporate the applicable GSE's selling and servicing guidelines.

*See id.* ¶ 34.

<u>*The Mortgage Servicing Rights Agreement*</u>

Ditech Financial performs loan servicing of mortgage loans that fall into two categories:
(i) mortgage loans for which Ditech Financial owns the mortgage servicing rights ("MSRs"), and
(ii) subservicing for third-party owners of MSRs. *See id.* ¶ 38. For mortgage loans where Ditech
Financial owns the MSRs, Ditech Financial services the mortgages in accordance with Fannie
Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable. *See id.* In 2013, Ditech
Financial (as successor to Green Tree Servicing LLC) and BANA (together, the "Parties"),
entered into that certain Mortgage Servicing Rights Purchase and Sale Agreement, dated as of
January 6, 2013 (the "MSRPSA"), pursuant to which Ditech Financial purchased MSRs from
BANA relating to a pool of mortgage loans. It also purchased associated servicing advances
totaling approximately $740 million from BANA. *See Motion* ¶ 9; Reply Ex. A (copy of the
MSRPSA). Under the agreement, in the event the Debtors are not able to recoup a servicing
advance payment from a borrower, they must first seek reimbursement of the advance from
Fannie Mae. *See Reply* ¶ 2. The Debtors submitted approximately $100 million in bulk
servicing advances purchased from BANA to Fannie Mae for reimbursement. *See id.* Generally,
the Fannie Mae guidelines governing its reimbursement of servicing advances mandate that a
servicer adhere to the procedures, thresholds and caps, and other requirements set forth in the
guidelines. *See id.* at 3, n.7. Ultimately, Fannie Mae agreed to reimburse approximately 77% of
the bulk servicing advances. Thereafter, Ditech Financial sought indemnification from BANA
under the MSRPSA for the $23 million in unreimbursed advances (the "Corporate Advances
Bulk Claims"). *Id.* at ¶ 2. BANA disputed that Ditech Financial had complied with all of its

obligations under MSRPSA or was otherwise entitled to indemnification with respect to certain

of the advances and, as such, BANA contended that it was not obligated to indemnify Ditech

Financial with respect to those unreimbursed advances.  *See id.*

<u>Resolution of the Corporate Advances Bulk Claims</u>

The Corporate Advances Bulk Claims are not the only disputed claims among the

Debtors and BANA under the MSRPSA.  Pursuant to an informal dispute resolution process that

they initiated prepetition, the Parties, with Fannie Mae's cooperation, worked towards resolving

their disputes under the agreement.  On or about December 31, 2018, the Parties entered into an

agreement (the "First Settlement Agreement"), which resolved certain causes of action, claims

and defenses that Ditech Financial or BANA may have against each other arising out of or

relating to the MSRPSA and a letter agreement among them effective as of June 26, 2014.  The

First Settlement Agreement did not resolve or release certain claims that are described in the

agreement (hereinafter, the "Excluded Claims").  The Corporate Advances Bulk Claims are a

subset of the Excluded Claims.  Schedule A to the First Settlement Agreement contains a list of

the mortgage loans underlying the Excluded Claims that are not Corporate Advances Bulk

Claims.  Schedule B to that agreement contains a list of the mortgage loans giving rise to the

Corporate Advances Bulk Claims.[8]  The Parties continued their negotiations after Ditech

Financial commenced its chapter 11 case.  In May of 2019, pursuant to the terms of the Second

Settlement Agreement, they agreed to settle 100% of the Corporate Advances Bulk Claims for

---

[8]    The First Settlement Agreement is not part of the record of the Motion.  However, as discussed below, the
Debtors provided counsel to the Consumer Creditors Committee with a copy of that agreement and annexed
Schedules A and B, for "professionals eyes only."  With the consent of all parties, the Court has reviewed a copy of
the First Settlement Agreement and the annexed schedules *in camera*.

approximately $10.6 million. The salient terms of the Second Settlement Agreement[9] are as

follows:

    a.    Upon the entry of an order approving the Debtors' entry into the Second Settlement Agreement (the "Effective Date"), in accordance with the Second Settlement Agreement, the BANA Releasors have agreed to release the Ditech Released Parties from any and all claims, rights, demands, causes of action, damages, liabilities, costs, expenses or losses of any kind or character whatsoever, whether presently known or unknown, asserted or unasserted, arising out of or related to the Corporate Advances Bulk Claims. This release does not apply to any Remaining Excluded Claims.

