UNITED STATES BANKRUPTCY COURT **Hearing Date:  August 7, 2019**
SOUTHERN DISTRICT OF NEW YORK **Hearing Time: 11:00 a.m.**

-----------------------------------------------------------------x

In re          <u>Chapter 11</u>

DITECH HOLDING CORPORATION. *et al.,*  Case No. 19-10412 (JLG)

      Debtors.   (Jointly Administered)

-----------------------------------------------------------------x

### OBJECTION AND RESERVATION OF RIGHTS OF THE UNITED STATES TRUSTEE IN CONNECTION WITH THE CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND <u>ITS AFFILIATED DEBTORS</u>

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2

By: Greg M. Zipes
  Benjamin J. Higgins
  Trial Attorneys
  Office of the United States Trustee
  U.S. Federal Office Building
  201 Varick Street, Suite 1006
  New York, NY 10014

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ..................................................................................................................... 2

    A.  General Background ..................................................................................................... 2

    B.  Consumer Borrowers ................................................................................................... 3

    C.  The Section 363 Sale Process ..................................................................................... 5

    D.  Prior Versions of the Plan Referencing Section 363 ................................................... 9

    E.  The Plan ...................................................................................................................... 10

ARGUMENT ........................................................................................................................... 13

    A.  Objection and Reservation of Rights on the Issue of Consumer Rights, Claims and
        Interests ...................................................................................................................... 13

    B.  The Plan Cannot be Confirmed Because It Authorizes a Sale Free and Clear of Claims
        and Defenses that are the Subject of Section 363(o) of the Bankruptcy Code ............. 15

    C.  The Plan Does Not Satisfy the Best Interests of Creditors Test ................................... 19

    D.  Release Issues ............................................................................................................. 21

        i. Third Party Releases – Impermissible Third Party Consent ....................................... 21

        ii. The Definitions of Released Parties and Exculpated Parties are Overly Broad ........ 23

    E.  The Debtors Seek to Sell Personally Identifiable Information of Individuals ............... 24

CONCLUSION ........................................................................................................................ 26

# TABLE OF AUTHORITIES

*Cases*

*In re Adelphia Commc'ns Corp.*,
 368 B.R. 140 (Bankr. S.D.N.Y. 2007)...............................................................20

*In re Accredited Home Lenders Holding Co.*,
 Case No. 09-11516 (MFW), 2010 WL 2821965 (Bankr. Del. 2010)................................17

*In re Aegean Marine Petroleum Network Inc.*,
 599 B.R. 717 (Bankr. S.D.N.Y. 2019)...............................................................22

*In re Am. Home Mortg. Holdings, Inc.*,
 Case No. 07-11047 (CSS), ECF No. 1711 (Bankr. D. Del. 2007) ....................................17

*In re Ashley River Consulting, LLC*,
 No. 14-13406 (MG), 2015 WL 6848113 (Bankr. S.D.N.Y. Nov. 6, 2015)........................20

*In re Bally Total Fitness of Greater N.Y., Inc.*,
 No. 07–12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ..............................13

*In re Chassix Holdings*,
 533 B.R. 64 (Bankr. S.D.N.Y. 2015)................................................................21

*In re Copy Crafters Quickprint, Inc.*,
 92 B.R. 973 (Bankr. N.D.N.Y. 1988) ...............................................................14

*In re Chrysler LLC*, 576 F.3d 108, 115 (2d Cir.),
 *vacated as moot, In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010)...............................15

*Daewoo Int'l (America) Corp. Creditor Trust v. SSTS America Corp.*,
 2003 WL 21355214 (S.D.N.Y. 2003)...............................................................14

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*,
 209 F.3d 252 (3d Cir. 2000)........................................................................14

*In re Grumman Olson Indus., Inc.*,
 467 B.R. 694 (S.D.N.Y. 2012).................................................................15, 18

*Hispanic Indep. Television Sales, LLC v. Kaza Azteca Am. Inc.*,
 Case No. 10 CIV. 932 SHS, 2012 WL 1079959 (S.D.N.Y. Mar. 30, 2012) ......................14

*In re Leslie Fay Companies, Inc.*,
 207 B.R. 764 (Bankr. S.D.N.Y. 1997)..............................................................19

*In re MetroCraft Public Servs.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ...............................................................20

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005).........................................................................21, 22

*In re New Century TRS Holdings, Inc., et al.*,
    Case No. 07-10416 (KCC), ECF No. 844 (Bankr. D. Del. 2007) ......................17

*In re Oneida, Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ...............................................................21

*In re Residential Capital, LLC, et al.*,
    Case No. 12-12020 (MG), ECF No. 2246 (Bankr. S.D.N.Y. Nov. 21, 2012) ...................16

*In re Residential Capital, LLC, et al.*,
    Case No. 12-12020 (MG), ECF No. 2247 (Bankr. S.D.N.Y. Nov. 21, 2012) ...................17

*In re SunEdison*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)...............................................................21

*In re Trans World Airlines, Inc.*,
    322 F.3d 283 (3d Cir.2003)...............................................................................15

*In re Washington Mutual, Inc.*,
    442 B.R. 314(Bankr. D. Del. 2011) ...................................................................21

**Statutes**

11 U.S.C § 332.........................................................................................................24, 25

11 U.S.C. § 363(b) ..............................................................................................*passim*

11 U.S.C. § 363(f) ...............................................................................................*passim*

11 U.S.C. §363(k).................................................................................................15, 17

11 U.S.C. § 363(o) ..............................................................................................*passim*

11 U.S.C. § 541(a)(1)...................................................................................................13

11 U.S.C. § 1125(a) .....................................................................................................14

11 U.S.C. § 1129(a) ...........................................................................................*passim*

11 U.S.C. § 1129(a)(1)..................................................................................................13

11 U.S.C. § 1129(a)(7)..........................................................................................................1, 19

**Other Authorities**

147 Cong. Rec. 2184, S2192 (Mar. 13, 2001)......................................................................16

7 Collier on Bankruptcy ¶ 1125.02 (16th ed. 2019) ........................................................20

7 Collier on Bankruptcy ¶ 1129.02 (16th ed. 2019) ........................................................19

*You Can't Buy Me Love and You Can't Buy a 363(f) Order*,
    Weil Bankruptcy Blog (July 27, 2016) ..........................................................................15

