WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------X
                                              :
In re                                         :    Chapter 11
                                              :
DITECH HOLDING CORPORATION, et al.,           :    Case No. 19-10412 (JLG)
                                              :
              Debtors.¹                       :    (Jointly Administered)
                                              :    Related Docket No. 422, 1071
----------------------------------------------------------------X
```

### NOTICE OF HEARING ON MOTION OF DEBTORS
### FOR (I) AUTHORIZATION TO ENTER INTO DIP AMENDMENT AND
### PAY RELATED FEES THEREUNDER AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**"),

of Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), for entry of an order authorizing the Debtors to enter into and

perform under the DIP Amendment, all as more fully set forth in the Motion, will be held before

the Honorable James L. Garrity, Jr., United States Bankruptcy Judge, at the United States

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

Bankruptcy Court for the Southern District of New York, Courtroom 601, One Bowling Green, New York, New York 10004 (the "**Bankruptcy Court**") on **August 7, 2019 at 11:00 a.m. (prevailing Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules, shall be filed with the Bankruptcy Court (i) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 211) (the "**Case Management Order**"), so as to be filed and received no later than **August 6, 2019 at 12:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: August 2, 2019
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\97142246\1\41703.0010

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                    :

In re                                :        **Chapter 11**
                                      :

**DITECH HOLDING CORPORATION**, *et al.*,  :        **Case No. 19-10412 (JLG)**
                                      :

                    Debtors.[1]      :        **(Jointly Administered)**
                                      :        **Related Docket No. 422, 1071**
----------------------------------------------------------------X

## MOTION OF DEBTORS FOR (I) AUTHORIZATION TO ENTER INTO DIP AMENDMENT AND PAY RELATED FEES THEREUNDER AND (II) GRANTING RELATED RELIEF

TO THE HONORABLE JAMES L. GARRITY, JR.,
UNITED STATES BANKRUPTCY JUDGE:

        Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

        1.    The Debtors seek authority to enter into and perform under the DIP Amendment (as defined herein) so that they can align the DIP Facilities (as defined in the Final DIP Order referred to below) with the Plan and Sale Transaction (as defined in the Plan). Specifically, the DIP Amendment will (i) provide a two-month extension to the scheduled DIP Maturity Date, which currently expires on August 10, 2019 pursuant to clause (3) of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

definition of "DIP Maturity Date" set forth in the Final DIP Order and (ii) allow the Debtors to close each of the Sale Transactions under the Plan on different dates on or prior to the Effective Date, if necessary.  As set forth in the *Declaration of Jeffrey Lewis in Support of Motion of Debtors for (I) Authorization to Enter into DIP Amendment and Pay Related Fees Thereunder and (II) Granting Related Relief* filed contemporaneously herewith (the "**Lewis Declaration**"), the DIP Amendment is necessary to ensure that the Debtors have sufficient financing and flexibility to consummate the Plan (as defined herein) and the sale transactions embodied therein. Without the DIP Amendment, the Debtors will lose critical access to their much-needed DIP Facilities, which could result in an immediate halt to the chapter 11 process and a failure of the Sale Transaction.  Accordingly, for the reasons set forth herein, the Debtors submit that the DIP Amendment is reasonable, appropriate and necessary and, should be approved by the Court.

### Background

2.      On February 11, 2019 (the "**Commencement Date**"), the Debtors filed the DIP Motion[2].  As set forth in the DIP Declaration[3], the DIP Facilities were obtained following a competitive prepetition marketing process that included proposals from and negotiations with various potential lenders.[4]  *See* DIP Decl. ¶ 13.  On February 13, 2019, the Court approved the

---

[2]     **DIP Motion** means the *Motion of Debtors for Interim and Final Orders (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* (ECF No. 26).

[3]     **DIP Declaration** means the *Declaration of Jeffrey Lewis in Support of Debtor's Motion For Interim and Final Orders (A) Authorizing* Debtors *to Enter into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief*    (ECF No. 27) (the "**DIP Declaration**").

[4]     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Gerald A. Lombardo Pursuant to*

DIP Motion on an interim basis pursuant to the Interim DIP Order.[5]  On April 17, 2019, the

Court approved the DIP Motion on a final basis pursuant to the Final DIP Order.[6]  Pursuant to

clause (3) of the definition of "DIP Maturity Date" set forth in the Final DIP Order, the

scheduled maturity date of the DIP Facilities is August 10, 2019 (the "**Stated DIP Maturity**

**Date**").

      3.     Since commencing these chapter 11 cases with the support of over 80% of

the Debtors' first lien term loan lenders, the Debtors have made substantial progress toward the

confirmation and consummation of a chapter 11 plan:

- Following extensive negotiations, the Debtors reached a global settlement (the "**Global Settlement**") with an ad hoc group of the Debtors' first lien term loan lenders and the official committee of unsecured creditors appointed in these chapter 11 cases (the "**Creditors' Committee**") after months of negotiations to resolve, among other things, the Creditors' Committee's objection to the DIP Financing.

- On May 10, 2019, the Debtors filed the *Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (ECF No. 542) (as amended, the "**Plan**"), which incorporated the terms of the Global Settlement and provided for a distribution to the Debtors' general unsecured creditors in accordance with the terms of the Global Settlement.

---

*Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* (the "**Lombardo Declaration**"), sworn to and filed on the Commencement Date (ECF No. 2).

[5]    "**Interim DIP Order**" means the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 363, 364, 503, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing Debtors to Enter into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief.* (ECF No. 53).

[6]    "**Final DIP Order**" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 363, 364, 503, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing Debtors to Enter into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; and (F) Granting Related Relief* (ECF No. 422).  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Final DIP Order.

- On June 18, 2019, the Debtors filed the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Forward Business)* (ECF No. 722) (the "**Notice of Forward Business Stalking Horse Bidder**") and *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Reverse Business)* (ECF No. 724) (the "**Notice of Reverse Business Stalking Horse Bidder**"), pursuant to which the Debtors announced that they had accepted stalking horse bids (the "**Stalking Horse Bids**") for the Debtors' origination and servicing platforms.

- On July 2, 2019, the Court entered an order approving the designation of the stalking horse bids and approving the stalking horse bid protections contained therein (ECF No. 808).

- On July 8, 2019, the deadline to submit qualified bids expired without the Debtors receiving any qualified bids other than the Stalking Horse Bids.  As such, on July 10, 2019, the Debtors filed the *Notice of (I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful Bidders* (ECF No. 830) providing notice that the auction was cancelled and that the Stalking Horse Bids were deemed successful bids.

- The Debtors' hearing to consider confirmation of the Plan and approval of the Stalking Horse Bids is scheduled for August 7, 2019.

## Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      Pursuant to sections 105(a), 363(b), and 364 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors seek authority to enter into the DIP Amendment, substantially in the form attached hereto as **Exhibit 1**, and to remit an amendment

7

and extension fee of up to $3,800,000 in connection therewith (the "**DIP Amendment Fee**"), to

be paid in two installments. *See infra*, ¶ 7.

6.      A proposed form of order granting the relief requested herein is annexed

hereto as **Exhibit 2** (the "**Proposed Order**").

