UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                              :
In re                                         :          Chapter 11
                                              :
DITECH HOLDING CORPORATION, *et al.*,         :          Case No. 19-10412 (JLG)
                                              :
Debtors.[1]                                   :          (Jointly Administered)
                                              :
----------------------------------------------------------------x

### MEMORANDUM DECISION ON CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**APPEARANCES**:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
By:    Ray C. Schrock, P.C.
       Sunny Singh

*Attorneys for the Debtors*

QUINN EMANUEL URQUHART &
  SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Susheel Kirpalani
       Benjamin I. Finestone
       Deborah J. Newman
       Victor Noskov

*Counsel to the Official Committee of Consumer Creditors*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
By:     Greg M. Zipes
        Benjamin J. Higgins
        Trial Attorneys

*Office of the United States Trustee*


PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
By:     Robert J. Feinstein
        Bradford J. Sandler
        Robert B. Orgel

*Counsel to the Official Committee of Unsecured Creditors*

**HONORABLE JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

## INTRODUCTION

In 2005, Congress amended section 363 of the Bankruptcy Code to add what is now

section 363(o).  Under that section, (a) if a person purchases (i) any interest in a consumer credit

transaction that is subject to the Truth in Lending Act or (ii) any interest in a consumer credit

contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1,

2004), as amended from time to time), and (b) if that interest is purchased through a sale under

section 363 of the Bankruptcy Code, then, notwithstanding the "free and clear" language in

section 363(f), such person remains subject to all claims and defenses assertible by the consumer

that are related to such consumer credit contracts and transactions to the same extent as such

person would be subject to such claims and defenses had the person acquired the interest

pursuant to a sale not under section 363.  In other words, in such a sale transaction, the purchaser

does not take the agreements "free and clear" of claims and defenses assertible by the consumer

creditors that are parties to those agreements.  Instead, the purchaser will be accountable for

those claims and defenses to the same extent it would be accountable under applicable non-

bankruptcy law.  The sale will not "cleanse" the assets of successor liability claims.

Ditech Holding Corporation (f/k/a Walter Investment Management Corp., "Ditech

Holding") is the ultimate parent of twenty-six direct and indirect subsidiaries and trust

companies, thirteen of which, with Ditech Holding, are chapter 11 debtors herein (collectively,

the "Debtors").  The Debtors, together with their non-Debtor subsidiaries (collectively, the

"Company"), operate as an independent servicer and originator of mortgage loans and servicer of

reverse mortgage loans.  The Debtors are party to approximately one million agreements with

individual consumer creditors (the "Consumer Creditors") that fall within the scope of section

1

363(o) (hereinafter, the Court will refer to those agreements as the "Consumer Creditor Agreements").  As of the February 27, 2019 (the "Petition Date"), the Debtors were subject to thousands of formal and informal proceedings pending in and out of court in which Consumer Creditors are asserting claims and defenses of types described in section 363(o) (hereinafter, the "Consumer Claims" and "Consumer Defenses," respectfully) in connection with their respective Consumer Creditor Agreements.

The matter before the Court is the Debtors' request for confirmation of the *Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (as the same has been or may be amended, modified, supplemented, or restated, the "Second Amended Plan").[2]  The plan is premised upon two going-concern sale transactions (collectively, the "Plan Sale Transactions" and each a "Plan Sale Transaction") of the Debtors' operations: a sale of the forward origination and servicing business (the "Forward Sale") to New Residential Investment Corp. ("NRZ" or the "Forward Buyer") and a sale of the reorganized reverse servicing business (the "Reverse Sale") to Mortgage Assets Management, LLC ("MAM") and SHAP 2018-1, LLC ("SHAP," and together with MAM, the "Reverse Buyer," and, together with the Forward Buyer, the "Buyers").  The plan also incorporates the Global Settlement (as defined below) agreed to by the Debtors, the Official Committee of Unsecured Creditors (the "Unsecured Creditors Committee") and the Consenting Term Lenders.[3]  The terms of that agreement are reflected in

---

[2]    *See Notice of Extended Voting Deadline and Filing of Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1032].

  Citations to "ECF No. ____" refer to entries on the electronic docket in this case, No. 19-10412.  References to entries on the electronic docket in other cases will be to "ECF No.__ (Case No. ____)."

[3]    The "Consenting Term Lenders" are defined in the Second Amended Plan as the Term Lenders that are party to that certain Restructuring Support Agreement with the Company, dated on or about February 8, 2019, together with their respective successors and permitted assigns and any subsequent Term Lenders that become party to that agreement in accordance with the terms of the agreement.  The "Term Lenders" are defined below.

2

the Second Amended Plan and the Debtors seek approval of the settlement pursuant to Rule 9019

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  One aspect of the

settlement is that if approved, the Debtors will establish a "Creditor Recovery Trust" for the

benefit of unsecured creditors, including Consumer Creditors.  Under the settlement, the trust

assets available for the sole benefit of the Consumer Creditors consist of cash totaling

$5,000,000, less certain fees and expenses (the "$5,000,000 Fund").  The trust will be funded

from a carve-out from the Term Lenders' collateral.

The bulk of the assets to be transferred to the Buyers under the Plan Sale Transactions are

Consumer Creditor Agreements.  The plan calls for the Debtors to sell the assets to the Buyers

pursuant to section 1123 of the Bankruptcy Code.  The Debtors assert that because they are

selling their Consumer Creditor Agreements through the plan, and not pursuant to section 363 of

the Bankruptcy Code, and because section 363(o) applies only to "free and clear" sales under

section 363(f), they can transfer the agreements to the Buyers "free and clear" of the Consumer

Claims and Consumer Defenses.  The Office of the United States Trustee (the "U.S. Trustee")

appointed an Official Committee of Consumer Creditors (the "Consumer Creditors Committee")

to represent the interests of Consumer Creditors herein.  The Consumer Creditors Committee, the

U.S. Trustee, and numerous other parties in interest filed objections to the Second Amended Plan

(collectively, the "Confirmation Objections").[4]  The objecting parties uniformly argue that the

---

[4]    *See Objection of the Official Committee of Consumer Creditors to the Debtors' Amended Joint Chapter 11 Plan and Sale of the Debtors' Forward and Reverse Businesses* [ECF No. 943] (the "Consumer Creditors Committee Objection"); *Sur-Reply of the Official Committee of Consumer Creditors in Connection with the Debtors' Second Amended Joint Chapter 11 Plan and sale of the Debtors' Forward and Reverse Businesses* [ECF No. 1077] (the "Sur-Reply"); *Objection and Reservation of Rights of the United States Trustee in Connection with the Confirmation of the Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 987] (the "U.S. Trustee Objection").  Additional objections and joinders include the following: [ECF No. 998] (Objection of the United States of America) (the "U.S. Government Objection"); [ECF No. 986] (Objection of the New York Attorney General) (the "NY AG Objection"); [ECF No. 946] (Objection of International Fidelity Insurance Company and Allegheny Casualty Company); [ECF No. 899] (Objection of the Geary Class Action Plaintiffs); [ECF No. 892] (Objection of Teresa Garcia-Kuhn); [ECF No. 628] (Objection of Marsha Chambers); [ECF No. 948] (Diamond

Debtors cannot transfer their Consumer Creditor Agreements "free and clear" of the Consumer

Claims and Consumer Defenses under the plan, without complying with section 363(f) of the

Bankruptcy Code and subject to the limitations on "free and clear" transfers in section 363(o).

They assert that because the Second Amended Plan does not provide for the sale of those assets

pursuant to section 363, the plan violates sections 1129(a)(1)-(3) of the Bankruptcy Code and, as

such, cannot be confirmed.  Along the same lines, some of the objecting parties contend that the

Second Amended Plan does not meet the "best interests" test under section 1129(a)(7), because

the Debtors' liquidation analysis (the "Liquidation Analysis") fails to account for the fact that in

a chapter 7 liquidation, the Debtors' Consumer Creditor Agreements can only be transferred

pursuant to sale under section 363 and, as such, Consumer Creditors will be able to assert

Consumer Claims and Consumer Defenses (which they say have significant value) against the

purchasers of the assets.  Those are not the only objections to confirmation, but they are the

principal objections.  Moreover, the Consumer Creditors Committee objects to the Global

Settlement, on the grounds that the $5,000,000 Fund does not adequately account for the claims

of the Consumer Creditors.  Thus, they contend that the proposed settlement is not "fair and

equitable," and should be rejected by the Court.

---

Victims' Joinder to Consumer Creditors Committee Objection); [ECF No. 949] (Attorney General of the State of
Colorado's Joinder to Consumer Creditors Committee Objection); [ECF No. 1024] (Second Amended Joinder of
Attorney General of State of Colorado to Consumer Creditors Committee Objection, attaching statements of
Attorney Generals from the States of Connecticut, Florida, Illinois, Iowa, Nevada, North Carolina, Ohio, Oregon,
Texas, and Washington, in support of joinder); [ECF No. 969] (Approximately 800 Consumer Creditors' Joinder to
Consumer Creditors Committee Objection); [ECF No. 976] (Certain Consumer Creditors' Joinder to Consumer
Creditors Committee Objection).

The Plan Sale Transactions contemplate that the Debtors will assume and assign certain executory contracts and
unexpired leases to the Buyers.  The Debtors received forty-four objections to the assumption, rejection, and/or
assumption and rejection of those executory contracts and unexpired leases.  Without limitation, those objections
raise issues relating to consent rights, cure amounts, and adequate assurances of future performance under the
agreements.  By agreement among the Debtors and those objecting parties, the Court will defer consideration of
those objections while the parties continue account reconciliations and settlement discussions.

In support of their request for confirmation of the Second Amended Plan, and in response and opposition to the Confirmation Objections, the Debtors filed the *Debtors' (I) Memorandum of Law In Support of Confirmation of Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* [ECF No. 1029] (the "Debtors Memorandum"). The Unsecured Creditors Committee, Forward Buyer, Reverse Buyer, and Term Loan Ad Hoc Group (defined below) filed pleadings in support of the Debtors' request that the Court confirm the Second Amended Plan.[5]

The Court conducted an evidentiary hearing on confirmation of the Second Amended Plan (the "Hearing"). At the Hearing, the Debtors offered the testimony of Gerald Lombardo, their Chief Financial Officer, Reid Snellenbarger of Houlihan Lokey Capital, Inc. ("Houlihan"), and James Nelson of Alix Partners LLP ("AlixPartners") in support of confirmation.[6] In support of its confirmation objection, the Consumer Creditors Committee called Varun Wadhawan, Managing Director at Fortress Investment Group (as investment manager of NRZ), as a hostile witness. No other parties offered evidence in support of, or in opposition to, plan confirmation.

---

[5]    *See Official Committee of Unsecured Creditors' Omnibus Reply in Support of Confirmation of the Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 1026] (the "Unsecured Creditors Committee Response"); *Joinder of Forward Buyer New Residential Investment Corp. in Further Support of Debtors' Reply to 363(o) Objections* [ECF No. 1027] (the "Forward Buyer Response"); *Statement of the Reverse Buyer in Support of Confirmation and Joinder to Debtors' (I) Memorandum of Law in Support of Confirmation of Second Joint Amended Plan of Ditech Holding Corporation and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* [ECF No. 1031]; The Term Loan Ad Hoc Group's *Statement in Support of the Debtors' (I) Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* [ECF No. 1047].

[6]    In support of their request for confirmation, and prior to the Hearing, the Debtors submitted declarations from each of the witnesses. *See Declaration of Gerald A. Lombardo, Debtors' Chief Financial Officer, in Support of the Sale Transactions and Confirmation of the Amended Plan* [ECF No. 1033] (the "Lombardo Decl."); *Declaration of Reid Snellenbarger of Houlihan Lokey Capital, Inc., Debtors' Investment Banker, in Support of the Sale Transactions and Confirmation of the Amended Plan* [ECF No. 1034] (the "Snellenbarger Decl."); and *Declaration of James Nelson of AlixPartners LLP, Debtors' Financial Advisor, in Support of Global Settlement and Confirmation of the Amended Plan* [ECF No. 1035] (the "Nelson Decl."). At the Hearing, by agreement among the parties, the Debtors presented the direct testimony of each witness through his declaration, subject to the right of interested parties to cross-examine the witness. Each witness was cross-examined by one or more objecting parties.

The Debtors bear the burden of establishing by a preponderance of the evidence that the Second Amended Plan satisfies the confirmation standards in section 1129(a) of the Bankruptcy Code. As set forth below, the Court holds that the Debtors have failed to satisfy sections 1129(a)(1)-(3) to the extent that the Second Amended Plan purports to limit the Consumer Creditors' ability to assert rights of recoupment against the Buyers. The Court also holds that the Debtors have not demonstrated that the Second Amended Plan satisfies the best interests of the holders of allowed Class 6 claims and as such, they have failed to satisfy section 1129(a)(7) of the Bankruptcy Code. Finally, the Court holds that the Debtors have failed to demonstrate that the Global Settlement is fair and equitable to the holders of allowed Class 6 claims and as such, the Debtors' request to enter into the agreement is denied. For those reasons, the Debtors' request to confirm the Second Amended Plan is denied.

## JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L).

## BACKGROUND[7]

### *The Debtors' Operations*

The Company operates as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans. For more than 50 years, it has offered a wide array of loans across the credit spectrum for its own portfolio and for government-sponsored enterprises (each a "GSE"), government agencies, third-party securitization trusts, and other credit owners. The Company originates and purchases residential loans through consumer, correspondent and

---

[7]    Unless stated otherwise, the facts set forth herein are not in dispute.

wholesale lending channels that are predominantly sold to GSEs and government entities.  *See Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of Local Bankruptcy Rules for the Southern District of New York* [ECF No. 2] (the "Rule 1007 Decl.") ¶ 6.  The Company's businesses are comprised of three primary segments: (i) forward mortgage origination; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing.  *Id.* ¶ 24.  Ditech Financial LLC ("Ditech Financial") primarily carries out the Company's forward mortgage origination and servicing operations (the "Forward Business"), and Reverse Mortgage Solutions, Inc. ("RMS") primarily carries out the Company's reverse mortgage servicing operations (the "Reverse Business").  *Id.* ¶¶ 25, 40.  More specifically:

Forward Mortgage Origination Business
The Debtors originate and purchase forward mortgage loans and sell substantially all of the mortgage loans they originate into Fannie Mae and Freddie Mac-sponsored securitizations or into mortgage pools insured by Ginnie Mae.  *See* Lombardo Decl. ¶¶ 11, 12.[8]  In general, when Ditech Financial originates a mortgage loan, it funds the loan using mainly cash borrowed from a lender in exchange for pledging the loan as security for such borrowings.  Ditech Financial subsequently sells the loans into a GSE-sponsored securitization and uses the proceeds for the sale of the mortgage-backed securities to repay the borrowed cash.

Forward Mortgage Servicing Business
The Debtors' "forward" mortgage servicing business performs loan servicing of mortgage loans that fall into two categories: (i) mortgage loans for which Ditech Financial owns the mortgage servicing rights ("MSRs"), and (ii) subservicing that Ditech Financial has contracted to perform for third-party owners of MSRs.  As of June 30, 2019, the Debtors serviced approximately 610,000 loans with a collective unpaid principal balance ("UPB") of approximately $63 billion.  As of June 30, 2019, the Debtors subserviced approximately 220,000 loans with a collective UPB of approximately $33 billion.  *Id.* ¶ 6.

---

[8]    As used herein, "Ginnie Mae" means the Government National Mortgage Association, "Fannie Mae" means the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation. Fannie Mae and Freddie Mac are GSEs chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders.  Ginnie Mae is a federal corporation within the Department of Housing and Urban Development ("HUD"), a federal agency that guaranties investors the timely payment of principal and interest on MBS backed by federally-insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs or the Department of Agriculture.  *See* Rule 1007 Decl. at 12, n.4.

<u>Reverse Mortgage Servicing Business</u>

The Debtors' "reverse" mortgage servicing business primarily focuses on servicing and subservicing reverse mortgage loans, the majority of which are home equity conversion mortgages ("HECMs") that are insured by the FHA. *Id.* ¶ 8. A HECM is a loan that allows homeowners to borrow money against the equity value of their homes. *Id.* HECM loan borrowers must be age 62 or over and typically rely on the proceeds of such loan to fund their living expenses. The Debtors perform servicing for "reverse" mortgage loans that fall into two categories: (i) mortgage loans that the Debtors own or own the mortgage servicing rights thereto, and (ii) mortgage loans for which the Debtors perform servicing and subservicing for third-party owners of loans. *Id.*

## ***The Previous Restructuring of Ditech Holding***

In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained their liquidity and ability to implement much needed operational initiatives. *See* Rule 1007 Decl. ¶ 7. In November 2017, in an effort to address the burden of the Debtors' overleveraged capital structure, Ditech Holding (then known as "Walter Investment Management Corp.") commenced a prepackaged chapter 11 case in this Court. *See In re Walter Investment Management Corp.*, Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017) (the "WIMC Chapter 11 Case"). The Company's goal in commencing that case was to deleverage its capital structure sufficiently to enable the reorganized debtor to implement a newly-developed and revamped business plan that called for cost reductions, operational enhancements and the streamlining of its business. Within two months of filing the WIMC Chapter 11 Case, Walter Investment Management Corp. confirmed its chapter 11 plan of reorganization (the "Walter Plan"). *See Order Confirming Amended Chapter 11 Plan* [ECF No. 172 (Case No. 17-13446)]. The plan left unsecured creditors unimpaired and, with the cooperation and support of key stakeholders, through the plan, the Debtors eliminated more than $800 million in funded corporate debt. *See* Rule 1007 Decl. ¶ 9. On February 9, 2018, Walter Investment Management Corp. emerged from bankruptcy as Ditech Holding. *See Notice of Occurrence of Effective Date of Amended Prepackaged Chapter 11 Plan*

*of Reorganization* [ECF No. 193 (Case No. 17-13446)].  The Court entered a final decree closing

the WIMC Chapter 11 Case on August 14, 2018.  *See Final Decree Pursuant to 11 U.S.C. §*

*350(a) and Fed. Bankr. P. 3022 Closing Reorganized Debtors' Chapter 11 Case* [ECF No. 257

(Case No. 17-13446)].

The Walter Plan provided for (reorganized) Ditech Holding to act as guarantor of certain

exit warehouse and servicing advance facilities (collectively, the "Warehouse Facilities") entered

into by Ditech Holding's operating subsidiaries as obligors, which facilities funded the

Company's forward and reverse mortgage and servicing businesses.  *See* Walter Plan § 5.4.  In

addition, on the effective date, (i) Ditech Holding, as borrower, entered into an Amended and

Restated Credit Facility Agreement (as amended, the "Term Credit Agreement," and the loans

thereunder, the "Term Loans"), with certain non-debtor affiliate guarantors named therein, and

Credit Suisse AG, Cayman Islands Branch, as administrative agent, and the lender parties thereto

(the "Term Lenders"), and (ii) new second lien notes (the "Second Lien Notes," and the holders

thereunder, the "Second Lien Noteholders") were issued pursuant to that certain Second Lien

Notes Indenture with Ditech Holding as issuer, the subsidiary guarantors named therein, and

Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral

agent.  *See id.* §§ 5.5, 5.6.

### *The Financial Struggles Continue After Ditech Holding Emerges from Bankruptcy*

Although the Company succeeded in deleveraging its capital structure through the WIMC

Chapter 11 Case, the Debtors continued to face liquidity and performance challenges that were

more persistent and widespread than they had anticipated.  Consequently, the Debtors were not

able to implement their new business plan.  *See* Rule 1007 Decl. ¶¶ 55-57.  The Debtors'

liquidity suffered from, among other things, a decrease in industry-wide mortgage originations, a

rise in interest rates, and implementation of new HUD regulations. It also suffered from burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties. To address their liquidity issues, the Debtors entered into various new agreements and transactions to generate cash. *Id.* ¶ 60. Notwithstanding those initiatives, the Debtors faced scheduled amortization payments of approximately $110 million in 2019, leaving them at a significant risk of receiving a going-concern qualification from their auditors, which would have triggered a domino effect of defaults and terminations throughout their corporate debt and working capital facilities. *Id.* ¶ 61.

### *Pre-Petition Marketing Process and Negotiations with Key Stakeholders*

In June of 2018, the Company initiated a process to evaluate strategic alternatives to enhance value and engaged Houlihan and Weil, Gotshal & Manges LLP ("Weil") to assist in such process. *See id.* ¶ 62. The Debtors' efforts were overseen by the board of directors of Ditech Holding (the "Board") and a Special Committee of the Board (the "Special Committee"), which is composed of five independent directors. *Id.* ¶ 63. With the assistance of Houlihan and Weil, the Special Committee evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity. The Board ultimately delegated to the Special Committee, decision-making authority over the marketing and sale process (the "Pre-Petition Marketing Process"). *Id.*

In furtherance of that process, the Debtors, with the assistance of their advisors

- prepared a comprehensive information memorandum, financial projections, and an electronic data room to provide potential buyers with adequate information upon which to make an offer; and

- reached out to thirty-three potentially-interested parties, including strategic investors (i.e., investors holding investments in the mortgage industry) and

> financial investors (i.e., private equity firms, hedge funds, etc., who may have an interest in the mortgage industry).

*See* Snellenbarger Decl. ¶ 7.  Ultimately, ten potential investors executed confidentiality agreements and were granted access to an electronic data room.  *Id.* ¶ 8.  The Debtors fixed July 17, 2018, as the deadline for interested investors to submit initial bids for the assets.  They received four indications of interest ("IOIs") from certain strategic and financial investors.  The Debtors vetted the IOIs with the Special Committee and selected three investors to attend onsite management presentations, which were held during the last week in July of 2018.  *Id.* ¶ 9.  In making that selection, the Debtors, with Houlihan's assistance, analyzed, among other things: (a) the structure of the proposed transaction; (b) the form and amounts of consideration offered; and (c) the assets to be acquired.  *Id.* ¶ 8.  Throughout August of 2018, the Debtors and their advisors actively engaged with each of the potential investors to clarify and advance their bids, and, on or about August 21, 2018, the Debtor received three second-round IOIs.  *Id.* ¶ 10.  Two of those bids were for the sale of certain servicing and reverse assets with subservicing retained by the Debtors (the "Alternative Bids") and one of which was a bid for substantially all of the Debtors' net assets as a going concern (the "All-Company Bid").  *Id.*  In October of 2018, following a month-long evaluation of the IOIs, including discussions with the Special Committee, the Debtors and their advisors concluded that: (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan; and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Second Lien Notes.

As a result, the Company elected to engage with an ad hoc group of the Second Lien Noteholders (the "Second Lien Ad Hoc Group") to explore the Company's strategic alternatives

and solicit input with respect to the sale process.  *See* Rule 1007 Decl. ¶ 66.  In December of

2018, the Debtors engaged in parallel discussions with an ad hoc group of the Term Lenders (the

"Term Loan Ad Hoc Group") to discuss the Pre-Petition Marketing Process and available

options for the Company.  *Id.* ¶ 68.  In late December of 2018, the bidder rescinded the All

Company Bid.  *Id.* ¶ 69.  Shortly thereafter, the Term Loan Ad Hoc Group submitted a proposal

for a recapitalization transaction, pursuant to which a portion of the Term Loans would be

equitized and incremental liquidity would be provided through, among other things, a new

revolving credit facility and a reduction in scheduled amortization payments.  *Id.* ¶ 70.

On December 17, 2018, the Debtors failed to make a $9 million cash interest payment

due under the Second Lien Notes and immediately entered a thirty-day grace period.  That event

of default under the Second Lien Notes Indenture also constituted an "event of default" under the

Term Credit Agreement and certain of the Debtors' Warehouse Facilities agreements.  *Id.* ¶ 75.

In January of 2019, the Debtors and, as applicable, certain of their subsidiaries, entered into

forbearance agreements (the "Forbearance Agreements") with (i) certain holders of greater than

75% of the aggregate principal amount of the outstanding Second Lien Notes (the "Notes

Forbearing Parties"), (ii) certain lenders and the agent under the Term Credit Agreement

(collectively, the "Credit Agreement Forbearing Parties"), and (iii) the requisite buyers and

variable funding noteholders, as applicable, under the Warehouse Facilities agreements

(collectively, the "Warehouse Lenders Forbearing Parties").  *Id.* ¶ 76.

Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the

Notes Forbearing Parties, Credit Agreement Forbearing Parties, and Warehouse Lenders

Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they

potentially had in respect of the aforementioned events of default or other defaults or events of

default arising out of or in connection therewith.  *See* Rule 1007 Decl. ¶ 77.  The expiration of

the Forbearance Agreements was tied to the maturity date of certain of the Debtors' repurchase

loan agreements with the Warehouse Lenders Forbearing Parties.  Without a viable

recapitalization of the Debtors in hand, the Warehouse Lenders Forbearing Parties were not in a

position to commit to a significant extension of their facilities with the Debtors.  Since those

facilities were critical to the Debtors' ordinary course of business operations, the Debtors

focused instead on refinancing those obligations through debtor-in-possession financing in a

chapter 11 filing.  *Id.* ¶ 78.

### *The Restructuring Support Agreement*

On February 8, 2019, the Company entered into that certain Restructuring Support

Agreement (the "RSA") with members of the Term Loan Ad Hoc Group.  *See* ECF No. 146, Ex.

B.  In substance, in that agreement, those Term Lenders agreed to support the consummation of a

reorganization transaction, including one pursuant to which over $800 million in funded debt

would be extinguished, leaving a significantly deleveraged reorganized Company wholly owned

by the Term Lenders, with $400 million of term loan debt and an appropriately-sized exit

working capital facility (the "Reorganization Transaction").  As a toggle to the Reorganization

Transaction, the RSA also provided for the continuation of the Company's Pre-Petition

Marketing Process whereby any and all bids for the Company or its assets would be evaluated as

a precursor to confirmation of any chapter 11 plan of reorganization.  Under the RSA, within five

business days following the conclusion of the Company's post-bankruptcy marketing and sale

process, holders of at least 66 ⅔% in aggregate principal amount outstanding of the Term Loans

could elect to pursue a sale transaction (the "RSA Sale Transaction"), a Reorganization

Transaction, or a hybrid of those transactions.  The RSA Sale Transaction contemplated that the

13

Debtors would distribute proceeds of such a transaction in accordance with the priority scheme under the Bankruptcy Code. *See* Rule 1007 Decl. ¶ 15. In contrast, the Reorganization Transaction contemplated the following treatment of creditors and interest holders:

> Term Loan Claims. On the effective date, the holders of Term Loan Claims would receive their pro rata share of new term loans under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million, and 100% of the New Common Stock;

> Second Lien Notes Claims. On the effective date, the holders of Second Lien Notes Claims would not receive any distribution;

> Go-Forward Trade Claims. On the effective date, holders of all Go-Forward Trade Claims (i.e., trade creditors identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of the reorganized entity) would receive a cash distribution in an amount equaling a certain percentage of their Claim, subject to an aggregate cap;

> General Unsecured Claims. On the effective date, the holders of general unsecured claims would not receive any distribution; and

> Existing Equity Interests. On the effective date, holders of Existing Equity Interests would have their claims extinguished.

*Id.* ¶ 14.

### **_The Debtors Commence These Bankruptcy Cases_**

On February 11, 2019, each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") to implement a restructuring with the support of the Term Loan Ad Hoc Group. As of the Petition Date, the Debtors' capital structure included:

- outstanding first lien secured Term Loans in the aggregate principal amount of approximately $961.4 million;

- outstanding Second Lien Notes in the aggregate amount of $253.9 million;

- outstanding forward and reverse mortgage loan Warehouse Facilities, with a combined maximum capacity level of $1.9 billion, and committed capacity levels ranging between $85 million and $1 billion; and

14

- outstanding general unsecured indebtedness totaling approximately $85 million, excluding lease rejection claims.

*See id.* ¶¶ 48-51.

On February 27, 2019, the U.S. Trustee appointed the Unsecured Creditors Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases. *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 127]. At present, the members include a consumer creditor (holding a judgment against the Debtors), trade creditors, trustees for mortgage backed securities, and "out of the money" secured creditors.[9]

To address their working capital needs and to support the transactions contemplated by the RSA, the Debtors obtained debtor-in-possession financing, including (a) up to $1.9 billion in warehouse financing, and (b) access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "DIP Facilities"). *See* ECF No. 26. The Term Lenders consented to the Debtors' use of cash collateral for the duration of the Chapter 11 Cases, in exchange for: (i) adequate protection liens; (ii) section 507(b) claims; (iii) adequate protection payments; and (iv) financial reporting. The Court entered a final order (the "Final DIP Order") on April 17, 2019 approving the DIP financing and use of cash collateral. *See* ECF No. 422.

---

[9]    At its formation, the members of the Unsecured Creditors Committee were: (i) Safeguard Properties Management, LLC (a vendor); (ii) Wilmington Savings Fund Society, FSB (as indenture trustee for the Second Lien Notes), (iii) Lee Kamimura (a consumer creditor/judgment creditor); (iv) ISGN Solutions, Inc. (a vendor); (v) Black Knight Financial Technology Solutions, LLC (a vendor); (vi) Cognizant Technology Solutions (a vendor); and (vii) Deutsche Bank National Trust Company (an indenture trustee for mortgage-backed securities). On April 22, 2019, the U.S. Trustee appointed two consumer borrowers to the Creditors Committee (i) Stephen Kulzyck, and (ii) Jose Martinez. *See* ECF No. 444.

   As described below, on or about May 2, 2019, the U.S. Trustee appointed the Consumer Creditors Committee. Messrs. Kulzyck and Martinez resigned from the Unsecured Creditors Committee, and thereafter were appointed to serve on the Consumer Creditors Committee. Mr. Kamimura remains an active member of the Unsecured Creditors Committee, participating through his advisors.

### *Post-Petition Sale Process*

The Term Lenders and lenders under the DIP Facilities (the "DIP Lenders") conditioned

access to the DIP Facilities and use of cash collateral on the Debtors' adherence to certain case

milestones contained in the RSA.  In entering the Final DIP Order, the Court also approved

certain milestones, including that:

> [O]n or before the date that is 22 days following the [Petition Date], the Debtors
> shall have filed with the Bankruptcy Court a motion, in form and substance
> satisfactory to the Required Buyers and the Requisite Term Lenders, seeking entry
> of an order by the Bankruptcy Court approving bidding procedures in connection
> with a marketing and 363 sale process pursuant to one or more asset purchase
> agreements, merger agreements, or similar agreements that provide for repayment
> in full in cash of the obligations under the DIP Documents on the closing of such
> agreement[.]

