**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                     :

In re                  :     **Chapter 11**
                     :

**DITECH HOLDING CORPORATION**, *et al.*,   :     **Case No. 19-10412 (JLG)**
                     :

           Debtors.[1]    :     **(Jointly Administered)**
                     :

-------------------------------------------------------------X

# DEBTORS' (I) MEMORANDUM OF LAW IN
## SUPPORT OF CONFIRMATION OF THIRD AMENDED
## JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS
## AFFILIATED DEBTORS AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Richard W. Slack
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and*
*Debtors in Possession*

Dated: September 22, 2019
       New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

GENERAL BACKGROUND ............................................................................................. 5

ARGUMENT ...................................................................................................................... 20

I.     DISCLOSURE STATEMENT SUPPLEMENT PROVIDES ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A)(1) OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ............. 20

    a.     The Debtors Have Satisfied Sections 1125 and 1127 of the Bankruptcy Code. ....................................................................................................... 20

II.     THE THIRD AMENDED PLAN SATISFIES THE REQUIREMENTS OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED. .......................................... 25

    a.     The CCC Settlement Is An Integral Component of the Third Amended Plan and Should Be Approved. .......................................................................... 25

        i.     The CCC Settlement Is Fair and Equitable and in the Best Interest of the Debtors' Estates. ........................................................................... 27

    b.     The Third Amended Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code. ....................................................................................................... 33

        i.     There Would Be No Sales In a Hypothetical Chapter 7 Liquidation. ........................................................................................... 34

        ii.     The Recovery Under the Third Amended Plan For 363(o) Claims Is Equal To or Greater Than a Hypothetical Chapter 7 Liquidation. ........ 37

    c.     The Third Amended Plan Satisfies Sections 1129(a)(1), 1129(a)(2), and 1129(a)(3) of the Bankruptcy Code. ................................................................. 48

    d.     The Third Amended Plan Satisfies Section 1129(a)(5) of the Bankruptcy Code. ....................................................................................................... 49

III.     THE OBJECTIONS TO THE THIRD AMENDED PLAN SHOULD BE OVERRULED AND THIRD AMENDED PLAN CONFIRMED. ................................. 49

CONCLUSION .................................................................................................................... 64

**Exhibits**

**Exhibit A**: Proposed Confirmation Order

WEIL:\97177007\6\41703.0011

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.H. Robins Co., Inc.*,
880 F.2d 694 (4th Cir. 1989) ............................................................................22

*In re Adelphia Commc'ns Corp.*,
352 B.R. 592 (Bankr. S.D.N.Y. 2006) ...............................................................21

*In re Adelphia Commc'sn Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...........................................................28, 34

*In re Affiliated Foods, Inc.*,
249 B.R. 770 (Bankr. W.D. Mo. 2000) ..............................................................34

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ..........................................................................................33

*In re Bernard L. Madoff Inv. Sec.*,
515 B.R. 117 (Bankr. S.D.N.Y 2014) ...............................................................54

*In re Best Prods. Co.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1994), *appeal dismissed sub nom. Resolution Tr. Co. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ..................................................................................................27

*In re Blockbuster Inc.*,
2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011) ..........................................54

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................28

*In re Copy Crafters Quickprint, Inc.*,
92 B.R. 973 (Bankr. N.D.N.Y. 1988) .................................................................21

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983) .............................................................................28

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ...............................................................22

*In re Delphi Corp.*,
No. 05-44481, 2009 WL 973130 (Bankr. S.D.N.Y. Apr. 2, 2009) .......................28

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 714 (Bankr. S.D.N.Y. 1992), *aff'd sub nom. Lambert Brussels Asocs, L.P. v. Drexel*

WEIL:\97177007\6\41703.0011

Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 140 B.R. 347
(S.D.N.Y. 1992) ................................................................................................ 27, 34, 51

In re Drexel Burnham Lambert Grp., Inc.,
960 F.2d 285 (2d Cir. 2009) ...........................................................................................27

In re Enron Corp.,
2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) .................................................51

In re Ferretti,
128 B.R. 16 (Bankr. D.N.H. 1991) ............................................................................ 22, 24

Geary v. Green Tree Servicing LLC,
No. 14-cv-522 (S.D. Ohio 2014)......................................................................................43

In re Hibbard Brown & Co.,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) ................................................................................27

In re Journal Register Co.,
407 B.R. 520 (Bankr. S.D.N.Y. 2009) ........................................................................ 50, 51

In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.,
149 B.R. 306 (Bankr. E.D.N.Y. 1992) ..............................................................................52

Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.),
2011 WL 1042767 (Bankr. S.D.N.Y 2011)........................................................................54

In re MF Glob. Inc.,
No. 11-2790, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) .....................................28

In re Michael Milken & Assocs. Sec. Litig., 150 F.R.D. 46, 53 (S.D.N.Y. 1993 ........................27

In re Momentum Mfg. Corp.,
25 F.3d 1132 (2d Cir. 1994) ...........................................................................................21

Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC),
478 F.3d 452 (2d Cir. 2007) ...........................................................................................29

Nellis v. Shugrue,
165 B.R. 115 (S.D.N.Y. 1994)..........................................................................................27

In re NII Holdings, Inc.,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ................................................................................28

Official Committee of Unsecured Creditors of AppliedTheory Corp. v. Halifax, L.P. (In re
AppliedTheory Corp.), 493 F. 3d 82, 86 (2d Cir. 2007)......................................................54

In re Oxford Homes, Inc.,
204 B.R. 264 (Bankr. D. Me. 1997)..................................................................................22

iii

*In re PC Liquidation Corp.*,
383 B.R. 856 (E.D.N.Y. 2008) ..................................................................................... 21, 22

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................................. 22

*In re Radco Props., Inc.*,
402 B.R. 666 (Bankr. E.D.N.C. 2009) ................................................................................ 21

*In re Residential Capital, LLC*,
497 B.R. 720 (Bankr. S.D.N.Y. 2013) ................................................................................ 28

*Sec. Investor Prot. Corp. v. Bernard Madoff Inv. Sec., LLC*,
429 B.R. 423 (Bankr. S.D.N.Y.2010) ................................................................................. 54

*In re Snyder*,
51 B.R. 432 (Bankr. D. Utah 1985) ..................................................................................... 24

*In re Spielfogel*,
211 B.R. 133 (Bankr. E.D.N.Y. 1997) ................................................................................ 28

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) ............................................................................................. 22

*Tran v. Green Tree Servicing LLC,*
Case No. 07-2014-00041141 (Cal. Sup. Ct. 2014) ............................................................. 43

*In re Union Cty. Wholesale Tobacco & Candy Co., Inc.*,
8 B.R. 442 (Bankr. D.N.J. 1981) ........................................................................................ 24

*In re W.R. Grace & Co.*,475 B.R. 34 (D. Del. 2012), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729
F.3d 332 (3d Cir. 2013) ....................................................................................................... 34

*In re W.T. Grant Co.*,
699 F.2d 599 (2d Cir. 2001 ................................................................................................. 28

*In re Winn-Dixie Stores, Inc.*,
356 B.R. 239 (Bankr. M.D. Fla. 2006) ............................................................................... 52

*In re Zenith Elec. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ..................................................................................... 24

**Statutes**

11 U.S.C. § 1123(b)(3)(A) ....................................................................................................... 27

11 U.S.C. § 1125(a)(1) ............................................................................................................. 21

11 U.S.C. § 1127(c), (f)(2) ....................................................................................................... 20

11 U.S.C. § 1129.................................................................................................*passim*

Fair Debt Collection Practices Act, 15 U.S.C. § 1692...........................................47

**Other Authorities**

Bankruptcy Rule 2019...........................................................................................56

H.R. Rep. No. 95-595 (1977) ...............................................................................22

WEIL:\97177007\6\41703.0011

Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] submit this supplemental Memorandum of Law and omnibus reply to the Confirmation Objections[3] (the "**Supplemental Memorandum**") in support of the Debtors' request for confirmation of the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, dated September 11, 2019 (ECF No. 1287) (as the same has been or may be amended, modified, supplemented, or restated, the "**Third Amended Plan**").

## PRELIMINARY STATEMENT

1.      The Third Amended Plan represents a global resolution with respect to the most contentious issue in these chapter 11 cases:  whether the Sale Transactions embodied in the Third Amended Plan can be consummated free and clear of consumer claims notwithstanding section 363(o) of the Bankruptcy Code.  On August 28, 2019, the Bankruptcy Court issued the Memorandum Decision finding that section 363(o) of the Bankruptcy Code did not apply to the proposed Sale Transactions but also concluding the best interests test under section 1129(a)(7) of the Bankruptcy Code was not satisfied with respect to consumer claims covered by section 363(o).

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan, Disclosure Statement, or Disclosure Statement Supplement, as applicable (each as defined herein).

[3]      Objections to confirmation of the Third Amended Plan (collectively, the "**Confirmation Objections**") consist of (i) The Geary Class Action's Objections to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan (ECF No. 1296); (ii) Consumer Creditors' Objection and Response to the Debtors' Motion for Orders Confirming Its Third Amended Plan of Reorganization With Points and Authorities (ECF No. 1302); (iii) Ms. Pefley's Objection to the Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan; (iv) Samuel Rodriguez's Objection to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan (ECF No. 1316); and (v) Launa L. Lishamer's Objection to Notice of Third Amended Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors.  The (a) Limited Objection and Reservation of Rights of Padgett Law Group to Confirmation of Third Amended Plan (ECF No. 1307) and (b) Limited Objection and Reservation of Rights of Korde & Associates, P.C. to Confirmation of Third Amended Plan (ECF NO. 1308) relate solely to the objecting party's rights pertaining to the assumption and assignment of certain contracts and cure amounts thereunder.

In addition, the Court found that Borrowers' defenses and rights of recoupment were not properly preserved.

2. Following the Court's denial of confirmation of the Second Amended Plan, the Debtors faced significant operational challenges, increasing liquidity constraints, and immense pressure to implement a solution to consummate the Sale Transactions and emerge from the Debtors' seven-month long bankruptcy cases as soon as possible. Recognizing the importance of (i) reaching a solution that achieved an immediate resolution and consummation of the Sale Transactions, (ii) avoiding significant value destruction, and (iii) preserving the rights of Borrowers in connection with the Sale Transactions, the Debtors immediately engaged with the Consumer Creditors' Committee, Term Loan Ad Hoc Group, Buyers, and other key stakeholders to negotiate amendments to the Second Amended Plan in a manner consistent with the Memorandum Decision.

3. Such arm's length negotiations were successful. On September 10, 2019, the Debtors announced a settlement in principle with the Consumer Creditors' Committee that was subsequently documented in the Third Amended Plan filed on September 11, 2019. The Third Amended Plan implements the following protections for Borrowers:

 i. **Preservation of Borrower Rights to Request and Enforce Account Corrections**. The Third Amended Plan preserves a Borrower's right, if any, to request corrections of any inaccurate statement of accounts due under the Borrower's loan or any other inaccurate terms related to the Borrower's loan (collectively, the "**Account Corrections**"). The Third Amended Plan also expressly provides that nothing in the Third Amended Plan ratifies any alleged amounts due under any loan or approves the sale of any assets that are not property of the Debtors' estates.

 ii. **Reasonable Investigation Efforts**. The Wind Down Estates, Buyers, and Reorganized RMS, as applicable, must reasonably investigate any alleged error in the prior servicing or accounting of a loan asserted by a Borrower, whether or not originally asserted as a proof of claim in these chapter 11 cases, and, if warranted, correct the account of a Borrower as appropriate so that any incorrect statement of accounts is not perpetuated to the detriment of a Borrower in

connection with (a) the proper characterization of payment status, (b) credit reporting status, (c) the proper receipt and application of payments by or on behalf of a Borrower or any insurer, (d) the proper advancing out of escrow accounts with funds previously provided by a Borrower, (e) the proper processing and evaluation of a Borrower's requests for and the provision of available loss mitigation options by the Buyers or Reorganized RMS, as applicable, (f) the proper assessment of fees, costs or other charges to a Borrower's account, (g) the proper pursuit of foreclosure and other disposition options in respect of any continuing default by a Borrower, or (h) any other misstated terms of a Borrower's loan accounts.

iii.   **Preservation of Defenses and Rights of Recoupment**.  All defenses and rights of recoupment of Borrowers under applicable state law are fully preserved against the Buyers, Reorganized RMS, and their Affiliates so long as application of those defenses and rights of recoupment do not require the Buyers, Reorganized RMS, or any of their Affiliates (or anyone acting on their behalf) to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of, the Borrower.

iv.   **Preservation of Borrower Rights Against Third Parties and Buyers**.  The Third Amended Plan expressly preserves the claims of Borrowers against any third party or the Buyers for pre-existing liability that the Buyers or any third party would otherwise have to such Borrower had the Buyers not acquired the Debtors' assets.

v.   **Consumer Representative**.   The Third Amended Plan provides for the appointment of a Consumer Representative that will manage the claims reconciliation process for all Consumer Creditor Claims and facilitate inquiries by Borrowers with respect to the obligations of the Wind Down Estates, the Buyers, and Reorganized RMS to reasonably investigate alleged errors in the prior servicing or accounting of the loan asserted by any Borrower and, if warranted, correct such errors.  The Consumer Representative will also have standing to appear in the Bankruptcy Court.

4.      In addition, the Consumer Creditor Reserve, consisting of $10,000,000 as a carve out from the Term Lenders' collateral, will be established for the exclusive benefit of holders of Consumer Creditor Claims.  Significantly, the commitment of the Buyers and Reorganized RMS to address Account Corrections, the preservation of Borrowers' defenses and rights of recoupment, and the proceeds of the Consumer Creditor Reserve are collectively more than sufficient to satisfy all 363(o) Claims in full under the Third Amended Plan.  As described in more detail herein, Mr. O'Connor of AlixPartners LLP—the Debtors' expert with forty (40) years of experience handling

3

consumer borrower claims, including Residential Capital LLC and Taylor Bean & Whitaker—supervised an independent review and analysis of all Consumer Creditor Claims filed in these chapter 11 cases. Mr. O'Connor concluded that the aggregate value of 363(o) Claims in these chapter 11 cases is well below $10,000,000 (after eliminating Account Corrections to be addressed by the Buyers and Reorganized RMS). This analysis and underlying data was shared with the Consumer Creditors' Committee and its advisors, who relied on that data to independently conclude that the $10,000,000 reserve (together with the commitment of the Buyers to address, and the preservation of rights by Borrowers to enforce, Account Corrections) is adequate to satisfy any remaining 363(o) Claims. Any portion of the $10,000,000 that remains in the Consumer Creditor Reserve following the satisfaction of all 363(o) Claims in full will be distributed to holders of Consumer Creditor Claims that do not hold 363(o) Claims. Accordingly, assuming a sale of the Debtors' assets could even be accomplished in a hypothetical chapter 7 liquidation, which the Debtors submit could not (as evidenced by the Amended Liquidation Analysis described herein), consumer borrowers with claims subject to section 363(o) of the Bankruptcy Code will still receive equal or better recovery under the Third Amended Plan.

5.      Compellingly, of the more than 1.5 million borrowers and other creditors who were served with notice of the Confirmation Hearing, only six (6) objections to the Third Amended Plan were filed—of which two (2) relate to cure and assumption issues. The four (4) remaining objections to confirmation of the Third Amended Plan are addressed in Section III and should be overruled for the reasons stated herein.

6.      The Third Amended Plan is supported by all of the Debtors' key stakeholders in these chapter 11 cases, including the Consumer Creditors' Committee, Unsecured Creditors' Committee, Term Loan Ad Hoc Group, DIP Lenders, Fannie Mae, Ginnie Mae, and the

Buyers. In addition, the Term Lenders have voted almost unanimously to accept the Third Amended Plan. The vast majority of opponents who objected to the Second Amended Plan—such as the U.S. Trustee, the New York Attorney General, and the U.S. Attorney for the Southern District of New York—are not opposing the Third Amended Plan. This is a resounding testament to the fairness of the Third Amended Plan, including the CCC Settlement embodied therein, and its satisfaction of the requirements of section 1129 of the Bankruptcy Code.

7. The Debtors are at a critical juncture of these chapter 11 cases. The denial of the Second Amended Plan and its effects, coupled with the unwillingness of the Buyers to change course on the previously stated positions of the terms under which they would consummate the Sale Transactions, has confirmed what the Debtors feared all along: there is no alternative option for the Debtors and their stakeholders. Accordingly, the Third Amended Plan must be confirmed to maximize value for all creditors in these chapter 11 cases.

8. A proposed order confirming the Third Amended Plan (the "**Proposed Confirmation Order**")[4] is attached hereto as **Exhibit A**, together with a redline to demonstrate changes to the confirmation order previously submitted to the Court in connection with the Second Amended Plan (ECF No. 1124).

## **GENERAL BACKGROUND**

9. A summary of the relevant facts and significant developments following the confirmation hearing that took place on August 7, 2019 and August 8, 2019 (the "**Initial Confirmation Hearing**") is set forth herein. The documents filed in support of the Second

---

[4] The Debtors and other parties in interest are continuing to review the Proposed Confirmation Order and may have further changes ahead of the hearing scheduled for September 25, 2019.

WEIL:\97177007\6\41703.0011

Amended Plan are incorporated herein by reference. In further support of the Third Amended

Plan, the Debtors submit the following declarations:

i. Declaration of Reid Snellenbarger of Houlihan Lokey Capital, Inc., Debtors' Investment Banker, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**Snellenbarger Declaration**");

ii. Declaration of Laura Reichel, Debtors' Senior Vice President of Investor Relations and Product Development, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**Reichel Declaration**");

iii. Declaration of James Nelson of AlixPartners LLP, Debtors' Financial Advisor, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**Nelson Declaration**");

iv. Declaration of Marc Brown of AlixPartners LLP, Debtors' Financial Advisor, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**Brown Declaration**");

v. Declaration of Denis O'Connor of AlixPartners LLP, Debtors' Financial Advisor, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**O'Connor Declaration**");

vi. Declaration of Jeffrey P. Naimon of Buckley LLP, Special Counsel for the Debtors, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**Naimon Declaration**"); and

vii. Declaration of William R. Thompson, Vice President and Senior Managing Counsel of Ditech Financial LLC, in Support of the Sale Transactions and Confirmation of the Third Amended Plan (the "**Thompson Declaration**").

10. The Debtors also respectfully refer the Court to the Affidavit of Service of

Solicitation Materials (ECF No. 1293) and the Second Supplemental and Restated Declaration of

Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots

Cast on the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated

Debtors, filed contemporaneously herewith (the "**Third Voting Certification**" and collectively

with the items listed in paragraph 8, the "**Supporting Declarations**"), and the record of these

chapter 11 cases for facts that bear on confirmation of the Third Amended Plan. The Supporting

Declarations and any testimony and other declarations that may be adduced or submitted at or in

connection with the Confirmation Hearing (as defined herein) are incorporated herein as if fully set forth.

### a. Debtors' Initial Plan.

11. On May 10, 2019, the Court entered the *Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Approving Confirmation Objection Procedures and Notice of Confirmation Hearing, and (V) Granting Related Relief* (ECF No. 544) (the "**Disclosure Statement Order**") approving the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 543) (the "**Disclosure Statement**"). Following the Court's entry of the Disclosure Statement Order, the Debtors commenced solicitation of the *Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 542) (the "**Initial Plan**") and caused Epiq Corporate Restructuring, LLC ("**Epiq**") to distribute copies of the Disclosure Statement Order, a notice of the confirmation hearing, and a form of ballot with voting instructions (the "**Ballot**" and, collectively, the "**Solicitation Package**") to each holder of a claim in Class 3 (Term Loan Claims) (the "**Voting Class**")— the only class of Claims entitled to vote.[5]

12. The Initial Plan represented months of negotiations with various parties in interest, including the Official Committee of Unsecured Creditors (the "**Unsecured Creditors' Committee**"), that ultimately culminated in a proposed compromise and settlement by and among the Debtors, the Unsecured Creditors' Committee, and an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**"), as further described in the Initial Plan,

---

[5]    *See* Affidavit of Service of Solicitation Materials (ECF No. 587).

Disclosure Statement, and Initial Memorandum[6] (the "**UCC Settlement**"). The UCC Settlement significantly improved the recoveries for holders of General Unsecured Claims by establishing the GUC Recovery Trust to which the Term Loan Ad Hoc Group will transfer $4,000,000 and a fifty percent (50%) undivided interest in the GUC Recovery Trust Causes of Action and the net proceeds thereof. The deadline to vote to accept or reject the Initial Plan was July 18, 2019 at 4:00 p.m. (prevailing Eastern Time). Epiq's analysis of the Ballots indicates that the Voting Class voted to accept the Initial Plan in accordance with the requirements of section 1126 of the Bankruptcy Code.[7]

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| Class 3 (Term Loan Claims) | 99.98% | 99.44% | 0.02% | 0.56% |

### b. Debtors' Second Amended Plan.

13. On July 30, 2019, the Debtors filed the *Notice of Extended Voting Deadline and Filing of Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1032) (the "**Second Amended Plan**"). The Second Amended Plan provided for, among other things, the contribution of $5,000,000 for the exclusive benefit of holders of Allowed Consumer Creditor Claims. Epiq resolicited the Voting Class, mailing each holder of a Claim in the Voting Class an amended Ballot, a copy of the notice extending the Voting Deadline, and a letter explaining that holders of Claims in the Voting Class were not required to

---

[6] "**Initial Memorandum**" means the *Debtors' (I) Memorandum of Law in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* (ECF No. 1029).

[7] *See* Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors (ECF No. 1037).

WEIL:\97177007\6\41703.0011

submit a new Ballot, but that holders of Claims could change their votes by submitting a new Ballot if they chose to do so. The deadline to vote to accept or reject the Second Amended Plan was August 5, 2019 at 10:00 a.m. (prevailing Eastern Time). Epiq's analysis of the Ballots indicates that the Voting Class voted to accept the Second Amended Plan in accordance with the requirements of section 1126 of the Bankruptcy Code.[8]

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| Class 3 (Term Loan Claims) | 99.10% | 98.38% | 0.90% | 1.62% |

### c. Initial Confirmation Hearing With Respect To the Second Amended Plan.

14. The Initial Confirmation Hearing before the Court took place over the course of two (2) days, during which the testimony of the following four (4) witnesses was presented: (i) Gerald A. Lombardo, the Debtors' Chief Financial Officer; (ii) Reid Snellenbarger of Houlihan Lokey Capital, Inc., the Debtors' investment banker; (iii) James Nelson of AlixPartners LLP, the Debtors' financial advisor; and (iv) Varun Wadhawan, a Managing Director at Fortress Investment Group. The testimony addressed, among other things, the Debtors' postpetition marketing process and the two (2) actionable bids received in connection therewith, the significant value destruction to the Debtors' operations in a chapter 7 liquidation, the low likelihood of the occurrence of a sale in a chapter 7 liquidation, and an overview of the Debtors' historical payouts of consumer claims in connection with the trend analysis conducted by AlixPartners.

---

[8]    *See* Supplemental Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors (ECF No. 1096).

15.     Upon closing the evidentiary record, counsel for the Debtors and the Consumer Creditors' Committee each addressed the main outstanding legal issues before the Court: (i) whether the Debtors could effectuate the Sale Transactions under the Second Amended Plan free and clear of section 363(o) Claims; (ii) whether the Second Amended Plan satisfied the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to holders of Consumer Creditor Claims; and (iii) the treatment of defenses and rights of recoupment of Borrowers.

### d. Court's Memorandum Decision.

16.     On August 28, 2019, the Court entered the *Memorandum Decision on Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1240) (the "**Memorandum Decision**") denying confirmation of the Second Amended Plan. The Court made the following findings with respect to the Second Amended Plan:

i.     Sections 1129(a)(6), 1129(a)(14), 1129(a)(15), and 1129(a)(16) are not applicable to the Second Amended Plan and thus, not relevant to the Court's analysis.

ii.    The Debtors satisfied the requirements of sections 1129(a)(4), 1129(a)(9), 1129(a)(10), 1129(a)(11), 1129(a)(12), and 1129(a)(13).

iii.   Section 363(o) of the Bankruptcy Code is limited to sales effectuated under section 363(f) and, thus, is inapplicable to sale transactions effectuated under section 1123. Accordingly, section 363(o) does not apply to the Sale Transactions incorporated in the Second Amended Plan.

iv.    The Debtors failed to satisfy the requirements of sections 1129(a)(1), 1129(a)(2), and 1129(a)(3) to the extent the Second Amended Plan purports to limit the ability of Borrowers to assert defenses and rights of recoupment against (a) New Residential Investment Corp. (the "**Forward Buyer**") and (b) Mortgage Assets Management, LLC and SHAP 2018-1, LLC (the "**Reverse Buyer**" and together with the Forward Buyer, the "**Buyers**") under applicable non-bankruptcy law; provided, that application of those defenses and rights of recoupment do not require the Buyers or any of their Affiliates (or anyone acting on their behalf) to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of, the Borrower.

WEIL:\97177007\6\41703.0011

v.  The Debtors failed to satisfy the requirements of section 1129(a)(7) and demonstrate that the holders of Consumer Creditor Claims will receive or retain a recovery under the Second Amended Plan greater than or equal to what such holders would receive or retain in a hypothetical chapter 7 liquidation.

vi.  The Debtors failed to demonstrate that the Global Settlement (as defined in the Memorandum Decision)—solely with respect to the Debtors' $5,000,000 contribution for the benefit of holders of Consumer Creditor Claims—is fair and equitable under the *Iridium* factors.

vii.  The Debtors failed to comply with the requirements of section 1129(a)(5).

**e.  Developments Following the Memorandum Decision.**

17.  Following the Court's entry of the Memorandum Decision, several of the Debtors' key stakeholders initiated demands that further exacerbated difficulties in sustaining the Debtors' business operations.  First, in connection with the Debtors' request to extend the milestone for the entry of a confirmation order under the DIP Facilities, the Debtors were required to execute an amendment[9] to the DIP Documents that reduced the Debtors' advance rates by a total of 150 basis points and ultimately resulted in margin calls on the Debtors under the DIP Facilities of approximately $19,000,000.[10]  In exchange, the DIP Lenders extended the milestone for the Debtors to obtain entry of an order confirming the Third Amended Plan through the earliest of (a) 6:00 p.m. (prevailing Eastern Time) on September 30, 2019; (b) the termination of the RSA, Forward Stalking Horse Purchase Agreement, and Reverse Stalking Horse Purchase Agreement; (c) the earliest milestone with respect to confirmation of the Third Amended Plan or approval of the Sale Transactions required by the RSA, Forward Stalking Horse Purchase Agreement, and Reverse Stalking Horse Purchase Agreement; and (d) the Consenting Term Lenders (as defined in the RSA) failing to hold at least sixty-six and two thirds percent ($66^{2/3}$%) of the aggregate principal

---

[9]  *See Notice of Amendments to DIP Facilities* (ECF No. 1263) (the "**DIP Amendment**").

[10]  *See* Snellenbarger Decl., ¶ 43.

WEIL:\97177007\6\41703.0011

amount of loans outstanding under the Prepetition Credit Agreement.

18. In connection with negotiating and executing the DIP Amendment, the DIP Lenders required the Debtors to obtain "hot servicer back-ups" for the servicing of certain assets so that those assets will be easier to transfer off the Debtors' servicing platform, thus foreshadowing a forced liquidation of the mortgage loans and other assets subject to the DIP Facilities if the Third Amended Plan is not timely confirmed.[11] Significantly, the DIP Lenders made clear that if the Third Amended Plan is not timely confirmed, the DIP Lenders would exercise all available remedies under the DIP Documents and foreclose on their collateral (collectively, the "**DIP Collateral**"). If the DIP Lenders terminated the transactions under the DIP Facilities and foreclosed on the DIP Collateral, it is expected that Fannie Mae, Freddie Mac, and Ginnie Mae would have little choice but to each exercise their respective rights under their contracts with the Debtors and extinguish the Debtors' rights thereunder, leaving the Debtors with essentially no mortgage assets remaining.

19. As set forth in the Snellenbarger Declaration, a reduction in the Debtors' advance rates under the DIP Facilities led to a corresponding reduction in the Debtors' liquidity reserve to approximately $45,000,000 on September 12, 2019.[12] Under the terms of the DIP Documents, the Debtors are required to hold $30,000,000 of unrestricted cash at all times, however, following the margin call, the Debtors only hold a $15,000,000 cushion, which is significantly lower than their typical cushion of $75,000,000 or more.[13]

20. Second, the Forward Stalking Horse Purchaser's position with respect to the assumption of 363(o) Claims under the Forward Stalking Horse Purchase Agreement remained

---

[11]   *Id.* at ¶ 45.

[12]   *Id.* at ¶ 43.

[13]   *Id.* at ¶ 44.

WEIL:\97177007\6\41703.0011

unchanged. Despite requests by the Debtors and the Consumer Creditors' Committee to reconsider its prior view on purchasing the forward mortgage loan-related assets subject to claims under section 363(o) of the Bankruptcy Code, the Forward Stalking Horse Purchaser flatly refused.[14] From the issuance of the Memorandum Decision through the Debtors' entry into the CCC Settlement, the Buyers extended the milestones under the Stalking Horse Purchase Agreements, sometimes on a day-to-day basis, requiring the Debtors' advisors to provide the Buyers with daily updates regarding the status of negotiations with Fannie Mae, Ginnie Mae, DIP Lenders, and the Consumer Creditors' Committee.

21. Third, in light of the delays and uncertainty with respect to consummating the Sale Transactions, Fannie Mae required the Debtors to enter into a stipulation that (i) increased the collateral posted under that certain Pledge and Security Agreement effective as of December 19, 2014 (the "**Fannie Mae Pledge Agreement**") by $2,000,000 to secure any and all obligations owed to Fannie Mae by the Debtors and (ii) established a milestone for the Debtors to obtain entry of an order confirming the Third Amended Plan no later than October 15, 2019 at 5:00 p.m. (prevailing Eastern Time) on terms that have been accepted by Fannie Mae in writing.[15] In addition to the foregoing, any material uncured default under the DIP Order and the DIP Documents, including any failure of the Debtors to comply with any term of the Existing Orders,[16] constitutes a cross-default pursuant to the Fannie Mae Stipulation. Any default under the Fannie

---

[14]  *Id.* at ¶ 41.

[15]  *See Stipulation Regarding Assurances of Performance of Debtors' Obligations Under Fannie Mae Agreements and Adequate Protection* (ECF No. 1292) (the "**Fannie Mae Stipulation**").

[16]  "**Existing Orders**" means the (i) *Final Order (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay On a Limited Basis to Facilitate Debtors' Ongoing Operations* (ECF No. 224); (ii) *Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* (ECF No. 229); (iii) DIP Order; and (iv) Bidding Procedures Order.

Mae Stipulation results in an immediate termination of the automatic stay to permit Fannie Mae to exercise any remedies under or related to the agreements between the Debtors and Fannie Mae, including the right to extinguish the Debtors' rights under any applicable mortgage servicing rights contract with Fannie Mae.

