WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X
                     :

**In re**                    :       **Chapter 11**
                     :

**DITECH HOLDING CORPORATION, *et al.*,**  :      **Case No. 19-10412 (JLG)**
                     :

          **Debtors.[1]**       :       **(Jointly Administered)**
                     :

----------------------------------------------------------------X

**MOTION OF DEBTORS PURSUANT TO RULE 9019 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE FOR APPROVAL OF SETTLEMENT WITH
PLS TRUSTEES WITH RESPECT TO OBJECTIONS TO FORWARD STALKING
HORSE AGREEMENT AND REVERSE STALKING HORSE AGREEMENT**

TO THE HONORABLE JAMES L. GARRITY, JR.,
UNITED STATES BANKRUPTCY JUDGE:

        Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its

debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

(collectively, the "**Debtors**"), submit this motion (the "**Motion**") and respectfully represent as follows:

**Background**

1.      Beginning February 11, 2019 (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On February 27, 2019, the United States Trustee for Region 2 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**"). On May 2, 2019, the U.S. Trustee appointed an official committee of consumer creditors (the "**Consumer Creditors' Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.      The Debtors commenced these chapter 11 cases on a prearranged basis and have the support of more than eighty percent (80%) of their term loan lenders.  Consistent with their obligations under that certain Restructuring Support Agreement, dated as of February 8, 2019, the Debtors filed the *Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* on March 5, 2019 (ECF No. 145) (as amended, modified, and supplemented, the "**Plan**") and the accompanying Disclosure Statement (ECF No. 146) (the "**Disclosure Statement**").  On May 10, 2019, the Court entered an order approving the *Amended Disclosure Statement for*

2

*Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 543). The Debtors commenced solicitation of the Plan on May 13, 2019.

5.    On August 28, 2019, the Court issued the *Memorandum Decision on Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1240). On September 11, 2019, after negotiations to resolve, among other things, the Consumer Creditors' Committee's objections to the Plan, the Debtors filed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (ECF No. 1287) (the "**Third Amended Plan**"), which incorporated the terms of a comprehensive settlement with the Consumer Creditors' Committee (the "**CCC Settlement**"). The hearing to consider confirmation of the Third Amended Plan is scheduled for September 25, 2019.

6.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* (the "**Lombardo Declaration**"), sworn and filed on the Commencement Date (ECF No. 2).[2]

### Jurisdiction

7.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Lombardo Declaration or the Plan, as applicable.

## Relief Requested

8.      By this Motion, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors seek approval of a resolution (the "**Resolution**") among (a) the Debtors, and (b) each of the PLS Trustees, which includes (i) the Bank of New York Mellon Trust Company, (ii) the Bank of New York Mellon, (iii) Deutsche Bank National Trust Company, and (iv) U.S. Bank National Association, each on behalf and in its various capacities as trustee, co-trustee, indenture trustee, registrar, custodian, and other agency roles and on behalf of certain affiliates in similar roles (each a "**PLS Trustee**," and collectively, the "**PLS Trustees**" and together with the Debtors, the "**Parties**") pursuant to which the Parties have agreed to resolve the PLS Trustees' Objections (as defined below).  In connection with the Resolution, the Parties seek a finding that each of the Parties have acted reasonably, in good faith and in the best interests of their respective constituencies in entering into the Resolution.  Finally, the Parties seek a finding from the Court that notice of this Motion and of the Resolution (the "**Notice**") is sufficient and effective in satisfaction of due process requirements to put the parties in interest in these chapter 11 cases and the investors in each PLS Trust on notice of the Resolution.

9.      A proposed form of order granting the relief requested herein is attached hereto as **Exhibit A** (the "**Proposed Order**").

## Relevant Background

### I.      The PLS Trusts

10.      Debtors Ditech Financial LLC ("**Ditech**") and Reverse Mortgage Solutions, Inc. ("**RMS**") serve as the mortgage servicers or subservicers for mortgage loans underlying mortgage-backed securities ("**MBS**") pursuant to certain mortgage servicing agreements ("**Servicing Agreements**," or "**Private Investor Servicing Agreements**").  The PLS Trustees serve as, among other things, indenture trustee, co-trustee, or trustee under certain indentures,

pooling and servicing agreements, or other trust governing agreements (collectively, the "**Trust Agreements**").  Certain MBS were issued pursuant to these agreements.

11.     The Debtors, together with their non-debtor subsidiaries, operate as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.  *See* Lombardo Declaration at ¶ 6.  The Debtors' mortgage servicing rights (the "**MSRs**") in forward mortgage loans and reverse mortgage loans are their most valuable assets, and a vital component of their business.  Among those mortgages to which the Debtors own MSRs are mortgages with approximately 230 private-label securitization trusts (the "**PLS Trusts**") sponsored by third parties.  The PLS Trustees are trustees for substantially all of those PLS Trusts.  Each PLS Trust was formed pursuant to a set of trust agreements which provided for administration of trust assets and the related MBS.

12.     During these chapter 11 cases, the Debtors sought and designated stalking horse bidders for their forward mortgage origination and servicing businesses (the "**Forward Business**") and their reverse mortgage servicing business (the "**Reverse Business**").[3]  In accordance with the Bidding Procedures Order, on June 18, 2019, the Debtors filed the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Forward Business)* (ECF No. 722) (the "**Notice of Designation of Stalking Horse Bidder (Forward Business)**") and the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Reverse Business)* (ECF No. 724) (the "**Notice of Designation of Stalking Horse Bidder (Reverse Business)**").

---

[3]     The process of designating the stalking horse bidders was governed by the *Order (I) Approving Bidding Procedures; (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* (ECF No. 456) (the "**Bidding Procedures Order**").

13.     Pursuant to the Notice of Designation of Stalking Horse Bidder (Forward Business), the Debtors announced that (a) the Debtors had accepted a stalking horse bid (the "**Forward Stalking Horse Bid**") submitted by New Residential Investment Corp. (the "**Forward Stalking Horse Buyer**"); (b) Ditech Holding Corporation and Ditech Financial LLC and the Forward Stalking Horse Buyer had executed a stalking horse agreement for the purchase of certain of the Debtors' assets (the "**Forward Stalking Horse Agreement**"); and (c) the estimated Purchase Price (as defined in the Bidding Procedures Order) payable to the Debtors under the Forward Stalking Horse Agreement, assuming the Debtors' March 31, 2019 balance sheet, was estimated to be approximately $1,055 million in cash (approximately $613 million of which would have been required to pay in full the Debtors' obligations under the DIP Facilities that were outstanding as of such date, assuming that the obligations under the RMS DIP Facility had been fully repaid on such date solely with the proceeds of the purchase price under the Reverse Stalking Horse Bid).

14.     Pursuant to the Notice of Designation of Stalking Horse Bidder (Reverse Business), the Debtors announced that (a) the Debtors had accepted a stalking horse bid (the "**Reverse Stalking Horse Bid**" and together with the Forward Stalking Horse Bid, the "**Stalking Horse Bids**") submitted by Mortgage Assets Management, LLC and SHAP 2018-1, LLC (together, the "**Reverse Stalking Horse Buyer**," and together with the Forward Stalking Horse Buyer, the "**Buyers**"), (b) Ditech Holding Corporation, Walter Reverse Acquisition LLC, and Reverse Mortgage Solutions, Inc. and the Reverse Stalking Horse Buyer had executed a stalking horse agreement for the purchase of certain of the Debtors' assets (the "**Reverse Stalking Horse Agreement**," and together with the Forward Stalking Horse Agreement, the "**Stalking Horse Agreements**"); and (c) the estimated Purchase Price (as defined in the Bidding Procedures Order)

payable to the Debtors under the Reverse Stalking Horse Agreement, assuming the Debtors' March 31, 2019 balance sheet, was estimated to be approximately $758 million, based upon management's estimates (approximately $616 million of which would have been required to pay in full the Debtors' obligations under the RMS DIP Facility that were outstanding as of such date).

