| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |

------------------------------------------------------------x
:
In re                                    :    Chapter 11
:
DITECH HOLDING CORPORATION, *et al.*,    :    Case No. 19-10412 (JLG)
:
Debtors.[1]                              :    (Jointly Administered)
:
------------------------------------------------------------x

# MEMORANDUM DECISION AND ORDER ON THE SEVENTEENTH AND TWENTY-SIXTH OMNIBUS OBJECTIONS TO PROOFS OF CLAIMS WITH RESPECT TO THE CLAIMS OF MICHELE AND THOMAS STURMAN (CLAIM NOS. 2448, 2551 AND 2685)

**APPEARANCES:**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
  By:   Sunny Singh
           Richard W. Slack
           Angeline J. Hwang

*Counsel for the Plan Administrator*

Tara Twomey
P.O. Box 5146
Carmel, CA 93921

*Consumer Representative*

Michele Sturman
4328 Ocean View Drive
Malibu, CA 90265

*Claimant, pro se*

---

[1] The Debtors' Plan (as defined below) was confirmed, which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

**HONORABLE JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

## Introduction

By order dated September 26, 2019 (the "Confirmation Order"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates (collectively, the "Debtors") confirmed the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors (the "Plan").[2]  Under the Plan, the Plan Administrator, the GUC Recovery Trustee, and the Consumer Representative have the exclusive authority to object to Claims filed against the Debtors.[3]  In accordance with the Claims Procedures Order, the Plan Administrator and the Consumer Representative have filed Omnibus Objections to Proofs of Claim (each an "Objection") that extend to thousands of Claims.  Under those procedures if a creditor challenges an Objection, it is deemed to hold a "Contested Claim" and the Court will conduct either a "Merits Hearing" or a "Sufficiency Hearing" on the Contested Claim.  Before the Court are the Objections of the Plan Administrator and Consumer Representative to the Contested Claims filed by Michele Sturman and Thomas Sturman (the

---

[2] *See* Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, dated September 22, 2019 (ECF No. 1326); Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, dated September 26, 2019 (ECF No. 1404). All capitalized terms are defined below or in the Plan.  All references to "ECF No. ___" are references to documents filed in these Chapter 11 Cases, Jointly Administered under Case No. 19-10412.

[3] Briefly, and without limitation, the Plan calls for the consummation of a Sale Transaction followed by the "Wind Down" of the Estates. *See* Plan Article V (Means for Implementation).  For these purposes, the term "Wind Down" means "following the closing of the Sale Transaction, the process to wind down, dissolve and liquidate the Estates and distribute any remaining assets in accordance with the Plan." *See id.* § 1.184.  The "Wind Down Estates" consist of the Debtors (excluding Reorganized RMS) pursuant to and under the Plan on or after the Effective Date. *See id.* § 1.186.  The Plan Administrator appointed under the Plan (*see id.* § 1.130) has the authority and right on behalf of each of the Debtors to carry out and implement all provisions of the Plan, including, without limitation, to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims and Consumer Creditor Claims (*see id.* § 5.6(e)).  The Plan Administrator is also responsible for making distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims and Allowed Consumer Creditor Claims. *Id.*

"Claimants") against Ditech Holding Corporation f/k/a Reverse Mortgage Solutions ("Ditech Holding"). Pursuant to the Objections, the Plan Administrator and Consumer Representative seek to expunge the Contested Claims.

The Court conducted a Sufficiency Hearing on the Contested Claims. Pursuant to the Claims Procedure Order, the legal standard of review that the Court applies at a Sufficiency Hearing is equivalent to the standard applied by the Court upon a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[4] For the reasons stated herein, the Court finds that accepting all factual allegations asserted by the Claimants in support of their Contested Claims as true, drawing all reasonable inferences in the Claimants' favor, and interpreting the Contested Claims, Responses and documents submitted by the *pro se* Claimants in support thereof to raise the strongest arguments that they suggest, the Contested Claims fail to state claims against Ditech Holding that are plausible on their face. Accordingly, the Court sustains the Objections and expunges the Contested Claims.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to §§ 1334(a) and 157(a) of title 28 of the United States Code, and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). This is a core proceeding. 28 U.S.C. § 157(b)(2)(B).

