UNITED STATES BANKRUPTCY COURT                          NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
In re                                               :        Chapter 11
                                                    :
DITECH HOLDING CORPORATION, *et al.*,               :        Case No. 19-10412 (JLG)
                                                    :
Debtors.[1]                                         :        (Jointly Administered)
                                                    :
-------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER ON THE FIRST AND ELEVENTH
OMNIBUS OBJECTIONS TO PROOFS OF CLAIMS WITH RESPECT TO THE
CLAIMS OF SOPHIA ELAINE DEMONTEGNAC AND  DESMOND ROY
DEMONTEGNAC (CLAIM NOS. 22628 AND 22631)**

**<u>APPEARANCES</u>:**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
By:     Sunny Singh
        Richard W. Slack
        Angeline J. Hwang

*Counsel for the Plan Administrator*

Tara Twomey
P.O. Box 5146
Carmel, CA 93921

*Consumer Representative*

Desmond Roy Demontegnac
36 Wentworth Street, Apartment 1
Boston, MA 02124

*Claimant, pro se*

---

[1]    The Debtors' Plan (as defined below) was confirmed, which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:

### Introduction

By order dated September 26, 2019 (the "Confirmation Order"), Ditech Holding

Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates

(collectively, the "Debtors") confirmed the Third Amended Joint Chapter 11 Plan of Ditech

Holding Corporation and its Affiliated Debtors (the "Plan").[2]  Under the Plan, the Plan

Administrator, the GUC Recovery Trustee, and the Consumer Representative have the exclusive

authority to object to Claims filed against the Debtors.[3]  In accordance with the Claims

Procedures Order, the Plan Administrator and the Consumer Representative have jointly filed

Omnibus Objections to Proofs of Claim (each an "Objection") that extend to thousands of

Claims.  Under those procedures if a creditor challenges an Objection, it is deemed to hold a

"Contested Claim" and the Court will conduct either a "Merits Hearing" or a "Sufficiency

Hearing" on the Contested Claim.  Before the Court are the Objections of the Plan Administrator

and Consumer Representative to the Contested Claims filed by Desmond Roy Demontegnac

---

[2] *See* Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, dated
September 22, 2019 [ECF No. 1326]; Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding
Corporation and Its Affiliated Debtors, dated September 26, 2019 [ECF No. 1404]. All capitalized terms are defined
below or in the Plan.  All references to "ECF No. ___" are references to documents filed in these Chapter 11 Cases,
Jointly Administered under Case No. 19-10412.

[3]     Briefly, and without limitation, the Plan calls for the consummation of a Sale Transaction followed by the
"Wind Down" of the Estates.  *See* Plan Article V (Means for Implementation).  For these purposes, the term "Wind
Down" means "following the closing of the Sale Transaction, the process to wind down, dissolve and liquidate the
Estates and distribute any remaining assets in accordance with the Plan." *See id.* § 1.184.  The "Wind Down
Estates" consist of the Debtors (excluding Reorganized RMS) pursuant to and under the Plan on or after the
Effective Date.  *See id.* § 1.186.  The Plan Administrator appointed under the Plan (*see id.* § 1.130) has the authority
and right on behalf of each of the Debtors to carry out and implement all provisions of the Plan, including, without
limitation, to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than
with respect to General Unsecured Claims and Consumer Creditor Claims (*see id.* § 5.6(e)).  The Plan Administrator
is also responsible for making distributions to holders of Allowed Claims in accordance with the Plan, other than
with respect to holders of Allowed General Unsecured Claims and Allowed Consumer Creditor Claims.  *Id.*

("Desmond Roy") and Sophia Elaine Demontegnac ("Sophia Elaine," and with Desmond Roy,

the "Claimants") against Ditech Financial LLC (f/k/a Green Tree Servicing LLC) ("Ditech

Financial").  Pursuant to the Objections, the Plan Administrator and Consumer Representative

seek to expunge the Contested Claims.

The Court conducted a Sufficiency Hearing on the Contested Claims.  Pursuant to the

Claims Procedure Order, the legal standard of review that the Court applies at a Sufficiency

Hearing is equivalent to the standard applied by the Court upon a motion to dismiss pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure.[4]  For the reasons stated herein, the Court

finds that accepting all factual allegations asserted by the Claimants in support of their Contested

Claims as true, drawing all reasonable inferences in the Claimants' favor, and interpreting the

Contested Claims, Responses and documents submitted by the *pro se* Claimants in support

thereof to raise the strongest arguments that they suggest, the Contested Claims fail to state

claims against Ditech Financial that are plausible on their face.  Accordingly, the Court sustains

the Objections and expunges the Contested Claims.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to §§ 1334(a) and 157(a) of title 28

of the United States Code, and the Amended Standing Order of Referral of Cases to Bankruptcy

Judges of the United States District Court for the Southern District of New York, dated January

31, 2012 (Preska, C.J.).  This is a core proceeding.  28 U.S.C. § 157(b)(2)(B).

## Background

---

[4]    Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") makes Rule 12 of the
Federal Rules of Civil Procedure applicable herein.

On February 11, 2019 (the "Commencement Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). On March 27, 2019, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") (ECF Nos. 289-313). On May 7, 2019, the Debtors filed certain amended Schedules (ECF Nos. 511-512).

On February 22, 2019, the Court entered the Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (ECF No. 90) (the "Bar Date Order"). Pursuant to the Bar Date Order, the Court set April 1, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity, not including governmental units (as defined in § 101(27) of the Bankruptcy Code) to file a proof of claim in the Debtors' chapter 11 cases (the "General Bar Date"). On March 27, 2019, the Court extended the General Bar Date to April 25, 2019 at 5:00 p.m. (prevailing Eastern Time) (ECF No. 272) (the "Extended General Bar Date"). On May 2, 2019, the Court extended the Extended General Bar Date solely for consumer borrowers to June 3, 2019 at 5:00 p.m. (prevailing Eastern Time) (ECF No. 496). The claims register is prepared and maintained by Epiq Corporate Restructuring, LLC. It shows that approximately 7,800 proofs of claim were filed in the chapter 11 cases. Pursuant to the Confirmation Order, the Court set the deadline for each person or entity asserting Administrative Expense Claims to file proofs of claim in the chapter 11 cases to thirty-five (35) days from the date of service of the notice of entry of the Confirmation Order - November 11, 2019.

### Claim Objection Procedures

Under the Plan, the Plan Administrator, on behalf of each of the Wind Down Estates, has exclusive authority to object to Administrative Expense Claims, Priority Tax Claims, Priority

Non-Tax Claims, and Intercompany Claims; the GUC Recovery Trustee, on behalf of the GUC

Recovery Trust, has the exclusive authority to object to General Unsecured Claims; and the

Consumer Representative has the exclusive authority to object to Consumer Creditor Claims.

