UNITED STATES BANKRUPTCY COURT          NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re:                                              :    Case No. 19-10412 (JLG)
                                                    :    Chapter 11
Ditech Holding Corporation, *et al.*,               :
                                                    :
                                Debtors.[1]         :    (Jointly Administered)

-------------------------------------------------------- x

## MEMORANDUM DECISION AND ORDER SUSTAINING THE FIFTY-SECOND OMNIBUS OBJECTION TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS) WITH RESPECT TO CLAIMS OF LIBERTY HOME EQUITY SOLUTIONS, INC. AND FINANCE OF AMERICA REVERSE LLC

**A P P E A R A N C E S :**

WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Plan Administrator*
767 Fifth Avenue
New York, New York 10153
By:    Ray C. Schrock, P.C.
       Richard W. Slack, Esq.
       Sunny Singh, Esq.

HUNTON ANDREWS KURTH LLP
*Attorneys for Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC*
200 Park Avenue
New York, New York 10166
By:    Peter S. Partee, Sr., Esq.
       Robert A. Rich, Esq.

---

[1]    The confirmation of the Debtors' Third Amended Plan (as defined below) created the Wind Down Estates. The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573. References to "ECF No. __" herein are to documents filed in the electronic docket in these jointly administered cases under Case No. 19-10412 (the "Chapter 11 Cases").

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[2]

Liberty Home Equity Solutions, Inc. ("LHES") and Finance of America Reverse LLC ("FoA") filed administrative expense claims against Reverse Mortgage Solutions, Inc. ("RMS") in these Chapter 11 Cases in the sums of $4,145,648.48 and approximately $14 million, respectively (collectively, the "Subservicing Administrative Expense Claims").[3] In its Fifty-Second Omnibus Claim Objection (the "Objection"),[4] the Plan Administrator, on behalf of the Wind Down Estates, seeks to reclassify those claims as General Unsecured Claims. LHES and FoA each responded in opposition to the Objection, and in support of their claims (collectively, the "Responses").[5] The Plan Administrator filed a single reply to the Responses (the "Reply").[6] Pursuant to the Claims Procedures Order,[7] the Court conducted a Sufficiency Hearing on the Subservicing Administrative Expense Claims, at which time counsel for the Plan Administrator and counsel for LHES and FoA were heard by the Court. The legal standard of review at a

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection or the Third Amended Plan, as applicable.

[3]  *See* Proof of Claim No. 60214 ("LHES Administrative Expense Claim"); Proof of Claim No. 60182 (asserting an administrative claim of $375,832.07) (together, the "FoA Administrative Expense Claim").

[4]  *See Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2186].

[5]  *See Finance of America Reverse LLC's Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2315] (the "FoA Response");*Liberty Home Equity Solutions Inc.'s Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims* [ECF No. 2314] (the "LHES Response"). LHES and FoA are represented by the same counsel and make essentially identical arguments in their respective Responses to the Objection. Moreover, as noted below, the Plan Administrator filed a single reply to the Responses. The Court will consider the Objection to the LHES and FoA claims together.

[6]  *See Reply of Plan Administrator in Support of Fifty-Second Omnibus Objection with Respect to Claims of Finance of America Reverse LLC (Claim Nos. 21347 and 60182) and Liberty Home Equity Solutions, Inc. (Claim No. 60214)* [ECF No. 3076].

[7]  *See Order Approving (1) Claim Objection Procedures and (II) Claim Hearing Procedures* [ECF No. 1632] (the "Claims Procedures Order").

Sufficiency Hearing is equivalent to the standard applied to a motion to dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[8]

For the reasons stated herein, the Court finds that LHES and FoA have not met their burden of demonstrating plausible grounds for according their claims administrative expense priority under the Bankruptcy Code. Accordingly, as a matter of law, the Court sustains the Objection and reclassifies the LHES Administrative Expense Claim and the FoA Administrative Expense Claim as General Unsecured Claims.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

**The Chapter 11 Cases**

On February 11, 2019 (the "Petition Date"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates ("Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court. Thereafter, the Debtors remained in possession and control of their business and assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 22, 2019, the Court entered an order fixing April 1, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity, not including governmental units (as defined in section 101(27) of the Bankruptcy Code)

---

[8]    *See* Claims Procedures Order ¶ 3(iv)(a). Rule 12(b)(6) is incorporated herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

to file a proof of claim in the Debtors' Chapter 11 Cases (the "General Bar Date").[9] The Court

extended the General Bar Date for consumer borrowers, twice, and ultimately to June 3, 2019 at

5:00 p.m. (prevailing Eastern Time).[10]

On September 26, 2019, the Debtors confirmed their Third Amended Plan, and on

September 30, 2019, that plan became effective (the "Effective Date").[11] In the Confirmation

Order, the Court set the deadline for the filing of administrative expense claims as October 31,

2019. The Plan Administrator is a fiduciary appointed under the Third Amended Plan who is

charged with the duty of winding down, dissolving and liquidating the Wind Down Estates. *See*

Third Amended Plan, ¶¶ 1.130, 1.184, 1.186. Among other things, the Third Amended Plan

authorizes the Plan Administrator, on behalf of each of the Wind Down Estates, to object to

Administrative Expense Claims. *See id.*, ¶ 7.1.

**The Subservicing Agreements**

As of the Petition Date, RMS was party to certain reverse mortgage subservicing

agreements with LHES and FoA. Pursuant to those agreements, RMS subserviced reverse

mortgage loans for LHES and FoA, as the owner and/or the named servicer of those loans, in

exchange for subservicing fees and other consideration. LHES Response ¶ 5; FoA Response ¶ 5.

The relevant agreements (collectively, the "Subservicing Agreements") are as follows:

---

[9]    *See Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [ECF No. 90].

[10]    *See Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc* [ECF No. 496].

[11]    *See Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1326] (the "Third Amended Plan"); *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1404] (the "Confirmation Order"); *Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* [ECF No. 1449].

