JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1600
Facsimile: (212) 891-1699
RLevin@jenner.com
Richard Levin

*Attorneys for the Consumer Claims Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
:
In re                                                        :          Chapter 11
:
DITECH HOLDING CORPORATION, et al.,     :          Case No. 19-10412 (JLG)
:
Debtors.[1]                                          :          (Jointly Administered)
:
:          Related Docket No. 2320
----------------------------------------------------------------X

REPLY OF THE CONSUMER CLAIMS TRUSTEE
IN SUPPORT OF THE CONSUMER CLAIMS TRUSTEE'S
TWENTY-SECOND OMNIBUS OBJECTION
WITH RESPECT TO THE CLAIM OF CHARLES HINKLE (2191)

---

[1]    On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404) (the "**Third Amended Plan**"), which created the Wind Down Estates. On February 22, 2022, the Court entered the Order Granting Entry of Final Decree (I) Closing Subsidiary Cases; and (II) Granting Related Relief (ECF No. 3903) (the "**Closing Order**"). Pursuant to the Closing Order, the chapter 11 cases of the following Wind Down Estates were closed effective as of February 22, 2022: DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). Under the Closing Order, the chapter 11 case of Ditech Holding Corporation (the "**Remaining Wind Down Estate**") (Case No. 19-10412 (JLG) remains open and, as of February 22, 2022, all motions, notices and other pleadings relating to any of the Wind Down Estates are to be filed in the case of the Remaining Wind Down Estate. The last four digits of the Remaining Wind Down Estate's federal tax identification number is (0486). The Remaining Wind Down Estate's principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573.

The Consumer Claims Trustee submits this reply (the "**Reply**") in support of the *Consumer Claims Trustee's Twenty-Second Omnibus Objection to Proofs of Claim (Insufficient Documentation and Untimely Unsecured Consumer Creditor Claims)* (ECF No. 2320), filed on May 8, 2020 (the "**Twenty-Second Omnibus Objection**"). The Reply is submitted in opposition to the *Response of Charles Hinkle/Connie Bennett* (ECF No. 2605) filed on June 18, 2020 (the "**Response**"). The Consumer Claims Trustee respectfully represents as follows:

<u>Background</u>

<u>Preliminary Statement</u>

1.      Charles Hinkle (the "**Claimant**") alleges that Ditech failed to credit a mortgage payment, improperly cancelled homeowner's insurance, and added erroneous fees to the account. Based upon the documentation provided and a review of publicly available records, the Claims Trustee is unable to determine any information about the underlying loan. According to Claimant's claim, the residence is located at 1325 Magnolia Street, Marion, Alabama 36756 (the "**Property**"); but the Claim provides no information as to what type of property it is (manufactured or a site-built, detached home), who owns the Property or how it is titled.

2.      It is also unclear from the records provided and from publicly available property records when the loan servicing was assigned to Ditech.

<u>The Bankruptcy Claim</u>

3.      On June 6, 2019, Claimant filed proof of claim 2191 (the "**Claim**") in these bankruptcy proceedings asserting an unsecured claim in the amount of $30,000.00. Claim at 1. The basis of the Claim is listed as "Goods sold, service performance". *Id.* The Claimant lists himself as the owner of the property; no other owners are listed on the Claim. Claim at 2. There is no further narrative or supporting information attached to the Claim.

4.      On May 8, 2020, the Consumer Claims Trustee filed the Twenty-Second Omnibus Objection, which objected on the grounds that the Claim contained insufficient documentation to support its underlying merits and was filed untimely. Twenty-Second Omnibus Objection at 14. [ECF No. 2320]

<u>The Response</u>

5.      On or around June 18, 2020, Claimant and Connie Bennett ("**Ms. Bennett**") jointly filed the Response.[2] Accordingly, the Trustee agreed to adjourn the hearing on Claimant's claim. *Notice of Adjournment of Hearing Consumer Claims Trustee's Twenty-Second Omnibus Objection to Proofs of Claim (Insufficient Documentation and Untimely Unsecured Consumer Creditor Claims).* [ECF No. 2521].

