JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1600
Facsimile: (212) 891-1699
RLevin@jenner.com
Richard Levin

*Attorneys for the Consumer Claims Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                  :

In re                               :        Chapter 11

DITECH HOLDING CORPORATION, et al.,  :        Case No. 19-10412 (JLG)

           Debtors.[1]       :        (Jointly Administered)

                                   :        Related Docket No. 3461
---------------------------------------------------------------X

**RESPONSE OF THE CONSUMER CLAIMS TRUSTEE TO THE SUR-REPLY OF CLAIMANT JAMES TURNER TO THE REPLY OF THE CONSUMER CLAIMS TURSTEE IN SUPPORT OF THE CONSUMER CLAIMS TRUSTEE'S FORTY-SIXTH OMNIBUS OBJECTION WITH RESPECT TO THE CLAIM OF JAMES TURNER (Claim No. 1012)**

---

[1]    On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404) (the "**Third Amended Plan**"), which created the Wind Down Estates. On February 22, 2022, the Court entered the Order Granting Entry of Final Decree (I) Closing Subsidiary Cases; and (II) Granting Related Relief (ECF No. 3903) (the "**Closing Order**"). Pursuant to the Closing Order, the chapter 11 cases of the following Wind Down Estates were closed effective as of February 22, 2022: DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). Under the Closing Order, the chapter 11 case of Ditech Holding Corporation (the "**Remaining Wind Down Estate**") (Case No. 19-10412 (JLG) remains open and, as of February 22, 2022, all motions, notices and other pleadings relating to any of the Wind Down Estates are to be filed in the case of the Remaining Wind Down Estate. The last four digits of the Remaining Wind Down Estate's federal tax identification number is (0486). The Remaining Wind Down Estate's principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573.

The Consumer Claims Trustee submits this *Response to Sur-Reply to Reply of the Consumer Claims Trustee's Forty-Sixth Omnibus Objection with Respect to the Claim of James Turner* in support of the *Consumer Claims Trustee's Forty-Sixth Omnibus Objection to Proofs of Claim (Insufficient Legal Basis Unsecured Consumer Creditor Claims)* (ECF No. 3461), filed on June 18,2021 (the "**Forty-Sixth Omnibus Objection**") and the *Reply of the Consumer Claims Trustee in Support of the Consumer Claims Trustee's Forty-Sixth Omnibus Objection with Respect to the Claim of James Turner (2876).* (ECF 4970). (the "**Trustee Reply**"). The Response is submitted in opposition to the *Response and Objection of James and Jeffrey Turner* (ECF No. 3561) filed on August 8, 2022 (the "**Response**") and the *Sur-Reply to Reply of the Consumer Claims Trustee's Forty-Sixth Omnibus Objection with Respect to the Claim of James Turner* (ECF No. 4992), filed on February 02, 2024 (the "**Sur-Reply**"). The Consumer Claims Trustee respectfully represents as follows:

### Claimant's Sur-Reply

1.      On April 12, 2019, Claimant, pro se, filed proof of claim number 1012 asserting an unsecured claim of $210,000 on the basis of "improper mortgage modification corp advances". Claim at 2. No documents were attached to the Claim. Claimant's allegations primarily focus upon the corporate advances made while the mortgage was in default for 8 years, between March 2008 and May 2016.

2.      After the Consumer Claims Trustee filed the Forty-Sixth Omnibus Objection on June 18, 2021, the Claimant filed a Response and Objection to Consumer Claims Trustee's Forty-Sixth Omnibus Objection to Proof of Claim (Insufficient Legal Basis Unsecured Consumer Creditor Claims) on July 19, 2021. ECF 3561. In his response, he alleged (1) violations of Florida Deceptive and Unfair Trade Practices Act, (2) Breach of Contract, (3) Breach of the Covenant of Good Faith and Fair Dealing, (4) Violation of the

Florida Consumer Collection Practices Act, (5) Unjust Enrichment, (6) Civil Conspiracy, (7) Fraud in the inducement, and (8) Breach of Fiduciary Duty against the Debtor Ditech Financial and Fannie Mae. Response at 2-3.

3.      On January 10, 2024 the Consumer Claims Trustee filed the Trustee Reply. The Trustee concurrently noticed a hearing on the claim, scheduled for January 24, 2024. (ECF 4971) (the "**First Notice of Hearing**").

4.      Claimant appeared at the January 24, 2024 sufficiency hearing and requested additional time in which to supplement his Claim. The Court adjourned the hearing on the Claim to February 29, 2024 and granted leave to file a sur-reply, requiring that Claimant submit his sur-reply by February 2, 2024 at 2:00 p.m. (ET). *See* "Minutes of Proceedings" at ECF 4989. The Court further ordered that the Consumer Claims Trustee's Response be filed by February 12, 2024. *Id*.

5.      On February 2, 2024 Claimant submitted his Sur-Reply. In the Sur-Reply, the Claimant has reframed a number of his prior arguments and added 87 paragraphs. For his breach of contract claim, the Claimant appears to no longer allege "Fannie Mae and its agent" breached the contract and instead asserts the same breach of contract claims as to "Debtors". Response at 9, Sur-Reply at 10.

6.      In his claim for civil conspiracy, Claimant alleges that Debtors conspired with its predecessors, rather than Fannie Mae, to overcharge and profit from multiple fraudulent disbursements. Sur-Reply at 13-14, 27. Claimant raises no new facts or claims regarding fraud in the inducement. As for his breach of fiduciary duty claims, Claimant asserts almost the exact same allegations in his Sur-Reply as were in his Response. Response at 11-23, Sur-Reply at 11-12.

