JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 891-1601
Facsimile: (212) 891-1699
Richard Levin
RLevin@jenner.com

*Attorneys for the Consumer Claims Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X
                      :

In re                      :        Chapter 11
                      :

DITECH HOLDING CORPORATION, et al.,  :        Case No. 19-10412 (JLG)
                      :

         Debtors.[1]      :        (Jointly Administered)
                      :        Related Docket Nos. 2689
                      :

---------------------------------------------------------------------X

**REPLY OF CONSUMER CLAIMS TRUSTEE IN SUPPORT OF THE**
**TWENTY-EIGHTH OMNIBUS OBJECTION WITH RESPECT TO THE CLAIM OF**
**STACY HARBAN (23572)**

---

[1] On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404) (the "**Third Amended Plan**"), which created the Wind Down Estates. On February 22, 2022, the Court entered the Order Granting Entry of Final Decree (I) Closing Subsidiary Cases; and (II) Granting Related Relief (ECF No. 3903) (the "**Closing Order**"). Pursuant to the Closing Order, the chapter 11 cases of the following Wind Down Estates were closed effective as of February 22, 2022: DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). Under the Closing Order, the chapter 11 case of Ditech Holding Corporation (the "**Remaining Wind Down Estate**") (Case No. 19-10412 (JLG) remains open and, as of February 22, 2022, all motions, notices and other pleadings relating to any of the Wind Down Estates are to be filed in the case of the Remaining Wind Down Estate. The last four digits of the Remaining Wind Down Estate's federal tax identification number is (0486). The Remaining Wind Down Estate's principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573.

The Consumer Claims Trustee submits this reply (the "**Reply**") in support of the *Twenty-Eighth Omnibus Objection to Proofs of Claim (Insufficient Documentation Unsecured Consumer Creditor Claims)* (ECF No. 2689) ( the "**Twenty-Eighth Omnibus Objection**") filed on July 16, 2020, and in opposition to the *Response of Stacy Harban* filed on January 8, 2024 by Stacy Harban (the "**Claimant**") (ECF No. 4965) (the "**Response**"). The Consumer Claims Trustee respectfully represents as follows:

## Background

### Preliminary Statement

1.     On June 3, 2019, Claimant, pro se, filed proof of claim number 23572 (the "**Claim**") asserting an unsecured claim of $100,000.00. There is no narrative explaining the nature and basis of the Claim. There are no documents attached to the Claim. The Response generally alleges (1) mishandling of a forbearance plan, (2) administrative errors which forced him into a loan modification, (3) Ditech's failure to adequately respond to Claimant's requests for information.

### The Loan

2.     On May 27, 2004, Claimant executed a Note in favor of Centennial Mortgage & Funding Inc. in the amount of $87,000.00 (the "**Note**"). The Note was secured by a Mortgage (the "**Mortgage**") on the property located at 1117 38th St. SE, Cedar Rapids, IA 52403 (the "**Property**") (together the Note and Mortgage are the "**Mortgage Loan**"). *See* Note and Mortgage attached as **Exhibit "A"**.[2] Interest

---

[2] "The Court can properly take judicial notice of matters of public record. *See Sutton ex rel. Rose v Wachovia Sec.*, LLC, 208 F. App'x. 27, 30 (2d Cir. 2006) (holding that filings and orders in other courts

on the thirty-year note was fixed at 6.25%, and Claimant was required to make monthly payments of $535.67.

3.    The Mortgage was assigned to Everhome Mortgage Company on February 2, 2009 and recorded on February 8, 2009. *See* Everhome Assignment, attached as **Exhibit "B".**

4.    The Mortgage was assigned to Green Tree Servicing, LLC, effective May 23, 2014 and recorded on June 27, 2014. *See* Green Tree Assignment, attached as **Exhibit "C".**

5.    Claimant entered a loan modification with Ditech on December 1, 2015, under which the unpaid principal balance was set at $89,016.20 (the "**First Loan Modification**"). *See* Modification Agreement, attached as **Exhibit "D".** The term of the loan was extended forty years at a fixed interest rate of 4.25%, with monthly principal and interest of $385.99 due beginning on January 1, 2016.

6.    The loan was modified a second time, on October 26, 2017, with a new unpaid principal balance of $100,119.85, of which $13,719.85 was deferred,

---

"are undisputably matters of public record"); *Ferrari v. County of Suffolk*, 790 F.Supp.2d 34, 38 n.4 (E.D.N.Y. 2011) ("In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*"); *Kaplan v Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) ("[Courts] must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice".); *Leon v. Shmukler*, 992 F.Supp.2d 179, 184 (E.D.N.Y. 2014) ("It is well-settled that, in considering a motion to dismiss, courts may take judicial notice of documents attached to, integral to, or referred to in the complaint, as well as documents filed in other courts and other public records"); See *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (in contract action, court can take judicial notice of underlying contract as a document 'integral to the complaint')."

leaving an interest-bearing principal amount of $86,400 (the "**Second Loan Modification**"). *See* Modification Agreement, attached as **Exhibit "E".** The loan term was again extended forty years at a fixed interest rate of 4.125%, with monthly principal and interest of $367.84 due beginning on November 1, 2017.

