UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                                           Chapter 11

DITECH HOLDING CORPORATION, *et al.*,            Case No. 19-10412 (JLG)

        Debtors.[1]                                              (Jointly Administered)
-----------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PAYMENT OF ATTORNEYS FEES AND EXPENSES AS ADMINISTRATIVE EXPENSES UNDER 11 U.S.C. § 503(B)(3)(D) AND (B)(4) FOR HAVING MADE A SUBSTANTIAL CONTRIBUTION IN THESE CHAPTER 11 CASES

**APPEARANCES:**

KELLETT & BARTHOLOW, PLLC
11300 N. Central Expressway, Suite 301
Dallas, TX 75243
Telephone: (214) 696-9000
Facsimile: (214) 696-9001
By:    Theodore O. Bartholow III

*Counsel for Richard and Gail Legans, Jose Martinez,*
*Grace Carleton, Dawn Davis, Robert and Sally Hall,*
*Matthew and Jazmin Bennett, Victor Ramalheira,*

---

[1]    On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, ECF No. 1404 (the "Third Amended Plan"), which created the Wind Down Estates. On February 22, 2022, the Court entered the *Order Granting Entry of Final Decree (I) Closing Subsidiary Cases; and (II) Granting Related Relief*, ECF No. 3903 (the "Closing Order"). Pursuant to the Closing Order, the chapter 11 cases of the following Wind Down Estates were closed effective as of February 22, 2022: DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). Under the Closing Order, the chapter 11 case of Ditech Holding Corporation (the "Remaining Wind Down Estate"), Case No. 19-10412, remains open and, as of February 22, 2022, all motions, notices and other pleadings relating to any of the Wind Down Estates are to be filed in the case of the Remaining Wind Down Estate. The last four digits of the Remaining Wind Down Estate's federal tax identification number are (0486). The Remaining Wind Down Estate's principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573. Unless otherwise indicated, "ECF No. __" refers to documents filed on the electronic docket in these Chapter 11 Cases. Capitalized terms used but not otherwise defined herein shall the meanings ascribed to them in the Third Amended Plan or the Confirmation Order, as applicable.

*Oriana Romero-Sosa, and Bettye O'Neal*

CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1A
Newport News, VA 23601
Telephone: (540) 442-7706
By:    Thomas D. Domonoske

*Counsel for Jose Martinez, Robert Hall and Sally Hall*

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
By:    Ray C. Shrock
       Richard W. Slack

*Counsel for Plan Administrator*

**HONORABLE JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

Theodore O. Bartholow III, Thomas D. Domonoske, and O. Max Gardner III (the "Applicants") acted as counsel to Jose Martinez, Richard Legans, Gail Legans, Matthew Bennett, Jazmin Bennett, Dawn Davis, Grace Carleton, Robert T. Hall, Sally W. Hall, Victor Ramalheira, Oriana Romero-Sosa, and Bettye O'Neal (collectively, the "Clients") in these Chapter 11 Cases. The matter before the Court is the Applicants' motion ("Motion")[2] pursuant to sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code for entry of an order allowing as administrative expenses their fees and expenses incurred in representing the Clients, totaling $574,938.20 (the

---

[2]    *Motion of Counsel for Certain Consumer Creditors Pursuant to Section 503(b)(3)(D) and (b)(4) of the Bankruptcy Code for Allowance of Payment of Fees and Expenses Incurred*, ECF No. 1579.

"Fees and Expenses").  The Plan Administrator filed an objection to the Motion ("Objection"),[3] and each side filed an additional responsive brief.[4]

For the reasons stated, the Motion is denied.

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## BACKGROUND[5]

### A.  The Chapter 11 Cases and the Appointment of the Consumer Creditors' Committee

On February 11, 2019 ("Petition Date"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates (collectively, the "Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Chapter 11 Cases").

---

[3]     *Plan Administrator's Objection to Motion of Consumer Creditor Counsel for Allowance of Payment of Fees and Expenses Incurred as Administrative Expense Claim*, ECF No 3668.

[4]     *Response of Counsel for Certain Consumer Creditors to Plan Administrator's Objection to Motion Pursuant to Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code for Allowance of Payment of Fees and Expenses Incurred*, ECF No. 3717 ("Response"); and *Reply of the Plan Administrator to the Response of Counsel for Certain Consumer Creditors to Plan Administrator's Objection to Motion Pursuant to Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code for Allowance of Payment of Fees and Expenses Incurred*, ECF No. 3885 ("PA Reply").

[5]     The following declarations were submitted in connection with the Motion: *Declaration of Thomas D. Domonoske in Support of Application for Fees*, ECF No. 1580; *Declaration of O. Max Gardner III*, ECF No. 1581; *Declaration of Theodore O. Bartholow, III in Support of Application for Administrative Claim Attorneys Fees Based on Substantial Contribution to Debtor's* [sic] *Bankruptcy Case*, ECF No. 1582 ("First Bartholow Declaration"); *Supplemental Declaration of Theodore O. Bartholow III in Support of Consumer Counsel's Application for Allowance of Substantial Contribution Administrative Claim for Attorneys' Fees and Expenses*, ECF No. 3717-1 ("Second Bartholow Declaration"); *Supplemental Declaration of O. Max Gardner, III in Support of Application for Administrative Claim Attorneys Fees Based on Substantial Contribution to Debtor's* [sic] *Bankruptcy Case*, ECF No. 3717-2; *Declaration of Jose Angel Martinez, Jr. in Support of Application for Administrative Claim Attorneys' Fees Based on Substantial Contribution to Debtor's* [sic] *Bankruptcy Case*, ECF No. 3717-3 ("Martinez Declaration"); *Declaration of Richard Legans in Support of Application for Administrative Claim Attorneys' Fees Based on Substantial Contribution to Debtor's* [sic] *Bankruptcy Case*, ECF No. 3717-4; *Declaration of Tara Twomey in Support of Motion of Counsel for Certain Consumer Creditors Pursuant to Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code for Allowance of Payment of Fees and Expenses Incurred*, ECF No. 3717-5 ("Twomey Declaration"); and *Declaration of Robert T. Hall in Support of Application for Administrative Claim Attorneys' Fees Based on Substantial Contribution to Debtor's* [sic] *Bankruptcy Case*, ECF No. 3717-8 ("Hall Declaration").

The circumstances leading to the filing and the major constituencies in the cases are described in detail in *In re Ditech Holding Corp.*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019) (hereinafter the "*Confirmation Decision*"). The Court assumes familiarity with the *Confirmation Decision* and recounts just the facts necessary for the disposition of the Motion.

Prior to the sale of the Debtors' business pursuant to the Third Amended Plan, the Debtors were an independent servicer and originator of mortgage loans and a servicer of reverse mortgage loans. The Debtors were party to approximately one million agreements with consumer borrowers. As of the Petition Date, the Debtors were subject to thousands of formal and informal proceedings in which consumer creditors alleged a wide range of misconduct, including overstating and failing to correct borrower accounts, improperly servicing borrower accounts, demanding payments barred by confirmed plans or bankruptcy discharge injunctions, wrongfully foreclosing on borrowers' properties, and violating consumer protection and debt collections laws.

