UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
In re:                                                :
                                                      :   Case No. 19-10412 (JLG)
                                                      :   Chapter 11
Ditech Holding Corporation, *et al.*,                 :
                                                      :
                                                      :   (Jointly Administered)
                                    Debtors.[1]       :
------------------------------------------------------- x

### MEMORANDUM DECISION AND ORDER SUSTAINING THE CONSUMER CLAIMS TRUSTEE'S TWENTY-EIGHTH OMNIBUS OBJECTION WITH RESPECT TO THE CLAIM OF STACY C. HARBAN

<u>**APPEARANCES**</u>:

JENNER & BLOCK, LLP
*Attorneys for the Consumer Claims Trustee*
1155 Avenue of the Americas
New York, New York 10036
By:     Richard Levin

STACY C. HARBAN
*Appearing Pro Se*
1117 38th St. SE
Cedar Rapids, Iowa 52403

---

[1] On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, ECF No. 1404 (the "Third Amended Plan"), which created the Wind Down Estates. On February 22, 2022, the Court entered the *Order Granting Entry of Final Decree (I) Closing Subsidiary Cases; and (II) Granting Related Relief*, ECF No. 3903 (the "Closing Order"). References to "ECF No. __" are documents filed on the electronic docket in these jointly administered cases under Case No. 19-10412. Pursuant to the Closing Order, the chapter 11 cases of the following Wind Down Estates were closed effective as of February 22, 2022: DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). Under the Closing Order, the chapter 11 case of Ditech Holding Corporation (the "Remaining Wind Down Estate") remains open and, as of February 22, 2022, all motions, notices, and other pleadings relating to any of the Wind Down Estates are to be filed in the case of the Remaining Wind Down Estate. The last four digits of the Remaining Wind Down Estate's federal tax identification number are (0486). The Remaining Wind Down Estate's principal offices are located at 2600 South Shore Boulevard, Suite 300, League City, Texas 77573.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[2]

On June 3, 2019, Mr. Stacy C. Harban ("Mr. Harban" or "Claimant"), acting pro se, filed proof of claim number 23572 (the "Claim") asserting an unsecured claim in the amount of $100,000.00 against Ditech Financial LLC ("Ditech").  Claim at 1–2.  On July 16, 2020, the Consumer Claims Trustee (also referred to herein as the "Trustee") filed her Twenty-Eighth Omnibus Objection to certain proofs of claim (the "Objection").[3]  In it, she objects to the Claim on the basis that it contains insufficient documentation to support its underlying merits.  Objection ¶ 8.  On or about October 17, 2022, Mr. Harban sent the Trustee his response to the Objection.  On January 8, 2024, the Trustee docketed that response (the "Response").[4]  On March 22, 2024, the Trustee filed a reply in support of the Objection (the "Reply").[5]

Pursuant to the Claims Procedures Order,[6] the filing of the Response caused an adjournment of the Objection so that the Court could conduct a Sufficiency Hearing on the Claim. Under that order, the legal standard of review at a Sufficiency Hearing is equivalent to the standard applied to a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").  Claims Procedures Order

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection, Claims Procedures Order, and Third Amended Plan, as applicable.  References to "ECF No. __" are to documents filed on the electronic docket in these jointly administered cases under Case No. 19-10412.

[3] *Consumer Claims Trustee's Twenty-Eighth Omnibus Objection to Proofs of Claim (Insufficient Documentation Unsecured Consumer Creditor Claims)*, ECF No. 2689.

[4] *Response of Stacy C. Harban to the Twenty-Eighth Omnibus Objection to Proofs of Claim (Insufficient Documentation Unsecured Consumer Creditor Claims) (Claim No. 23572)*, ECF No. 4965.  The Response does not include internal pagination; citations to the document refer to its PDF pagination.

[5] *Reply of Consumer Claims Trustee in Support of the Twenty-Eighth Omnibus Objection with Respect to the Claim of Stacy Harban (23572)*, ECF No. 5020.

[6] *Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures*, ECF No. 1632 ("Claims Procedures Order").

¶ 3(iv)(a).  In accordance with the Claims Procedures Order, the Court conducted a Sufficiency Hearing on the Claim.  The Consumer Claims Trustee appeared through counsel and Claimant appeared pro se.  The Court heard arguments on the Objection.

The Court has reviewed the Claim, Objection, Response, and Reply, including all documents submitted in support thereof, and has considered the arguments made by the parties in support of their respective positions.  As explained below, accepting the well-pleaded factual allegations asserted by Claimant in support of the Claim as true, drawing all reasonable inferences in Claimant's favor, and liberally construing the Claim and Response to raise the strongest arguments that they suggest, the Claim fails to state a plausible claim to relief against Ditech. Accordingly, the Court sustains the Objection and disallows and expunges the Claim.

## <u>Jurisdiction</u>

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## <u>Background</u>[7]

### <u>The Mortgage Loan</u>

On May 27, 2004, Mr. Harban executed a thirty-year note in the amount of $87,000 (the "Note") in favor of Centennial Mortgage & Funding Inc. ("Centennial").  Interest on the Note was

---

[7] "On a motion to dismiss pursuant to Rule 12(b)(6), the Court limits consideration to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and effect the complaint relies heavily, *i.e.,* documents that are 'integral' to the complaint." *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (citation omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  In support of the Reply, the Consumer Claims Trustee annexes the Note, Mortgage, First Loan Modification Agreement, Forbearance Agreement, Second Loan Modification Agreement, and assignments of the Mortgage. Likewise, in support of the Response, Mr. Harban attaches correspondence between himself and Ditech, and two

fixed at 6.25%, and the Note called for monthly payments of $535.67.  Reply ¶ 2.  The Note was

secured by a Mortgage (the "Mortgage," and together with the Note, the "Mortgage Loan") on the

property located at 1117 38th St. SE, Cedar Rapids, IA 52403 (the "Property").  *Id.* ¶ 2.[8]  On

February 2, 2009, Centennial assigned the Mortgage to Everhome Mortgage Company

("Everhome").  On February 8, 2009, Everhome recorded the Mortgage.  *Id.* ¶ 3.

## The First Foreclosure Action

Claimant defaulted under the Mortgage.  On January 29, 2009, Everhome commenced a

foreclosure action against Claimant in an Iowa state court.[9]  On April 7, 2009, that court entered a

judgment of foreclosure (the "Foreclosure Judgment").  *See* 2009 Foreclosure Docket, Dkt. No.