    b.    Within five (5) business days of the Effective Date, BANA has agreed to pay or cause to be paid to Ditech Financial the Settlement Payment of $7,600,000 without offset (the "Settlement Amount"), in accordance with the Second Settlement Agreement. The $7.6 million Settlement Amount is net of $3 million applied to the indemnification threshold under the MSRPSA. To the extent the Debtors make any future claims for reimbursement under the MSRPSA, the Debtors will not incur any future offsets. *See* Reply ¶ 1, n.5.

    c.    Upon the occurrence of the Effective Date and subject to payment in full of the Settlement Payment, the Ditech Releasors have agreed to release and discharge the BANA Released Parties from any and all claims, rights, demands, causes of action, damages, liabilities, costs, expenses or losses of any kind or character whatsoever, whether presently known or unknown, asserted or unasserted, that the Ditech Releasors ever had, may currently have, or may have in the future arising out of or related to the Corporate Advances Bulk Claims, in accordance with the Second Settlement Agreement.

    d.    To ensure that obligations and rights under the First Settlement Agreement are preserved, the Debtors have agreed that the First Settlement Agreement as modified by the Second Settlement Agreement shall be identified for assumption (or assumption and assignment) pursuant to 11 U.S.C. § 365 and pursuant to the Plan and order confirming the Plan in the chapter 11 cases, in accordance with the terms of the Second Settlement Agreement.

---

[9]    In discussing the Second Settlement Agreement and its provisions, capitalized terms that are not separately defined herein shall have the meanings ascribed to them in the agreement.

*See* Second Settlement Agreement §§ 2-5.  The effectiveness of the Second Settlement

Agreement is conditioned on the Court's approval of the Debtors' entry into the agreement.  *See*

*id.* §§ 1-2.  The agreement does not resolve, and the mutual releases therein expressly carve out,

certain "Claims Not Released" under the agreement.  *See id*. § 5.  Section 5(c) of the agreement

defines the term "Remaining Excluded Claims" to mean "claims (and defenses thereto) that are

reserved in Sections 5(a) or 5(b)."[10]  Under Section 5(a), the Parties preserve their rights to

enforce any provision of the Second Settlement Agreement.  *See id.* § 5(a) ("The Ditech

Releasors and BANA Releasors do not release, waive, or discharge claims to enforce any

provision of this Second Agreement.").  Section 5(b) contains a description of the claims

between the Parties under the MSRPSA not released in the Second Settlement Agreement, and

which claims are set forth in Schedule A to the First Settlement Agreement.  Schedule A to the

Second Settlement Agreement contains a list of the consumer mortgage loans underlying the

claims not released in the Second Settlement Agreement.  It is identical to the list of mortgage

loans in Schedule A to the First Settlement Agreement.[11]

---

[10]    That section goes on to provide that:

> For the avoidance of doubt, with respect to the loans listed on Schedule A, BANA does not waive
> any defenses with respect to time periods, survival periods or deadlines under the MSRPSA,
> including without limitation the periods for a Party to provide an indemnification notice or otherwise
> notify a Party of actual or potential claims pursuant to the MSRPSA.

Second Settlement Agreement § 5(c).

[11]    Where "Schedule A" to the Second Settlement Agreement is to be attached, the agreement states as follows:

> [See Certain Fannie Mae Demand Loans per Section 3(b) of the First Settlement Agreement and
> Attached as Schedule A Thereto]

*See* Second Settlement Agreement at 9.

*The Redaction Order*

The Debtors and BANA contend that the description of non-released claims in Section 5(b) of the Second Settlement Agreement is "commercial information" that is protected from disclosure under section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1. The Debtors advised the U.S. Trustee that in filing the Motion, it would seek authorization of this Court to file a copy of the Second Settlement Agreement with the description of the non-released claims in Section 5(b) redacted. Prior to filing the Motion to Redact, the Debtors and BANA worked with the U.S. Trustee to reach terms on the extent of disclosure of the redactions that they were seeking. *See* Reply ¶ 4. The U.S. Trustee agreed not to object to the Motion to Redact so long as the Debtors provided the unredacted version of the Second Settlement Agreement on a professional eyes-only basis to the Creditors' Committee and Consumer Creditors Committee upon request. *Id.* ¶ 5.