TO:    **THE HONORABLE JAMES L. GARRITY,**
       **UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "**United States**

**Trustee**"), hereby submits his objection (the "**Objection**") to the Confirmation of the Amended

Joint Chapter 11 Plan [ECF Doc. No. 542] (the "**Plan**") of Ditech Holding Corporation and its

Affiliated Debtors (collectively, the "**Debtors**").[1]  In support thereof, the United States Trustee

respectfully states:

## PRELIMINARY STATEMENT

The Debtors recently concluded a marketing and bidding process for a sale of their assets

pursuant to section 363 of the Bankruptcy Code.  They emerged from this process having

executed two asset purchase agreements: one for assets constituting their so-called "forward

business" (the "**Forward Business**") and another for assets and certain stock constituting their

"reverse business" (the "**Reverse Business**").  The Debtors now seek confirmation of the Plan

which authorizes the Debtors to consummate these two sale transactions.  The United States

Trustee objects to the sale transactions and to confirmation of the Plan to the extent the Plan fails

to comply with applicable provisions of the Bankruptcy Code.  Specifically, the United States

Trustee objects because:

   a) The Plan does not clearly set forth the rights of consumer borrowers.  Specifically, the
      Plan does not address the rights of consumer borrowers in relation to the Debtors'
      misapplication and miscalculation of payments.  The Reverse Business agreement
      appears to require the purchaser to assume certain claims directly related to the Debtors'
      misapplication and miscalculation of payments.  The Court should not approve the
      Forward Business transaction absent similar express language.  For both transactions, the
      Plan does not expressly address consumer rights to recoupment, setoff, and other
      defenses.  Nor does the Plan address gross negligence and willful misconduct that causes
      harm to the consumers.  The Plan cannot be confirmed unless modified to address these
      issues.

---

[1] Unless otherwise indicated, capitalized terms shall have the same meaning as in the Disclosure Statement.

b) Under the Plan, the Debtors seek authorization to sell both the Forward Business assets and Reverse Business assets free and clear of claims that are the subject of section 363(o) of the Bankruptcy Code. The Bankruptcy Code expressly prohibits such a sale. This appears to be an unprecedented request. Section 363(o) refers to claims and defenses related to consumer credit contracts and transactions. Congress expressed a strong desire to protect consumer rights, claims, and defenses in connection with sales of mortgage company assets with the enactment of section 363(o). The Debtors should not be permitted to evade this clear statutory mandate, especially after having taken advantage of section 363 to obtain the relief necessary to run their bidding process.

c) The Plan fails the "best interests of creditors" test. The Debtors contend that they can sell assets free and clear of consumer claims because 363(o) does not apply to a chapter 11 plan sale. However, any sale in the context of a hypothetical chapter 7 liquidation would occur under section 363, and consumer creditors would retain their claims and interests in such a sale. Accordingly, under the Plan, consumer creditors would receive less favorable treatment than in a hypothetical chapter 7 liquidation in violation of 11 U.S.C. § 1129(a)(7).

d) The Plan impermissibly deems the consent of parties who have not affirmatifdvely manifested their consent to third party releases. Additionally, the Plan's definitions of released parties and exculpated parties are overly broad.

e) The Plan, as currently drafted, appears to authorize the sale of personally identifiable information of individuals without complying with applicable provisions of the Bankruptcy Code.

For these reasons, as more fully detailed below, the United States Trustee objects to confirmation of the Plan. Additionally, the United States Trustee reserves his rights in relation to certain remediation efforts undertaken by the Debtors.[2]

## **BACKGROUND**

### A.    **General Background**

1.    On February 11, 2019 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. ECF No. 1.

2.    The cases are being jointly administered for procedural purposes only pursuant to

---

[2] The United States Trustee reserves the right to amend, modify, supplement or withdraw his objections to the Plan and proposed sales pending further discussions with counsel for the Debtors. The United States Trustee specifically reserves the right to request clarification that the Debtors' Plan and proposed sales do not affect the compliance obligations of the Debtors or purchasers, and do not impair the police or regulatory authority of any governmental entity under applicable state and federal laws with respect to the assets transferred or excluded.

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  ECF No. 50.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") on February 27, 2019 and an Official Committee of Consumer Creditors (the "**Consumer Committee**") on May 2, 2019.  ECF Nos. 127 and 498, respectively.

**B.      Consumer Borrowers**

4.      The Debtors, together with their non-Debtor subsidiaries (collectively, the "**Company**"), operate as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.  *See* Disclosure Statement (defined below) at 6.  As of December 31, 2018, Debtor Ditech Financial LLC ("**Ditech Financial**") had serviced approximately 1.4 million residential loans with an unpaid principal balance of $170.1 billion.  As of December 31, 2018, Debtor Reverse Mortage Solutions, Inc. ("**RMS**") had serviced or subserviced approximately 88,000 reverse mortgage loans with an unpaid principal balance of $17.1 billion. *Id.* at 22-23.

5.      The Debtors' schedules listed thousands of unsecured claims held by individuals related to litigation as contingent, unliquidated, disputed claims in undetermined amounts listing the dates the claims were incurred as "unknown" and the account numbers as "not available." *See, e.g.*, Schedule E/F for Ditech Financial, LLC, Claims 3.1371 – 3.2621, ECF Doc. No. 290; Schedule E/F for Reverse Mortgage Solutions, Inc., Claims 3.521 – 3.1047, ECF Doc. No. 308. A large portion of these unsecured claim holders appear to be ordinary consumers whose residential mortgage loans or reverse mortgage loans were either originated or serviced by the Company.  On May 7, 2019, at least one of the Debtors' schedules E/F was amended to add what appeared to be hundreds of additional such claims.  *See* Amended Schedule E/F for Ditech

Financial LLC, Claims 3.1308 – 3.2866, ECF Doc. No. 511.

6.     The Debtors acknowledge that, throughout the case, they "have received numerous inquiries from consumer borrowers who are unfamiliar with the chapter 11 process regarding the purpose of, and procedures for, filing proofs of claim.  Such consumer borrowers are typically not sophisticated and are not represented by counsel.  A large number of consumer borrowers have requested extensions of the General Bar Date."  Motion to Extend the General Bar Date, ECF No. 468, at ¶ 12.