**Summary of the DIP Amendment**

7.      The table below summarizes the substantive terms of the DIP

Amendment.  In addition to the terms set forth below, the parties are continuing to discuss a

further potential amendment that would provide the Debtors with additional flexibility on closing

each of the Sale Transactions to allow the Debtors to close one or both of the Sale Transactions

after the Effective Date, if necessary.[7]

| SUMMARY OF DIP AMENDMENT | | |
|---|---|---|
| | **Pre-DIP Amendment** | **Post-DIP Amendment** |
| **DIP Amendment Fee** Section 2 of DIP Amendment | Not applicable | Fee for Maturity Extension, Milestone Extension and Other Amendments: 0.20% of Maximum Available Funding (as defined in the DIP Amendment) payable in two installments:  (i) 12.5 basis points ($2,375,000) payable upon the effectiveness of the DIP Amendment in exchange for, among other things, an extension of the Confirmation Order Milestone and initial 30-day extension to the Stated DIP Maturity Date, and (ii) 7.5 basis points (up to $1,425,000) payable on September 9, 2019 in exchange for an additional 30-day extension to the Stated DIP Maturity Date, if necessary. |
| **Stated DIP Maturity Date** Section 1(d) of DIP Amendment Final DIP Order, ¶ 29(a)(A)(3) | August 10, 2019 | October 9, 2019 |

---

[7]  The DIP Lenders have indicated a willingness to work with the Debtors on such an amendment without a further fee on terms to be mutually agreed so long as appropriate protections are provided.

| | SUMMARY OF DIP AMENDMENT | |
|---|---|---|
| | **Pre-DIP Amendment** | **Post-DIP Amendment** |
| **Milestones**<br>Section 1(h) of DIP Amendment<br><br>Final DIP Order, ¶ 28(h)(1) | June 25, 2019: Original milestone for entry of an order confirming Debtors' chapter 11 plan (the "**Confirmation Order Milestone**")[8] | Extension of the Confirmation Order Milestone to August 15, 2019[9] |
| **Non-Contemporaneous Close Requirements**<br>*Inter alia*, Section 1(c) of DIP Amendment<br><br>Final DIP Order, *Inter alia*, ¶ 29(a)(W) | Requires contemporaneous sale and paydown of forward and reverse business units and related DIP Facility warehouse line(s) | Permits non-contemporaneous sale and paydown of forward and reverse of forward and reverse business units and related DIP Facility warehouse line(s) pre-Effective Date |

## Entry Into DIP Amendment and Payment of DIP Amendment Fee Should Be Approved

8.      The Court may authorize a debtor to use assets of the estate pursuant to section 363(b) of the Bankruptcy Code. 11 U.S.C. § 363(b)(1).  Section 363(b) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve the use, sale, or lease of property outside the ordinary course of business, courts require only that a debtor "show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *see, e.g.*, *Myers v. Martin (In re Martin)*, 91 F. 3d 389, 395 (3rd Cir. 1996); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *See, e.g., Official Comm.*

---

[8]   The DIP Lenders agreed to limited extensions of the Confirmation Order Milestone in order to allow the parties to finalize the terms of the DIP Amendment.

[9]   In the event that the Debtors resolicit acceptances of an acceptable chapter 11 plan with respect to any class of creditors in accordance with Section 1125 of the Bankruptcy Code on or prior to August 15, 2019, then such August 15, 2019 deadline shall be immediately and automatically extended to September 16, 2019 without any further action from any party.

WEIL:\97142246\1\41703.0010

of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650,

656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal

dismissed, 3 F.3d 49 (2d Cir. 1993). Moreover, if "the debtor articulates a reasonable basis for its

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants

v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)

(citation omitted).

9.      The DIP Amendment is authorized under the Final DIP Order, which

provides the following:

> The Debtors, the DIP Agent and the DIP Credit Parties, as applicable, are
> authorized, subject to the DIP Documents, to implement, in accordance
> with the terms of the respective DIP Documents, any amendments,
> waivers, consents or other modifications to or under the DIP Documents
> (including any change to the number or composition of DIP Repo Facility
> Purchasers, DIP Servicer Advance Facility VFN Noteholders, or DIP
> MSFTA Counterparties) without further order of this Court unless such
> amendment, waiver, consent or other modification (a) restricts, limits or
> prohibits any payments required pursuant to Paragraph 26 of this Final
> Order, or (b) shortens the maturity or the scheduled termination date
> thereunder.

See Final DIP Order ¶ 27.

10.     The terms of the DIP Amendment comply with the Final DIP Order and

do not (i) restrict, limit, or prohibit the payments required pursuant to paragraph 26 of the Final

DIP Order or (ii) shorten the DIP Maturity Date or the scheduled termination date thereunder.

Notwithstanding the explicit authority provided in the Final DIP Order to enter into amendments

relating to the DIP Facilities, the Debtors seek entry of the Proposed Order out of an abundance

of caution.  As consideration for extending the Stated DIP Maturity Date, the Debtors negotiated

WEIL:\97142246\1\41703.0010

a DIP Amendment Fee in the aggregate amount of up to $3,800,000, which the Debtors believe is reasonable and proportionate to those fees charged in similar circumstances.

11.     The Debtors' investment banker, Houlihan Lokey Capital Inc. ("**Houlihan Lokey**"), reviewed amendment fees paid in similar circumstances. Specifically, Houlihan Lokey analyzed amendments for other debtor-in-possession financings that extended the DIP maturity for debtors across a range of industries (ranging from a one-month to a twelve-month DIP maturity extension). Across these companies, the median fee as a percentage of the facility size was 50 basis points, with a low of 25 basis points and a high of 100 basis points. The proposed DIP Amendment Fee carries a highly competitive 20 basis points fee as a percentage of the DIP Facilities—lower than any of the companies Houlihan Lokey reviewed. Thus, the proposed DIP Amendment Fee is well within market, and it is highly unlikely the Debtors would find an extension of the DIP Facilities with more favorable terms. Lewis Decl. ¶ 13.

12.     Houlihan Lokey also compared the DIP Amendment Fee to the cost of paying either the Default Rate (as defined in the Master Refinancing Agreement) for the DIP Facilities or the pro rata portion of the Arranger Fee under and as defined in the Master DIP Fee Letter (as defined in the Master Refinancing Agreement) for the DIP Facilities through October 9, 2019. The DIP Amendment Fee is less than the cost of paying the Default Rate on the DIP Facilities (which would increase the interest rate by 2.00% per annum) and is also less than the pro rata portion of the Arranger Fee for the two-month period for which the Stated DIP Maturity Date is proposed to be extended. Lewis Decl. ¶ 14.

13.     The Debtors believe that entry into the DIP Amendment and payment of the DIP Amendment Fee is an exercise of their sound business judgment. As described in the Lewis Declaration, paying the DIP Amendment Fee is in the best interests of the Debtors' estates

WEIL:\97142246\1\41703.0010

and will allow the Debtors to avoid the substantial disruption that would result if any of the existing DIP Facilities were allowed to expire on August 10, 2019.  It is also highly unlikely the Debtors would be able to obtain alternative warehouse financing of $1.9 billion.  Lewis Decl. ¶ 15.  The lack of alternative financing would cause severe disruption to the Debtors' operations. Given the unique and extensive nature of the Debtors' capital requirements, in the absence of the availability of the DIP Facilities, the continued operation of the Company's business would not be possible, and serious and irreparable harm to the Debtors, their estates, and its creditors would occur, effectively precluding the Debtors' ability to consummate the Sale Transaction.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of capital from the DIP Facilities.

14.     As discussed in the Lewis Declaration, the DIP Amendment is fair and reasonable under these circumstances, was negotiated at arm's length, and was improved as a result of negotiations.  *Id.*  The Debtors also consulted with the Ad Hoc Term Lenders and Creditors' Committee regarding the DIP Amendment and DIP Amendment Fee.  Such parties are supportive of or do not oppose the DIP Amendment.

15.     Further, the DIP Amendment Fee is payable over time, with each payment calculated with reference to the maximum available funding under the DIP Facilities as of such payment date (or, in the case of the second installment, as of a date shortly prior to such payment date).  The first installment is payable upon the effectiveness of the DIP Amendment in the amount of $2,375,000 (representing approximately 62.5% of the DIP Amendment Fee). The second installment is equal to 0.075% of the maximum available funding under the DIP Facilities (or up to $1,425,000) is not payable unless and until the earlier of (i) September 9, 2019 (to the extent that the Sale Transaction has not been consummated and the DIP Facilities

12

paid in full in connection therewith on or prior to September 3, 2019) and (ii) the acceleration of any of the DIP Facilities following the occurrence of any of the events of default specified in paragraph 29 of the Final DIP Order. In the event that the Sale Transaction has been consummated as of September 3, 2019, then it is anticipated that the second installment of the DIP Amendment Fee will be significantly reduced because the maximum available funding under the DIP Facilities will have been reduced following the repayment of the DIP Facilities with proceeds of the Sale Transaction.