Final DIP Order ¶ 28(d).  In accordance with that order, and as contemplated in the RSA, the

Debtors initiated a marketing and sale process for their businesses, pursuant to section 363 of the

Bankruptcy Code (the "Post-Petition Sale Process").  To promote the sale of their businesses, on

March 5, 2019, the Debtors filed a motion (the "Sale Procedures Motion") seeking approval of,

among other things, certain bidding and auction procedures (the "Bidding Procedures").  *See*

ECF No. 147.  Through the proposed Bidding Procedures, the Debtors sought to dictate the

process by which interested parties could submit bids to purchase the Debtors' assets and to

establish the criteria that the Debtors would apply in determining the highest and best bid, if any,

including through the operation of an auction.  *See* Sales Procedures Motion ¶¶ 97-98.  To help

facilitate the Post-Petition Sale Process, the Debtors sought Court authorization to designate a

stalking horse bidder and offer any such bidder a break-up fee and certain other bid protections

(collectively, the "Stalking Horse Bid Protections").  *See id.* ¶ 88.  The Debtors relied on section

363 of the Bankruptcy Code in support of that request.  *Id.* ¶ 100 ("Bidding incentives such as

these Stalking Horse Bid Protections have become commonplace in connection with sales of assets under section 363 of the Bankruptcy Code."); *see also id.* ¶ 11 (listing section 363 as one of the statutory bases for the motion). The Debtors also invoked the Amended Sale Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York (the "Sale Guidelines") as authority for approval of the Bidding Procedures. *See* Sale Procedures Motion at ¶ 11. The Sale Guidelines govern "the conduct of asset sales under section 363(b)" and "are intended to supplement the requirements of section 363(b)." Sale Guidelines at 1. The Sale Guidelines specifically reference section 363(o) and provide that sales may not be free and clear of "[c]laims and defenses of a consumer under any consumer credit transaction that is subject to the Truth in Lending Act or a consumer credit contract (as defined in 16 C.F.R. § 433.1, as amended)." Sale Guidelines at 15, 16.

On April 23, 2019, the Court entered an order approving the Bidding Procedures pursuant to, *inter alia*, section 363 of the Bankruptcy Code [ECF No. 456] (the "Sale Procedures Order"). Among other things, the order set an objection deadline to the sale of the Debtors' assets "free and clear of liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code." *Id.* ¶ 18. Thereafter, over the course of the following months, the Debtors and their advisors engaged in a post-petition marketing process.

### *Initial Chapter 11 Plan and Objections by the U.S. Trustee & Unsecured Creditors Committee*

On March 5, 2019, in accordance with the milestones in the Final DIP Order, the Debtors filed a chapter 11 plan (the "Initial Plan"),[10] and accompanying disclosure statement (as amended from time to time, the "Disclosure Statement").[11] *See* ECF Nos. 145, 146. The Initial Plan was

---

[10]    The Initial Plan was amended to incorporate minor changes on March 28, 2019. *See* ECF No. 314.

[11]    There were multiple amendments to the disclosure statement, often in conjunction with revisions and modifications to the plan. *See* ECF Nos. 315, 470, 516, 537, and 543.

filed before the Debtors completed the Post-Petition Sale Process and therefore, the Debtors had

not determined whether the plan would be implemented through an RSA Sale Transaction or a

Reorganization Transaction.  In the section entitled "Means of Implementation," the Initial Plan

provided for, among other things:

(1)    The "Compromise and Settlement of Claims, Interests, and Controversies," pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for distributions and other benefits under the Initial Plan; and

(2)    that the "Sources of Consideration for Plan Distributions" would derive either from the closing of an [RSA Sale Transaction] or a Reorganization Transaction, each as contemplated by the RSA.

*See* Initial Plan, Article V.

Under the Initial Plan, general unsecured creditors were viewed as being "out of the

money" and were not projected to receive any recovery on account of their claims.[12]  After

conducting an analysis of the financial circumstances of the Debtors and the extent of the  Term

Lenders' security interests, the Unsecured Creditors Committee took issue with the Debtors'

proposed treatment of unsecured claims under the Initial Plan.  In its objection to the Disclosure

Statement (which doubled as an objection to the Initial Plan) the committee asserted that

although an assumption underlying the treatment of creditors under the Initial Plan was that the

Debtors' assets were fully encumbered by liens securing the Term Loans, its research indicated

that there were very valuable unencumbered assets in the Debtors' estates and that the equity

value in those assets should inure to the benefit of the Debtors' unsecured creditors (the

---

[12]    The RSA term sheet (RSA, Ex. A) and Initial Plan indicated that, under a sale transaction, general unsecured claims would be paid only if holders of the Term Loans and Second Lien Notes were paid in full.  At that time, the Debtors indicated that it was highly unlikely that the claims of the senior creditors would be fully satisfied.

"Unencumbered Assets Dispute").  *See* UCC Disclosure Statement Objection ¶¶ 3, 16.[13]  The committee argued that the Court should not approve the Disclosure Statement because the Initial Plan was "patently unconfirmable" since, among other things, it violated the Bankruptcy Code's best interests test and the absolute priority rule.  *See id.* ¶¶ 11-29.

The Unsecured Creditors Committee also objected to the Disclosure Statement on the grounds that it failed to disclose that section 363(o) of the Bankruptcy Code would apply to any sale transaction under the plan.  *Id.* ¶ 58.  The U.S. Trustee made a similar objection.  *See Objection of the United States Trustee to the Approval of the Disclosure Statement for Joint Chapter 11 Plan for Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 348] ("UST Disclosure Statement Objection") ¶¶ 40-41.  The Unsecured Creditors Committee argued that the Initial Plan and "any purchase agreement entered into with a Successful Bidder[] must incorporate . . . Section 363(o)."  *See* UCC Disclosure Statement Objection ¶ 58.  The U.S. Trustee argued that the plan must "explicitly provide that, in the event of a sale of the Debtors' assets under section 363 of the Bankruptcy Code, the successor in interest to the Debtors must be liable for consumer claims" and that if the plan is implemented through a reorganization the Debtors should incorporate analogous language.[14]  *See* UST Disclosure Statement Objection ¶ 40.

In their reply to these objections, the Debtors announced, in substance, that: (i) any sale of Consumer Creditor Agreements would be conducted under the plan, and not pursuant to

---

[13]   *See Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [ECF No. 337] (the "UCC Disclosure Statement Objection").

[14]   The Initial Plan and Disclosure Statement indicated that in a Sale Transaction, the assets acquired would be transferred "free and clear."  *See* Initial Plan § 5.6; Disclosure Statement at 42.

section 363 of the Bankruptcy Code; (ii) section 363(o) of the Bankruptcy Code only applies to a

sale pursuant to section 363; and, accordingly, (iii) section 363(o) does not apply to the sale of

the Consumer Creditors Agreements under the plan. *See Debtors' Omnibus Reply to Objections

to Debtors' Disclosure Statement* [ECF No. 424], Ex. A. The subtext was that the sale of those

agreements would be "free and clear" of all Consumer Claims and Consumer Defenses. The

Debtors agreed to amend the plan to provide, in substance, that Consumer Claims and Consumer

Defenses that: (1) do not result in an award of money damages against the Debtors or

Reorganized Debtors; or (2) do not result in attorney's fees, are unaffected by a Reorganization

Transaction. *See id.* ¶¶ 7, 27-28; *see also Notice of Filing of Amended Joint Chapter 11 Plan of

Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 469] § 4.7.

### *The Global Settlement and First Amended Plan*

In an attempt to resolve its objections to the Initial Plan, the Unsecured Creditors

Committee entered into negotiations with the Term Loan Ad Hoc Group and the Debtors.

According to counsel for the Unsecured Creditors Committee, those negotiations "really focused

on economics, not on borrower issues like 363(o)." *See* Hr'g Tr. at 25:11-13, May 10, 2019

[ECF No. 1080]. Through those negotiations, the parties reached an agreement that resolved the

Unencumbered Asset Dispute and the committee's plan objections, including those relating to

the application of section 363(o) to an RSA Sale Transaction (the "Global Settlement"). The

settlement is not reflected in a stand-alone settlement agreement. Rather, the terms of the deal

were reflected in the Debtors' First Amended Plan[15] as follows:

(i)     Holders of Term Loan Claims (Class 3) would receive Net Cash Proceeds from an
        RSA Sale Transaction,

---

[15]     *See Amended Joint Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF Nos. 515, 536, 542]
(the "First Amended Plan"). In describing the terms therein, capitalized terms not otherwise defined shall have the
definitions ascribed to them in the First Amended Plan.

(ii)     The Term Lenders' deficiency claims (the "Term Loan Deficiency Claims")[16] are waived for purposes of participating in recoveries for non-priority, unsecured claims;

(iii)    Holders of Second Lien Notes Claims (Class 4) would receive cash of $1.5 million plus a contingent recovery if the proceeds from the sale transactions are high enough;

(iv)    Holders of General Unsecured Claims (Class 5) would receive: (i) a *pro rata* share, with holders of Borrower Non-Discharged Claims[17] (Class 6), from a GUC

---

[16]    The Term Loan Deficiency Claims are estimated to be in excess of $500 million. *See* Unsecured Creditors Committee Response, at 4, n.5.

[17]    A "Borrower Non-Discharged Claim" is defined in the First Amended Plan to mean "a Claim of a Borrower of the kind set forth on Schedule 1 of [the First Amended Plan]." Schedule 1 set forth the following description for "Borrower Non-Discharged Claims":

"**Borrower Non-Discharged Claims**" shall mean, Claims of Borrowers, to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) do not result in any order, judgment, verdict, decree, or arbitration award against the Debtors or Reorganized Debtors entitling any party to an award of monetary damages, including, without limitation, attorneys' fees or costs, penalties or fines (including, for the avoidance of doubt, statutory penalties and fines) but excluding restitution, reimbursement, refunds, or account credits relating solely to a final, non-appealable judgment that a Debtor made a servicing or origination error, or committed fraud, and (b) are necessary for the resolution of the following actions:

1.  A claim or defense involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages (including reverse mortgages) owned or serviced by the Debtors, including quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action;

2.  A claim or defense brought by a bankrupt Borrower (including any heir, non-borrowing spouse, estate, and/or other successor in interest) who has sought, or may seek, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "Bankrupt Borrower") to:
    a)  assert a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure;
    b)  assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;
    c)  assert appeals with respect to items (a) and (b); or
    d)  seek accounting from the Debtors with respect to the underlying reverse mortgage loan;

3.  A claim or defense that is the subject of § 363(o) of the Bankruptcy Code; or

4.  A claim or defense brought by a Borrower on account of a Debtor's alleged prepetition:
    a)  failure to comply with loan modification obligations;
    b)  improper assignment of deeds of trust;

Recovery Trust (the "GUC Trust") which assets include $4 million in Cash (less certain indenture trustee expenses and expenses of the Unsecured Creditors Committee's advisors) and 50% of the net proceeds from certain, unwaived causes of action (the "GUC Recovery Trust Causes of Action"), plus (ii) a contingent recovery if the proceeds from the sale transactions are high enough; the foregoing being net of the costs associated with the administrative processes of liquidating the assets and resolving the allowance of the claims; and

(v)     Holders of Borrower Non-Discharged Claims (Class 6) will receive the same treatment as Allowed General Unsecured Claims unless such holder's claim is assumed by a purchaser.  The plan provided that in a Reorganization Transaction, Borrower Non-Discharged Claims would ride through the bankruptcy unaffected and "be treated in the ordinary course, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such claims.

*See* First Amended Plan §§ 4.3-4.6 (describing distributions), 5.2(b) (describing settlement), 10.6 (describing release); *see also* Unsecured Creditors Committee Response ¶ 3.  In all instances, the source of the cash to be paid to Class 4, 5, and 6 creditors was a carve-out from the Term Lenders' collateral.  Additionally, by the Global Settlement, the Unsecured Creditors Committee agreed not to object to confirmation of the plan, and to comply with a $300,000 per month cap on their advisors' fees and expenses.  *See* First Amended Plan §§ 5.2(b)(vi), (viii), and (x).  The First Amended Plan provides that the GUC Trust is to be administered by a person selected by the Unsecured Creditors Committee (the "GUC Trustee") who—together with the Debtors, the

---

c)   violation of the Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 *et seq.*, the Fair Credit Reporting Act (15 U.S.C. § 1681)), and/or the Truth in Lending Act (12 C.F.R. § 1026);  d) failure to remit payment to the taxing authority that results in penalties to the Borrower;

e)   failure to remit payment to insurance authorities, the consequence of which includes both a lapse in coverage and actual pecuniary harm to the Borrower; or

f)   servicing errors directly relating to Debtors' prepetition:
   i.   misapplication of borrower payments;
   ii.  miscalculations of loan principal amounts;
   iii. miscalculations of loan interest amounts; or
   iv.  failure to credit funds to the correct account

First Amended Plan, Schedule 1.

Reorganized Debtors, and Plan Administrator—would have the exclusive authority to object to claims. *See* First Amended Plan § 7.1.

### *The U.S. Trustee Appoints the Consumer Creditors Committee*

The Consumer Creditors comprise the most numerous creditor constituency in these cases. As a group, they currently have (and may in the future, assert) claims and defenses against the Debtors arising out of a wide range of alleged misconduct relating to the Debtors' ownership, origination, and/or servicing of mortgages, including, among other things, overstating and failing to correct borrower accounts, improperly servicing borrower accounts in contravention of applicable regulations and statutes, demanding payments barred by confirmed plans or the discharge injunction in consumer borrowers' chapter 13 bankruptcy cases, improperly applying funds paid by borrowers, wrongfully foreclosing on borrowers' properties, and violations of state and federal consumer protection and debt collection laws such as the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. § 2601 *et seq.*, "RESPA"), the Fair Credit Reporting Act (15 U.S.C. § 1681, "FCRA"), the Truth in Lending Act (12 C.F.R. § 1026, "TILA"), and the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 *et seq.*, "FCFPA"). In pursuing those claims, the Consumer Creditors may seek, in individual actions or through class actions, monetary damages, corrections to account balances, vacaturs of wrongful foreclosures, and other injunctive or remedial relief available under applicable state or federal laws. *See* Consumer Creditors Committee Objection ¶ 1.[18]

---

[18]    By further way of example, certain consumer creditors who object to the plan allege that the Company mechanically engages various trade creditors to (i) perform unwarranted property inspections, (ii) conduct redundant appraisals/valuations of borrowers' homes, (iii) repeatedly run title reports, (iv) purchase unauthorized, unnecessary and duplicative hazard and other insurance products for borrowers' properties, and (v) employ attorneys and other vendors to provide foreclosure and bankruptcy services after creating havoc with the borrowers' accounts. *See Objection [of the Bartholow Consumers] to the Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 945] (the "Bartholow Objection") ¶ 3. The consumer creditors maintain that all of those vendor processes result in charges against the borrowers (whether or not the Company actually pays them), and the Company assesses nearly all of these charges (whether or not they have been paid) to the borrowers'

On May 2, 2019, as the Unsecured Creditors Committee was finalizing the terms of the Global Settlement with the Debtors and Term Lenders, and before the Debtors filed their First Amended Plan, the U.S. Trustee appointed the Consumer Creditors Committee pursuant to section 1102(a) of the Bankruptcy Code to represent the interests of Consumer Creditors in the Chapter 11 Cases.  *See Notice of Appointment of Official Committee of Consumer Creditors* [ECF No. 498].[19]  The Unsecured Creditors Committee supported the appointment of the Consumer Creditors Committee, principally on the grounds that the committee would be best suited to review and attempt to represent the interests of the Consumer Creditors, including in matters relating to the application of section 363(o) in these cases.  Promptly, thereafter, the Debtors moved to disband the committee.[20]  The Court denied that motion.  *See* Hr'g Tr. at 47:7-13, May 17, 2019 [ECF No. 1081].  Part of the Court's rationale in denying the motion was that the Consumer Creditors Committee had a key role to play in representing the many Consumer Creditors in these cases, and in particular, the issues unique to those creditors, especially given that pursuant to the Global Settlement, the Unsecured Creditors Committee agreed to support the First Amended Plan pursuant to the Global Settlement and, in doing so, settled all issues relating to the application of section 363(o) to the Plan Sale Transactions.  *See id.* at 47:1-6.

---

accounts, to be recovered either from the borrowers directly or from the proceeds the Company obtains when it forecloses on borrowers' homes.  *Id.*  Those creditors assert that beyond the obvious harms of unwarranted foreclosures, for many borrowers, the Company's improper charges create and perpetuate suffocating, bogus, and seemingly incurable defaults, which can result in disastrous inaccuracies on borrowers' credit reports.  *Id.* ¶ 4.

[19]    The members of the Consumer Creditors Committee are Stephen Kulzyck, Jose Martinez, LeRon Harris, Melinda Hopkins, and D.C. Randall.  Four of the five members are represented by counsel for non-profit legal services organizations or legal aid entities.  On May 6, 2019, the Consumer Creditors Committee retained Quinn Emanuel Urquhart & Sullivan, LLP as its attorneys.  *See Order Signed on 7/16/2019 Granting Application to Employ Quinn, Emanuel, Urquhart & Sullivan, LLP as Counsel* [ECF No. 881].

[20]    *See Motion of Debtors for Entry of an Order (I) Disbanding the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limiting the Scope of Such Committee and Capping the Fees and Expenses Which May be Incurred by Such Committee* [ECF No. 522].

### *The Stalking Horse Bids*

During this period, the Debtors pressed forward with the Post-Petition Sale Process under the Sale Procedures Order.  The Debtors and their advisors solicited eighty-seven potentially interested parties including strategic and financial buyers.  To that end: (i) forty-eight parties received copies of non-disclosure agreements ("NDAs"); (ii) thirty-seven executed NDAs and received access to the Debtors' data room; and (iii) thirteen parties submitted proposals.  *See* Snellenbarger Decl. ¶¶ 19, 20.  When that process concluded, the only offers for substantially all of the Debtors' Forward and Reverse Businesses were the Forward and Reverse Buyers, respectively.[21]  Although the Debtors received eleven proposals to acquire select assets and operations of their businesses, the preliminary estimates on those offers indicated values inferior to that of the Forward and Reverse Buyers' respective offers.  The estimated purchase prices under the Forward Buyer's offer and Reverse Buyer's offer, based upon values reflected in the Debtors' March 31, 2019 balance sheet, are approximately $1,055,000,000 (of which approximately $613,000,000 would be available to pay the Debtors' DIP obligations) and $762,000,000 (of which approximately $616,000,000 would be available to pay the Debtors' DIP obligations), respectively.  *See id.*

### *Forward Buyer Offer*

The Forward Buyer's offer generally contemplates an acquisition of substantially all of the assets of Ditech Holding and Ditech Financial pursuant to an asset purchase agreement (the "Forward APA").  *See* Notice of Forward Business Stalking Horse Bidder, Ex. A. at 4-7.  Under

---

[21]    *See Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Forward Business)* [ECF No. 722] (the "Notice of Forward Business Stalking Horse Bidder"); *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Reverse Business)* [ECF No. 724] (the "Notice of Reverse Business Stalking Horse Bidder" and with the Notice of Forward Business Stalking Horse Bidder, the "Stalking Horse Bidder Notices").

the Forward APA, NRZ has a right to terminate the agreement if the Court does not enter a

confirmation order that provides, among other things, that the Forward Sale will be "free and

clear" of claims, including claims that are the subject of section 363(o) of the Bankruptcy Code,

"to the maximum extent permitted by the Bankruptcy Code." *See* Forward APA § 8.1(c)(vi).

The Debtors attempted to engage NRZ on a bid that would include NRZ assuming the

liabilities associated with the Consumer Creditor Agreements, but NRZ flatly refused to engage

in such discussions at any level of consideration. *See* Snellenbarger Decl. ¶ 24.  NRZ

unequivocally ended the negotiations, and stated that it was going "pencils down" when the

Debtors attempted to solicit a bid that included an assumption of the liabilities associated with

the Debtors' consumer claims. *Id.*  NRZ also refused to engage in any discussion regarding a

purchase price reduction in exchange for assuming such claims, or establishing an escrow

arrangement to provide for the payment of the liabilities associated with those agreements. *Id.*

NRZ agreed to reengage in negotiations only after the Debtors agreed to discuss a transaction on

terms that did not include an assumption of those liabilities, and expressly included, as a term of

its proposal, that such claims and defenses would not ride through to NRZ. *Id.*  At no point did

any party make a proposal for the Debtors' forward mortgage business, in whole or in part, that

contemplated assuming the Consumer Claims and Consumer Defenses. *See id.* ¶ 20.

### *Reverse Buyer's Offer*

The Reverse Buyer's offer is for the purchase of RMS's reverse mortgage servicing

business pursuant to a stock and asset purchase agreement.  *See* Notice of Reverse Business

Stalking Horse Bidder, Ex. C (the "Reverse SAPA").  The Reverse SAPA contemplates a multi-

step sale process for the Reverse Sale.  In general terms, mortgage loans owned by RMS and

related servicing rights will be sold to SHAP (the "Reverse Loan Sale"), and other acquired

assets will be sold to MAM (the "Reverse Platform Sale"). Subsequent to those sales, equity in

RMS will be transferred to MAM and MAM will re-transfer the assets it acquired in the Reverse

Platform Sale back to RMS. *See* Reverse SAPA § 2.1.

The Reverse Buyer's offer is slightly different from the Forward Buyer's offer with

respect to the treatment of the claims of Consumer Creditors. Under the Reverse SAPA, the

Reverse Buyer agreed to assume certain claims and defenses relating to servicing errors.[22]

Moreover, while the Reverse SAPA provides that the Debtors will have an obligation to seek an

order from the Court providing for the Reverse Sale "free and clear" of Consumer Claims, such

an order is not a condition to closing. *See* Notice of Reverse Business Stalking Horse Bidder,

Ex. A; Reverse SAPA § 7.13.

As with NRZ, the Debtors requested that MAM make a bid that included an assumption

of the liabilities associated with the Consumer Creditor Agreements. *See* Snellenbarger Decl. ¶

28. Unlike NRZ, MAM agreed to engage in such discussions, and after substantial arm's length

negotiations, MAM agreed to a $10,000,000 purchase price reduction for potential liabilities

arising under those agreements not otherwise discharged by the Court. *See id.* The Debtors are,

however, obligated to pursue in earnest an order of the Court declaring that the transfer of assets

to MAM would be free and clear of consumer claims. *See id.* If, prior to MAM's purchase of

substantially all of the reverse business, the Debtors reach a settlement with the Consumer

Creditors Committee concerning how potential liabilities arising from consumer claims not

otherwise discharged by the Court will be addressed, MAM's purchase price will increase with

---

[22]    Specifically, MAM will assume claims relating to servicing errors directly related to Sellers (as defined in the Reverse SAPA): misapplication of borrower payments, miscalculation of mortgage loan principal amounts, miscalculation of mortgage loan interest amounts or failure to credit funds to the correct account. *See* Reverse SAPA at 8, Definitions of "Consumer Claim" and "Assumed Claims."

the number of claims settled, and, in the event that the Debtors settle all consumer claims prior to

Mortgage Assets Management's purchase, the purchase price will increase by $750,000.  *See id.*

### *The Debtors Cancel the Auction*

On July 3, 2019, the Court entered orders which approved the Stalking Horse Bid

Protections for the Forward and Reverse Buyers' bids in accordance with the Sale Procedures

Order.  *See* ECF Nos. 808, 809.  Additionally, on July 10, 2019, the Debtors filed the *Notice of*

*(I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful*

*Bidders* [ECF No. 830] (the "Notice of Successful Bidders").[23]  Pursuant to the Notice of

Successful Bidders, the Debtors announced that (i) no qualified bids (other than the Forward

Buyer's and Reverse Buyer's bids) were received by the bid deadline; (ii) the auction was

cancelled; and (iii) as no other qualified bids were received by the bid deadline, the Debtors

deemed the Forward APA and Reverse SAPA to be the winning bids for their Forward Business

and Reverse Business, respectively.

### *Objections to Sale, Modifications to the Global Settlement, and the Second Amended Plan*

The Stalking Horse Bidder Notices set July 18, 2019 as the deadline for objections to a

proposed Plan Sale Transaction including any objections to the sale of the Debtors' assets free

and clear of liens, claims, interests, and encumbrances "pursuant to section 363(f) of the

Bankruptcy Code and/or entry of a sale order."  *See* Notice of Forward Stalking Horse Bidder at

4; Notice of Reverse Stalking Horse Bidder at 3.  The July 18 deadline corresponds to the

---

[23]    Prior thereto, on July 8, 2019, in connection with the Post-Petition Sale Process, the Debtors filed a *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824].  In that notice, the Debtors acknowledge that the Bidding Procedures, which are authorized by Section 363, "govern the auction and sale process of any and all of the Debtors' assets to the highest or otherwise best bidder."  *Id.* at 1.

objection deadline for plan confirmation objections (the "Objection Deadline").  *See Notice of Sale and Confirmation Deadlines* [ECF No. 748].

Numerous interested parties timely filed objections to the First Amended Plan and the Sale Transactions.  On or about July 30, 2019, the Debtors, the Term Loan Ad Hoc Group, and the Unsecured Creditors Committee modified the Global Settlement to provide for the $5,000,000 Fund for the exclusive benefit of holders of Allowed Consumer Creditor Claims. The modified settlement is reflected in the Second Amended Plan.  It calls for the establishment of a "Creditor Recovery Trust" in place of the GUC Trust under the First Amended Plan, and a "Creditor Recovery Trustee" in place of the GUC Trustee.  *See* Second Amended Plan Notice, Ex. B (Incremental Blackline).[24]  The trust assets will be available to satisfy "Consumer Creditor Claims" – i.e., certain monetary and non-monetary claims that Consumer Creditors may have against the Debtors.[25]

---

[24]    The Creditor Recovery Trust will be created pursuant to a Creditor Recovery Trust Agreement, and the Creditor Recovery Trustee will be selected by the Unsecured Creditors Committee.  There are no other notable changes from the GUC Trust to the Creditor Recovery Trust other than the nomenclature and the additional $5,000,000 Fund that will be contributed as Consumer Creditor Recovery Trust Assets for the exclusive benefit of Consumer Creditors.

[25]    More specifically, the Second Amended Plan defines a Consumer Creditor Claim as "any Claim asserted by a Borrower against the Debtors, including those set forth on Schedule 1 of this Plan."  *See* Second Amended Plan § 1.34.  Schedule 1 to the Second Amended Plan states:

> "Consumer Creditor Claims" shall mean, all Claims of Borrowers, including, without limitation, claims, cross-claims, third-party claims, and counterclaims (a) do not result in any order, judgment, verdict, decree, or arbitration award against the Debtors entitling any party to an award of monetary damages, including, without limitation, attorneys' fees or costs, penalties or fines (including, for the avoidance of doubt, statutory penalties and fines) but excluding restitution, reimbursement, refunds, or account credits relating solely to a final, non-appealable judgment that a Debtor made a servicing or origination error, or committed fraud, and (b) are necessary for the resolution of the following actions:
>
> 1.   A claim or defense involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages (including reverse mortgages) owned or serviced by the Debtors, including quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action;

### *Scope of Sale Transactions as Contemplated by the Second Amended Plan*

In the proposed form of order confirming the Second Amended Plan [ECF No. 1124] (the "Proposed Confirmation Order"), the Debtors address the scope of the "free and clear" aspect of the sales under the Plan Sale Transactions.  First, it provides that certain consumer defenses sounding in recoupment or setoff will be preserved and unaffected by the Plan Sale Transactions, provided that they satisfy the following criteria (the "Recoupment Criteria"):

- Defense is asserted in an individual action asserted in response to the Buyer's attempt to collect a debt,

- Defense does not arise out of origination of the loan,

- Defense does not result in money damages or refunds (except for escrow advances),

---

2.   A claim or defense brought by a bankrupt Borrower (including any heir, non-borrowing spouse, estate, and/or other successor in interest) who has sought, or may seek, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "Bankrupt Borrower") to:
    a)   assert a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure;
    b)   assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;
    c)   assert appeals with respect to items (a) and (b); or
    d)   seek accounting from the Debtors with respect to the underlying reverse mortgage loan;

3.   A claim or defense that is the subject of § 363(o) of the Bankruptcy Code; or

4.   A claim or defense brought by a Borrower on account of a Debtor's alleged prepetition:
    a)   failure to comply with loan modification obligations;
    b)   improper assignment of deeds of trust;
    c)   violation of the Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681), and/or the Truth in Lending Act (12 C.F.R. § 1026);
    d)   failure to remit payment to the taxing authority that results in penalties to the Borrower;
    e)   failure to remit payment to insurance authorities, the consequence of which includes both a lapse in coverage and actual pecuniary harm to the Borrower; or
    f)   servicing errors directly relating to Debtors' prepetition:
        i. misapplication of borrower payments;
        ii. miscalculations of loan principal amounts;
        iii. miscalculations of loan interest amounts; or
        iv. failure to credit funds to the correct account.

Second Amended Plan, Sch. 1.

- Defense does not expand or create any rights of Consumer Creditors under any applicable law; and

- Defense does not require the Reverse Buyer to violate the provisions of any third-party servicing agreement.

Proposed Confirmation Order, Schedule 1 ¶ 8; *id.*, Schedule 2 ¶ 14.  Second, the Proposed

Confirmation Order states that neither the Forward Buyer nor the Reverse Buyer will be deemed

a "successor" of any of the Debtors for purposes of successor liability pursuant to section

1141(c) of the Bankruptcy Code.  Finally, the Proposed Confirmation Order purports to enjoin

third parties from asserting "Claims, Interests, Liens, and other encumbrances" (except defenses

meeting the Recoupment Criteria and, with respect to the Reverse Transaction, the assumed

consumer liabilities) against the Forward Buyer and Reverse Buyer.  *See id.*, Schedule 1 ¶¶ 9-12;

*id.*, Schedule 2, ¶¶ 3, 19-20.[26]

---

[26]    Specifically, paragraph 10 of Schedule 1 of the Proposed Confirmation Order (i.e., the sale order approving the Reverse SAPA) states:

> Pursuant to section 1141(c) of the Bankruptcy Code, all Persons are forever prohibited and ***enjoined*** from taking any action against Reorganized RMS or the Reverse Buyer (or any of their respective property, Affiliates, successors and assigns) based on any Claims, Interests, Liens, and other encumbrances (other than Assumed Liabilities and the Permitted Consumer Borrower Defenses) to the extent such Claims, Interests, Liens, and other encumbrances are released or discharged pursuant to the terms of the Plan; provided that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

Proposed Confirmation Order, Schedule 1 ¶ 10 (emphasis added).

There is a similar injunctive provision in Schedule 2 of the Proposed Confirmation Order (i.e., the sale order approving the Forward APA), ¶ 3, which states, in relevant part:

> On and after the Closing, except for Persons or Entities entitled to enforce Assumed Liabilities and Permitted Liens, and except in respect of Permitted Consumer Borrower Defenses (as defined in Paragraph 14 below), all Persons and Entities (including, but not limited to, the Debtors and/or their respective successors (including any trustee), creditors, investors, certificate holders, securitization trustees, borrowers, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Claims against the Acquired Assets or against the Debtors in respect of the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and ***permanently enjoined*** from asserting, prosecuting, or otherwise pursuing any Claims of any kind or nature whatsoever (including, without limitation, Claims or

Additionally, under the Second Amended Plan, there is a change in the structure of the

Reverse Sale.  Specifically, the Second Amended Plan provides that the Reverse Sale will occur

in the following sequence: (1) the reorganization of RMS and discharge of all liabilities that are

not "Assumed Liabilities," (2) the Reverse Loan Sale to SHAP; and (3) the issuance of 100% of

Reorganized RMS's[27] equity "free and clear" to MAM.  *See* Second Amended Plan § 5.6(b).  In

this way, the Reverse Sale structure no longer provides for the Reverse Platform Sale to MAM.