22.    Fourth, as described in the Disclosure Statement, Ginnie Mae issued a Notice of Violation on February 8, 2019 stating that it would forbear from taking any actions for 125 days through June 13, 2019 (the "**Ginnie Mae Forbearance**").[17]  For the last three (3) months, the Debtors have negotiated rolling extensions of such forbearance period with Ginnie Mae on the basis that the Debtors (i) participate in recurring conference calls to update Ginnie Mae on the status of the Sale Transactions; (ii) commit to administering these chapter 11 cases efficiently towards emergence from chapter 11; and (iii) continue to perform in all other respects in accordance with the Ginnie Mae program requirements.  Most recently, the Debtors obtained a further extension of the Ginnie Mae Forbearance through October 9, 2019, pursuant to which Ginnie Mae reserved the right "to make additional requests of [the Debtors]" and further reserved Ginnie Mae's "right to terminate or restrict [the Debtors'] participation in the Ginnie Mae HMBS program."  Importantly, in a letter memorializing the Ginnie Forbearance through October 9, 2019, Ginnie Mae explicitly stated that in the event it acquires additional information "that, in Ginnie Mae's sole discretion, causes Ginnie Mae to determine that forbearance increases Ginnie Mae's level of risk, Ginnie Mae may at any time effect the termination and extinguishment of" the Debtors' rights under their mortgage servicing rights contracts.[18]

---

[17]    *See* Disclosure Statement at 36.

[18]    *See* Reichel Decl., Exhibit A (the "**Ginnie Mae Forbearance Letter**").

WEIL:\97177007\6\41703.0011

23.    Further exacerbating the Debtors' operational challenges following entry of the Memorandum Decision, the Debtors experienced continuing reductions in their workforce due to the uncertainty regarding future employment.  As of September 13, 2019, the Debtors employed approximately 2,200 employees— approximately 700 fewer than as of the Commencement Date, approximately 250 fewer than as of June 30, 2019, and approximately 80 fewer employees since the Memorandum Decision was issued.  The Debtors cannot afford additional reductions in their workforce, which is certain to occur if the Third Amended Plan is not confirmed.

> **f.    Negotiations with the Consumer Creditors' Committee and the CCC Settlement.**

24.    Immediately following entry of the Memorandum Decision, the Debtors and the Official Committee of Consumer Creditors (the "**Consumer Creditors' Committee**") attempted to consensually resolve the issues raised in the Memorandum Decision with respect to the treatment of holders of Consumer Creditor Claims under the Second Amended Plan.  Over the course of approximately two (2) weeks, the Debtors and the Consumer Creditors' Committee engaged in extensive, good faith negotiations through conference calls and an in-person meeting that took place on September 4, 2019 at the offices of Weil, Gotshal and Manges LLP ("**Weil**").

25.    Throughout such settlement discussions, the Debtors, with the assistance of Weil, AlixPartners LLP ("**AlixPartners**"), Epiq, and other advisors evaluated the Claims filed by Borrowers in the Debtors' chapter 11 cases on a claim-by-claim basis to analyze (i) the merits of the asserted consumer claims, (ii) the type of Claims asserted (*e.g.*, an alleged loan account error or damages claim) and whether such Claims would be addressed by the Buyers, and (iii) whether such Claims fall within section 363(o) of the Bankruptcy Code and could be asserted against the Buyers under theories of successor liability or otherwise under non-bankruptcy law.  The Debtors' analysis was shared with the Consumer Creditors' Committee's advisors, who conducted their own

independent analysis of the claims filed by Borrowers in the Debtors' chapter 11 cases. Following the independent review by the Consumer Creditors' Committee, the Debtors and the Consumer Creditors' Committee exchanged views with respect to the Debtors' historical payout of such Claims and other relevant considerations.

26. In an effort to allow the settlement discussions with the Consumer Creditors' Committee to continue, the Debtors negotiated and successfully obtained extensions to various milestones under the Forward Stalking Horse Purchase Agreement, the Reverse Stalking Horse Purchase Agreement, and the DIP Facilities. On September 9, 2019, the Debtors and the Consumer Creditors' Committee reached a global settlement (the "**CCC Settlement**"). As set forth in the Third Amended Plan and the Disclosure Statement Supplement (as defined herein), the CCC Settlement provides for the contribution of $10,000,000 (as a carve out from the Term Lenders' collateral or the proceeds or value thereof) to a reserve (the "**Consumer Creditor Reserve**") for the exclusive benefit of holders of Allowed Consumer Creditor Claims. A consumer representative selected by the Consumer Creditors' Committee (the "**Consumer Representative**") will administer the claims reconciliation process and the resolution of Consumer Creditor Claims, including the distribution of proceeds to holders of Allowed Consumer Creditor Claims in accordance with the Third Amended Plan. A fee reserve of $1,000,000 will be established to satisfy the expenses incurred by the Consumer Representative in connection with its duties under the Third Amended Plan. To the extent the Consumer Representative's fees exceed $1,000,000, the Consumer Representative may satisfy its fees and expenses using proceeds from the Consumer Creditor Reserve.

27.     As evidenced by the Consumer Creditors' Committee's support,[19] the CCC Settlement provides Borrowers with certainty that their Claims will be administered efficiently and fairly under the supervision of the Consumer Representative, which is responsible for objecting to, reconciling, or settling Consumer Creditor Claims in accordance with the Third Amended Plan.  Significantly, the CCC Settlement (i) requires the Buyers to reasonably investigate any alleged prior servicing or accounting errors asserted by Borrowers and to subsequently correct the account as appropriate and (ii) preserves Borrowers' rights of recoupment under applicable non-bankruptcy law; provided, that the Buyers and their Affiliates (or anyone acting on their behalf) are not required to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of a Borrower, in accordance with the Memorandum Decision.  The Consumer Creditors' Committee correctly points out in the CCC Statement that in the absence of a resolution with the Debtors, substantial uncertainty would remain with respect to the treatment of Consumer Creditor Claims under an alternative chapter 11 plan and the significant risks associated with another contested confirmation hearing based on new evidence.

### g.  Overview of the Debtors' Third Amended Plan.

28.     The overarching structure of the proposed Sale Transactions remains unchanged.  The Third Amended Plan is premised upon two going concern and value-maximizing sale transactions of the Debtors' operations:  a sale of the forward origination and servicing business to the Forward Buyer and a sale of the reorganized reverse servicing business to the Reverse Buyer.  The Sale Transactions effectuated through the Third Amended Plan permit the

---

[19]    *See* Statement of the Official Committee of Consumer Creditors In Support of the Debtors' Third Amended Joint Chapter 11 Plan (ECF No. 1301) (the "**CCC Statement**").

WEIL:\97177007\6\41703.0011

Debtors to, among other things, transfer the forward loan origination and servicing segment operated by Ditech Financial and the reverse mortgage servicing and subservicing segment operated by Reverse Mortgage Solutions, Inc. free and clear of all Consumer Creditor Claims (including 363(o) Claims) to the Buyers. The Third Amended Plan, however, now satisfies the best interests test under section 1129(a)(7) of the Bankruptcy Code through (i) preserving recoupment and other defenses under applicable non-bankruptcy law; (ii) preserving Borrower rights to correct their accounts and establishing procedures to reasonably investigate and correct accounts of Borrowers, as necessary; and (iii) establishing a $10,000,000 dedicated pool of cash to satisfy any remaining 363(o) Claims in full.

29. Upon entry into the CCC Settlement, the Debtors modified the Second Amended Plan to reflect the terms of the CCC Settlement and to address the deficiencies in the Second Amended Plan identified by the Court in the Memorandum Decision, as set forth in the table below.

| BANKRUPTCY CODE PROVISION | ISSUE IDENTIFIED IN MEMORANDUM DECISION | TREATMENT IN THIRD AMENDED PLAN |
|---|---|---|
| 11 U.S.C. §§ 1129(a)(1), (2), and (3) | The Second Amended Plan improperly limited the ability of Borrowers to assert defenses and rights of recoupment against the Buyers under applicable non-bankruptcy law. | The Third Amended Plan preserves Borrowers' defenses and rights of recoupment under applicable non-bankruptcy law, subject only to the limitations set forth in the Memorandum Decision—namely, the application of those defenses and rights of recoupment will not require the Forward Buyer, Reverse Buyer, Reorganized RMS, or any of their Affiliates (or anyone acting on their behalf) to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of, a Borrower. *See* Third Amended Plan, § 4.6(b). |
| 11 U.S.C. § 1129(a)(5) | The Second Amended Plan failed to disclose the identity of the Plan Administrator. | The Third Amended Plan discloses (i) Gerald A. Lombardo as the Plan Administrator; (ii) Mr. John Ray, Mr. Rishi Jain, and Mr. Jeffrey Stein as the members of the New |

| BANKRUPTCY CODE PROVISION | ISSUE IDENTIFIED IN MEMORANDUM DECISION | TREATMENT IN THIRD AMENDED PLAN |
| --- | --- | --- |
| | | Board of Ditech Holding Corporation; and (iii) Ms. Tara Twomey as the Consumer Representative. *See* Third Amended Plan, §§ 1.41, 1.130, 5.6(f). |
| **11 U.S.C. § 1129(a)(7)** | The Second Amended Plan failed to demonstrate that the holders of Consumer Creditor Claims will receive equal or greater recovery under the Second Amended Plan than such holders would receive or retain in a hypothetical chapter 7 liquidation. | The Third Amended Plan satisfies the best interests test as to any claim under section 363(o) that could be successfully asserted against a hypothetical buyer through (i) the preservation of defenses and rights of recoupment (*see* Third Amended Plan, § 4.6(b)); (ii) the preservation of Borrower rights to correct their accounts and the commitment of the Buyers to investigate errors and implement Account Corrections in accordance with section 5.6(d) of the Third Amended Plan; and (iii) the $10,000,000 Consumer Creditor Reserve, which shall first be made available exclusively to holders of 363(o) Claims. Following the payment of 363(o) Claims in full, any remaining cash in the Consumer Creditor Reserve will be distributed to holders of Allowed Consumer Creditor Claims. *See* Third Amended Plan, § 4.6(b). |

30.     As set forth in the Third Voting Certification, each holder of a Claim in Class 3 (Term Loan Claims) was sent an amended Ballot, a copy of the notice extending the Voting Deadline, the Third Amended Plan, the Disclosure Statement Supplement, and a letter explaining that holders of Claims in the Voting Class were not required to submit a new Ballot, but that holders of Claims could change their votes by submitting a new Ballot if they chose to do so (the "**Resolicitation Package**").  The Resolicitation Package was transmitted in connection with the solicitation of votes to accept or reject the Third Amended Plan as set forth in the Third Voting Certification.

31.     The deadline to vote to accept or reject the Third Amended Plan was September 17, 2019 at 4:00 p.m. (prevailing Eastern Time).  Epiq's analysis of the Ballots indicates

that the Voting Class voted to accept the Third Amended Plan in accordance with the requirements of section 1126 of the Bankruptcy Code.[20]

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| Class 3 (Term Loan Claims) | 99.11% | 98.20% | 0.89% | 1.80% |

## ARGUMENT

I. **DISCLOSURE STATEMENT SUPPLEMENT PROVIDES ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A)(1) OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS ENTITLED TO VOTE**

   a. **The Debtors Have Satisfied Sections 1125 and 1127 of the Bankruptcy Code.**

32.     Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify a plan "at any time before confirmation, but may not modify such plan so that the plan as modified fails to meet the requirements of section 1122 and 1123 of the Bankruptcy Code.  After a plan proponent files a modification of such plan with the court, the plan as modified becomes the plan." 11 U.S.C. § 1127(a).  A modified plan must comply with section 1125 of the Bankruptcy Code and shall "become the plan only after there has been disclosure under section 1125 as the court may direct, notice and a hearing, and such modification is approved."  11 U.S.C. § 1127(c), (f)(2).

33.     Pursuant to section 1125 of the Bankruptcy Code, a plan proponent must provide holders of impaired claims and equity interests with "adequate information" regarding a proposed chapter 11 plan.  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's

---

[20]     *See* Third Voting Certification.

WEIL:\97177007\6\41703.0011

books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1). Thus, a disclosure statement must, as a whole, provide information that is reasonably practicable to permit an informed judgment by impaired creditors or equity interest holders entitled to vote on a plan of reorganization. *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re PC Liquidation Corp.*, 383 B.R. 856, 866 (E.D.N.Y. 2008) (holding that a disclosure statement was adequate when it "enable[d] a reasonable creditor to make an informed judgment about the [p]lan"); *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 600 (Bankr. S.D.N.Y. 2006) (explaining that "an adequate disclosure determination requires a bankruptcy court to find not just that there is enough information there, but also that what is said is not misleading"); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (adequacy of disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties").

34. A disclosure statement must clearly and succinctly inform the "average unsecured creditor 'what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.'" *See In re Radco Props., Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (quoting In re Joseph A. Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)). In examining the adequacy of the information contained in a disclosure statement, bankruptcy courts have broad discretion. *See In re A.H. Robins Co., Inc.*, 880 F.2d 694, 696 (4th Cir. 1989); *In re Tex. Extrusion*

*Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988); *see also In re Oxford Homes, Inc.*, 204 B.R. 264, 269 (Bankr. D. Me. 1997) (noting that Congress intentionally drew vague contours of what constitutes adequate information so that bankruptcy courts may exercise discretion to tailor them to each case's particular circumstances); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (bankruptcy court has "wide discretion to determine . . . whether a disclosure statement contains adequate information, without burdensome, unnecessary, and cumbersome detail"). This grant of discretion was intended to facilitate the effective reorganization of a debtor in the broad range of businesses in which chapter 11 debtors engage and the broad range of circumstances that accompany chapter 11 cases. *See* H.R. Rep. No. 95-595, at 408–09 (1977). "In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest." *Id.* at 409. Accordingly, the determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case. *See In re PC Liquidation Corp.*, 383 B.R. at 865; *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

35.     On May 10, 2019, the Court entered the Disclosure Statement Order approving the Disclosure Statement as containing adequate information and authorizing the Debtors to solicit votes on the Initial Plan based upon the adequacy of the information contained in the Disclosure Statement. On September 11, 2019, the Debtors filed the *Disclosure Statement Supplement for the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1287) (the "**Disclosure Statement Supplement**") to provide holders of Claims in the Voting Class with additional information regarding the amendments incorporated in the Third Amended Plan.

WEIL:\97177007\6\41703.0011

36.     Specifically, the Disclosure Statement Supplement provides a detailed description of the following:

    i.    developments in the chapter 11 cases following entry of the Disclosure Statement Order (Section I);

    ii.    negotiations with the Consumer Creditors' Committee following entry of the Memorandum Decision and the terms of the CCC Settlement as incorporated in the Third Amended Plan (Section I.E);

    iii.    modified treatment of Consumer Creditor Claims, including 363(o) Claims, under the Third Amended Plan in comparison to the Second Amended Plan (Section I.E);

    iv.    overview of the Consumer Representative's role in the claims reconciliation process with respect to Consumer Creditor Claims (Section I.E);

    v.    the replacement of the Plan Administrator Oversight Board with a New Board comprised of three members selected by the Requisite Term Lenders (Section I.E);

    vi.    Debtors' support explaining why the CCC Settlement is in the best interests of creditors and parties in interest (Section I.F);

    vii.    certain amendments to the Reverse Stalking Horse Purchase Agreement including an extension of the deadline to obtain entry of the Confirmation Order to September 30, 2019 and certain adjustments to the purchase price to account for the portion of the CCC Settlement allocable to Consumer Creditor Claims relating to the Debtors' reverse business and any collateral or other assurances required by Ginnie Mae or Fannie Mae in connection with their approval of the transactions contemplated by the Reverse Stalking Horse Purchase Agreement (Section I.H);

    viii.    the NRZ Exit Tail Bridge Facility and related agreements to provide the Wind Down Estates with an exit bridge repo facility of up to $125,000,000 to facilitate the transfer of certain mortgage loans to the Forward Buyer under the Forward Stalking Horse Purchase Agreement (Section I.I);

    ix.    summary of classifications and treatment of Claims and Interests under the Third Amended Plan (Section III); and

    x.    procedures and significant deadlines related to the Debtors' solicitation and confirmation of the Third Amended Plan (Section II; IV-V).

37.     Consistent with the solicitation procedures set forth in the Disclosure Statement Order, the only parties entitled to vote to accept or reject the Third Amended Plan are

holders of Term Loan Claims in Class 3. The Court, therefore, must only determine whether the holders of Term Loan Claims have received adequate information. *See, e.g., In re Ferretti*, 128 B.R. 16, 18–20 (Bankr. D.N.H. 1991) (holding that the purpose of a disclosure statement is to give parties in interest, whose votes are being solicited, adequate information about the plan); *In re Zenith Electronics Corp.*, 241 B.R. 92, 99–100 (Bankr. D. Del. 1999) ("In considering the adequacy of a disclosure statement, it is important to keep in mind the audience. Here, those entitled to vote on the Plan are sophisticated, institutional investors. . . Given the sophistication of the parties, the wealth of information contained in the Disclosure Statement and publicly available elsewhere, the approval by the SEC and the lack of objection by any party entitled to vote on the Plan, we readily conclude that the Disclosure Statement contains adequate information and the votes solicited by it are valid."); *In re Union Cty. Wholesale Tobacco & Candy Co., Inc.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (holding that congressional intent behind section 1125 was to restrict the purpose of the disclosure statement in a bankruptcy proceeding to solicitation of acceptances or rejections of a plan of arrangement, and thus a disclosure statement is not required in the absence of solicitation of votes for acceptance or rejection of a plan); *see also, e.g. In re Snyder*, 51 B.R. 432, 436–437 (Bankr. D. Utah 1985) ("…the Senate Report implies that the term "solicitation" should be given a narrow interpretation when it states that "[s]olicitations with respect to a plan do not involve just mere requests for opinions." . . . The terms "solicit" and "solicitation," as used in § 1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization").

38. The Disclosure Statement Supplement provides holders of Claims in the Voting Class with sufficient information regarding the modifications incorporated in the Third Amended Plan, while also avoiding the cost associated with preparing and circulating a revised

WEIL:\97177007\6\41703.0011

disclosure statement that would merely replicate the unchanged terms of the Second Amended Plan. Moreover, as acknowledged by the Court,[21] holders of Term Loan Claims are sophisticated, institutional investors that are and have been actively represented by competent counsel throughout these chapter 11 cases and in connection with the CCC Settlement.

39.     Accordingly, the Disclosure Statement Supplement satisfies the requirements of sections 1125 and 1127 of the Bankruptcy Code and should be approved.

## II.     THE THIRD AMENDED PLAN SATISFIES THE REQUIREMENTS OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED.

40.     Section II of this Supplemental Memorandum addresses the unsatisfied requirements for confirmation of the Second Amended Plan under the applicable sections of 1129 of the Bankruptcy Code identified by the Court in the Memorandum Decision. The Debtors hereby incorporate the *Debtors' (I) Memorandum of Law In Support of Confirmation of Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors and (II) Omnibus Reply To Objections Thereto* (ECF No. 1029) in full, except as modified or supplemented below.

### a.     The CCC Settlement Is An Integral Component of the Third Amended Plan and Should Be Approved.

41.     The CCC Settlement provides a path to a critical resolution to these chapter 11 cases, provides value for junior unsecured creditors that would otherwise not be entitled to receive any distributions under the Third Amended Plan (or in a hypothetical chapter 7 liquidation), and resolves significant contentious issues regarding the treatment of 363(o) Claims and other disputes specific to Consumer Creditor Claims. Following entry of the Memorandum Decision, the Debtors were subject to operational challenges and liquidity constraints and received

---

[21]     *See* Memorandum Decision at 129 ("There is nothing in the record of these Chapter 11 Cases that suggests that the holders of the Term Loan Claims lacked the sophistication to understand the consequences of the opt out election in the ballot and of abstaining from voting.").

WEIL:\97177007\6\41703.0011

significant pressure to complete the Sale Transactions within an expedited timeframe. Specifically, the Debtors faced fast-approaching milestones established by each of the Buyers under their respective purchase agreements and the DIP Lenders under the relevant DIP Documents. To provide the Debtors with additional time to consummate the Sale Transactions and engage in settlement discussions with the Consumer Creditors' Committee, the Debtors negotiated and successfully obtained short milestone extensions with each of the Buyers and the DIP Lenders, which, in most cases, were day-to-day extensions in light of the extremely fragile situation and heightened concerns of such parties.

42.     The breathing space afforded by such extensions allowed the Debtors and the Consumer Creditors' Committee to engage in robust settlement discussions. As more fully set forth in the Nelson Declaration, AlixPartners continued its analysis of Borrower-related proofs of claim following entry of the Memorandum Decision, which included a detailed analysis of such proofs of claim by category. AlixPartners shared this analysis with the Consumer Creditors' Committee's advisors. The revised analysis reflected AlixPartners' review of all 4,218 identified potential Consumer Creditor Claims and details the analysis conducted to identify the population of 363(o) Claims that could potentially be asserted against a third party purchaser in a hypothetical chapter 7 liquidation. Two (2) days later, the Debtors and the Consumer Creditors' Committee successfully reached an agreement in principle that was announced to the Court on September 10, 2019.

43.     The CCC Settlement is fair and reasonable and should be approved. In particular, the $10,000,000 contribution to the Consumer Creditor Reserve is reasonable because, among other reasons, such amount was premised upon a comprehensive analysis that consisted of reviewing 4,218 proofs of claim, determining which claims resulted in potential successor

26

liability under section 363(o) and applicable non-bankruptcy law, analyzing the Debtors' historical payout on such claims, and, ultimately, valuing any potential claims subject to section 363(o) of the Bankruptcy Code (after excluding claims related to Account Corrections that will be addressed by the Buyers and Reorganized RMS). As described in greater detail below, such analysis demonstrates that the total payout for all 363(o) Claims filed against the Debtors should not exceed $10,000,000 (after taking into account the preservation of Borrowers' rights to correct their accounts, the Buyers' commitment to implement Account Corrections, and the preservation of Borrowers' defenses and rights of recoupment). Accordingly, for the reasons set forth below, the Debtors respectfully submit that the Court should approve the CCC Settlement.

>    i.    **The CCC Settlement Is Fair and Equitable and in the Best Interest of the Debtors' Estates.**

44.    Section 1123(b)(3) of the Bankruptcy Code provides that a "plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). Courts have broad authority to approve compromises and settlements as they allow the estate to avoid the expenses and burdens associated with litigating claims. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 758. The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 292). The court's discretion must be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citing *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and . . . in the best interests of the [debtor's] estate." *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (citations and internal quotation marks omitted), *appeal dismissed sub nom. Resolution Tr.*

*Co. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

45.     A settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness." *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015); *In re Adelphia Commc'sn Corp.*, 368 B.R. at 225 ("A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'"); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 143-44 (Bankr. E.D.N.Y. 1997) (citing *In re W.T. Grant Co.*, 699 F.2d at 608). The business judgment of the debtor in recommending the settlement should factor into the court's analysis. *In re Residential Capital, LLC*, 497 B.R. 720, 749-750 (Bankr. S.D.N.Y. 2013) (citations omitted); *In re MF Glob. Inc.*, No. 11-2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (citing *In re Charter Commc'ns*, 419 B.R. at 252), *appeal dismissed sub nom. Hamann v. Giddens (In re MF Glob. Inc.),* No. 11-2790, 2013 WL 652421 (S.D.N.Y. Feb. 22, 2013); *see In re Delphi Corp.*, No. 05-44481, 2009 WL 973130, at *2 (Bankr. S.D.N.Y. Apr. 2, 2009).

46.     Courts in the Second Circuit have set forth factors to evaluate if a settlement is fair and equitable, including: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (iii) the paramount interests of creditors, including each affected class' relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (iv) whether other parties in interest support the settlement; (v) the "competency and

experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) "the extent to which the settlement is the product of arm's-length bargaining." *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). For the reasons stated below, the CCC Settlement is fair and equitable and falls above the lowest point in the range of reasonableness.

### A. Balance Between Possibility of Success in Litigation and Future Benefits of CCC Settlement Weighs in Favor of CCC Settlement.

47. As set forth in the Nelson Declaration, the CCC Settlement is the result of extensive analysis by the Debtors, the Consumer Creditors' Committee, and each of their respective advisors, and is well within the range of reasonableness because the risks associated with litigating the value of 363(o) Claims outweighs any benefit to the Debtors' estates. Mr. O'Connor's analysis shows that holders of 363(o) Claims are entitled to receive less than $10,000,000 (excluding Account Corrections) on account of such claims. The value provided to holders of 363(o) Claims through the CCC Settlement—including non-economic benefits such as the appointment of a Consumer Representative and the absence of a reversionary interest in the Consumer Creditor Reserve—is far better than the alternative recovery such holders would receive if these chapter 11 cases converted to cases under chapter 7 following a failure to consummate the Sale Transactions by the end of September 2019 (*i.e.*, no recovery) and is not contingent on the outcome of another costly litigation before the Court regarding the value of 363(o) Claims in these chapter 11 cases.

WEIL:\97177007\6\41703.0011

**B. Absent the CCC Settlement, There Is a Substantial Likelihood of Complex and Protracted Litigation.**

48.     It is unquestionable that if the dispute regarding the value of 363(o) Claims was not resolved under the Third Amended Plan, the Debtors would incur significant delay and expense engaging in lengthy and protracted litigation to estimate the value of 363(o) Claims in connection with another request to confirm a plan. The costs attendant to a highly contested estimation trial—replete with expert opinions, countless declarations, and multiple depositions—would considerably deplete the Debtors' resources, divert value from the Debtors' creditors, and negatively impact the Debtors' business operations. A depletion of the Debtors' resources in this manner would not only harm the Debtors' estates but would also result in significantly lower recoveries to creditors under the Third Amended Plan.

49.     Moreover, the delays associated with another heavily contested confirmation trial (i) could result in the Debtors' failure to meet the various milestones imposed by the Buyers, DIP Lenders, Fannie Mae, and Ginnie Mae that may not be extended (at least not without significant cost) and (ii) could also cause the Debtors to fail to consummate the Sale Transactions under the Third Amended Plan, resulting in extinguishment of the Debtors' rights under their mortgage servicing contracts with Fannie Mae and Ginnie Mae and a foreclosure on a majority of the Debtors' assets by the DIP Lenders. Accordingly, entry into the CCC Settlement ensures that recoveries for all stakeholders, including holders of Consumer Creditor Claims, are maximized and avoids needless litigation and attendant costs.

WEIL:\97177007\6\41703.0011

### C. The CCC Settlement Is In the Paramount Interests of Creditors.

50.     The CCC Settlement is in the paramount interests of the Debtors' creditors because, among other reasons, (i) holders of 363(o) Claims will be paid in full from the Consumer Creditor Reserve or satisfied in full through Account Corrections; (ii) the CCC Settlement establishes a Consumer Representative to administer and oversee the claims reconciliation process with respect to Consumer Creditor Claims; and (iii) the CCC Settlement facilitates the swift resolution of these chapter 11 cases, the consummation of the Sale Transactions (and the realization of the benefits thereunder), and prompt emergence from chapter 11.

51.     First, as discussed below, Mr. O'Connor conducted an extensive analysis with respect to the value of 363(o) Claims, which was provided to the Consumer Creditors' Committee's advisors.  The Consumer Creditors' Committee's advisors relied on information provided to them by the Debtors and subsequently reviewed and conducted their own independent analysis.  Following such independent review, the Consumer Creditors' Committee agreed with the Debtors' assessment that the Consumer Creditor Reserve was fair and reasonable, when coupled with the other consideration provided under the CCC Settlement, including, crucially, the preservation of Borrower rights to correct their accounts.  The support of the Consumer Creditors' Committee—an estate fiduciary appointed specifically to represent approximately one million Borrowers in these chapter 11 cases—should not be overlooked as it represents a significant indicator that the terms of the CCC Settlement serve the paramount interests of Borrowers in these chapter 11 cases.

52.     Second, the CCC Settlement establishes the Consumer Representative to administer the resolution and reconciliation of Consumer Creditor Claims in accordance with the Consumer Representative Agreement and manage distributions to holders of Allowed Consumer

Creditor Claims in accordance with the Third Amended Plan. The Consumer Representative has been chosen by the Consumer Creditors' Committee to ensure efficiency and fairness with respect to the claims reconciliation process affecting Borrowers.

53. Last, in light of the Debtors' significant liquidity constraints and deteriorating business operations, a swift resolution of these chapter 11 cases is essential to preserve value for all of the Debtors' stakeholders, including holders of Consumer Creditor Claims. Further extensions of the various milestones under the Forward Stalking Horse Purchase Agreement, Reverse Stalking Horse Purchase Agreement, Fannie Mae Stipulation, and the DIP Documents is far from guaranteed. As such, prompt approval of the CCC Settlement maximizes recoveries to all creditors, including holders of Consumer Creditor Claims, and ensures the Debtors' swift emergence from bankruptcy.

### D. The CCC Settlement Is Supported By Other Parties In Interest.

54. The CCC Settlement is supported by key stakeholders in these chapter 11 cases—Fannie Mae, Ginnie Mae, DIP Lenders, and the Term Loan Ad Hoc Group. Without the support of the foregoing parties, the Debtors would be unable to successfully implement the Sale Transactions under the Third Amended Plan in a timely manner. Importantly, without the support of the Term Loan Ad Hoc Group, the Debtors would be unable to fund the Consumer Creditor Reserve to satisfy 363(o) Claims in full.

### E. The CCC Settlement Is the Product of Arm's Length Bargaining and the Parties Were Counseled by Skilled Advisors.

55. The CCC Settlement is the product of good faith, arm's length negotiations among the Debtors, Term Loan Ad Hoc Group, Consumer Creditors' Committee, as well as other parties in these chapter 11 cases. Following entry of the Memorandum Decision, the Debtors' legal and financial advisors met with the Consumer Creditors' Committee's advisors and

participated in various conference calls with advisors to the Consenting Term Lenders and the Consumer Creditors' Committee to discuss the various outstanding issues related to the value of 363(o) Claims in these chapter 11 cases. At all times during such negotiations, the parties were represented by skilled advisors, which further supports approval of the CCC Settlement. The terms of the CCC Settlement were negotiated, reviewed, and recommended by professionals from (i) Weil, Gotshal and Manges LLP, (ii) Houlihan Lokey Capital, Inc., (iii) AlixPartners LLP, (iv) Kirkland & Ellis LLP, (v) FTI Consulting, Inc., (vi) Quinn Emanuel Urquhart & Sullivan, LLP; (vii) TRS Advisors LLC; and (viii) Ms. Tara Twomey.