15.    On July 10, 2019, the Debtors filed the Notice of (I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful Bidders (ECF No. 830), in which the Debtors announced that (a) no Qualified Bids (other than the Stalking Horse Bids) were received by the Bid Deadline (as defined in the Bidding Procedures Order); (b) the Auction (as defined in the Bidding Procedures Order) was cancelled; and (c) as no Qualified Bids were received by the Bid Deadline, the Debtors selected the Forward Stalking Horse Bid and the Reverse Stalking Horse Bid as the Successful Bid for their respective Acquired Assets (each as defined in the Stalking Horse Bids).

16.    On July 30, 2019, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1032), which incorporated both Stalking Horse Agreements and set a confirmation hearing date for August 7, 2019.

## II.    The PLS Trustees' Objections

17.    On July 8, 2019, the Debtors filed the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of the Debtors* (ECF No. 824), which included a schedule of certain executory contracts and unexpired leases the Debtors may seek to assume and assign in sales, or assume pursuant to their restructuring plan.

18.    On July 11, 2019, the Debtors filed (a) the *Supplemental Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and*

*Unexpired Leases of Debtors* (ECF No. 834); (b) a *Notice of Assumption or Rejection of Executory Contracts and Unexpired Leases of Debtors (Wind Down Estates)* (ECF No. 837); (c) a *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors (Reverse Buyer)* (ECF No. 839); and (d) a *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors (Forward Buyer)* (ECF No. 843) (collectively, the "**Assumption and Rejection Notices**").

19.    The Assumption and Rejection Notices disclosed the intent by the Debtors to assume, or assume and assign, certain Servicing Agreements to the Forward Stalking Horse Buyer.  Certain PLS Trust Servicing Agreements related to the Reverse Business were proposed to be assumed or assumed and assigned.[4]

20.    On July 18, 2019, the PLS Trustees filed the *Limited Objection of Certain Trustees to the Debtors' Proposed Cure Costs and Adequate Assurance of Future Performance for the Assumption and Assignment of Executory Contracts* (the "**Initial Limited Objection**") (ECF No. 944).  The PLS Trustees primarily objected to the cure amounts the Debtors listed for the agreements to which the PLS Trusts/Trustees are parties, and the Debtors' demonstration of adequate assurance of future performance.  The PLS Trustees stated that they were unable to ascertain whether the Debtors' proposed cure amounts provided adequate assurance that the Debtors would cover all amounts due and owing under the assumed Servicing Agreements, and that they believed the Debtors' reported cure amounts might be inaccurate.  In the Initial Limited Objection, the PLS Trustees asserted that a reserve must be established to account for estimated cure amounts and to meet estimated future indemnification costs for pre-closing claims that would

---

[4]    Those assumed or assumed and assigned PLS Trust Servicing Agreements are for Mortgage Equity Conversion Assets Trust 2011-1, Cascade Funding Mortgage Trust 2018-RM1, Cascade Funding Mortgage Trust 2018-RM2, and Cascade Funding Mortgage Trust 2019-RM3.

not be assumed by the Buyers.  The PLS Trustees further asserted that the Debtors did not clearly

establish whether their indemnification obligations for post-closing losses, based upon facts or

circumstances existing on or before the time of the anticipated September 30, 2019 closing (the

"**Closing Date**"), would be assumed by the Buyers.

21.    The PLS Trustees also objected to the exclusion of the PLS Trustees' and

PLS Trusts' fees and expenses for assuming and assigning agreements to the Buyers in the

Debtors' cure costs.  The PLS Trustees argued that the Debtors were required to bear all costs

related to the assumption and assignment.

22.    The PLS Trustees also asserted that the Debtors were required to

demonstrate that the Buyers satisfy all contractual requirements relating to the transfer of servicing

or that under the Bankruptcy Code, the Buyers were not required to comply with certain

requirements.  The PLS Trustees requested that the Debtors provide them with any proposed

language for the sale order in order to satisfy adequate assurance of future performance.

Additionally, the PLS Trustees reserved the right to amend and/or supplement the Initial Limited

Objection and to join in any objection or reservation raised by any party in interest.

23.    On July 30, 2019, the Debtors filed the *Statement in Support of the Debtors'*

*(I) Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11*

*Plan of Ditech Holding Corporation and Its Affiliated Debtors and (II) Omnibus Reply to*

*Objections Thereto* (ECF No. 1029), in response to, among other things, the Initial Limited

Objection.

24.    On August 3, 2019, the PLS Trustees filed the *Sur-Reply and Reservation*

*of Rights of Certain Trustees to Statement in Support of the Debtors' (I) Memorandum of Law in*

*Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding*

*Corporation and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* (the "**Sur-Reply**") (ECF No. 1076).

25.    On August 5, 2019, the Debtors supplemented their Schedule of Contracts by filing a *Third Supplemental Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 1087) (the "**Supplemental Cure Notice**").   On August 6 and 7, 2019, the Debtors also filed (a) a *Second Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Transferred Contracts Schedule (Forward Buyer)* (ECF No. 1099); (b) a *Supplemental Notice of Assumption of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Transferred Contracts Schedule (Reorganized RMS)* (ECF No. 1101); and (c) a *Second Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Transferred Contracts Schedule (Wind Down Estates)* (ECF No. 1103) (together, the "**Supplemental Assumption Notices**").

26.    On August 15, 2019, the PLS Trustees filed the *Limited Objection of Certain Trustees to the Debtors' Proposed Cure Costs and Adequate Assurance of Future Performance for the Assumption and Assignment of Executory Contracts* (ECF No. 1173) (together with the Initial Limited Objection and the Sur-Reply, the "**PLS Trustees' Objections**"), in which the PLS Trustees raised similar objections with respect to the Supplemental Cure Notice and Supplemental Assumption Notices to those asserted in the Initial Limited Objection.

### III.    The Resolution Negotiations

27.    The PLS Trustees worked with the Debtors to reconcile the status of the Servicing Agreements relating to each of the PLS Trusts to determine their inclusion in the

Stalking Horse Agreements.    The Reverse Stalking Horse Buyer determined not to include Servicing Agreements relating to certain reverse mortgage PLS Trusts in the Reverse Stalking Horse Agreement.[5]  The rejected reverse servicing agreements would be deemed rejected on the Effective Date.    The PLS Trustees raised objections to the continuity of servicing for these transactions and engaged in discussions with the Debtors and the Reverse Stalking Horse Buyer.

28.    Following the filing of the PLS Trustees' Objections, the Debtors and the PLS Trustees have participated in discussions over the course of several weeks with the goal of resolving the PLS Trustees' Objections and reaching a consensual solution.    The Debtors have provided documents to the PLS Trustees and their advisors with documents and data related to the cure issues in order to further the negotiations.    Specifically, the Debtors have provided, among other things, information about loans serviced by the PLS Trusts, non-assessable property preservation expenses the Debtors incurred yet did not pass onto the PLS Trusts, litigation reports in connection with the PLS Trusts, and pre-attorney complaint information.    The PLS Trustees engaged Duff & Phelps, LLC to assist them in their valuation of the cure amount and adequate assurance amount and have been represented by counsel throughout these proceedings.    While the Debtors and the PLS Trustees were unable to at this time to fix a cure claim amount, they were able to determine a reasonable cure claim reserve amount that will protect the PLS Trusts' cure claims while the parties continue discussions over the next few weeks.