## Background

---

[4] Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") makes Rule 12 of the Federal Rules of Civil Procedure applicable herein.

On February 11, 2019 (the "Commencement Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). On March 27, 2019, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") (ECF Nos. 289-313). On May 7, 2019, the Debtors filed certain amended Schedules (ECF Nos. 511-512).

On February 22, 2019, the Court entered the Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (ECF No. 90) (the "Bar Date Order"). Pursuant to the Bar Date Order, the Court set April 1, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity, not including governmental units (as defined in § 101(27) of the Bankruptcy Code) to file a proof of claim in the Debtors' chapter 11 cases (the "General Bar Date"). On March 27, 2019, the Court extended the General Bar Date to April 25, 2019 at 5:00 p.m. (prevailing Eastern Time) (ECF No. 272) (the "Extended General Bar Date"). On May 2, 2019, the Court extended the Extended General Bar Date solely for consumer borrowers to June 3, 2019 at 5:00 p.m. (prevailing Eastern Time) (ECF No. 496). The claims register is prepared and maintained by Epiq Corporate Restructuring, LLC. It shows that approximately 7,800 proofs of claim were filed in the chapter 11 cases. Pursuant to the Confirmation Order, the Court set the deadline for each person or entity asserting Administrative Expense Claims to file proofs of claim in the chapter 11 cases to thirty-five (35) days from the date of service of the notice of entry of the Confirmation Order - November 11, 2019.

## Claims Objection Procedures

Under the Plan, the Plan Administrator, on behalf of each of the Wind Down Estates, has exclusive authority to object to Administrative Expense Claims, Priority Tax Claims, Priority

Non-Tax Claims, and Intercompany Claims; the GUC Recovery Trustee, on behalf of the GUC Recovery Trust, has the exclusive authority to object to General Unsecured Claims; and the Consumer Representative has the exclusive authority to object to Consumer Creditor Claims. *See* Plan § 7.1. Hereinafter, the Plan Administrator, GUC Recovery Trustee and the Consumer Representative collectively will be referred to as the "Estate Representatives." On November 19, 2019, the Bankruptcy Court entered an Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures (ECF No. 1632) (the "Claims Procedures Order"). That order authorizes the Estate Representatives to object to Claims in accordance with the Claims Objection Procedures set forth in the order. *See* Claims Procedures Order ¶ 2. Without limitation, the procedures authorize the Estate Representatives to file Omnibus Objections to Claims seeking reduction, reclassification, or disallowance of Claims. In support of those objections, the Estate Representatives are permitted to rely on the grounds set forth in Bankruptcy Rule 3007(d), as well as on one or more of the following grounds:

(1) The amount claimed contradicts the Debtors' books and records;
(2) The Claim seeks recovery of amounts for which the Debtors are not liable;
(3) The Claims are not entitled to the asserted status or priority;
(4) There is insufficient legal basis for the Claim;
(5) The Claims do not include sufficient documentation to ascertain the validity of such Claims;
(6) The Claims were or will be satisfied in the normal course of business;
(7) The Claims have been waived, withdrawn, or disallowed pursuant to an agreement with the Debtors or an order of this Court; and
(8) The Claims are objectionable under section 502(e)(1) of the Bankruptcy Code.

*See id.* ¶ 2(i)(a)-(h).