*See* Plan § 7.1.  Hereinafter, the Plan Administrator, GUC Recovery Trustee and the Consumer

Representative collectively will be referred to as the "Estate Representatives."  On November 19,

2019, the Bankruptcy Court entered an Order Approving (I) Claim Objection Procedures and (II)

Claim Hearing Procedures (ECF No. 1632) (the "Claims Procedures Order").  That order

authorizes the Estate Representatives to object to Claims in accordance with the Claims

Objection Procedures set forth in the order.  *See* Claims Procedures Order ¶ 2.  Without

limitation, the procedures authorize the Estate Representatives to file Omnibus Objections to

Claims seeking reduction, reclassification, or disallowance of Claims.  In support of those

objections, the Estate Representatives are permitted to rely on the grounds set forth in

Bankruptcy Rule 3007(d), as well as on one or more of the following grounds:

(1) The amount claimed contradicts the Debtors' books and records;
(2) The Claim seeks recovery of amounts for which the Debtors are not liable;
(3) The Claims are not entitled to the asserted status or priority;
(4) There is insufficient legal basis for the Claim;
(5) The Claims do not include sufficient documentation to ascertain the validity of such Claims;
(6) The Claims were or will be satisfied in the normal course of business;
(7) The Claims have been waived, withdrawn, or disallowed pursuant to an agreement with the Debtors or an order of this Court; and
(8) The Claims are objectionable under section 502(e)(1) of the Bankruptcy Code.

*See id.* ¶ 2(i)(a)-(h).

Under the procedures, a properly filed and served response to an Omnibus Objection

gives rise to a "Contested Claim."  The Estate Representative is required to schedule a contested

hearing (each a "Claim Hearing") for each such claim.  *Id.* ¶ 3(iv).  The Claim Hearing will be

scheduled as either a "Sufficiency Hearing" or a "Merits Hearing." A Sufficiency Hearing is a

non-evidentiary hearing to address whether the Contested Claim has stated a claim for relief that

can be allowed against the Debtors. *Id.* ¶ 3(iv)(a). The legal standard of review that the Court

will apply at a Sufficiency Hearing is equivalent to the standard that the Court applies to motions

under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id*. A Merits Hearing is an

evidentiary hearing on the merits of the Contested Claims. *Id.* ¶ 3(iv)(b).

## **Contested Claims**

The following Contested Claims are at issue herein:

| | | |
|---|---|---|
| Claim No. 22628 | Claimant: | Desmond Roy (the "Desmond Roy Claim") |
| | Debtor: | Ditech Financial |
| | Amount: | $119,500,000 |
| | Status: | Secured |

| | | |
|---|---|---|
| Claim No. 22631 | Claimant: | Sophia Elaine (the "Sophia Elaine Claim") |
| | Debtor: | Ditech Financial |
| | Amount: | $112,500,000 |
| | Status: | Secured |

The Claimants did not include a narrative description of their Claims in their respective proofs of

claim, although both annexed voluminous documentation to the claims.

The Plan Administrator and Consumer Representative filed joint Objections to those

claims.[5] The substance of the Objections is identical. In part, in support of the Objections, the

Plan Administrator and Consumer Representative assert, as follows:

---

[5] The Plan Administrator and Consumer Representative jointly objected to the Desmond Roy Claim in the First
Omnibus Objection and to the Sophia Elaine Claim in the Eleventh Omnibus Objection. *See* First Omnibus
Objection to Proofs of Claim (No Basis Consumer Creditor Claims), dated December 6, 2019 [ECF No. 1666];
Eleventh Omnibus Claims Objection to Proofs of Claim (No Basis Consumer Creditor Claims), dated January 7,
2020 [ECF No. 1743].

The Plan Administrator asserts that based on the books and records, the Plan Administrator believes there is no basis for the Proof(s) of Claim.

The Plan Administrator, with the assistance of its professionals, and the Consumer Representative have examined each Claim, documentation provided with respect to each Claim and the Debtors' respective books and records, and have determined in each case that (i) there is insufficient evidence  to support the validity of the Claims, in the amounts and priorities asserted, and/or (ii) such Claims are deemed to have no merit by the Debtors.

The Plan Administrator and the Consumer Representative believe the Claims have no basis at all in their entirety based on the Debtors' books and records and the supporting documentation submitted by the Borrower, if any.

*See, e.g.,* First Omnibus Objection ¶ 13.

Each Claimant timely filed a response to the Objections (collectively, the "Responses").

The Responses are identical in form and substance, except for the identity of the Claimant and the amount of damages claimed by the Claimant.  The Responses are, as follows:

(i)    Opposition of the Disallowance and Expungement of Proof of Claim Reply to Ditech's Request to Justify UCC Lien Placed Against Real Property [ECF No. 1706] ("Desmond Roy Response")

(ii)   Supplement and Amendment as Requested by the Court, and Here is the Supplement and Amendment as follows of Proof of Claim (22631) Reply to Ditechs [sic] Request to Justify UCC Lien Placed Against Real Property [ECF No. 1830] ("Sophia Elaine Response")

In their Responses, the Claimants included narrative descriptions of their Claims, including citations to facts and law in support of the claims.  They annexed to the Responses copies of the documents that they attached to their Claims.  *See* Desmond Roy Response, Exs. A-E; Sophia Elaine Response, Exs. A-E.  The Plan Administrator and Consumer Representative jointly filed a Reply and Supplemental Reply to the Responses.  *See* Joint Reply of Plan Administrator and Consumer Representative in Support of the First Omnibus Objection with Respect to Claim of Desmond Roy Demontegnac (Claim No. 22628) [ECF No. 1834]; Supplemental Joint Reply of Plan Administrator and Consumer Representative in Support of Omnibus Objections to Claims

of the Demontegnacs [ECF No. 2028].  They did not submit any documents in support of their

replies.  The Court conducted a joint Sufficiency Hearings on the Contested Claims.

## <u>Applicable Legal Standards</u>

Under § 502(a) of the Bankruptcy Code, "a claim . . . proof of which is filed under

section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. §

502(a).  *See also* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance

with these rules shall constitute prima facie evidence of the validity and amount of the claim.").

Section 502(b) sets forth the grounds for disallowing a properly filed proof of claim.  *See* 11

U.S.C. § 502(b); *see also Travelers Cas. and Sur. Co. of Am. v. Pacific Gas and Elec. Co.,* 549

U.S. 443, 449 (2007) ("But even where a party in interest objects [to a claim], the court 'shall

allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions

enumerated in § 502(b)"); *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07 Civ. 3088 (GBD),

2010 WL 3835200 at *5 (S.D.N.Y. Sept. 15, 2010) ("All claims are allowed unless specifically

proscribed by one of the nine exceptions listed in § 502(b)." (citing *Travelers,* 549 U.S. at 449)).

As relevant, § 502(b) states that if a party in interest objects to a claim, the Court:

> [A]fter notice and a hearing, shall determine the amount of such claim in lawful
> currency of the United States as of the date of the filing of the petition, and shall
> allow such claim in such amount, except to the extent that— (1) such claim is
> unenforceable against the debtor and property of the debtor, under any agreement
> or applicable law for a reason other than because such claim is contingent or
> unmatured[.]

11 U.S.C. § 502(b)(1).  Whether a claim is allowable "generally is determined by applicable

nonbankruptcy law."  *In re W.R. Grace & Co*., 346 B.R. 672, 674 (Bankr. D. Del. 2006).  In the

face of a properly filed claims objection, the claimant must prove by a preponderance of the

evidence that under applicable law the claim should be allowed.  *In re Rockefeller Ctr. Props*.,

272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to

overcome the prima facie validity of the claim, the claimant is required to meet the usual burden

of proof to establish the validity of the claim."). "[T]he ultimate burden of persuasion is always

on the claimant." *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991).