LHES

> Reverse Mortgage Subservicing Agreement, dated as of November 17, 2008 (the "LHES November 2008 Agreement").

FoA

> Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011 (the "FoA March 2011 Agreement");

> Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017 (the "FoA December 2017 Agreement"); and

> Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018 (the "FoA October 2018 Agreement").

By their terms, the LHES November 2008 Agreement and the FoA March 2011 Agreement were scheduled to expire in November 2013 and March 2018, respectively. Prior to the Petition Date (i.e., February 11, 2019), pursuant to a series of agreements (collectively, the "Prepetition Extension Agreements"), the parties extended the expiration dates of both agreements – without altering the other terms and conditions of the agreements. LHES Response ¶¶ 6-7; FoA Response ¶¶ 6-8.  As of the Petition Date, those agreements were in effect, and pursuant to the Prepetition Extension Agreements, their termination dates had been extended to March 31, 2019. LHES Response ¶ 6; FoA Response ¶ 7. Post-petition, under those agreements, RMS subserviced the covered reverse mortgage loans, and LHES/FoA paid RMS subservicing fees post-petition, through March 31, 2019.  LHES Response ¶¶ 6-7; FoA Response ¶¶ 7-8. Thereafter, RMS entered into a series of agreements with LHES and FoA, respectively (collectively, the "Post-Petition Extension Agreements") pursuant to which the parties extended the expiration dates of the LHES November 2008 Agreement and the FoA March 2011 Agreement ultimately through September 30, 2019, again, without altering the other terms and conditions of the agreements. LHES Response ¶ 7; FoA Response ¶ 8.

Pursuant to the Post-Petition Extension Agreements, RMS continued to subservice the covered reverse mortgage loans, and LHES/FoA continued to pay RMS subservicing fees, from April 1, 2019 through September 30, 2019. LHES Response ¶ 7; FoA Response ¶ 8. Separately, the FoA December 2017 Agreement and the FoA October 2018 Agreement (collectively with the FoA March 11 Agreement, the "FoA Subservicing Agreements") each have a one-month term subject to FoA's monthly renewal option. FoA exercised its renewal option under both agreements, prepetition and post-petition through February 2019 and September 2019, respectively, but otherwise on the same terms and conditions stated in the agreements. FoA Response ¶ 6. RMS subserviced the reverse mortgage loans, and FoA paid RMS a subservicing fee, through the prepetition and post-petition periods covered by those agreements, in accordance with the terms of those agreements. *Id.*

To summarize, prior to the Petition Date, the Debtors entered into eight (8) Prepetition Extension Agreements with FoA and seven (7) Prepetition Extension Agreements with LHES. The Debtors also entered into four (4) Post-Petition Extension Agreements with FoA and two (2) Post-Petition Extension Agreements with LHES. LHES Response ¶¶ 5-7; FoA Response ¶¶ 7-8. None of those agreements (collectively, the "Extension Agreements") altered the terms of the Subservicing Agreements in any way except by extending the termination date of each such agreement.[12]

---

[12]    The Court more fully describes the LHES November 2008 Agreement and the FoA March 2011 Agreement below.

LHES

    The initial term of the LHES November 2008 Agreement was three years and it automatically renewed for an additional two years through November 17, 2013. LHES Response ¶ 6. In 2013, LHES and RMS entered into one or more agreements pursuant to which they extended the term of the LHES November 2008 Agreement through March 31, 2019, but otherwise on the same terms and conditions stated in the agreement (the "LHES Prepetition Extension Agreements"). *Id.* Thus,

Under the Third Amended Plan, the Debtors sold their reverse mortgage business to the Reverse Buyer. The Debtors consummated the sale on September 30, 2019. The Subservicing Agreements expired on or before the Effective Date, and RMS did not assign any of those agreements to the Reverse Buyer. The Third Amended Plan provides for the assumption of all executory contracts listed by the Debtors on an assumption notice or on the Assumption Schedule. All other executory contracts of the Debtors are deemed rejected as of the Effective Date unless such executory contracts previously expired or terminated pursuant to its own terms

---

as of the Petition Date, RMS and LHES were party to the LHES November 2008 Agreement, as extended through March 31, 2019.

After the Petition Date, RMS subserviced the reverse mortgage loans, and LHES paid RMS subservicing fees, through March 31, 2019, in accordance with the terms of the LHES November 2008 Agreement, as extended by the LHES Prepetition Extension Agreements. Thereafter, LHES and RMS entered into two agreements further extending the term of the LHES November 2008 Agreement through June 30, 2019 and September 30, 2019, respectively (the "LHES Post-Petition Extension Agreements"). Thus, post-petition, RMS subserviced the reverse mortgage loans, and LHES paid RMS a subservicing fee, from April 1, 2019 through September 30, 2019, in accordance with the terms of the LHES November 2008 Agreement, as extended by the LHES Post-Petition Extension Agreements.

FoA

The initial term of the FoA March 2011 Agreement was five years and it automatically renewed for an additional two years through March 18, 2018. FoA Response ¶ 5. In 2018, FoA and RMS entered into the first of seven prepetition agreements pursuant to which the parties ultimately extended the term of the FoA March 2011 Agreement through March 31, 2019, on the same terms and conditions stated in the FoA March 2011 Agreement (the "FoA Prepetition Extension Agreements"). *Id.* ¶ 7. RMS subserviced the covered reverse mortgage loans, and FoA paid RMS subservicing fees, through March 31, 2019 in accordance with the FoA Prepetition Extension Agreements. *Id.* After the Petition Date, FoA and RMS entered into four agreements that collectively further extended the term of the FoA March 2011 Agreement through September 30, 2019 (the "FoA Post-Petition Extension Agreements"). The FoA Post-Petition Extension Agreements are dated as of March 29, 2019, April 15, 2019, June 30, 2019, and August 16, 2019, respectively. RMS subserviced the covered reverse mortgage loans, and FoA paid RMS a subservicing fee, from April 1, 2019 through September 30, 2019 in accordance with the terms of the FoA March 2011 Agreement, as extended by the FoA Post-Petition Extension Agreements. *Id.* ¶ 8.