6.      The Response contains a handwritten letter from Claimant explaining that Ditech allegedly withdrew $430.00 from Ms. Bennett's bank account but failed to credit the payment to the note account. Response at 1. Ms. Bennett was allegedly charged a $19.00 service fee for the debit. *Id.* Claimant contends that Ditech told him to provide bank statements to verify that the $430.00 payment was debited from the account. *Id.* Attached to the Response are two pages of bank statements showing an automatic debit from Ms. Bennett's account withdrawn on September 5, 2017. *Id.* at 5-6. In connection with this uncredited payment, Claimant requested a pay history from Ditech, but claims to never have received it. *Id.*

7.      Claimant additionally alleges that Ditech cancelled his homeowner's insurance and did not refund his money. Response at 1. Attached to the Response is a

---

[2] The Response is jointly filed by Charles Hinkle and Connie Bennett. Correspondence from Ditech attached to the Claim is addressed to Charles Hinkle at 1325 Magnolia St., Marion, AL 36746. Bank statements attached to the Claim are addressed to Connie Bennett at 1325 Magnolia St., Marion, AL 36756. In the absence of additional records, including a Mortgage, Note or financing contract, it is impossible for the Trustee to ascertain whether both Mr. Hinkle and Ms. Bennett are co-borrowers or co-mortgagors.

3

Confirmation of Cancellation showing the policy cancelled at the lien holder's request, effective February 22, 2019. *Id.* at 7.

8.     Claimant claims that the final billing statement from Ditech showed that he owed $1,700.00 and that a subsequent statement from another company showed that he owed $3,500.00 for fees "Ditech added to [his] account". Response at 1. Claimant does not attach any supporting documentation or provide any supporting detail.

9.     Also attached to the Response are three letters from Ditech to Claimant. Two of the letters, dated December 29, 2017 and July 19, 2018 respectively, each acknowledge receipt of an inquiry from Claimant and indicate that Ditech is looking into the matter and temporarily ceasing collection activities pending the investigation(s). Response at 4, 2. The third letter, dated February 21, 2019, relates to a change in Claimant's account number. *Id.* at 3. All correspondence from Ditech is addressed to Claimant, and there is no correspondence from Ditech to Ms. Bennett.

10.     Under the procedure established by the Claim Procedures Order, the submission of the Response caused an adjournment of the Twenty-Second Omnibus Objection as to the Claim so that the Court may conduct a Sufficiency Hearing (as defined in the Claim Procedures Order). The Claim Procedures Order dictates that the legal standard of review at a Sufficiency Hearing will be the equivalent to the standard applied upon a motion to dismiss for failure to state a claim upon which relief can be granted. *See* Claim Procedures Order, § 3(iv)(a).

## The Motion to Estimate

11.     On March 23, 2023, the Consumer Claims Trustee filed the *Consumer Claims Trustee's Omnibus Motion to Estimate for Purposes of Distribution Reserves and to Classify Certain Proofs of Claim.* [ECF No. 4650]. (the "**Estimation Motion**").

12.    The Estimation Motion sought to estimate Claim 2191 at $30,000.00 for the purpose of setting a distribution reserve. The Estimation Motion further requested that the Claim be established as a Class 6 Consumer Creditor Claims that was not a 363(o) Claim, as defined by the Third Amended Plan. Estimation Motion at 17.

13.    By order dated May 11, 2023, Claim 2191 was estimated at $30,000.00 for purposes of setting a distribution reserve and classified as a non-363(o), Class 6 Consumer Creditor Claim, as defined in the Third Amended Plan. *Order Granting Consumer Claims Trustee's Omnibus Motion to Estimate for Purposes of Distribution Reserves and to Classify Certain Proofs of Claim* at 6. [ECF No. 4733]. (the "**Estimation and Classification Order**").

## Jurisdiction

14.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Reply

### A. Rule 12(b)(6) of the Federal Rules of Civil Procedure Is the Applicable Pleading Standard

15.    A filed proof of claim is "deemed allowed, unless a party in interest…objects." 11 U.S.C. §502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the claimant bears the burden to demonstrate the validity of the claim. *See Residential Capital, LLC*, 2016 WL 796860, at *9 (S.D.N.Y. 2016); *In re Motors Liquidation Co.*, 2012 WL 1886755, at *3 (S.D.N.Y. 2012).

16.    Additionally, section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…." 11 U.S.C. § 502(b)(1).

17.     Although claims submitted by *pro se* claimants are construed liberally, such claims must nevertheless be supported by specific and detailed factual allegations that provide a fair understanding for the basis of the claim and the legal grounds for recovery against a debtor. *Kimber v. GMAC Mortgage, LLC* (*In re Residential Capital, LLC*), 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (citing *Iwachiw v. New York City Bd. of Elections*, 126 Fed. Appx. 27, 29 (2d Cir. 2005)). As such, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). See also *Barberan v. Nationpoint*, 706 F.Supp. 2d 408, 413 (S.D.N.Y. 2010); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d. Cir. 1994).