7.    In his Sur-Reply, the Claimant reiterates his prior allegations that Fannie Mae employed the Debtor to service his mortgage. Sur-Reply at 3. He still does not explain when Fannie Mae became the holder of the note or was assigned the mortgage. He does, however, allege that Green Tree Servicing LLC acquired the mortgage servicing rights by merger with Everhome Mortgage Company in 2014. Sur-Reply 3-4.

8.    Claimant attaches to the Sur-Reply additional exhibits including the Fannie Mae Allowable Foreclosure Attorney Fees schedule, the second page of a debt validation letter, pages 2-14 of the 18-page Mortgage, a third ledger from Debtors, a debt dispute letter dated April 22, 2018, and an order rescheduling the foreclosure sale date. Sur-Reply, 32, 34, 44-57, 65-77.

9.    For his damages, he estimates Debtors charged him a minimum of "$10700.00 [sic] and probably in excess of $210,000.00." Sur-Reply at 2.

<u>Argument</u>

**A. The Claimant Fails to Assert Facts Sufficient to State a Plausible Claim Under Rule 12(b)(6)**

10.    Claimant has now had multiple opportunities in this Court in which to allege sufficient facts to substantiate his claim, an opportunity that has been in addition to his numerous attempts to allege the same allegations in state court through two separate foreclosure actions that were extensively litigated. Trustee Reply, Exhibit X and Exhibit Y. Yet he still has failed to plead any causes of action with sufficient plausibility.

11.    Although pro se pleadings are held to a less stringent standard, liberal construction of those pleadings "does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action". *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014) (citations omitted). Nor is the Trustee required to write the Claimant's claim for him.

4

### a. Ditech did not breach the contract.

12.    In his Sur-Reply, the Claimant now no longer alleges Fannie Mae breached the contract. Instead, his allegations are now against "Debtor", specifically alleging Debtor breached sections 15, 18, and 22 of the Mortgage because the corporate advances charged were not reasonable or appropriate. Sur-Reply at 10.

13.    He cites to paragraph 18, which pertains to acceleration of the note if a borrower attempts to transfer their interest at a future date to a purchaser. Sur-Reply at 75. Though Claimant cites to paragraph 18, he does not articulate in what way Ditech breached this provision, and the Consumer Claims Trustee is unable to decipher which factual allegations pertain to this argument.

14.    The elements of an action for breach of contract in Florida are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach. See *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). To maintain an action for breach of contract, a claimant must also prove performance of their obligations under the contract or provide a legal excuse for nonperformance. See *Old Republic Ins. Co. v. Von Onweller Constr. Co.*, 239 So.2d 503, 505 (Fla. 2d DCA 1970); *Marshall Constr., Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So.2d 845, 848 (Fla. 1st DCA 1990).

15.    Claimant alleges the Debtors violated the Mortgage and attaches most of the Mortgage contract but does not include page 1 or pages 15 and 16 of the contract. Sur-Reply 65-77. Those are the pages that show that the Mortgage was between the Claimant, James E. Turner, and DHI Mortgage Company LTD. Trustee Reply at 30 (Exhibit B).

16.    Perhaps because Claimant does not provide those pages, he provides no explanation as to who were the parties to the mortgage contract. Instead, his allegations focus upon who had the servicing rights, alleging Green Tree Servicing LLC acquired the

mortgage servicing rights by merger with Everhome Mortgage Company in 2014. Sur-Reply 3-4. Claimant provides no explanation as to how or when Debtors became the servicer or holder of the note,

17.    In *James v. Litton Loan Servicing, L.P.*, No. 4:09-CV-147 CDL, 2011 WL 59737 (M.D. Ga. Jan. 4, 2011), the district court granted summary judgment to the defendant servicer on the borrower's breach of contract claim, finding:

> Plaintiffs did not ... allege that they had a contract with Litton, nor did they point to any evidence of such contract. As a loan servicer, Litton is not a party to or an assignee of the Note itself. In the absence of evidence of a contract between Plaintiffs and Litton, Plaintiffs' breach of contract claim fails.

(Id. at *11); *see also* Edwards v. Ocwen Loan Serv., LLC, 24 F. Supp. 3d 21, 28 (D.D.C. 2014) (dismissing borrower's breach of contract and breach of implied covenant claims against servicer, finding they were insufficient as a matter of law and noting: "Judges around the country—including at least two of my colleagues—have held that a loan servicer, as a lender's agent, has no contractual relationship or privity with the borrower and therefore cannot be sued for breach of contract.") as adopted by *Bank of Am., N.A. v. Zaskey*, No. 9:15-CV-81325, 2016 WL 2897410, at *6–7 (S.D. Fla. May 18, 2016)

18.    Claimant is required to plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In spite of having an additional opportunity to supplement his claim, Claimant has not pled facts demonstrating he is in privity with Green Tree.

### i.    Property Inspections

19.    Claimant re-alleges that Ditech "breached the express provisions in the Mortgage sections 15, 18, 22 of the Mortgage, *states 'Lender must provide notice' 'can pay*

*whatever is reasonable or appropriate to protect the Lender's interest in the Property*" by charging unreasonable corporate advances. Response at 9, Sur-Reply at 10.

20.    Claimant believes Ditech violated paragraph 15 of the Mortgage by not providing him with notice prior to conducting property inspections. Sur-Reply ¶ 61, at 13.