<u>The Bankruptcy Claim</u>

7.      The basis for the Claims is "Customer Claims". Claim at 2. The unsecured amount sought is $100,000.00, but Claimant also indicates that the amount is unliquidated. *Id.* There is no further narrative or supporting documentation attached to the Claim.

<u>The Response</u>

8.      The Response generally alleges (1) mishandling of a forbearance plan, (2) administrative errors which forced him into a loan modification, and (3) Ditech's failure to adequately respond to Claimant's requests for information.

9.      Claimant asserts that there were two occasions on which Ditech offered him "a type of repayment plan or refinancing that was started, then terminated by [Ditech] due to their own inability to start them in the first place".[3] Response at 5. These events occurred between May 2016 and June 2017. *Id.*

10.     Claimant alleges that he contacted Ditech by phone in May 2015 because he was experiencing an employment-related hardship and struggling to pay his mortgage. Response at 6. Ditech offered him a "six month payment plan to bring [him] current" so long as he "did the first three checks by phone". *Id.* Ditech later said

---

[3] Claimant uses the term "refinancing" throughout his narrative, and the Trustee construes this to refer to his efforts to secure either a forbearance or modify the current loan with Ditech.

there was "an issue with the amount" and ultimately told Claimant that his only financial assistance option was a loan modification. *Id.*

11.    After he' had "filled out and sent in all that was needed for a modification review", Claimant says that he received a letter offering a forbearance. Response at 6.  He attaches a copy of a September 28, 2016 letter from Ditech offering him a forbearance that would reduce his monthly payments to $231.93 for a period of six months, effective October 1, 2016, through and including March 1, 2017. *Id.* at 8. Claimant made his first payment under the forbearance plan on October 14, 2016 via electronic debit. Response at 11. Claimant also states he mailed checks into Ditech as "pre-payments" but does not state when the checks were sent. Response at 5.

12.    In a letter dated December 5, 2016, Ditech informed Claimant that his payment could not be processed because (1) the funds received were not enough to pay off the account, (2) the funds needed to have been certified, and (3) the payments were insufficient to bring the account current. Response at 13. Ditech sent a subsequent letter on December 9, 2016 acknowledging receipt of a recent payment in the amount of $231.83, informing him that the funds were insufficient to reinstate the account and indicating that Ditech had commenced foreclosure proceedings. *Id.* at 15.

13.    On December 27, 2016, Ditech sent an additional letter stating the account was in default and that the payment submitted was insufficient to reinstate the account. Response at 16. Ditech indicated that it was pursuing foreclosure and attached two returned checks, each in the amount of $231.93. *Id.* at

17. One check was dated November 9, 2016 and the other December 7, 2016. *Id.* The invoice to which the checks are affixed, however, suggests that one payment of $231.93 was rejected. *Id.*

14.    Also attached are both the First Loan Modification and the Second Loan Modification. Response at 21, 29. Claimant relies on the modifications, in part, to demonstrate his damages. In addition to "13 months of no payment being allowed made, interest gaining, credit dropping and lost gained equity", he observes that his principal balance pursuant to the First Loan Modification was $89,016.20 and rose to $100,119.85 in the Second Loan Modification. Response at 5.

15.    Finally, Claimant attaches three additional letters from Ditech dated December 15, 2016, January 9, 2017, and February 20, 2017, each acknowledging receipt of correspondence from Claimant and informing him that Ditech is in the process of reviewing his enquiries. Response at 18–20.

16.    Under the procedure established by the Claim Procedures Order, the filing of the Response caused an adjournment of the Twenty-Eighth Omnibus Objection as to the Claim so that the Court could conduct a Sufficiency Hearing (as defined in the Claim Procedures Order).[4] The claim procedures dictate that the legal standard of review at a Sufficiency Hearing will be the equivalent to the standard

---

[4] In fact, in August 2020, based on a verbal response from Claimant, the Trustee agreed informally to continue the hearing on Claimant's objection, which was originally scheduled for August 27, 2020. Claimant subsequently submitted numerous documents directly to the Trustee, which were ultimately lodged with the Court on January 8, 2024, following notice to Claimant of the Trustee's intention to do so. See *Notice of Adjournment of Hearing,* filed August 21, 2020. (ECF No. 2794).

applied upon a motion to dismiss for failure to state a claim upon which relief can be granted. *See* Claim Procedures Order, § 3(iv)(a).