On February 27, 2019, the United States Trustee ("UST") appointed the Official Committee of Unsecured Creditors ("Official Creditors Committee") pursuant to section 1102(a) of the Bankruptcy Code.[6] Upon appointment of the Official Creditors Committee, the UST received several letters from representatives of consumer creditors requesting the appointment of an official committee to represent the rights of consumer creditors. Initially, the UST added two consumer creditors to the Official Creditors Committee.[7] Shortly thereafter, however, the UST appointed an Official Committee of Consumer Creditors ("Consumer Creditors' Committee").[8] Client Jose Martinez has served as the chair of that committee. The Consumer Creditors'

---

[6]    *Notice of Appointment of Official Committee of Unsecured Creditors*, ECF No. 127.

[7]    *Amended Notice of Appointment of Official Committee of Unsecured Creditors*, ECF No. 444.

[8]    *Notice of Appointment of Official Committee of Consumer Creditors*, ECF No. 498.

Committee retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as counsel and

Tara Twomey, Esq. as special consumer counsel, and the Court approved each retention.[9]

Shortly after its formation, the Debtors moved to disband the Consumer Creditors'

Committee or to limit the scope of the committee's mandate ("Motion to Disband").[10]  The Court

denied the Debtors' motion by bench ruling on May 17, 2019.[11]

Upon confirmation of the Third Amended Plan, the Court approved the fees and expenses

incurred by Quinn Emanuel and Ms. Twomey on behalf of the Consumer Creditors' Committee.[12]

## B. The Class Action Adversary Proceedings and Proofs of Claim

Between late April and early June 2019, the Applicants commenced four adversary

proceedings on behalf of the Clients.  *See Bettye O'Neal v. Ditech Financial, LLC*, Adv. P. No.

19-01123 (Bankr. S.D.N.Y. Apr. 24, 2019); *Ramalheira v. Ditech Financial, LLC*, Adv. P. No.

19-01124 (Bankr. S.D.N.Y. Apr. 25, 2019); *Hall v. Ditech Financial, LLC*, Adv. P. No. 19-01231

(Bankr. S.D.N.Y. June 3, 2019); and *Martinez v. Ditech Financial, LLC*, Adv. P. No. 19-01235

(Bankr. S.D.N.Y. June 3, 2019) ("Martinez Action," and collectively, the "Adversary

Proceedings").  Each Adversary Proceeding was brought as a class action and alleged prepetition

misconduct in connection with mortgage servicing performed by Debtor Ditech Financial LLC

---

[9]      *Order, Pursuant to 11 U.S.C. §§ 1103(a), 328(a), and 330, Granting Application of the Official Committee for Consumer Creditors to Retain and Employ Quinn Emanuel Urquhart & Sullivan, LLP as Counsel Effective Nunc Pro Tunc to May 6, 2019*, ECF No. 881; and *Order Authorizing the Official Committee of Consumer Creditors to Retain and Employ Tara Twomey as Special Counsel Nunc Pro Tunc to June 13, 2019*, ECF No. 1158.

[10]     *Motion of Debtors for Entry of an Order (I) Disbanding the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limiting the Scope of Such Committee and Capping the Fees and Expenses Which May Be Incurred by Such Committee*, ECF No. 522.

[11]     *Order Denying Debtors' Motion to (I) Disband the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limit the Scope of Such Committee and Cap Its Fees and Expenses*, ECF No. 1288; *see also Transcript Regarding Hearing Held on 5/17/19*, ECF No. 1081.

[12]     *Second Interim and Final Order Granting Professionals' Applications for Interim and Final Allowance of Compensation and Reimbursement of Expenses*, ECF No. 1701

("Ditech Financial"). In December 2022, the Applicants, on behalf of the Clients, voluntarily dismissed the Adversary Proceedings, except the Martinez Action.

Proofs of claim were also submitted on behalf of the Clients (collectively, the "Proofs of Claim")[13] seeking damages based on the conduct alleged in the Adversary Proceedings. As set forth in the following chart, some of the Proofs of Claim have been partially allowed and some sought payment of attorneys' fees and costs as part of the claim:

| CLIENT | CLAIM NO. | AMOUNT CLAIMED ($) | SEEKS ATTYS' FEES/COSTS | STATUS | AMOUNT ALLOWED ($) |
|---|---|---|---|---|---|
| Bettye O'Neal | 1358 | 1,002,000 | Yes | Partially allowed[14] | 10,000 |
| Oriana Romero-Sosa | 1359 | 606,000 | Yes | Partially allowed[15] | 30,000 |
| Victor Ramalheria | 1367 | 600,600 | Yes | Partially allowed[16] | 30,000 |
| Robert & Sally Hall | 20246 | 552,000 | No | Partially allowed[17] | 46,500 |
| Matthew & Jazmin Bennett | 21178 | 18,000 | No | Disallowed[18] | n/a |
| Richard & Gail Legans | 21190 | 500,000 | Yes | Partially allowed[19] | 82,700 |
| Grace Carleton | 21394 | 8,000 | No | Disallowed[20] | n/a |
| Jose Martinez | 21463 | 250,000 | No | Pending | n/a |
| Robert & Sally Hall, et al. | 23561 | 10,000,000 | Yes | Disallowed[21] | n/a |

---

[13] Several of the Proofs of Claim were submitted by Applicants' co-counsel on behalf of the Clients.

[14] *Order Granting Consumer Claims Trustee's Forty-Eighth Omnibus Objection to Proofs of Claim to Allow and Classify Unsecured Consumer Creditor Claims*, ECF No. 3761, Ex. A.

[15] *Id.*

[16] *Id.*

[17] *Stipulation Resolving Proofs of Claim Nos. 20246, 23561*, ECF No. 4097.

[18] *Order Granting Consumer Claims Trustee's Seventh Omnibus Objection to Proofs of Claim (Insufficient Documentation Unsecured Consumer Creditor Claims)*, ECF No. 2280, Ex. A.

[19] *Order Granting Consumer Claims Trustee's Sixtieth Omnibus Objection to Proofs of Claim to Allow and Classify Unsecured Consumer Creditor Claims*, ECF No. 4411, Ex. A.

[20] *Order Granting Consumer Claims Trustee's Fifteenth Omnibus Objection to Proofs of Claim (Insufficient Documentation Unsecured Consumer Creditor Claims)*, ECF No. 2612, Ex. A.

[21] *Stipulation Resolving Proofs of Claim Nos. 20246, 23561*, ECF No. 4097.

| CLIENT | CLAIM NO. | AMOUNT CLAIMED ($) | SEEKS ATTYS' FEES/COSTS | STATUS | AMOUNT ALLOWED ($) |
|---|---|---|---|---|---|
| Jose Martinez & all similarly situated | 23657 | 100,000,000 | Yes | Estimated for purposes of setting distribution reserve[22] | 510,000[23] |

## C. <u>The Engagement Agreements</u>

As described below, the Plan Administrator challenges the Applicants' standing to prosecute the Motion. In response, the Applicants submitted the engagement agreements they have with several of the Clients.[24] The engagement agreements are similar in substance, and the Court will reference the agreement with Jose Martinez as the "Martinez Engagement Agreement." The agreement states that the "subject matter of this representation is Client's disputes with Ditech, and any of such creditor's predecessors, assigns, and or successors . . . regarding . . . servicing of Client's mortgage loan." Martinez Engagement Agreement § 1.02. With respect to the payment of attorneys' fees and expenses, the agreement provides the following:

- Subject to periodic adjustments, the hourly rate for attorneys is between $250 and $500 per hour, and the rate for law clerks and legal assistants is between $75 and $200 per hour, *id*. §§ 4.01, 4.02;

- Outstanding legal fees and expenses "shall be deducted from any settlement or award to Client," *id*. § 4.06; and

- "Attorneys will attempt to obtain payment of their fees and expenses from Defendants. However, at all times, Client remains responsible for payment of the fees and expenses." *Id*. § 4.07.