13.  By Notice of Rescission of Foreclosure Judgment dated on or about August 24, 2010,

Everhome rescinded the Foreclosure Judgment, leaving the Mortgage enforceable on its original

terms as if the Foreclosure Judgment had not been entered.[10]

---

checks that were returned to him by Ditech.  The Court takes judicial notice of those documents because they are integral to the Claim. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (holding that a trial court may take judicial notice of underlying contract as a document integral to the complaint); *Ng v. HSBC Mortg. Corp.*, No. 07-cv-5434, 2010 WL 889256, at *9 n.13 (E.D.N.Y. Mar. 10, 2010) (taking judicial notice of settlement statements in a mortgage dispute).

The Consumer Claims Trustee relies on the dockets of, pleadings filed in, and decisions rendered in, without limitation, the three foreclosure actions to which the Property was subject.  "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case sub judice." *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011); *see Sutton ex rel. Rose v. Wachovia Sec., LLC*, 208 F. App'x 27, 30 (2d Cir. 2006) (summary order) (holding that filings and orders in other courts were "undisputably matters of public record").  The documents cited by the Consumer Claims Trustee directly bear on the legal sufficiency of the Claim and the merits of the Objection.  Thus, the Court takes judicial notice of those documents and, as necessary, will cite to those documents herein.

[8] The Note and Mortgage are annexed to the Reply as Exhibit A.

[9] *See Everhome Mortgage Company v. Stacy C. Harban*, No. EQCV064269 (Iowa Dist. Ct. filed Jan. 29, 2009) (the "Everhome Foreclosure").  The docket (the "2009 Foreclosure Docket") is annexed to the Reply as Exhibit F.

[10]  The Notice of Rescission of Foreclosure Judgment is annexed to the Reply as Exhibit G.

**The First Loan Modification Agreement**

Effective May 23, 2014, Everhome assigned the Mortgage to Green Tree Servicing, LLC ("Green Tree").[11]  On June 27, 2014, Green Tree recorded the Mortgage.  On December 31, 2015, Mr. Harban entered into a loan modification agreement with Ditech, as successor to Green Tree (the "First Loan Modification Agreement").[12]  That agreement fixed the unpaid principal balance of the Note to $89,016.20, effective December 1, 2014.  It extended the term of the Note to forty years at a fixed interest rate of 4.25%, with monthly principal and interest of $385.99 due beginning on January 1, 2016.

**The Second Foreclosure Action**

Beginning February 1, 2016, Claimant failed to make payments under the Note and breached the First Loan Modification Agreement.  On July 20, 2016, Ditech filed a foreclosure complaint against Claimant (the "2016 Ditech Foreclosure Complaint") in an Iowa state court.[13] Ditech alleged that Claimant was in default under the Note as of February 1, 2016, and sought to recover the outstanding principal balance of $88,945.48 plus late fees, interest, attorney's fees and costs.  On August 9, 2016, the Iowa state court dismissed the 2016 Ditech Foreclosure Complaint.[14]

**The Forbearance Agreement**

By letter dated September 28, 2016, Ditech confirmed the terms of a forbearance agreement (the "Forbearance Agreement") that Claimant requested for the Mortgage Loan (the "September 2016 Letter").[15]  The letter specified that the principal amount due under the Note totaled

---

[11] The Green Tree Assignment is annexed to the Reply as Exhibit C.

[12] The First Loan Modification Agreement is annexed to the Reply as Exhibit D.

[13] The 2016 Ditech Foreclosure Docket is annexed to the Reply at Exhibit H.  The 2016 Ditech Foreclosure Complaint is annexed to the Reply as Exhibit I.

[14] *See* 2016 Ditech Foreclosure Docket at Entry 3.

[15] The September 2016 Letter is annexed as Exhibit A1 to the Response.

$88,945.48 and that it was accruing interest at an annual rate of 4.25%. It also provided that for a six-month period beginning October 1, 2016, and ending March 1, 2017, Mr. Harban would pay his regular mortgage payments at a reduced rate of $231.93 per month, and that at the end of that period, the Mortgage Loan would revert to its original terms and conditions. Mr. Harban could consent to the terms of the Forbearance Agreement by paying the first reduced monthly payment.

Mr. Harban made three payments under the Forbearance Agreement. On October 14, 2016, in response to the September 2016 Letter, Mr. Harban contacted Ditech and placed an electronic payment over the telephone with a Ditech representative (the "First Payment"). By letter dated October 14, 2016, Ditech confirmed its receipt of the First Payment (the "October 14 Letter").[16] Mr. Harban then sent two checks each in the approximate sum of $232 and payable to Ditech, dated November 9, 2016 (the "Second Payment"), and December 7, 2016 (the "Third Payment"), respectively.[17] In letters dated December 5, 9, and 27, 2016, Ditech informed Claimant that it was rejecting his payments.[18]

---

[16] The October 14 Letter is annexed as Exhibit A2 to the Response.

[17] The checks are annexed to the Response at page 17.

[18] Each letter is annexed to the Reply as part of Exhibit A3. In the first letter (the "December 5 Letter"), Ditech acknowledged "receipt of the enclosed payment" and advised that "we are unable to process your payment at this time for one or more of the following reasons . . . ." December 5 Letter at 1. Those reasons were: (i) "The funds received were not enough to pay off the account"; (ii) "Funds must be certified"; and (iii) "The payments are not sufficient to bring the account current." *Id.*

The text of the December 9 and 27 letters (respectively, the "December 9 Letter" and the "December 27 Letter") are substantially similar. In those letters, Ditech acknowledged receipt of Claimant's payment in the sum of, but informed Claimant that it was returning the payment. Ditech also advised Claimant (i) that his "account is currently in default and the amount of your payment is not sufficient to reinstate the account," and (ii) that "Ditech has pursued its rights and remedies under the security agreement and has started foreclosure proceedings . . . ." December 9 Letter at 1; *accord* December 27 Letter at 1.

**The Second Loan Modification Agreement**

On November 20, 2017, Mr. Harban executed a second loan modification agreement, effective November 1, 2017 (the "Second Loan Modification Agreement").[19]  Under the Second Loan Modification Agreement, the Note's principal was increased to $100,119.85, with $13,719.85 being deferred, thus leaving $86,400 of principal-bearing interest.  The loan term was again extended to forty years at a fixed interest rate of 4.125%, with monthly principal and interest of $367.84 due beginning on November 1, 2017.

**The Third Foreclosure Action**

Beginning on October 1, 2018, Claimant failed to make payments under the Note and breached the Second Loan Modification Agreement.  On April 3, 2019, Ditech filed a foreclosure petition against Claimant in an Iowa state court.  *See* 2019 Ditech Foreclosure Petition.[20]  The petition alleged that Claimant was in default as of October 1, 2018, and sought recovery of the outstanding principal balance of $99,400.40 plus late fees, interest, attorney's fees, and costs.  *See* 2019 Ditech Foreclosure Petition ¶¶ 13, 24.  On July 26, 2019, the Iowa state court dismissed the 2019 Ditech Foreclosure Complaint.  *See* 2019 Foreclosure Docket, Dkt. No. 12.