Thereafter, the Debtors sought and obtained the Redaction Order *ex parte*. BANA supported Debtors' Motion to Redact and in furtherance of that motion, it submitted the declaration of Elizabeth Chen, a BANA officer (the "Chen Declaration").[12] The Redaction Order authorizes, but does not direct, the Debtors "to redact the description of the non-released claims contained in the Second Settlement Agreement." Redaction Order ¶ 2. The Debtors filed the Second Settlement Agreement with portions of Section 5(b) redacted, as follows:

> The Ditech Releasors and BANA Releasors do not release, waive or discharge (and do not waive any defenses with respect to) claims arising from **REDACTED** ("Demand") for any loans listed on Schedule A of the First Settlement Agreement which is also attached hereto, provided that the Demand is based solely **REDACTED** If Ditech receives a Demand that Ditech believes should be excluded under this section 5(b), Ditech must send a copy of the Demand to BANA within

---

[12]   *See Declaration of Elizabeth Chen In Support of Debtors for Entry of Order Authorizing Redaction of Commercially Sensitive Information in Debtors' Motion for Approval of Settlement and Mutual Release With Ban of America, N.A.* [ECF No. 693].

ten (10) business days.  After reviewing the Demand, if BANA believes that the
Demand is based on **REDACTED** BANA has the right to appeal the Demand on
that basis and the Parties agree to work in good faith to resolve those disputed
Demands.

Second Settlement Agreement § 5(b) (redacted).  The Redaction Order provides that "[t]he

redactions contained in the Second Settlement Agreement shall remain redacted and shall not be

made available to anyone other than to (i) the Court, (ii) the U.S. Trustee, (iii) advisors to the

Unsecured Creditors Committee, and (iv) advisors to the Consumer Creditors Committee, on a

confidential and professional eyes only basis, if requested."  Redaction Order ¶ 3.  The Debtors

provided counsel to the Consumer Creditors Committee with unredacted versions of the

following documents on a professional eyes-only basis: (i) the Second Settlement Agreement;

(ii) Schedule A to the First Settlement Agreement (also cross-referenced as Schedule A of the

Second Settlement Agreement); (iii) the First Settlement Agreement; and (iv) Schedule B to the

First Settlement Agreement.  *See id.* ¶ 7.[13]

*The Consumer Creditors Committee's Objection to the Motion*

The Consumer Creditors Committee objects to the Motion on the grounds that the

Debtors failed to submit any evidence in support of the Motion and thus cannot meet their

burden of proof on the merits of the Motion.  The Consumer Creditors Committee contends that

the Motion fails to disclose sufficient details concerning the nature and amounts of the claims

being settled.  *See, e.g.*, Objection ¶ 14.  It contends that the Motion lacks "adequate disclosures

from the Debtors with regards to the claims at question[,]" and that the Debtors fail to address

basic questions, including:  (i) why Ditech Financial was unable to collect the corporate

advances at issue, (ii) why BANA refused to indemnify Ditech Financial, (iii) which advances

---

[13]    The Unsecured Creditors Committee has taken no position on the Motion, the Motion to Redact or the
Redaction Order.

were not reimbursed by Fannie Mae, (iv) the types and amounts of the disputed indemnification claims at issue, and (v) the impact of the settlement on consumer borrowers' claims. *See id.* ¶ 16. The Consumer Creditors Committee also challenges the adequacy of the Debtors' description of the First Settlement Agreement and the related schedules. *See id.* ¶ 17. It also maintains that the Court erred in entering the Redaction Order because the description of the Remaining Excluded Claims in Section 5(b) of the Second Settlement Agreement does not constitute "commercial information" under section 107(b) of the Bankruptcy Code, and contends that the Court should unseal the redacted language in Section 5(b). *See* Objection ¶¶ 7, 20. The Consumer Creditors Committee further asserts that the Court should compel the Debtors to file copies of Schedule A to the Second Settlement Agreement and Schedule B to the First Settlement Agreement of record, subject to the redaction of PII with respect to the mortgage loans listed in the Schedules. *See id.*; *see also* Supplemental Statement ¶¶ 6, 8.[14]

*The Hearing*

The Consumer Creditors Committee's objections to the adequacy of the Motion are well taken. As filed, the Motion contained only a cursory description of the claims at issue and the terms of the proposed settlement. Moreover, it contained no evidentiary support for the requested relief. On June 26, 2019, the Court conducted a hearing on the Motion. At the hearing, the Debtors produced Mr. Jeffrey Baker, the President of RMS, as a witness with firsthand knowledge of Ditech Financial's relationship with BANA under the MSRPSA, and of the negotiation of the Second Settlement Agreement. The Debtors failed to identify Mr. Baker

---

[14]    The "Supplemental Statement" is the *Statement of the Official Committee of Consumer Creditors in Connection With Its Limited Objection to Debtors' Motion Pursuant to the Federal Rule of Bankruptcy 9019 for Approval of a Settlement Agreement and Mutual Release Among Debtors and Bank of America* [ECF No. 773]. The Consumer Creditors Committee filed the statement, with leave of the Court at the close of the evidentiary hearing described below.

as a witness until the morning of the hearing.  The Consumer Creditors Committee did not object

to Mr. Baker testifying at the hearing and cross-examined him.  *See* Hr'g Tr. at 9:13-20, June 26,

2019 [ECF No. 792].