7.     The Debtors also acknowledge:

In the ordinary course of business, the Debtors are defendants in, or parties to, pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants. Many of these actions and proceedings are based on alleged violations of consumer protection laws governing the Company's servicing and origination activities, and in certain instances, claims for substantial monetary damages are asserted against the Company. The Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with formal and informal inquiries, the Company receives numerous requests in connection with various aspects of the Company's activities.

Disclosure Statement at 39.

8.     Further, "in the ordinary course of business, the Company is involved in numerous pending and threatened legal actions and proceedings, as well as in routine proceedings such as foreclosures, evictions, title disputes, collection actions, and borrower bankruptcy cases."  Disclosure Statement at 40.

9.     This Court has detailed the body of the Debtors' consumer borrowers as follows:

As of the petition date, the Debtors were servicing approximately 1.5 million loans made to individuals -- I'll refer to them as 'the Consumer Borrowers' -- and that were secured by forward and reverse mortgages on their residences. The Debtors acknowledge that at this time RMS is party to approximately 6,000 judicial and non-judicial foreclosure proceedings and more than 600 eviction proceedings and that Ditech is party to 16,400 judicial and non-judicial foreclosure proceedings and approximately 350 eviction proceedings. [. . .]

> It's undisputed that in many of the judicial and non-judicial foreclosure
> proceedings, the Consumer Borrowers are asserting claims and defenses to
> foreclosure including claims against RMS and Ditech [Financial]. In addition,
> apart from the foreclosure-related litigation, Consumer Borrowers have sued
> RMS and Ditech on account of their alleged illegal and fraudulent loan
> origination, servicing, and accounting practices. [. . .]
>
> As of the petition date, the Debtors were party to thousands of actions involving
> Consumer Borrowers, asserting consumer creditor claims which include non-
> monetary claims and/or money damages claims against the Debtors.

May 17, 2019 Hr'g Tr. at 10:15-12:15. A copy of the relevant excerpt of this transcript is annexed hereto as Exhibit A.

### C.    The Section 363 Sale Process

10.    On the Petition Date, the Debtors asked the Court to approve case milestones in connection with their Motion for Debtor in Possession Financing (the "**DIP Motion**"). ECF No. 26. Among other milestones, the Debtors asked the Court to require that "[o]n or before the date that is 15 days following the Petition Date, the Debtors shall have filed with the Bankruptcy Court a motion seeking approval of bidding procedures in connection with a 363 sale." DIP Motion at 21. The Court's interim order approving the DIP Motion did not approve this milestone but required the Debtors to seek approval of this milestone upon entry of a final order. ECF No. 53 at ¶ 27.

11.    The Court eventually entered a final order approving certain of the relief requested in the DIP Motion (the "**DIP Order**"). ECF No. 422. This DIP Order approved the following milestone:

> on or before the date that is 22 days following the Petition Date, the Debtors shall
> have filed with the Bankruptcy Court a motion, in form and substance satisfactory
> to the Required Buyers and the Requisite Term Lenders, seeking entry of an order
> by the Bankruptcy Court approving bidding procedures in connection with a
> marketing and 363 sale process pursuant to one or more asset purchase
> agreements, merger agreements, or similar agreements that provide for repayment
> in full in cash of the obligations under the DIP Documents on the closing of such

agreement;

*Id.* at ¶ 28(d).

12.     On March 5, 2019, the Debtors filed a motion seeking approval of, *inter alia*, certain bidding and auction procedures (the "**Bidding Procedure Motions**").  ECF No. 147.

13.     Through the Bidding Procedures Motion, the Debtors sought approval of certain bidding and auction procedures (the "**Bidding Procedures**") including the ability to offer any stalking horse bidders a break-up fee and certain other protections (collectively, the "**Stalking Horse Bid Protections**").

14.     As the statutory basis for the relief requested in the Bidding Procedures Motion, the Debtors cited, *inter alia*, section 363 of the Bankruptcy Code.  Bidding Procedures Motion at ¶ 10.  As the basis for approval of the Stalking Horse Bid Protections, the Debtors cited section 363 as the sole statutory basis stating, "[b]idding incentives such as these Stalking Horse Bid Protections have become commonplace in connection with sales of assets under section 363 of the Bankruptcy Code."  Bidding Procedures Motion at ¶ 100.

15.     On April 23, 2019, the Court entered an order approving the Bidding Procedures Motion (the "**Bidding Procedures Order**").  ECF No. 456.  The Bidding Procedures Order provides that the statutory and legal predicates for the relief requested in the Bidding Procedures Motions include section 363 of the Bankruptcy Code.  Bidding Procedures Order at ¶ B.  The Bidding Procedures Order specifies an objection deadline (which has since been extended) to object to a sale of the Debtors' assets free and clear of liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.  *Id.* at ¶ 18.

16.     On July 2, 2019, the Debtor filed the *Debtors' Notice of Designation of Stalking Horse Bid And Request For Approval Of Stalking Horse Bid Protections (Forward Business)* (the "**Forward Stalking Horse Request**") and the *Debtors' Notice of Designation of Stalking*

*Horse Bid And Request For Approval Of Stalking Horse Bid Protections (Reverse Business)* (the

"**Reverse Stalking Horse Request**").  ECF Nos. 722 and 724, respectively.

17.     The Forward Stalking Horse Request provides that the Debtors have accepted a

stalking horse bid submitted by New Residential Investment Corp. ("**NRZ**") and that NRZ and

certain Debtors have executed an asset purchase agreement (the "**NRZ Agreement**") for the

purchase of certain of the Debtors' assets.   Through the Forward Stalking Horse Request and

pursuant to the Bidding Procedures Order, the Debtors sought the approval of certain Stalking

Horse Bid Protections for NRZ including a break-up fee of $30,000,000 to be paid under certain

circumstances as well as expense reimbursement.