16.    Without the relief requested herein, the Debtors would be unable to effectuate the transactions (including the sale transactions) contemplated by the Plan, to the detriment of all parties in interest.  For the reasons set forth in the DIP Motion and the DIP Declaration, the Debtors have already demonstrated that the terms of the DIP Facilities were the only practical financing available under the circumstances, and the Debtors would be unable to obtain this level of credit at more attractive terms.  DIP Decl. ¶ 23.  Seeking financing from another source is not a viable alternative in view of the current posture of these chapter 11 cases. Even if the Debtors found such an alternative, the administrative burden of documenting the postpetition financing, implementing a new warehouse facility for just two months, and the fees associated therewith would be burdensome and cost-prohibitive.  Avoiding these costs is precisely why the Final DIP Order provides for consensual amendments to the Final DIP Order and DIP Documents.  Moreover, the DIP Amendment Fee has been fully negotiated and is reasonable under the circumstances. Accordingly, the Debtors maintain that the relief sought in this Motion and the Proposed Order is crucial to their estates and may be granted.

17.    The Unsecured Creditors' Committee and the advisors to the Term Loan Ad Hoc Group have been consulted on the DIP Amendment and support it.

WEIL:\97142246\1\41703.0010

## Bankruptcy Rules 6004(h)

18.     Ample cause exists to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply. Without the waiver of Rule 6004(h), the DIP Facilities would mature prior to the implementation of an order approving the DIP Amendment.  Thus, the Debtors request a waiver of the stay imposed by Bankruptcy Rule 6004(h) to avoid the disruption caused by an expiration of the DIP Facilities prior to the effectiveness of the DIP Amendment.

## Notice

19.     Notice of this Motion will be provided in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 211) (the "**Case Management Order**").  The Debtors respectfully submit that no further notice is required.

20.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WEIL:\97142246\1\41703.0010

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 2, 2019
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

15

**Exhibit 1**

**DIP Amendment**

## OMNIBUS AMENDMENT TO DIP DOCUMENTS

This OMNIBUS AMENDMENT TO DIP DOCUMENTS, dated as of August [__], 2019 (this "Amendment"), is entered into by and among BARCLAYS BANK PLC ("Barclays"), as Administrative Agent (as defined in the Master Refinancing Agreement (as defined below)), BARCLAYS, as a Buyer (as defined in the Master Refinancing Agreement), NOMURA CORPORATE FUNDING AMERICAS, LLC ("Nomura"), as a Buyer, BARCLAYS CAPITAL INC. ("Barclays Capital"), as an MSFTA Counterparty (as defined in the Master Refinancing Agreement), NOMURA SECURITIES INTERNATIONAL, INC. ("Nomura Securities"), as an MSFTA Counterparty, DITECH FINANCIAL LLC ("Ditech"), REVERSE MORTGAGE SOLUTIONS, INC. ("RMS" and, together with Ditech, the "Sellers"), RMS REO BRC II, LLC (the "REO Subsidiary" and together with the Sellers, the "DIP Sellers"), and DITECH HOLDING CORPORATION ("Guarantor").

### Recitals

WHEREAS, reference is made to the Master Refinancing Agreement, dated as of February 14, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Master Refinancing Agreement"; capitalized terms used and not otherwise defined herein having the meanings assigned to them in the Master Refinancing Agreement), by and among the Administrative Agent, the Buyers and MSFTA Counterparties party thereto from time to time, the DIP Sellers and the Guarantor;

WHEREAS, the requisite parties to the Master Refinancing Agreement agreed to certain extensions and other modifications to the Chapter 11 Milestones from time to time prior to the date hereof; and

WHEREAS, the DIP Sellers and certain of their Affiliates have requested that certain Chapter 11 Milestones be further extended and that certain other amendments and modifications be made to the Master Refinancing Agreement and certain other Program Agreements as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and other agreements contained herein and for other good and valuable consideration, the parties hereto, intending to be legally bound, hereby agree as follows:

1.  **Amendments**.  Effective as of the Amendment Effective Date (as defined below), the Master Refinancing Agreement and other Program Agreements, as applicable, are hereby amended and modified as follows:

    (a)    Sections 1 and 2 of the Master DIP Fee Letter are hereby amended by:

        (i)    deleting each reference to the phrase "(other than any credit or rebate arrangement set forth herein)" contained in Sections 1 and 2 of the Master DIP Fee Letter;

        (ii)    deleting in their entirety the following defined terms set forth in Section 1 of the Master DIP Fee Letter: "Specified Conditions", "Subsequent Transaction" and "Subsequent Transaction Fees";

        (iii)    replacing the paragraph set forth opposite the caption "Crediting" in Section 2 of the Master DIP Fee Letter with a reference to "None" (it being understood and agreed that, notwithstanding anything to the contrary in the Master DIP Fee

Letter or any other Program Agreement, none of the fees paid or payable to Administrative Agent, any Buyer or any of their respective affiliates in any capacity pursuant to the Master DIP Fee Letter, the Barclays Fee Letter (as defined in the Master DIP Fee Letter) or any other Program Agreement shall be refundable under any circumstances or subject to reduction by way of setoff, counterclaim or any fee credit or rebate arrangement); and

(iv)     amending and restating in its entirety the third sentence of the paragraph set forth opposite the caption "Arranger Fee" in Section 2 of the Master DIP Fee Letter as follows:

"The remaining 50% of each Committed Buyer's portion of the Arranger Fee shall be due and payable to such Committed Buyer upon the earliest to occur of the following (such earliest date, the "Subsequent Payment Date"): (i) any refinancing, replacement, restructuring, repayment, defeasance or redemption of any of the facilities under the DIP Warehouse Facility Agreements, (ii) the occurrence of the Termination Date, (iii) the acceleration or termination of any of the Secured Obligations and the termination of the commitments under the Governing Agreements, (iv) the occurrence of any Event of Default under any of the DIP Warehouse Facility Agreements, and (v) first day on which any Seller or any of its Affiliates receives any cash proceeds from any Prepayment Event."

(b)     Section C of Article 1 of the Master Refinancing Agreement is hereby amended by adding the following new defined terms in their correct alphabetical order:

"Amendment Effective Date" has the meaning assigned to such term in the Omnibus Amendment.

"Bidding Procedures Order" shall mean the *Order (I) Approving the Bidding Procedures, (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* (ECF No. 456), entered by the Bankruptcy Court on April 23, 2019, as may be amended or modified from time to time in accordance with the terms of this Master Refinancing Agreement.

"DIP Payoff Requirements" shall be satisfied at any time of determination, if (a) the Sale Agreement(s) then in effect in compliance with this Master Refinancing Agreement and, after the earlier to occur of entry of the order(s) referred to in Section E of the Chapter 11 Milestones and the Specified Milestone Date, that have been approved by the Sale Order, shall collectively provide (i) for the termination of all the commitments of the Secured Parties under the DIP Warehouse Facility Agreements and (ii) net cash proceeds in an aggregate amount sufficient for, and that such proceeds are to be used for, the payment in full in cash of all obligations of the Guarantor, each DIP Seller, each Depositor, each SAF SPV and their respective Affiliates under each of the DIP Warehouse Facility Agreements and other Program Agreements (including the Obligations), in each case of this clause (a), after giving effect to the closings contemplated by such Sale Agreements in accordance with the respective terms thereof, (b) the Sale Agreements referred to in clause (a) above collectively contemplate, and any order referred to in Section E of the Chapter 11 Milestones requires, that the termination of all such commitments and the payment in full in cash of all such obligations shall occur no later than the earlier of (i) the

2

effective date of an Acceptable Plan confirmed by the Bankruptcy Court and (ii) substantially concurrently with the latest closing date to occur under such Sale Agreements, and (c) each Sale Agreement referred to in clause (a) above contemplates, and any order referred to in Section E of the Chapter 11 Milestones related to such Sale Agreement requires, the satisfaction of the applicable requirements set forth in Article 3 of this Master Refinancing Agreement.