At the Hearing, counsel explained that it was necessary to change the structure of the transaction

because Ginnie Mae would not allow the Reverse Sale to proceed as originally structured

because, as a result, MAM, an entity not licensed by Ginnie Mae, would service certain assets

pooled in Ginnie Mae-backed securitizations.[28]

The Debtors say that the Second Amended Plan, and the Sale Transactions and modified

Global Settlement contemplated therein, achieve the following benefits for all their constituents:

    i.    transition of the forward mortgage loan origination and servicing segment operated by Ditech Financial LLC to one of the leading mortgage servicers in the United States;

    ii.    transition of the reverse mortgage servicing and subservicing segment operated by Reverse Mortgage Solutions, Inc. to the Reverse Buyer—one of a handful of companies that operates in the reverse mortgage industry with the same level of experience, quality, and loan portfolio size as the Debtors;

---

Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing) against the Forward Buyer or any Affiliate of the Forward Buyer or any of their respective property, successors and assigns, or the Acquired Assets, as an alleged successor or on any other grounds, it being understood that nothing herein shall affect assets of the Debtors that are not Acquired Assets.

Proposed Confirmation Order, Schedule 2 ¶ 3 (emphasis added).

[27]   As defined in the Second Amended Plan.

[28]   The Court directed the Debtors to file a statement explaining the change in the Reverse Sale structure in the Second Amended Plan in further detail, which they did.  *See Notice Regarding Stock and Asset Purchase Agreement (Reverse Transaction)* [ECF No. 1139].

     iii.     minimize disruption to the Debtors' approximately one million consumer creditors through a complex and orderly transition plan that allows the Debtors, the Forward Buyer, and the Reverse Buyer to continue originating and servicing mortgage loans, as applicable, in the ordinary course of business as the Debtors' loan platforms are transferred to the Forward Buyer and the Reverse Buyer;

     iv.     utilize the proceeds of the Plan Sale Transactions to satisfy the Debtors' administrative and priority claims;

     v.     preserve jobs for as many of the almost 2,500 employees of the Debtors as possible; and

     vi.     fund a recovery trust established under the Second Amended Plan for the exclusive benefit of the Debtors' general unsecured creditors and consumer creditors notwithstanding that such parties would not otherwise be entitled to a recovery.

*See* Debtors' Memorandum ¶ 3. As noted above, confirmation of the Second Amended Plan, and approval of the Plan Sale Transactions and Global Settlement is supported by the lenders, the Buyers, and the Unsecured Creditors Committee. The Unsecured Creditors Committee recently explained its rationale behind the Global Settlement, as follows:

> In participating in [settlement] negotiations, the Creditors' Committee was aware that the assets of the Estates are now subject to their second chapter 11 proceeding within a relatively short time and are substantially encumbered by secured claims. It also learned that the deficiency claims of the Term Loan Lenders will likely be substantial, and materially dilute recoveries to other non-priority, unsecured creditors, which has turned out to be the case based on the unfortunate, albeit robust, sale process. Moreover, the Creditors' Committee was mindful that the numerous counsel for consumer creditors were carrying the laboring oar in advocating for consumer borrowers, seeking to address their unique issues, and attempting to secure 'pass-through' treatment for their claims.

Unsecured Creditors Committee Response ¶ 2. By contrast, the Consumer Creditors Committee, which did not participate in the negotiations leading to the Global Settlement (as it was appointed after the settlement was reached), and did not agree to the establishment of the $5,000,000 Fund, does not support the Global Settlement.

## **DISCUSSION**

To confirm the Second Amended Plan, the Debtors must demonstrate, by a preponderance of the evidence, that it satisfies section 1129(a) of the Bankruptcy Code. *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018) ("The proponent of confirmation of a plan must prove by a preponderance of the evidence that it satisfies the relevant requirements of 11 U.S.C. § 1129(a)[.]") (citation omitted). The Debtors consensually resolved the majority of the objections filed to the plan. The Court will not address those objections in this Memorandum Decision and Order. The principal unresolved plan objections are grouped as follows:

1.    The Second Amended Plan fails to meet the requirements under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code in that:

    (i)    The Debtors' proposed Second Amended Plan improperly seeks approval of Plan Sale Transactions "free and clear" of the protections of section 363(o)'s proscription against the stripping of consumer borrower claims;

    (ii)    The Debtors' proposed Second Amended Plan fails to sufficiently preserve the rights of consumer borrowers to assert defenses of recoupment and setoff under applicable non-bankruptcy law.

    (iii)    The terms of the Second Amended Plan—including, for example, the claims reconciliation process, the selection of the Creditor Recovery Trustee, and conduct of the Plan Sale Transactions, and the elevation of certain general unsecured claims (as executory contracts) – were not proposed in good faith and does not comport with applicable sections of the Bankruptcy Code.

2.    The Second Amended Plan does not satisfy the best interests of creditors test required under section 1129(a)(7) of the Bankruptcy Code, and the Global Settlement is not "fair and equitable" in regard to the holders of Allowed Class 6 Consumer Claims.

3.    The Third Party Releases and Exculpation provisions in the Second Amended Plan do not comport with the legal standards required for their approval under the Second Circuit's holding in *Metromedia*, and the Court does not have subject

34

matter jurisdiction to approve such Third Party Releases and Exculpation provisions under the holding in *Johns-Manville*.[29]

There are other and additional plan objections which, while significant, do not warrant extensive discussion.

To address the confirmation objections, the Court first will briefly review the confirmation requirements under section 1129(a). In doing so, it will address and resolve certain of the plan objections, although it will reserve discussion of the principal objections until after its brief overview of the confirmation requirements. There is no dispute that the Debtors have satisfied many of those requirements. Before addressing the relevant portions of section 1129(a) the Court finds, as a preliminary matter, that section 1129(a)(6) and sections 1129(a)(14)-(16) are not applicable to the Second Amended Plan. As such, they are not relevant to the Court's analysis.[30] The Court now considers whether the Debtors have met their burden of demonstrating that the plan satisfies the remainder of the section 1129(a) confirmation requirements.

---

[29]   *See Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) (hereinafter "*Metromedia*"); *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008), *rev'd and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009) (hereinafter "*Johns-Manville*").

[30]   Section 1129(a)(6) provides that the Court shall only confirm a plan if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). The Second Amended Plan does not provide for any rate changes, and thus, this section is inapplicable.

Section 1129(a)(14) of the Bankruptcy Code requires a debtor to pay domestic support obligations as mandated by any judicial or administrative order, or by statute. *See* 11 U.S.C. § 1129(a)(14). The Debtors here are not subject to any domestic support obligations.

Section 1129(a)(15) is applicable where the debtor is an "individual" (as that term is defined in the Bankruptcy Code). See 11 U.S.C. § 1129(a)(15). Here, none of the Debtors are individuals.

Section 1129(a)(16) provides that property transfers by a corporation or trust that is "not a moneyed, business, or commercial corporation or trust" must be made in accordance with any applicable provisions of nonbankruptcy law. 11 U.S.C. § 1129(a)(16). Each of the Debtors here is a moneyed, business, or commercial corporation.

### *Section 1129(a)(1)-1129(a)(3)*

Under sections 1129(a)(1) and (a)(2), both the plan and the plan proponents must comply with all applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(1), (a)(2). Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).

The Consumer Creditors Committee and the "Bartholow Consumers"[31] object to the Second Amended Plan on the basis that the plan should allow additional time for Consumer Creditors to object to claims, which they have a right to under section 502 of the Bankruptcy Code; and a Consumer Creditors representative should be added to anybody supervising the Creditor Recovery Trustee.  *See* Consumer Committee Objection ¶ 81; Bartholow Objection ¶ 22.  The Debtors counter that the Creditor Recovery Trust and claims process proposed under the Second Amended Plan is typical of and consistent with other chapter 11 plans, and is intended to streamline the post-confirmation claims process and minimize the time and costs associated with claims reconciliation and distribution, and should be approved.  The Court agrees.  There is no support in the law or facts to justify the appointment of a separate Consumer Creditors representative to supervise the Creditor Recovery Trustee, or to find that the proposed claims reconciliation process through the Creditor Recovery Trustee is unreasonable or inappropriate. Accordingly, this objection is overruled.

Second, the Geary Class Action Plaintiffs (the "GCAPs") have filed an objection to the confirmation of the plan [ECF No. 905] (the "GCAP Plan Objection").  Their objections as they relate to section 1129(a)(1) of the Bankruptcy Code are as follows.  First, they argue that Ditech

---

[31]    The "Bartholow Consumers" are: Joe Martinez, Richard Legans, Gail Legans, Matthew Bennett, Jazmin Bennett, Dawn Davis, Grace Carleton, Robert T. Hall, Sally W. Hall, Victor Ramalheira, Oriana Romero-Sosa, and Bettye O'Neal.  They are represented by Theodore Bartholow and have played an active role in these Chapter 11 Cases.

Financial is not entitled to a discharge under section 727 of the Bankruptcy Code.  *See* GCAP

Plan Objection at 4-5.  This objection is overruled because under the Second Amended Plan

Ditech Financial is not receiving a discharge.  Next, the GCAPs argue that the Second Amended

Plan cannot be confirmed because it does not incorporate the effects of section 363(o).  *Id.* at 4.

Matters relating to the application of section 363(o) are separately discussed below.  Third,  the

GCAPs argue that the  Second Amended Plan provides for disparate, unfair, and unreasonable

classification, in violate of sections 1129(a)(1) and 1122 of the Bankruptcy Code because certain

general unsecured creditors will be cured in full (and thus receive recoveries ahead of other

unsecured creditors) upon the assumption and assignment of their contracts to the Buyers where

such contracts are not executory.  *See id.* at 10-14.  This argument is not supported by any facts

in the record or in the law, and is therefore, overruled.  The GCAPs have not demonstrated that

the contracts for assumption and assignment are not executory, or that classification of the

General Unsecured Claims (Class 5) and Consumer Creditor Claims (Class 6) is unfair or

discriminatory.  There is a reasonable basis for such separate classification—namely, to give

effect to the Global Settlement.

Third, several *pro se* Consumer Creditors filed objections, styled as objections to

confirmation, which generally raised issues concerning the payment or status of their respective

mortgage claims.  *See, e.g.*, *Objection of Marsha Chambers* [ECF Nos. 264, 518, 628]

(contending, *inter alia*, that the Debtors did not properly schedule her claim); *Objection of*

*Darryl Keith Browder* [ECF No. 738] (contending that the automatic stay should be lifted to

allow his litigation in Iowa against the Debtors to proceed); and *Objection of Artist and Elaine*

*Thornton* [ECF Nos. 817, 988] (contending that their property may not be sold because it is the

subject of ongoing state court litigation).  No *pro se* consumer borrower appeared at the Hearing

in support of any objections to confirmation of the Second Amended Plan.  In response to these objections, the Debtors say: (i) they are not plan confirmation objections, (ii) these objections/concerns should be addressed through other procedural means (such as a motion for relief from the stay), and/or (iii) the objecting creditors have misunderstood the Sale Transactions and Second Amended Plan and its impact on their individual mortgage loans.  The Court agrees and for these reasons, respectfully overrules these objections.

Remaining outstanding objections that relate to sections 1129(a)(1)-(3), specifically as they relate to the Consumer Creditors' recoupment rights, the application of section 363(o) to the Plan Sale Transactions, and the Debtors' good faith in proposing the plan, are discussed below.

### *Section 1129(a)(4)*

Section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Pursuant to this section, first there must be disclosure of the proposed payment, second the court must approve the reasonableness of payments.  *See In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009) (internal citation omitted); *see also In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990) (holding "procedures for the Court's review and ultimate determination of the fees and expenses paid by the Debtors satisfies Section 1129(a)(4)" (internal citation omitted)); *In re Texaco Inc.*, 84 B.R. 893, 907-08 (Bankr. S.D.N.Y. 1988) (same), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988).  The Second Amended Plan provides that professional fee claims must be approved by this Court pursuant to final fee applications.  *See* Second

Amended Plan § 2.2.  As such, the Second Amended Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### *Section 1129(a)(5)*

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and that such appointment be consistent with the interests of creditors and equity security holders and with public policy.  *See* 11 U.S.C. § 1129(a)(5)(A).  To date, the Debtors have failed to comply with these provisions, as they have not yet disclosed the identity of the Plan Administrator called for under section 1.121 of the Second Amended Plan.[32]  The Debtors have not complied with section 1129(a)(5).

### *Section 1129(a)(7)*

Section 1129(a)(7) contains the so-called "best interests" test.  Whether the Second Amended Plan meets that standard is hotly contested.  The Court considers that matter below.

### *Section 1129(a)(8)*

Section 1129(a)(8) of the Bankruptcy Code provides that:  "[w]ith respect to each class of claims or interests –

> (A) such class has accepted the plan; or
>
> (B) such class is not impaired under the plan."

---

[32]    *See* Hr'g Tr. at 19:14-17, August 7, 2019 [ECF No. 1148] (the "Aug. 7 Tr.") (Debtors' counsel: "[T]hat plan administrator, Your Honor, again, has not been announced, but the creditors have been working with individuals to try to get that firmed up and announced as soon as possible.").

11 U.S.C. § 1129(a)(8). The holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), and Class 8 (Intercompany Interests) are not impaired under the Second Amended Plan and are, therefore, conclusively presumed to have accepted the Second Amended Plan. *See* 11 U.S.C. § 1126(f). Class 3 (Term Loan Claims) is impaired but have voted to accept the plan by holders of more than one-half in number and with claims in excess of two-thirds in amount. *See id.* § 1126(c). Accordingly, section 1129(a)(8) is met as to those classes. However, Class 4 (Second Lien Notes Claims), Class 5 (General Unsecured Claims), Class 6 (Consumer Creditor Claims), Class 9 (Parent Equity Interests), and Class 10 (Subordinated Securities Claims) are also impaired classes (with estimated recoveries of 0%), and they are deemed to have rejected the Second Amended Plan, and their votes were not solicited. *See id.* § 1126(g). Therefore, the Second Amended Plan fails to satisfy section 1129(a)(8) of the Bankruptcy Code.

Notwithstanding the failure to meet subsection (a)(8), the Court may still confirm the Second Amended Plan under the "cram down" provisions of section 1129(b) if "all of the applicable requirements of subsection (a) are met," and the Second Amended Plan "does not discriminate unfairly, and is fair and equitable[.]" *See* 11 U.S.C. § 1129(b)(1)-(2). The cram down requirements of section 1129(b) are discussed below.

### *Section 1129(a)(9)*

Section 1129(a)(9) of the Bankruptcy Code[33] "contains a system of priorities in chapter 11" for certain secured and unsecured administrative, "gap" and tax claims. *See* 7 COLLIER ON

---

[33] That section states:

   Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

BANKRUPTCY ¶ 1129.02[9][a] (16th ed. 2010).  The Second Amended Plan comports with this

section because it provides that:

     i.     holders of allowed section 503(b) administrative expense claims will be paid in full, in cash, on the later of the effective date and the first business day that is thirty days after such claim is allowed.  *See* Second Amended Plan § 2.1.

    ii.     holders of allowed 507(a) priority non-tax claims will (i) be paid in full, in cash, on the later of the effective date and the date that is ten business days after such claim is allowed, (ii) be reinstated, or (iii) receive such other treatment so as to render such holder's claim unimpaired.  *See id.* § 4.1.

   iii.     holders of allowed priority tax claims (i) will be paid cash in an amount equal to such claim on, or as soon thereafter as is reasonably practicable, the later of (a) the effective date, (b) the first business day after the date that is thirty days after such claim is allowed, and (c) the date such claim is due and payable in the ordinary course; or (ii) will receive equal annual cash payments in an aggregate amount equal to the amount of such claim (with interest), over a period not exceeding five years from the [Petition Date].  *See id.* § 2.3.

---

(A)     with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)     with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--
(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C)     with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash-
(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;
(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and
(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D)     with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9).

### Section 1129(a)(10)

Under section 1129(a)(10) "[i]f a class of claims is impaired under the plan, at least one

class of claims that is impaired under the plan [must] accept[] the plan," (excluding any

acceptance of the plan by any insider).  *See* 11 U.S.C. § 1129(a)(10).  Class 3 (Term Loan

Claims) is the only impaired class entitled to vote on the Second Amended Plan.  The class voted

to accept the plan.  Accordingly, section 1129(a)(10) is satisfied.

### Section 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code contains the "feasibility test."  It requires

that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation

is proposed in the plan. 11 U.S.C. § 1129(a)(11).  Thus, in applying the test in these cases, the

Court must determine whether the Second Amended Plan may be implemented and whether it

has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549

(1990); *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 649 (2d Cir.

1988).  The Bartholow Consumers contend that the plan is not feasible because it is unlikely that

the Debtors will be able to make the distributions called for under the plan as set forth in the

Liquidation Analysis.  *See* Bartholow Consumers Obj. ¶ 26.  However, they have submitted no

evidence in support of that contention.  More importantly, Mr. Lombardo's uncontested

testimony establishes that the Second Amended Plan calls for the orderly wind down of the

Debtors' estates and the delivery of distributions to holders of Allowed Claims following the

consummation of the Plan Sale Transactions.  The plan calls for the payment of Allowed

Administrative Expense Claims and Allowed Priority Tax and Non-Priority Tax Claims.  It

makes provision for the payment of all other claims.  The mere prospect of financial uncertainty

cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co.,* 47 B.R. 932, 944

(E.D. Mich. 1985), *aff'd sub nom. Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir. 1986).  The Court overrules the Bartholow objection.

### *Section 1129(a)(12)*

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]" 11 U.S.C. § 1129(a)(12).  Under section 507, such fees are afforded priority as administrative expenses.  *See* 11 U.S.C. § 507(a)(2).  The Second Amended Plan provides for the payment of such fees, together with interest (if any), pursuant to section 31 U.S.C. § 3717, on the effective date and thereafter as may be required.  *See* Second Amended Plan § 12.1.  As such, the Second Amended Plan complies with section 1129(a)(12).

### *Section 1129(a)(13)*

Section 1129(a)(13) requires that a plan,

> provides for the continuation after its effective date of payment of all retiree benefits . . . at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).  The Second Amended Plan provides for the continuation of all existing retiree benefits after the effective date.  *See* Second Amended Plan § 5.9(e).  Accordingly, it satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

To summarize, the Debtors have met their burden of establishing that the plan satisfies (or need not satisfy) the confirmation requirements of sections 1129(a)(4)-(6) and (a)(9)-(16).  The Court now focuses on its discussion on the balance of the plan objections and, in doing so,

whether the Second Amended Plan satisfies the confirmation requirements in sections

1129(a)(1)-(3), and (7).

### I. Do the Debtors and the Second Amended Plan Satisfy
### Section 1129(a)(1)-(3) of the Bankruptcy Code?

Sections 1129(a)(1), (2), and (3) of the Bankruptcy Code provide in substance,

respectively, that for a chapter 11 plan to be confirmed, (i) the plan must comply with the

applicable provisions title 11, (ii) the proponent must comply with the applicable provisions of

title 11, and (iii) the plan must be proposed by means not forbidden by law. 11 U.S.C. §

1129(a)(1)-(3).  Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the

applicable provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(1)

explains that this provision encompasses the requirements of sections 1122 and 1123 of the

Bankruptcy Code governing classification of claims and contents of the plan, respectively.  *See*

H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Johns-*

*Manville Corp.*, 843 F.2d at 648-49; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723,

757 (Bankr. S.D.N.Y. 1992); *In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988)

(observing "applicable provisions" in section 1129(a)(1) include sections 1122 and 1123 of the

Bankruptcy Code).  Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents

comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2).  The

legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the

disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.

*See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the

proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125

regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000);

*Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 759.

Courts have denied confirmation pursuant to sections 1129(a)(1)-(2), where the plan, or

plan proponent's conduct, is contrary to provisions of title 11 not found in chapter 11. *See e.g.*,

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995)

(finding that section 1129(a)(1) requires that plan comply with section 524(e) of Bankruptcy

Code); *In re Beyond.com Corp.*, 289 B.R. 138, 143 (Bankr. N.D. Cal. 2003) (finding proposed

plan that dramatically reduced notice to creditors otherwise applicable under other provisions of

the Bankruptcy Code did not comply with section 1129(a)(1)); *In re Wermelskirchen*, 163 B.R.

793, 796 (Bankr. N. D. Ohio 1994) (finding section 521 of Bankruptcy Code applicable

provision for purposes of 1129(a)(2)).  For purposes of this Memorandum Decision and Order,

the Court will assume that section 1129(a)(1)-(2) requires compliance with all "applicable

provisions" of the Bankruptcy Code, regardless of whether they appear in chapter 11 or

elsewhere in the Bankruptcy Code.

The plan proponent bears the burden of establishing "good faith" under section

1129(a)(3).  *See In re TCI 2 Holdings*, *LLC*, 428 B.R. 117, 142 (Bankr. D. N.J. 2010) (citation

omitted).  "Good faith" is not defined in the Bankruptcy Code.  In evaluating whether a plan is

proposed in "good faith" under section 1129(a)(3), courts consider whether "there is a likelihood

that the plan will achieve a result consistent with the standards prescribed under the Code." *In re*

*Best Products Co., Inc.*, 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994) (quoting *In re Texaco, Inc.*, 84

B.R. at 907); *see also In re Combustion Engineering, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004)

("'[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of

inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the

objectives and purposes of the Bankruptcy Code.'") (citations omitted).  Chapter 11 policies, or objectives, include, "preserving going concerns and maximizing property available to satisfy creditors . . . .[G]iving debtors a fresh start in life, discourag[ing] debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice." *See In re American Capital Equip.*, *LLC*, 688 F.3d 145, 156-57 (3d Cir. 2012) (citations and quotation marks omitted).

If a plan is proposed with "honesty and good intentions" and with "a basis for expecting that a reorganization can be effected" the plan will satisfy section 1129(a)(3). *See In re Johns-Manville Corp.*, 843 F.2d at 649 (citations omitted).  By contrast, a plan that, for instance, is proposed for ulterior motives not aligned with the Bankruptcy Code, will fail to satisfy section 1129(a)(3). *See In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984) (citing, *inter alia*, *Gonzalez Hernandez v. Borgos*, 343 F.2d 802, 805 (1st Cir. 1965) ("A Chapter XII proceeding may not be used as a vehicle to place a debtor's assets beyond the reach of dependent children."); *In re Weathersfield Farms, Inc.*, 14 B.R. 572, 574 (Bankr. D. Vt. 1981) (bankruptcy cannot be used to thwart foreclosure).  "[T]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir.1984) (citation omitted).

With these standards established, the Court will consider the following objections concerning section 1129(a)(1)-(3):

(i)      The Debtors' proposed Second Amended Plan improperly seeks approval of Plan Sale Transactions "free and clear" of the protections of section 363(o)'s proscription against the stripping of consumer borrower claims;

(ii)     The Debtors' proposed Second Amended Plan fails to sufficiently preserve the rights of consumer borrowers to assert defenses of recoupment and setoff under applicable non-bankruptcy law.

(iii)    The terms of the Second Amended Plan—including, for example, the claims
reconciliation process, the selection of the Creditor Recovery Trustee, and
conduct of the Plan Sale Transactions, and the elevation of certain general
unsecured claims (as executory contracts) – were not proposed in good faith and
does not comport with applicable sections of the Bankruptcy Code.

It will address the objections in this order.

## A.    Whether the Second Amended Plan Runs Afoul of Section 363(o)

The Consumer Creditors Committee and others assert that neither the Second Amended

Plan nor the Debtors have complied with the "applicable provisions" of title 11, and the Second

Amended Plan is being "proposed by means . . . forbidden by law," because it fails to comply

with section 363(o)'s proscription against the stripping of Consumer Claims from the Consumer

Creditor Agreements subject to the Plan Sale Transactions.  The Debtors deny that there is merit

to the objection because they are free to sell the Consumer Creditor Agreements free and clear of

Consumer Claims, Consumer Defenses and any other claims or interests not expressly assumed

by the Forward and Reverse Buyers pursuant to sections 1123(b)(4) and 1141(c) of the

Bankruptcy Code.  The Court considers those matters below.

### *The Two Ways to Sell Assets in a Bankruptcy Case*

Sections 1123 and 363 are the two provisions of the Bankruptcy Code that address the

sale of assets during a bankruptcy case.  *See In re New 118th Inc.*, 398 B.R. 791, 794 (Bankr.

S.D.N.Y. 2009) ("A trustee may sell property prior to confirmation, 11 U.S.C. § 363, or through

a plan.") (citing 11 U.S.C. §§ 1123(a)(5)(D), 1123(b)(4)).  Section 1123 applies only in chapter

11 cases.  *See* 11 U.S.C. § 103(g) ("[S]ubchapters I, II and III of chapter 11 of this title apply

only in a case under such chapter.").  It regulates the "contents" of a plan of reorganization.  *See*

11 U.S.C. § 1123; *see also In re Federal-Mogul, Global, Inc.*, 684 F.3d 355, 367 (3d Cir. 2012)

("Section 1123 of the Bankruptcy Code establishes the contents of a plan of reorganization under

Chapter 11."). To that end, it identifies both mandatory and permissive plan provisions. Section

1123(a) contains the Bankruptcy Code's mandatory plan provisions. *See* 11 U.S.C. § 1123(a) (a

plan "shall"). As relevant, section 1123(a)(5) directs that a plan "provide adequate means for the

plan's implementation." 11 U.S.C. § 1123(a)(5). One of the illustrative, non-exclusive means

for implementing a plan of reorganization is through the "sale of all or any part of the property of

the estate, either subject to or free of any lien, or the distribution of all or any part of the property

of the estate among those having an interest in such property of the estate." 11 U.S.C. §

1123(a)(5)(D). A plan can call for such a sale, "[n]otwithstanding any otherwise applicable

nonbankruptcy law[.]" *Id.* However, while section 1125(a) preempts state law, "it does not

displace other portions of the Bankruptcy Code." *In re Federal-Mogul, Global, Inc.*, 684 F.3d at

372 ("Congress unambiguously limited the scope of the 'notwithstanding' clause in §1123(a) to

'non bankruptcy law,' leaving other Code provisions intact."). Section 1123 speaks of

provisions that, subject to section 1125(a), "may" be contained in a reorganization plan. *See* 11

U.S.C. § 1123(b) (subject to section 1123(a), a plan "may"). Section 1123(b)(4), which

supplements section 1123(a)(5)(D), is relevant herein. It states that a plan "may . . . provide for

the sale of all or substantially all of the property of the estate, and the distribution of proceeds of

such sale among the holders of claims or interests." 11 U.S.C. § 1123(b)(4). Thus, "a trustee is

authorized pursuant to 11 U.S.C. s 1123(b)(4) to propose a plan which provides for the sale of all

or substantially all the property of the estate[.]" *In re WHET, Inc.*, 12 B.R. 743, 750 (Bankr. D.

Mass. 1981).

Because, by definition, sales under section 1123 can only be effectuated under a chapter

11 plan, a debtor seeking to sell assets pursuant to section 1123 cannot obtain approval of the

sale without confirming the plan. To do so, the debtor must satisfy broad noticing requirements,

obtain approval of the disclosure statement, and prove that the plan meets the detailed

"confirmation requirements" set forth in section 1129 of the Bankruptcy Code. *See* 11 U.S.C. §§

1123 (specifying required contents and permissive contents of a plan), 1125 (setting forth

requirements for disclosure of the plan and solicitation thereof), 1128 (requiring the court hold a

hearing on confirmation of plan and providing parties in interest may object), 1129 (setting forth

requirements for confirmation). If the debtor satisfies all of the conditions to confirmation and

the court confirms the plan, section 1141 states, in relevant part, that "except as otherwise

provided in the plan or in the order confirming the plan, after confirmation of a plan, the property

dealt with by the plan is free and clear of all claims and interests of creditors, equity security

holders, and of general partners in the debtor." *See* 11 U.S.C. § 1141(c).

Section 363(b) of the Bankruptcy Code is the other section of the Bankruptcy Code

which authorizes a debtor to sell its property. It authorizes a trustee or debtor in possession,

"after notice and a hearing," to "use, sell or lease, other than in the ordinary course of business,

property of the estate[.]" 11 U.S.C. § 363(b)(1). Section 363 applies in cases under chapters 7,

11, 12 and 13 of the Bankruptcy Code. *See* 11 U.S.C. § 103(a). To obtain court approval of

such a sale, the debtor or trustee must prove that the sale is an exercise of its sound business

judgment. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063,

1071 (2d Cir. 1983). *See also In re Advanced Contracting Solutions, LLC*, 582 B.R. 285, 310

(Bankr. S.D.N.Y. 2018). A sale pursuant to section 363(b) may be made "free and clear of any

interest in such property" if the trustee or debtor satisfies any of the conditions set forth in

section 363(f).[34] The power under section 363 to authorize sales of assets "free and clear" of

---

[34]    Section 363(f) states:

    The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest
    in such property of an entity other than the estate, only if—

interests is related to the plan discharge provisions in section 1141(c) of the Bankruptcy Code. *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olsen Indus., Inc.)*, 467 B.R. 694, 704 (S.D.N.Y. 2012). Nonetheless, the "free and clear" relief available to a debtor under section 363(f) is narrower than that afforded to a debtor under a confirmed plan because the relief is limited to "interests" in property and only to the extent provided for under section 363(f)(1)-(5). The Bankruptcy Code does not define the term "interest" as used in section 363(f) and courts address the phrase "on a case-by-case basis." *PBBPC, Inc. v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860, 867 (B.A.P. 1st Cir. 2013); *see also Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000) ("Courts faced with the task of defining the scope of the term 'any interest' have been unable to provide a precise definition."). Recently, in *Elliott v. GM LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016) (hereinafter "Elliott"), the Second Circuit considered whether successor liability claims are "interests" under section 363(f). As relevant, in that case the bankruptcy court entered an order authorizing the debtor ("Old GM") to close a sale of substantially all of its assets to a buyer ("New GM") pursuant to section 363(f) of the Bankruptcy Code. *Id.* at 145. The sale order provided that the property transferred was free and clear of certain liabilities associated with Old GM, effectively barring those liabilities from being asserted against New GM as a successor. *Id.*

---

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

at 146-147.  After the sale closed, a group of plaintiffs initiated an adversary proceeding in the

bankruptcy court against New GM, asserting claims arising from ignition switch defects in

certain vehicles manufactured by Old GM.  Following the bankruptcy court's adjudication of that

proceeding, they appealed to the Second Circuit.  *Id.* at 152.  Among other things, the appellants

challenged the extent to which the bankruptcy court could absolve New GM as a successor

corporation of Old GM's liabilities.  In considering the scope of a bankruptcy court's power to

sell assets free and clear of interests in property under section 363(f) the Second Circuit held that

"successor liability claims can be 'interests' [under § 363(f)] when they flow from a debtor's

ownership of transferred assets." *Id.* at 155.  In doing so, it looked, in part, to the breadth of the

"free and clear" relief available under section 1141(c) to a debtor under a confirmed plan.  The

Court reasoned that although section 363(f) does not "expressly invoke the Chapter 11 definition

of 'claims' . . . it makes sense to 'harmonize' Chapter 11 reorganizations and § 363 sales 'to the

extent permitted by the statutory language.'"  *See id.* (citing *In re Chrysler LLC*, 576 F.3d 108,

125 (2d Cir. 2009) *vacated as moot* 592 F.3d 370 (2d Cir. 2010); *In re Lionel Corp.*, 722 F.2d at

1071).  The Second Circuit concluded that "the bankruptcy court's power to bar 'claims' in a

quick § 363 sale is plainly no broader than its power in a traditional Chapter 11 reorganization."