56.    For the reasons stated herein, the Debtors submit that the CCC Settlement was the result of arm's length and good faith negotiations and represents the best path forward to avoid protracted and costly litigation that could ultimately delay the consummation of the Sale Transactions to the detriment of all creditors and parties in interest. Accordingly, the CCC Settlement should be approved by the Court because the CCC Settlement is in the best interests of the Debtors' estates, falls well within the range of reasonableness, and is fair and equitable under the *Iridium* factors.

b.    **The Third Amended Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code.**

57.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity interest holders in the Debtors—commonly referred to as the "best interests" test. The best interests test focuses on potential individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 441 n.13 (1999). It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

WEIL:\97177007\6\41703.0011

58.     Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252.  The Court must evaluate the liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."  *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012) ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation"), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729 F.3d 332 (3d Cir. 2013).  As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

i.      **There Would Be No Sales In a Hypothetical Chapter 7 Liquidation.**

59.     On July 11, 2019, the Debtors filed a liquidation analysis (ECF No. 833) (the "**Initial Liquidation Analysis**"), pursuant to which the Debtors assumed that the Debtors' operations would cease upon conversion to a liquidation under chapter 7 and, subject to cooperation of, among other parties, Fannie Mae, Freddie Mac, Ginnie Mae, and the DIP Lenders, their assets would be sold pursuant to a sale under a twelve (12)-month liquidation process

34

administered by a chapter 7 trustee.[22]  Importantly, the Debtors also assumed that they would have continued access to sufficient financing on near-market terms, the support of Fannie Mae, Freddie Mac, and Ginnie Mae, and the continued retention of necessary employees throughout the twelve (12)-month liquidation process.[23]  The Debtors noted, however, that an inability to maintain financing, a seizure of collateral by secured creditors, failure to obtain forbearances from Fannie Mae, Freddie Mac, and Ginnie Mae, and/or significant employee attrition would likely yield significantly lower recoveries.[24]

60.     Based, in part, on the assumptions in the Initial Liquidation Analysis, the Court held that the Debtors failed to satisfy the requirements of section 1129(a)(7) with respect to holders of Consumer Creditor Claims.  Namely, the Court held that in a liquidation under chapter 7 of the Bankruptcy Code, in the event the Debtors sold their assets in accordance with the assumptions set forth in the Initial Liquidation Analysis, holders of Consumer Creditor Claims would retain their claims and defenses pursuant to section 363(o).  As such, the Court found that the Initial Liquidation Analysis should have accounted for such claims.

61.     In response to the changed circumstances following the Court's issuance of the Memorandum Decision, the Debtors have filed the Amended Liquidation Analysis contemporaneously herewith (the "**Amended Liquidation Analysis**"), which assumes the Debtors would:

i.      cease all operations following a hypothetical liquidation date of October 7, 2019;

ii.     lose the support of Fannie Mae, Freddie Mac, and Ginnie Mae upon a conversion to chapter 7;

---

[22]     *See* Initial Liquidation Analysis at 3.

[23]     *Id.*

[24]     *Id.*

iii.    lose access to cash collateral and the financing provided under the DIP Facilities; and

iv.    lose critical employees as a result of departures, including employees involved in accounting, treasury, IT support, and management.[25]

62.    The aforementioned assumptions underlying the Amended Liquidation Analysis were made in light of, among other things, the Fannie Mae Stipulation, the Ginnie Mae Forbearance Letter, the DIP Amendment, communications among the Debtors' advisors with Fannie Mae, Ginnie Mae, and the DIP Lenders, and management's concerns regarding the viability of the Debtors' operations in the midst of a rapidly decreasing workforce. As a result, the Amended Liquidation Analysis, unlike the Initial Liquidation Analysis, does not contemplate a sale of the Debtors' assets by a chapter 7 trustee because—as Fannie Mae, Ginnie Mae, and the DIP Lenders have made clear of their intents—the risk of extinguishment of the Debtors' rights under their mortgage servicing rights contracts and a foreclosure and immediate seizure of the DIP Collateral will preclude a chapter 7 trustee from selling, transferring or otherwise administering such contracts and collateral in a chapter 7 liquidation.

63.    As a direct result of the potential extinguishment of the Debtors' rights in their most valuable contracts and foreclosure by the DIP Lenders on substantially all of their mortgage servicing assets, the Debtors do not believe that a chapter 7 trustee would be able to conduct sales of the Debtors' assets under section 363 of the Bankruptcy Code in a hypothetical chapter 7 liquidation, thus rendering section 363(o) and potential successor liability inapplicable to the best interests test. Because holders of General Unsecured Claims are projected to receive no recovery in a hypothetical chapter 7 liquidation, holders of Consumer Creditor Claims—

---

[25]    *See* Brown Decl., ¶ 13.

WEIL:\97177007\6\41703.0011

including holders of 363(o) Claims—would also receive no recovery in a hypothetical chapter 7 liquidation.

64.     Nevertheless, to the extent the Court found that a hypothetical chapter 7 sale of the Debtors' assets could occur, the best interests test is satisfied as to such 363(o) Claims through one or more of (i) the Buyers' commitment to implement Account Corrections and the preservation of Borrower rights to correct their accounts; (ii) the preservation of Borrowers' defenses and rights of recoupment under applicable non-bankruptcy law; and (iii) the Consumer Creditor Reserve.  As set forth more fully in the following section and the O'Connor Declaration, holders of 363(o) Claims will receive or retain under the Third Amended Plan property having a present value, as of the effective date of the Third Amended Plan, not less than the amount such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Accordingly, the Court may conclude that the best interests test is satisfied as to 363(o) Claims.

**ii.     The Recovery Under the Third Amended Plan For 363(o) Claims Is Equal To or Greater Than a Hypothetical Chapter 7 Liquidation.**

65.     Following the Court's issuance of the Memorandum Decision, the Debtors engaged Mr. O'Connor from AlixPartners as an expert for the purpose of valuing 363(o) Claims. Significantly, Mr. O'Connor's analysis omitted claims related to Account Corrections on the basis that the Third Amended Plan preserves Borrowers' rights to request  and enforce Account Corrections from the Buyers and Reorganized RMS.  An overview of Mr. O'Connor's analysis is below:

  i.     Epiq identified 4,218 proofs of claim ("**POCs**") as potential Consumer Creditor Claims and provided the POCs to AlixPartners.  Such amount includes POCs that were not timely filed.

  ii.     AlixPartners reviewed all 4,218 POCs and categorized the POCs as either potential 363(o) Claims or non-363(o) Claims.

iii.   AlixPartners identified a total of 2,283 potential 363(o) Claims—2,154 of which related to claims that were unsubstantiated (*i.e.*, unlikely to receive a recovery) and 129 of which related to claims that were substantiated (*i.e.*, likely to obtain a potential recovery).

iv.   AlixPartners identified 16 POCs related to ongoing class action litigation or purporting to assert a claim on behalf of a class, and valued these claims based on the Debtors' historical litigation payout.

66.   Mr. O'Connor ultimately concluded that the value of 363(o) Claims in these chapter 11 cases is between $2,136,928 and $ 2,926,428.  Accordingly, in the event the Court holds that a chapter 7 trustee would conduct section 363 sales in a hypothetical chapter 7 liquidation, holders of 363(o) Claims will receive or retain under the Third Amended Plan property having a present value, as of the effective date of the Third Amended Plan, not less than the amount such holder would receive or retain under chapter 7 of the Bankruptcy Code.

### A.   Identification of Potential 363(o) Claims.

67.   Working with a team at AlixPartners, Mr. O'Connor narrowed the 4,218 potential Consumer Creditor Claims to a potential 363(o) Claims population of 2,283.[26]  Following an initial review, AlixPartners determined that 27 POCs did not constitute Consumer Creditor Claims because the POCs related to ongoing commercial litigation.[27]  Mr. O'Connor and his team also determined that 1,545 POCs corresponded to loans that the Debtors service but do not own.[28]  Because the Debtors do not own such loans, such loans cannot be sold to a hypothetical purchaser in a chapter 7 sale.[29]  As such, any claims relating to these loans cannot be 363(o) Claims and were excluded from further review.

---

[26]   *See* O'Connor Decl., ¶¶ 56-60.

[27]   *Id.* at ¶ 35.

[28]   *Id.* at ¶ 48.

[29]   *Id.* at ¶ 51.

WEIL:\97177007\6\41703.0011

68.     The remaining 2,630 POCs were further analyzed by AlixPartners, in conjunction with the Debtors' servicing team.  They matched 1,530 POCs to loans owned by the Debtors' forward mortgage loan servicing business (the "**Forward Business**"), 132 POCs to loans owned by the Debtors' reverse mortgage loan servicing business (the "**Reverse Business**"), and were unable to match 968 POCs to any loan existing in the Debtors' loan databases.[30]  With respect to the 968 POCs that AlixPartners was unable to match, AlixPartners and the Debtors ran exhaustive searches in the Debtors' loan database using the names of the borrower, descriptions of a loan account, and address listed on the POCs.[31]  Despite such efforts, the lack of accurate and sufficient loan identifying information in such POCs resulted in a failure to match these POCs to a loan in the Debtors' databases.

69.     For the POCs that were matched to a loan, AlixPartners and the Debtors' servicing team examined the POCs, as well as the corresponding account information and loan documents in the Debtors' records, to determine whether there was sufficient or insufficient information to determine the underlying complaint.[32]  This team also reviewed the POCs and underlying documents to isolate any claims solely seeking an account correction, as these claims are preserved under Section 5.6(d) of the Third Amended Plan, and can be asserted by Borrowers against the Buyers.[33]  The results of this review are summarized below:

---

[30]     *Id.* at ¶ 49.

[31]     *Id.*

[32]     *Id.* at ¶ 52.

[33]     *Id.* at ¶¶ 55, 58.

| Category | Claim Count |
|---|---|
| Claims Not Matched to a Loan | 968 |
| Claims Matched to a Forward Business Loan | |
| *Claims with Insufficient Information* 1,090 | |
| *Claims with Sufficient Information* 110 | 1,530 |
| *Claims Related to a Potential Account Correction* 330 | |
| *Subtotal* *1,530* | |
| Claims Matched to a Reverse Business Loan | |
| *Claims with Insufficient Information* 96 | |
| *Claims with Sufficient Information* 19 | 132 |
| *Claims Related to a Potential Account Correction* 17 | |
| *Subtotal* *132* | |
| **Total** | **2,630** |

70.     After removing all POCs that sought an account correction, Mr. O'Connor and AlixPartners identified 2,283 POCs as potential remaining 363(o) Claims.

**B.     Valuing Substantiated and Unsubstantiated POCs.**

71.     To value these 2,283 POCs, Mr. O'Connor determined that historical pre-litigation complaint and litigation payout data was the most reliable metric by which to assess the potential exposure to 363(o) Claims.[34]  After considering other available valuation metrics, such as face value listed on the POCs and corresponding unpaid principal balance, Mr. O'Connor determined that applying the Debtors' past payment amounts to the identified population was the most accurate way to assess the value of the 363(o) Claims.[35]

72.     Mr. O'Connor requested specific raw historical data from both the Forward Business and the Reverse Business dating back to January 2018.[36]  Mr. O'Connor and his team then conducted an independent analysis and calculation of possible valuation metrics.  All figures

---

[34]     *Id.* at ¶¶ 33-44.

[35]     *Id.*

[36]     *Id.* at ¶ 41.

WEIL:\97177007\6\41703.0011

that Mr. O'Connor calculated were calculated by AlixPartners without input from the Debtors. Ultimately, based on his review and analysis of the underlying complaint and litigation information, Mr. O'Connor determined that there were 3 reliable values that could be applied to the potential 363(o) Claims population:  (i) average payout resulting from a pre-litigation complaint;[37] (ii) average payout resulting from litigation against the Forward Business; and (iii) average payout resulting from litigation against the Reverse Business.[38]

| Type of Complaint | Complaints Filed | Total Payout | Median Payout | Average Payout |
|---|---|---|---|---|
| Pre-Litigation Complaint | 2,788 | $125,552 | $0 | $45 |
| Forward Business Litigation | 1,120 | $6,196,788 | $0 | $5,533 |
| Reverse Business Litigation | 425 | $637,371 | $0 | $1,500 |

73.    Mr. O'Connor then categorized the POCs into two categories: unsubstantiated (*i.e.*, the POCs did not have sufficient support to allow AlixPartners to determine the underlying complaint) and substantiated (*i.e.*, AlixPartners was able to identify the alleged underlying grievance).[39]

---

[37]    The Reverse Business did not make payments in response to pre-litigation complaints during the requested time period.

[38]    *Id.* at ¶¶ 64, 66.

[39]    *Id.* at ¶ 56.

WEIL:\97177007\6\41703.0011

| Category | | Claim Count |
|---|---|---|
| **Potential 363(o) Claims - Recovery is Unsubstantiated** | | |
| *Claims Not Matched to a Loan* | *968* | 2,154 |
| *Claims with Insufficient Information – Forward Business Loan* | *1,090* | |
| *Claims with Insufficient Information – Reverse Business Loan* | *96* | |
| *Subtotal* | *2,154* | |
| **Potential 363(o) Claims - Recovery is Substantiated** | | |
| *Claims with Sufficient Information – Forward Business Loan* | 110 | 129 |
| *Claims with Sufficient Information – Reverse Business Loan* | 19 | |
| *Subtotal* | *129* | |
| **Total** | | **2,630** |

74. Mr. O'Connor concluded that the substantiated POCs should be assigned a higher value because his team was able to discern the alleged underlying wrongdoing.[40] As such, Mr. O'Connor applied the higher litigation payout values to this set of claims, which totaled $637,130.[41]

| Category | Claim Count | Applicable Avg. Historical Payout | Payout Value |
|---|---|---|---|
| Claims with Sufficient Information - Forward Business Loan | 110 | $ 5,533 | $ 608,630 |
| Claims with Sufficient Information - Reverse Business Loan | 19 | $ 1,500 | $ 28,500 |
| **Total** | 129 | | $ 637,130 |

75. With respect to unsubstantiated POCs, Mr. O'Connor chose to treat this category of claims as unknown complaints.[42] Using the Debtors' historical complaint data, Mr. O'Connor calculated that 99.5% of complaints were resolved before they escalated to litigation

---

[40] *Id.* at ¶¶ 60, 72.

[41] *Id.* at ¶ 72.

[42] *Id.* at ¶ 70.

WEIL:\97177007\6\41703.0011

and 0.5% of all complaints were escalated to litigation,[43] resulting in an ultimate value of $157,298.[44]

| Category | Claim Count | Applicable Avg. Historical Payout | Payout Value |
|---|---|---|---|
| **Potential 363(o) Claims – Recovery is Unsubstantiated** | | | |
| *Non-Litigation Complaint - 99.5%* | 2,143 | $ 45 | $ 96,435 |
| *Litigation - 0.5%* | 11 | $ 5,533 | $ 60,863 |
| **Total** | 2,154 | | $ 157,298 |

76.    As a result of this detailed and independent analysis, Mr. O'Connor valued the substantiated POCs and unsubstantiated POCs at $794,428.

| Category | Claim Count | Avg. Hist. Payout | Total - Low |
|---|---|---|---|
| Potential 363(o) Claims – Recovery is Unsubstantiated | | | |
| *Non-Litigation Complaint - 99.5%* | 2,143 | $ 45 | $ 96,435 |
| *Litigation - 0.5%* | 11 | $ 5,533 | $ 60,863 |
| *Subtotal* | 2,154 | | $ 157,298 |
| Potential 363(o) Claims – Recovery is Substantiated | | | |
| *Claims with Sufficient Information - Forward Business Loan* | 110 | $ 5,533 | $ 608,630 |
| *Claims with Sufficient Information - Reverse Business Loan* | 19 | $ 1,500 | $ 28,500 |
| *Subtotal* | 129 | | $ 637,130 |
| **Total** | 2,299 | | $ 794,428 |

## C.    Valuing Class Actions Certified Prepetition.

77.    Mr. O'Connor valued POCs relating to class actions separately on the basis that claims concerning class actions generally have a higher value based on the potential for class liability.  AlixPartners identified sixteen unique POCs that could implicate a class action.[45]  After conferring with the Debtors, Mr. O'Connor determined that only two of the sixteen POCs related

---

43    *Id.* at ¶ 71.

44    *Id.*

45    *Id.* at ¶ 75.

WEIL:\97177007\6\41703.0011

to class actions where the classes were certified prepetition.[46]  For the fourteen POCs that did not have a certified class, Mr. O'Connor applied the $39,500 average class action settlement payout, which he calculated from the Debtors' historical data.  Mr. O'Connor opined that the potential liability for these POCs amounted to $553,000.[47]

78.     Mr. O'Connor separately valued the two class actions certified prepetition: *Geary, et al. v. Green Tree Servicing LLC, et al.,* No. 14-cv-522 (S.D. Ohio 2014) (the "**Geary Class Action**") and *Tran, et al. v. Green Tree Servicing LLC, et al.*, Case No. 07-2014-00041141 (Cal. Sup. Ct. 2014) ("**Tran Class Action**").  To value these claims, Mr. O'Connor reviewed the POCs, class complaints, docket sheets, certification orders, and other publicly filed documents.[48]

79.     With respect to the Geary Class Action—a Fair Debt Collection Practices Act suit—Mr. O'Connor first identified which class members, out of the total certified class, were borrowers under loans that the Debtors owned.  Working with the Debtors' servicing team, Mr. O'Connor determined that only 2,299 class members were associated with loans owned by the Debtors.[49]  Based on his experience with class actions, Mr. O'Connor determined that a value range was more appropriate for the Geary Class Action in light of the many variable factors that may affect its settlement value.[50]  To determine a reliable value range, Mr. O'Connor considered all of the valuation metrics he could apply, including, but not limited to, the statutory cap under the Fair Debt Collection Practices Act and the face amount of the POC.[51]  Mr. O'Connor determined that using $500 as an estimated recovery per class member (which is the amount cited

---

[46]     *Id.*

[47]     *Id.* at ¶¶ 76-77.

[48]     *Id.* at ¶¶ 83, 86

[49]     *Id.* at ¶ 81.

[50]     *Id.* at ¶ 78.

[51]     *Id.* at ¶¶ 82-83.

WEIL:\97177007\6\41703.0011

by the Gearys in their objection) was a reasonable, but high figure. As such, Mr. O'Connor relied on this amount to calculate the high end of the valuation range.[52] Based on his experience settling class actions, Mr. O'Connor determined that at least half of the claims were unlikely to generate damages—as a result, Mr. O'Connor used $250 as an estimated recovery per class member to calculate the low end of the valuation range.[53] Applying this range to the 2,299 class members, Mr. O'Connor valued the POC as between $574,750 and $1,149,500.[54]

80.     Mr. O'Connor applied a similar approach to the Tran Class Action, which alleged violations of California's state debt collection statute. Mr. O'Connor determined that 859 class members were associated with loans owned by the Debtors. Mr. O'Connor then utilized a similar methodology, relying on his experience with class actions, to apply a $500 high and $250 low estimation for the values of potential recovery by class members in the Tran Class Action.[55] Applying this range to the 859 class members, Mr. O'Connor valued the POC as between $214,750 and $429,500.[56]

81.     Based on Mr. O'Connor's independent assessment, he determined that the value of potential 363(o) Claims in these chapter 11 cases were valued between $ 2,136,928 and $ 2,926,428. [57]

---

[52]   *Id.* at ¶ 83.

[53]   *Id.*

[54]   *Id.*

[55]   *Id.* at ¶ 86.

[56]   *Id.* at ¶ 87.

[57]   *Id.*

| Category | Claim Count | Avg. Hist. Payout | Total - Low | Total - High |
|---|---|---|---|---|
| Potential 363(o) Claims – Recovery is Unsubstantiated | | | | |
| *Non-Litigation Complaint - 99.5%* | 2,143 | $ 45 | $ 96,435 | $ 96,435 |
| *Litigation - 0.5%* | 11 | $ 5,533 | $ 60,863 | $ 60,863 |
| *Subtotal* | 2,154 | | $ 157,298 | $ 157,298 |
| Potential 363(o) Claims – Recovery is Substantiated | | | | |
| *Claims with Sufficient Information and Matched to a Forward Business Loan* | 110 | $ 5,533 | $ 608,630 | $ 608,630 |
| *Claims with Sufficient Information and Matched to a Reverse Business Loan* | 19 | $ 1,500 | $ 28,500 | $ 28,500 |
| *Subtotal* | 129 | | $ 637,130 | $ 637,130 |
| Potential 363(o) Claims – Related to Class Action | | | | |
| Certified Class Claims | 2 | *See declaration* | $ 789,500 | $ 1,579,00 |
| Non-Certified Class Claims | 14 | $ 39,500 | $ 553,000 | $ 553,000 |
| *Subtotal* | 16 | | $ 1,342,500 | $2,132,000 |
| **Total** | 2,299 | | $ 2,136,928 | $ 2,926,428 |

82.     Mr. O'Connor's valuation establishes that holders of 363(o) Claims will be satisfied in full by the $10,000,000 Consumer Creditor Reserve established under the Third Amended Plan, after taking into account the Account Corrections implemented by the Buyers and the preservation of defenses and rights of recoupment of Borrowers.

### D.     Low Likelihood of Success on Successor Liability Claims Against Potential Purchasers.

83.     Notwithstanding Mr. O'Connor's detailed analysis, the $2.1 million to $2.9 million estimated value of potential 363(o) Claims in these chapter 11 cases likely significantly overstates the possible recovery for creditors holding 363(o) Claims as few, if any, of these creditors' claims likely could be asserted against a purchaser of assets in a hypothetical chapter 7 liquidation sale.  Jeffrey Naimon, the Debtors' special counsel on consumer claim liability within the consumer lending and mortgage services industry with twenty-five (25) years of experience representing residential mortgage lenders and servicers, reviewed the statutes that permit a consumer creditor to hold a new mortgage servicer liable for a prior servicer's alleged

WEIL:\97177007\6\41703.0011

wrongdoing.[58]  In connection with his mortgage lender and servicing experience, Mr. Naimon has become familiar with consumer claims brought against lenders and loan servicers, and whether such claims survive a transfer from the originator of a loan or the servicer who conducted the activities at issue, to a purchaser of the loan or the mortgage servicing rights.

84.  After reviewing the various statutes and laws regarding the assertion of liability against a successor, Mr. Naimon concluded that "the likelihood that there are claims by consumer borrowers here that would flow through to a Chapter 7 Purchaser in a hypothetical sale of loan assets in a Chapter 7 liquidation sale here is miniscule.  The bar to assert such claims is very high and under the circumstances here and given the Debtors' business, the chances of such claims is low."[59]  Further, Mr. Naimon specifically reviewed the dockets, class complaints, and proofs of claim for each Consumer Creditor Claim identified by AlixPartners as potentially related to a class action.  Based on his review of applicable laws relating to the assertion of successor liability of a loan servicer, Mr. Naimon concluded that none of the potential class claims asserted could recover against a purchaser in a hypothetical chapter 7 sale.[60]

85.  While Mr. Naimon did not engage in a claim by claim analysis (other than with respect to the class claims), his review of the applicable laws and the proofs of claim filed in these chapter 11 cases enabled him to conclude that few of these claims, if any, would actually be permitted against a purchaser in a hypothetical chapter 7 sale.  Thus, while Mr. O'Connor's analysis found that the range of potential 363(o) Claims would be  between $2,136,928 and $2,926,428, based on Mr. Naimon' s analysis, the actual amount of potential 363(o) Claims would be significantly less.  In particular, based on Mr. Naimon's specific review of the class claims and

---

[58]   *See* Naimon Decl., ¶¶ 19-20.

[59]   *Id.* at ¶ 9.

[60]   *Id.* at ¶¶ 22-24.

WEIL:\97177007\6\41703.0011

applicable law, it is clear that none of the class claims will be able to be asserted against a purchaser in a hypothetical chapter 7 sale. As such, holders of 363(o) Claims will be satisfied in full from the proceeds of the Consumer Creditor Reserve under the Third Amended Plan.

        **c.**        **The Third Amended Plan Satisfies Sections 1129(a)(1), 1129(a)(2), and 1129(a)(3) of the Bankruptcy Code.**

        86.      Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). As set forth in the Memorandum Decision, the Debtors failed to meet the requirements of the three aforementioned Bankruptcy Code sections solely to the extent that the Second Amended Plan purports to limit the ability of Borrowers to assert defenses and rights of recoupment against the Buyers under applicable non-bankruptcy law.

        87.      Unlike the Second Amended Plan, the Third Amended Plan preserves Borrowers' defenses and rights of recoupment under applicable non-bankruptcy law, subject to the limitations set forth in the Memorandum Decision—namely, the application of those defenses and rights of recoupment will not require the Forward Buyer, Reverse Buyer, Reorganized RMS, or any of their Affiliates (or anyone acting on their behalf) to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of, a Borrower. *See* Third Amended Plan, § 4.6(b). Accordingly, the Third Amended Plan satisfies the requirements of sections 1129(a)(1), 1129(a)(2), and 1129(a)(3) of the Bankruptcy Code.

WEIL:\97177007\6\41703.0011

### d. The Third Amended Plan Satisfies Section 1129(a)(5) of the Bankruptcy Code.

88.  The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code, which requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors proposed to serve after confirmation of the plan and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. The Third Amended Plan discloses Gerald A. Lombardo as the Plan Administrator. Moreover, the New Board of Ditech Holding Corporation will consist of three (3) members selected by the Requisite Term Lenders—Mr. John Ray, Mr. Rishi Jain, and Mr. Jeffrey Stein. The Third Amended Plan also discloses Ms. Tara Twomey as the Consumer Representative.

89.  The appointment of the Plan Administrator and the members of the New Board is consistent with the interests of creditors and equity security holders and public policy. *See* 11 U.S.C. § 1129(a)(5)(A)(ii). Moreover, no party has objected to confirmation of the Third Amended Plan on the basis that the Debtors have failed to satisfy section 1129(a)(5) of the Bankruptcy Code. Accordingly, the Third Amended Plan complies with section 1129(a)(5) of the Bankruptcy Code.

### III. THE OBJECTIONS TO THE THIRD AMENDED PLAN SHOULD BE OVERRULED AND THIRD AMENDED PLAN CONFIRMED.

#### i. The Geary Class Action Objection Should Be Overruled.

90.  The Geary Class Action (the "**GCA**") objects to confirmation of the Third Amended Plan on four grounds: (i) the Third Amended Plan does not provide sufficient detail to allow the GCA to ascertain which of the accounts in the GCA fall within the scope of a "363(o) Claim" as defined in the Third Amended Plan; (ii) the Third Amended Plan fails to satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code; (iii) the distribution scheme under the

Third Amended Plan is disparate, unfair, and inequitable under section 1129(b)(2) of the Bankruptcy Code; and (iv) the Third Amended Plan improperly eliminates the GCA's right to seek equitable subordination or claim reclassification under section 510(c) of the Bankruptcy Code.

91.     As the GCA's objection sets forth, Brian and Connie Geary (the "**Gearys**") executed a Note and Security Agreement (the "**Loan**") with Citifinancial Servicing, LLC ("**Citi**") in the original amount of $13,504.84, the proceeds of which were used to purchase a vehicle.  In August 2011, the Gearys filed a chapter 7 bankruptcy petition in the Southern District of Ohio. Despite entering into a reaffirmation agreement with Citi, Citi allegedly continued to overcharge the Gearys on a monthly basis.  The overcharges allegedly continued to occur when Citi transferred the Loan to Green Tree Servicing, LLC ("**Green Tree**"), at which point the Gearys filed a class action against Green Tree.  The Gearys claim that Green Tree violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("**FDCPA**"), by sending allegedly defective billing statements and notices to Green Tree's consumer borrowers.  After class certification motion practice, the district court certified six (6) sub-classes on the issues of liability and statutory damages, but declined to certify the class as to individual damages.  As the Gearys acknowledge in their proof of claim, statutory damages under the FDCPA are capped at $500,000.  The district court found that the statutory cap applied to each subclass, thus limiting the statutory damages in the GCA to a maximum of $3 million (six (6) subclasses multiplied by $500,000 per class).  Irrespective of the district court's application of the statutory cap and explicit refusal to certify a class as to individual damages, the proof of claim filed by the Gearys contends that the class action is worth $25,500,000.

> a.     **The Value of Potential 363(o) Claims in the GCA is Substantially Lower than the Damages Asserted in the Proof of Claim.**

92.     Notably, with respect to the Gearys in their individual capacity, the Gearys would not hold a 363(o) Claim in a hypothetical chapter 7 liquidation because the Debtors do not

own the Loan. As such, any recovery by the Gearys on their claims in a hypothetical sale under chapter 7 would be limited to the Debtors rather than a hypothetical purchaser. It also means that the Gearys could not serve as an adequate class representative for a complaint filed against a hypothetical purchaser in a chapter 7 liquidation. Notwithstanding this fact, as set forth in the O'Connor Declaration, only 2,299 class members in the GCA match with loans owned by the Debtors[61]—in other words, only 2,299 individuals out of the entire certified GCA have assets that could be sold in a hypothetical chapter 7 liquidation, and gain the protection of section 363(o) of the Bankruptcy Code.[62] As 21,924 class members were identified during class discovery, this means that only approximately 10.5% of the GCA class members could have a potential 363(o) Claim.[63]

93. Based on Mr. O'Connor's experience valuing and assisting in settling class actions, Mr. O'Connor determined a range of values that he could apply to 363(o) Claims stemming from the GCA rather than a determinate amount. Mr. O'Connor examined the proof of claim filed by the Gearys, including the class certification order, class complaint, and the FDCPA statute, to determine an appropriate value of the claim. Geary's counsel estimated that each individual class member would recover approximately $500 as a result of the class action.[64] Mr. O'Connor used $500 as the high end of the valuation range and multiplied this amount by the 2,299 potential 363(o) Claims in the GCA, concluding that the high end of the valuation range was $1,149,500.[65] Mr. O'Connor determined that the low end of the valuation range was $250 per

---

[61]  *See* O'Connor Decl., ¶ 81.

[62]  *Id.*

[63]  *Id.*

[64]  *Id.* at ¶ 83.

[65]  *Id.*

class member and ultimately concluded that the value of potential 363(o) Claims in the GCA is valued between $574,750 and $1,149,500.[66]

94.     Importantly, Mr. Naimon reviewed the proof of claim filed by the Gearys and concluded that there would be no assignee liability because the proof of claim asserts claims solely under the FDCPA in the servicing context—as set forth in the Naimon Declaration, the FDCPA does not authorize assignee liability for servicing issues.[67]

95.     Based on Mr. O'Connor's analysis, the value of any potential 363(o) Claims that could be asserted against a hypothetical purchaser in a chapter 7 liquidation is between $574,750 and $1,149,500.  As such, the Consumer Creditor Reserve adequately provides for the payment of claims that the Gearys may recover in a chapter 7 liquidation thus satisfying the best interests test with respect to the Gearys.

b.     **The Distribution Scheme Under the Third Amended Plan is Fair and Equitable.**

96.     The GCA contends that the distribution scheme with respect to holders of Consumer Creditor Claims in Class 6 is disparate, unfair, and inequitable.  Namely, the GCA takes issue with the fact that holders of 363(o) Claims will be satisfied in full from Consumer Creditor Net Proceeds <u>before</u> distributions are made to holders of Allowed Consumer Creditor Claims that are not 363(o) Claims.  The GCA also asserts that because the Third Amended Plan does not provide a timeline regarding the initiation or completion of the process undertaken by the Debtors and Buyers to correct misstated accounts, holders of Consumer Creditor Claims that do not require corrections may needlessly wait a long time before receiving a distribution on account of their Consumer Creditor Claims.  The GCA's objection is misplaced and should be overruled.