29.    The Parties have also been engaged in discussions with the Forward Stalking Horse Buyer regarding adequate assurance of future performance and on-going servicing

---

[5]    Those PLS Trusts with rejected reverse servicing agreements are: Mortgage Equity Conversion Asset Trust 2010-1 ("**MECA 2010-1**" and the servicing agreement for MECA 2010-1, the "**MECA 2010-1 Servicing Agreement**"), Reverse Mortgage Loan Trust 2008-1, Reverse Mortgage Funding, LLC, UFG 214-FASST 2019 HB1, UFG 212-FASST 2018 HB1, UFG 209- FASST 2017, RML Trust 2013-1, and RML Trust 2013-2.

obligations.  The Forward Stalking Horse Agreement does not obligate the Forward Stalking Horse Buyer to perform certain servicing obligations related to actions or inactions that occur, in whole or in part, during the period prior to the Closing Date ("**Pre-Closing Conduct**").  The Forward Stalking Horse Buyer was not willing to accept the transfer of servicing for any PLS Trusts to the extent the Forward Stalking Horse Buyer would be obligated to pay fees and expenses of the PLS Trusts and the PLS Trustees, including indemnification obligations thereto, related to Pre-Closing Conduct.  To the extent the Forward Stalking Horse Buyer does not accept transfer of servicing for the PLS Trusts, the Debtors may reject those servicing agreements as of the Effective Date of the Plan.  Upon the rejection of the Servicing Agreements, the PLS Trusts would potentially face an immediate cessation of servicing that would adversely affect the value of the PLS Trusts' assets. The Forward Stalking Horse Buyer required assurance that it would be compensated for servicing relating to Pre-Closing Conduct.

30.    Additionally, the PLS Trustees worked with the Reverse Stalking Horse Buyer and the Debtors to ensure continuity of servicing for MECA 2010-1 through an interim servicing arrangement (the "**Interim Servicing Agreement**") with the Reverse Stalking Horse Buyer.  The Reverse Stalking Horse Buyer was unwilling to service under the existing terms of MECA 2010-1 Servicing Agreement because it contended that the terms were not economically viable.  The Debtors advised that they would be unable to continue interim servicing of MECA 2010-1 after the closing of the reverse sale.  The Reverse Stalking Horse Buyer required certain economic modifications to the MECA 2010-1 Servicing Agreement during an interim servicing period.  The Interim Servicing Agreement will ensure continuity of servicing of MECA 2010-1 on an interim basis, preserve the value of the assets in the MECA 2010-1 PLS Trust and provide adequate time to secure servicing for MECA 2010-1 on a more permanent basis.

31.    Following weeks of arm's-length formal and informal negotiations and discussions, the parties were able to resolve the PLS Trustees' Objections by resolving, among other things: (a) an amount the Debtors will establish as an estimated reserve for the PLS Trustees' cure claim for the purpose of curing the PLS Trustees' agreements with the claim cure to be determined based on resolution or the Court's determination, (b) adequate assurance of future performance to ensure continuity of servicing for the PLS Trusts included in the forward sale transaction, and (c) interim servicing for MECA 2010-1.

32.    In sum, the Debtors proposed to assume and assign 195 out of 228 Forward Business Servicing Agreements related to the PLS Trusts to the Forward Stalking Horse Buyer and, following negotiations with the Reverse Stalking Horse Buyer, four (4) out of thirteen (13) servicing agreements relating to the reverse business to the Reverse Stalking Horse Buyer.

## The Resolution

33.    The salient terms of the Resolution are as follows:

a)  <u>Interim and Final Cure Payment.</u>  On the Effective Date of the Plan, the Debtors shall (i) pay in cash to each of the PLS Trustees' outstanding and unpaid fees and expenses (including, fees and expenses of counsel and advisors and those relating to the Debtors' chapter 11 cases) through the sale closings upon the submission of customary invoices; (ii) segregate and reserve $750,000 (the "**Interim Cure Fund**"), to be accessible by the PLS Trustees or any party acting on behalf of the PLS Trustees, including the Forward Stalking Horse Buyer or its designees (including NewRez LLC, d/b/a Shellpoint Mortgage Servicing ("**Shellpoint**")), to pay the indemnification obligations of the applicable Debtors to the PLS Trustees for or related to any acts or omissions of the Debtors occurring prior to the Closing Date, in each case to the extent permitted by the Proposed Order (each a "**Covered Claim**"), and (iii) segregate and reserve an additional $5.5 million (the "**Cure Reserve**") pending resolution as to the amount of the final cure payment to the PLS Trustees (the "**Final Cure Fund**").  The Debtors will hold the Cure Reserve and not distribute it as part of their post-Effective Date distributions until a resolution regarding a Final Cure Fund is reached upon determination by the Court, if necessary, subsequent to approval of the Interim Cure Fund and Cure Reserve; provided, that the Debtors and the PLS Trustees may resolve the Final Cure Fund at any time following the entry of the Proposed Order subject to further approval of the Court.  All rights with respect to the Final Cure Fund are fully reserved.

b) <u>Adequate Assurance for Forward Sale</u>.  The Forward Stalking Horse Buyer agrees, in its capacity as successor servicer, successor subservicer, or successor master servicer to any Debtor under any Private Investor Servicing Agreement, to, among other things, subject to the material terms, conditions and limitations set forth in Paragraphs 3, 5 and 6 of the Proposed Order, pay fees and expenses of the PLS Trusts and the PLS Trustees, including indemnification obligations thereto, to the extent (i) required by any Private Investor Servicing Agreement, related to the period prior to the closing or resulting from any action or inaction that occurs, in whole or in part, from and prior to the closing, and (ii) that there are no other Viable Sources (as defined below) obligated under or pursuant to the applicable Private Investor Servicing Agreement to pay such fees and expenses of the PLS Trusts and the PLS Trustees.

c) <u>MECA 2010-1</u>.  The Reverse Stalking Horse Buyer will service MECA 2010-1, on an interim basis, subject to certain deemed modifications to the MECA-2010-1 Servicing Agreement and related Trust Agreement as set forth in the Interim Servicing Agreement.  The MECA 2010-1 Servicing Agreement will be deemed rejected by the Debtors at the expiration of the Interim Servicing Agreement.  The terms of the Interim Servicing Agreement are set forth in **<u>Schedule I</u>** hereto and incorporated by reference herein.[6]

d) <u>Reasonableness of PLS Trustees' Conduct</u>.  The proposed order approving the Motion will include findings relating to the PLS Trustees, each of the PLS Trusts and the investors in each of the PLS Trusts, including that: (i) each of the PLS Trustees acted reasonably and in good faith with respect to the Debtors' Cases, the Resolution, the Motion and any modifications to the Trust Agreements provided for in the Resolution, (ii) each of the PLS Trustees conduct is in the best interests of each of the PLS Trusts and the investors in each of the PLS Trusts in connection with the Debtors' Cases, the Resolution and the Motion, (iii) the modifications to the Trust Agreements provided for in the Resolution and the Motion are necessary to ensure continuity of servicing for the PLS Trusts and preserve the value of the PLS Trusts' assets.