Under the procedures, a properly filed and served response to an Omnibus Objection gives rise to a "Contested Claim." The Estate Representative is required to schedule a contested hearing (each a "Claim Hearing") for each such claim. *Id.* ¶ 3(iv). The Claim Hearing will be

scheduled as either a "Sufficiency Hearing" or a "Merits Hearing." A Sufficiency Hearing is a non-evidentiary hearing to address whether the Contested Claim has stated a claim for relief that can be allowed against the Debtors. *Id.* ¶ 3(iv)(a). The legal standard of review that the Court will apply at a Sufficiency Hearing is equivalent to the standard that the Court applies to motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id.* A Merits Hearing is an evidentiary hearing on the merits of the Contested Claims. *Id.* ¶ 3(iv)(b).

## Contested Claims

The following Contested Claims are at issue herein:

| | | |
|---|---|---|
| Claim No. 2448 | Claimant: | Michele and Thomas Sturman ("Secured Claim I") |
| | Debtor: | Ditech Holding |
| | Amount: | $995,000 |
| | Status: | Secured |
| | | |
| Claim No. 2685 | Claimant: | Michele and Thomas Sturman ("Secured Claim II," together with Secured Claim I, the "Secured Claims") |
| | Debtor: | Ditech Holding |
| | Amount: | $1,535,000 |
| | Status: | Secured |
| | | |
| Claim No. 2551 | Claimant: | Michele and Thomas Sturman ("Administrative Expense Claim") |
| | Debtor: | Ditech Holding |
| | Amount: | $158.99 |
| | Status: | Administrative Expense |

The Claimants filed a "Mortgage Proof of Claim Attachment" and an additional 70 pages of documents in support of Secured Claim I, and 15 pages of documents in support of Secured Claim II. They filed a one-page summary of expenses incurred in support of the Administrative

Expense Claim, together with a copy of the Debtors' Notice of Entry of the Confirmation Order.[5]

The Plan Administrator and Consumer Representative filed joint Objections to those claims.[6] The substance of the Objections is identical. In part, in support of the Objections, the Plan Administrator and Consumer Representative assert, as follows:

> The Plan Administrator asserts that based on the books and records, the Plan Administrator believes there is no basis for the Proof(s) of Claim.
>
> The Plan Administrator, with the assistance of its professionals, and the Consumer Representative have examined each Claim, documentation provided with respect to each Claim and the Debtors' respective books and records, and have determined in each case that (i) there is insufficient evidence to support the validity of the Claims, in the amounts and priorities asserted, and/or (ii) such Claims are deemed to have no merit by the Debtors.
>
> The Plan Administrator and the Consumer Representative believe the Claims have no basis at all in their entirety based on the Debtors' books and records and the supporting documentation submitted by the Borrower, if any.

*See, e.g.*, Seventeenth Omnibus Objection ¶ 13.

The Claimants timely filed a response to the Objections (the "Response").[7] The Plan Administrator and Consumer Representative jointly filed a reply to the Response (the "Reply").[8] They did not submit any documents in support of their Reply. The Court conducted a Sufficiency Hearing on the Contested Claims.

## **Applicable Legal Standards**

---

[5] *See* Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims (ECF No. 1449).

[6] *See* Seventeenth Omnibus Claims Objection to Proofs of Claim (No Basis Consumer Creditor Claims), dated January 17, 2020 (ECF No. 1749); Twenty-Sixth Omnibus Claims Objection to Proofs of Claim (No Basis Consumer Creditor Claims), dated January 17, 2020 (ECF No. 1758).

[7] *See* Objection to Motion (ECF No. 1903).

[8] *See* Joint Reply of Plan Administrator and Consumer Representative in Support of Omnibus Objections with Respect to Claims of Michele and Thomas Sturman (Claim Nos. 2448, 2551, 2685) (ECF No. 2027).