Bankruptcy Rule 7008 incorporates Rule 8 of the Federal Rule of Civil Procedure. As

relevant, Rule 8 states that a claim for relief must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). "In determining

whether a party has met their burden in connection with a proof of claim, bankruptcy courts have

looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." *In re

DJK Residential LLC,* 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009). *See also In re 20/20 Sport,

Inc.,* 200 B.R. 972, 978 (Bankr. S.D.N.Y. 1996) ("In bankruptcy cases, courts have traditionally

analogized a creditor's claim to a civil complaint [and] a trustee's objection to an answer[.]").

Accordingly, claims drafted by *pro se* claimants "are to be construed liberally, but they must

nonetheless be supported by specific and detailed factual allegations sufficient to provide the

court and the defendant with 'a fair understanding of what the plaintiff is complaining about and

... whether there is a legal basis for recovery.'" *Kimber v. GMAC Mortg., LLC (In re Residential

Capital, LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (quoting Iwachiw *v. New York City

Bd. of Elections,* 126 Fed. Appx. 27, 29 (2d Cir. 2005)).

Pursuant to the Claims Procedures Order, "the legal standard of a review that will be

applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the

Court [pursuant to Bankruptcy Rule 7012] upon a motion to dismiss for failure to state a claim

upon which relief can be granted." *See* Claims Procedures Order, ¶ 3(iv)(a). Under Rule

12(b)(6), a claim may be dismissed due to a "failure to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6).  Under that rule, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323-24 (2d Cir. 2011), *cert. denied*, 565 U.S. 1241 (2012).  In assessing the sufficiency of the allegations, the Court accepts the complaint's factual allegations as true and must draw reasonable inferences in favor of the plaintiff.  *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 323 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678.  As such, courts "are not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555.  In assessing the merits of the Rule 12(b)(6) motion, the Court "must liberally construe all claims . . . and draw all reasonable inferences in favor of the plaintiff." *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003)).  In particular, the Court must construe a *pro se* complaint liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008); *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008).  Moreover, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 322.

## **Facts**[6]

---

[6]    Subject to the standards applicable to Rule 12(b)(6) motions, the Court relies on the Contested Claims, the Responses and the documents annexed to the Contested Claims and Responses as the source of Facts for this Memorandum Decision and Order.

Desmond Roy and Sophia Elaine are borrowers under a second lien residential mortgage loan (the "Loan") that was originated by Household Finance Corporation II on December 14, 2006.  Desmond Roy Response at 192.[7]  The Loan totaled $54,927.77 and is secured by real property located at 36 Wentworth Street, Apt. 1, Boston, MA 02124.  *Id.*  On June 16, 2014, the servicing of the Loan was transferred to Ditech Financial.  *Id.* at 168.  On May 3, 2018, Desmond Roy sent a self-styled Common Law Copyright Notice (the "Copyright Notice") to the Debtor.  In part, it asserts a:

> Copyright of trade-name/trademark DESMOND ROY DEMONTEGNAC TRUST including any and all derivatives and variations in the spelling, i.e. <u>NOT</u> limited to all capitalized names: DESMOND ROY DEMONTEGNAC TRUST . DESMOND ROY DEMONTEGNAC or any derivatives thereof are under Copyright 1967.  Said common-law trade-name/trademark, DESMOND ROY DEMONTEGNAC TRUST may neither be used nor reproduced, neither in whole or in part, in any manner whatsoever, without the prior, express, written consent and acknowledgment of Trustee/Trust in writing.

Desmond Roy Claim at 10.  On April 20, 2018, Sophia Elaine sent a nearly identical notice to the Ditech Financial.  *See* Sophia Elaine Claim at 10-11.

Without limitation, the Copyright Notice advises that:

> **With the Intent of being Contractually Bound**, any Juristic Person, as well as the agent thereof, by notice of this copyright is noticed that neither said Juristic Person nor agent thereof is authorized to display, nor otherwise use in any manner, the common-law trade-name/trademark nor the copyright described herein, nor any derivative of,  nor any variation in the spelling thereof, without the prior, written consent and acknowledgment of Trustee/TRUST, as signified in writing with signed consent.  Trustee/Trust neither grants, nor implies, nor otherwise gives consent for any unauthorized use of DESMOND ROY DEMONTEGNAC, and **all such unauthorized use is strictly prohibited.**

---

[7]    As noted, in form and substance, the Sophia Elaine's Contested Claim and Response are identical to the Desmond Roy's Contested Claim and Response.  Except as necessary to highlight facts unique to Sophia Elaine's Contested Claim, the Court will only cite to the Desmond Roy's Claim and/or Response.

Desmond Roy Claim at 10.  The Copyright Notice goes on to state **"[t]his is notification that you are in BREACH"** and offers **"two options for remedy."**  *Id.*  The second option is relevant herein.  It purports to give rise to a "Self-executing Contract/Security Agreement."  Under that option, Ditech Financial, as "the Juristic Person and the agent thereof" as "User," is deemed "to consent and agree that any use of trade-name/trademark copyright other than authorized use as set forth [in the Copyright Notice] constitutes unauthorized use and counterfeiting of property, contractually binds User and renders this [Copyright] Notice a Security Agreement wherein User is TRUST and DESMOND ROY DEMONTEGNAC TRUST is Secured Party."  Desmond Roy Claim at 10, ¶ 2(a).  In summary it also provides that the Copyright Notice signifies that User:

> (i) "consents to be invoiced for outstanding balance and agrees that User shall pay TRUST all unauthorized use fees in full within thirty (30) days of the date User is sent an 'Invoice' itemizing said fees";
>
> (ii) "[g]rants Trustee/Trust the right to invoice three times at thirty day intervals at which time User consents to the outstanding balance with will be filed as a lien/levy via a UCC Financing Statement . . . and that Secured Party may file such lien/levy against property as a security interest in all of User's assets, land and personal property, and all of User's interest in assets, land and personal property, in the sum certain amount of $500,000 per each occurrence of use of the common-law copyrighted trade-name/trademark plus costs, plus triple damages"; and
>
> (iii) "[c]onsent[s] and agrees that said UCC Financing Statement . . . is a continuing financing statement."