The FoA December 2017 Agreement and the FoA October 2018 Agreement each have one-month terms subject to FoA's monthly renewal option. FoA exercised its monthly renewal option through February 2019 and through September 2019 under the respective agreements, but otherwise on the same terms and conditions stated in the agreements. *Id.* ¶ 6. RMS subserviced the reverse mortgage loans, and FoA paid RMS a subservicing fee, through the pre- and post- petition periods covered by the FoA December 2017 Agreement and FoA October 18, 2019 Agreement, in accordance with the terms of those agreements.

or by agreement of the parties. *See* Third Amended Plan, ¶ 8.1. The Debtors did not assume the

Subservicing Agreements under the Third Amended Plan, or otherwise.

**The LHES and FoA Claims**

LHES Administrative Expense Claim

On November 11, 2019, LHES timely filed the LHES Administrative Expense Claim in

the amount of $4,145,648.48, plus other amounts to be determined, for damages resulting from

RMS' alleged post-petition subservicing errors and other material alleged post-petition breaches

of the LHES November 2008 Agreement. LHES Administrative Expense Claim at 2; LHES

Response ¶ 10. LHES does not claim any damages resulting from any purported rejection of that

agreement, or for any breach of the agreement that may have occurred after the Effective Date.

LHES Response ¶ 10.

FoA Claim Administrative Expense Claim

On November 11, 2019, FoA timely filed the FoA Administrative Expense Claim in the

amount of $375,832.07, plus other amounts to be determined, for damages resulting from RMS'

alleged post-petition subservicing errors and other alleged material post-petition breaches of the

FoA Subservicing Agreements. FoA Response ¶ 12.[13] FoA has since quantified its realized and

unrealized losses resulting from RMS' alleged post-petition subservicing errors and other alleged

material post-petition breaches in the approximate amount of $14 million, plus other amounts to

be determined. *Id.* FoA does not claim any damages resulting from any purported rejection of the

---

[13]    On April 25, 2019, FoA timely filed Proof of Claim No. 21347 ("Claim No. 21347") in the Chapter 11 Cases in the amount of $54,085,624, plus other amounts to be determined, as a general unsecured claim and an undetermined amount as an administrative expense claim under section 507(a)(2), for damages resulting from RMS' alleged subservicing errors and other alleged material breaches of the FoA Subservicing Agreements. In that claim, FoA expressly reserved the right to assert administrative expense priority claims at the appropriate time for any damages resulting from RMS' subservicing errors and other material breaches of the FoA Subservicing Agreements occurring after the Petition Date. FoA acknowledges that the $54,085,624 amount is based on alleged prepetition breaches of the FoA Subservicing Agreements. That claim is not at issue herein.

agreements, or for any breaches of the agreements that may have occurred after the Effective Date.

**The Claims Procedures Order**

On November 19, 2019, the Court entered the Claims Procedures Order. Under that order, the Plan Administrator is authorized to file Omnibus Objections seeking reduction, reclassification, or disallowance of claims on the grounds set forth in Bankruptcy Rule 3007(d) and additional grounds set forth in the Claims Procedures Order. *See* Claims Procedures Order ¶ 2(i)(a)-(h). A properly filed and served response to an objection gives rise to a "Contested Claim" that will be resolved at a Claim Hearing. *Id.* ¶ 3(iv). The Plan Administrator has the option of scheduling the Claim Hearing as either a "Merits Hearing" or a "Sufficiency Hearing." *Id.* ¶ 3(iv)(a), (b). A "Merits Hearing" is an evidentiary hearing on the merits of a Contested Claim. A "Sufficiency Hearing" is a non-evidentiary hearing to address whether the Contested Claim states a claim for relief against the Debtors. The legal standard of review that will be applied by the Court at a Sufficiency Hearing is equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Id.* ¶ 3(iv)(a).

**The Objection**

In the Objection, the Plan Administrator seeks to reclassify the Subservicing Administrative Expense Claims to General Unsecured Claims. As support for the Objection, the Plan Administrator contends that it has examined each of those claims, the documents submitted in support of the claims and the Debtors' books and records and has determined that the claims are improperly classified as administrative expense claims. Objection ¶ 13. It says that is so

because they are damage claims arising from the rejection of prepetition contracts in these

Chapter 11 Cases and, as such, are properly classified as general unsecured claims. *Id.*

## Applicable Legal Standards

Section 503(b) of the Bankruptcy Code provides that "[a]fter notice and a hearing,

there shall be allowed, administrative expenses. . . including the actual, necessary costs and

expenses of preserving the estate. . ." 11 U.S.C. § 503(b). This administrative expense priority is

based on the premise that the operation of the business during the bankruptcy case benefits

prepetition creditors; therefore, any claims that result from that operation are entitled to payment

prior to payment to "creditors for whose benefit the continued operation of the business was

allowed." LHES Response ¶ 13; FoA Response ¶ 15 (citing *Cramer v. Mammoth Mart, Inc. (In

re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976)). Agreements entered into by the

debtor-in-possession and supported by consideration beneficial to the debtor-in-possession, are

actual and necessary to preserve the estate, and therefore a claim for damages arising from a

debtor-in-possession's breach of a post-petition agreement gives rise to an administrative

expense claim for the full amount of the damages provided for in the contract. *See Nostas

Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 26 (2d Cir. 1996)

("[P]ostpetition claims ... arising, for example, . . . from contracts entered into by the trustee or

debtor-in-possession are entitled to administrative expense priority."); *GATX Leasing Corp. v.

Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503, 1509 (11th Cir. 1985) (holding that

breach of post-petition contract gives rise to an administrative expense claim under section

503(b)). A claimant that asserts a priority claim bears the burden of establishing its entitlement to

priority. *See, e.g.*, *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167,

172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment . . . rests with the

party requesting it."); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr.