18.     Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim may be dismissed due to a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); see also Fed. R. Bankr. P. 7012 (incorporating Rule 12(b)(6)). The adequacy of the Claim should be analyzed in accordance with the standards established under Rule 12(b)(6), which requires the claimants to allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Owens v. Textron Financial Corp.*, 2014 WL 3887181, at *4 (S.D.N.Y. July 14, 2014) ("Moreover, because plaintiff has not identified any cognizable legal theory applicable here, the Court cannot reasonably infer defendant is liable under any such theory").

19.     A claimant cannot meet this Rule 12(b)(6) standard if the pleadings are clear that an affirmative defense, such as res judicata, bars the claim. *See Thompson v. Cty. of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994).

20.     Here, even a generous reading of the Claim and the Response does not support any viable claim for recovery against the Consumer Creditor Reserve as a matter of law.

### B. The Claimant Fails to Adequately Plead a Claim Under Federal Rule of Civil Procedure 8(a)

21.     Under Fed. R. Civ. P. 8(a), complaints must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" such that a defendant "has fair notice of what the … claim is and the grounds upon which it rests". *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007); *Ashcroft v. Iqbal*, 129 U.S. 1937, 1949-51 (2009). Courts require that a pleading contain "enough facts to state a claim for relief that is plausible on its face". *Twombly* at 770. Each allegation in a pleading must be "simple, concise, and direct" but no technical pleading form is required. Fed. R. Civ. P. 8(d)(1). Courts are obliged to construe pleadings "so as to do justice". Fed. R. Civ. P. 8€

22.     Dismissal of a pleading under Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised". *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir. 2000) (quotations omitted). Dismissal of a complaint is appropriate where "it presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims". *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).

23.     Neither the Claim nor the Response state any legal causes of action. Although the Response provides several complaints about Ditech's servicing, the underlying facts are too vaguely stated to enable the Trustee to evaluate any alleged wrongdoing. For example, Claimant provides no information regarding the underlying debt contract or the property that secures it. Without knowledge of the loan origination, credit terms or even

whether the property is a single-family residence or a manufactured home, it is impossible to ascertain the rights and obligations of Claimant or Ditech in connection with the servicing of this loan.

24.     Without this foundational information, the Trustee is unable to determine the nature and basis of the Claim. This is precisely the dilemma which Rule 8 was designed to prevent. "In accordance with the liberal pleading standards of Rule 8, a plaintiff must disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery". *In re Marketxt Holdings Corp.,* 361 B.R. 369, 384 (Bankr. S.D.N.Y. 2007), citing *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000), quoting *Ricciutti v. N.Y. City Trans. Auth.*, 941 F.2d 119, 123 (2d. Cir. 1991), (internal quotation marks omitted).

## C.  The Claimant Fails to Assert Facts Sufficient to State a Plausible Claim Under Rule 12(b)(6)

25.     If the Claim is not dismissed for failure to comport with Fed. R. Civ. P. 8, it should be dismissed under Fed. R. Civ. P. 12(b)(6). Claimant fails to plead any causes of action. His concerns are Ditech's failure to credit a mortgage payment and provide a proper explanation to follow up requests, cancellation of a homeowner's insurance policy, and erroneous fee assessments. He does not articulate the legal theories under which he pursues relief for any of these alleged acts by Debtor or the damages caused by Ditech's actions.

26.     Although pro se pleadings are held to a less stringent standard, liberal construction of those pleadings "does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action". *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014) (citations omitted). Nor is the Trustee required to write the Claimant's complaint for him.

27.     Although Claimant does not directly implicate any statutory scheme, servicing on mortgages of real estate is generally regulated by the Real Estate Settlement Procedures Act ("**RESPA**"), and consumer credit is generally regulated by the Truth in Lending Act ("**TILA**"). In an effort to interpret the claim liberally, even though the Claim does not assert it relates to a real property mortgage, the Trustee will construe Claimant's complaints as requests for relief under RESPA. To the extent Claimant alleges that Ditech failed to perform its duties under a mutual agreement, the Trustee will construe and analyze the Claim as an effort by Claimant to assert a breach of contract.

### i.    Claimant Fails to State a Claim Under RESPA

#### a.    Claimant Does Not Plead Facts to Establish Loan is Federally Related and Under Scope of RESPA

28.     The Real Estate Settlement Procedure Act ("**RESPA**"), codified at 12 U.S.C. §2601, et seq., establishes uniform procedures designed to create greater transparency for borrowers during the real estate settlement process. RESPA is a "consumer protection statute". *Roth v. Citimortgage Inc.,* 756 F.3d 178, 181 (2d. Cir. 2014).