21.    However, Claimant ignores provision 7 of the Mortgage, which states:

> Lender or its agent may make reasonable entries upon and inspections of the Property. If it has a reasonable cause, Lender may inspect the interior of the improvements on the property. Lender shall give borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Sur-Reply at 71. Neither paragraph 7 nor paragraph 15 makes reference to the other. No notice is required.

22.    Claimant does not allege that any of the property inspections included the interior of the property requiring notice as described in the Mortgage. Instead, his claim focuses upon the frequency of the inspections and the unreasonableness of charging him for 42 property inspections on April 5, 2016 as shown on the ledgers. Sur-Reply at 13. He alleges the Debtors were only allowed to charge for a property inspection "not more frequently than every twenty days. (See Paragraph 84 guidelines)" and all the charges were fraudulent because none of the inspections took place. Sur-Reply at 12.

23.    Claimant's allegations rely upon the three ledgers he attaches to his Sur-Reply, but he is misinterpreting the ledgers. Sur-Reply Exhibit 1 – D & E. All three ledgers show numerous "transactions" on April 5, 2016. *Id*. The Claimant seems to wrongfully interpret this to mean April 5, 2016 is the date in which the inspections took place. Sur-Reply at 5, 7, 13, 16.

24.    What the ledgers actually reflect is Debtor's compliance with Fannie Mae's Servicing Guide, which requires servicers to incorporate all out-of-pocket expenses

such as foreclosure title searches, court filing fees, service of process costs, and publication costs to be collected as a condition of a workout agreement. *Fannie Mae Servicing Guide*, Foreclosures, Conveyances and claims and Acquired Properties, Section 104 (June 10, 2011) at 860.

25.     In order to be eligible for the Mortgage Modification, Claimant was required to make three trial period payments and only if he did so and met all of the applicable qualification requirements would the mortgage be permanently modified on May 1, 2016. Sur-Reply at 61, CCT Reply at 100.

26.     Debtor was thus required to add in all out-of-pocket expenses into the work out agreement to ensure they were collected. Given that the Claimant had been in default on his Mortgage since March 1, 2008, this required Debtor to incorporate 8 years of insurance premiums, property inspections, attorneys fees, court costs, property tax payments, and interest, which apparently had not been previously charged. CCT Reply at 101, Mortgage Modification paragraph B. Forty-two inspections over 8 years would not be unreasonable. For this reason, Claimant's generalized allegations are insufficient to show an unreasonable number of inspections.

### ii.     Attorney's Fees

27.     Claimant alleges that Ditech breached Paragraph 22 of the Mortgage which pertains to the acceleration of the Mortgage and explicitly states "Lender shall be entitled to collect all expenses incurred in pursing the remedies provided in section 11, including, but not limited to, reasonable attorneys' fees and costs of title evidence". Sur-Reply at 77.

28.     In asserting his claim, Claimant overlooks Paragraph 9 of the Mortgage which states a: "[l]ender may do and pay for whatever is reasonable or appropriate to protect

Lender's interest in the Property and rights" including but not limited to "protecting and/or assessing the value of the Property", "appearing in court", and "paying reasonable attorneys' fees". Sur-Reply at 71.

29.    Claimant believes that Ditech overcharged him $15,717.78 in attorneys' fees and costs. Sur-Reply at 7. In his allegations, the Claimant groups together foreclosure attorneys' fees with court costs. In reality, the attorneys' fees were $12,417.78. This amount alarms the Claimant because Fannie Mae's allowable *foreclosure attorney* fees caps the amount of attorney's fees charged at $3,450 in Florida. Sur-Reply at 32. Claimant misunderstands this statutory cap.

30.    Claimant fails to take into account that the capitalized attorney's fees included non-foreclosure related attorney's fees to allow the Debtor's to maintain its secured position in a bankruptcy proceeding. Paragraph 9 lists out instances in which the lender "may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property". Sur-Reply at 71. "Lender's actions can include, but are not limited to … (b) appearing in court; and (c) paying reasonable attorney's fees to protect it interest in the Property … including its secured position in a bankruptcy proceeding". *Id*.  Paragraph 24 of the Mortgage further addresses Ditech's right to charge attorneys' fees incurred in a bankruptcy proceeding. Sur-Reply at 77.

31.    On September 26, 2011, in the midst of the State Foreclosure Action, Claimant filed a Chapter 7 petition for bankruptcy. Exhibit X, Bankruptcy Docket. His filing of the bankruptcy resulted in a stay of the foreclosure proceedings, necessitating Debtor's filing of a motion for relief of stay in the bankruptcy proceeding. Exhibit X, Bankruptcy Docket at 12. Claimant contested Debtor's motion and it was not until January 5, 2012 that the stay was lifted. *Id*. At entry 39. On June 4, 2012, the bankruptcy case was closed without

9

discharge due to Claimant's failure to file Certification of Completion of Financial Management Course. The bankruptcy was eventually reopened and Claimant obtained a discharge on May 2, 2012.

32.    In addition, the Fannie Mae Servicing Guide allows servicers to be reimbursed for unexpected events, including but not limited to additional court appearances, litigation activities, and intervention by other claimants. *Fannie Mae Servicing Guide, Part VIII, Chapter 1, Section 104 (June 10, 2011) at 801-19 to 801-26.*

33.    Furthermore, $12,417.78, or even $15,717.78, in attorneys' fees is not unreasonable for 8 years of litigation.

### iii.    Insurance Premiums

34.    Claimant, also, alleges that Ditech breached the Modification and Mortgage by charging "hyper-inflated and illegitimate non-competitive 'premiums' for forced-placed insurance, property inspections and fraudulent corporate advances that included undisclosed kickbacks". Sur-Reply at 10-11.