<u>Foreclosure History</u>

17.     There have been three separate foreclosure actions with respect to the Property. The first was filed by predecessor-servicer Everhome on January 29, 2009. *Everhome Mortgage Company v. Stacy C. Harban; State of Iowa*, Equity Case No. EQCV064269, Dist. Court for Linn County, Iowa, (Jan. 29, 2009) (the "**Everhome Foreclosure**"). *See* Docket, attached as **Exhibit "F"** (the "**Everhome Docket**"). A judgment of foreclosure was entered on April 7, 2009. *See* Everhome Docket at Entry 13. The judgment was subsequently rescinded. *See* attached **Exhibit "G".**

18.     On July 20, 2016, Ditech filed a foreclosure complaint against Claimant. *See* Docket, attached as **Exhibit "H"** (the "**2016 Ditech Foreclosure Docket**"). The foreclosure complaint alleged that Claimant was in default as of February 1, 2016 and sought recovery of the outstanding principal balance of $88,945.48 plus late fees, interest, attorney's fees and costs. *See* Complaint attached as **Exhibit "I"** (the "**2016 Ditech Complaint**"). The 2016 Ditech Foreclosure Complaint was dismissed on August 9, 2016. *See* 2016 Ditech Foreclosure Docket at entry 3.

19.     Ditech again filed a foreclosure complaint against Claimant on April 3, 2019. *See* Docket attached as **Exhibit "J"** (the "**2019 Ditech Foreclosure Docket**"). The foreclosure complaint alleged that Claimant was in default as of October 1, 2018 and sought recovery of the outstanding principal balance of $99,400.40 plus late fees, interest, attorney's fees, and costs. *See* Complaint attached

as **Exhibit "K"** (the "**2019 Ditech Complaint**"). The 2019 Ditech Foreclosure Complaint was dismissed on July 26, 2019. *See* 2019 Foreclosure Docket at entry 12.

### The Motion to Estimate

20.    On March 23, 2023, the Consumer Claims Trustee filed the *Consumer Claims Trustee's Omnibus Motion to Estimate for Purposes of Distribution Reserves and to Classify Certain Proofs of Claim.* [ECF No. 4650]. (the "**Estimation Motion**").

21.    The Estimation Motion sought to estimate the Claim at $100,000.00 for the purpose of setting a distribution reserve. The Estimation Motion further requested that the Claim be established as Class 6 Consumer Creditor Claims that was not a 363(o) unsecured Consumer Creditor Claim, as defined by the Third Amended Plan. Estimation Motion at 1.

22.    By order dated May 11, 2023, the Claim was estimated at $100,000.00 for the purposes of distribution reserves and classified as non 363(o), Class 6 Consumer Creditor Claim, as defined in the Third Amended Plan. *Order Granting Consumer Claims Trustee's Omnibus Motion to Estimate for Purposes of Distribution Reserves and to Classify Certain Proofs of Claim* at 5. [ECF No. 4733]. (the "**Estimation and Classification Order**").

### Jurisdiction

23.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Reply

### A. Rule 12(b)(6) of the Federal Rules of Civil Procedure Is the Applicable Pleading Standard

24.    A filed proof of claim is "deemed allowed, unless a party in interest…objects." 11 U.S.C. §502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the claimant bears the burden to demonstrate the validity of the claim. *See Residential Capital, LLC*, 2016 WL 796860, at *9 (S.D.N.Y. 2016); *In re Motors Liquidation Co.*, 2012 WL 1886755, at *3 (S.D.N.Y. 2012).

25.    Additionally, section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…." 11 U.S.C. § 502(b)(1).

26.    Although claims submitted by *pro se* claimants are construed liberally, such claims must nonetheless be supported by specific and detailed factual allegations that provide a fair understanding for the basis of the claim and the legal grounds for recovery against a debtor. *Kimber v. GMAC Mortgage, LLC (In re Residential Capital, LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (citing *Iwachiw v. New York City Bd. of Elections*, 126 Fed. Appx. 27, 29 (2d Cir. 2005)). As such, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). See also *Barberan v. Nationpoint*, 706 F.Supp. 2d 408, 413 (S.D.N.Y. 2010); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d. Cir. 1994).

27.     Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim may be dismissed due to a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); see also Fed. R. Bankr. P. 7012 (incorporating Rule 12(b)(6)). The adequacy of the Claim should be analyzed in accordance with the standards established under Rule 12(b)(6), which requires the claimants to allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Owens v. Textron Financial Corp.*, 2014 WL 3887181, at *4 (S.D.N.Y. July 14, 2014) ("Moreover, because plaintiff has not identified any cognizable legal theory applicable here, the Court cannot reasonably infer defendant is liable under any such theory").

28.     To satisfy Rule 12(b)(6), the Claimant's "pleadings must create the possibility of a right to relief that is more than speculative". *Spool v. World Child Int'l. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). In evaluating that standard, courts must assume the truth of all material facts alleged in support of the claim and draw all reasonable inferences in the claimant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The court "need not accord 'legal conclusions, deductions or opinions that are couched as factual allegations…a presumption of truthfulness'". *Hunt v. Enzo Biochem, Inc., (In re NYSE Specialists Sec. Litig.)*, 503 F.3d 89, 95 (2d Cir. 2007)). In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of the court is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support

thereof.'" *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 112 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)).

29.     A claimant cannot meet this Rule 12(b)(6) standard if the pleadings are clear that an affirmative defense, such as res judicata, bars the claim. *See Thompson v. Cty. of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994).