---

[22]    *Order Granting Consumer Claims Trustee's Omnibus Motion to Estimate for Purposes of Distribution Reserves and to Classify Certain Proofs of Claim*, ECF No. 4733, Ex. A.

[23]    This amount represents the estimated amount of the claim pursuant to 11 U.S.C. § 502(c) for purposes of setting the distribution reserve.

[24]    The engagement agreements with Clients Richard Legans, Grace Carleton, Matthew and Jazmin Bennett, Dawn Davis, and Jose Martinez were appended as Exhibit C to the Second Bartholow Declaration.

D. **Litigation Pertaining to Section 363(o)**

In the summer of 2019, the Debtors were negotiating a reorganization plan, which resulted in the Debtors' proposal of a plan (the "Second Amended Plan") which contemplated (i) the sale of the mortgage servicing and origination business to New Residential Investment Corp., (ii) the sale of the reverse mortgage servicing business to Mortgage Assets Management, LLC and SHAP 2018-1, LLC, (iii) a settlement of the claims of most of the major creditor constituencies, except for the Consumer Creditors' Committee, and (iv) the establishment of a $5 million fund available to satisfy claims of consumer creditors. *Confirmation Decision*, 606 B.R. at 551, 566-68. A central issue that arose in connection with confirmation of the Second Amended Plan was whether the Debtors' assets could be sold "free and clear" of claims held by consumer creditors. Specifically, section 363(o) of the Bankruptcy Code provides that the purchaser does not receive the assets free and clear of certain consumer borrower claims when such assets are sold under section 363:

> Notwithstanding [11 U.S.C. § 363(f)], if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

11 U.S.C. § 363(o).[25] The Debtors took the position that section 363(o) did not apply to the sale transactions in the Second Amended Plan because they were being sold under a plan pursuant to 11 U.S.C. §§ 1123(b)(4) and 1141(c) rather than as a sale under 11 U.S.C. § 363. Objectors to the Second Amended Plan led by the Consumer Creditors' Committee took the position that the plan

---

[25]    Section 363(f) of the Bankruptcy Code permits the sale of estate property "free and clear of any interest in such property" if any of the five conditions set forth in subsections (1) through (5) of section 363(f) are met. 11 U.S.C. § 363(f).

could not be confirmed because it would strip the consumer creditors' claims against the purchasers in violation of section 363(o). *Confirmation Decision*, 606 B.R. at 583-86.

The Court denied confirmation of the Second Amended Plan. The Court found that although the Debtors were correct that section 363(o) did not apply in the context of a plan sale, *id*. at 593, the Second Amended Plan violated the so-called "best interest" of creditors test set forth in 11 U.S.C. § 1129(a)(7), *id.* at 621, which requires that a dissenting creditor "receive or retain" value in a plan that is not less than the amount such creditor would receive or retain in a hypothetical chapter 7 liquidation of the debtor. The Court reasoned that the consumer creditors would retain their claims in a sale in a hypothetical chapter 7 case because the assets would be sold under section 363, the Debtors' liquidation analysis did not take these claims into account, and therefore, the Debtors failed to establish that the Second Amended Plan satisfied the best interest of creditors test. *Id.* at 609-21.

## E. __Confirmation of the Third Amended Plan__

After the Court denied confirmation of the Second Amended Plan, the Debtors and the Consumer Creditors' Committee engaged in arms-length negotiations culminating in a settlement and the committee's support for the Debtors' Third Amended Plan.[26] CCC Statement ¶ 5. The material aspects of the settlement were as follows:

- Inclusion of a plan provision allowing consumer borrowers to raise issues associated with their accounts and to pursue remedies to correct those accounts if they are misstated or invalid, *id*. ¶¶ 6-7;

- investigation by the Debtors and the proposed purchasers to correct alleged errors in borrower accounts, *id*. ¶ 10(a)-(b);

---

[26]    *See Statement of the Official Committee of Consumer Creditors in Support of the Debtors' Third Amended Joint Chapter 11 Plan*, ECF No. 1301 ("CCC Statement").

- creation of a $10 million reserve ("Consumer Claims Reserve") to pay claims of consumer creditors covered under section 363(o) of Bankruptcy Code, *id*. ¶¶ 8-9; and

- appointment of a consumer representative ("Consumer Claims Representative") to administer the Consumer Claims Reserve with standing to raise any issue pertaining to claims reconciliation and account correction, *id*. ¶ 10(d).

The Court entered the Confirmation Order confirming the Third Amended Plan on September 26, 2019, and the plan went effective on September 30, 2019.[27]  The Third Amended Plan appointed the Plan Administrator who is charged with the duty of winding down, dissolving, and liquidating the Wind Down Estates.  Among other things, the Third Amended Plan authorizes the Plan Administrator, on behalf of the Wind Down Estates, to object to Administrative Expense Claims.  *See* Third Amended Plan § 7.1.

## F.  **The Claims Procedures Order**

On November 19, 2019, the Court entered the Claims Procedures Order,[28] under which the Plan Administrator is authorized to file objections seeking reduction, reclassification, or disallowance of claims on grounds set forth in Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and additional grounds enumerated in the Claims Procedures Order.  *See* Claims Procedures Order ¶ 2(i)(a)-(h).  A properly filed and served response to an objection gives rise to a contested claim that will be resolved at a contested hearing.  *Id*. ¶ 3(iv). The Plan Administrator has the option of scheduling the hearing as either a "Merits Hearing" or a "Sufficiency Hearing."  *Id*. ¶ 3(iv)(a), (b).  A "Merits Hearing" is an evidentiary hearing on the merits of a contested claim, while a "Sufficiency Hearing" is a non-evidentiary hearing to address

---

[27]    *See Notice of (I) Entry of Order Confirming Third Amended Joint Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims*, ECF No. 1449.

[28]    *Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures*, ECF No. 1632 ("Claims Procedures Order").

whether the Contested Claim states a claim for relief against the Debtors.  The legal standard of review to be applied in a Sufficiency Hearing is equivalent to the standard applied on a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules").  *Id*. ¶ 3(iv)(a).  This Motion is proceeding as a Sufficiency Hearing under the Claims Procedures Order.

### G.  The Parties' Contentions

#### 1.  *Motion*

By the Motion, the Applicants seek payment of their attorneys' fees and expenses in the total amount of $643,929.92 [29] for their representation of the Clients in these cases.  Motion ¶ 6. They argue that the actions they took satisfy the admittedly stringent standard for having made a "substantial contribution" under section 503(b)(3)(D) of the Bankruptcy Code.  *Id*. ¶¶ 3, 4, 7-18. The Applicants further assert that the amount of fees and expenses incurred were reasonable and necessary.  *Id*. ¶¶ 19-32.