**The Chapter 11 Cases**

On February 11, 2019, Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates, including Ditech (the "Debtors"), filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Chapter 11 Cases").  The Debtors remained in possession of their business and assets as debtors and debtors in possession pursuant to sections

---

[19] The Second Loan Modification Agreement is annexed as Exhibit E to the Reply.

[20] The "2019 Ditech Foreclosure Petition" is annexed to the Reply as Exhibit L.  The "2019 Ditech Foreclosure Docket" is annexed to the Reply as Exhibit J.

1107(a) and 1108 of the Bankruptcy Code.  On February 22, 2019, the Court entered an order

fixing April 1, 2019, at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or

entity, not including governmental units (as defined in section 101(27) of the Bankruptcy Code)

to file a proof of claim in the Chapter 11 Cases (the "General Bar Date").[21]  Thereafter, the Court

extended the General Bar Date for consumer borrowers twice, ultimately setting the date as June 3,

2019, at 5:00 p.m. (prevailing Eastern Time).[22]

On September 26, 2019, the Debtors confirmed their Third Amended Plan,[23] and on

September 30, 2019, that plan became effective.[24]  The Consumer Claims Trustee is a fiduciary

appointed under the Third Amended Plan who is responsible for the reconciliation and resolution

of Consumer Creditor Claims and distribution of the Consumer Creditor Net Proceeds from the

Consumer Creditor Recovery Cash Pool to holders of Allowed Consumer Creditor Claims in

accordance with the Third Amended Plan.  *See id.* art. I, § 1.41.  The Consumer Claims Trustee

has the exclusive authority to object to all Consumer Creditor Claims.  *See id.* art. VII, § 7.1.

**The Claims Procedures Order**

On November 19, 2019, the Court entered the Claims Procedures Order.  Under that order,

the Consumer Claims Trustee is authorized to file Omnibus Objections seeking reduction,

reclassification, or disallowance of claims on the grounds set forth in Bankruptcy Rule 3007(d)

---

[21] *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, ECF No. 90.

[22] *Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc*, ECF No. 496.

[23] *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, ECF No. 1404.

[24] *Notice of (i) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (ii) Occurrence of Effective Date, and (iii) Final Deadline for Filing Administrative Expense Claims*, ECF No. 1449.

and additional grounds set forth in the Claims Procedures Order. *See* Claims Procedures Order ¶ 2(i)(a)–(h). A properly filed and served response to an objection gives rise to a "Contested Claim" that will be resolved at a Claim Hearing. *Id.* ¶ 3(iv). The Consumer Claims Trustee, as appropriate, has the option of scheduling the Claim Hearing as either a "Merits Hearing" or a "Sufficiency Hearing." *Id.* ¶ 3(iv)(a), (b). A "Merits Hearing" is an evidentiary hearing on the merits of a Contested Claim. A "Sufficiency Hearing" is a non-evidentiary hearing to address whether the Contested Claim states a claim to relief against the Debtors. The legal standard of review that will be applied by the Court at a Sufficiency Hearing is equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Id.* ¶ 3(iv)(a).

### The Claim

On June 3, 2019, Mr. Harban filed the Claim, asserting an unsecured claim in the amount of $100,000.00 against Ditech Financial LLC. Claim at 1–2. In the section of the claim form to explain the basis of the Claim, Mr. Harban wrote only "Customer Claims." *Id.* at 2. The Claim attached no documents.

### The Objection

On July 16, 2020, the Consumer Claims Trustee filed her Objection to the Claim. She objects to the Claim on the basis that the Claim contained insufficient documentation to support its underlying merits. Objection ¶ 8.

### The Response

The Response includes Claimant's single-page "Customer Claim" and "Hardship Letter," correspondence between Claimant and Ditech, and miscellaneous documents, including both loan modification agreements and the Forbearance Agreement. Claimant contends that there were two

instances in which Ditech offered him "a type of repayment plan or refinancing that was started, then terminated by [Ditech] due to their own inability to start them in the first place." Response at 5. He says that "[e]ach one was a long process that caused large amounts of stress, near foreclosure and complete refinancing with added interest and fees." *Id.*

Claimant says that his "hardship," as he characterizes it, began in the winter of 2015, which was at the end of the second year during which he was operating a general construction business. Response at 6. He says that his business was slow during the winter, and although he had a part-time job, he fell behind on his Mortgage payments. *Id.* He contends that in May 2015, he called Ditech to discuss the state of his account, and says that he advised a Ditech representative that he was behind on his Mortgage payments, as well as other bills, but that he wanted to pay off the past-due amount under the Mortgage to bring his account current. *Id.* He says that during that conversation, the representative offered him an alternative to using all his funds to immediately bring the account current; according to Claimant, the representative told him that Ditech could enroll him in a six-month payment plan to bring his account current, provided that he made the first three payments by telephone (the "May 2015 Payment Plan"). *Id.* Claimant asserts that during the call, he agreed to the representative's proposal and made the first three payments over the telephone. He maintains that he accepted the proposal so that he could use the cash he had accumulated in excess of those payments to pay other bills. *Id.*

Claimant contends that three days after that telephone conversation, he received a call from a Ditech representative who stated that there was an issue with the payment plan, so he would need to cancel the checks that he had paid over the telephone and process new checks. Response at 6. Claimant says that he agreed to do so, but after he cancelled the checks, the Ditech representative told him that Ditech could not set up a payment plan, and that he would have to consider other

options.  According to Claimant, "[t]his was the first mistake [Ditech] made to create a situation of [Claimant] being this far behind [on the Mortgage]."  *Id.*  In substance, he says that in reliance on the proposed payment plan, he used funds that he had allocated to bring the Mortgage current to pay other bills.  *Id.*  He contends that "[a]fter doing all I could to get this fixed other than legal options, the only option [Ditech] would offer is applying for a modification."  *Id.*

As noted, Claimant entered the First Loan Modification Agreement effective December 1, 2014, and defaulted under that agreement on February 1, 2016.  He blames his default on Ditech.  *See* Response at 6.  According to Claimant, after he completed the loan modification application and provided the necessary information to Ditech, he "ended up getting a letter and offered a forbearance*." Id.*  This "seemed weird to [him]," and he contacted Ditech and was advised by a Ditech representative that the purpose of the Forbearance Agreement was to give Ditech more time to review the request for the loan modification.  *Id.*  Claimant maintains that he elected to proceed under that program and made three payments based on the Ditech representative's recommendation.  However, he claims that after he made the Third Payment, Ditech returned several payments to him without an explanation why it had done so.  He says that he had never received anything regarding the forbearance issue other than a couple of letters saying that Ditech was investigating the issue.  *Id.*

Claimant maintains that Ditech's actions gave rise to "13 months of no [Mortgage] payment being allowed made, interest gaining, credit dropping and lost gained equity."  Response at 5.  As support for his $100,000 claim, he maintains that when he entered into the Second Loan Modification Agreement, the principal balance of the mortgage increased from $89,016.20 to $100,119.85.  He says that the increased principal, coupled with the lost equity in the Property,

more than accounts for the claimed $100,000 in damages.  *Id.* ("As a growing business at that time the lost capital and stress was huge and immeasurable, but the damage has been done.").