Mr. Baker is the President of RMS and has served in that role since October of 2016.  *See*

*id. at* 11:5-7.  In addition, he served as Ditech Financial's Chief Operating Officer during the

period of October of 2017 through February of 2018, and as its interim President and Chief

Executive Officer from February of 2018 to April of 2018.  *See id.* at 11:8-12.  During and after

his tenure with Ditech Financial ended, Mr. Baker was the Debtors' point person in Ditech

Financial's negotiations with BANA of the First and Second Settlement Agreements.  *See id.* at

20:10-17.  He testified that by early 2019, the Debtors had not recovered $23 million out of the

$740 million in advance payments that they purchased from BANA under the MSRPSA.  *See id.*

13:5-9.  That amount represented the advances that Fannie Mae refused to reimburse and that

BANA refused to indemnify under the MSRPSA.  *See id.* 14:16-24; 15:9-16.  He explained that

Fannie Mae denied reimbursement because the advance claims were allegedly submitted late,

lacked proper documentation, or sought the reimbursement of expenses in amounts that exceeded

those authorized under the Fannie Mae guidelines.  *See id.* at 14:10-15; 24:16-24; 28:9-12.  He

testified that BANA had refused to indemnify Ditech Financial based on Ditech Financial's

alleged errors in submitting the claims for reimbursement (including missing documentation),

and had reimbursed Ditech Financial's own expenses ahead of the BANA advances.  *See id.* at

15:9-16:6; 22:14-23; 26:20-27:12.  Mr. Baker testified that under the MSRPSA, the Parties were

required to arbitrate disputes over indemnification of corporate advance claims, and that to

arbitrate the disputes relating to the $23 million of advance payments, the Parties likely would

have been required to expend significant amounts of time, money and other resources since they

would be required to review over one million line items of expenses. *See id.* at 13:17-18; 16:23-17:5. He stated that in light of those issues, although the $23 million of unreimbursed advances at issue are tied to individual mortgage borrower accounts, the Parties did not resolve them on an account by account basis. *See id.* at 13:13-15. Rather, the Parties employed a sampling method of review, whereby the claims were grouped by category from which samples were selected for review. *See id.* at 13:16-14:1. Specifically, Ditech Financial and BANA placed the unpaid advances into "buckets" of expenses (e.g., attorney's fees, inspection fees, appraisal fees, fees incurred in maintaining the real property (e.g., yard mowing, snow plowing) once the borrower has vacated the property). *See id.* at 32:6-13; 33:12-17. Each party submitted "representative" invoices to each bucket and, thereafter, their respective subject matter experts reviewed the invoices and, as necessary, challenged or rebutted the claims. *See id.* at 16:13-17. Ultimately, the Parties came to an agreement regarding the percentage of claims to be allowed for each bucket. The aggregate amount of claims in respect of the buckets is $10.6 million. Mr. Baker described the negotiations as "very difficult and challenging" (*see id*. at 17:17-18) and testified that he believed that the settlement "was a good result." *See id.* at 17:15. He also explained that because the Parties adopted the sample methodology to resolve the claims, Ditech Financial would not look to the individual consumer borrowers to recoup the unpaid advances. *See id.* at 17:21-18:10; 18:21-19:9.

The Consumer Creditors Committee did not introduce any evidence. After Mr. Baker testified on direct and cross-examination, the Court adjourned the hearing to afford the Consumer Creditors Committee an opportunity to supplement the Objection in light of Mr. Baker's testimony. *See id.* at 58:19-24. On June 27, 2019, the committee submitted its Supplemental Statement. In it, among other things, the Consumer Creditors Committee stated, in

substance, that while it no longer objects to the merits of the Motion, it maintains its objection to

the Debtors' redactions in Section 5(b) of the Second Settlement Agreement.  Further, the

Consumer Creditors Committee argued that the Debtors must also publicly file Schedules A and

B, subject to redactions for consumer borrowers' PII.  *See* Supplemental Statement ¶¶ 6, 8.

## Discussion

### *Bankruptcy Rule 9019*

Bankruptcy Rule 9019(a) provides, in part, that "after notice and a hearing, the court may

approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Courts favor resolving

disputes through settlements.  *See In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y.