18.     Under the NRZ Agreement, NRZ has a right of termination if, *inter alia*, the

Court enters an order confirming the Plan that is not in form and substance reasonably acceptable

to NRZ.   NRZ Agreement, § 8.1(c)(vi).  NRZ also has a right of termination if the Court will not

enter a confirmation order that provides for the sale to NRZ of certain of the Debtors' assets free

and clear of all Liens, including Claims that are the subject of section 363(o) of the Bankruptcy

Code.  *Id.*

19.     The NRZ Agreement provides that "Lien" means:

> any mortgage, pledge, lien, charge, deed of trust, Claim, lease, security interest,
> option, right of first refusal, easement, security agreement or other encumbrance
> or restriction on the use or transfer of any property; provided, however, that
> "Lien" shall not be deemed to include any license, covenant or other right to or
> under Intellectual Property.

NRZ Agreement at 16.

20.     The NRZ Agreement provides that "Claims" means

> all claims, defenses, cross claims, counter claims, debts, suits, remedies,
> liabilities, demands, rights, obligations, damages, expenses, rights to refunds,
> reimbursement, recovery, indemnification or contribution, attorneys' or other
> professionals' fees and causes of action whatsoever, whether based on or
> sounding in or alleging (in whole or in part) tort, contract, negligence, gross

negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off.

NRZ Agreement at 7.

21.     The Reverse Stalking Horse Request provides that the Debtors have accepted a stalking horse bid submitted by Mortgage Assets Management, LLC and SHAP 2018-1, LLC (together, the "**Reverse Stalking Horse Bidder**") and that the Reverse Stalking Horse Bidder and the Debtors have executed a stock and asset purchase agreement (the "**Reverse Agreement**").  Through the Reverse Stalking Horse Request and pursuant to the Bidding Procedures Order, the Debtors sought the approval of certain Stalking Bid Horse Protections for the Reverse Stalking Horse Bidder including a break-up fee as well as expense reimbursement.

22.     The Reverse Agreement appears to require the Reverse Stalking Horse Bidder to assume the following claims:

For the avoidance of doubt, it is understood and agreed that no claims brought by a consumer borrower or any other Person claiming servicing errors directly related to Sellers' (A) misapplication of borrower payments, (B) miscalculation of Mortgage Loan principal amounts, (C) miscalculation of Mortgage Loan interest amounts or (D) failure to credit funds to the correct account shall in any way be Consumer Claims hereunder, and no Buyer shall have any claim, or right to bring a claim, against any Seller or any Affiliate of any Seller in connection therewith (clauses (A) through (D), collectively, the "Assumed Claims").

*See* Reverse Agreement at 8.

23.     The Reverse Stalking Horse Request provides that the Debtors have an obligation to seek an order from this Court providing for a sale free and clear of consumer claims, but such

an order is not a condition to closing.  Reverse Stalking Horse Request at 14.

24.     Both the Forward Stalking Horse Request and the Reverse Stalking Horse

Request set forth deadlines for "[o]bjections to a proposed Sale Transaction including any

objection to the sale of the Debtors' assets free and clear of liens, claims, interests, and

encumbrances pursuant to section 363(f) of the Bankruptcy Code." Forward Stalking Horse

Request at 4; Reverse Stalking Horse Request at 3.

25.     On July 3, 2019, the Court entered an order which approved the Stalking Horse

Bid Protections for NRZ and the Reverse Stalking Horse Bidder in accordance with the Bidding

Procedures Order.  ECF No. 808.

26.     On July 10, 2019, the Debtors filed a *Notice of (I) Cancellation of Auction, (II)

Sale and Confirmation Objection Deadline, and (III) Successful Bidders*.  ECF 830.  This notice

provided that the Debtors received no Qualified Bids other than the Stalking Horse Bids.

Accordingly, the Debtors canceled any auction and deemed the bids of NRZ and the Reverse

Stalking Horse Bidder to be Successful Bids, as defined in the Plan.

        **D.       Prior Versions of the Plan Referencing Section 363 of the Bankruptcy Code**

27.     The Debtors filed an initial joint chapter plan (the "**Initial Plan**") and disclosure

statement on March 5, 2019.  ECF Nos. 145 and 146, respectively.  On March 28, 2019, the

Debtors filed a first amended plan (the "**First Amended Plan**").  ECF No. 314.  On April 26,

2019, the Debtors filed a second amended plan (the "**Second Amended Plan**").  ECF No. 469.

28.     Article V of the Initial Plan, the First Amended Plan, and the Second Amended

Plan are all titled, "Means for Implementation."  These plans all contain an identical Section 5.2

which is titled, "Compromise and Settlement of Claims, Interests, and Controversies" and

provides, in part, "Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and

Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided

pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of

Claims, Interests, and controversies relating to the contractual, legal, and subordination rights

that a creditor or an Interest holder may have with respect to any Claim or Interest or any

distribution to be made on account of an Allowed Claim or Interest." Initial Plan, § 5.2.

29.     On May 8, 2019, the Debtors filed a third amended plan (the "**Third Amended**

**Plan**"). ECF No. 515. The reference to section 363 is removed from Section 5.2 of the Third

Amended Plan and from subsequent versions. Third Amended Plan, § 5.2.

### E.      **The Plan**

30.     On May 10, 2019, the Debtors filed the current Plan. ECF No. 542. On May 10,

2019 the Debtors filed and the Court approved the *Amended Disclosure Statement for Amended*

*Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (the "**Disclosure**

**Statement**"). ECF No. 544.

31.     The Court's order approving the Disclosure Statement required the Debtors to

serve a consumer borrower notice (the "**Consumer Borrower Notice**"). ECF No. 544 at 40-44.

The Consumer Borrower Notice provides, *inter alia*, "If you have an existing mortgage with or

loan serviced by Ditech or RMS, your obligations under your loan agreement are unchanged, and

you should continue to make your mortgage or other required payments on time and in full." *Id.*

at 1.

32.     The Plan provides for approval of a Sale Transaction that transfers assets to

purchasers free and clear of a broad swath of liens, claims, and interests. Specifically, the Plan

provides that:

> On the Effective Date, the Debtors shall be authorized to consummate the Sale
> Transaction contemplated by the Successful Bid and, among other things, the
> Debtors' assets (including executory contracts and unexpired leases assumed and
> assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant
> to Section 1141 of the Bankruptcy Code, be transferred to and vest in the

applicable Successful Bidder free and clear of all Liens,[3] Claims,[4] charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

Plan, § 5.6.