"Forward Sale Agreement" shall mean either the Forward Stalking Horse Sale Agreement or the Replacement Sale Agreement then in effect that replaced the Forward Stalking Horse Sale Agreement in accordance with this Master Refinancing Agreement.

"Forward Stalking Horse Bidder" has the meaning assigned to such term in the definition of "Forward Stalking Horse Sale Agreement".

"Forward Stalking Horse Sale Agreement" shall mean that certain Asset Purchase Agreement, dated as of June 17, 2019, by and between the Guarantor, as a seller, Ditech, as a seller, and New Residential Investment Corp., a Delaware corporation, as the buyer (the "Forward Stalking Horse Bidder"), collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Master Refinancing Agreement and the Omnibus Amendment.

"Omnibus Amendment" shall mean the Omnibus Amendment to DIP Documents, dated as of August [__], 2019, by and among the Administrative Agent, the Buyers and MSFTA Counterparties party thereto, the DIP Sellers and the Guarantor.

"Original Sale Agreements" shall mean, collectively, the Forward Stalking Horse Sale Agreement and the Reverse Stalking Horse Sale Agreement.

"Prepayment Event" shall mean any sale, transfer, assignment, conveyance or other disposition (including by way of merger, consolidation or any similar transaction) of any Collateral or any other assets shall be consummated by Guarantor, any DIP Seller, any Depositor, any SAF SPV or any of their respective Subsidiaries (i) pursuant to any Sale Agreement or (ii) that is prohibited by, or would result in a Default or Event of Default under, this Master Refinancing Agreement.

"Proposed Stalking Horse Bidders" shall mean (a) with respect to the Forward Stalking Horse Sale Agreement, the Forward Stalking Horse Bidder, and (b) with respect to the Reverse Stalking Horse Sale Agreement, the Reverse Stalking Horse Bidders.

"Replacement Sale Agreement" shall mean one or more sale agreements entered into within five (5) days following the termination, rescission or revocation of an Original Sale Agreement, collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, which Replacement Sale Agreement is an Acceptable Sale Agreement, as such Replacement Sale Agreement may be amended,

restated, supplemented or otherwise modified from time to time in accordance with the terms of this Master Refinancing Agreement and the Omnibus Amendment.

"Reverse Sale Agreement" shall mean either the Reverse Stalking Horse Sale Agreement or the Replacement Sale Agreement then in effect that replaced the Reverse Stalking Horse Sale Agreement in accordance with this Master Refinancing Agreement.

"Reverse Stalking Horse Bidders" has the meaning assigned to such term in the definition of "Reverse Stalking Horse Sale Agreement".

"Reverse Stalking Horse Sale Agreement" shall mean that certain Stock and Asset Purchase Agreement, dated as of June 17, 2019, by and between the Guarantor, as a seller, Walter Reverse Acquisition LLC, a Delaware limited liability company, as a seller, RMS, as a seller, Mortgage Assets Management, LLC, a Delaware limited liability company, as the platform buyer, and SHAP 2018-1, LLC, a Delaware limited liability company, as the loan buyer (and together with Mortgage Assets Management, LLC, the "Reverse Stalking Horse Bidders"), collectively with all schedules and exhibits thereto and all other agreements, documents and instruments related thereto and executed and/or delivered in connection therewith, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Master Refinancing Agreement and the Omnibus Amendment.

"Sale Agreement Deposit Proceeds" shall mean any cash deposits or proceeds from any escrow agreement or other security or credit enhancements provided by or on behalf of a purchaser or the purchasers under any Sale Agreement (including any terminated or replaced Sale Agreement) that the Guarantor, any DIP Seller, any other Debtor, any SAF SPV or any of their respective Subsidiaries have received (and have the right to retain pursuant to the terms of the relevant Sale Agreement).

(c)     Clause (b) of the definition of "Change in Control" set forth in Section C of Article 1 of the Master Refinancing Agreement is hereby amended and restated in its entirety as follows:

"(b)     the sale, transfer, or other disposition, directly or indirectly (including by way of merger, consolidation or any similar transaction), of all or substantially all the assets of either or both of the Sellers pursuant to one or more related or unrelated transactions (excluding (i) any such action taken in connection with any securitization transaction or routine sales of mortgage loans or routine sales of mortgage servicing rights and (ii) any such sale, transfer, or other disposition of all or substantially all the assets of either Ditech or RMS (but not both of the Sellers) that complies with the applicable requirements set forth in this Master Refinancing Agreement and the Omnibus Amendment and is not otherwise prohibited by this Master Refinancing Agreement); or"

(d)     The definitions of "Acceptable Plan", "Acceptable Sale Agreement", "Sale Agreement" and "Stated Termination Date" set forth in Section C of Article 1 of the Master Refinancing Agreement are hereby amended and restated in their entirety as follows:

2023342.06-NYCSR07A - MSW

"Acceptable Plan" shall mean a chapter 11 plan of reorganization in the Cases that (a) satisfies the DIP Payoff Requirements and is otherwise consistent with the applicable provisions of this Master Refinancing Agreement and the Omnibus Amendment, (b) contains release, indemnification and exculpatory provisions relating to the Secured Parties that are satisfactory to the Administrative Agent (with the consent of the Required Buyers in their sole discretion), (c) authorizes and implements the sale transactions contemplated under the Sale Agreements, (d) is otherwise in form and substance reasonably satisfactory to the Buyers, and (e) contemplates effectiveness of such plan no later than the Stated Termination Date.

"Acceptable Sale Agreement" shall mean any Sale Agreement that satisfies each of the requirements listed below and complies with any other applicable requirements set forth in this Master Refinancing Agreement and the Omnibus Amendment:

(a) The agreement shall be in form and substance reasonably satisfactory to Administrative Agent (at the direction of Required Buyers).

(b) Without limiting the generality of clause (a) above, the agreement shall not be subject to any diligence or financing conditions and the proposed purchaser(s) shall have obtained all requisite corporate/ organizational approvals, and has obtained, or is reasonably likely to obtain all necessary governmental and third-party consents, within a time frame such that the contemplated sale is capable of being consummated in accordance with the Chapter 11 Milestones prior to the Stated Termination Date.

(c) The proposed purchaser(s) is/are capable of consummating the sale in accordance with the Chapter 11 Milestones prior to the Stated Termination Date, after taking into account all relevant legal, regulatory, and business considerations.

(d) The proposed purchaser(s) shall have provided such financial and other information demonstrating the proposed purchaser's or purchasers' financial wherewithal and business capabilities to fulfill all obligations in connection with the transactions contemplated by the agreement, including, without limitation, any equity or debt financing commitment letters.

(e) Prepetition 1L Lenders holding, in the aggregate, at least sixty-six and two thirds percent (66 2/3%) of the outstanding First Lien Term Loan Obligations shall have irrevocably agreed in writing to support such agreement and the transactions contemplated thereby, which approval shall be subject only to terms and conditions that are reasonably satisfactory to the Administrative Agent and the Buyers.

(f) The agreement, collectively with the other Sale Agreements then in effect (excluding any Sale Agreement being replaced by such agreement), would satisfy the DIP Payoff Requirements.

"Sale Agreements" shall mean, collectively, the Forward Sale Agreement(s) then in effect and the Reverse Sale Agreement then in effect.

"Stated Termination Date" shall mean Wednesday, October 9, 2019.