*Id.* at 155-56 (comparing 11 U.S.C. § 363(f) ("free and clear of any interest in such property")

*with* 1141(c) ("free and clear of all claims and interests.").  Thereafter, the Court considered what

type of claims can be "reorganiz[ed]" under chapter 11 generally.  *See Elliott*, 829 F.3d at 156

(discussing definition of "claim" contained within section 101(5) of the Bankruptcy Code).

After reasoning that the term "claim" cannot extend to completely unknown and unidentifiable

claims, the Second Circuit reached the following holding:

> [A] bankruptcy court may approve a § 363 sale 'free and clear' of successor liability
> claims if those claims flow from the debtor's ownership of the sold assets [and]

> [s]uch . . . claim[s] . . . arise[s] from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim.  Further there must be some contact or relationship between the debtor and the claimant such that the claimant is identifiable.

*Id.* at 156.  Other courts have similarly recognized that claims arising from property can constitute "interests" for purposes of section 363(f).  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) (finding employment discrimination and travel voucher claims were "interests" because they were connected to or arose from the assets sold); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) (concluding that claim-holders' rights to collect premiums from a purchaser of coal assets under the Coal Industry Retiree Health Benefit Act of 1992 were "interests" under section 363(f) because the claims were "grounded, at least in part, in the fact that those very assets have been employed for coal mining purposes"); *In re Old Carco, LLC*, 538 B.R. 674, 684-85 (Bankr. S.D.N.Y. 2015) (holding that manufacturer's experience rating was an "interest" because it arose from the assets and continuation of the business); *In re Mundy Ranch, Inc.*, 484 B.R. 416, 421-23 (Bankr. D. N.M. 2012) (finding that a partition claim was an "interest" under section 363(f)).

Section 363(o) of the Bankruptcy Code applies in asset sales under section 363.  It provides an exception to the application of section 363(f), and states that:

> Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

*See* 11 U.S.C. § 363(o).  It was enacted in 2005 in an effort to address what Senator Schumer

described in 2001 as "a new problem" with predatory lenders.  147 CONG. REC. 2018, at *2032

(March 8, 2001).  He described the problem as follows:

> We have a new problem with these predatory lenders . . . In recent months, several
> large subprime lenders have obtained orders from bankruptcy courts, providing for
> the sale of their loans or the servicing rights associated with them under section 363
> of the bankruptcy code.  Consumers who have attempted to challenge these loans
> or their servicing obligations based on violations of fair lending laws have been told
> by the purchasers of these loans they were sold free and clear of any consumer
> claims and defenses.  The fact that innocent borrowers can be left in the lurch is flat
> out wrong.

*See id.*  If section 363(o) is applicable to a sale of interests in consumer credit contracts or

transactions, the buyer of those assets will be subject to claims and defenses related to the assets

"to the same extent" the buyer would be so liable "had such interest been purchased at a sale not

under this section."  Thus, section 363(o) does not create rights not otherwise available to a

consumer borrower under non-bankruptcy law and does not limit defenses to liability otherwise

available to purchasers.  In this regard, it is possible that even if section 363(o) takes effect, the

purchaser will not be subject to consumer claims because under "traditional common law, a

corporation that purchases the assets of another corporation is generally not liable for the seller's

liabilities."  *See New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).

### The Dispute Concerning Section 363(o)

Pursuant to the Plan Sale Transactions under the Second Amended Plan, the Debtors seek

to sell interests in Consumer Creditor Agreements free and clear of Consumer Claims.[35]  It is

undisputed that if the Debtors were conducting those transactions as pre-confirmation sales under

---

[35]    As noted above, part of the Reverse Sale contemplates a reorganization transaction.  The parties did not brief
the issue of whether that aspect of the transaction would constitute a "sale" for purposes of section 363(o).  As
discussed below, that issue need not be reached because even if it were to be considered a "sale," section 363(o)
would still not apply.

section 363 of the Bankruptcy Code, and sought to transfer the assets "free and clear" of Consumer Claims and other liabilities flowing from the Debtors' ownership of the Consumer Creditor Agreements pursuant to section 363(f), section 363(o) would apply to the transactions. In that case, the Forward and Reverse Buyers would remain subject to Consumer Claims and Consumer Defenses related to the Consumer Creditor Agreements to the same extent as they would be subject to such claims and defenses had the "free and clear" provisions of section 363(f) not taken effect.  Courts routinely include section 363(o) protections in chapter 11 cases where a chapter 11 debtor is selling its assets outside of a plan pursuant to sections 363(b) and (f).[36]

The parties dispute whether section 363(o) applies to an asset sale under section 1123 of the Bankruptcy Code.  One aspect of that dispute centers on the interpretation of the language of the statute and, specifically, clauses "*if such interest is purchased through a sale under this section*" and "*to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.*"  The text below shows that the former triggers application of section 363(o), while the latter accounts for the effect of the application of the section:

> Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), *and if such interest is purchased through a sale under this section, then* such person shall remain subject to all claims and defenses that are related to such consumer credit

---

[36]    *See, e.g., In re Accredited Home Lenders Holding Co.*, No. 09-11516, 2010 Bankr. LEXIS 3274, at *24 (Bankr. Del. Jan. 20, 2010) (sale of mortgage loans and real property of the Debtors outside of a proposed Chapter 11 plan); *In re Residential Capital, LLC*, No. 12-12020 (MG), 2012 Bankr. LEXIS 6318, at *25 (Bankr. S.D.N.Y. Nov. 21, 2012) (approving BH Legacy Asset Purchase Agreement proposed outside of, and not incorporated into, any Chapter 11 plan); *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG), ECF No. 2247 (Bankr. S.D.N.Y. Nov. 21, 2012) (asset sale outside of Chapter 11 plan); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KCC), ECF No. 844 (Bankr. D. Del. May 13, 2007) (same); *In re Am. Home Mortg. Holdings, Inc.*, Case No. 07-11047 (CSS), ECF No. 1711 (Bankr. D. Del. Oct. 30, 2007) (same).

transaction or such consumer credit contract, *to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.*

11 U.S.C. § 363(o) (emphasis added).  The Debtors interpret the triggering clause "and if such interest is purchased through a sale under this section," to mean: "and if such interest is purchased through a sale under section [363]."  Debtors Memorandum ¶ 178; *see also Debtors Presentation for Confirmation of the Second Amended Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* at 14.[37]  Thus, they maintain that the sale of a Consumer Creditor Agreement under section 1123 does not implicate section 363(o).  *Id.* ¶ 181.  A premise underlying the Debtors' reading of the statute is that a chapter 11 debtor can sell assets under a plan "free and clear" of claims without invoking section 363(f).  *Id.* ¶¶ 181-85.  They say that is so because sections 1123(a)(5)(D) and 1123(b)(4) provide that a plan may be implemented through an all-asset sale and, upon confirmation, section 1141(c) will provide the free and clear treatment of the assets sold in accordance with the plan.  *Id.* ¶ 184.  Thus, they argue that satisfying the conditions of section 363(f) to provide "free and clear" treatment to a purchaser (as limited by section 363(o)) is not a pre-requisite to confirming a plan proposing a free and clear sale for purposes of section 1129(a)(1)-(3).

The Debtors interpret section 363(o)'s effect clause:

Notwithstanding subsection (f), if . . . then such person shall remain subject to all claims and defenses *. . . to the same extent as such person would be subject to such claims and defenses had such interest been purchased at a sale not under this section.*

to mean:

---

[37]    The Forward Buyer filed a joinder to the Debtors Memorandum and largely makes the same points as the Debtors.  *See* [ECF No. 1027].  The Court will refer to all section 363(o) arguments made in support of confirming the Second Amended Plan as the Debtors' arguments.

> Notwithstanding subsection (f), if . . .then such person shall remain subject to all claims and defenses . . . *to the same extent as such person would be subject to such claims and defenses had such interest been purchased at a [non-bankruptcy sale].*

*See* Hr'g Tr. at 32:1-9, August 8, 2019 [ECF No. 1155] (the "Aug. 8 Tr."). At bottom, the Debtors read section 363(o) to apply only to a pre-plan sale under section 363. *See id.* They submit that section 363(o) limits the scope of section 363(f)'s "free and clear" relief so that the purchaser takes an interest in a Consumer Creditor Agreement as if section 363(f) had no effect to cleanse the Consumer Creditor Agreement of Consumer Claims and Consumer Defenses, leaving the purchaser open to potential future litigation to the same extent as if the sale was an ordinary course, non-bankruptcy sale. *See id.* The Debtors concede that this reading of the statute provides Consumer Creditors with different rights in a pre-plan section 363 sale and a plan sale but argue that the legislative history of section 363(o) and the absence of cross-references elsewhere in the Bankruptcy Code evidences Congress's clear intent to do just that. *See* Debtors Memorandum ¶¶ 172-173. Moreover, they contend that it is not unprecedented to provide different rights to parties in a plan sale context versus a pre-plan section 363 context. *See id.* ¶ 189 (citing *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008); *see also* Forward Buyer Response ¶ 17 (same)).

The Consumer Creditors Committee, the U.S. Trustee and others offer a different construction of the statute. First, they argue that section 363(o)'s triggering phrase "*and if such interest is purchased through a sale under this section*" should be read to mean "*and if such interest is purchased through a sale under [section 363(f)].*" Although that interpretation may seem similar to that of the Debtors, the committee and others give it an entirely different meaning because they contend that section 363(f) is the only authority in the Bankruptcy Code which permits sales free and clear of claims arising out of the sold property. *See* Consumer

Creditors Committee Objection ¶ 39.  The committee argues that when a debtor seeks to sell assets "free and clear" of claims under a plan it can only do so pursuant to section 363(f) of the Bankruptcy Code.  *See id.* ¶¶ 4-5.  It contends that section 363(f) regulates the scope of "free and clear" sales, both in the context of pre-plan sales pursuant to section 363 and plan sales pursuant to section 1123.  *See* Aug 8 Tr. at 79:11-80:3.  From there, the committee contends that section 363(f), as limited by section 363(o), is an "applicable provision[] of the Bankruptcy Code" that the Debtors must comply with to satisfy sections 1129(a)(1)-(3), and before a plan that calls for a sale "free and clear" of claims can be confirmed.  *See* Consumer Committee Objection ¶ 38.  It argues the Second Amended Plan therefore cannot be confirmed because it does not comply with section 363(f), as limited by section 363(o).  *Id.*

Second, the Consumer Creditors Committee interprets the section 363(o) effect clause:

> then such person shall remain subject to all claims and defenses . . . ***to the same extent as such person would be subject to such claims and defenses . . . had such interest not been purchased at a sale not under this section.***

to mean:

> Then such person shall remain subject to all claims and defenses . . . ***to the same extent as such person would be subject to such claims and defenses*** . . . had such interest not been purchased at a sale not ***under [section 363(f)].***

*See* Aug. 8 Tr. at 79:11-80:3.  The committee argues that this clause demonstrates Congress's understanding that section 363(f) is the only provision that may authorize free and clear sales in bankruptcy.  *See* Sur-Reply ¶¶ 4-5.  It reasons that if a plan sale could provide for free and clear treatment of Consumer Claims without invoking section 363(f), the purchaser in a pre-plan section 363(f) sale could take assets subject to Consumer Claims "to the same extent" as the free and clear plan sale.  The committee therefore argues the Debtors' interpretation, that plan sales can be effectuated free and clear without implicating section 363(f), cannot be correct because it would have the effect of rendering section 363(o)'s effect a nullity in pre-plan section 363(f)

sales. *Id.* ¶ 5.  Like the Debtors, the committee argues that the legislative history of section

363(o) supports their interpretation.

The objecting parties also advance several independent arguments as to why section

363(o) should apply here:

- The U.S. Trustee and certain other parties argue that because the Debtors invoked section 363 of the Bankruptcy Code in connection with running the Post-Petition Sale Process, they should not be able to say now that the sales are not under section 363 such that section 363(o) does not apply.  *See* U.S. Trustee Objection at 17-18; NYAG Objection ¶ 19.

- The U.S. Trustee argues that because section 363 has increasingly been utilized as a vehicle for major transactions, it makes sense to import section 363(o)'s effect to plan sales by finding section 363(o) an "applicable provision of title 11" that the Debtors must comply with in order to confirm their plan under section 1129(a).  *See* U.S. Trustee Objection at 18.

- The Attorney General of the State of New York ("NYAG") and United States of America (the "U.S. Government"), through the Office of the United States Attorney for the Southern District of New York, argue that public policy supports giving effect to section 363(o) in these cases.  They are concerned that if section 363(o) is not given effect, it could interfere with state and federal government enforcement actions and certain state programs designed to protect consumer borrowers.  *See* NYAG Objection ¶¶ 21-33; U.S. Government Objection ¶¶ 34-41.[38]

The Court considers those matters below.

### *Whether The Debtors Can Confirm A Plan Calling For The "Free and Clear" Sale Of Consumer Creditor Agreements Without Resorting To Section 363 Of The Bankruptcy Code*

A chapter 11 plan is a contract between the debtor and its creditors.  *See Lawski v.*

*Frontier Ins. Grp., LLC (In re Frontier Insurance Group, Inc.)*, 585 B.R. 685, 693 (Bankr.

---

[38]    Additionally, the NYAG filed a claim against RMS in an amount of no less than $1,000,000 in connection with an ongoing investigation of RMS.  *See* NYAG Objection ¶ 4.  It requests that the plan be amended to exempt its claim from any releases.  *Id.* ¶ 34.

S.D.N.Y. 2018) ("It is often stated that a chapter 11 plan is a new contract between the debtor

and its creditors[.]").  Through a chapter 11 plan, a debtor can resolve disputed claims and rights

to property.  *See id.* (noting that "the chapter 11 plan is the crucible by which the parties' claims

and rights in property dealt with under the plan are transformed and governed post-

confirmation[.]").  That is one way that a plan sale differs from an asset sale under section 363

because the former can provide for the distribution of sale proceeds among creditors, while, as a

general rule, the latter cannot.  *See Clyde Bergemann, Inc. v. The Babcock & Wilcox Co. (In re*

*The Babcock & Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 ... do

not allow a debtor to gut the bankruptcy estate before reorganization or to change the

fundamental nature of the estate's assets in such a way that limits a future reorganization plan."

(citing *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983)); *In re Gulf Coast Oil*

*Corp.*, 404 B.R. 407, 414 (Bankr. S.D. Tex. 2009).  Given the breadth of relief available to a

debtor under a chapter 11 plan, the Bankruptcy Code mandates, among other things, that a debtor

satisfy broad noticing requirements, obtain approval of disclosure statement, and propose a plan

that complies with the many provisions in section 1129 of the Bankruptcy Code before it is

confirmed.  As the *Gulf Coast Oil Corp.* court observed, this process is more fulsome than that

involved in obtaining leave to conduct an asset sale under section 363:

> A § 363(b) sale is generally viewed as quicker.  Only a motion and a hearing are
> required, and most courts apply a 'business judgment test' to determine whether to
> approve the sale.  By contrast, confirmation of a chapter 11 plan usually involves
> (i) preparation, court approval, and distribution of a disclosure statement, (ii) voting
> by creditors to accept or to reject the plan, and (iii) determination by the Court of
> whether the plan meets statutory confirmation standards.

*Id.* at 415 (citations omitted).  As such, a sale effectuated pursuant to a plan can provide benefits

such as the sale free and clear of successor liability and the authority to transfer free and clear of

a lien. *Id.* (citing 11 U.S.C. § 1123(a)(5)(D); George W. Kuney, *Misinterpreting Bankruptcy Code 363(f) and Undermining the Chapter 11 Process*, 76 Am. Bankr. L.J. 235 (2002).

While the Consumer Creditors Committee submits that section 1123(a)(5)(D) arguably only provides that a plan may transfer assets free and clear of liens, not claims arising from property,[39] and that section 1141(c)'s free and clear power "puts the cart before the horse" because it only applies after a plan is confirmed,[40] these arguments miss the point. Sections 1123(a)(5)(D) and 1123(b)(4) together provide that a plan may propose a sale of substantially all property of the estate free of *in rem* interests and then distribute the proceeds to holders of claims. *See* 11 U.S.C. §§ 1123(a)(5)(D), 1123(b)(4). Further, the plan may also provide that, upon confirmation, the sale be free and clear of claims arising from property pursuant to section 1141(c). *See* 11 U.S.C. § 1141(c); *In re Motors Liquidation Co.*, 829 F.3d at 155 (reasoning "the bankruptcy court's power to bar 'claims' in a quick § 363 sale is plainly no broader than its power in a traditional Chapter 11 reorganization."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987) (reasoning "[t]he court's power to sell free and clear is limited by its authority to affect claims . . . . Its equitable power to sell free and clear must be interpreted consistent with its power to discharge claims under a plan of reorganization" (internal citation omitted)). In contrast to sales under section 363(f), which only provide free and clear treatment if one of five criteria is met, the "*quid pro quo*" for section 1141(c)'s free and clear benefit is "negotiation and acceptance (or cram down) of a chapter 11 plan." *See In re Gulf Coast Oil Corp.*, 404 B.R. at 414. In this way, while section 1141(c) undoubtedly only takes effect upon confirmation of a

---

[39]    *See* Consumer Creditor Committee Objection ¶¶ 48-49.

[40]    *See* Consumer Creditor Committee Objection ¶¶ 7, 51-52.

plan, it does not diminish the ability to propose a section 1123 plan sale that contemplates free and clear treatment upon confirmation pursuant to section 1141(c).  *See Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.*, 333 B.R. 30, 54 (S.D.N.Y. 2005) ("This is a Chapter 11 case. Chapter 11 authorizes the alteration of objecting creditors' rights through the plan confirmation process."), *rev'd on other grounds*, 600 F.3d 231 (2d Cir. 2010).  That is what the Second Amended Plan calls for here.  *See* Second Amended Plan § 5.6(a)(i) (providing that, on the closing date of  the Forward APA, the Forward Sale will be consummated pursuant to section 1141 and terms of the Forward APA, Second Amended Plan, and Confirmation Order); *id.* § 5.6(b)(i) (providing that the Reverse Sale will be consummated pursuant to the Reverse SAPA, Second Amended Plan, and Confirmation Order).  Moreover, the Consumer Creditors Committee and other consumer creditors have been actively involved in these cases, their claims are being "dealt with" by the plan (i.e. classified and treated in Class 6), and neither the confirmation order or plan will preserve their claims.  The Court therefore sees no reason why section 1141(c) cannot provide that the property transferred to the Buyers be "free and clear" of claims upon confirmation, just as it would be free and clear of liens.  *See In re Frontier Ins. Grp., Inc.*, 585 B.R. at 697 ("Section 1141(c)'s 'dealt with' requirement is satisfied by, among other things, a plan provision stating that 'all property' of the debtor shall be free and clear of claims, liens and interests, that is, a general reference that would encompass the property at issue, in light of the principle that 'creditors have a responsibility to take an active role in protecting their claims.'").  As Professor Kuney notes:

> The Bankruptcy Code provides two separate and distinct sets of provisions under which a Chapter 11 debtor or trustee may sell property free and clear of claims or interests.   Sections 363(b) and 363(f) govern sales prior to plan approval and impose only the Bankruptcy Code's minimal requirements for notice and a hearing.   Sections 1123(a)(5)(D) and 1141(c) govern sales made a part of a plan of reorganization confirmed after extensive disclosure and a multiple hearing

As would be expected given the more extensive process involved in plan confirmation, the literal language of §§ 1123 and 1141 gives the bankruptcy court broader authority to approve sales free and clear of claims and interests than does § 363(f), which requires little in the way of notice, disclosure, and an opportunity for objectors and alternate bidders to actually be heard. Section 1141(c) authorizes the post-sale vesting of property free and clear of all "claims and interests," whereas § 363(f) only authorizes the sale free of "any interests."

George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process*, 76 Am. Bankr. L.J. 235, 236-37 (2002). *See also In re Gen. Motors Corp.*, 407 B.R. 463, 486-87 (Bankr. S.D.N.Y. 2009) ("[S]ection 1123 of the Code . . . provides, as one of the things that a plan *may do*: provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests . . . . But neither section 363 nor section 1123(b)(4) provides that resort to 1123(b)(4) is the only way by which all or substantially all of the assets can be sold in a chapter 11 case.") *enforcement denied, In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015) *aff'd in part and rev'd in part on other grounds, In re Motors Liquidation Co.*, 829 F.3d 135, 152 (2d Cir. 2016) ("The Code permits a debtor to sell substantially all of its assets to a successor corporation through a section 363 sale, outside of the normal reorganization process.").

Accordingly, while the Second Amended Plan will need to withstand scrutiny under the standards of section 1129 before it is confirmed and the free and clear sales are effectuated, it does not follow that section 1141(c) cannot be invoked to provide that the property dealt with by the plan upon confirmation will be free and clear of claims. As such, and as further discussed below, complying with section 363(f) is not necessary to confirm a plan that provides for a sale free and clear of claims upon confirmation.

### Whether Section 363(o)Applies Only to Sale Transactions Under Section 363 and Not Plan Sales Under Section 1123

The Court next considers whether section 363(o) mandates that it apply to sales of Consumer Creditor Agreements not under section 363(f). It is well established that, "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Trustee,* 540 U.S. 526, 534 (2004) (citations omitted). The Debtors contend that it is clear from both the plain language of section 363(o) (reproduced above) and its legislative history that section 363(o) applies only to asset sales under section 363 of the Bankruptcy Code.[41] The Court credits those contentions. As set forth above, the statute is clear that a purchaser of an "interest in consumer credit transactions" or an "interest in consumer credit contracts" will be subject to section 363(o) only "if such interest is purchased through a sale under . . . section [363]." 11 U.S.C. § 363(o). Thus, the statute speaks only to sales under section 363.

The legislative history supports that reading of the statute. On March 8, 2001, Senator Schumer proposed the following amendment to section 363 (proposed as subsection (p)), as part of the Bankruptcy Reform Act of 2001:

> Notwithstanding subsection (f), the sale by a trustee or transfer under a plan of reorganization of any interest in a consumer credit transaction that is subject to the Truth in Lending Act (15 U.S.C. 1601 et seq.), or a consumer credit transaction as defined by the Federal Trade Commission Preservation of Claims Trade Regulation, is subject to all claims and defenses which the consumer could assert against the debtor.

---

[41]   They also contend that section 363(o) is not applicable to an asset sale under a chapter 11 plan because (i) it is a "self-contained" statute, unlike sections 363(c)(2), 363(k) and 365 of the Bankruptcy Code, which are expressly incorporated in chapter 11. *See* Debtors Memorandum ¶ 177. *See also* 11 U.S.C. §1129(b)(2)(A) (incorporating section 363(k)); 1123(b)(2) (incorporating section 365). They also contend that section 1141 provides no "section 363(o)-style" exceptions to discharge for the claims that section 363(o) would except from a free and clear transfer under section 363(f). *See* Debtors Memorandum ¶¶ 191-192.

147 CONG. REC. 2018, at *2031 (March 8, 2001).  Thus, as proposed, the legislation applied to

the transfer "of any interest in a consumer credit transaction that is subject to the Truth in

Lending Act (15 U.S.C. 1601 et seq.), or a consumer credit transaction as defined by the Federal

Trade Commission Preservation of Claims Trade Regulation" inside and outside of a plan of

reorganization, and made the asset transfer "subject to all claims and defenses that the consumer

could have asserted against the debtor."  In support of the proposed amendment, Senator

Schumer stated:

> By adopting this amendment, we can take a very small but important step against
> predatory lending.  We will prevent predatory lenders from being able to use
> bankruptcy as a means by which to shield themselves from liability and cut off
> consumer claims and defenses . . . . We will prevent predatory lenders from being
> able to use the bankruptcy code as a means by which to shield themselves from
> liability . . . . And we will protect consumers from those who seek to purchase
> predatory loans with the knowledge that the consumer's right has been undermined.

*Id.*  Five days later the Senate took the provision up for further debate.  Senator Hatch sought

unanimous consent to call up this proposed provision and stated that "there is expected to be an

amendment to his amendment by Senator [Phil] GRAMM." 147 CONG. REC. 2184, at *2189-

90 (March 13, 2001). Senator Gramm's proposed amendment (i) removed the language "under a

plan of reorganization," (ii) narrowed the scope of section 363(o) to a sale under section 363, and

(iii) limited potential successor liability to such claims and defenses available to the consumer

had the sale taken place other than under title 11.  The amendment read, as follows:

> Notwithstanding subsection (f), if a person purchases any interest in a consumer
> credit transaction that is subject to the Truth in Lending Act (15 U.S. Code 1601 et.
> seq.), or any interest in a consumer credit contract as defined by the Federal
> Trade Commission Preservation of Claims Trade Regulation, and that interest is
> purchased through a sale under this section, then that person shall remain subject
> to all claims and defenses that are related to the consumer credit transaction or
> contract, to the same extent as that person would be subject to such claims and
> defenses of the consumer had the sale taken place other than under title 11.'

*Id.* at *2191.  Senator Gramm's modification therefore represents a significant scaling back of Senator Schumer's amendment by ensuring section 363(o) does not apply to a transfer pursuant to a plan and does not automatically subject purchasers to all claims that could otherwise be asserted against the debtor.  Still, Senator Gramm opposed the amendment.  He argued the broad original language would make mortgage assets unmarketable in bankruptcy to the prejudice of the debtor's creditor body.  *See id.* ("Here is the problem in a nutshell: This will destroy the secondary market for the assets of bankruptcy companies . . . . The people who are going to suffer are the creditors who won't be able to sell the assets of the company because there will be a potential cloud against those assets."); *see also id.* at *2192 ("What we would do if this amendment passed is we would literally cloud the title and the marketability of every financial asset of every financial company in America").  He also voiced a concern that "people who may have . . . . imagined or made-up grievances against the company" would be encouraged to sue a purchaser of section 363(o) assets.  *See id.*  Following Senator Gramm's remarks, Senator Schumer again rose to defend the amendment as modified.  He explained his understanding of the amendment as follows:

> What it does is very simple.  It deals with the kinds of situations . . . . That the predatory lender sells knowingly to the secondary mortgagor and that mortgagor then says: There is nothing I can do.  Even though I knew these were horrible loans that violated the law, I am immune from any claim.

*See id.*  Before passage, the proposed legislation was slightly modified from Senator Gramm's version of section 363(o) as follows.  The below prior language:

> **and that** interest is purchased through a sale under this section, **then that** person shall remain subject to all claims and defenses that are related to the consumer credit transaction or contract, **to the same extent as that person would be subject to such claims and defenses of the consumer had the sale taken place other than under title 11**.

changed to the current version:

*and if such* interest is purchased through a sale under this section, *then such* person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as *such* person would be subject to such claims and defenses of the consumer *had such interest been purchased at a sale not under this section.*

The Consumer Creditors Committee argues that this change is clear evidence of Congress's understanding that section 363(f) is the only authority pursuant to which a debtor can conduct a free and clear bankruptcy sale—whether pre-plan or pursuant to a plan. *See* Sur-Reply ¶¶ 4-5. It argues that if a free and clear sale can occur under a plan sale "not under this section [363(f)]" then by section 363(o)'s effect clause, a purchaser in a section 363 sale will be able to take assets free and clear of Consumer Claims. *Id.*; *see also* 11 U.S.C. § 363(o) (subjecting purchaser to consumer claims and defenses "to the same extent as such person would be subject to such claims and defenses had such interest been purchased at a sale not under this section"). As discussed above though, plan sales *can* be free and clear of claims without invoking section 363(f). Moreover, there is nothing in the legislative history that suggests that Congress's last change to the amendment that would become section 363(o) was intended to undo the initial compromise which limited the amendment's application to section 363 sales, as opposed to section 363 and plan sales.[42] In this regard, the Court surmises that the change was likely made to conform language in section 363(o)'s effect clause: "a sale not under this section" to match language in its triggering clause: "and if such interest is purchased through a sale under this section."

---

[42] As the Supreme Court recently explained, "often and by design it is 'hard-fought compromise[ ],' not cold logic, that supplies the solvent needed for a bill to survive the legislative process," and "[i]f courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to 'tak[e] . . . account of' legislative compromises essential to a law's passage and, in that way, thwart rather than honor 'the effectuation of congressional intent.'" *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019) (*quoting Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 374 (1986)).

It is sensible to interpret section 363(o)'s triggering and effect clauses together in this way.  If a purchaser acquires an interest in a Consumer Creditor Agreement under a section 363 sale, it takes the agreement subject to Consumer Claims and Consumer Defenses to the same extent as if section 363(f) did not take effect in the section 363 sale.  If a purchaser acquires an interest in a Consumer Creditor Agreement not under a section 363 sale, section 363(o) does not apply.  In this way, the Court avoids interpreting section 363(o) in a way that would lead to the bizarre result that the Consumer Creditors Committee contends must follow if plan sales can be free and clear without being authorized under section 363.  *See In re Federal-Mogul, Global, Inc.*, 402 B.R. 625, 642 (Bankr. D. Del. 2009) (noting "'[a] basic tenet of statutory construction is that courts should interpret a law to avoid bizarre or absurd results'" (quoting *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006))).  Bolstering the Court's interpretation of section 363(o) is the fact that neither section 363(f) nor section 363(o) appear anywhere else in the Bankruptcy Code.  Section 363 does not appear, as section 365 does, in section 1123.  *See* 11 U.S.C. § 1123(b)(2) ("subject to section 365").  Nor does it appear, as does section 363(k), in the Bankruptcy Code's "cram-down" provisions, which provide substantive rights to impaired creditors.  *See* 11 U.S.C. § 1129(b)(2); *id.* § 1129(b)(2)(A)(ii) ("subject to section 363(k)").  Finally, section 1141 does not limit the free and clear effect that a confirmed plan has on property dealt with under the plan by the limitations of section 363(o).  This all suggests that Congress intended to limit section 363(o)'s effect to pre-plan sales, not chapter 11 reorganizations, including those effectuated through plan sales.  *See Lorrilard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change"); *see also Cervantes-Ascencio v. U.S. I.N.S.*, 326 F.3d 83 (2d. Cir. 2003) (finding no

authority, "absent substantial evidence to the contrary, to 'add terms or provisions where

Congress has omitted them'") (citation omitted).

### Whether Section 363(f) Is An "Applicable Provision" Of Title 11 Under Section 1129(a)(1)-(2) and Whether Proposing a Sale Free and Clear of Consumer Claims is "Forbidden By Law" Under Section 1129(a)(3)

While it is true that chapter 3 of the Bankruptcy Code applies in chapter 11 cases—*see* 11

U.S.C. § 103(a)—it does not follow that all such provisions are applicable in every chapter 11

case. Here, where a debtor proposes a sale pursuant to a plan, the sale is not under section 363

and, by its plain terms, section 363(f) is inapplicable.