---

[66]     *Id.*

[67]     *See* Naimon Decl., ¶ 24.

WEIL:\97177007\6\41703.0011

i. **Separate Treatment of Creditors is Justified Where Creditors Possess Distinct Legal Rights.**

97.     Although the GCA's objection relies on section 1129(b) of the Bankruptcy Code for its assertion that the Third Amended Plan's distribution scheme is disparate, unfair, and inequitable, this provision prohibits unfair discrimination <u>between</u> classes of creditors with the same level of bankruptcy priority—"it is concerned with plan treatment between classes, not within classes." *In re Journal Register Co.*, 407 B.R. at 532.  As such, section 1129(b) is not violated by the Third Amended Plan on the ground of unfair discrimination.  As stated by the bankruptcy court in *In re Journal Register*, an objection to confirmation by a creditor that claims to be damaged by unequal treatment when compared to members of its class can be made under section 1123(a)(4) of the Bankruptcy Code.  *Id.*

98.     In *In re Journal Register*, an unsecured creditor objected to plan confirmation on the basis that unsecured trade creditors in the same class were entitled to receive additional distributions as a gift from a separate trade account trust established by the debtors' secured lenders.  *Id.* at 532-33.  The bankruptcy court held that because members of an unsecured class may have rights to payment from third parties (joint obligors, sureties, guarantors, etc.) that "may entitle them to a disproportionate recovery compared to other creditors of the same class[,] . . .the existence of such additional rights to payment does not create a classification problem under section 1123(a)."  *Id.* at 533.  Moreover, the bankruptcy court noted that the funds in the trade account trust were not property of the debtors' estate but rather property of the debtors' secured lenders—as such, even if the bankruptcy court "excised the gift provision from the [p]lan, the recoveries of the 'disfavored' Class 4 creditors would not be increased."  *Id.*

99.     It is undisputed that holders of 363(o) Claims retain distinct legal rights than other consumer creditors in light of the protections afforded under section 363(o) of the

Bankruptcy Code. Section 363(o) carves out interests in consumer credit transactions and consumer credit contracts from free and clear sales conducted under section 363(f) of the Bankruptcy Code. As such, a third party purchaser in any sale under section 363 may not purchase assets free and clear of claims that are the subject of section 363(o). This statutory protection in a chapter 7 translates to different legal rights under a chapter 11 plan between 363(o) Claims and other Consumer Creditor Claims by virtue of the best interests test, as explained in the Memorandum Decision. Holders of Consumer Creditor Claims that do not constitute 363(o) Claims do not enjoy these same protections and third party purchasers are not potentially liable to such creditors. This significant difference in the legal rights of consumer borrowers permits the different treatment of consumer creditors in Class 6 and justifies the payment of 363(o) Claims in full ahead of non-section 363(o) claims in the same class. *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and treatment was rational where members of each class "possess[ed] different legal rights"), *aff'd sub nom. Lambert Brussels Asocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992); *In re Journal Register Co.*, 407 B.R. at 532.

100.  In addition, as was the case in *Journal Register*, the $10,000,000 transferred to the Consumer Creditor Reserve is a gift, as a carve-out from the Term Lenders' collateral or the value thereof, to creditors in Class 6 under the Third Amended Plan. The gift provided by the Term Lenders to Class 6 is wholly consensual on their part and there is no contention that they are making the gift to another class over the dissent of an intervening class. Importantly, as discussed further below, the Term Lenders' gift to Class 6 is the linchpin of the CCC Settlement and is a critical component in implementing the Third Amended Plan. Therefore, it is permissible to make it available first to satisfy 363(o) Claims before other Consumer Creditor Claims may participate.

ii. **Separate Treatment of Creditors is Justified Where Settlement is Necessary to the Implementation of Plan.**

101. Courts have approved separate classification and unequal treatment of similarly-situated creditors where a settlement with the separately classified class was necessary to implementation of a debtor's plan. *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *92-98, *261-262 (Bankr. S.D.N.Y. July 15, 2004) (approving separate classification and treatment of intercompany and guarantee claims in plan in light of global settlement of issues including substantive consolidation embodied in the plan); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 244-54 (Bankr. M.D. Fla. 2006) (approving separate classification of general unsecured claims in order to implement settlement of substantive consolidation); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (allowing separate classification and finding discrimination fair where trade union received greater recovery than other general unsecured claimants pursuant to settlement and trade union's support of the plan was critical to the company's overall reorganization).

102. Separate treatment of 363(o) Claims in Class 6 is required to implement the CCC Settlement. Pursuant to the CCC Settlement, 363(o) Claims are receiving different treatment than other Consumer Creditor Claims in light of the statutory protections afforded to such claims under section 363(o) of the Bankruptcy Code and the enhanced rights of holders of claims subject to section 363(o) vis a vis consumer borrowers who do not hold such rights, as explained in the Court's Memorandum Decision. The treatment of 363(o) Claims is a highly contested issue in these chapter 11 cases and informed the extensive negotiations between the Debtors and the Consumer Creditors' Committee following the Court's issuance of the Memorandum Decision. The Debtors and the Term Loan Ad Hoc Group determined that any settlement with the Consumer Creditors' Committee must include a resolution with respect to the treatment and value of 363(o)

Claims—as such, the Term Loan Ad Hoc Group carved out $10,000,000 for the payment of 363(o) Claims. As part of the negotiations, the Debtors and the Term Loan Ad Hoc Group agreed, however, that any excess amounts following the satisfaction of 363(o) Claims in full would be available for distribution to other consumer creditors notwithstanding their distinct legal rights pursuant to the terms of the Consumer Representative Agreement.

103. Moreover, with respect to the GCA's statement that holders of Consumer Creditor Claims that do not require corrections may needlessly wait a long time before receiving a distribution on account of their claims, the GCA overlooks the fact that the Consumer Representative can establish appropriate reserves or make distributions to holders of Consumer Creditor Claims as she sees fit. The Consumer Representative will have discretion to manage the timing and amount of payments made in accordance with the Third Amended Plan and the Consumer Representative Agreement.

104. In sum, the GCA's objection emphasizes form over substance. Even if the Debtors separately classified 363(o) Claims from all other Consumer Creditor Claims, they would be permitted to do so and provide the exact same treatment to such parties as proposed by the Third Amended Plan. The holders of 363(o) Claims would be entitled to receive $10,000,000 on account of their claims, with any remaining proceeds distributed to the class of separately classified Consumer Creditor Claims on a *pro rata* basis—the same treatment afforded now to holders of Consumer Creditor Claims under the Third Amended Plan. In light of the statutory protections afforded by section 363(o) of the Bankruptcy Code, the Debtors would have a reasonable basis to separately classify 363(o) Claims from other Consumer Creditor Claims. Regardless of whether the Debtors separately classify 363(o) Claims or not, however, the result is the same. The Court should not overlook the significant fact that payment of 363(o) Claims in full is a critical

WEIL:\97177007\6\41703.0011

component of the CCC Settlement and necessary to successfully implement the Third Amended Plan. Accordingly, the GCA's objection to the distribution scheme in Class 6 should be overruled.

c. **The Third Amended Plan Does Not Improperly Eliminate Rights of Equitable Subordination.**

105. The GCA argues that the Third Amended Plan improperly eliminates the GCA's purported right to seek equitable subordination or claim reclassification of the Term Loan Claims under section 510(c) of the Bankruptcy Code. But the GCA has no standing to assert equitable subordination. Bankruptcy courts in the Southern District of New York have held that "a claim based on equitable subordination does not exist or belong to creditors under New York law[.]." *In re Bernard L. Madoff Inv. Sec.*, 515 B.R. 117, 159 (Bankr. S.D.N.Y 2014); *see Lyme Regis Partners, LLC v. Icahn* (*In re Blockbuster Inc.*), 2011 WL 1042767 (Bankr. S.D.N.Y 2011) ("Because the remedy of equitable subordination is designed to vindicate the rights of the estate as a whole, that remedy, with limited exception, can only be brought by the debtor."). A "creditor may bring an equitable subordination claim only if he can allege a particularized injury resulting from the defendant's inequitable conduct." *In re Bernard L. Madoff Inv. Sec.*, 515 B.R. at 159 (citing *In re Blockbuster Inc.*, 2011 WL 1042767, at *2 (Bankr. S.D.N.Y. Mar. 17, 2011)). A particularized injury is an "injury 'significantly different from the injuries to creditors in general." *Sec. Investor Prot. Corp. v. Bernard Madoff Inv. Sec., LLC*, 429 B.R. 423, 431 (Bankr. S.D.N.Y.2010).

106. The case law is clear that equitable subordination rights under section 510(c) of the Bankruptcy Code belong exclusively to the Debtors unless the Gearys demonstrate a particularized injury. The Gearys have failed to allege an injury that is specific to the Gearys and distinct from other creditors. The objection states that the Gearys could have obtained a pre-judgment attachment or a constructive trust (holding the Debtors' assets) in its pending FDCPA

57

action had they been provided notice of the Debtors' entry into the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture. The Gearys, however, are not the only unsecured creditors who can make such allegations. Any creditor with a claim under FDCPA or related statutes could assert identical allegations as those in the objection filed by the Gearys. *In re Blockbuster Inc.*, 2011 WL 1042767, at *2 (citing *Official Committee of Unsecured Creditors of AppliedTheory Corp. v. Halifax, L.P. (In re AppliedTheory Corp.)*, 493 F. 3d 82, 86 (2d Cir. 2007)) ("Indeed, allowing individual unsecured creditors . . .to go forward with their claims for generalized harms could wreak havoc on any reorganization and result in a "net loss to the entire estate.").

107. Even if the Gearys could allege a particularized injury, they have failed to preserve their rights under the final order authorizing the Debtors' use of cash collateral.[68] The Gearys' rights (and frankly all parties' rights other than the Unsecured Creditors' Committee) to challenge the liens of the Debtors' prepetition secured lenders expired on June 15, 2019.[69] The Debtors and all parties in interest have relied on the expiration of such challenge period in negotiating the Third Amended Plan. The Gearys cannot now—at the last minute—appear and try

---

[68] *See* Final Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Granting Related Relief (ECF No. 578) (the "**Final Cash Collateral Order**").

[69] *See* Final Cash Collateral Order, ¶ 4 ("Notwithstanding any other provisions of this Final Cash Collateral Order or the Final DIP Order, (a) the Creditors' Committee is permitted until the later of (i) the effective date of an Acceptable Chapter 11 Plan and (ii) 30 calendar days following the date on which the Court denies confirmation of the Acceptable Chapter 11 Plan or the Debtors file a chapter 11 plan that is not an Acceptable Chapter 11 Plan, and **(b) all other parties in interest and official committees appointed in the Chapter 11 Cases are permitted until 30 calendar days following entry of this Final Cash Collateral Order** (collectively, the "**Cash Collateral Challenge Period**") to investigate and commence a Challenge with respect to the Debtors' Stipulations or any other stipulations or findings contained in the Final DIP Order or this Final Cash Collateral Order with respect to the Prepetition 1L/2L Liens or the Prepetition 1L/2L Obligations, including, without limitation, any challenge to the validity, priority or enforceability of the Prepetition 1L/2L Liens or the Prepetition 1L/2L Obligations, to assert any claim or cause of action against the Prepetition 1L/2L Parties, including, without limitation, whether in nature of a setoff, counterclaim, or defense[.]").

WEIL:\97177007\6\41703.0011

to revive a challenge period under the Final Cash Collateral Order that has long expired and delay confirmation of the Third Amended Plan through the assertion of prohibited claims.

108. Accordingly, for the reasons stated herein, the GCA objection to confirmation of the Third Amended Plan should be overruled.

ii. **The Greenwald Objection Should Be Overruled.**

109. Mr. Greenwald, who purports to represent approximately eight hundred (800) consumer creditors in these chapter 11 cases, filed an objection to confirmation of the Third Amended Plan on the basis that $10,000,000 is insufficient to satisfy his clients' claims, relying primarily on a hypothetical example—not actual facts or evidence. Mr. Greenwald filed a verified statement under Bankruptcy Rule 2019[70] merely three (3) days before the filing of this Supplemental Memorandum and one hundred and forty-nine (149) days following Mr. Greenwald's notice of appearance in these chapter 11 cases (despite repeated requests by the Debtors).[71] It is far from clear whether Mr. Greenwald represents every individual listed in the 2019 Statement as the 2019 Statement provides little to no information regarding whether the individuals listed actually hold mortgages that are serviced by or were originated by the Debtors. Moreover, none of the information provided by Mr. Greenwald in his objection asserts or establishes a claim on behalf of one or more of these 800 consumers.

110. Following an exhaustive review process by the Debtors and AlixPartners, only twenty-three (23) individuals from the 2019 Statement matched to filed proofs of claim in these chapter 11 cases. The Debtors' servicing team confirmed that 431 individuals from the 2019

---

[70] *See* Statement Pursuant to Fed. R. Bankr. P. 2019 (ECF No. 1309) (the "**2019 Statement**").

[71] *See* Notice of Appearance and Request for Service of Papers (ECF No. 448). Notably, Mr. Greenwald's notice of appearance indicates that he appeared on behalf of one creditor, Monique Scranton, in these chapter 11 cases.

WEIL:\97177007\6\41703.0011

Statement matched to loan numbers in the Debtors' database.[72]  Following additional review of these 431 loans, Mr. O'Connor and the Debtors determined that 353 loans were owned by the Debtors.[73]  After filing his objection, Mr. Greenwald sent the Consumer Creditors' Committee additional information related to ongoing litigations that he had filed on behalf of his clients.[74] Mr. O'Connor reviewed these documents and determined that only one of the litigations involved a creditor listed in the 2019 Statement—*Green Tree v. Martinez*, No. 2013-0120 (Miss. Cir. Ct. Pearl River Cnty., Aug. 9, 2013) (the "**Martinez Action**").[75]

111.    To ascertain the value of potential claims asserted by Mr. Greenwald, Mr. O'Connor removed the Martinez Action from the 353 loans that were Debtor-owned as it is an identified litigation and applied the average litigation payout value to that claim.[76]  Mr. O'Connor subsequently applied the same methodology that he applied for the unsubstantiated potential 363(o) Claims to arrive at a valuation of $27,745.[77]  This analysis confirms that even if the Debtors included the 800 consumers purportedly represented by Mr. Greenwald in Mr. O'Connor's valuation of 363(o) Claims, this would not materially increase the total amount of 363(o) Claims in these chapter 11 cases.  Accordingly, Mr. Greenwald's objection should be overruled.

iii.    **The Pefley Objection Should Be Overruled.**

112.    Ms. Pefley filed an objection to confirmation of the Third Amended Plan on the basis that certain claims asserted against the Debtors for malicious prosecution, willful misconduct, and fraud are not dischargeable under section 523(a)(6) of the Bankruptcy Code.  Ms.

---

[72]    *See* O'Connor Decl, ¶ 94.

[73]    *Id.*

[74]    *Id.* at ¶ 95.

[75]    *Id.*

[76]    *Id.* at ¶ 96.

[77]    *Id.*

Pefley filed an amended proof of claim (No. 22049) on May 13, 2019 in the amount of $90,000,000 related to her claims against the Debtors.

113.    In May 2007, Ms. Pefley obtained a mortgage loan from National City Mortgage in the amount of $297,000.  The loan was secured by a mortgage on real property located in Loxahatchee, Florida.  Ms. Pefley defaulted on the note and mortgage and remains overdue to pay the November 1, 2008 payment and all subsequent payments.  In November 2009, Ditech Financial LLC ("**Ditech Financial**") began servicing the mortgage loan.  After satisfying all conditions precedent to foreclosure, Ditech Financial commenced a foreclosure action on May 7, 2010.  The court initially granted a summary final judgment on August 23, 2010 for Ditech Financial against Ms. Pefley.  Upon reconsideration, the court vacated its decision and the sale on December 14, 2010.  On August 18, 2014, the Honorable Richard L. Oftedal, Circuit Court Judge, ruled in part that the only remaining issues in Ms. Pefley's action were the counterclaims for money damages and demand for jury trial.  On February 8, 2019, the court dismissed the fraud count of Ms. Pefley's fourth amended counterclaim.

114.    On May 28, 2019, Ms. Pefley filed the *Maliciously Prosecuted Victim, Cherane Pefley's Motion to Lift the Automatic Stay for Her Jury Trial in Palm Beach County, Florida* (ECF No. 606) seeking relief from the automatic stay to proceed with these claims in state court.  The Debtors filed the *Debtors' Objection to Motion of Cherane Pefley for Relief from the Automatic Stay* (ECF No. 704) on June 13, 2019, setting forth additional facts regarding the posture of Ms. Pefley's claims.  The Court denied Ms. Pefley's motion for stay relief on July 11, 2019 (ECF No. 838).

115.    Ms. Pefley's objection should be overruled in light of the fact that her account, which is currently serviced by Ditech Financial, will be transferred to the Forward

WEIL:\97177007\6\41703.0011

Stalking Horse Purchaser in the Sale Transaction. Ditech Financial is not receiving a discharge under the Third Amended Plan[78] and Ms. Pefley may continue to assert her claims against the Consumer Creditor Reserve. As such, Ms. Pefley's objection is moot and should be overruled.

iv.     **The Rodriguez Objection Should Be Overruled.**

116.     Mr. Rodriguez objects to confirmation of the Third Amended Plan on the basis that, among other things, the Third Amended Plan does not meet the best interests test with respect to Mr. Rodriguez. Mr Rodriguez also adopts the arguments set forth in the objection filed by the GCA. The Debtors are currently assisting the advisors for the Consumer Creditors' Committee with respect to the foreclosure-related issues set forth in Mr. Rodriguez's objection. With respect to Mr. Rodriguez's assertion, however, that the best interests test is not satisfied with respect to his claim, such objection is moot. The Debtors sold Mr. Rodriguez's loan in 2018, therefore, Mr. Rodriguez would not hold a 363(o) Claim in a hypothetical sale under chapter 7. In light of this significant fact, Mr. Rodriguez's objection should be overruled.

v.     **The Lishamer Objection Should Be Overruled.**

117.     Ms. Lishamer joined in the objections filed by the GCA and Mr. Greenwald and objects to confirmation of the Third Amended Plan on substantially the same grounds— namely, the distribution scheme in Class 6 is not fair or equitable and the Consumer Creditor

---

[78]  *See* Third Amended Plan, § 10.3(b) ("In a Sale Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder **shall be deemed to have forever waived, released, and discharged Reorganized RMS, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities against, in, or of Reorganized RMS that arose prior to the Effective Date**; including, for the avoidance of doubt, Consumer Creditor Claims. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors, the Wind Down Estates, the Successful Bidders, the GUC Recovery Trust, or Reorganized RMS, or any of their Assets or property (including Assets acquired in a Sale Transaction), whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.") (emphasis added).

WEIL:\97177007\6\41703.0011

Reserve is not sufficient to satisfy claims in Class 6.  For the reasons stated herein, Ms. Lishamer's objection should be overruled.

**CONCLUSION**

118.     The Third Amended Plan complies with all of the requirements of section

1129 of the Bankruptcy Code and should be confirmed.

Dated: New York, New York
           September 22, 2019

                                        /s/ Sunny Singh
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York  10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007
                                        Ray C. Schrock, P.C.
                                        Richard W. Slack
                                        Sunny Singh

                                        *Attorneys for Debtors*
                                        *and Debtors in Possession*

WEIL:\97177007\6\41703.0011

**Exhibit A**

**Proposed Confirmation Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
                                                 :

**In re**                                  :            **Chapter 11**

                                               :

**DITECH HOLDING CORPORATION**, *et al.*,  :           **Case No. 19-10412 (JLG)**

                                             :

                    **Debtors.**[1]               :            **(Jointly Administered)**
                                           :            **Related Docket No. [_]**
---------------------------------------------------------------- X

## ORDER CONFIRMING THIRD AMENDED JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

Upon the filing by Ditech Holding Corporation and its affiliated debtors in the above captioned chapter 11 cases (collectively, the "**Debtors**"), as "proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), of the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, dated September 11, 2019 [ECF No. 1287] (as amended, modified, or supplemented in accordance with its terms, the "**Third Amended Plan**"), which is attached hereto as **Exhibit A**;[2] and the Court previously having approved the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, dated May 10, 2019 [ECF No. 543] (the "**Disclosure Statement**") and the solicitation procedures related to the Disclosure Statement, Third Amended Plan, and the *Disclosure*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used in this order (the "**Order**") but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan (as defined below), or as the context otherwise requires.

Statement Supplement for the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors (the "**Disclosure Statement Supplement**") [ECF No. 1287]; and the Court having entered the *Memorandum Decision on Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 1240], in which the Court denied confirmation of the Debtors' Second Amended Plan; and the Disclosure Statement Supplement and the Third Amended Plan reflecting a settlement with the Consumer Creditors' Committee and extending the Voting Record Date and the Voting Deadline; and the Debtors having complied with the solicitation and notice requirements of the Disclosure Statement Order, *see Affidavit of Service* [ECF Nos. [●]]; and the Court having re-considered the record in these Chapter 11 Cases, the stakeholder support for the Third Amended Plan evidenced on the record and in the *Second Supplemental Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. [●]], the Sale Transactions incorporated in the Third Amended Plan, the compromises and settlements embodied in and contemplated by the Third Amended Plan, the briefs and arguments regarding confirmation of the Third Amended Plan, the evidence in support of the Third Amended Plan adduced at the Confirmation Hearing (defined below), and a hearing on confirmation of the Third Amended Plan having been held on September 25, 2019 (the "**Confirmation Hearing**"); and after due deliberation:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and venue is proper under 28 U.S.C. §§ 1408 and 1409.

WEIL:\97193774\1\41703.0011

B.     The Third Amended Plan satisfies the requirements for confirmation of section 1129 of the Bankruptcy Code by a preponderance of evidence.

C.     The Disclosure Statement Supplement contains adequate information within the meaning of section 1125 of the Bankruptcy Code, and the extension of the Voting Record Date and Voting Deadline was reasonable and appropriate.

D.     The Third Amended Plan was solicited in good faith and in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order.  The Debtors participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation, offer, issuance, sale, and/or purchase of the assets and securities offered under the Third Amended Plan, and therefore are entitled to the protections of section 1125(e) of the Bankruptcy Code.

E.     The Third Amended Plan has been proposed in good faith and not by any means forbidden by law.  In so finding, the Court has considered the totality of the circumstances of the Chapter 11 Cases.  The Third Amended Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.

F.     The Third Amended Plan is "fair and equitable" with respect to the Classes that are Impaired and are deemed to reject the Third Amended Plan, because no Class senior to any rejecting Class is being paid more than in full and the Third Amended Plan does not provide a recovery on account of any Claim or Interest that is junior to such rejecting Classes.

G.     The releases contained in Article X of the Third Amended Plan are an essential component of the Third Amended Plan and appropriate.  The Third Party Release contained in Section 10.6(b) of the Third Amended Plan is consensual because all parties to be bound by such release were entitled to vote, given due and adequate notice of the Third Party Release and

sufficient opportunity and instruction to elect to opt out of such release if they rejected the Third Amended Plan or abstained from voting on the Third Amended Plan. Good and valid justification have been demonstrated in support of the Debtor Release. Accordingly, the releases contained in Section 10.6 of the Third Amended Plan are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 10.6 of the Third Amended Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; and (e) given and made after due notice and opportunity for hearing.

H. The exculpation provided by Section 10.7 of the Third Amended Plan for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of the Chapter 11 Cases.

I. The Third Amended Plan does not discriminate unfairly among the different Classes of unsecured creditors and does not offend the fair and equitable standard of the Bankruptcy Code because grounds and justifications exist for treating the Classes differently in the Chapter 11 Cases.

J. The UCC Settlement and CCC Settlement were negotiated in good faith and at arm's length and are essential elements of the Third Amended Plan. The UCC Settlement and CCC Settlement are fair, equitable, and in the best interest of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and satisfy the standards for approval under Bankruptcy Rule 9019.

K. As of the date of this Order, Fannie Mae has not consented to the Debtors' assumption or assignment of any Fannie Mae-related mortgage servicing contracts and/or rights (or other contracts, agreements, or rights) subject to the Sale Transactions provided under the

Third Amended Plan. Nor have the Debtors reached agreement with Fannie Mae regarding the respective Cure Amounts and other amounts to be paid to Fannie Mae to cover the resolution of certain of their contractual obligations to Fannie Mae that are not being transferred to the Forward Buyer and the Reverse Buyer that must be completed as a pre-condition to Fannie Mae's consent to the Sale Transactions.

L. A consumer privacy ombudsman has been appointed (the "**Ombudsman**") [ECF No. 1206], and the Ombudsman filed the *Report of the Consumer Privacy Ombudsman* [ECF No. 1237] (the "**Ombudsman Report**"), recommending, from a privacy perspective, that the Court approve the proposed sale and transfer of the Debtors' assets and related loan files containing personally identifiable information, subject to continued compliance with applicable federal and state law.

M. The findings of fact and conclusions of law set forth on **Schedule 1** and **Schedule 2** to this Order as to the Successful Bids of Mortgage Assets Management, LLC and SHAP 2018-1, LLC (together, the "**Reverse Buyer**") under the Stock and Asset Purchase Agreement,[3] and New Residential Investment Corp. (the "**Forward Buyer**" and together with the Reverse Buyer, the "**Buyers**") under the Asset Purchase Agreement,[4] are incorporated herein by reference in their entirety.

N. The NRZ Exit Tail Bridge Facility is an essential element of the Plan and entry into the NRZ Exit Tail Bridge Facility is in the best interests of the Debtors, their Estates, and

---

[3]   The "**Stock and Asset Purchase Agreement**" means that certain *Stock and Asset Purchase Agreement* by and among Ditech Holding Corporation, Walter Reverse Acquisition LLC, Reverse Mortgage Solutions, Inc., Mortgage Assets Management, LLC, and SHAP 2018-1, LLC, dated June 17, 2019 (as amended, modified, and supplemented from time to time).

[4]   The "**Asset Purchase Agreement**" means that certain *Asset Purchase Agreement* by and among Ditech Holding Corporation, Ditech Financial LLC, and New Residential Investment Corp., dated June 17, 2019 (as amended, modified, and supplemented from time to time).

WEIL:\97193774\1\41703.0011

their creditors. The Debtors have exercised sound business judgment in deciding to enter into the NRZ Exit Tail Bridge Facility and have provided adequate notice thereof. The NRZ Exit Tail Bridge Facility has been negotiated in good faith and at arm's length among the Debtors and the NRZ Exit Tail Bridge Facility Credit Parties, and any credit extended to and transactions entered into thereunder with the Debtors or Wind Down Estates, as applicable, and any fees paid thereunder are deemed to have been extended, issued, and made in good faith.

**FURTHER, IT IS HEREBY ORDERED THAT:**

**Confirmation of the Third Amended Plan**

1. The Third Amended Plan is confirmed.

2. Any and all objections (except for objections that have been adjourned as identified on <u>Exhibit A</u> to the Debtors' Agenda [ECF No. [●]] (the "**Adjourned Cure/Adequate Assurance Objections**")) to the entry of this Order, the Third Amended Plan, the Sale Transactions, including any objections to Cure Amounts, the assumption and/or assumption and assignment of executory contracts and unexpired leases, or any terms of the Asset Purchase Agreement, the Stock and Asset Purchase Agreement, or the NRZ Exit Tail Bridge Facility Documents, and any joinders thereto, that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice, except to the extent any objections to the assumption and assignment of assigned contracts or Cure Amounts or the Debtors' right to assume and assign any such assumed contract were unresolved and/or adjourned prior to or at the Confirmation Hearing.

3. The documents contained in the Plan Supplement are integral to the Third Amended Plan and are approved by the Court, and the Debtors, the Plan Administrator, the GUC Trustee, and the Consumer Representative (as applicable) are authorized to take all actions

WEIL:\97193774\1\41703.0011

required under the Third Amended Plan and the Plan Supplement to effectuate the Third Amended Plan and the transactions contemplated therein.

4.     On September [●], 2019, the Debtors filed the Consumer Representative Agreement [ECF No. [●]], which is hereby approved by the Court.

5.     The terms and provisions of the Third Amended Plan, including the terms of the Asset Purchase Agreement and the Stock and Asset Purchase Agreement incorporated therein, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Order.  The terms of the Third Amended Plan, the Plan Supplement, all exhibits thereto, the Asset Purchase Agreement, the Stock and Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility Documents, and all other relevant and necessary documents shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Debtors, their Estates and their creditors, non-debtor affiliates, any affected third parties, all holders of equity interests in the Debtors, all holders of any Claims, whether known or unknown, against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets owned by the Debtors, including, but not limited to all contract counterparties, Borrowers, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and each of their respective affiliates, successors and assigns.  The Asset Purchase Agreement, the Stock and Asset Purchase Agreement, the Third Amended Plan, and this Order shall inure to the benefit of the Debtors, their Estates and creditors, the Forward Buyer, the Reverse Buyer, Reorganized RMS, and their respective successors and assigns.  The NRZ Exit Tail Bridge Facility Documents, the Third Amended Plan, and this Order shall inure to

the benefit of the Wind Down Estates party to the NRZ Exit Tail Bridge Facility Documents, the NRZ Exit Tail Bridge Facility Credit Parties and their respective successors and assigns. The Asset Purchase Agreement (including the transactions contemplated thereby), the Stock and Asset Purchase Agreement (including the transactions contemplated thereby), the NRZ Exit Tail Bridge Facility Documents (including the transactions contemplated thereby), and this Order shall not be subject to rejection or avoidance by the Debtors, their Estates, their creditors or any trustee, examiner or receiver.

6.      Any failure of this Order to specifically include or refer to any particular article, section, or provision of the Third Amended Plan, the Plan Supplement, the Stock and Asset Purchase Agreement, the Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility Documents, or any related document does not and shall not be deemed to diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of the Court that all such documents are approved in their entirety.

7.      Except as provided in the Third Amended Plan, the Asset Purchase Agreement, the Stock and Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility Documents, this Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Third Amended Plan and any other acts that may be necessary or appropriate for the implementation or consummation of the Third Amended Plan.

8.      Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept for filing and/or recording any and all documents, mortgages

WEIL:\97193774\1\41703.0011

and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Third Amended Plan and this Order.

9.      The compromises and settlements set forth in the Third Amended Plan are approved, including, but not limited to, the UCC Settlement and CCC Settlement (for the avoidance of doubt, including the release of Claims and Causes of Action contained in Section 5.2(b)(x) of the Third Amended Plan), and the resolution with National Founders (the "**National Founders Resolution**"), and will be effective immediately and binding on all parties in interest on the Effective Date.