34.    The Debtors have determined in good faith that the terms of the Resolution are in the best interests of the Debtors, their estates and their creditors.  Approval of the Resolution will enable the Debtors to resolve the remaining disputes with the PLS Trustees and avoid expending further resources on litigation with the PLS Trustees.  Similarly, the PLS Trustees have

---

[6]    The pricing provisions in Schedule I are proprietary and confidential to the Reverse Stalking Horse Buyer and will be redacted and filed under seal.  This information will be made available to Investors in  MECA 2010-1 who provide a certification of ownership form and an executed non-disclosure agreement.  The PLS Trustee for MECA 2010-1 will provide investors in MECA 2010-1 with information regarding the process to obtain the unredacted version of Schedule I.

determined in good faith that the terms of the Resolution are in the best interests of each PLS Trust and of the investors in each such PLS Trust.

35.    Resolution of the outstanding issues between the Debtors and the PLS Trustees by the Closing Date is critical.  First, all the Forward Business Servicing Agreements are expected to be transferred to the Forward Stalking Horse Buyer at the closing.  The Debtors are expecting proceeds in excess of $100 million from the transfer of their rights and interests related to the PLS Trusts, primarily from the repayment of servicing advances.  Accordingly, the sooner the PLS Trust rights are transferred, the better for the Debtors and their stakeholders.  Second, the Forward Stalking Horse Agreement and the calculated purchase price are based on the balance sheet for the business, which includes PLS Trustee assets and liabilities.  If the Resolution is not finalized on or before the Closing Date, the Debtors will have to undergo a complex, time-consuming process to de-consolidate the balance sheet and remove those assets and liabilities. Failure to timely close the Stalking Horse Agreements will cause delay and hardship to the Debtors and their estates.   Third, the servicing advances related to the Forward Business Servicing Agreements are financed by certain of the DIP Facilities.  If the Company were required to use corporate cash to pay off the PLS-related DIP indebtedness, which automatically matures on the Closing Date, this would negatively impact the liquidity that the Company has to continue the origination of loans in the pipeline and winding down the Debtors' estates.  If the Company did not use corporate cash to pay off the PLS-related DIP indebtedness, the Company would need to negotiate an amendment with the DIP Lenders and likely an extension to the DIP maturity.  There is no certainty that the DIP Lenders would agree to such an amendment or to provide the Debtors an extension beyond the current scheduled maturity date of October 9, 2019 on any terms.  If the Debtors are required to ask the DIP Lenders for another extension of the DIP maturity, the DIP

Lenders are likely to demand another advance rate reduction and fees from the Debtors.  Fourth, the Debtors plan to transfer the PLS Trust agreements through March 2020, assuming a closing of the Forward Stalking Horse Agreement on or before the Closing Date.  Any delay that would be caused if the Resolution is not closed in time will elongate this transition process, at substantial expense to the estate because the Debtors will need to retain or pay for employees and infrastructure to service the loans underlying the PLS Trusts.

36.    The effectiveness of the Resolution is conditioned on the Court's approval of this Motion and of the Debtors' entry into the Resolution.

### The Resolution Is In the Debtors', the PLS Trusts', and the Investors' Best Interests and Should Be Approved

37.    The Debtors submit that the Resolution is in the Debtors' best interests and should be approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule 9019(a) provides that on motion and after notice and a hearing, "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  In granting a motion pursuant to Bankruptcy Rule 9019(a), a Court must find that the proposed settlement is fair and equitable and is in the best interests of the debtor's estate.  *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re 47-49 Charles St., Inc.*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). The Settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness."  *In re Drexel Burnham Lambert Group*, *Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

38.    Compromises are "a normal part of the process of reorganization." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. at 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  The decision to approve a particular compromise lies within the sound discretion of the Court.  *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The Court's discretion should be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).   A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).  The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

39.    Courts typically consider the following factors in determining whether a settlement should be approved:  (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (v) the competence and experience of counsel who support the settlement; (vi) the relative benefits to be received by members of any affected class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and (viii) the debtor's informed judgment that the settlement is fair and reasonable. *See, e.g., TMT Trailer Ferry*, 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. at 804; *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).

40.    The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424. However, a court need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation. *See In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact . . . . The court need only canvas the settlement to determine whether it is within the accepted range of reasonableness" —even if that point is "the lowest point in the range of reasonableness." *Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994) (internal citations omitted). As one court explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the [. . .] Settlement Agreement *in its entirety* is appropriate for the . . . estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) (emphasis added).

41.    Further, the Court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Grp.*, 134 B.R. at 505 (citations omitted); *see also In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that [the Court] substitute [its] judgment for the Trustee's, but only that [the Court] test [its] choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, [the Court] must approve that choice, even if, all things being equal, [the Court] would have selected the other.") (citations omitted).

42.    The Resolution is consistent with the objectives of chapter 11 and satisfies the requirements of *TMT Trailer Ferry*.

43.    <u>Success of Litigation, Duration and Burdens of Alternative Litigation</u>. Establishment of an interim cure claim reserve for the PLS Trustees and adequate assurance for the Forward Business Servicing Agreements transferred pursuant to the Forward Stalking Horse Agreement provides significant benefits to the Debtors and their estates.  The transfer of the Debtors' rights in connection with the PLS Trusts will generate significant value for the Debtors. The Debtors could only achieve this value through a consensual resolution of an interim cure claim reserve amount and adequate assurance, and the agreed-to interim servicing of MECA 2010-1, or litigation of such disputes.  The PLS Trustees have already objected to the cure amounts and adequate assurance proposed by the Debtors.  Moving forward without a settled interim cure claim reserve amount or satisfactory adequate assurance, or without the Interim Servicing Agreement, would entail prolonged and costly litigation that would further deplete the resources of the Debtors' estates and will delay the transfer of the PLS Trust Servicing Agreements to the detriment of the Debtors and their estates.  The Debtors estimate that the Resolution will save significant amounts in incremental costs to the Debtors and their estates that would have been expended in litigation.  Because the interim cure reserve amount and adequate assurance amount are largely based upon indemnifications not yet asserted or that could be asserted, they would require an estimation process and be heavily fact-intensive.  The PLS Trustees have already served the Debtors with discovery and deposition requests.

44.    The Debtors and their advisors carefully analyzed the costs, benefits and risks of each alternative and reasonably determined that a consensual settlement on the terms incorporated in the Resolution presents the best available option.

45.    <u>Advice of Advisors</u>.  Throughout the process of negotiating the Resolution, each party was advised by competent and experienced counsel and other professionals familiar with the issues, well versed in nuances of the facts and law in dispute, and with a clear understanding of the implications that a prolonged litigation could have on the Debtors' operations and reorganization.  In the process of negotiating this Resolution with the PLS Trustees, the Debtors evaluated and provided information including but not limited to: (1) the Servicing Agreements with Ditech and RMS broken down per trustee, including the number of loans per PLS Trustee and unpaid balances; (2) property preservation expenses on each of the loan deals; (3) complaints received from consumers and how much money spent on those complaints; and (4) open and closed litigation claims escalated from consumer complaints, the costs of litigating those complaints, and the settlement or judgment amount.  Based on this analysis, the Debtors believe the Resolution is fair and reasonable.

46.    <u>Arm's Length Bargaining</u>.  The Resolution has been achieved in good faith after extensive arm's length bargaining.  The parties spent nearly two months engaging in communications and discussions.  Indeed, the length, complexity and intensity of the negotiations are all testament to the fact that the Resolution is the product of hard fought negotiations among sophisticated parties represented by capable advisors.  All parties to the Resolution represented their respective constituencies regarding issues to which each constituency gave great importance. Each party has made certain sacrifices to reach consensus.