Under § 502(a) of the Bankruptcy Code, "a claim . . . proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). *See also* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). Section 502(b) sets forth the grounds for disallowing a properly filed proof of claim. *See* 11 U.S.C. § 502(b); *see also Travelers Cas. and Sur. Co. of Am. v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 449 (2007) ("But even where a party in interest objects [to a claim], the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b)"); *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07 Civ. 3088 (GBD), 2010 WL 3835200, at *5 (S.D.N.Y. Sept. 15, 2010) ("All claims are allowed unless specifically proscribed by one of the nine exceptions listed in § 502(b)." (citing *Travelers*, 549 U.S. at 449)). As relevant, § 502(b) states that if a party in interest objects to a claim, the Court:

> [A]fter notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that— (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]

11 U.S.C. § 502(b)(1). Whether a claim is allowable "generally is determined by applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006). In the face of a properly filed claims objection, the claimant must prove by a preponderance of the evidence that under applicable law the claim should be allowed. *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim."). "[T]he ultimate burden of persuasion is always on the claimant." *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991).

Bankruptcy Rule 7008 incorporates Rule 8 of the Federal Rule of Civil Procedure. As relevant, Rule 8 states that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). "In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009). *See also In re 20/20 Sport, Inc.*, 200 B.R. 972, 978 (Bankr. S.D.N.Y. 1996) ("In bankruptcy cases, courts have traditionally analogized a creditor's claim to a civil complaint [and] a trustee's objection to an answer[.]"). Accordingly, claims drafted by *pro se* claimants "are to be construed liberally, but they must nonetheless be supported by specific and detailed factual allegations sufficient to provide the court and the defendant with 'a fair understanding of what the plaintiff is complaining about and ... whether there is a legal basis for recovery.'" *Kimber v. GMAC Mortg., LLC (In re Residential Capital, LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (quoting *Iwachiw v. New York City Bd. of Elections,* 126 Fed. Appx. 27, 29 (2d Cir. 2005)).

Pursuant to the Claims Procedures Order, "the legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court [pursuant to Bankruptcy Rule 7012] upon a motion to dismiss for failure to state a claim upon which relief can be granted." *See* Claims Procedures Order, ¶ 3(iv)(a). Under Rule 12(b)(6), a claim may be dismissed due to a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under that rule, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323-24 (2d Cir. 2011), *cert.*

*denied*, 565 U.S. 1241 (2012). In assessing the sufficiency of the allegations, the Court accepts the complaint's factual allegations as true and must draw reasonable inferences in favor of the plaintiff. *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 323 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. As such, courts "are not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555. In assessing the merits of the Rule 12(b)(6) motion, the Court "must liberally construe all claims . . . and draw all reasonable inferences in favor of the plaintiff." *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003)). In particular, the Court must construe a *pro se* complaint liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008); *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008). Moreover, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 322.

## Facts[9]

The Claimants own a home located at 4328 Ocean View Drive, Malibu, California 90265 (the "Property"). They are borrowers under a series of mortgage loans secured by the Property. On January 5, 2004, the Claimants executed a mortgage for $370,000 with Countrywide Home Loans, Inc., with an initial interest rate of 6.875 percent and a maturity date of February 1, 2034

---

[9]  Subject to the standards applicable to Rule 12(b)(6) motions, the Court relies on the Contested Claims, the Responses and the documents annexed to the Contested Claims and Responses as the source of Facts for this Memorandum Decision and Order.

(the "2004 Mortgage"). *See* Secured Claim I at 28.[10] On August 12, 2005, the Claimants executed a new mortgage with Countrywide Home Loans, Inc. for $487,100, with an initial interest rate of 8.5 percent and a maturity date of September 1, 2035 (the "2005 Mortgage," and together with the 2004 Mortgage, the "Forward Mortgages"). *See id.* at 48-49. In October 2007, the Claimants entered into a reverse mortgage loan agreement (the "Reverse Mortgage") originated by Countrywide Bank, FSB ("Countrywide"). *See id.* at 56-68. At that time, the Claimants executed a Deed of Trust to secure advances to them under the Reverse Mortgage not to exceed $1,535,000 in the aggregate. *Id.* at 58.