*Id.* ¶ 2(b)-(d).  The copies of the Copyright Notice annexed to the Contested Claims are not executed by Ditech Financial and the record does not otherwise include a copy of the Copyright Notice executed by Ditech Financial.  Beginning in May 2018, Desmond Roy sent a total of three single page invoices (the "Desmond Roy Invoices") to Ditech Financial asserting penalties for its alleged unauthorized use of his name aggregating $119,500,000.  *See* Desmond Roy Claim at 7-9.  In his invoices, Desmond Roy asserts that Ditech Financial executed the Copyright Notice on May 11, 2018, June 18, 2018, and July 17, 2018.  *Id.*.  Sophia Elaine also purported to

invoice Ditech Financial three times (the "Sophia Elaine Invoices") for penalties totaling $112,500,000 based upon its alleged unauthorized use of her name. *See* Sophia Elaine Claim at 7-9. In her invoices, Sophia Elaine asserts that Ditech Financial executed the Copyright Notices on May 11, 2018, June 18, 2018 and July 4, 2018. *See* Sophia Elaine Claim at 7-9. [8]

Between May and June 2018, the parties communicated in an effort to resolve the disputes.[9] On May 31, 2018, the Debtor informed the Claimants' that their "common law copyright" claims were invalid and may have originated from an online debt elimination scam. *See* Desmond Roy Claim at 32; Sophia Elaine Claim at 24. On August 28, 2018 Sophia Elaine filed her UCC-1 Financing Statement and on August 31, 2018 Desmond Roy filed his UCC-1 Financing Statement (collectively, the "Financing Statements") in the amount of $112,500,000 and $119,500,000 respectively, to secure their claims predicated on Ditech Financial's alleged common law copyright and/or trade-name violations. Desmond Roy Claim at 6; Sophia Elaine Claim at 6. The respective statements named Ditech Financial as debtor and Desmond Roy and

---

[8]    The Desmond Roy Invoices consist of those dated:

   May 31, 2018:  $2 million penalty for 4 uses of Desmond Roy's name.

   July 1, 2018:  $74,500,000 penalty for an aggregated 119 uses of Desmond Roy's name.

   July 31, 2018:  $119,500,000 penalty for an aggregated 239 uses of Desmond Roy's name.

The Sophia Elaine Invoices consist of those dated:

   May 17, 2018: $1,000,000 claim for 2 uses of the Claimant's name.

   June 18, 2018: $74,000,000 claim for aggregated 148 uses of the Claimant's name.

   July 18, 2018:  $112,500,000 claim for aggregated 225 uses of the Claimant's name.

Sophia Elaine Claim at 7-9.

[9] *See* Desmond Roy Claim at 24-39 (correspondence from Ditech Financial directed to the Claimants.)

Sophia Elaine, respectively, as the secured party and purported to cover "all of [the] Debtor's

assets, land, and personal property[.]"  Desmond Roy Claim at 6; Sophia Elaine Claim at 6.

## Analysis

As set forth in the Contested Claims and Responses, the essence of the Contested Claims

is that in sending payment notices and other correspondence to the Claimants, in their respective

names, Ditech Financial violated the Copyright Notice and with that, copyright law and

trademark law.  In resolving the Objections, the Court considers whether the Contested Claims

state claims for relief under copyright and trademark law.

## Copyright Infringement

The Claimants' copyright infringement claim consists of two parts.  They allege (i) that

Ditech Financial has appropriated copyrighted materials – i.e., their names, and (ii) that it

unlawfully reproduced their names.  *See* Desmond Roy Invoices; Sophia Elaine Invoices.  To

state a claim for copyright infringement under the Copyright Act the Claimants must state facts

demonstrating that they owned a valid copyright, and that the Ditech Financial copied constituent

elements of the work that are original.  *See Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011)

("To maintain an action for [copyright] infringement, a plaintiff must establish '(1) ownership of

a valid copyright, and (2) copying of constituent elements of the work that are original.'"

(quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991))).  *See also*

*Charles v. Seinfeld*, 410 F. Supp. 3d 656, 659 (S.D.N.Y. 2019) ("To successfully sue for

copyright infringement, a plaintiff must show '(1) ownership of a valid copyright, and (2)

copying of constituent elements of the work that are original.'" (quoting *Kwan v. Schlein*, 634

F.3d at 229)).

The Court first considers whether the Claimants have alleged facts in the Contested Claims demonstrating that "the material alleged to have been copied [i.e., their names] is itself copyrightable[.]" *Skinder-Strauss Assocs. v. Mass. Continuing Legal Educ., Inc.*, 914 F. Supp. 665, 670 (D. Mass. 1995). "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression[.]" 17 U.S.C. § 102. Valid copyrights under the Copyright Act concern the original expression of ideas, "independently created by the author" and "possess[ing] at least some minimal degree of creativity." *Sands v. CBS Interactive Inc.*, No. 18-cv-7345 (JSR), 2019 WL 1447014, at *3 (S.D.N.Y. March 13, 2019) (citing to *Feist Publ'ns, Inc.,* 499 U.S. at 361)). Accordingly, "'[t]he *sine qua non* of copyright is originality.' . . . Originality is a constitutional requisite and requires that the 'work was independently created by the author (as opposed to copied from other works) and that it possesses at least some minimal degree of creativity.'" *New York Mercantile Exch., Inc. v. IntercontinentalExchange*, *Inc.*, 497 F.3d 109, 113 (2d Cir. 2007) (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 345). "[I]t is axiomatic that words, short phrases, titles, and slogans are not subject to copyright[.]" *Moody v. Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992) (single words or short phrases are not copyrightable); *Ventures Educ. Sys. Corp. v. Prof'l Dev. Assocs., Inc.*, No. 07–CV–223, 2008 WL 3166667, at *3 (S.D.N.Y. July 31, 2008) ("There is . . . no copyright protection for titles, words, or ordinary phrases." (citing *Arica Inst., Inc. v. Palmer*, 970 F.2d at 1072)).

Assuming, *arguendo*, the truth of the allegations in support of the Contested Claims and drawing all reasonable inferences in favor of the Claimants, the Claimants have not plausibly alleged a claim for copyright infringement against Ditech Financial, and they are not able to do so. That is because a person's name is not copyrightable material. *See Bell v. Blaze Magazine*,

No. 99 Civ. 12342 (RCC), 2001 WL 262718, at *2 (S.D.N.Y. March 16, 2001) (citing *Arica Inst., Inc. v. Palmer*, 970 F.2d at 1072); *see also* 37 C.F.R. § 202.1(a) (2018) ("[w]ords and short phrases such as names" are not subject to copyright).  As such, as a matter of law, they cannot state a claim for copyright infringement on the part of Ditech Financial.  *Momentum Luggage & Leisure Bags v. Jansport, Inc.,* No. 00 CIV. 7909 (DLC), 2001 WL 830667 at *7 (July 23, 2001) (granting summary judgment to defendant on Lanham Act claim finding that plaintiff had not demonstrated that it had a valid mark entitled to protection and "[e]ven if plaintiff owned common law trademark rights in the 'Momentum' mark, . . . its federal claim for trademark infringement would fail because it has not shown that Jansport's use of the 'Momentum' mark is likely to cause confusion[.]"); *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 429 (S.D.N.Y. 2012) (in action brought by clothing designer asserting, among other claims, Lanham Act claims against Old Navy for its use of "Lower East Side," "LES NYC," and "LES" marks, the district court granted summary judgment to the defendant on the Lanham Act claims finding that "considered together, the six relevant factors favor, decisively, a finding of no secondary meaning[,]" and concluding that "[o]n the evidence at hand, no reasonable jury could find that . . . consumers had come to identify the Lower East Side Mark or LES NYC Mark with [the plaintiff] or his company."); *Bell v. Blaze Magazine*, 2001 WL 262718, at *3-4 (S.D.N.Y. March 16, 2001) (In action brought by *pro se* plaintiff asserting copyright infringement claims against a magazine and certain of its contributors for their use of a manuscript he created entitled "Hip Hop Behind the Walls" in writing and publishing articles in the magazine, the district court granted summary judgment to the defendants finding that the ideas expressed in the manuscript were not novel and it had "examined all of the[] alleged similarities and conclude[ed] that they all relate[d] to unprotectable concepts and ideas and not Plaintiff's expression of th[ose] ideas.").  *See also*

*Demontegnac v. Selene Finance L.P.*, No. 18-12560 (NMG), 2019 WL 3546885 at *8 (D. Mass.
April 16, 2019) ("Because a name is not a copyrightable work of creativity or authorship, the
complaint fails to allege facts to plausibly establish the first element of copyright infringement,
ownership of a valid copyright.  Therefore, the complaint fails to state a claim for copyright
infringement.")[10]

## **Trademark Infringement**

Trademark and trade-name protection serve to safeguard the holder's commercial interest
in a distinctive mark or name.  *See Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) ("principle
underlying trademark protection is that distinctive marks . . . distinguish a particular artisan's
goods from those of others." (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct.