S.D.N.Y. 1991) ("The burden of establishing entitlement to priority rests with the claimant and

should only be granted under extraordinary circumstances") (citation omitted).

In filing the Objection, the Plan Administrator initiated a contested matter. *See* Fed.

R. Bankr. P. 3007 advisory committee's note ("[t]he contested matter initiated by an objection to

a claim is governed by Rule 9014. . ."). *See also In re Tender Loving Care Health Servs., Inc.*,

562 F.3d 158, 162 (2d Cir. 2009) (stating that "when a debtor files an objection to a claim, the

objection has initiated a contested matter"). Bankruptcy Rule 9014 governs contested matters.

The rule does not explicitly provide for the application of Bankruptcy Rule 7012. However,

Bankruptcy Rule 9014 provides that a bankruptcy court "may at any stage in a particular matter

direct that one or more of the other Rules in Part VII shall apply." Fed. R. Bankr. P. 9014. The

Court did so here. Under the Claims Procedures Order, the legal standard of review the Court

applies at a Sufficiency Hearing is equivalent to the standard applied by the Court under Rule

12(b)(6) on a motion to dismiss for failure to state a claim upon which relief could be granted.

*See* Claims Procedures Order ¶ 3(iv)(a). *See also In re 20/20 Sport, Inc.*, 200 B.R. 972, 978

(Bankr. S.D.N.Y. 1996) ("In bankruptcy cases, courts have traditionally analogized a creditor's

claim to a civil complaint [and] a trustee's objection to an answer. . . ").

In applying Rule 12(b)(6) to the Subservicing Administrative Expense Claims, the Court

assesses the sufficiency of the facts alleged in support of the claims in light of the pleading

requirements under Rule 8(a) of the Federal Rules of Civil Procedure.[14]  Rule 8(a)(2) states that a

claim for relief must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To meet that standard, the claims "must contain

---

[14]   Rule 8 is made applicable herein pursuant to Bankruptcy Rule 7008.

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."
*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("*Iqbal*") (citations omitted); *accord Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678; *accord Twombly,* 550 U.S. at 570. To satisfy Rule 12(b)(6), the "pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). In considering whether that standard is met for a particular claim, the court must assume the truth of all material facts alleged in support of the claim and draw all reasonable inferences in the claimant's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007). However, the court "need not accord 'legal conclusions, deductions or opinions that are couched as factual allegations . . . a presumption of truthfulness.'" *Hunt v. Enzo Biochem, Inc.,* 530 F.Supp.2d 580, 591 (S.D.N.Y. 2008) (quoting *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir. 2007)). In short, "[i]n ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 113 (2d Cir. 2010) (citation and internal quotation marks omitted).[15]

---

[15]    In support of the Objection, the Plan Administrator provides representative samples of Prepetition and Post-Petition Extension Agreements. *See* Reply Exs. A-1, A-2, B-1 and B-2. Because the Subservicing Agreements and the Prepetition and Post-Petition Extension Agreements are referenced by LHES and FoA in the Responses and serve as the bases for their claims, the Court may consider those documents in resolving the Objection. *See, e.g., Bd. of Trs. of Ft. Lauderdale v. Mechel OAO,* 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO,* 475 F. App'x 353 (2d Cir. 2012) (Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken."); *Flake v. Alper Holdings USA, Inc.* (*In re Alper Holdings USA, Inc.),* 398 B.R. 736, 748 (S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be

## Discussion

LHES and FoA maintain that the Subservicing Agreements are not the operative

documents for calculating their claims. They contend that under state law, each Extension

Agreement is a new subservicing agreement among RMS and LHES or FoA. LHES Response ¶¶

15-16; FoA Response ¶¶ 17-18.  The LHES and FoA Administrative Expense Claims consist of

(i) subservicing damage claims arising under the Post-Petition Extension Agreements, and (ii)

subservicing damage claims arising under the Prepetition Extension Agreements during the post-

petition period of February 11, 2019 through March 31, 2019. LHES and FoA contend that the

Post-Petition Extension Agreements are not executory contracts, and that the Prepetition

Extension Agreements expired by their terms post-petition prior to the Effective Date. They

assert that the Court should overrule the Objection because they are not seeking damages under

rejected executory contracts and, as a matter of law, their claims are entitled to administrative

priority status under section 503(b) of the Bankruptcy Code.

The Plan Administrator disputes those contentions. The Court considers those matters

below.

**Whether the Damage Claims Arising Under
the Post-Petition Extension Agreements are
<u>Entitled to Administrative Expense Priority</u>**

The Post-Petition Extension Agreements are "on the same terms and conditions as stated

in the original [Subservicing] Agreement[s]," except that each agreement extends the expiration

---

treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a
complaint are treated on a Rule 12(b)(6) motion to dismiss") (citation omitted).

date of the original agreement. *See* Reply, Exs. A-1;[16] B-1.[17] LHES and FoA assert that under

applicable state law, by reason of the modifications to the termination dates under the

Subservicing Agreements, the Post-Petition Extension Agreements are new, post-petition

contracts between RMS, as debtor-in-possession, and FoA and LHES, respectively, that

supersede and replace the Subservicing Agreements and that RMS was authorized to execute in

---

[16]   The final Post-Petition Extension Agreement between LHES and RMS states, in part, as follows:

> WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated November 17, 2008 expired on November 17, 2013, and the parties subsequently agreed to extend the agreement through June 30, 2019.

> WHEREAS, to allow the parties further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

> NOW THEREFORE, the parties agree that the Agreement shall be extended through September 30, 2019. Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement. This Extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.

Reply, Ex. A-2.