29.     RESPA applies to federally related mortgage loans. 12 C.F.R. § 1024.5(a). Federally related mortgage loans are defined, in pertinent part, as any loan secured by a lien on residential real property. 12 C.F.R. §1024.2(b). RESPA coverage extends to manufactured homes when the loan is also secured by a lien on the real property under the home. *Id.[3]*

---

[3] Dep't of Hous. & Urban Dev., FAQs About RESPA for Industry (undated) ("[A] loan secured by a manufactured home (mobile home)  [is a]  covered  transaction  under RESPA . . . *only if* the manufactured home is located on real property on which the lender's interest is secured by a lien."). *See* 40 Fed. Reg. 22,448 (May 22, 1975) (final notice for original Reg. X, stating that: "The final regulations cover, mobile homes and mobile home lots only if both the mobile home and the lot on which it is to be located are being purchased with the proceeds of the loan in question").

30.    Claimants do not allege that theirs is a federally related mortgage loan. Nor do they specify whether the loan is secured by real property. The Trustee was unable to locate any information in publicly available records regarding the Property or the land on which the Property sits. If the Property is a manufactured home titled as personal property and Claimant does not own the land on which the home is located, the loan is not covered by RESPA's scope, and Claimant cannot state a valid claim under RESPA.

### b.  Notice of Error

31.    Even if Claimant established that his loan fell within RESPA's scope, the general vagueness of his allegations do not give rise to a claim under RESPA. In connection with the allegedly uncredited payment of $430.00, Claimant asserts that he tried to communicate with Ditech to understand what happened. Response at 1. He states that Ditech requested proof of payment via a bank statement, which he provided to Ditech. *Id.* He then claims that Ditech did not respond to his request for a copy of his payment history and then subsequently stopped answering his calls. *Id.*

32.    Attached to the Response is a handwritten letter dated December 21, 2017 wherein Claimant asks Ditech to remedy the unapplied payment issue, reimburse Claimant for any erroneous charges and provide an accurate account statement. Response at 8. Claimant purports to enclose a copy of the bank statement showing the debit and asks Ditech to investigate the matter and make corrections to the billing as soon as possible. *Id.* The letter does not request a copy of the payment history but instead requests an "accurate statement". *Id.* The letter is not formally addressed to Ditech, and Claimant does not provide any mailing receipts or other documentation showing when, where, or to whom the document was sent.

33.    However, Claimant attaches a responsive letter from Ditech, dated December 29, 2017, which acknowledges receipt of correspondence from Claimant on

December 26, 2017. Response at 4. The letter indicates that Ditech is looking into the matter and will follow up with Claimant after investigating, during which time all collection activities on the account will be suspended. *Id.*

34.    RESPA sets forth error resolution procedures where a borrower disputes activity on their account. 12 CFR § 1024.35. Upon written notice from the borrower which includes sufficient information to allow the servicer to identify both the mortgage and the alleged error, the servicer must, within five days of receipt, formally acknowledge receipt of the notice of error. 12 CFR §1024.35(a),(d). Among the errors covered are a servicer's "[f]ailure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments", "[f]ailure to credit a payment to a borrower's mortgage loan account as of the date of receipt in violation of 12 CFR §1026.36(c)(1)" and "[i]mposition of a fee or charge that the servicer lacks a reasonable basis to impose on the borrower". 12 CFR §1024.35(b)(1),(3),(5).

35.    "To plead a claim under the RESPA, plaintiff must offer proof either by attaching the letter or pleading with specificity such facts—such as when the letter was sent and to whom it was directed, why it was sent, and the contents of the letter—that the Court may determine if the letter qualifies as a QWR or notice of error". *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F.Supp.3d 526, 538 (E.D.N.Y. 2015) (citing *Miller v. HSBC Bank U.S.A., N.A.*, No 13-7500, 2015 WL 585589, at *10 (S.D.N.Y. Feb. 11, 2015 (collecting cases)).

36.    Pursuant to 12 CFR § 1024.35(c), "a servicer may, by written notice provided to a borrower, establish an address that a **borrower must use** to submit a notice of error". (emphasis added). Servicers must respond to error notices by either correcting the error and providing a written explanation of the correction, or conducting a reasonable investigation and providing a written explanation of the results of such an investigation. 12 CFR § 1024.35(e)(1).

37.     Claimant himself admits that Ditech complied with its initial obligations under RESPA by sending the December 29, 2017 letter acknowledging receipt of his question and indicating that Ditech was investigating the matter. Claimant also notes that he subsequently provided bank statements at Ditech's request, but does not provide any explanation or documentation as to when Ditech made the request or how Ditech responded after receiving the information. Response at 1. (Servicers are permitted to request corroborating information from the borrower. 12 CFR § 1024.35(e)(2)).