35.    Paragraph 5 of the Mortgage required the Claimant to keep the Property insured. Sur-Reply at 69-70. It allowed the Borrower to choose the insurance carrier subject to the Lender's right to disapprove. *Id*. However, the Mortgage states that in the event the Claimant was unable to maintain insurance coverage:

> Lender may obtain coverage, at Lender's option and Borrower's expense … Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that the Borrower could have obtained. Any amounts disbursed by Lender … shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*Id*.

36.     Claimant again fails to provide a sufficient basis for his allegations that Ditech rejected an insurance carrier chosen by him, and the Mortgage itself put him on notice that if the Lender had to obtain coverage it would exceed his own cost.

37.     As previously raised by the Consumer Claims Trustee, to maintain a breach of contract action, a claimant must also prove that it performed its obligations under the contract or provide a legally valid excuse for nonperformance. *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. App. 2006). In the Sur-Reply, the Claimant has failed to prove he complied with the requirements of the Mortgage.

38.     Claimant further alleges:

> One of the most egregious acts of the Debtor and its predecessors was to charge the Turners for flood insurance and unfathomable insurance fees when they knew the Turner property was not in a flood zone and this type of insurance was not required … [and they] were compelled to obtain a survey of their property and submit in August 2014 to the Federal Emergency Management Agency a request to establish their structure was not subject to the requirement for Flood Insurance."

Sur-Reply at 8. Yet, the Mortgage states:

> [l]ender may require Borrower to pay … either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remapping or similar charges occur which might reasonable affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Sur-Reply at 69.

39.     Claimant does not provide any documentation of his claim that the Property was not in a flood plain. Neither does the Claimant demonstrate within his exhibits the amount charged to him for such coverage. Instead, he appears to be relying on Ditech's ledgers for his calculations, and much like he picks and chooses which excerpts from the Mortgage to support his claim, he similarly does so with the ledger.

11

40.     Claimant provides no explanation as to how he calculated the costs of flood insurance at $75,000 and instead provides a ledger in which the only the only reference to flood is a $388.00 deduction on July 11, 2014. He also provides no explanation as to the $16,191.28 credited to his account on July 14, 2016. Instead of relying on Claimant's speculations, the Court should look to the exhibits provided.

41.     The pleadings are "deemed to include any written instrument attached to [them] as an exhibit, materials incorporated in [them] by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.2004) (citations and internal quotation marks omitted). If the allegations of a pleading "are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y.1994); *see, e.g.*, *Feick v. Fleener*, 653 F.2d 69, 75 & n. 4 (2d Cir.1981).Furthermore, the Claimant executed a Modification incorporating these charges and agreeing to a new modified balance amount of $631,766.12, which included the charges he now disputes. *See* CCT Reply, Modification at 8.

### iv.    Mortgage Modification

42.     Claimant also alleges that the Debtors violated the Modification. Sur-Reply at 10. However, he does not provide the full text of the provision he alleges Debtors violated. In his Sur-Reply, Claimant now states "Ditech's manager" rather than "Fannie Mae and its agent":

> sought to dispel the Turners concerns by advising them "Item 4 of the modification document", titled "Additional Agreements" contained a paragraph which stated at "K-ii. Correct the terms and conditions of this plan if an error is detected after execution of this agreement". (Trustee confirms this in paragraph 9 of their reply Doc-4970).

Sur-Reply at 78,80.

43.    In fact, the full provision of paragraph K of the Modification states:

> *That, [Claimant] will execute such other document as may be reasonably necessary to* either (i) consummate the terms and conditions of this Agreement; or (ii) *correct the terms and conditions of this Plan if an error is detected after execution of this Agreement*. I understand that a corrected Agreement will be provided to me and this Agreement will be void and no legal effect upon notice of such error. If I elect not to sign any said corrected Agreement, the terms of the original Account Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

Trustee Reply, Ex. I, at 103-104 (emphasis added).

44.    The initial portion of the section identifies who is subject to the provision—it is not the Debtors—and the later portions outline the consequences resulting from a breach of this provision.

45.    Claimant alleges because Debtors did not agree with his interpretation of the amount due, they violated the contract. However, the provision he points to is a provision that binds the Claimant's obligations, not the Debtors' obligation. Nothing within this provision attests to Debtors obligation to investigate Claimant's allegations or to change the terms of the agreement.

46.    Claimant allegations are analogous to the failed attempts of borrowers to require lenders to modify a mortgage without due consideration. Because oral contracts in Florida are "subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms[,]" *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004), and Claimant has not alleged that a bargained-for-exchange occurred, the alleged agreement is nothing more than a gratuitous offer to review his complaint. *Molina v. Aurora Loan Servs., LLC*, 710 F. App'x 837, 839 (11th Cir. 2017)

47.    Furthermore, "[c]ontracting parties are at liberty to address any issue they see fit, including the question of whether their agreement may be modified at all, and,

if so, how." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So.3d 989, 993 (Fla. 4th

DCA 2014). This requires:

> that a plaintiff plead (and again eventually prove): (a) that the parties
> agreed upon and accepted the oral modification (i.e., mutual assent); *and*
> (b) that both parties (or at least the party seeking to enforce the
> amendment) performed consistent with the terms of the alleged oral
> modification (not merely consistent with their obligations under the
> original contract); *and* (c) that due to plaintiff's performance under the
> contract as amended the defendant received and accepted a benefit that it
> otherwise was not entitled to under the original contract (i.e., independent
> consideration). Absent such a showing, the parties will be held to the
> bargain as negotiated and memorialized in their written agreement.