30.     Here, even a generous reading of the Claim and the Response does not support any viable claim for recovery against the Consumer Creditor Reserve as a matter of law.

## B. The Claimants Fail to Adequately Plead a Claim Under Federal Rule of Civil Procedure 8(a)

31.     Under Fed. R. Civ. P. 8(a), complaints must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" such that a defendant "has fair notice of what the … claim is and the grounds upon which it rests". *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007); *Ashcroft v. Iqbal*, 129 U.S. 1937, 1949-51 (2009). Courts require that a pleading contain "enough facts to state a claim for relief that is plausible on its face". *Twombly* at 770. Rule 8 does not require " 'detailed factual allegations', but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation". *Ashcroft* at 678, citing *Twombly* at 555.

32.     Neither the Claim nor the Response meet these minimum pleading standards. The Claim contains no cause of action and no statement of the relief to which Claimant believes he is entitled. The Response articulates confusion

surrounding a repayment plan, forbearance and two loan modifications, but does not state any causes of action, or any legal claim against Ditech.

33.    Claimant refers to a repayment plan but attaches no documents confirming such a plan, making it impossible for the Trustee to ascertain whether such an agreement was established, much less breached by Ditech. He claims Ditech returned checks related to a forbearance agreement but does not allege or provide sufficient facts or documentation  to support his contention that doing so was improper. Finally, he appears to complain of the difference in terms between two loan modifications, but such distinction does not form the basis for a legal claim.

34.    Without sufficient information to ascertain the claims asserted against Debtors, the Trustee is unable to determine the nature and basis of the Claim. This is precisely the dilemma which Rule 8 was designed to prevent. "In accordance with the liberal pleading standards of Rule 8, a plaintiff must disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery". *In re Marketxt Holdings Corp.,* 361 B.R. 369, 384 (Bankr. S.D.N.Y. 2007), citing *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir. 2000), quoting *Ricciutti v. N.Y. City Trans. Auth.,* 941 F.2d 119, 123 (2d. Cir. 1991), (internal quotation marks omitted).

35.    The Claimant fails to adequately plead a claim under Rule 8(a) and the Claim should be disallowed on that basis.

### C. The Claimants Fail to Assert Facts Sufficient to State a Plausible Claim Under Rule 12(b)(6)

36.     If the Claim is not dismissed for failure to comport with Fed. R. Civ. P. 8, it should be dismissed under Fed. R. Civ. P. 12(b)(6). Claimant fails to plead any causes of action. He alleges that (1) Ditech prevented him from making mortgage payments, forcing him to need a loan modification, and (2) Ditech provided contradictory communications to him by phone and in writing. Claimant does not articulate the legal theories under which he pursues relief for any of these alleged acts by Ditech.

37.     Although pro se pleadings are held to a less stringent standard, liberal construction of those pleadings "does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action". *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014) (citations omitted). Nor is the Trustee required to write the Claimants' complaint for them.

38.     Although Claimant does not state any legal claims or refer to any specific statutory violations, mortgage servicer obligations are regulated by the Real Estate Settlement Procedures Act ("**RESPA**"), and credit reporting is governed by the Fair Credit Reporting Act (the "**FCRA**"). In an effort to interpret the claim liberally, the Trustee will evaluate Claimants' complaints under the foregoing statutory schemes. Additionally, the Trustee will construe Claimant's concerns with the forbearance offer as a breach of contract claim.

### i.    Claimant Fails to State a Claim for Breach of Contract

39.    To establish a breach-of-contract claim under Iowa law, a plaintiff must show: " '(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) the plaintiff has suffered damages as a result.'" *Spears v. Com Link, Inc.*, 837 N.W.2d 680, 2013 Iowa App. LEXIS 738, at *12–13 (Iowa App. 2013) (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

40.    "A contract may be express or implied. When the parties manifest their agreement by words, the contract is said to be express. When it is manifested by conduct, it is said to be implied in fact. Both are true contracts formed by a mutual manifestation of assent by the parties to the same terms of the contract. The differentiation arises from the method of proving the existence [of the contract]." *Irons v. Community State Bank*, 461 N.W.2d 849, 855 (Iowa App. 1990) (citing *Duhme v. Duhme*, 260 N.W.2d 415, 419 (Iowa 1977); see also *Walz*, 149 N.W.2d at 152-53; *Maasdam v. Maasdam's Estate*, 237 Iowa 877, 889-90, 24 N.W.2d 316, 322 (1946); Restatement (Second) of Contracts § 4 (1981)).

41.    The forbearance offer, extended in writing, invited Claimant to consent to its terms by making his first monthly payment, which he apparently did. Response at 9, 11. It's terms and conditions were outlined within the letter. However, Claimant fails to establish that he performed all the terms and conditions required under the contract. He notes only that he sent in post-dated checks, but provides no

information to suggest that the payments were made in a timely manner. The forbearance letter expressly provides the following language regarding termination:

> Any payment not received within 15 days of the due date will constitute failure to comply and result in immediate cancellation of the Program without further notice to you and the account will revert back to its original terms and conditions inclusive of any prior modifications.