According to the Applicants, the outcomes that were achieved as a result of their work, either entirely or in part, include—

- several extensions of the bar date for filing proofs of claim;

- appointment of the Consumer Creditors' Committee;

- temporary appointment of consumer creditors to the Official Creditors Committee;

- denial by the Court in *In re Ditech Holding Corp.*, No. 19-10412, 2019 WL 3294684 (Bankr. S.D.N.Y. July 19, 2019) of a request by the Debtors and Bank of America to redact a portion of their settlement;

- protection of consumer creditors' claims under 11 U.S.C. § 363(o), including by obtaining denial of the Second Amended Plan;

---

[29]   As set forth below, after discussions with the UST, the Applicants reduced their request to $574,938.20.

- appointment of the Consumer Claims Representative to correct errors in borrowers' accounts; and

- establishment of a Consumer Claims Reserve to pay consumer creditor claims.

Motion ¶ 2; *see also id.* ¶¶ 13-14.  The Applicants add that, in the early stages of the case, they helped coalesce representatives of consumer creditors nationwide to advocate for appointment of the Consumer Creditors' Committee and presented multiple webinars to help consumer borrowers navigate these Chapter 11 Cases.  *Id.* ¶¶ 2, 14.  They state that their actions were taken "without any reasonable expectation that it would be paid by its clients, who, like the thousands of other consumer creditors in this case, lack the means to compensate [the Applicants] for the legal services provided."  *Id.* ¶ 16.  The Applicants conclude that, but for their efforts, "it is likely that this case would have had one or [sic] two outcomes: either the rights of hundreds thousands [sic] of consumer creditors would have been stripped, or this case would have converted to a Chapter 7."  *Id.* ¶ 11.

### 2. *Objection*

As a threshold matter, the Plan Administrator objects to the Motion on the grounds that the Applicants lack standing under 11 U.S.C. § 503(b)(3)(D).  Objection ¶ 3.  The statute is plainly limited to expenses incurred by "a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102."  *Id.* ¶ 29 (quoting 11 U.S.C. § 503(b)(3)(D)).  Attorneys cannot seek reimbursement under the statute for expenses incurred on their own behalf.  *Id.* ¶¶ 30-34.  In that regard, the Plan Administrator points out that the Applicants never expected to be paid by their Clients.  *Id.* ¶ 35-36.

The Plan Administrator also contends that the Motion fails because the Applicants' work was not "extraordinary."  *Id.* ¶ 6.  He argues that the record is clear that the Applicants' actions do

not support a claim for "substantial contribution" because they were routine tasks undertaken for the primary benefit of the Clients rather than the Debtors' estates as a whole and because the Applicants had virtually no involvement in the negotiation or confirmation of the Third Amended Plan. *Id.* ¶¶ 49-54. Moreover, he argues that payment to the Applicants is improper because the Court appointed the Consumer Creditors' Committee to represent the interests of all consumer borrowers, and that committee was ably represented by Quinn Emanuel whose fees and expenses were borne by the Debtors' estates. *Id.* ¶¶ 7-8, 57-61.

### 3. *Applicants' Response*

In their response, the Applicants report that, in consultation with the UST, they have voluntarily reduced their request by $68,991.72. Response ¶ 2. Thus, the revised amount sought by the Applicants is $574,938.20, *i.e.*, the Fees and Expenses.

Moreover, they maintain that they have standing to prosecute the Motion because their actions are supported by the Clients. *Id.* ¶¶ 53-54; *see also* Martinez Declaration ¶¶ 15, 17-18; Hall Declaration ¶¶ 21-23. Further, the Applicants contend that, notwithstanding their prior statement that they did not expect payment from their Clients, the Clients have a contractual obligation to pay the Fees and Expenses. Response ¶ 52; Martinez Declaration ¶ 7-8.

The Applicants argue that they have demonstrated that their actions benefited not just the consumer creditors, but all creditor constituencies and the estates as a whole. They assert that:

- the consumer creditors benefited from the Applicants' negotiation of procedures to correct account discrepancies and inaccuracies, Response ¶¶ 60-62;

- the non-consumer creditors benefited from the Applicants' efforts to create a separate Consumer Claims Reserve because funds set aside for satisfaction of general unsecured claims were not diluted by consumer creditor claims, *id.* ¶ 64; and

- the estates benefited from the Applicants' account-correction procedures which were ultimately incorporated into the Third Amended Plan, *id.* ¶ 65.

The Applicants further contend that their work was complimentary, not duplicative, of the work performed by Quinn Emanuel. *Id*. ¶¶ 69-72. According to the Applicants, they provided "consumer law expertise and deep knowledge of mortgage servicing practices" which guided Quinn Emanuel's approach for representing the Consumer Creditors' Committee. *Id*. ¶ 69; *see also id*. ¶ 73. They say that they played a leadership role in various aspects of the case, that their prosecution of the Adversary Proceedings was intended to benefit all consumer creditors, and that their extraordinary contributions to the case satisfy the 11 U.S.C. § 503(b)(3)(D) standard. *Id*. ¶¶ 74-97.

### 4. *Plan Administrator's Reply*

The Plan Administrator argues that (i) the Applicants lack standing under section 503(b)(3)(D), *see* PA Reply ¶¶ 11-18; (ii) the Applicants' actions were intended to benefit the Clients, and perhaps the consumer creditor constituency, but not the estates as a whole, *id*. ¶¶ 27-29; (iii) a substantial portion of the work performed by the Applicants was routine work commonly performed in a chapter 11 case, *id*. ¶¶ 35-36; and (iv) payment to the Applicants is not appropriate where the Consumer Creditors' Committee was appointed to represent the entire consumer creditor constituency, *id*. ¶ 50-54. The Plan Administrator rebuts the assertion that the Applicants provided consumer law expertise by pointing out that Ms. Twomey was formally retained to perform that exact function. *Id*. ¶ 55.

The Plan Administrator adds that payment of the Clients' attorneys' fees pursuant to the Motion would run afoul of the settlements reached with the Consumer Creditors' Committee incorporated in the Third Amended Plan. That settlement created the Consumer Claims Reserve to pay consumer creditor claims, which include attorneys' fees awardable under applicable law.

Thus, any payment on account of the Fees and Expenses should be paid from the Consumer Claims

Reserve rather than as administrative expenses of the Wind Down Estates. *Id*. ¶¶ 44-49.

The Court heard oral argument on the Motion and took the matter under advisement.

## DISCUSSION

### A. Rule 12(b)(6) Standard

A dispute pertaining to the whether a claim may be allowed is a contested matter governed

by Bankruptcy Rule 9014. *Pleasant v. TLC Liquidation Trust* (*In re Tender Loving Care Health

Servs., Inc.*), 562 F.3d 158, 162 (2d Cir. 2009) ("when a debtor files an objection to a claim, the

objection has initiated a contested matter"). Federal Rule 12(b) applies in adversary proceedings,

*see* Fed. R. Bankr. P. 7012(b), but is generally not applicable in contested matters. *See* Fed. R.