**The Reply**

In the Reply, the Trustee contends that Mr. Harban has offered no substantive explanation or legal theory in support of the Claim.  Reply ¶ 7.  She argues that the Claim lacks sufficient information or explanation to enable her to determine the nature and basis of the Claim, and thus it fails to satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a).  *Id.* ¶¶ 31–35.  She also asserts that the Court should dismiss the Claim under Federal Rule of Civil Procedure 12(b)(6) because, under the most liberal reading of the Claim, Claimant fails to plead any plausible claim to relief against Ditech.  *Id.* ¶ 28.

**Applicable Legal Principles**

Under section 502(a) of the Bankruptcy Code, "a claim . . . proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  The filing of a proof of claim constitutes "prima facie evidence of the validity and amount of a claim."  Fed. R. Bankr. P. 3001(f).  Section 502(b) of the Bankruptcy Code prescribes nine categories of claims that will be disallowed, including that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ."  11 U.S.C. § 502(b)(1).  If an objection filed pursuant to section 502(b)(1) refutes at least one of the claim's essential allegations, the burden to demonstrate the validity of the claim shifts to the claimant.  *See, e.g.*, *Rozier v. Rescap Borrower Claims Tr. (In re Residential Cap., LLC)*, No. 15-cv-3248, 2016 WL 796860, at *9 (S.D.N.Y. Feb. 22, 2016); *Hasson v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 11-cv-8444, 2012 WL 1886755, at *3 (S.D.N.Y. May 12, 2012).

When evaluating the Claim, the Court applies the legal standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See* Claims Procedures Order ¶ 3(iv)(a). The Rule 12(b)(6) standard requires courts to accept all factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *Green v. Dep't of Educ.*, 16 F.4th 1070, 1076 (2d Cir. 2021). In ruling on a Rule 12(b)(6) motion, "[t]he court's function is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'" *Havens v. James*, 76 F.4th 103, 116-17 (2d. Cir. 2023) (quoting *Festa v. Loc. 3 IBEW*, 905 F.2d 35, 37 (2d Cir. 1990)). Rule 12(b)(6) "ensures that, consistent with Rule 8(a), a complaint includes 'sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Alharbi v. Miller*, 368 F. Supp. 3d 527, 560 (E.D.N.Y. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Accordingly, in applying the legal standards applicable to Rule 12(b)(6) to the Claim, the Court assesses the sufficiency of the facts alleged in support of the Claim in light of the pleading standards under Rule 8(a).

Where, as here, Claimant is acting pro se, the Court must construe the claim "liberally with 'special solicitude' and interpret[] [it] to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). Although the Court must construe a pro se claim liberally, it must nonetheless be supported by specific and detailed factual allegations that provide a fair understanding for the basis of the claim and the legal grounds for recovery against a debtor. *Kimber v. GMAC Mortg., LLC (In re Residential Cap., LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (citing *Iwachiw v. N.Y.C. Bd. of Elections*, 126 F. App'x 27, 29 (2d Cir. 2005) (summary order)); *see also McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156–57 (2d Cir. 2017) (discussing the policy considerations undergirding liberal construction of pro se litigants' filings). However, a Court may not "invent

factual allegations" that were not pleaded by the pro se litigant. *Mirarchi v. Nofer (In re Nofer)*, 514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).

<u>**Discussion**</u>

The Claim, as supplemented by the Response, sounds in Ditech's alleged breach of the Forbearance Agreement based on its improper failure to accept payments made thereunder. It contains detailed factual allegations in support of the Claim. Together, those documents plainly provide the Consumer Claims Trustee with "fair notice" of the basis of the Claim. *See Owens v. Suter*, No. 02-cv-8198, 2003 WL 942554, at *1 (S.D.N.Y. Mar. 7, 2003); *In re MarketXT Holdings Corp.*, 361 B.R. 369, 384 (Bankr. S.D.N.Y. 2007). Moreover, in her Reply, the Consumer Claims Trustee acknowledges that the Response generally alleges (i) mishandling of a forbearance plan, (ii) administrative errors by Ditech that forced Claimant into a loan modification, and (iii) Ditech's failure to adequately respond to Claimant's requests for information. Reply ¶ 1. Moreover, she asserts that although Claimant does not state any legal claims for relief or refer to any specific statutory violations, the obligations of a mortgage servicer, like Ditech, are governed by the Real Estate Settlement Procedures Act ("RESPA"), and credit reporting is governed by the Fair Credit Reporting Act (the "FCRA"). In interpreting the Claim liberally, the Trustee construes the Claim as a breach of contract claim, and she evaluates the Claim in light of relevant provisions of RESPA and the FCRA. At the Sufficiency Hearing, Mr. Harban did not object to that construction of his Claim. Accordingly, the Court assesses the Claim in that light and considers those matters below.

<u>**Breach of Contract**</u>

Under Iowa law, the elements of a claim for breach of contract are "(1) the existence of a contract; (2) the terms and conditions of the contract; (3) [the plaintiff's performance of] all the

terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) [that] the plaintiff has suffered damages as a result." *Spears v. Com Link, Inc.*, No. 12-1223, 2013 WL 3457171, at *5 (Iowa App. July 10, 2013) (table case) (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). "Any damages awarded must relate to the nature and purpose of the contract itself. *Med. Assocs. of Clinton, P.L.C. v. Martin*, No. 13-1358, 2014 WL 3511872, at *5 (Iowa App. July 16, 2014).

As to the first element, Mr. Harban has adequately pleaded the existence of two contracts: the May 2015 Payment Plan and the Forbearance Agreement.  Response at 5–10.[25]  As to the second element, Claimant pleads the terms of the May 2015 Payment Plan only vaguely and indefinitely, *id.* at 6, and admits that he does not "have documentation for [that] case[]," *id.* at 5. Although "documentation" is unnecessary to state a claim under Rule 12(b)(6), a court is bound to accept only a claimant's "well-pleaded factual allegations," in which case the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  Claimant has not described the May 2015 Payment Plan with sufficient specificity to satisfy the second element of a claim for breach of contract.  Accordingly, any breach of contract claim on account of the May 2015 Payment Plan must fail.[26]  However, as for the Forbearance Agreement, its terms and conditions are contained within the writing that memorializes that agreement, thus satisfying the second element.  Response at 8–10.