2010) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact,

encouraged.") (footnote omitted); *see also In re Motors Liquidation Co.*, 555 B.R. 355, 364-65

(Bankr. S.D.N.Y. 2016) ("Settlements and compromises are favored in bankruptcy as they

minimize costly litigation and further parties' interests in expediting the administration of the

bankruptcy estate." (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996))).

Before a court may approve a settlement, it must find that it is fair and equitable, and in

the best interests of the estate.  *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496

(Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailers Ferry,

Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).  *See also In re Chemtura Corp.*, 439 B.R. at 593-94.

The determination of whether a settlement meets those standards is within the discretion of the

court.  *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A

Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision

is manifestly erroneous and 'a clear abuse of discretion.'") (citations omitted); *Kenton Cty.

Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y.

2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement.") (citation omitted).  In exercising that discretion, the court does not conduct a mini-trial on the merits of the settlement or otherwise resolve disputed issues of law or fact underlying the settlement.  Instead, the court need only to "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983). *See also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) ("[T]he court must make an informed and independent judgment as to whether a proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" (quoting *Anderson*, 390 U.S. at 424))).  In doing so, the court should accord proper deference to a debtor's business judgment.  *See In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) ("Although approval of a settlement rests in the Court's sound discretion . . . the debtor's business judgment should not be ignored.") (citations omitted).  In the Second Circuit, the factors that a court must weigh in determining whether a proposed settlement is "fair and equitable," are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*See Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations omitted).

14

As discussed above, the Consumer Creditors Committee objected to the Motion on the grounds that the Debtors failed to submit any evidence in support of approving the Second Settlement Agreement, and thus, did not even attempt to demonstrate that it is "fair and equitable" and in the best interests of the Debtors' estate.  In the wake of the evidentiary hearing, the committee advised that it "did not object to the merits of the settlement, and will, of course, defer to the Court's analysis of whether the Debtors have carried the burden under Rule 9019 to demonstrate that the settlement is fair and reasonable."  Supplemental Statement ¶ 7.  The Court finds that the Debtors have met that burden.  It is undisputed that if the settlement is not approved, the parties likely will be required to arbitrate the merits of BANA's refusal to indemnify Ditech Financial for its service advance losses on a claim by claim basis and that the process will be labor intensive, time consuming and expensive.  Moreover, the Debtors have demonstrated through the sampling process that the Parties utilized in negotiating the settlement, that the settlement is the product of arm's length bargaining and that the Settlement Amount represents a fair assessment of risk to the Debtors in arbitrating the claims.  Accordingly, application of the first, second and seventh *Iridium* factors weighs in favor of approving the settlement.  So too does the application of the third, fourth and fifth *Iridium* factors.  No creditors oppose the merits of the settlement and the Term Loan Ad Hoc Group supports it.[15]  The Debtors have demonstrated that they will benefit from the receipt of the $7.6 million in net settlement proceeds and they have been represented by competent, experienced counsel throughout the settlement process.  The sixth *Iridium* factor is not relevant because the settlement does not call

---

[15]    The Term Loan Ad Hoc Group is comprised of certain entities that hold, or that act as investment manager of or advisor to certain funds, controlled accounts, and/or other entities that is a lender that is party to that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) by and among Ditech Holding Corporation, as borrower, Credit Suisse AG, as administrative agent and collateral agent, and the lenders party thereto.

for the release of officers and directors.  The Court finds that the Debtors have established that

the settlement does not fall below the "lowest level of reasonableness," and, as such, should be

approved by the Court.

*The Redaction Order*

Section 107(a) of the Bankruptcy Code provides that, with certain limitations, all papers

"filed in a case under this title . . . are public records and open to examination by an entity at

reasonable times without charge."  11 U.S.C. § 107(a).  "The policy of open inspection, codified

generally in section 107(a) of the Bankruptcy Code, evidences [C]ongress's strong desire to

preserve the public's right of access to judicial records in bankruptcy proceedings."  *Video*

*Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d

Cir. 1994).  *See also In re Borders Grp., Inc*., 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011) (noting

that section 107(a) codifies "[t]he presumption of open access to court records[.]").  Section

107(b)(1) contains one such limitation.  It provides that:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy
> court's own motion, may—
>
> (1)     Protect an entity with respect to a trade secret or confidential
>         research, development, or commercial information. . . .

11 U.S.C. § 107(b)(1).  Bankruptcy Rule 9018 and Local Rule 9018-1 establish the procedure by

which a party in interest may obtain a protective order authorizing the filing of a document under

seal pursuant to section 107(b) of the Bankruptcy Code.  Rule 9018 states in relevant part, that

"[o]n motion or on its own initiative, with or without notice, the court may make any order

which justice requires to protect the estate or any entity in respect of a trade secret or any

confidential research, development, or commercial information[.]"  Fed. R. Bankr. P. 9018.