33.     The Plan defines "Sale Transaction" to mean, "the sale of all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, contemplated by the Successful Bid."  Plan, § 1.140.  The Plan defines Successful Bid to mean, "one or more bids to purchase all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, that the Debtors determine, in an exercise of their business judgment and subject to the RSA, constitutes the highest or best bid." Plan, § 1.150.  "Successful bidder" is defined as "the bidder(s) who submit(s) a Successful Bid."  As detailed above, the Debtors have deemed the bids of NRZ and the Reverse Stalking Horse Bidder to be Successful Bids.

34.     The Plan does not carve out from the "free and clear" provision any claims or defenses that are the subject of section 363(o) of the Bankruptcy Code.  To the contrary, the Debtors take the position that section 363(o) does not apply to asset sales under the Plan.  Disclosure Statement at 41.

35.     The Plan does not explicitly provide for the preservation of consumers' rights to challenge misstated amounts on their accounts.  The Plan does not explicitly provide for the preservation of any setoff rights, recoupment rights or other defenses of consumer creditors.  Additionally, the Plan cannot effectuate any sale free and clear of such setoff rights, recoupment rights or other defenses.

36.     The Plan specifies two classes of unsecured claims: General Unsecured Claims

---

[3] The Plan provides that "Lien has the meaning set forth in section 101(37) of the Bankruptcy Code."
[4] The Plan provides that "Claim has the meaning set forth in section 101(5) of the Bankruptcy Code, as against the Debtor."

and Borrower Non-Discharged Claims.  Plan, § 3.3; Disclosure Statement at 13.  The Plan

provides for the creation of a trust for the benefit of unsecured creditors (the "**GUC Recovery**

**Trust**").  Disclosure Statement at 66.  Under the Plan, in the event of a Sale Transaction, General

Unsecured Claims shall receive a *pro rata* share of the GUC Recovery Trust assets and any net

cash proceeds from the sale available for distribution after senior classes are paid.  Under the

Plan, in the event of a sale transaction, Borrower Non-Discharged Claims receive the same

treatment as General Unsecured Claims.  Disclosure Statement at 13.

37.     On July 11, 2019, the Debtors filed a liquidation analysis which purports to show

that creditors receive a more favorable recovery under the Plan than in a hypothetical chapter 7

liquidation (the "**Liquidation Analysis**").  ECF No. 833.

38.     The Plan provides for a third party release of certain defined "Released Parties."

Plan, § 10.6(b).  The Plan provides for exculpation of certain "Exculpated Parties."  *Id*, § 10.7.

Both the definitions of Released Parties and Exculpated Parties include "Related Parties for each

of the foregoing."  *Id.*, §§ 1.130, 1.70.   Related Parties are broadly defined as follows

> ***Related Parties*** means with respect to any Exculpated Party or any Released
> Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates,
> managed accounts or funds, and all of their respective current and former officers,
> directors, principals, stockholders (and any fund managers, fiduciaries or other
> agents of stockholders with any involvement related to the Debtors), members,
> partners, employees, agents, advisory board members, financial advisors,
> attorneys, accountants, investment bankers, consultants, representatives,
> management companies, fund advisors and other professionals, and such persons'
> respective heirs, executors, estates, servants and nominees.

*Id.*, § 1.129.

39.     The Third Party Release is binding on various parties including "holders of Term

Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not

opt-out of these releases on the Ballot . . ."  Plan, § 10.6(b)(iii).

## ARGUMENT

**A.** **Objection and Reservation of Rights on the Issue of Consumer Rights, Claims, and Interests**

Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" of the requirements of section 1129(a). 11 U.S.C. § 1129(a). The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07–12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007). Among other requirements, section 1129(a) mandates that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. 1129(a)(1).

The Disclosure Statement and the Consumer Borrower Notice make clear that all of the *obligations* of consumer borrowers will continue after the sale transactions. *See* Consumer Borrower Notice, ECF No. 544 at 40-44 (". . . your obligations under your loan agreement are unchanged . . ."). However, the Plan does not clearly set forth the *rights* of consumer borrowers in connection with the proposed sale transactions. Specifically, the treatment of consumer claims, rights, and defenses related to the Debtors' misapplication or miscalculation of payments is not explained in Plan. The Reverse Agreement provides for the purchaser to assume claims related to the Debtors' miscalculation or misappropriation of payments. The NRZ Agreement contains no such provision. At a minimum, the Plan should require the same provision for the sale of the Forward Business. The Debtors have no legal or equitable right to any amounts that have been misstated or inflated. *See* 11 U.S.C. § 541(a)(1) (Property of the estate includes ". . . all legal or equitable interest of the debtor in property as of the commencement of the case.")

Additionally, neither the NRZ Agreement nor the Reverse Agreement expressly address consumer borrower rights to recoupment, setoff, and other defenses. The Plan cannot discharge

any setoff or recoupment rights or other defenses of consumer creditors and cannot effectuate any sale free and clear of such setoff rights or recoupment rights or other defenses. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252 (3d Cir. 2000) (finding that affirmative defenses of setoff, recoupment, and other contract defenses are not "interests" and therefore cannot be extinguished in by a section 363 sale.); *Hispanic Indep. Television Sales, LLC v. Kaza Azteca Am. Inc.*, No. 10 CIV. 932 SHS, 2012 WL 1079959, at *5 (S.D.N.Y. Mar. 30, 2012) (". . sales pursuant to section 363(f) do not extinguish affirmative defenses."); *Daewoo Int'l (America) Corp. Creditor Trust v. SSTS America Corp.*, 2003 WL 21355214, at *5 (S.D.N.Y. 2003) ("recoupment is not a 'claim' within the meaning of the Bankruptcy Code and this right is, as a general matter, unaffected by the debtor's discharge . . .") (internal citations omitted).  The Plan cannot be confirmed unless these rights are expressly preserved.

Additionally, this lack of clarity regarding the treatment of consumer borrowers in the wake of the Debtors' execution of the NRZ Agreement and the Reverse Agreement runs afoul of the "adequate information" standard set forth in section 1125.  *See* 11 U.S.C. § 1125(a).  Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).  Here, in approving the Disclosure Statement at the start of the marketing process, the Court and the parties had the reasonable expectation that any asset purchase agreements would specifically address these material issues.  The Plan cannot be confirmed absent appropriate disclosure of these material issues.