2023342.06-NYCSR07A - MSW

(e)      Article 3 of the Master Refinancing Agreement is hereby amended and restated in its entirety as follows:

> "ARTICLE 3: PREPAYMENTS AND MANDATORY COMMITMENT REDUCTIONS.
>
> Substantially concurrently with any Prepayment Event pursuant to clause (i) of the definition thereof with respect to the sale, transfer, assignment, conveyance or other disposition pursuant to the Reverse Sale Agreement of all or any portion of the Purchased Assets or any related Collateral under the RMS Repurchase Agreement or DIP HMBS Repurchase Agreement (or any other material assets that are required to be first priority Collateral for any of the foregoing), (i) all of the commitments of the Administrative Agent and the Buyers under the RMS Repurchase Agreement and any DIP HMBS Repurchase Agreement shall be automatically and permanently terminated (and all related Unused Line Fees (as defined in the Master DIP Fee Letter) shall cease to accrue thereon) and (ii) the Guarantor and the Sellers shall pay or cause to be paid an amount equal to the Secured Obligations (including any accrued and unpaid interest and fees with respect thereto) under the RMS Repurchase Agreement, any DIP HMBS Repurchase Agreement and any related Program Agreements.
>
> Substantially concurrently with any Prepayment Event pursuant to clause (i) of the definition thereof with respect to the sale, transfer, assignment, conveyance or other disposition pursuant to any Forward Sale Agreement of all or any portion of the Purchased Assets or any related Collateral under the Ditech Repurchase Agreement or any Collateral under any Indenture (or any other material assets that are required to be first priority Collateral for or mortgage servicing rights that relate to any of the foregoing), (i) all of the commitments of the Administrative Agent and the Buyers under the Ditech Repurchase Agreement and the Indentures shall be automatically and permanently terminated (and all related Unused Line Fees (as defined in the Master DIP Fee Letter) shall cease to accrue thereon) and (ii) the Guarantor and the Sellers shall pay or cause to be paid an amount equal to the Secured Obligations (including any accrued and unpaid interest and fees with respect thereto) under the Ditech Repurchase Agreement, the Indentures and related Program Agreements.
>
> Substantially concurrently with the receipt of any Sale Agreement Deposit Proceeds, the Guarantor and the Sellers shall pay or cause to be paid an amount equal to the lesser of (i) such Sale Agreement Deposit Proceeds and (ii) the Secured Obligations, which amount shall be applied to the Secured Obligations as directed by the Required Buyers, with a corresponding permanent reduction to the commitments under the relevant Governing Agreement so repaid.
>
> The Sellers shall provide written notice of any Prepayment Event or other event that results in a prepayment being required to be made pursuant to this Article 3 as promptly as possible, but in any event no later than three (3) Business Days prior to the date on which any payment or termination of commitments is required to be made in connection therewith pursuant to this Article 3."

(f)      Article 4 of the Master Refinancing Agreement is hereby amended by adding the following language at the end of such Article as a new Section 9 thereto:

6

"9. <u>Obligations Regarding Sale Process</u>. The Guarantor and the DIP Sellers (a) shall, and shall cause their respective Subsidiaries to, (i) diligently prosecute the sale motion referred to in the Chapter 11 Milestones (and any other sale motion seeking approval of an Acceptable Sale Agreement), (ii) use their best efforts to provide written notice to the Buyers at least seven (7) days prior to the termination of any Sale Agreement, and (iii) take all commercially reasonable steps to obtain entry of the order(s) referred to in the applicable Chapter 11 Milestone and to consummate the transactions under the Sale Agreements and (b) shall not, and shall not permit their respective Subsidiaries to, without obtaining the prior written consent of the Required Buyers: (i) withdraw such sale motion (except in connection with the filing of a new sale motion under Section 363 of the Bankruptcy Code seeking approval of an Acceptable Sale Agreement, which motion shall be filed within one Business Day of entering into any such Acceptable Sale Agreement) or (ii) agree to, cause or permit any amendment, restatement, supplement or other modification to, or waiver of, any Sale Agreement, the Bidding Procedures Order, any Acceptable Plan filed with or confirmed by the Bankruptcy Court, or any order (after entry thereof) referred to in Section E of the Chapter 11 Milestones, in any such case, (x) in a manner that is inconsistent with any applicable requirements contained in this Master Refinancing Agreement or the Omnibus Amendment, (y) that could reasonably be expected to materially impair the rights and claims of any of the Secured Parties (as determined by Required Buyers in their sole discretion) in and to the Collateral or (z) that otherwise could reasonably be expected to be adverse in any material respect to the interests of any of the Secured Parties (as determined by Required Buyers in their sole discretion) (it being understood and agreed that any of the foregoing that would have the effect of, or otherwise result in, the DIP Payoff Requirements not being satisfied shall be considered materially adverse). The Guarantor shall also promptly deliver to the Administrative Agent and the Buyers true and correct copies of any amendment, waiver or other modification to the RSA."

(g)     Sections 19, 23 and 24 of Article 5 of the Master Refinancing Agreement are hereby amended and restated in their entirety as follows:

"19. <u>Chapter 11 Plan Filing and Certain Orders</u>. The filing of any chapter 11 plan of reorganization (or a disclosure statement describing a chapter 11 plan of reorganization) in any of the Cases or any motion to approve any Sale Agreement, any plan support agreement or any other asset purchase agreement or similar agreement or the entry of an order approving any of the foregoing, in any such case, that does not either (a) satisfy the requirements set forth in Section E of the Chapter 11 Milestones or (b) provide that, at the closing thereof, (i) all the commitments of the Secured Parties under the DIP Warehouse Facility Agreements shall be terminated and (ii) all obligations of the Guarantor, each DIP Seller, each Depositor, each SAF SPV and their respective Affiliates under each of the DIP Warehouse Facility Agreements and other Program Agreements (including the Obligations) shall be paid in full in cash (other than with respect to any other asset purchase agreement or similar agreement relating to a sale or disposition on terms and conditions consented to by the Buyers, subject to any applicable prepayment requirements set forth herein or in any other DIP Warehouse Facility Agreement);

23. <u>Sale Agreements</u>. Any event described in clause (a), (b) or (c) below shall occur, unless the relevant Sale Agreement subject to such event is replaced by a Replacement Sale Agreement entered into within five (5) days of such event (and

7

which replacement is an Acceptable Sale Agreement that is approved no later than the date specified in Section E of the Chapter 11 Milestones): (a) any Original Sale Agreement or any other Sale Agreement at any time after execution thereof shall be (i) amended in a manner that results in such Sale Agreement no longer complying with any applicable requirements set forth herein and in the other DIP Warehouse Facility Agreements or (ii) withdrawn, rescinded, revoked or terminated (in whole or in part) by any party thereto or otherwise by operation of the terms thereof or any order of the Bankruptcy Court; (b) the Guarantor, any DIP Seller, any Depositor, any SAF SPV, any of their respective Affiliates party to any Sale Agreement or, to the extent such event referred to in this clause (b) continues uncured or unremedied for a period of five (5) days, any other party to any Sale Agreement shall (i) admit in writing or state publicly its intent not to pursue all or a material portion of the transactions contemplated by such Sale Agreement, or (ii) act or fail to act in a manner that materially impairs such party's ability to perform its obligations under, or otherwise constitutes a breach or default under or an anticipatory repudiation of, such Sale Agreement (to the extent not cured within the applicable grace period); or (c) the Bankruptcy Court denies (in whole or in any material respect) any of the relief sought in any motion seeking approval of a Sale Agreement unless the initial relief requested shall be approved by the Bankruptcy Court pursuant to a Sale Order no later than the date specified in Section E of the Chapter 11 Milestones;