The Court disagrees that, in this case, section 363(f) and section 363(o) are "applicable

provisions" of title 11. The Consumer Creditors Committee cites a number of cases and court

orders in support of its contention that section 363(f) is applicable to plan sales. The Court

accords little weight to them, as they are distinguishable.[43] Moreover, the Court is aware of

---

[43] The Consumer Creditors Committee cites cases and confirmation orders entered in other cases to support the proposition that "where a plan contemplates the sale of assets free and clear, section 1129(a)(1) incorporates the requirements of section 363(f). *See* Consumer Committee Objection ¶¶ 43-44. The Court gives no weight to the various confirmation orders which apply section 363(f) as they do not indicate the rationale for doing so. Moreover, each case cited by the committee is distinguishable. It cites *In re Patriot Place, Ltd.* where the court determined that a plan which proposed a sale free and clear of a leasehold interest did not comply "with the applicable provisions of § 363(f)" and accordingly denied confirmation of the plan pursuant to section 1129(a)(1). 486 B.R. 773, 814 & n.22 (Bankr. W.D. Tex. 2013). That case is inapposite because the plan there expressly invoked section 363(f) for authority for the sale and the court did not discuss why section 363(f) is applicable in the first instance. *See id.* at 814 ("The PPL Plan . . . seeks to sell . . . 'free and clear' . . . under § 363(f)[.]"). The Committee also quotes *In re Dynamic Tooling Sys., Inc.*, as follows: "[the] acquisition of the [debtor's] assets can only be characterized as a sale under § 1123(b)(4) and, to the extent the sale is made free and clear of liens and interests, the concepts of § 363(f) governing such sales are implicated." *See* 349 B.R. 847, 855 (Bankr. D. Kan. 2006). That court did not find section 363(f) was an "applicable provision" for purposes of confirmation. Instead, the court mentioned section 363(f) simply to inform a discussion of whether a sale can be free and clear of a licensee's right to use intellectual property, notwithstanding section 365(n) of the Bankruptcy Code which generally allows lessees to elect to retain their rights to use intellectual property if a debtor rejects its license. *See id.*; *see also* 11 U.S.C. § 365(h). The court ultimately determined to use "the Court's § 363(e) powers" to order that the sale not be free and clear of the licensee's rights. *See id.* at 855-56. It did not hold that section 363(f) must apply to a plan sale. Finally, the Consumer Creditors Committee cites *In re Saint Peter's School* because the court referenced section 363(f)(3) in a discussion of whether a debtor had demonstrated an effective reorganization was likely for adjudicating a lift stay motion. *See* 16 B.R. 404, 409 (Bankr. S.D.N.Y. 1982). The Court finds that discussion insignificant because it was dicta made after the court determined that the debtor had not demonstrated it would satisfy section 1129(b)(2)(A)(ii) of the Bankruptcy Code. *See id.* at 409 ("It should be observed that a debtor may propose a plan for the sale subject to Code s 363(k), of property free and clear of liens, with such liens to attach to the proceeds provided that the proceeds equal the present value of the lienor's claim. Code s 1129(b)(2)(A)(ii). It cannot presently be found that after the

cases that support the contrary proposition that section 363 is inapplicable in the plan sale

context. *See In re Nagy*, No. 10-10404-TPA, 2013 WL 364649, at *6 (Bankr. W.D. Pa. Jan. 29,

2013) (considering, in context of contested confirmation, whether debtor complied with

provision of section 363(f) in selling property free and clear of lien and reasoning, "[s]ection

363(f) does not apply and the Debtors therefore do not have to demonstrate that the proposed

sale . . . would meet one of the 363(f) subsections. The reason for the conclusion is that the

proposed sale would be conducted pursuant to a confirmed plan, not pursuant to section 363"); *In*

*re Smurfit-Stone container Corp.*, No. 09-10235 (BLS), 2010 WL 2403793, at *10 (Bankr. D.

Del. June 11, 2010) (suggesting that section 363 requirements do not apply to a plan sale); *see*

*also Miami Center Ltd. Partnership v. Bank of New York*, 838 F.2d 1547, 1553 (11th Cir. 1988)

(finding section 363(m) not applicable to plan sale); *Twenty-Nine Palms Enter. Corp. v. Bardos*

*(In re Bardos)*, BAP No. CC-13-1316-PaKuBl, 2014 WL 3703923, at *9 (Bankr. B.A.P. 9th Cir.

July 25, 2014) (same); *cf. Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1165 (5th Cir. 2013)

("We have some doubt as to whether the application of 11 U.S.C. § 363[m] was proper in this

case . . . . There is a definite implication that [section 363(m)] concern[s] the trustee's authority

during the administration of the estate and not at the final disposition of the property of the estate

pursuant to a plan of reorganization."). Here, the Court finds that sections 1123(a)(5)(D) and

1123(b)(4) provide the applicable authority to propose the Second Amended Plan which

contemplates the Plan Sale Transactions that upon confirmation will transfer the Debtor's assets

(including the Consumer Creditor Agreements) free and clear of claims pursuant to section

1141(c). Sections 363(f) and 363(o), which is self-contained by limiting the scope of section

---

consummation of such a sale free of all liens, the proceeds will satisfy the first mortgagee bank's secured claim.")
(internal citation omitted). None of these cases considered the interplay of sections 363(f), 363(o), 1123(b), 1129(a),
and 1141(c) of the Bankruptcy Code and therefore are inapposite.

363(f) sales, simply do not come into play. Relatedly, as section 363(f) and section 363(o) are not applicable provisions under section 1129(a)(1)-(2), it follows that proposing a plan which does not incorporate these provisions is not "forbidden by law" so as to violate 1129(a)(3).[44]

### Consideration of Policy Matters

It is not inconsistent with the Bankruptcy Code that the Debtors have broader powers to reorganize and affect consumer creditor rights pursuant to a plan sale than under a section 363 sale. Such an outcome is consistent with the notion that the plan sale process provides a more fulsome process than section 363 sales. *See In re Smurfit- Stone*, 2010 WL 2403793 at *26 ("A sale pursuant to a plan of reorganization frankly provides greater protections for affected parties than a sale pursuant to section 363 of the Bankruptcy Code . . . . An asset sale pursuant to a plan of reorganization provides for a heightened degree of notice and disclosure surrounding all aspects of the sale, and allows the affected creditors to vote to accept or reject the plan, including the asset sale."). It is also consistent with the fact that confirmed plans, as opposed to section 363 sales, allow debtors to reorganize and affect claims in a multitude of ways that a section 363 sale cannot. *See*, *e.g.*, 11 U.S.C. § 1123(a)(5)(B), (C), (J) (generally providing for consolidation, merger, and recapitalization transactions); *id.* § 1146(a) (exempting chapter 11 plan sales from transfer taxes); 1141(c)-(d) (providing for discharge of claims against the debtor and free and clear treatment of property dealt with under the plan). In any case, the Court believes its job is to interpret the Bankruptcy Code as Congress wrote it; not to substitute its policy views for

---

[44] Several more specific objections that the Second Amended Plan cannot be confirmed because it does not meet the "good faith" requirement of section 1129(a)(3) are discussed in detail below.

Congress's.  *See Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 35

(2008).[45]

In this regard, the NYAG and U.S. Government's assertions that if section 363(o) does

not apply it will interfere with government enforcement power or state law programs designed to

protect consumers are unavailing.  Moreover, state law programs designed to assist consumer

borrowers and fight predatory lending will still exist despite this Court's ruling on section

363(o).  This determination is not intended to interfere with or abridge the rights of governmental

units to pursue enforcement actions in furtherance of their policy and regulatory powers.[46]

### Whether The Fact That The Debtors Invoked Section 363 Earlier in These Cases Makes the Plan Sale Transactions "Sales Under Section 363"

The U.S. Trustee and others argue that because the Debtors invoked section 363 of the

Bankruptcy Code in connection with running the Post-Petition Sale Process, they cannot contend

now that section 363(o) does not apply to the plan sales.  *See* U.S. Trustee Objection at 17-18;

*see also* NYAG Objection ¶ 19.  In support thereof, they say that the Debtors, "asked the Court

to approve a milestone setting a section 363 process in motion," which the Court approved, and

then relied on section 363 to seek approval of the Bidding Procedures that set a deadline for

objecting to a sale of the Debtors' assets free and clear of claims under section 363(f) of the

Bankruptcy Code.  *See* U.S. Trustee Objection at 17-18.  Moreover, they note that: (i) the

---

[45]    For instance, the Supreme Court in *Piccadilly Cafeterias* found that a section 363 sale which transferred assets prior to confirmed plan would not be exempt of stamp taxes pursuant to section 1146(a) because that section provides an exemption only for transfers "under a plan confirmed."  554 U.S. at 35.  When faced with the argument that interpreting § 1146(a) to apply solely to postconfirmation transfers would undermine Chapter 11's twin objectives of "preserving going concerns and maximizing property available to satisfy creditors" the Court reasoned, "'it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress.'" *See id.* at 52 (quoting *In re Hechinger Inv. Co. of Delaware, Inc.*, 335 F.3d 243, 256 (3d Cir. 2003)).

[46]    The Court understands that the Debtors and Attorney General for the Southern District of New York are negotiating language as it relates to the treatment of government enforcement actions.  *See* Proposed Confirmation Order ¶¶ 26-32.

Debtors cited section 363 as the sole basis for the approval of the Stalking Horse Bid Protections; (ii) the plan provides for credit bidding rights under section 363(k) of the Bankruptcy Code; and (iii) prior versions of the plan referenced section 363 as a basis for finding that the Plan constitutes a good faith compromise of claims and compromises. *Id.* The U.S. Trustee asserts that "[t]he Debtors cannot cherry-pick the subsections of section 363 that suit their purposes and argue that the rest do not apply because they are pursuing a plan sale. The Court should not permit the Debtors to sidestep Congressional intent to protect consumers after having already conducted a section 363 marketing and bidding process." *See id.* at 18. The Consumer Creditors Committee similarly observes that the Debtors have invoked section 363 at various times in connection with running the Post-petition Sale Process. *See* Consumer Creditor Committee Objection ¶¶ 26-36. Moreover, the committee points out that in other cases, including cases in which Weil has acted as debtor's counsel, plan sale orders have incorporated certain provisions of section 363, including section 363(f). *Id.* ¶¶ 43-45. Accordingly, the committee contends that "even [the Debtors] know that the sale must be subject to section 363." *See id.* at Table of Contents, Heading IV.

The Court is not persuaded by these arguments. First, under the facts of the case, the Court does not find that the Debtors so embraced section 363 during the Post-Petition Sale Process that they have agreed that the assets must be sold pursuant to a section 363 sale. To be sure, the Debtors utilized section 363 in the early stage of the case, but firmly embraced the plan sale process when they filed the First Amended Plan. Moreover, the Court attaches no weight to the fact that Debtors' counsel has invoked section 363 in other plan sale transactions. Second, the U.S. Trustee effectively abandoned any argument that the Debtors should be estopped from arguing that the Plan Sale Transactions are not sales under section 363 of the Bankruptcy Code at

the Hearing.  *See* Aug. 8 Tr. at 130:21-132:10.  More specifically, counsel clarified that the U.S.

Trustee's position is that because "debtors have increasingly used section 363 to do things that

used to only be done under Chapter 11 plans . . . . [W]e think it makes sense to interpret Section

363 and Section 1141 in a way that's consistent to . . . the extent the statute allows that." *Id.* at

132:4-10.  The Court reads section 363(o) of the Bankruptcy Code to mean that if an interest in a

Consumer Creditor Agreement is purchased in a sale under section 363, section 363(o) takes

effect.  *See* 11 U.S.C. § 363(o) ("and if such interest is purchased through a sale under this

section").  It does not take effect when the interest is purchased through a sale under section

1123 pursuant to a plan.  The Debtors' reliance on section 363 in these cases as it relates to the

Post-Petition Sale Process is irrelevant to the resolution of the issues relating to application of

section 363(o) to the Plan Sale Transactions.

**B.      Whether the Second Amended Plan Preserves the Rights of Consumer Creditors to
         Assert Defenses of Recoupment and Setoff Under Applicable Law**

        The U.S. Trustee, Consumer Creditors Committee, and Bartholow Consumers, among

others, contend that the Second Amended Plan fails to satisfy sections 1129(a)(1), (2) and (3) of

the Bankruptcy Code because it is silent as to the treatment of consumer borrower defenses

including setoff and recoupment.  To that end, they maintain that the Debtors are improperly

trying to sell the assets free and clear of Consumer Creditors' rights that cannot be expunged

through bankruptcy, such as defenses and affirmative defenses, including their rights to setoff[47]

and recoupment.  They say that under the Debtors' Second Amended Plan, consumer creditors

---

[47]   Section 553 of the Bankruptcy Code is titled "Setoff" and states, in relevant part:

      (a)  Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does
           not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that
           arose before the commencement of the case under this title against a claim of such creditor against
           the debtor that arose before the commencement of the case, except to the extent that . . .

      11 U.S.C. § 553(a).

will be barred from asserting various defenses to improper foreclosures, such as loan

modification errors, mishandling and/or misstatements of accounts, imposition of improper fees,

misapplication of property tax advances, failure to honor repayment plans, misrepresentations,

failure to abide by bankruptcy discharge orders, and/or errors committed during servicing

transfers of the loan.

They rely on two legal principles in support of those contentions. First, to the extent that

a consumer borrower's mortgage loan account is overstated, the misstated portion is not estate

property under section 541 of the Bankruptcy Code and cannot be conveyed as an asset in the

Plan Sale Transactions. *See Malinowski v. New York State Dep't of Labor (In re Malinowski)*,

156 F.3d 131, 133 (2d Cir. 1998) ("funds subject to recoupment are not the debtor's property");

*In re Whitehall Jewelers Holdings, Inc*., No. 08-11261, 2008 WL 2951974, at *4 (Bankr. D. Del.

July 28, 2008) ("A bankruptcy court may not allow the sale of property as 'property of the estate'

without first determining whether the property is property of the estate."); *In re Hiler*, 99 B.R.

238, 244 (Bankr. D.N.J. 1989); (noting that "the right of recoupment is unaffected by bankruptcy

[and] is founded in 11 U.S.C. § 541(a)(1), pursuant to which the estate can have no greater right

in property than the debtor had."); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*,

139 S. Ct. 1652, 1663 (2019) (recognizing the "general bankruptcy rule [that] the estate cannot

possess anything more than the debtor itself did outside bankruptcy" and that "[a] debtor's

property does not shrink by happenstance of bankruptcy, but it does not expand, either."); 

*accord, Butner v. U.S.*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of

property rights in the assets of a bankrupt's estate to state law[.]").

Second, defenses to enforcement, such as recoupment, cannot be extinguished in

bankruptcy—whether through a sale or discharged under a plan—because they are neither

74

"claims" nor "debts," nor "interests." *See, e.g.*, *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 261 (3d Cir. 2000) (holding that "a right of recoupment is a defense and not an interest and therefore is not extinguished by a § 363(f) sale"); *SAIF Corp. v. Harmon (In re Harmon)*, 188 B.R. 421 (1995) ("Because recoupment only reduces a debt as opposed to constituting an independent basis for a debt, it is not a claim in bankruptcy, and is therefore unaffected by the debtor's discharge." (*citing Brown v. General Motors Corp.*, 152 B.R. 935 (W.D. Wis. 1993)); *Hispanic Indep. Television Sales, LLC v. Kaza Azteca Am. Inc.*, No. 10 Civ. 932, 2012 WL 1079959, at *5 (S.D.N.Y. Mar. 30, 2012) ("[S]ales pursuant to section 363(f) do not extinguish affirmative defenses. As recoupment is a defense, it is not extinguished by a section 363(f) sale.") (citations omitted); *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629, 2003 U.S. Dist. LEXIS 9802, at *17 (S . D.N.Y. June 9, 2003) (same); *Hispanic Indep. Television Sale, LLC v. Una Vez Mas, LP*, 110 A.D.3d 474, 474 (1st Dep't 2013) (same).

The parties resolved the objections as they relate to setoff rights.  The Debtors assert, and the Consumer Creditors concede, that the Plan Sale Transactions will not extinguish rights of setoff under section 553 of the Bankruptcy Code as against the Debtors, but will extinguish them as against the Forward Buyer and Reverse Buyer.  *See Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d at 263 (finding that in a "free and clear" sale, setoff rights against property may be extinguished as to the purchaser); *In re Trans World Airlines, Inc.*, 275 B.R. 712, 718 (Bankr. D. Del. 2002) (holding that "to the extent MBNA had any setoff right against the account receivable sold, it has been preserved as a claim against the Debtor and the proceeds of the sale.").  To resolve the objections relating to the preservation of setoffs, the Debtors have amended the Proposed Confirmation Order to clarify that confirmation of the

Second Amended Plan will not preclude or otherwise affect the rights of any creditor to

effectuate, subject to advanced Bankruptcy Court approval, a setoff pursuant to common law or

otherwise in accordance with section 553 of the Bankruptcy Code against the Debtors, the Wind

Down Estates, or the Creditor Recovery Trust, as applicable.  The proposed language reads as

follows:

> **No Waiver of Rights and Defenses**.  Except as otherwise agreed, the provisions
> of the Amended Plan and this Order shall not enjoin, impair, prejudice, have any
> preclusive effect upon, or otherwise affect the rights of any Creditor to effectuate,
> subject to advance Bankruptcy Court approval, a defensive right of recoupment
> pursuant to common law or defensive right of setoff pursuant to common law or
> otherwise in accordance with section 553 of the Bankruptcy Code against the
> Debtors, the Wind Down Estates or the Creditor Recovery Trust, as applicable
> (subject to the Debtors', Wind Down Estates' or Creditor Recovery Trust's rights
> to contest the validity of such asserted right of setoff or recoupment); provided,
> however, that no such rights of recoupment and/or setoff may be asserted against
> the Buyers, Reorganized RMS, or any of their respective affiliates, successors, and
> assigns.

Proposed Confirmation Order ¶ 36.  The Court understands that the proposed language is

acceptable to the Consumer Creditors Committee and other objecting parties, to the extent it

addresses the parties' objections and concerns as to setoff rights.

The parties have not resolved their disputes relating to the application of the doctrine of

recoupment to the Consumer Creditor Agreements being transferred under the Plan Sale

Transactions.  Recoupment is not defined in the Bankruptcy Code, but "comes into bankruptcy

law through common law[.]".  *In re Malinowski*, 156 F.3d at 133; *New York State Elec. and Gas

Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 95 (2d Cir. 1997) ("While the Bankruptcy

Code does not mention recoupment explicitly, bankruptcy law does recognize the recoupment

doctrine."); *Megafood Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assoc.)*, 60

F.3d 1031, 1035 (3d Cir. 1995) (explaining that the "common law doctrine [of recoupment] is

not codified in the Bankruptcy Code, but has been established through decisional law.").

Generally, the common law doctrine of recoupment refers to a "defendant's right, in the same action, to reduce or eliminate the plaintiff's claim, either because the plaintiff has not complied with some cross-obligation of the contract on which he or she sues or because the plaintiff has violated some legal duty in the making or performance of that contract." 20 Am. Jur. 2d Counterclaim, Recoupment, Etc. § 5. However, the precise scope and elements of a claim for recoupment are determined under state law, or applicable federal statute. *See, e.g.*, *In re McMahon*, 129 F.3d at 96 ("Recoupment and setoff rights are determined by nonbankruptcy law, which ordinarily is state law." (quoting *In re Village Craftsman, Inc.*, 160 B.R. 740, 746 (Bankr. D.N.J. 1993))); *Kaza Azteca Am. Inc.*, 2012 WL 1079959, at *5 ("In determining recoupment and set off rights, we apply nonbankruptcy law." (quoting *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2d Cir. 2002))). *Cf. Orr and Hollis v. Ameriquest Mortg. Co. (In re Hollis)*, No. 07-22759, 2009 WL 3030125, at *3 (Bankr. D.N.J. Sept. 17, 2009) (allowing debtor's damages claim under the Truth in Lending Act (TILA) as an affirmative recoupment defense to the secured lender's claim).

The Debtors do not deny that they cannot convey assets to the Buyers that they do not own, and that the Consumer Creditors' defenses to enforcement—including rights of recoupment—cannot be extinguished through the Plan Sale Transactions. However, they argue that the Consumer Creditors Committee is trying to "shoehorn" affirmative claims and recovery into the definition of recoupment so that Consumer Creditors are free to pursue any and all claims against the Buyers, who would otherwise have received the benefit of the assets they acquired "free and clear" pursuant to section 1141(c) of the Bankruptcy Code.[48]  The Debtors

---

[48]    Under the proposed Reverse Sale, SHAP is also acquiring the newly-issued stock of Reorganized RMS, and thus, the Second Amended Plan also contemplates a discharge pursuant to section 1141(d) of the Bankruptcy Code.

maintain that the affirmative claims that are "disguised" as recoupment should not be asserted

against the Buyers, but rather, should remain as claims against the Debtors to be resolved in

these Chapter 11 Cases.  As support, they contend that the concept of recoupment is construed

narrowly in the bankruptcy context—citing *FormTech Indus., LLC v. Magna Powertrain USA,*

*Inc. (In re FormTech Indus., LLC)*, 439 B.R. 352, 363 (Bankr. D. Del. 2010) ("[T]he alleged

claim to be recouped is not the typical claim for overpayment, damage-in-transit, and late

delivery, but rather for damages as a result of rejection of the contract."); *Sacramento Mun. Util.*

*Dist. v. Mirant Ams. Energy Mktg. LP (In re Mirant Corp.)*, 331 B.R. 693, 696 (N.D. Tex. 2005)

(noting that "recoupment is appropriate when a buyer erroneously overpays a seller for goods or

services" and more broadly to "prevent a windfall to the debtor in the overpayment context").

Moreover, they note that not all cases in which claims, and counterclaims arise from the same

contract are appropriate for recoupment.  *See Malinowski*, 156 F.3d at 135 ("Where the contract

itself contemplates that the business to be transacted as discrete and independent units, even

claims predicated on a single contract will be ineligible for recoupment.").

To address the objections concerning the preservation of recoupment rights, the Debtors

note that the Reverse Agreement already provides that the Reverse Buyer "will assume claims

brought by consumer creditors related to servicing errors by the Debtors," and that the Forward

Buyer has agreed to include an additional proviso in the Proposed Confirmation Order to

preserve recoupment rights.  The relevant language is as follows:

> Notwithstanding the foregoing or anything to the contrary in the Plan, this Order,
> or the Asset Purchase Agreement or the Related Agreements: (a) a Borrower may
> assert in an individual action any defense by recoupment or set-off, which would
> otherwise be available to the Borrower but for the entry of this Order, in connection
> with an action by or on behalf of the Forward Buyer to collect the debt (such
> defenses, the "Permitted Consumer Borrower Defenses"); and (b) the Forward
> Buyer will use commercially reasonable efforts to investigate any error in the prior
> servicing of the loan asserted by a Borrower and, if warranted, take commercially

reasonable steps to correct the account of the Borrower as appropriate so that the prior error is not perpetuated to the detriment of the Borrower in connection with the proper characterization of payment status, the proper receipt and application of payments by or on behalf of the Borrower or any insurer, the proper advancing out of escrow accounts with funds previously provided by the Borrower, the proper processing and evaluation of a Borrower's requests for and the Forward Buyer's provision of available loss mitigation options, and the proper pursuit of foreclosure and other disposition options in respect of a Borrower's continuing default; provided, however, that neither of the foregoing clauses (a) or (b) shall or shall be deemed or construed to: (i) apply to any claims or defenses (x) asserted other than in an individual action, (y) arising out of the origination of the loan, or (z) requiring the Forward Buyer or any of its Affiliates (or anyone acting on its or their behalf) to pay money damages to, refund amounts paid by, or pay monies (except for escrow advances) on behalf of or for the account of, the Borrower; (ii) expand or create any rights of Borrowers under any applicable federal, state or local law or regulation, common law or inequity; or (iii) require the Forward Buyer to violate the provisions of any third party servicing or sub-servicing agreement.

Proposed Confirmation Order (Schedule 2), ¶ 14.[49]  The Debtors also say that they have amended the Proposed Confirmation Order to clarify that creditors, including consumer creditors, retain common law recoupment rights against the Debtors, the Wind Down Estates, or the Creditor Recovery Trust, as applicable.  *See* Proposed Confirmation Order ¶ 36.

The Consumer Creditors Committee maintains that, rather than address its objection, the Debtors' proposed "fix" severely limits recoupment rights without authority.  It says that, if adopted, the proposed language will preclude consumer borrowers from bringing actions, including class actions to redress systematic overcharging, to recover refunds, or to challenge fraudulent loans.  It also argues that there is no basis for restricting the definition of recoupment based upon the terms of a buyer's servicing agreements with other third parties, particularly where consumer borrowers are not parties to such agreements.  *See* Sur-Reply ¶¶ 18-19.

---

[49]   The Proposed Confirmation Order (Schedule 1) also contains identical language with respect to the Reverse Buyer and Reverse Sale.  *See id.* ¶ 8.

In arguing that the Court should distinguish between defensive and affirmative recoupment, the Debtors ignore the fact that many courts have allowed recoupment to be brought "offensively" by, for example, the commencement of an action, or in seeking monetary damages and statutory fees and penalties.  *See Una Vez Mas, LP,* 110 A.D.3d at 475 (concluding that defendant's breach of contract claim against debtor constituted a recoupment defense against buyer of accounts receivable); *In re Flagstaff Realty Assocs.*, 60 F.3d at 1034-35 (finding that tenant could recoup amounts owed to the debtor-landlord where tenant was on the "offensive" by commencing declaratory adversary proceeding against debtor); *In re Hollis*, No. 07-22759, 2009 WL 3030125, at *3 (Bankr. D.N.J. Sept. 17, 2009) (explaining that the filing of a bankruptcy petition truncates the foreclosure process and likens a creditor's proof of claim to the commencement of an action) (citations omitted); *Wentz v. Saxon Mortg. (In re Wentz)*, 393 B.R. 545, 560 (Bankr. S.D. Ohio 2008) (finding that plaintiff's causes of action against lender based on violations of TILA, Home Ownership and Equity Protection Act (HOEPA) and Real Estate Settlement Procedures Act (RESPA), which included claims for attorneys' fees and costs, were in the nature of recoupment claims).  Further, some federal statutes also specifically provide that certain claims thereunder sound in the nature of recoupment.  For example, section 1640(k) of the Truth in Lending Act (i.e., Defense to Foreclosure) specifically provides that:

> Notwithstanding any other provision of law, when a creditor, assignee, or other holder of a residential mortgage loan or anyone acting on behalf of such creditor, assignee, or holder, initiates a judicial or nonjudicial foreclosure of the residential mortgage loan, or any other action to collect the debt in connection with such loan, a consumer may assert a violation by a creditor of paragraph (1) or (2) of section 1639b(c) of this title, or of section 1639c(a) of this title, as a matter of defense by recoupment or set off without regard for the time limit on a private action for damages under subsection (e).

15 U.S.C. § 1640(k)(1).

Moreover, while it is true that some courts narrowly construe recoupment rights in

bankruptcy cases, the vast majority of those types of cases address the issue of recoupment as a

claim asserted against the debtor's estate during the pendency of the bankruptcy case. *See, e.g.*,

*City of New York v. Matamoros and Vargas and Preuss*, No. 18-11713, 2019 WL 3543865, at

*5-7 (Bankr. S.D.N.Y. Aug. 2, 2019) (holding, *inter alia*, that the city's affirmative claim for

recoupment against the debtor could not be maintained because "recoupment is in the nature of a

defense," and the debtor had not asserted any claims or demands against the city); *In re*

*McMahon*, 129 F.3d at 96-97 (concluding, notwithstanding narrow construction of recoupment,

that, in the special context of public utilities, NYSEG's post-petition application of a pre-petition

deposit to debtor's pre-petition arrears was recoupment). Courts narrowly construe recoupment

rights during a bankruptcy case because (i) the automatic stay does not bar the exercise of those

rights, and (ii) the exercise of those rights may elevate the payment and priority of one creditor's

claim over the claims of similarly situated creditors. *See, e.g., In re Mirant Corp.*, 331 B.R. at

696 (noting that rejection claims should be treated the same as other general unsecured claims,

but that "[r]ecoupment operates as an exception to the statutory priorities of claims in a

bankruptcy case and, thus, is narrowly construed"); *In re Public Serv. Co. of New Hampshire*,

107 B.R. 441, 444 (Bankr. D.N.H. 1989) (noting that recoupment "should be narrowly construed

as an exception to the general rule against preferring one creditor over another." (citing *Elec.*

*Metal Prod., Inc. v. Honeywell, Inc.*, 95 B.R. 768, 770 (D. Colo. 1989))). *See also In re*

*Malinowski*, 156 F.3d at 133 ("The distinction between set-off and recoupment is crucial because

set-off claims are subject to the automatic stay of 11 U.S.C. § 362 and are substantively limited

by the Bankruptcy Code, 11 U.S.C. § 553 (1994)"). But those concerns are not relevant in this

case. The Court is not being asked to authorize the consumer borrowers to take actions during

these Chapter 11 Cases that could alter priority rights among similarly situated creditors.  The

issue is whether the Court should limit the consumer borrowers' recoupment rights post-

confirmation under agreements to be transferred to the Buyers.

The doctrine of recoupment is a creature of non-bankruptcy law, and a defense –

sometimes asserted affirmatively -- that does not give rise to a claim or debt that is dischargeable

in bankruptcy, or a right to demand payment.  Recoupment varies widely under different states

and non-bankruptcy law.  The Debtors do business in multiple states, and no party has identified

the scope of non-bankruptcy law relevant to the application of the doctrine of recoupment in

these cases.  The Court finds no basis for limiting application of the doctrine as requested by the

Debtors in the proposed "additional proviso" to the Proposed Confirmation Order.  Among other

things, the Debtors purport to (i) limit recoupment to "defensive" recoupment, (ii) limit the

application of the doctrine to individual customers, (iii) limit the assertion of defenses arising out

of loan originations, and (iv) limit the assertion of defenses based upon the Forward Buyer's

agreements with third parties.  The Court sees no basis for that relief.  Rather, the Court finds

that the Proposed Confirmation Order should leave undisturbed an individual Consumer

Creditor's defenses or rights of recoupment under applicable non-bankruptcy law, provided that

application of those defenses and rights of recoupment do not require the Buyers or any of their

Affiliates (or anyone acting on their behalf) to pay money damages to, refund amounts paid by,

or pay monies (except escrow advances) on behalf of or for the account of, the Borrower.

## C.    **Whether The Plan Was Proposed in Good Faith**

Section 1129(a)(3) of the Bankruptcy Code mandates that a plan "be proposed in good

faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Bartholow

Consumers and the Greenwald Consumers object to confirmation on the grounds that, among

other things, the Second Amended Plan fails to meet that standard.[50]  Specifically, the Bartholow

Consumers assert that the record of these cases evidence that the Second Amended Plan is not

the product of good faith and is being proposed by means forbidden by law.

First, they assert that, because Black Knight Financial Solutions, LLC, who "developed

and manages the servicing software which causes and/or contributes to innumerable servicing

errors" is the chair of the Unsecured Creditors Committee, and the GUC Trustee will be selected

by the Unsecured Creditors Committee, "the Court cannot be assured that the proposed GUC

Trustee – however well-intentioned – will be willing and sufficiently independent to fully

explore, evaluate, and object to trade creditors' claims."  *See* Bartholow Objection ¶¶ 7-16.