10.      Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Third Amended Plan are hereby approved and will be effective immediately on the Effective Date without further order or action by the Court, any of the parties to such release, or any other Entity: (a) Estate Releases (Section 10.6(a)); (b) Third-Party Release (Section 10.6(b)); (c) Exculpation (Section 10.7); (d) Injunction (Section 10.5), and (e) Discharge of Claims and Termination of Interests (Section 10.3).

11.      Notwithstanding the injunction provision in Section 10.5 of the Third Amended Plan, the limited relief granted pursuant to paragraphs 16 through 22 of the *Final Order: (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations* [ECF No. 224] (the "**Forward OCB Order**") and paragraphs 15 through 21 of the *Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations* [ECF No. 229] (the "**Reverse OCB Order**"), as applicable, including the

WEIL:\97193774\1\41703.0011

continuation of actions seeking of nonmonetary relief in Permitted Default Actions, Bankrupt Borrower proceedings, and Permitted Title Disputes (as defined in the Forward OCB Order and Reverse OCB Order), shall apply on and after the Effective Date to assets vesting to the Wind Down Estates pursuant to Section 10.1 of the Third Amended Plan. For the avoidance of doubt, such limited relief will not apply to assets transferred to either of the Buyers. Further, the injunction provision in Section 10.5 of the Third Amended Plan shall not affect Borrowers' rights to assert defenses or rights of recoupment as set forth in Sections 4.6(b) and 5.6(d) of the Third Amended Plan.

12. Except as otherwise provided in the Third Amended Plan, the Stock and Asset Purchase Agreement, the Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Third Amended Plan, on the Effective Date and, in the case of an Other Secured Claim, satisfaction in accordance with the Third Amended Plan of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be deemed fully released, and the holder of such Other Secured Claim shall be authorized and directed to take such action as provided in Section 5.13 of the Third Amended Plan. All holders of Other Secured Claims are directed to cooperate with the Debtors or the Plan Administrator, as the case may be, in implementing this paragraph and any administrative details relating thereto.

13. For the avoidance of doubt, nothing in the Third Amended Plan, the Sale Transactions, or this Order shall be deemed to release any lien or security interest held by Fannie Mae in custody accounts and amounts therein (the "**Collateral**" as defined in that certain Pledge and Security Agreement effective as of December 19, 2014 together with all supplements,

WEIL:\97193774\1\41703.0011

addenda, and amendments thereto and related agreements) as collateral security for, among other things, the Debtors' obligations under the Fannie Mae Lender Contracts (the "**Fannie Mae Collateral**"). If and to the extent the automatic stay under Bankruptcy Code section 362(a) applies to any request by Fannie Mae to transfer the Fannie Mae Collateral to Fannie Mae on account of the respective Cure Amounts and other amounts to be paid to Fannie Mae to cover the resolution of certain of the Debtors' contractual obligations to Fannie Mae that are not being transferred to the Forward Buyer and the Reverse Buyer that must be completed as a pre-condition to Fannie Mae's consent to the Sale Transactions, the automatic stay is hereby modified to permit such request and the transfer of the Fannie Mae Collateral to Fannie Mae.

14. The Debtors shall cause to be served a notice (the "**Confirmation Notice**") of the entry of this Order and the Administrative Expense Claims Bar Date (as defined herein) upon (a) all parties listed in the creditor matrix maintained by Epiq Corporate Restructuring, LLC (the "**Claims and Noticing Agent**"), (b) all Borrowers, and (c) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter. The Debtors shall cause the Confirmation Notice to be published in the national editions of *The New York Times* and *USA Today* no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter.

### Findings and Decrees Relating to the Sale Transactions

15. The findings of fact and conclusions of law set forth on **Schedule 1** to this Order are incorporated herein by reference in their entirety and shall govern the sale of the Acquired Assets (as defined in the Stock and Asset Purchase Agreement) from the Debtors to the Reverse Buyer.

16.     The findings of fact and conclusions of law set forth on **Schedule 2** to this Order are incorporated herein by reference in their entirety and shall govern the sale of the Assets (as defined in the Asset Purchase Agreement) from the Debtors to the Forward Buyer.

### Findings and Decrees Relating to the NRZ Exit Tail Bridge Facility

17.     From and after the Effective Date, the Plan Administrator and the applicable Wind Down Estates shall be authorized to enter into the NRZ Exit Tail Bridge Facility and the transactions thereunder, the terms of which will be set forth in the NRZ Exit Tail Bridge Facility Documents. Confirmation of the Plan shall be deemed approval of the entry into the NRZ Exit Tail Bridge Facility Documents by the Plan Administrator and the Wind Down Estates, as applicable, and authorization of the Plan Administrator or Wind Down Estates, as applicable, to enter into and execute the NRZ Exit Tail Bridge Facility Documents and such other documents as may be required to effectuate the treatment afforded by the NRZ Exit Tail Bridge Facility, and no further corporate action or any further action by the Plan Administrator, the Debtors, or the Wind Down Estates, as applicable, and no further notice to or action, order, or approval of the Court shall be required in connection therewith.

18.     The Plan Administrator, the Debtors, and the Wind Down Estates, as applicable, and the persons and entities granted such liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents as necessary to establish and perfect such liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other

12

filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

19.     To the extent mutually agreed among the Plan Administrator, the applicable Wind Down Estates, and the NRZ Exit Tail Bridge Facility Credit Parties, the custodial and disbursement agreement and certain account control agreements for the NRZ Exit Tail Bridge Facility are authorized to be in the form of amendments and restatements of certain existing custodial and disbursement agreements and account control agreements relating to the DIP Facilities.  Any such amendment and restatement of any such existing agreement entered into by the NRZ Exit Tail Bridge Facility Credit Parties on the Effective Date after, or substantially concurrently with, the payment in full of the DIP Claims shall not require the consent of the DIP Lenders, so long as (x) all obligations of the DIP Agent (in its capacity as such) and the DIP Lenders (in their capacities as such) under such agreement are terminated as of the amendment and restatement thereof and (y) all rights of the DIP Agent and DIP Lenders to indemnification and similar rights under such agreement are preserved, to the extent that such rights would otherwise survive the termination of such agreement. Upon any such agreement being amended and restated, such agreement, as so amended and restated, shall continue in effect from and after the Effective Date as a NRZ Exit Tail Bridge Facility Document.

20.     Notwithstanding anything to the contrary in the Third Amended Plan or this Order, in the event of any conflict between the terms and provisions of the NRZ Exit Tail Bridge Facility Documents, on the one hand, and any other document or order referred to in Article I.D. of the Third Amended Plan, on the other hand, the terms of the NRZ Exit Tail Bridge Facility Documents shall govern and control in all respects solely as to the rights and obligations

WEIL:\97193774\1\41703.0011

between the Wind Down Estates and the NRZ Exit Tail Bridge Facility Credit Parties under the NRZ Exit Tail Bridge Facility Documents.

<u>**Administrative Expense Claims Bar Date**</u>

21. Except as otherwise provided in the DIP Order, the orders approving the bar date (ECF Nos. 90, 392, 496, and 272) or the Third Amended Plan, requests for payment of Administrative Expense Claims (other than Fee Claims and DIP Claims) must be filed with the Bankruptcy Court and served on the Debtors or Plan Administrator (as the case may be), the Claims and Noticing Agent, and the U.S. Trustee within thirty-five (35) days from the date of service of notice of the entry of this Order (the "**Administrative Expense Claims Bar Date**"). Such proof of Administrative Expense Claim must include at a minimum: (a) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (b) the name of the holder of the Administrative Expense Claim; (c) the asserted amount of the Administrative Expense Claim; (d) the basis of the Administrative Expense Claim; and (e) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF, FOR ANY REASON, ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE THIRD AMENDED PLAN.**

WEIL:\97193774\1\41703.0011

**Provisions Related to Fannie Mae Consent to Sale Transactions**

22.     The Sale Transactions under the Third Amended Plan require Fannie Mae's express written consent to become effective. The Debtors' assumption and/or assignment of Fannie Mae-related mortgage servicing contracts and/or rights in connection with the Sale Transactions are conditioned on its consent under the Fannie Mae Lender Contracts and applicable law. The terms of any consent provided by Fannie Mae, and any related agreements upon which Fannie Mae's consent is conditioned, shall be binding upon the parties to any such assumed and/or assigned agreements including, without limitation, Reorganized RMS.

23.     The Debtors, Buyers, and Fannie Mae are authorized to enter into and perform resolution and/or servicing transfer agreements to obtain Fannie Mae's consent to the closing of the Sale Transactions and to effectuate the transfer of Fannie-Mae related mortgage servicing contracts and/or rights to the Forward Buyer and Reverse Buyer, respectively, in connection with the Sale Transactions. The Debtors are authorized to pay Cure Amounts and other amounts to Fannie Mae to cover the resolution of certain of their contractual obligations to Fannie Mae that are not being transferred to the Forward Buyer and the Reverse Buyer. The Debtors are authorized to cover the Cure Amounts and other amounts related to the Fannie Mae contracts and/or rights that will be subject to resolution and/or transfer agreements in the amount of up to $45 million (the "**Maximum Fannie Mae Payment**"). Fannie Mae is authorized to demand payment equal to, or, subject to Court approval, above the Maximum Fannie Mae Payment. The Debtors are further authorized to enter, and perform under, such supplemental agreements with Fannie Mae as may be necessary and appropriate to effectuate Fannie Mae's rights as provided or preserved in this Order, the Bidding Procedures Order, the Third Amended Plan, and applicable law.

WEIL:\97193774\1\41703.0011

24. To the extent the automatic stay of section 362(a) of the Bankruptcy Code applies to Fannie Mae's termination of the Debtors' Fannie Mae Lender Contracts and related agreements that are not being assumed and assigned in connection with the Sale Transactions, or to the Debtors' payment to Fannie Mae of the Cure Amounts or other amounts due under the applicable resolution and/or transfer agreements, the automatic stay is modified to permit such termination and payment.

25. The Debtors, the Wind Down Estates, and the Plan Administrator shall perform all obligations, and pay all claims and amounts due, under the Fannie Mae Lender Contracts (and any other agreements with Fannie Mae) whether arising prior to or after the Commencement Date and are directed to maintain compliance with the Fannie Mae Assurances of Future Performance (as set forth on Schedule 1 to the *Final Order (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* [ECF No. 224]) and the *Stipulation Regarding Assurances of Performance of Debtors' Obligations Under Fannie Mae Agreements and Adequate Protection and Order Thereon* [ECF No. [●]]) pending any transfer of servicing approved by Fannie Mae, any assumption or rejection of the Fannie Mae Lender Contracts by the Debtors, or any exercise of Fannie Mae's rights to terminate the Fannie Mae Lender Contracts and transfer servicing of loans owned by Fannie Mae.

26. Fannie Mae shall not be required to file a proof of claim, an administrative expense claim, or take any other action to preserve any of its rights, claims, or defenses against the Debtors, all of which are expressly preserved and shall survive entry of this Order, the Third Amended Plan's discharge and injunction provisions, and the effectiveness of the Third

WEIL:\97193774\1\41703.0011

Amended Plan. If the Debtors, the Wind Down Estates, or the Plan Administrator fail to satisfy all of the obligations owing to Fannie Mae, Fannie Mae shall be permitted to seek recovery against the Debtors, the Wind Down Estates, or the GUC Recovery Trust (as applicable). Neither the automatic stay nor any post-confirmation injunction, including the Injunction provision in Section 10.5 of the Third Amended Plan, shall apply to Fannie Mae's exercise of any rights or remedies under the Fannie Mae Lender Contracts (or any other agreement), including with respect to any collateral securing Fannie Mae's claims or with respect to Fannie Mae's rights to unilaterally terminate or transfer servicing of loans owned by Fannie Mae.

27. Notwithstanding any other provision of this Order, absent express written consent by Fannie Mae, all of Fannie Mae's rights with respect to the Sale Transactions, its mortgage servicing rights, the Fannie Mae Lender Contracts, and all other related agreements are reserved. Fannie Mae further reserves all other rights provided in the Bidding Procedures Order, the Third Amended Plan, and applicable law.

## Ginnie Mae/HUD Provision

28. Nothing in this Order (including any schedule), the Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement shall preclude or limit: (1) Ginnie Mae's rights pursuant to 12 U.S.C. § 1721(g) or the Ginnie Mae Agreements; (2) HUD's rights pursuant to 12 U.S.C. §§ 1708, 1709, 1710, 1715u, and 1715z-20 or HUD Agreements; or (3) the right of any governmental unit to take any action not subject to the automatic stay with respect to the Debtors or the Wind Down Estates. The express approvals of Ginnie Mae and HUD are conditions precedent for consummation of the Reverse Sale Transaction, and nothing in this Order, the Third Amended Plan, or the Stock and Asset Purchase Agreement shall be construed as the provision of either approval. The express approval of

WEIL:\97193774\1\41703.0011

Ginnie Mae is a condition precedent to the occurrence of the Ginnie Mae Closing (as defined in the Asset Purchase Agreement) in connection with the Forward Sale Transaction, and nothing in this Order (including any schedule), the Third Amended Plan, or the Asset Purchase Agreement shall be construed as the provision of such approval. In the event of a conflict between the Ginnie Mae Agreements, on the one hand, and this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement, on the other, the relevant terms of the Ginnie Mae Agreements shall govern.

29. Nothing in the Third Amended Plan, the Plan Supplement, this Order (including any schedule), the Asset Purchase Agreement (Forward Business), the Stock and Asset Purchase Agreement (Reverse Business), DIP Order, Bidding Procedures Order, or the GUC Recovery Trust Agreement, including any amendments, supplements or modifications thereto, shall discharge, release, extinguish, terminate, modify, subordinate, prime, grant a lien or administrative claim in, or otherwise impair, Ginnie Mae's interests in or rights to the mortgages backing the Ginnie Mae securities and any related collateral. Ginnie Mae's collateral includes, but is not limited to, cash, account or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Ginnie Mae, or any other party in connection with the Ginnie Mae Guaranty Agreements, including without limitation Principal and Interest Custodial Accounts and funds, and Taxes and Insurance Custodial Accounts and funds, established in accordance with the Ginnie Mae program requirements. Nothing in this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement shall permit any entity to acquire, possess, or control Ginnie Mae securities or related collateral except with Ginnie Mae's express written consent and in accordance with the Ginnie Mae Agreements.

WEIL:\97193774\1\41703.0011

30.    The Debtors, the Wind Down Estates, and the Plan Administrator shall perform all obligations, and pay all amounts due under the Ginnie Mae Guaranty Agreements (and any other agreements with Ginnie Mae) whether arising prior to or after the Commencement Date, and are directed to maintain compliance with the Ginnie Mae Assurances of Future Performance (as set forth on Schedule 3 to the *Final Order (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* [ECF No. 224]; and the *Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations* [ECF No. 229]) pending any transfer of servicing by the Debtors subject to the approval of Ginnie Mae.

31.    Ginnie Mae shall not be required to file a proof of claim, an administrative expense claim, or take any other action to preserve any of its rights, claims, or defenses against the Debtors, all of which are expressly preserved and shall survive entry of this Order and the effectiveness of the Third Amended Plan, and notwithstanding any provisions of the Third Amended Plan (including but not limited to the discharge and injunction provisions of the Third Amended Plan).

### Freddie Mac Provisions

32.    Notwithstanding any other provision of this Order, the Third Amended Plan, the Plan Supplement, the Sale Transactions, the Exit Warehouse Facilities Documents, the Exit Working Capital Facility Documents, or any other order in the Chapter 11 Cases (a) neither the Freddie Mac Agreements nor any other agreement between the Debtors and Freddie Mac shall be assumed, assumed and assigned, or rejected and instead such agreements shall ride

through the Chapter 11 Cases unaffected in any respect; (b) none of the Debtors' rights with respect to the Freddie Mac Agreements or the loans serviced by the Debtors on behalf of Freddie Mac shall be transferred, sold, or otherwise conveyed to the Buyers (or any other entity) absent Freddie Mac's express written consent; (c) the Debtors, the Wind Down Estates, and the Plan Administrator shall perform all obligations, and pay all claims and amounts due, under the Freddie Mac Agreements (and any other agreements with Freddie Mac) whether arising prior to or after the Commencement Date and are directed to maintain compliance with the Freddie Mac Assurances of Future Performance (as set forth on Schedule 2 to the *Final Order (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* [ECF No. 224]) pending any transfer of servicing approved by Freddie Mac; and (d) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, lien rights, security interests, and claims against the Debtors or any other entity shall not be discharged, enjoined, impaired, released, modified, or limited in any respect.

33. Freddie Mac shall not be required to file a proof of claim, an administrative expense claim, or take any other action to preserve any of its rights, claims, or defenses against the Debtors, all of which are expressly preserved and shall survive entry of this Order, the Third Amended Plan's discharge and injunction provisions, and the effectiveness of the Third Amended Plan. If the Debtors, the Wind Down Estates, or the Plan Administrator fail to satisfy all of the obligations owing to Freddie Mac, then Freddie Mac shall be permitted to seek recovery against the Debtors, the Wind Down Estates, or the GUC Recovery Trust (as applicable). Neither the automatic stay nor any post-confirmation injunction shall apply to Freddie Mac's exercise of any rights or remedies under the Freddie Mac Agreements (or any

WEIL:\97193774\1\41703.0011

other agreement), including with respect to any collateral securing Freddie Mac's claims or with respect to Freddie Mac's rights to unilaterally terminate or transfer servicing of loans owned by Freddie Mac.

34.     Immediately upon entry of this Order, the Debtors, the Wind Down Estates, and the Plan Administrator are authorized to enter into, and perform under, any agreements or settlements with Freddie Mac, including with respect to the resolution of claims, the termination of servicing rights, or the transfer of servicing rights, without further court approval or order.

### Provisions for Governmental Units

35.     As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in the Third Amended Plan or this Order shall limit or expand the scope of discharge, release or injunction to which the Debtors, the Wind Down Estates, Reorganized RMS, the Buyers, or the GUC Recovery Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Third Amended Plan and this Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to this Order, pursuing any police or regulatory action.

36.     Accordingly, notwithstanding anything contained in the Third Amended Plan or this Order to the contrary, nothing in the Third Amended Plan or this Order shall discharge, release, impair or otherwise preclude:  (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors, the Wind Down Estates, Reorganized RMS, the Buyers, or the GUC Recovery Trust under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor,

WEIL:\97193774\1\41703.0011

lessee or operator of property that such entity owns, operates or leases after the Effective Date. Nor shall anything in this Order or the Third Amended Plan: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Order, the Third Amended Plan, or the Bankruptcy Code.

37.    Nothing in this Order or the Third Amended Plan shall release or exculpate any non-debtor, including any Released Parties and/or Exculpated Parties, from any liability to any Governmental Unit, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in this Order or the Third Amended Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-debtor for any liability whatsoever; provided, however, that the foregoing sentence shall not (x) limit the scope of discharge granted to the Debtors and Reorganized RMS under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

38.    Nothing contained in the Third Amended Plan or this Order (including Schedules 1 and 2) shall be deemed to determine the tax liability to a Governmental Unit of any person or entity, including but not limited to the Debtors, the Wind Down Estates, Reorganized RMS, the Buyers, and the GUC Recovery Trust, nor shall the Third Amended Plan or this Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Third Amended Plan, the Reverse Investment Transaction (as defined in Schedule 1 to this Order), or the Forward Sale Transaction, nor shall

anything in the Third Amended Plan or this Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

39.     With respect to any Governmental Unit, nothing in the Third Amended Plan, this Order, or any schedules to the Third Amended Plan or this Order, including the four paragraphs above, shall limit or expand the meaning or effect of section 1141(c) of the Bankruptcy Code with respect to the sale transactions set forth in the Asset Purchase Agreement and the Stock and Asset Purchase Agreement, including but not limited to the provision that "the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." With respect to any property transferred in the Reverse Sale Transaction (as described in <u>Schedule 1</u> to this Order) and the Forward Sale Transaction (as described in <u>Schedule 2</u> to this Order), nothing in the Plan, this Order (including any schedule), the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement (as applicable) releases, nullifies, precludes or enjoins the enforcement of any liability to a Governmental Unit under police and regulatory statutes or regulations (including but not limited to environmental laws or regulations), and any associated liabilities for penalties, damages, restitution, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order; <u>provided</u>, <u>however</u>, that all parties' rights and defenses under non-bankruptcy law are fully preserved. Nothing contained in this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement (as applicable) shall in any way diminish the obligation of any entity, including the Debtors and the Buyers, to comply with environmental laws. Nothing in the Third Amended Plan, this Order (including any schedule),

the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement (as applicable) authorizes the transfer to the Buyers of any licenses, permits, registrations, or governmental authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

### IRS Settlement

40.     New WEI, Inc. ("**New WEI**"), on its own behalf and as common parent and agent for its consolidated group and subsidiaries, and the United States of America (the "**United States**"), by and through the Internal Revenue Service (the "**IRS**"), have agreed on a global settlement in principle of the unpaid consolidated income tax liabilities of New WEI, its consolidated group and its subsidiaries (together, the "**New WEI Group**" (formerly, the Walter Energy, Inc., Walter Industries, Inc., Hillsborough Holdings Corp., and Jim Walter Corporation consolidated group)) for the tax years ended August 31, 1983, through 1987; May 31, 1990, through 1994; May 31, 2000; December 31, 2000, through 2002; and December 31, 2004, through 2006, plus interest thereon (collectively, the "**New WEI Group Tax Liabilities**" or "**New WEI Group Tax Debts**").  New WEI and the United States have agreed in principle to settle the New WEI Group Tax Liabilities for the sum of approximately $37,397,495.92 as of January 31, 2019, plus interest thereon (totaling approximately $39 million as of September 30, 2019) (the "**New WEI Settled Tax Liabilities**"), subject to and conditioned upon approval of a full and controlling written settlement agreement by the United States Bankruptcy Court for the Northern District of Alabama ("**Alabama Bankruptcy Court**"), *In re New WEI, Inc., et al.,* Case No. 15-02741-TOM7 and *Hillsborough Holdings Corp. v. United States*, Adv. Proc. No. 15-00127-TOM (the "**New WEI Settlement**").

41.     Certain of the Debtors and Mueller Water Products, Inc. ("**Mueller Water**"), as former members of the New WEI Group, may be severally liable for the New WEI

Group Tax Debts. *See* 26 C.F.R. § 1.1502-6(a). Accordingly, in recognition of certain of the Debtors' and Mueller Water's potential respective several obligations for the New WEI Group Tax Liabilities, the Debtors and Mueller Water have agreed that they will pay the New WEI Settled Tax Liabilities as follows: (a) the Debtors shall pay in the manner set forth in Paragraphs 42 and 43, below (the "**Debtors' Payment**"), an amount that is estimated to be approximately $16.5 million as of September 30, 2019; and (b) Mueller Water shall pay the balance of the New WEI Settled Tax Liabilities after taking into account the Debtors' Payment, an amount that is estimated to be approximately $22.5 million as of September 30, 2019.

42. The Debtors agree that they shall fund the Debtors' Payment as follows: (a) by authorizing the IRS to set off the overpayments of consolidated income taxes of Ditech Holding Corporation and its subsidiaries (together, the "**Ditech Group**") for the tax years 2013 and 2014 net of the agreed tax deficiencies of the Ditech Group for the tax years 2015 and 2016 in the approximate amounts of $280,000 and $204,000, respectively (subject to interest netting, if applicable, pursuant to 26 U.S.C. § 6621(d)) (the "**Ditech Group Overpayments**"), an amount estimated to be approximately $13.8 million, including interest thereon as of September 30, 2019, against the New WEI Settled Tax Liabilities, and with respect to the Ditech Group Overpayments, the Debtors shall be deemed to have fully, finally and forever surrendered, relinquished and released any right, title or interest in such overpayments; and (b) upon occurrence of the Effective Date, the Debtors shall deposit the sum of $2,735,000 in an escrow account for the benefit of the IRS (the "**IRS Escrowed Amount**"), and with respect to said escrow account, the Debtors shall be deemed to have waived any and all rights to challenge the IRS's ability to collect from that account once the New WEI Settlement is approved by the Alabama Bankruptcy Court.

WEIL:\97193774\1\41703.0011

43. Within five calendar days of the later of (i) entry of an order by the Alabama Bankruptcy Court approving the New WEI Settlement, or (ii) the Effective Date, (1) the Debtors shall cause the IRS Escrowed Amount to be disbursed to the United States, and (2) the IRS shall set off the Ditech Group Overpayments against the New WEI Settled Tax Liabilities. To the extent the automatic stay of section 362 of the Bankruptcy Code applicable in Debtors' bankruptcy cases would otherwise bar such setoff, the Court finds that cause pursuant to section 362(d) exists, and the stay is hereby modified to permit the IRS to effect such a setoff.

44. Upon the United States' receipt of the Debtors' Payment in full, as described above, the Debtors, the Ditech Group, the Released Parties, and the Related Parties shall be deemed fully and forever released and discharged from any and all civil liabilities or obligations arising out of or in connection with the New WEI Group Tax Liabilities by the United States (including the IRS) and Mueller Water or that were or could have been raised in the pending cases. Within ten calendar days of the United States' receipt of the Debtors' Payment in full, the IRS shall withdraw its Proof of Claim in Debtors' bankruptcy, Claim No. 24019. If the IRS fails to withdraw Claim No. 24019 within such time period, Claim No. 24019 shall be deemed withdrawn in its entirety with prejudice.

45. For the avoidance of doubt, nothing in Paragraphs 40 or 44 of this Order shall or shall be construed to impose any liability on the Buyers and Reorganized RMS on account of the New WEI Group Tax Liabilities or the New WEI Settled Tax Liabilities, including the Debtors' Payment.

46. For the avoidance of doubt, nothing in the Third Amended Plan, the Plan Supplement, this Order (including the findings of fact and conclusions of law set forth in Schedules 1 and 2 attached hereto and incorporated herein), the Asset Purchase Agreement

(Forward Business), the Stock and Asset Purchase Agreement (Reverse Business), or the GUC Recovery Trust Agreement, including any amendments, supplements or modifications thereto, shall discharge, release, extinguish, terminate, modify, impair or otherwise preclude the United States' right to offset any overpayments of tax of Ditech Holding Corporation and its subsidiaries (and any successors thereto), plus interest thereon, against New WEI Group's unpaid tax debts (to the extent such offset rights exist), as described further in the Internal Revenue Service's proof of claim and the United States' objection to confirmation. The Debtors, Wind Down Estates, GUC Recovery Trustee, and Plan Administrator retain the right to dispute any such asserted right of offset by the IRS, except with respect to the setoff of the Ditech Group Overpayments against the New WEI Settled Tax Liabilities, provided for in paragraphs 42 through 44 of this Order.

## U.S. Trustee

47. For the avoidance of doubt, the discharge, release, and injunction provisions contained in the Third Amended Plan and this Order are not intended and shall not be construed to bar the United States Trustee Program from enforcing any liabilities relating to the conduct described in that certain pending Memorandum of Understanding between Ditech and the United States Trustee Program. Nothing contained in this Order or the Third Amended Plan shall (1) release or exculpate any non-debtor, including any Released Parties and/or Exculpated Parties, from any liabilities to a Governmental Unit relating to the conduct addressed in that certain pending Memorandum of Understanding between Ditech and the United States Trustee Program, or (2) be construed to change, amend, or deem ineffective the terms of that Memorandum of Understanding.

WEIL:\97193774\1\41703.0011

## Taxing Authorities

48.     Holders of Allowed Priority and/or Secured Tax Claims ("**Tax Claims**") shall retain their tax liens to the same validity, extent, and priority as existed on the Commencement Date until all validly determined taxes and related interest, penalties, and fees (if any) have been paid in full.  To the extent they are not paid in the ordinary course of business, payment of Tax Claims shall include interest through the date of payment at the applicable state statutory rate as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

49.     Delinquent property taxes, penalties, and interest are to be paid in full from the proceeds of the sale, at the time of the closing of the Sale Transactions, and the ad valorem tax liens for the 2019 tax year are hereby expressly retained until payment by the Debtors and Buyers of the 2019 ad valorem taxes, as apportioned and prorated between those parties pursuant to the Stock and Asset Purchase Agreement and the Asset Purchase Agreement (as applicable), and any penalties or interest which may ultimately accrue to those taxes in the ordinary course of business.

## Sureties

50.     Notwithstanding any other provision of (i) this Order (including the Schedules), (ii) the Third Amended Plan, (iii) the Plan Supplement, (iv) the Sale Transactions (including any order or purchase agreements related thereto), and (v) any amended versions of the foregoing (the "**Confirmation and Sale Documents**"), the rights of International Fidelity Insurance Company and Allegheny Casualty Company (collectively, the "**Surety**") against the Debtors and Wind Down Estates in connection with (a) the surety bonds issued by the Surety in connection with the business operations of any of the Debtors and/or non-Debtor affiliates (collectively, the "**Bonds**"); (b) that certain Agreement of Indemnity, dated July 16, 2018, between Ditech Holding Corporation and the Surety (the "**Indemnity Agreement**"); (c) that

WEIL:\97193774\1\41703.0011

certain Cash Collateral Escrow Agreement, dated February 8, 2018, between Walter Investment Management Corp. and the Surety (the "**Cash Collateral Agreement**") (sections (a) through (c) herein collectively, the "**Surety Documents**"); and (d) the cash collateral held by the Surety in connection with the Bonds and pursuant to the Indemnity Agreement and the Cash Collateral Agreement in the amount of $15,000,000 (the "**Cash Collateral**") are neither affected nor impaired by the Confirmation and Sale Documents. Nothing in the Confirmation and Sale Documents shall restrict, limit, transfer or otherwise negatively impact the Surety's rights against the Debtors or Wind Down Estates. Nothing in the Confirmation and Sale Documents shall restrict, limit, transfer, or otherwise negatively impact the Surety's right to hold and/or apply collateral, including, but not limited to, the Cash Collateral in accordance with the terms of the Indemnity Agreement, Cash Collateral Agreement, and/or applicable law. Notwithstanding any provision in the Confirmation and Sale Documents:

(a) Surety has a trust fund claim and the Surety may continue to hold trust funds to apply against any and all liability for losses and/or expenses in accordance with the terms of the Indemnity Agreement;

(b) All set-off and recoupment rights of Surety and obligees pursuant to the Bonds are preserved against the Debtors and Wind Down Estates; to the extent that any sales are free and clear of set-off and recoupment rights of Surety and any obligees under any of the Bonds, such rights may be asserted against the proceeds of any sale in the same priority as may have existed against the asset being sold pre-closing;

(c) The Surety Documents may not be assumed, assumed and assigned, or otherwise used for the benefit of the Buyers, Debtors, Reorganized RMS, Wind Down Estates, and/or the Plan Administrator or any related entities without the Surety's express consent;

WEIL:\97193774\1\41703.0011

(d)     The Debtors, Wind Down Estates, and/or Plan Administrator (collectively, the "**Debtor Entities**") shall not be permitted to use the Bonds after the Effective Date of the Third Amended Plan without the Surety's express consent.  To the extent the Bonds are required for operations post-Effective Date and the Surety does not consent to the use of such Bonds, the Debtor Entities will have replacement bonds in place prior to the Effective Date;

(e)     The Surety reserves all of its rights to modify, extend, or cancel any and all existing Bonds in accordance with the Indemnity Agreement to the extent permitted by law;

(f)     The Surety has no obligation to issue any new bonds to any entity;

(g)     For the avoidance of doubt, the third-party releases in the Third Amended Plan shall not purport to release claims held by the Surety or the obligees under the Bonds;

(h)     The Surety retains its claims against individual Debtors, and such claims are not reduced or consolidated into one claim;

(i)     The Debtor Entities shall not knowingly destroy any books or records that they may possess pertaining to any of the Debtors' obligations which relate to the Bonds that have not been fully released or otherwise fully discharged, and, if the Surety receives a claim under any of the Bonds, any books and/or records that may then be in the possession of the Debtor Entities related to such claim shall be produced to the Surety upon written request.