47.    <u>Debtors' Informed Business Judgment</u>.  As discussed above, the Resolution is a significant development in the Debtor's chapter 11 case that will benefit the Debtors and all of their stakeholders, including the PLS Trustees.  The Resolution paves the way for the Debtors' emergence from chapter 11 and closing of the Stalking Horse Agreements in full on the current

20

timeline.  The Debtors are expecting proceeds in excess of $100 million from the transfer of their
rights relating to the PLS Trusts.  In the absence of the Resolution, the Debtors would face
(a) litigation and its attendant costs and uncertainty, (b) delayed closing on PLS Trusts, which
would significantly complicate the closing of the Forward Stalking Horse Agreement on the
remaining assets, and (c) a greater burden and strain on the Debtors' limited resources, all of which
would likely diminish the Debtors' estates.  After carefully balancing the pros and cons of the
Resolution, and evaluating the facts and circumstances described above, the Debtors concluded
that this settlement of the PLS Trustees' Objections is the best outcome.

48.    <u>PLS Trustees' Findings.</u>  The Resolution is in the best interests of each of
the PLS Trusts and the investors in each of the PLS Trusts.  The PLS Trustees have acted in good
faith and upon the advice of advisors.  Each of the PLS Trustees will submit declarations describing
their conduct in connection with the Debtors' Cases, the Resolution and this Motion, including the
engagement of an expert to advise them in connection with the determination of a reasonable
interim cure claim reserve amount, efforts to ensure continuity of servicing and to preserve the
value of the PLS Trusts' assets, and their efforts to inform investors of the Debtors' Cases, the sale
process, the Resolution and the Motion.  The PLS Trustees' declarations will be filed before the
hearing on this Motion.

49.    For these reasons, the Debtors' entry into the Resolution falls well within
the range of reasonableness and should be approved.

**<u>Waiver of Bankruptcy Rule 6004(h)</u>**

50.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale
or lease of property other than cash collateral is stayed until the expiration of 14 days after entry
of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors seek a

waiver of the 14-day stay extant in Bankruptcy Rule 6004(h) to avoid any delays in the receipt of cure claim amounts, including the Interim Cure Fund and establishment of the Cure Reserve, which will inure to the benefit of the Debtors and their estates.

## Notice

51.     Notice of this Motion will be provided in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 211).  Each of the PLS Trustees will provide separate notice of the Motion to the investors for the PLS Trusts in accordance with the Trust Agreements.  The Debtors respectfully submit that no further notice is required.

52.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

## Conclusion

53.     The Resolution represents the culmination of extensive arm's-length discussions and negotiations between the Parties.  The Parties believe that the Resolution represents a fair and reasonable compromise intended to benefit all relevant stakeholders, including each of the PLS Trusts and the investors in each of the PLS Trusts, and therefore have concluded in their sound business judgment that performance under the Resolution is in the best interests of all of their stakeholders.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE** the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: September 23, 2019
     New York, New York

                       /s/ Sunny Singh
                       WEIL, GOTSHAL & MANGES LLP
                       767 Fifth Avenue
                       New York, New York 10153
                       Telephone:  (212) 310-8000
                       Facsimile:   (212) 310-8007
                       Ray C. Schrock, P.C.
                       Sunny Singh

                       *Attorneys for Debtors*
                       *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                            :
In re                                                       :    **Chapter 11**
                                                            :
**DITECH HOLDING CORPORATION,** *et al.*,                   :    **Case No. 19-10412 (JLG)**
                                                            :
                                Debtors.[1]                 :    **(Jointly Administered)**
                                                            :
-------------------------------------------------------------X

**ORDER GRANTING**
**MOTION OF DEBTORS PURSUANT TO RULE 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**FOR APPROVAL OF SETTLEMENT WITH PLS TRUSTEES**
**WITH RESPECT TO OBJECTIONS TO FORWARD STALKING**
**HORSE AGREEMENT AND REVERSE STALKING HORSE AGREEMENT**

Upon consideration of the Motion (the "**Motion**")[2] of the above-captioned debtors

and debtors in possession (collectively , the "**Debtors**" and each, a "**Debtor**") for entry of an order

authorizing the Debtors to enter into and perform under the Resolution by and among (a) the

Debtors, and (b) each of the PLS Trustees, which includes (i) the Bank of New York Mellon Trust

Company, (ii) the Bank of New York Mellon, (iii) Deutsche Bank National Trust Company, and

(iv) U.S. Bank National Association, each on behalf and in its various capacities as trustee, co-

trustee, indenture trustee, registrar, custodian, and other agency roles and on behalf of certain

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the Plan, as applicable.

affiliates in similar roles (each a "**PLS Trust**," and collectively, the "**PLS Trustees**") and the declarations submitted by each of the PLS Trustees; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given, and it appearing that no other or future notice need be provided; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates and their creditors; and the Court having found that each of the parties to the Resolution, including the PLS Trustees, have acted reasonably, in good faith and in the best interests of their respective constituencies in entering into the Resolution; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** to the extent set forth herein.

2.      Pursuant to Bankruptcy Rule 9019, the Resolution is approved and the Debtors are hereby authorized to enter into and perform the Resolution.

3.      The Private Investor Servicing Agreements (as defined in the Forward Stalking Horse Agreement) and all other agreements relating to the Private Investor Loans (collectively, for purposes of this Order, the "**Private Investor Servicing Agreements**") that are being assumed and assigned to NewRez LLC d/b/a Shellpoint Mortgage Servicing ("**Shellpoint**") pursuant to the Forward Stalking Horse Agreement consist solely of enforceable contracts providing MSRPA Servicing Rights related to the Private Investor Loans.  Some or all of the Private Investor Loans are owned by private label securitization Trusts and similar structures (the "**PLS Trusts**" and the trustees of the PLS Trusts, the "**PLS Trustees**").  As used in this Order, "**Other Agreements**" means any right, obligation, representation, covenant or agreement

contained in a Private Investor Servicing Agreement that is not related to any of the following in Shellpoint's capacity following closing as (x) successor servicer to any Debtor under any Private Investor Servicing Agreement, (y) successor subservicer to any Debtor under any Private Investor Servicing Agreement or (z) successor master servicer to any Debtor under any Private Investor Servicing Agreement, as applicable (in all cases regardless of whether such Other Agreement arises from, or is memorialized in, the same writing as a Private Investor Servicing Agreement): (a) collections with respect to, or the administration, servicing, subservicing or master servicing, as applicable, of, or reporting in respect of, Private Investor Loans, (b) servicing fees or ancillary income, (c) the disbursement of collections with respect to Private Investor Loans, (d) the making of delinquency advances and servicing advances in connection with the servicing or subservicing or master servicing, as applicable, of Private Investor Loans, (e) payment of expenses associated with the administration, servicing or subservicing or master servicing, as applicable, of Private Investor Loans, including but not limited to, those relating to foreclosure, remediation of property, chattel and equipment and the maintenance of REO property, chattel and equipment to the extent required by the applicable Private Investor Servicing Agreement, (f) the limitation on liability of Shellpoint, and indemnification in favor of Shellpoint as the servicer, subservicer or master servicer, as applicable, thereunder, (g) representations, warranties and covenants running in favor of the servicer, subservicer or master servicer, as applicable, thereunder, (h) responding to borrower inquires relating to loans, counseling or otherwise working with delinquent borrowers (including, but not limited to helping borrowers modify their loans in accordance with federal programs and public policy intended to assist homeowners' efforts to remain in their homes) to the extent required by the applicable Private Investor Servicing Agreement and applicable law, (i) supervising foreclosures and property dispositions consistent with the Servicing Agreements to

the extent required by the applicable Private Investor Servicing Agreement and applicable law,