Under the Reverse Mortgage, the Claimants had an initial principal limit of $537,250, but over time, the principal limit has increased. *See* Secured Claim I at 4, 6 & 7 (indicating principal limits of $892,591.79 as of Dec. 31, 2017; $900,051.53 as of Feb. 28, 2018, and $938,295.84 as of Jan. 19, 2019).[11] Interest accrues on the Reverse Mortgage monthly in proportion to the size of the loan balance. The accrued interest is then added to the loan balance. The interest rate adjusts every six months and is based on the six-month LIBOR index, plus a 3.5% margin. *Id.* at 4 & 63. The Reverse Mortgage matures on November 20, 2092. *Id.* at 58. Prior to maturity, it will become "due and payable" upon the Claimants' deaths or the sale of the Property, or at such time that the Property is no longer their principal residence. *Id.* at 61.[12] When the Reverse Mortgage becomes due and payable, the Claimants must either: (a) pay the balance in full; (b)

---

[10] References are to pages of the Proofs of Claim and filings are cited to the PDF page of the relevant Proof of Claim or filing.

[11] As the principal limit increased, the Claimants were able to borrow more money. For example, in 2017, the Claimants received loan advances of $43,300, and in 2018, the Claimants received loan advances of $45,400. *See* Secured Claim I at 5 & 7. In each instance, the totals of additional draws, or advances, were added to the loan balance.

[12] To date, none of these conditions has occurred, and there has been no demand for full repayment of the Reverse Mortgage.

sell the Property for the lesser of the balance or 95% of the appraised value, and apply the net proceeds of the sale towards the balance; (c) provide the lender under the Reverse Mortgage (the "Lender") a deed in lieu of foreclosure; or (d) correct the matter (e.g., non-occupancy or non-payment of taxes or insurance) that resulted in the loan becoming due and payable. *Id.* at 61-62. The Claimants are not personally liable for the payment of any amounts due under the Reverse Mortgage. That is because the Deed of Trust contains a "Non-Recourse Liability" provision which prevents the Lender from enforcing the monetary obligations under the Reverse Mortgage against anything other than the Property. *Id.* at 63. In or about January 2013, Reverse Mortgages Solutions ("RMS") became the servicer for the Reverse Mortgage. On April 8, 2013, RMS, as servicer, executed an assignment of Deed of Trust (the "Assignment") to Bank of America ("BofA"). *See id.* at 70. The Assignment recites the maximum secured amount of $1,535,000 provided for in the Deed of Trust. *Id.*

On September 9, 2019, the Claimants filed Secured Claim I, asserting a secured claim of $995,000, which they alleged was the amount of excessive interest charged on the Reverse Mortgage. *See* Response at 2.[13] On September 20, 2019, the Claimants filed an objection to the Debtors' Third Amended Plan (ECF No. 1360) (the "Plan Objection"). In the Plan Objection, the Claimants alleged that Countrywide's licensed inspector visited and appraised the Property at

---

[13] In support of that claim, they assert, as follows:

> THE AMOUNT OF $995,000.00 REPRESENTS THE HIGH AMOUNT OF INTEREST PUT ON OUR SMALL ORIGINAL LOAN OF $500,000. THE LOAN INCREASED TO $1,500,000 DUE TO THE INTEREST $995,000 AND OUR ADVANCES $505,000.

Response at 2. The Claimants included a "Mortgage Proof of Claim Attachment" in support of the claim. *See* Secured Claim I at 3. In it, they listed the principal balance of their Reverse Mortgage as $537,250, but the interest due on their Reverse Mortgage as $997,750, i.e., approximately $2,750 more than the amount the Claimants assert as their Secured Claim. *Id.* The Claimants do not account for the difference, although it is not material to the Court's resolution of the Objections.

a value of $2.0 million, and that Countrywide and BofA changed the valuation of the Property to $1.5 million and in 2013 placed a $1.5 million lien (the "2013 Lien") on the Property. Plan Objection at 1-2. The Claimants did not provide evidence of the $2.0 million appraisal, or any other documentation regarding the value of the Property. There is no evidence in the record of a lien being filed against the Property in 2013. The document which the Claimants refer to as creating the 2013 Lien appears to be the Assignment.