---

[10]    This is not the first time that Desmond Roy has asserted trade-name/trademark and copyright infringement
claims against loan servicers based upon their use of his name in alleged violation of a "Common Law Copyright
Notice."  In *Demontegnac v. Selene Finance L.P.*, 2019 WL 3546885, Desmond Roy sued Selene Finance LP
("Selene") and Select Portfolio Servicing ("SPS" and collectively with Selene, the "Defendants") for damages
occasioned by their alleged copyright and trademark/tradename infringement, breach of contract, and breach of a
security agreement (the "Complaint").  *Id.* at *1.  The Defendants moved to dismiss the Complaint pursuant to Rule
12(b)(6) on the grounds that the Complaint was "devoid of sufficient facts to plausibly suggest" that Desmond Roy
could state a claim for relief  or, alternatively, under the doctrine of res judicata because the claims were adjudicated
in a prior litigation.  *Id.*

The loan at issue was evidenced by a loan agreement executed by Desmond Roy and Sophia Elaine on October 3,
2007 in the amount of $459,997.54 in favor of Household Financing Corp. II and secured by a mortgage on what
appears to be the real property located at 36 Wentworth Street.  *Id.* at *3.  SPS serviced the Demontegnacs' loan
from March 20, 2015 through June 27, 2018, whereupon Selene took over as servicer.  *Id.*  At some point Desmond
Roy sent each Defendant "Common Law Copyright Notices" virtually identical to those at issue herein.  *Id.* at *5.
Between April 23 and June 25, 2018, Desmond Roy mailed three invoices to SPS billing it between $2 million and
$28 million for between four and 56 "unauthorized uses."  *Id.* at *6.  Similarly, between July 9 and September 13,
2018, Desmond Roy mailed Selene three nearly identical invoices billing it between $5 million and $19 million for
between 10 and 38 "unauthorized uses" *Id.*  When the Defendants refused to pay the invoices, Desmond Roy filed
UCC Financing Statements naming the Defendants as debtors and himself as a secured creditor for the amounts due
under the invoices.  *Id.*

In its report and recommendation recommending dismissal of the Complaint, the court found, without limitation,
that the Claimants failed to "allege facts sufficient to plausibly show a valid trademark or trade-name," and that
"[b]ecause a name is not a copyrightable work of creativity or authorship, the [Claimant] fails to allege facts to
plausibly establish . . . ownership of a valid copyright." *Id.* at *7-8.  That decision does not have the force of
collateral estoppel or res judicata in this matter.  However, the well-reasoned decision supports this Court's
conclusion that the Contested Claims do not state claims for copyright or trademark infringement.

1293, 1299 (2015))).  Accordingly, the principal purpose of federal trademark law is to secure

"the public's interest in protection against deceit as to the sources of its purchases, [and] the

businessman's right to enjoy business earned through investment in the good will and reputation

attached to a trade name."  *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d

Cir.1995) (alteration in the original) (quoting *Nat'l Color Labs, Inc. v. Phillip's Foto Co.*, 273 F.

Supp. 1002, 1003 (S.D.N.Y. 1967)).  A trade name is entitled to protection if it identifies a

person's "business or vocation."  *See* 15 U.S.C. § 1127.  In that way, "a trade name is a name,

phrase or symbol that is used to identify and distinguish the business itself from other entities

rather than distinguishing the goods or services the company provides."  *Dial-A-Mattress*

*Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1346 (E.D.N.Y. 1997); *see also*

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986) ("A name becomes a

trade name and merits protection under [federal trademark law] . . . when it acquires a

'secondary meaning', i.e., when the name comes to 'symbolize a particular business ...' to

consumers." (quoting *Dallas Cowboys, Etc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 n.5 (2d

Cir. 1979))).  In contrast to trade-names, trademarks identify products.  A trademark is "any

word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify

and distinguish his or her goods, including a unique product, from those manufactured or sold by

others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. §

1127.  *See also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) ("[T]he crucial issue

in an action for trademark infringement ... is whether there is any likelihood that an appreciable

number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to

the source of the goods in question." (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580

F.2d 44, 47 (2d Cir. 1978))); *Jordache Enters., Inc. v. Levi Straus & Co.*, 841 F. Supp. 506, 514-

15 (S.D.N.Y. 1993) ("Types of confusion that constitute trademark infringement include where: (1) prospective purchasers believe that the senior user sponsored or otherwise approved of the junior user's trademark . . . ; (2) potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase . . . ; and (3) customers are confused as to the source of the junior user's product when this product is observed in the post-sale context . . . ." (internal citations omitted)).

To state a claim of trademark or trade-name infringement, including for trademarks that are not registered under the Lanham Act, a claimant must allege facts demonstrating that his mark is entitled to trademark protection, and that the allegedly infringing use is likely to cause consumer confusion. *Genesee Brewing Co., Inc. v. Stroh Brewing Co*., 124 F.3d 137, 142 (2d Cir. 1997). Even assuming, *arguendo*, the truth of the facts alleged in support of the Contested Claims, the Claimants have not shown that they have a commercial interest in their names warranting trade name or trademark protection. The facts alleged do not demonstrate that their name has acquired a "secondary meaning" or is synonymous with unique products. Accordingly, the Claimants have not alleged, and cannot plausibly allege, a claim for trade name or trademark infringement against Ditech Financial. *See Left Bank Co. v. Elliman-Gibbons & Ives, Inc.*, No. 99CIV11251(RO), 1999 WL 1114745 at *3 (S.D.N.Y. 1999) (In denying Plaintiff's application for a preliminary injunction, court found that plaintiff had not shown a secondary meaning of their trade name protectible under section 43(a) of the Lanham Act); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier, S.A.*, 209 F. Supp. 3d 612, 656-57 (S.D.N.Y. 2016) (granting summary judgment to defendant finding a toe plate affixed to men's shoes constituted product design trade dress not protectable under Lanham Act absent a showing

of secondary meaning);  *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 429 (S.D.N.Y. 2012) (granting summary judgment to defendant on plaintiff's Lanham Act claims finding that plaintiff's marks had not attained secondary meaning).

Based on the foregoing, the Court finds that accepting all factual allegations asserted by Desmond Roy and Sophia Elaine in support of their Contested Claims as true, drawing all reasonable inferences in their favor, and interpreting the Claims and Responses submitted by the *pro se* Claimants to raise the strongest arguments that they suggest, the Contested Claims fail to state plausible claims for copyright and/or trademark law violations.  Accordingly, the Court sustains the Objections and expunges the Desmond Roy Claim and the Sophia Elaine Claim.