[17]   The August 16, 2019 Post-Petition Extension Agreement between FoA and RMS states, as follows:

> WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated March 18, 2011 expired on March 18, 2018, and the parties subsequently agreed to extend the Agreement for an additional term commencing upon the expiration date of March 18, 2018 and expiring on May 11, 2018; and the parties further agreed to extend the Agreement for further subsequent extensions commencing upon the expiration dates of May 11, 2018, June 30, 2018, August 30, 2018, October 31, 2018, November 30, 2018, December 31, 2018, January 30, 2019, March 31, 2019, April 15, 2019, June 30, 2019, and August 31, 2019, respectively.

> WHEREAS, to allow the parties further time to negotiate and execute an Amended and Restated Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

> Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement.

> Each of RMS and [FoA] have entered into this Extension Agreement solely to temporarily extend the term of the Agreement and do not intend this Extension Agreement or the transactions contemplated hereby to be, and this Extension Agreement and the transactions contemplated hereby shall not be construed to be or operate as, a novation, modification, or release of any of the obligations owing by RMS to FAR or in connection with the Agreement, all of which are hereby expressly preserved in their entirety.

Reply, Ex. B-2.

the ordinary course of its business pursuant to section 363(c) of the Bankruptcy Code. LHES

Response ¶¶ 15-16 and 16 n.5; LHES Response ¶¶ 17-18 and 18 n.5. They also contend that the

Post-Petition Extension Agreements are supported by consideration beneficial to RMS, including

in the form of subservicing fee rights, and that RMS continued to subservice mortgage loans

covered by the Post-Petition Extension Agreements and to accept its subservicing fee through the

end of the term of each Post-Petition Extension Agreement. LHES Response ¶¶ 6, 20; FoA

Response ¶ 18, 22. Accordingly, LHES and FoA contend that their timely filed administrative

expense claims for damages resulting from RMS' alleged subservicing errors and other alleged

material breaches of the Post-Petition Extension Agreements are entitled to administrative

expense priority. LHES Response ¶ 18; FoA Response ¶ 20. In making this argument they assert

that the Plan Administrator mistakenly contends that they are claiming damages under a rejected

contract. LHES Response ¶ 17; FoA Response ¶ 19 (citing Objection, Ex. A). They correctly

note that contracts entered post-petition are not subject to assumption or rejection because they

are not executory contracts "of the debtor." 11 U.S.C. § 365(a). *See In re Leslie Fay Companies,

Inc*., 168 B.R. 294, 300 (Bankr. S.D.N.Y. 1994) ("[C]ontracts … entered into postpetition are not

subject to rejection under section 365."); *In re Airport Executive Center, Ltd*., 138 B.R. 628, 629

(Bankr. M.D. Fla. 1992) ("[Section 365(a)] applies to leases which exist prepetition, and not

those which are entered into post-petition"); *In re IML Freight, Inc.,* 37 B.R. 556, 559 (Bankr. D.

Utah 1984) ("The post-petition agreements entered into between the Trustee for the estate and

the Unions were not executory contracts of the debtor and therefore are not subject to Section

365 of the Code.").

To create an enforceable contract the parties must agree to the material terms of the

bargain and intend to be bound by their agreement. *Tractebel Energy Mktg., Inc. v. AEP Power*

*Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir. 2007) (holding that where "the parties have agreed on

all material terms of the contract and clearly manifested their intent to be bound by those terms. .

. the contract will be enforced."); *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985) ("Where the intention

of the parties is clearly and unambiguously set forth, effect must be given to the intent as

indicated by the language used"); *Kasowitz, Benson, Torres & Friedman, LLP v. Reade,* 98

A.D.3d 403, 404 (2012), *aff'd,* 20 N.Y.3d 1082 (2013) ("To establish the existence of an

enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration,

mutual assent, and an intent to be bound") (citation omitted). "In determining the intent of the

parties, the court has a duty to ascertain the intent as manifested in the language of the

agreement. If the terms of the agreement are clear from the face of the document, the intent of

the parties is found in the document." *In re Chateaugay Corp.*, 116 B.R. 887, 902–03 (Bankr.

S.D.N.Y. 1990) (citations omitted). But "'where the language used is susceptible to differing

interpretations, each of which may be said to be as reasonable as another,' then the interpretation

of the contract becomes a question of fact ... and extrinsic evidence of the parties' intent properly

is admissible." *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir. 1995) (citations

omitted); *see also Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 192 (1st Dep't 1995)

("Where a contract is straightforward and unambiguous, its interpretation presents a question of

law for the court to be made without resort to extrinsic evidence").

Here, the Plan Administrator contends that the Court can determine, as a matter of law,

that the Extension Agreements are not new subservicing agreements because it is clear on the

face of each such agreement that the purpose of the agreement merely was to extend the

termination date of the subject Servicing Agreement, while post-petition, the parties negotiated the terms of a new agreement. Reply ¶ 35. The Plan Administrator maintains that the plain language of the Extension Agreements is clear and unambiguous that in executing those agreements, either before or after the Petition Date, the parties did not intend to enter into new subservicing agreements and in executing the Extension Agreements, they did not do so. Reply ¶ 40.

The LHES and FoA Post-Petition Extension Agreements are governed by Delaware and New York law, respectively. Under Delaware law, "[a] new contract. . . does not destroy the obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely." *Lee Builders v. Wells,* 92 A.2d 710, 715 (Del.Ch.1952), *rev'd on other grounds,* 99 A.2d 620 (Del.1953). "Whether the parties to a contract intended a new contract to supersede an old one, whether partially or entirely, depends on their intent." *Haft v. Dart Grp. Corp.,* 841 F. Supp. 549, 568 (D. Del. 1993) (internal citations omitted). The intent of the parties "must be ascertained from the language of the contract." *Id.* at 564; *see also Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992) ("It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. Only when there are ambiguities may a court look to collateral circumstances."). Likewise, New York law is clear that "the objective of contract interpretation is to give effect to the *expressed* intentions of the parties, '[t]he best evidence of what parties to a written agreement intend is what they say in their writing,'. . . 'Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms,' 'without the aid of extrinsic evidence.'" *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 467–68

(2d Cir. 2010) (internal citations omitted).  *See, e.g., Network Publishing Corp. v. Shapiro,* 895

F.2d 97, 99 (2d Cir.1990) ("[w]e must consider the words [of a contract] themselves for they are

always the most important evidence of the parties' intention" (internal quotation marks

omitted)); *Bailey v. Fish & Neave,* 8 N.Y.3d 523, 528 (2007)("[w]here the language is clear,

unequivocal and unambiguous, the contract is to be interpreted by its own language").