38.     Instead, Claimant provides a letter from Ditech dated July 18, 2018 acknowledging recipient of Claimant's question on July 16, 2018, but Claimant does not provide any information regarding the request or subsequent response from Ditech. Response at 2.

39.     Ditech complied with RESPA by providing an acknowledgement of receipt within the required five-day time period. Claimant does not provide sufficient information to show that Ditech otherwise failed to address the borrower's requests.

### c.  Cancellation of Insurance

40.     Claimant contends that Ditech cancelled his home insurance and did not refund his money. He says he "felt like [he] had been rip-off [sic] by Ditech". Response at 1. Claimant provides a "Confirmation of Cancellation" notice dated February 22, 2019 from American Bankers Insurance Company of Florida, indicating that insurance on the Property had been cancelled at Ditech's request. *Id.* at 7. The document notes the total premium cost was $410.00 and the premium amount returned was $189.83. *Id.*

41.     Mortgage servicers may obtain hazard insurance on a borrower's behalf for the purpose of protecting their security interest in the property. 12 CFR § 1024.37. A servicer may not charge a borrower for such insurance unless the servicer has "a reasonable basis to believe that the borrower has failed to comply with the mortgage loan contract's

requirement to maintain hazard insurance". 12 CFR § 1024.37(b). Before obtaining its own

policy, a servicer must provide written notice, including an explanation of why existing

insurance is either insufficient or not being supplied by the borrower. *Id.*

42.     Conversely, a servicer may also, upon 15 days' notice from the borrower,

cancel the force-placed insurance as long as the borrower has demonstrated that they have

obtained an individual policy that "complies with the loan contract's requirements to

maintain hazard insurance". 12 CFR § 1024.37(g).

43.     Claimant provides no additional factual context regarding the

insurance issue. Claimant does not, for example, assert that Ditech failed to provide notice

that it intended to force-place insurance. Nor does Claimant state or provide support to

suggest that he was current on his insurance policy premiums. It is not apparent from the

information provided whether Claimant paid his own insurance or paid monthly into an

escrow account.

### ii.     Claimant Fails to State a Claim Under TILA

44.     Claimant contends that Ditech collected a $430.00 mortgage payment

via direct debit but failed to credit the payment to the account. Response at 1. By way of

support, Claimant provides Ms. Bennett's bank statement showing what appears to be a debit

of $430.00 by "Ditech – Financial Mortgage" on September 5, 2017. Response at 5, 6. The

bank statement also shows a $19.00 deduction on the same day by "PMNTUS SVC FEE

SERVICEFEE". The Claimant's name is not on the bank account, nor is there any

documentation to show which Ditech account the payment was directed.

45.     The TILA has "the broad purpose of promoting 'the informed use of

credit' by assuring 'meaningful disclosure of credit terms' to consumers". *Parrish v. Blazer

Financial Services, Inc.*, 868 So. 2d 406, 410 (Ala. 2003), citing *Ford Motor Credit Co. v.

Millhollin*, 444 U.S. 555, 559 (1980). TILA's implementing regulations are set forth in

Regulation Z, 12 C.F.R. Pt. 1026, which is accompanied by official interpretations at 12 C.F.R. Pt. 1026, Supp. I, Pts. 1–5 (the "Official Interpretations"). TILA requires servicers and creditors to timely credit payments on home loans, credit cards, and other forms of open-end credit. 15 U.S.C. §§ 1639f, 1666c(a).

46.    TILA applies to credit transactions involving loans where the creditor takes a security interest in the real or personal property intended for use as the borrower's principal dwelling. 15 U.S.C. § 1603(3). The implementing regulations further impose limitations on mortgages that are subject to the requirements of 12 C.F.R. § 1026.32, prohibit certain acts or practices in connection with credit secured by a dwelling in 12 C.F.R. § 1026.36 and credit secured by a consumer's principal dwelling in 12 C.F.R. § 1026.35.

> Subpart E contains special rules for mortgage transactions. Section 1026.32 requires certain disclosures and provides limitations for closed-end credit transactions and open-end credit plans that have rates or fees above specified amounts or certain prepayment penalties. Section 1026.33 requires special disclosures, including the total annual loan cost rate, for reverse mortgage transactions. Section 1026.34 prohibits specific acts and practices in connection with high-cost mortgages, as defined in § 1026.32(a). Section 1026.35 prohibits specific acts and practices in connection with closed-end higher-priced mortgage loans, as defined in § 1026.35(a). Section 1026.36 prohibits specific acts and practices in connection with an extension of credit secured by a dwelling. Sections 1026.37 and 1026.38 set forth special disclosure requirements for certain closed-end transactions secured by real property or a cooperative unit, as required by § 1026.19(e) and (f).