*Id*. at 955.

48.    However, Claimant fails to allege how Defendant received any benefit.

Debtors were not required to modify the mortgage even though the Claimant performed

under the Trial Period Plan ("**TPP**") Agreement. "TPP Agreements are indefinite and

uncertain as to material terms of the permanent loan modifications, such agreements

represent, at best, unenforceable agreements to agree that do not rise to the level of a valid

contract." *Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1351 (S.D. Fla. 2011)

49.    In contrast, Claimant significantly benefited from the Modification. The

Modification allowed Claimant (1) to retain the property in spite of being in default and the

Note being accelerated, (2) significantly reduced the interest rate from 7.250% to 2.00% on

$267,150.43 of the outstanding balance and to 0% on the remaining balance of $364,619.69,

(3) reduced the monthly payment from $2,262.78 to $809.00,  and (4) waived all late fees.

50.    Claimant may argue that the Modification included fraudulent charges

"probably in excess of $210,000". Yet he provides no plausible basis for his claims. The

Foreclosure Judgment in 2011 established that the Claimant's indebtedness on the Mortgage

had increased by $98,520.56 in 18 months. This balance includes interest on the note and

mortgage ($84,287.14) as well as property taxes ($11,650.50), neither of which are terms

disputed by the Claimant, which taken together amount to 97% of the balance increase as ratified by the Court. Trustee Reply, Exhibit H. Under the terms of the Modification, the new modified balance was $631,766.12 as of May 1, 2016, which means that the balance increased a total of $305,724.64 over 8 years of nonpayment. Claimant relies on this increase to substantiate his damages claim even though it resulted in an annual increase on his unpaid balance of only $38,215.58 per year.

51.     What Claimant fails to acknowledge, among other things, is that the interest-bearing balance under the Modification ($267,150.43) is actually less than the principal due on the Mortgage at the time of the Foreclosure Judgment ($326,041.48).

**b. No Provision of a Contract is Identified as a Predicate to the Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing**

52.     The Claimant re-alleges each of his breach of contract claims as a breach of the covenant of good faith and fair dealing. *See* Sur-Reply. He also alleges that Ditech breached the covenant by "failing to preserve the spirit – not merely the letter of the bargain …. [P]arties to a contract are mutually obligated to comply with the substance of their contract in addition to its form". Sur-Reply at 22.

53.     "The implied obligation of good faith cannot be used to vary the express terms of a contract." *See City of Riviera Beach v. John's Towing*, 691 So.2d 519, 521 (Fla. 4th DCA 1997); *Riedel v. NCNB Nat'l Bank of Florid*a, 591 So.2d 1038, 1040 (Fla. 1st DCA 1991).

54.     Generally, a claim for breach of the implied covenant cannot be maintained in absence of an alleged breach of an express contractual term. *Centurion Air Cargo, Inc. v. United Parcel Svc. Co.*, 420 F.3d 1146, 1152 (11th Cir.2005) (the "covenant" is not an independent contract term). The covenant applies, however, when the propriety of the conduct is not resolved by the express terms of the contract, and its application does not contradict the express terms of the contract. *See Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092,

1097–98 (Fla.Dist.Ct.App.1999) ("Cox ") (written loading contracts were silent with regard to the methodology or standards to be used by the defendant in exercising its discretion to assign loads for transport).

55.    Where, as here, a contract vests a party with discretion, the implied duty of good faith and fair dealing attaches as a gap-filling default rule. *Speedway SuperAm., LLC v. Tropic Enters.*, Inc., 966 So.2d 1, 3 (Fla.Dist.Ct.App.2007). "Florida's implied covenant of good faith and fair dealing is a gap-filling default rule. It is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654–55 (Fla.Dist.Ct.App.2004). Where there are no standards for exercising discretion, the implied covenant of good faith protects contracting parties' reasonable commercial expectations. *Id*. at 655 (Fla. Dist. Ct. App. 2004).

56.    In this instance, Ditech was subject to defined standards as set out in the Fannie Mae Servicing Guide which set forth specific requirements on property inspections, attorneys fees, and flood insurance requirements. The Servicing Guide fills any gaps in the Mortgage and shows Ditech acted in a commercially reasonable manner.

57.    The Fannie Mae Servicing Guide establishes the maximum attorney fees that Fannie Mae will allow for legal proceedings unless the law firm obtains the appropriate excess fee approval. *Fannie Mae Servicing Guide,* Part VIII, Chapter 1, Section 104 (June 10, 2011) at 801-19 to 801-26.[2] The maximum allowable attorney fees does not include the costs involved in such a proceeding, such as title charges, filing costs, recording

---

[2]    The June 10, 2011 Servicing Guide is available at https://singlefamily.fanniemae.com/media/18801/display. The Fannie Mae Servicing Guide is regularly updated yet the attorney fees provisions remain consistent during the time of the Claimant's allegations. The Fannie Mae Servicing Guides are only available through 2013. The current Servicing Guide is available at https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/.

costs, process server expenses, and publication costs, as applicable. *Id*. at

https://singlefamily.fanniemae.com/media/18801/display. The Guide further states servicers

are to be reimbursed for unexpected events, including but not limited to additional court

appearances, litigation activities, and intervention by other claimants. *Id*. All of these

occurred during Debtor's attempt to foreclose on the Claimant's Property. Trustee Reply,

Exhibit G, Foreclosure Docket.