Response at 9. Given Claimant's failure to allege that he performed under the terms of the contract, he cannot demonstrate that Ditech breached the agreement by returning the checks.

42.    Finally, Claimant does not adequately allege damages resulting from Ditech's alleged failure to comply with the terms of the forbearance agreement. "The general rule of damages for breach of contract comes down to us from the opinion of *Hadley v. Baxendale*, 9 Exch. 341, and is as follows: "When two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fully and reasonably be considered either as arising naturally—i.e. according to the usual course of things—from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." *Mentzer v. The Western Union Telegraph Co.*, 62 N.W. 1, 93 Iowa 752, 759-760 (Iowa 1895).

43.    At the time of the forbearance offer letter on September 28, 2016, Claimant's regularly monthly mortgage payment was $660.07. *See* First Loan Modification. As of July 2016, Claimant was six months in default. *See* 2016 Ditech Foreclosure Complaint. Claimant himself acknowledges that he made no mortgage

payments between May 2016 and June 2017. Response at 5. It defies logic to suggest that he sustained $100,000.00 in damages due to Ditech's rejection of three checks totaling $695.79, or that either party would have contemplated as much when they made the alleged forbearance contract.

44.     Furthermore, Claimant signed a loan modification agreement in which he agreed to pay the unpaid principal balance of $100,119.85. Response at 29–40.

45.     Claimant fails to state a claim for breach of contract.

### ii. Claimant Fails to State a Claim Under the Real Estate Settlement Procedures Act

46.     The Real Estate Settlement Procedures Act ("**RESPA**") is a consumer protection statute that regulates the real estate settlement process." *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006). Under RESPA, mortgage servicers are required to maintain policies and procedures that enable them to manage borrower loans transparently and effectively. 12 C.F.R. §1024.38.

### a. Loss Mitigation Procedures

47.     Loss mitigation refers to the steps mortgage servicers take to work with a mortgage borrower to avoid foreclosure. Loss mitigation procedures are governed by the RESPA and codified at 12 C.F.R. §1024.41. Although borrowers may seek relief for violations of section 1024.41, nothing in the section imposes a duty on servicers to provide borrowers with any specific loss mitigation option. 12 U.S.C. §2605(f). *Id.* §1024.41(a).

48.    Claimant argues that "[b]eing in a situation where a modification was required all began with a mistake by Ditech". Response at 5. He generally alleges that Ditech prevented him from making payments between May 2016 and June 2017. *Id.* These allegations are inconsistent with the facts. The 2016 Loan Modification became effective December 1, 2015 and, according to the 2016 Ditech Foreclosure Complaint, Claimant had already defaulted by February 1, 2016. *See* 2016 Ditech Foreclosure Complaint, Exhibit "X" at 3. By the time Ditech filed the 2016 foreclosure in July 2016, Claimant had thus not made a mortgage payment for at least seven months.

49.    Claimant acknowledges that, when he received the forbearance offer letter dated September 28, 2016, he "thought it was weird" because he had already "sent in all information for a modification review". Under the Fannie Mae Servicing Guidelines, servicers *must* offer short-term forbearances where a borrower has demonstrated one of a short list of hardships and needs additional time to resolve the temporary hardship.[5] Among the designated hardships is unemployment. Although unclear from the record, it appears Claimant's particular hardship was related to unemployment: "My hardship began in the winter of 2015, It was the end of the second year of my general construction business and winter was beginning, a slower time for work..... I did have a part-time job for the winter to help out but it still wasn't enough to stay caught up".) Response at 6.

---

[5] *Fannie Mae September 2016 Single-Family Servicing Guide*, at D-2-3.2-01, Fannie's Home Retention Workout Options, (eff. Sep. 14, 2016).

50.     A forbearance based on unemployment is authorized if the mortgage loan is less than or equal to 12 months delinquent.[6] As of July 2016, Claimant was seven months in default. He provides nothing to suggest that he made mortgage payments in August or September 2016.

51.     The forbearance offer letter from Ditech required the payments to be made on the first of each month. Response at 8. Payments not received within fifteen days of the due date would be considered non-compliant and result in termination of the plan. *Id.* at 9. Claimant provides confirmation of the first payment, made by phone on October 14, 2016, within the late-payment grace period by one day. *Id.* at 11. The confirmation letter shows a payment amount of $231.93—the amount required by the forbearance offer—but notes that the payment includes a $19.00 electronic payment fee. The indication that the processing fee was *included* in the debited amount would result in the payment being insufficient. Claimant provides no supporting evidence to show that he made the full required installment under the forbearance plan.[7]

52.     Claimant notes that he mailed in two additional checks for November and December 2016. Response at 5. These two checks were returned to him by Ditech. *Id.* at 17. Claimant does not indicate when he mailed these checks to Ditech, nor does he attach mailing receipts. The post-dated checks are dated "11/9/16"

---

[6] *Fannie Mae September 2016 Single-Family Servicing Guide*, at D-2-3.2-02, Forbearance Plan for an Unemployed Borrower (11/12/2014) (eff. Sep. 14, 2016).