Bankr. P. 9014(c) (rules applicable in contested matters). Nonetheless, Bankruptcy Rule 9014(c)

gives the Court discretion to apply Bankruptcy Rule 7012(b), and thereby, Federal Rule 12(b), in

contested matters. *Id.* ("The court may at any stage in a particular matter direct that one or more

of the other rules in Part VII shall apply"). Here, as set forth in the Claims Procedures Order, the

Court will apply the legal standard applicable to a motion to dismiss for failure to state a claim

under Federal Rule 12(b)(6) to this Sufficiency Hearing. Claims Procedures Order ¶ 3(iv)(a)

(applying Bankruptcy Rule 7012 to Sufficiency Hearings).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing

*Twombly*, 550 U.S. at 556). Determining plausibility is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The plausibility

standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 678 (citing *Twombly*, 550 U.S. at 557). Thus, courts should utilize a two-prong approach to decide motions to dismiss. First, the court should begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. Second, the court should assume the veracity of all well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." *Id*. When deciding a motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

As applied here, the Court will analyze whether the Motion and supporting documents plausibly assert an entitlement to the Fees and Expenses for having made a substantial contribution to these cases.

### B. Standard for Substantial Contribution

Section 503(a) of the Bankruptcy Code permits "[a]n entity" to timely file a request for payment of administrative expenses. 11 U.S.C. § 503(a). The categories of allowable administrative expenses are set forth in the subsections of section 503(b), and section 503(b)(3)(D) authorizes payment of expenses incurred in making a "substantial contribution" by certain enumerated entities including a creditor:

> the actual, necessary expenses, other than compensation and reimbursement specified in [section 503(b)(4)], incurred by . . . *a creditor*, an indenture trustee, an

equity security holder, or a committee representing creditors or equity security
holders other than a committee appointed under section 1102 of this title, *in making
a substantial contribution* in case under chapter . . . 11 of this title . . . .

11 U.S.C. § 503(b)(3)(D) (emphasis added). Section 503(b)(4), in turn, provides for the payment

of professional fees, including legal fees, incurred by such entity in making the substantial

contribution. 11 U.S.C. § 503(b)(4) (allowing payment of "reasonable compensation for

professional services" including attorney's fees "of an entity whose expense is allowable under

subparagraph . . . (D) . . . of paragraph (3) of this subsection"). The "most natural reading" of

these provisions is that "the entity" who may file a request under section 503(a) and for attorneys'

fees under section 503(b)(4) is the same entity whose expenses are allowable under section

503(b)(3)(D), *i.e.*, the creditor. *Olsen v. Robinson Brog Leinwand Greene Genovese & Gluck P.C.*

(*In re Olsen*), 334 B.R. 104, 106 (S.D.N.Y. 2005); *see also id.* ("[T]he creditor, and not the

creditor's attorney, may apply for the payment of fees from the estate."); *In re Synergy Pharms.*

*Inc.*, 621 B.R. 588, 602-03 (Bankr. S.D.N.Y. 2020) (recognizing that "[c]ourts in this circuit read

the plain language of the statute to bar a professional retained by an ad hoc committee from filing

its own application for the payment of an administrative expense under section 503(a) of the

Bankruptcy Code").

The phrase "substantial contribution" is not defined in the Bankruptcy Code and has been

limited to "those rare occasions when the creditor's involvement truly fosters and enhances the

administration of the estate." *Short Pump Ent., L.L.C. v. Randall's Island Family Golf Ctrs., Inc.*

(*In re Randall's Island Family Golf Ctrs., Inc.*), 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003)

(quoting *In re Best Prods. Co., Inc.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994)). This Court has

recognized the tension in the contrasting policies of promoting meaningful creditor participation

on the one hand and minimizing administrative expenses on the other:

>While the policy aim behind these provisions is to promote meaningful creditor
>participation in the reorganization process, tension exists between this aim and the
>contrasting policy that administrative expenses of the estate be kept to a minimum.
>That tension gives rise to the well settled rule that these statutory provisions are to
>be narrowly construed, and that any recovery is subject to strict scrutiny by the
>court.

*In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) (citations omitted).  Accordingly, the "integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."  *In re Bayou Grp., LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010) (quoting *Best Prods.*, 173 B.R. at 866).

"The substantial contribution inquiry is factual," and the movant bears the burden of proof. *Id*. at 560 (citing *U.S. Lines*, 103 B.R. at 429).  Thus, although the substantial contribution inquiry typically calls for the Court to render factual determinations, the parties have agreed to proceed under a motion to dismiss standard under the Claims Procedures Order.  The Court recognizes the tension in these standards, and indeed, the parties, in their submissions, have appeared to make arguments on the sufficiency of the evidence.  Nonetheless, consistent with the parties' agreement, the Court will apply only a plausibility standard.

"Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests."  *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (quoting *U.S. Lines*, 103 B.R. at 430); *accord Trade Creditor Grp. v. L.J. Hooker Corp., Inc. (In re Hooker Invs., Inc.)*, 188 B.R. 117, 120 (S.D.N.Y. 1995).  "[S]ervices calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate."  *Dana Corp.*, 390 B.R. at 108 (citing *U.S. Lines*, 103 B.R. at 430).  "A direct benefit also cannot be established merely by the movant's extensive participation in the case or be based on services that duplicated those of professionals already compensated by the estate, such

as counsel for the debtor or an official committee." *Bayou Grp.*, 431 B.R. at 561 (citing *In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997); *Dana Corp.*, 390 B.R. at 108). This Court has observed that most of the cases allowing a substantial contribution claim "found that the creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed . . . ." *Id.* at 562; *see also id.* ("most have . . . involved a creditor who actively facilitated the negotiation and successful confirmation of the chapter 11 plan or, in opposing a plan, brought about the confirmation of a more favorable plan"). "In contrast, work performed on behalf of 'unofficial committees' that merely further the interests of their own constituents are not compensable under these provisions." *Bayou Grp.*, 431 B.R. at 562; *accord Synergy Pharms.*, 621 B.R. at 610. Moreover, "[c]ompensable services foster and enhance—rather than retard and interrupt—the progress of reorganization." *Granite Partners*, 213 B.R. at 446 (collecting cases). "Thus, the general rule remains that attorneys must look to their own clients for payment." *Best Prods.*, 173 B.R. at 866 (citing *In re McLean Indus., Inc.*, 88 B.R. 36, 38 (Bankr. S.D.N.Y. 1988)).

## C. <u>Analysis</u>

### 1. *Standing*

The Plan Administrator challenges the Applicants' standing to bring the Motion, asserting two related arguments: (i) the Applicants cannot assert a substantial contribution claim on their own behalf, *see* Objection ¶¶ 30, 34, and (ii) there can be no substantial contribution claim because the Clients are not obligated to pay the Fees and Expenses, *see id.* ¶¶ 31, 35. The Court addresses each argument below.

#### a. <u>The Entity Seeking Payment</u>

As stated, the "entity" whose attorneys' fees are reimbursable under section 503(b)(4) is the same entity whose expenses are payable under section 503(b)(3)(D). *Olsen*, 334 B.R. at 106.