With respect to the Forbearance Agreement, the Consumer Claims Trustee contends that Claimant has not adequately pleaded the third element—the plaintiff's performance of all terms

---

[25] In assessing the breach of contract claim, the Trustee addresses the Forbearance Agreement, but not the May 2015 Payment Plan.  The Court will consider both.

[26] Because Claimant cannot satisfy the second element of a claim for breach of contract as it relates to the May 2015 Payment Plan, the Court does not consider whether the remaining elements of that claim are met.

and conditions required under the contract—because (i) Mr. Harban "notes only that he sent in post-dated checks, but provides no information to suggest that the payments were made in a timely manner," Reply ¶ 41; and (ii) the initial $231.93 monthly payment was insufficient because the confirmation letter "notes that the payment includes a $19.00 electronic payment fee," and the "indication that the processing fee was included in the debited amount would result in the payment being insufficient," *id.* ¶ 51.[27]  The Court disagrees with both points.

On the first point, the Trustee argues specifically that:

> The forbearance offer, extended in writing, invited Claimant to consent to its terms by making his first monthly payment, which he apparently did.  Response at 9, 11. It's [sic] terms and conditions were outlined within the letter.  However, Claimant fails to establish that he performed all the terms and conditions required under the contract.  He notes only that he sent in post-dated checks, but provides no information to suggest that the payments were made in a timely manner.

*Id.* ¶ 41.  She quotes the forbearance letter's term that "[a]ny payment not received within 15 days of the due date will constitute failure to comply and result in immediate cancellation of the Program without further notice to you and the account will revert back to its original terms and conditions inclusive of any prior modifications."  *Id.* (quoting Response at 9).  She argues that, because of Mr. Harban's "failure to allege that he performed under the terms of the contract, he cannot demonstrate that Ditech breached the agreement by returning the checks."  *Id.*

---

[27] With respect to the adequacy of the October 14, 2016 payment, the Trustee's Reply is internally inconsistent. In paragraph 41, while addressing the breach of contract argument, the Trustee concedes that Mr. Harban "apparently" consented to the terms of the Forbearance Agreement "by making his first monthly payment," i.e., the October 14, 2016 payment.  Reply ¶ 41.  In paragraph 51, while addressing the RESPA argument, the Trustee says that the first payment includes a $19.00 electronic payment fee, and that the "indication that the processing fee was included in the debited amount would result in the payment being insufficient."  *Id.* ¶ 51.  Even if the Court accepted the Trustee's factual assertion that the first monthly payment was short by $19.00, as asserted in the RESPA argument, the Trustee explicitly conceded the adequacy of the first monthly payment with respect to the breach of contract claim.  *See Altowaiti v. Wolf*, No. 18-cv-508, 2021 WL 2941753, at *4 (S.D.N.Y. July 12, 2021) (observing a party may concede or waive the issue of failure to state a claim).  The Court analyzes this argument only in the interest of completeness.

The Court understands this argument to mean that Mr. Harban did not satisfy the third element of an Iowa breach of contract claim that the plaintiff "performed all the terms and conditions required under the contract," *Molo Oil*, 578 N.W.2d at 224, though the Reply does not make that point explicit. That argument is unpersuasive. The Court does not know, and the Trustee does not explain, the meaning or significance of the so-called "post-dated checks."[28] The Court presumes that the Trustee means that Claimant breached the terms of the forbearance offer by paying late, but the Trustee fails to support that contention by citation to any of Claimant's allegations, any document attached to Claimant's submissions, or documents to which the Court may take judicial notice. Even if any of Claimant's checks were post-dated to the correct date, it is unclear how that would result in a breach of the Forbearance Agreement, since a postdated check would have been sent *before* the date on its face, or here, before November 9, 2016, and December 7, 2019, placing each well within the fifteen-day grace period.

If the Trustee means that Claimant breached the terms of the Forbearance Agreement because his checks were backdated,[29] none of Claimant's allegations, no document attached to Claimant's submissions, nor any documents of which the Court may take judicial notice suggest that these checks were sent after their face dates. In fact, the documents attached to Claimant's response demonstrate that the opposite is true. Mr. Harban's December 9, 2016 letter states that a Ditech representative "instructed him to send [the November payment] back with a copy of the

---

[28] To "postdate" means: "To put a date on (an instrument, such as a check) that is later than the actual date." *Postdate*, Black's Law Dictionary (10th ed. 2014). Mr. Harban attaches two checks that were returned to him by Ditech, dated November 9, 2016, and December 7, 2016. Nothing in the record suggests that these checks were signed at any time other than the date those checks respectively bear. While the Response refers to "letters I received back with the checks I had mailed previously as pre-payments," Response at 5, the Court does not read the reference to "pre-payments" to mean that the returned checks (each dated later than that month's due date) were postdated. To the extent Ditech uses the phrase "post-dated" to mean that the checks were dated later than the first-of-the-month due date, each date is well within the fifteen-day grace period to which Ditech refers.

[29] To "backdate" means, "To put a date earlier than the actual date on (something, as an instrument)." *Backdate*, Black's Law Dictionary (10th ed. 2014).

forbearance," and suggests that at least one check for $231.93 was enclosed in that December 9, 2016 letter. Response at 7. Ditech's response, dated December 15, 2016, reflects that Ditech received the December 9 letter on December 12, within the fifteen-day grace period. *Id.* at 18. Accordingly, the Trustee has articulated no basis for its unfounded factual assertion that Mr. Harban's November and December 2016 payments were received outside the fifteen-day grace period.

As to the Trustee's factual assertion that the first monthly payment was insufficient, Reply ¶ 51, any argument that Mr. Harban failed to make the full first monthly payment is meritless. At best, it is ambiguous on the face of Ditech's October 14, 2016 letter whether the $19.00 electronic payment fee was deducted from the $231.93 payment, or whether it was an additional payment, *see* Response at 11, and in any event, the Court must draw "all reasonable inferences" in favor of the Claimant. *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010). Moreover, Mr. Harban unambiguously alleges that he placed that payment over the phone through a Ditech representative. Response at 5. To the extent that the payment the Ditech representative placed was short by $19.00, Ditech has not explained why its error in placing that payment means that Mr. Harban failed to perform. Accordingly, Mr. Harban has adequately alleged the third element of a breach of contract claim.

The Trustee does not address the fourth element. The Court interprets Mr. Harban's Response to suggest that Ditech breached the Forbearance Agreement by rejecting his November and December 2016 payments. *Id.* at 5, 16–17. Those rejections, assumed to be true, satisfy the fourth element.