Once the Court determines that a party in interest is seeking to protect information that falls

within the scope of section 107(b), "the court is *required* to protect a requesting interested party

and has no discretion to deny the application." *In re MF Global, Inc.,* No. 11-2790*, 2012 WL*

3260393, at *2 (Bankr. S.D.N.Y. Aug. 8, 2012) (citing *In re Orion Pictures Corp.,* 21 F.3d at

27)). Conversely, "if the information does *not* fall into a specified category, the information

*must* be made publicly available." *Motors Liquidation Co. Avoidance Action Trust v. JP Morgan*

*Chase Bank, N.A. (In re Motors Liquidation Co.)*, 561 B.R 36, 42 (Bankr. S.D.N.Y. 2016) (citing

*In re Food Mgmt. Grp., LLC,* 359 B.R. 543, 554 (Bankr. S.D.N.Y. 2007)).

 The Redaction Order states that "[n]othing in this Order prejudices the rights of any party

in interest, including the U.S. Trustee, to seek on appropriate motion, the unsealing of the

redactions in the Second Settlement Agreement or any part thereof." Redaction Order ¶ 7. The

Consumer Creditors Committee contends that the description of non-released claims in Section

5(b) of the Second Settlement Agreement is not "commercial information" that is protected from

disclosure under section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule

9018-1, and that the Court erred in issuing the order. As that order was entered *ex parte*, in the

face of the Objection, Ditech Financial bears the burden of showing that the redacted information

in Section 5(b) is protected from disclosure under section 107(b)(1). *See In re FiberMark, Inc.*,

330 B.R. 480, 488 (Bankr. D. Vt. 2005) ("[T]he Seal Proponents have the burden of proof to

demonstrate grounds for an exception under § 107(b)."). The Parties assume a heavy burden of

proof in demonstrating that the information redacted from Section 5(b) of the Settlement

Agreement is entitled to protection under section 107(b). *See In re Orion Pictures Corp*., 21

F.3d at 27 ("In most cases, a judge must carefully and skeptically review sealing requests to

insure that there really is an extraordinary circumstance or compelling need." (citing *City of*

*Hartford v. Chase*, 942 F.2d 130, 135-36 (2d Cir. 1991))); *see also In re Motors Liquidation Co.*,

561 B.R. at 42 ("The burden of proof is heavy, requiring an 'extraordinary circumstance or compelling need.'") (citations omitted). Accordingly, "[e]vidence—not just argument—is required to support the extraordinary remedy of sealing. *Id.* at 43; *see also In re Dreier LLP*, 485 B.R. 821, 823 (Bankr. S.D.N.Y. 2016) (finding that "conclusory statements in [a declaration] are not probative").

The statute speaks to "protect[ing] an entity with respect to . . . commercial information." 11 U.S.C. § 107(b)(1). Accordingly, BANA's interests can be protected under this section. *See In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (stating that the protection under section 107(b) does not "just extend to a debtor," but to "any entity" including the purchaser and debtor's indirect subsidiary, and authorizing redaction of identities of key employees and vendors and confidential information of the purchaser and subsidiary). Section 107(b) and Bankruptcy Rule 9019 are intended to "protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." *In re Global Crossing Ltd.,* 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) (noting that "commercial information that is entitled to protection under Code section 107(b) and Bankruptcy Rule 9018 must be viewed from the practical perspective of damage to the estate or its creditors[.]" (citing *In re Farmland Indus.*, 290 B.R. 364 (Bankr. W.D.N.Y. 2003))). As such, the term "commercial information" includes information that would cause "'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *In re Orion Pictures Corp.*, 21 F.3d at 27 (quoting *Ad Hoc Protective Comm. for 10 1/2% Debenture Holders v. Itel Corp.(In re Intel Corp.)*, 17 B.R. 942, 944 (9th Cir. BAP 1982)). *See also In re Farmland Indus., Inc*., 290 B.R. at 369 (finding that information regarding time lines established by debtor-in-possession (DIP) credit agreement for the marketing and sale of Chapter 11 debtors'

assets if debtors were to qualify for DIP financing, as well as information regarding debtors'

monetary liquidity, was "commercial information" that was deserving of protection in order to

prevent prospective purchasers from having distinct advantage in connection with sale of

debtors' assets). The Parties contend that the redacted language in Section 5(b) reflects

"commercial information" within the meaning of Section 107(b) because that language

"disclose[s] the economic outcome of confidential negotiations between the Company and