The United States Trustee understands that the Debtors, the Consumer Committee, and the purchasers may be negotiating the terms of consumer rights, claims, and interests.  The United States Trustee objects to confirmation of the current Plan unless modified to address these

issues and reserves his rights to raise any objections to revised versions of the Plan.

**B.** **The Plan Cannot be Confirmed Because It Authorizes a Sale Free and Clear of Claims and Defenses that are the Subject of Section 363(o) of the Bankruptcy Code**

Section 363(b) allows a trustee or debtor in possession to sell assets other than in the ordinary course of business after notice and a hearing. *See* 11 U.S.C. § 363(b). Section 363(f) permits a debtor in possession to "sell property under subsection (b) or (c) of this section free and clear of any interest in such property" provided certain conditions are met. *See* 11 U.S.C § 363(f).

"[Section] 363(b) asset sales have become common practice in large-scale corporate bankruptcies." *In re Chrysler LLC*, 576 F.3d 108, 115 (2d Cir.), *vacated as moot*, *In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010) (internal citations omitted).[5] "Although the text of the statute expressly refers only to interests in the property itself, it is now generally agreed—including in this Circuit—that this provision may more broadly extinguish claims that "arise from the property being sold.'" *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 702 (S.D.N.Y. 2012) (*citing In re Chrysler LLC*, 576 F.3d at 126 (*quoting In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir.2003))). However, the ability to sell property free and clear of interests under section 363 is not without limits. *See, e.g.*, 11 U.S.C. § 363(f)(1)-(5) (imposing limitations on sales free and clear of interests); 11 U.S.C. § 363(k) (subjects sales to a secured creditor's right

---

[5] *You Can't Buy Me Love and You Can't Buy a 363(f) Order*, WEIL BANKRUPTCY BLOG (July 27, 2016), https://business-finance-restructuring.weil.com/363-sales/you-cant-buy-me-love-and-you-cant-buy-a-363f-order ("In many situations, section 363(f) allows the bankruptcy estate to unlock the value of certain assets that might be wholly unmarketable, or otherwise severely diminished in value on account of unknown or unasserted claims against such assets or due to uncertainty regarding the amounts of, or relative priority among, secured claims against such assets. In some cases, access to section 363(f) is the primary driving force behind a bankruptcy filing.")

to credit bid unless the court orders otherwise for cause). [6]

Section 363 is expressly limited by section 363(o), which prohibits the transfer of estate assets free and clear of certain consumer claims and defenses.  Section 363(o) was enacted in the wake of several subprime mortgage lender failures and it provides:

> (o) Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

11 U.S.C. § 363(o).

Section 363(o) was designed to prevent exactly what the Debtors propose to do in this case, which is to sell off mortgage company assets free and clear of consumer borrower claims. As explained by Senator Schumer in debating the legislation, section 363(o) was meant to prevent a "predatory lender from declaring bankruptcy, selling its loans into the secondary market, and then vamoosing, leaving the poor homeowner with nothing." 147 CONG. REC. 2184, S2192 (Mar. 13, 2001).

Recognizing the importance of section 363(o), courts that have approved sales of mortgage company assets since the provision's enactment have been careful to include explicit language in sale orders preserving the applicability of section 363(o).  *See, e.g.*, *In re Residential Capital, LLC*, *et al.*, Case No. 12-12020 (MG), ECF No. 2246 (Bankr. S.D.N.Y. Nov. 21, 2012), at ¶ 9 (sale order providing for the sale of assets free and clear of claims and interests except as

---

[6] *You Can't Buy Me Love and You Can't Buy a 363(f) Order*, ("The bankruptcy court was likely aware that by assiduously guarding access to section 363(f) and protecting the integrity of the statute, it was reducing potential recoveries to the very interest holders the statute was designed to protect.  Sometimes, however, principle wins over pragmatism.  Practitioners should take note and make absolutely certain that they can satisfy at least one of the conditions of 363(f)(1)-(5) because courts will likely not tolerate any 363(f) deficiencies, regardless of how good a deal it represents for the estate.")

provided by section 363(o)); *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG),

ECF No. 2247 (Bankr. S.D.N.Y. Nov. 21, 2012)*,* at ¶ 8 (sale order providing for the sale of

assets free and clear of claims and interests except as provided by section 363(o)). *In re*

*Accredited Home Lenders Holding Co.*, 2010 WL 2821965, *9 (Bankr. Del. 2010) (sale order

providing that "[n]othing contained in this Sale Order shall alter the provisions of section 363(o)

of the Bankruptcy Code."); *In re New Century TRS Holdings, Inc., et al.,* Case No. 07-10416

(KCC), ECF No. 844 (Bankr. D. Del. 2007), at ¶ 37 (sale order providing that purchasers shall

remain subject to claims and defenses provided for in section 363(o)); *In re Am. Home Mortg.*

*Holdings, Inc.*, Case No. 07-11047 (CSS), ECF No. 1711 (Bankr. D. Del. 2007), at ¶ 4 (sale

order providing that purchasers shall remain subject to claims and defenses provided for in

section 363(o)).

The Debtors contend that section 363(o) does not apply in the context of a plan sale.

However, the Debtors have run a section 363 sale process from the beginning of this case.  On

the Petition Date, the Debtors asked the Court to approve a milestone setting a section 363

process in motion.  The Court eventually approved such as a milestone in the DIP Order.  The

Debtors relied on section 363 in seeking approval of the Bid Procedures and setting a deadline to

object to a sale of the Debtors assets free and clear of liens, claims, and encumbrances under

section 363(f) of the Bankruptcy Code.  The Debtors cited section 363 as the sole statutory basis

for the approval of the Stalking Horse Bid Protections.  The Plan provides for credit bidding

rights under section 363(k).  Prior versions of the Plan referenced section 363 as a basis for a

finding that the provisions of the Plan shall constitute a good faith compromise of claims,

interests, and controversies, presumably because the Debtors believed that section 363 was a

necessary statutory predicate for the relief they are seeking in the Plan.