24. <u>Sale, Transfer or Disposition of Servicing Rights</u>. Any sale, transfer or other disposition of (i) any mortgage servicing rights with respect to any mortgage loans (including any manufactured housing loans) or rights to reimbursement for advances related thereto or (ii) any other assets of the Guarantor, any DIP Seller, any other Debtor, any Depositor or any SAF SPV and, in the case of this subclause (ii), the sale, transfer or other disposition of such other asset would materially impair the rights and claims of any of the Secured Parties (as determined by Required Buyers in their sole discretion) in and to the Collateral, in any such case of this Section 24, other than any sale, transfer or other disposition (x) of such servicing rights or assets occurring in the ordinary course; *provided* that the outstanding Repurchase Price or other Secured Obligations (including any accrued and unpaid interest and fees with respect thereto) owed to any of the Secured Parties with respect to such sold mortgage servicing rights or any rights to reimbursement for advances related thereto or, to the extent constituting Collateral, other sold assets shall be repaid no later than substantially concurrently with such sale, transfer or other disposition or (y) consummated pursuant to any Sale Agreement after the later of August 9, 2019 and the first date on which the requirements of Section E of the Chapter 11 Milestones have been fully satisfied, so long as both before and after giving effect thereto: (a) the DIP Payoff Requirements are satisfied (including any payments and commitment reductions required in connection therewith pursuant to Article 3), (b) no uncured Default or Event of Default exists or would result therefrom, and (c) the net cash proceeds received for such assets shall be sufficient to pay, and are applied to pay, the amounts required to be paid pursuant to Article 3;"

(h)     Section E of Article 8 of the Master Refinancing Agreement is hereby further amended by amending and restating such Section in its entirety as follows:

"E. On or before August 15, 2019, the Bankruptcy Court shall have entered an order (or two or more orders shall have been entered by the Bankruptcy Court substantially concurrently with each other): (1) confirming an Acceptable Plan, and (2) approving

the Sale Agreements (which Sale Agreements so approved comply with the applicable requirements set forth in this Master Refinancing Agreement and the Omnibus Amendment and satisfy the DIP Payoff Requirements), and authorizing the applicable Debtors to consummate the transactions contemplated thereby, which order(s) (i) shall be (x) in form and substance satisfactory to the Required Buyers, to the extent relating to the any DIP Warehouse Facility Agreement, the DIP Payoff Requirements, any other applicable requirements set forth in this Master Refinancing Agreement or the Omnibus Amendment with respect to the Acceptable Plan or any Sale Agreement approved by such order(s), and releases and other exculpatory provisions for the Secured Parties and (y) otherwise in form and substance reasonably satisfactory to the Required Buyers, and (ii) shall not have been (x) vacated, reversed, or stayed, or (y) amended or modified except as otherwise agreed to in writing by the Required Buyers; *provided*, *however*, that, in the event that the Debtors resolicit acceptances of an Acceptable Plan with respect to any class of creditors in accordance with Section 1125 of the Bankruptcy Code on or prior to August 15, 2019, then such August 15, 2019 deadline shall be immediately and automatically extended to September 16, 2019 without any further action from any party (such deadline, as may be extended pursuant to this proviso, the "<u>Specified Milestone Date</u>").  Any such order(s) approving the matters referred to in clause (2) above is referred to herein as the "<u>Sale Order</u>")."

(i)     Article 10 of the Master Refinancing Agreement is hereby amended and restated in its entirety as follows:

"ARTICLE 10: CONFLICTS.  Notwithstanding anything in the DIP Warehouse Facility Agreements to the contrary, in the event of any conflict between the terms of a DIP Warehouse Facility Agreement and the other related Program Agreements, the documents shall control in the following order of priority:  <u>first</u>, the terms of the Omnibus Amendment shall prevail, <u>second</u>, the other terms of this Master Refinancing Agreement shall prevail, <u>third</u>, the terms of the related Pricing Side Letter shall prevail, <u>fourth</u>, the terms of the Administration Agreement shall prevail, <u>fifth</u>, the terms of the relevant Governing Agreement shall prevail, and <u>sixth</u>, the terms of the other related Program Agreements shall prevail."

(j)     The definition of "Maximum Available Funding" set forth in Section 1.1(b) of the Administration Agreement is hereby amended and restated in its entirety as follows:

"Maximum Available Funding" shall mean, (a) with respect to the Ditech Repurchase Agreement, the "Maximum Committed Purchase Price" as defined therein, (b) with respect to the RMS Repurchase Agreement, the "Maximum Aggregate Purchase Price" as defined therein and (c) with respect to each Indenture, the "Maximum VFN Principal Balance" as defined in such Indenture.

(k)     Section 2 of the Barclays Fee Letter (as defined in the Master DIP Fee Letter) is hereby amended by replacing clauses (i) through (iv) in the paragraph set forth opposite the caption "Structuring Fee" in Section 2 of the Barclays Fee Letter with the following language:

"the Subsequent Payment Date (as defined in that certain Master DIP Fee Letter, dated February 14, 2019, among Barclays, as administrative agent, Barclays and the other entities party thereto as buyers, and the Sellers, and acknowledged by the

9

Guarantor, as in effect on the Amendment Effective Date)."

2.    **Amendment Fees**.  Subject to the entry of the Amendment Approval Order (as defined below) and the occurrence of the Amendment Effective Date (as defined below), each of the Sellers, on a joint and several basis, agrees to pay, or cause to be paid, to the Buyers amendment fees in an aggregate amount equal to 0.20% of the amount of the Maximum Available Funding (as of the Amendment Effective Date) for each of the Governing Agreements, all of which shall be fully earned and, except as otherwise expressly provided in this Section 2, non-refundable on the Amendment Effective Date (collectively, the "Amendment Fees"), and which shall be due and payable as follows:

(a)    Amendment Fees in an amount equal to 0.125% of the amount of the Maximum Available Funding (as of the Amendment Effective Date) for each of the Governing Agreements shall be due and payable on the Amendment Effective Date; and

(b)    Amendment Fees in an amount equal to 0.075% of the amount of the Maximum Available Funding (as of 5:00 p.m. (New York City time) on September 3, 2019) for each of the Governing Agreements shall be due and payable on September 9, 2019;

*provided* that, notwithstanding anything to the contrary herein, to the extent not paid prior to such time, all of the Amendment Fees shall be due and payable automatically (and without any further notice or other action required by Administrative Agent or any other Secured Party) upon the acceleration of any of the Secured Obligations or the termination of any commitments of the Buyers under any of the Governing Agreements to make Fundings thereunder, in any such case, as a result of an exercise of remedies pursuant to Article 6 of the Master Refinancing Agreement (any such acceleration or termination referred to in this proviso, an "Acceleration Event").  Any failure to pay any portion of the Amendment Fees at the time such portion is due and payable pursuant to this Section 2 shall constitute an Event of Default under the Master Refinancing Agreement.  The Amendment Fees (and any rebate thereof pursuant to this Section 2) shall be allocated as follows: (i) Barclays shall receive the Barclays Pro Rata Portion of the Amendment Fees for each of the Governing Agreements, and (ii) Nomura shall receive the Nomura Pro Rata Portion of the Amendment Fees for each of the Governing Agreements.  If the Specified Rebate Conditions (as defined below) have been satisfied prior to 5:00 p.m. (New York City time) on September 3, 2019 and the Amendment Fees set forth in clause (a) above have been paid in full in cash, then the Sellers shall be rebated Amendment Fees in an aggregate amount equal to (x) 0.20% of the amount of the Maximum Available Funding (as of the Amendment Effective Date) for each of the Governing Agreements minus (y) the aggregate amount of Amendment Fees required to be paid pursuant to clause (a) above.  If the Specified Rebate Conditions have been satisfied after the time referred to in the immediately preceding sentence but prior to 5:00 p.m. (New York City time) on October 9, 2019 and the Amendment Fees set forth in clauses (a) and (b) above have been paid in full in cash, then the Sellers shall be rebated Amendment Fees in an aggregate amount equal to (x) 0.20% of the amount of the Maximum Available Funding (as of the Amendment Effective Date) for each of the Governing Agreements minus (y) the aggregate amount of Amendment Fees required to be paid pursuant to clauses (a) and (b) above.  Any rebate of Amendment Fees pursuant to this Section 2 shall only apply to the portion of Amendment Fees earned as of the Amendment Effective Date but not yet required to be paid at the time of such rebate (and to the extent such portion of the Amendment Fees has not yet been paid in cash at such time, such portion of the Amendment Fees shall be discharged by such rebate on a cashless basis).  "Specified Rebate Conditions" shall mean, as of any time of determination, (a) an Acceleration Event has not occurred, (b) all the commitments of the Secured Parties under the DIP Warehouse Facility Agreements have been terminated prior to such time and (c) all

obligations (other than any obligation to pay any Amendment Fees that are not yet due and payable in accordance with this <u>Section 2</u>) of the Guarantor, each DIP Seller, each Depositor, each SAF SPV and their respective Affiliates under each of the DIP Warehouse Facility Agreements and other Program Agreements (including the Obligations) have been paid in full in cash prior to such time.