Moreover, the Bartholow Consumers allege that the structure of the GUC Trust will not address

their request for declaratory and injunctive relief, which is integral to their claims and their goal

of resolving servicing and accounting errors.  *Id.* ¶¶ 20-21, 25.  They argue it also could result in

the GUC Trust's assets being exhausted prior to allowance of consumer claims.  *Id.* ¶ 23.

Second, the Bartholow Consumers allege that the plan is intentionally vague and intended

to confuse and overwhelm creditors because it: (i) proposes the assumption and assignment of

certain executory contracts, but does not explain why such contracts are to be assumed and

assigned nor why the cure costs are justified; (ii) does not disclose any details about the

insurance policies maintained by the Debtors nor what claims may be covered by available

insurance; and (iii) is generally overly complex.  *See* Bartholow Objection ¶¶ 29-31.

---

[50]    *See generally* Bartholow Objection; Aug. 8 Tr. at 160:11-21.  The "Bartholow Consumers" are defined *supra*. The "Greenwald Consumers" comprise a group of approximately 800 consumer creditors represented in these cases by Wayne Greenwald.  *See* Aug. 8 Tr. at 156:23-25.

The Halls are also plaintiffs in an adversary proceeding against the Debtors, among others, that they commenced in this Court, AP No. 19-01231.

Third, the Bartholow Consumers argue that the Second Amended Plan proposes to assume and assign contracts without establishing the executory nature of such contracts or whether the cure payments are reasonable, thereby elevating certain prepetition claims over others in a biased and unfair manner. *See* Bartholow Objection ¶¶ 43-48.

Finally, at the Hearing, Mr. Bartholow asserted that many of his clients had obtained chapter 13 discharge injunctions, but insinuated that the Debtors continued to attempt collection of discharged debt. *See* Aug. 8 Tr. at 141:18-142-24. He argued that confirming the Second Amended Plan would "destroy [the Bartholow Consumers'] hard-earned [Chapter 13] bankruptcy discharge injunctions" and otherwise subvert the policy of the Bankruptcy Code because it purports to sell the rights to service such discharged loan obligations, or otherwise voidable loan obligations, to the Buyers.[51] All of these arguments are in support of the Bartholow Consumers' thesis that the Second Amended Plan is inconsistent with the objectives and purposes of the Bankruptcy Code because it impermissibly strips rights from consumer creditors to increase sale proceeds that enrich the Debtors' lenders and trade creditors.[52] He

---

[51] *See id.* Mr. Bartholow asserted, as follows:

> The debtors, their secured lenders and NRZ are all asking this Court to confirm the plan so they can pay the secured lenders and their preferred trade creditors . . . nearly a billion dollars from the sale of what would become court-ratified balances of consumers' accounts that they know are alleged to be loaded up with unlawful fees and charges, payment misapplications and amounts incurred – and amounts cured in consumers' Chapter 13 and 11 bankruptcy cases, as well as court ratified balances owed on loans that have allegedly been fraudulently taken out against consumer's homes.

*See id.* at 142:25, 143:1-16. It is undisputed that, at one time, NRZ was Ditech Financial's largest subservicing customer. *See* Rule 1007 Decl. ¶ 39. The consumers allege that NRZ has "intimate knowledge of Ditech's servicing operations" and therefore knows that "a substantial portion of Ditech's accounts contain invalid/undocumented/excessive advances that are not properly included on the loan accounts and are therefore not lawfully recoverable from the borrowers or their homes." *See* Bartholow Objection ¶ 5. While testimony at the Hearing did show that NRZ acquired certain performing loans from the Debtors in August of 2016, those loans are not the loans at issue here. *See* Aug. 7 Tr. at 172:12-15. Accordingly, the Court attaches no weight these unsubstantiated allegations.

[52] *See* Aug. 8 Tr. at 142:20-21 ("[Nothing in the record supports a finding that this plan was filed in good faith."); *id.* at 143:12-15 ("We've alleged that they're taking money out of our clients' pockets, money that our clients do not owe, in order to pay Ditech's sophisticated lenders and trade creditors. That's basically theft, Your Honor.").

argues, "there hasn't been any showing from the debtors" that justifies the Second Amended

Plan and that "it's clear now that they didn't try real hard to get a deal done that took care of the

consumer issues for the benefit of the consumers . . . until after the committee was established."

*See id.* at 153:2-9.

Mr. Greenwald argued at the Hearing that the Second Amended Plan cannot be

confirmed for similar reasons.  He argued:

> 18 U.S.C. 157 . . . prohibits using the bankruptcy case to further the execution of a
> fraud or a fraudulent scheme . . . what we have here is effectively the laundering
> of consumer paper so it can be sold.  Laundering it of fraud claims.  So effectively
> what you have here is a debtor furthering a fraud through the bankruptcy process
> and, specifically, by looking to avoid 363(o).  Bankruptcy is a privilege.  It is not
> a right, and a privilege of confirming the plan of reorganization has not been
> demonstrated.

*See id.* at 160:11-21.

The Court has considered each of the matters raised by the Bartholow and Greenwald

Consumers and finds that they are unsupported by the record and do not bar confirmation of the

Second Amended Plan on the grounds that it fails to meet the "good faith" standards under

section 1129(a)(3).  Rather, the Court finds that the Debtors have established "good faith" for

purposes of section 1129(a)(3).

The record shows that the Debtors commenced these cases with the legitimate chapter 11

goal of effectuating a reorganization that would either: (1) preserve the Debtors' businesses as a

going concern through a Reorganization Transaction, or (2) see the business sold through a Plan

Sale Transaction to maximize a distribution to its creditors and/or allow the business to continue

under new ownership.  *See* Rule 1007 Decl. ¶¶ 14-15.  Moreover, it's undisputed that the reason

the Debtors commenced these cases is because they were facing approximately $110 million of

amortizations payments due in 2019, which put the Debtors at risk of receiving a going-concern

qualification from their auditors. That would have triggered a domino of effect of defaults and termination throughout their capital structure. *See* Rule 1007 Decl. ¶¶ 55-57; *id.* ¶¶ 60-61.

After the cases were filed, the Debtors engaged in dialogue with their various constituencies, which led to modifications of their plan. Of relevant note, the Debtors made the following changes which affected Consumer Creditors. First, following objections received from the U.S. Trustee and the Unsecured Creditors Committee concerning the application of section 363(o), the Debtors revised the plan to provide that "Borrower Non-Discharged Claims," which *inter alia* include claims and defenses subject to section 363(o) of the Bankruptcy Code, that would not be discharged in a Reorganization Transaction. *See Notice of Filing of Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 469] § 4.7, Schedule 1. Second, to resolve the Unencumbered Assets Dispute with the Unsecured Creditors Committee, the Debtors agreed to the Global Settlement. That settlement was incorporated in the First Amended Plan and, among other things, provides for a recovery for junior creditors in the event of a Plan Sale Transaction. *See* Unsecured Creditors Committee Response ¶ 3. Third, the Debtors made changes to the First Amended Plan in response to certain objections to the Plan Sale Transactions by: (1) modifying the Global Settlement to provide for a $5,000,000 Fund for the benefit of Consumer Creditor Claims (Class 6); and (2) clarifying that the Plan Sale Transactions would not be free and clear of certain defenses meeting the Recoupment Criteria, which the Debtors recognize cannot be discharged by the Bankruptcy Code. *See* Second Amended Plan §§ 1.36, 4.6; Proposed Confirmation Order, Schedule 1 ¶ 8; *id.*, Schedule 2 ¶ 14.

The record also shows that the Debtors conducted a robust marketing and sale process for their businesses. Prepetition, the Debtors and their advisors spent nine months conducting the

Pre-Petition Marketing Process, which was overseen by the Special Committee.  *See* Snellenbarger Decl. ¶ 6.  Through that process, the Debtors solicited interest from potential purchasers and granted such purchasers access to an electronic data room containing significant diligence regarding the Debtors' businesses.  *See id.* ¶ 7.  The Debtors' CFO testified that the process "was one of the most extensive I've seen in my career."  *See* Aug. 7 Tr. at 98:20-21.  The Pre-Petition Marketing Process yielded the three Alternative Bids and the All-Company Bid, which the Debtors pursued before it was withdrawn.  *See* Snellenbarger Decl. ¶¶ 11, ¶ 14.[53] When the All-Company Bid was withdrawn, the Debtors re-engaged with NRZ to pursue a potential bid for substantially all of the Debtors' assets, but no agreement was reached.  *See id.*[54]

The Debtors continued the sale process post-petition.  According to the Debtors' investment banker, that process was "[a]s comprehensive or more" than any other sale processes he had conducted over his career.  *See* Aug. 7 Tr. at 132:25-133:6.  The Post-Petition Sale Process spanned the course of several months and involved soliciting interest from 87 potentially-interested parties.  *See* Snellenbarger Decl. ¶ 19.  At the end of that process, only the Forward Buyer offered to acquire substantially all of the Forward Business and only the Reverse Buyer offered to acquire substantially all of the Reverse Business.  *See id.*  While 11 proposals for select assets and operations were received, the values of those offers were inferior to that of the Forward Buyer.  *See id*.

---

[53]    The All-Company Bid was rescinded as a result of the potential purchaser's diligence.  *See id.* at 98:10-14.

[54]    The Consumer Creditors Committee demonstrated that there is no evidence that either the All Company Bid or NRZ's bid was predicated on taking assets "free and clear" of consumer claims and defenses or otherwise that the Debtors would indemnify the prospective purchasers for such claims.  *See* Aug. 7 Tr. at 92:12-25; 94:12-95:2.  Each of the Alternative Bids and the All-Company Bid, however, were subject to further negotiation.  *See id.* at 97:7-19. Accordingly, the Court does not find it significant that those bids did not include a discussion of the treatment of consumer claims.

In the third week of May, approximately one month before the Debtors' deadline to obtain approval of stalking horse agreements and a few days after the Court's decision denying the Debtors' motion to disband the Consumer Creditors Committee, the Debtors first made a request to the Forward Buyer to assume consumer claims. *See* Aug. 7 Tr. at 124:15-125-10; 128:4-8. Up until that point, the Forward Buyer made clear it was unwilling to enter into a transaction that would not provide for "free and clear" treatment as it relates to claims. *See id.* at 125:17-20; *see also id.* at 156:6-10 ([Mr. Wadhawan]: "[E]arlier on in the prepetition process, as early as when the first turn on the term sheet came, we had the words "free and clear" in our markup to the company and it's always been there that way.").[55] Further, Mr. Wadhawan noted that the Forward Buyer is "a fixed-income investor" and looks "for a certainty in returns." *See id*. at 161:17-20. For that reason, Mr. Wadhawan stated, the Forward Buyer is keen on obtaining assets from the Debtors "free and clear." *Id.* at 183:20-184:4. He had this to say in response to the question of why "free and clear" was so important to the Forward Buyer:

> [I]t really goes to the core of our business. We are a fixed-income investor . . . . [W]e like the returns to be predictable and, you know, we pay a fixed dividend to our shareholders that we look out for. The returns that we seek should be predictable and the reason free and clear is important is just because it's hard to put your arms around what the exposure could be[.]").

*Id.*

Given the testimony adduced at the Hearing, it is unsurprising that when the Debtors made the request that the Forward Buyer take assets subject to potential consumer claims and defenses, the Forward Buyer went "pencils down." *See* Aug. 7 Tr. at 130:17-131:6. Mr. Snellenbarger testified that the Debtors were "disappointed" about that, but decided to pursue the

---

[55]    This being said, Mr. Wadhawan also indicated that if there was a substantially material reduction in the purchase price in exchange for assuming consumer claims, NRZ would consider that offer. *See id.* at 161:8-16.

Forward Buyer's offer because it contemplated: (i) taking the Forward Business as a going concern, (ii) hiring a significant amount of the Debtors' employees, (iii) assuming various locations and leases, and (iv) the Forward Buyer being viewed favorably by the GSEs. *See id.* at 137:9-17. All this led the Debtors to conclude the Forward Buyer's offer added substantial value to the estate as a whole. *See id.*

The Debtors had better success with the Reverse Buyer as it relates to Consumer Claims. Specifically, in response to the Debtors' request regarding the assumption of Consumer Claims, the Reverse Buyer agreed to a structure whereby the Debtors would continue to pursue a sale "free and clear" of consumer liabilities, but if the Debtors could not consummate such a sale, the Reverse Buyer would continue with the sale, subject to a $10 million purchase price reduction. *See id.* at 133:18-134:6; Snellenbarger Decl. ¶ 28.

Against this record, the Court concludes that the Debtors have conducted these cases and proposed the Second Amended Plan with good intentions that comport with the goals of the Bankruptcy Code. The uncontroverted evidence in the record demonstrates that the Debtors, with the advice of their professionals, undertook a transparent and robust marketing and sale process, pursuant to the Sale Procedures Order. It is uncontroverted that the Debtors engaged in arms'-length negotiations with the Forward and Reverse Buyers over the terms of the Plan Sale Transactions, including the possible assumption of Consumer Creditor Claims by the respective Buyers. *See* Snellenbarger Decl. ¶¶ 16-31. Moreover, throughout these cases the Debtors have been transparent with all constituencies and proposed the Second Amended Plan following several modifications to address various stakeholders' concerns. That plan provides for the distribution of Net Cash Proceeds in accordance with the Bankruptcy Code's priority scheme and incorporates the Global Settlement which allows for junior stakeholders to recover as well.

While the Court does take note that, in connection with the sale process, the Debtors only raised the consumer claim issue in late May 2019, any contention that such conduct evidences bad faith is unpersuasive. The evidence shows that the Debtors sought the assumption of consumer claims, but ultimately was constrained by the Buyers' demands. The Debtors moved forward with the Plan Sale Transactions and the Second Amended Plan because they believe it provides substantial value to the estate as a whole. Thus, based on the Debtors' conduct in these cases and the application of relevant law, the Court finds that the Second Amended Plan has been proposed "in good faith and not by any means forbidden by law" for purposes of section 1129(a)(3) of the Bankruptcy Code.

The Bartholow Consumers' contentions do not support a contrary finding. First, the Court notes that the Unsecured Creditors Committee has selected META Advisors LLC, as the GUC Trustee. *See Notice of Selection of Creditor Recovery Trustee* [ECF No. 1085]. There is no evidence that the trustee was selected at the behest of the Debtors, or that the trustee will administer the GUC Trust with a bias against consumer creditors or in favor of trade creditors.[56]

Second, there is no merit to the Bartholow Consumers' assertion that the plan provisions are intentionally vague in order to confuse and mislead consumer creditors; such assertion is simply baseless. Third, there is no evidence of any bad faith on the parts of the Debtors and the Buyers in determining which executory contracts and unexpired leases are to be assumed and assigned in the Plan Sale Transactions. That any outstanding arrears or defects must be cured in

---

[56]    The Creditor Recovery Trust's structure, and the Creditor Recovery Trustee's authority to administer the trust, is substantially similar to structures implemented in other large chapter 11 cases. Towards that end, the purpose of the GUC Trust is not to provide injunctive relief to creditors – for example, to remedy bad servicing practices – but to reconcile claims, pursue causes of action, and administer the trust's assets for the benefit of creditors. In doing so, the Second Amended Plan provides that a reserve will be established for disputed claims. *See* Second Amended Plan § 1.114 (defining "Net Cash Proceeds" to mean *inter alia* sale proceeds minus "the amount of Cash (i) necessary to pay holders of Allowed (or reserved for Disputed) [claims]"); *see also* Debtors Memorandum at 19 ("The [Second] Amended Plan provides a reserve for Disputed Claims, whether liquidated or unliquidated").

order to assume and assign those executory contracts and unexpired leases does not improperly

elevate such claims, nor demonstrate any conspiracy to prefer such claims; it is merely what is

required under sections 1123(b)(2) and 365(b) of the Bankruptcy Code to assume and assign

those contracts and leases.  Further, the benefit to the Debtors' estates in satisfying cure

obligations under the Bankruptcy Code is clear—the consummation of the proposed Plan Sale

Transactions would result in proceeds paid to these estates, which will fund distributions to the

estates' creditors.

Finally, the Court does not agree with the Bartholow Consumers and Greenwald

Consumers to the extent they argue that the Debtors have acted in bad faith by proposing a plan

that strips consumers of their rights for the benefit of others.  Rather, the Court finds that the

Debtors are advancing what they believe to be a reasonable interpretation of the Bankruptcy

Code to consummate a plan they believe is value-maximizing.


**II. Does the Second Amended Plan Satisfy the Best Interests of Creditors Test Required Under Section 1129(a)(7) of the Bankruptcy Code, and is the Global Settlement "Fair and Equitable" in Regard to the Holders of Allowed Class 6 Consumer Claims?**


**A.    Whether the Plan Satisfies the Best Interests Test**

Section 1129(a)(7) "is one of the cornerstones of chapter 11 practice."  7 COLLIER ON

BANKRUPTCY ¶ 1129.02[7] 1129-33 (16th ed. 2014).  It states that with respect to "each impaired

class of claims,"

> (A)    each holder of a claim or interest of such class—
>    (i)    has accepted the plan; or
>    (ii)   will receive or retain under the plan on account of such claim or
>           interest property of a value, as of the effective date of the plan, that
>           is not less than the amount that such holder would so receive or
>           retain if the debtor were liquidated under chapter 7 of this title on
>           such date . . .

11 U.S.C. § 1129(a)(7)(A). The Debtors bear the burden of demonstrating that the Second

Amended Plan satisfies the "best interest" test. *See, e.g.*, *In re GSC, Inc.*, 453 B.R. 132, 179 n.66

(Bankr. S.D.N.Y. 2011) ("The proponents of a plan bear the burden of proof under section

1129(a)(7)." (citing *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia*

*Commc'ns Corp.)*, 361 B.R. 337, 366 (S.D.N.Y. 2007))); *In re Jennifer Convertibles, Inc.*, 447

B.R. 713, 724 (Bankr. S.D.N.Y. 2011) (noting that the burden to satisfy section 1129(a)(7) is on

the debtors). That test "focuses on individual creditors rather than classes of claims . . . [and]

requires that each holder of a claim or interest either accept the plan or receive or retain property

having a present value, as of the effective date of the plan, not less than the amount such holder

would receive or retain if the debtor were liquidated under Chapter 7." *In re Drexel Burnham*

*Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (internal citation omitted). *See*

*also In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) (stating that in

applying the best interests test, the court "must find that each [dissenting] creditor will receive or

retain value that is not less than the amount he [or she] would receive if the debtor were

liquidated.") (citation omitted). In that way, "[i]t is an individual guaranty to each creditor or

interest holder that it will receive as much in reorganization as it would in liquidation." 7

COLLIER ON BANKRUPTCY ¶ 1129.02[7]. *See also In re Crowers McCall Pattern, Inc.*, 120 B.R.

279, 297 (Bankr. S.D.N.Y. 1990) ("To be sure, the command of section 1129(a)(7)(A)(ii) is

perhaps the strongest protection creditors have in chapter 11.")

The Consumer Creditors hold Class 6 Consumer Creditor Claims. *See* Second Amended

Plan § 4.6. Under the Second Amended Plan, the holders of Allowed Consumer Creditor Claims

are entitled to receive on account of their claims (i) their *pro rata* shares of the Net Cash

Proceeds (as defined in the Second Amended Plan) from the Plan Sale Transactions (after senior

claims are paid in full); and (ii) subject to the approval and consummation of the Global

Settlement, their *pro rata* share of the $5,000,000 Fund, which will be made available as a carve-

out from the Term Lenders' collateral (the "Consumer Creditor Recovery Trust Assets").  *See id.*

§§ 1.36, 1.37, 4.6(b)(i).[57]  There are no Net Cash Proceeds.  Accordingly, the sole source of

recovery for the holders of Allowed Consumer Creditor Claims will be from the Consumer

Creditor Recovery Trust Assets, if the Global Settlement – which the Consumer Creditors

Committee opposes – is approved.

The Debtors submitted a Liquidation Analysis prepared by AlixPartners, its financial

advisor, utilizing values as of a March 31, 2019 measurement date, comparing the estimated

recoveries under the plan to a hypothetical chapter 7 liquidation.[58]  *See* ECF No. 833.  The

Liquidation Analysis shows that in a hypothetical liquidation under chapter 7, the holders of

Class 6 claims will receive a 0% recovery on account of their claims.  Because that analysis

demonstrates that those claim-holders will receive value under the plan that is not less than the

value they would receive if the Debtors were liquidated under chapter 7, the Debtors contend that

they have satisfied the "best interests" test for the holders of allowed Class 6 claims.

The Consumer Creditors Committee disputes that assertion.  It contends that in a

hypothetical chapter 7 case, the trustee could sell the Consumer Creditor Agreements only

pursuant to section 363(f), and as such, the Class 6 Consumer Creditor Claimants would retain

the benefits of section 363(o).  It asserts that those claimants necessarily will "receive or retain"

---

[57]    Only Allowed Consumer Creditor Claim holders will share in the Consumer Creditor Recovery Trust Assets.
*See id.*

[58]    The Liquidation Analysis was prepared and filed prior to the Second Amended Plan, and did not incorporate the
$5,000,000 in the estimated recoveries.

more on account of their claims in a hypothetical chapter 7 liquidation than under the Second

Amended Plan because they would retain their right to assert Consumer Claims (which they say

have value) against the purchasers of the Consumer Creditor Agreements.  The committee

contends that the Liquidation Analysis is flawed because it does not account for the value of the

Consumer Claims or address how those claims would be treated in a chapter 7 liquidation

scenario.[59]  *See* Consumer Creditors Objection ¶¶ 75-77; *see also* Consumer Creditors Reply ¶ 8.

The Consumer Creditors Committee is correct that section 363 provides the only

mechanism to sell property free and clear in a chapter 7 case.  *See In re Gerwer*, 898 F.2d 730,

733 (9th Cir. 1990) ("Subsection (f) permits the Trustee to sell such property free and clear under

two conditions that are relevant here[.]"); *In re USA United Fleet Inc.*, 496 B.R. 79, 83, 85-86

(Bankr. E.D.N.Y. 2013) ("A Chapter 7 trustee is duty-bound to use the tools provided by the

Bankruptcy Code to marshal and liquidate estate assets to achieve the highest possible return to

creditors. One tool is Section 363(f), which permits the trustee, upon court approval, to sell estate

property 'free and clear of any interest in such property of an entity other than the estate'

provided one of five alternative conditions is met."); *Citicorp Homeowners Servs., Inc. v. Elliot

(In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[I]f any of the five conditions of § 363(f) are

met, the Trustee has the authority to conduct the sale free and clear of all liens.… In this case, the

authority for the sale can be found in 11 U.S.C. § 363(f)(2).").  Moreover, section 363 is clear

that any sale under section 363(f) involving interests in consumer credit transactions or contracts

implicates section 363(o).  *See* 11 U.S.C. § 363(o) ("Notwithstanding subsection (f), if a person

purchases any interest in a consumer credit transaction … or any interest in a consumer credit

---

[59]    The U.S. Trustee also objected to confirmation on the grounds that the Second Amended Plan fails to comply
with section 1129(a)(7).  His arguments overlap those of the Consumer Creditors Committee.  Accordingly, the
Court will focus its discussion on the committee's objection.

contract … then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract[.]"); *cf. MacNeal v. Equinamics, Corp. (In re MacNeal)*, 308 F. App'x 311, 315-16 (11th Cir. 2009) (finding that section 363(o) not implicated where there was no purchase of interests in consumer credit transactions).  Finally, it is undisputed that the Liquidation Analysis did not account for the value of the consumer claims that would be retained pursuant section 363(o) by the holders of Class 6 claims in a chapter 7 scenario.

Still, the Debtors maintain that they have satisfied the best interest test, and that the Court should overrule the committee's objection.  First, the Debtors contend that the Consumer Creditors Committee is improperly using the best interests test to bootstrap the application of section 363(o) into the Second Amended Plan.  They contend that since the draftsmen intentionally removed language from section 363(o) that would have made it applicable to asset sales under a chapter 11 plan, it cannot be the case that Congress intended that section 363(o) would apply indirectly, through the best interests of creditors test, to restrict free and clear sales under chapter 11 plans.  *See* Debtors Memorandum ¶ 219.  They maintain that if, as the Consumer Creditors Committee contends, the Debtors must include the section 363(o) claims in their liquidation analysis (and presumably in full), they will tilt the best interests scale in favor of liquidation and render meaningless Congress's determination not to impute section 363(o) into chapter 11 plans.  *See id.* ¶ 220.  They say, in that light, the only way a chapter 11 plan could provide better relief to creditors than a liquidation would be if the plan accounts for section 363(o) claims—but that doing so then leaves them with no option:  either the Debtors must retain section 363(o) claims or risk having their plan denied.  *Id.*

95

There is no merit to that assertion. To satisfy the best interest test, the Debtors must

prove that the holders of Class 6 claims will "receive or retain property having a present value, as

of the effective date of the plan, not less than the amount such holder would receive or retain if

the debtor were liquidated under Chapter 7." *In re Drexel Burnham Lambert Grp., Inc.*, 138

B.R. at 761. It is undisputed that if the Debtors were liquidated under chapter 7, sections 363(f)

and (o) would apply to a sale of the Consumer Creditor Agreements. The Court must apply

those provisions in determining whether the Debtors have met their burden under section

1129(a)(7), notwithstanding that the Court has determined that sections 363(f) and (o) are not

applicable to the Plan Sale Transactions, and nothing in the Code says otherwise. The case of *In

re Quigley Co., Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ("hereinafter, *Quigley*") is

instructive. There, as relevant to this matter, Judge Bernstein considered whether the debtor

satisfied the best interest test with respect to certain holders of impaired claims that voted against

plan confirmation. In his analysis, he noted that in calculating the amounts a creditor would

receive on account of its claim under the plan and a hypothetical liquidation under chapter 7,

relevant provisions of the Bankruptcy Code might apply in one way in a chapter 11 case, but in a

different way under chapter 7, and that the difference in application could impact the results of

the best interest analysis:

> At times, a Code provision that affects the amount available for distribution applies
> under one chapter but not the other. For example, the trustee of an insolvent chapter
> 7 partnership may sue the general partners to recover any deficiencies. *See* 11
> U.S.C. § 723(a). The trustee in a chapter 11 partnership case does not have this
> right. The "best interest of creditors" test in a partnership chapter 11 case must
> estimate the probable collection from the general partners because these additional
> assets would be available to pay creditors in a hypothetical chapter 7 case. *See* 7
> COLLIER ON BANKRUPTCY ¶ 1129.02[7][c][iv], at 1129–38.

> At other times, a Code provision may affect the amount of a creditor's claim under
> one chapter but not the other, altering the distribution to the remaining creditors.
> With certain exceptions, 11 U.S.C. § 1111(b)(1) gives a secured creditor in chapter

11 an unsecured deficiency claim whether or not the creditor has recourse under
non-bankruptcy law. Chapter 7 does not provide a non-recourse creditor with
recourse, i.e., the creditor does not get the unsecured deficiency claim. The absence
of a deficiency claim in chapter 7 can dramatically affect the distribution to the
other unsecured creditors in chapter 7 and must be factored into the "best interest"
test.

Different priority rules can have a similar effect. Penalty claims are statutorily
subordinated to unsecured claims in chapter 7, see 11 U.S.C. § 726(a)(4), but there
is no comparable subordination of penalty claims under chapter 11. *Cf. United
States v. Reorganized C F & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228–29,
116 S. Ct. 2106, 135 L.Ed.2d 506 (1996) (holding that bankruptcy court cannot
equitably subordinate tax penalty claim based solely on its characteristic as a
penalty). The distribution to the other unsecured creditors may be greater in chapter
7 where they do not have to share *pari passu* with the penalty claim.

437 B.R. at 144.  Although the Court has determined that sections 363(f) and (o) are not

applicable to the Plan Sale Transactions, those provisions plainly are applicable in a hypothetical

liquidation under chapter 7, and thus, are relevant to the Court's determination of whether the

Debtors have met their burden under section 1129(a)(7).  That is so, even if, as the Debtors

contend, application of those provisions will tilt the analysis in favor of liquidation.  There is no

merit to the Debtors' "boot strapping" objection.

Next, the Debtors contend that even if sections 363(f) and (o) are applicable to the best

interests analysis, they are not required to account for the value of the Consumer Claims in

meeting that test.  The Debtors say that when considering whether a creditor will receive or

retain as much on account of its claim under the plan as it would in a liquidation under chapter 7,

courts should only consider the level of recovery from the debtor and not recoveries available to

the creditor from third parties.  They assert that this is clear from the statute which considers only

recoveries received and retained "if the debtor were liquidated."  Moreover, they contend that the

statute only refers to "claims" and that claims are defined as against debtors only, and not against

third parties.  *See LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 496 (2d

Cir. 1995) (noting that "claim," as defined in Bankruptcy Code section 101(5), was intended by Congress to be broadly interpreted so that "all legal obligations of the debtor . . . will be able to be dealt with in a bankruptcy case.").  They also maintain that in accordance with the plain terms of the statute, courts: (i) look to the dividend that an impaired creditor will receive from a chapter 7 trustee, and only that amount, for a comparison with the dividend available under the chapter 11 plan; (ii) consider only liquidation of estate property; and (iii) exclude claims against non-debtor third parties.  *See* Debtors Memorandum ¶ 213.[60]

As support for these arguments, the Debtors urge the Court to look to the application of the best interest test in chapter 13 cases.  That test is contained in section 1325(a)(4) of the Bankruptcy Code and provides that a court shall confirm a plan if:

> the value, as of the effective of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1325(a)(4).  The Debtors correctly note that in applying the best interests test in chapter 13 cases, courts do not account for claims against non-debtor third parties.  *Id.* ¶¶ 214-215.  In some of  the cases cited by the Debtors, the courts held that the unliquidated value of a

---

[60]   The Debtors cite to *In re Gen. Teamsters, Warehousemen and Helpers Union Local*, 890, 225 B.R. 719 (N.D. Cal. 1998) for the unexceptional proposition that in a liquidation analysis, a court should evaluate a liquidation of property of the estate.  In that case, certain judgment creditors of the debtor, a local labor union, objected to the debtor's plan on multiple grounds, including that the plan failed to satisfy the best interests of creditors test.  *See id.* at 733.  To that end, they contended that the debtor's liquidation analysis failed to consider the liquidation value of the debtor's collective bargaining agreements (the "CBAs") with various employers.  The bankruptcy court rejected that argument, reasoning that (i) it was "questionable at best" whether the CBAs represented assets of any economic value to the debtor (and was not treated as an asset on the debtor's financial statements), and (ii) the CBAs are not capable of liquidation in a chapter 7 because a chapter 7 trustee would not be able to continue to act as a union representative for the members under those CBAs, and such CBAs were not assignable under section 365(c)(1) of the Bankruptcy Code.  *See id.* at 733-34.  It thus concluded that while those CBAs were technically property of the estate, their inclusion did not alter the liquidation analysis because the value of the CBAs is zero.  Here, neither the Consumer Creditors Committee nor the U.S. Trustee argues that the Liquidation Analysis failed to include the liquidation value of some material asset that is property of the Debtors' estates.  The issue before the court is whether the Consumer Claims that would be retained (not liquidated) in a chapter 7 scenario pursuant to section 363(o), have any value and should be accounted for in the best interests of creditors test.

legal right to sue on a non-dischargeable debt should not be included in the "amount that would be paid" under chapter 7, within the meaning of section 1325(a)(4).[61]  However, in those cases and the others cited by the Debtors, the courts did not consider the value of claims retained by creditors under chapter 7.[62]  That is because the best interests tests in sections 1129(a)(7) and

---

[61]    The case of *In re Rimgale*, 669 F.2d 426 (7th Cir. 1982) is instructive.  In that case, the chapter 13 debtor filed a plan that proposed to pay $120 a month for 42 months to various unsecured creditors.  The largest claim against the debtor was a tort judgment (the "Judgment"), which was dischargeable under section 1328(a) of the Bankruptcy Code.  *Id.* at 427.  Although the debtor's chapter 13 plan provided for payment of the Judgment, it did not provide for it to be paid in full.  *Id.* at 430.  The Judgment holder objected to confirmation on the grounds that the Judgment would be non-dischargeable in a chapter 7 case, and as such, the chapter 13 plan failed the best-interests test under section 1325(a)(4) because it did not provide for the full repayment of the Judgment.  The Seventh Circuit rejected that argument, finding that under section 1325(a)(4), "[t]he amount that would be paid on such claim if the estate of the debtor were liquidated . . . does not include additional amounts that a creditor may be able to collect after a liquidation, if he can keep the judgment alive."  *Id.* (internal quotation marks omitted) (citation omitted).  In reaching that conclusion, the court reasoned, in part, that to hold otherwise, "any creditor with a nondischargeable debt could block a Chapter 13 plan by insisting that his claim might someday be satisfiable in full.  Such a creditor would have a virtual veto over a Chapter 13 plan, while ordinary unsecured creditors have not even a vote.  The generous discharge provisions of Chapter 13 would be illusory, subject to abrogation whenever a creditor with the sort of claim they cover objected to the plan."  *Id.* at 430-31.  Moreover, the Seventh Circuit noted that "[a]s a quid pro quo for not objecting, such a creditor might be able to insist on specific levels of repayment, although the statute itself has no explicit minimum payment requirement.  In short, this reading of the 'best interests' test undercuts the limiting of creditors' power and the inducement of broad discharges, both integral parts of Congress's revision of Chapter 13."  *Id.* at 431.  *Accord In re Syrus*, 12 B.R. 605, 608 (Bankr. D. Kan. 1981) ("[T]his Court follows the overwhelming weight of authority in holding that the unliquidated value of a legal right to sue on a nondischargeable debt is not included in the "amount that would be paid" under chapter 7, within the meaning of §1325(a)(4).").