The rights of the Debtors and the Wind Down Estates, as applicable, to raise any objections, claims, or defenses in connection with subsections (a), (b), (e), and (h) of this paragraph (including the right to amend the provisions in this paragraph as agreed to with the Surety (and,

to the extent any such amendment affects the Buyer(s) and/or Reorganized RMS, the Buyer(s) and/or Reorganized RMS, as applicable) without further Court order) are fully preserved.

**Consumer Representative**

51.     The Consumer Representative Agreement shall become effective on the Effective Date and a Consumer Representative shall be appointed and have all powers necessary to establish a Consumer Creditor Reserve as a trust and implement the provisions of the Consumer Representative Agreement and administer the Consumer Creditor Reserve, including, without limitation, the power to: (i) reconcile and resolve of Consumer Creditor Claims, (ii) hold, manage and administer the Consumer Creditor Recovery Cash Pool, (iii) distribute the Consumer Creditor Net Proceeds to holders of Allowed Consumer Creditor Claims, (iv) facilitate inquiries by Borrowers with respect to the obligations of the Wind Down Estates, Forward Buyer, Reverse Buyer, and Reorganized RMS to reasonably investigate alleged errors in the prior servicing or accounting of the loan asserted by any Borrower and, if warranted, correct such errors in accordance with Sections 4.6(b) and 5.6(d) of the Third Amended Plan, and (v) otherwise perform the functions and take the actions provided for in the Consumer Representative Agreement or permitted in the Third Amended Plan and/or this Order or in any other agreement executed pursuant to the Third Amended Plan.  In the event of a conflict between the provisions of this Order (including its schedules) and the Third Amended Plan, on the one hand, and the Consumer Representative Agreement and/or any other agreement executed pursuant to the Third Amended Plan, on the other hand, the relevant provisions of this Order (including its schedules) and/or the Third Amended Plan shall govern.

52.     To facilitate the appointment of the Consumer Representative and provide for the efficient administration of its duties, the Consumer Creditors' Committee, notwithstanding section 12.9 of the Third Amended Plan, shall continue to exist and retain

professionals, for a period of no more than three (3) weeks (unless otherwise agreed to by the Term Lenders) (the "**Consumer Representative Transition Period**"), for the limited purpose of assisting the Consumer Representative in its duties. For the avoidance of doubt, the fees and expenses of any professionals retained by the Consumer Creditors' Committee during the Consumer Representative Transition Period shall be paid by the Reorganized Debtors pursuant to section 2.2(d) of the Third Amended Plan, but shall not exceed $80,000 in the aggregate.

## Miscellaneous

53. With respect to executory contracts and/or unexpired leases of nonresidential real property that are being assumed or assumed and assigned pursuant to the Third Amended Plan and this Order, the Cure Amounts set forth in the Cure Notices[5] only relate to any outstanding prepetition amounts owed by the Debtors. The Debtors shall continue to timely perform in the ordinary course of business and in accordance with the terms of such executory contracts and/or unexpired leases of nonresidential real property with respect to obligations accruing postpetition as required under section 365 of the Bankruptcy Code until the Effective Date, at which time the Wind Down Estates, Reorganized RMS, or the Forward Buyer, as applicable, will assume responsibility of performing under the assumed and assumed and assigned executory contracts and/or unexpired leases with respect to obligations accruing from and after the Effective Date.

54. **No Waiver of Rights and Defenses.** Except as otherwise agreed, the provisions of the Third Amended Plan and this Order shall not enjoin, impair, prejudice, have

---

[5]   "**Cure Notices**" means collectively, the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 824); *Supplemental Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 834); and *Second Supplemental Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 1013).

WEIL:\97193774\1\41703.0011

any preclusive effect upon, or otherwise affect the rights of any Creditor to effectuate, subject to advance Bankruptcy Court approval, a defensive right of recoupment pursuant to common law or defensive right of setoff pursuant to common law or otherwise in accordance with section 553 of the Bankruptcy Code against the Debtors, the Wind Down Estates or the GUC Recovery Trust, as applicable (subject to the Debtors', Wind Down Estates' or GUC Recovery Trust's rights to contest the validity of such asserted right of setoff or recoupment); provided, however, that no such rights of recoupment and/or setoff may be asserted against the Buyers, Reorganized RMS, or any of their respective affiliates, successors, and assigns. This paragraph shall not affect or limit Sections 4.6 or 5.6(d) of the Third Amended Plan with respect to the Borrowers.

55. For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, nothing in this Order shall be deemed to give a Borrower a right to payment, allowed Claim or any other right against the Debtors' Estates by virtue of entry of this Order, and all of the Debtors' defenses, Claims and other rights and actions with regard to the distribution of assets of the Debtors' Estates, whether in law or equity, are expressly preserved.

56. **Borrower Rights.** For the avoidance of doubt, notwithstanding any other provisions of the Confirmation and Sale Documents, nothing in this Order or any other Confirmation and Sale Documents shall be deemed to limit Borrowers' rights under, *inter alia*, Sections 4.6, 5.2(c), and 5.6(d) of the Third Amended Plan.

57. **National Founders Facility Resolution.** The Debtors shall take all steps necessary to effectuate the National Founders Resolution, and such National Founders Resolution is hereby approved in complete resolution of the National Founders Objection, including the following: the Debtors, Reorganized RMS, and the Reverse Buyer, as applicable, shall, in good faith and in cooperation with National Founders in all respects, take all steps

WEIL:\97193774\1\41703.0011

necessary to (a) prior to the Effective Date, continue to service the National Founders Mortgage Assets, the TRM, LLC Portfolio, and the Low Valley Trust Portfolio pursuant to the National Founders Servicing Agreement and TRM, LLC Servicing Agreement, as applicable; (b) on and after the Effective Date, continue to service the National Founders Mortgage Assets, the TRM, LLC Portfolio, and the Low Valley Trust Portfolio pursuant to an interim subservicing agreement between Reorganized RMS and National Founders, which interim subservicing agreement shall be negotiated and agreed to by National Founders and the Reverse Buyer (which agreement shall be binding on Reorganized RMS) in good faith prior to the Effective Date, reflect commercially reasonable and market-based terms, and be effective until such time as National Founders, using commercially reasonable efforts to do so as soon as practicable, appoints a successor servicer (such date the "**Appointment of a Successor Servicer**"); (c) upon the Appointment of a Successor Servicer, or as soon thereafter as practicable, transfer servicing of the National Founders Mortgage Assets as set forth in the National Founders Servicing Agreement to a successor servicer designated by National Founders; (d) upon the Appointment of a Successor Servicer, or as soon thereafter as practicable, transfer servicing of the TRM, LLC Portfolio and Low Valley Trust Portfolio pursuant to the TRM, LLC Servicing Agreement from RMS to a servicer designated by National Founders; (e) upon the Effective Date, the Debtors shall transfer and shall be deemed to transfer to National Founders (or its designee) all of their rights, title and interest in and to the RMS SPV Equity to National Founders (or its designee), and in accordance with section 1141 of the Bankruptcy Code, the RMS SPV Equity shall automatically vest in National Founders (or its designee) free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax in accordance with section 1146 of the Bankruptcy Code; and (f) upon

WEIL:\97193774\1\41703.0011

the Effective Date, or as soon thereafter as practicable as agreed upon between the parties, the Debtors or Reorganized RMS, as applicable, shall transfer and shall be deemed to transfer to National Founders (or its designee) all of their rights, title and interest in and to the bare legal title of the Mortgage Assets and the Collateral Accounts, including any Mortgage Asset Proceeds, and in accordance with section 1141 of the Bankruptcy Code, the bare legal title of the Mortgage Assets and the Collateral Accounts, including any Mortgage Asset Proceeds shall automatically vest in National Founders (or its designee) free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax in accordance with section 1146 of the Bankruptcy Code. For the avoidance of doubt, the transfer of RMS SPV Equity, bare legal title of the Mortgage Assets, the Collateral Accounts, and the Mortgage Asset Proceeds, shall be transferred, free and clear of Claims and Liens other than the National Founders Permitted Liens. The cost of effectuating the transfer of the Servicing Agreements shall be borne by National Founders; provided, however, notwithstanding Section 10.6 of the Third Amended Plan, the Reserved Reimbursement Claims[6] are preserved in all respects.

58. Nothing in the Third Amended Plan, Plan Supplement, or this Order shall waive, release, discharge, enjoin or otherwise limit (a) any rights or any defenses, including for setoff, of TIAA, FSB f/k/a Everbank against the Debtors, in connection with the Mortgage Servicing Rights Purchase and Sale Agreement dated October 30, 2013, between TIAA, FSB f/k/a Everbank and Ditech Financial LLC f/k/a Green Tree Servicing LLC ("**2013 MSR PSA**")

---

[6] "**Reserved Reimbursement Claims**" means any and all rights of National Founders under the DIP Order, the Bankruptcy Code, or National Founder Facility to assert a claim for reimbursement of costs and expenses in connection with the National Founders Resolution; provided, however, that the Debtors or the successor in interest to the Debtors' Estates shall retain all rights to object to such claims.

WEIL:\97193774\1\41703.0011

and the Amended and Restated Mortgage Servicing Rights Purchase and Sale Agreement dated May 20, 2015, between TIAA, FSB f/k/a Everbank and Ditech Financial LLC f/k/a Green Tree Servicing LLC ("**2015 MSR PSA**"); or (b) any claims of TIAA, FSB f/k/a Everbank against the Debtors in connection with the 2013 MSR PSA and 2015 MSR PSA, as asserted in Claim No. 21420, as may be amended.

59.      The *Objection of Bank of America, N.A. to the Plan, the Proposed Sales, and Related Matters Set For Hearing on August 7, 2019* [ECF No. 941] (the "**BANA Objection**") is adjourned with respect to issues raised in the BANA Objection other than setoff or recoupment rights, to a date and time to be mutually agreed by the Debtors and Bank of America, N.A. (including any of its affiliates doing business with the Debtors, collectively "**BANA**") prior to the closing of the Reverse Investment Transaction (as defined in <u>Schedule 1</u>), and BANA's rights as to such issues and the Debtors' rights to raise any objections to such issues are fully preserved.

60.      **Preservation of BANA and Nationstar Setoff and Recoupment**. Notwithstanding anything to the contrary contained in this Order, the provisions of the Third Amended Plan or the Plan Supplement, except as provided in this paragraph and subject to compliance with section 553 of the Bankruptcy Code as to setoff rights arising before the Commencement Date, all rights of setoff or recoupment of BANA and Nationstar Mortgage LLC (including any of its affiliates doing business with the Debtors, collectively "**Nationstar**"), respectively, against the Debtors (including the rights of setoff provided in Section 5.2(b) of the Third Amended Plan) are preserved and retained and shall not be enjoined, impaired, prejudiced, discharged, or released against the Debtors, the Wind Down Estates, or the GUC Recovery Trust, and each of BANA and Nationstar shall be entitled to assert any and all setoff and recoupment

WEIL:\97193774\1\41703.0011

rights against the Debtors, the Wind Down Estates, or the GUC Recovery Trust. For so long as the Bankruptcy Cases are open or the Wind Down Estates or GUC Recovery Trust are in existence, a determination on the merits of BANA's or Nationstar's asserted setoff and recoupment rights shall either be made by agreement of the parties, who shall negotiate in good faith to resolve any dispute, or failing that, a court of competent jurisdiction, absent which, BANA or Nationstar may not effectuate any setoff or recoupment. For the sake of clarity, the Bankruptcy Court retains non-exclusive jurisdiction to adjudicate the merits of BANA's or Nationstar's asserted setoff and recoupment rights. Other than rights, claims, liabilities, and obligations arising under Transferred Contracts (as defined in the Stock and Asset Purchase Agreement and the Asset Purchase Agreement) as part of the Sale Transactions, all receivables asserted by the Debtors relating to BANA or Nationstar or arising under the (a) Agreement for the Flow Purchase and Sale of Mortgage Servicing Rights dated October 31, 2018; (b) Mortgage Servicing Rights Purchase and Sale Agreement dated January 6, 2013; (c) Flow Subservicing Agreement dated May 23, 2012; (d) Flow Servicing Agreement dated November 27, 2012 (CC-20003); (e) Settlement Agreement and Mutual Release dated December 31, 2018; (vi) Second Settlement Agreement and Mutual Release dated May 20, 2019; (f) Flow Servicing Agreement dated as of March 1, 2011 (CC-10180); and (g) Investor Agreement (CC-20004) are deemed to be "Excluded Assets" (as defined in the Stock and Asset Purchase Agreement and the Asset Purchase Agreement). Accordingly, effective as of the Effective Date, such receivables will be the exclusive property of the Debtors, the Wind Down Estates, or the GUC Recovery Trust.

61. Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Order will be effective and enforceable immediately upon its entry.

62.     Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, subject to the occurrence of the Effective Date, on and after the entry of this Order, the provisions of the Third Amended Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holders' respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Third Amended Plan and whether such holder has accepted the Third Amended Plan.

63.     Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Third Amended Plan.

64.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets and issuance of equity securities in Reorganized RMS, as applicable, to the Buyers; (b) interpret, implement, and enforce the provisions of this Order, the Asset Purchase Agreement, and the Stock and Asset Purchase Agreement; (c) protect the Buyers against any Interests against the Sellers or the Acquired Assets of any kind or nature whatsoever, and (iv) enter any order under section 365 of the Bankruptcy Code.

Dated:                    , 2019
          New York, New York

_____
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

WEIL:\97193774\1\41703.0011

## Stock and Asset Purchase Agreement[1]

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction.** This Court has jurisdiction over the issuance of the Reorganized RMS Stock to the Reverse Buyer and sale of Acquired Assets and the assumption of the Assumed Liabilities (collectively, the Acquired Assets and the Assumed Liabilities, the "**RMS Assets**") in accordance with the Stock and Asset Purchase Agreement (the "**Reverse Investment Transaction**") pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

C. **Notice and Opportunity to Object.** As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, the Sale Transaction, including the Reverse Investment Transaction, the Stock and Asset Purchase Agreement, the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Reverse Business)* [ECF No. 724], the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan or the Stock and Asset Purchase Agreement (as amended, modified, and supplemented from time to time), as applicable, or as the context otherwise requires.

*Unexpired Leases of Debtors* [ECF No. 824], *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors (Reverse Buyer)* (ECF No. 839) (the "**Initial Assumption and Assignment Notice**"), *Supplemental Notice of Assumption of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Transferred Contracts Schedule (Reorganized RMS)* [ECF No. 1101] (the "**Supplemental Assumption Notice**"), the Third Amended Plan, and the Confirmation Hearing have been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and entities.

D. **Title to the RMS Assets.** Subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, the RMS Assets constitute property of RMS's Estate and good title is presently vested in RMS within the meaning of section 541(a) of the Bankruptcy Code.[2] Except as provided in the Stock and Asset Purchase Agreement and subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, RMS is the sole and rightful owner of such RMS Assets with all rights, title and interests to the RMS Assets, and no other person has any ownership right, title, or interests therein.

E. **Extensive Efforts by Debtors.** As of the Commencement Date and for a period of more than nine months preceding the Commencement Date, the Debtors, with the assistance of their counsel and other advisors, evaluated strategic alternatives including extensive marketing efforts. The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a possible

---

[2]    Pursuant to the DIP Facilities, certain of the Acquired Assets consisting of mortgage loans originated or acquired by the Debtors are currently subject to "repurchase agreements" as defined under Section 101(47) of the Bankruptcy Code.

WEIL:\97193783\1\41703.0011

sale of all or substantially all of the Debtors' assets. The Reverse Investment Transaction is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' Estates for the benefit of creditors.

F.     **Business Justification.**    The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for this Court to approve the issuance and sale of the Reorganized RMS Stock, and the transfer to Reverse Buyer of the Acquired Assets and the assumption by Reverse Buyer of the Assumed Liabilities in accordance with the Stock and Asset Purchase Agreement and the Related Agreements pursuant to sections 1123(a)(5), 1123(b) and 1141(c) of the Bankruptcy Code. In light of the circumstances of these Chapter 11 Cases and the risk of deterioration in the going concern value of the RMS Assets pending the issuance of the Reorganized RMS Stock and consummation of the Reverse Investment Transaction, time is of the essence in (i) consummating the Reverse Investment Transaction, (ii) preserving the value of the RMS Assets and viability of RMS's business as a going concern, and (iii) minimizing widespread and adverse economic consequences for RMS, its Estates, and its creditors and employees. RMS's entry into and performance under the Stock and Asset Purchase Agreement: (x) are a result of due deliberation by RMS and constitute a sound and reasonable exercise of RMS's business judgment consistent with its fiduciary duties; (y) provide value to and are beneficial to RMS's Estate, and are in the best interests of RMS and its Estate, creditors and other parties in interest; and (z) are reasonable and appropriate under the circumstances.

G.     **Compliance with Bidding Procedures.**    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders. The Bidding Procedures afforded adequate notice and a full, fair, and reasonable opportunity for any Person to

3

make a higher or otherwise better offer to purchase the RMS Assets. The Debtors, the Reverse Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.

H. **Adequate Marketing; Highest or Best Offer.** Other than the Stock and Asset Purchase Agreement, no Qualified Bids for the RMS Assets were received by the Debtors before the Bid Deadline. The Debtors cancelled the Auction in accordance with the Bidding Procedures Order and, on July 10, 2019, caused the *Notice of (I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful Bidders* [ECF No. 830] to be filed with the Court identifying the Reverse Buyer as the Successful Bidder in accordance with the Bidding Procedures. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Confirmation Hearing, and (ii) the representations of counsel made on the record at the Confirmation Hearing, (a) the Debtors and their advisors have adequately marketed the RMS Assets and conducted the sale process in compliance with the Bidding Procedures and Bidding Procedures Order; (b) full, fair, and reasonable opportunity was given to all Persons to make a higher or better offer to purchase the RMS Assets; (c) no Person, other than the Reverse Buyer, timely submitted a Qualified Bid in accordance with the Bidding Procedures Order; (d) the Reverse Buyer submitted the highest and best bid for the RMS Assets and was designated as the Successful Bidder; (e) the consideration provided by the Reverse Buyer under the Stock and Asset Purchase Agreement constitutes the highest and best offer for the RMS Assets; (f) the consideration provided by the Reverse Buyer for the RMS Assets under the Stock and Asset Purchase Agreement is fair and reasonable consideration for the RMS Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia or any other applicable jurisdiction with laws substantially

4

similar to the foregoing, (g) the consideration provided by the Reverse Buyer for the RMS Assets under the Stock and Asset Purchase Agreement provides reasonably equivalent value and constitutes fair consideration under the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act; (h) taking into consideration all relevant factors and circumstances, the Reverse Investment Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (i) no other Person has offered to purchase the RMS Assets for greater economic or non-economic value to the Debtors or their Estates; and (j) the Debtors' determination that the Reverse Investment Transaction and the Stock and Asset Purchase Agreement constitutes the highest and best offer for the RMS Assets constitutes a valid, sound and reasonable exercise of the Debtors' business judgment.

I.    **Good Faith; No Collusion**.  The Stock and Asset Purchase Agreement and all aspects of the Reverse Investment Transaction were negotiated, proposed, and entered into by the Debtors and the Reverse Buyer and each of their management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Reverse Buyer has proceeded in good faith in all respects in that, among other things: (i) the Reverse Buyer has recognized that the Debtors were free to deal with any Person in connection with the marketing and sale of the RMS Assets; (ii) the Reverse Buyer has complied with the applicable provisions of the Bidding Procedures Order in all respects; (iii) the Reverse Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Reverse Buyer under the Stock and Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Reverse Buyer

5

and the Debtors in connection with the Reverse Investment Transaction have been disclosed and are reasonable and appropriate. Neither the Debtors nor the Reverse Buyer, nor any affiliate of the Reverse Buyer, have engaged in collusion, fraud, or any conduct that would cause or permit any aspect of the Reverse Investment Transaction, including, without limitation, the Stock and Asset Purchase Agreement or any Related Agreement, to be avoided or costs or damages to be imposed. Accordingly, no aspect of the Reverse Investment Transaction, including, without limitation, the Stock and Asset Purchase Agreement or any Related Agreement, may be avoided and no party shall be entitled to costs, damages or any other recovery. Specifically, the Reverse Buyer has not acted in a collusive manner with any Person or entity.

J. **Opportunity to Object.** In compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and the Bidding Procedures Order, a fair and reasonable opportunity to object or be heard with respect to the Third Amended Plan, the Reverse Investment Transaction, and the Stock and Asset Purchase Agreement have been afforded to all interested Persons, including, without limitation, the Objection Notice Parties (as defined in the Bidding Procedures Order).

K. **Best Interests.** The actions represented to have been taken, or to be taken, by the Sellers (as defined in the Stock and Asset Purchase Agreement) and the Reverse Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their Estates, creditors, and other parties in interest. Approval of the Stock and Asset Purchase Agreement and of the Reverse Investment Transaction at this time is in the best interests of the Debtors, their creditors, their Estates and all other parties in interest.

L. **Prompt Consummation.** The Stock and Asset Purchase Agreement and the Reverse Investment Transaction must be approved and consummated as promptly as

practicable in order to preserve the value of the RMS Assets and the viability of the business to which the RMS Assets relate as a going concern.

M. **Corporate Authority.** Each applicable Debtor (i) has full organizational power and authority to execute the Stock and Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby, and the Reverse Investment Transaction has been duly and validly authorized by all necessary organizational action of each of the applicable Debtor, (ii) has all of the organizational power and authority necessary to consummate the transactions contemplated by the Stock and Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby, (iii) has taken all organizational action necessary to authorize and approve the Stock and Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby and the consummation by RMS of the Reverse Investment Transaction, and (iv) needs no consents or approvals, other than those expressly provided for in the Stock and Asset Purchase Agreement and the Related Agreements, from any other person to consummate the Reverse Investment Transaction.

N. **Discharge.** On the Effective Date, other than the Excluded Assets and Excluded Liabilities, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of RMS shall vest in Reorganized RMS free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments,

WEIL:\97193783\1\41703.0011

leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution,

indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever

against RMS or any of the RMS Assets, including, without limitation, any debts arising under or

out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands,

guaranties, rights, contractual commitments, restrictions, product liability claims, environmental

liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims,

multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes

of or against any of the Debtors, Claims or Liabilities relating to any act or omission of any

originator, holder or servicer of Mortgage Loans prior to the Effective Date, any indemnification

Claims or Liabilities relating to any act or omission of the Sellers or any other Person prior to the

Effective Date or any Excluded Liabilities, and any derivative, vicarious, transferee or successor

liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law

or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or

possession thereof or the District of Columbia), whether arising prior to or subsequent to the

commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured,

liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected

or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded,

contingent or non-contingent, material or non-material statutory or  non-statutory, legal or

equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising

under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors'

interests in the RMS Assets, the operation of any of the Debtors' businesses before the Effective

WEIL:\97193783\1\41703.0011

Date (collectively, excluding any Assumed Liabilities and Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, the "**Claims**").

O.    **Section 363(o) of the Bankruptcy Code.**    The Reverse Investment Transaction does not constitute a sale pursuant to section 363 of the Bankruptcy Code and section 363(o) of the Bankruptcy Code shall not apply.  As used herein, except for the Assumed Claims (as defined in the Stock and Asset Purchase Agreement), or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, the term "Claims" shall include (a) all Claims or Causes of Action relating to conduct prior to Closing brought by a consumer borrower against any Debtor for the violation of (i) The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.), (ii) The Fair Credit Reporting Act (15 U.S.C. § 1681), (iii) The Truth in Lending Act (12 C.F.R. § 1026), (iv) The Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p) and (v) any and all state law equivalents of the foregoing clauses (i) through (iv) and (b) any other Claim or Cause of Action for fraudulent inducement of a consumer borrower to enter into a loan. All such Claims and any other similar claims implied in section 363(o) of the Bankruptcy Code shall be discharged against RMS, Reorganized RMS, and the Reverse Buyer (and their respective property, affiliates, successors and assigns) to the maximum extent permitted in section 1141 of the Bankruptcy Code except as specifically set forth in the Stock and Asset Purchase Agreement.

P.    The Purchase Price was calculated in a manner consistent with the Reverse Buyer's reliance on this Order to vest Reorganized RMS with all rights, title, and interest in and to the RMS Assets free and clear of all Claims, including, without limitation, any claims that are the subject of section 363(o) of the Bankruptcy Code.  For the avoidance of doubt, notwithstanding any other provisions of the (i) Confirmation Order (including the Schedules), (ii) the Third Amended Plan, (iii) the Plan Supplement, (iv) the Sale Transactions (including any order or

purchase agreements related thereto), and (v) any amended versions of the foregoing (the "**Confirmation and Sale Documents**"), nothing in the Confirmation and Sale Documents shall be deemed to (a) limit or alter Borrowers' express rights under the Third Amended Plan, including, *inter alia*, Sections 4.6(b), 5.2(c), and 5.6(d) of the Third Amended Plan, or (b) otherwise modify the CCC Settlement.

Q.      Except as applicable to the assertion of rights protected by Sections 4.6(b), 5.2(c), or 5.6(d) of the Third Amended Plan, all Persons having Claims of any kind or nature whatsoever against the Debtors or the RMS Assets (including, without limitation, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Effective Date, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person prior to the Effective Date) shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against Reorganized RMS, the Reverse Buyer , or any Affiliate of the Reverse Buyer  or any of their respective property, successors and assigns, as an alleged successor or on any other ground, it being understood that nothing herein shall affect assets of the Debtors that are not RMS Assets.

R.      The Reverse Buyer would not have entered into the Stock and Asset Purchase Agreement and would not consummate the value maximizing transaction contemplated thereby if the Claims against the RMS Assets were not discharged, if the Reverse Buyer or Reorganized RMS would, or in the future could, be liable for any such Claims, including, as

applicable, certain liabilities that will not be assumed by Reorganized RMS, as described in the Stock and Asset Purchase Agreement.

S. **Necessity of Order.** The Reverse Buyer would not have entered into the Stock and Asset Purchase Agreement and would not consummate the Reverse Investment Transaction without all of the relief provided for in this Order (including that, in each case other than the assumption of the Assumed Liabilities, except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, (1) the transfer of the Reorganized RMS Stock to the Reverse Buyer be free and clear of all Claims, Interests, Liens, and encumbrances, including rights or Claims based upon successor or transferee liability, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Effective Date, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person prior to the Effective Date, and (2) the Reverse Buyer not be liable for any Cure Costs or any other pre-Closing liabilities with respect to any Assumed Contracts (as defined below)). The consummation of the Reverse Investment Transaction pursuant to this Order and the Stock and Asset Purchase Agreement is necessary for the Debtors to maximize the value of their Estates for the benefit of all creditors and other parties in interest. The Reverse Buyer has agreed to the Reverse Investment Transaction with the intent of purchasing the Reorganized RMS Stock and purchased assets and does not and would not agree to assume any Liabilities other than the Assumed Liabilities or as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan.

T. **Cure Notice.** As evidenced by the affidavits of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Confirmation Hearing, the Cure Notice (as defined below) on each non-Debtor counterparty to the Assumed Contracts (each, a "**Counterparty**" and collectively, the

"**Counterparties**"), dated July 8, 2019 and August 5, 2019, which provided notice of the Debtors' intent to potentially assume such Assumed Contracts (to the extent the Assumed Contract is an executory contract or lease) and notice of the related proposed Cure Costs upon each Counterparty. The service of the Cure Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption of the Assumed Contracts. *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824]; *Third Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 1087] (collectively, the "**Cure Notices**"); *see also Affidavits of Service* [ECF Nos. 867, 868, 1119]. All Counterparties (to the extent the Assumed Contract is an executory contract or lease and was listed on the Cure Notices) have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice and to the assumption of the Assumed Contracts in accordance with the Bidding Procedures Order.

U.   **Assumption of Assumed Contracts.**  It is an exercise of the Debtors' reasonable and sound business judgment to assume the Assumed Contracts in connection with the consummation of the Reverse Investment Transaction, and the assumption of the Assumed Contracts is in the best interests of the Debtors, their Estates and creditors, and other parties in interest.  The assumption of the Assumed Contracts (i) is an integral part of the business of Reorganized RMS, (ii) allows the Debtors to sell their business to the Reverse Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assumed Contracts, and

WEIL:\97193783\1\41703.0011

(iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' Estates by avoiding the rejection of the Assumed Contracts.

V.      **Cure/Adequate Assurance.**   Other than with respect to the Adjourned Cure/Adequate Assurance Objections, the Debtors have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code. For the avoidance of doubt, all objections identified on Exhibit A to the Debtors' Agenda [ECF No. 1091] are adjourned.  Unless otherwise agreed to by the parties, the Cure Costs set forth in the Cure Notice are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assumed Contracts.  Reorganized RMS's promise to perform the obligations under the Assumed Contracts after the Effective Date shall constitute adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  For the avoidance of doubt, all pre-Effective Date accrued amounts due under such Assumed Contracts shall be satisfied by the Debtors.  All Counterparties who did not timely file an objection to the assumption of the Assumed Contracts in accordance with the Third Amended Plan, Initial Assumption and Assignment Notice, and the Supplemental Assumption Notice are deemed to consent to the assumption by Reorganized RMS of their respective Assumed Contract.  To the extent not resolved and/or adjourned at or prior to the Confirmation Hearing, the objections of all Counterparties of Assumed Contracts that did file a timely objection to the assumption of such Counterparties' respective Assumed Contracts relating thereto were heard at the Confirmation Hearing (to the extent not withdrawn), were considered by the Court, and are overruled on the merits with prejudice; provided, however, that to the extent an

WEIL:\97193783\1\41703.0011

objection of a Counterparty, or unresolved portion thereof, relates solely to Cure Costs (a "**Cure Dispute**"), RMS or Reorganized RMS, as applicable, may assume the applicable Assumed Contract(s) prior to the resolution of the Cure Dispute, provided, that RMS either (i) reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the applicable Counterparty (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such Counterparty and RMS), or (ii) with the consent of a Counterparty, such Counterparty shall have an administrative priority claim. The Court finds that with respect to all such Assumed Contracts the payment of the Cure Costs is appropriate and is deemed to fully satisfy RMS's obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 1123(b)(2) and 365(b) of the Bankruptcy Code have been satisfied for the assumption by the Debtors of each of the Assumed Contracts.