(j) holding and disbursing custodial and escrow funds for payment of property taxes and insurance

premiums consistent with the Private Investor Servicing Agreements to the extent required by the

applicable Private Investor Servicing Agreement and applicable law, (k) satisfying requirements

related to the eligibility of a Person or Entity to act as servicer, subservicer or master servicer, as

applicable, following the Closing as set forth in the Private Investor Servicing Agreements,

(l) paying fees and expenses of the PLS Trusts and the PLS Trustees, including indemnification

obligations thereto, to the extent expressly required by the Private Investor Servicing Agreements,

related to the period from and after the Closing or resulting from any action or inaction that occurs

from and after the Closing, and (m) subject, in all cases, to the terms, conditions, and limitations

of Paragraph 5, paying fees and expenses of the PLS Trusts and the PLS Trustees, including

indemnification obligations thereto, to the extent (1) required by any Private Investor Servicing

Agreement, related to the period prior to the Closing or resulting from any action or inaction that

occurs, in whole or in part, from and prior to the Closing, and (2) that there are no other Viable

Sources (as defined in the following sentence) obligated under or pursuant to the applicable Private

Investor Servicing Agreement to pay such fees and expenses of the PLS Trusts and the PLS

Trustees.  For purposes hereof, "**Viable Source**" means a person, entity or other source of funds

(including a "trust fund" or the equivalent under a Private Investor Servicing Agreement) other

than any such person, entity or other source that is (i) subject to an insolvency proceeding as a

debtor (or the equivalent thereof), or (ii) no longer in existence because such person, entity or other

sources has been liquidated or dissolved.

4.    The Private Investor Servicing Agreements assumed by the Debtors and

assigned to the Forward Stalking Horse Buyer or its designees (including Shellpoint) do not

include any Other Agreements, regardless of whether such Other Agreements arise from, or are memorialized in, the same writing as the Private Investor Servicing Agreements, and to the extent any Private Investor Servicing Agreements arise from, or are memorialized in, one or more writings which include an Other Agreement, such Private Investor Servicing Agreements are severable from any Other Agreements.  The Sellers are not assuming and assigning to Shellpoint, and neither Shellpoint nor the Forward Stalking Horse Buyer has any Liability under, any Other Agreement.  Nothing in the Forward Stalking Horse Agreement or this Order shall have any effect on any Other Agreement or any claims related thereto against the Debtors, and the rights, if any, of all Persons or Entities against the Debtors in respect of Other Agreements are reserved.  The rights, if any, of Persons or Entities against the Debtors in respect of Other Agreements are not the subject matter of the Motion or the hearing thereon and are expressly reserved; provided, however, that no party to an Other Agreement may proceed against the Forward Stalking Horse Buyer, its Affiliates or the Acquired Assets.  No delay or failure of performance by the Debtors under or in respect of any Other Agreement will (i) affect any right of the Forward Stalking Horse Buyer or its designee (including Shellpoint), or any obligation of any other Person or Entity, under any Assigned Contract (including, without limitation, any Private Investor Servicing Agreement) or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, Claim, counterclaim, default or other impairment of the rights of the Forward Stalking Horse Buyer or its designee under any Assigned Contract (including, without limitation, any Private Investor Servicing Agreement).

5.     Notwithstanding anything to the contrary in clause (m) of Paragraph 3 and Paragraph 4 hereof, neither the Forward Stalking Horse Buyer nor its designee (including Shellpoint) shall have any obligation to pay fees and expenses of the PLS Trusts and/or the PLS

Trustees (including indemnification obligations thereto) related to the period prior to the Closing

or resulting from any action or inaction that occurs in whole or in part prior to the Closing unless

Shellpoint is advanced in cash the costs, expenses, losses, liabilities or other obligations estimated

by Shellpoint to be incurred by Shellpoint in connection therewith from either (i) the Interim Cure

Fund or the Final Cure Fund (as defined below) or (ii) another source (excluding the Forward

Stalking Horse Buyer's, Shellpoint's, and/or Shellpoint's affiliates' own funds) determined to be

available by Shellpoint in its sole and absolute discretion.  Shellpoint shall be entitled to include

in its estimated costs and expenses incurred in connection with any of the foregoing (including the

administration of any of the foregoing), its reasonable internally allocated costs and expenses

excluding general overhead.  In no event shall the Forward Stalking Horse Buyer, Shellpoint or

any affiliate thereof be required to do any of the following in connection with this Paragraph 5 or

in connection with clause (m) of Paragraph 3: (A) expend or risk its own funds, (B) risk any loss,

incur or risk the incurrence of any damages (whether economic or non-economic), or (C) incur or

risk the incurrence of any costs (including reasonable internally allocated costs, but excluding

general overhead), expenses (including reasonably internally allocated expenses, but excluding

general overhead), losses, liabilities or other obligations, in each case of (A), (B) and (C) above,

as determined by the Forward Stalking Horse Buyer or Shellpoint in its sole and absolute

discretion.  If Shellpoint determines that it is unable to obtain payment in accordance with this

Paragraph 5, it shall provide notice to the applicable PLS Trustee as promptly as practicable.  No

PLS Trustee, and no person or entity, claiming by or through any of them, shall have any grounds

to challenge, and shall not challenge (or allege or pursue any matter, cause of action or claim

arising under, with respect to or in any case based upon), any determination by the Forward Buyer

or Shellpoint (i)(A) that it or any affiliate would be required to expend or risk its own funds,

(B) that it or any affiliate would risk any loss, incur or risk the incurrence of any damages (whether economic or non-economic), or (C) that it or any affiliate would incur or risk the incurrence of any costs, expenses, losses, liabilities or other obligations, in any case, in connection with this Paragraph 5 or in connection with clause (m) of Paragraph 3 or (ii) based upon any determination by the Forward Buyer or Shellpoint that there is not a satisfactory other "source" within the meaning of clause (ii) of the first sentence of this Paragraph 5.  Subject to Bankruptcy Court approval of the Debtors' 9019 motion relating to the PLS Trusts and the PLS Trustee, and notwithstanding anything to the contrary in Paragraph 3 or, in the Private Investor Servicing Agreements, Shellpoint shall be entitled to indemnification from, and shall be advanced or reimbursed by, the related trust fund (including from any collection account into which mortgage loan proceeds are deposited) for any liability, cost or expense incurred by it in paying any PLS Trustee fee or expense and for furnishing any indemnification to the PLS Trustees to the extent that any such liability, cost or expense relates to the period prior to the closing, results from any action or inaction that occurred prior to the Closing or relates to the origination or the sale of Private Investor Loans to pay such fees and expenses of the PLS Trusts and the PLS Trustees, and the PLS Trustees and Shellpoint shall be authorized and protected in relying on this Order in respect thereto.