On November 7, 2019, the Claimants filed Secured Claim II. In it, they list the claim in the amounts of $1.210 million and $1.535 million.[14] The latter is the amount the Claimants assert in Secured Claim I as the value of the Property, as well as the total debt they owe on the Reverse Mortgage. *See* Secured Claim II at 2; Secured Claim I at 2-3. Among other things, in support of Secured Claim II, the Claimants attached a copy of a letter dated November 7, 2019 from Ms. Sturman to "Ditech Holding Corporation, Claims Processing Center." *Id.* at 4-5. Without limitation, in the letter, Ms. Sturman asserts that, due to high interest rates on their 2004 Mortgage, the accrued principal on such mortgage reached $1.535 million by 2013. *Id*. at 4. She also asserts that the $1.535 million principal under the Reverse Mortgage was due in November 2092, and that the 2013 Lien on the Property was therefore placed 79 years prematurely. *Id.* In doing so, Ms. Sturman apparently misconstrued the Assignment as a new lien and asserts that no

---

[14] The Claimants neither explain how they calculated the $1.210 million number, nor refer to that number again. The claim plainly exceeds $1.210 million. The Claimants included with their Proofs of Claim annual statements including a monthly loan transaction summary. According to the 2011 annual statement, the Claimants received $31,957.01 in advances and accumulated $30,871.51 in interest on the principal balance, bringing the outstanding balance of their Reverse Mortgage to approximately $804,000. *See* Secured Claim II at 15. The monthly loan transaction summary from BofA for August 2012 indicates that, as of August 31, 2012, the Claimants' principal had risen to approximately $849,000. *See* Secured Claim I at 9. The Claimants did not submit their financial statements for the period between 2013 and 2016. According to the 2017 annual statement, the Claimants received $43,300.00 in advances and accumulated $60,302.67 in interest on the principal balance, raising their outstanding loan balance to approximately $1,296,000. *Id.* at 6. According to the 2018 annual statement, the Claimants received $45,400.00 in advances and accumulated $76,754.02 in interest on the principal balance, raising their outstanding loan balance to approximately $1,418,000. *Id*. at 7.

lien should have been placed on the Property until the Reverse Mortgage matured in 2092. *Id.* On October 25, 2019, the Claimants filed their Administrative Expense Claim in the sum of $156.45 for the costs of copying and mailing their materials in connection with these chapter 11 cases. *See* Administrative Expense Claim at 1. They have since increased the claim to $158.99.

## Analysis

The Court summarizes the Claimants' contentions in support of the Secured Claims as follows: (1) BofA and RMS caused the 2013 Lien to be placed on the Property; (2) the Claimants cannot sell the Property without paying off the 2013 Lien, even though the Property is held in their names; (3) the 2013 Lien is "unfair" because it puts an actual amount that must be paid even though the Property may not be worth that amount if they decide to sell the Property; (4) the $995,000 in interest that has accrued under the Reverse Mortgage is excessive; (5) BofA or Countrywide changed the terms of their Reverse Mortgage between 2004 and 2013, as evidenced by the shifting maturity date on the Reverse Mortgage; and (6) the Reverse Mortgage had a very high interest rate and there were misrepresentations made to the Claimants, when they obtained the Reverse Mortgage. *See* Response at 1-2. The Court interprets the Secured Claim as seeking damages from Ditech Holding for alleged breaches of the Reverse Mortgage agreement through the filing of the alleged 2013 Lien, and the accrual of excessive interest charges under the Reverse Mortgage, and damages for allegedly misleading them and wrongly inducing them to enter into the Reverse Mortgage and execute the Deed of Trust.