In reaching this determination, the Court does not credit the Claimants' arguments in response to the Objections.  First, they contend that the Plan Administrator and Consumer Representative lack standing to challenge their claims.  Desmond Roy Response at 19.  The Court finds no merit to that contention because, as previously noted, § 7.1 of the Plan vests the Plan Administrator and Consumer Representative with the standing to do so.  They also suggest that the Court lacks the authority to rule on this dispute.  Desmond Roy Response at 20.  As support, they cite to *United States v. Clearfield Trust Co.,* 318 U.S. 363 (1943).[11]  The Court finds no merit to that contention.  The Court has the jurisdiction to finally resolve the matters at issue in the Objections by application of 28 U.S.C. §§ 1334(a) and 157(b)(2)(B).  Moreover,

---

[11]    The Demontegnacs' assert, as follows:

> The [S]upreme Court has stated, in United States [v]. Clearfield Trust Co., S.Ct. (Hist.) that even the United States is a company and as such before enforcing its demands - called statutes - they must upon request present and exhibit the original contract or commercial agreement upon which the right to make demands is presumed to have arisen in their favor and if they cannot they have no right to enforce until they do (paraphrasing).

Desmond Roy Response at 20.

*Clearfield Trust Co. v. United States* has no application to this matter.  The issue in that case was

whether state or federal law governed the rights and duties of the United States in respect of a

forged government check.  The Supreme Court held that federal common law applied.  318 U.S.

at 367.  *Clearfield* clearly is not relevant here.  The United States is not a party to this action, and

the matters at issue herein do not involve the United States or rights under commercial paper.[12]

The Claimants also argue that Ditech Financial cannot complain about the filing of the

Financing Statements because it knew that they filed the statements when they filed them, and it

---

[12]    In that case, in April 1936, a check was drawn on the Treasurer of the United States through the Federal Reserve Bank of Philadelphia to the order of Clair A. Barner ("Barner") in the amount of $24.20, for services rendered by Barner to the Works Progress Administration (the "W.P.A.").  *Clearfield Trust Co.*, 318 U.S. at 364. The check was placed in the mail, addressed to Barner at his address in Mackeyville, PA, but Barner never received it.  *Id.*  That is because a third party (the "Forger") obtained the check and presented it to a J.C. Penny store ("J.C. Penny") representing that he was the payee and identifying himself as such to the satisfaction of the J.C. Penny employees.  He endorsed the check in Barner's name and transferred it to J.C. Penny, in exchange for cash and merchandise.  Barner neither authorized the endorsement nor participated in the proceeds of the check.  *Id.* at 364. In turn, J.C. Penney endorsed the check to Clearfield Trust Company ("Clearfield Trust").  It accepted the check as "agent for the purpose of collection and endorsed it as . . . 'Pay to the Order of the Federal Reserve Bank of Philadelphia, Prior Endorsements Guaranteed.'"  *Id.*  Clearfield Trust collected the check from the Federal Reserve Bank of Philadelphia and paid the full amount to J.C. Penney.  *Id.*  In May 1936, Barner advised the foreman of the W.P.A. project on which he was employed that he had not received the check, and in November 1936, after that information was communicated to other agents of the United States, he executed an affidavit that the endorsement of his name on the check was a forgery.  *Id.*    J.C. Penny and Clearfield Trust were notified of the forgery in January 1937, and in August 1937, the United States first notified Clearfield Trust that it was seeking reimbursement on account of the forged check.  *Id.*  In 1939, the United States sued Clearfield Trust under federal law in the United States District Court based on Clearfield Trust's express guaranty of prior endorsements.  *Id.* at 365-66.  The District Court held that Pennsylvania state law governed the rights of the parties and that by application of the doctrine of laches as applied under state law, the United States unreasonably delayed in giving Clearfield Trust notice of the forgery and, accordingly, was barred from recovering from Clearfield Trust.  *Id.* at 366.  The Circuit Court of Appeals reversed the dismissal.  The Supreme Court granted a petition for a writ of certiorari, to consider whether the rule of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) applied in the action.  Under that rule, a United States District Court must apply the law of the state in which it is sitting.  The Supreme Court held that it did not apply and that "[t]he rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law."  In part, the Supreme Court noted that "[w]hen the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. . . . The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state."  *Id.* at 366.  The Supreme Court held that federal law governs questions concerning the rights of the federal government under federal programs, such that, in the absence of an act of Congress applicable to the functioning of such programs, the federal courts may fashion an appropriate and governing rule of law according to their own standards.  *Id.* at 367.  The primary doctrine derived from *Clearfield* is that federal common law will displace state law, and can be created by federal courts, only when "uniquely federal interests" are involved and the application of state law would "significant[ly] conflict" with federal policy or objectives. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 507–08 (1988).

had a moral obligation to challenge that action at that time. They say that since Ditech Financial

failed to do so, the Plan Administrator and Consumer Representative are barred from challenging

the enforceability of the Financing Statements. Desmond Roy Response at 20.[13]  The Court

understands the Claimants to be making an "equitable estoppel by silence or acquiescence"

argument. The New York Court of Appeals defined estoppel by acquiescence as follows:

> Where a person wronged is silent under a duty to speak, or by an act or declaration
> recognizes the wrong as an existing and valid transaction, and in some degree, at
> least, gives it effect so as to benefit himself or so as to affect the rights or relations
> created by it between the wrongdoer and a third person, he acquiesces in and assents
> to it and is equitably estopped from impeaching it.

*Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 564 (1959) (quoting *Rothschild v. Title Guar.*

*& Trust Co.*, 204 N.Y. 458, 461 (1912)). *See also In re Vebeliunas*, 252 B.R. 878, 888 (Bankr.

S.D.N.Y. 2000) (Under New York law, the elements of estoppel by silence or inaction are "'(1) a

duty to speak; (2) an opportunity to speak; and, (3) injury to another party as a result of the

failure to speak.'" (quoting *Ellison Assoc. v. Eastwood Mgmt. Corp. (In re Ellison Assocs.)*, 13

B.R. 661, 675-76 (Bankr. S.D.N.Y. 1981), *aff'd,* 63 B.R. 756 (S.D.N.Y. 1983))).  There is no

merit to the matters raised by the Claimants because their factual predicate is wrong. As

---

[13]    In part, the Claimants assert, as follows:

> Other authority, pertinent to this, has clarified that where there is a legal or moral duty to speak or
> to be held to what the silence would mean the party not observing their legal or moral duty must
> be held - by law - to what their silence would be deemed to mean and be forever bound to it. The
> Debtor listed in the Financing Statement was made fully aware of all premises of the claims,
> damages, billing, invoices, and filings against them and in favor of the Undersigned. They never
> said anything nor presented or exhibited anything. Now they complain of invalidity and
> impropriety of the same transactions, but the time for that lapsed and the Undersigned relied upon
> their implied representations in their silence, and they initiated the transactions that gave rise to
> inquiry that gave rise to proof of their lack of standing that ultimately gave rise to damages,
> billings, and sums due in the Undersigned's favor. They must not now be heard to speak against
> their expressly implied private-agreements with the Undersigned. And the attorneys must not
> attempt to speak against what the DITECH individually themselves did not oppose in over 90 days
> to date.