        The case of *In re Bush Indus., Inc*., No. 05-CV-119S, 2006 WL 8455682 (W.D.N.Y.

Mar. 29, 2006) is instructive in construing the Extension Agreements at issue herein. There, the

claimant ("Hain") was party to a prepetition consulting agreement (the "Consulting Agreement")

with the debtor ("Bush") and the debtor's wholly owned subsidiary ("Color Works"). *Id.* at *1.

Prepetition, Hain executed an agreement to reduce his guaranteed payments under the Consulting

Agreement. *Id.* Five months after Bush filed for bankruptcy, Hain notified Bush that the

agreement was null and void because Bush and Color Works had not executed the agreement. *Id.*

at *2. Nonetheless, Hain accepted the payments called for under the new agreement and filed an

administrative expense claim equal to the difference between the amounts that he was paid under

the new agreement and the amounts he would have been paid under the Consulting Agreement.

*Id.* Hain argued that the agreement reducing the amount of guaranteed payment was a new

contract that was unenforceable because it did not contain the signatures of each party to the

agreement. *See id*. The bankruptcy court disagreed, finding that the agreement was a

modification rather than a new contract due to a clause allowing modification by an instrument

"signed by the party against whom enforcement of any such amendment, supplement or

modification is sought." *Id*.  Thus, the agreement was a modification that became effective when

signed by the claimant. *See id*. On appeal, the district court ruled that the bankruptcy court

correctly relied only on the unambiguous documents presented and resolved the issue as a matter

of law. *See id.* at *4. In analyzing the question of modification, the district court found, in

substance, that an agreement that restates contract provisions with no substantive changes,

involves the same relationship among the same parties, contains clauses that state the parties'

desire to amend and restate prior agreements, and merely adjusts the term of the agreement or the

compensation, does not constitute a new contract. *See id* at *5. Furthermore, the district court

found where underlying agreements permit amendment, supplementation, or modification in

whole or in part, subsequent agreements will be considered modifications rather than new

agreements. *See id*.

Applying the settled rules of contract construction to the Post-Petition Extension

Agreements, and the teachings of *Bush,* the Court finds, as a matter of law, that in executing the

Extension Agreements, RMS was not entering into new agreements with LHES or FoA, and that

those agreements do not supersede and replace the Subservicing Agreements. The plain,

unambiguous language of the Post-Petition Extension Agreements is clear that they are not

"new" post-petition agreements among RMS, as debtor in possession and LHES or FoA. Both

agreements speak only of "extending" the original agreements "on the same terms and conditions

as stated in the original [Subservicing] Agreement[s]." *Supra* n.16, 17.[18] Moreover, the parties

tacitly acknowledge that the Extension Agreements are not new agreements among the parties

because they agreed to extend the termination dates of the agreements "to allow the parties

further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement." *Supra*

n.16, 17. Further, the FoA Post-Petition Extension Agreement provides that it "shall not be

construed to be or operate as, a novation, modification, or release of any of the obligations owing

---

[18]    The Prepetition Extension Agreements contain similar language. *See* Reply, Ex. A-1 (LHES Prepetition
Extension Agreement) ("This extension shall be on all other terms and conditions as stated in the original
Agreement."); *Id*., Ex. B-1 (FoA Prepetition Extension Agreement) ("Except as provided herein, this extension shall
be on the same terms and conditions as stated in the original Agreement.").

by RMS to [FoA] or in connection with the [FoA November 2011] Agreement, all of which are hereby expressly preserved in their entirety." *Supra* n.17.[19] Finally, the extensions fail to address, at all, the rights and obligations under the subservicing relationship that constitute breach, notification of breach, indemnity, dispute resolution, or the treatment of claims arising under the agreement. Thus, like the agreement at issue in *Bush,* the Post-Petition Extension Agreements merely (i) restate the provisions of the applicable Subservicing Agreement with no substantive changes, (ii) involve the same relationship among the same parties, and (iii) state the parties' intention to extend terms of the subject Subservicing Agreements. Accordingly, those agreements do not constitute new contracts. *See United States Aviation Underwriters, Inc. v. Preservatrice-Fonciere Compagnies D'Assurance*, No. 83 CIV. 3935 (GLG), 1986 WL 3779, at *2 (S.D.N.Y. Mar. 21, 1986) (noting that renewal of the contract was viewed "as an extension of the original [contract], not a new contract"), *aff'd sub nom. U.S. Aviation v. Preservatrice-Fonciere*, 801 F.2d 391 (2d Cir. 1986); *In re Country Club Ests. at Aventura Maint. Ass'n, Inc*., 227 B.R. 565, 567–68 (Bankr. S.D. Fla. 1998) (noting that the automatically renewed service agreement on the same terms of the original agreement was not a new post-petition contract, "but rather a mere continuation of [the] parties' executory, prepetition agreement.").

---

[19]    The non-inclusion of such language in the two LHES Post-petition Extension Agreements does not undermine this analysis. The Plan Administrator asserts that the failure to include that language in the LHES documents is a consequence of the parties' routine practice of using prior extensions in their business relationship, not their intent to exclude the provisions from nearly identical contracts. *See* Reply ¶ 37 n.4 (citing *Nycal Corp. v. Inoco PLC*, 166 F.3d 1201 (2d Cir. 1998) ("any differences in the wording used in the three contemporaneous settlement agreements can only be reasonably viewed as a consequence of the different relationships and dealings between the respective companies and not as an indication of a different intent with respect to the Nycal-Inoco release.") (internal quotations omitted). The Court credits that contention.