12 C.F.R. § 1026.1(d)(5).

47.    The Claimant fails to provide enough information to determine what, if any, provisions of TILA apply.

### a. Crediting of Payment

48.    For closed-end credit transactions secured by a borrower's principal dwelling, servicers must credit periodic payments to the account as of the date of receipt. 12 CFR § 1026.36(c)(1). Servicers may also place partial payments into suspense accounts,

holding the funds in such accounts until sufficient funds exist to cover an entire periodic payment. *Id.*

49.     Under TILA, servicers are required to promptly credit payments received, except when a delay in crediting does not result in a finance or other charge. 12. C.F.R. §1026.36(c)(1)(i). The official interpretation to this section further states:

> a mortgage servicer must credit a payment to a consumer's loan account *as of the date of receipt*. This does not require that a mortgage servicer post the payment to the consumer's loan account on a particular date; the servicer is only required to credit the payment as of the date of receipt. Accordingly, a servicer that receives a payment on or before its due date (or within any grace period), and does not enter the payment on its books or in its system until after the payment's due date (or expiration of any grace period), does not violate this rule as long as the entry does not result in the imposition of a late charge, additional interest, or similar penalty to the consumer, or in the reporting of negative information to a consumer reporting agency.[4]

50.     What Claimant neglects to show is that Ditech did not in fact credit the $430.00 payment. There are, for example, no billing statements or correspondence from Ditech indicating that the funds were not applied to the account. Moreover, while the payment does appear to have been debited on September 5, 2017, and the bank account shows a positive balance, Claimant provides no information showing what the regularly monthly payment should have been, what the due date of the regular monthly payment was, whether or not there were additional funds due for escrow, whether the account was behind when the payment was remitted, or even if the "Ditech – Financial Mortgage" debit was directed to the appropriate Ditech account.

### b.  Charging a Service Fee

51.     As for the $19 charge, it is unclear whether that fee was charged by Ditech (rather than Claimant's bank, for example). If the fee was charged, the fee was

---

[4] https://www.consumerfinance.gov/rules-policy/regulations/1026/interp-36/

charged at the same time as the transaction, and the Claimant describes the $19 charge as a "service fee". Claim at 1. TILA allows servicers to specify the terms in which a payment may be made. See, 12 C.F.R. § 1026.36(c)(1)(iii) (indicating that servicers may "specif[y] in writing requirements for the consumer to follow in making payments"); Official Interpretations at § 1026.36(c)(1)(iii) ¶ 1 ("The servicer may specify reasonable requirements for making payments in writing."); *Fridman v. NYCB Mortg. Co., LLC*, 780 F.3d 773, 782 ("[A] servicer may require customers to pay using a menu of ways that it specifies."). In the absence of specific requirements, or an agreement to electronic fund transfer, the servicer must accept payment "by cash, money order, draft, or other similar instrument in properly negotiable form." Official Interpretations at § 1026.36(c)(1)(iii) ¶ 3. There is no requirement under TILA or Regulation Z that servicers accept payment by credit or debit card, see, *Id.*; *Fridman,* 780 F.3d at 782, or that they offer consumers the ability to make online payments free of charge. *Kier v. Ocwen Loan Servicing, LLC*, 122 F. Supp. 3d 786, 790 (N.D. Ill. 2015) (finding no violation of the prompt crediting rule where servicer imposed a standard $10 fee to pay online, but did not impose any fee as a result of a delay in processing a timely online payment)

52.    The Seventh Circuit has indicated that the purpose of § 1026.36(c)(1)(i) is to protect consumers from incurring penalties as a result of delayed payment crediting:

> Reading TILA to require mortgage servicers to credit electronic authorizations when they are received protects consumers from this unwarranted—and possibly limit-less—delay.... TILA's requirement that servicers credit electronic authorizations when they are received provides legal assurance that consumers are not injured by delays that are out of their hands.

*Fridman*, 780 F.3d at 780. This interpretation is consistent with the Official Interpretations, which state that no TILA violation occurs when a servicer's delay does not result in late charges, additional interest, or similar penalties. Official Interpretations at § 1026.36(c)(1)(i)

¶ 1. In this case, however, there was no late charge, merely the assessment of a fee apparently for an online payment.