58.    As for the Claimant's allegations that the property inspections were in

excess, the Fannie Mae Servicing Guide also requires:

> For a first-lien mortgage loan, the servicer must make its initial property inspection by the 135th day of delinquency or by the date it decides to initiate foreclosure proceedings (if that decision is made earlier than the 135th day of delinquency). The servicer must schedule any subsequent property inspections that may be required at 60-day intervals until it establishes contact with the borrower (and is working with him or her to resolve the delinquency) or, if it has decided to initiate foreclosure proceedings or accept a deed-in-lieu, until the date of the comprehensive property inspection report that Fannie Mae requires prior to the foreclosure sale date or the date a deed-in-lieu is executed.

*Fannie Mae Servicing Guide,* General Servicing Functions, Property Inspections, Section 303

(November 29, 1999) at 303-4. As noted above, the Claimant fails to establish Ditech

conducted an excessive number of property inspections. Claimant relies on a ledger showing

42 inspections on April 5, 2016, which would seem excessive, but would be reasonable if the

inspections were conducted between when the Claimant defaulted in 2008 and the execution

of the Modification in May 2016. Forty-two inspections over 8 years would average 1

inspection every 5 months, which would not be an unreasonable expense. For this reason,

Claimant's generalized allegations are insufficient to show an unreasonable number of

inspections.

59.    Chapter 3 of the Fannie Mae Servicing Guide establishes the servicer

requirements for ensuring that properties have adequate flood insurance both at origination

and "if the remapping of a flood zone results in the security property being in a Special Flood Hazard Area (even though no flood insurance would have been required when the mortgage loan was originated)." *Fannie Mae Servicing Guide,* Mortgage and Property Insurance, Flood Insurance, Section 301, Chapter 3 (January 31, 2003) at 203-1. The Servicing Guide provides standards for servicers to use in determining if a property is in a flood area, requires flood insurance to be in the form of the standard policy issued under FEMA's National Flood Insurance Program, and sets forth the minimum amount of flood insurance required and what a borrower must provide to discontinue flood insurance coverage. *Id*. at Chapter 3.

60.    The Fannie Mae Servicing Guide outlines the servicer's responsibility to ensure that there is hazard insurance in place, specific to Fannie Mae Guides, at all times. *Id*. at Chapter 6. In this instance, there are several guidelines that servicers should apply, subject to the provisions of and in compliance with applicable law and the mortgage loan documents. *Id*.

61.    Claimant has failed to provide sufficient details regarding the "force-placed insurance" or flood insurance demonstrating Ditech's failure to adhere to the commercially reasonable standards as set forth in the Fannie Mae Servicing Guide.

### c.    Florida Law Provides No Fiduciary Duty Exists Between Lender And Borrower Absent Special Circumstances Not Present.

62.    Claimant alleges that the Modification agreement created a fiduciary relationship with Ditech, and Ditech breached its fiduciary duty in the management of his escrow account. Response at 11-12. Claimant asserts almost the exact same allegations in his Sur-Reply. Sur-Reply at 11-12.

18

63.     Under Florida law, "[g]enerally, an arms-length lender-borrower relationship implies no fiduciary duties from the lender to the borrower." *Wilson v. Everbank*, N.A., 77 F. Supp. 3d 1202, 1223 (S.D. Fla 2015).

64.     Although an agreement for extra services might import a fiduciary relationship, the only extra services alleged here are establishing and maintaining an escrow account, which was already expressly provided for under the Mortgage paragraph 3. Sur-Reply at 68. In fact, the Modification, paragraph D, includes the same language as the Mortgage. CCRT Reply at 102. The establishment of such an account does not render the lender a fiduciary for the borrower.

### d.  Unjust Enrichment Claim Fails

65.     In his Sur-Reply, the Claimant asserts a common law claim for unjust enrichment against Ditech for knowingly receiving and retaining "wrongful benefits and funds" from its forced placed insurance policies, property inspections, attorney fees and costs and practices which it received in "an unfair, unconscionable, and oppressive manner". Sur-Reply at 26.

66.     In Florida, "it is well-settled that the law will not imply a contract where an express contract exists concerning the same subject matter." *Kovtan v. Frederiksen*, 449 So.2d 1, 1 (Fla. 2d DCA 1984). There is no doubt that an express contract exists which "concerns the same subject matter". *Agritrade, LP v. Quercia*, 253 So. 3d 28, 34 (Fla. Dist. Ct. App. 2017)

### e.  Florida Deceptive and Unfair Trade Practices Act Claim Fails

67.     In his Sur-Reply, Claimant narrows his basis for asserting that Ditech violated the FDUTPA and focuses his allegations on Ditech purchasing insurance on behalf of the Claimant at "exorbitant rates" and on being paid commissions or other remunerations by the insurance carriers". Sur-Reply at 18.

68.    He alleges "From 2008 to 2016 Ditech as agent for AMERICAN SECURITY INSRANCE COMPANY wrongly claimed Mr. Turner did not have property flood insurance and purchased force-placed Flood Insurance on the Turner Property." Sur-Reply at 15. He also claims that Ditech "Did Force Place Property Insurance on the Turners property and charge premiums to his account that were two to four time greater than the going rate." Sur-Reply at 15. He relies on the Ditech ledgers attached to his Sur-Reply, specifically Exhibit 1 – D & E.

69.    To establish a claim under the Florida deceptive and unfair business practices law, a plaintiff must prove three elements: (i) a deceptive act or unfair practice; (ii) causation; and (iii) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006).