[7] Per the terms of the Mortgage, "Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted". Mortgage at 3, para.1.

and "12/7/16" respectively. *Id.* Ditech's December 9, 2016 letter to Claimant acknowledges that it "recently received [his] payment in the amount of $231.83" but that his account is "currently in default and the amount of [his] payment is not sufficient to reinstate the account". *Id.* at 15. Given that Ditech previously provided a letter on October 14, 2016 confirming receipt of his direct debit payment for October 14, 2016, this later letter from Ditech likely refers to a payment sent in for November or December 2016. Claimant does not demonstrate that he made either the November or December 2016 payments on time. Late payment would have been a viable cause to terminate the forbearance agreement.

53.     Even if the forbearance offer were mishandled by Ditech or offered in error, Claimant's allegation do not demonstrate how he was damaged. He claims that Ditech's repeated mistakes forced him into a loan modification and prevented him from making payments for thirteen months. Response at 5. But Ditech did not and could not force him into a loan modification. The purpose of loan modification is to enable borrowers to retain their homes by modifying the terms of the mortgage instead of paying off the full reinstatement amount in one lump sum. Claimant ostensibly entered into the First Loan Modification in an effort to stay in his home. It is unclear whether he made a single payment under that modification.

54.     The problems with the rejected forbearance payments did not occur until December 2016, a full year after the implementation of the First Loan Modification. Claimant provides no cohesive explanation as to why he did not send in

any payments between the date of default, February 1, 2016, and the date of his first electronic payment under the forbearance offer, October 14, 2016.

55.     The loan was eventually modified a second time, in October 2017. Claimant provides no information regarding payment attempts between December 2016 and October 2017. It is not enough for him to conclude that Ditech did not allow him to make payments. In any event, the Second Loan Modification was ultimately more favorable to Claimant than the first.

|  | Interest-Bearing Principal Balance | Interest Rate | Monthly Payment | Term |
|---|---|---|---|---|
| First Loan Modification December 1, 2015 | $89,016.20 | 4.25% | $660.07 | 40-year |
| Second Loan Modification October 26, 2017 | $86,400.00 plus a deferred balance of $13,719.85 at 0% interest. | 4.125% | $628.02 | 40-year |

56.     Claimant contends that the $11,103.65 increase in principal balance between the two modifications represents at least part of his damages. However, the Second Modification defers $13,719.85 of the new principal balance, leaving Claimant with a lower interest-bearing principal balance than he had under the First Loan Modification, waiving interest on the entirety of the capitalized arrears, and lowering the fixed interest rate. *See* Second Loan Modification. This effectively undercuts Claimant's allegation that "interest gaining" between May 2016 and June 2017 could form a portion of his damage claim. Moreover, Claimant had the use of the Mortgage Loan for the months during which he was not paying interest. The accrual of interest cannot constitute damages to him.

57.    Additionally, Claimant argues that he has lost more than $100,000.00 in equity. Response at 5. He provides nothing to substantiate this claim. It is also implausible that that 13 months of non-payment on a thirty-year loan that has been modified with extended terms three times would make any measurable difference in equity gains.

### b. Qualified Written Request

58.    Claimant contends that he contacted Ditech in order to obtain records pertinent to his Claim but that he was provided records only from his previous mortgage servicer, Everhome. Response at 5.

59.    RESPA imposes various duties on mortgage loan servicers. 12 U.S.C. § 2605. One duty is to respond to certain borrower inquires, called "qualified written requests," ("**QWR**") in one of three ways. § 2605(e). First, the servicer may correct the borrower's account and notify the borrower of the correction. § 2605(e)(2)(A). Second, the servicer may, "after conducting an investigation," provide the borrower with "a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer." § 2605(e)(2)(B)(i). Or third, the servicer may, "after conducting an investigation," provide the borrower with the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer." § 2605(e)(2)(C)(i).

60.    If the servicer does not respond to a QWR, the borrower "is entitled to 'any actual damages … as a result of the failure.'" *Wirtz v. Specialized Loan*

*Serv'g, LLC*, 886 F.3d 713, 715 (8th Cir. 2018)(quoting 12 U.S.C. § 2605(f)(1)(A)). To prevail on a RESPA claim, the plaintiff must show actual damages because those damages are the "only relief available" on such a claim. *Id.* at 718–19. In addition, RESPA requires that the damages be incurred "as a result of the failure." 12 U.S.C. § 2605(f)(1)(A); *Wirtz*, 886 F.3d at 719. "Congress's use of the phrase 'as a result of' dictates that 'there must be a "causal link" between the alleged the alleged violation and the damages.' " *Wirtz*, 886 F.3d at 719 (quotation omitted). The borrower also may recover "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." § 2605(f)(1)(B).