The entities enumerated in section 503(b)(3)(D) include "a creditor," and the Clients are creditors in these cases. In certain parts of the Motion, however, the Applicants suggest that they are seeking payment, not on behalf of the Clients they represented, but on their own behalf. *See* Motion ¶ 2 ("[a]s a result, [sic] of Counsel's actions, the following beneficial outcomes . . . were achieved"); *id*. ¶ 4 ("Counsel respectfully requests that the Court allow recovery by Counsel of the fees and expenses set forth more fully herein"); *id*. ¶ 10 ("the central issue before the Court is whether the efforts of the Counsel amounted to a substantial contribution to the Debtors and their creditors"); *id*. ¶ 11 ("it is clear that Counsel have made a substantial contribution to these chapter 11 cases"); *id*. ¶ 14 ("[b]ut for the actions of Counsel, this result would likely not have happened"); *id*. ¶ 15 ("Counsel's actions, which went well beyond the representation of their own clients, fostered and enhanced a reorganization process"). Attorneys do not independently have standing to apply for payment of their legal fees for having made a substantial contribution. *Olsen*, 334 B.R. at 106; *Am. Preferred Prescription*, 194 B.R. at 726.

In response to the Plan Administrator's argument, two of the Clients submitted declarations in support of the Motion and the legal work performed by the Applicants in these cases. *See* Martinez Declaration ¶¶ 15, 17-18; Hall Declaration ¶¶ 21-23. The district court in *Olsen* suggested that a court could consider a substantial contribution application that is submitted by counsel "on behalf of" their clients "so that the court may proceed directly to its merits without multiplying proceedings by standing on formalities." 334 B.R. at 106 (quoting *In re Oxford Homes, Inc.*, 204 B.R. 264, 268 (Bankr. D. Me. 1997)); *accord Synergy Pharms.*, 621 B.R. at 603-05. Based on the declarations of Messrs. Martinez and Hall, the Court is satisfied that the Applicants' Motion is made on behalf of the Clients.

b.   <u>Obligation to Pay the Fees and Expenses</u>

Sections 503(b)(3)(D) and 503(b)(4) authorize payment of legal fees of a creditor who made a substantial contribution to the case.  However, if the creditor has incurred no obligation to pay such legal fees, the attorneys may not seek their payment from the estate under section 503(b).

In *Olsen*, the district court analyzed this issue.  There, the debtor filed for chapter 11 bankruptcy.  A law firm, Robinson Brog, who represented the debtor's husband, Reynold Olsen, filed an application under 11 U.S.C. § 503 in Reynold's name, requesting $75,000 in compensation for the service it provided to Reynold from the proceeds of the sale of the debtor's and her husband's co-op.  *Olsen*, 334 B.R. at 105.  Reynold objected to the request.  The bankruptcy court granted the application.  *Id.*

On appeal, the district court held that under section 503, only a creditor or an attorney acting on behalf of a creditor may seek fees for substantial contribution, and not the attorney acting on his own behalf.  *Id.* at 106.  Since Reynold objected to Robinson Brog's application, the firm was not authorized to file it under section 503.  *Id.* at 106-07.

The Court rejected Robinson Brog's argument that an attorney may seek fees under section 503 without a corresponding payment obligation by that attorney's client.  In doing so, the district court disagreed with the ruling of a California bankruptcy court in *In re W. Asbestos Co.*, 318 B.R. 527 (Bankr. N.D. Cal. 2004), which supports the proposition that an attorney who is not entitled to payment by the client may nonetheless file a substantial contribution application:

> The only case supporting Robinson Brog's reading of section 503 is *In re Western Asbestos Co.*, which holds that an attorney may seek fees under section 503 even though no payment obligation has been incurred by the attorney's creditor client.  318 B.R. 527, 530-31 (Bankr. N.D. Cal. 2004).   An implication of *Western Asbestos*'s holding is that, at least under certain circumstances, an attorney is entitled to payment under section 503 *in his own right*.  The Court rejects this analysis. First, for the reasons discussed above (and ignored by the *Western Asbestos* court), only a creditor, or an attorney acting on behalf of a creditor, may

apply for and receive attorneys' fees under section 503.  Where the creditor has incurred no obligation to pay his attorney, that attorney cannot be said to be seeking fees from the estate "on the creditor's behalf."  Second, section 503(b)(3) expressly states that it covers "the actual, necessary expenses, other than *compensation and reimbursement specified in paragraph (4) of this subsection, incurred by*," § 503(b)(3) (emphasis added), "*a creditor* . . . in making a substantial contribution in a case under chapter 9 or 11 of this title," § 503(b)(3)(D) (emphasis added).  In this Court's view, the statute contemplates that the fees covered by subsection (b)(4), like those covered by subsection (b)(3), will have been "incurred by" a creditor.

*Olsen*, 334 B.R. at 107; *accord Synergy Pharms.*, 621 B.R. at 608 (adopting the *Olsen* ruling and rejecting the *W. Asbestos* ruling).  The Court agrees with the court's reasoning in *Olsen*, and finds that attorneys' fees are only payable under 11 U.S.C. § 503(b)(4) to the extent the creditor (or other enumerated party in section 503(b)(3)(D)) has incurred the obligation to pay the fees.

The Applicants suggest that *Olsen* is distinguishable because Reynold objected to Robinson Brog's application for fees, and here, the Clients do not object to the Applicants' application.  However, this distinction is not a meaningful one, since it does nothing to defeat the proposition that where a creditor has not incurred an obligation to pay his attorney, that attorney cannot be said to be seeking fees from the estate "on the creditor's behalf."  *See id.* at 107.  If, in *Olsen*, Robinson Brog had waived Reynold's debt, Reynold could not have "incurred" the attorneys' fees as required by the statute.  The absence of an objection from the client does nothing to change that conclusion.

The engagement agreements provide that, "at all times, Client remains responsible for the payment of the fees and expenses."  *See* Martinez Engagement Agreement § 4.07.  However, the agreements require the Applicants to "attempt to obtain payment of their fees and expenses from Defendants," *id.*, and states that outstanding attorneys' fees and expenses "shall be deducted from any settlement or award to Client[.]"  *Id.* § 4.06.

Here, several of the Proofs of Claim have already been partially allowed, and another sizeable claim has been estimated for purposes of setting distribution reserves.  A distribution on account of an allowed Proof of Claim would be an "award" to the respective Client within the meaning of section 4.06 of the Engagement Agreement that "shall" be applied to outstanding legal fees and costs.  Martinez Engagement Agreement § 4.06; *see* Response ¶ 14 ("Applicants' ability to actually be paid with respect to representing their [Clients] is directly impacted by the extent of the relief Applicants are able to obtain on behalf of such clients.").

Further, consistent with section 4.07 of the agreement, the Applicants (or their co-counsel), on behalf of the Clients, have sought payment of legal fees and expenses as part of certain Proofs of Claim including some that have been partially allowed (*see* Proofs of Claim Nos. 1358, 1359, 1367, and 21190) or remain pending (*see* Proof of Claim No. 23657).  It is unknown what portion, if any, of the allowed amount of these Proofs of Claim are earmarked to satisfy the Fees and Expenses.[30]

The Applicants acknowledge in the Response that their clients, some of whom were themselves Chapter 13 debtors, would not be able to pay the six-figure fees that the Applicants incurred representing their interests.  Response ¶ 53.  However, their practical inability to pay does not, solely by virtue of that fact, relieve them of their obligation to do so.  The fee agreements plainly contemplated that the Applicants' payment would likely come from proceeds of the Clients' ostensible mortgage creditors, including the Debtor.  *Id.* ¶ 13.  The fact that the Applicants' recovery is speculative does not mean that the Clients' obligations are fictitious.  The Clients do not lack standing to bring the Motion.