As for the fifth element, the Trustee argues that Mr. Harban did not adequately allege damages. Reply ¶ 42. The Trustee contends that it "defies logic to suggest that [Mr. Harban]

sustained $100,000 in damages due to Ditech's rejection of three checks totaling $695.79, or that either party would have contemplated as much when they made the alleged forbearance contract." *Id.* ¶ 43. The Trustee references Mr. Harban's failure to make mortgage payments between May 2016 and June 2017, and his agreement to the terms of the Second Loan Modification Agreement, in which he agreed to pay the unpaid principal balance of $100,119.85. *Id.* ¶¶ 43–44.

The Court agrees. Damages as a result of breach are an essential element of a breach of contract claim under Iowa state law. *Med. Assocs. of Clinton, P.L.C.*, 2014 WL 3511872, at *5. Here, Mr. Harban has not plausibly alleged that, as a result of Ditech's failure to honor the Forbearance Agreement, he incurred a loss of up to $100,000.

Mr. Harban refers to three items of damages: (i) lost equity, or the difference between the principal balance between the First Loan Modification, $89,016.20, and the Second Loan Modification Agreement, $100,119.85; (ii) higher interest, and (iii) a decreased credit score. On the first item, lost equity, the principal balance increased, and Claimant's equity in the Property correspondingly decreased, as a result of entering into the Second Loan Modification Agreement, not because Ditech breached the Forbearance Agreement.[30]

As to the second item, higher interest, the interest on the Mortgage Loan would have eventually been due whether or not Claimant had secured a temporary forbearance. Since Claimant has not alleged that the interest that he attempted to pay in November and December 2016 and that Ditech wrongly rejected accrued to the principal and thereby made him liable to pay

---

[30] Claimant also does not account for the deferment of $13,719.85 in principal. When applied to the $100,119.85, the non-deferred principal balance was reduced to $86,400. Likewise, the monthly payments were reduced from $385.99 to $367.84, and the new interest rate was reduced from 4.25% to 4.125%.

more than he otherwise would have, he has not alleged that he was damaged by Ditech's breach of the Forbearance Agreement.

As to the third item, a decreased credit score, although neither the Iowa Supreme Court nor lower Iowa courts appear to have passed on the issue of whether a change in credit score alone can constitute damages to support a breach of contract claim, the Court expects that it would follow other courts in holding that it cannot. *See, e.g.*, *Peterson v. Experian Info. Sols.*, 44 F.4th 1124, 1127 (8th Cir. 2022) (in context of FCRA claim, holding that "alleg[ations of] injury solely from diminution in . . . credit score [is a] type of abstract harm does not support actual damages"); *Divenuta v. Bilcare, Inc.*, No. CIV.A. 09-3657, 2011 WL 1196703, at *8 (E.D. Pa. Mar. 30, 2011) (holding decline in credit score is not proof of damage without tangible pecuniary loss); *Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 392 (E.D.N.Y. 2022) (noting, in context of constitutional standing, "Absent from plaintiff's submissions are any allegations or other support that plaintiff was in fact denied credit or that plaintiff suffered any concrete consequences as a result of an allegedly lowered credit score. A lowered credit score in and of itself is not a concrete harm.").

## RESPA

### *Loss Mitigation Procedures*

The Real Estate Settlement Procedures Act ("RESPA") is a consumer protection statute that regulates the real estate settlement process." *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006). RESPA's implementing regulations, collectively known as "Regulation X," are set forth in 12 C.F.R. §§ 1024.1–1024.41. Under RESPA, mortgage servicers are required to maintain policies and procedures that enable them to manage borrower loans transparently and effectively. 12 C.F.R. § 1024.38. Loss mitigation refers to the steps mortgage servicers take to

work with a mortgage borrower to avoid foreclosure. Loss mitigation procedures are governed by RESPA and codified at 12 C.F.R. § 1024.41. Although borrowers may seek relief for violations of section 1024.41, 12 U.S.C. § 2605(f), section 1024.41 does not impose a duty on servicers to provide borrowers with any specific loss mitigation option.

Fannie Mae's Servicing Guidelines require that servicers must offer short-term forbearances where a borrower has demonstrated one of a short list of hardships and needs additional time to resolve the temporary hardship. *See Fannie Mae September 2016 Single-Family Servicing Guide*, at D-2-3.2-01, Home Retention Workout Options (eff. Sep. 14, 2016). A forbearance based on unemployment is authorized if the mortgage loan is less than or equal to 12 months delinquent. *See Fannie Mae September 2016 Single-Family Servicing Guide*, at D-2-3.2-02, Forbearance Plan for an Unemployed Borrower (11/12/2014) (eff. Sep. 14, 2016).

Mr. Harban maintains that Ditech prevented him from making Mortgage payments between May 2016 and June 2017, but the Consumer Claims Trustee disputes those allegations as "inconsistent with the facts." Reply ¶ 48. She says that the "2016 Loan Modification became effective December 1, 2015 and, according to the 2016 Ditech Foreclosure Complaint, Claimant had already defaulted by February 1, 2016." *Id.* ¶ 48 (citing 2016 Ditech Foreclosure Complaint at 3).[31] Accordingly, "[b]y the time Ditech filed the 2016 foreclosure in July 2016, Claimant had thus not made a mortgage payment for at least seven months." *Id.* ¶ 48. The Trustee says that Mr. Harban "provides no supporting evidence to show that he made the full required installment under the forbearance plan." *Id.* ¶ 51. The Trustee points to the October 14 Letter confirming Mr. Harban's first payment in the amount of $231.93, the same amount as the minimum monthly

---

[31] The 2016 Ditech Foreclosure Complaint is attached to the Reply as Exhibit I.

payment.  *Id.*  That document says that the payment includes a $19.00 electronic payment fee

charged by a third party.  Based on this alone, the Trustee asserts as follows:

> The indication that the processing fee was *included* in the debited amount would
> result in the payment being insufficient.  Claimant provides no supporting evidence
> to show that he made the full required installment under the forbearance plan.

*Id.* ¶ 51.  The Trustee attaches no additional evidence supporting her interpretation of the October

14, 2016 letter.  Nor does she address Mr. Harban's allegation that a Ditech representative

facilitated that electronic payment over the telephone.  Next, the Trustee states that Mr. Harban

"does not demonstrate that he made either the November or December 2016 payments on time,"

and that "[l]ate payment *would have been* a viable cause to terminate the forbearance agreement."