BANA." Chen Declaration ¶ 4. *See also* Motion to Redact (stating that the redacted language

concerns "the commercial contract terms between [Ditech Financial] and BANA."). Along those

lines, BANA asserts that redacting the language in section 5(b) redounds to the benefit of the

Debtors' estates and their creditors because "[i]n anticipation that the terms of the settlement

would be treated as confidential, BANA negotiated with the Debtors without significant

concerns presented by disclosing the terms of such negotiations to third-parties unconnected to

these proceedings." *Id.* BANA explains that "it is engaged in parallel negotiations with other

counterparties [to mortgage loan servicing agreements] who are making claims similar to those

asserted by the Debtors here," and that "[a]bsent confidentiality, those other counterparties could

seek to use to their negotiation advantage the insight they gain into the terms on which BANA

has agreed to settle with the Debtors, specifically the category of claims BANA was willing to

exclude from its settlement with the Debtors." *Id.* BANA maintains that it will be prejudiced in

its negotiations with third parties since the disclosure of the information "would very directly

result in more protracted negotiations as BANA seeks to distinguish its negotiation with the

Debtors from others." *Id.* It suggests that such a result would undermine any future negotiations

among BANA and the Debtors because "the prospect of confidentiality here allowed BANA to

negotiate more freely with the Debtors and thus redounded to the benefit of the estates." *Id.* The

Debtors contend that, like BANA and Ditech Financial, the counterparties that BANA is

concerned about are in the mortgage servicing business, buy and sell MSRs to each other, and, as

necessary, settle disputes under their respective MSR purchase agreements.  *See* Reply ¶ 13.

From that, they assert that the redacted language in the Second Settlement Agreement contains

terms representing the economic outcome of confidential negotiations between the Parties related

to the transfer of mortgage servicing rights.  *Id*.  They maintain that the public filing of such

material would give competitors an unfair advantage by giving them insight into BANA's

commercial operations and claim resolution strategies.  *Id.*

In essence, the Debtors are contending that BANA will be placed at a competitive

disadvantage if the Court unseals the redacted information because they will lose leverage in

future negotiations with counterparties to other mortgage loan servicing agreements.  However,

the cases are clear that bargaining leverage in future unrelated cases does not rise to the level of

"commercial information" under section 107(b).  *See In re Quigley Co., Inc*., 437 B.R. 102, 153

(Bankr. S.D.N.Y. 2010) (denying motion to seal settlement agreement because "bargaining

leverage in future unrelated cases is not commercial information"); s*ee also In re Alterra

Healthcare Corp*., 353 B.R. 66, 76 (Bankr. D. Del. 2006) ("The Reorganized Debtor argues that

if the unsettled claimants are privy to the settlement amounts, the claimants will use this

information as leverage to force higher settlements in their respective cases. An unfair advantage

to a tort claimant (creditor) of a debtor, however, does not create an unfair advantage to its

market competitors.").  The case of *Geltzer v. Anderson Worldwide, S.C.*, No. 05 Civ. 3339

(GEL), 2007 WL 273526 (S.D.N.Y. Jan. 30, 2007), is instructive.  There, a chapter 7 trustee (the

"Trustee") sued the defendants for professional malpractice and other torts in connection with

the services they provided to the debtor.  The parties reached a settlement of the litigation and the

20

Trustee filed a motion pursuant to Bankruptcy Rule 9019 seeking approval of the settlement agreement. *See id.* at *2. The Trustee's motion papers did not disclose the amount of the settlement, although he offered to provide the information for *in camera* review by the district court. The Trustee maintained that the Settlement Amount constituted "commercial information" under section 107(b) of the Bankruptcy Code, because the defendants were no longer engaged in accounting or other professional service business operations, and that their principal activity was resolving claims asserted against them. *See id.* at *3. The district court rejected that contention, finding that "the terms of the instant settlement have to do only with the instant litigation, and have nothing to do with the competitive business operations of the debtor or of [the defendants] in any normal sense of the words." *Id.* The district court found that there was "no discernable public interest, or interests of the bankruptcy estates, in preserving Andersen's 'leverage' as to other parties who have sued it." *Id.* It also found that the Trustee had failed to cite "any authority to support its implicit proposition that protecting the bargaining position of the defendant in other, unrelated cases, is even a proper consideration of a court being asked to approve a settlement in a given case." *Id.* That rationale applies equally in this case. Based on the record of this Motion, there is no discernable public interest or interests of the Debtors in preserving BANA's leverage in negotiations with other parties with respect to different mortgage loan servicing agreements.