Now, after having taken advantage of the benefits of section 363 to run the sale process

17

and to lock in stalking horse bids, the Debtors have airbrushed their pleadings of references to section 363 in order to argue that section 363(o) does not apply to the proposed sale transactions. The Debtors want to have their cake and eat it too.  The reality is that the Debtors have utilized section 363 as a basis for the relief they are seeking (or have *already sought* and the Court has approved), but they now want to argue that an unfavorable subsection, such as section 363(o), does not apply.  This argument is inconsistent with the Debtors' conduct to date.  The Debtors cannot cherry-pick the subsections of section 363 that suit their purposes and argue that the rest does not apply because they are pursuing a plan sale.  The Court should not permit the Debtors to sidestep Congressional intent to protect consumers after having already conducted a section 363 marketing and bidding process.

Additionally, the Court should reject the Debtors' argument that section 363(o) does not apply in the context of a plan sale.  The Debtors have provided no authority for this assertion, and the United States Trustee is not aware of any court permitting such a result since the enactment of section 363(o).  This approach is inconsistent with section 1129, which requires a plan to comply with all applicable provisions of the Bankruptcy Code.  As parties have increasingly utilized section 363 as the vehicle for major transactions, courts in this circuit have recognized that "[g]iven the expanded role of [section] 363 in bankruptcy proceedings, it makes sense to harmonize the application of § 1141(c) and § 363(f) to the extent permitted by the statutory language."  *In re Grumman Olson Indus., Inc.*, 467 at 703 (*citing Chrysler*, 576 F.3d at 125).  The Debtors, however, advocate an asymmetric result where mortgage companies that are unequivocally prohibited from selling assets free and clear of consumer claims in a section 363 sale could do so in a chapter 11 plan sale.  The Debtors' attempted end-run around section 363(o) is directly contrary to Congressional intent and public policy in the context of the sale of mortgage company assets.  Congress enacted section 363(o) to prevent this exact scenario.  The

18

Court should reject the Debtors' argument and deny confirmation of the Plan.

### C.    The Plan Does Not Satisfy the Best Interests of Creditors Test

Even if the Court were to determine that section 363(o) does not apply to a chapter 11

plan sale, the Court cannot approve the Plan because it fails the best interests of creditors test.

Under section 1129(a)(7), in order to confirm the Plan, the Debtors must show that the Plan is in

the "best interests" of all holders of claims and interests that are impaired by the Plan and that

have not accepted the Plan.  Section 1129(a)(7) requires, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)  each holder of a claim or interest of such class—
>
>> (i)     has accepted the plan; or
>>
>> (ii)    will receive or retain under the plan on account of such
>>         claim or interest property of a value, as of the effective date
>>         of the plan, that is not less than the amount that such holder
>>         would so receive or retain if the debtor were liquidated
>>         under chapter 7 of this title on such date; [. . .]

11 U.S.C. § 1129(a)(7).  Section 1129(a)(7) imposes on the Debtors "an individual guaranty to

each creditor or interest holder that it will receive at least as much in reorganization as it would

in liquidation."  7 COLLIER on Bankruptcy ¶ 1129.02 (16th ed. 2019); *In re Leslie Fay*

*Companies, Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997).  Courts in this district have

explained as follows with respect to this confirmation requirement:

> The plan proponent has the burden of proof to establish by a preponderance of the
> evidence that its plan meets the Best Interests test. In determining whether the
> best interests standard is met, the court must measure what is to be received by
> rejecting creditors in the impaired classes under the plan against what would be
> received by them in the event of liquidation under chapter 7. In doing so, the court
> must take into consideration the applicable rules of distribution of the estate under
> chapter 7, as well as the probable costs incident to such liquidation.

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (citations omitted).

Courts in this district and others have also required disclosure statements to include an estimated

return to creditors under a chapter 7 liquidation. *See In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 6848113, at *8 (Bankr. S.D.N.Y. Nov. 6, 2015) (*citing In re MetroCraft Public Servs.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); 7 COLLIER ON BANKRUPTCY ¶ 1125.02 (16th ed. 2019).

Here, the Plan contains two classes of creditors that appear to include consumer creditors' claims: General Unsecured Creditors and Borrower Non-discharged Claims.  Both of these classes are impaired and deemed to reject the Plan.  Disclosure Statement at 13.  The Debtors' Liquidation Analysis provides that these classes are estimated to receive a *pro rata* recovery of approximately 12.4 percent to 21.5 percent under the Plan.  *See* Liquidation Analysis at 5.  The Debtors' estimate that these classes will receive no recovery in hypothetical chapter 7 liquidation.  *Id.*

However, the Debtors fail to account for the impact of the applicability of section 363(o) in a liquidation scenario.  In a hypothetical chapter 7 liquidation, sales under sections 1123 and 1141(c) are not available.  Accordingly, a chapter 7 trustee would sell the Debtors assets under section 363, and there would be no dispute that section 363(o) applies.  Any purchasers would take the Debtors' assets subject to 363(o) claims and defenses.  Consumer creditors would retain such claims and defenses, and they would be free to pursue them against the purchasers.  Under the Plan, holders of such claims retain no such interests and are instead limited to their *pro rata* distribution.  In other words, creditors with section 363(o) claims and defenses are being treated worse under the Plan then they would be in a chapter 7 context.  The Plan does not satisfy the best interests of creditors test and cannot be confirmed.

D.    **Release Issues**

i.    **Third Party Release – Impermissible "Deemed" Consent**

Releases in favor of nondebtors in Chapter 11 cases have been allowed if the affected

parties have individually consented to them, and case law addresses how valid consent can be

established.  *See, e.g., In re Oneida, Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) ("'[n]ondebtor

releases may also be tolerated if the affected creditors consent'") (*quoting In re Metromedia*

*Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("*Metromedia*")).  In *In re SunEdison*, 576

B.R. 453, 461 (Bankr. S.D.N.Y. 2017), the Court (J. Bernstein) recently held that creditor silence

did not signify consent.  The Court went on to state that the "meager recoveries (here, less than

3% for unsecured creditors) may explain their inaction without regard to the Release."  *Id.*  In

holding that the nonvoting creditors did not consent, the Court stated that "[c]harging all inactive

creditors with full knowledge of the scope and implications of the proposed third party releases,

and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not

realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id.*

(*quoting In re Chassix Holdings*, 533 B.R. 64, 80-81 (Bankr. S.D.N.Y. 2015) (finding that

creditors who "opted in" to a release clearly consented, while creditors who had taken no action

at all did not)); s*ee also In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011)

("Failing to return a ballot is not a sufficient manifestation of consent to a third party release").