3.    **<u>Conditions Precedent to Effectiveness</u>**.

(a)    This Amendment shall become effective on the first day (the "<u>Amendment Effective Date</u>") on which each of the following conditions have been satisfied (or waived by the Administrative Agent at the direction of the Required Buyers) in accordance with the terms hereof (and capitalized terms used in this <u>Section 3(a)</u> shall be deemed to have the respective meanings that would be assigned to them after giving effect to the amendments and modifications set forth in <u>Section 1</u> hereof):

(i)    the Administrative Agent shall have received counterparts of this Amendment duly executed and delivered by each of the Administrative Agent, the Buyers, the MSFTA Counterparties, the DIP Sellers, and the Guarantor;

(ii)    the Sellers shall have paid to the Buyers the portion of Amendment Fees due and payable on or prior to the Amendment Effective Date pursuant to <u>Section 2</u>, it being understood that (x) once paid, any amounts payable hereunder or any part thereof payable hereunder shall not be refundable under any circumstances and (y) all amounts payable hereunder shall be paid in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim;

(iii)    the Administrative Agent, the Buyers and the MSFTA Counterparties shall have received payment for all fees, costs and expenses of the Administrative Agent, the Buyers and the MSFTA Counterparties incurred in connection with the negotiation, preparation and administration of this Amendment and the other Program Agreements or otherwise in connection with matters related to any of the Cases, including all reasonable legal fees and expenses, in each case, then due and payable by any Seller or any Affiliate thereof pursuant to Article 7 of the Master Refinancing Agreement or any other provision of any Program Agreement (in the case of costs and expenses, to the extent invoiced at least one (1) Business Day prior to the Amendment Effective Date (except as otherwise reasonably agreed by the Sellers));

(iv)    immediately after giving effect to this Amendment, no uncured Event of Default or uncured Default under any DIP Warehouse Facility Agreement shall exist or would result from the effectiveness of this Amendment;

(v)    the representations and warranties set forth in <u>Section 4</u> of this Amendment shall be true and correct in all material respects on and as of the Amendment Effective Date; *provided* that, to the extent that any such representation or warranty specifically refers to an earlier date, it shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that any representation or warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

11

(vi)    (A) Prepetition 1L Lenders holding, in the aggregate, at least sixty-six and two thirds percent (66 2/3%) of the outstanding First Lien Term Loan Obligations shall have irrevocably agreed in writing, on terms and conditions that are reasonably satisfactory to the Administrative Agent and the Buyers: (x) to support the Sale Agreements in effect on the Amendment Effective Date in satisfaction of the conditions set forth in Section 3(a)(vii) and the transactions contemplated thereby and (y) to elect to pursue a Sale Transaction (as defined in the RSA) in accordance with the RSA, and (B) each of the Sale Agreements in effect on the Amendment Effective Date in satisfaction of the conditions set forth in Section 3(a)(vii) below and the agreements of the Prepetition 1L Lenders referred to in subclause (A) above, in each case, shall be in full force and effect and shall not have been (x) revoked, terminated or withdrawn, or (y) amended or modified in a manner that is adverse to the interests of the Administrative Agent and the Buyers;

(vii)    the Bankruptcy Court shall have entered one or more orders (in form and substance reasonably acceptable to the Required Buyers (it being acknowledged that the relevant orders entered on July 2, 2019, as in effect on such date, are reasonably acceptable to the Required Buyers)) approving the following with respect to each Original Sale Agreement: (A) the designation of the Proposed Stalking Horse Bidder(s) for such Original Sale Agreement as Stalking Horse Bidder(s) (as defined in the Bidding Procedures Order), and (B) the relevant Debtors providing the Proposed Stalking Horse Bidder(s) for such Original Sale Agreement with the protections set forth in such Original Sale Agreement, and each such order shall be in full force and effect and shall not have been (x) vacated, reversed, or stayed, or (y) amended or modified except as otherwise agreed to in writing by the Required Buyers;

(viii)    the Bankruptcy Court shall have entered an order (in form and substance reasonably acceptable to the Required Buyers), approving (x) the amendments and modifications set forth in Section 1 hereof and (y) the Amendment Fees and related payment terms set forth in Section 2 hereof (such order, the "Amendment Approval Order"), which Amendment Approval Order (A) shall provide, among other things, that the Sellers' obligations in respect of the Amendment Fees shall constitute additional "DIP Obligations" (as defined in the Final DIP Order) and that the Administrative Agent and the Buyers shall be entitled to the same benefits, protections, rights and remedies in respect thereof as provided in the Final DIP Order with respect to the other DIP Obligations, whether or not the transactions contemplated by this Amendment are consummated, and (B) shall be in full force and effect and shall not have been (x) vacated, reversed, or stayed, or (y) amended or modified except as otherwise agreed to in writing by the Required Buyers;

(ix)    none of the Administrative Agent and Buyers shall have discovered or otherwise become aware of any information not previously disclosed to them that they believe to be inconsistent in a material and adverse manner with their understanding, based on the information provided to them prior to August 1, 2019, of the business, assets, liabilities, operations, financial conditions and operating results of the Guarantor and its subsidiaries or each DIP Seller and their respective subsidiaries, in each case, taken as a whole;

(x)     the Administrative Agent shall have received indenture supplements to the SAF Agency Indenture and the SAF PLS Indenture, each in form and substance reasonably satisfactory to the Administrative Agent and duly executed and delivered by the Depositors, SAF SPVs, SAF Agency Noteholders, SA FPLS Noteholders and the other Persons required to be party thereto;

(xi)    the Guarantor shall have delivered to the Buyers true and correct copies of the RSA and all amendments thereto entered into on or prior to the Amendment Effective Date; and

(xii)   the Administrative Agent on behalf of the Buyers shall have received such other documents as the Administrative Agent or counsel to the Administrative Agent may reasonably request, each of which shall be satisfactory to the Administrative Agent in form and substance.

(b)     **Third Party Beneficiary**.  The parties hereto acknowledge and agree that Wells Fargo, as SAF Agency Indenture Trustee and SAF PLS Indenture Trustee under Indentures, shall each be a third party beneficiary of this Section 3.