Further, none of the chapter 13 cases cited by the Debtors addressed the issue of recovery from third party claims, but whether recovery from the debtor on a non-discharged claim should be evaluated.

[62]    The Debtors also cite *In re Dow Corning Corp.*, 237 B.R. 380 (E.D.Mich. 1999), as an example of courts that have analogized the best interests test under section 1129(a)(7) to the best interests test under section 1325(a)(4).  In *Dow Corning*, the bankruptcy court was faced with objections by the unsecured creditors committee and other creditors to confirmation of the debtor's plan, "one of [which] objections turns on the interpretation of the term "interest at the legal rate" in section 726(a)(5) of the Bankruptcy Code.  *Id.* at 384.  More specifically, the parties' dispute centered on whether the post-petition interest required to be paid under the plan, for purposes of satisfying the best interests test in section 1129(a)(7), is the federal post-judgment interest rate under 28 U.S.C. § 1961(a) or under agreed-to contractual rates or other applicable statutory rates.  *See id.* at 385.  As part of its analysis, the *Dow Corning* court recognized that an analogy could be made to the application of the best interests test in chapter 13 plan contexts where courts have disregarded the effect of, or ability to pursue, non-dischargeable claims in a chapter 7 liquidation, as irrelevant.  However, the *Dow Corning* court did not adopt the chapter 13 case approach in resolving which interest rate was applicable.  To the contrary, it then continued to recognize the difference in the best interests test statutory language in a chapter 11 versus chapter 13, stating:

On the other hand, a corporate debtor whose assets are liquidated in a chapter 7 does indeed remain liable for claims not paid in full since such claims are not discharged.  11 U.S.C. § 727(a)(1).  And § 1129(a)(7)'s version of the best-interest-of-creditors test is actually slightly different from § 1325(a)(4)'s.  The chapter 11 version refers to the "amount that . . . [a creditor] would  . . . receive or retain" in a chapter 7 whereas § 1325(a)(4) refers to the "amount that [a creditor] would be paid"

99

1325(a)(4) are different.  There is no requirement under section 1325(a)(4) that the court

evaluate claims and interests "retained" by creditors.  Thus, those cases are inapposite to the

matters before the Court.

Without limitation, that is what Judge Bernstein found in *Quigley,* 437 B.R. 102, 147

(Bankr. S.D.N.Y. 2010).  In that case, an ad hoc committee of tort victims and the U.S. Trustee

objected to the confirmation of the debtor's reorganization plan.  *Id.* at 124.  Quigley was a

manufacturer of refractory products, some of which contained asbestos.  Those products gave

rise to hundreds of thousands of personal injury asbestos-based claims against it, which totaled

approximately 411,100 by the date Quigley commenced its chapter 11 case in 2004.  *See id.* at

112.  Approximately 280,000 of those personal injury claims were also derivatively asserted

against Pfizer,[63] a global pharmaceuticals company that acquired Quigley in 1968, and remained

Quigley's sole shareholder.  *See id.* at 111-112.

---

in a chapter 7. Thus, a non-frivolous, but decidedly novel, argument could be made that § 1129(a)(7)'s best-interests-of-creditors test should account for the value of any cause of action that a creditor would retain against a chapter 7 corporate debtor.

*Id.* at 411.  The *Dow Corning* court went on to note that [n]o case has ever discussed, let alone decided, this issue[,] [a]nd Collier's discussion of § 1129(a)(7)'s best-interests-of-creditors test applies the chapter 13 formulation, entirely disregarding the "or retain" terminology."  *Id.*  The court then concluded that the federal judgment rate is the correct rate to apply within the context of section 726(a)(5) because it is incorrect to assume that a creditor's claim, if it is repaid in full with interest, could be pursued outside of bankruptcy in a chapter 7.  *See id.* at 412. Here, for the reasons discussed herein, it is precisely because of this difference in statutory language, and the reference to what a creditor would "retain," as noted by the *Dow Corning* court, that renders the chapter 13 cases inapposite to our analysis.  *Dow Corning* thus provides no support to the Debtors' arguments.

[63]    The court described the derivative claims against Pfizer, as follows:

Most if not all of these [asbestos] claims were based on exposure to Quigley's products rather than Pfizer's products such as Kilnoise or Firex. In other words, the plaintiffs in these lawsuits sued Pfizer, Quigley's wealthy parent, for injuries resulting from Quigley's alleged misconduct relating to the manufacture and sale of Insulag or one of Quigley's other asbestos-containing products. The claims against Pfizer based on Quigley products are referred to as derivative claims.

437 B.R. at 112.

Over the years, Pfizer and Quigley tried unsuccessfully to stem the tide of the asbestos

litigation, and in 2003, Pfizer devised a global strategy to do so. *See id.* at 113.  The strategy

called for Quigley to commence a chapter 11 petition, and for Pfizer to enter into settlement

agreements as to its own liabilities with asbestos personal injury claimants, that were contingent

on the confirmation of a Quigley chapter 11 plan, which included a section 524(g) injunction in

Pfizer's favor.  As of the commencement of Quigley's chapter 11 case, Pfizer was party to

approximately seventy settlement agreements that resolved the claims of approximately 193,000

asbestos tort claimants (the "Settling Claimants") for the aggregate sum of approximately $500

million. *See id.* at 115.  The United States Trustee appointed a statutory committee of unsecured

creditors, which consisted of seven individual asbestos claimants, four of whom were Settling

Claimants.  Three groups of asbestos claimants that did not reach settlement agreements with

Pfizer (the "Non-Settling Claimants"), joined together to form the ad hoc committee of tort

claimants (the "AHC").

As contemplated, Quigley's chapter 11 plan called for the creation of an asbestos trust

fund (the "Trust") under section 524(g), with an injunction channeling all asbestos claims to the

Trust and barring asbestos claimants from seeking further recovery on account of those claims,

against Quigley, Reorganized Quigley or any other protected party, including Pfizer. *See

Quigley*, 437 B.R. at 121.  In exchange for such protection, Pfizer agreed to make certain

contributions to the Trust and plan, including: (i) contribution of the stock of Reorganized

Quigley to the Trust, (ii) waiver of $30 million of Pfizer's secured claim against Quigley, and

(iii) contribution of $50 million in cash to the Trust, and (iv) payment of an annuity with a

nominal face value of $45.1 million. *See id.* at 119-121.  The plan projected that Non-Settling

Claimants would receive a distribution on account of their claims equal to 7.5% of those claims,

and the debtor's liquidation analysis showed that the claimants would do far worse in a hypothetical chapter 7 liquidation.

The AHC objected to confirmation, arguing, among other things, that the liquidation analysis was flawed, and the plan did not meet the best interests test under section 1129(a)(7). *See id.* at 123-24. The AHC challenged that analysis on the grounds that it did not account for the fact that in a chapter 7 liquidation, Pfizer would not get a release, the Non-Settling Claimants would retain the right to pursue their derivative claims against Pfizer, and that those derivative claims had value. Judge Bernstein agreed. He reasoned that by the plain terms of the statue, in conducting the best interest analysis, the court must consider both the distributions under the plan and in a hypothetical chapter 7 case, and the "value of the property that each dissenting creditor will retain under the plan and in the hypothetical chapter 7." *Id.* at 145-46. The evidence showed that between 1985 and the 2004 petition date, Pfizer paid over $1.2 billion in insurance proceeds to settle asbestos claims against itself and Quigley. Overall, 23% of these settlement costs were allocated to Pfizer and 77% were allocated to Quigley. *Id.* at 134. Based on that analysis, the Court concluded that the estimated recovery for non-settling claimants' derivative suits against Pfizer was 23% based on Pfizer's settlement history. On that basis, the Court found that Quigley's plan did not satisfy the best interest test under section 1129(a)(7).

The Debtors contend that *Quigley* is distinguishable and not applicable in this case because it involved derivative claims against a co-obligor, which is not the case here. Instead, the Debtors urge this Court to be guided by *In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N.D. Cal. 2012), *aff'd* 485 B.R. 203 (N.D. Ca. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) and *aff'd* 544 F. App'x 669 (9th Cir. 2013). In that case, the debtor was in the business of selling, installing, and repairing asbestos-containing products. Facing thousands of

102

asbestos-related lawsuits that would likely outstrip its insurance coverage, it filed a voluntary

petition for relief under chapter 11.  469 B.R. at 848.  Ultimately, the debtor sought to confirm a

chapter 11 plan that contained, as its principal component, an injunction that channeled all

asbestos injury claims to a fund established pursuant to section 524(g) of the Bankruptcy Code.

The debtor's insurers were encouraged to make lump sum contributions to the trust in exchange

for protection from future liability for asbestos claims, including claims for equitable

contribution that could be (and in some instances were) asserted by other insurers.  *See id.* at 853.

However, not all insurers agreed to settle their claims and contribute to the 524(g) trust fund.

Instead, those non-settling insurers voted to reject the plan and objected to plan confirmation on

the grounds that the plan did not meet the best interest test under section 1129(a)(7) as to them.

*See id.* at 886.  They contended that because the channeling injunction under section 524(g)

applies only in chapter 11 cases, in a hypothetical chapter 7 liquidation, they would retain their

equitable contribution claims against the settling insurers.  They argued that once those claims

were accounted for, the liquidation analysis showed that they would receive a greater recovery in

a hypothetical chapter 7 case, than under the plan.  *See id*.

The *Plant Insulation* court rejected that argument and held that the chapter 7 test did not

apply to the non-settling insurers' equitable contribution claims because the test applies only to

claims that creditors can assert against the debtor.  *Id.*  The court noted that the Bankruptcy Code

defines the term "claim" to refer to liability of the debtor and section 101(10)(A) defines

"creditor" to be an entity with a claim against the debtor.  It reasoned that construing the term

"claim" in section 1129(a)(7) to refer to only to liability of the debtor "is consistent with the

overall content and structure of the Bankruptcy Code."  *Id.* at 887 ("Except as provided in

section 524(g), the Bankruptcy Code does not purport to affect the liabilities of third parties.")

(footnote omitted).  The court also distinguished *Quigley* (which the non-settling insurers had

relied on in support of their argument), finding that the holding in *Quigley* was expressly based

on the "fact that the claims to be released were claims against the debtor on which Pfizer was a

co-obligor[,]" whereas the claims at issue – i.e., the equitable contribution claims by non-settling

insurers against settling insurers, are claims can never be asserted against the debtor.  *Id.*

     The Court respectfully declines to follow the holding in *Plant Insulation*.  It is true that

the Bankruptcy Code defines a "claim" as liability of the debtor.  But it does not follow that

section 1129(a)(7)'s reference to "receiving or retaining" under a chapter 7 imports the

requirement "from the debtor" based on that claim.  Moreover, although the claims against Pfizer

released under the *Quigley* plan were "derivative claims," nothing in the *Quigley* case suggests

that the court's construction of the best interest test under section 1129(a)(7) turned on the

derivative nature of those released claims.  Rather, the *Quigley* court's analysis was based on the

language of the statue ("[t]he express language of § 1129(a)(7) also requires me to consider the

value of the property that each dissenting creditor will retain under the plan and in the

hypothetical chapter 7"), fairness to parties ("[y]et, the best interests equation also properly

mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent

the plan is treating those non-debtor claims by release" (citing Ralph Brubaker, *Bankruptcy

Injunctions and Complex Litigation: A Critical Reappraisal of Non–Debtor Releases in Chapter

11 Reorganizations*, 1997 U. ILL. L. REV. 959, 992 (1997)), and the fact that the released claims

satisfied the definition of "property," had "value," and were "neither speculative nor incapable of

estimation."  *Quigley*, 437 B.R. at 145.  In any event, even if the derivative nature of the claims

in *Quigley* was important to the court's analysis, the Consumer Claims here are claims against

the Debtors in the same way that the claims in *Quigley* were claims against the debtor there.  The

Consumer Claims and Consumer Defenses arise from the Debtors' alleged misconduct (e.g., account misstatements, wrongful foreclosures, unfair collection practices, etc.), and any value or recovery that can be realized from the Buyers would be derivative of those claims.

The Court is facing a situation in this case that is similar to that which the *Quigley* court encountered. Pursuant to the Second Amended Plan and Sale Transactions, the Debtors are transferring the acquired assets (and stock) "free and clear" of liens and claims, including the Consumer Claims. In a liquidation under chapter 7 the holders, Consumer Creditors would retain their claims and defenses pursuant to section 363(o). The Liquidation Analysis did not account for these Consumer Claims, but should have. That is because these claims: (i) fit the definition of "property," (ii) have "value" and (iii) although they are unliquidated, they are "neither speculative nor incapable of estimation." *See Quigley*, 437 B.R. at 145. As such, the Debtors have failed to satisfy the "best interests" test of section 1129(a)(7). *See id.* at 144-46; *see also In re SunEdison, Inc.*, 576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017) ("Non-voting classes deemed to reject the *Plan* under 11 U.S.C. § 1126(g) could not be bound by the Release. Such a provision would violate the best interests test under 11 U.S.C. § 1129(a)(7)(A)(ii) and render the Plan unconfirmable. While the class would not receive a distribution in either chapter 11 or chapter 7, the class members would retain their third party claims in a chapter 7."); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) (remanding to bankruptcy court to consider whether extinguishment of third-party guarantees under plan violates the "best interest" test);[64] *In re Washington Mutual , Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) (disagreeing with the debtor's "assum[ption] that what creditors can

---

[64]    On remand, the bankruptcy court ruled that the plan was not feasible and did not address the "best interest" question. *See In re Milford Conn. Assocs., L.P.*, No. 04–30511(ASD), 2008 WL 687266 (Bankr. D. Conn. Mar.10, 2008).

recover from other sources should be ignored under section 1129(a)(7)," stating "in a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 plan as they would in a chapter 7 liquidation").

Finally, the Debtors contend that, in any event, they need not account for the potential recoveries on the section 363(o) claims under the best interest test because those recoveries are speculative and hypothetical. It is true, as the Debtors contend, that when weighing specific claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation and should exist on the date selected for valuation in a hypothetical chapter 7 case. *See Quigley*, 437 B.R. at 145-46. The Debtors argue that even if this Court concludes that the value or recovery, if any, from Consumer Claims (preserved under section 363(o)) must be accounted for in the liquidation analysis, the Consumers Committee's objection should be overruled because any recovery on alleged successor liability claims against the Forward and Reverse Buyers is "highly speculative and uncertain." *See* Debtors Memorandum ¶ 222. In support, they contend, as follows:

- The Consumer Creditors Committee erroneously assumes that the Debtors' assets will definitely be sold to the Forward and Reverse Buyers in a hypothetical chapter 7 liquidation just as they are under the Second Amended Plan. There is no reason to think that those sales could be achieved in a chapter 7 liquidation because (i) the Debtors have marketed these assets over the course of two years, yet they received only one offer for their Forward Business assets, on the express condition that these claims are discharged in the sale; and (ii) the evidence demonstrates that the Forward Buyer will not assume these liabilities. Accordingly, while the Consumer Creditors Committee assumes that the consumer creditors will receive the benefit of these transactions in a chapter 7 liquidation, in reality the prospects of selling the assets to the Forward and Reverse Buyers will almost certainly be lost.

- If the Sale Transactions embodied in the Amended Plan are rejected, the Term Lenders will almost certainly terminate the Restructuring Support Agreement and the DIP Lenders will foreclose under the DIP Facilities.

- It is not possible to execute the proposed Sale Transaction with the Reverse Buyer in a chapter 7 case because the licenses from Ginnie Mae that are necessary to operate the reverse business cannot be transferred pursuant to such a sale.

- Even if there are buyers who are willing to proceed with sales in a chapter 7 case without a comprehensive "free and clear" order, it does not follow that consumer creditors will definitely recover against the Forward and Reverse Buyers on theories of successor liability. Any retained consumer borrower claims—to the extent they could even be asserted against a successor servicer—are speculative and hypothetical in nature and, accordingly, cannot upend the best interests analysis. And there is nothing in the record that suggests that these speculative claims are higher than the recoveries made available to consumer borrowers under the Amended Plan, *i.e.*, $5 million.

*See id.* ¶¶ 223-225. The Court does not credit those arguments. First, in assailing creditors' assumption that the assets can be sold in a chapter 7 case, the Debtors are abandoning the Liquidation Analysis they submitted at the Hearing, and in support of confirmation of the Second Amended Plan. No party challenged it, except that the Consumer Creditors Committee contends that it is flawed because it fails to account for the Consumer Claims. The Debtors bear the burden of proving that the Second Amended Plan satisfies the best interest test and they submitted the analysis "for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Assets were liquidated in accordance with chapter 7 of the Bankruptcy Code[.]" Liquidation Analysis at 2. In doing so, they assume the facts that they now dispute. Specifically, in presenting the analysis, the Debtors assumed, without limitation, as follows:

- On the Liquidation Date,[65] the Chapter 11 Cases (i) will convert to chapter 7, and (ii) the Bankruptcy Court will appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' Estates.

---

[65]    The Debtors prepared their Liquidation Analysis assuming that they converted their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about August 9, 2019 (the "Liquidation Date"). *See* Liquidation Analysis at 3.

- The operations of the Debtors (the "Liquidating Entities") will cease, and the related individual Assets will be sold, pursuant to a sale under a twelve (12)-month liquidation process (the "Liquidation Timeline") that utilizes the Debtors' resources and third-party advisors.

- The Trustee will sell the Assets of the Liquidating Entities and the Cash proceeds, net of liquidation-related costs, will then be distributed to creditors in accordance with applicable law: (a) first, for payment of post-conversion liquidation and wind down expenses, trustee fees, and professional fees attributable to the liquidation and wind down; (b) second, to pay the DIP Claims; (c) third, to pay the secured portions of all Allowed Secured Claims and Allowed Other Secured Claims; (d) fourth, to pay chapter 11 administrative expense claims, and (e) fifth, to pay amounts on the Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims. Any remaining net Cash would then be distributed to creditors holding Allowed Unsecured Claims, including (i) Deficiency Claims that arise to the extent of the unsecured portion of any Allowed Secured Claims and Allowed Other Security Claims, (ii) General Unsecured Claims, and (iii) Borrower Non-Discharged Claims.

- The Debtors will have continued access to sufficient financing on near-market terms, the support of Fannie Mae, Freddie Mac, and Ginnie Mae, and the continued retention of necessary employees during the Liquidation Timeline.

- The Debtors will continue to have access to Cash collateral during the course of the Liquidation Timeline and can fund Wind Down Expenses therewith and (b) the accounting, treasury, IT support, and other management services needed to wind down the Estates will continue.

*Id.* at 3-4. The Debtors are clear that "[t]here can be no assurance . . . that a liquidation [will] be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the Assets herein [will] in fact be realized." *Id.* at 3. Moreover, they specifically note that:

An inability by the Debtors to maintain financing, a seizure of collateral by secured creditors, failure to obtain forbearances from Fannie Mae, Freddie Mac, and Ginnie Mae, and/or significant employee attrition would likely yield significantly lower recoveries than estimated in this Liquidation Analysis.

*Id.* However, until now, they have never asserted that they will not be able to sell the Assets.

The Court will hold the Debtors to the Liquidation Analysis. The Court attaches no weight to the

Debtors' assertions that in a liquidation scenario, a chapter 7 Trustee will not be able to sell the assets.

The Debtors also assert that even if the Buyers were willing to proceed with sales in a chapter 7 without a comprehensive "free and clear" order, that does not mean that consumer creditors will definitely recover against the Forward and Reverse Buyers on theories of successor liability. *See* Debtors Memorandum ¶ 225. As the Debtors correctly note, section 363(o) merely protects consumer claims and defenses to the same extent as if the applicable interest had been purchased outside of section 363 of the Bankruptcy Code. 11 U.S.C. § 363(o). To that end, they correctly contend that (i) to establish a claim under section 363(o), a Consumer Creditor must establish a successor's liability under applicable non-bankruptcy law, and then litigate to judgment their asserted claims or defenses against such successor; and (ii) the law does not generally apply successor liability to asset purchasers, especially when the purchase agreement expressly disclaims any such liability. *See id.* To be sure, as the Debtors contend, under the "traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). Exceptions to the general rule apply such as when "(1)the purchasing corporation expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations[.]" *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244-45 (1983). As the Debtors and Forward Buyer contend, some courts find that those exceptions are not applicable in the mortgage context. *See Mobine v. OneWest Bank, FSB*, No. 11-cv-2550-IEG (BGS), 2012 WL 243351, at *4 (S.D. Cal. Jan. 24, 2012) (holding that successor liability under

the Truth in Lending Act did not apply in the sale of a mortgage pursuant to a purchase and

assumption agreement). Thus, the Debtors contend that any retained consumer borrower

claims—to the extent they could even be asserted against a successor servicer—are speculative

and hypothetical in nature and, accordingly, cannot upend the best interests analysis. *See id.*

However, it is not that simple. The Consumer Creditors Committee correctly notes that federal

cases expressly acknowledge that there may be successor liability in a non-bankruptcy sale,

including for claims brought under the RESPA, TILA, FCRA, and FDCPA. *See, e.g.*, *F.T.C. v.

Citigroup, Inc.*, 239 F. Supp. 2d 1302, 1307-08 (N.D. Ga. 2001) (denying motion to dismiss

FCRA and TILA claims brought against putative successor of lender after a merger because

successor liability is a fact specific inquiry); *Prince v. U.S. Bancorp*, No. 2:09-cv-01095-KJD-

PAL, 2010 WL 3385396, at *5 (D. Nev. Aug. 25, 2010) (stating "Defendant cites no authority

for the proposition that it cannot be held liable as a successor-in-interest on a RESPA [or

FDCPA] claim . . . . Indeed, federal courts appear to assume that a successor in interest can be

held liable for RESPA [or FDCPA] claims under certain circumstances," and denying a motion

to dismiss RESPA and FDCPA claims); *Abdollahi v. Washington Mut., FA*, No. C09-00743-

HRL, 2009 WL 1689656, at *1 (N.D. Cal. June 15, 2009) (where defendant filed motion to

dismiss complaint that asserted TILA and RESPA claims, declining to decide whether JPMorgan

impliedly assumed Washington Mutual's liabilities "as it pertains to plaintiffs' mortgage"

because that is a question of fact, and then analyzed whether plaintiffs had stated TILA and

RESPA claims on the merits). And similar state laws also impose liability on successors and

assigns. *See, e.g.*, *Drakopoulos v. U.S Bank Nat'l Ass'n*, 991 N.E.2d 1086, 1092 (Mass. 2013)

(assignee of loan may be liable for claims under consumer protection act and borrower's interest

act under Massachusetts law). The Court agrees with the Consumer Creditors Committee that

whether such claims ride through is entirely dependent on the specific factual and legal details related to each claim.

Finally, the Debtors contend there is nothing in the record that suggests that these allegedly speculative claims are would yield greater recoveries than what has now been made available for Allowed Consumer Creditor Claims under the Second Amended Plan – i.e., the $5,000,000 Fund. *See id.* ¶ 226. The Court also finds no weight to the assertion that the Consumer Creditor Claims have, at best, speculative value, or that the $5,000,000 Fund adequately compensates Consumer Creditors for those claims, such that the Debtors have satisfied the best interest test as to the holders of Class 6 claims.

The Court understands that at various times after the Consumer Creditors Committee was formed, the Debtors reached out to the committee and its professionals in an effort to address and resolve the committee's plan objections. Those discussions were not fruitful and in late June of 2019, the Special Committee of the Board requested Mr. Nelson of AlixPartners to advise the committee whether a $5,000,000 offer to resolve consumer creditor issues was "reasonable" when one compared: (1) the historical trends of what the Debtors paid out to consumer creditors in resolving their complaints and litigation to; (2) the number and types of consumer proofs of claims filed in these cases. *See* Aug. 7 Tr. at 104:7-13. Mr. Nelson testified that AlixPartners performed a "reasonableness test" in response to that request and in so doing so concluded that "the $5,000,000 is a reasonable settlement amount for the Debtors' consumer creditors." Nelson Decl. ¶ 5. Below, the Court reviews the methodology that Mr. Nelson employed in conducting the "reasonableness test."

- First, he instructed Epiq Corporate Restructuring, LLC ("Epiq"), the Court-appointed claims and noticing agent in these Chapter 11 Cases, to review the proofs of claims filed in these cases in an effort to identify any claims that could potentially be "consumer related" claims. He explained that under AlixPartners'

oversight, Epiq searched for proofs of claims that were potentially consumer-related both by searching proofs of claims for key words appearing in the stated "basis of claim" and by searching claims that appeared to be submitted by an individual or by a law firm that appeared to be representing a consumer based on the stated basis of claim. He testified that, as a result of this search, Epiq identified and provided to AlixPartners approximately 3,900 proofs of claims that could potentially be consumer-related.

• Next, AlixPartners worked with the Debtors to determine whether any of the approximately 3,900 proofs of claims matched any verbal or written consumer complaints already made to, or litigation filed against, the Debtors. He says that, ultimately, 265 proofs of claims were determined to match litigation already filed against the Debtors and another 66 proofs of claims were determined to match consumer complaints already communicated to the Debtors.

• Thereafter, for all remaining proofs of claims that were identified as being possibly submitted by a consumer but were not matched to any written consumer complaints already communicated to or consumer litigation filed against the Debtors, AlixPartners reviewed each proof of claim form and any attached supporting documentation in an effort to determine whether any proofs of claim appeared to be consumer claims. Mr. Nelson says that he personally reviewed approximately 850 of those proofs of claims, and that in doing so, he considered each proof of claim to be a single potential consumer complaint and did not consider whether a proof of claim could represent a class action. In analyzing whether proofs of claims were consumer claims, AlixPartners divided the proofs of claims into the following four categories:

1.  Likely a consumer complaint: proofs of claims that included attached documentation describing a complaint or simply specified a basis for claim that was interpreted as a complaint (for example, used the word "complaint," "customer fees," "fines/penalties," "litigation," "insurance");

2.  Unlikely a complaint: proofs of claims that did appear to be from a consumer but for which the basis of claim provided was innocuous (e.g., "borrower" or "customer claim") and either contained no support or was supported by documentation that only evidenced the existence of a mortgage loan from the Debtors (such as a loan or escrow statement, a loan agreement, or deed);

3.  Not a consumer: proofs of claims that appeared to be filed by vendors based on a basis of claim stating "rejection damages" or the inclusion of unpaid invoices as attached support; and

4.    Undetermined: proofs of claims that contained no attached documentation and either showed no basis for a claim or contained a basis for a claim that did not clearly identify whether the claimant is a consumer.[66]

- After so categorizing the proofs of claims, Mr. Nelson and his team asked the Debtors to provide: (1) the average cash payout to consumers for which no litigation was ever filed that were resolved between January 1, 2018 and June 30, 2019,[67] and (2) the Debtors' average cash payout for consumer litigation claims that were resolved between January 1, 2018 and May 31, 2019.

- He testified that: (i) Ditech Financial LLC's average cash payout to consumers for written consumer complaints for which no litigation was ever filed that were resolved between January 1, 2018 and June 30, 2019 was approximately $28 per complaint; (ii) RMS did not pay out any cash to consumers for written consumer complaints for which no litigation was ever filed that were resolved between January 1, 2018 and June 30, 2019; and (iii) the Debtor' average cash payout amount to consumers for consumer litigation claims that were closed or disposed of between January 1, 2018 and May 31, 2019 was approximately $4,953 for Ditech Financial LLC and approximately $2,777 for RMS.  He explained that those amounts do not include either the cost of legal fees to defend litigation, or the value of any account adjustment or fee waiver that may have been part of certain complaint resolutions.  Mr. Nelson also testified that the Debtors informed him that less than 0.5% of the consumer complaints that were resolved in 2018 and 2019 ever resulted in litigation.

*See id.* ¶¶ 6-10.  Mr. Nelson says that "[a]pplying this historical data provided by the Debtors to

the results of AlixPartners' assessment of the proofs of claims filed in this bankruptcy under the

process described above, $5,000,000 is significantly higher than the amount of the historical

settlement or resolution value of claims of the Debtors' consumer creditors." *Id.* ¶ 11.  At the

---

[66]    *See* Nelson Decl. ¶ 8.  AlixPartners determined that of the proofs of claims reviewed, 651 fell into the category of "likely a consumer complaint"; 1,870 fell into the category of "unlikely a complaint"; 46 fell into the category of "not a consumer"; and 999 fell into the category of "undetermined."  Nelson Decl. ¶ 9.  Mr. Nelson says that based on AlixPartners' review, he believes that the 46 falling into the category of "not a consumer" are not consumer claims, and that based on that review, he believes that it is highly likely that a significant number of the 1,870 falling into the category of "unlikely a complaint" and the 999 falling into the category of "undetermined" are not consumer complaints.  *Id.*

[67]    Mr. Nelson testified that such average payouts were $28 for Ditech Financial and inapplicable to RMS, which did not pay out any cash for such complaints during the period of January 1, 2018 and June 30, 2019.  *See* Nelson Decl. ¶ 10 (not including legal fees, the value of any account adjustments, or fee waivers).