W. Notwithstanding anything else contained in this Order, this Court: (a) has not found that the Debtors have demonstrated that the proposed transactions, pursuant to which the Debtors propose to transfer to the Reverse Buyer the servicing and servicing-related rights and obligations the Debtors hold with respect to the PLS Trusts[3] (i) will result in the cure of all applicable defaults under the relevant agreements nor (ii) provide the PLS Trustees with adequate assurance of future performance, in each case as required pursuant to section 365 of the Bankruptcy Code, and (b) has, as the date hereof, neither authorized nor approved RMS' rejection of servicing and servicing-related rights with respect to any reverse mortgage that is part of a PLS Trust or otherwise administered by a PLS Trustee, and a hearing on the foregoing matters may be scheduled

---

[3] The Bank of New York Mellon Trust Company, The Bank of New York Mellon, Deutsche Bank National Trust Company, and U.S. Bank National Association, each on its own behalf and in its various capacities as trustee, co-trustee, indenture trustee, registrar, custodian and other agency roles and on behalf of certain affiliates in similar roles are referred to in such capacities, collectively as the "**PLS Trustees**" in connection with certain private label securitization trusts or similar structures (the "**PLS Trusts**").

WEIL:\97193783\1\41703.0011

for a date to be agreed upon by the parties (the "**PLS Hearing**").  In the event the Debtors and the PLS Trustees are able to resolve the foregoing, as well as any other outstanding issues, the Debtors will seek entry of a separate order in respect of such resolution.  If such disputes cannot be resolved, the Debtors may seek a determination by the Court upon adequate notice to be given by the Debtors.

X.  **Surety**.  Notwithstanding any provision in this Order or the Stock and Asset Purchase Agreement, if the Reverse Buyer (and/or any entity acquired by the Reverse Buyer) requires bonds for operations for which Debtors currently have any Bonds posted by Surety, and the Reverse Buyer and Surety have not reached an agreement otherwise, then the Reverse Buyer (or such acquired entity), by the time of closing, will post bonds that replace any and all such Bonds.  The Reverse Buyer has indicated that it may wish to use some of the Bonds or otherwise obtain surety credit from the Surety.  If no agreement between Reverse Buyer and Surety is reached with respect to the use of any Bonds or surety credit from the Surety, and Reverse Buyer is unable to post the aforementioned replacement bonds at the time of closing after using its best efforts, then Reverse Buyer will: protect Surety from liability from any loss associated with the use of such Bonds; cause to be issued a letter of credit in favor of Surety by the time of closing on the Reverse Business in the amount of the penal sum of the Bonds not replaced; and is required to continue to use its best efforts to obtain aforementioned replacement bonds.  Post-Effective Date, there shall be no transition or interim agreement with respect to the sale of the Reverse Business.  From and after the closing of the Reverse Investment Transaction, the Reverse Buyer shall not knowingly destroy any books or records that it may possess which may pertain to any of the obligations of the Debtors and/or their non-debtor affiliates (and Reverse Buyer, to the extent applicable) which relate to the Bonds; and, if the Surety receives a claim under any of the Bonds, any books and/or

WEIL:\97193783\1\41703.0011

records that may then be in the possession of the Reverse Buyer related to such claim shall be produced to the Surety upon its written request.

Y.  **Valid and Binding Contract.**  The Stock and Asset Purchase Agreement is a valid and binding contract between the Debtors and the Reverse Buyer and shall be enforceable pursuant to its terms.  The Stock and Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtors or the Reverse Buyer is, or will be, entering into the Stock and Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose. The Stock and Asset Purchase Agreement and the Reverse Investment Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in the Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Z.  **Unenforceability of Anti-Assignment Provisions.**  Anti-assignment provisions in any Assumed Contract—including any provisions requiring rating agency confirmation, "no downgrade" letters, any other third party consent, or of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code—shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are unenforceable anti-assignment

WEIL:\97193783\1\41703.0011

provisions in connection with the Reverse Investment Transaction within the meaning of section 365(f) of the Bankruptcy Code.

AA.     **Final Order.**  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     **Approval.**  Pursuant to sections 1123(b)(4) and 1141(c) of the Bankruptcy Code, the issuance, sale and/or transfer (as applicable) of the Reorganized RMS Stock to the Reverse Buyer in accordance with the terms of the Third Amended Plan and the Stock and Asset Purchase Agreement and the Related Agreements, and all transactions contemplated thereby, and all of the terms and conditions thereof, are authorized and approved.  The failure to specifically reference any particular provision of the Stock and Asset Purchase Agreement or any of the Related Agreements in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Stock and Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Reverse Buyer and the Debtors in connection with the Reverse Investment Transaction, and each and every provision, term, and condition thereof be authorized and approved in its entirety.

2.     **Fair Purchase Price**.  The consideration provided by the Reverse Buyer under the Stock and Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

WEIL:\97193783\1\41703.0011

3.      **Consummation of the Reverse Investment Transaction.**  The Debtors,
their affiliates and their respective officers, employees and agents, are authorized to execute and
deliver, and empowered to perform under, consummate, and implement, the Stock and Asset
Purchase Agreement, the Related Agreements and all additional instruments and documents that
the Debtors or the Reverse Buyer deem necessary or appropriate to implement the Stock and Asset
Purchase Agreement or the Related Agreements and effectuate the issuance, sale and/or transfer
of the Reorganized RMS Stock to the Reverse Buyer, and to take all further actions as may be
reasonably required by the Reverse Buyer for the purpose of issuing, assigning, transferring,
granting, and conveying to and conferring on (as applicable) to the Reverse Buyer, the Reorganized
RMS Stock, the RMS Assets, and assumption of the Assumed Liabilities or as may be necessary
or appropriate to the performance of the parties' obligations under the Stock and Asset Purchase
Agreement, Related Agreements, the Third Amended Plan, and this Order, including any and all
actions reasonably requested by the Reverse Buyer that are consistent with the Stock and Asset
Purchase Agreement, the Related Agreements and any and all instruments and documents entered
into in connection therewith shall be deemed authorized, approved, and consummated, all without
further order of the Court.

4.      **Surrender of Possession.**  All Persons that are currently in possession of
some or all of the RMS Assets are hereby directed to surrender possession of such RMS Assets to
Reorganized RMS as of the Closing or at such later time as the Reverse Buyer or Reorganized
RMS reasonably requests.  To the extent required by the Stock and Asset Purchase Agreement,
the Debtors agree to exercise commercially reasonable efforts to assist Reorganized RMS in
assuring that all Persons that are presently, or on the Closing Date may be, in possession of some

or all of the RMS Assets will surrender possession of the RMS Assets to either (i) the Debtors before the Closing Date or (ii) Reorganized RMS on or after the Closing Date.

5. **Direction to Release Liens.** As of the Effective Date, each of RMS's creditors and any holder of a Lien, including rights or Claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien on or against the RMS Assets, if any, as such Lien may have been recorded or may otherwise exist. If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Claims against or in the Debtors or the RMS Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Liens and Claims (collectively, the "**Release Documents**") the Person has with respect to the Debtors or Reorganized RMS or otherwise: (i) the Debtors are hereby authorized and directed to, and the Reverse Buyer or Reorganized RMS is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the RMS Assets; (ii) the Reverse Buyer or Reorganized RMS is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and Liens against Reorganized RMS; and (iii) the Reverse Buyer or Reorganized RMS may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Liens and Claims with respect to Reorganized RMS other than liabilities expressly assumed under the Stock and Asset Purchase Agreement, or as set forth in Sections 4.6(b) or 5.6(d) of the Third Amended Plan; provided that, notwithstanding anything in this Order or the Stock and

Asset Purchase Agreement to the contrary, the provisions of this Order shall be self-executing, and neither the Sellers nor Reverse Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

6. **Direction to Government Agencies.** This Order is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrar of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**"). Each and every Recording Officer is authorized and specifically directed, from and after the Effective Date, to strike all recorded Claims, Interests, Liens, or other encumbrances in, on or against Reorganized RMS (other than the Assumed Liabilities, the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan) and/or RMS Assets from their records, official or otherwise without further order of the Court or act of any party. A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims recorded prior to the date of this Order. All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stock and Asset Purchase Agreement, and to

accept and rely on this Order as the sole and sufficient evidence of the issuance of the Reorganized RMS Stock to the Reverse Buyer.

7. **No Discriminatory Treatment.** To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of Reorganized RMS on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Stock and Asset Purchase Agreement.

8. **The Reverse Investment Transaction is Not Subject to Section 363(o) of the Bankruptcy Code**. The Reverse Investment Transaction is not and shall not be deemed or construed to be a sale pursuant to section 363 of the Bankruptcy Code, and section 363(o) of the Bankruptcy Code does not and shall not be deemed or construed to apply to the Reverse Investment Transaction.

9. **Issuance of Reorganized RMS Stock Free and Clear**. On the Effective Date, in accordance with the Stock and Asset Purchase Agreement, the Third Amended Plan, and this Order, the Reorganized RMS Stock shall be issued to the Reverse Buyer free and clear of all Claims, Interests, Liens, and encumbrances to the maximum extent permitted by section 1141(c) of the Bankruptcy Code. On the Effective Date, Reorganized RMS shall be discharged of all claims (including Intercompany Claims) and liabilities to the fullest extent allowed by section 1141 of the Bankruptcy Code, except with respect to the Assumed Liabilities, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.

10. Pursuant to section 1141(c) of the Bankruptcy Code, all Persons are forever prohibited and enjoined from taking any action against Reorganized RMS or the Reverse Buyer (or any of their respective property, Affiliates, successors and assigns) based on any Claims,

Interests, Liens, and other encumbrances (other than Assumed Liabilities or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan) to the extent such Claims, Interests, Liens, and other encumbrances are released or discharged pursuant to the terms of the Third Amended Plan; provided that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

11. **No Successor or Other Derivative Liability**. By virtue of the Reverse Investment Transaction, the Reverse Buyer and its affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Reverse Buyer has not assumed nor is in any way responsible for any liability or obligation of the Debtors or the Debtors' Estates, except with respect to the Assumed Liabilities or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan. Except as expressly set forth in the Stock and Asset Purchase Agreement, the Reverse Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Effective Date, including, without limitation,

WEIL:\97193783\1\41703.0011

liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of RMS or the RMS Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

12. Except as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan or as expressly set forth herein or in the Stock and Asset Purchase Agreement, Reorganized RMS and the Reverse Buyer and their respective successors, Affiliates, and assigns shall have no liability for any Claim against the Debtors, the Debtors' Estates, or Excluded Liabilities, whether known or unknown as of the Effective Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E)

the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (U) the Claims or Liabilities relating to conduct prior to Closing brought by a consumer borrower against any Debtor for the violation of (i) The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.), (ii) The Fair Credit Reporting Act (15 U.S.C. § 1681), (iii) The Truth in Lending Act (12 C.F.R. § 1026), (iv) The Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p), and (v) any and all state law equivalents of the foregoing clauses (i) through (iv); (V) any other Claim or Cause of Action for fraudulent inducement of a consumer borrower to enter into a loan; and (W) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

WEIL:\97193783\1\41703.0011

13.     **Not an Insider.**  As of the date hereof, the Reverse Buyer is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Reverse Buyer.

14.     **Assumption of Assumed Contracts.**  Pursuant to sections 1123(b)(2) and 365 of the Bankruptcy Code and subject to and conditioned upon the confirmation of the Third Amended Plan, the Debtors are hereby authorized to assume the Assumed Contracts.  With respect to each of the Assumed Contracts, the Debtors, in accordance with the provisions of the Third Amended Plan and Stock and Asset Purchase Agreement, have cured or will cure before the Effective Date, or have provided adequate assurance of the prompt cure after the Effective Date of, any monetary default required to be cured with respect to the Assumed Contracts under sections 1123(b)(2) and  365(b)(1) of the Bankruptcy Code, and the Reverse Buyer has provided adequate assurance of Reorganized RMS's future performance under the Assumed Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparty to such Assumed Contracts.

15.     The Debtors served all Counterparties to the Assumed Contracts with the Initial Assumption and Assignment Notice, and the Supplemental Assumption Notice, and the deadline to object to the Cure Costs and adequate assurance of future performance has passed. Accordingly, unless an objection to the proposed Cure Costs or adequate assurance information was filed and served before the applicable deadline, each Counterparty to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors, Reorganized RMS, or the Reverse Buyer, their Affiliates, successors or assigns or the property of

any of them, any default existing as of the date of the Confirmation Hearing if such default was not raised or asserted prior to or at the Confirmation Hearing.

16.    All of the requirements of sections 1123(b)(2), 365(b), and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption of the Assumed Contracts by Reorganized RMS.

17.    To the extent a Counterparty to an Assumed Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Supplemental Assumption Notice and any such Counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

18.    Except as otherwise specifically provided for by order of this Court, upon the assumption of the Assumed Contracts under the provisions of this Order, no default shall exist under any Assumed Contracts, and no Counterparty to any Assumed Contracts shall be permitted to declare a default by any Debtor, Reorganized RMS or the Reverse Buyer or otherwise take action against Reorganized RMS or the Reverse Buyer (or any of their respective property, Affiliates, successors and assigns) as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.  The failure of the Debtors, Reorganized RMS, or the Reverse Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors', Reorganized RMS's, and the Reverse Buyer's rights to enforce every term and condition of the Assumed Contract.

WEIL:\97193783\1\41703.0011

19.     Nothing contained in this Order or the Reverse Investment Transaction is intended to relieve the Reverse Buyer from the servicer's indemnification obligations to the PLS Trustees under the applicable provisions in the Assumed Contracts that provide indemnification to the PLS Trustees for losses, liabilities and expenses in connection with the performance of their obligations and the exercise of their rights under the Assumed Contracts arising after the Effective Date.

20.     **No Avoidance of Stock and Asset Purchase Agreement.**  Neither the Debtors nor the Reverse Buyer have engaged in any conduct that would cause or permit the Stock and Asset Purchase Agreement to be avoided or costs or damages to be imposed.  Accordingly, the Stock and Asset Purchase Agreement and the Reverse Investment Transaction shall not be avoidable under chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery under the Bankruptcy Code in respect of the Stock and Asset Purchase Agreement or the Reverse Investment Transaction.

21.     **Modification of Stock and Asset Purchase Agreement**.  The Stock and Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided, that any such modification, amendment or supplement does not materially change the terms of the Stock and Asset Purchase Agreement or Related Agreements, documents or other instruments or have any adverse effect on the Debtors' Estates.

22.     **No Stay of Order.**  This Order shall be effective immediately upon entry, and the Debtors and the Reverse Buyer are authorized to close the Reverse Investment Transaction immediately upon entry of this Order.  Time is of the essence in closing the Reverse Investment

WEIL:\97193783\1\41703.0011

Transaction in accordance with the terms of the Stock and Asset Purchase Agreement, and the Debtors and the Reverse Buyer intend to close the Reverse Sale Transaction as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk its appeal being foreclosed as moot.

23. **Releases**. Upon entry of this Order approving the Reverse Investment Transaction contemplated by the Stock and Asset Purchase Agreement, except for the rights and obligations of the Debtors or the Reverse Buyer under the Stock and Asset Purchase Agreement and the Related Agreements, in connection with the Stock and Asset Purchase Agreement and for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the Reverse Buyer's payment of the Purchase Price under the Stock and Asset Purchase Agreement:

(a) the Debtors and their controlled Affiliates, on behalf of themselves and, to the extent applicable, their Estates, shall and shall be deemed to fully, finally, and completely remise, release, acquit, and forever discharge the Reverse Buyer Parties[4] and its respective property of and from any and all claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted

---

[4]   "**Reverse Buyer Parties**" means Mortgage Assets Management, LLC, SHAP 2018-1, LLC, Reorganized RMS, and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

or unasserted, fixed or contingent, matured or unmatured, existing or having arisen up to and including the signing of the Stock and Asset Purchase Agreement, whether in contract, tort, or otherwise, whether statutory, at common law, or in equity, arising out of, based upon, or relating in any way, in whole or in part, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or implementation of the Stock and Asset Purchase Agreement and the Related Agreements, or (ii) the Debtors' chapter 11 cases (collectively, the "**Ditech Released Claims**");

(b)        The Reverse Buyer and any of its respective Affiliates shall and shall be deemed to fully, finally, and completely remise, release, acquit, and forever discharge the Debtor Parties[5] and their respective property of and from any and all claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted or unasserted, fixed or contingent, matured or unmatured, existing or having arisen up to and including the signing of the Stock and Asset Purchase Agreement, whether in contract, tort, or otherwise, whether statutory, at common law, or in equity, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or implementation of the Stock

---

[5]    "**Debtor Parties**" means the Debtors and their Estates (to the extent applicable), and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

WEIL:\97193783\1\41703.0011

and Asset Purchase Agreement and the Related Agreements, except as expressly set forth therein, or (ii) the Debtors' chapter 11 cases (the foregoing released claims, collectively, the "**Reverse Buyer Released Claims**");

(c)        the Debtors, their controlled Affiliates, and, to the extent applicable, their Estates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any Ditech Released Claim against the Reverse Buyer Parties; (ii) continuing or commencing any action or other proceeding with respect to any Ditech Released Claim against the Reverse Buyer Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the Reverse Buyer Parties or property of the Reverse Buyer Parties with respect to any Ditech Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Reverse Buyer Parties or the property of the Reverse Buyer Parties with respect to any Ditech Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Reverse Buyer Parties with respect to any Ditech Released Claim; and

(d)        The Reverse Buyer Parties and its respective Affiliates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any Reverse Buyer Released Claim against the Debtor Parties; (ii) continuing or commencing any action or other proceeding with respect to any Reverse Buyer Released Claim against the Debtor Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the Debtor Parties or property of the Debtor Parties with respect to any Reverse Buyer Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor Parties or the property of the Debtor Parties with respect to any Reverse Buyer Released Claim; and (v) asserting any right of setoff, subrogation,

or recoupment of any kind against any obligations due to the Debtor Parties with respect to any Reverse Buyer Released Claim.

(e)     Notwithstanding anything in this paragraph 23 or any Confirmation and Sale Documents, nothing in the Confirmation and Sale Documents shall affect or limit in any way any defenses or claim held by a Borrower against the Reverse Buyer or any third party or their affiliates or assigns for pre-existing liability that the Reverse Buyer or any third party would otherwise have to such Borrower had the Reverse Buyer not acquired the Acquired Assets.

Dated: _____, 2019
　　　　New York, New York

_____
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

WEIL:\97193783\1\41703.0011

**Asset Purchase Agreement[1]**

**IT IS HEREBY FOUND AND DETERMINED THAT:**

      A.     <u>**Findings of Fact and Conclusions of Law**</u>. The findings and conclusions set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are adopted as such.

      B.     <u>**Jurisdiction**</u>. This Court has jurisdiction over the sale of the Acquired Assets from Debtors Ditech Holding Corporation and Ditech Financial LLC (together, the "**Sellers**") to the Forward Buyer and the assumption of the Assumed Liabilities by the Forward Buyer (the "**Forward Sale Transaction**") pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

      C.     <u>**Notice and Opportunity to Object**</u>. As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, the Sale Transaction, including the Forward Sale Transaction, the Asset Purchase Agreement, the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Forward Business)* [ECF No. 722], the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824], the *Supplemental Notice of Cure Costs and Potential*

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan, the Asset Purchase Agreement, or the Bidding Procedures Order, as applicable, or as the context otherwise requires.

*Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 834], the *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors (Forward Buyer)* [ECF No. 840] (the "**Initial Assumption and Assignment Notice**"), *Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Initial Notice (Forward Buyer)* [ECF No. 1014] (the "**Supplemental Assumption and Assignment Notice**"), *Second Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Initial Notice (Forward Buyer)* [ECF No. 1099] (the "**Final Assumption and Assignment Notice**"), the Third Amended Plan, and the Confirmation Hearing have been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and Entities.

D. **Title to the Acquired Assets**. Subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, the Acquired Assets are owned by the Debtors and constitute property of the Debtors' Estates, and good title is presently vested in the Debtors' Estates within the meaning of section 541(a) of the Bankruptcy Code.[2] Except as provided in the Asset Purchase Agreement and subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, the Debtors are the sole and rightful owners of the Acquired Assets, with all right, title and interest to transfer and convey the

---

[2]  Pursuant to the DIP Facilities, certain of the Acquired Assets consisting of mortgage loans originated or acquired by the Debtors are currently subject to "repurchase agreements" as defined under Section 101(47) of the Bankruptcy Code.

WEIL:\97193817\1\41703.0011

Acquired Assets to the Forward Buyer, and no other Person or Entity has any ownership right, title, or interest therein.

E. **Extensive Efforts by Debtors**.  As of the Commencement Date and for a period of more than nine months preceding the Commencement Date, the Debtors, with the assistance of their counsel and other advisors, evaluated strategic alternatives including extensive marketing efforts.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a possible sale of all or substantially all of the Debtors' assets.  The Forward Sale Transaction is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' Estates for the benefit of creditors.

F. **Business Justification**.  The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for this Court to approve the Forward Sale Transaction, the Asset Purchase Agreement, and the Related Agreements pursuant to sections 1123(a)(5), 1123(b) and 1141(c) of the Bankruptcy Code.  In light of the circumstances of these Chapter 11 Cases and the risk of deterioration in the going concern value of the Acquired Assets pending consummation of the Forward Sale Transaction, time is of the essence in (i) consummating the Forward Sale Transaction, (ii) preserving the value of the Acquired Assets and the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their Estates, and their creditors and employees.  The Debtors' entry into and performance under the Asset Purchase Agreement: (x) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties;

(y) provide value to and are beneficial to the Debtors' Estates, and are in the best interests of the Debtors and their Estates, creditors and other parties in interest; and (z) are reasonable and appropriate under the circumstances.

G. **Compliance with Bidding Procedures**. The Bidding Procedures were substantively and procedurally fair to all Persons, including all potential bidders. The Bidding Procedures afforded adequate notice and a full, fair, and reasonable opportunity for any Person or Entity to make a higher or otherwise better offer to purchase the Acquired Assets. The Debtors, the Forward Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.

H. **Adequate Marketing; Highest or Best Offer**. Other than the Asset Purchase Agreement, no Qualified Bids for the Acquired Assets were received by the Debtors before the Bid Deadline. The Debtors cancelled the Auction in accordance with the Bidding Procedures Order and, on July 10, 2019, caused the *Notice of (I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful Bidders* [ECF No. 830] to be filed with the Court identifying the Forward Buyer as the Successful Bidder in accordance with the Bidding Procedures. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Confirmation Hearing, and (ii) the representations of counsel made on the record at the Confirmation Hearing, (a) the Debtors and their advisors have adequately marketed the Acquired Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order; (b) full, fair, and reasonable opportunity was given to all Persons and Entities to make a higher or otherwise better offer to purchase the Acquired Assets; (c) no Person or Entity, other than the Forward Buyer, timely submitted a Qualified Bid in accordance with the Bidding Procedures Order; (d) the Forward Buyer submitted the highest and

best bid for the Acquired Assets and was properly designated as the Successful Bidder; (e) the consideration provided by the Forward Buyer under the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (f) the consideration provided by the Forward Buyer for the Acquired Assets under the Asset Purchase Agreement is reasonably equivalent value, fair consideration and fair value for the Acquired Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing; (g) the consideration provided by the Forward Buyer for the Acquired Assets under the Asset Purchase Agreement is reasonably equivalent value and fair consideration under the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act, respectively; (h) taking into consideration all relevant factors and circumstances, the Forward Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (i) no other Person or Entity has offered to purchase the Acquired Assets for greater economic or non-economic value to the Debtors or their Estates; and (j) the Debtors' determination that the Forward Sale Transaction and the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid, sound and reasonable exercise of the Debtors' business judgment.

I.    **Good Faith; No Collusion**.  The Asset Purchase Agreement and all aspects of the Forward Sale Transaction were negotiated, proposed, and entered into by the Debtors and the Forward Buyer and each of their management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, in good faith, without collusion or fraud, and from arm's-length bargaining positions.  The Forward Buyer is a "good faith purchaser" of the Acquired Assets.  The Forward Buyer has proceeded in good faith

WEIL:\97193817\1\41703.0011

in all respects in that, among other things: (i) the Forward Buyer has recognized that the Debtors were free to deal with any other Person or Entity in connection with the marketing and sale of the Acquired Assets; (ii) the Forward Buyer has complied with the applicable provisions of the Bidding Procedures Order in all respects; (iii) the Forward Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Forward Buyer under the Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Forward Buyer and the Debtors in connection with the Forward Sale Transaction have been disclosed and are reasonable and appropriate. The Purchase Price was not controlled by any agreement among potential bidders and neither the Debtors nor the Forward Buyer, nor any affiliate of the Forward Buyer, have engaged in collusion, fraud, or any conduct that would cause or permit the any aspect of the Forward Sale Transaction, including, without limitation, the Asset Purchase Agreement or any Related Agreement, to be avoided or costs or damages to be imposed. Accordingly, no aspect of the Forward Sale Transaction, including, without limitation, the Asset Purchase Agreement or any Related Agreement, may be avoided and no Person or Entity shall be entitled to costs, damages or any other recovery. Specifically, the Forward Buyer has not acted in a collusive manner with any Person or Entity.

J.     **Opportunity to Object**. In compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and the Bidding Procedures Order, a fair and reasonable opportunity to object or be heard with respect to the Third Amended Plan, the Forward Sale Transaction, and the Asset Purchase

WEIL:\97193817\1\41703.0011

Agreement have been afforded to all interested Persons and Entities, including, without limitation, the Objection Notice Parties.

K. **Sale in Best Interests**. The actions represented to have been taken, or to be taken, by the Sellers and the Forward Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their Estates, creditors, and all other parties in interest. Approval of the Asset Purchase Agreement and of the Forward Sale Transaction is in the best interests of the Debtors, their Estates, creditors, and all other parties in interest.

L. **Prompt Consummation**. The Asset Purchase Agreement and the Forward Sale Transaction must be approved and consummated as promptly as practicable in order to preserve the value of the Acquired Assets and the viability of the business to which the Acquired Assets relate as a going concern.

M. **Corporate Authority**. Each of the Sellers (i) has full organizational power and authority to execute the Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby, and the Forward Sale Transaction has been duly and validly authorized by all necessary organizational action of each of the applicable Debtors, (ii) has all of the organizational power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby, (iii) has taken all organizational action necessary to authorize and approve the Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby and the consummation by the Debtors of the Forward Sale Transaction, and (iv) needs no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement and the

WEIL:\97193817\1\41703.0011

Related Agreements, from any other Person or Entity to consummate the Forward Sale Transaction.

N.     **Binding and Valid Transfer**.  The transfer of the Acquired Assets to the Forward Buyer will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Assumed Liabilities, the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, will vest the Forward Buyer with all right, title, and interest of the Sellers in and to the Acquired Assets free and clear of all Liens[3] of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor or transferee liability; provided, however, that, nothing in this Order shall be deemed or construed as a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets.

O.     **Section 363(o) of the Bankruptcy Code**.  The Forward Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Forward Sale Transaction if the sale of the Acquired Assets was not free and clear of all Liens, including, without limitation, if the Forward Buyer would, or in the future could, be liable for any claims that are the

---

[3]     The Asset Purchase Agreement defines (i) "**Lien**" as any mortgage, pledge, lien, charge, deed of trust, Claim, lease, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license, covenant or other right to or under Intellectual Property; and (ii) "**Claims**" as all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off.

subject of section 363(o) of the Bankruptcy Code, except as provided under Sections 4.6(b) or 5.6(d) of the Third Amended Plan.

P.    The Purchase Price was calculated in a manner consistent with the Forward Buyer's reliance on this Order to vest the Forward Buyer with all right, title and interest in and to the Acquired Assets free and clear of all Claims, including, without limitation, any claims that are the subject of section 363(o) of the Bankruptcy Code. For the avoidance of doubt, notwithstanding any other provisions of the (i) Order (including the Schedules), (ii) the Third Amended Plan, (iii) the Plan Supplement, (iv) the Sale Transactions (including any order or purchase agreements related thereto), and (v) any amended versions of the foregoing (the "**Confirmation and Sale Documents**"), nothing in the Confirmation and Sale Documents shall be deemed to (a) limit or alter Borrowers' express rights under the Third Amended Plan, including, inter alia, Sections 4.6(b), 5.2(c), and 5.6(d) of the Third Amended Plan, or (b) otherwise modify the CCC Settlement.

Q.    **Necessity of Order**. The Forward Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Forward Sale Transaction without all of the relief provided for in this Order (including, without limitation, that, in each case other than the assumption of the Assumed Liabilities, except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, (1) the transfer of the Acquired Assets to the Forward Buyer be free and clear of all Liens, including rights or Claims based upon successor or transferee liability, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing Date, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing Date, and (2) the Forward Buyer not be liable for any Cure Costs (except up to the Buyer Cure Cap) or any other pre-Closing Liabilities with respect to any Assigned Contracts (as defined below)). The

WEIL:\97193817\1\41703.0011

consummation of the Forward Sale Transaction pursuant to this Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their Estates for the benefit of all creditors and other parties in interest. The Forward Buyer has agreed to the Forward Sale Transaction with the intent of purchasing the Acquired Assets and does not and would not agree to assume any Liabilities other than the Assumed Liabilities.

R. **Cure Notices**. As evidenced by the affidavits of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Confirmation Hearing, the Cure Notices (as defined below) on each non-Debtor counterparty to the Assigned Contracts (each, a "**Counterparty**" and collectively, the "**Counterparties**"), dated July 8, 2019, July 11, 2019, and July 26, 2019, which provided notice of the Debtors' intent to assume and assign such Assigned Contracts (to the extent the Assign Contract is an executory contract or lease) and notice of the related proposed Cure Costs upon each Counterparty. The service of the Cure Notices was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Contracts. *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824], *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 834], *Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 1013] (each, a "**Cure Notice**" and together, the "**Cure Notices**"); *see also Affidavits of Service* [ECF Nos. 867, 868, 900, 1048]. All Counterparties (to the extent the Assigned Contract is an executory contract or lease and was listed on the Cure Notices) have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice and

WEIL:\97193817\1\41703.0011

to the assumption and assignment of the Assigned Contracts to the Forward Buyer in accordance with the Bidding Procedures Order.

S.  **Assumption and Assignment of Assigned Contracts**. It is a valid exercise of the Debtors' reasonable and sound business judgment to assume and assign the Assigned Contracts to the Forward Buyer in connection with the consummation of the Forward Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their Estates and creditors, and all other parties in interest. The assumption and assignment of the Assigned Contracts being assigned to the Forward Buyer or its designees (i) is an integral part of the Acquired Assets being purchased by the Forward Buyer, (ii) allows the Debtors to sell the Acquired Assets to the Forward Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Contracts, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' Estates by avoiding the rejection of the Assigned Contracts.