6.    In resolution of the cure objections filed by the PLS Trustees to the assumption and assignment of the Private Investor Servicing Agreements, subject to Bankruptcy Court approval of the Debtors' Motion, on the Effective Date of the Plan, the Debtors shall (i) pay in cash to each of the PLS Trustees' outstanding and unpaid fees and expenses (including, fees and expenses of counsel and advisors and those relating to the Debtors' chapter 11 cases) through the sale closings upon the submission of customary invoices; (ii) segregate and reserve $750,000 (the

7

"**Interim Cure Fund**"), to be accessible by the PLS Trustees or any party acting on behalf of the PLS Trustees, including the Forward Stalking Horse Buyer or its designees (including Shellpoint), to pay the indemnification obligations of the applicable Debtors to the PLS Trustees for or related to any acts or omissions of the Debtors occurring prior to the Closing, in each case to the extent permitted by this Order, and (iii) segregate and reserve an additional $5.5 million (the "**Cure Reserve**") pending resolution as to the amount of the final cure payment to the PLS Trustees (the "**Final Cure Fund**").  The Debtors will hold the Cure Reserve and not distribute it as part of their post-Effective Date distributions until a resolution regarding the amount of the Final Cure Fund is reached or upon determination by the Court, if necessary; provided, that the Debtors and the PLS Trustees may settle the Final Cure Fund at any time following the entry of the Proposed Order subject to further approval of the Court.  All rights with respect to the Final Cure Fund are fully reserved.

7.    On the Effective Date of the Plan, subject to Bankruptcy Court approval of the Debtors' Motion, the Debtors shall allocate the Interim Cure Fund to each of the PLS Trustees in the following amounts in cash (each, an "**Interim Cure Fund Payment**"):

| | |
|---|---|
| The Bank of New York Mellon; The Bank of New York Mellon Trust Company, as trustees | [TBD] |
| Deutsche Bank National Trust Company, as trustee | [TBD] |
| U.S. Bank National Association, as trustee | [TBD] |

which amounts shall be applied by the respective PLS Trustees or any party acting on behalf of the respective PLS Trustees, including without limitation the Forward Stalking Horse Buyer or its designees (including Shellpoint), to pay any of the following (each a "**Covered Claim**"): (i) the indemnification obligations of the applicable Debtors to the PLS Trustees for or related to any acts

or omissions of the Debtors occurring prior to the Closing, in each case to the extent required by

the Private Investor Servicing Agreements, including the fees and expenses of the PLS Trusts and

the PLS Trustees, (ii) amounts estimated by the Forward Stalking Horse Buyer or Shellpoint,

subject to the limitations of Paragraph 5, in connection with clause (m) of Paragraph 3, and (iii) any

amounts advanced, payable or reimbursable to Shellpoint pursuant to Paragraph 5 above (including

reimbursement or payment of amounts to Shellpoint or its designee if Shellpoint or its designee

incurs costs and/or expenses in connection with clause (m) of Paragraph 3 without receiving a

prior advance for such costs and/or expenses).  If Shellpoint or its designee elects to incur costs

and/or expenses in connection with clause (m) of Paragraph 3 without receiving a prior advance

for such costs and/or expenses, the related PLS Trustee shall promptly cause funds to be released

from the applicable Interim Cure Fund Payment to be paid to Shellpoint or its designee to pay or

reimburse such costs and/or expenses following Shellpoint's or the Forward Buyer's request

therefor.  Each Interim Cure Fund Payment shall be administered by the relevant PLS Trustee

pursuant to this Order and its customary trust administration practices.  Shellpoint or any party

acting on behalf of Shellpoint shall be under no obligation to oversee, investigate or review the

administration of any Interim Cure Fund Payment by any PLS Trustee.  In connection with any

request by Shellpoint for payment of a Covered Claim, Shellpoint shall provide to the applicable

PLS Trustee a written request for payment from an authorized officer of Shellpoint or the Forward

Stalking Horse Buyer specifying the amount requested and the applicable PLS Trust, which such

request shall state that the requested amount is for a Covered Claim.  At any time after the sixth

anniversary of the establishment of the Interim Cure Fund, the related PLS Trustee may divide, on

a per-trust basis, amounts remaining in the Interim Cure Fund among related PLS Trusts which

have not been terminated and distribute such amounts as if they were a "subsequent recovery" on

mortgage loans (or, in the absence of a definition of "subsequent recovery" in a Private Investor Servicing Agreement", as additional principal received in respect of mortgage loans). The PLS Trustees and Shellpoint may enter into such additional documentation and agreements as they determine to be necessary and appropriate, and consistent with terms of this Order, concerning the establishment and administration of the Interim Cure Fund.   Under no circumstance will the Debtors be required to pay any consideration other than or in excess of the Interim Cure Fund and, upon a resolution regarding the amount of the Final Cure Fund, the Final Cure Fund, on account of any Covered Claims.

8.      On the Effective Date of the Plan, the Debtors shall pay each of the PLS Trustees cash in the amount of each of their respective outstanding fees and expenses (including, fees and expenses of counsel and advisors and those relating to the Debtors' chapter 11 cases) through the sale closings upon the submission of customary invoices.

9.      The Debtors are hereby authorized to execute and deliver to the Forward Stalking Horse Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Forward Buyer as provided in the Forward Stalking Horse Agreement.  With respect to each of the Assigned Contracts, the Debtors or the Forward Stalking Horse Buyer, in accordance with the provisions of the Plan and Forward Stalking Horse Agreement, has cured or will cure before the Closing (subject to the Buyer Cure Cap), or have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Assigned Contracts under sections 1123(b)(2) and 365(b)(1) of the Bankruptcy Code, and the Forward Stalking Horse Buyer has provided, as set forth herein, adequate assurance of future performance under the Assigned Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is

required and not waived by the Counterparty to such Assigned Contracts.  Upon the Closing Date

or the applicable date of assumption and assignment with respect to an Assigned Contract, the

Forward Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors

under such Assigned Contract and, pursuant to sections 1123(b)(2) and 365(k) of the Bankruptcy

Code, the Debtors shall be relieved from any further liability with respect to breach of such

Assigned Contract occurring after such assumption and assignment to Shellpoint.  The Forward

Stalking Horse Buyer acknowledges and agrees that from and after the applicable date of

assumption and assignment with respect to an Assigned Contract, subject to and in accordance

with the Forward Stalking Horse Agreement, it shall comply with the terms of this order and each

of such Assigned Contract in its entirety, including any indemnification obligations expressly

contained in such Assigned Contract that could arise as a result of events or omissions that occur

from and after the Closing, unless any such provisions are not enforceable pursuant to the terms

of this Order, including, without limitation, with respect to Other Agreements.  Other than as set

forth in Paragraph 3 above, nothing contained in this Order or the Forward Stalking Horse

Agreement is intended to relieve the Forward Stalking Horse Buyer or Shellpoint from the Sellers'

indemnification obligations to the PLS Trustees under the applicable provisions of the Private

Investor Servicing Agreements that provide indemnification to the PLS Trustees for losses,

liabilities and expenses in connection with the performance of their obligations and the exercise of

their rights under the Private Investor Servicing Agreements arising after the Closing Date.  The

assumption by the Debtors and assignment to the Forward Stalking Horse Buyer or its designees

(including Shellpoint) of any Assigned Contract shall not be a default under such Assigned

Contract.  To the extent any Assigned Contract provides that any Person's or Entity's consent is

required as a condition to the assignment of such Private Investor Servicing Agreement, such

consent requirement shall be deemed satisfied by virtue of the findings and conclusions in this Order and shall be of no further force or effect.

10.    No Person or Entity shall assert, and the Forward Stalking Horse Buyer and the Servicing Agreements shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), Claims or Liabilities, of any kind or nature whatsoever to delay, defer, or impair any right of the Forward Buyer or the Debtors, or any obligation of any other Person or Entity, under or with respect to, any PLS Assets (including, without limitation, a Private Investor Servicing Agreement), with respect to any act or omission that occurred prior to the Closing or with respect to any Excluded Contract, any Other Agreement or any obligation of Debtors that is not an Assumed Liability.

11.    The Debtors are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Resolution and perform any and all obligations contemplated therein without further order of the Court.

12.    The Resolution, including the PLS Trustees' performance contemplated thereunder, is in the best interests of the Debtors, the Debtors' estates, the Debtors' creditors, the PLS Trusts, the investors in each PLS Trust, and the PLS Trustees.

13.    The PLS Trustees acted reasonably, in good faith and in the best interests of the PLS Trusts and of the investors in each PLS Trust in connection with the Debtors' Cases, the Interim Servicing Agreement, the Resolution and the Motion.

14.    The modifications to the Private Investor Servicing Agreements and related Trust Agreements provided for in the Resolution, including the Interim Servicing Agreement, are

necessary and appropriate to preserve the value of the PLS Trusts and ensure the continuity of servicing.

15.     The Interim Servicing Agreement is approved and the MECA 2010-1 Servicing Agreement and related Trust Agreement are deemed modified pursuant to the terms of the Interim Servicing Agreement.

16.     The MECA 2010-1 Servicing Agreement is deemed rejected as of the expiration date of the Interim Servicing Agreement.

17.     As set forth in the Reverse Stalking Horse Agreement, the Assumption and Rejection Notices and/or the Supplemental Assumption Notices, the following PLS Trust Servicing Agreements related to the Reverse Business are being assumed or assumed and assigned: (i) Mortgage Equity Conversion Assets Trust 2011-1; (ii) Cascade Funding Mortgage Trust 2018-RM1; (iii) Cascade Funding Mortgage Trust 2018-RM2; and (iv) Cascade Funding Mortgage Trust 2019-RM3 (collectively, the "**Assumed Reverse PLS Trusts Servicing Agreements**").  Any and all cure amounts related to the assumption or assumption and assignment of the Assumed Reverse PLS Trusts Servicing Agreements shall be paid by the Debtors to the PLS Trustees, whether from the Interim Cure Fund or otherwise.  In no event shall the Reverse Stalking Horse Buyer, Reorganized RMS, or their respective affiliates, have any obligations to pay any cure amounts related to the assumption or assumption and assignment of the Assumed Reverse PLS Trusts Servicing Agreements.  The Reverse Stalking Horse Buyer and/or Reorganized RMS have provided adequate assurance of future performance under the Assumed Reverse PLS Trusts Servicing Agreements in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparty to such contracts.

18. The Forward Stalking Horse Buyer, the Reverse Stalking Horse Buyer, and the PLS Trustees are authorized to implement and perform any and all obligations contemplated herein without further order of the Court or formal amendments to any of the Private Investor Servicing Agreements and related Trust Agreements.

19. The Findings of Fact and Conclusions of Law stated in Paragraphs U, V, Z, and 14 through 19 of Schedule 1 of the *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. __) (the "**Confirmation Order**") are herein incorporated by reference.  In the event of any conflict between the provisions of Schedule 1 of the Confirmation Order and the provisions of this Order, then the provisions of this Order shall govern.

20. The Findings of Fact and Conclusions of Law that pertain to the Forward Stalking Horse Buyer's purchase of the Acquired Assets and the assumption by the Debtors and assignment to the Forward Stalking Horse Buyer or its designees (including Shellpoint) of the Assigned Contracts, including, without limitation, those stated in Paragraphs Q through U, Y, 4, 5, and 23 through 30 of Schedule 2 of the Confirmation Order, are herein incorporated by reference and shall expressly apply with equal force to the Forward Stalking Horse Buyer's purchase of the PLS Assets and the assumption by the Debtors and assignment to Shellpoint of the Private Investor Servicing Agreements.  In the event of any conflict between the provisions of Schedule 2 of the Confirmation Order and the provisions of this Order with respect to the PLS Assets or the Private Investor Servicing Agreements, then the provisions of this Order shall govern.

21. For the avoidance of doubt, nothing in this Order shall preclude, limit, or otherwise affect the rights of Borrowers pursuant to the Plan, the Confirmation Order, or otherwise.

22.     Notwithstanding the possible applicability of any Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry pursuant to Rule 6004(h).

23.     Notice of the Motion and of the Resolution as provided therein is sufficient and effective in satisfaction of due process requirements to put the parties in interest in these chapter 11 cases, including the investors in each PLS Trust, on notice of the Resolution.

24.     This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Order.

Dated: _____, 2019
       New York, New York

_____
_____JAMES J. GARRITY
United States Bankruptcy Judge

## **SCHEDULE I**

# SCHEDULE I TO COURT ORDER

1.  RMS shall have no liability for any losses that arise or result from any act or omission of the originator or the prior servicer.

2.  RMS shall not have liability for any losses, including HUD curtailment losses or HUD curtailment-related losses, arising out of or resulting from events that occurred prior to the effective date of the Agreement.

3.  RMS shall not assume any HUD curtailment losses, curtailment-related losses, or other losses related to RMS' inability to assign a Mortgage Loan or inability to claim any expenses incurred due to any act or omission of any originator, prior servicer, prior subservicer or investor error, action, inaction, or delay, or due to any other reason reasonably outside of RMS' control or due to insufficient documentation from the originator, prior servicer or prior subservicer as required by HUD from time to time provided, however, that this shall not relieve the Servicer from any liability that the Servicer would otherwise incur by reason of its willful misconduct, bad faith or gross negligence in the performance of its obligations under the Agreement.

4.  RMS shall not have liability for any losses related to RMS' failure to **<REDACTED>** where RMS does not receive notice of such **<REDACTED>** within fifty-nine (59) days of **<REDACTED>** or for any losses that result or arise from any uncontrollable delays in the HUD claim process. RMS shall not have liability for any losses related to **<REDACTED>** unless RMS has actual knowledge as of the date of such **<REDACTED>**. RMS shall not have liability for any losses related to **<REDACTED>**. RMS shall not have liability for any losses related to **<REDACTED>** to the extent that such **<REDACTED>** are outside of RMS' control.

5.  RMS shall have no liability for losses that arise from **<REDACTED>**, including **<REDACTED>**; provided, however, that RMS shall at all times be obligated to comply with applicable law.

6.  During the Servicing Transition Period, the following Servicing Fees shall apply and shall be invoiced and payable in the same manner as currently provided for under the Agreement: Base Monthly Servicing Fee: $**<REDACTED>** per month; $**<REDACTED>** monthly additional fee per Mortgage Loan in pre-default, default, foreclosure or bankruptcy; Additional fee per Mortgage Loan in REO status: $**<REDACTED>** monthly fee; Assignment Fee: $**<REDACTED>** per assignment filed or if unable to be filed due to prior servicer or origination issues; Claim & Supplemental Claim Fee: $**<REDACTED>** per claim or supplemental; REO Liquidation Fee: the greater of **<REDACTED>**% of the sale price of the Mortgaged Property or $**<REDACTED>** per Mortgaged Property. "Servicing Transition Period" shall have the meaning set forth in the related court order.

7.  Except as modified hereunder, all other provisions of the Agreement shall remain in full force and effect during the Servicing Transition Period. As used herein, the Servicing Transaction Period shall commence on the effective date of the confirmed plan for the Debtors and shall terminate on the earlier of (i) the date such modifications and additional modifications as mutually agreed by the parties are implemented on a permanent basis and (ii) a successor servicer agrees to transition the Rejected Reverse Servicing Agreements. For the avoidance of doubt, the Servicing Transaction Period shall not exceed **<REDACTED>** from the effective date of the confirmed plan unless an extension is mutually agreed by the parties.