The Claimants cannot plausibly assert a claim against RMS for fraudulently or negligently inducing them to enter into the Reverse Mortgage agreement because RMS did not begin to service the mortgage until 2013, and the Claimants do not allege that RMS played a role in the Reverse Mortgage transaction. There is no evidence in the record that could plausibly

support such a claim.[15] Nor can they plausibly state a breach of contract claim against RMS because RMS is not party to any of the agreements at issue herein.[16] Moreover, and in any event, as discussed below, the Claimants have failed to demonstrate that any of their claims have merit.

First, the Deed of Trust gave rise to a lien (the "2007 Lien") on the Property, and the documents that the Claimants submitted in support of the Secured Claims do not demonstrate that another lien was filed against the Property in 2013. The Claimants executed the Deed of Trust on October 9, 2007 and Countrywide recorded it in the land records on October 16, 2007. *See* Secured Claim I at 57 & 70. RMS assigned the Deed of Trust to BofA in 2013. In part, the Assignment states that it conveys "all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with Interest and all rights accrued or to accrue under said Deed of Trust." *Id.* The Assignment identifies the "Date of Deed of Trust" as the Deed of Trust executed on "10/9/2007," and the "Original Loan Amount" as $1,535,000. *Id.* Thus, the Assignment in 2013 did not give rise to a new loan or lien against the Property, and it did not alter the terms of the Deed of Trust. *Id*. Rather, through the Assignment, BofA is now the beneficiary under the

---

[15] In California, the "'elements of fraud which give rise to the tort action for deceit are: (1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage.'" *Bower v. AT & T Mobility, LLC*, 127 Cal. Rptr. 3d 569, 579 (Cal. Ct. App. 2011) (quoting *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 80 Cal. Rptr. 2d 329, 354 (Cal. Ct. App. 1998)). Similarly, "[t]he requirements of a claim for negligent misrepresentation coincide with those for fraud, except that they do not include knowledge of falsity or intent to defraud." *Ono v. Head Racquet Sports USA, Inc.*, No. CV 13–4222 FMO (AGRx), 2016 WL 6647949, at *14 (C.D. Cal. Mar. 8, 2016) (citations omitted).

[16] To establish "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Cal. Ct. App. 2008) (citation omitted).

Deed of Trust and holds the security interest in the Property arising under the Deed of Trust executed on October 9, 2007.

Second, the Claimants assert that the amount of the 2007 Lien and the amount owed under the Reverse Mortgage may be more than the selling value of the Property, and that they cannot sell the Property without paying off the lien. However, that is what is required under the terms of the Reverse Mortgage. The Deed of Trust provides that the Lender may require immediate payment in full of all claims secured by the Deed of Trust if "[a]ll of the Borrower's title in the Property . . . is sold or otherwise transferred[.]" *See* Secured Claim at 61.[17]

Third, the Claimants contend that the terms of their loan agreements changed without their knowledge or consent. As evidence of this change, the Claimants point to the different maturity dates for their Forward Mortgages and the Reverse Mortgage. The Court understands that Claimants to contend that the respective maturity dates for each of their loans was instead a change in the maturity date for their Reverse Mortgage -- as if they only had one loan rather than three loans: (i) the 2004 Mortgage, (ii) the 2005 Mortgage, and (iii) the Reverse Mortgage. *See* Secured Claim II at 4 ("In 2004 our principal was $370,000 with the reverse mortgage company…. However, due to the high interest rate our principal became $1,535,000 in 2013."). However, the record is clear that the maturity dates of the Claimants' loans did not change. The 2004 Mortgage had a maturity date of 2034, and the 2005 Mortgage had a maturity date of 2035. The Reverse Mortgage had a maturity date of 2092. Each alleged "changed" due date corresponds to a maturity date of a different mortgage of the Claimants.

---

[17] As previously noted, the Claimants' Reverse Mortgage is, by its own terms, nonrecourse, and therefore the Claimants will never be personally liable for the amounts due under the Deed of Trust. Only the Property can satisfy the obligations under the Deed of Trust. *See* Secured Claim I at 63.

Fourth, the Claimants assert that their Reverse Mortgage has accumulated "excessive interest" totaling $995,000. As of March 2018, the actual accrued interest on the Reverse Mortgage totaled $418,000, or roughly less than half of what the Claimants are asserting. *See* Secured Claim I at 4-5.[18] The Claimants have not demonstrated that they have accumulated $995,000 in interest under the Reverse Mortgage.[19]

Based on the foregoing, it is clear that the Secured Claims do not state plausible claims for relief against Ditech Holding. The same holds true for the Administrative Expense Claim. Section 507 of the Bankruptcy Code gives priority to "administrative expenses allowed under [11 U.S.C.] section 503(b)," which is defined as including "the actual, necessary costs and expenses of preserving the estate, including . . . wages, salaries and commissions for services rendered after the commencement of the case." 11 U.S.C. §§ 503(b)(1)(A), 507(a)(2). The Claimants have the burden to demonstrate their right to administrative priority. *See, e.g.*, *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it." (citing *Woburn Assocs. V. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992)); *In re Drexel Burnham Lambert Grp. Inc.,* 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) ("The burden of establishing entitlement to priority rests with the claimant and should only be granted under

---

[18] This estimate is calculated by subtracting the March 2018 principal balance ($896,169.95) from the March 28 closing loan balance ($1,314,230.04). *See id*. at 4-5.

[19] RMS correctly contends that the Claimants' February 2018 monthly statement provides a clear picture of how their Reverse Mortgage accumulated interest over time. The 2018 Statement indicates that the Claimants' were charged a 5% interest rate for the months of February, March, and April of 2018. Interest accrued on the Claimants' Reverse Mortgage daily, and the 2018 Statement breaks down the February 2018 interest rate into monthly and daily periodic rates. *See* Secured Claim II at 11-12. At the beginning of February 2018, the Claimants had an outstanding loan balance of $1,305,061.14, and in the month of February 2018, the Claimants requested an advance of $3,700. *Id* at 12. That month they accrued $5,448.90 in interest charges. *Id*. In March 2018, the Claimants' outstanding balance was comprised of approximately $896,000 in principal and approximately $418,000 in accrued interest. *Id*. at 11-12. In this light, the Claimants' own documents demonstrate that it is not possible that they accumulated almost $1 million interest on their Reverse Mortgage as they assert.

extraordinary circumstances . . . when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate." (citing *In re Amfesco Indus., Inc.*, 81 B.R. 777, 785 (Bankr. E.D.N.Y. 1988)) (internal quotation omitted). The Claimants contend that they incurred expenses totaling $158.99 in preparing various filings in connection with these chapter 11 cases, mainly costs for postage, docket downloads, copies, faxes etc. *See* Response at 3-4. "[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, . . . and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (citations and quotations omitted). *See also In re Hostess Brand, Inc.*, 499 B.R. 406, 411-12 (S.D.N.Y. 2013). In this light, the Claimants' Administrative Expense Claim is simply not an allowable administrative expense claim under §§ 507 and 503 of the Bankruptcy Code. The asserted administrative expenses were not costs incurred to preserve the Debtors' estates but rather costs expended by the Claimants to participate in these chapter 11 cases. They have not demonstrated any grounds for according such claim administrative priority. Accordingly, the Court expunges the Administrative Expense Claim.

## Conclusion

The Court finds that accepting all factual allegations asserted by the Claimants in support of their Contested Claims as true, drawing all reasonable inferences in the Claimants' favor, and interpreting the Contested Claims, Responses and documents submitted by the pro se Claimants in support thereof to raise the strongest arguments that they suggest, the Claimants have not met their burden of demonstrating that the Contested Claims state claims for relief against Ditech

Holding that are plausible on their face.  Accordingly, the Court sustains the Objections and expunges the Contested Claims.

IT IS SO ORDERED.

Dated: July 3, 2020
      New York, New York

/s/ *James L. Garrity, Jr.*
Honorable James L. Garrity, Jr.
United States Bankruptcy Judge