Desmond Roy Response at 20.

evidenced by the correspondence annexed to both the Desmond Roy Claim and Sophia Elaine

Claims, Ditech Financial protested and indicated that it would challenge Claimants' alleged

rights to act against it should the Demontegnacs' take action against it.[14]  Moreover, and in any

event, the facts alleged in support of the Contested Claims and found in the documents annexed

to the claims and Responses, do not bear out the Claimants' assertion that Ditech Financial had a

duty to speak.  Assuming, *arguendo*, the truth of the allegations therein, the Claimants have

failed to demonstrate either that (i) a fiduciary or confidential relationship exists between them

and Ditech Financial, (ii) that Ditech Financial had superior knowledge on matters relating to the

Claimants' Copyright Notices, the Financing Statements or any other matters or documents

pertaining to the Contested Claims, and (iii) that Ditech Financial will be unjustly enriched if the

Contested Claims are expunged.  The Claimants cannot demonstrate that the doctrine of

equitable estoppel bars the Plan Administrator and Consumer Representative from challenging

the filing of the Financing Statements.  *See Mitsubishi Elec. Corp. v. Westcode, Inc.*, No. 3:15-

cv-505 (MAD/DEP), 2016 WL 3855180, at *9 (N.D.N.Y. July 12, 2016) (court refused to apply

estoppel by silence as an affirmative defense to defendant's counterclaims seeking accounting

and asserting a claim for set-off, finding that the plaintiff had failed to allege that the defendant

had a duty to assert its rights prior to the commencement of that action and had not alleged any

injury caused by the defendant's "waiting to assert its arguments as counterclaims in the instant

action rather than raising them earlier in an independent suit."); *K. Bell & Assocs., Inc. v. Lloyd's*

*Underwriters*, No. 92 Civ. 5249 (AJP) (KTD), 1997 WL 96551, at *5-7 (S.D.N.Y. 1997)

(finding that defendant was not estopped from denying indemnity insurance coverage to plaintiff

because defendant notified the plaintiff of its reservation of rights as to the denial of coverage,

---

[14]     *See* Desmond Roy Claim at 24, 27, 32 & 37

the defendant monitoring of underlying liability action did not give rise to any reliance by the plaintiff, and the defendant did not have a duty to speak.).

Finally, they argue that the Court cannot expunge their Contested Claims because they have demonstrated that they are secured creditors of Ditech Financial with perfected security interests in its assets. The Claimants filed the Financing Statements in New York state. Desmond Roy Claim at 6; Sophia Elaine Claim at 6. In substance, the Claimants assert that in filing those statements, they became secured creditors of Ditech Financial. Desmond Roy Response ¶¶ 19-20. They say that is so because to establish that they hold secured claims against Ditech Financial they need only explain the foundation of their alleged secured claims and show that they filed financing statements – and they have done so. *Id.* However, the Claimants' misapprehend the nature of a UCC-1 Financing statement. The filing of a financing statement against a debtor does not, in and of itself, create a secured claim. Rather, the "primary purpose of a Financing Statement is to provide notice to the public of a security interest in the debtor's property." *PaineWebber Inc. v. Nwogugu*, No. 98 Civ. 2441, 1998 WL 193110, at *4 (S.D.N.Y. Apr. 22, 1998) (citation omitted). *See also General Ins. Co. of America v. Mezzacappa Bros., Inc.*, 110 F. App'x 184, 185 (2d Cir. 2004) ("Under New York law a filing [of a financing statement] does not, in itself, bespeak the intent required to form a security agreement within the meaning of the UCC." (citation omitted)). Thus, when a creditor presents a standard financing statement to establish a valid and enforceable security interest, "there must be some further documentation corroborative of the debtor's intent to pledge collateral." *In re Modafferi*, 45 B.R. 370, 372 (S.D.N.Y. 1985). *See also In re K-V Discovery Sols.*, No. 12–13346 (ALG), 2013 WL 501721, at *4 n.9 (Bankr. S.D.N.Y. Feb. 11, 2013) ("[A] financing statement cannot expand a security interest beyond that which is granted in the security agreement." (citation omitted)). As

discussed below, there is no evidence in the record of an agreement among the Claimants and

Ditech Financial pursuant to which Ditech Financial, as debtor, granted a security interest in its

assets to the Claimants.

Alleged creditors of a debtor do not have unfettered rights to file financing statements

against the debtor, and a court, in appropriate circumstances, can direct the expungement of a

financing statement filed without authorization.  Under the N.Y. U.C.C., a party may only file a

UCC filing statement if the debtor authorizes the filing (i) by authenticated record, or the party

holds an agricultural lien that has become effective at the time of filing and the financing

statement covers only collateral in which the party holds an agricultural lien; (ii) by being bound

to a valid, enforceable security agreement; or (iii) by acquiring collateral with a continued

security interest.  *See* N.Y. U.C.C. § 9-509(a)-(c) (McKinney 2018).  *See also McDaniel v. 162*

*Columbia Heights Hous. Corps.*, 863 N.Y.S. 2d 346, 350-51 (N.Y. Sup. Ct. 2008) (finding that

plaintiff was not authorized to  file a UCC-1 financing statement under § 9-509 because  there

was no authenticated record in which the defendant authorized the filing, the plaintiff did not

hold an agricultural lien, no security agreement was entered into between the parties, and the

plaintiff never acquired collateral in which an existing security interest was in place and

continued); *Lashua v. La Duke*, 272 A.D. 2d 750, 751 (N.Y. App. Div. 2000) (for a party relying

on N.Y. U.C.C. § 9-509(b), a valid enforceable security agreement is required as a predicate to

the filing of a financing statement).

Assuming*, arguendo*, the truth of the allegations in support of the Contested Claims, the

Claimants have not demonstrated, and cannot plausibly demonstrate, that Ditech Financial, their

alleged debtor, authorized them to file the Financing Statements.  The assets in which they claim

security interests do not constitute collateral that they obtained from Ditech Financial with a

continued security interest, and they do not purport to hold an agricultural lien.  Thus, the

Claimants cannot satisfy UCC §§ 9-509(a)(2) or 9-509(c).  Under N.Y. U.C.C. § 9-102(a)(7), the

term  "'[a]uthenticate' means: (A) to sign; or (B) with present intent to adopt or accept a record,

to attach to or logically associate with the record an electronic sound, symbol, or process."  N.Y.

U.C.C. Law § 9–102(a)(7).  The term "record" means "information that is inscribed on a tangible

medium or which is stored in an electronic or other medium and is retrievable in perceivable

form."  *See* N.Y. U.C.C. § 9-102(a)(70).  Accordingly, for purposes of N.Y. U.C.C. § 9-509, an

"authenticated record" is "some written [or electronic] evidence of the debtor's intent to grant the

security interest."  *McDaniel v. 162 Columbia Heights Hous. Corps.*, 863 N.Y.S. 2d at 350; *see

also Clayson v. Conesus Milk Prods. Assoc., Inc. (In re Clayson)*, 341 B.R. 137, 140 (Bankr.

W.D.N.Y. 2006) (finding a check itself to be an authenticated record because the paper on which

a check is printed became a record listing the payees, which an agent for the payor signed).

The Copyright Notices are the only documents that purport to grant the Demontegnacs'

security interests in Ditech Financial's assets.  In part, they provide that:

> By this Notice, [Ditech] and the agent thereof, hereinafter, jointly and severally
> "User", consent and agree that any use of trade-name/trademark copyright other
> than authorized use as set forth herein, constitutes unauthorized use and
> counterfeiting of property, contractually binds User and renders this Notice a
> Security Agreement wherein User is TRUST and DESMOND ROY
> DEMONTEGNAC TRUST is Secured Party, and signifies that User:
>
> \*                    \*                    \*                    \*
>
> Grants Trustee/TRUST the right to invoice three times at thirty day intervals at
> which time User consents to the outstanding balance that will be filed as a lien/levy
> via a UCC Financing Statement in the UCC filing office and/or in any county
> recorder's office, wherein User is TRUST and Trustee is Secured Party and that
> Secured Party may file such lien/levy against property as security interest in all of
> User's assets, land and personal property, and all of User's interest in assets, land
> and personal property, in the sum certain amount of $500,000.00 per each
> occurrence of use of the common-law copyrighted trade-name/trademark, plus
> costs, plus triple damages.

Desmond Roy Claim at 10 ¶ 2(a), (c). Ditech Financial is not a party to that notice and it is not plausible to construe the notice to evidence Ditech Financial's intent to grant the Demontegnacs' security interests in its assets. As such, the Claimants have not demonstrated that the Copyright Notices constitute "authenticated records" that support the filing of the Financing Records under N.Y. U.C.C. § 9-509(a)(1). Nor is it plausible to construe the Copyright Notice as a security agreement for purposes of § 9-509(b). Under the N.Y. UCC, a "[s]ecurity agreement" is "an agreement that creates or provides for a security interest." N.Y. U.C.C. § 9–102(a)(74). "A security agreement . . . need not be embodied in a formal document . . . . Rather, it is sufficient that there exist, in addition to a standard form financing statement, some written evidence of the assignor's intent to grant the security interest." *King v. Tuxedo Enters., Inc.,* 975 F. Supp. 448, 452 (E.D.N.Y. 1997). However, where, as here, the alleged secured party is not in possession of the collateral, "a security agreement requires a writing signed by the debtor which describes the collateral." *Lashua v. La Duke*, 272 A.D. at 751 (citation omitted); *1380 Hous. Dev. Fund v. Carlin*, 31 N.Y.S. 3d 29, 30 (N.Y. App. Div. 2016) ("[I]n the case of a security agreement, there must be a writing that objectively indicates the parties intended to create a security interest[.]" (citing *Matter of Talco Contrs. v. New York State Tax Comm.*, 528 N.Y.S. 2d 219 (N.Y. App. Div. 1988)). Ditech Financial did not execute the Copyright Notices, and those notices cannot reasonably be construed as proof that Ditech Financial intended to grant the Demontegnacs' security interests in its assets.

Since the Claimants have not demonstrated that they were authorized to file the Financing Statements, those statements are null and void, and are ineffective to perfect a security interest. *See* N.Y. U.C.C. § 9-510 ("A filed record is effective only to the extent that it was filed by a person that may file it under Section 9-509.") To that end, the case

of *McDaniel v. 162 Columbia Heights Housing Corporations,* 863 N.Y.S.2d 346 (N.Y.

Sup. Ct. 2008) is instructive.  There, the plaintiff ("McDaniel") advanced funds to 162

Columbia Heights Housing Corporation (the "Housing Corporation") to underwrite the

settlement of a lawsuit involving one of the five residential units (the "Garden Unit") in a

building owned by the Housing Corporation.  *Id.* at 348-49.  McDaniel and the Housing

Corporation did not execute a security agreement.  Nonetheless, after advancing the

funds, McDaniel filed a UCC–1 financing statement against the Housing Corporation and

the Garden Unit in which she claimed that the Housing Corporation was the "debtor" and

she was a "secured party."  She contended that her collateral extended to the propriety

lease and shares issued appurtenant to the Garden Unit.  *Id.* at 349.  McDaniel sued the

Housing Corporation and others for repayment of the amounts that she advanced to the

Housing Corporation.  In that action, among other things, the Housing Corporation

moved for an order terminating the financing statement**.**  *Id.* at 348.  McDaniel opposed

the motion.  She argued that she had a "common-law" lien against the Garden Unit which

justified the filing of the UCC–1 financing statement.  *Id.* at 349-350.  The court rejected

that contention and found that she held no such lien.  *Id.* at 350.  It also found that

McDaniel was not a "secured party" under UCC § 9-102(a)(72), and that "[n]othing in

UCC article 9 permits the filing of a UCC–1 financing statement to protect the existence

of such an alleged 'common-law' lien."  *Id.*   The court concluded that McDaniel could

not comply with UCC § 9-509, and thus could not demonstrate that she had the right to

file the financing statement.  In that regard, McDaniel did not dispute that there was no

authenticated record in which the Housing Corporation authorized the filing of the UCC-

1 financing statement and, as such, she could not satisfy UCC § 9-509(a)(1).  *Id.*  The

court found that UCC § 9-509(a)(2) was irrelevant because McDaniel did not hold an

agricultural lien against the Garden Unit.  It also found that McDaniel did not satisfy

UCC § 9-509(b) because she did not have an enforceable security agreement with the

Housing Corporation and that she could not meet the standards of UCC § 9-509(c)

because she did not acquire collateral in which an existing security interest was in place

and continued.  *Id.* at 351.

In sum, the court found that McDaniel had no right to file the UCC-1 financing

statement.  In granting the Housing Corporation's motion to terminate the financing

statement, the court also held that since there "[was no justification for plaintiff's filing

of the UCC–1 financing statement against [the Housing Corporation] plaintiff must be

directed to immediately terminate it by filing a termination statement in the Office of the

Secretary of State[.]"  *Id.* at 351-52. (citations omitted).  This case is on all fours with

*McDaniel v. 162 Columbia Heights Housing Corporations*.  Here, like McDaniel, the

Demontegnacs' do not have a lien on its alleged debtor's property and had no right to file

the Financing Statements.  Accordingly, the Court directs the Demontegnacs immediately

to terminate them by filing termination statements with the Secretary of State.  *See also A
to Z Assocs. v. Vamco, Inc.*, 651 N.Y.S.2d 761, 763 (N.Y. App. Div. 1997) (Ordering

defendant to file a termination statement).

## Conclusion

Based on the foregoing, the Court finds that accepting all factual allegations

asserted by the Claimants in support of their Contested Claims as true, drawing all

reasonable inferences in the Claimants' favor, and interpreting the Claims and Responses

submitted by the *pro se* Claimants to raise the strongest arguments that they suggest, the

Contested Claims fail to state claims against Ditech Financial that are plausible on their face. The Court sustains the Objections, expunges the Contested Claims and directs the Demontegnacs to terminate the Financing Statements by filing termination statements with the Secretary of State.

IT IS SO ORDERED.

Dated: July 9, 2020
      New York, New York

/s/ *James L. Garrity, Jr.*
     Honorable James L. Garrity, Jr.
     United States Bankruptcy Judge