**Whether the Damage Claims Resulting From RMS'**
**Post-Petition Breach of the Subservicing Agreements**
**are Entitled to Administrative Expense Priority**

LHES and FoA contend that their damage claims resulting from RMS' post-petition

breach of the Subservicing Agreements, as extended by the Prepetition Extension Agreements

are entitled to administrative expense priority under section 507(a)(2) of the Bankruptcy Code.

They maintain that is so because a debtor's post-petition obligations under a prepetition contract

that has not yet been assumed or rejected will give rise to administrative expense claims where

the debtor-in possession continues to perform under such contract and receive the benefits

thereunder. LHES Response ¶ 19; FoA Response ¶ 21. They assert that RMS elected to continue

subservicing reverse mortgage loans under the LHES and FoA Prepetition Extension

Agreements on a post-petition basis and accepted the post-petition subservicing fees paid in

exchange for its performance under those contracts through March 31, 2019.  Accordingly,

LHES and FoA maintain their respective timely filed administrative expense claims for damages

resulting from RMS' post-petition subservicing errors and other material post-petition breaches

of the Prepetition Extension Agreements are entitled to administrative expense priority. LHES

Response ¶ 20; FoA Response ¶ 22.

The Bankruptcy Code determines when claims arise. *See, e.g., Pearl-Phil GMT (Far*

*East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 581 (S.D.N.Y. 2000) ("[I]t is well settled that the

Bankruptcy Code governs *when* a claim arises."). Section 101(5) of the Bankruptcy Code defines

"claim" to include any

> [R]ight to payment, whether or not such right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
> equitable, secured, or unsecured; . . .

11 U.S.C. § 101(5)(A). That term "is sufficiently broad to encompass any possible right to

payment." *Mazzeo v. United States (In re Mazzeo),* 131 F.3d 295, 302 (2d Cir. 1997). *See also*

*United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir. 1991) (noting

that as defined, the term "claim" "contemplates that all legal obligations of the debtor, no matter

how remote or contingent, will be able to be dealt with in the bankruptcy case.") (quoting H.R.

Rep. No. 95-595 at 300 (1978), reprinted in U.S. Code Cong. & Admin. News 5787, 5963,

6266). For these purposes, "[a] 'contingent' claim . . . refers 'to obligations that will become due

upon the happening of a future event that was within the actual or presumed contemplation of the

parties at the time the original relationship between the parties was created.'" *Ogle v. Fid. &*

*Deposit Co. of Md.,* 586 F.3d 143, 146 (2d Cir.2009) (quoting *In re Manville Forest Prods.*

*Corp.,* 209 F.3d 125, 128–29 (2d Cir. 2000)); *see also In re St. Vincent's Catholic Med. Ctrs.,*

440 B.R. 587, 602 (Bankr.S.D.N.Y.2010).

Claims based on un-assumed prepetition contracts are contingent prepetition claims that

arise upon the execution of the contract. S*ee Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d

at 147 ("an unsecured claim for post-petition fees, authorized by a valid pre-petition contract," is

a contingent claim "deemed to have arisen pre-petition.") (citing *In re SNTL Corp.*, 571 F.3d

826, 844 (9th Cir. 2009)); *Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap.,*

*LLC)*, 558 B.R. 77, 86 (S.D.N.Y. 2016) ("The appellees' claims for attorney's fees accrued at the

time the Contracts were executed even though they remained contingent until the Trust allegedly

breached the Contracts"); *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc*., 531 B.R. 339, 343

(S.D.N.Y. 2015) ("The relationship between Conway and LBSF therefore was created upon the

signing of the…Agreement. The fact that the Lehman bankruptcy—the relevant contingency—

materialized post-petition does not transmogrify the claim into a post-petition claim, but merely

means that the contingent claim moved closer to becoming liquidated"). *See also In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) (holding that "the Second Circuit recognizes that contract-based bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim"); *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. at 582 (finding that the "Bankruptcy Court's conclusion is supported by the clear weight of case law in this Circuit which recognizes that contract-based bankruptcy claims arise at the time the contract is executed. For example, courts consistently hold that a post-petition breach of a pre-petition contract gives rise only to a pre-petition claim").[20]

Where parties contemplate the possibility of future breach in their contracts, such breaches are treated as contingent prepetition claims rather than post-petition claims. *See In re Residential Cap., LLC*, 558 B.R. at 85-87; *see also In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (claims for indemnity arose prepetition where "the terms of the indemnification agreements were so broad as to encompass all types of future liability"); *In re*

---

[20]    The Court held as much in these Chapter 11 Cases in granting the Debtors' motion to enforce the Plan Injunction contained in the Third Amended Plan to enjoin Gautam and Panthobi Sharma (the "Sharmas") from prosecuting counterclaims seeking monetary relief against the Debtors in Illinois state court. *See Memorandum Decision and Order Granting Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order as it Relates to Gautam and Panthobi Sharma* [ECF No. 3034] (Nov. 30, 2020). The Sharmas were parties to a prepetition mortgage and note that had been assigned to Ditech. After confirmation of the Third Amended Plan, Ditech brought a foreclosure action based on the mortgage. The Sharmas asserted counterclaims in that action seeking monetary relief, principally attorneys' fees and costs, alleging under both contract and Illinois statutory law that Ditech failed to give proper notice of the foreclosure and therefore the foreclosure was invalid. *Id.* at 7-8. It was undisputed that the Sharmas asserted counterclaims for monetary relief against Ditech, and that those counterclaims for monetary relief would be covered by the Plan Injunction if the claims arose prior to the Effective Date of the Plan. *Id.* The sole issue before the Court was when those claims arose. Relying on the precedent cited above, the Court found that the counterclaims were subject to the injunction, reasoning, in part, that "[c]ontract claims arise upon execution of the agreement…It is settled that prepetition contract based claims for attorney's fees are deemed to arise upon execution of the contract." *Id.* at 13 (citations omitted).

*Chateaugay Corp.*, 944 F.2d at 1004 ("In the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'") (internal citations omitted). The Subservicing Agreements contemplate the possibility of servicing errors and establish procedures for dealing with errors, including through indemnity provisions.  The risk of subservicing errors in the post-petition period was within the fair contemplation of the parties, and the fact that the Debtors received compensation for their services does not transform the claims into administrative expense claims. Rather, under Second Circuit case law, the claims are contingent prepetition claims, which are not afforded administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.[21]

The Subservicing Agreements were executory contracts under which the Debtors provided servicing in exchange for fees from LHES and FoA. Executory contracts for services, like all executory contracts, are subject to assumption or rejection. *See, e.g., In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 279 (Bankr. S.D.N.Y. 2013) (Support-plus agreements under which purchasers had reporting obligations in return for continuing support from debtor were

---

[21]   In support of their contention that their claims arose post-petition under the Servicing Agreements, as extended by the Prepetition Extension Agreements, FoA and LHES rely on: *Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553 F.2d 305, 308 (2d Cir. 1977) ("It is settled law that a claim arising under an executory contract is entitled to priority if the trustee or debtor in possession elects to assume the contract *or if he receives benefits under it*.") (emphasis added); *In re Enron Corp.*, 279 B.R. 79, 87 (Bankr. S.D.N.Y. 2002) ("With respect to an executory contract, the focus is on whether the debtor used the nondebtor's property in the ordinary course of its business, and continued to receive and accept the nondebtor's performance."); *Texaco Inc. v. Bd. Of Commissioners for the LaFourche Basin Levee Dist. (In re Texaco Inc.)*, 254 B.R. 536, 556 (Bankr. S.D.N.Y. 2000) ("As long as the debtor continues to receive benefits under such contract it must also bear the burdens or obligations imposed under the contract."); *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982) (same); *In re Shoppers Paradise, Inc.*, 8 B.R. 271, 279 (Bankr. S.D.N.Y. 1980) ("Even where court approval was not obtained the debtor-in-possession may be deemed to have adopted the contract or lease where it received benefits and when the issue presented is whether or not such benefits should be entitled to an administration expense claim."). *See* LHES Response ¶ 19; FoA Response ¶ 21. FoA and LHES misplace their reliance on those cases. All of them pre-date the Second Circuit's clear direction that claims based upon un-assumed prepetition contracts are contingent prepetition claims that arise upon the execution of the contract. Thus, in that regard, they have no precedential value.

executory contracts subject to rejection). Where a debtor-in-possession exercises its right to

reject an executory contract either prior to plan confirmation or under a confirmed plan, the

rejection is treated as occurring "immediately before the date of the filing of the petition." 11

U.S.C. § 365(g)(1). "The Bankruptcy Code… specifically provides that such claim against the

estate is treated as a pre-petition claim, thereby affording it general unsecured status." *In re Old*

*Carco LLC*, 424 B.R. 633, 639 (Bankr. S.D.N.Y. 2010) (internal citation omitted).

The Third Amended Plan provided that all executory contracts not otherwise assumed

would be rejected. *See* Third Amended Plan, ¶ 8.1(a). The Debtors did not assume the

Subservicing Agreements. *See* LHES Response ¶ 9; FoA Response ¶ 11. LHES and FoA note

that the terms of the LHES November 2008 Agreement and FoA Subservicing Agreements (as

extended by the Prepetition Extension Agreements) expired at the end of March 2019, well

before the Effective Date. They assert that those agreements never were assumed or rejected

under the terms of the Third Amended Plan. LHES and FoA do not assert claims resulting from

any failure by RMS to perform after the Effective Date, which they say is the earliest date the

Prepetition Subservicing Agreements could have been rejected under the Third Amended Plan.

Thus, they contend they are not asserting rejection damages claims that would be deemed to have

occurred prepetition under section 365(g) of the Bankruptcy Code. LHES Response ¶ 22; FoA

Response ¶ 24. The Court finds no merit to that contention. "The effect of rejection is that the

*estate* does not become obligated on the contract…Thus, rejection is the equivalent of electing

not to assume a contract." *In re Old Carco LLC*, 424 B.R. at 639; *see also In re A.C.E. Elevator*

*Co.,* 347 B.R. 473, 483–84 (Bankr. S.D.N.Y. 2006) (finding when debtor did not reject an

agreement post-petition and allowed the agreement to expire by its terms, employees' claim for

delinquent contributions was not entitled to administrative priority). Even though the Debtors

were unable to reject the Prepetition and Post-Petition Extension Agreements because they

expired prior to the Effective Date, the Claims still arise under the Subservicing Agreements and

the Debtors did not assume those agreements. Accordingly, the Claims are, at most, contingent

prepetition general unsecured claims regardless of whether the Subservicing Agreements and/or

the Prepetition and Post-Petition Extension Agreements were deemed rejected or expired on their

terms.

### Conclusion

Based on the foregoing, the Court sustains the Debtors' Objection to the LHES and FoA

Administrative Expense Claims[22] and reclassifies them as General Unsecured Claims.[23]

IT IS SO ORDERED.

Dated: New York, New York
       October 21, 2021

                                                    /s/ *James L. Garrity, Jr.*
                                                    Hon. James L. Garrity, Jr.
                                                    U.S. Bankruptcy Judge

---

[22]    To be clear, to the extent that FoA is asserting administrative expense claims in Claim No. 21347, those claims are reclassified as General Unsecured Claims.

[23]    In support of the Objection, the Plan Administrator also asserted that (i) even if the Court found that the Post-Petition Extension Agreements are in fact post-petition contracts (i) LHES and FoA would not be entitled to collect on an administrative priority basis because the parties did not obtain Court approval of the extensions (*see* Reply ¶¶ 41-49); and (ii) the claims would be limited to the reasonable value conferred upon the estates. *Id.* ¶¶ 61-71. The Court need not, and does not, address those arguments.