### c.  Periodic Statements

53.     Claimant further alleges that Ditech failed to provide accurate periodic statements. He claims that Ditech sent him a statement saying he owed $1,700, and then another company told him he owed $3,500. Response at 1. He also requested an accurate statement in his letter to Ditech on December 21, 2017. Response at 8. The Claimant provides no periodic statements in which to evaluate his claims.

54.     TILA does require a servicer of a closed-ended consumer credit transaction secured by a dwelling to provide a periodic statement for each billing cycle which includes (a) amount due (b) explanation of amount due (c) past payment breakdown (d) transaction activity (e) partial payment information (f) contact information (g) account information, and (h) delinquency information. 12 CFR § 1026.41.

55.     Claimants acknowledges Ditech sent him statements stating "they [*sic*] last statement Ditech sent me" was for only $1,700 "and now another company is saying I owe $3,500 for fees [D]itech added to my account". Response at 8. Claimant does not provide the statement from Ditech, the statement from new company or even the dates the statements were sent. He further fails to provide any details regarding the type of credit transaction to determine which provision of TILA, if any, would apply.

### d.  Cancellation of Insurance

56.     Claimant also contends that Ditech cancelled his home insurance and did not refund his money. Response at 1. He provides a confirmation of cancellation which states the home insurance was cancelled at the lienholder's request and a premium of $189.83 was returned. He does not explain how the initial premium was paid, if he initially obtained

the insurance or even what the credit term was in which to determine if the property insurance premiums are a finance charge as defined by TILA. 12 CFR § 1026.4(d)(2).

57.    TILA does allow a creditor to "reserve the right to refuse to accept, for reasonable cause, an insurer offered by a consumer". 12 CFR §1026.4(d)(2)(i). But it is unclear from the information provided by the Claimant if he is concerned about the cancellation of the insurance or just Ditech's alleged failure to return the premium.

58.    Without the credit transaction terms, periodic statements, or any details regarding the parties agreements, there is insufficient information in which to substantiate his claims.

59.    Because Claimant provided no information about the underlying loan contract, he is unable to show whether the amount financed subjected the loan to TILA or that the $430.00 was sufficient to cover a full mortgage payment. Without more, he also fails to demonstrate that Ditech did not properly and timely credit the payment or that finance charges in connection with this transaction were erroneously charged. Claimant does not directly assert any claims under TILA and fails to provide sufficient information to enable the Trustee to liberally construe any claims in his favor.

### iii.    Claimant Fails to State a Claim for Breach of Contract

60.    Claimant disputes the application of a payment, cancellation of his homeowner's insurance, and improper fees. Typically, installment payments, insurance coverage and fee assessments would be governed by an underlying agreement between the parties. In an effort to liberally construe Claimant's Claim, the Trustee will analyze these generalized complaints as potential claims for breach of contract.

61.    "To establish a breach of contract claim, a plaintiff must show '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under

the contract, (3) the defendant's nonperformance, and (4) damages". *Jones v. Alfa Mut. Ins. Co.*, 875 So.2d 1189, 1195 (Ala. 2003) (citations omitted).

62.     At base, Claimant fails to identify the existence of a contract binding the parties. "A contract cannot be formed without an offer, an acceptance, consideration and mutual assent to terms essential to the contract". *Ex parte Payne*, 741 So. 2d 398, 403 (Ala. 1999). In failing to identify the contract upon which his Claim is based, Claimant makes it impossible for the Trustee to ascertain the contract terms and evaluate whether or not they have been breached.

63.     Claimant also fails to demonstrate that he performed under the terms of the contract, that Ditech failed to perform, or that Ditech's nonperformance caused him damages.

64.     In addition, he provides no basis or explanation for the $30,000.00 sought. He claims failure to credit a payment of $430 plus improper imposition of fees. Without more, it is not plausible that he was damaged to the extent of $30,000.

65.     He is thus unable to state a claim for breach of contract.

**iv.    Claimant's Other Causes of Actions Are Too Vague to State a Plausible Claim**

66.     Claimant alleges that Ditech's last statement indicated that he owed $1,700.00 and "now another company is saying I owe [$]3,500 for fees Ditech added to my account". Response at 1. Claimant does not provide a copy of either statement. Claimant does not explain what the "other company" is or how he has determined that this company is charging fees which Ditech erroneously added to the account. Without more information regarding the nature and basis for these fees, including whether and why they may have been assessed, it is impossible for the Trustee to make out any legal claim.

### v.    The Claim Should Be Disallowed As Untimely

67.    In addition to being deficient on the merits, the Claim is untimely and should therefore be barred. The Extended General Bar Date for the filing of consumer borrower claims was June 3, 2019. ECF 496. The Claimant filed the Claim on June 6, 2019, past the extended bar date. The Claim should be disallowed on that basis. *See In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 122 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. CVI GVF (Lux) Master Sarl. v Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011) ("Missing the bar date applicable to all claims is fatal.").

68.    Bar dates are not employed as "a procedural gauntlet" but instead serve as "an integral step in the reorganization process" and efficient administration of bankruptcy cases. *In re Hooker Invest., Inc.,* 937 F.2d 833, 840 (2d Cir.1991); *In re Best Prods. Co., Inc.*, 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992). The bar date allows "the parties in interest to ascertain with reasonable promptness the identity of those making claims against the estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization". *Best Prods. Co. Id.* "The Second Circuit strictly observes bar dates … [and] the equities will rarely if ever favor a party who fails to follow the clear dictates of a court rule". *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 119 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. CVI GVF (Lux) Master Sarl. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011) ("Missing the bar date applicable to all claims is fatal.").

69.    Rule 9006(b)(1) governs the permissibility of filing a late claim in a chapter 11 case. *See Pioneer Inv. Servc. Co. v. Brunswick Associated Ltd. P'ship,* 507 U.S. 380, 389 (1993) ("The 'excusable neglect' standard of Rule 9006(b)(1) governs late filings of proofs of claim in Chapter 11 cases but not in Chapter 7 cases."); *see also Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),* 419 F.3d 115, 121 (2d Cir. 2005) ("Rule 9006 governs the admission of proofs of claim filed after a court-ordered bar

date.") (citing *Pioneer*, 507 U.S. at 382). Under that rule, the court has discretion to extend

the bar date to late filed claims "where the failure to act was the result of excusable neglect."

Fed. R. Bankr. P. 9006(b)(1). In *Pioneer,* the Supreme Court construed the phrase "excusable

neglect" as it is used in Bankruptcy Rule 9006(b)(1) and concerned the filing of late claims.

It found that the determination is an equitable one that takes account of all of the

surrounding circumstances:

> These include … the danger of prejudice to the debtor, the length of the
> delay and its potential impact on judicial proceedings, the reason for the
> delay, including whether it was within the reasonable control of the
> movant, and whether the movant acted in good faith.

*Pioneer*, 507 U.S. at 395. The burden of proof rests with the party asserting excusable neglect.

*In re Enron Corp*, 419 F.3d at 121.

71. The Claimant bears the burden of demonstrating his excusable neglect

in failing to timely file the Claim. *In re Enron Corp.,* 419 F.3d at 121 ("The burden of proving

excusable neglect lies with the late-claimant.") (quoting *Jones v. Chemetron Corp.*, 212 F.3d

199, 205 (3d Cir. 2000)). Courts look to the factors set forth in *Pioneer* to determine whether

excusable neglect is pled. They do not assign equal weigh to each factor. Typically, "the length

of the delay, the danger of prejudice, and the movant's good faith 'usually weigh in favor of

the party seeking the extension.'" *Id.* at 122 (quoting *Silivanch v. Celebrity Cruises, Inc.*, 333

F.3d 355, 366 (2d Cir. 2003), *cert. denied*, 540 U.S. 1105 (2004)). The reason for the delay

may be the most important factor. "While prejudice, length of delay, and good faith might

have more relevance in a close[d] case, the reason-for-delay factor will always be critical to

the inquiry." *Silivanch*, 333 F.3d at 366 n.7 (quoting *Graphic Commc'ns Int'l Union v.

Quebecor Printing Providence, Inc.,* 270 F.3d 1, 5–6 (1st Cir. 2001) (alterations in original)).

Here, the Claim was filed just three days late, but Claimant makes effort to explain why he

did not timely file the Claim or to address any of the *Pioneer* factors. He has failed to

demonstrate excusable neglect in the untimely filing of the Claim. Accordingly, the Court disallows and expunges the late-filed Claim and the Court should disallow the Claim on that basis.

**Reservation of Rights**

71.    The Consumer Claims Trustee hereby reserves the right to amend, modify, or supplement this Reply.

WHEREFORE the Consumer Claims Trustee respectfully requests entry of an order denying the request for relief in the Claims and such other or relief as is just.

Dated: February 9, 2024
        New York, New York

                                        */s/ Richard Levin*
                                        JENNER & BLOCK LLP
                                        1155 Avenue of the Americas
                                        New York, NY 10036
                                        Telephone: (212) 891-1600
                                        Facsimile: (212) 891-1699
                                        RLevin@jenner.com
                                        Richard Levin

                                        *Attorneys for the Consumer Claims Trustee*