70.    Under FDUTPA, 'trade or commerce' means:

[A]dvertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

Fla. Stat. § 501.203(8).

71.    Several courts have held that debt collection activities are not 'trade or commerce' for FDUTPA purposes." *Williams v. Nationwide Credit, Inc.*, 890 F. Supp. 2d 1319, 1321 (S.D. Fla. 2012) (citing *State v. Shapiro & Fishman, LLP*, 59 So.3d 353, 355–57 (Fla. 4th DCA 2011); *Law Office of David J. Stern, P.A. v. State*, 83 So.3d 847, 849–50 (Fla. 4th DCA 2011); *Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F.Supp.2d 1356, 1371–77 (S.D. Fla. 2010); *Trent v. Mortgage Electronic Registration Sys., Inc.*, 618 F.Supp.2d 1356, 1365 n. 12 (M.D. Fla. 2007)).

72.    FDUTPA claims have been dismissed where "none of Defendants' loan modification activities fall within the purview of trade or commerce," and "[a]s with mortgage enforcement generally, a loan servicer's handling of a loss mitigation application—obligatory and reactive in nature—does not involve the loan servicer 'advertising, soliciting, providing, offering, or distributing' anything to borrowers." *Rodriguez v. Ocwen Fin. Corp.*, 2017 WL 3593972, at *6 (S.D. Fla. Aug. 21, 2017) (quoting Fla. Stat. § 501.203(8)).

73.    However, the FDUTPA does encompass conduct that is related to debt collection such as: force-placement of insurance ***where none was required***, charging excessive amounts for force-placed insurance, billing for specific services that were unauthorized or never performed, or double-billing. See *Bank of Am., N.A. v. Zaskey*, No. 9:15-CV-81325, 2016 WL 2897410, at *11 (S.D. Fla. May 18, 2016); *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1224 (S.D. Fla. 2013); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1324 (S.D. Fla. 2014); *MSPA Claims 1, LLC v. Halifax Health, Inc.*, 295 F. Supp. 3d 1335, 1341 (M.D. Fla. 2018), reconsideration denied, 2018 WL 3458298 (M.D. Fla. July 18, 2018).

74.    Unlike in *Martorella*, Claimant has failed to allege Ditech claimed Claimant did not have insurance on his property when he in fact did. He provides no insurance policy showing he had purchased insurance as required by the Mortgage. He does not claim or allege that he selected an insurance policy that Ditech rejected. He does not claim or allege that he purchased his own policy and Ditech refused to cancel the force-placed insurance. Instead, he relies upon conclusory statements and cites to Ditech Ledger  1–D & E as his basis for claim that Ditech made "99 insurance disbursements ranging in value from $10 to $4064.38 for the period April 30th, 2014 to October 8th, 2015 totaling thousands of dollars." Sur-Reply at 16.

21

75.      To state a FDUTPA claim for damages, "a plaintiff must show not only that the conduct complained of was unfair, unconscionable, or deceptive, but also that it has suffered actual damages proximately caused by the unlawful conduct." *Hanson Hams, Inc. v. HBH Franchise Co., LLC*, No. 03–61198–CIV, 2004 WL 5470401, at *4 (S.D. Fla. Dec. 21, 2004) (citing *Macias v. HBC of Fla., Inc.*, 694 So.2d 88, 90 (Fla. 3rd DCA 1997) & *Himes v. Brown & Co. Secs. Corp.*, 518 So.2d 937, 938 (Fla. 3d DCA 1988)). For purposes of recovery under FDUTPA, "actual damages" do not include consequential damages. *See Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So.2d 311, 314 (Fla. 4th DCA 1998).

76.      Claimant has failed to adequately allege that he was either charged excessive costs for his insurance or that Ditech was the one that selected the insurance carrier.

77.      Furthermore, a FDUTPA action may not be brought more than four years after the occurrence of a violation or more than two years after the last payment in a transaction involved in a violation of the law. § 501.207(5), Fla. Stat. (2011). *See State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380, 387 (Fla. Dist. Ct. App. 2014)

78.      Claimants alleges Ditech force-place insurance from 2008 to 2016 yet he failed to raise the claim until May 22, 2019.[3] It was not until May 22, 2019 that Claimant first alleged that Ditech had violated the FDUTPA. Second Foreclosure Action at XX. For this reason, Claimant's FDUTPA claims should be barred as outside the statute of limitations.

---

[3] Claimant attempted to file counter-claims in the first foreclosure action for declaratory judgment, fraud in the inducement and damage on August 28, 2008. *See* Order on Defendants' Motion for Default, Exhibit X, at 1. His claims were dismissed on May 20, 2010. *Id*. Claimant then waited 14 months to file his amended counter-claims, and the Court found the counterclaim was a nullity. *Id*.

**f.   Claimant Fails to State a Claim for Civil Conspiracy**

79.     The Sur-Reply contains several references to a conspiracy in which it appears the Claimant is stating that Ditech conspired with "its predecessors". Sur-Reply at 13-14, 27. He also alleges that Green Tree Servicing LLC acquired the mortgage servicing rights by merger with Everhome Mortgage Company in 2014. Sur-Reply 3-4.

80.     However, a company cannot conspire with its own officers, employees, and agents. *Mancinelli v. Davis*, 217 So. 3d 1034, 1036 (Fla. Dist. Ct. App. 2017)

81.     Because a civil conspiracy requires "an agreement between two or more parties," *Lipsig v. Ramlawi*, 760 So.2d 170, 180 (Fla. 3d DCA 2000), "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself," *Dickerson v. Alachua Cty Comm'n*, 200 F.3d, 761, 767 (11th Cir. 2000).

82.     Claimant's Civil Conspiracy claim lacks merit.

**g.   Claimant's Claim Under the Florida Consumer Collection Practices Act Fails**

83.     Claimant alleges Debtors violated the Florida Consumer Collection Practices Act by asserting in its communications with Claimant he was required to pay for property inspections, attorneys fees, and force-placed insurance when Debtor knew the charges were improper. Sur-Reply 24-26. Claimant alleges that this practice began in 2008 through 2015. Sur-Reply at 4.

84.     To establish a violation under the FCCPA, the Claimant must first show that that Debtors qualifies as a "debt collector" subject to the statute. Under the statue, the term "debt collector" does not include:

> Any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent that such activity is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; concerns a debt which was originated by such person; concerns a debt which was not in default at the time it was obtained by

such person; or concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

Fla. Stat. § 559.55(6)(f).

85.    Based upon Claimant's own allegations in the Sur-Reply, the Debtor merged with Everhome Mortgage Company in 2014.

86.    Within the first foreclosure action against Claimant, Everhome Mortgage Company owned and held the Mortgage Note and Mortgage. Trustee Reply, Exhibit F. Claimant disputed Everhome's ownership, alleging Everhome Mortgage Company fabricated documents. Exhibit N, Order on Defendant's Default Motion. The Court ultimately disagreed and awarded a final judgment of foreclosure to Everhome Mortgage Company in August 2011. Trustee Reply, Exhibit H.

87.    Claimant fails to establish a basis for the FCCPA because he fails to allege when the Debtors came into possession of the Note or began servicing the Mortgage.

88.    In addition, as argued above, Claimant has failed to demonstrate the fees charged to his account were improper. To prevail on an FCCPA claims, "Plaintiff must prove ... that Defendants had actual knowledge that their claim of a right to enforce the debt was [invalid.]" *McCorriston v. L.W.T., Inc.*, 536 F.Supp.2d 1268, 1279 (M.D.Fla.2008) (Whittemore, J.). The statute does not provide for recovery if the creditor merely should have known the debt was not legitimate." *Arianas v. LVNV Funding LLC*, 132 F. Supp. 3d 1322, 1330 (M.D. Fla. 2015) *See* also *Kelly v. Davis*, No. 3:10cv392-MW/EMT, 2014 WL 12515345, at *11 (N.D. Fla. July 17, 2014) ("Rather than acting with the requisite knowledge, the [defendant], at worst, is simply on notice that the assessments imposed against [plaintiff] are now being contested. The mere existence of such a dispute falls short of the statutory knowledge requirement, especially where substantial evidence tends to establish the legitimacy of the debt at issue.")

89.    Constructive knowledge is not sufficient. *Williams v. Streeps Music Co.,
Inc.*, 333 So.2d 65, 67 (Fla. 4th DCA 1976) (striking allegation that debt collector "should
have known" the claim was not legitimate).

90.    In *Groves v. U.S. Bank*, Plaintiff alleged that Defendant U.S. Bank
violated Ch. 559.72(9), Florida Statutes, by attempting to collect a debt when Defendant U.S.
Bank knew the amount of the debt was not legitimate, and trying to collect collection fees in
excess of the fees allowed when Defendant U.S. Bank knew the right to collect the fees did
not exist. No. 8:10-CV-2665-T-17TGW, 2011 WL 2192821, at *2 (M.D. Fla. June 6, 2011). The
court found that Plaintiff's complaint concerned the amount of the deficiency due to
Defendant. It is not clear how Defendant U.S. Bank could have actual knowledge that the
debt it was seeking to collect was not legitimate, if Defendant has not obtained a deficiency
judgment, and Plaintiff's claims for breach of contract and for violation of Ch. 679.625,
Florida Statutes, had not been adjudicated. *Id*. at 4.

91.    The Claimant's alleged dispute of the debt amount with Debtors does
not establish Debtors' actual knowledge that they had no legal right to pursue the debt, nor
do the Debtors concede that the balance due under the Modification are inaccurate or unfair.
*Finster v. U.S. Bank Nat'l Ass'n*, 245 F. Supp. 3d 1304, 1321 (M.D. Fla. 2017), aff'd, 723 F.
App'x 877 (11th Cir. 2018)

92.    Furthermore, violations of the FCCPA must be brought within two
years of the date the violation occurs. *See* § 559.77(4), Fla. Stat. Claimant first raised his
claims Debtors had violated the FCCPA in his Claim filed on April 12, 2019.

## **Reservation of Rights**

93.    The Consumer Claims Trustee reserves the right amend, modify, or
supplement this Reply.

WHEREFORE the Consumer Claims Trustee respectfully requests entry of an order denying the request for relief in the Claims and such other or relief as is just.

Dated: February 12, 2024
　　　New York, New York

　　　　　　　　　　　　　　　*/s/ Richard Levin*
　　　　　　　　　　　　　　　JENNER & BLOCK LLP
　　　　　　　　　　　　　　　1155 Avenue of the Americas
　　　　　　　　　　　　　　　New York, NY 10036
　　　　　　　　　　　　　　　Telephone: (212) 891-1600
　　　　　　　　　　　　　　　Facsimile: (212) 891-1699
　　　　　　　　　　　　　　　RLevin@jenner.com
　　　　　　　　　　　　　　　Richard Levin

　　　　　　　　　　　　　　　*Attorneys for the Consumer Claims Trustee*