61.    Regulation X, RESPA's implementing regulation, permits a servicer to "establish a separate and exclusive office and address for the receipt and handling of qualified written requests." 24 C.F.R. § 3500.21(e)(1). Designation of such an address aids servicers in meeting RESPA's deadlines when responding to potentially detailed inquiries from borrowers. *Roth v. CitiMortgage, Inc.,* 756 F. 3d 178, 181 (2d Cir.2014). "If a servicer establishes a designated QWR address, then the borrower must deliver its request to that office in order for the inquiry to be a qualified written request." *Id.* "Failure to send the [alleged] QWR to the designated address for the receipt and handling of QWRs does not trigger the servicer's duties under RESPA." *Id.* at 182 quoting *Berneike v. CitiMortgage, Inc.*, 708 F. 3d 1141, 1149 (10th Cir. 2013).

62.    Pursuant to 12 CFR §1024.36(b), "a servicer may, by written notice provided to a borrower, establish an address that a **borrower must use** to request information". (emphasis added). The servicer must acknowledge receipt of an information request from a borrower within five days and must fully respond to the request within 30 days. 12 CFR §1024.36(c). A servicer may extend the time for respond by an additional 15 days. 12 CFR §1024.36(d)(2)(ii). In general, a servicer is not required to respond if the information requested is substantially the same as information previously requested, information is not relevant, or the request is overbroad or unduly burdensome. 12 CFR §1024.36(f)(1).

63.    Claimant states that he "contacted" Ditech to request his "records" but does not indicate whether that request for information was in writing, what documentation he requested, or where it was directed. Response at 5. He does attach three responsive letters from Ditech, each acknowledging correspondence received from Claimant and indicating that Ditech is investigating his requests. Response at 18–20. He also includes an undated Hardship Letter, apparently sent to Ditech, but without any address or information to show how or if it was provided to Ditech. *Id.* at 6. However, it is impossible to tell from the face of the Response whether Claimant provided a written request conforming with the regulations or whether Ditech failed to comply.

### c.  Notice of Error

64.    According to Claimant, he was confused when he received the September 28, 2016 forbearance offer letter from Ditech because he thought he was

already being evaluated for a loan modification. Response at 5. After his first three forbearance payments were rejected, Claimant alleges that on December 9, 2016 he sent a letter to Ditech asking why his November forbearance payment was rejected. *Id.* He attaches a copy of that letter. *Id.* at 7. The letter is not addressed. *Id.*

65.    Servicing error resolution procedures are set forth in 12 CFR §1024.35. A borrower asserting an error must provide written notice to the servicer with identifying information and a clear articulation of the alleged error. §1024.35(a). Among the errors that fall within the scope of these procedures are (1) failure to accept a payment that conforms to the servicer's written requirements for the borrow to follow in making payments, (2) failure to apply an accepted payment to principal, interest, escrow or other charges under the terms of the mortgage loan and applicable law, (3) failure to credit a payment to a borrower's mortgage loan account as of the date of receipt. §1024.35(b)(1)-(3).

66.    Within five business days of receipt of a notice of error from a borrower, a servicer must respond by either correcting the error or conducting a reasonable investigation and providing a written explanation to the borrower. §1024.35(e). Ditech appears to have done so. On December 15, 2016, Ditech remits a letter to borrower indicating that they received Claimant's "question about [his] Ditech account on 12/12/2016" and that they are currently investigating it. Response at 18. Although Claimant's December 9, 2016 letter does not have any information regarding where or how it was remitted to Ditech, the timing of Ditech's responsive

letter suggests that Claimant's letter was received and that Ditech was investigating the matter.

67.    Less clear are two additional letters from Ditech. On January 9, 2017, Ditech sends a follow-up letter indicating that their research on Claimant's "written request on the above-referenced account" has not yet concluded. *Id.* at 19. On February 20 ,2017, Ditech sends a letter stating that Claimant's "request has been forwarded to the appropriate department for review". *Id.* at 20 . Claimant also states he has provided "copies of the only written responses from [Ditech] for months before a proposal for a modification trial on 6/23/17" seeming to indicate at some point Ditech did respond before he had to execute the Second Modification.

68.    Without additional context or records, it is impossible to ascertain whether Claimant sent additional information requests or notices of error and whether these two letters are responsive to those requests. Claimant has provided insufficient information to state a RESPA claim regarding his attempts to get information regarding alleged account errors.

c.    **Damages.**

69.    The only relief available under RESPA is an award of actual damages and "additional damages" in certain circumstances, so an assertion that a servicer breached a duty under RESPA without causing actual harm does not state a claim under the statute. *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 718–19 (8th Cir. 2018).

70.    Claimant has failed to allege how he was harmed by the alleged failure of Ditech to respond to his request. As previously stated, he has failed to allege any damage for Ditech's failure to adhere to the forbearance plan. The Claimant was ultimately offered a loan modification which waived his late fees, reduced his interest rate, lowered his interest bearing principle and reduced his monthly payments.

71.    Furthermore, a "borrower cannot recover 'additional' damages under § 2605(f)(1)(B) without first recovering actual damages. '[A]dditional' means '[e]xisting in addition, coming by way of addition; added." *Id.* at 719-720 citing 1 Oxford English Dictionary 144 (2d ed. 1989). "For RESPA's statutory damages to be 'additional,' there must be other damages to which they are 'added.'" *Id.* In this instance, Claimant has failed to present sufficient evidence that Ditech engaged in a "pater or practice of noncompliance' as required for damages under § 2605(f)(1)(B).

### iii. Claimant Fails to State a Claim Under the Fair Credit Reporting Act

72.    Claimant attributes a drop in his credit score to Ditech's alleged failure to accept his payments between May 2016 and June 2017. Response at 5.

73.    The Fair Credit Reporting Act ("**FCRA**") governs the accuracy of credit reporting information on consumers. *See* 15 U.S.C. § 1681. Furnishers of information, such as Ditech, are required to provide accurate credit information to Credit Reporting Agencies ("**CRAs**"). §1681s-2(a). The duties of furnishers in the face of a dispute regarding the completeness or accuracy of a consumer's credit report are set forth in section 1681s-2(b). *See* § 1681s-2; *see also Sprague v. Salisbury Bank & Tr. Co.*, 969 F.3d 95, 98–99 (2d Cir. 2020) (discussing application of sections 1681s-2(a) & (b)).

74.    Under section 1681s-2(a), information furnishers must refrain from knowingly reporting inaccurate information, *see* § 1681s–2(a)(1), and must correct any information they later discover to be inaccurate, *see* § 1681s–2(a)(2). FCRA affords consumers the right to dispute any information reported to a credit reporting agency. See § 1681g(c)(1)(B)(iii). Moreover, in appropriate circumstances, a consumer may bring a civil cause of action against any person who willfully or negligently fails to comply with any requirement imposed under FCRA and, as appropriate, recover actual or statutory damages, punitive damages, costs, and attorney's fees. *See* § 1681n (civil liability for willful noncompliance); § 1681o (civil liability for negligent noncompliance). However, section 1681s-2(d) specifically limits enforcement of section 1681s-2(a) exclusively to federal agencies and officials and select state officials. See § 1681s-2(d).

75.    Accordingly, "the FCRA does not provide a private cause of action for violations of Section 1681s-2(a)." *Sprague*, 969 F.3d at 99 (citing § 1682s-2(d)); *accord Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012) ("[T]he statute plainly restricts enforcement of [§ 1681s-2(a)] to federal and state authorities."). S*ee, e.g.*, *Howard v. Mun. Credit Union*, No. 05 Civ. 7488, 2008 WL 782760, at * 7 (S.D.N.Y. Mar. 25, 2008) (granting Rule 12(b)(6) motion to dismiss).

76.    The only provision of the FCRA that is actionable against a furnisher, such as Ditech, arises when the furnisher fails to conduct a reasonable investigation in response to a dispute communicated to it by a consumer reporting agency. *See* 15 U.S.C. § 1681s-2(b). By itself, a dispute sent directly to the furnisher

does not trigger any duties under section 1681s-2(b). The failure to allege that a notice of inaccuracy was provided to the information furnisher by a credit reporting agency is fatal to an FCRA § 1681s-2(b) claim. *Markovskaya v. Am. Home Mortg. Servicing, Inc.*, 867 F. Supp. 2d 340, 344 (E.D.N.Y. 2012).

77.     Claimant does not allege that Ditech reported inaccurate information to the credit bureaus. Neither does he claim to have disputed the reporting with Ditech or the CRAs. Given that he had defended against three separate foreclosure actions in a ten-year-period, it is not implausible that his credit score would have been impacted by his own multiple delinquencies. He also does not allege that Ditech's rejection of payments between May 2016 and June 2017 was improper or that he made any regular attempts to pay his mortgage during that time period. As such, he has failed to demonstrate that any negative reporting by Ditech to the credit bureaus was inaccurate, much less that he disputed the reporting and that Ditech failed to correct it. He fails to state a claim for relief under the FCRA.

78.     Where, as here, an objection refuting at least one of the claim's essential allegations is asserted, the claimant bears the burden to demonstrate the validity of the claim. *See Residential Capital*, LLC, 2016 WL 796860, at *9 (S.D.N.Y. 2016); *In re Motors Liquidation* Co., 2012 WL 1886755, at *3 (S.D.N.Y. 2012). The Claimant has failed to meet his burden of proof as he has provided no specific factual allegations that would support a claim.

### Reservation of Rights

79.    The Consumer Claims Trustee hereby reserves the right amend,

modify, or supplement this Reply.

WHEREFORE the Consumer Claims Trustee respectfully requests entry of an

order denying the request for relief in the Claims and such other or relief as is just.

Dated: March 22, 2024
    New York, New York

*/s/ Richard Levin*
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1600
Facsimile: (212) 891-1699
RLevin@jenner.com
Richard Levin

*Attorneys for the Consumer Claims Trustee*