---

[30]    The orders allowing or estimating the Proofs of Claim did not specify whether any distribution on account of the claims should be used to pay attorneys' fees and costs.  That question is not before the Court, and the Court expresses no view on the issue.

2.  *The Applicants' Activities*

As outlined above, allowance of a substantial contribution claim is generally limited to an extraordinary action, where a creditor assumes a leadership role that would ordinarily be expected of an estate-compensated professional in negotiating a plan or opposing a plan which leads to the confirmation of a more favorable plan. *Bayou Grp.*, 431 B.R. at 562. The denial of confirmation of the Second Amended Plan followed by the prompt negotiation and confirmation of the Third Amended Plan was extraordinary. However, the constituency that led those efforts on behalf of consumer creditors was the Consumer Creditors' Committee. The Applicants acted for the Clients, and any benefit that flowed to the estate for doing so was incidental.

The Applicants purport to identify many bases for their substantial contribution claim. Generally, they all center around the following events: in March 2019, the Applicants recognized that consumer borrowers could be harmed by the Debtor's proposed sale of its mortgage servicing rights free and clear of consumer claims and defenses. Response ¶¶ 18, 21, 93. The Applicants objected to the Second Amended Plan for this reason, and proposed, among other things, a consumer account correction process to resolve such concerns. *Id.* ¶¶ 40, 43. The Third Amended Plan ultimately included such procedures, which benefitted creditors, the estate, and the buyer of the servicing rights. *Id.* ¶¶ 50-51, 58-67.

More specifically, Applicants say that in March 2019, they attempted to contact the Debtors' counsel to ask that they modify their proposed plan to confirm that consumer borrowers' accounts would retain the protections of section 363(o) of the Bankruptcy Code. *Id.* ¶ 21. The Debtors' counsel did not respond to the Applicants' request in writing. *Id.* ¶ 22.

The Applicants essentially argue that they gained leverage to defeat the Second Amended Plan and bargain for better protections for consumer borrowers in the Third Amended Plan by

helping to expose errors in Ditech's mortgage servicing practices. They claim to have uncovered evidence showing that Ditech's servicing portfolio was "rife with servicing errors" and that Ditech was attempting to use the sale process—which contemplated a free and clear sale of the servicing rights—to ratify and collect on these improper fees. *Id.* ¶¶ 34, 42. The Applicants, together with the Consumer Creditors' Committee, "elicited testimony from Ditech's witness that approximately 23% of the corporate advances assessed to accounts Ditech obtained from Bank of America could not be substantiated and were therefore uncollectable." *Id.* ¶ 34. The Applicants say that this evidence came about because they instructed the Consumer Creditors' Committee to object to the confidentiality of the Bank of America settlement terms. *Id.* ¶ 72.

The Applicants say that they, together with the Consumer Creditors' Committee, then objected to the confirmation of the Second Amended Plan for failing to include the correction procedures. *Id* ¶ 43. The Applicants maintain that after the Court denied the Second Amended Plan, the account correction procedures "ultimately became the vehicle" through which Ditech could confirm its Third Amended Plan. *Id.* ¶ 49.

The Applicants maintain that these account correction procedures became part of the Third Amended Plan due to their efforts. They say that they were the first to propose and negotiate consumer account correction procedures, which would provide a way to resolve disputes relating to Ditech's alleged mismanagement of mortgage loan accounts before those servicing rights were transferred to a new servicer. *Id.* ¶ 60. Such procedures, they say, avoided the new servicer taking the servicing rights and loan accounts free and clear of any claims by consumers, which would have allowed the new servicer to collect allegedly unlawful amounts from them without consequences. *Id.*

Moreover, they claim responsibility for establishing the Consumer Creditors' Committee, and together, negotiating a $10 million consumer creditor recovery cash pool and $1 million consumer creditor fee reserve, thus obviating the need for consumer creditors to share in the $4 million GUC recovery trust. *Id.* ¶ 64. Sharing in the trust, the Applicants say, would have had the effect of reducing the pro rata recovery of non-consumer GUCs. *Id.*

As to their contribution to the estate generally, the Applicants say that after the Court denied confirmation of the Second Amended Plan, the Debtors risked terminating their servicing agreements; this would have precluded a contemplated sale of servicing rights and would have destroyed the Term Lender's collateral. *Id.* ¶ 65. They also argue that the estates are now directly benefiting from the consumer protection mechanisms—specifically, because the Plan Administrator relied on those provisions in seeking the Court's authorization to administer approximately $96 million in recovered pre-petition unclaimed funds which resulted from excess payments by borrowers. *Id.* ¶ 66. The Applicants claim that they were the only party advocating for a cost-effective claims estimation process or resolving consumer issues through such an account correction process or a sale that preserved the borrowers' claims and defenses. *Id.* ¶ 40.

Finally, in addition to claiming credit for the appointment of the Consumer Creditors' Committee, the Applicants also maintain that they filled a gap in the Consumer Creditors' Committee's counsel's knowledge on consumer mortgage litigation. The Applicants say that while Quinn Emanuel, counsel for the Consumer Creditors' Committee, had experience in Chapter 11 cases and on some mortgage-related issues, it lacked extensive expertise in consumer mortgage litigation related to origination and servicing issues. *Id.* ¶ 30. The Applicants and their fellow legal aid attorneys on the Consumer Creditors' Committee brought experience and knowledge on the consumer mortgage servicing issues that were key to the consumer claims in the bankruptcy.

*Id.* ¶ 31. The Applicants say that they devoted substantial time and resources to lend this expertise to benefit the Consumer Creditors' Committee's constituents, and not just their own clients. *Id.* Moreover, the Applicants say that after the Consumer Creditors' Committee was appointed, they continued to participate meaningfully, "working independently, yet generally in coordination with [Consumer Creditors' Committee] counsel, but focusing solely on consumer issues from the perspective of a consumer litigator, as contrasted with the [Consumer Creditors' Committee]'s counsel's more technical Chapter 11 focus." *Id.* ¶¶ 32, 70.[31]

Even assuming that the Applicants' factual contentions are all true, the Consumer Creditors' Committee, through their counsel, Quinn Emanuel, led the efforts to oppose the Debtors' Second Amended Plan. Quinn Emanuel successfully argued, among other things, that the Second Amended Plan violated the "best interest" of creditors test because the Debtors had failed to account for the retention by consumer creditors of claims pursuant to 11 U.S.C. § 363(o) in a hypothetical chapter 7 liquidation. *Confirmation Decision*, 606 B.R. at 621 ("Accordingly, the Second Amended Plan does not satisfy the confirmation requirements in section 1129(a)(7) of the Bankruptcy Code"). The Applicants acknowledge this fact. Response ¶ 70 ("[Quinn Emanuel's] work in opposing confirmation of Ditech's second proposed plan, based on extremely technical and nuanced arguments related to the Chapter 11 process, was nothing short of masterful. That was the job [Quinn Emanuel] was retained to perform, and they were excellent at it.").

---

[31] The remaining work performed by the Applicants were activities designed to further the interests of their Clients or similarly situated creditors, including:

- filing and prosecuting class action adversary proceedings and proofs of claim;
- seeking extensions of the bar date and improved language in the corresponding notices, First Bartholow Declaration ¶ 28; and
- presenting information about Ditech's bankruptcy during continuing legal education webinars, *id.* ¶ 29.

The Applicants cannot plausibly claim that they were responsible for the formation of the Consumer Creditors' Committee.  *Id.* ¶¶ 27, 64; *see also* First Bartholow Declaration ¶ 23 ("I believe the letter I prepared and sent to the United States Trustee's counsel for this case, in which I advocated for the appointment of a separate consumer creditors' committee, was both helpful and persuasive to the United States Trustee's attorneys in their eventual determination to establish the consumer creditors' committee for this case.").  The UST's contemporaneous account of relevant events is set forth in his May 13, 2019 objection to the Debtors' Motion to Disband ("UST Disband Objection").[32]  According to the UST, his office received "at least eight letters" requesting the formation of an official committee to represent the interests of consumer creditors.  UST Disband Objection ¶ 18.  The UST initially responded by adding two consumer creditors to the Unsecured Creditors Committee.  *Id.* ¶ 19.  Around the time the two new members were added, the members of the Unsecured Creditors Committee were about to vote on a proposed settlement with the other major constituencies that omitted a requirement to sell the Debtors' assets subject to section 363(o) of the Bankruptcy Code.  *Id.*, Ex. A (April 29, 2023 email from counsel to Unsecured Creditors Committee to the UST).  Given the potential divergence of interests between the original and new members, the new members of the Unsecured Creditors Committee requested that the committee vote on whether it would support the formation of a separate committee for consumer creditors.  *Id.*  With the new members abstaining, the original members of the Unsecured Creditors Committee voted unanimously to "not oppose the formation of a separate consumers' committee."  *Id.*  A few days later, the UST appointed the Consumer Creditors' Committee.  *Id.* ¶ 22.  Even assuming that the Applicants' efforts caused the UST to appoint the Consumer Creditors'

---

[32]    *Objection of the United States Trustee to the Motion of the Debtors for Entry of an Order Disbanding the Official Committee of Consumer Creditors*, ECF No. 556.

Committee, "that alone is not sufficient to establish 'substantial contribution' to the estates." *Synergy Pharms.*, 621 B.R. at 617.  It is true that the Applicants penned one of the eight letters sent to the UST, but they have not contended that the UST gave greater weight to their letter than the other seven.  The Applicants claim that they were responsible for the formation of the Consumer Creditors' Committee is implausible.

Nor did the Applicants make a substantial contribution to the case by educating the Consumer Creditors' Committee on consumer mortgage law; the committee retained Ms. Twomey for this very purpose,[33] and her retention was approved by the Court pursuant to sections 1103(a), 328(a), and 330 of the Bankruptcy Code.[34]  The Applicants were not retained by the Consumer Creditors' Committee, and to the extent the Applicants also supplied the committee with consumer law expertise, their work was necessarily duplicative of the services being provided by Ms. Twomey.  *See Bayou*, 431 B.R. at 561 ("services that duplicated those of professionals already compensated by the estate" do not qualify for a substantial contribution claim).

Finally, the Applicants argue that they should receive credit for negotiating and advocating for the core components of the Third Amended Plan.  Without question, the Applicants supported the components that were incorporated into the Third Amended Plan.[35]  However, the Applicants were not a part of the negotiations with the Debtors culminating in the inclusion of those components in the Third Amended Plan:  after the Court denied confirmation of the Second

---

[33]      *See Application to Retain and Employ Tara Twomey as Special Consumer Counsel to the Official Committee of Consumer Creditors Nunc Pro Tunc to June 13, 2019*, ECF No. 1009, ¶ 13 ("The Consumer Creditors' Committee seeks to employ and retain Ms. Twomey as Special Consumer Counsel because Ms. Twomey has a wealth of experience in the field of consumer protection laws and the mortgage servicing and origination industry.").

[34]      *See Order Authorizing the Official Committee of Consumer Creditors to Retain and Employ Tara Twomey as Special Consumer Counsel Nunc Pro Tunc to June 13, 2019*, ECF No. 1158.

[35]      The Applicants were particularly vocal advocates for the inclusion of account correction procedures. Twomey Declaration ¶ 12.

Amended Plan, the Applicants emailed Debtors' counsel proposing mediation among numerous parties including the Debtors, the UST, the Clients, the Consumer Creditors' Committee, a major lender constituency, the proposed purchaser of the Debtors' assets, Fannie Mae, Freddie Mac, and another mortgage servicing company. Second Bartholow Declaration, Ex. B (September 4, 2019 email exchange between Applicants and Debtors' counsel). Debtors' counsel responded that, given the limited amount of time, gathering all those parties for a mediation was unworkable. *Id.* Instead, Debtors' counsel suggested that the Applicants work through Quinn Emanuel. *Id.* Ultimately, the Consumer Creditors' Committee , through its counsel Quinn Emanuel, represented the interests of consumer creditors in negotiations with the Debtors that led to the Third Amended Plan. *See* CCC Statement.[36]

Even if the Applicants were responsible for establishing the Consumer Creditors' Committee, and together with it, negotiating the consumer creditor recovery cash pool and consumer creditor fee reserve, obviating the need for consumer creditors to share in the GUC recovery trust, the increase in the pro rata recovery of non-consumer GUCs would be only an indirect effect of the Applicants' having acted on behalf of their own clients. "[S]ervices calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate." *Dana Corp.*, 390 B.R. at 108 (citing *U.S. Lines*, 103 B.R. at 430). The Applicants have not argued, nor could they plausibly argue, that their efforts were not calculated specifically to secure those benefits for their clients.

---

[36]    The Applicants state that they emailed Quinn Emanuel on September 5, 2019, advocating for the key terms that were included in the Third Amended Plan. Response ¶ 48; Second Bartholow Declaration ¶ 7. However, there is nothing in the record (including in materials submitted with the Motion) suggesting that this email materially contributed to Quinn Emanuel's negotiation strategy. Moreover, the Applicants neither filed a brief supporting the Third Amended Plan nor appeared at the confirmation hearing, and there was no mention of the Applicants during the confirmation proceedings.

As outlined above, creditors face an "especially difficult burden" in seeking a substantial contribution claim because they are presumed to act in their own interest rather than the estate as a whole. *Dana Corp.*, 390 B.R. at 108. These actions do not satisfy the very high burden for substantial contribution under section 503(b) because they were neither extraordinary nor directly benefited all major constituencies in these Chapter 11 Cases. *Id.*; *see also Bayou Grp.*, 431 B.R. at 560.

In sum, the Applicants have failed to plausibly assert an entitlement to a substantial contribution claim pursuant to 11 U.S.C. § 503(b)(3)(D) and (b)(4) for payment of the Fees and Expenses.

## **CONCLUSION**

For the reasons set forth herein, the Motion is denied.

IT IS SO ORDERED.

Dated: March 27, 2024
New York, New York

/s/ *James L. Garrity, Jr.*
Honorable James L. Garrity, Jr.
United States Bankruptcy Judge