*Id.* ¶ 52 (emphasis added).  She concedes that the two checks returned to Mr. Harban were dated

"11/9/16" and "12/7/16," but nonetheless states that Mr. Harban "does not indicate when he mailed

these checks to Ditech, nor does he attach mailing receipts."  *Id.*  The Trustee again describes these

checks as "post-dated," but she does not explain why she believes these checks were postdated,

much less point to any evidence for support.  *Id.*[32]

In any event, the Trustee argues that "[e]ven if the forbearance offer were mishandled by

Ditech or offered in error," Mr. Harban still fails to allege how he was damaged.  *Id.* ¶ 53.  Mr.

Harban contends that Ditech's mistakes forced him into a loan modification, but "Ditech did not

and could not force him into a loan modification."  *Id.*  Next, while he "contends that the

$11,103.65 increase in principal balance between the two modifications represents at least part of

his damages . . . the Second Loan Modification defers $13,719.85 of the new principal balance,

leaving Claimant with a lower interest-bearing principal balance than he had under the First Loan

---

[32] *See supra* n.28.

Modification, waiving interest on the entirety of the capitalized arrears, and lowering the fixed interest rate." *Id.* ¶ 56. This, the Trustee says, effectively undercuts Mr. Harban's "allegation that 'interest gaining' between May 2016 and June 2017 could form a portion of his damage claim," and Mr. Harban "had the use of the Mortgage Loan for the months during which he was not paying interest." *Id.* ¶ 56. Therefore, interest accrual cannot constitute damages to him." *Id.* As to Mr. Harban's assertion that he has lost more than $100,000.00 in equity, the Trustee asserts that he "provides nothing to substantiate this claim," and that it is "implausible that 13 months of non-payment on a thirty-year loan that has been modified with extended terms three times would make any measurable difference in equity gains." *Id.* ¶ 57 (citing Response at 5).

The record of this proceeding does not support the Consumer Claims Trustee's argument about the sufficiency of Mr. Harban's monthly payments under the Forbearance Agreement. As described in the Response, and as the materials attached to it suggest, Mr. Harban timely made the initial payment over the telephone with a Ditech representative; there is nothing to suggest that the November and December checks were sent any later than the date on their face. As to the factual question of whether the First Monthly Payment was short $19.00 because of a third-party surcharge, (i) the October 14 Letter is ambiguous as to that issue, (ii) in any event, the First Monthly Payment was placed with the assistance of a Ditech representative, and (iii) Mr. Harban does not allege that Ditech ever articulated that problem to him—the Trustee's theory about this surcharge is advanced for the first time in the Trustee's Reply.

However, the Court agrees with the Trustee as to the issue of damages. Under the terms of the Forbearance Agreement, termination of that agreement would result in a reversion to his previous monthly payments, which in this case would be a reversion to the terms of the First Loan Modification. Even assuming, as Mr. Harban asserts, that Ditech erred in failing to honor his

payments under the Forbearance Agreement and that this failure forced him to enter the Second

Loan Modification Agreement, Ditech was not required to offer Mr. Harban the Second Loan

Modification Agreement, and Mr. Harban was not required to accept it.[33]   In any event, to the

extent Mr. Harban believes that the terms of the First Loan Modification Agreement or Second

Loan Modification Agreement are less favorable than the Forbearance Agreement and caused him

to lose equity in his home, pay more in interest, or owe more in principal, that harm does not result

from Ditech's loss-mitigation errors in handling the Forbearance Agreement—it arises from Mr.

Harban's accession to the First Loan Modification Agreement or Second Loan Modification

Agreement.

### *Qualified Written Request*

RESPA imposes various duties on mortgage loan servicers.  12 U.S.C. § 2605.  One duty

is to respond to qualified written requests ("QWRs").  *Id.* § 2605(e).[34]  A servicer may elect to do

so in three ways.  First, the servicer may correct the borrower's account and notify the borrower

of the correction.   *Id.* § 2605(e)(2)(A).    Second, the servicer may, "after conducting an

investigation," provide the borrower with "a statement of the reasons for which the servicer

believes the account of the borrower is correct as determined by the servicer . . . ."  *Id.*

---

[33] The terms of the Second Loan Modification Agreement are arguably more favorable than those of the First Loan Modification.  The monthly payments were reduced from $385.99 to $367.84, and the new interest rate was reduced from 4.25% to 4.125%.  Moreover, while the principal balance increased under the Second Loan Modification Agreement from $89,016.20 to $100,119.85, after applying the deferred $13,719.85 under the Second Loan Modification Agreement, the principal balance upon which interest is accruing is $86,400.

[34] Section 2605(e)(1)(B) explains that:

> [A] qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
>
> > (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> >
> > (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

§ 2605(e)(2)(B)(i).  Or third, the servicer may, "after conducting an investigation," provide the borrower with the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer . . . ." *Id.* § 2605(e)(2)(C)(i).  If the servicer does not respond to a QWR, then the borrower "is entitled to 'any actual damages . . . as a result of the failure.'" *Wirtz v. Specialized Loan Serv'g, LLC*, 886 F.3d 713, 715 (8th Cir. 2018) (quoting 12 U.S.C. § 2605(f)(1)(A)).

To prevail on a RESPA claim, the plaintiff must show actual damages, because those damages are the "only relief available" on such a claim.  *Id.* at 718–19.  In addition, RESPA requires that the damages be incurred "as a result of the failure . . . ."  12 U.S.C. § 2605(f)(1)(A); *Wirtz*, 886 F.3d at 719 ("Congress's use of the phrase 'as a result of' dictates that 'there must be a "causal link" between the alleged violation and the damages.'" (quoting *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241 (11th Cir. 2016))).  The borrower also may recover "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000."  12 U.S.C. § 2605(f)(1)(B).  However, a "borrower cannot recover 'additional' damages under § 2605(f)(1)(B) without first recovering actual damages.  '[A]dditional' means '[e]xisting in addition, coming by way of addition; added."  *Wirtz*, 886 F.3d at 719–20.  "For RESPA's statutory damages to be 'additional,' there must be other damages to which they are 'added.'" *Id.*

Pursuant to 12 C.F.R. § 1024.36(b), "[a] servicer may, by written notice provided to a borrower, establish an address that a borrower must use to request information."  "[I]f a servicer establishes a designated QWR address, 'then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" *Roth v. CitiMortgage, Inc.*, 756 F. 3d 178, 181 (2d Cir. 2014) (quoting Real Estate Settlement Procedures Act, Section 6, Transfer of

Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. 65,442, 65,446 (Dec. 19, 1994)).  Thus, if a borrower does not send a QWR to the designated QWR address, that "does not trigger the servicer's duties under RESPA."  *Id.* at 182 (quoting *Berneike v. CitiMortgage, Inc.*, 708 F. 3d 1141, 1149 (10th Cir. 2013)).

The servicer must acknowledge receipt of an information request from a borrower within five days and must fully respond to the request within thirty days. 12 C.F.R. § 1024.36(c).  A servicer may extend the time to respond by an additional fifteen days.  *Id.* § 1024.36(d)(2)(ii).  In general, a servicer is not required to respond if the information requested is substantially the same as information previously requested, information is not relevant, or the request is overbroad or unduly burdensome.  *Id.* § 1024.36(f)(1).

The Trustee asserts that Mr. Harban does not state whether his request to Ditech for records was made in writing, what documentation he requested, or where it was directed.  Reply ¶ 63.  The Court agrees.  Here, Mr. Harban does not allege that he ever made a request to Ditech in writing. He attaches no written document that could be construed as a QWR sent from him to Ditech.  Nor do any of the attached letters from Ditech refer to a QWR.  Therefore, Mr. Harban cannot state a RESPA claim on the basis that Ditech failed to respond to a QWR.  *See Roth*, 756 F.3d at 182. Moreover, Mr. Harban makes no allegation connecting his request for damages to Ditech's failure to respond to a written request.  12 U.S.C. § 2605(f)(1)(A); *Wirtz*, 886 F.3d at 719.  For these reasons, Claimant has not stated a claim for failure to respond to a QWR under RESPA.

***Notice of Error***

The Trustee analyzes the December 16, 2016 letter asking why his November forbearance payment was rejected as a notice of error under RESPA.  Servicing error resolution procedures are set out in 12 C.F.R. § 1024.35.  A borrower asserting an error must provide written notice to the

servicer with identifying information and a clear articulation of the alleged error. *Id.* § 1024.35(a). Among the errors that fall within the scope of these procedures are (i) failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments; (ii) failure to apply an accepted payment to principal, interest, escrow or other charges under the terms of the mortgage loan and applicable law; and (iii) failure to credit a payment to a borrower's mortgage loan account as of the date of receipt. *Id.* § 1024.35(b)(1)–(3). Within five business days of receipt of a notice of error from a borrower, a servicer must acknowledge receipt of the notice of error, *id.* § 1024.35(d), and must then investigate and respond to the notice of error within seven days for errors related to the failure to provide an accurate payoff balance, or generally within thirty days for other errors, *id.* § 1024.35(e).

On December 15, 2016, Ditech sent a letter to Mr. Harban that it received his "question about [his] Ditech account on 12/12/2016" and that Ditech was investigating it. Response at 18. On January 9, 2017, Ditech sent a follow-up letter indicating that its investigation on Claimant's "written request on the above-referenced account" had not yet concluded. *Id.* at 19. On February 20, 2017, Ditech sent a letter stating that Claimant's "request has been forwarded to the appropriate department for review." *Id.* at 20. Mr. Harban also suggests that he may have received other written responses from Ditech "for months before a proposal for a modification trial on 6/23/17," leading up to the Second Loan Modification Agreement.

The Consumer Claims Trustee asserts that the December 15 letter satisfied the five-day response requirement, asserting that it was a response to Mr. Harban's December 9 Letter. Reply ¶ 66. She also argues that Mr. Harban's response is not clear as to whether Ditech sent Mr. Harban additional written responses further explaining its treatment of his payments. *Id.* ¶ 67. Accordingly, the RESPA claim under the notice of error requirement should be rejected because

"it is impossible to ascertain whether Claimant sent additional information requests or notices of error and whether these two letters are responsive to those requests." *Id.* ¶ 68. In any event, the Trustee claims that Mr. Harban had not adequately pleaded damages as the result of a violation by Ditech. *Id.* ¶¶ 69–70.

Here, Mr. Harban has adequately pleaded that Ditech failed to accept, apply or credit his payments under the Forbearance Agreement. *See* 12 C.F.R. § 1024.35(b)(1)–(3). Moreover, based on Claimant's submissions, there is no indication that Ditech ever provided Mr. Harban with an explanation why his payments under the Forbearance Agreement were rejected. *See id.* § 1024.35(e). However, Mr. Harban has not adequately alleged how an improper rejection of his forbearance payments caused him harm. Shortly after the forbearance payments were rejected, Mr. Harban voluntarily entered into the Second Loan Modification Agreement. Accordingly, the RESPA notice-of-error claim fails because Mr. Harban has not adequately alleged damages for actual harm. *Wirtz*, 886 F.3d at 718–19.

### FCRA

The Fair Credit Reporting Act ("FCRA") governs the actions of credit reporting agencies and imposes obligations on parties who furnish information to those agencies. *Howard v. Mun. Credit Union*, No. 05-cv-7488, 2008 WL 782760, at *6 (S.D.N.Y. Mar. 25, 2008) (citing 15 U.S.C. § 1681s-2). Under the FCRA, furnishers of information must report information accurately to credit reporting agencies and have an ongoing duty to update and correct the information they report under 15 U.S.C. § 1681s-2(a). *Id.* at *7. However, violations of these duties may only be enforced by a government agency or official; no private right of action is available to consumers under this provision. *Id.* (citing *Prakash v. Homecomings Fin.*, No. 05-cv-2895, 2006 WL 2570900, at *2 (E.D.N.Y. Sept. 5, 2006)). By itself, a dispute sent directly to the furnisher does

not trigger any duties under section 1681s-2(b), and "the FCRA does not provide a private cause of action for violations of Section 1681s-2(a)." *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012).

Though disputes sent directly to a furnisher from a consumer do not trigger section 1681s-2(b) duties, if a furnisher is notified by a consumer reporting agency that a consumer disputes the accuracy of furnished information, the furnisher has an obligation to investigate and perform certain other actions under section 1681s-2(b). *Id.* (citing 15 U.S.C. § 1681s-2(b)). Unlike subsection 2(a), subsection 2(b) generally affords an affected consumer a private right of action, allowing them to pursue claims against the furnisher for non-compliance with their duties in the event of such a dispute. *Id.* Therefore, a failure to allege that a notice of inaccuracy was provided to the information furnisher by a credit reporting agency is fatal to a section 1681s-2(b) claim. *Markovskaya v. Am. Home Mortg. Servicing, Inc.*, 867 F. Supp. 2d 340, 344 (E.D.N.Y. 2012).

Here, Mr. Harban does not allege that Ditech reported inaccurate information to any credit reporting agency, nor that he disputed any credit reporting with Ditech or with any credit reporting agency and that Ditech subsequently failed to correct a disputed report. Accordingly, Mr. Harban cannot state a claim under the FCRA. *See id.*

**Conclusion**

Based on the foregoing, the Court sustains the Objection and disallows and expunges the

Claim.

Dated: June 10, 2024
New York, New York

/s/ *James L. Garrity, Jr.*
Honorable James L. Garrity, Jr.
United States Bankruptcy Judge