Recently, in *In re Gibbs*, Case No. 11-03070, 2017 WL 6506324 (Bankr. D. Haw. Dec. 17, 2017), the court adopted the *Geltzer* court's rationale in rejecting a request by BANA to seal the amount BANA agreed to pay in settlement of a consumer borrower's claim against it. There, the bankruptcy estate included a claim that BANA improperly foreclosed a mortgage made by the debtor. *See id.* at *1. The trustee and BANA negotiated a settlement of the claim and jointly

21

petitioned the court for leave to file under seal the settlement agreement and to permit the trustee to redact the settlement amount from any other filing in which it might otherwise appear. The U.S. Trustee objected to the request. *See id.* In part, in support of the motion, BANA and the trustee contended that the amount of the settlement was "sensitive financial information" that should remain confidential because "[i]f made public, the terms of the settlement agreement would cause an unfair advantage to BANA's competitors in regard to BANA's settlement strategy and its assessment and scope of its legal risks, especially in light of the large number of matters involving nearly identical allegations pending in Hawaii[.]" *Id.* (internal quotation marks omitted). The court rejected that contention. It found that the filings made clear that BANA was not really concerned about its competitors getting access to the settlement information. Rather BANA was concerned that "if the settlement amount in this case is disclosed, other parties claiming that BANA engaged in wrongful foreclosure conduct will demand similar amounts." *Id.* at *2. Citing to *Geltzer*, the court found that "[t]his does not amount to 'confidential commercial information' within the meaning of section 107." *Id.*

The Parties have failed to meet their burden of demonstrating that the redacted language in the Second Settlement Agreement constitutes "commercial information" under section 107(b) of the Bankruptcy Code. Accordingly, the Court vacates the Redaction Order and directs the Debtors to file the Second Settlement Agreement in unredacted form.

### *Filing Schedule A – the Excluded Claims*

Schedule A is a list of approximately 200,000 consumer mortgage loan accounts that underlie the Excluded Claims that are not resolved by the Second Settlement Agreement. The Debtors have agreed to file Schedule A, with redactions of PII with respect to the mortgage loans listed in the Schedules. *See* ECF No. 797 (*Order Authorizing Redaction of Personally*

22

*Identifiable Information in Connection with Debtors' Motion for Approval of Settlement and*

*Mutual Release with Bank of America, N.A.*).  As such, the Consumer Creditors Committee's

request to compel the Debtors to do so is denied, as moot.

### *Filing Schedule B – the Corporate Advances Bulk Claims*

Schedule B is a list of approximately 260,000 consumer mortgage loan accounts that

underlie the Corporate Advances Bulk Claims.  The Debtors did not rely on Schedule B in filing

the Motion and did not file it as an exhibit to the Motion.  The Consumer Creditors Committee's

objection to its omission from the Motion is not a request to "unseal" documents that the Court

had authorized to be sealed under the Sealing Order.  Rather, through its Objection, the

Consumer Creditors Committee asks the Court to compel the Debtors to file the Schedule.  The

committee is correct that Schedule B identifies the mortgage loan accounts giving rise to the

claims that are being settled in the Second Settlement Agreement.  However, the Consumer

Creditors Committee has made no showing that the disclosure of the list of the individual

borrowers' accounts underlying the Corporate Advances Bulk Claims provides additional useful

information towards the assessment of the propriety or reasonableness of the Second Settlement

Agreement.  Moreover, Mr. Baker also testified that the Corporate Advances Bulk Claims were

not being resolved on an individual, case-by-case basis, but rather in bulk, based upon the

sampling methodology that the Parties agreed to employ in reaching the proposed resolution.

Further, he testified that the Debtors will not look to the consumer borrowers to collect any part

of the Corporate Advances Bulk Claims not recovered in the Second Settlement Agreement.

There is simply no grounds to compel the Debtors to file Schedule B.  Accordingly, the

Consumer Creditors Committee's request in this regard is denied.

**Conclusion**

Based upon the foregoing, the Court:

(i)     grants the Motion and approves the Second Settlement Agreement;

(ii)    grants the Consumer Creditors Committee's request to unseal the redacted information in Section 5(b) of the Second Settlement Agreement, and directs the Debtors to file an unredacted copy of the Second Settlement Agreement on the docket of these chapter 11 cases; and

(iii)   denies, as moot, the Consumer Creditors Committee's request that the Court compel the Debtors to file Schedule A to the Second Settlement Agreement, and denies its request to compel the Debtors to file Schedule B to the First Settlement Agreement.


IT IS SO ORDERED.

Dated: New York, New York
       July 19, 2019                                    /s/ James L. Garrity, Jr.
                                                        Hon. James L. Garrity, Jr.
                                                        United States Bankruptcy Judge