Here, with respect to the Third Party Releases of claims against *non-debtor parties*, the

Plan impermissibly deems the consent of holders of Term Loan Claims who abstain from voting

on the Plan or vote to reject the Plan but do not opt of these release.  Plan, § 10.7(b)(iii).  This

treatment is impermissible under recent case law as detailed in *SunEdison* and *Chassix*.  In order

for parties to be bound by the Plan's Third Party Releases, they must demonstrate affirmative

consent.

To the extent the Debtors seek to impose releases on non-consenting third parties, they have not satisfied the standards set forth in the Second Circuit's decisions in *Metromedia* and *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ("*Manville II*"), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010) ("*Manville III*"). The Debtors have not established that the Court has subject matter jurisdiction to approve the third party releases as required by *Manville II*. Nor have the Debtors established that the Court has personal jurisdiction over non-debtor claims against other non-debtors. *See In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) ("We are very accustomed, in the bankruptcy court and during the bankruptcy process, to giving creditors notice of things we propose to do, and in the context of the exercise of our statutory '*in rem*' jurisdiction such notice is sufficient. But we are not talking here about a disposition of the Debtors' own assets, or of the resolution of claims over which we have *in rem* jurisdiction. Instead we are talking about issuing a ruling that extinguishes one non-debtor's claim against another non-debtor.") Finally, the Debtors have not established that this is a rare and extraordinary case where non-debtor, non-consensual releases are integral to the reorganization itself. *See id.* at 726 ("The issues I have described above ought to illustrate just how extraordinary a thing it is for us to impose involuntary releases and why, as commanded by the Second Circuit in *Metromedia*, we should do so only in those extraordinary cases where a particular release is essential and integral to the reorganization itself."). For these reasons, the Court should not approve the releases of claims against non-debtor parties by other non-debtor parties who have not affirmatively manifested their consent to such releases.

ii.    **The Definitions of Released Parties and Exculpated Parties are Overly Broad**

The Plan provides for a estate and third party releases of certain defined "Released

Parties."  Plan, § 10.6(b).  The Plan provides for exculpation of certain "Exculpated Parties."

*Id.*, § 10.7.  Both the definitions of Released Parties and Exculpated Parties include "Related

Parties for each of the foregoing."  *Id.*, §§ 1.130, 1.70.   Related Parties are broadly defined as

follows

> ***Related Parties*** means with respect to any Exculpated Party or any Released
> Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates,
> managed accounts or funds, and all of their respective current and former officers,
> directors, principals, stockholders (and any fund managers, fiduciaries or other
> agents of stockholders with any involvement related to the Debtors), members,
> partners, employees, agents, advisory board members, financial advisors,
> attorneys, accountants, investment bankers, consultants, representatives,
> management companies, fund advisors and other professionals, and such persons'
> respective heirs, executors, estates, servants and nominees.

*Id.*, § 1.129.

The definition of Related Parties continues to be overly broad and the Court

should not approve the Plan's release and exculpation provisions without as a minimum

narrowly tailoring the same to address specific individuals or entities described on the

record at the hearing.  The current vague and overly broad language may inadvertently

include individuals or entities not entitled to a release.  For example, certain homeowners

may have claims against the estate or its agents in connection with a scheme that resulted

ultimately in a superceding indictment against an individual who sold reverse mortgages

that may have included Ditech loans.  *See* The Diamond Victims' Joinder in the

Objection of the Consumer Committee, ECF No. 948, at 2.  The Debtors or their agents

should not receive a release in relation to this scheme or any similar conduct.  For this

reason, the releases are too broad as they may improperly protect the Debtors and their

agents against improper conduct.

23

### E.  **The Debtors Seek to Sell Personally Identifiable Information of Individuals**

Section 363(b)(1) of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless –
>
>> (A)    such sale or lease is consistent with such policy; or
>>
>> (B)    after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease –
>>
>>> (i)    giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>>>
>>> (ii)    finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

Section 332 of the Bankruptcy Code provides:

> (a) If a hearing is required under section 363(b)(1)(B), the court shall order the United States trustee to appoint, not later than 7 days before the commencement of the hearing, 1 disinterested person (other than the United States trustee) to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman.
>
> (b) The consumer privacy ombudsman may appear and be heard at such hearing and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of personally identifiable information under section 363(b)(1)(B).  Such information may include presentation of—
>
>> (1) the debtor's privacy policy;

(2) the potential losses or gains of privacy to consumers if
such sale or such lease is approved by the court;
(3) the potential costs or benefits to consumers if such sale or
such lease is approved by the court; and
(4) the potential alternatives that would mitigate potential
privacy losses or potential costs to consumers.

(c) The consumer privacy ombudsman shall not disclose any personally
identifiable information obtained by the ombudsman under this title.

The Debtors have not disclosed (i) whether they will be selling personally identifiable

information of their customer base, (ii) their privacy policies that apply to their customer base,

(iii) whether the sale will be conducted in accordance with the Debtors' privacy policies, and (iv)

whether a purchaser will be required to comply with the Debtors' privacy policies.  If the

Debtors seek to sell their customers' personally identifiable information, the Debtors must

demonstrate why the requirements of sections 332 and 363(b)(1) are not applicable or the Court

should require the appointment of a consumer privacy ombudsman pursuant to section 332(a).

## **CONCLUSION**

WHEREFORE, the United States Trustee respectfully requests that the Court deny

confirmation of the Plan in its current form and deny the Debtors' requested approval of the

proposed sale transactions.

Dated: New York, New York
      July 22, 2019

                                  Respectfully submitted,

                                  WILLIAM K. HARRINGTON
                                  UNITED STATES TRUSTEE, Region 2

                                  By: /s/ Greg M. Zipes
                                  Greg M. Zipes
                                  Benjamin J. Higgins
                                  Trial Attorneys
                                  Office of the United States Trustee
                                  201 Varick Street, Room 1006
                                  New York, New York 10014
                                  Tel. (212) 510-0500