4.      **Representations and Warranties**.  Each of Guarantor, DIP Sellers, Depositors and SAF SPVs (collectively, the "Ditech Parties") hereby represents and warrants that:

(a)     such party has all necessary corporate or other power, authority and legal right to execute, deliver and perform its obligations under this Amendment;

(b)     the execution, delivery and performance by such party of this Amendment have been duly authorized by all necessary corporate or other organizational action;

(c)     the execution, delivery and performance by such party of this Amendment do not and will not (i) conflict with any term or provision of the formation documents, by-laws or other organizational documents of such party or any law, rule, regulation, order, judgment, writ, injunction or decree applicable to such party of any court, regulatory body, administrative agency or governmental body having jurisdiction over such party, (ii) result in any violation of any such mortgage, instrument, agreement or obligation to which such party is a party, or (iii) require any consent, approval, authorization or order of, registration or filing with, or notice to any Governmental Authority or court under applicable law;

(d)     this Amendment (i) has been duly executed and delivered by such party and (ii) is valid, binding and enforceable against such party in accordance with its terms except as such enforcement may be affected by bankruptcy, by other insolvency laws, or by general principles of equity; and

(e)     immediately after giving effect to this Amendment, (i) no uncured Event of Default or uncured Default under any DIP Warehouse Facility Agreement shall exist or would result from the effectiveness of this Amendment, and (ii) the representations and warranties of each Ditech Party set forth in the DIP Warehouse Facility Agreements are true and correct in all material respects; *provided* that, to the extent that any such representation or warranty specifically refers to an earlier date, it shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that any representation or warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be

true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

5. **Reaffirmation; Reference to and Effect on the Master Refinancing Agreement and the other Program Agreements**.

(a)     Each Ditech Party hereby consents to the amendment of the Master Refinancing Agreement and other Program Agreements, as applicable, effected hereby and confirms and agrees that, notwithstanding the effectiveness of all or this Amendment, each Program Agreement to which such Ditech Party is a party is, and the obligations of such Ditech Party contained therein are, and shall continue to be, in full force and effect and are hereby ratified and confirmed in all respects, in each case as amended by this Amendment.  For greater certainty and without limiting the foregoing, each Ditech Party hereby confirms that the existing security interests and/or guarantees granted by such Ditech Party in favor of the Secured Parties, as applicable, pursuant to the Program Agreements in the Collateral described therein shall continue to secure the DIP Obligations (as defined in the Final DIP Order) or relevant portion thereof.

(b)     Except to the extent expressly set forth in this Amendment, the execution, delivery and performance of this Amendment shall not constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of the Administrative Agent, any Buyer, any MSFTA Counterparty or any other Secured Party under, the Master Refinancing Agreement or any of the other Program Agreements.  The Secured Parties expressly reserve all of their rights, powers and remedies under the Program Agreements, under applicable law or otherwise.

(c)     On and after the Amendment Effective Date, (i) each reference in the Master Refinancing Agreement, the Master DIP Fee Letter or any other applicable Program Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Master Refinancing Agreement, the Master DIP Fee Letter or such other applicable Program Agreement, as the case may be, shall mean and be a reference to the Master Refinancing Agreement, the Master DIP Fee Letter or such other applicable Program Agreement, as the case may be, as amended by this Amendment; (ii) each reference in the other Program Agreements to the "Master Refinancing Agreement", "thereunder", "thereof" or words of like import referring to the Master Refinancing Agreement shall mean and be a reference to the Master Refinancing Agreement as amended by this Amendment; and (iii) each reference in the other Program Agreements to any specific Program Agreement amended or modified hereby shall mean and be a reference to that specific Program Agreement as amended by this Amendment.

6. **Amendment, Modification and Waiver**.  Neither this Amendment nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the Sellers, the Administrative Agent and Required Buyers.

7. **Buyers and MSFTA Counterparties May Act Through Administrative Agent**.  Each Buyer and MSFTA Counterparty has designated the Administrative Agent for the purpose of performing any action hereunder.  The exculpatory and liability-limiting provisions contained in the Administration Agreement with respect to the Administrative Agent shall also apply in all respects to the Administrative Agent hereunder and under the other DIP Warehouse Facility Agreements as amended and modified hereby.

8.    **Binding Effect; Entire Agreement**.  This Amendment and the other DIP Warehouse Facility Agreements (as amended and modified hereby) represent the entire agreement between the parties hereto with respect to the subject matter contained herein and therein. This Amendment supersedes all prior agreements and understandings, oral or written, with respect to the subject matter hereof.  This Amendment shall be binding and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Amendment shall not constitute a novation of any amount owing under any of the Program Agreement, and all amounts owing in respect of principal, interest, fees and other amounts pursuant to any Program Agreement shall, to the extent not paid on or prior to the Amendment Effective Date, continue to be owing under such Program Agreement until paid in accordance therewith.

9.    **Severability**.  Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein.  If any provision of this Amendment is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.    **Counterparts**.  This Amendment may be executed by each of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Amendment in Portable Document Format (PDF) or by facsimile shall be effective as delivery of a manually executed original counterpart of this Amendment.

11.    **General Interpretive Principles**.  Section O of Article 11 of the Master Refinancing Agreement is hereby incorporated by reference in, and shall apply to, this Amendment, *mutatis mutandis*.

12.    **GOVERNING LAW; WAIVER OF JURY TRIAL; JURISDICTION.  SECTIONS K, L AND M OF ARTICLE 11 OF THE MASTER REFINANCING AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE IN, AND SHALL APPLY TO, THIS AMENDMENT, *MUTATIS MUTANDIS*.**

13.    **Program Agreement**.  On and after the Amendment Effective Date, (a) this Amendment shall constitute a "DIP Warehouse Facility Agreement" for all purposes of the Master Refinancing Agreement and the other Program Agreements, and (b) all references to "Program Agreements" and "Program Documents" herein and in each Repurchase Agreement shall be deemed to include this Amendment (in addition to the other DIP Warehouse Facility Agreements (as amended or otherwise modified hereby) referred to in Section B of Article 1 of the Master Refinancing Agreement).

[Signature Pages Follow]

2023342.06-NYCSR07A - MSW

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be duly executed as of the date first above written.

BARCLAYS BANK PLC,
as Administrative Agent


By_____
    Name:
    Title:




BARCLAYS BANK PLC,
as a Buyer and a Committed Buyer


By_____
    Name:
    Title:




BARCLAYS CAPITAL INC.,
as an MSFTA Counterparty


By_____
    Name:
    Title:

NOMURA CORPORATE FUNDING AMERICAS,
LLC, as a Buyer and a Committed Buyer


By_____
   Name:
   Title:


NOMURA SECURITIES INTERNATIONAL, INC., as
an MSFTA Counterparty


By_____
   Name:
   Title:

DITECH FINANCIAL LLC,
as a DIP Seller


By_____
    Name:
    Title:


REVERSE MORTGAGE SOLUTIONS, INC.,
as a DIP Seller


By_____
    Name:
    Title:


RMS REO BRC II, LLC, as a DIP Seller


By_____
    Name:
    Title:


DITECH HOLDING CORPORATION,
as Guarantor


By_____
    Name:
    Title:

**<u>Exhibit 2</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                  :

In re                              :       **Chapter 11**
                                  :

**DITECH HOLDING CORPORATION**, *et al.*,   :       **Case No. 19-10412 (JLG)**
                                  :

            Debtors.[1]          :       **(Jointly Administered)**
                                  :       **Related Docket No. [_]**
-------------------------------------------------------------X

### ORDER (I) AUTHORIZING DEBTORS TO ENTER INTO
### AN AMENDMENT TO POSTPETITION FINANCING ARRANGEMENT
### AND PAYMENT OF FEES THEREUNDER AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Ditech Holding Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (a) authorizing the Debtors' entry into the DIP Amendment to the DIP Facilities and payment of the DIP Amendment Fee thereunder and (b) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

Parties in accordance with the Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing on the Motion to consider the relief requested in the Motion on August 7, 2019 (the "**Hearing**"); and upon the Lewis Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors are authorized to enter into and perform their obligations under the DIP Amendment.

3.      The Debtors are authorized to pay the DIP Amendment Fee in accordance with the DIP Amendment.

4.      The requirements of Bankruptcy Rule 6004(h) are waived, and this Order shall be immediately effective and enforceable upon its entry.

5.      The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

WEIL:\97142246\1\41703.0010

6.      The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Order.


Dated: _____, 2019
            New York, New York

_____
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

3