Hearing, Mr. Nelson clarified that his exercise essentially involved "developing a view of historical trends, taking that," and "applying it to current circumstances in order to predict future behavior." *See* Aug. 7 Tr. at 113:8-12. Through the analysis, Mr. Nelson testified that he "believe[s] that $5,000,000 is a reasonable settlement amount for the Debtors' consumer creditors." Nelson Decl. ¶ 11.

It is undisputed that Mr. Nelson did not evaluate the merits of any Consumer Creditor Claims and that his report does not purport to be a valuation of Consumer Claims. *See* Aug. 7 Tr. at 42:12-21 ([Debtors' counsel]: "[Mr. Nelson] is not a valuation expert or a damages expert, and he did not submit or undertake a valuation or damages analysis. He did not review the merits of the consumer claims and he's not opining as to the likelihood of success of those claims."); *see also id.* at 107:23-108:9; *id.* at 109:23-110:1 ("Q: In connection with the declaration submitted in support of confirmation, you did not conduct a valuation exercise, correct? [Nelson]: That's correct."). Moreover, the Debtors are not offering Nelson's analysis as support for their contention that they satisfy the "best interests" test. *See* Aug. 7 Tr. at 42:22-43:5 ([Debtors' Counsel]: "We're not here to prove through Mr. Nelson's declaration or through the amendment to the global settlement that $5 million is more than the consumer borrowers would receive if they could hypothetically pursue third party claims. We don't think we need to prove that -- we think we could, if Your Honor ultimately required something like that, but we think we win on the law with respect to best interests and this settlement -- this is a settlement issue that's coming in before the Court."). Mr. Nelson's analysis simply represents a post-hoc historical trend analysis undertaken for the purpose of determining whether the Debtors' request of the Consenting Term Lenders to provide the $5,000,000 Fund as a "gift" and to resolve the

Consumer Claims is "reasonable."[68]  The Debtors have failed to meet their burden of proving

that the holders of allowed Class 6 claims will receive or retain more under the Second Amended

Plan than they would receive or retain in a hypothetical chapter 7 liquidation.  Accordingly, the

Second Amended Plan does not satisfy the confirmation requirements in section 1129(a)(7) of

the Bankruptcy Code.

## B.    Whether The Global Settlement Should Be Approved

The Debtors are seeking approval of the Global Settlement as fair, equitable, and in the

best interest of the Debtors' estates and all parties in interest.  They say that the Court should

approve the settlement because it was negotiated in good faith and at arm's length and is an

essential element of the Second Amended Plan.  As discussed above, the Debtors, the Unsecured

Creditors Committee, and the Consenting Term Lenders agreed to the Global Settlement just

prior to the Disclosure Statement hearing in connection with the First Amended Plan.  The

settlement resolved the Unencumbered Assets Dispute and all of the committee's objections to

the plan, and a key component of the agreement was the establishment and funding of the $4

million GUC Trust for the benefit of general unsecured creditors, including Consumer Creditors.

However, the settlement did not resolve the Consumer Creditors Committee's objections to the

plan and, in particular, the section 363(o) issues unique to the Consumer Creditors.

---

[68]    The testimony at the Hearing was that the $5 million was an "offer" by the Debtors to the Term Lenders—i.e., the Debtors asked that the Term Lenders carve out such amount from their collateral to pay Consumer Creditor Claims under the Second Amended Plan.  It was not an "offer" by the Debtors or Term Lenders to the Consumer Creditors Committee to resolve the section 363(o) issues, and in fact, does not resolve the Consumer Creditors Committee's objections with respect to the section 363(o) claims.  *See* Aug. 8 Tr. at 55:5-17 (Counsel for the Term Lenders Ad Hoc Group:  "We did not – [the Debtors] came to us and they said, look, we think we ought to be making a pot of money available for the consumer creditors. We said, okay, what's that based on? So we went through their analysis, we said, okay, let's make that available.").

As described above, in late June, the Special Committee engaged AlixPartners to undertake the trend analysis to determine if $5,000,000 was a "reasonable" settlement offer. Mr. Nelson concluded that it was "reasonable" and the Consenting Term Lenders agreed to fund a settlement out of the proceeds of their collateral. The Debtors contend that the $5,000,000 represents a fair settlement of the Consumer Creditors Claims in these cases. *See* Aug. 7 Tr. at 42:2-11 (Debtors' Counsel: "Your Honor, in our view, this $5 million is a gift or a settlement consideration for consumer creditor claims in Class 6 . . . . [It] represents a carveout from the term loan lenders' collateral to settle all of the issues and disputes that are being raised with respect to consumer creditor claims."); *see also id.* at 43:13-15 ("And so, therefore, what it represents is a proposed resolution settlement of all the legal disputes brought by the Consumer Creditors Committee in these cases[.]"). The Debtors ask this Court to approve the Global Settlement, as enhanced by the $5,000,000 Fund, pursuant to Bankruptcy Rule 9019, and as an integral part of the Second Amended Plan. However, the Consumer Creditors Committee is not party to the agreement and objects to it.[69]

Bankruptcy Rule 9019 provides courts with authority to approve a compromise or settlement on motion and after notice and a hearing. *See* Fed. R. Bankr. P. 9019(a). A chapter 11 plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." *See* 11 U.S.C. § 1123(b)(3)(A). Even if a settlement does not relate to a

---

[69] *See* Aug. 8 Tr. at 54:16-25 ([Counsel for the Consumer Creditors Committee]: The second point, and this point we as the committee similar to Your Honor were slightly confused by this when we first saw the submissions on July 30th by the debtors, that there was a declaration by Mr. Nelson suggesting that a $5 million settlement with the committee before the claims of consumer creditors is reasonable. We did not agree to any settlement with the debtors, and we have had discussions with the debtors and disagree with the characterizations that the debtors have provided this Court, but we're not here to talk about that."); *see also id.* at 21:7-14 ([Debtors' Counsel]: "Obviously, the Consumer Creditors' Committee has not accepted that settlement and they're not a party to it, but as between the debtors, the term lenders, and the unsecured creditors, it is a term that's part and parcel of the global settlement that the debtors requested and the term lenders ultimately agreed to make $5 million available for the consumer borrower claims under the sale scenario.").

claim or interest belonging to the debtor or its estate, a plan may, "include any other appropriate provision not inconsistent with the applicable provisions of this title." *See* 11 U.S.C. § 1123(b)(6).  Accordingly, while section 1123(b)(3)(A) pertains to settlements of claims and interests belonging to the debtor and its estate, courts nonetheless consider plan settlements of non-debtor claims under the same standards that govern Bankruptcy Rule 9019 settlements. *See In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (recognizing inapplicability of section 1123(b)(3)(A) as authority to settle creditor's claim in plan, but considering settlement under Bankruptcy Rule 9019 standards); *see also In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'") (citation omitted); *In re Woodbridge Grp. of Cos.*, 592 B.R. 761, 772  (Bankr. D. Del. 2018) (noting bankruptcy courts may approve settlements under Bankruptcy Rule 9019 or as part of a debtor's plan and that the standards are the same) (citing *inter alia* sections 1123(b)(3)(A) and 1123(b)(6)); *In re G-I Holdings Inc*, 420 B.R. 216, 256 (D.N.J. 2009) ("[T]the Plan by its terms is a motion for approval of the Global Settlement." (citing *In re Texaco*, 84 B.R. at 90)).

Before a court may approve a settlement in a plan, it must find that it is fair and equitable, and in the best interests of the estate. *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailers Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); s*ee also In re Chemtura Corp.*, 439 B.R. 561, 593-94 (Bankr. S.D.N.Y. 2010).  The determination of whether a settlement meets those standards is within the discretion of the court. *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should

not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion.'")

(citations omitted); *Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*,

374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no

reasonable man could agree with the decision' to approve a settlement.") (citation omitted).   In

exercising that discretion, courts do not conduct a mini-trial on the merits of the settlement or

otherwise resolve disputed issues of law or fact underlying the settlement.   Instead, courts need

only to "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the

range of reasonableness.'"   *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.

1983) (citation omitted); *see also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr.

E.D.N.Y. 2009) ("[T]he court must make an informed and independent judgment as to whether a

proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an

intelligent and objective opinion of the probabilities of ultimate success should the claim be

litigated.'" (quoting *Anderson*, 390 U.S. at 424)).   In doing so, the court should accord proper

deference to a debtor's business judgment.   *See In re Stone Barn Manhattan LLC*, 405 B.R. 68,

75 (Bankr. S.D.N.Y. 2009) ("Although approval of a settlement rests in the Court's sound

discretion . . . the debtor's business judgment should not be ignored.") (internal citations

omitted).

     In the Second Circuit, the factors that a court must weigh in determining whether a

proposed settlement is "fair and equitable," are:

| | |
|---|---|
| (1) | the balance between the litigation's possibility of success and the settlement's future benefits; |
| (2) | the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; |
| (3) | the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; |
| (4) | whether other parties in interest support the settlement; |

(5)     the competency and experience of counsel supporting, and the experience and
knowledge of the bankruptcy court judge reviewing, the settlement;

(6)     the nature and breadth of releases to be obtained by officers and directors; and

(7)     the extent to which the settlement is the product of arm's length bargaining.

*See Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452,

462 (2d Cir. 2007) (citations omitted).   There is no dispute that the Unsecured Creditors

Committee, the Debtors, and the Term Lenders resolved the Unencumbered Assets Dispute and

the committee's objections to the Initial Plan following hard-fought, arm's length and good faith

negotiations.   The Court has no difficulty in finding that this aspect of the Global Settlement is

fair and equitable, satisfies the *Iridium* factors, and does not fall below the lowest level of

reasonableness.

The Court cannot make the same finding with respect to the agreement, as sweetened by

the $5,000,000 Fund.   The Unsecured Creditors Committee does not speak for the consumer

creditors generally or specifically on matters relating to the resolution of the Consumer Claims.

By necessity, in these cases the Unsecured Creditors Committee largely focused on resolving the

Unencumbered Assets Dispute to achieve a recovery for the out-of-the-money general unsecured

creditors.   It realized that goal through the Global Settlement.   *See* Unsecured Creditors

Committee Response ¶¶ 2-3.   In negotiating the Global Settlement, the Unsecured Creditors

Committee did not attempt to resolve specific issues germane to Consumer Creditors.   Indeed,

the committee was transparent in its view that those matters should be addressed by the

Consumer Creditors Committee.   As part of the Global Settlement, the Unsecured Creditors

Committee agreed to support the plan.   Thus, after the committee struck that deal, it could no

longer take up consumer issues, and has not purported to do so.   The committee supports the

enhanced settlement because if approved, the recovery for general unsecured creditors (that are not Consumer Creditors) will be enhanced.

In evaluating whether to approve the enhanced settlement, the Court must consider the fact that the Consumer Creditors Committee is not party to the settlement, and that it objects to it. The Debtors do not dispute otherwise.[70]  *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 835-36 (Bankr. D. Del. 2008) (finding plan settlement was not fair and equitable to certain trade creditors "not at the negotiating table.").  As recently noted by Judge Lane:

> Notwithstanding the [*Iridium*] factors, the Second Circuit has explicitly instructed "that when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties."  *Stanwich Fin. Servs. Corp. v. Pardee (In re Stanwich Fin. Servs. Corp.)*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 995 F.2d 1138, 1146–47 (2d Cir. 1993)); *see also In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval .... [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside.").

*See In re Miami Metals I, Inc.*, Case No. 18-13359 (SHL), 2019 WL 3773881, at *3 (Bankr. S.D.N.Y. Aug. 9, 2019).  Here, the Consumer Creditors are "non-settling parties" and the Debtors have failed to demonstrate that the establishment of the $5,000,000 Fund represents a fair and equitable resolution of their disputes with the Debtors.  The Consumer Creditors Committee did not negotiate the "settlement" let alone agree to it, and it rejects the contention that that amount represents a reasonable settlement of Consumer Creditor claims and associated issues.  While the Debtors cite to Mr. Nelson's analysis to demonstrate that the $5,000,000 is a

---

[70]    *See* Aug. 7 Tr. at 46:11-15 ([Debtors' counsel]:  And then Your Honor would have to look at the entire global settlement and say, is this reasonable from the perspective of the debtors and in the interests of their estates. And I think you would take into consideration that [the Consumer Creditors Committee is] opposing it.").

reasonable settlement amount, the evidence simply does not support that assertion.  Mr. Nelson

did not analyze the claims of the Class 6 creditors, or otherwise attempt to place a value on those

claims.  He was asked to do a trend analysis to justify a pre-ordained settlement amount.  The

Debtors have failed to meet their burden of demonstrating that the proposed settlement is fair and

equitable to the holders of allowed Class 6 claims.  *See, e.g.*, *In re Miami Metals I, Inc.*, 2019

WL 3773881, at *3 (finding settlement between debtors, unsecured creditors committee, and

senior lenders, which would resolve dispute over ownership of precious metals supplied by

certain customers to debtors, failed to meet the standards under Bankruptcy Rule 9019 because

the customers did not participate in or assent to the settlement and settlement would cap

customer recovery at a level below what customers could conceivably recover if they prevailed

on their claims).

### III. Do The Third Party Releases and Exculpation Provisions in the Second Amended Plan Comport With the Legal Standards Required for Their Approval Under the Second Circuit's holding in *Metromedia*, and Does the Court Have Subject Matter Jurisdiction to Approve such Third Party Releases and Exculpation Provisions Under The holding in *Johns-Manville*?

The Second Amended Plan provides for releases of claims held by: (i) the Debtors and

their estates (the "Estate Releases")—*see* Second Amended Plan, § 10.6(a); and (ii) the

Unsecured Creditors' Committee and the holders of Term Loan Claims, who were entitled to

vote and either accepted the Amended Plan or rejected the Amended Plan or abstained from

voting but did not opt out of the release (the "Third Party Releases" and, together with the Estate

Releases, the "Plan Releases")—*see id.* § 10.6(b); in each case, against the "Released Parties."[71]

---

[71]  Pursuant to section 1.137 of the Second Amended Plan, the term "Released Parties" means collectively the:

(a) Debtors; (b) Reorganized Debtors; (c) the Wind Down Estates (if applicable); (d) Consenting Term Lenders; (e) Prepetition Administrative Agent; (f) Prepetition Warehouse Parties; (g) DIP Credit Parties; (h) National Founders; (i) Unsecured Creditors' Committee and each of its members

The Debtors contend that the Court should approve the Plan Releases because they (i) are integral components of the Restructuring Support Agreement and the Second Amended Plan (including the transactions embodied therein), (ii) are appropriate and necessary under the circumstances, (iii) are consistent with the Bankruptcy Code, (iv) with respect to the Third Party Releases, are limited solely to the Term Lenders and the Unsecured Creditors' Committee; and (v) comply with applicable law.  *See* Debtors Memorandum ¶ 89.

Only the Third Party Releases are at issue.  The U.S. Trustee objects to the Third Party Releases on the grounds that: (i) the Court lacks subject matter jurisdiction to grant them; (ii) they do not satisfy the standards set forth in *Metromedia,* 416 F.3d 136 (2d Cir. 2005); and (iii) they are overbroad.  The Debtors dispute those assertions.  First, they contend that this Court has subject matter jurisdiction and that they can satisfy the *Metromedia* standards.  However, they say that the latter point is academic because the Releasing Parties have consented to the Third Party Releases.  Finally, they have narrowed the releases and they contend that the Court should approved the releases, as narrowed.

---

in their capacity as such; (j) Creditor Recovery Trustee; (k) Reorganized RMS; and (l) *Related Parties* for each of the foregoing.

Second Amended Plan § 1.137 (emphasis added).  In turn, section 1.136 of the Second Amended Plan defines "Related Parties" to mean:

> with respect to (i) any Exculpated Party or any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (ii) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such Persons and Entities acted on the behalf of the Released Parties in connection with the matters as to which releases are provided herein, and (iii) such persons' respective heirs, executors, estates, servants and nominees.

Second Amended Plan § 1.136.

In this Circuit, it is settled that a bankruptcy court has subject matter jurisdiction to enjoin "third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Johns-Manville,* 517 F.3d 52, 66 (2d Cir. 2008); *Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),* 676 F.3d 45, 57 (2d Cir. 2012) (same); *see also Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),* 740 F.3d 81, 88 (2d Cir. 2014) ("[T]he touchstone for bankruptcy jurisdiction [over a nondebtor's claim] remains whether its outcome might have any 'conceivable effect' on the bankruptcy estate."). *Accord, Metromedia*, 416 F.3d at 141 ("We have previously held that '[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.'" (quoting *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.),* 960 F.2d 285, 293 (2d Cir. 1992))). A bankruptcy court can assert jurisdiction over a proceeding "so long as it is possible that the proceeding may affect the debtor's rights or the administration of the estate." *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07 CIV. 4634 (GEL), 2007 WL 4323003, at *1 (S.D.N.Y. Dec. 10, 2007) (internal quotation marks and citations omitted). *See also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018) ("A claim need not be certain to provide a federal court with jurisdiction: "contingent outcomes can satisfy the 'conceivable effects' test, so long as there is the possibility of an effect on the estate." (citing *N.Y. Commercial Bank v. Pullo*, No. 12-02052 (BRL), 2013 WL 494050, at *3 (Bankr. S.D.N.Y. Feb. 7, 2013))).

The claims being released under the Third Party Releases include "any derivative Claims asserted on behalf of a Debtor" that are

> based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, ***the subject matter of, or***

> ***the transactions or events giving rise to, any Claim or Interest that is treated in the Plan,*** the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan . . . .

*See* Second Amended Plan § 10.6(b) (emphasis added).  The claims described in the Third Party Releases could have a conceivable effect on the administration of these Chapter 11 Cases and assets, or the *res*, belonging to these estates.  Moreover, as the Debtors have correctly pointed out, many of the Released Parties have indemnification rights against the Debtors' estates under various documents, such as the DIP financing agreements and prepetition financing agreements. The Debtors also have indemnification obligations to its directors and officers under their organizational documents (for actions taken in their capacities as such).  *See* Debtors Memorandum ¶ 112.  The U.S. Trustee does not contend otherwise.  Accordingly, the Court concludes that the third-party claims that the subject of the Third Party Releases could have a conceivable effect on the property of the Debtors' estates, and as such, this Court has subject matter jurisdiction to evaluate, and if appropriate, grant, the Third Party Releases in the Second Amended Plan.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 289 (Bankr. S.D.N.Y. 2016) (concluding that the Court had jurisdiction over the challenged third-party releases and noting that "a contingent indemnification obligation can be sufficient to satisfy the 'conceivable effect' test"); *In re MPM Silicones, LLC*, No. 14-22503 (RDD), 2014 WL 4436335, at *34 (Bankr. S.D.N.Y. Sept. 9, 2014) (stating "I firmly believe that I have jurisdiction [over the third party releases]").

Section 10.6(b) of the Second Amended Plan contains the Third Party Releases.  As drafted, those releases do not apply to -- and the Debtors say that there will be no attempt to

124

impose them on -- those parties not entitled to vote on the Second Amended Plan including,

without limitation, the general unsecured creditors and the Consumer Creditors.[72]  Under that

section, the following parties (collectively, the "Releasing Parties") will grant releases to

Released Parties:

   i.      Holders of Impaired Claims who voted to accept the Amended Plan;

   ii.     The Consenting Term Lenders;

   iii.    Holders of Term Loan Claims (Class 3) who abstain from voting on the
           Amended Plan or vote to reject the Amended Plan but do not opt-out of the
           Third Party Releases on the ballots;

   iv.     The Unsecured Creditors' Committee and each of its members in their
           capacities as such; and

   v.      With respect to the entities in the foregoing clauses (i) through (iv), such
           entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates,
           managed accounts or funds, managed or controlled by such entity and (z)
           all persons entitled to assert Claims through or on behalf of such entities
           with respect to the matters for which the releasing entities are providing
           releases.

Second Amended Plan 10.6(b).[73]

---

[72]    The Bartholow Consumers and Consumer Creditors Committee also objected to the Third Party Releases, on grounds substantially similar to those advanced by the U.S. Trustee.  As such, the Court will principally discuss these objections as arguments by the U.S. Trustee.

   The Bartholow Consumers additionally contended that the definition of the "Causes of Action" are being released would "severely limit[] the remedies and consumer protections allowed to consumer borrowers under the law. There is simply insufficient consideration granted to the Consumer Creditors under the Plan in exchange for such an expansive release."  See Bartholow Objection ¶ 36.  Such concern, insofar as it is directed as an objection to the Third Party Release, is misguided.  The consumer creditors are not deemed to have granted any releases by virtue of section 10.6(b) of the Second Amended Plan.  As such, the Court will not further consider that objection.

[73]    The Debtors propose that the Third Party Releases extend to:

       any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests

The Third Party Releases are binding on the Unsecured Creditors Committee, their members in their capacities as such, and the Consenting Term Lenders, because they have consented to the release. *See, e.g.*, *Metromedia*, 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent." (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993))). *Cf. In re MPM Silicones, LLC*, 2014 WL 4436335, at *32 ("[I]f [the non-debtor releases] are consensual or are not objected to after proper notice, courts generally approve them unless they are truly overreaching on their face."). The holders of Class 3 Term Loan Claims are the only creditors entitled to vote on the plan. The voting results are as follows:

- 185 ballots were returned.

- Of the Class 3 Term Loan claimants that cast ballots, 99.98% in amount, and 99.44% in number, accepted the plan.

- Three parties entitled to vote rejected the plan and opted out of the Third Party Releases.

- Forty-seven parties did not return a ballot and failed to opt-out of the Third Party Releases.[74]

---

before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order. The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

*Id.*

[74]    Initially, the Debtors asserted that approximately fifty-four parties entitled to vote did not return Ballots. However, they made that calculation based upon the initial solicitation and votes on the First Amended Plan. *See Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 1037]. The voting deadline was thereafter extended for Class 3 to reconsider their votes as to the Second Amended Plan. *See Supplemental Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 1096]. From that, additional votes were submitted, including two

The U.S. Trustee does not dispute that the Third Party Releases are binding on the holders of Term Loan Claims that voted to accept the Second Amended Plan. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) ("[I]f, as here, the proposed release is appropriately disclosed, that consent can be established by a vote in support of a plan"); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("The Court agrees that "Consenting Creditors" should include creditors who voted in favor of the Plan."); *In re Crabtree & Evelyn, Ltd.*, No. 09-14267-BRL, 2010 WL 3638369, at *11 (Bankr. S.D.N.Y. 2010) (confirming plan with release by "Persons who directly or indirectly, have held, hold, or may hold Claims or Interests who voted to accept the Plan"). However, he contends that they are not binding on the forty-seven parties that did not return a ballot and that did not opt out of the release. He says that this treatment of "deemed consent," by mere inaction (i.e., abstention) is impermissible. The Debtors contest that assertion.

The case of *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015) is instructive. There, Judge Wiles confirmed the debtor's 11 plan, but with certain modifications to the release provisions therein. The release defined the term "consenting creditors" to mean:

> (a) any holder of a Claim other than any holder who voted to reject the Plan and elected not to provide the release (as set forth on the applicable ballot), and (b) any Released Party.

*Id.* at 75. Thus, in that case, a creditor who abstained from voting or who voted against the plan, but did not affirmatively opt out of the release, was deemed to consent to the release. The court found that it was inappropriate to treat creditors who were entitled to vote, but who chose to take no action at all, as having "consented" to the release. *See id.* at 80. In finding that "it would be

---

votes to reject the plan and the releases therein, bringing the total abstaining voters to forty-seven. *See* Supplemental Voting Tabulation ¶ 10.

inappropriate to treat such inaction as a 'consent' to third party releases," Judge Wiles reasoned that:

> The relatively small recoveries that were initially proposed, and the widely-publicized fact that other creditor groups had endorsed the proposed Plan, could easily have prompted an even higher-than usual degree of inattentiveness or inaction among affected creditors in these cases. Furthermore, many creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to their dealings with the Debtors and would not affect their claims against other parties. Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.

*Id.* at 80-81.  However, he noted that his holding was based on the facts and circumstances specific to that case, and that in another situation, the use of an "opt-out" election for third party releases may be appropriate.  *See id.* at 79 ("Circumstances may justify a different approach in different cases. . . . The Court does not know what considerations were debated in those cases that approved voting procedures like the ones the Debtors proposed in this case (or, indeed, if any objections were made in those cases).  In these cases, however, the Court was not persuaded that the proposed procedures were appropriate.").

In *Chassix*, Judge Wiles did not advocate a hard and fast rule for reviewing third party releases and, in this case, the Court finds merit to that approach.  Based on the facts of this case, it finds that the forty-seven parties that did not return a ballot and failed to opt-out of the Third Party Releases are deemed to consent to the Third Party Releases.  It is undisputed that --

- The Third Party Releases were conspicuously disclosed in boldface type in the First Amended Plan, the Disclosure Statement, and the ballots.

- The ballots plainly indicated that a vote to accept the plan constituted consent to the Third Party Releases.

- The ballots plainly notified abstaining creditors or creditors who voted to reject the plan the requirement to affirmatively opt out of the Third Party Release in order not to be bound thereby.

- An overwhelming majority of creditors entitled to vote on the plan did so.

It is also undisputed that each party that did not return a ballot and did not opt-out of the Third Party Releases was properly served with the ballot and related plan documents. There is no question that those parties received the ballots and actual notice of the consequences of failing to cast the allot and to opt out of the release. There is nothing in the record of these Chapter 11 Cases that suggests that the holders of the Term Loan Claims lacked the sophistication to understand the consequences of the opt out election in the ballot and of abstaining from voting. To the contrary, the Court finds it significant that the overwhelming majority of Class 3 creditors entitled to vote actually voted, and that three parties voted against the plan and opted out of the release. It seems clear that all those parties understood the consequences of not casting a ballot in these Chapter 11 Cases. Under these facts and circumstances, the Court finds that those parties have consented to the Third Party Releases.

Lastly, the U.S. Trustee take issue with the "overly broad" and "vague" definition of the "Related Parties," which is included as among the Released Parties in the Third Party Releases. The Second Amended Plan defines "Related Parties" to mean:

> with respect to (i) any Exculpated Party or any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (ii) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, ***solely to the extent such Persons and Entities acted on the behalf of the Released Parties in connection with the matters as to which releases are provided herein,*** and (iii) such persons' respective heirs, executors, estates, servants and nominees.

Second Amended Plan § 1.136 (emphasis added).

The objectors argue that such a broad and vague definition, if not more narrowly tailored, would inadvertently include individuals or entities not entitled to a release, and impermissibly protect them from improper conduct, such as, by way of example, those individuals or entities that participated in a scheme that ultimately resulted in a superseding indictment against an individual who sold reverse mortgages that may have included Ditech loans. *See, e.g.*, U.S. Trustee Objection at 23.  As revised in the Second Amended Plan, the Debtors have narrowed the definition of "Related Parties" (by the emphasized language highlighted above), ostensibly in response to the concerns as to the overbreadth of that term.  Insofar as the objection still stands with respect to the revised definition of "Related Parties" in the Second Amended Plan, the Court respectfully overrules the objection.  By narrowing that definition, the objectors' concerns over inadvertently releasing individuals and entities not otherwise entitled to a release has been rendered moot because a Related Party would receive a release only to the extent it had acted on behalf of a Released Party in connection with the matters to be released.

The U.S. Trustee also objected to the Exculpation provision[75] on the same grounds that the Exculpated Parties was too broadly defined and improperly included unspecified Related

---

[75]    The Exculpation provision is set forth in section 10.7 of the Second Amended Plan, and states:

> To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and

Parties.  *See* U.S. Trustee Objection at 23.  At the Hearing, the Debtors explained that the

Exculpated Parties had been narrowed to limit the scope of persons and entities being exculpated

and does not include any Related Parties.  The term "Exculpated Parties" is now defined as:

> collectively the: (a) Debtors; (b) Reorganized Debtors; (c) Reorganized RMS; (d)
> Plan Administrator; (e) the Wind Down Estates; (f) Consenting Term Lenders; (g)
> Prepetition Administrative Agent; (h) Prepetition Warehouse Parties, (i) DIP Credit
> Parties; (j) Successful Bidders; (k) Unsecured Creditors' Committee and each of its
> members in their capacity as such; (l) Exit Warehouse Facilities Lenders; (m)
> National Founders; (n) Creditor Recovery Trustee; ***and (o) with respect to each of
> the foregoing Entities in clauses (a) through (n), all Persons and Entities who
> acted on their behalf in connection with the matters as to which exculpation is
> provided herein.***

Second Amended Plan § 1.76 (emphasis added).

The Court understands that, with the narrowed revised language highlighted above, the

U.S. Trustee's objection to the Exculpation provision is now moot.  *See, e.g.*, Aug. 8 Tr. at

186:13-187:24.[76]  As such, the finds that the Exculpation clause, as amended, is reasonable and

may be approved.  *See, e.g.*, *In re Walter Investment Management Corp.*, Case No. 17-13446

---

not in limitation of, all other releases, indemnities, exculpations and any other applicable law or
rules protecting such Exculpated Parties from liability.

Second Amended Plan § 10.7
[76]    The parties' exchange on this point was as follows:

[Debtors' Counsel]:    I would also note, Your Honor, [the U.S. Trustee] talked about that the definition of
released parties, the scope is too broad. Your Honor, in the amended plan, and I'm not
faulting him for this, but just to give the Court an update.  We did file a lot of paper. In
the amended plan and the definition of released parties, which is at -- apologies -- related
parties, excuse me, Section 1136 of the plan, we've added at the end "solely to the extent
that such persons or entities acted on behalf of a released party in connection with the
matters in which the releases are to be provided herein." So it's not just some random
officer of a released party, Your Honor. It is actually somebody involved in these cases.
And you'll find the same definition and the same language in exculpated parties, and that
same limitation in that definition which appears at Section 1.76 of the plan which ends,
"with respect to each of the foregoing in Clauses A through N all persons and entities
who acted on their behalf in connection with matters as to which exculpation is to be
provided."

[U.S. Trustee's Office]:    With respect to the scope of the releases, if we were working on a prior version of the
plan I apologize, Your Honor, with respect to that comment. I don't know if it's possible it
carried over from our disclosure statement objection. So I don't --

(JLG) (Bankr. S.D.N.Y. Nov. 30, 2017) [ECF No. 172] (confirming plan containing substantially similar exculpation provision).

## **CONCLUSION**

Based on the foregoing, the Court holds that the Debtors have failed to satisfy sections 1129(a)(1)-(3) of the Bankruptcy Code to the extent that the Second Amended Plan purports to limit the Consumer Creditors' ability to assert rights of recoupment against the Buyers. The Court also holds that the Debtors have not demonstrated that the Second Amended Plan satisfies the best interests of the holders of allowed Class 6 claims and as such, they have failed to satisfy section 1129(a)(7) of the Bankruptcy Code. Finally, the Court holds that the Debtors have failed to demonstrate that the Global Settlement is fair and equitable to the holders of allowed Class 6 claims and as such, the Debtors' request to enter into the agreement is denied. For those reasons, the Debtors' request for confirmation of the Second Amended Plan is denied.

Dated: August 28, 2019
New York, New York

/s/ *James L. Garrity, Jr.*
Honorable James L. Garrity, Jr.
United States Bankruptcy Judge