T.  **Validity of the Transactions**.  As of the Closing Date, the Debtors' assumption and assignment of the Assigned Contracts to the Forward Buyer or its designees will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Forward Buyer with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims against the Debtors in accordance with the terms of this Order and the Third Amended Plan, including Sections 4.6(b) and 5.6(d) thereof.  The consummation of the Forward Sale Transaction is legal, valid and properly authorized under all applicable provisions of the

WEIL:\97193817\1\41703.0011

Bankruptcy Code and the Bankruptcy Rules, and all of the applicable requirements of such applicable provisions have been complied with in respect of the Forward Sale Transaction.

U. **Cure/Adequate Assurance**. Other than with respect to the Adjourned Cure/Adequate Assurance Objections, the Debtors and the Forward Buyer (in the case of the Forward Buyer, subject to the Buyer Cure Cap) have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing under any of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the of the Bankruptcy Code. For the avoidance of doubt, all objections identified on Exhibit A to the Debtors' Agenda [ECF No. 1091] that are not resolved are adjourned. Unless otherwise agreed to by the parties, the Cure Costs set forth in the Cure Notices are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assigned Contracts. The Forward Buyer's promise to perform the obligations under the Assigned Contracts after the Closing Date shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. For the avoidance of doubt, all post-Confirmation, pre-Effective Date accrued amounts due under such Assigned Contracts, to the extent not covered by the Buyer Cure Cap, shall be satisfied by the Debtors. All Counterparties who failed to timely file an objection to the assumption and assignment of the Assigned Contracts in accordance with the Third Amended Plan, the Initial Assumption and Assignment Notice, the Supplemental Assumption and Assignment Notice, and the Final Assumption and Assignment Notice are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Forward Buyer or its designees. To the extent not resolved and/or adjourned at or prior to the Confirmation Hearing, the objections of all

Counterparties of Assigned Contracts that did file a timely objection to the assumption and assignment of such Counterparties' respective Assigned Contracts relating thereto were heard at the Confirmation Hearing (to the extent not withdrawn), were considered by the Court, and are overruled on the merits with prejudice; provided, however, that to the extent an objection of a Counterparty, or unresolved portion thereof, relates solely to Cure Costs (a "**Cure Dispute**"), the Debtors may assume and assign the applicable Assigned Contract(s) prior to the resolution of the Cure Dispute, provided that the Debtors or the Forward Buyer (subject to the Buyer Cure Cap) reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the applicable Counterparty (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such Counterparty and the applicable Debtor). The Court finds that with respect to all such Assigned Contracts the payment of the Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 1123(b)(2) and 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtors to the Forward Buyer or its designees of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Forward Buyer in accordance with the terms of the Order that are applicable to the Acquired Assets, and the Forward Buyer shall have no liability or obligation for any (a) defaults or breaches under such agreement that relate to acts or omissions that occurred or otherwise arose during the period prior to the date of the entry of the Order, and (b) Claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including without limitation,

WEIL:\97193817\1\41703.0011

any right of recoupment) with respect to such Assigned Contract, that relate to any acts or omissions that arose or occurred prior to the date of the entry of this Order.

V. Notwithstanding anything else contained in this Order, this Court has not found that the Debtors have demonstrated that the proposed transactions, pursuant to which the Debtors propose to transfer to the Forward Buyer the servicing and servicing-related rights and obligations the Debtors hold with respect to the PLS Trusts[4] (i) will result in the cure of all applicable defaults under the relevant agreements nor (ii) provide the PLS Trustees with adequate assurance of future performance, in each case as required pursuant to section 365 of the Bankruptcy Code. In the event the Debtors and the PLS Trustees resolve the foregoing, as well as any other outstanding issues, the Debtors will seek entry of a separate order in respect of such resolution. If such disputes cannot be resolved, the Debtors may seek a determination by the Court upon adequate notice to be given by the Debtors.

W. **Surety**. The Forward Buyer has indicated that the only surety bond issued by International Fidelity Insurance Company or Allegheny Casualty Company (collectively, "**Surety**") in connection with the business operations of the Debtors and/or non-debtor affiliate(s) (each, a "**Bond**") that the Forward Buyer may need to rely on or replace prior to the termination of the given Bond pursuant to its terms, is the Bond issued by Surety bearing number 0743440. The Forward Buyer shall not rely on any other Bond absent the express consent of Surety. The Forward Buyer will not acquire the Acquired Assets related to the Bond bearing number 0743440 issued by International Fidelity Insurance Co. ("**IFIC**") until it acquires a replacement bond or

---

[4] The Bank of New York Mellon Trust Company, The Bank of New York Mellon, Deutsche Bank National Trust Company, and U.S. Bank National Association, each on its own behalf and in its various capacities as trustee, co-trustee, indenture trustee, registrar, custodian and other agency roles and on behalf of certain affiliates in similar roles are referred to in such capacities, collectively as the "**PLS Trustees**" in connection with certain private label securitization trusts or similar structures (the "**PLS Trusts**").

WEIL:\97193817\1\41703.0011

issues a standby letter of credit in favor of IFIC in an amount deemed sufficient by IFIC to collateralize the penal amount of the Bond bearing number 0743440. From and after the closing of the Forward Sale Transaction until the later of (a) the second anniversary thereof or (b) the time required under Forward Buyer's record retention policies, the Forward Buyer shall not knowingly destroy any books or records that it may possess pertaining to any of the obligations of the Debtors and/or their non-debtor affiliate(s) (or Forward Buyer, to the extent applicable) which relate to the Bonds, including, without limitation, the Bond bearing number 0743440 and, if the Surety receives a claim under any of the Bonds, any books and/or records that may then be in the possession of the Forward Buyer related to such claim shall be produced to the Surety upon its written request.

X.    **Valid and Binding Contract**.  The Asset Purchase Agreement and the Related Agreements are valid and binding contracts between the Debtors and the Forward Buyer and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, or possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.  None of the Debtors or the Forward Buyer is, or will be, entering into the Asset Purchase Agreement, the Related Agreements and the transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Forward Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without

WEIL:\97193817\1\41703.0011

posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person or Entity.

Y. **Unenforceability of Anti-Assignment Provisions**. Anti-assignment provisions in any Assigned Contract—including any provisions requiring rating agency confirmation, "no downgrade" letters, any other third party consent, or of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code—shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and are unenforceable anti-assignment provisions in connection with the Forward Sale Transaction within the meaning of section 365(f) of the Bankruptcy Code.

Z. **Personally Identifiable Information**. The Debtors have provided certain privacy policies to consumers that govern the disclosure of "personally identifiable information" (as defined in Bankruptcy Code section 101(41A)) to unaffiliated third parties. Although sections 332 and 363(b)(1) do not apply to sales pursuant to a chapter 11 plan, the Debtors have complied and will continue to comply with these privacy policies in accordance with both sections and the Gramm-Leach-Bliley Act, consistent with the recommendation of the Ombudsman in the Ombudsman Report [ECF No. 1237].

AA. **Final Order**. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. **Approval**. Pursuant to sections 1123(b)(4) and 1141(c) of the Bankruptcy Code, the sale and transfer of the Acquired Assets to the Forward Buyer in accordance with the terms of the Third Amended Plan and the Asset Purchase Agreement and the Related Agreements,

WEIL:\97193817\1\41703.0011

and all transactions contemplated thereby, and all of the terms and conditions thereof, are authorized and approved. The failure to specifically reference any particular provision of the Asset Purchase Agreement or any of the Related Agreements in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Forward Buyer and the Debtors in connection with the Forward Sale Transaction, and each and every provision, term, and condition thereof be authorized and approved in its entirety.

2.      **Binding Effect of Order**.  This Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Claims (including holders of rights or claims based on any successor or transferee liability), all Counterparties, all successors and assigns of the Forward Buyer, each of the Sellers and their Affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in these Chapter 11 Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code.

3.      **Injunction**.  All Persons and Entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Forward Buyer in accordance with the Asset Purchase Agreement and this Order.  On and after the Closing, except for Persons or Entities entitled to enforce Assumed Liabilities and Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, all Persons and Entities (including, but not limited to, the Debtors and/or their respective successors (including any trustee), creditors, investors, certificate holders, securitization trustees, borrowers, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any

authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Claims against the Acquired Assets or against the Debtors in respect of the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Claims of any kind or nature whatsoever (including, without limitation, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing) against the Forward Buyer or any Affiliate of the Forward Buyer or any of their respective property, successors and assigns, or the Acquired Assets, as an alleged successor or on any other grounds, it being understood that nothing herein shall affect assets of the Debtors that are not Acquired Assets.

4. Except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, upon the transfer or assignment of the Assigned Contracts to the Forward Buyer, each Counterparty to an Assigned Contract is hereby forever barred, estopped, and permanently enjoined from asserting against the Acquired Assets, the Forward Buyer, its Affiliates or its or their respective property (a) any setoff, defense, recoupment, Claim, counterclaim or default asserted or assertable against, or otherwise delay, defer or impair any rights of the Forward Buyer with respect to the Acquired Assets with respect to an act or omission of, the Debtors, or (b) any rent acceleration, assignment fee, default, breach or Claim, or pecuniary loss or condition to assignment or transfer, arising under or related to an Assigned Contract existing as of the Closing, or arising by reason of the Closing. No delay or failure of performance under or in respect of any Excluded Contract will (i) affect any right of the Forward Buyer, or any obligation of any other Person or Entity, including any Counterparty, under any Assigned Contract or (ii) permit, result in

or give rise to any setoff, delay, deferral, defense, recoupment, Claim, interest, counterclaim, default or other impairment of the right to receive any payment or otherwise to enforce any other rights under any Assigned Contract.

5.      Except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, no Person or Entity shall assert, and the Forward Buyer and the Acquired Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), Claims or Liabilities, of any kind or nature whatsoever to delay, defer, or impair any right of the Forward Buyer or the Debtors, or any obligation of any other Person or Entity, under or with respect to, any Acquired Assets (including, without limitation, an Assigned Contract), with respect to any act or omission that occurred prior to the Closing or with respect to any Excluded Contract or any obligation of Debtors that is not an Assumed Liability.

6.      **General Assignment**.  Upon the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer by the Sellers of the Acquired Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title, and interest in and to the Acquired Assets to the Forward Buyer.  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Forward Sale Transaction.

7.      **Fair Purchase Price**.  The consideration provided by the Forward Buyer under the Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair

consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under the laws of the United States, any state, territory, possession thereof, the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

8. **Consummation of the Forward Sale Transaction**. The Debtors, their Affiliates, and their respective officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the Asset Purchase Agreement, the Related Agreements and all additional instruments and documents that the Debtors or the Forward Buyer deem necessary or appropriate to implement the Asset Purchase Agreement or the Related Agreements and effectuate the sale and transfer of the Acquired Assets to the Forward Buyer, and to take all further actions as may be reasonably requested by the Forward Buyer for the purpose of assigning, transferring, granting, and conveying to and conferring on the Forward Buyer, or reducing to the Forward Buyer's possession, the Acquired Assets or as may be necessary or appropriate to the performance of the parties' obligations under the Asset Purchase Agreement, the Related Agreements and the Third Amended Plan, including any and all actions reasonably requested by the Forward Buyer that are consistent with the Asset Purchase Agreement and the Related Agreements and the assumption and assignment of the Assigned Contracts, and any and all instruments and documents entered into in connection therewith shall be deemed authorized, approved, and consummated without further order of the Court.

9. **Direction to Release Liens**. As of the Closing, each of the Sellers' creditors and any other holder of a Lien, including rights or Claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien on or against the Acquired Assets, if any, as such Lien may

have been recorded or may otherwise exist. If any Person or Entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Claims in or against the Debtors or the Acquired Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Liens the Person or Entity has with respect to the Debtors or the Acquired Assets or otherwise, then, with regard to the Acquired Assets that are purchased by the Forward Buyer pursuant to the Asset Purchase Agreement and this Order: (i) the Debtors are hereby authorized and directed to, and the Forward Buyer is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the applicable Person or Entity with respect to the Acquired Assets; (ii) the Forward Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens against the Acquired Assets; and (iii) the Forward Buyer may seek in this Court or any other court to compel appropriate Persons or Entities to execute termination statements, instruments of satisfaction, and releases of all Liens with respect to the Acquired Assets other than the Assumed Liabilities, the Permitted Liens, or as set forth in Sections 4.6(b) or 5.6(d) of the Third Amended Plan; provided that, notwithstanding anything in the Order or the Asset Purchase Agreement to the contrary, the provisions of this Order shall be self-executing, and neither the Sellers nor Forward Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of the Order. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

WEIL:\97193817\1\41703.0011

10.     **Surrender of Possession**.  All Persons or Entities that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Forward Buyer as of the Closing or at such later time as the Forward Buyer reasonably requests.  To the extent required by the Asset Purchase Agreement or the Related Agreements, the Debtors agree to exercise commercially reasonable efforts to assist the Forward Buyer in assuring that all Persons or Entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing or (ii) the Forward Buyer on or after the Closing.

11.     **Direction to Government Agencies**.  The Asset Purchase Agreement is binding on all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons or Entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease (the "**Recordation Officers**").  Each and every Recordation Officer is authorized, from and after the Closing, to strike all Liens, Claims, interests, or other encumbrances in, on or against the Acquired Assets (other than Assumed Liabilities and the Permitted Liens) from their records, official and otherwise, without further order of the Court or act of any Person or Entity.  Each and every Recordation Officer is authorized (i) to file, record, and/or register any and all documents and instruments presented to consummate or memorialize the Asset Purchase Agreement, and (ii) to accept and rely on this Order as the sole and sufficient evidence of the transfer of the Acquired Assets to the Forward Buyer.

12.     **No Interference**.  Following the Closing, no holder of any Lien or Claim shall interfere with the Forward Buyer's title to, or use and enjoyment of, the Acquired Assets based on, or related to, any such Lien or Claim, or based on any actions the Debtors may take in their Chapter 11 Cases.

13.     **No Discriminatory Treatment**.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Forward Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Forward Sale Transaction.

14.     **The Forward Sale Transaction is Not Subject to Section 363(o) of the Bankruptcy Code**.  The Forward Sale Transaction is not and shall not be deemed or construed to be a sale pursuant to section 363 of the Bankruptcy Code, and section 363(o) of the Bankruptcy Code does not and shall not be deemed or construed to apply to the Forward Sale Transaction.

15.     **Transfer of the Acquired Assets Free and Clear**.  Except for the Assumed Liabilities, the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, pursuant to sections 105(a), 1123(b)(4) and 1141(c) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Forward Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Liens asserted by any Person or Entity (including, without limitation, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing) and any and all rights and claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute or otherwise and whether occurring or arising before, on or after the

WEIL:\97193817\1\41703.0011

Commencement Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens to attach to the proceeds of the Forward Sale Transaction ultimately attributable to the property against or in which the holder of a Lien asserts or may assert a Lien, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

16.     **Valid Transfer**.  Upon the Closing, the transfer of the Acquired Assets to the Forward Buyer shall: (i) be valid, legal, binding and effective; (ii) vest the Forward Buyer with all right, title and interest of the Debtors in and to the Acquired Assets; and (iii) be free and clear of all Liens of any kind or nature whatsoever, other than the Assumed Liabilities and the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.

17.     **No Successor or Other Derivative Liability**.  By virtue of the Forward Sale Transaction, the Forward Buyer and its Affiliates, and its and their respective successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and neither the Forward Buyer nor its Affiliates, nor any of its or their respective successors or assigns have assumed or are in any way responsible for any liability or obligation of the Debtors or the Debtors' Estates, except with respect to the Assumed Liabilities or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.  Except as expressly set forth in the Asset Purchase Agreement, neither the Forward Buyer nor its Affiliates, nor its or their respective successors or assigns shall have any successor, transferee or vicarious

liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

18. Except as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan or as expressly set forth herein or in the Asset Purchase Agreement, neither the Forward Buyer, nor its Affiliates, nor its successors or assigns shall have any liability for any Lien or Claim against the Debtors or the Debtors' Estates or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Arrangements and any participation or other agreements related to the Employee Arrangements, or the termination of

WEIL:\97193817\1\41703.0011

any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (U) the "claims and defenses" that are the subject of section 363(o) of the Bankruptcy Code; and (V) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

19.     **Application of Proceeds of Forward Sale Transaction**.  The net proceeds of the Forward Sale Transaction from the Acquired Assets upon which the DIP Credit Parties (as defined in the DIP Order) have a first lien shall be used to repay in full in cash all DIP Obligations (as defined in the DIP Order) on the Closing and all other Claims (including, without limitation, contingent indemnification obligations) that represent interests in property shall attach to the net proceeds of the Forward Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.

20.     **Transition Services**.  Pursuant to the Asset Purchase Agreement, the Parties shall enter into a Transition Services Agreement on the Closing Date, substantially in the form attached to the Asset Purchase Agreement as Exhibit E, pursuant to which the Sellers shall provide to the Forward Buyer and the Forward Buyer shall provide to the Sellers, as applicable, certain services for a specified time period following the Closing Date.  The Forward Buyer and the Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Asset Purchase Agreement, and to perform all such other and further acts as may be required under or in connection with the Transition Services Agreement, including, without limitation, executing the Transition Services Agreement and performing and receiving services thereunder.

21.     **Not an Insider**.  As of the date hereof, the Forward Buyer is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Forward Buyer.

WEIL:\97193817\1\41703.0011

22.    **Assumption and Assignment of Assigned Contracts**.    Pursuant to sections 1123(b)(2) and 365 of the Bankruptcy Code and subject to and conditioned upon the Closing, the Debtors are hereby authorized to assume and assign the Assigned Contracts to the Forward Buyer or its designees free and clear of all Liens and Claims to the extent set forth in this Order, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

23.    The Debtors are hereby authorized to execute and deliver to the Forward Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contacts to the Forward Buyer or its designees as provided in the Asset Purchase Agreement.  With respect to each of the Assigned Contracts, the Debtors or the Forward Buyer, in accordance with the provisions of the Third Amended Plan and Asset Purchase Agreement, has cured or will cure before the Closing (subject to the Buyer Cure Cap), or have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Assigned Contracts under sections 1123(b)(2) and  365(b)(1) of the Bankruptcy Code, and the Forward Buyer has provided adequate assurance of future performance under the Assigned Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparty to such Assigned Contracts.  Upon the Closing Date or the applicable date of assumption and assignment with respect to an Assigned Contract, the Forward Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Contract and, pursuant to sections 1123(b)(2) and 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Assigned Contract occurring after such assumption and assignment to the Forward Buyer or its designees.  The Forward Buyer acknowledges and agrees

that from and after the applicable date of assumption and assignment with respect to an Assigned Contract, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Contract in its entirety, including any indemnification obligations expressly contained in such Assigned Contract that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Order. The assumption by the Debtors and assignment to the Forward Buyer or its designees of any Assigned Contract shall not be a default under such Assigned Contract. To the extent any Assigned Contract provides that any Person's or Entity's consent is required as a condition to the assignment of such Assigned Contract, such consent requirement shall be deemed satisfied by virtue of the findings and conclusions in this Order and shall be of no further force or effect.

24. The Debtors served all Counterparties to the Assigned Contracts with the Initial Assumption and Assignment Notice, the Supplemental Assumption and Assignment Notice, and the Final Assumption and Assignment Notice, and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Forward Buyer has passed. Accordingly, unless an objection to the proposed Cure Costs or adequate assurance information with respect to the Forward Buyer was filed and served before the applicable deadline, each Counterparty to an Assigned Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Forward Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Confirmation Hearing if such default was not raised or asserted prior to or at the Confirmation Hearing.

25. All of the requirements of sections 1123(b)(2), 365(b), and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs

required under the Bankruptcy Code have been satisfied for the assumption by the Debtors and assignment to the Forward Buyer or its designees of all Assigned Contracts. The Forward Buyer has satisfied its adequate assurance of future performance requirements with respect to the Assigned Contracts and demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Assigned Contracts.

26. To the extent a Counterparty to an Assigned Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the applicable Cure Notice and any such Counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

27. The failure of the Sellers or the Forward Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Forward Buyer's rights to enforce every term and condition of the Assigned Contracts.

28. **Ipso Facto Clauses Ineffective**. Except as otherwise specifically provided for by order of this Court or the Asset Purchase Agreement, the Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Forward Buyer, notwithstanding any provision in any such Assigned Contract (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no, and all Counterparties to any Assigned Contract are forever barred and permanently enjoined from raising or asserting against the Debtors or the Forward Buyer any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Forward Buyer or the

Debtors as a result of the assumption or assignment of the Assigned Contracts or the Closing to the maximum extent permitted by the Bankruptcy Code.

29.     Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Contracts to the Forward Buyer or its designees under the provisions of this Order, no default shall exist under any Assigned Contracts, and no Counterparty to any Assigned Contracts shall be permitted to declare a default by any Debtor or the Forward Buyer or otherwise take action against the Forward Buyer as a result of any Debtor's financial condition, servicer rating, bankruptcy or failure to perform any of its obligations under the relevant Assigned Contract. Any provision in an Assigned Contract that prohibits or conditions the assignment of such Assigned Contract or allows the Counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect solely in connection with the transfer thereof pursuant to this Order. The failure of the Debtors or the Forward Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Forward Buyer's rights to enforce every term and condition of the Assigned Contract.

30.     **Bulk Sale**. No law of any state or other jurisdiction, including any bulk sales law or similar law, shall apply in any way to the transactions contemplated by the Asset Purchase Agreement and this Order.

31.     **No Avoidance of Asset Purchase Agreement**. Neither the Debtors nor the Forward Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed. Accordingly, the Asset Purchase

Agreement and the Forward Sale Transaction shall not be avoidable under chapter 5 of the Bankruptcy Code, and no Person or Entity shall be entitled to any damages or other recovery under the Bankruptcy Code in respect of the Asset Purchase Agreement or the Forward Sale Transaction.

32.     **Modification of Asset Purchase Agreement**.     The Asset Purchase Agreement and the Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or the Related Agreements, documents or other instruments or have any adverse effect on the Debtors' Estates.

33.     **No Stay of Order**.     This Order shall be effective immediately upon entry, and the Debtors and the Forward Buyer are authorized to close the Forward Sale Transaction immediately upon entry of this Order.     Time is of the essence in closing the Forward Sale Transaction in accordance with the terms of the Asset Purchase Agreement, and the Debtors and the Forward Buyer intend to close the Forward Sale Transaction as soon as practicable.     Any Person or Entity objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk its appeal being foreclosed as moot.

34.     **Releases**.     Upon entry of this Order approving the Forward Sale Transaction contemplated by the Asset Purchase Agreement, except for the rights and obligations (i) of the Debtors or the Forward Buyer under the Asset Purchase Agreement and the Related Agreements and (ii) identified in Paragraph 37 below, in connection with the Asset Purchase Agreement and for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the Forward Buyer's payment of the Purchase Price under the Asset Purchase

Agreement, and in acknowledgement that, at the time of issuance of termination notices of the Subservicing Agreement dated as of August 8, 2016 between New Residential Mortgage LLC ("**NRM**") and Ditech Financial LLC (as amended, the "**Subservicing Agreement**") by NRM, certain termination events had occurred under Section 5.3 of the Subservicing Agreement permitting a termination for cause of the Subservicing Agreement with respect to all mortgage loans, which termination events had not been timely cured or remedied (if applicable):

(a)      the Debtors and their controlled Affiliates, on behalf of themselves and, to the extent applicable, their Estates, shall and shall be deemed to fully, finally, and completely remise, release, acquit, and forever discharge the NRZ Parties[5] and their respective property of and from any and all claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted or unasserted, fixed or contingent, matured or unmatured, existing or having arisen up to and including the signing of the Asset Purchase Agreement, whether in contract, tort, or otherwise, whether statutory, at common law, or in equity, including, but not limited to, claims for breach of contract, breach of the implied covenant of good faith and fair dealing, statutory or regulatory violations, for subrogation, indemnity, contribution, or reimbursement, or punitive, exemplary, or extra-

---

[5]   "**NRZ Parties**" means New Residential Investment Corp., New Residential Mortgage LLC, NewRez LLC (f/k/a New Penn Financial, LLC), and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

WEIL:\97193817\1\41703.0011

contractual damages of any type, arising out of, based upon, or relating in any way, in whole or in part, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or implementation of the Asset Purchase Agreement and the Related Agreements, except as expressly set forth therein, (ii) the Debtors' chapter 11 cases, (iii) the Subservicing Agreement, including, but not limited to, the termination thereof and the transfer of rights and transition of the subservicing of loans thereunder, or (iv) any other agreement between the Forward Buyer, NRM, NewRez LLC (f/k/a New Penn Financial, LLC) ("**NewRez**"), and any of their Affiliates, on the one hand, and one or more of the Debtors, on the other hand, or any performance guaranty executed by one or more of the Debtors in favor of the Forward Buyer, NRM, NewRez, and any of their Affiliates (the foregoing released claims, subject to Paragraph 37 below, collectively, the "**Ditech Released Claims**");

(b)     The Forward Buyer, NRM, NewRez and any of their respective Affiliates shall and shall be deemed to fully, finally, and completely remise, release, acquit, and forever discharge the Debtor Parties[6] and their respective property of and from any and all claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted or unasserted, fixed or contingent, matured or unmatured,

---

[6]     "**Debtor Parties**" means the Debtors and their Estates (to the extent applicable), and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

existing or having arisen up to and including the signing of the Asset Purchase Agreement, whether in contract, tort, or otherwise, whether statutory, at common law, or in equity, including, but not limited to, claims for breach of contract, breach of the implied covenant of good faith and fair dealing, statutory or regulatory violations, for subrogation, indemnity, contribution, or reimbursement, or punitive, exemplary, or extra-contractual damages of any type, arising out of, based upon, or relating in any way, in whole or in part, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or implementation of the Asset Purchase Agreement and the Related Agreements, except as expressly set forth therein, (ii) the Debtors' chapter 11 cases, (iii) the Subservicing Agreement, including, but not limited to, the termination thereof and the transfer of rights and transition of the subservicing of loans thereunder, or (iv) any other agreement between the Forward Buyer, NRM, NewRez, and any of their Affiliates, on the one hand, and one or more of the Debtors, on the other hand, or any performance guaranty executed by one or more of the Debtors in favor of the Forward Buyer, NRM, NewRez, and any of their Affiliates (the foregoing released claims, subject to Paragraph 37 below, collectively, the "**NRZ Released Claims**");

> (c)     the Debtors, their controlled Affiliates, and, to the extent applicable, their Estates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any Ditech Released Claim against the NRZ Parties; (ii) continuing or commencing any action or other proceeding with respect to any Ditech Released Claim against the NRZ Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the NRZ Parties or property of the NRZ Parties with respect to any Ditech Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of

WEIL:\97193817\1\41703.0011

any kind against the NRZ Parties or the property of the NRZ Parties with respect to any Ditech Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the NRZ Parties with respect to any Ditech Released Claim; and

(d)       The Forward Buyer, NRM, NewRez, and their respective Affiliates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any NRZ Released Claim against the Debtor Parties; (ii) continuing or commencing any action or other proceeding with respect to any NRZ Released Claim against the Debtor Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the Debtor Parties or property of the Debtor Parties with respect to any NRZ Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor Parties or the property of the Debtor Parties with respect to any NRZ Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Debtor Parties with respect to any NRZ Released Claim.

(e)       Notwithstanding anything in this paragraph 34 or any Confirmation and Sale Documents, nothing in the Confirmation and Sale Documents shall affect or limit in any way any defenses or claim held by a Borrower against the Forward Buyer or any third party or their affiliates or assigns for pre-existing liability that the Forward Buyer or any third party would otherwise have to such Borrower had the Forward Buyer not acquired the Acquired Assets.

35.       For the avoidance of doubt, the Ditech Released Claims, which pursuant to this Order are fully, finally, and completely remised, released, acquitted, and forever discharged, shall not constitute GUC Recovery Trust Causes of Action (or exist or be valid for any other purpose), and neither the GUC Trustee nor anyone else shall have any right to institute, file, prosecute, pursue, or take any other action with respect to the Ditech Released Claims.

36.     For the avoidance of doubt, except in respect of the Subservicing Agreement Claim (as defined below), pursuant to this Order, the NRZ Released Claims are fully, finally, and completely remised, released, acquitted, and forever discharged, notwithstanding any proofs of claim filed by the Forward Buyer, NRM, NewRez and any of their respective Affiliates in connection with the Debtors' chapter 11 cases.  All such proofs of claim shall be disallowed with prejudice, and the NRZ Parties shall not be entitled to any recovery thereon.  Notwithstanding the foregoing, nothing in this Order shall or shall be deemed to disallow, discharge, prejudice, or otherwise modify any proof of claim filed by the Forward Buyer, NRM, NewRez or any of their respective Affiliates to the extent such proof of claim asserts amounts owed to the NRZ Parties under that certain Subservicing Agreement dated August 8, 2016, as amended (the "**Subservicing Agreement Claim**").  Any distribution to the NRZ Parties on account of the Subservicing Agreement Claim shall be made in accordance with the provisions of the Third Amended Plan for distributions to holders of Allowed General Unsecured Claims.

37.     Notwithstanding the entry of this Order or anything to the contrary contained herein, the Ditech Released Claims and the NRZ Released Claims shall not include, and the NRZ Parties and the Debtor Parties shall not be released from: (a) any servicing or document holdback obligations pursuant to any agreement between the Debtors and their controlled Affiliates, on the one hand, and the Forward Buyer, NRM, NewRez and any of their respective Affiliates, on the other hand (the "**Existing Agreements**"), pursuant to which any servicing or document holdback amounts shall continue to be paid to the relevant party thereto in accordance with the terms of the Existing Agreements up to and following the Closing (as defined in the Asset Purchase Agreement); (b) ordinary-course payments due in respect of interest on escrows, recapture and rebates, servicer incentives, remittance of advance recoveries and claims payments

received by Debtors, payment by Debtors of interest on custodial accounts, servicing fees, and other amounts invoiced in the ordinary course of business between the Debtors and their controlled Affiliates, on the one hand, and the Forward Buyer, NRM, NewRez and any of their respective Affiliates, on the other hand, under the Existing Agreements, which shall continue to be paid to the relevant party thereto in accordance with the terms of the Existing Agreements, consistent with past practices, up to and following the Closing (as defined in the Asset Purchase Agreement); or (c) the amounts due and owing between the Debtors and their controlled Affiliates, on the one hand, and the Forward Buyer, NRM, NewRez, and their respective Affiliates, on the other hand, under the Existing Agreements (the "**Existing Agreement Balances**") solely to the extent such amounts are listed on Schedule A to Exhibit G to the Asset Purchase Agreement.

38.     For the avoidance of doubt, subject to Paragraph 37(b) and Paragraph 37(c) above, the Purchase Price (as defined in the Asset Purchase Agreement) shall be payable by the Forward Buyer without any set-off, offset, adjustment, counterclaim, recoupment or any other reduction to the Purchase Price including in connection with any NRZ Released Claim, except as set forth in the Asset Purchase Agreement.

Dated: _____, 2019
      New York, New York

_____
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE